# Exhibit 1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| REMINGTON OUTDOOR COMPANY, INC., *et al.*, [1] | Case No. 20-81688-CRJ11 |
| Debtors. | Jointly Administered |

**ORDER APPROVING THE SALE OF THE DEBTORS' LONOKE AMMUNITION
BUSINESS AND CERTAIN OF THE DEBTORS' INTELLECTUAL PROPERTY
ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS, AND INTERESTS**

This matter having come before the Court upon the motion (the "**Motion**")[2] by Remington

Outdoor Company, Inc., ("**Remington**" or the "**Company**"), and its affiliated debtors and debtors

in possession (collectively the "**Debtors**") in the above-captioned Chapter 11 cases seeking entry

of this order (this "**Sale Order**") (a) authorizing the sale of the Acquired Assets (as defined in the

Asset Purchase Agreement (as defined below)) free and clear of all Interests (as defined below),

pursuant to that certain Asset Purchase Agreement, dated as of September 26, 2020, attached

hereto as <u>Exhibit A</u> (the "**Asset Purchase Agreement**"), by and among the Debtors and Vista

Outdoor, Inc. (the "**Buyer**"), and all other transaction documents related thereto; (b) authorizing

the assumption and assignment of certain executory contracts and unexpired leases; and (c)

granting the related relief contemplated therein; and the Court having found that (i) the Court has

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405).  The Debtors' corporate headquarters is located at 100 Electronics Blvd SW, Huntsville, Alabama 35824.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion or the Asset Purchase Agreement, as applicable.

jurisdiction over this matter; (ii) venue is proper in this District; (iii) this is a core proceeding; (iv) the notice of the Motion and the Sale Hearing (as defined below) was sufficient under the circumstances; and (v) there is good cause to waive the stay of Bankruptcy Rule 6004(h); and based on the statements of counsel and the evidence presented in support of the relief requested by the Debtors in the Motion at a hearing before this Court on September 29, 2020 (the "**Sale Hearing**"); and it appearing that no other notice need be given; and it further appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.    **Jurisdiction, Core Proceeding, Statutory Predicates, and Venue**.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *General Order of Reference* of the United States District Court for the Northern District of Alabama dated July 16, 1984 as amended July 17, 1984.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The predicates for the relief granted herein are Bankruptcy Code Sections 105, 363, and 365 and Bankruptcy Rules 2002, 6004, and 6006.  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    **Just Cause**.  The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.  Entry of this Sale Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties in interest.

C.    **Notice**.  The notice of the Motion, the Sale Hearing, the Asset Purchase Agreement, the transactions contemplated therein or in connection therewith and corresponding transactions documents (the "**Transactions**"), and the proposed entry of this Sale Order was adequate and sufficient under the circumstances of the Chapter 11 Cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  A

reasonable opportunity to object or be heard regarding the relief granted by this Sale Order has been afforded to those parties entitled to notice pursuant to the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. Accordingly, no further notice of the Motion, the Sale Hearing, or this Sale Order is necessary or required.

D.      The Publication Notice was published in the *New York Times* on August 24, 2020. Such Publication Notice was compliant with the Bidding Procedures Order, and was sufficient and proper notice to any other interested parties, including those whose identities are unknown to the Debtors.

E.      **Extensive Efforts by Debtors**. Since before the commencement of the Chapter 11 Cases, the Debtors worked with their counsel and financial advisors to implement a viable transaction that would allow them to maximize the value of the Acquired Assets. The Sale Transaction that is the subject of this Sale Order is the result of the Debtors' extensive efforts seeking to maximize recoveries to the Debtors' estates for the benefit of the Debtors' creditors.

F.      **Business Justification**. The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business justification for the Court to grant the relief requested in the Motion, including, without limitation, to (i) authorize the sale of the Acquired Assets free and clear of Interests other than Permitted Liens (as defined in the Asset Purchase Agreement) and Assumed Liabilities (as defined in the Asset Purchase Agreement); (ii) authorize the assumption and assignment of certain executory contracts and unexpired leases; and (iii) grant related relief as set forth herein. Such compelling and sound business justification, which was set forth in the Motion and on the record at the Sale Hearing, are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

G.      **Bidding Procedures Order**.  The Bidding Procedures Order [Docket No. 411] was entered by the Court on August 20, 2020, which, among other things (i) approved the Bidding Procedures; (ii) established the Assumption and Assignment Procedures; (iii) approved the form and manner of notice with respect to all procedures, protections, schedules, and agreements described in the Motion and attached thereto; and (iv) scheduled a date for the Auction and Sale Hearing.  The Bidding Procedures provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the Acquired Assets.

H.      **Auction; Successful Bidder**.  The sale process was properly conducted by the Debtors in accordance with the Bidding Procedures Order and in a manner designed to result in the highest or otherwise best offer for the Acquired Assets.  At the Auction, the Debtors agreed in a reasonable exercise of their business judgment, in consultation with their management, the Restructuring Committee, advisors and the Bid Consultation Parties, to enter into and consummate the Asset Purchase Agreement with the Buyer.  At the conclusion of the Auction, the Buyer was determined to be the Successful Bidder.

I.      **Asset Purchase Agreement**.  The consummation of the Transactions contemplated by the Asset Purchase Agreement, the Motion, and this Sale Order is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and all of the applicable requirements of such sections and rules have been complied with in respect of such transactions.

J.      **Sale Hearing**.  The Sale Hearing occurred on September 29, 2020 in accordance with the Bidding Procedures Order.

K.      **Adequate Marketing; Highest or Otherwise Best Offer.**  As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing, including the

*Declaration of Ken D'Arcy in Support of Chapter 11 Petitions and First Day Pleadings of Remington Outdoor Company, Inc. and Its Affiliated Debtors and Debtors-Possession* [Docket No. 6 and the *Declaration of Bradley C. Meyer in Support of Debtors' Cash Collateral Motion and Bidding Procedures Motion* [Docket No. 355]; and (ii) the representations of counsel made on the record at the Bidding Procedures Hearing and the Sale Hearing, (a) the Debtors have adequately marketed the Acquired Assets and conducted a sale process in a non-collusive, fair and good faith manner in compliance with the Bidding Procedures Order; (b) the process set forth in the Bidding Procedures Order afforded a full, fair and reasonable opportunity for any interested party to make the highest or otherwise best offer to purchase the Acquired Assets and assume the Assumed Liabilities; (c) the consideration provided by the Buyer in the Asset Purchase Agreement constitutes the highest or otherwise best offer to purchase the Acquired Assets and assume the Assumed Liabilities; (d) the consideration provided by the Buyer in the Asset Purchase Agreement provides fair and reasonable consideration for the Acquired Assets and the assumption of the Assumed Liabilities and constitutes reasonably equivalent value, fair value and reasonable market value under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, the District of Columbia, or other applicable law; (e) the Sale will provide a greater recovery for the Debtors' creditors with respect to the Acquired Assets than would be provided by any other practically available alternative; (f) taking into consideration all relevant factors and circumstances, and after taking account of the Bid Protections, no other entity has offered to purchase the Acquired Assets for greater economic value to the Debtors or their estates; and (g) the Debtors' determination that the Asset Purchase Agreement constitutes the highest or otherwise best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment.

L.    **No Successor Liability.**  Neither the Buyer nor any of its affiliates, officers, directors, shareholders, members, partners, principals or any of their respective representatives, successors, or assigns is an "insider or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors, or stockholders existed or exists between the Buyer and the Debtors.  The transfer of the Acquired Assets to and the assumption of the Assumed Liabilities by the Buyer, except as otherwise set forth in the Asset Purchase Agreement, does not, and will not, subject the Buyer to any liability whatsoever, with respect to the operation of the Debtors' businesses prior to the closing of the Sale or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity including, without limitation, any laws affecting antitrust, successor, transferee, or vicarious liability.  Pursuant to the Asset Purchase Agreement, the Buyer is not purchasing all of the Debtors' assets in that the Buyer is not purchasing any of the Excluded Assets or assuming the Excluded Liabilities, and the Buyer is not holding itself out to the public as an *alter ego* or a continuation of the Debtors.  The Sale does not amount to a consolidation, merger, or *de facto* merger of the Buyer and the Debtors.  There is no substantial continuity between the Buyer and the Debtors, and there is no continuity of enterprise between the Debtors and the Buyer.  The Buyer is not a mere continuation of the Debtors or the Debtors' estates, and the Buyer does not constitute a successor to the Debtors or the Debtors' estates.  None of the Transactions, including, without limitation, the Sale or the assumption and assignment of the Assigned Contracts, is being undertaken for the purpose of escaping liability for any of the Debtors' debts or hindering, delaying, or defrauding creditors under the Bankruptcy Code or for any other purpose that would give rise to statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy

Code or under the laws of the United States, any state, territory, possession thereof, the District of Columbia, or any other applicable jurisdiction with laws substantially similar to the foregoing.

M.    **Acquired Assets Property of the Estate.**  The Acquired Assets are property of the Debtors' estates and title thereto is vested in the Debtors' estates.

N.    **Sale in Best Interest/Fiduciary Duties**.  The Debtors have demonstrated a sufficient basis and compelling circumstances requiring them to enter into the Asset Purchase Agreement and sell the Acquired Assets and such actions are appropriate under the circumstances of these Chapter 11 Cases, are in the best interests of the Debtors, their estates and creditors, and other parties in interest, and represent a reasonable exercise of business judgment by the Debtors and the Restructuring Committee and their fulfillment of their fiduciary duties under applicable law.  Approval of the Asset Purchase Agreement, the Sale, and the Transactions at this time is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest. Unless the sale is concluded expeditiously, the recoveries of all of the Debtors' estates and constituencies are likely to be adversely affected.

O.    **Not a *Sub Rosa* Plan.**  The consummation of the Sale outside of a plan of reorganization pursuant to the Asset Purchase Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a plan of reorganization or liquidation for the Debtors.  The Asset Purchase Agreement, the Sale and the transactions contemplated therein and associated therewith do not constitute an impermissible *sub rosa* Chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford.

P.    **Arm's-Length Sale.**  The Asset Purchase Agreement, the Sale, and the Transactions were negotiated, proposed, and entered into by the Debtors and the Buyer without

collusion, in good faith, and from arm's-length bargaining positions.  Neither the Debtors, their insiders and affiliates, nor the Buyer have engaged in any conduct that would cause or permit the Asset Purchase Agreement, the Sale, or any part of the transactions thereby to be avoided under Bankruptcy Code Section 363(n).

Q.     **Good Faith Buyer.**  The Buyer is a good faith purchaser under Bankruptcy Code Section 363(m) and, as such, is entitled to all of the protections afforded thereby.  Specifically: (i) the Buyer recognized that the Debtors were free to deal with any other party interested in acquiring the Acquired Assets; (ii) the Buyer complied in all respects with the provisions of the Bidding Procedures Order; (iii) the Buyer agreed to subject its bid to the competitive bid procedures set forth in the Bidding Procedures Order; (iv) all payments to be made by the Buyer in connection with the Sale have been disclosed; (v) no common identity of directors, officers or controlling stockholders exists among the Buyer and the Debtors; (vi) the negotiations and execution of the Asset Purchase Agreement was at arm's-length and in good faith, and at all times each of the Buyer and the Debtors were represented by competent counsel of their choosing; (vii) the Buyer did not in any way induce or cause the Chapter 11 filing of the Debtors; and (viii) the Buyer has not acted in a collusive manner with any person.  The Buyer will be acting in good faith within the meaning of Bankruptcy Code Section 363(m) in closing the transactions contemplated by the Asset Purchase Agreement.

R.     **Corporate Authority.**  Each Debtor (i) has full corporate power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale of the Acquired Assets has been duly and validly authorized by all necessary corporate actions of each of the Debtors; (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the Asset Purchase Agreement; (iii) has taken all corporate action

necessary to authorize and approve the Asset Purchase Agreement and the consummation by the Debtors of the transactions contemplated thereby; and (iv) needs no consents or approvals, other than those expressly provided for in the Asset Purchase Agreement, which may be waived in accordance with the terms therewith.

      S.    **Free and Clear Findings Required by the Buyer.**  The Buyer would not have entered into the Asset Purchase Agreement and would not consummate the Sale Transaction, thus adversely affecting the Debtors, their estates, and their creditors, if the Sale of the Acquired Assets to the Buyer and the assumption and assignment of Acquired Contracts, were not, pursuant to Bankruptcy Code Section 363(f), free and clear (except for Permitted Liens and Assumed Liabilities) of (i) all liens (statutory or otherwise), claims, mortgages, deeds of trust, pledges, charges, security interests, rights of first refusal, hypothecations, encumbrances, easements, servitudes, leases or subleases, rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, rights of offset or recoupment, right of use or possession, licenses, indentures, instruments, conditional sale arrangements, (ii) all claims as defined in Bankruptcy Code Section 101(5), including all rights or causes of action (whether in law or in equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, indemnity or contribution, obligations, demands, restrictions, indemnification claims, or liabilities relating to any act or omission of the Debtors or any other person prior to the Closing, consent rights, options, contract rights, covenants, and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of the above-captioned cases, and whether imposed by agreement, understanding, law, equity or otherwise, and (iii) all debts, liabilities, obligations, contractual rights and claims and labor, employment and

pension claims, in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or un-matured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise (excluding Permitted Liens and Assumed Liabilities, (i), (ii), and (iii) collectively, the "**Interests**").  Except as expressly provided in the Asset Purchase Agreement, the Sale shall be free and clear of, and the Buyer shall not be responsible for, any Interests, including, without limitation, in respect of the following:  (i) any rights or Interests based on any successor or transferee liability, (ii) any Interests that purport to give any party a right or option to effect any forfeiture, modification, right of first offer or first refusal, or termination of the Debtors' or the Buyer's interest in the Acquired Assets, or any similar rights; (iii) any labor or employment agreements; (iv) mortgages, deeds of trust, and security interests; (v) intercompany loans and receivables between the Debtors and any non-Debtor subsidiary; (vi) any pension, multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of ERISA), health or welfare, compensation or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plans of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (vii) any other employee, worker's compensation, occupational disease, or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age

Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code and of any similar state law (collectively, "**COBRA**"), (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors, or (1) the WARN Act (29 U.S.C. §§2101 *et seq*.); (viii) any bulk sales or similar law; (ix) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (xii) any unexpired and executory contract or unexpired lease to which a Debtor is a party that is not an Assigned Contract that will be assumed and assigned pursuant to this Sale Order and the Asset Purchase Agreement; (xiii) any other Excluded Liabilities as provided in the Asset Purchase Agreement.  A sale of the Acquired Assets other than one free and clear of all Interests would yield substantially less value for the Debtors' estates, with less certainty, than the Sale as contemplated.  Therefore, the Sale contemplated by the Asset Purchase Agreement and approved herein free and clear of all Interests, except for Permitted Liens and Assumed Liabilities, is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

> T.    **Valid and Binding Transfer.**  The transfer of the Acquired Assets to the Buyer will be a legal, valid, and effective transfer of the Acquired Assets and, except for the Permitted Liens and Assumed Liabilities, will vest the Buyer with all right, title, and interest of the Debtors to the Acquired Assets free and clear of all Interests and any liabilities of the Debtors.

> U.    **Satisfaction of Section 363(f) Standards.**  The transfer of the Acquired Assets to the Buyer under the Asset Purchase Agreement shall be a legal, valid, and effective transfer of all

the legal, equitable, and beneficial right, title and interest in and to the Acquired Assets free and clear of all Interests, other than the Assumed Liabilities and Permitted Liens. The Debtors may sell the Acquired Assets free and clear of all Interests, except for the Permitted Liens and the Assumed Liabilities, because, in each case, one or more of the standards set forth in Bankruptcy Code Section 363(f)(1) through (5) has been satisfied, with all such Liens and Interests to attach to the proceeds of the Sale Transaction to be received by the Debtors with the same validity, force, priority and effect that they had as against the Acquired Assets, and any claims and defenses the Debtors and their estates may possess with respect thereto. Those holders of Interests, and non-debtor parties to the Assigned Contracts who did not object, or who withdrew their objections, to the Motion are, without limitation, deemed to have consented pursuant to Bankruptcy Code Section 363(f)(2). In all cases, each such person with Interests in the Acquired Assets is enjoined from taking any action against the Buyer, the Buyer's affiliates, or any agent of the foregoing to recover any such Interest.

V.      **Necessity of Order.** The Buyer would not have entered into the Asset Purchase Agreement and would not consummate the Sale Transaction without all of the relief provided for in this Sale Order (including, but not limited to, that the transfer of the Acquired Assets to the Buyer be free and clear of all Interests (other than Permitted Liens and the Assumed Liabilities)). The consummation of the Sale Transaction pursuant to this Sale Order and the Asset Purchase Agreement is necessary for the Debtors to maximize the value of their estates for the benefit of all creditors and other parties in interest.

W.      **Time of the Essence**. The sale of the Acquired Assets must be approved and consummated promptly in order to preserve the value of the Acquired Assets. Therefore, time is

of the essence in consummating the Sale, and the Debtors and the Buyer intend to close the Sale as soon as reasonably practicable.

X.    **Assigned Contracts.**  The Debtors have demonstrated that it is their sound business judgment to sell, assume, and assign the "Assumed Contracts" and "Assumed Leases" (as such terms are defined in the Asset Purchase Agreement), including, without limitation, the unexpired leases and executory contracts designated on <u>Schedule 1.1(j)</u> of the Asset Purchase Agreement (collectively, the "**Assigned Contracts**" and, individually, an "**Assigned Contract**") to the Buyer in connection with the consummation of the Sale, and the assumption and assignment of the Assigned Contracts is in the best interests of the Debtors, their estates and creditors, and other parties in interest.  The Assigned Contracts being assigned to the Buyer are an integral part of the Acquired Assets being purchased by the Buyer, and, accordingly, such assumption and assignment of the Assigned Contracts and the liabilities associated therewith are reasonable and enhance the value of the Debtors' estates.  No section of any Assigned Contract that purports to prohibit, restrict, impose any penalty or fee on, or condition the use, consideration, or assignment of any such Assigned Contract in connection with the Transactions shall have any force or effect.

Y.    **Cure and Adequate Assurance.**  Through Buyer's commitment to pay the Buyer Cure Amount (or, in the case of the Backup Bidder (as defined below), the Cure Amount) related to the Assigned Contracts and upon the payment of the Buyer Cure Amount (or, in the case of the Backup Bidder, the Cure Amount) by the Buyer and the Seller Cure Amount, if any, pursuant to the terms of the Asset Purchase Agreement, the Debtors (solely in connection with closing of the Successful Bid and not in connection with the Backup Bid) and the Buyer, as applicable, have cured or otherwise have demonstrated their ability to cure any default with respect to any act or omission that occurred prior to the Closing (as defined in the Asset Purchase Agreement) under

any of the Assigned Contracts, within the meaning of Bankruptcy Code Section 365(b)(l)(A). The proposed Cure Costs or any other cure amount reached by agreement after any objection by a counterparty to an Assigned Contract (an "**Assigned Contract Objection**") or otherwise are deemed the amounts necessary to "cure" all "defaults," each within the meaning of Bankruptcy Code Section 365(b), under such Assigned Contracts. The Buyer's promise to perform the obligations under the Assigned Contracts shall constitute adequate assurance of its future performance of and under the Assigned Contracts, within the meaning of Bankruptcy Code Sections 365(b)(l) and 365(f)(2). Subject to the Bidding Procedures Order, all counterparties to the Assigned Contracts who did not file an Assigned Contract Objection or an objection to the assumption and assignment of the Assigned Contracts prior to the Sale Hearing, are deemed to consent to the assumption by the Debtors of their respective Assigned Contract and the assignment thereof to the Buyer. The filed objections of all counterparties to the Assigned Contracts that were heard at the Sale Hearing (to the extent not withdrawn or adjourned), were considered by the Court, and are overruled on the merits with prejudice. The Court finds that, with respect to all such Assigned Contracts, the payment of the proposed Cure Costs by the Buyer or, solely in connection with Successful Bid and not in connection with the Backup Bid, the Seller, as applicable, in accordance with the terms of the Asset Purchase Agreement is appropriate and is deemed to fully satisfy the Debtors' obligations under Bankruptcy Code Section 365(b). Accordingly, and without limitation of the Buyer's rights under Sections 1.5(b) and 1.5(d) of the Asset Purchase Agreement (or Sections 1.5(a) and 1.5(d) of the Backup Bid Agreement (as defined below)), all of the requirements of Bankruptcy Code Section 365(b) have been satisfied for the assumption and the assignment by the Debtors to the Buyer of each of the Assigned Contracts. To the extent any Assigned Contract is not an executory contract within the meaning of Bankruptcy Code Section

365, it shall be transferred to the Buyer in accordance with the terms of this Sale Order that are applicable to the Acquired Assets. In addition, for the avoidance of doubt, to the extent the Backup Bidder becomes the Successful Bidder as set forth in this Sale Order, the provisions herein with respect to the Assigned Contracts shall apply likewise to the Backup Bidder as Buyer, in accordance with the terms of the Backup Bid Agreement.

Z.    **Unenforceability of Anti-Assignment Provisions.**    Any provisions in any Assigned Contract that restrict, limit, prohibit or condition the assumption, assignment, and sale of the Assigned Contracts or that allow the counterparty so such Assigned Contract to terminate, recapture, impose any penalty or fee, accelerate, increase any rate, condition on renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract, should be deemed and found to be unenforceable anti-assignment provisions that are void and of no force and effect within the meaning of Bankruptcy Code Section 365(f).

AA.    **Objections are Overruled**.  All objections to the relief requested in the Motion that have not been withdrawn, waived, adjourned or settled as announced to the Court at the Sale Hearing or by stipulations filed with the Court are overruled except as otherwise set forth herein.

BB.    **Final Order**.  This Sale Order constitutes a final order within the meaning of 20 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order and expressly directs entry of judgment as set forth herein.

CC.    **Best Interest**.  Entry of this Sale Order is in the best interests of the Debtors, the Debtors' estates, their creditors, and other parties in interest.

DD.    **Findings and Conclusions**.  The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule

7052, made applicable pursuant to Bankruptcy Rule 9014. To the extent any findings of facts are conclusions of law, they are adopted as such. To the extent any conclusions of law are findings of fact, they are adopted as such.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

**General Provisions**

1.     The Motion is **APPROVED** and the relief requested therein with respect to the Sale is granted and approved in its entirety, as set forth herein.

2.     Any objections to the entry of this Sale Order or to the relief granted herein or the relief requested in the Motion, including any objections to the proposed Cure Costs or the assumption and assignment of any Assigned Contracts, that have not been adjourned, withdrawn, waived, or settled, or not otherwise addressed or resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.

**Approval of the Sale of the Acquired Assets**

3.     The Debtors are authorized to enter into the Asset Purchase Agreement (and all ancillary documents) and all the terms and conditions thereof, and all of the Transactions contemplated therein are approved in all respects. The transfer of the Acquired Assets by the Debtors to the Buyer shall be a legal, valid and effective transfer of the Acquired Assets.

4.     Pursuant to Bankruptcy Code Section 363(b), the sale of the Acquired Assets to the Buyer free and clear of all Interests (other than the Permitted Liens and the Assumed Liabilities), and the transactions contemplated thereby is approved in all respects.

**Sale and Transfer of the Acquired Assets**

5.     Pursuant to Bankruptcy Code Sections 105, 363, and 365, the Debtors are authorized to (a) take any and all actions necessary or appropriate to perform their obligations under, and comply with the terms of, the Asset Purchase Agreement and consummate the Sale and

the Transactions pursuant to, and in accordance with, the terms and conditions of the Asset Purchase Agreement and this Sale Order, including, without limitation (i) executing, acknowledging, and delivering such deeds, assignments, conveyances and other assurances, documents, and instruments of transfer and taking any action for purposes of assigning, transferring, granting, conveying, and conferring to the Buyer, or reducing to possession, any or all of the Acquired Assets and (ii) entering into the Ancillary Agreements, any transition services or operations support agreements with the Buyer and any other agreements related to implementing the Transactions and (b) take any and all further actions as may be necessary or appropriate to the performance of their obligations as contemplated by the Asset Purchase Agreement or this Sale Order.  The Debtors are further authorized to pay, without further order of this Court, whether before, at, or after the Closing, any reasonable expenses or costs that are required to be paid to consummate the Transactions or perform their obligations under the Asset Purchase Agreement.

6.    Following the Closing, the Debtors or the Buyer and/or their respective designees are authorized to execute and file a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all obligations, liabilities, and Interests in the Acquired Assets of any kind or nature whatsoever (other than the Permitted Liens and Assumed Liabilities).  Upon the Closing and the Debtors' receipt of the Purchase Price, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Debtors' interests in the Acquired Assets and a bill of sale transferring good and marketable title in the Acquired Assets to the Buyer free and clear of all Interests, except for the Permitted Liens and Assumed Liabilities. Each and every federal, state, and local governmental agency, quasi-agency, or department is

hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions.

7.      Except for the Permitted Liens, Assumed Liabilities or as expressly provided in the Asset Purchase Agreement, pursuant to Bankruptcy Code Sections 105(a) and 363(f), upon the Closing and the Debtors' receipt of the Purchase Price, the Acquired Assets shall be transferred to the Buyer as required under the Asset Purchase Agreement, and such transfer shall be free and clear of all Interests of any person, including, without limitation, all such Interests specifically enumerated in this Sale Order, whether arising by agreement, by statute, or otherwise and whether occurring or arising before, on, or after the Petition Date, whether known or unknown, occurring, or arising prior to such transfer, with all such Interests to attach to the proceeds of the Sale ultimately attributable to the property against or in which the holder of an Interest claims or may claim an Interest, in the order of their priority, with the same validity, force, and effect which they now have, subject to any claims and defenses the Debtors may possess with respect thereto. Without limiting the generality of the foregoing, the Acquired Assets shall be transferred to the Buyer free and clear of the following: (i) satisfy and release of record, Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated June 15, 2018, and filed for record June 19, 2018, in/as Instrument No. 2018-05836 of the Records of Lonoke County, AR, executed by Remington Arms Company, LLC, in favor of Ankura Trust Company, LLC, securing the original principal amount of $55,000000; (ii) satisfy and release of record, Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated June 15, 2018, and filed for record June 19, 2020, in/as Instrument No. 2018-05387, of the records of Lonoke County, AR, executed by Remington Arms Company, LLC, in favor of Ankura Trust Company, LLC, securing the original principal amount of $100,000,000; (iii) satisfy and release of record, Mortgage,

Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated April 18, 2019, and filed for record April 22, 2019, in/as Instrument No. 2019-03652, of the Records of Lonoke County, AR, executed by Remington Arms Company, LLC, in favor of Cantor Fitzgerald Securities, securing the original principal amount of $90,500,000; and (iv) satisfy and release of record, Lien Subordination Agreement by and between Remington Arms Company, LLC, Cantor Fitzgerald Securities, and Ankura Trust Company, LLC, dated February 21, 2020, and filed for record February 28, 2020, in/as Instrument No. 2020-02102, records of Lonoke County, Arkansas.

8.    The transfer of the Acquired Assets to the Buyer pursuant to the Asset Purchase Agreement constitutes a legal, valid, and effective transfer of the Acquired Assets and shall vest the Buyer with all right, title, and interest of the Debtors in and to the Acquired Assets free and clear of all Interests of any kind or nature whatsoever, except for the Permitted Liens and Assumed Liabilities, with all such Interests to attach to the proceeds of the Sale ultimately attributable to the property against or in which the holder of an Interest claims or may claim an Interest, in the order of their priority, with the same validity, force, and effect which they now have, subject to any claims and defenses the Debtors may possess with respect thereto.

9.    All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Acquired Assets to the Buyer in accordance with the Asset Purchase Agreement and this Sale Order; *provided* that the foregoing restriction shall not prevent any party from appealing this Sale Order in accordance with applicable law or opposing any appeal of this Sale Order, or from enforcing its rights under Bankruptcy Code Section 365 or relieve the Buyer of any Assumed Liability.

10.    Except as expressly permitted by the Asset Purchase Agreement or this Sale Order, all persons and entities, including, but not limited to, all debt security holders, equity security

holders, governmental, tax, and regulatory authorities, lenders, trade creditors, dealers, employees, litigation claimants, contract counterparties and other creditors, holding liens, claims encumbrances, and other interests of any kind or nature whatsoever, including, without limitation, rights or claims based on any taxes or successor or transferee liability, against or in a Debtor or the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtors, the Acquired Assets or the operation of the Acquired Assets before the Closing, or the transactions contemplated by the Asset Purchase Agreement, including, without limitation, the Sale and the assumption and assignment of the Assigned Contracts, are forever barred, estopped, and permanently enjoined from asserting against the Buyer, its respective successors and assigns, its respective property and the Acquired Assets, such persons' or entities' liens, claims, encumbrances, or other Interests, including, without limitation, rights or claims based on any taxes or successor or transferee liability, *provided* that nothing herein shall impair or otherwise affect any right under Bankruptcy Code Section 365 of a lease or contract counterparty to an Assigned Contract under its respective Assigned Contract(s), or relieve the Buyer of any Assumed Liability.

11.     Upon the Closing, each of the Debtors' creditors and any other holder of an Interest is authorized and directed, without cost to the Debtors, to execute such documents and take all other actions as may be necessary to release its Interest in the Acquired Assets, if any, as such Interest may have been recorded or may otherwise exist. If any person or entity that has filed financing statements or other documents or agreements evidencing an Interest in the Debtors or the Acquired Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of

satisfaction, releases of all Interests, which the person or entity has with respect to the Debtors or the Acquired Assets or otherwise, then the Buyer and its designees are authorized to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Debtors or the Acquired Assets and to file, register, or otherwise record a certified copy of this Sale Order, which shall constitute conclusive evidence of the release of all Interests of any kind or nature whatsoever in the Debtors or the Acquired Assets (other than the Permitted Liens and Assumed Liabilities). Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement, including, without limitation, recordation of this Sale Order.

12. Upon the Closing and the Debtors' receipt of the Purchase Price, all entities that are currently, or on the Closing may be, in possession of some or all of the Acquired Assets are hereby directed to surrender possession of the Acquired Assets to the Buyer, unless the Buyer otherwise agrees.

13. This Sale Order is self-executing, and neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Sale Order.

14. To the maximum extent permitted by applicable non-bankruptcy law, (a) the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval (collectively, the "**Permits**") of the Debtors with respect to and included in the Acquired Assets, and (b) all Permits that are included in the Acquired Assets are deemed to have been, and hereby are directed to be, transferred to the Buyer as of the Closing Date. Nothing in this Sale Order, and nothing in the foregoing sentence, authorizes the transfer or

assignment of any governmental Permit or the discontinuation of any obligation thereunder without compliance with all applicable legal requirements and approvals under police or regulatory law. To the extent any Permit cannot be transferred to the Buyer in accordance with this paragraph, the Buyer, with such assistance from the Debtors as is required under the Asset Purchase Agreement, will work promptly and diligently to apply for and secure all necessary government approvals for the transfer or new issuance of the Permit(s) to the Buyer, and the Debtors shall maintain the Permits to the extent required under and subject to the terms of the Asset Purchase Agreement. For the avoidance of doubt, while nothing in this Sale Order or the Asset Purchase Agreement releases, nullifies, limits, waives, precludes, or enjoins the enforcement of any police or regulatory authority of a governmental unit, Buyer shall be entitled to operate under each state Permit currently held by or on behalf of the Debtors in relation to the Acquired Assets until such time as each such Permit is transferred to the Buyer and/or an equivalent Permit is issued to the Buyer.

15.    To the extent provided by Bankruptcy Code Section 525, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Acquired Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these Chapter 11 Cases or the consummation of the transactions contemplated by the Asset Purchase Agreement and this Sale Order.

**Implementation of the Sale**

16.    On Closing, the Buyer shall (a) pay the Purchase Price to the Debtors; (b) pay the Cure Costs as more fully described in paragraph 30 of this Sale Order and the Asset Purchase Agreement; (c) assume the Assumed Liabilities; and (d) perform any other obligations required to be performed by Buyer on the Closing. Each and every federal, state, and local governmental

agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement, including, without limitation, recordation of this Sale Order.

17.    Within three (3) business days of the Debtors' receipt of the Net Sale Proceeds (as defined in the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying Automatic Stay, and (IV) Granting Related Relief* [Docket No. 410] (as it may be modified from time to time, the "**Cash Collateral Order**")) from the sale of the Acquired Assets, the Debtors shall pay the Net Sale Proceeds of the Acquired Assets to the Priority Term Loan Agent, for the account of the Priority Term Loan Secured Creditors, to the extent required under and in accordance with the terms of the Cash Collateral Order or such other order of the Court.  Upon the Priority Term Loan Agent's timely receipt of such payment, (a) the Priority Term Loan Obligations shall be paid and satisfied to the extent of the payment and (b) all liens and security interests against the Acquired Assets securing the Priority Term Loan Obligations shall be automatically released and discharged without further action by any person.  Upon the payment in full in cash of the Priority Term Loan Obligations and the occurrence of the Challenge Period Termination Date (as defined in the Cash Collateral Order), (w) the Debtors shall have no further indebtedness, liabilities or obligations owing under the Priority Term Loan Credit Agreement or the other "Financing Agreements" (as defined in the Priority Term Loan Agreement, the "**Priority Term Loan Documents**"), (x) other than any provisions thereof that survive pursuant to the terms thereof, the Priority Term Loan Credit Agreement and all other Priority Term Loan Documents (including, without limitation, any mortgages, guaranties and security agreements) and all of the Debtors' obligations thereunder shall terminate and be of no further force and effect, (y) all liens and security interests against the

property and assets of the Debtors securing the Priority Term Loan Obligations shall be automatically fully released and discharged without further action by any person, and (z) each deposit account control agreement in respect of or other sweeps or blocks of any Debtor's deposit accounts or lockboxes in favor of any of the Priority Term Loan Secured Parties shall terminate.

18.     The Debtors shall pay the Net Sale Proceeds from the sale of the Acquired Assets to the FILO Agent, for the account of the FILO Term Loan Secured Creditors, to the extent required under and in accordance with the terms of the Cash Collateral Order or such other order of the Court.  For the avoidance of doubt, any further payment to the FILO Agent shall be subject to orders previously entered by this Court and any further orders of this Court or provided under the Debtors' Chapter 11 plan.

19.     All parties in interest in these Chapter 11 Cases expressly reserve their rights with respect to any allocation of the Purchase Price or value among the purchased Acquired Assets, and any allocation of the Purchase Price or value among the purchased Acquired Assets as determined by the Buyer shall not be determinative or binding on any party in interest in these Chapter 11 Cases except as ordered by the Court after notice and a hearing.

**<u>No Successor Liability</u>**

20.     Other than as expressly set forth in the Asset Purchase Agreement, the Buyer shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any Interests, including under any theory of successor or transferee liability, *de facto* merger or continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated, including without limitation, with respect to any of the following: (i) any foreign, federal, state, or local revenue law, pension law, ERISA, COBRA, tax law, labor law, employment law, the WARN Act, antitrust law,

CERCLA, and any other environmental, health and safety laws, or other law, rule, or regulation (including, without limitation, filing requirements under any such laws, rules or regulations); (ii) under any products liability law, rule, regulation, or doctrine with respect to the Debtors' liability under such law, rule, regulation, or doctrine, or under any product warranty liability law or doctrine; (iii) under any unfair trade practices law, rule, regulation or doctrine with respect to the Debtors' liability under such law, rule, regulation or doctrine, or under any unfair trade practices liability law or doctrine; (iv) any employment or labor agreements, consulting agreements, severance arrangements, change-in-control agreements, or other similar agreement to which the Debtors are a party; (v) any welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of the Debtors; (vi) the cessation of the Debtors' operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation, or other employee benefit plans, agreements, practices and programs, obligations that might otherwise arise from or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967, (g) the Americans with Disabilities Act of 1990, or (h) COBRA; (vii) any liabilities, debts, or obligations of or required to be paid by the Debtors for any taxes of any kind for any period; (viii) any environmental liabilities, debts, claims fines, penalties, or obligations arising from conditions, facts or circumstances first existing or occurring on or prior to the Closing (including, without limitation, the presence of or exposure to chemical, hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis and at any time, including, without limitation, any liabilities, debts, claims, fines, penalties or obligations arising under CERCLA, or any other environmental, health, and safety laws; (viii) any

liabilities, debts, claims, fines, penalties, or obligations of or required to be paid by the Debtors for any taxes of any kind for any period; (ix) any liabilities, debts, claims, fines, penalties, or obligations of or required to be paid by the Debtors under any labor, employment, or other law, rule, or regulation (including, without limitation, filing requirements under any such laws, rules, or regulations); (x) any bulk sale law; and (xi) any litigation. The Buyer shall have no liability or obligation under the WARN Act simply by virtue of its purchase of assets from the Debtors.

21. The Buyer has given substantial consideration under the Asset Purchase Agreement, which consideration shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of the Buyer and which shall be deemed to have been given in favor of the Buyer by all holders of Interests and liabilities (except for Permitted Liens and the Assumed Liabilities) in or against the Debtors, or the Acquired Assets. Without limiting the Buyer's obligation to pay and satisfy the Assumed Liabilities, upon consummation of the Sale, the Buyer shall not be deemed to (a) be the successor to the Debtors or their estates, (b) have, *de facto* or otherwise, merged with or into the Debtors, or (c) be a mere continuation, alter ego or substantial continuation of the Debtors under any theory of law or equity as a result of any action taken in connection with the Asset Purchase Agreement or any of the transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Acquired Assets.

22. Effective upon the Closing, except with respect to Assumed Liabilities and Permitted Liens, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against the Buyer or its assets (including the Acquired Assets) with respect to any (a) Claim or Lien or (b) successor or transferee liability, including,

without limitation, the following actions with respect to clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or Claim; (iv) asserting any setoff, right of subrogation, or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating, or failing or refusing to renew any License, permit, or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with such assets.

**Good Faith**

23.    The transactions contemplated by the Asset Purchase Agreement are undertaken by the Buyer without collusion and in good faith, as that term is used in Bankruptcy Code Section 363(m), and, accordingly, the reversal or modification on appeal of the authorization provided in this Sale Order to consummate the Sale and the Transactions shall not affect the validity of the transactions (including the assumption and assignment of any of the Assigned Contracts). The Buyer is a purchaser in good faith of the Acquired Assets and is entitled to all the protections afforded by Bankruptcy Code Section 363(m).

24.    As a good faith purchaser of the Acquired Assets, the Buyer has not entered into an agreement with any other potential bidders at the Auction (other than its agreement with the Firearms Buyer as was fully disclosed to all participants at the Auction), and has not colluded with any of the other bidders, potential bidders or any other parties interested in the Acquired Assets, and, therefore, neither the Debtors nor any successor in interest to the Debtors' estates shall be

entitled to bring an action against the Buyer, and the Sale may not be avoided pursuant to Section 363(n) of the Bankruptcy Code.

25.     The consideration provided by the Buyer for the Acquired Assets under the Asset Purchase Agreement constitutes reasonably equivalent value, fair value, reasonable market value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.  The Sale may not be avoided under Bankruptcy Code Section 363(n).  The Asset Purchase Agreement was not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or for any other purpose that would give rise to statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable jurisdiction with laws substantially similar to the foregoing.  Neither the Debtors nor the Buyer have entered into the Asset Purchase Agreement or any agreement contemplated thereby or are consummating the Sale with any fraudulent or otherwise improper purpose, including, without limitation, to evade any pension liabilities.  No other person or entity or group of persons or entities has offered to purchase the Acquired Assets for an amount that would provide greater value to the Debtors and their estates than the value provided by the Buyer.  The Court's approval of the Motion and the Asset Purchase Agreement are in the best interests of the Debtors, the Debtors' estates, their creditors, and all other parties in interest.

26.     The Buyer is not an "insider" as that term is defined in Section 101(31) of the Bankruptcy Code.

**Assumption and Assignment of Assigned Contracts; Assumed Liabilities**

27.     Pursuant to Bankruptcy Code Sections 105(a), 363, and 365, the Bidding Procedures Order, and subject to and conditioned upon the Closing of the Sale, the Debtors' sale, assumption and assignment to the Buyer of the Assigned Contracts is approved, and the requirements of Bankruptcy Code Section 365(b)(1) with respect thereto are deemed satisfied.

28.     The Debtors are authorized in accordance with Bankruptcy Code Sections 105(a) and 365 to (i) assume and assign to the Buyer, effective as of the Closing and at such other times as may be specified in accordance with the terms and conditions of the Asset Purchase Agreement, as provided by, and in accordance with, the Bidding Procedures Order and the Asset Purchase Agreement, the Assigned Contracts free and clear of all Interests of any kind or nature whatsoever, other than the Permitted Liens and Assumed Liabilities, and (ii) execute and deliver to the Buyer such documents or other instruments as the Buyer reasonably deems necessary to assign and transfer the Assigned Contracts to the Buyer.

29.     The Assigned Contracts shall be transferred and assigned to, pursuant to the Bidding Procedures Order and the Asset Purchase Agreement, and thereafter remain in full force and effect for the benefit of, the Buyer, notwithstanding any provision in any such Assigned Contract (including, but not limited to, those of the type described in Bankruptcy Code Sections 365(b)(2), (e)(1), and (f)) that prohibits, restricts, or conditions such assignment or transfer.  The Debtors shall be relieved from any further liability with respect to the Assigned Contracts after such assumption and assignment to the Buyer.  The Debtors may assign each Assigned Contract in accordance with Bankruptcy Code Sections 363 and 365, and any provisions in any Assigned Contracts that prohibit or condition the assignment of such Assigned Contracts or terminate, recapture, impose any penalty, condition, renewal, or extension, or modify any term or condition upon the assignment of such Assigned Contracts, constitute unenforceable anti-assignment

provisions which are void and of no force and effect. All other requirements and conditions under Bankruptcy Code Sections 363 and 365 for the assumption by the Debtors and assignment to the Buyer of each Assigned Contract have been satisfied.

30. All defaults and all other obligations or liabilities under any Assigned Contract occurring, arising, or accruing prior to the date of the assignment or transfer to the Buyer shall be deemed cured or satisfied upon payment by the Buyer and/or the Debtors (in each case in accordance with Section 1.5 of the Asset Purchase Agreement) of the proposed Cure Cost, as set forth in the Notice of Assumption and Assignment, any Supplemental Notice of Assumption and Assignment, or any other cure amount reached by agreement after an Assigned Contract Objection or otherwise, and, without limiting the foregoing, no effect shall be given to any default of the type set forth in Bankruptcy Code Section 365(b)(2), or the type of default concerning an unexpired lease of real property described in Bankruptcy Code Section 365(b)(1) whether or not such Assigned Contract is an executory contract within the meaning of Bankruptcy Code Section 365.

31. Each non-Debtor counterparty to the Assigned Contracts shall be forever barred, estopped, and permanently enjoined from (a) asserting against the Debtors, the Buyer, or their respective property (including the Acquired Assets) any fee, acceleration, default, breach, Claim (including any counterclaim, defense, or setoff capable of being asserted against the Debtors), pecuniary loss, or condition to assignment existing, arising, or accruing as of the Closing Date, or arising by reason of the Closing, including any breach related to or arising out of any change-in-control provision in such Assigned Contracts, or any purported written or oral modification to the Assigned Contracts, and (b) asserting against the Buyer (or its property, including the Acquired Assets) any Claim or Lien, counterclaim, breach, condition or setoff asserted or capable of being

asserted against the Debtors existing as of the Closing Date or arising by reason of the Closing except for the Assumed Liabilities and Permitted Liens.

32.    The Cure Costs amounts listed on the Notice of Assumption and Assignment, any Supplemental Notice of Assumption and Assignment, or any other cure amount reached by agreement after an Assigned Contract Objection or otherwise, reflect the sole amounts necessary under Bankruptcy Code Section 365(b) to cure all monetary defaults under the Assigned Contracts, and no other amounts are or shall be due to the non-debtor parties in connection with the assumption by the Debtors and assignment to the Buyer of the Assigned Contracts. Notwithstanding anything to the contrary herein, if the Cure Costs for an Assigned Contract is determined to be greater than the proposed Cure Costs asserted in the Notice of Assumption and Assignment or Supplemental Notice of Assumption and Assignment, the Buyer may decide, in its discretion, not to assume that Assigned Contract.  Notwithstanding anything to the contrary herein, in each case in accordance with Bidding Procedures Order and the terms and conditions of the Asset Purchase Agreement, the Buyer may decide (i) not to assume one or more unexpired leases and executory contracts designated on Schedule 1.1(h) of the Asset Purchase Agreement (or Schedule 1.1(g) of the Backup Bid Agreement), and (ii) to supplement Schedule 1.1(h) of the Asset Purchase Agreement (or Schedule 1.1(g) of the Backup Bid Agreement) by including any previously omitted unexpired lease or executory contract.

33.    The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Buyer's rights to enforce every term and condition of the Assigned Contracts.

34.     Notwithstanding anything in the Asset Purchase Agreement or this Sale Order to the contrary and for the avoidance of doubt, the Acquired Assets shall not include any of the Excluded Assets as set forth in Section 1.2 of the Asset Purchase Agreement.

35.     The Buyer shall be responsible for the satisfaction of the Assumed Liabilities under the Asset Purchase Agreement, including without limitation the Buyer Cure Amount (or in the case of the Backup Bid Agreement, the Cure Amount) arising under the Assigned Contracts. Except as provided in the Asset Purchase Agreement or this Sale Order, after the Closing, the Debtors and their estates shall have no further liability or obligations with respect to any Assumed Liability, including those arising under the Assigned Contracts, and all holders of such claims are forever barred and estopped from asserting any claims under any Assumed Liability (including those arising under the Assigned Contracts) against the Debtors, their successors or assigns, and their estates.

**Backup Bidder**

36.     SIG Sauer, Inc. (the "**Backup Bidder**") is hereby approved as the "Backup Bidder" under the Bidding Procedures Order, and pursuant to Bankruptcy Code Sections 105, 363, and 365, the Asset Purchase Agreement attached hereto as Exhibit B (the "**Backup Bid Agreement**") submitted by the Backup Bidder, the sale of the Acquired Assets (as defined in the Backup Bid Agreement), and consummation of the Sale to the Backup Bidder are hereby approved as the Backup Bid under the Bidding Procedures Order. The Backup Bid on the terms set forth in the Backup Bid Agreement is hereby approved and authorized as a Backup Bid and shall remain open as a Backup Bid pursuant to the terms of the Bidding Procedures Order and the bid terms submitted at the Auction. In the event that the Successful Bidder cannot or refuses to consummate the Sale because of a breach or failure on the part of the Successful Bidder, the Backup Bidder will be

deemed the new Successful Bidder and the Debtors shall be authorized, but not directed, to close, and take all actions necessary to close, with the Backup Bidder on the Backup Bid Agreement without further order of the Court, and in such case, all findings and other provisions of this Sale Order shall apply to the Backup Bidder and the Backup Bid Agreement to the same extent they do with respect to the Buyer and the Asset Purchase Agreement.

**Other Provisions**

37. Nothing in this Sale Order or in the Asset Purchase Agreement entered into pursuant to this Sale Order releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory authority of a governmental unit.

38. This Sale Order and the Asset Purchase Agreement shall be binding in all respects upon all known and unknown creditors of, and holders of equity security interests in, any Debtor, including any holders of Interests, all counterparties to the Assigned Contracts, all counterparties to contracts that are not assumed or assigned, all successors and assigns of the Buyer, each Debtor and their affiliates and subsidiaries, the Acquired Assets, and any trustees appointed in the Chapter 11 Cases or upon a conversion to cases under Chapter 7 of the Bankruptcy Code, and this Sale Order shall not be subject to amendment or modification and the Asset Purchase Agreement shall not be subject to rejection. Nothing contained in any Chapter 11 plan confirmed in any Debtor's bankruptcy case, any order confirming any such Chapter 11 plan, or any other order in the Chapter 11 Cases shall alter, conflict with, or derogate from, the provisions of the Asset Purchase Agreement or this Sale Order.

39. To the extent applicable, the automatic stay pursuant to Section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtors to the extent necessary, without further order of the Court (a) to allow the Buyer to give the Debtors any notice provided for in the

Asset Purchase Agreement, and (b) to allow the Buyer to take any and all actions permitted by the Asset Purchase Agreement.

40.    No bulk sales law or similar law shall apply in any way to the transactions contemplated by the Sale, the Asset Purchase Agreement, the Motion, and this Sale Order.

41.    This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the Asset Purchase Agreement, all amendments thereto, and any waivers and consents thereunder, including, but not limited to, retaining jurisdiction to (i) enforce the terms of the Asset Purchase Agreement; (ii) compel delivery of the Acquired Assets to the Buyer; (iii) interpret, implement, and enforce the provisions of this Sale Order; (iii) protect the Buyer, any of the Buyer's affiliates, or any agent of the foregoing, against any Interests against the Debtors or the Acquired Assets of any kind or nature whatsoever, except for the Permitted Liens and Assumed Liabilities, and (iv) enter any order under Bankruptcy Code Sections 363 and 365.

42.    No brokers were involved in consummation of the Sale, and no brokers' commissions are due to any person in connection with the Sale; *provided, however*, that this provision does not impact any transaction or other fees due to investment bankers or financial advisors employed (a) by the Debtors, including, but not limited to Ducera Partners LLC, or certain of their creditors for which the Debtors may be obligated to pay in accordance with an engagement letter with such professional(s), or (b) by the Buyers.

43.    To the extent there is any inconsistency between the terms of this Sale Order and the terms of the Asset Purchase Agreement (including all ancillary documents executed in connection therewith), the terms of this Sale Order shall govern.

44.     The failure to specifically include any particular provision of the Asset Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Asset Purchase Agreement be authorized and approved in its entirety.

45.     The Asset Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, *provided* that the Debtors shall provide the Bid Consultation Parties with three (3) business days' notice thereof and *provided* further that any such modification, amendment, or supplement does not, based on the Debtors' judgment, have a material adverse effect on the Debtors' estates.

46.     Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), this Sale Order shall not be stayed for fourteen (14) days after its entry and shall be effective immediately upon entry, and the Debtors and the Buyer are authorized to close the transaction immediately upon entry of this Sale Order.  Time is of the essence in closing the transactions referenced herein, and the Debtors and the Buyer intend to close the transactions as soon as practicable.  This Sale Order is a final, appealable order and the period in which an appeal must be filed shall commence upon the entry of this Sale Order.

47.     The provisions of the Asset Purchase Agreement and this Sale Order may be specifically enforced in accordance with the Asset Purchase Agreement notwithstanding the appointment of any Chapter 7 or Chapter 11 trustee after the Closing.

48.     Headings utilized in this Sale Order are for convenience of reference only, and do not constitute a part of this Sale Order for any other purpose.

49.    All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

50.    The provisions of this Sale Order are non-severable and mutually dependent.

51.    All issues raised by Oracle America, Inc. ("**Oracle**") in *Oracle's Limited Objection and Reservation of Rights Regarding (a) Debtors' Motion for (a) an Order Establishing Bidding Procedures and Granting Related Relief and (ii) an Order or Orders Approving the Sale of the Debtors' Assets; and (b) Notice of Executory Contracts and Unexpired Leases that May Be Assumed and Assigned in Connection with the Sale of the Debtors' Assets and the Proposed Cure Cost with Respect Thereto* (the "**Oracle Objection**") [Docket No. 529] are expressly reserved. The Oracle Objection may be set for hearing on an expedited basis upon the request of Oracle and/or the Debtors.

52.    Nothing in the Asset Purchase Agreement or in this Order shall have the effect of transferring, impairing, reducing or otherwise limiting any of the Debtors' rights in any insurance policies covering Excluded Liabilities or the proceeds of such polices. For the avoidance of doubt, the Debtors reserve control over the privilege concerning any retained Documents and nothing in this Order relieves the Debtors of any document retention obligations.

53.    Notwithstanding anything to the contrary in this Order or the Asset Purchase Agreement, the Debtors do not purport to assume or assign to Buyer the license agreement dated as of January 23, 2008 between Magpul Industries Corp ("**Magpul**") and the Debtors, and nothing in this order limits or otherwise modifies, to the extent such license exists, any express or implied license granted by the Debtors to Magpul in connection with Magpul's production of accessories for Debtors' firearm products or any rights or defenses of the Debtors in connection therewith,

including any right of revocation and any right to assign the Debtors' rights in connection therewith

to the Buyer.

Dated this the 30th day of September, 2020.

/s/ Clifton R. Jessup, Jr.
Clifton R. Jessup, Jr.
United States Bankruptcy Judge

**<u>Exhibit A</u>**

**Asset Purchase Agreement**

**<u>Exhibit B</u>**

**Backup Bid Agreement**

**EXECUTION VERSION**

---

### ASSET PURCHASE AGREEMENT

by and among

VISTA OUTDOOR INC.

as Buyer,

and

REMINGTON OUTDOOR COMPANY, INC.

and

EACH OF THE SUBSIDIARIES OF REMINGTON OUTDOOR COMPANY, INC.,

as Seller

SET FORTH ON THE SIGNATURE PAGES HERETO

Dated as of September 25, 2020

---

# TABLE OF CONTENTS

Page

ARTICLE 1 PURCHASE AND SALE OF THE ACQUIRED ASSETS ...................................... 2

1.1    Transfer of Acquired Assets ............................................................................ 2
1.2    Excluded Assets ............................................................................................... 5
1.3    Assumed Liabilities .......................................................................................... 6
1.4    Excluded Liabilities .......................................................................................... 7
1.5    Assumption/Rejection of Certain Assets; Cure Amount ............................... 8
1.6    Non-Assignment of Acquired Assets .............................................................. 10
1.7    Conflicts with Other Bidders .......................................................................... 11

ARTICLE 2 CONSIDERATION .............................................................................................. 11

2.1    Consideration .................................................................................................. 11
2.2    Good Faith Deposit ......................................................................................... 11
2.3    Purchase Price Adjustment ............................................................................ 13
2.4    Withholding ..................................................................................................... 16

ARTICLE 3 CLOSING AND DELIVERIES ............................................................................ 17

3.1    Closing ............................................................................................................. 17
3.2    Seller's Deliveries ........................................................................................... 17
3.3    Buyer's Deliveries ........................................................................................... 18

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLER ................................. 19

4.1    Corporate Organization .................................................................................. 19
4.2    Authorization and Validity .............................................................................. 19
4.3    No Conflict or Violation .................................................................................. 19
4.4    Title and Ownership ........................................................................................ 20
4.5    Compliance with Law ...................................................................................... 20
4.6    Remington Licensing Corporation ................................................................. 20
4.7    Material Contracts and Leases ....................................................................... 21
4.8    Permits ............................................................................................................ 21
4.9    Real Property .................................................................................................. 21
4.10   Financial Statements ...................................................................................... 22
4.11   No Undisclosed Material Liabilities ................................................................ 22
4.12   Absence of Certain Changes .......................................................................... 22
4.13   Proceedings .................................................................................................... 23
4.14   Intellectual Property ....................................................................................... 23
4.15   Environmental, Health and Safety Matters ................................................... 25
4.16   Product Liability; Warranties ......................................................................... 26
4.17   Security Arrangements .................................................................................... 26
4.18   Customers and Suppliers ................................................................................ 26

- i -

| 4.19 | Trade and Anti-Corruption | 26 |
| 4.20 | Brokers | 27 |
| 4.21 | Employment Matters | 27 |
| 4.22 | Taxes | 28 |
| 4.23 | Warranties Exclusive | 29 |

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER .................................. 30

| 5.1 | Corporate Organization | 30 |
| 5.2 | Qualification to do Business | 30 |
| 5.3 | Authorization and Validity | 30 |
| 5.4 | No Conflict or Violation | 30 |
| 5.5 | Consents and Approvals | 31 |
| 5.6 | Adequate Assurances Regarding Assumed Contracts | 31 |
| 5.7 | Financial Capability | 31 |
| 5.8 | Investigation by Buyer | 31 |
| 5.9 | Warranties Exclusive | 32 |

ARTICLE 6 COVENANTS OF THE PARTIES ............................................................. 32

| 6.1 | Efforts to Close; Further Assurances | 32 |
| 6.2 | Access to Properties and Documents | 33 |
| 6.3 | Seller Confidentiality | 33 |
| 6.4 | Operation of the Business | 34 |
| 6.5 | Adequate Assurances Regarding Assumed Contracts | 34 |
| 6.6 | Wrong Pockets | 34 |
| 6.7 | Cure of Defaults | 34 |
| 6.8 | Released Claims | 35 |
| 6.9 | Insurance | 35 |
| 6.10 | No Successor Liability | 35 |
| 6.11 | Notification of Certain Matters | 36 |
| 6.12 | Real Property Matters | 36 |
| 6.13 | Acquired Permits | 36 |
| 6.14 | HSR Act | 37 |

ARTICLE 7 ADDITIONAL AGREEMENTS .................................................................. 38

| 7.1 | Bankruptcy Matters | 38 |
| 7.2 | Transition Arrangements | 39 |

ARTICLE 8 EMPLOYEES AND EMPLOYEE BENEFITS ................................................ 39

| 8.1 | Transferred Employees | 40 |
| 8.2 | Employment Tax Reporting | 40 |
| 8.3 | Benefits | 40 |
| 8.4 | WARN Act | 40 |
| 8.5 | Third Party Beneficiary | 41 |

ARTICLE 9 TAXES.................................................................................................... 41

    9.1   Taxes Related to Purchase of Assets ............................................... 41
    9.2   Cooperation on Tax Matters ............................................................ 41
    9.3   Allocation of Purchase Price ........................................................... 41
    9.4   FAET Matters .................................................................................. 41

ARTICLE 10 CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES. ................. 42

    10.1  Conditions Precedent to Performance by Seller ............................ 42
    10.2  Conditions Precedent to Performance by Buyer ........................... 43

ARTICLE 11 TERMINATION. ................................................................................... 44

    11.1  Conditions of Termination ............................................................. 44
    11.2  Effect of Termination; Remedies .................................................. 46

ARTICLE 12 MISCELLANEOUS ............................................................................... 46

    12.1  No Survival of Representations and Warranties ............................ 46
    12.2  Successors and Assigns .................................................................. 47
    12.3  Governing Law; Jurisdiction .......................................................... 47
    12.4  WAIVER OF JURY TRIAL ........................................................... 47
    12.5  Expenses ......................................................................................... 47
    12.6  Severability .................................................................................... 47
    12.7  Notices ............................................................................................ 48
    12.8  Amendments; Waivers ................................................................... 49
    12.9  Specific Performance ..................................................................... 49
    12.10 Public Announcements ................................................................... 49
    12.11 Entire Agreement ........................................................................... 50
    12.12 Exhibits and Schedules .................................................................. 50
    12.13 Parties in Interest ........................................................................... 50
    12.14 Bulk Sales Laws ............................................................................ 50
    12.15 Construction ................................................................................... 50
    12.16 Counterparts and Facsimiles ......................................................... 51

ARTICLE 13 DEFINITIONS ...................................................................................... 51

    13.1  Certain Terms Defined .................................................................... 51
    13.2  All Terms Cross-Referenced ......................................................... 64

## **EXHIBITS**

Exhibit 1      -     Bidding Procedures Order
Exhibit 2      -     Good Faith Deposit Escrow Agreement
Exhibit 3      -     Form of Bill of Sale
Exhibit 4      -     Form of Assignment and Assumption Agreement
Exhibit 5      -     RESERVED
Exhibit 6      -     Form of Intellectual Property Assignment Agreement
Exhibit 7      -     Form of Transition Services Agreement
Exhibit 8      -     Form of Trademark License Agreement
Exhibit 9      -     Form of Adjustment Escrow Agreement
Exhibit 10     -     Form of Sale Order
Exhibit 11     -     Balance Sheet Rules and Inventory Amount Illustrative Example

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of September 25, 2020 (the "Effective Date"), is entered into by and among Remington Outdoor Company, Inc., a Delaware corporation and debtor-in-possession ("ROC"), each of the subsidiaries of ROC set forth on the signature pages to this Agreement (collectively with ROC, "Seller"), and Vista Outdoor Inc. ("Buyer"), or a Buyer Acquisition Vehicle as assignee in accordance with Section 12.2. Capitalized terms used in this Agreement are defined or cross-referenced in Article 13.

## RECITALS

A.      Seller is engaged in the manufacturing and sale of sale of ammunition, ammunition products and related components at the Arkansas Property other than under the Barnes Bullets brand (the "Business"), and owns various assets related to the Business. On July 27, 2020 (the "Petition Date") Seller filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Alabama (the "Bankruptcy Court" and the case arising under such petition, the "Bankruptcy Case").

B.      On the Petition Date, Seller filed a Motion for (I) an Order Establishing Bidding Procedures and Granting Related Relief and (II) an Order or Orders Approving the Sale of the Debtors' Assets (the "Bidding Procedures Motion") pursuant to which Seller sought and the Bankruptcy Court approved, the Bidding Procedures Order attached hereto as Exhibit 1 (the "Bidding Procedures Order").

C.      Buyer desires to purchase the Acquired Assets free and clear of Liens, Claims and Interests (other than Permitted Liens), except for assumption of the Assumed Liabilities from Seller, and Seller desires to sell, convey, assign and transfer to Buyer, the Acquired Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code.

D.      Buyer, in exchange for the transfer to Buyer of the Acquired Assets, desires to provide certain consideration (as set forth below) to Seller.

E.      Concurrently with the execution and delivery of this Agreement, in order to secure certain obligations of Buyer, each of ROC, Buyer and the Escrow Agent have entered into that certain Good Faith Deposit Escrow Agreement as further described herein.

F.      Concurrently with the execution and delivery of this Agreement, Roundhill Group, LLC (the "Firearms Buyer"), has entered into a separate asset purchase agreement with Seller (the "Firearms Asset Purchase Agreement") providing for the sale of the Firearms Business to the Firearms Buyer;

G.      The Acquired Assets and Assumed Liabilities are assets and Liabilities of Seller, which are to be purchased and assumed by Buyer pursuant to the Sale Order, which order will include the authorization for the assumption by Seller and assignment to Buyer of certain executory contracts and unexpired leases and Liabilities thereunder under Section 365 of the

- 1 -

Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with the applicable provisions of the Bankruptcy Code. The consummation of the transactions set forth in this Agreement is subject, among other things, to the entry of the Sale Order.

## STATEMENT OF AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer agree as follows:

## ARTICLE 1
## PURCHASE AND SALE OF THE ACQUIRED ASSETS.

1.1    <u>Transfer of Acquired Assets</u>. At the Closing, upon and subject to the terms and conditions set forth in this Agreement, Seller shall sell to Buyer, and Buyer shall acquire from Seller, all of Seller's right, title and interest in and to the Acquired Assets free and clear of all Liens, Claims and Interests (other than Permitted Liens and the Assumed Liabilities). For all purposes under this Agreement, the term "<u>Acquired Assets</u>" shall only include the following properties, assets, Interests, and rights of Seller existing as of the Closing Date, of any kind or nature, real or personal, tangible or intangible:

(a)    the Arkansas Property;

(b)    all of Seller's owned (i) (A) equipment, machinery, furniture, fixtures and improvements, tooling and spare parts and any other tangible property located at the Arkansas Property (including, any consumables thereon) or that is otherwise primarily used or primarily held for use in the ownership, operation and/or management of the Business, including the Huntsville Owned Ammo FF&E and (B) assets otherwise set forth on <u>Schedule 1.1(b)</u> (clauses (i)(A) and (i)(B) of this <u>Section 1.1(b)</u>, collectively, the "<u>Owned FF&E</u>"), and (ii) to the extent assignable, rights to any warranties and licenses received from manufacturers and sellers of the Owned FF&E;

(c)    all of Seller's (i) equipment, machinery, furniture, fixtures and improvements, tooling and spare parts and other tangible property located at the Arkansas Property or that is otherwise primarily used or primarily held for use in the ownership, operation and/or management of the Business, including the Huntsville Leased Ammo FF&E and those such assets leased pursuant to the Contracts set forth on <u>Schedule 1.1(c)</u> (the "<u>Assumed FF&E Leases</u>" and the equipment, machinery, furniture, fixtures and improvements, tooling and spare parts so leased, the "<u>Leased FF&E</u>"), (ii) rights under the Assumed FF&E Leases, and (iii) to the extent assignable, rights to any warranties and licenses received from manufacturers and lessors of the Leased FF&E;

(d)    all of Seller's (i) owned cars, trucks and other motor vehicles primarily used or primarily held for use in the ownership, operation and/or management of the Business, including those such assets set forth on <u>Schedule 1.1(d)</u> (the "<u>Owned Motor Vehicles</u>"), and (ii) rights to the warranties and licenses received from manufacturers and sellers of the Owned Motor Vehicles;

- 2 -

(e)      all of Seller's (i) cars, trucks and other motor vehicles that are both leased pursuant to any Contract and primarily used for the ownership, operation of management of the Business, including those such assets set forth on <u>Schedule 1.1(e)</u> (the "<u>Assumed Motor Vehicle Leases</u>" and the cars, trucks and other motor vehicles so leased, the "<u>Leased Motor Vehicles</u>"), (ii) rights under the Assumed Motor Vehicle Leases, and (iii) rights to the warranties and licenses received from manufacturers and lessors of the Leased Motor Vehicles;

(f)      all insurance proceeds received by Seller and insurance awards received by Seller with respect to any of the Acquired Assets after the Closing Date (including under any Excluded Insurance Policies), which, for the avoidance of doubt, shall not include the proceeds of any D&O Insurance;

(g)      to the extent assignable under applicable Law (including the Bankruptcy Code), all (i) IP Licenses and (ii) rights of Seller to use and/or access any commercially available off-the-shelf software licensed pursuant to non-negotiated standard end-user object code shrink-wrap or click-wrap licenses, in each case that are used or held for use by Seller in connection with the ownership, operation and/or management of the Business, in each case, to the extent (x) related to Seller's customer relationship management (CRM) system (e.g., Salesforce) or (y) set forth on <u>Schedule 1.1(g)</u> (the "<u>Business IP Licenses</u>");

(h)      subject to <u>Section 1.5</u>, all Contracts set forth on <u>Schedule 1.1(h)</u> (together with the Assumed Motor Vehicle Leases, the Assumed FF&E Leases, and the Business IP Licenses, the "<u>Assumed Contracts</u>");

(i)      to the extent transferable under applicable Law, all Permits issued to Seller by any Government and used in connection with the ownership, operation and/or management of the Business, and all pending applications therefor, including those Permits set forth on <u>Schedule 1.1(i)</u> (the "<u>Acquired Permits</u>");

(j)      all (i) Intellectual Property owned and used or held for use by Seller in connection with the ownership, operation and/or management of the Business, (ii) Trademarks containing the name or other usage of "Remington" or any other Business Name, either alone or in combination with other words, graphics or designs, including all rights in said term as a trade name, trademark, corporate name, service mark and domain name, and any confusingly similar variation, derivative or transaction thereof (the "<u>Remington Brand</u>"), and (iii) rights to any domain names (including application therefore) containing or otherwise utilizing the Remington Brand and/or the Business Names, and any and all corresponding rights that, now or hereafter, may be secured throughout the world, including the Intellectual Property set forth on <u>Schedule 1.1(j)</u> (the "<u>Acquired Intellectual Property</u>");

(k)      all of the Equity Interests (the "<u>RLC Shares</u>") of Remington Licensing Corporation, a Delaware corporation ("<u>RLC</u>"), that are owned by RA Brands, L.L.C., a Delaware limited liability company ("<u>RA Brands</u>");

(l)      all IT Systems owned by Seller;

(m)      all Business Data;

- 3 -

(n)     all sales orders or other commitments of Seller to purchasers of goods, services or products produced or sold by the Business that are set forth on Schedule 1.1(n) (the "Customer Orders");

(o)     all outstanding purchase orders or other commitments of Seller to suppliers of goods and services for materials, supplies or other items primarily used in connection with the ownership, operation and/or management of the Business that are set forth on Schedule 1.1(o) (the "Purchase Orders");

(p)     all right, title and interest in and to all inventory, supplies, works in progress, and finished goods (i) within the scope of the operations of the Business, (ii) located on the Arkansas Property, or (iii) (to the extent within the scope of the operations of the Business) in the possession of any Affiliate of Seller or any third-party that holds such assets for the benefit of Seller (collectively, the "Inventory");

(q)     all (i) rights to refunds relating to, and prepaid expenses and deposits attributable to, any Purchase Orders, Customer Orders, Assumed Contracts, Inventory, and/or any other Acquired Assets, and all rights under credit card merchant accounts, (ii) prepaid charges and deposits in respect of telephone, electricity, water and sewer and other utilities provided to the Arkansas Property, and (iii) other deposits, prepaid charges and expenses paid by Seller and other rights of Seller in connection with or primarily relating to any Acquired Asset;

(r)     all goodwill associated with the Acquired Intellectual Property or any of the Acquired Assets or otherwise primarily associated with the Business;

(s)     all Claims held by Seller that relate to Acquired Assets;

(t)     subject to Section 1.2(p), to the extent permitted by applicable Law (and other than all Documents of Seller held by Seller or Seller's counsel related to the Retained Litigation), all Documents (including Employee Records) that are primarily used in, primarily held for use in, or that primarily relate to, the Acquired Assets, the Assumed Liabilities or the Business;

(u)     subject to Section 1.2(p), originals of all financial, marketing and business information, pricing and cost information, business and marketing plans and other information, files, correspondence, records, data, plans, reports and recorded knowledge, historical trademark files, prosecution files of Seller in whatever media retained or stored, including computer programs and disks, in each case to the extent exclusively arising out of or exclusively relating to the ownership, operation and/or management of the Business; provided that, to the extent such information (i) primarily (but not exclusively) arises out of or primarily (but not exclusively) relates to the ownership, operation and/or management of the Business, or (ii) exists only in electronic form, then in each case the Acquired Assets will instead include only copies of the applicable information described in this Section 1.1(u);

(v)     copies of all ATF Records; and

(w)     all other assets set forth on Schedule 1.1(w).

- 4 -

1.2    <u>Excluded Assets</u>. Notwithstanding any provision to the contrary in this Agreement, Buyer is not acquiring any right, title or interest in any assets of Seller other than the Acquired Assets, including the following assets, properties and rights of Seller (collectively, "<u>Excluded Assets</u>"):

(a)    other than with respect to the Intellectual Property rights associated with the Remington Brand and/or the Business Names, if applicable, any asset that is exclusively related to the operation of the Firearms Business;

(b)    all Owned Real Property, other than the Arkansas Property;

(c)    all Leased Real Property;

(d)    all (i) minute books, stock ledgers, corporate seals and stock certificates of Seller, and other similar books and records that Seller is required by Law to retain and (ii) Tax Returns, financial statements and corporate or other entity filings; <u>provided</u> that Seller shall provide Buyer with reasonable access to the same following the Closing to the extent relating to the Acquired Assets and when reasonably requested by Buyer;

(e)    all (i) retainers, prepayments or on-account cash paid to Seller's professionals and advisors, including any carve-out under any Cash Collateral Order (whether retained in the Bankruptcy Case or otherwise) and (ii) other deposits, prepaid charges and expenses paid by Seller to the extent in connection with or relating to any Excluded Asset;

(f)    subject to <u>Section 1.1(f)</u>, all insurance policies of ROC and any of its subsidiaries (including the D&O Insurance), and all rights thereunder;

(g)    all rights to or claims for refunds, overpayments or rebates of Pre-Closing Taxes, including any refunds, overpayments or rebates of Pre-Closing Taxes, other than, in any of the foregoing cases, any such refunds, overpayments or rebates that are attributable to Taxes actually paid by Buyer;

(h)    all shares of capital stock (and any other Equity Interests or rights convertible into Equity Interests) issued by any Seller;

(i)    other than with respect to the Acquired Assets relating to the Remington Brand and/or the Business Names, all Documents exclusively relating to any Excluded Asset;

(j)    all Documents exclusively relating to any Employees who do not become Transferred Employees; <u>provided</u> that, to the extent permitted by applicable Law, Seller shall be permitted to make copies of such Documents available to Buyer if reasonably related to addressing or defending any such Employees' claims against Buyer;

(k)    subject to <u>Section 1.6</u>, any asset that requires the consent of a third party to be transferred, assumed or assigned hereunder as to which, by the Closing Date (and after giving effect to the entry of the Sale Order and any other Order of the Bankruptcy Court eliminating any contractual right of third parties to withhold such consent), such consent to transfer, assumption

- 5 -

or assignment has not been effected or excused (for clarity, all Liabilities associated with each such asset are Excluded Liabilities pursuant to <u>Section 1.4(a)</u>);

    (l)  all Employee Benefit Plans and all assets of, and Contracts relating to or associated with such Employee Benefit Plans;

    (m)  all Cash and Accounts Receivable;

    (n)  any rights of Seller under this Agreement or any Ancillary Agreement to which Seller is a party, including any rights relating to the Purchase Price;

    (o)  copies of all Historic Firearms Books and Records of Seller, other than any records that also constitute the ATF Records;

    (p)  all Documents of Seller held by Seller or Seller's counsel relating to or that could be discoverable in any litigation against Seller; <u>provided</u>, <u>however</u>, if requested by Buyer, Seller shall upon reasonable request of Buyer provide copies of all such correspondence to Buyer if such documents relate to any Acquired Assets or Assumed Liabilities;

    (q)  all rights of recovery, insurance (subject to <u>Section 1.1(f)</u>), rights of set-off, rights of indemnity, contribution or recoupment, warranties, guarantees, rights, remedies, counter-claims, cross-claims and defenses related to any Excluded Liability;

    (r)  all Avoidance Actions;

    (s)  the Arkansas Grant Agreement and all Distributor Agreements (other than any Distributor Agreements set forth on <u>Schedule 1.1(h)</u>); and

    (t)  all assets that are otherwise set forth on <u>Schedule 1.2(t)</u>.

Notwithstanding anything to the contrary herein, nothing in this <u>Section 1.2</u> shall be deemed to characterize the Remington Brand or any other Business Name as an Excluded Asset.

  1.3  <u>Assumed Liabilities</u>. At the Closing, upon and subject to the terms and conditions set forth in this Agreement, Buyer shall assume, and Buyer agrees to thereafter pay, perform and discharge when due (in accordance with their respective terms and subject to the respective conditions thereof), only the following Liabilities (to the extent not fully paid or discharged prior to the Closing) and no others (all items in this <u>Section 1.3</u> being collectively, the "<u>Assumed Liabilities</u>"):

    (a)  all Liabilities of Seller arising under any Assumed Contract (in each of the foregoing cases solely to the extent arising or attributable to any period after the Closing), and the Buyer Cure Amount in connection with the assignment of the Assumed Contracts to, and the assumption of the Assumed Contracts by, Buyer;

    (b)  all Liabilities and obligations of Seller under the Customer Orders and the Purchase Orders (including liabilities in respect of customer deposits, security deposits and prepaid items); and

(c)     all Liabilities and obligations for Transfer Taxes; and

(d)     all accrued Liabilities for salary and workers' compensation related to the Transferred Employees; provided, however, for purposes of clarity, the parties acknowledge and agree that Buyer is not assuming any Liabilities related to any Employee Benefit Plans, including the Pension Plan.

1.4    Excluded Liabilities. Notwithstanding any provision to the contrary set forth in this Agreement, Buyer will not assume, and will not be obligated to assume or be obliged to pay, perform or otherwise discharge, or in any other way be liable or responsible for, any Liability whatsoever of Seller or the Business, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities (such Liabilities, collectively, the "Excluded Liabilities"). Without limiting the foregoing, Buyer shall not be obligated to assume, and does not assume, and hereby disclaims all of the Excluded Liabilities, which for the avoidance of doubt, include:

(a)     except as otherwise contemplated in Section 1.3, all Liabilities of Seller arising out of or relating to the operation of the Business or use of the Acquired Assets prior to the Closing;

(b)     subject to Section 1.3(d), all Liabilities (including any Employee Liabilities) arising out of or relating to any Employee Benefit Plan, Pension Plan or any other benefit or compensation (i) plan, (ii) program, (iii) policy, (iv) Contract, (v) agreement, or (vi) arrangement of any kind; in each case of the foregoing cases (A) that is or at any time was sponsored, maintained, contributed to or required to be contributed to by Seller or any of its Affiliates or (B) under or with respect to which Seller or any of its Affiliates has any Liability;

(c)     all Liabilities arising out of or relating to the employment or engagement, potential employment or engagement, or termination of employment or engagement of any employee, consultant or independent contractor of Seller (including all former employees and/or any dependent or beneficiary of any employee), including all Liabilities arising from (i) the misclassification of any Employee as exempt from the requirements of the Fair Labor Standards Act or analogous applicable Laws of any state, (ii) the misclassification of any employee as an independent contractor, (iii) workers' compensation and short- or long-term disability claims (except as otherwise expressly included in the calculation of the Final Inventory Amount), or (iv) any collective bargaining agreements;

(d)     all Liabilities arising out of or relating to any Excluded Asset;

(e)     all Liabilities and obligations of Seller arising out of or relating to the Priority Term Loan, the FILO Facility, the Exit Term Loan or the Intercompany Note;

(f)     all Liabilities of Seller arising out of or relating to any violation of Environmental Laws or the presence or Environmental Release of, or exposure to, any Hazardous Substance at, on, under or migrating from or to any Acquired Assets or at, on, under or migrating from or to any real property currently or previously used or owned by Seller or its predecessor in interest, in each case solely to the extent occurring prior to the Closing Date, including any Proceedings or Orders in respect of the foregoing (and including all fines, penalties or other obligations arising therefrom);

(g)    all Liabilities arising out of or relating to the WARN Act that are attributable to any acts or omissions of Seller or its Affiliates prior to the Closing;

(h)    all Liabilities and obligations for Pre-Closing Taxes;

(i)    all Liabilities and obligations of Seller arising out of or relating to the negotiation, preparation, execution and performance of this Agreement, the Ancillary Agreements to which Seller is a party and the transactions contemplated hereby and thereby, including fees and expenses of counsel, accountants, consultants, advisers and others;

(j)    all Liabilities of, and Claims against, Seller arising out of or relating to the grants of restricted common unit/share awards and stock options by Seller;

(k)    all Liabilities and obligations of Seller arising out of or relating to any Distributor Agreement (other than any Distributor Agreements set forth on Schedule 1.1(h)) and the Arkansas Grant Agreement;

(l)    any Liabilities and obligations of Seller under this Agreement, or any Ancillary Agreement to which Seller is a party;

(m)    all State of Alabama Project Development Liabilities;

(n)    all City of Huntsville Project Development Liabilities;

(o)    all Liabilities and obligations under the CBA;

(p)    the Retained Litigation;

(q)    all Liabilities for the Seller Cure Amount; and

(r)    all Liabilities set forth on Schedule 1.4(r).

1.5    Assumption/Rejection of Certain Assets; Cure Amount.

(a)    At the Closing and at such other times as may be specified in accordance with the terms and conditions hereof, pursuant to Section 365 of the Bankruptcy Code, subject to the terms and conditions hereof, Seller shall assign to Buyer and Buyer shall assume from Seller, the Assumed Contracts. The amounts necessary, pursuant to Section 365 of the Bankruptcy Code, to cure any and all defaults and to pay all actual or pecuniary losses that have resulted from any such defaults under any Assumed Contract (such aggregate amount, the "Cure Amount"), shall be borne by Buyer as and when finally determined by the Bankruptcy Court pursuant to the procedures set forth in the Sale Order, the Bidding Procedures Order and this Agreement; provided, however, in no event shall Buyer's obligation to pay the Cure Amount (Buyer's portion of the Cure Amount, the "Buyer Cure Amount") exceed, in the aggregate, $8,100,000, and Seller shall be responsible for any excess thereof (Seller's portion of the Cure Amount, the "Seller Cure Amount").

- 8 -

(b)     From and after the Effective Date until the Closing (or the earlier termination of this Agreement pursuant to Article 11), Buyer shall have the right to notify Seller in writing of Buyer's election to designate any 365 Contract that is (i) scheduled as an Assumed Contract hereunder that Buyer does not wish to assume or acquire as an Excluded Asset and/or an Excluded Liability or (ii) identified as an Excluded Asset hereunder (other than any Contracts that Seller has previously agreed to transfer or sell to an unaffiliated third party; provided, however that Seller shall not transfer or sell (or agree to transfer or sell) any Contracts required for Buyer to perform the Buyer Transition Services (as defined in the Transition Services Agreement without the prior written consent of Buyer) that Buyer wishes to assume or acquire as an Assumed Contract or an Acquired Asset. With respect to all such assets, if notice is given to Seller prior to the Closing, all Schedules and Exhibits to this Agreement shall be automatically updated and amended (without any other action of any party or Person) to reflect such request by Buyer; provided, that there shall be no corresponding adjustment to Purchase Price related to such designation. Each 365 Contract that Buyer wishes to assume or acquire pursuant to clause (ii) of the first sentence of this Section 1.5(b) shall be conveyed to Buyer under this Agreement, so long as (x) such 365 Contract is added to the Assumed Contracts prior to the entry of any Order of the Bankruptcy Court approving the rejection of such 365 Contract, and (y) the assumption and assignment has been or is approved by the Bankruptcy Court, including through the Sale Order or a "Supplemental Designated Contract Order" (as defined in the Bidding Procedures Order). Any 365 Contracts of Seller that are listed on Schedule 1.5(c) as of the Closing Date and that Buyer does not designate in a written notice to Seller (no less than two (2) Business Days prior to the Closing) for assumption shall not be considered Assumed Contracts or Acquired Assets and shall automatically be deemed Excluded Assets (and for the avoidance of doubt, Buyer shall not be responsible for any related Cure Amounts related to any 365 Contract not so duly designated).

(c)     Schedule 1.5(c) contains a true, complete and correct list of all 365 Contracts and Seller's good faith estimate as of the Effective Date of the Cure Amount for each such 365 Contract as of the date hereof.

(d)     Following the Effective Date, Buyer shall have the right (upon prior written notice to Seller specifying the applicable non-debtor counterparty) (i) to discuss the terms and the related Cure Amount of any 365 Contracts set forth on Schedule 1.5(c) with the applicable non-debtor counterparty thereto and enter into negotiations with such counterparty to reduce the Cure Amount with respect to the applicable 365 Contract and (ii) to cause Seller to serve a "Supplemental Notice of Assumption and Assignment" (as defined in the Bidding Procedures Order) on one or more non-debtor counterparties to any of the 365 Contracts set forth on Schedule 1.5(c). Upon Buyer's reasonable request, Seller shall provide additional reasonably detailed information as to the Liabilities under the 365 Contracts sufficient for Buyer to make an informed assessment whether to accept an assignment and assumption of such 365 Contract hereunder. Seller shall cooperate with Buyer to facilitate the payment of the Cure Amounts to the Contract counterparties. Seller shall use commercially reasonable efforts to assume and assign the Assumed Contracts to Buyer (other than payment of the Buyer Cure Amount, if so required), including taking all reasonable actions necessary to obtain an Order containing a finding that the proposed assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable requirements of Section 365 of the Bankruptcy Code.

(e)    If the non-debtor Contract counterparty objects to the Cure Amount asserted by Seller or the assumption and assignment of such Contract by Seller (including pursuant to a Supplemental Notice of Assumption and Assignment) with regard to any Assumed Contract (such contract, a "Disputed Contract") and such non-debtor Contract counterparty and Buyer are unable to reach a consensual resolution with respect to the objection, Seller will use commercially reasonable efforts to seek a hearing before the Bankruptcy Court to determine the Cure Amount or otherwise resolve such objection and approve the assumption (it being understood and agreed that Buyer shall be responsible for the resolution of any such objection and Buyer shall reasonably cooperate with counsel to Seller on briefing and arguing all matters relating to any such objection). In no event shall Seller settle a Cure Amount objection or otherwise agree to any Cure Amount with regard to any Assumed Contract without the express written consent of Buyer (not to be unreasonably withheld, conditioned or delayed). In the event that a dispute regarding the Cure Amount or otherwise the assumption and assignment with respect to an Assumed Contract has not been resolved as of the Closing Date, Buyer and Seller shall nonetheless (and notwithstanding anything to the contrary in Section 10.1(b) or Section 10.2(b)) remain obligated to consummate the transactions contemplated hereby. Upon an Order determining any Cure Amount or otherwise resolving an objection to assumption and assignment regarding any Disputed Contract after the Closing, Buyer shall have the option to (i) pay the Cure Amount with respect to such Disputed Contract and assume the Disputed Contract as an Assumed Contract or (y) designate the Disputed Contract as an Excluded Asset, in which case, for the avoidance of doubt, Buyer shall not assume the Disputed Contract and shall not be responsible for any associated Cure Amount.

(f)    Notwithstanding any provision in this Agreement to the contrary, if for any reason Buyer fails to pay the Buyer Cure Amount or Seller fails to pay the Seller Cure Amount in respect of any Assumed Contract when due and payable pursuant to this Agreement, the Sale Order or any other Order of the Bankruptcy Court, (i) the other party may pay or otherwise satisfy such Cure Amount or any other liability or obligation under such Assumed Contract and shall be reimbursed by the party responsible to make such payment within five (5) Business Days of notice of such payment (ii) each party shall indemnify and hold harmless the other party in respect of such Cure Amount, liability or obligation as well as any expenses (including legal fees and expenses) incurred by the other in defending any claim for payment of the Cure Amount or any other liability or obligation arising under such Contract or Lease asserted by the counterparty thereto and (iii) Seller or Buyer may reject, and nothing in this Agreement shall prohibit Seller or Buyer from rejecting, such Contract or Lease.

(g)    Without limiting any of the foregoing, at any time after the Closing, Seller and Buyer may (but shall have no obligation to) mutually agree to seek authorization from the Bankruptcy Court, pursuant to Section 365 of the Bankruptcy Code, to assume and assign a Contract that was not identified as an Assumed Contract as of Closing; provided, that Buyer will be solely responsible to pay the Cure Amount required to assume such Contract.

1.6    Non-Assignment of Acquired Assets. Notwithstanding any provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not effect the assignment or transfer of any Acquired Asset if (a) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any party thereto other than Seller (each such action, a "Necessary Consent"), would constitute a breach thereof (after giving effect to any waiver by the applicable counterparty or any

- 10 -

elimination of such approval, authorization or consent requirement by operation of the Sale Order) or in any way adversely affect the rights or obligations of Buyer thereunder and such Necessary Consent is not obtained and (b) the Bankruptcy Court shall not have entered an Order providing that such Necessary Consent is not required because the transfer thereof shall be deemed by the Bankruptcy Court to be (x) effective and (y) not a breach thereof, notwithstanding the failure to obtain such Necessary Consent. In such event, Seller and Buyer will use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Acquired Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Buyer as Buyer may reasonably request; provided, however, that Seller shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or Proceedings to obtain any such consent or approval. If such Necessary Consent is not obtained, or if such Acquired Asset or an attempted assignment thereof would otherwise be ineffective or would adversely affect the rights of Seller thereunder so that Buyer would not in fact receive all such rights, Seller and Buyer will cooperate in a mutually agreeable arrangement, to the extent feasible and at no out-of-pocket expense to Seller or Buyer, under which Buyer would obtain the benefits and assume the obligations (to the extent otherwise constituting Assumed Liabilities hereunder) thereunder in accordance with this Agreement, including subcontracting, sublicensing or subleasing to Buyer, or under which Seller would enforce for the benefit of, and at the direction of, Buyer, with Buyer assuming Seller's obligations (to the extent otherwise constituting Assumed Liabilities hereunder), any and all rights of Seller thereunder.

      1.7    <u>Conflicts with Other Bidders</u>. In the event of any conflict regarding the Acquired Assets or the Assumed Liabilities between this Agreement and agreements governing other sales of the Seller's assets in the Bankruptcy Case (the "<u>Other Agreements</u>"), Buyer shall cooperate in good faith with any other purchasers of Seller's assets pursuant to such Other Agreements, whether before or after the Closing Date, to ensure that all assets or liabilities are appropriately apportioned between Buyer and such other purchasers in order to reflect the intent of Buyer and such other purchasers hereunder and thereunder.

ARTICLE 2
CONSIDERATION

      2.1    <u>Consideration</u>. The aggregate consideration for the sale and transfer to Buyer of the Acquired Assets shall be:

      (a)    an amount in cash equal to the Estimated Purchase Price (the Estimated Purchase Price as finally adjusted in accordance with <u>Section 2.3</u>, the "<u>Purchase Price</u>"); and

      (b)    the assumption of the Assumed Liabilities.

      2.2    <u>Good Faith Deposit</u>.

      (a)    Concurrently with the execution and delivery of this Agreement Buyer, ROC and the Escrow Agent have entered into that certain Escrow Agreement (the "<u>Good Faith Deposit Escrow Agreement</u>"), dated as of September 4, 2020 (as amended), which is attached hereto as <u>Exhibit 2</u>. Within one (1) day of the date hereof, Buyer shall deposit or shall cause to be

- 11 -

deposited with the Escrow Agent an amount equal to twelve million, two hundred and ten thousand United States Dollars ($12,210,000) by wire transfer of immediately-available funds (the "Good Faith Deposit Initial Amount", and together with the Good Faith Deposit Additional Amount (if applicable), the "Good Faith Deposit") to an account specified by Escrow Agent (the "Good Faith Deposit Escrow Account"), which Good Faith Deposit shall be held, safeguarded and released pursuant to the terms of this Agreement, the Good Faith Deposit Escrow Agreement and the Bidding Procedures Order. The Good Faith Deposit shall not be subject to any Lien, attachment, trustee process, or any other judicial process of any creditor of any Seller or Buyer.

(b)    The Good Faith Deposit shall be released from the Good Faith Deposit Escrow Account by the Escrow Agent and delivered to either Buyer or Seller, in accordance with the provisions of this Agreement, the Good Faith Deposit Escrow Agreement and the Bidding Procedures Order as follows (and Buyer and ROC shall deliver joint written instructions to the Escrow Agent, within three (3) Business Days, to effect such distributions as and when required hereunder):

(i)    if the Closing occurs, the entirety of the Good Faith Deposit (including any amounts previously released to Seller in accordance with the terms hereof) shall be credited or otherwise applied towards the amount payable by Buyer pursuant Section 3.3(b);

(ii)    if this Agreement has been terminated by Seller pursuant to Section 11.1(b) or by Seller or Buyer pursuant to Section 11.1(l), then the Good Faith Deposit shall be released from the Good Faith Deposit Escrow Account to Seller;

(iii)    if the Closing shall not have occurred by the initial Outside Date solely as a result of a failure of the conditions to Closing set forth in Section 10.1(c)(ii) and Section 10.2(c)(ii) to be satisfied and (A) Seller is entitled to terminate this Agreement due to such conditions not being satisfied and (B) Buyer does not extend the Outside Date in accordance with Section 11.1(d), then the Good Faith Deposit shall be released from the Good Faith Deposit Escrow Account to Seller;

(iv)    if, at any time prior to the extension of the Outside Date in accordance with Section 11.1(d) (if applicable), this Agreement has been terminated by any party, other than as contemplated by Section 2.2(b)(ii) or Section 2.2(b)(iii), then the Good Faith Deposit Initial Amount shall be released from the Good Faith Deposit Escrow Account to Buyer;

(v)    if Buyer extends the Outside Date in accordance with Section 11.1(d), then within three (3) Business Days after such extension, the Good Faith Deposit Initial Amount shall be released from the Good Faith Deposit Escrow Account to Seller and, subsequently:

(1)    if the Closing shall not have occurred by the extended Outside Date as a result of a failure of the conditions to Closing set forth in Section 10.2 (other than the condition set

- 12 -

forth in Section 10.2(c)(ii)) and (A) Buyer is entitled to retain the Good Faith Deposit in accordance with the terms hereof and (B) either party terminates this Agreement then (x) the Good Faith Deposit Additional Amount shall be released from the Good Faith Deposit Escrow Account to Buyer and (y) Seller shall, within three (3) Business Days by wire transfer of immediately available funds, pay the Good Faith Deposit Initial Amount to Buyer (and to the extent unpaid, the parties acknowledge and agree that such amount shall be treated as an administrative claim of Buyer against Seller and the estate for all purposes under the Bankruptcy Case); or

(2)     if the Closing shall not have occurred by the extended Outside Date, other than as contemplated by Section 2.2(b)(v)(1) and (A) Buyer is entitled to retain the Good Faith Deposit in accordance with the terms hereof and (B) either party terminates this Agreement, then (x) the Good Faith Deposit Additional Amount shall be released from the Good Faith Deposit Escrow Account to Buyer and (y) Seller shall, within three (3) Business Days by wire transfer of immediately available funds, pay the Good Faith Deposit Initial Amount to Buyer (and to the extent unpaid, the parties acknowledge and agree that such amount shall be treated as a general unsecured claim of Buyer against Seller and the estate for all purposes under the Bankruptcy Case).

2.3     Purchase Price Adjustment.

(a)     At least five (5) Business Days prior to the Closing Date, ROC shall deliver to Buyer a reasonably detailed statement (the "Pre-Closing Statement") setting forth ROC's good faith calculation (i) the Estimated Inventory Amount, as well as the resulting Estimated Inventory Amount Excess (if any) or Estimated Inventory Amount Shortfall (if any), as the case may be, and (ii) the Estimated Purchase Price; provided, however, the parties acknowledge and agree that in the event that the Estimated Inventory Amount Excess or the Estimated Inventory Amount Shortfall, as applicable, is *equal to or less* than $2,000,000 (the "Inventory Collar Amount"), then the Estimated Inventory Amount Excess or Estimated Inventory Amount Shortfall, as applicable, shall be deemed to be zero dollars ($0) for all purposes of this Agreement. Following the delivery of the Pre-Closing Statement, ROC shall provide Buyer and its Representatives with reasonable access to work papers and other books and records for purposes of assisting Buyer in its review. Prior to the Closing, ROC shall consider in good faith any revisions to the Pre-Closing Statement raised by Buyer in connection with its review of the Pre-Closing Statement (which shall be modified to include any such revisions accepted by ROC in good faith). In connection with the preparation of the Pre-Closing Statement, within seven (7) days prior to the Closing, if requested by Buyer, ROC shall conduct a physical count of the Inventory, which Buyer and its Representatives may observe.

- 13 -

(b)        No later than thirty (30) days after the Closing Date, Buyer shall deliver to ROC a reasonably detailed statement (the "Post-Closing Statement") setting forth Buyer's good faith calculation of (i) the Closing Inventory Amount (without regard to the Inventory Collar Amount), and (ii) any resulting adjustments to the Estimated Purchase Price.

(c)        After receipt of the Post-Closing Statement, ROC shall have ten (10) days (the "Review Period") to review the Post-Closing Statement. During the Review Period, ROC and its accountants, to the extent reasonably necessary for their review of the Post-Closing Statement, shall have reasonable access to the books and records of the Business, the personnel of, and work papers prepared by, Buyer and/or Buyer's accountants; provided, that such access shall be subject to then-applicable COVID Restrictions and shall be done in a manner that does not interfere with the normal business operations of Buyer or the Business. The Post-Closing Statement shall become final and binding upon the parties hereto following the expiration of the Review Period unless ROC delivers written notice of its disagreement with the Post-Closing Statement (a "Notice of Disagreement") to Buyer prior to such date. Any Notice of Disagreement shall specify in reasonable detail ROC's objections to the Post-Closing Statement, indicating each disputed item or amount and the basis for ROC's disagreement therewith. If a Notice of Disagreement is received by Buyer prior to the expiration of the Review Period, then during the ten (10) day period (the "Resolution Period") following the delivery of a Notice of Disagreement, ROC and Buyer shall negotiate in good faith to resolve in writing any differences that they may have with respect to the matters specified in such Notice of Disagreement. If such differences are so resolved within the Resolution Period, the revised Post-Closing Statement, with such changes as may have been previously agreed in writing by Buyer and ROC shall be final and binding. If, at the end of the Resolution Period, ROC and Buyer have not resolved in writing the matters specified in the Notice of Disagreement, ROC and Buyer shall submit any amounts remaining in dispute to the Accounting Firm, who, acting as experts and not arbitrators, shall resolve such disputed amounts only and make any adjustments to the Post-Closing Statement. Buyer and ROC agree that all adjustments shall be made without regard to materiality. The Accounting Firm shall render a written decision resolving the matters submitted to the Accounting Firm as soon as practicable, and in any event within ten (10) days of the receipt of such submission (or such other time as Buyer and ROC shall agree in writing). The scope of the disputes to be resolved by the Accounting Firm shall be limited to fixing mathematical errors and determining whether the items in dispute were determined in accordance with the Balance Sheet Rules and the terms of this Agreement, and no other matters. The Accounting Firm's decision shall be (w) limited to the specific items under dispute by the parties (x) made strictly in accordance with the Balance Sheet Rules and the terms of this Agreement and (y) final and binding on all of the parties hereto, absent manifest error. The Accounting Firm may not assign a value greater than the greatest value for such item claimed by either party or smaller than the smallest value for such item claimed by either party. The fees and expenses of the Accounting Firm incurred pursuant to this Section 2.3(c) shall be borne pro rata as between ROC, on the one hand, and Buyer, on the other hand, in proportion to the final allocation made by such Accounting Firm of the disputed items weighted in relation to the claims made by ROC and Buyer, such that the prevailing party pays the lesser proportion of such fees, costs and expenses.

(d)        Purchase Price Adjustment Payment Calculation. Within three (3) Business Days after the final determination of the Final Inventory Amount, the Estimated Purchase Price

- 14 -

shall be adjusted in accordance with this <u>Section 2.3(d)</u> as follows (and any requisite payments, if any, shall be made in accordance with <u>Section 2.3(e)</u>):

(i)    if there was no adjustment to the Estimated Purchase Price pursuant to <u>Section 2.3(a)</u>, then the post-Closing adjustment with respect the Final Inventory Amount shall be determined as follows: (A) if the Final Inventory Amount is <u>greater than</u> the Inventory Amount Target by an amount greater than the Inventory Collar Amount, then Buyer shall pay to Seller an amount equal to the difference between the Final Inventory Amount and the Inventory Amount Target; (B) if the Inventory Amount Target is <u>greater than</u> the Final Inventory Amount by an amount greater than the Inventory Collar Amount, then Seller shall pay to Buyer an amount equal to the difference between the Inventory Amount Target and the Final Inventory Amount; or (C) if the difference (expressed as a positive number) between the Final Inventory Amount and the Inventory Amount Target is <u>less than or equal to</u> the Inventory Collar Amount, then the parties shall make no further adjustment to the Estimated Purchase Price;

(ii)    if there was an Estimated Inventory Amount Excess, then the post-Closing adjustment with respect the Final Inventory Amount shall be determined as follows: (A) if the Final Inventory Amount is <u>greater than</u> or <u>equal to</u> the Estimated Inventory Amount, then Buyer shall pay to Seller an amount equal to the difference between the Final Inventory Amount and Estimated Inventory Amount; or (B) if the Final Inventory Amount is <u>less than</u> the Estimated Inventory Amount, then Seller shall pay to Buyer an amount equal to the difference between the Estimated Inventory Amount and the Final Inventory Amount; <u>provided</u>, <u>however</u>, if the difference (expressed as a positive number) between the Final Inventory Amount and the Inventory Amount Target is less than or equal to the Inventory Collar Amount, then Seller shall pay to Buyer an amount equal to the difference between the Estimated Inventory Amount and the Inventory Amount Target; or.

(iii)    if there was an Estimated Inventory Amount Shortfall, then the post-Closing adjustment with respect the Final Inventory Amount shall be determined as follows: (A) if the Final Inventory Amount is <u>less than</u> or <u>equal to</u> the Estimated Inventory Amount, then Seller shall pay to Buyer an amount equal to the difference between the Estimated Inventory Amount and the Final Inventory Amount; or (B) if the Final Inventory Amount is <u>greater than</u> Estimated Inventory Amount, then Buyer shall pay to Seller an amount equal to the difference between the Final Inventory Amount and the Estimated Inventory Amount; <u>provided</u>, <u>however</u>, if the difference (expressed as a positive number) between the Inventory Amount Target and the Final Inventory Amount is less than or equal to the Inventory Collar Amount, then Buyer shall pay to Seller an amount equal to the difference between the Inventory Amount Target and the Estimated Inventory Amount.

(e)    Subject to the determination of any adjustments to the Estimated Purchase Price pursuant to <u>Section 2.3(d)</u>, the following payments shall be made, as applicable:

- 15 -

(i)    if any amounts are owed to Seller in accordance with <u>Section 2.3(d)</u> (such amount, the "<u>Adjustment Surplus Amount</u>"), then:

(A)    Buyer shall pay (or caused to be paid) to ROC (on behalf of itself and, if and to the extent applicable, Seller), by wire transfer of immediately available funds to a bank account designated in writing by ROC, the Adjustment Surplus Amount; and

(B)    Buyer and ROC shall execute and deliver a joint written instruction to the Escrow Agent directing the Escrow Agent to release the Adjustment Escrow Amount, to ROC (on behalf of itself and, if and to the extent applicable, Seller).

(ii)    if any amounts are owed to Buyer in accordance with <u>Section 2.3(d)</u> (such amount, the "<u>Adjustment Deficit Amount</u>"), then Buyer and ROC shall execute and deliver a joint written instruction to the Escrow Agent directing the Escrow Agent to release from the Adjustment Escrow Account and pay to Buyer an amount equal to such Adjustment Deficit Amount, and in the event that such Adjustment Deficit Amount:

(A)    *is greater than* the Adjustment Escrow Amount, then ROC shall pay, or cause to be paid, to Buyer, by wire transfer of immediately available funds to a bank account designated in writing by Buyer, an amount equal to the remaining portion of such Adjustment Deficit Amount to Buyer; or

(B)    *is less than* the Adjustment Escrow Amount, Buyer and ROC shall execute and deliver a joint written instruction to the Escrow Agent directing the Escrow Agent to release from the Adjustment Escrow Account any remaining amounts in the Adjustment Escrow Account (after payment of such Adjustment Deficit Amount from the Adjustment Escrow Account to Buyer), to ROC (on behalf of itself and, if and to the extent applicable, Seller).

(f)    Any payments made pursuant to this <u>Section 2.3</u> shall be treated by the parties hereto as an adjustment to the Purchase Price for Tax purposes and shall be reported as such by the parties hereto on their Tax Returns, in each case to the greatest extent permitted by applicable Law.

2.4    <u>Withholding</u>. Buyer and its applicable Affiliates may deduct and withhold from any consideration otherwise payable pursuant to this Agreement any amounts required to be deducted and withheld under applicable Law. To the extent that such amounts are deducted and withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person with respect to which such deduction and withholding was made.

- 16 -

ARTICLE 3
CLOSING AND DELIVERIES

3.1 <u>Closing</u>. Subject to the terms and conditions set forth herein, the consummation of the transactions contemplated by this Agreement (the "<u>Closing</u>") shall occur simultaneously with the closing of the transactions contemplated by the Firearms Asset Purchase Agreement. The Closing shall take place remotely by the electronic exchange of documents and signatures, or such other date or place as may be agreed upon on the third (3rd) Business Day following the satisfaction or, to the extent permitted by this Agreement, waiver of each of the conditions set forth in <u>Article 10</u> of this Agreement (other than those conditions that, by their nature, are to be satisfied at the Closing, but subject to the satisfaction, or waiver to the extent permitted by this Agreement, of such conditions), or such other date as may be agreed to by Seller and Buyer, which date shall not be earlier than the first (1st) day following the entry of the Sale Order by the Bankruptcy Court (the "<u>Closing Date</u>"). The Closing shall be deemed effective for all purposes as of 12:01 a.m. Central Time on the Closing Date (the "<u>Calculation Time</u>").

3.2 <u>Seller's Deliveries</u>. At the Closing, Seller shall deliver or cause to be delivered to Buyer:

(a) a joint payment instruction letter, duly executed by ROC, directing the Escrow Agent to immediately release the balance of the Good Faith Deposit from the Good Faith Deposit Escrow Account to ROC;

(b) all of the Acquired Assets, together with a duly executed Bill of Sale, substantially in the form of Exhibit 3 (the "<u>Bill of Sale</u>"), along with one or more duly executed and/or endorsed certificates of title and other evidence of transfer of motor vehicles and instruments of conveyance appropriate for the applicable Acquired Assets, each as reasonably requested by Buyer and otherwise in form and substance customary for transactions of this nature and reasonably acceptable to Buyer; <u>provided</u> that Seller's conveyance of deliverables relating to the Arkansas Property shall be governed by <u>Section 3.2(j)</u>;

(c) an assignment and assumption agreement for the Assumed Contracts and the Assumed Liabilities, duly executed by any applicable Seller, substantially in the form of Exhibit 4 (each, an "<u>Assignment and Assumption Agreement</u>");

(d) an assignment agreement covering (i) the trademark and patent registrations and applications included in the Acquired Intellectual Property registered in the name of Seller, (ii) the Internet domain name registrations and applications included in the Acquired Intellectual Property registered in the name of Seller, and (iii) general assignments of all other Acquired Intellectual Property, duly executed by any applicable Seller and substantially in the form of Exhibit 6 (the "<u>Intellectual Property Assignment Agreement</u>");

(e) a transition services agreement, by and between Seller and Buyer (or one of Buyer's Affiliates), duly executed by any applicable Seller, substantially in the form of <u>Exhibit 7</u> (the "<u>Transition Services Agreement</u>");

(f) the Adjustment Escrow Agreement, duly executed by ROC;

- 17 -

(g)    a duly executed certificate from an officer of Seller, solely in such capacity on behalf of Seller, dated as of the Closing Date, in form and substance reasonably satisfactory to Buyer, certifying that the conditions set forth in <u>Section 10.2(a)</u> and <u>Section 10.2(b)</u> have been satisfied;

(h)    a copy of the Sale Order as entered by the Bankruptcy Court;

(i)    an affidavit executed by ROC and each applicable Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b) along with an executed IRS Form W-9, certifying that such Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code;

(j)    possession of the Arkansas Property, together with duly executed special warranty deed conveying fee simple title in the Arkansas Property to Buyer, which shall be (i) expressly subject only to the Permitted Liens, and (ii) otherwise in form and substances reasonably acceptable to Buyer and Seller, and any corresponding and necessary transfer, transfer tax or withholding forms;

(k)    a standard and commercially reasonable form of Owner's Affidavit, duly executed by Seller, as reasonably required by the Title Company in connection with the Title Policy;

(l)    certificates or lost stock affidavits representing all of the RLC Shares, duly endorsed in blank or accompanied by (as applicable) stock powers duly executed in blank in proper form for transfer; and

(m)    evidence, in form and substance reasonably satisfactory to Buyer, of the resignations or removal of the Class A Directors (as defined in the Certificate of Incorporation of RLC) and any officers of RLC appointed by RA Brands, such resignations or removal to be effective concurrently with the Closing.

3.3    <u>Buyer's Deliveries</u>. At the Closing, Buyer shall deliver or cause to be delivered:

(a)    the following payments:

(i)    to Seller, cash in an amount equal to the Estimated Purchase Price <u>minus</u> (A) the Good Faith Deposit, and (B) the Adjustment Escrow Account, by wire transfer of immediately available funds to the account or accounts designated by Seller no less than three (3) Business Days prior to the Closing Date;

(ii)    to the Escrow Agent, the Adjustment Escrow Amount, by wire transfer of immediately available funds in accordance with the terms of the Adjustment Escrow Agreement;

(b)    to Seller, a joint payment instruction letter, duly executed by Buyer, directing the Escrow Agent to immediately release the balance of the Good Faith Deposit from the Good Faith Deposit Escrow Account to ROC;

(c)     the Assignment and Assumption Agreement, duly executed by Buyer;

(d)     the Intellectual Property Assignment Agreement, duly executed by Buyer;

(e)     the Adjustment Escrow Agreement, duly executed by Buyer;

(f)     the Transition Services Agreement, duly executed by Buyer; and

(g)     a duly executed certificate from an officer of Buyer, solely in such capacity on behalf of Buyer, dated as of the Closing Date, in form and substance reasonably satisfactory to Buyer, certifying that the conditions set forth in <u>Section 10.1(a)</u> and <u>Section 10.1(b)</u> have been satisfied.

ARTICLE 4
REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer as of (unless otherwise specified in the applicable provisions of this <u>Article 4</u>) the Effective Date and as of the Closing Date as follows:

4.1     <u>Corporate Organization</u>. Each entity comprising Seller is duly formed or incorporated and validly existing and in good standing under the laws of its respective state of domicile. Subject to any necessary authority from the Bankruptcy Court, each entity comprising Seller has the requisite corporate or limited liability company power and authority to conduct the Business as now being conducted and to carry out its obligations under this Agreement. Each entity comprising Seller is qualified, licensed, registered, and in good standing (to the extent such concept is applicable) in each jurisdiction in which the ownership or lease of property or the conduct of the Business requires such qualification, license or registration except where the failure to be so qualified, licensed or registered or in good standing (to the extent such concept is applicable) would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.2     <u>Authorization and Validity</u>. Each entity comprising Seller has the corporate or limited liability company power and authority necessary to enter into this Agreement and each Ancillary Agreement to which it is a party, and, subject to (a) the Bankruptcy Court's entry of the Sale Order and such other authorization as is required by the Bankruptcy Court, and (b) the termination or expiration of the waiting period under the HSR Act (if applicable), to carry out its obligations hereunder and thereunder. The execution and delivery of this Agreement and each Ancillary Agreement to which each entity comprising Seller is a party has been duly authorized by all necessary corporate or limited liability company action by the boards of directors or managers of such entity comprising Seller, as applicable, and no other corporate or limited liability company proceedings are necessary for the performance by Seller of its obligations hereunder or thereunder or the consummation by Seller of the transactions contemplated hereby or thereby. This Agreement has been duly and validly executed and delivered by Seller, subject to the Bankruptcy Court's entry of the Sale Order and assuming due authorization, execution and delivery by Buyer, is a valid and binding obligation of Seller enforceable against Seller in accordance with its terms.

4.3     <u>No Conflict or Violation</u>. The execution and delivery by Seller of this Agreement and any of the Ancillary Agreements to which Seller is a party, the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements (subject to (x) the

- 19 -

Bankruptcy Court's entry of the Sale Order and (y) the termination or expiration of the waiting period under the HSR Act, if applicable), and compliance by Seller with any of the provisions hereof or thereof, do not and will not (whether with notice, lapse of time or both), except to the extent excused by applicable Restructuring Law, (i) conflict with or result in any breach of any provision of the respective certificates of incorporation or formation of Seller or the respective by-laws or operating agreements of Seller, (ii) violate any provision of applicable Law or any Order applicable to Seller or any of its properties or assets, and (iii) except as set forth on Schedule 4.3, require any consent under, or give any third party any rights of termination, amendment, suspension, revocation or cancellation of, any Material Contract or Permit of Seller. Other than the Bankruptcy Court's entry of the Sale Order, no authorization or approval or other action by, and no notice to or filing with, any Government (other than as required pursuant to the HSR Act, if applicable) will be required to be obtained or made by Seller in connection with the execution, delivery and performance by Seller of this Agreement or any Ancillary Agreement to which it is a party and the consummation by Seller of the transactions contemplated hereby and thereby.

4.4    Title and Ownership.

(a)    Schedule 1.1(b) sets forth a true, complete and correct list of all tangible assets that are material to the operation of the Business as currently conducted.

(b)    Seller has good title to, or right by license, lease or other agreement to use, the Acquired Assets. Subject to the entry of the Sale Order, at the Closing, Seller will have the right to transfer the Acquired Assets to Buyer free and clear of all Liens, other than Liens included in the Assumed Liabilities and Permitted Liens.

(c)    All of the material equipment, machinery, vehicles and other tangible assets of the Business, included in the Acquired Assets are suitable for use by Buyer to conduct the Business as currently conducted by Seller in all materials respects.

4.5    Compliance with Law. Except as set forth on Schedule 4.5, (a) Seller has operated the Business in material compliance with all applicable Laws, and (b) except as may result from the Bankruptcy Case, Seller has not received written notice of any violation of any applicable Laws, nor is Seller in default with respect to any Order applicable to the Acquired Assets.

4.6    Remington Licensing Corporation.

(a)    Capitalization.

(i)    To the Knowledge of Seller (A) the authorized capital stock of RLC consists of (1) 100 shares of Class A Common Stock, par value $0.00 per share, all of which are outstanding, and (2) 100 shares of Class B Common Stock, par value $0.00 per share, all of which are outstanding, (B) other than as set forth in the foregoing clause (A), there are no other Equity Interests of RLC issued or outstanding as of the Effective Date, (C) RLC does not have any Subsidiaries, and (D) RLC does not own, directly or indirectly, or have the right to acquire, any Equity Interests of any Person.

- 20 -

(ii)    To the Knowledge of Seller, all of the RLC Shares have been duly authorized, are validly issued, and are owned of record and beneficially by RA Brands, free and clear of all Liens (other than restrictions on future transfers arising under the Securities Act of 1933, as amended and applicable state securities Laws). The RLC Shares constitute fifty percent (50%) of the outstanding Equity Interests of RLC.

(b)    Assets; Liabilities. To the Knowledge of Seller, except for the Trademarks set forth on Schedule 4.6(b), RLC does not hold any right, title or Interest in or to any properties, assets, Contracts, Interests, or other rights. RLC has no outstanding obligations to pay, perform or discharge any Liabilities.

4.7    Material Contracts and Leases.

(a)    Complete and correct copies (including all material modifications and amendments thereto) of the 365 Contracts and the Material Contracts have been made available to Buyer.

(b)    Each Assumed Contract constitutes a legal, valid, binding and enforceable obligation of Seller and, to the Knowledge of Seller and assuming due authorization, execution, delivery and performance by each other party thereto, each other party thereto, and is in full force and effect in accordance with its terms, except as enforceability may be limited by the application of Restructuring Law. To the Knowledge of Seller, no Occurrence has occurred which, with the passage of time or the giving of notice, or both, would, subject to the application of Restructuring Law (1) constitute a material default under or a material violation of any Material Contract or (2) cause the acceleration of any obligation of Seller or, to the Knowledge of Seller, any other party thereto or the creation of a Lien upon any Acquired Asset. Neither Seller nor, to the Knowledge of Seller, any other party thereto is in breach or violation of or default under any Material Contract in any material respect and, to the Knowledge of Seller, no Occurrence has occurred that, with the lapse of time or the giving of notice or both, would, subject to the application of Restructuring Law (x) constitute a default thereunder by Seller or (y) permit or cause the termination, non-renewal or modification thereof or acceleration or creation of any right or obligation thereunder, in each case except as would not, individually or in the aggregate, reasonably be expected to be adversely material to the Business or the Acquired Assets.

4.8    Permits. Schedule 4.8 sets forth a true, complete and correct list of all Permits maintained by Seller that are material to the operation of the Business. All such Permits are currently held by Seller and are in full force and effect. Seller has not received written notice of material default under any such Permit or that such Permit shall not be renewed, and no violations exist in respect of any such Permits.

4.9    Real Property.

(a)    Seller has good, insurable, and valid fee simple title to the Arkansas Property, which will be subject only to the Permitted Liens at Closing. Seller does not currently lease or otherwise grant the right to use or occupy any parcel or any portion of any parcel of the

- 21 -

Arkansas Property to any other Person. There are no outstanding options, rights or first offer or rights of first refusal to purchase the Arkansas Property or any portion thereof or interest therein.

(b)     Seller has not received written notice of any condemnation, expropriation or other Proceedings with eminent domain pending or threatened, with respect to the Arkansas Property.

(c)     To the Knowledge of Seller, all material improvements or facilities located on the Arkansas Property are presently used and operated in compliance, in all material respects, with all covenants, easements, restrictions or similar provision in any instrument of record or other unrecorded agreement affecting the Arkansas Property, and Seller has not received any written notice of any such non-compliance that is material to the operation of the Business.

4.10     <u>Financial Statements</u>. Seller has made available to Buyer true, complete and correct copies of each of (a) the unaudited balance sheet of the Business (the "<u>Balance Sheets</u>") as of December 31, 2018 and December 31, 2019 (December 31, 2019 shall be referred to herein as the "<u>Balance Sheet Date</u>") and the related unaudited statements of income/loss, operations, and stockholders equity and cash flows of the Business for the fiscal years then ended and (b) the unaudited interim balance sheet of the Business as of June 30, 2020 (the "<u>Latest Balance Sheet</u>"), and the related unaudited interim statements of income/loss, operations, and stockholders equity and cash flows for the six (6) month period then ended (collectively, the "<u>Financial Statements</u>"). Each of the Financial Statements fairly present, in conformity with GAAP applied on a consistent basis (except as may be indicated in the notes thereto), the financial position of the Business as of the dates thereof and its results of income, operations, and stockholder's equity and cash flows of the Business for the periods then ended (subject, in each case, to normal year-end adjustments in the case of the Latest Balance Sheet).

4.11     <u>No Undisclosed Material Liabilities</u>. There are no material Liabilities (whether accrued, absolute, contingent or otherwise) of the Business, other than (a) Liabilities reflected, accrued for, or specifically reserved or against in, or otherwise expressly provided on the face of the Latest Balance Sheet; (b) Liabilities incurred in the ordinary course of business, consistent with past practices, since the Balance Sheet Date (none of which result from any violation of Law); (c) Liabilities incurred in connection with the transactions contemplated by this Agreement; (d) Liabilities that will constitute Excluded Liabilities; and (e) Liabilities that would not reasonably be expected to be material to the Business taken as a whole.

4.12     <u>Absence of Certain Changes</u>. Other than as a result of the Bankruptcy Case, other preparations for filing for relief under the Bankruptcy Code and COVID Restrictions, from the Balance Sheet Date, the Business has been conducted, and the Acquired Assets have been maintained and operated, in the ordinary course and consistent in all material respects with past practices and there has not been any Occurrence (other than those arising from preparations for filing for relief under the Bankruptcy Code and COVID Restrictions) that has had or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Other than those arising from preparations for filing or filing for relief under the Bankruptcy Code and COVID Restrictions, between the Balance Sheet Date and the Effective Date, (a) there has not been any material loss, damage or destruction to, or any interruption in the use of, any of the assets used in the operation of the Business (whether or not covered by insurance), other than ordinary wear and tear, (b) Seller has not granted any powers of attorney that affect the Business, and (c)

Seller has not taken any action that, if taken after the Effective Date, would require the consent of Buyer pursuant to Section 6.4.

4.13    Proceedings. Except for those arising from the Bankruptcy Case, there is no Proceeding or Order (other than the COVID Restrictions) pending, outstanding or to the Knowledge of Seller, threatened by any Person, relating to the Business, the Acquired Assets or Assumed Liabilities, that (a) is material to the Business or the Acquired Assets or that could reasonably be expected to give rise to any material Liability of Buyer or be materially adverse to the ownership or use by Buyer of the Acquired Assets after the Closing; (b) would challenge the validity or enforceability of the obligations of Seller under this Agreement and the Ancillary Agreements to which it is a party or (c) is against Seller and seeks to prevent, restrain, materially delay, prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or by any of the Ancillary Agreements. Except as set forth on Schedule 4.13, there is no Order enjoining Seller from engaging in or continuing any conduct or practice, or requiring Seller to take any material action, in connection with the ownership, lease, possession, use or operation of the Acquired Assets owned or held by Seller, and Seller is not, nor are any of its respective Affiliates, is subject to any outstanding Order relating to the Business, the Acquired Assets, or Assumed Liabilities other than, in each case, COVID Restrictions and Orders of general applicability or arising from the Bankruptcy Case.

4.14    Intellectual Property.

(a)    Schedule 1.1(j) contains a true, complete and correct list of all registrations and applications for registration of the Intellectual Property that is owned by Seller and used or held for use by Seller and is material to the ownership, operation and/or management of the Business that is subject to issuance, registration, or application by or with any Government or authorized private registrar in any jurisdiction (collectively, "Registered Intellectual Property"), setting forth for each item: (i) the record owner, and, if different, the legal owner and beneficial owner of such item; (ii) the jurisdiction in which such item is issued, registered or pending; (iii) the issuance, registration, filing or application date and serial or identification number of such item; and (iv) for domain names, the registrant, the registrar, and the expiration date. Schedule 1.1(j) sets forth a true, complete and correct list of all material unregistered Intellectual Property that is owned by Seller and used or held for use by Seller in connection with the ownership, operation and/or management of the Business, including all such material unregistered Trademarks, product designs, and trade secrets (by high level description only) (such material unregistered Intellectual Property, together with the Registered Intellectual Property, the "Acquired Material IP").

(b)    Schedule 1.1(g) contains a true, complete and correct list of:

(i)    each license, sublicense, consent to use agreement, settlement, coexistence agreement, covenant not to sue, waiver, release, or other express grants or right to use which a Seller has granted to any third party with respect to any Intellectual Property that is primarily used or held for use by Seller in the ownership, operation and/or management of the Business, other than non-exclusive end user licenses granted in the ordinary course of business and licenses granted to service providers solely permitting the provision of services to Seller ("IP Outbound Licenses"); and

- 23 -

(ii)    each license, sublicense, consent to use agreement, settlement, coexistence agreement, covenant not to sue, waiver, release, or other express grants of or right to use which any third party has granted to Seller and is primarily used in the ownership, operation and/or management of the Business, other than licenses or service Contracts providing rights to use and/or access to commercially available off-the-shelf software licensed pursuant to non-negotiated standard end-user object code shrink-wrap or click-wrap licenses ("IP Inbound Licenses" and together with the IP Outbound Licenses, the "IP Licenses").

(c)    Except as set forth on Schedule 4.14, the Acquired Material IP is, to the Knowledge of Seller, valid, enforceable and subsisting. To the Knowledge of Seller, Seller has a right to use, all Intellectual Property used or held for use in connection with the operation of the Business by Seller as currently conducted. To the Knowledge of Seller, the Acquired Intellectual Property, together with all Intellectual Property licensed under the Business IP Licenses and Assumed Contracts (the "Licensed Intellectual Property"), constitute all of the Intellectual Property primarily used in the operation of the Business as currently conducted.

(d)    To the Knowledge of Seller, the operation of the Business by Seller does not infringe, misappropriate or otherwise violate, and has not infringed, misappropriated or otherwise violated, any Intellectual Property of any Person. Seller has not received any written notice since the date that is six (6) years prior to the Effective Date alleging that the operation of the Business or any Acquired Intellectual Property or Licensed Intellectual Property infringes, misappropriates, or otherwise violates the Intellectual Property of any other Person (including any notice inviting Seller to take a license under any Intellectual Property of a third party or consider the applicability of any Intellectual Property of a third party to the conduct of the Business). To the Knowledge of Seller, no Person is infringing, misappropriating or otherwise violating any Acquired Intellectual Property and no such actions are currently being asserted or threatened against any Person by Seller. Seller has not sent any written notice since the date that is six (6) years prior to the Effective Date alleging a Person has infringed, misappropriated or otherwise violated any Acquired Intellectual Property.

(e)    Seller is in actual possession of and/or has control over, and has the right to use a copy of all Data, data sets and databases that are materially necessary for the conduct of the Business (including as related to legacy products and products that have been or are in the process of being developed), including Seller's operation of its enterprise resource planning (ERP) systems (collectively, "Business Data"). All such Business Data is included as part of the Acquired Assets. For the avoidance of doubt, Business Data does not include any database Software used to access such Business Data. The Business Data required to operate Seller's enterprise resource planning (ERP) systems is located at Seller's owned facility in Raleigh, North Carolina. The only deployed cloud-based SAP systems used in the operation of the Business are C4C (used by Consumer Services / Call Center) and LMS (used by HR for salary learning management).

(f)    To the Knowledge of Seller, there has been no unauthorized access, loss, damage use, sharing, modification, or other misuse of any Personal Information by Seller. Except as set forth on Schedule 4.14(f), Seller has not received any notice of any claims, investigations (including investigations by any Government) or alleged violations of applicable Laws with respect to Personal Information processed by Seller.

- 24 -

(g)    All of the IT Systems are material for the conduct of the Business are owned by, or validly licensed, leased or supplied under a written Contract with a Seller, and they comprise all of the IT Systems that are required to carry on the Business as it was carried out as of immediately prior to the Closing. Such IT Systems are in good and working order and have been maintained consistently with the recommendations of the relevant manufacturers and suppliers of such IT Systems. To the Knowledge of Seller, Seller has not suffered any material security breaches that have resulted in a third-party obtaining access to any material confidential information of Seller or of any customers or of other third parties.

4.15    <u>Environmental, Health and Safety Matters</u>.

(a)    Except for the recognized environmental conditions set forth in the Environmental Phase I Reports, the Acquired Assets and the operation of the Business are and, at all times during the prior five (5) years have been, used and/or operated in compliance in all material respects with applicable Environmental Laws, Seller has not received any written notice alleging noncompliance with or violation of applicable Environmental Laws from any Government or other Person, the subject of which is unresolved and that reasonably could be expected to result in a Liability of the Business, and there is no Proceeding or Order pending, outstanding, or threatened in writing against Seller pursuant to Environmental Laws with respect to the Acquired Assets or the operation of the Business.

(b)    Except for the recognized environmental conditions set forth in the Environmental Phase I Reports, there has been no Environmental Release of any Hazardous Substances by Seller or any third Person on, under, in or at the Acquired Assets, any property now or previously owned, operated or leased by Seller or any third-party location, and Seller has not generated, manufactured, sold, handled, treated, recycled, stored, transported, disposed of, arranged for the disposal of, or placed any Hazardous Substance, in each case, in a manner that could reasonably be expected to give rise to any material Liabilities to Seller under Environmental Laws.

(c)    Seller has not received any written notice that any Acquired Assets or property now or previously owned, operated or leased by Seller is listed or is proposed for listing on the National Priorities List pursuant to Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), the Comprehensive Environmental Response, Compensation and Liability Information System List (CERCLIS), any Government-operated registry of contaminated land sites requiring investigation or cleanup, and as of the Closing, no Lien (other than Permitted Liens) shall encumber either the personal or real property included in Acquired Assets under any Environmental Law.

(d)    To the Knowledge of Seller, except as described in the Environmental Phase I Reports there are no current or proposed requirements under Environmental Law which would require material capital expenditures in the next twelve (12) months that are not reflected on the Latest Balance Sheet. Seller has not agreed to assume any actual potential Liability under any Environmental Laws of any other Person relating to the Business.

(e)    To the Knowledge of Seller, neither the execution, delivery nor performance of this Agreement nor the consummation of the transactions contemplated thereby

- 25 -

will trigger any reporting, investigation or remedial obligations under any property transfer Environmental Laws. Seller has made available to Buyer true, complete and correct copies of all non-privileged environmental site assessments and audit reports (including Phase I or Phase II reports) and any other material information relating to environmental, health and safety matters concerning the Business or the Acquired Assets in the custody or control of Seller.

4.16    Product Liability; Warranties. Seller has made available to Buyer a true, complete and correct standard warranty to the material products of the Business manufactured, sold or delivered since January 1, 2019 (to the extent any such warranty is offered by Seller in respect of the applicable product). Except as would not, individually or in the aggregate, reasonably be expected to have a material Liability on the Business, there have been no material design, manufacturing or other defects, latent or otherwise, with respect to any products of the Business sold by Seller since January 1, 2019, or which violate applicable Law or any of the Business's standard warranty or warranties. Since January 1, 2019, Seller has not received in writing any evidence of incidents of product tampering with the products of the Business by Seller, its employees or agents or any other third parties that would reasonably be expected to result in any material Liability to the Business.

4.17    Security Arrangements. Schedule 4.17 sets forth a true, complete and correct list of all bonds, letters of credit and guarantees posted by Seller with any Government or any third parties and relating to the Acquired Assets.

4.18    Customers and Suppliers.

(a)    Schedule 4.18(a) sets forth a true, complete and correct list of the five (5) largest customers, including distributors, of the Business, taken as a whole, for the twelve (12) months ended December 31, 2019 (determined on the basis of the total dollar amount of sales) (collectively, the "Material Customers") showing the total dollar amount of gross sales to each such Material Customer during such period.

(b)    Schedule 4.18(b) sets forth a true, complete and correct list of the five (5) largest suppliers of the Business, taken as a whole, for the twelve (12) months ended December 31, 2019 (determined on the basis of the total dollar amount of purchases) (collectively, the "Material Suppliers"), in each case, showing the total dollar amount of purchases by the Business from each such Material Supplier during such period.

(c)    From the Balance Sheet Date through the Effective Date, Seller has not received in writing any evidence that a Material Customer or Material Supplier has terminated, materially reduced, or otherwise materially changed its business with the Business or provided written, notice to Seller stating that it intends to terminate, materially reduce or otherwise materially change its business with the Business or that it is materially dissatisfied with the performance of the Business (or any portion thereof).

4.19    Trade and Anti-Corruption.

(a)    Neither Seller, nor any of its respective officers, directors, or employees, nor, to the Knowledge of Seller, any agent or third party representative of the Business or any Seller with respect to the Business, is currently or has in the last five (5) years been: (A) a Sanctioned Person; (B) operating in, organized in, conducting business with, or otherwise

- 26 -

engaging in dealings with or for the benefit of any Sanctioned Person or in any Sanctioned Country, except to the extent authorized by governmental license or governmental authorization; or (C) otherwise in violation of any Sanctions and Import/Export Control Laws or U.S. antiboycott requirements (collectively, "Trade Controls"). Neither the Business, nor, to the extent related to the Business, Seller is or has within the past five (5) years been the subject of any Proceeding or inquiry by any Government regarding any offense or alleged offense under Trade Controls or Anti-Corruption Laws (including by virtue of having made any disclosure relating to any offense or alleged offense), and no such Proceeding or inquiry has been threatened or are pending and there are no circumstances likely to give rise to any such Proceeding or inquiry.

(b)    None of Seller, nor, to the Knowledge of Seller, any of its Representatives or any other Person acting on or behalf of Seller has, in connection with or relating to the Business or the Acquired Assets, directly or indirectly, violated the U.S. Foreign Corrupt Practices Act of 1977 or any other Laws relating to the prevention of corruption and bribery (collectively, the "Anti-Corruption Laws"). Seller has in place and maintains policies, procedures and controls with respect to the Business that are reasonably designed to promote and ensure compliance with Anti-Corruption Laws in each jurisdiction in which the Business operates. There is no pending or threatened investigation, inquiry, or enforcement Proceeding upon the Business, Seller or the Acquired Assets by any Government regarding any offense or alleged offense under Anti-Corruption Laws. None of the current officers, directors or employees of Seller is an employee of any Government or of any instrumentality of a Government.

(c)    The Business has been conducted and the Acquired Assets have been operated in material compliance with all applicable Trade Controls and anti-money laundering and financial record-keeping and reporting laws. Seller has maintained and currently maintains (i) books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the Business, and (ii) internal accounting controls reasonably designed to provide reasonable assurances that all transactions and access to assets of the Business were, have been and are executed only in accordance with management's general or specific authorization. There is no pending or threatened investigation, inquiry, or enforcement Proceeding upon the Business or the Acquired Assets by any Government regarding any actual or possible violation of any anti-money laundering or financial record-keeping and reporting laws, and there has been no such Proceeding.

4.20    Brokers. Except for fees and expenses payable to Ducera Partners LLC, Seller has not incurred any obligation or Liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with this Agreement, the Ancillary Agreements or the transactions contemplated hereby or thereby for which Buyer is or will become liable.

4.21    Employment Matters.

(a)    There has been no union organizing campaigns or activity in the past three (3) years related to the Business. There are no controversies, strikes, slowdowns, work stoppages or any other material labor disputes involving any Employee, nor have there been any such controversies, strikes, slowdowns or work stoppages in the past three (3) years involving any Employee. There are no grievances or unfair labor practice complaints pending against Seller before the National Labor Relations Board or any other Government with respect to any Employee.

- 27 -

(b)    Seller has made available to Buyer a true, complete and correct list of all Employees by: name; title or position; status (part-time, full-time, exempt or non-exempt) whether paid on a salaried, hourly or other basis; current base salary or wage rate (including all shift differentials); current target bonus, if applicable; start date; service reference date; work location (city and state); PTO entitlement formula; amount of accrued but unused PTO by category; and an indication of whether or not such Employee is on leave of absence and the nature/cause of any such absence. All Employees are authorized to work in the United States. Seller has made available to Buyer a true, complete and correct list of all Employees who are independent contractors of Seller and all leased employees of the Business by: job position or function; work location (city and state); hourly pay rate or other compensatory arrangement; hire date; regular hours per work week; term of engagement; and the total amount paid by Seller to such Person in 2019.

(c)    Seller has complied with the WARN Act, and any applicable state mini-WARN Act as it related to the Business.

4.22    <u>Taxes</u>. Except as set forth on <u>Schedule 4.22</u>:

(a)    Seller has timely filed (taking into account any extensions of time for such filings that have been properly and timely requested) all Tax Returns that were required to be filed. All such Tax Returns are complete and accurate in all material respects. All Taxes owed by Seller (whether or not shown on any Tax Return) have been paid. Seller is not currently the beneficiary of any extension of time within which to file any Tax Return. No claim has ever been made by an authority in a jurisdiction in which Seller does not file Tax Returns that Seller is or may be subject to Tax by that jurisdiction.

(b)    There are no pending or threatened audits, investigations, disputes, notices of deficiency, claims or other actions for or relating to any Liability for Taxes of Seller or with respect to the Business or the Acquired Assets. Seller has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(c)    The unpaid Taxes of Seller did not, as of the Balance Sheet Date, exceed the reserve for Tax Liability (excluding any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the Balance Sheets (rather than in any notes thereto). Since the Balance Sheet Date, Seller has not incurred any Liability for Taxes outside the ordinary course of business consistent with past practice.

(d)    No Acquired Asset (i) constitutes "tax-exempt use property" within the meaning of Section 168(h) of the Code, (ii) is "tax-exempt bond financed property" within the meaning of Section 168(g) of the Code, (iii) secures any debt the interest of which is tax-exempt under Section 103(a) of the Code or (iv) is subject to a Section 467 rental agreement as defined in Section 467 of the Code.

(e)    Seller has never been a party to, or participated in, a transaction that is or is substantially similar to a "reportable transaction," as such term is defined in Treasury Regulations Section 1.6011-4(b)(1), or any other transaction requiring disclosure under analogous provisions of state, local or foreign Tax Law.

- 28 -

(f)    There are no Liens for Taxes (and no Government shall have proposed or threatened any Liens for Taxes) on any of the Acquired Assets, in each case other than Permitted Liens.

(g)    None of the Acquired Assets is an interest in a Person (other than RLC) taxable as a corporation, partnership, disregarded entity, trust or real estate mortgage investment conduit for U.S. federal income tax purposes.

(h)    Seller has never executed or entered into any agreement with, or obtained any consents or clearances from, any Government with respect to Taxes, or has been subject to any ruling guidance that would be binding on Buyer for any Tax period (or portion of any Tax period) beginning after the Closing Date.

(i)    Seller is not a party to, bound by, or has any obligation under any Tax sharing or Tax indemnity agreement or similar Contract or arrangement other than any customary commercial agreement entered into in the ordinary course of business a primary subject matter of which is not Taxes.

(j)    To the Knowledge of Seller (i) RLC has timely filed (taking into account applicable extensions of time for such filings that have been properly and timely requested) all Tax Returns that were required to be filed, and all such Tax Returns are complete and accurate in all material respects, (ii) all Taxes owed by RLC (whether or not shown on any Tax Return) have been fully and timely paid, (iii) RLC has not been subject to any audit or other proceeding by any Government with respect to Taxes for any period for which the statute of limitations has not expired, and (iv) no such audit or other proceeding has been threatened in writing with respect to any Taxes due from or with respect to RLC.

(k)    RLC is not and has never been a member of an affiliated group within the meaning of Section 1504(a) of the Code (or any similar group defined under a similar provision of state, local, or foreign Law) filing a consolidated Tax Return, nor does it have any Liability for the Taxes of any Person under Treasury Regulation Section 1.1502-6 or any analogous or similar provision of Law, by Contract, as a transferee or successor, or otherwise.

4.23    <u>Warranties Exclusive</u>. The representations and warranties contained in this <u>Article 4</u> (as modified by the Schedules hereto), any Ancillary Agreement or any certificate delivered in connection herewith are the only representations or warranties given by Seller and all other express or implied warranties are disclaimed. Without limiting the foregoing and subject to the representations and warranties set forth herein, the Acquired Assets are otherwise conveyed "AS IS", "WHERE IS" and "WITH ALL FAULTS" and all warranties of merchantability or fitness for a particular purpose are disclaimed. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS <u>Article 4</u> (AS MODIFIED BY THE SCHEDULES HERETO), ANY ANCILLARY AGREEMENT OR ANY CERTIFICATE DELIVERED IN CONNECTION HEREWITH, SELLER AND SELLER'S AFFILIATES AND THEIR RESPECTIVE RELATED PERSONS HAVE MADE NO REPRESENTATION OR WARRANTY CONCERNING (A) ANY USE TO WHICH THE ACQUIRED ASSETS MAY BE PUT, (B) ANY FUTURE REVENUES, COSTS, EXPENDITURES, CASH FLOW, RESULTS OF OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT MAY

- 29 -

RESULT FROM THE OWNERSHIP, USE OR SALE OF THE ACQUIRED ASSETS OR THE ASSUMPTION OF THE ASSUMED LIABILITIES, (C) ANY OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO BUYER OR ITS AFFILIATES OR RELATED PERSONS OR (D) THE CONDITION OF THE ACQUIRED ASSETS, INCLUDING COMPLIANCE WITH ANY ENVIRONMENTAL LAWS OR OTHER LAWS.

ARTICLE 5
REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as of the Effective Date and as of the Closing Date as follows:

5.1     <u>Corporate Organization</u>. Buyer is a corporation duly incorporated, validly existing and in good standing under the Laws of the jurisdiction of its incorporation. Buyer has the requisite corporate power and authority to own its properties and assets and to conduct its business as now conducted and to carry out its obligations under this Agreement and each of the Ancillary Agreements to which Buyer is a party.

5.2     <u>Qualification to do Business</u>. Buyer is duly qualified to do business as a foreign corporation and is in good standing in every jurisdiction in which the character of the properties owned or leased by it or the nature of the business(es) conducted by it makes such qualification necessary, except where the failure to be so qualified would not or would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.

5.3     <u>Authorization and Validity</u>. Buyer has the requisite corporate power and authority necessary to enter into this Agreement and each of the Ancillary Agreements to which Buyer is a party, and to carry out its obligations hereunder and thereunder. The execution and delivery of this Agreement and those Ancillary Agreements to which Buyer is a party have been duly authorized by all necessary corporate action by the board of directors (or equivalent), and no other corporate proceedings are necessary for the performance by Buyer of its obligations under this Agreement and each of the Ancillary Agreements to which Buyer is a party, or the consummation by Buyer of the transactions contemplated hereby or thereby. This Agreement and each of the Ancillary Agreements to which Buyer is a party have been duly and validly executed and delivered by it and are valid and binding obligations of Buyer enforceable against it in accordance with their respective terms.

5.4     <u>No Conflict or Violation</u>. Neither the execution and delivery by Buyer of this Agreement or any of the Ancillary Agreements to which Buyer is a party, nor the consummation of the transactions contemplated hereby or thereby, nor compliance by Buyer with any of the provisions hereof or thereof, will (a) conflict with or result in any breach of any provision of the certificate of incorporation or by-laws (or equivalent documents) of Buyer, (b) violate any provision of Law, or any Order applicable to Buyer or any of its properties or assets (subject to (x) the Bankruptcy Court's entry of the Sale Order and (y) the termination or expiration of the waiting period under the HSR Act, if applicable), or (c) automatically result in a modification, violation or breach of, or constitute (with or without notice or lapse of time or both) a default (or give rise to any right, including but not limited to, any right of termination, amendment, cancellation or

- 30 -

acceleration) under, any of the terms, conditions or provisions of any contract, indenture, note, bond, lease, license or other agreement to which Buyer is a party or by which it is bound or to which any of its properties or assets is subject, except, in each case, for any such violations, breaches, defaults or other Occurrences that would not or would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.

5.5    <u>Consents and Approvals</u>. The execution, delivery and performance of this Agreement and the Ancillary Agreements to which Buyer is a party do not and will not require the consent or approval of, or filing with, any Government or any other Person, other than (a) as may be required to be obtained by Buyer after the Closing in order to own or operate any of the Acquired Assets; (b) for entry of the Sale Order by the Bankruptcy Court; (c) as required pursuant to the HSR Act, if applicable), or (d) for such consents, approvals and filings, of which the failure to obtain or make would not, individually or in the aggregate, have a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Ancillary Agreements to which Buyer is a party.

5.6    <u>Adequate Assurances Regarding Assumed Contracts</u>. Buyer is and will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

5.7    <u>Financial Capability</u>. Buyer and any Buyer Acquisition Vehicle currently has or at Closing will have available funds necessary to consummate the transactions contemplated by this Agreement, including the acquisition of the Acquired Assets and assumption of the Assumed Liabilities, and the payment therefor to Seller of the Purchase Price and to perform its obligations under this Agreement and the Ancillary Agreements to which Buyer is a party on the terms and subject to the conditions contemplated hereby and thereby.

5.8    <u>Investigation by Buyer</u>. Buyer has conducted its own independent review and analysis of the Business, the Acquired Assets and the Assumed Liabilities, operations, technology, assets, liabilities, financial condition and prospects of the Business as formerly carried on by Seller and acknowledges that Seller has provided Buyer with reasonable access to the personnel, properties, premises and records of the Business for this purpose. Buyer has conducted its own independent review of all Orders of, and all motions, pleadings, and other submissions to, the Bankruptcy Court in connection with the Bankruptcy Case. In entering into this Agreement, Buyer (i) acknowledges that neither Seller nor any of its Affiliates or Related Persons makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to Buyer or its Affiliates or Related Persons, except for the representations and warranties contained in <u>Article 4</u> (which are subject to the limitations and restrictions contained in this Agreement), any Ancillary Agreement or any certificate delivered in connection herewith; and (ii) agrees, to the fullest extent permitted by Law, that none of Seller, its Affiliates or any of their respective Related Persons shall have any Liability or responsibility whatsoever to Buyer or its Affiliates or Related Persons on any basis (including in contract or tort, under federal or state securities Laws or otherwise, but excluding misrepresentation or concealment arising from actual fraud of Seller) based upon any information provided or made available, or statements made, to Buyer or its Affiliates or Related Persons (or any omissions therefrom), including in respect of the specific representations and warranties of

- 31 -

Seller set forth in this Agreement, except, with regard to Seller, for the representations and warranties contained in Article 4), any Ancillary Agreement or any certificate delivered in connection herewith and, with respect to such representations and warranties, subject to the limitations and restrictions contained in this Agreement.

5.9    Warranties Exclusive. The representations and warranties contained in this Article 5, any Ancillary Agreement or any certificate delivered in connection herewith are the only representations or warranties given by Buyer and all other express or implied warranties are disclaimed.

## ARTICLE 6
## COVENANTS OF THE PARTIES

6.1    Efforts to Close; Further Assurances.

(a)    Efforts of Seller. Between the Effective Date and the Closing Date (or the earlier termination of this Agreement pursuant to Article 11) Seller shall use commercially reasonable efforts to (i) obtain all necessary consents, waivers, authorizations and approvals of all Governments, and of all other Persons, required to be obtained by Seller in connection with the execution, delivery and performance by it of this Agreement and the Ancillary Agreements to which Seller is a party, (ii) take, or cause to be taken, all actions, and to do, or cause to be done, all things reasonably necessary or proper, consistent with applicable Law, to consummate and make effective in an expeditious manner the transactions contemplated by this Agreement and the Ancillary Agreements, and (iii) maintain the Acquired Assets substantially in accordance with Seller's current practices and procedures (as adjusted for the effects of any then-applicable COVID Restrictions).

(b)    Efforts of Buyer. Between the Effective Date and the Closing Date (or the earlier termination of this Agreement pursuant to Article 11), Buyer shall use commercially reasonable efforts to (i) obtain all consents and approvals of all Governments, and all other Persons, required to be obtained by Buyer to effect the transactions contemplated by this Agreement and the Ancillary Agreements, and (ii) take, or cause to be taken, all action, and to do, or cause to be done, all things reasonably necessary or proper, consistent with applicable Law, to consummate and make effective in an expeditious manner the transactions contemplated by this Agreement and the Ancillary Agreements.

(c)    Further Assurances. After the Closing, at the cost of the requesting party, Seller and Buyer shall, and Seller and Buyer shall cause its Affiliates to, execute, acknowledge and deliver all such further actions, as may be reasonably necessary or appropriate to sell, transfer, convey, assign and deliver fully to Buyer and its respective successors or permitted assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and to assure fully to Seller and its successors and permitted assigns, the assumption of the Assumed Liabilities and obligations intended to be assumed by Buyer under this Agreement, and to otherwise make effective or evidence the transactions contemplated by this Agreement.

(d)    Additional Seller Entities. Between the Effective Date and the Closing Date (or the earlier termination of this Agreement pursuant to Article 11), if either party discovers that any of the rights, interests, properties, or other assets constituting the Acquired Assets is owned by a Subsidiary of Seller who is not a party to this Agreement, Seller shall promptly cause such Subsidiary to become a Seller hereunder as if an original party hereto (by delivering a joinder in form and substance reasonably acceptable to Buyer) and promptly transfer (or cause to be transferred) all such applicable assets to Buyer in accordance with the terms of this Agreement. Prior to such Subsidiary of Seller becoming a Seller hereunder, Seller shall cause any such Subsidiary to hold all such applicable assets in trust for the benefit of Buyer.

6.2    Access to Properties and Documents; Buyer Confidentiality. Seller shall afford to Buyer, and to the Representatives of Buyer, reasonable access (subject to any then-applicable COVID Restrictions) during normal business hours throughout the period from the Effective Date until the Closing Date (or the earlier termination of this Agreement pursuant to Article 11) to all Documents of Seller relating to the Acquired Assets and the Assumed Liabilities. Upon reasonable prior notice, Seller shall also afford Buyer access that is reasonable under the circumstances, taking into account any then-applicable COVID Restrictions, during normal business hours, to all Acquired Assets, and to Seller's Representatives, throughout the period prior to the Closing Date (or the earlier termination of this Agreement pursuant to Article 11). The rights of access contained in this Section 6.2 are granted subject to, and on, the following terms and conditions: (i) any such investigation shall not include physical testing or sampling and will be conducted in a reasonable manner; and (ii) all information provided to Buyer or Representatives by or on behalf of Seller or its Representatives (whether pursuant to this Section 6.2 or otherwise) will be governed and protected by the Confidentiality Agreement, dated as of May 22, 2020 by and between Buyer and ROC (the "Confidentiality Agreement"). The terms of the Confidentiality Agreement shall continue in full force and effect until the Closing, at which time the Confidentiality Agreement shall terminate. In the event of the termination of this Agreement for any reason prior to the Closing, the Confidentiality Agreement shall continue in full force and effect in accordance with its terms. Buyer shall indemnify, defend and hold harmless (i) Seller, (ii) the lessors of any Leased Real Property, and (iii) Seller's and such lessors' respective Affiliates and Related Persons from and against any and all losses, costs and expenses (including, attorneys' fees and disbursements) suffered or incurred by such Persons in connection with any bodily injury or physical damage on the Arkansas Property or the Leased Real Property to the extent caused by Buyer or its Representatives in connection with the exercise of the right of access pursuant to this Section 6.2.

6.3    Seller Confidentiality. From and after the Closing, Seller shall, and shall cause its Affiliates, Representatives and successors-in-interest to, treat and hold as confidential, and shall not use or disclose (a) any documents and information concerning Buyer, or any of its Affiliates, furnished to it by Buyer or its Representatives in connection with this Agreement, the Ancillary Agreements or the transactions contemplated hereby or thereby, and (b) any information regarding the Business or the Acquired Assets, including trade secrets, know-how or confidential information of the Business (such information in clause (b), the "Confidential Information"). In the event that Seller or any of its Affiliates, Representatives and/or successors-in-interests, is requested or required (by oral question or request for information or documents in any Proceeding, interrogatory, subpoena, civil investigative demand or similar process) to disclose any Confidential Information, Seller shall use commercially reasonable efforts to promptly notify Buyer of the request or requirement so that Buyer may seek, at its sole cost and expense, an appropriate

- 33 -

protective order or waive compliance with the provisions of this <u>Section 6.3</u>. If, in the absence of a protective order or the receipt of a waiver hereunder, Seller is, on the advice of counsel, legally required to disclose any such information, Seller may disclose such information to the requesting authority; <u>provided</u>, <u>however</u>, that Seller shall use commercially reasonable efforts to obtain, at the reasonable request of Buyer and at Buyer's sole cost, an order or other assurance that confidential treatment will be accorded to such portion of the information required to be disclosed as Buyer shall designate in good faith.

6.4     <u>Operation of the Business</u>. Except (a) as otherwise contemplated or permitted by this Agreement or the Ancillary Agreements, (b) with the prior consent of Buyer (such consent not to be unreasonably withheld, conditioned or delayed), or (c) in connection with any Order relating to the Bankruptcy Case, between the Effective Date and the Closing Date, Seller shall (A) use its commercially reasonable efforts to operate the Business in all material respects in the ordinary course consistent with current practices (after taking into account Seller's status as a debtor-in-possession and any COVID Restrictions), (B) not remove or dispose of any Owned FF&E, other than Inventory; and (D) notify Buyer of any notices relating to or proposed changes affecting Seller's insurance policies covering any of the Acquired Assets.

6.5     <u>Adequate Assurances Regarding Assumed Contracts</u>. With respect to each Assumed Contract, Buyer shall provide adequate assurance of the future performance of such Assumed Contract by Buyer; <u>provided</u> that, for clarity the failure to provide adequate assurance shall not be a breach of this <u>Section 6.5</u> if Buyer has undertaken reasonable efforts to provide such assurance. Buyer agrees that it will promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Sale Order, including, furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's employees and Representatives available to testify before the Bankruptcy Court.

6.6     <u>Wrong Pockets</u>. If between the Closing Date and the Wind-Up Date (a) Buyer or any of its Subsidiaries holds any Excluded Assets or Excluded Liabilities or (b) Seller or any Affiliate holds any Acquired Assets or Assumed Liabilities, Buyer or Seller, as applicable, will promptly transfer (or cause to be transferred) such assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the other party hereto, including with respect to any revenue associated with any Acquired Intellectual Property. Prior to any such transfer, the party receiving or possessing any such asset will hold it in trust for the benefit of such other party without any additional cost or consideration.

6.7     <u>Cure of Defaults</u>. Subject to <u>Section 1.5(a)</u> and <u>Section 1.5(e)</u>, (a) Buyer shall, without any adjustment to the Purchase Price, as of the Closing or, in respect of any Assumed Contract for which the Bankruptcy Court does not enter an Order fixing the Cure Amount until after the Closing (including any Disputed Contract and any Assumed Contract pursuant to which a Supplemental Notice of Assumption and Assignment has been served on or before the Closing), immediately following the entry of such Order, cure any and all defaults under the Assumed Contracts, including paying the Buyer Cure Amount, which defaults are required to be cured under the Bankruptcy Code, so that such Assumed Contracts may be assumed by Seller and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code and (b) Seller shall, without any adjustment to the Purchase Price, as of the Closing or, in respect of any Assumed

Contract for which the Bankruptcy Court does not enter an Order fixing the Cure Amount until after the Closing, then immediately following the entry of such Order, pay the applicable Seller Cure Amount.

6.8     Released Claims. Effective as of the Closing Date, Buyer, on behalf of itself and its Affiliates and each of their respective employees, directors, officers, shareholders, and advisors, hereby covenants and agrees that it shall not, except in the case of fraud, (a) assert any Claims that constitute Acquired Assets to the extent such Claims have been, or are at any time thereafter, released by or on behalf of Seller or any other Person pursuant to the Plan, an Order of the Bankruptcy Court, or otherwise or (b) pursue, prosecute or assert any rights related to any Claims against employees, officers of directors of Seller, including in any of the foregoing cases by way of offset or recoupment.

6.9     Insurance. Notwithstanding anything to the contrary in this Agreement, each of Seller and Buyer acknowledge and agree that from and after the Closing, to the extent that any Seller has the right to pursue a claim under any occurrence-based insurance policy that covers or may reasonably be expected to cover in whole or in part any Assumed Liability assumed by Buyer (each such Assumed Liability, an "Excluded Policy Covered Loss" and each such insurance policy, an "Excluded Insurance Policy"), Seller shall (to the extent requested in writing from time to time by Buyer) use commercially reasonable efforts to file and pursue on behalf of Buyer claims under any applicable Excluded Insurance Policy for such Excluded Policy Covered Loss on behalf of Buyer. To the extent that Seller actually collects proceeds under any applicable Excluded Insurance Policy pursuant to this Section 6.9, Seller shall promptly remit to Buyer the portion of such proceeds that are attributable to the applicable Acquired Asset and/or Assumed Liability. Seller shall not, without the prior written consent of Buyer, amend, modify or waive any of its rights under the applicable Excluded Insurance Policies to the extent that doing so could reasonably be expected to adversely affect any coverage thereunder of Buyer. Subject to the following sentence, Seller shall retain the exclusive right to control claims under such Excluded Insurance Policies, provided that Buyer shall have the right, but not the duty, to monitor such claims. Upon the request of Buyer, Seller shall use commercially reasonable efforts to cause Buyer to be added as an insured on any applicable Excluded Insurance Policy covering or potentially covering Excluded Policy Covered Losses with respect to which Buyer is or may be a Buyer. Notwithstanding anything to the contrary in this Section 6.9, the parties hereto obligations under this Section 6.9 shall cease upon the Wind-Up Date.

6.10    No Successor Liability. The parties intend that upon the Closing, Buyer and its Affiliates shall not and shall not be deemed to: (a) be a successor (or other such similarly situated party), or otherwise be deemed a successor, to Seller, including, a "successor employer" for the purposes of the Code, ERISA, or any other applicable Laws, including with respect to any Pension Plan or any other Employee Benefit Plans; (b) have any responsibility or Liability for any obligations of Seller, or any Affiliate of Seller based on any theory of successor or similar theories of Liability; (c) have, de facto or otherwise, merged with or into any Seller; (d) be an alter ego or a mere continuation or substantial continuation of any of any Seller (and there is no continuity of enterprise between Buyer and any Seller), including, within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental, or other law, rule or regulation (including filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to Seller's Liability under such law, rule or

- 35 -

regulation or doctrine; or (e) be holding itself out to the public as a continuation of any of any Seller or their respective estates.

6.11    <u>Notification of Certain Matters</u>. From and after the Effective Date through the Closing (or the earlier termination of this Agreement pursuant to <u>Article 11</u>), Seller shall use commercially reasonable efforts to promptly notify Buyer in writing of the discovery by any Seller of (a) any Occurrence that occurred or existed on or prior to the Effective Date that caused or constitutes a material breach of or a material inaccuracy in any representation or warranty made by Seller in this Agreement; (b) any Occurrence that occurs, arises or exists after the Effective Date that could cause or constitute a material breach of or a material inaccuracy in any representation or warranty made by Seller in this Agreement if: (i) such representation or warranty had been made as of the time of the Occurrence or (ii) such Occurrence had occurred, arisen or existed on or prior to the Effective Date; (c) any material breach of any covenant or obligation of Seller, and (d) any Occurrence that is reasonably likely to make the timely satisfaction of any of the conditions set forth in <u>Article 10</u> impossible or unlikely; <u>provided</u> that the delivery of any notice pursuant to this <u>Section 6.11</u> will not limit the remedies available to Buyer under or with respect to this Agreement.

6.12    <u>Real Property Matters</u>. From and after the Effective Date until the Closing (or the earlier termination of this Agreement pursuant to <u>Article 11</u>), Seller shall, at no out-of-pocket cost or expense to Seller, use commercially reasonable efforts to assist Buyer in obtaining the following:

(a)    a commitment for a 2006 ALTA Owner's Title Insurance Policy for the Arkansas Property (such policy together with a copy of all documents referenced therein, the "<u>Title Commitment</u>"), issued by a title insurance company satisfactory to Buyer (the "<u>Title Company</u>"), <u>provided</u> that, (A) any failure to obtain the Title Commitment for any reason other than Seller's failure to assist Buyer pursuant to this <u>Section 6.12</u> shall not be a breach of or default under of this Agreement, and (B) Buyer obtaining the Title Commitment or a title insurance policy ("<u>Title Policy</u>") resulting therefrom, or any other form of title insurance, shall not be a condition to Buyer's performance of its obligations under this Agreement or Buyer's consummation of the transactions contemplated by this Agreement; and

(b)    a survey for the Arkansas Property, dated no earlier than the Effective Date, prepared by a surveyor licensed in the jurisdiction of the Arkansas Property conforming to 2016 ALTA/ACSM Minimum Detail Requirements for Land Title Surveys, (the "<u>Survey</u>").

6.13    <u>Acquired Permits</u>. Between the Closing Date and the Wind-Up Date, if not transferred pursuant to the terms hereof, Seller shall cause each Acquired Permit to be retained in its name until the applicable Government transfers such Acquired Permit to Buyer in order to allow Buyer to obtain such Acquired Permits in its own name. Immediately upon the Closing Date and to the extent allowed by and in accordance with applicable Law, Seller shall grant or cause to be granted to Buyer the right to use the Acquired Permits to conduct the Business as permitted by such Acquired Permits. From and after the Effective Date, Seller shall make available to Buyer each person who is required to sign all requisite transfer applications and other documents necessary or appropriate to effect the transfer of the Acquired Permits, and Seller shall cause such persons to execute and deliver all such applications and documents. As of the Closing Date and thereafter until the Wind-Up Date, Seller shall, without further consideration or the obligation to

incur any costs or expenses, use commercially reasonable efforts to cooperate with Buyer, including by the execution of such documents and instruments as may reasonably be deemed necessary or desirable to cause Buyer or its Affiliates (to the extent permitted under applicable Law): (i) to be allowed to operate on the Acquired Permits, including, designating Buyer as an "operator" under the Acquired Permits and approving and signing all operator change forms or revisions prepared by Buyer at or immediately after the Closing; and (ii) to receive transfer of such Acquired Permits or to become the successor thereto as the Government may require.

6.14    HSR Act.

(a)    If applicable, subject to the terms and conditions of this Agreement, each of the parties will (i) use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable Antitrust Laws to consummate the transactions contemplated by this Agreement, (ii) if the transactions contemplated hereby require a Notification and Report Form pursuant to the HSR Act, use commercially reasonable efforts to file such Notification and Report Form with respect to the transactions contemplated by this Agreement within five (5) Business Days following the entry of the Sale Order, supplying as promptly as practicable any additional information and documentary material that may be requested pursuant to the HSR Act and (iii) use commercially reasonable efforts to cause the expiration or termination of the applicable waiting periods under the HSR Act as soon as practicable; provided, however, nothing in this Section 6.14, or otherwise in this Agreement, shall require Buyer to take any action that would prohibit or limit in any respect, or place any conditions on, the ownership or operation by Buyer or its Subsidiaries or Affiliates of any portion of the business or assets of Buyer or its Subsidiaries or Affiliates, or compel Buyer or its Subsidiaries or its Affiliates to dispose of, divest, hold separate or license any portion of the business, assets or any intellectual property rights of Buyer or any of its Subsidiaries or Affiliates, respectively, in each case as a result of the transactions contemplated by this Agreement.

(b)    In connection with the efforts referenced in Section 6.14(a) to obtain all requisite approvals and authorizations for the transactions contemplated by this Agreement under the HSR Act or any other Antitrust Law (if applicable), each of the parties shall use commercially reasonable efforts to (i) cooperate with each other in connection with any filing or submission and in connection with any investigation or other inquiry, including any proceeding initiated by a private party, (ii) keep the other parties informed in all material respects of any material communication received by such party from, or given by such party to, the Federal Trade Commission (the "FTC"), the Antitrust Division of the Department of Justice (the "DOJ") or any other Government authority and of any material communication received or given in connection with any proceeding by a private party, in each case regarding any of the transactions contemplated by this Agreement and (iii) permit the other parties to review any material communication given to it by, and consult with each other in advance of any meeting or conference with, the FTC, the DOJ or any other Government authority in connection with any proceeding by a private party. The foregoing obligations in this Section 6.14(b) shall be subject to the Confidentiality Agreement with respect to the confidential information of Buyer and Seller, and any attorney-client, work product or other privilege, and each of the parties to this Agreement will coordinate and cooperate fully with the other parties to this Agreement in exchanging such information and providing such assistance as such other parties may reasonably request in connection with the foregoing. Any competitively sensitive information that is disclosed pursuant to this Section 6.14(b) will be limited

to each party's respective counsel and economists pursuant to a separate customary confidentiality agreement.

ARTICLE 7
ADDITIONAL AGREEMENTS

7.1     <u>Bankruptcy Matters</u>.

(a)     <u>Backup Bidder</u>. In the event that an Auction is conducted, and Seller does not choose Buyer as the Successful Bidder, but instead determines that Buyer submits the second highest or second best bid for all or a portion of the Acquired Assets at Auction and chooses Buyer as the Backup Bidder (in accordance with and as defined in the Bidding Procedures Order) with respect to the Business, Buyer agrees that it will keep the "Backup Bid" (as defined in the Bidding Procedures Order) with respect to the Business open and irrevocable until the earlier of 5:00 p.m. (prevailing Central Time) on the date that is sixty (60) days after the date of entry of the Bankruptcy Court's Order approving the Alternative Transaction and the closing date of the Alternative Transaction. Notwithstanding anything to the contrary in this Agreement, Seller may also identify and enter into agreements respecting (x) a "back-up" bid relating to an Alternative Transaction, and/or (y) a liquidation sale of all or a portion of the Inventory and the other assets of Seller, in either case to become effective in the event Buyer does not perform in accordance with the terms of this Agreement.

(b)     <u>Notice to Holders of Liens, Claims and Interests</u>. Seller has provided notice of the Sale Order to all holders of Liens, Claims and Interests in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules for the Bankruptcy Court and any other applicable Order of the Bankruptcy Court.

(c)     <u>Entry of Sale Order</u>. Seller has filed with the Bankruptcy Court one or more motions which, collectively, seek the entry by the Bankruptcy Court of the Sale Order. Seller shall use commercially reasonable efforts to secure the entry of the Sale Order and any other necessary Orders to close the sale of the Acquired Assets, and to consummate the transactions contemplated by this Agreement. Buyer agrees that it will take such actions that are reasonably requested by Seller to assist in securing the entry of any such Orders to close the sale of the Acquired Assets, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. In the event that the entry of the Sale Order and any other necessary Orders of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any such Order), Seller and Buyer will cooperate in determining and pursuing the response to any such appeal, petition or motion and Seller and Buyer shall use their commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion.

(d)     Seller will use commercially reasonable efforts to give Buyer reasonable advance notice and proposed drafts of all pleadings, motions, Orders, notices, hearings, and other Proceedings related to this Agreement and the transactions contemplated hereby, and will provide

- 38 -

Buyer and its counsel with a reasonable opportunity to review such papers prior to filing with the Bankruptcy Court unless such advance notice is impossible or impracticable under the circumstances, in which case Seller will deliver copies of such papers substantially simultaneously with the filing with the Bankruptcy Court.

7.2    Transition Arrangements.

(a)    Access Covenant. Upon reasonable request from Seller, following the Closing Date, Buyer shall afford to Seller, and to the Representatives of Seller, including any administrator of the Plan or Seller's estate, reasonable access (subject to any then-applicable COVID Restrictions), to the pre-closing books and records relating to the Business as is reasonably necessary to permit Seller to monetize any Excluded Assets and otherwise liquidate its estate after the Closing and confirmation of the Plan and to conclude the Bankruptcy Case, including the administration of the Plan, reconciliation and litigation of claims and making of distributions contemplated under the Plan or otherwise. Such access will include reasonable access to Buyer's personnel, information technology systems and books and records. Buyer will provide such services free of any charges, fees or rents; provided, that Seller will reimburse Buyer for reasonable out-of-pocket costs and expenses incurred by Buyer in connection with providing such services (which for the avoidance of doubt will not include salaries paid to Buyer's consultants or employees or Buyer's overhead, but may include temporary service workers, at customary and reasonable hourly costs, if needed based upon the reasonable time demands of the regular work of Buyer's employees and the reasonable time demands of Seller's employees engaged in the liquidation).

(b)    Transitional License. Effective upon the Closing, for a period not to exceed one hundred and eighty (180) calendar days or until the Wind-Up Date (if earlier), Buyer shall grant Seller a non-exclusive, royalty-free right and license to use the Remington Brand and the Business Names, solely in connection with the wind-down and liquidation of Seller's estate and the conclusion of the Bankruptcy Case, including for purposes of administering a plan of liquidation of the Excluded Assets, reconciling claims and making distributions.

(c)    Transitional Regulatory Matters. From the Effective Date until the Closing Date, Buyer and Seller shall each use commercially reasonable efforts to cooperate in the registration of Buyer as licensee, as of and conditional upon the Closing, under the Critical Licenses.

(d)    Trademark License Agreement. In the event that the Firearms Asset Purchase Agreement is terminated in accordance with its terms, then, if requested in writing by Seller, Buyer shall enter into a license agreement with the Backup Bidder (as defined in the Bidding Procedures Order) with respect to the Firearms Business or any other purchaser of the Firearms Business, in each case, in order to license the Remington Brand in accordance with the terms and conditions set forth in the Trademark License Agreement attached hereto as Exhibit 8 (the "Trademark License Agreement").

ARTICLE 8
EMPLOYEES AND EMPLOYEE BENEFITS

8.1     <u>Transferred Employees</u>. Within ten (10) days after entry of the Sale Order, Buyer shall offer employment, effective as of the Closing, to substantially all of the non-management Employees engaged in the Business (i) located at the Arkansas Property or (ii) that are otherwise approved by Buyer following the Effective Date, including those Employees set forth on <u>Schedule 8.1</u> (which, for the avoidance of doubt, may be updated by Buyer, in its discretion, prior to the Closing) (the "<u>Offered Employees</u>"). Subject to applicable Law, each such offer shall include a waiver of any costs related to the termination of employment of such Offered Employee by Seller in connection with the transactions contemplated by this Agreement (including any severance or WARN Act payments), as against Buyer, Seller and their respective Affiliates. If the Closing occurs, any Offered Employees who accept any such offer and commence employment with Buyer no later than five (5) days after the Closing Date (or with respect to any Offered Employee on an approved leave of absence as of the Closing, upon such Offered Employee's return from leave within sixty (60) days of Closing) are referred to in this Agreement as the "<u>Transferred Employees</u>".

8.2     <u>Employment Tax Reporting</u>. With respect to Transferred Employees, Buyer and Seller shall use the standard procedure set forth in Revenue Procedure 2004-53, 2004-34 I.R.B. 320, for purposes of employment Tax reporting.

8.3     <u>Benefits</u>. For the twelve (12) month period following the Closing, Buyer shall, or shall cause an Affiliate of Buyer to, provide (whether under existing or newly-established Buyer compensation or benefits plans (collectively, the "<u>Buyer Plans</u>")) to each Transferred Employee and their eligible dependents benefits that are no less favorable to the applicable Transferred Employee in the aggregate than the practice, plans, policies or Contracts in effect for similarly situated employees of Buyer, excluding any defined benefit pension plans and equity plans or agreements. If applicable, for purposes of eligibility, vesting and the calculation of the eligibility for and amount of vacation, sick pay or severance under Buyer Plans, Buyer shall credit each Transferred Employee with his or her years of service with Seller to the same extent as such Transferred Employee was entitled immediately prior to the Closing to credit for such service under a comparable Employee Benefit Plan; <u>provided</u>, <u>however</u>, that no such service recognition shall result in any duplication of benefits or apply to any defined benefit pension plans or equity plans or agreements. In addition, to the extent it has the right to do so, Buyer shall use commercially reasonable efforts to (a) waive under any health or welfare plans maintained by Buyer for Transferred Employees any pre-existing condition limitations and eligibility waiting periods for Transferred Employees and their eligible dependents (but only to the extent such pre-existing condition limitations, eligibility waiting periods and evidence of insurability requirements were satisfied under Seller's comparable health plans as of the Closing Date), and (b) provide that the dollar amount of all eligible expenses incurred by Transferred Employees and their eligible dependents during the calendar year in which the Closing Date occurs shall be taken into account for purposes of satisfying the applicable deductibles, co-payments or out-of-pocket limitations for such calendar year under the relevant Buyer's health or welfare plans.

8.4     <u>WARN Act</u>. Buyer shall not, at any time prior to ninety (90) days after the Closing Date, effectuate a "plant closing" or "mass layoff" (as those terms are defined in the WARN Act) affecting the Transferred Employees without complying in full with the WARN Act.

8.5    Third Party Beneficiary. No provision of this Article 8 shall (a) create any third party beneficiary or other rights in any Employee or former employee (including any beneficiary or dependent thereof) of Seller, Buyer or any other Person, (b) constitute or create, or be deemed to constitute or create, an employment agreement or employee benefit plan, (c) constitute or be deemed to constitute an amendment to any employee benefit plan sponsored or maintained by Seller or Buyer, or (d) alter or change the employment at-will status of any Employees.

## ARTICLE 9
### TAXES.

9.1    Taxes Related to Purchase of Assets. All recording and filing fees and all federal, state and local sales, use, goods and services, stock transfer, real property transfer, stamp, registration, documentary, recording, excise, value-added or other similar Taxes imposed by any Government in connection with the transfer of the Acquired Assets or other transactions contemplated hereby that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets, and which are not exempt under Section 1146(a) of the Bankruptcy Code (collectively, "Transfer Taxes"), shall be borne by Buyer. Buyer and Seller agree to cooperate to determine the amount of Transfer Taxes payable in connection with the transactions contemplated under this Agreement. The party that is responsible for filing the required Tax Returns under applicable Law for or with respect to such Transfer Taxes shall timely file or cause to be timely filed such Tax Returns with the appropriate taxing authorities. Seller and Buyer shall cooperate in the preparation, execution and filing of all Tax Returns or other applicable documents for or with respect to Transfer Taxes at the reasonable request of the other party. The provisions of this Section 9.1 shall expressly survive Closing.

9.2    Cooperation on Tax Matters. Buyer and Seller agree to furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Acquired Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other required or optional filings relating to Tax matters, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other Proceeding relating to Tax matters and for the answer to any governmental or regulatory inquiry relating to Tax matters.

9.3    Allocation of Purchase Price. Within fifteen (15) days following the final determination of the Purchase Price in accordance with Section 2.3, Buyer shall deliver a schedule to Seller allocating the Purchase Price (and other amounts treated as purchase price for Tax purposes) among the Acquired Assets (the "Allocation"). Such allocation shall be made pursuant to Section 1060 of the Code and the Treasury Regulations thereunder (and any similar provision of state, local or non-U.S. Law, as appropriate). Seller and Buyer shall cooperate to resolve any disputes regarding the Allocation and shall prepare and file all Tax Returns related to the transactions contemplated by this Agreement, including IRS Form 8594, in a manner consistent with the Allocation.

9.4    FAET Matters. Buyer and Seller will cooperate and Buyer shall use commercially reasonable efforts to cause the Buyer or any Buyer Acquisition Vehicle to be registered with the Alcohol and Tobacco Tax and Trade Bureau as a "manufacturer" for purposes of the Firearms Ammunition and Excise Tax on or before the Closing Date.

- 41 -

ARTICLE 10
CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES.

10.1    <u>Conditions Precedent to Performance by Seller</u>. The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which (other than the conditions contained in <u>Section 10.1(c)</u>) may be waived by Seller in its sole discretion:

(a)    <u>Representations and Warranties of Buyer</u>. All representations and warranties made by Buyer in <u>Article 5</u> shall be true and correct on and as of the Closing Date as if again made by Buyer on and as of such date, except for such representations and warranties expressly stated to relate to an earlier date, in which case, as of such earlier date; <u>provided</u>, <u>however</u>, this condition shall be considered satisfied unless the failure of such representations or warranties to be true and correct, individually or in the aggregate, would reasonably be expected to have a material adverse effect on Buyer's ability to perform its obligations hereunder.

(b)    <u>Performance of the Obligations of Buyer</u>. Buyer shall have performed in all material respects all obligations required under this Agreement to be performed by it on or before the Closing Date (except with respect to the obligation to pay, and authorize the release of, the Good Faith Deposit and the Purchase Price in accordance with the terms of this Agreement, which obligations shall be performed in all respects).

(c)    <u>Consents and Approvals</u>.

(i)    The Bankruptcy Court shall have entered the Sale Order and the Sale Order (A) shall be in full force and effect and (B) shall not have been stayed, amended, modified, or vacated.

(ii)    The applicable waiting period under the HSR Act shall have expired or terminated (if applicable) and no court of competent jurisdiction or other Government shall have issued an order or taken any other action restraining, enjoining, or otherwise prohibiting the transactions contemplated by this Agreement pursuant to Antitrust Law.

(d)    <u>No Violation of Orders</u>. No preliminary or permanent injunction or other Order that declares this Agreement invalid or unenforceable in any respect or which prevents the consummation of the transactions contemplated by this Agreement shall be in effect.

(e)    <u>Cure of Defaults</u>. At or prior to the Closing, Buyer shall have cured, or made arrangements, satisfactory to Seller in its reasonable discretion, to promptly cure, any and all defaults under the Assumed Contracts (other than any Disputed Contract and any Assumed Contract pursuant to which a Supplemental Notice of Assumption and Assignment has been served, but with respect to which a Supplemental Designated Contract Order has not been entered) that are required to be cured under the Bankruptcy Code, so that such Assumed Contracts may be assumed by Seller and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code.

- 42 -

(f) <u>Consummation of Closing under Firearms Asset Purchase Agreement</u>. The transactions contemplated by the Firearms Asset Purchase Agreement shall be completed simultaneously with the Closing hereunder.

(g) <u>Buyer's Deliveries</u>. Buyer shall have delivered to Seller all of the items set forth in <u>Section 3.3</u>.

10.2 <u>Conditions Precedent to Performance by Buyer</u>. The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which (other than the conditions contained in <u>Section 10.2(c)</u>) may be waived by Buyer in its sole discretion:

(a) <u>Representations and Warranties of Seller</u>. All of the representations and warranties made by Seller in <u>Article 4</u> (without giving effect to any qualifications or exceptions as to "materiality" or "Material Adverse Effect" set forth therein) shall be true and correct in all respects on and as of the Closing Date as if again made by Seller on and as of such date, in each case, except for such representations and warranties expressly stated to relate to an earlier date, in which case, as of such earlier date; <u>provided</u>, <u>however</u>, that this condition shall be considered satisfied unless the failure of such representations or warranties to be true and correct, has individually or in the aggregate had a Material Adverse Effect.

(b) <u>Performance of the Obligations of Seller</u>. Seller shall have performed all obligations required under this Agreement to be performed by it on or before the Closing Date in all material respects.

(c) <u>Consents and Approvals</u>.

(i) The Bankruptcy Court shall have entered the Sale Order and the Sale Order (A) shall be in full force and effect and (B) shall not have been stayed, amended, modified, or vacated.

(ii) The applicable waiting period under the HSR Act shall have expired or terminated (if applicable) and no court of competent jurisdiction or other Government shall have issued an order, or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement pursuant to Antitrust Law.

(d) <u>No Violation of Orders</u>. No preliminary or permanent injunction or other Order that declares this Agreement invalid in any respect or prevents the consummation of the transactions contemplated by this Agreement shall be in effect.

(e) <u>Satisfaction of Conditions under Firearms Asset Purchase Agreement</u>. The conditions to Closing (as that term is defined in the Firearms Asset Purchase Agreement) set out in <u>Article 10</u> of the Firearms Asset Purchase Agreement shall have been satisfied or waived in accordance with the terms of the Firearms Asset Purchase Agreement.

(f)     <u>Consummation of Closing under Firearms Asset Purchase Agreement</u>. The transactions contemplated by the Firearms Asset Purchase Agreement shall be completed simultaneously with the Closing hereunder.

(g)     <u>Seller's Deliveries</u>. Seller shall have delivered to Buyer all of the items set forth in <u>Section 3.2</u>.

ARTICLE 11
TERMINATION.

11.1    <u>Conditions of Termination</u>. This Agreement may be terminated at any time before the Closing:

(a)     by mutual written consent of Seller and Buyer;

(b)     by Seller, by written notice to Buyer, upon a breach of any covenant or agreement on the part of Buyer, or if any representation or warranty of Buyer shall have become untrue, in each case, such that the conditions set forth in <u>Section 10.1(a)</u> or <u>Section 10.1(b)</u> would not be satisfied, including a breach of Buyer's obligation to consummate the Closing; <u>provided</u> that (i) if such breach is curable by Buyer then Seller may not terminate this Agreement under this <u>Section 11.1(b)</u> unless Buyer has been promptly notified (in writing) of such breach and such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) five (5) Business Days after Seller notifies Buyer of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 11.1(b)</u> shall not be available to Seller at any time that Seller is in material breach of, any covenant, representation or warranty hereunder;

(c)     by Buyer, by written notice to Seller, upon a breach of any covenant or agreement on the part of Seller, or if any representation or warranty of Seller shall have become untrue, in each case, such that the conditions set forth in <u>Section 10.2(a)</u> or <u>Section 10.2(b)</u> would not be satisfied; <u>provided</u> that (i) if such breach is curable by Seller then Buyer may not terminate this Agreement under this <u>Section 11.1(c)</u> unless Seller has been promptly notified (in writing) of such breach and such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) five (5) Business Days after Buyer notifies Seller of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 11.1(c)</u> shall not be available to Buyer at any time that Buyer is in material breach of, any covenant, representation or warranty hereunder;

(d)     by written notice of either Buyer or Seller (to the other party), if the Closing shall not have occurred on or before the date that is twenty one (21) calendar days after the entry of the Sale Order (the "<u>Outside Date</u>"); <u>provided</u>, <u>however</u>, that (i) if, on such date, the conditions to Closing set forth in <u>Section 10.1(c)(ii)</u> and <u>Section 10.2(c)(ii)</u> are applicable and shall not have been fulfilled but all the other conditions to Closing set forth in <u>Article 10</u> have been satisfied (other than those conditions which, by their terms, are to be satisfied or waived at the Closing), then Buyer may, in its discretion, upon written notice to Seller and upon an additional deposit into the Good Faith Deposit Escrow Account in an amount equal to eight million, one hundred and forty thousand United States Dollars ($8,140,000) (the "<u>Good Faith Deposit Additional Amount</u>"),

- 44 -

elect to extend the Outside Date by an additional thirty (30) calendar days (in which case, such date shall become the "Outside Date" for all purposes of this Agreement); provided that if such date is not a Business Day, then the next immediately available Business Day shall become the "Outside Date" for all purposes of this Agreement, and (ii) neither party shall be permitted to terminate this Agreement pursuant to this Section 11.1(d) if the failure of the Closing to have occurred by the Outside Date was caused by the breach or action or inaction of such party.

(e)    by Buyer, by written notice to Seller, or by Seller, by written notice to Buyer, if the Bankruptcy Court enters an Order dismissing or converting the Bankruptcy Case into a case under Chapter 7 of the Bankruptcy Code, appointing a trustee in the Bankruptcy Case, or appointing an examiner with enlarged power related to the operation of the Business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, or the occurrence of any of the foregoing;

(f)    by written notice of either Buyer or Seller (to the other party), if the Bankruptcy Court has not entered the Sale Order on or before October 16, 2020;

(g)    by Buyer, by written notice to Seller, or by Seller, by written notice to Buyer, upon (i) any announcement by Seller at the close of an Auction held in accordance with the Bidding Procedures Order that Buyer is not the Successful Bidder or the Backup Bidder, or (ii) the consummation of an Alternative Transaction;

(h)    by Buyer, by written notice to Seller, if any creditor of Seller or its Affiliates obtains relief from the stay to foreclose on, or otherwise take possession of, a material portion of the Acquired Assets;

(i)    by Buyer, by written notice to Seller, following any occurrence of the Termination Notice Date (as defined in the Cash Collateral Order), unless as of the Termination Notice Date, Seller has obtained (1) use of Cash Collateral or (2) debtor-in-possession financing in an amount at least sufficient to fund the Budget (as defined in the Cash Collateral Order) for the remaining period thereof;

(j)    by Buyer, by written notice to Seller, upon any announcement by Seller at the close of an Auction held in accordance with the Bidding Procedures Orders that the Firearms Buyer is not the successful bidder for the Firearms Business (in accordance with the terms of the Firearms Asset Purchase Agreement);

(k)    by Buyer, by written notice to Seller, if the Firearms Asset Purchase Agreement is terminated in accordance with its terms; and

(l)    by written notice of either Buyer or Seller (to the other party), if, by the Outside Date (as extended, if applicable, in accordance with Section 11.1(d)), the conditions to Closing set forth in Section 10.1(c)(ii) and Section 10.2(c)(ii) (in the event that such conditions are applicable) shall not have been fulfilled, but all the other conditions to Closing set forth in Article 10 have been satisfied (other than those conditions which, by their terms, are to be satisfied or waived at the Closing); provided, however, that neither party shall be permitted to terminate this Agreement pursuant to this Section 11.1(l) if the failure of the Closing to have occurred by the Outside Date was caused by the breach or action or inaction of such party.

- 45 -

11.2    Effect of Termination; Remedies.

(a)    In the event that this Agreement is terminated as provided herein, then each of the parties will be relieved of its duties and obligations arising under this Agreement after the date of such termination and there will be no Liability or obligation on Buyer, any Seller or any of their respective Representatives; provided, however, that Section 2.2, this Article 11, Article 12, and Article 13 shall survive any such termination and will be enforceable hereunder; and provided, further that nothing in this Section 11.2 will be deemed to release any party from Liability for any willful breach of this Agreement prior to such termination and nothing in this Section 11.2 shall be deemed to interfere with (i) the parties' rights set forth in Section 12.9, or (ii) Seller's rights to receive and retain the Good Faith Deposit, Buyer's obligation to direct the Escrow Agent to release the Good Faith Deposit to Seller, or Seller's obligation to direct the Escrow Agent to return the Good Faith Deposit to Buyer, in each case as provided in Section 2.2.

(b)    Notwithstanding anything to the contrary herein, (i) Seller's right to receive and retain the Good Faith Deposit, as set forth in Section 2.2(b)(ii) and Section 2.2(b)(iii), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Seller for its efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision. If this Agreement is terminated in a manner in which Seller is entitled to receive the Good Faith Deposit in accordance with Section 2.2(b)(ii) or Section 2.2(b)(iii), and Seller receives the Good Faith Deposit instead of any remedies available to Seller pursuant to Section 12.9, then such amount shall be the sole and exclusive remedy (at law, in equity or otherwise) available to Seller (other than in accordance with Section 11.2(a)) and any other Person against Buyer, its Subsidiaries, and any of their respective Affiliates in connection with this Agreement and the transactions contemplated hereby (including as a result of the failure to consummate the Closing or for a breach or failure to perform hereunder or otherwise) and none of Buyer, its Subsidiaries or any of their respective Affiliates shall have any further liability relating to or arising out of this Agreement or the transactions contemplated hereby, and (ii) Buyer's right to receive the Good Faith Deposit and any claims of Buyer against Seller or the estate, in each case, as set forth in Section 2.2(b)(iv) and Section 2.2(b)(v), shall be the sole and exclusive remedy (at law, in equity or otherwise) available to Buyer (other than in accordance with Section 11.2(a)) and any other Person against Seller, its Subsidiaries, and any of their respective Affiliates in connection with this Agreement and the transactions contemplated hereby (including as a result of the failure to consummate the Closing or for a breach or failure to perform hereunder or otherwise) and none of Seller, its Subsidiaries or any of their respective Affiliates shall have any further liability relating to or arising out of this Agreement or the transactions contemplated hereby. Each party hereto acknowledges and agrees that the agreements contained in this Section 11.2 are an integral part of the transactions contemplated by this Agreement, that without these agreements the parties would not have entered into this Agreement.

ARTICLE 12
MISCELLANEOUS

12.1    No Survival of Representations and Warranties. None of the representations or warranties of Seller and Buyer set forth in this Agreement or in any certificate delivered pursuant

- 46 -

to Section 3.2(g) shall survive the Closing. The respective covenants and agreements of the parties hereto set forth in this Agreement or any Ancillary Agreement shall survive the Closing Date until they are fully performed or terminated in accordance with their respective terms, and in the absence of any specified time period, for the maximum duration permitted by Law.

12.2    Successors and Assigns. Prior to the Closing, neither Buyer nor Seller shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other, and any such attempted assignment without such prior written consent shall be void and of no force and effect; provided that Buyer may in its sole discretion assign its rights, obligations and Liabilities hereunder no later than three (3) days prior to the Closing Date to a Buyer Acquisition Vehicle. This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties to this Agreement.

12.3    Governing Law; Jurisdiction. This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of Delaware (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such State are superseded by the Bankruptcy Code. For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties to this Agreement irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After Seller is no longer subject to the jurisdiction of the Bankruptcy Court, the parties to this Agreement irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction over the Northern District of Alabama.

12.4    WAIVER OF JURY TRIAL. EACH PARTY TO THIS AGREEMENT IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE SUCH WAIVER, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, (C) IT MAKES SUCH WAIVER VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 12.4.

12.5    Expenses. Except as expressly otherwise provided herein, each of the parties to this Agreement shall pay its own expenses in connection with this Agreement and the transactions contemplated by this Agreement, including any legal and accounting fees, whether or not the transactions contemplated by this Agreement are consummated.

12.6    Severability. In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall

- 47 -

remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms shall provide for the consummation of the transactions contemplated by this Agreement in substantially the same manner as originally set forth at the later of the date this Agreement was executed or last amended.

12.7    <u>Notices</u>.

(a)    All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (i) on the date of service, if served personally on the party to whom notice is to be given; (ii) when transmitted via electronic mail to the applicable electronic mail address set forth below if confirmation of receipt is obtained promptly after completion of transmission; (iii) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service; or (iv) on the fifth (5th) day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to Seller:

Remington Outdoor Company, Inc.
100 Electronics Blvd., SW
Huntsville, Alabama 35824
Attention: Ken D'Arcy
Email: ken.darcy@remington.com

With a copy in either case to (which copy alone shall not constitute notice):

O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, California 90071
Attention: John-Paul Motley, Esq., and Stephen H. Warren, Esq.
Phone: (213) 430-6100 and (213) 430-7875, respectively
Email: jpmotley@omm.com and swarren@omm.com, respectively

If to Buyer:

Vista Outdoor Inc.
1 Vista Way
Anoka, MN 55303
Attention: Dylan S. Ramsey
Email: Dylan.Ramsey@VistaOutdoor.com

With a copy to (which copy alone shall not constitute notice):

Reed Smith LLP
599 Lexington Avenue
New York, NY 10022

- 48 -

Attention: Christopher M. Sheaffer
Email: CSheaffer@ReedSmith.com

(b)     Any party may change its address for the purpose of this <u>Section 12.7</u> by giving the other party written notice of its new address in the manner set forth above.

12.8     <u>Amendments; Waivers</u>. This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the parties to this Agreement, or in the case of a waiver, by the party waiving compliance. Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

12.9     <u>Specific Performance</u>. The parties hereto agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur if any provision of this Agreement were not performed in accordance with the terms hereof, including if any of the parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement, and that the parties shall be entitled to an injunction or injunctions, specific performance or other equitable relief without proof of damages or posting a bond or other security to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity. Unless otherwise expressly stated in this Agreement, no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a party from pursuing other rights and remedies to the extent expressly provided for under this Agreement, at law or in equity. The right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, none of Buyer or any Seller would have entered into this Agreement.

12.10     <u>Public Announcements</u>. Promptly after the execution and delivery of this Agreement, the parties shall make a joint press release in form and substance reasonably satisfactory to both of them regarding the transactions contemplated herein. Thereafter, no party shall make any press release or public announcement concerning the transactions contemplated by this Agreement without the prior written consent of the other party (such consent not to be unreasonably withheld, conditioned or delayed) unless a press release or public announcement is required by applicable Law, stock exchange requirements, or Order of the Bankruptcy Court. If any such announcement or other disclosure is required by Law, stock exchange requirements, or Order of the Bankruptcy Court, the disclosing party shall use commercially reasonable efforts to give the non-disclosing party reasonable prior notice of, and an opportunity to comment on, the proposed disclosure. Notwithstanding anything to the contrary in this <u>Section 12.10</u>, (a) Seller shall file this Agreement, but not any Schedules or Exhibits hereto, with the Bankruptcy Court in connection with obtaining the Sale Order and (b) the parties may disclose any information that is reasonably required to be disclosed in confidence to a party's and its Affiliates' respective directors, officers, employees, professional advisers, current lenders and investors and other Representatives, in each case who are bound by customary obligations of confidentiality with respect to such disclosures.

12.11    Entire Agreement. This Agreement (including the Ancillary Agreements referenced herein), the Sale Order and the Confidentiality Agreement contain the entire understanding between the parties to this Agreement with respect to the transactions contemplated by this Agreement and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions. All schedules to this Agreement and any documents and instruments delivered pursuant to any provision of this Agreement are expressly made a part of this Agreement as fully as though completely set forth in this Agreement.

12.12    Exhibits and Schedules.

(a)    The Schedules and Exhibits hereto are hereby incorporated into this Agreement and are hereby made a part hereof as if set out in full in this Agreement.

(b)    The Schedules shall be construed with and as an integral part of this Agreement and any matter or item set forth therein shall be interpreted to the same extent as if it was set forth verbatim herein. The disclosure of any matter or item in any Schedule hereto shall not be deemed to constitute an acknowledgement that any such matter is required to be disclosed or is material.

12.13    Parties in Interest. Nothing in this Agreement is intended to or shall confer any rights or remedies under or by reason of this Agreement on any Persons other than Seller and Buyer and their respective successors and permitted assigns. Nothing in this Agreement is intended to or shall relieve or discharge the obligations or Liability of any third Persons to Seller or Buyer. This Agreement is not intended to nor shall give any third Persons any right of subrogation or action over or against Seller or Buyer.

12.14    Bulk Sales Laws. Buyer waives compliance by Seller and Seller waives compliance by Buyer, with the provisions of the "bulk sales", "bulk transfer" or similar laws of any state other than any Laws which would exempt any of the transactions contemplated by this Agreement from any Tax liability which would be imposed but for such compliance. Pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any security interests in the Acquired Assets, including any Liens or Claims arising out of the bulk transfer laws, other than the Assumed Liabilities and Permitted Liens, and the parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

12.15    Construction. The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement. The parties to this Agreement have jointly participated in the negotiation and drafting of this Agreement. In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumptions or burdens of proof shall arise favoring any party by virtue of the authorship of any of the provisions of this Agreement. Each defined term used in this Agreement has a comparable meaning when used in its plural or singular form. As used in this Agreement, the word "including" and its derivatives means "without limitation" and its derivatives, the word "or" is not exclusive and the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. When a reference in this Agreement is made to a "party" or "parties," such reference shall be to a party or parties to this Agreement unless otherwise indicated. The phrases "made available," "provided to" or similar

- 50 -

phrases, when used in reference to anything made available to Buyer or its Representatives, shall be deemed to mean uploaded to and made available to Buyer or its Representatives in the electronic data room established by Seller in connection with the transactions contemplated hereby, or otherwise delivered to, or being in the possession of, Buyer or its Representatives in each case, at least two (2) Business Days prior to the Effective Date.

12.16  <u>Counterparts and Facsimiles</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument. Executed signature pages to this Agreement may be delivered by electronic mail and such electronic copies will be deemed as sufficient as if actual signature pages had been delivered.

ARTICLE 13
DEFINITIONS

13.1  <u>Certain Terms Defined</u>. As used in this Agreement, the following terms shall have the following meanings:

"<u>365 Contract</u>" means any of Seller's executory Contracts or unexpired Leases used by Seller in connection with the ownership, operation and/or management of the Business, in each case, within the meaning of Section 365 of the Bankruptcy Code.

"<u>Accounting Firm</u>" means a nationally recognized accounting firm mutually agreed to by Buyer and Seller in writing.

"<u>Accounts Receivable</u>" means any and all accounts, notes, trade and other receivables owed to Seller, together with all security or collateral therefor and any interest or unpaid financing charges accrued thereon, including all Proceedings pertaining to the collection of amounts that are payable, or that may become payable, to Seller with respect to products sold or services performed on or prior to the Closing Date.

"<u>Adjustment Escrow Account</u>" means the sub-account designated by the Escrow Agent as the "Adjustment Escrow Sub-Account" into which the Adjustment Escrow Amount is deposited with the Escrow Agent and held by it, subject to disbursement as provided in this Agreement and in the Adjustment Escrow Agreement.

"<u>Adjustment Escrow Agreement</u>" means that certain escrow agreement by and among ROC, Buyer and the Escrow Agent governing the administration of the Adjustment Escrow Amount, in the form attached hereto as Exhibit 9.

"<u>Adjustment Escrow Amount</u>" means $1,000,000.

"<u>Affiliate</u>" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under direct or indirect common control with such other Person.

"<u>Alternative Transaction</u>" means Seller consummating one or more transactions or series of transactions, whether a going concern sale, liquidation or otherwise, that involves a sale of all or any portion of the Business or the Acquired Assets by Seller, in either case to a purchaser or purchasers other than Buyer.

- 51 -

"Ancillary Agreements" means, collectively, the Assignment and Assumption Agreements, Intellectual Property Assignment Agreement, the Transition Services Agreement, deeds, and other certificates, affidavits and releases delivered pursuant to Article 3.

"Antitrust Law" means the Sherman Act, as amended, the Clayton Act, as amended, the HSR Act, the Federal Trade Commission Act, as amended, and all other Laws and Orders, that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition.

"Arkansas Grant Agreement" means that certain Grant Agreement, dated January 21, 2016, by and between Remington Arms Company, LLC and Arkansas Economic Development Commission, as amended

"Arkansas Property" the Owned Real Property of the Business located at 2592 Arkansas Highway 15 N, Lonoke, Arkansas 72086 (consisting of tax parcels numbers 001-13127-001 and 001-13127-000), including all buildings, structures, fixtures and other improvements located thereon, and all easements, rights of way, servitudes, tenements, hereditaments, appurtenances, privileges and other rights thereto (including air, oil, gas, mineral, and water rights).

"ATF" means the United States Bureau of Alcohol, Tobacco, Firearms and Explosives.

"ATF Records" means all books and records related to the Business required to be maintained by the Bureau of Alcohol Tobacco and Firearms and transferred to successors under federal law, including 27 CFR 478.127 and 27 CFR 555.128.

"Auction" has the meaning set forth in the Bidding Procedures Order.

"Avoidance Actions" means any and all claims and remedies of Seller under Sections 510 and 542 through 553 of the Bankruptcy Code or under similar state laws including fraudulent conveyance claims, and all other causes of action of a trustee and debtor-in-possession under the Bankruptcy Code.

"Balance Sheet Rules" means the Balance Sheet Rules listed on Exhibit 11.

"Base Amount" means $81,400,000.

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in Anoka, Minnesota or Huntsville, Alabama are authorized by Law or other governmental action to close.

"Business Name" means the trade names, trademarks, corporate names, service marks and domain names set forth on Schedule 13.1(a).

"Buyer Acquisition Vehicle" means a Creditworthy entity that is the indirect or indirect Subsidiary of, and controlled by, Buyer.

"Cash" means all cash and cash equivalents held by Seller, including all petty cash, register cash, undeposited checks, cash in transit and marketable securities (and including (i) any fee

- 52 -

reserves or escrows established by Seller, and (ii) any cash in the Dominion Account (as defined in the Priority Term Loan)); provided, however, that the Good Faith Deposit, the Purchase Price and the Adjustment Escrow Amount shall not be included in the definition of Cash.

"Cash Collateral" means the cash collateral securing the Exit Term Loan, the FILO Facility and the Priority Term Loan Facility.

"Cash Collateral Order" means the final Order of the Bankruptcy Court entered on August 20, 2020, authorizing, among other things, the Debtors' use of Cash Collateral.

"CBA" means that certain Collective Bargaining Agreement between Remington Arms Company, LLC and International Union, United Mine Workers of America (2016-2022), as amended or otherwise modified from time to time.

"City of Huntsville Project Development Liabilities" means all liabilities arising under (a) that certain Project Development Agreement dated as of February 27, 2014, by and among the City of Huntsville, Alabama, Madison County, Alabama, The Industrial Development Board of the City of Huntsville, and Seller, as amended or otherwise modified from time to time, (b) that certain note issued by Seller to the City of Huntsville on February 27, 2014 in the original principal amount of $12,500,000, and (c) that certain Mortgage and Security Agreement dated as of February 27, 2014, by Seller in favor of the City of Huntsville.

"Claims" encompasses the definition in Bankruptcy Code §101(5) and under this Agreement also includes any and all Liabilities, rights, credits, defenses, allowances, rebates, choses in action, rights of recovery, set-off, causes of action, civil or criminal, any contributions received from or owed to charitable or other organizations, assertions of legal or moral responsibility, in each case known or unknown, pending or threatened, at law or in equity, direct or derivative, liquidated or unliquidated, matured or unmatured, disputed or undisputed, choate or inchoate, judgments, demands, rights of first refusal or offer, recoupment, rights of recovery, reimbursement, contribution, indemnity, exoneration, rights under products liability, alter ego, environmental, intellectual property (including any infringement thereof), tort, contract and any other legal or equitable basis of liability, charges of any kind or nature, debts arising in any way in connection with any agreements, acts or failures to act, and all pending, threatened, asserted or unasserted actions against Seller or any of its Affiliates, or any of their respective current or former officers, employees, agents or independent contractors, any of their assets or properties, the Business, or any of their operations or activities arising out of or relating to any matter, Occurrence, and includes any Claims against Buyer under doctrines of successor liability or any other ground or theory (which Claim may also be an Interest or Lien).

"Closing Inventory Amount" means the Inventory Amount, determined in accordance with the Balance Sheet Rules, as of the Calculation Time.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any written or oral contract, agreement, indenture, note, bond, lease, license, premium finance arrangement, purchase order, sales order, warranty, guaranty, undertaking, understanding or other binding commitment, arrangement or other agreement of the Business, including all amendments thereto.

"Creditworthy" means sufficiently capitalized, to the reasonable satisfaction of Seller upon provision to Seller of substantiating documentary evidence, to be able to pay the Purchase Price.

"Critical Licenses" means all of those licenses issued by ATF that are necessary for Buyer to conduct the Business as currently conducted, including, Federal Firearm Licenses, Federal Explosives Licenses and SOT stamps.

"D&O Insurance" means the policy in effect as of the Effective Date that provides for insurance from Liability for current and former directors and officers of Seller, including insurance from liabilities with respect to all claims (including, under "tail" insurance coverage, those claims brought within six (6) years from the Closing Date) arising out of or relating to events which occurred on or prior to the Closing Date (including in connection with the transactions contemplated by this Agreement).

"Data" means customer lists, correspondence, and other data relating to customers of the Business and all other reports, information and documentation collected or maintained by Seller regarding the visitors to websites owned or controlled by Seller.

"Data Protection Laws" means the data protection and privacy laws of each jurisdiction where Seller is established and those of each jurisdiction where any Personal Information is collected, transmitted, secured, stored, shared or otherwise processed by or on behalf of Seller, including, the General Data Protection Regulation (EU 2016/679) (GDPR), the e-Privacy Directive (Directive 2002/58/EC) and the e-Privacy Regulation (Regulation 2017/003) (once it takes effect), the California Consumer Privacy Act, Section 5 of the (U.S.) Federal Trade Commission Act and any and all laws and regulations governing privacy, cybercrime, use of electronic data, or unfair or deceptive trade practices.

"Distributor Agreements" means any Contract or any other arrangement with any sales representative or distributor of any Seller, including any sales representatives and distributors of the Business.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, surveys, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"Employee Benefit Plans" means (a) all "employee benefit plans," as defined in Section 3(3) of ERISA, (b) all employment, consulting or other individual compensation agreements, and (c) all bonus or other incentive, equity or equity-based compensation, deferred compensation, severance pay, sick leave, vacation pay, salary continuation, disability, hospitalization, medical, life insurance, scholarship programs or other plans, contracts, policies, agreements or arrangements that provide for compensation or employee benefits for any current or former employee, officer, director or independent contractor and as to which Seller has any obligation or Liability, contingent or otherwise.

- 54 -

"Employee Liabilities" means all Liabilities of Seller to or with respect to all Employees whenever arising and Liabilities of the type specified in Section 1114 of the Bankruptcy Code owing to retired employees of Seller, which are deemed to arise from any Employee Benefit Plan.

"Employee Records" means all employment and benefit records (in whatever form maintained) in the possession of Seller or its agents and pertaining to any Transferred Employee, or any spouse, dependent or other beneficiary of any such Transferred Employee.

"Employees" means all individuals, as of the Effective Date, employed by Seller or any of its Subsidiaries (including Employees who are absent due to COVID Restrictions or vacation, family leave, short-term disability, COVID 19-related furloughs or absences or other approved leave of absence) in connection with the ownership, operation and/or management of the Business.

"Environmental Laws" means all applicable federal, state and local statutes, ordinances, rules, Orders, regulations and other provisions having the force of law, all judicial and administrative Orders and determinations, and all common law concerning or relating to (a) pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health (as pertains to exposure to Hazardous Substance) or worker safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Substance. The term "Environmental Law" includes, but is not limited to, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, as amended, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq. and the California Safe Drinking Water and Toxic Enforcement Act of 1986 (also known as "Proposition 65").

"Environmental Phase I Reports" means that certain Phase I Environmental Site Assessment of the Remington Arms Company, LLC property located at 2592 Arkansas Highway 15 N in Lonoke, Arkansas, dated August 2020, performed by Ramboll US Corporation.

"Environmental Release" means any presence, release, spill, emission, leaking, pumping, pouring, placing, injection, deposit, disposal, discharge, dispersal, dumping, emptying, migrating, escaping or leaching into, onto, under or through the environment.

"Equity Interests" means: (a) any shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, (b) any ownership interests in a Person other than a corporation, including membership interests, partnership interests, joint venture interests and beneficial interests; and (c) any warrants, options, convertible or exchangeable securities, calls or other rights to purchase or acquire any of the foregoing.

- 55 -

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means all trades or businesses (whether or not incorporated and whether or not subject to U.S. law) that would at the relevant time be treated together with Seller or any contributing employer in any Pension Plan as a "single employer" within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"Escrow Agent" means Delaware Trust Company.

"Estimated Inventory Amount" means Seller's good faith estimate of the Closing Inventory Amount, as set forth on the Pre-Closing Statement.

"Estimated Inventory Amount Excess" means the amount by which the Estimated Inventory Amount *exceeds* the Inventory Amount Target, subject to Section 2.3(a).

"Estimated Inventory Amount Shortfall" means the amount by which the Inventory Amount Target *exceeds* the Estimated Inventory Amount, subject to Section 2.3(a).

"Estimated Purchase Price" means an amount equal to (a) the Base Amount, plus or minus (b) the Estimated Inventory Amount Excess or the Estimated Inventory Amount Shortfall, as applicable.

"Exit Term Loan" means that certain Term Loan Agreement, dated as of May 15, 2018 (as amended by that certain Amendment No. 1, dated as of April 18, 2019, that certain Amendment No. 2, dated as of May 1, 2019, that certain Amendment No. 3, dated as of August 15, 2019, that certain Amendment No. 4, dated as of February 21, 2020, and that certain Amendment No. 5, dated as of March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto from time to time, Ankura Trust Company, LLC, as administrative agent and collateral agent and the lenders party thereto.

"FILO Facility" means that certain First Lien Last-Out Term Loan Agreement, dated as of May 15, 2018 (as amended by that certain Amendment No. 1, dated as of April 18, 2019, that certain Amendment No. 2, dated as of May 1, 2019, that certain Amendment No. 3, dated as of August 15, 2019, that certain Amendment No. 4, dated as of October 11, 2019, that certain Amendment No. 5 dated as of February 21, 2020, and that certain Amendment No. 6, dated as of March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto from time to time, Ankura Trust Company, LLC, as administrative agent and collateral agent and the lenders party thereto.

"Final Inventory Amount" means the Closing Inventory Amount as finally agreed or determined in accordance with Section 2.3(c).

"Firearms Business" has the meaning of "Business" as defined in the Firearms Asset Purchase Agreement.

"GAAP" means United States generally accepted accounting principles, as in effect from time to time.

"Government" means any agency, division, subdivision, audit group, procuring office or governmental or regulatory authority in any event or any adjudicatory body thereof, of the United States, or any state, county or municipality thereof, including the employees or agents thereof.

"Hazardous Substance" means any pollutants, contaminants, explosive materials, radioactive materials, chemicals, petroleum, petroleum products, or hydrocarbons, asbestos or any asbestos-containing material, per- and polyfluoroalkyl substances, polychlorinated biphenyls, toxic mold, mycotoxins or microbial matter (naturally occurring or otherwise), infectious waste or industrial, toxic or hazardous substances or any "contaminant," "pollutant", "hazardous waste," "hazardous material", "hazardous substance", "extremely hazardous substance" or "toxic substance" or words of similar import under any applicable Environmental Law.

"Historic Firearms Books and Records" means all historic books and records relating to the sale of firearms included in the Acquired Assets, including all records required to be kept pursuant to parts 447, 478, and, 479 of title 27, Code of Federal Regulations.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Huntsville Leased Ammo FF&E" means equipment, machinery, furniture, fixtures and improvements, tooling and spare parts primarily used in the ownership, operation or management of the Business located in Huntsville, Alabama, including any of the foregoing used for research and development purposes, that are leased pursuant to any Contract.

"Huntsville Owned Ammo FF&E" means equipment, machinery, furniture, fixtures and improvements, tooling and spare parts primarily used in the ownership, operation or management of the Business located in Huntsville, Alabama, including any of the foregoing used for research and development purposes.

"Intellectual Property" means (a) all intellectual property, whether or not registered, arising from or in respect of the following: (i) all patents and applications therefore (including petty patents, utility models, and certificates of invention), including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon; (ii) all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names, social media accounts, corporate names and general intangibles of a like nature, including the Business Name and all other similar indicia of source or origin (including all Trademarks), together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof; (iii) copyrights and registrations and applications therefore and works of authorship (whether or not copyrightable, including websites and pages, and other content and data), and mask work rights, and all renewals thereof; (iv) confidential information, know-how, industrial designs, trade secrets (including any trade secrets protectable under applicable law, and any other information that derives independent economic value (actual or potential) from not being generally known to and not being readily ascertainable by proper means by a person able to obtain economic value from its use or disclosure) and inventions; and (v) all other intellectual

property (including rights in Software); (b) all royalties, fees, income, payments, and other proceeds now or hereafter due or payable to Seller with respect to the rights listed in subsection (a) or the Remington Brand that is not an Excluded Asset; (c) all claims or causes of action arising out of or related to past, present or future infringement or misappropriation of the Business' rights or interests in the rights listed in subsection (a) that is not an Excluded Asset and any related remedies, including the right to sue for past, present or future infringement, misappropriation, or violation of rights related to the Intellectual Property and collect damages therefor, and (d) any Seller's rights pursuant to any Contract with RLC.

"Intercompany Note" means that certain Amended and Restated Promissory Note issued on April 18, 2019, for the principal amount of $100,000,000, by Remington Arms Company, LLC in favor of FGI Holding Company, LLC.

"Interests" means all rights and entitlements of any nature including security interests, assignments of Liens or Claims, licenses, leases, contract rights, indentures, instruments, licenses, options, escheatment, abandoned property, unclaimed property, covenants, conditions, zoning, planning and any other restrictions, easements, encroachments, permits or other interests in property or limitations on the use of real property or irregularities in title, rights of first refusal, rights to injunctive or other legal relief, any attributes of ownership, rights or restrictions of any kind and nature, whenever incurred, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, matured or unmatured, legal or equitable (which Interests may also be Liens or Claims).

"Inventory Amount" means, at any date, the value of the Inventory calculated in accordance with the Balance Sheet Rules. A sample calculation of the Inventory Amount is attached hereto as Exhibit 11.

"Inventory Amount Target" means $17,100,000.

"IT Systems" means the information and communications technologies used by Seller in connection with the ownership, operation and/or management of the Business, including any enterprise resource planning (ERP) system, hardware, Software and networks.

"Knowledge of Seller" or any other similar term or knowledge qualification means, with respect to the actual knowledge of Ken D'Arcy (President and Chief Executive Officer of ROC), Mark Little (Vice President and Chief Financial Officer of ROC), Chuck Rink (Chief Operating Officer of ROC), and Melissa Cofield (Chief Human Resources Officer of ROC) and the knowledge such persons would have after reasonable due inquiry.

"Law" means any federal, national, territorial, state, municipal or local, foreign, multi-national or domestic statute, act, law (including common law), treaty, ordinance, rule, regulation, order, writ, injunction, directive, judgment, award, code, Order, approval, permit, decree, ruling or other legally-binding requirement, in each case, having the force and effect of law, or any similar form of decision or approval of, or determination by, or binding interpretation or administration of, any of the foregoing issued, enacted, adopted, promulgated, implemented or otherwise put in effect by or under the authority of any Government.

"Leased Real Property" means all leasehold or subleasehold estates and other rights of Seller to possess, use or occupy (or to grant others the right to possess, use or occupy) any land, buildings, structures, improvements, fixtures or other interest in real property, in each of the foregoing cases, to the extent possessed, used or occupied in connection with the Business.

"Leasehold Improvements" means all buildings, structures, improvements and fixtures that are owned by Seller and located on any Leased Real Property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the Lease for such Leased Real Property.

"Leases" means all leases, ground leases, subleases, licenses and other agreements, including all amendments, extensions, renewals, and other agreements with respect thereto, pursuant to which Seller has the right to possess, use, lease or occupy (or to grant others the right to possess, use or occupy) any Leased Real Property.

"Liability" means any and all Claims, debts, indebtedness, Liens, losses, Taxes, damages, adverse claims, liabilities, fines, penalties, duties, responsibilities, obligations and expenses (including reasonable attorneys' fees and reasonable costs of investigation and defense) of any kind, character, or description, whether known or unknown, direct or indirect, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, ascertained or ascertainable, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, vested or unvested, executory, determined, determinable, in contract, tort, strict liability, or otherwise, or otherwise due or to become due.

"Lien" means any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement, other than (a) a lessor's interest in, and any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement on or affecting a lessor's interest in, property underlying any leases; (b) any imperfection of title with respect to any asset that does not materially interfere with the present occupancy, use or marketability of such asset and the continuation of the present occupancy or use of such asset; and (c) such covenants, conditions, restrictions, easements, encroachments or encumbrances that are not created pursuant to mortgages or other financing or security documents, or any other state of facts, that do not materially interfere with the present occupancy or use of an asset.

"Material Adverse Effect" means any Occurrence that results in a material and adverse effect on the value, operation, or condition (financial or otherwise) of the Acquired Assets taken as a whole, but excludes any Occurrence relating to (a) changes resulting from the filing of the Bankruptcy Case, including the impact thereof on the relationships of Seller with its employees, customers, distributors, financing sources, service providers and other business partners, (b) the public disclosure of this Agreement or any of the Ancillary Agreements or any of the transactions contemplated hereby or thereby, (c) changes, after the Effective Date, in GAAP, (d) changes in general United States economic, monetary or financial conditions, including changes in prevailing interest rates, credit availability, and the credit markets generally, as well as changes in the commercial real estate markets in the geographic regions in which Seller operates the Business, (e) changes in the ammunition industry in general, (f) any acts of God, natural disasters, terrorism, armed hostilities, sabotage, war (whether or not declared) or (g) any Occurrence, outbreak, escalation or worsening of, or furloughs or Government actions (including any quarantine, "shelter

- 59 -

in place", "stay at home", workforce reduction, social distancing, shut down, closure, sequester or any other applicable Law, order, directive, guideline or recommendation by any Government of competent jurisdiction (collectively, "COVID Restrictions")) instituted in response to, any epidemic, pandemic or other disease (including the COVID-19 virus); provided, that in the case of the foregoing clauses (d), (e), and (f) such Occurrence shall be taken into account to the extent such Occurrence has a disproportionate impact on results of operations or financial condition of the Business or the Acquired Assets compared to other companies operating in the industries in which the Business operates.

"Material Contract" means a Contract that is material to the results or operations of the Business.

"Occurrence" means any individual or set of events, developments, omissions, situations, occurrences, circumstances, facts or effects.

"OFAC" means the U.S. Department of Treasury Office of Foreign Assets Control.

"Order" means any judgment, order, writ, injunction, decision, ruling, temporary restraining order, executive order, stipulation, determination, decree or award of, or settlement or agreement with, any Government.

"Owned Real Property" means all land and all buildings, structures, fixtures and other improvements located thereon, and all easements, rights of way, servitudes, tenements, hereditaments, appurtenances, privileges and other rights thereto, owned by Seller.

"Pension Plan" means (a) the Remington Arms Company, LLC Pension and Retirement Plan, (f/k/a Remington Arms Company, Inc. Pension and Retirement Plan), as amended from time to time, which includes by merger, effective December 31, 2018, the Marlin Firearms Co. Employees' Pension Plan (a/k/a Marlin Firearms Company Employees Pension Plan), as amended from time to time and (b) any other pension or similar plan subject to Title IV of ERISA or Section 412 of the Code maintained by Seller or any of its Affiliates.

"Permits" means any consents, authorizations, registrations, waivers, licenses, permits, franchises, approvals, certificates, registrations, Orders or rights.

"Permitted Liens" mean: (a) Liens and Interests consisting of (i) current Taxes and assessments not yet due and payable, or Liens for Taxes that are being contested in good faith by appropriate Proceedings as set forth on Schedule 4.22 and for which appropriate reserves under GAAP have been established in the Balance Sheets, (ii) all easements, rights-of-way, servitudes, covenants, conditions, restrictions, obligations and other similar matters of record affecting title to real property, (iii) statutory, common law or contractual liens of landlords, (iv) the applicable zoning and use regulations or other Laws of any Government, in each case, that do not materially affect the current use of the underlying asset and are not violated in any material respect by the current use or occupancy of the Arkansas Property or the operation of the Business as currently conducted thereon, and (v) the lien of any water and sewer and other utilities not yet due and payable; and (b) all terms, conditions and restrictions under any Acquired Permit.

"<u>Person</u>" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or Government.

"<u>Personal Information</u>" means any information relating to an identified or identifiable natural person; an "identifiable person" is one who can be identified, directly or indirectly, in particular by reference to an identification number or to one or more factors specific to his or her physical, physiological, mental, economic, cultural or social identity, including, unique device or browser identifiers, names, addresses, telephone numbers, email addresses, social security numbers, or account information.

"<u>Plan</u>" means a Joint Chapter 11 Plan filed by Seller with the Bankruptcy Court.

"<u>Pre-Closing Taxes</u>" means any Taxes: (a) of, or imposed on, Seller or any of its Affiliates, whether or not such Taxes related to the Business or the Acquired Assets; and (b) paid, payable, or that become payable, by or in connection with Seller or any of its Affiliates, or arising out of or relating to the Business or the Acquired Assets in respect of a taxable period (or portion thereof) ending on or before the Closing Date, including any and all Taxes arising out of, or resulting from, the transactions contemplated by this Agreement (other than any Transfer Taxes, but including any Taxes imposed under Section 4181 of the Code). For purposes of determining Pre-Closing Taxes, in the case of any Straddle Period, (i) any real, personal and intangible property Taxes, ad valorem Taxes and similar Taxes imposed with respect to the Business or the Acquired Assets shall be apportioned to the periods before and after the Closing Date pro rata, based on the number of days of such Straddle Period in the period before and ending on and including the Closing Date and the number of days of such Straddle Period in the period beginning after the Closing Date, and (ii) all other Taxes imposed with respect to the Business or the Acquired Assets (other than Transfer Taxes which shall be borne by the parties as provided in <u>Section 9.1</u>) shall be calculated by assuming that the Straddle Period consisted of two (2) taxable periods, one which ended at the close of the Closing Date and the other which began at the beginning of the day following the Closing Date, and such Taxes shall be allocated between such two (2) taxable periods on a "closing of the books basis" by assuming that the books of Seller were closed at the end of the Closing Date.

"<u>Priority Term Loan</u>" means that certain Loan and Security Agreement, dated as of April 18, 2019 (as amended by that certain Amendment No. 1, dated May 1, 2019, that certain Amendment No. 2, dated June 24, 2019, that certain Amendment No. 3, dated August 15, 2019, that certain Amendment No. 4, dated October 11, 2019, that certain Amendment No. 5, dated February 21, 2020, and that certain Amendment No. 6, dated March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto, Cantor Fitzgerald Securities, as administrative agent and initial collateral agent, and the lenders party thereto.

"<u>Proceeding</u>" means any Claim, action, arbitration, audit, appeal, petition, inquiry, investigation, complaint, hearing, litigation, suit, or other dispute (whether civil, criminal or administrative) commenced, brought, conducted, or heard by or before any Government or arbitrator.

"<u>PTO</u>" means paid vacation, paid sick-leave and other paid time off.

- 61 -

"<u>Related Party Agreement</u>" means any Contract among any entity comprising Seller and any of its Affiliates and applicable to the operation of the Business and/or use of any Acquired Assets.

"<u>Related Person</u>" means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, attorneys, accountants, investment bankers or Representatives of any such Person.

"<u>Representatives</u>" means, with respect to any Person, any director, officer, agent, employee, general partner, member, stockholder, legal counsel, accountant, advisor or representative of such Person.

"<u>Restructuring Law</u>" means all applicable bankruptcy, insolvency, reorganization, moratorium or other similar applicable Laws relating to or affecting creditors' rights generally or general principles of equity (regardless of whether enforcement is sought in a Proceeding in equity or at law).

"<u>Retained Litigation</u>" means all litigation and Claims arising from or related to events prior to the Closing, including, (a) lawsuits, pre-litigation claims, settled litigation claims, investigations and Proceedings, and (b) *Soto v. Bushmaster et al*. alleging violations of the Connecticut Unfair Trade Practices Act (or any other Claim arising out of the same or similar set of facts).

"<u>Sale Order</u>" means an Order of the Bankruptcy Court, which Order shall be substantially in the form of Exhibit 10, and shall, among other things, provide for the following; (a) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement; (ii) the sale of the Acquired Assets to Buyer on the terms set forth herein and free and clear of all Liens, Claims and Interests (other than the Assumed Liabilities and Permitted Liens), and (iii) the performance by Seller of its obligations under this Agreement; (b) subject to <u>Section 1.5(e)</u>, authorize and empower Seller to assume and assign to Buyer the Assumed Contracts; (c) find that Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code and grant Buyer the protections of Section 363(m) of the Bankruptcy Code; (d) find that Buyer is not a successor of any Seller; (e) enjoin all Persons holding Liens, Claims and Interests or other rights against Seller or the Acquired Assets, including rights or claims based on any successor or transferee liability, from asserting them against Buyer; (f) find that this Agreement was negotiated, proposed and entered into without collusion, in good faith and from arm's length bargaining positions; (g) find that Seller and Buyer have not engaged in any conduct that would cause or permit this Agreement to be avoided under Section 363(n) of the Bankruptcy Code; (h) find that this Agreement and the transactions contemplated hereby, are binding upon, and are not subject to rejection or avoidance by, any chapter 7 or chapter 11 trustee of Seller; (i) find that fair and reasonably equivalent value was received in connection with this Agreement; (j) authorize Seller and Buyer to execute and file termination statements, instruments of satisfaction, releases and similar documents with respect to all Liens, Claims and Interests that any Person has with respect to the Acquired Assets; and (k) find that notice was properly given to all holders of any Lien, Claim or Interest against Seller or the Acquired Assets, and to all counterparties to the Assumed Contracts.

"Software" means any and all (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (b) data, databases and compilations, in any form, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, (d) screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (e) all Documents related to any of the foregoing.

"State of Alabama Project Development Liabilities" means all Liabilities under that certain Project Agreement dated as of February 17, 2014, by and between the State of Alabama and ROC, as amended or otherwise modified from time to time.

"Straddle Period" means any taxable period beginning on or before, and ending after, the Closing Date.

"Subsidiary" means, when used with respect to any specified Person, any other Person (a) of which the specified Person or any Subsidiary thereof is a general partner, (b) of which the specified Person or a Subsidiary thereof own at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions for such other Person of which owns the specified person or a Subsidiary thereof, or (c) that is directly or indirectly controlled by the specified Person or any Subsidiary thereof.

"Successful Bidder" means the bidder with the highest or otherwise best bid for all of the Acquired Assets, as determined in accordance with the Bidding Procedures Order.

"Tax Return" means any report, return, declaration, form (including Form TD F 90-22.1 and FinCEN Form 114 and any predecessor or successor forms), claim for refund, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing filed or required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"Taxes" or "Tax" means (a) any and all taxes, charges, withholdings, fees, levies, imposts, duties and governmental fees or other like assessments, any Liability under unclaimed property, escheat, or similar Laws or charges of any kind whatsoever in the nature of taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Government, which taxes shall include all income taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise (whether or not deferred), franchise, gross receipts, occupation, real and personal property, stamp, transfer, worker's compensation, customs duties, registration, documentary, value added, alternative or add-on minimum, estimated, environmental (including taxes under section 59A of the Code) and other obligations of the same or a similar nature, whether arising before, on or after the Closing Date; and (b) Liability in respect of any item described in clause (a) payable by reason of Contract (including any tax sharing, indemnification, allocation or similar agreement), assumption, transferee, successor or similar Liability, bulk sales or similar Liability, operation of

- 63 -

Law (including pursuant to Treasury Regulations Section 1.1502-6 (or any predecessor or successor thereof or any analogous or similar state, local, or foreign Law)) or otherwise.

"<u>Trademarks</u>" means any trademark, trade name, corporate name, business name, domain name, trade style, trade dress, service mark, logo, source identifier, business identifier, or design of like nature, and all goodwill associated therewith, any registration of the foregoing, and any application in connection therewith, including any such registration or application in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, or any other jurisdiction, and all extensions or renewals of any of the foregoing.

"<u>WARN Act</u>" means the Worker Adjustment and Retraining Notification Act of 1988, as amended.

"<u>Wind-Up Date</u>" means the date upon which each Seller's corporate existence ceases to exist.

13.2    <u>All Terms Cross-Referenced</u>. Each of the following terms is defined in the Section set forth opposite such term:

| **Term** | **Section** |
|---|---|
| "Acquired Assets" | Section 1.1 |
| "Acquired Intellectual Property" | Section 1.1(j) |
| "Acquired Material IP" | Section 4.14(a) |
| "Acquired Permits" | Section 1.1(i) |
| "Adjustment Deficit Amount" | Section 2.3(e)(ii) |
| "Adjustment Surplus Amount" | Section 2.3(e)(i) |
| "Agreement" | *Preamble* |
| "Anti-Corruption Laws" | Section 4.19(b) |
| "Assignment and Assumption Agreement" | Section 3.2(c) |
| "Assumed Contracts" | Section 1.1(c) |
| "Assumed FF&E Leases" | Section 1.1(c) |
| "Assumed Liabilities" | Section 1.3 |
| "Assumed Motor Vehicle Leases" | Section 1.1(e) |
| "Backup Bid" | Section 7.1(a) |
| "Balance Sheet Date" | Section 4.10 |
| "Balance Sheets" | Section 4.10 |
| "Bankruptcy Case" | *Recitals* |
| "Bankruptcy Code" | *Recitals* |
| "Bankruptcy Court" | *Recitals* |
| "Bidding Procedures Motion" | *Recitals* |
| "Bidding Procedures Order" | *Recitals* |
| "Bill of Sale" | Section 3.2(b) |
| "Business" | *Recitals* |
| "Business Data" | Section 4.14(e) |
| "Business IP Licenses" | Section 1.1(g) |
| "Buyer" | Preamble |

"Buyer Cure Amount" .........................................................................Section 1.5(a)
"Closing" .......................................................................................... Section 3.1
"Closing Date" ................................................................................... Section 3.1
"Confidential Information" .................................................................. Section 6.3
"Confidentiality Agreement" ............................................................... Section 6.2
"Consent" .......................................................................................... Section 1.6
"Cure Amount" ..................................................................................Section 1.5(a)
"Disputed Contract" ...........................................................................Section 1.5(e)
"DOJ" ...............................................................................................Section 6.14(b)
"Excluded Assets" .............................................................................. Section 1.2
"Excluded Insurance Policy" ............................................................... Section 6.9
"Excluded Liabilities" ........................................................................ Section 1.4
"Excluded Policy Covered Loss" ......................................................... Section 6.9
"Financial Statements" ...................................................................... Section 4.10
"Firearms Asset Purchase Agreement" ................................................. *Recitals*
"Firearms Buyer" ............................................................................... *Recitals*
"FTC" ...............................................................................................Section 6.14(b)
"Good Faith Deposit" .........................................................................Section 2.2(a)
"Good Faith Deposit Additional Amount" ............................................Section 2.2(a)
"Good Faith Deposit Escrow Account" .................................................Section 2.2(a)
"Good Faith Deposit Escrow Agreement" .............................................Secction 2.2(a)
"Good Faith Deposit Initial Amount" .................................................. Secction 2.2(a)
"Intellectual Property Assignment Agreement" ....................................Section 3.2(d)
"Inventory" ........................................................................................Section 1.1(n)
"Inventory Collar Amount" .................................................................Section 2.3(b)
"Latest Balance Sheet" ...................................................................... Section 4.10
"Leased FF&E" ..................................................................................Section 1.1(c)
"Leased Motor Vehicles" ....................................................................Section 1.1(e)
"Licensed Intellectual Property" .........................................................Section 4.14(c)
"Material Customers" .........................................................................Section 4.18(a)
"Material Suppliers" ...........................................................................Section 4.18(b)
"Necessary Consent" ......................................................................... Section 1.6
"Notice of Disagreement" ...................................................................Section 2.3(c)
"Offered Employees" .......................................................................... Section 8.1
"Other Agreement" ............................................................................ Section 1.7
"Outside Date" ...................................................................................Section 11.1(d)
"Owned FF&E" ..................................................................................Section 1.1(b)
"Owned Motor Vehicles" ....................................................................Section 1.1(d)
"Petition Date" ................................................................................... *Recitals*
"Pre-Closing Statement" .....................................................................Section 2.3(b)
"Post-Closing Statement" ...................................................................Section 2.3(b)
"Purchase Price" ................................................................................Section 2.1(a)
"RA Brands" ......................................................................................Section 1.1(k)
"Registered Intellectual Property" .......................................................Section 4.14(a)
"Remington Brand" ............................................................................Section 1.1(j)
"Resolution Period" ...........................................................................Section 2.3(c)

"Review Period" .................................................................................Section 2.3(c)
"RLC"....................................................................................................Section 1.1(k)
"RLC Shares".........................................................................................Section 1.1(k)
"ROC"............................................................................................................ Preamble
"Seller"......................................................................................................... Preamble
"Seller Cure Amount"...........................................................................Section 1.5(a)
"Supplemental Designated Contract Order"......................................Section 1.5(b)
"Supplemental Notice of Assumption and Assignment"..................Section 1.5(d)
"Survey".................................................................................................Section 6.12(b)
"Title Commitment" ............................................................................Section 6.12(a)
"Title Company".................................................................................Section 6.12(a)
"Title Policy" .....................................................................................Section 6.12(a)
"Trade Controls"..................................................................................Section 4.19(a)
"Transfer Taxes" ...................................................................................... Section 9.1
"Transferred Employees"........................................................................ Section 8.1
"Transition Services Agreement" ........................................................Section 3.2(e)

*[Signatures are on the following pages.]*

- 66 -

IN WITNESS WHEREOF, the parties to this Agreement have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**BUYER**

VISTA OUTDOOR INC.

By: _S. S. Priyadarsh_____
    Name:  Sudhanshu Priyadarshi
    Title: Senior Vice President and Chief
    Financial Officer

[Signature Page to Asset Purchase Agreement]

IN WITNESS WHEREOF, the parties to this Agreement have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**ROC**

REMINGTON OUTDOOR COMPANY, INC.

By:_____

Name:

Title:

**SUBSIDIARIES OF ROC**

FGI OPERATING COMPANY, LLC

By:_____

Name:

Title:

FGI HOLDING COMPANY, LLC

By:_____

Name:

Title:

BARNES BULLETS, LLC

By:_____

Name:

Title:

REMINGTON ARMS COMPANY, LLC

By:_____

Name:

Title:

RA BRANDS, L.L.C.

By:_____

Name:

Title:

[Signature Page to Asset Purchase Agreement]

IN WITNESS WHEREOF, the parties to this Agreement have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

FGI FINANCE INC.

By:_____
Name:
Title:

HUNTSVILLE HOLDINGS LLC

By:_____
Name:
Title:

TMRI, INC.

By:_____
Name:
Title:

REMINGTON ARMS DISTRIBUTION COMPANY, LLC

By:_____
Name:
Title:

32E PRODUCTIONS, LLC

By:_____
Name:
Title:

[Signature Page to Asset Purchase Agreement]

EXECUTION VERSION

**DISCLOSURE SCHEDULES**

**to**

**ASSET PURCHASE AGREEMENT**

**by and among**

**VISTA OUTDOOR INC.**

**and**

**REMINGTON OUTDOOR COMPANY, INC.**

**and**

**EACH OF THE SUBSIDIARIES OF REMINGTON OUTDOOR COMPANY, INC.**

**Dated as of September 26, 2020**

OMM_US:79020306.11

DISCLOSURE SCHEDULES

These Disclosure Schedules (these "Schedules" and each a "Schedule") are furnished pursuant to the Asset Purchase Agreement (the "Agreement"), dated as of September 26, 2020, by and among Remington Outdoor Company, Inc., a Delaware corporation and debtor-in-possession ("ROC"), each of the subsidiaries of ROC set forth on the signature pages to the Agreement (collectively with ROC, "Seller"), and Vista Outdoor, Inc., a Delaware corporation ("Buyer"). All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Agreement, unless the context otherwise requires.

These Schedules are hereby incorporated in and made a part of the Agreement as if set forth in full therein and are an integral part of the Agreement. The information contained in these Schedules is disclosed solely for purposes of the Agreement, and no information contained herein shall be deemed to be an admission by any party to the Agreement to any third party of any matter whatsoever (including any violation of law or breach of contract). These Schedules and the information and disclosures contained herein are intended only to qualify and limit the representations, warranties or covenants of the Seller contained in the Agreement and shall not be deemed to expand in any way the scope or effect of any of such representations, warranties or covenants. In disclosing the information in these Schedules, Seller does not waive any attorney-client privilege associated with such information or any protection afforded by the work-product doctrine with respect to any of the matters disclosed or discussed herein. Any matter, information or item disclosed in the Schedules delivered under any specific representation, warranty or covenant or Schedule number hereof, shall be deemed to have been disclosed for purposes of this Agreement in response to the representations and warranties or covenants in this Agreement in respect of which such disclosure is reasonably apparent on its face notwithstanding the omission of an appropriate cross-reference.

Neither the specification of any dollar amount in any representation or warranty nor the disclosure of a document or information in these Schedules is intended, or shall be construed or offered in any dispute between the parties to the Agreement as evidence of, the materiality of such dollar amount, document or information, nor does it establish any standard of materiality upon which to judge the inclusion or omission of any similar documents or information in such Schedule or any other Schedule. The headings and descriptions of the disclosures herein are for convenience of reference only and are not intended and do not alter the meaning of any provision of the Agreement or these Schedules.

2

OMM_US:79020306.11

## **Schedule 1.1(b)**
## **Owned FF&E**

1.  *See* attached Fixed Asset List - Lonoke.

3

## Schedule 1.1(c)
## Assumed FF&E Leases

1.  Lease Agreement, dated as of December 19, 2016, by and between Remington Arms Company, LLC and De Lage Landen Financial Services, Inc.

2.  Master Equipment Rental Agreement, dated as of December 31, 2019, by and between Remington Arms Company, LLC and Wiese USA, Inc.

**Schedule 1.1(d)**
**Owned Motor Vehicles**

1. *See* attached Fixed Asset List - Lonoke.

5

**Schedule 1.1(e)**
**Assumed Motor Vehicle Leases; Leased Motor Vehicles**

None.

## Schedule 1.1(g)
## Business IP Licenses

1. For the avoidance of doubt, each of the following Contracts constitutes a 365 Contract and shall be assumed by Buyer; provided, however, the below list may be updated after the date hereof in accordance with Section 1.5 of the Agreement.

7

| # | Category | Relates Primarily to | Location / Function | Contract Counter Party | Services Provided | Type | Inception Date | Expiration Date | Latest Cure Cost Estimate [1] |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Corporate | Corporate | HR | SAP Success Factors | Premium Content Management (PCM) | Contract | 12/31/16 | 12/30/21 | 50,960 |
| 2 | Corporate | Corporate | IT | CISCO SmartNet (via SHI) | Cisco Equipment Maintenance | Contract | Annual | 12/31/20 | N/A |
| 3 | Corporate | Corporate | IT | DPSI[2] | Scanner Maint. | Contract | 10/02/18 | 12/31/20 | 9,348 |
| 4 | Corporate | Corporate | IT | Paymetric | Credit Card Tokenization | Contract | 12/21/10 | 12/31/20 | 38,262 |
| 5 | Corporate | Corporate | IT | SEI | HP / EMC Maint. | Contract | 04/01/20 | 03/31/23 | 2,006 |
| 6 | Corporate | Corporate | IT | Windstream | Global WAN | Contract | 09/01/17 | 03/26/24 | N/A |
| 7 | Corporate | Corporate | IT | Panaya | Testing Automation | Contract | 05/31/18 | 05/31/21 | 7,372 |
| 8 | Corporate | Corporate | IT | AT&T | IP Flex at Madison | Contract | 08/01/18 | 08/01/21 | 2,174 |
| 9 | Corporate | Corporate | IT | DPSI | Printer Maint. | Contract | 09/07/18 | 09/07/21 | N/A |
| 10 | Corporate | Corporate | IT | Microsoft EA & SCE | Microsoft Licensing; excludes subscription | Contract | 10/31/18 | 10/31/21 | 6,819 |
| 11 | Corporate | Corporate | IT | ERP Maestro | SAP SOD | Contract | 02/06/19 | 02/05/22 | 1,769 |
| 12 | Corporate | Corporate | IT | Sunview Software | Change Gear | Contract | 03/30/16 | 03/31/21 | N/A |
| 13 | Corporate | Corporate | IT | NetBrain | Network Monitoring Tool | Contract | 06/28/19 | 06/30/22 | 9,052 |
| 14 | Corporate | Corporate | IT | SAP C4C | SAP C4C Licensing | Contract | 07/12/13 | Annual | 472,524 |
| 15 | Corporate | Corporate | IT | Segra (formerly Data Chambers / Northstate) | Data Center Hosting | Contract | 02/20/14 | 2/29/2021 | 53,592 |
| 16 | Corporate | Corporate | IT | Darktrace | Network Packet AI | Contract | 05/31/19 | 05/31/22 | N/A |
| 17 | Corporate | Corporate | Licensing | Coastal Pet | Licensing – Outbound | Contract | 01/18/17 | 12/31/21 | 1,341 |
| 18 | Corporate | Corporate | Licensing | Spectrum / Remington Products, Inc. | Intellectual Property Licensing Agreement | Contract | 12/5/1986 | (See Footnote 3) | 235 |

**Notes:**
(1) Amounts represent what has been recorded in the accounts payable ledger as of the petition date, noting that "N/A" means the Cure Cost is $0. These figures do not include (i) future commitments under the contracts, (ii) amounts due under development agreements, (iii) future commitments under any purchase orders and (iv) goods received and not invoiced. The Debtors are continuing to review and reconcile pre-petition liabilities and cure costs; all amounts are subject material change.
(2) DPSI has multiple agreements; current accounts payable balance was not bifurcated by agreement but rather shown only once.
(3) Contract does not have a specific end date. Certain licensing agreements may terminate upon expiration of the patent.

8

Outbound Licenses

1. Trademark License Agreement, dated as of March 19, 2015, by and between RA Brands, L.L.C. and Ashgrove Marketing, Ltd.

2. Trademark License Agreement, dated as of July 1, 2011, by and between RA Brands, LLC and Baschieri & Pellagri, S.p.A., as amended by Amendment #1 to Trademark License Agreement dated as of June 28, 2019.

3. Trademark License Agreement, dated as of May 17, 2012, by and between RA Brands, L.L.C. and Hi-Performance Designs, Inc., amended by Amendment #2 to Trademark License dated April 1, 2019.

4. Trademark License Agreement, dated as of January 1, 2020, by and between RA Brands, L.L.C. and IRIS USA, Inc.

5. License Agreement, dated as of April 1, 2009, by and between RA Brands, LLC and Nippo Kogyo Co., Ltd., as amended by Amendment #1 to License Agreement dated as of March 31, 2012, Amendment #2 to License Agreement dated as of August 8, 2014, Amendment #3 to License Agreement dated as of March 31, 2017.

6. Trademark License Agreement, dated as of May 22, 2012, by and between RA Brands, L.L.C. and Open Roads Brands, LLC, as amended by Renewal and Amendment #2 to Trademark License Agreement dated June 23, 2015.

7. Trademark License Agreement, dated as of May 23, 2003, by and between RA Brands, LLC and Outdoor Cap Company, Inc., as amended by Amendment #1 to Trademark License Agreement dated as of October 26, 2006, Amendment #2 to Trademark License Agreement dated as of October 24, 2007, Amendment #3 to Trademark License Agreement dated as of May 12, 2009, Amendment #4 to Trademark License Agreement dated as of July 1, 2009, Amendment #5 to Trademark License Agreement dated as of January 1, 2013, Amendment #6 to Trademark License Agreement dated as of April 1, 2014, Amendment #7 to Trademark License Agreement dated as of April 25, 2016, and Revival and Amendment #8 to Trademark License Agreement dated as of December 19, 2019.

8. Trademark License Agreement, dated as of September 1, 2015, by and between RA Brands, LLC and Top Promotions Inc.

9. Trademark License Agreement, dated as of January 1, 2017, by and between RA Brands, LLC and P.L. Austin Inc. d/b/a Vintage Editions, as amended by Amendment #1 to Trademark License Agreement dated as of February 12, 2020.

## Schedule 1.1(h)
## Assumed Contracts

1. For the avoidance of doubt, each of the following Contracts constitutes a 365 Contract and shall be assumed by Buyer; provided, however, the below list may be updated after the date hereof in accordance with Section 1.5 of the Agreement.

2. The information in Schedule 1.1(g) is hereby incorporated by reference.

10

| # | Category | Relates Primarily to | Location / Function | Contract Counter Party | Services Provided | Type | Inception Date | Expiration Date | Latest Cure Cost Estimate (1) |
|---|----------|---------------------|---------------------|------------------------|-------------------|------|---------------|-----------------|-------------------------------|
| 1 | Ammunition | Lonoke | Federal | DHS-FLETC | Federal Contract | Contract | 04/27/17 | 05/27/22 | N/A |
| 2 | Ammunition | Lonoke | Federal | DHS-FLETC | Federal Contract | Contract | 10/07/19 | 09/30/24 | N/A |
| 3 | Ammunition | Lonoke | Lonoke | National Machinery, LLC | Tooling and Technology | Contract | 11/20/15 | 05/18/34 | 92,605 |
| 4 | Ammunition | Lonoke | Lonoke | Video Jet | VJ Service | Contract | 12/11/17 | 12/31/20 | 6,575 |
| 5 | Ammunition | Lonoke | Lonoke | Arkansas Copier (De Large) | Copier and IT equipment | Lease | 01/01/17 | 12/31/21 | 4,183 |
| 6 | Ammunition | Lonoke | Lonoke | Wiese Lifts | Forklifts | Lease | 12/31/19 | 12/30/24 | 48,712 |
| 7 | Ammunition | Lonoke | Lonoke | Siemens | Fire Alarm | Contract | 06/06/18 | 06/05/25 | 13,228 |

**Notes:**

(1) Amounts represent what has been recorded in the accounts payable ledger as of the petition date, noting that "N/A" means the Cure Cost is $0. These figures do not include (i) future commitments under the contracts, (ii) amounts due under development agreements, (iii) future commitments under any purchase orders and (iv) goods received and not invoiced. The Debtors are continuing to review and reconcile pre-petition liabilities and cure costs; all amounts are subject material change.

11

**Schedule 1.1(i)**
**Acquired Permits**

1.  The information in Schedule 4.8 is hereby incorporated by reference.

## Schedule 1.1(i)
### Acquired Intellectual Property

(ii)

I. Patents[1]

| Owner | Patent Number | Description | PatSnap Family (International Rights) |
|---|---|---|---|
| RA Brands, LLC | 6,131,515 | ELECTRIC PRIMER | |
| RA Brands, LLC | 6,478,903 | NON-TOXIC PRIMER MIX | AT315016T \| AU2001072180A1 \| AU782638B2 \| BRPI0104341A2 \| CA2357632A1 \| CA2357632C \| CN1179928C \| CN1349959A \| DE60116453D1 \| DE60116453T2 \| EP1195366A2 \| EP1195366A3 \| EP1195366B1 \| HK1045832A \| HK1045832A1 \| IL145482A \| IL145482D0 \| KR1020020027280A \| MXPA01010110A \| US6478903 |
| RA Brands, LLC | 5,646,367 | CONDUCTIVE PRIMER MIX (RA-0272) | |
| RA Brands, LLC | 5,811,723 | SOLID COPPER HOLLOW POINT BULLET | |
| RA Brands, LLC | 5,684,268 | LEAD-FREE PRIMER MIX | |
| RA Brands, LLC | 5,917,143 | FRANGIBLE POWDERED IRON PROJECTILES | |
| RA Brands, LLC | 6,691,623 | FRANGIBLE POWDERED IRON PROJECTILES | |
| RA Brands, LLC | 6,073,560 | SABOT | |
| RA Brands, LLC | 7,201,104 | LEAD ATTACHED SABOT SLUG | BRPI0304109A2 \| CA2437515A1 \| CN1495404A \| EP1391683A2 \| EP1391683A3 \| IL157493D0 \| KR1020040018192A \| MXPA03007580A \| US2004007925 6A1 \| US2007011 9330A1 \| US60404979P0 \| US7201104 \| US8261667 |
| RA Brands, LLC | 8,128,766 | BISMUTH-OXIDE PRIMER MIXTURE | CA2556595A1 \| CA2556595C \| US20050183805A1 \| US20050189053A1 \| US20120125493A1 \| US20140305555A1 \| US8128766 \| US8597445 \| US8784583 \| WO2006009579A2 \| WO2006009579A3 |

[1] The foreign equivalent of the relevant U.S. patents that are listed in the "PatSnap Family" column will be assumed by Buyer to the extent possible. The patents listed in the "PatSnap Family" column have expired and/or lapsed. Seller makes no representations about such patents.

13

| Owner | Patent Number | Description | PatSnap Family (International Rights) |
|---|---|---|---|
| RA Brands, LLC | 6,272,993 | ELECTRIC PRIMER (RA-0290A) | |
| RA Brands, LLC | 6,487,972 | ELECTRIC PRIMER | |
| RA Brands, LLC | 6,892,647 | LEAD FREE POWDERED METAL PROJECTILES | |
| RA Brands, LLC | 8,597,455 | BISMUTH-OXIDE PRIMER COMPOSITION | CA2556595A1 \| CA2556595C \| US20050183805A1 \| US2005018900053A1 \| US2012012549 3A1 \| US20140305555A1 \| US8128766 \| US8597445 \| US8784583 \| WO2006009579A2 \| WO2006009579A3 |
| RA Brands, LLC | 9,052,174 | TIPPED PROJECTILES | AU2008325066A1 \| AU2008325066B2 \| CA2697225A1 \| CZ2195603B6 \| EP2195603A2 \| EP2195603B1 \| ES2452568T3 \| MX2010002313A \| MX311672B \| US20120216700A1 \| US60967207P0 \| US9052174 \| WO2009061545A2 \| WO2009061545A3 |
| RA Brands, LLC | 8,261,667 | LEAD ATTACHED SABOT SLUG | BRPI0304109A2 \| CA2437515A1 \| CN1495404A \| EP1391683A2 \| EP1391683A3 \| IL157493D0 \| KR1020040018192A \| MXPA03007580A \| US20040079256A1 \| US20070119330A1 \| US60404979P0 \| US7201104 \| US8261667 |
| RA Brands, LLC | 8,784,583 | PRIMING MIXTURES FOR SMALL ARMS | CA2556595A1 \| CA2556595C \| US20050183805A1 \| US2005018900053A1 \| US2012012549 3A1 \| US20140305555A1 \| US8128766 \| US8597445 \| US8784583 \| WO2006009579A2 \| WO2006009579A3 |
| RA Brands, LLC | 8,220,393 | WAD WITH IGNITION CHAMBER | AU2009320150A1 \| AU2009320150B2 \| AU2013288690A1 \| AU2014280889A1 \| CA2741769A1 \| CA2878589A1 \| EP2350559A1 \| EP2872852A1 \| MX2011004500A \| MX2015000512A \| MX320691B \| US2010010 1444A1 \| US20140076187A1 \| US20140345488A1 \| US61108678P0 \| US61113286P0 \| US8220393 \| US8800449 \| US9500453 \| WO2010062584A1 \| WO2010062584A4 \| WO2014011628A1 |

14

| Owner | Patent Number | Description | PatSnap Family (International Rights) |
|---|---|---|---|
| RA Brands LLC | 8,011,128 | APPARATUS AND METHOD OF USE FOR UNIFORM MUZZLE LOADING | US20110209378A1 \| US8011128 |
| RA Brands LLC | 8,800,449 | WAD WITH IGNITION CHAMBER | AU2009320150A1 \| AU2009320150B2 \| AU2013288690A1 \| AU2014280889A1 \| CA2741769A1 \| CA2878589A1 \| EP2350559A1 \| EP2872852A1 \| MX2011004500A \| MX2015000512A \| MX320691B \| US20100101444A1 \| US20140076187A1 \| US20140345488A1 \| US61108678P0 \| US61113286P0 \| US8220393 \| US8800449 \| US9500453 \| WO2010062584A1 \| WO2010062584A4 \| WO2010062584A9 \| WO2014011628A1 |
| RA Brands LLC | 9,188,414 | REDUCED FRICTION EXPANDING BULLET WITH IMPROVED CORE RETENTION FEATURE AND METHOD OF MANUFACTURING THE BULLET | AU2014265928A1 \| CA2901145A1 \| EP2956741A1 \| MX2015010565A \| US20140230683A1 \| US9188414 \| WO2014186007A1 |
| RA Brands LLC | 9,500,453 | WAD WITH IGNITION CHAMBER | AU2009320150A1 \| AU2009320150B2 \| AU2013288690A1 \| AU2014280889A1 \| CA2741769A1 \| CA2878589A1 \| EP2350559A1 \| EP2872852A1 \| MX2011004500A \| MX2015000512A \| MX320691B \| US20100101444A1 \| US20140076187A1 \| US20140345488A1 \| US61108678P0 \| US61113286P0 \| US8220393 \| US8800449 \| US9500453 \| WO2010062584A1 \| WO2010062584A4 \| WO2010062584A9 \| WO2014011628A1 |
| RA Brands LLC | 9,506,731 | MULTIPLE PROJECTILE FIXED CARTRIDGE | US20140261042A1 \| US9506731 |

15

| Owner | Patent Number | Description | PatSnap Family (International Rights) |
|---|---|---|---|
| RA Brands LLC | 9,534,876 | PROJECTILE AND MOLD TO CAST PROJECTILE | US20150226531A1 \| US6185593P0 \| US9534876 |
| RA Brands LLC | 9,778,002 | SHOT CUP WAD | AU2014277702A1 \| CA2875089A1 \| EP2887004A1 \| MX2015000226A \| US20150176954A1 \| US6191903IP0 \| US9778002 |
| RA Brands LLC | D733,252 | FIREARM BULLET AND PORTION OF FIREAM CARTRIDGE (BLACK BAND) | AU2012287057A1 \| AU2014209240A1 \| CA2842326A1 \| CA2898919A1 \| EP2737276A1 \| EP2948728A1 \| MX2014000995A \| MX2015009540A \| US20130025490A1 \| US20140311372A1 \| US20140331885A1 \| US20150338198A1 \| US8752484 \| US8950333 \| US9207052 \| US9366512 \| USD733252 \| USD733834 \| USD733835 \| USD733836 \| USD733837 \| USD734419 \| USD735289 \| USD791264 \| USD791265 \| USD791266 \| USD800244 \| USD800245 \| USD800246 \| USD802705 \| WO2013016330A1 \| WO2014116950A1 |
| RA Brands LLC | D733,834 | FIREARM BULLET | AU2012287057A1 \| AU2014209240A1 \| CA2842326A1 \| CA2898919A1 \| EP2737276A1 \| EP2948728A1 \| MX2014000995A \| MX2015009540A \| US20130025490A1 \| US20140311372A1 \| US20140331885A1 \| US20150338198A1 \| US8752484 \| US8950333 \| US9207052 \| US9366512 \| USD733252 \| USD733834 \| USD733835 \| USD733836 \| USD733837 \| USD734419 \| USD735289 \| USD791264 \| USD791265 \| USD791266 \| USD800244 \| USD800245 \| USD800246 \| USD802705 \| WO2013016330A1 \| WO2014116950A1 |
| RA Brands LLC | D733,835 | FIREARM BULLET | AU2012287057A1 \| AU2014209240A1 \| CA2842326A1 \| CA2898919A1 \| EP2737276A1 \| EP2948728A1 \| MX2014000995A \| MX2015009540A \| US20130025490A1 \| US20140311372A1 \| US20140331885A1 \| US20150338198A1 \| US8752484 \| US8950333 \| US9207052 \| US9366512 \| USD733252 \| USD733834 \| USD733835 \| USD733836 \| USD733837 \| USD734419 \| USD735289 \| USD791264 \| USD791265 |

16

| Owner | Patent Number | Description | PatSnap Family (International Rights) |
|---|---|---|---|
| RA Brands LLC | D733,836 | FIREARM BULLET | USD791266 \| USD800244 \| USD800245 \| USD800246 \| USD802705 \| WO2013016330A1 \| WO2014116950A1 |
| RA Brands LLC | D733,837 | FIREARM BULLET | AU2012287057A1 \| AU2014209240A1 \| CA2842326A1 \| CA2898919A1 \| EP2737276A1 \| EP2948728A1 \| MX2014000995A \| MX2015009540A \| US20130025490A1 \| US20140311372A1 \| US20140311885A1 \| US20150338198A1 \| US8752484 \| US8950333 \| US9207052 \| US9366512 \| USD733252 \| USD733834 \| USD733835 \| USD733836 \| USD733837 \| USD734419 \| USD735289 \| USD791264 \| USD791265 \| USD791266 \| USD800244 \| USD800245 \| USD800246 \| USD802705 \| WO2013016330A1 \| WO2014116950A1 |
| RA Brands LLC | D734,419 | FIREARM BULLET | AU2012287057A1 \| AU2014209240A1 \| CA2842326A1 \| CA2898919A1 \| EP2737276A1 \| EP2948728A1 \| MX2014000995A \| MX2015009540A \| US20130025490A1 \| US20140311372A1 \| US20140311885A1 \| US20150338198A1 \| US8752484 \| US8950333 \| US9207052 \| US9366512 \| USD733252 \| USD733834 \| USD733835 \| USD733836 \| USD733837 \| USD734419 \| USD735289 \| USD791264 \| USD791265 \| USD791266 \| USD800244 \| USD800245 \| USD800246 \| USD802705 \| WO2013016330A1 \| WO2014116950A1 |
| RA Brands LLC | D735,289 | FIREARM BULLET | AU2012287057A1 \| AU2014209240A1 \| CA2842326A1 \| CA2898919A1 \| EP2737276A1 \| EP2948728A1 \| |

17

| Owner | Patent Number | Description | PatSnap Family (International Rights) |
|---|---|---|---|
| | | | MX2014000995A \| MX2015009540A \| US2013002540A \| US201403118541372A \| US8752484 \| US2014033118854A \| US2015033198A1 \| US8752484 \| US8950333 \| US9207052 \| US9366512 \| USD733252 \| USD733834 \| USD733835 \| USD733836 \| USD733837 \| USD734419 \| USD735289 \| USD791264 \| USD791265 \| USD791266 \| USD800244 \| USD800245 \| USD800246 \| USD802705 \| WO2013016330A1 \| WO2014116950A1 |
| RA Brands LLC | D791,264 | FIREARM BULLET AND PORTIONS OF FIREARM CARTRIDGE | AU2012287057A1 \| AU2014209240A1 \| CA2842326A1 \| CA2898919A1 \| EP2737276A1 \| EP2948728A1 \| MX2014000995A \| MX2015009540A \| US2013002540A \| US201403118541372A \| US2014033118854A \| US2015033198A1 \| US8752484 \| US8950333 \| US9207052 \| US9366512 \| USD733252 \| USD733834 \| USD733835 \| USD733836 \| USD733837 \| USD734419 \| USD735289 \| USD791264 \| USD791265 \| USD791266 \| USD800244 \| USD800245 \| USD800246 \| USD802705 \| WO2013016330A1 \| WO2014116950A1 |
| RA Brands LLC | D791,265 | FIREARM BULLET AND PORTION OF A FIREARM CARTRIDGE | AU2012287057A1 \| AU2014209240A1 \| CA2842326A1 \| CA2898919A1 \| EP2737276A1 \| EP2948728A1 \| MX2014000995A \| MX2015009540A \| US2013002540A \| US201403118541372A \| US2014033118854A \| US2015033198A1 \| US8752484 \| US8950333 \| US9207052 \| US9366512 \| USD733252 \| USD733834 \| USD733835 \| USD733836 \| USD733837 \| USD734419 \| USD735289 \| USD791264 \| USD791265 \| USD791266 \| USD800244 \| USD800245 \| USD800246 \| USD802705 \| WO2013016330A1 \| WO2014116950A1 |
| RA Brands LLC | D791,266 | FIREARM BULLET AND PORTIONS OF FIREARM CARTRIDGE | AU2012287057A1 \| AU2014209240A1 \| CA2842326A1 \| CA2898919A1 \| EP2737276A1 \| EP2948728A1 \| MX2014000995A \| MX2015009540A \| US2013002540A \| US201403118541372A \| US2014033118854A \| US2015033198A1 \| US8752484 \| US8950333 \| US9207052 \| US9366512 \| USD733252 |

18

| Owner | Patent Number | Description | PatSnap Family (International Rights) |
|---|---|---|---|
| | | | USD733834 | USD733835 | USD733836 | USD733837 | USD734419 | USD735289 | USD791264 | USD791265 | USD791266 | USD800244 | USD800245 | USD800246 | USD802705 | WO2013016330A1 | WO2014116950A1 |
| RA Brands LLC | D800,244 | FIREARM BULLET | AU2012287057A1 | AU2014209240A1 | CA2842326A1 | CA2898919A1 | EP2737276A1 | EP2948728A1 | MX2014000995A | MX2015009540A | US20130025490A1 | US20140311372A1 | US20140331885A1 | US20150338198A1 | US8752484 | US8950333 | US9207052 | US9366512 | USD733252 | USD733834 | USD733835 | USD733836 | USD733837 | USD734419 | USD735289 | USD791264 | USD791265 | USD791266 | USD800244 | USD800245 | USD800246 | USD802705 | WO2013016330A1 | WO2014116950A1 |
| RA Brands LLC | D800,245 | FIREARM BULLET | AU2012287057A1 | AU2014209240A1 | CA2842326A1 | CA2898919A1 | EP2737276A1 | EP2948728A1 | MX2014000995A | MX2015009540A | US20130025490A1 | US20140311372A1 | US20140331885A1 | US20150338198A1 | US8752484 | US8950333 | US9207052 | US9366512 | USD733252 | USD733834 | USD733835 | USD733836 | USD733837 | USD734419 | USD735289 | USD791264 | USD791265 | USD791266 | USD800244 | USD800245 | USD800246 | USD802705 | WO2013016330A1 | WO2014116950A1 |
| RA Brands LLC | D800,246 | FIREARM BULLET | AU2012287057A1 | AU2014209240A1 | CA2842326A1 | CA2898919A1 | EP2737276A1 | EP2948728A1 | MX2014000995A | MX2015009540A | US20130025490A1 | US20140311372A1 | US20140331885A1 | US20150338198A1 | US8752484 | US8950333 | US9207052 | US9366512 | USD733252 | USD733834 | USD733835 | USD733836 | USD733837 | USD734419 | USD735289 | USD791264 | USD791265 | USD791266 | USD800244 | USD800245 | USD800246 | USD802705 | WO2013016330A1 | WO2014116950A1 |

19

| Owner | Patent Number | Description | PatSnap Family (International Rights) |
|---|---|---|---|
| RA Brands LLC | D802,705 | FIREARM BULLET | AU2012287057A1 \| AU2014209240A1 \| CA2842326A1 \| CA2898919A1 \| EP2737276A1 \| EP2948728A1 \| MX2014000995A \| MX2015009540A \| US20130025490A1 \| US20140311372A1 \| US2014031885A1 \| US20150338198A1 \| US8752484 \| US8950333 \| US9207052 \| US9366512 \| USD733252 \| USD733834 \| USD733835 \| USD733836 \| USD733837 \| USD734419 \| USD735289 \| USD791264 \| USD791265 \| USD791266 \| USD800244 \| USD800245 \| USD800246 \| USD802705 \| WO2013016330A1 \| WO2014116950A1 |
| RA Brands, LLC | US8752484 | Three component bullet with core retention feature and method of manufacturing the bullet | AU2012287057A1 \| AU2014209240A1 \| CA2842326A1 \| CA2898919A1 \| EP2737276A1 \| EP2948728A1 \| MX2014000995A \| MX2015009540A \| US20130025490A1 \| US20140311372A1 \| US2014031885A1 \| US20150338198A1 \| US8752484 \| US8950333 \| US9207052 \| US9366512 \| USD733252 \| USD733834 \| USD733835 \| USD733836 \| USD733837 \| USD734419 \| USD735289 \| USD791264 \| USD791265 \| USD791266 \| USD800244 \| USD800245 \| USD800246 \| USD802705 \| WO2013016330A1 \| WO2014116950A1 |
| RA Brands, LLC | US8950333 | Multi-component bullet with core retention feature and method of manufacturing the bullet | AU2012287057A1 \| AU2014209240A1 \| CA2842326A1 \| CA2898919A1 \| EP2737276A1 \| EP2948728A1 \| MX2014000995A \| MX2015009540A \| US20130025490A1 \| US20140311372A1 \| US2014031885A1 \| US20150338198A1 \| US8950333 \| US9207052 \| US9366512 \| USD733252 \| USD733834 \| USD733835 \| USD733836 \| USD733837 \| USD734419 \| USD735289 \| USD791264 \| USD791265 \| USD791266 \| USD800244 \| USD800245 \| USD800246 \| USD802705 \| WO2013016330A1 \| WO2014116950A1 |
| RA Brands, LLC | US9207052 | Three component bullet with core retention feature and method of manufacturing the bullet | AU2012287057A1 \| AU2014209240A1 \| CA2842326A1 \| CA2898919A1 \| EP2737276A1 \| EP2948728A1 \| MX2014000995A \| MX2015009540A \| US20130025490A1 \| US20140311372A1 \| US2014031885A1 \| US20150338198A1 \| US8950333 \| US9207052 \| US9366512 \| USD733252 \| USD733834 \| USD733835 \| USD733836 \| USD733837 |

20

| Owner | Patent Number | Description | PatSnap Family (International Rights) |
|---|---|---|---|
| RA Brands, LLC | US9366512 | | USD734419 \| USD735289 \| USD791264 \| USD791265 \| USD791266 \| USD800244 \| USD800245 \| USD800246 \| USD802705 \| WO2013016330A1 \| WO2014116950A1 |
| RA Brands, LLC | US9366512 | Multi-component bullet with core retention feature and method of manufacturing the bullet | AU2012287057A1 \| AU2014209240A1 \| CA2842326A1 \| CA2898919A1 \| EP2737276A1 \| EP2948728A1 \| MX2014000995A \| MX2015009540A \| US20130025490A1 \| US20140311372A1 \| US20140331885A1 \| US20150338198A1 \| US8752484 \| US8950333 \| US9207052 \| US9366512 \| USD733252 \| USD733834 \| USD733835 \| USD733836 \| USD733837 \| USD734419 \| USD735289 \| USD791264 \| USD791265 \| USD791266 \| USD800244 \| USD800245 \| USD800246 \| USD802705 \| WO2013016330A1 \| WO2014116950A1 |
| RA Brands, LLC | USD750727 | Portion of a target | USD750727 |
| RA Brands, LLC | USD744058 | Target | USD744058 |
| RA Brands, LLC | USD747773 | Portion of a target | USD747773 |
| RA Brands, LLC | US8555785 | Shotshell wad with shot confinement feature | |

## II. Copyrights

| Jurisdiction | Entity | Registration Number | Published | Registered | Description |
|---|---|---|---|---|---|
| United States | RA Brands, L.L.C. | TX-4-623-182 | April 30, 1996 | March 25, 1998 | Remington Country |
| United States | RA Brands, L.L.C. | TX-5-502-022 | April 1, 2001 | April 10, 2001 | www.remington.com |
| United States | RA Brands, L.L.C. | TX-5-549-172 | July 1, 2001 | July 13, 2001 | www.remington.com: July 2000 |
| United States | RA Brands, L.L.C. | TX-5-594-362 | August 1, 2002 | August 15, 2002 | www.remington.com: 08/01/02 |

21

| United States | RA Brands, L.L.C. | TX-5-629-853 | September 18, 2001 | November 2, 2001 | Remington Arms Guide to Shooting and Hunting Safety |
|---|---|---|---|---|---|
| United States | RA Brands, L.L.C. | TX-5-629-854 | October 1, 2001 | October 31, 2001 | www.remington.com |
| United States | RA Brands, L.L.C. | VA-846-724 | June 13, 1994 | April 3, 1997 | Fish logo |
| United States | RA Brands, L.L.C. | VAU-114-907 | N/A | August 11, 1987 | Remington Marsh Grass |
| United States | RA Brands, L.L.C. | H64,178 | March 16, 1976 | April 9, 1976 | "CANADIAN GEESE IN FLIGHT" |
| United States | RA Brands, L.L.C. | K222,150 | August 4, 1971 | September 16, 1971 | "KNOW YOUR DUCKS" POSTER |
| United States | RA Brands, L.L.C. | K226,376 | July 28, 1972 | September 26, 1972 | "KNOW YOUR UPLAND GAME BIRDS" POSTER |
| United States | RA Brands, L.L.C. | K231,173 | August 27, 1973 | October 4, 1973 | "KNOW YOUR BIG GAME OF NORTH AMERICA" POSTER |

22

III. Trademarks[2]

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| European Community | 1816 | 11704608 | RA Brands, L.L.C. | |
| Mexico | 1816 | 1386669 | RA BRANDS, L.L.C. | |
| US | 1816 | 4548428 | RA Brands, L.L.C. | |
| United States of America | 2020 | 4,693,025 | RA Brands, L.L.C. | Gun scopes; spotting scopes |
| European Community | #1 AMERICAN BRAND SINCE 1816 MORE PEOPLE CHOOSE REMINGTON | 9127614 | RA Brands, L.L.C. | |
| US | 20 TACTICAL* | 3257280 | Remington Arms Company, LLC | |
| US | 20 VarTarg (Stylized)* | 3287922 | Remington Arms Company, LLC | |
| United States of America | 2020 & Design | 4,693,072 | RA Brands, L.L.C. | Gun scopes; spotting scopes |
| US | 423 DAKOTA* | 3257279 | Remington Arms Company, LLC | |
| US | ACCELERATOR* | 1095914 | RA Brands, L.L.C. | |
| US | AIRMASTER* | 2978531 | RA Brands, L.L.C. | |

23

[2] The trademarks with an asterisk (*) have expired and/or lapsed. Seller makes no representations about such trademarks.

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| US | BASIC ISSUE OPTICS* | 85/342,768 | Remington Arms Company, LLC | |
| US | BIG SHOT | 4548395 | RA Brands, L.L.C. | |
| Canada | BLACK BELT | TMA940,219 | RA Brands, L.L.C. | Ammunition |
| European Union (Community) | BLACK BELT | 11624244 | RA Brands, L.L.C. | Firearms; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; large calibre ammunition; medium calibre ammunition; small calibre ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shields adapted for firearms; scrapers for cleaning firearms; breeches of firearms; covers for firearms; barrel reflectors for firearms; firearm sights; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms; parts and fittings for firearms |
| Mexico | BLACK BELT | 1374219 | RA Brands, L.L.C. | Ammunition |
| United States of America | BLACK BELT | 4,708,640 | RA Brands, L.L.C. | Ammunition |
| US | BLUE ROCK* | 292568 | RA Brands, L.L.C. | |
| US | BRITEBORE (STYLIZED) | 2041024 | RA Brands, L.L.C. | |
| United States of America | BUCKHAMMER | 2,841,836 | RA Brands, L.L.C. | Ammunition |
| US | BULLET (WORD) | 3055409 | RA Brands, L.L.C. | |
| Canada | BULLET DESIGN | TMA701,604 | RA Brands, L.L.C. | |

24

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| US | BULLET DESIGN | 3198065 | RA Brands, L.L.C. | |
| United States of America | CBEE22 | 1,648,789 | RA Brands, L.L.C. | Ammunition |
| European Union (Community) | CLAW | 12019493 | RA Brands, L.L.C. | |
| Mexico | CLAW | 1440090 | RA BRANDS, L.L.C. | |
| US | CLAW | 4606403 | RA Brands, L.L.C. | |
| US | COMPACT ALLOY* | 2082805 | RA Brands, L.L.C. | |
| Canada | CONQUEST* | TMA545,584 | RA Brands, L.L.C. | |
| Canada | COPPER SOLID* | 1374525 | RA Brands, L.L.C. | |
| European Union (Community) | COPPER SOLID | 6464961 | RA Brands, L.L.C. | Paints, varnishes, lacquers; preservatives against rust and against deterioration of wood; colorants; mordals; raw natural resins; metals in foil and powder form for painters, decorators, printers and artists; coatings; preservatives; protective coating for use in connection with firearms; Lubricants, gun lubricants and lubricants for bullets; gas for firearms; Firearms; ammunition; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; medium calibre ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shields adapted for firearms; scrapers for cleaning firearms; breeches of firearms; covers for firearms; barrel reflectors for firearms; firearm sights; sighting telescopes for firearms; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms |
| United States of America | COPPER SOLID | 3,500,765 | RA Brands, L.L.C. | Ammunition |

25

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| United States of America | COPPER-LOKT | 1,631,525 | RA Brands, L.L.C. | Shot component of lead shot ammunition |
| France | CORE-LOKT | 1471364 | RA Brands, L.L.C. | Firearms, ammunition and projectiles, explosives, substances fireworks |
| United States of America | CORE-LOKT | 530,361 | RA Brands, L.L.C. | Ammunition, particularly fixed ammunition for small arms and components and thereof |
| Canada | CUSTOM CARRY | TMA720,656 | RA Brands, L.L.C. | |
| US | CUSTOM CARRY* | 3287241 | RA Brands, L.L.C. | |
| United States of America | DAKOTA | 2009886 | Remington Arms Company, LLC | |
| Canada | Design Only (Circle)* | TMDA31732 | Remington Arms Company, LLC | |
| Canada | DISINTEGRATOR | TMA548,072 | RA Brands, L.L.C. | Ammunition |
| United States of America | DISINTEGRATOR | 2,288,199 | RA Brands, L.L.C. | Ammunition |
| US | DOUBLE STRIKE* | 3800934 | RA Brands, L.L.C. | |
| Canada | DROP-DEAD BETTER | TMA733807 | RA BRANDS, L.L.C. | |
| European Community | DROP-DEAD BETTER* | 5595285 | RA Brands, L.L.C. | |
| US | DROP-DEAD BETTER* | 3406987 | RA Brands, L.L.C. | |
| Canada | DUPLEX | TMA382,702 | RA Brands, L.L.C. | Ammunition; namely, shotshells |
| US | DUPLEX* | 1487521 | RA Brands, L.L.C. | |
| US | E. REMINGTON & SONS, ILION, N.Y.* | 3610508 | RA Brands, L.L.C. | |

26

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| Canada | ECHO | TMA720,267 | RA Brands, L.L.C. | |
| US | ECHO* | 3337309 | RA Brands, L.L.C. | |
| Canada | ELITE HUNTER | TMA730,154 | RA Brands, L.L.C. | |
| US | ELITE HUNTER* | 3309831 | RA Brands, L.L.C. | |
| European Community | ELITE SKINNER* | 6530869 | RA Brands, L.L.C. | |
| US | ELITE SKINNER* | 3599384 | RA Brands, L.L.C. | |
| Australia | ETRONX | 818762 | RA Brands, L.L.C. | Firearms and ammunition |
| European Community | ETRONX | 1443589 | RA Brands, L.L.C. | |
| Switzerland | ETRONX | P-469.107 | RA Brands, L.L.C. | Firearms and ammunition |
| United States of America | ETRONX | 2,553,080 | RA Brands, L.L.C. | Ammunition |
| Canada | EXCURSION | TMA733,840 | RA Brands, L.L.C. | |
| US | EXCURSION* | 3337310 | RA Brands, L.L.C. | |
| Benelux | EXPRESS | 580117 | RA Brands, L.L.C. | Ammunition |
| Finland | EXPRESS | 200,172 | RA Brands, L.L.C. | Ammunition, shotgun shells and cartridges and firearms |
| France | EXPRESS | 95573376 | RA Brands, L.L.C. | Ammunition, shotgun shells and cartridges and firearms |
| Germany | EXPRESS | 39522063 | RA Brands, L.L.C. | Ammunition, shotgun shell and cartridges and firearms |
| Greece | EXPRESS | 142885 | RA Brands, L.L.C. | Ammunition, namely shotgun shells; firearms, namely shotguns |
| Italy | EXPRESS | 714454 | RA Brands, L.L.C. | Ammunition, shotgun shells and cartridges and firearms |

27

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| Norway | EXPRESS | 172.88 | RA Brands, L.L.C. | Ammunition, shotgun shells and cartridges and firearms |
| Switzerland | EXPRESS | 442537 | RA Brands, L.L.C. | Firearms; ammunition and projectiles; explosives; fireworks |
| United States of America | EXPRESS | 1,629,078 | RA Brands, L.L.C. | Shotgun shells |
| United States of America | EXPRESS | 4507951 | RA Brands, L.L.C. | Firearms, namely shotguns |
| US | EXPRESS | 2031473 | RA Brands, L.L.C. | |
| Canada | F.A.S.T. | TMA759,472 | RA Brands, L.L.C. | |
| US | F.A.S.T.* | 3148490 | RA Brands, L.L.C. | |
| Canada | FAST ACTION SOFT TOUCH | TMA759,917 | RA Brands, L.L.C. | |
| US | FAST ACTION SOFT TOUCH* | 3145310 | RA Brands, L.L.C. | |
| US | FIRE BALL* | 797013 | RA Brands, L.L.C. | |
| European Community | FIRST IN THE FIELD | 11704558 | RA Brands, L.L.C. | |
| Mexico | FIRST IN THE FIELD | 1386668 | RA BRANDS, L.L.C. | |
| US | FIRST IN THE FIELD | 4548427 | RA Brands, L.L.C. | |
| Canada | GOLDEN SABER | TMA764,695 | RA Brands, L.L.C. | Ammunition, namely, bullets |
| European Union (Community) | GOLDEN SABER | 6464952 | RA Brands, L.L.C. | Paints, varnishes, lacquers; preservatives against rust and against deterioration of wood; colorants; mordants; raw natural resins; metals in foil and powder form for painters, decorators, printers and artists; coatings; preservatives; protective coating for use in connection with firearms; Lubricants, gun lubricants and lubricants for bullets; gas for firearms; Firearms; ammunition; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; |

28

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| United States of America | GOLDEN SABER | 3,456,762 | RA Brands, L.L.C. | launchers for ammunition; medium calibre ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shields adapted for firearms; scrapers for vleaning firearms; breeches of firearms; covers for firearms; barrel reflectors for firearms; firearm sights; sighting telescopes for firearms; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms |
| US | GREAT EASTERN | 2498142 | RA Brands, L.L.C. | Ammunition |
| United States of America | GREEN (Box) | 2,132,273 | RA Brands, L.L.C. | Ammunition |
| United States of America | GREEN (Bullet With Green Casing) | 2,673,478 | RA Brands, L.L.C. | Ammunition, namely shotshells |
| Canada | GUN CLUB | TMA495,982 | RA Brands, L.L.C. | Ammunition |
| United States of America | GUN CLUB | 2,220,937 | RA Brands, L.L.C. | Ammunition |
| United States of America | HI-SPEED | 3,614,383 | RA Brands, L.L.C. | Ammunition |
| Canada | HOG HAMMER | TMA927,085 | RA Brands, L.L.C. | Ammunition |
| European Union (Community) | HOG HAMMER | 11503216 | RA Brands, L.L.C. | Firearms; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; large calibre ammunition; medium calibre ammunition; small calibre ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shields adapted for firearms; scrapers for cleaning firearms; breeches of firearms; covers for firearms; barrel reflectors for firearms; firearm sights; foresights for firearms; sight protectors for firearms; sights, other than |

29

| Country | Trademark | Registration Number | Owner | Goods |
|---------|-----------|---------------------|-------|-------|
| | | | | telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms; parts and fittings for firearms |
| Mexico | HOG HAMMER | 1361726 | RA Brands, L.L.C. | Ammunition; firearms |
| United States of America | HOG HAMMER | 4,422,859 | RA Brands, L.L.C. | Ammunition |
| Canada | HYPERSONIC | TMA918,832 | RA Brands, L.L.C. | Ammunition |
| Mexico | HYPERSONIC | 1355526 | RA Brands, L.L.C. | Ammunition |
| United States of America | HYPERSONIC | 4,471,615 | RA Brands, L.L.C. | Ammunition |
| Australia | HYPERSONIC STEEL | 1353562 | RA Brands, L.L.C. | Ammunition |
| Canada | HYPERSONIC STEEL | TMA814,336 | RA Brands, L.L.C. | Ammunition |
| European Union (Community) | HYPERSONIC STEEL | 8982803 | RA Brands, L.L.C. | Paints, varnishes, lacquers; preservatives against rust and against deterioration of wood; colorants; mordants; raw natural resins; metals in foil and powder form for painters, decorators, printers and artists; coatings; presevatives; protective coating in the nature of a polymer sealant used to improve resistance to wear and marring for exterior use on firearms ; Lubricants, gun lubricants and lubricants for bullets; gas for firearms; Firearms; ammunition; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; medium calibre ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shields adapted for fireauns; scrapers for cleaning firearms; breeches of firearms; covers for firearms; barrel reflectors for firearms; firearm sights; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms |

30

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| Japan | HYPERSONIC STEEL | 5346205 | RA Brands, L.L.C. | |
| Mexico | HYPERSONIC STEEL | 1162499 | RA Brands, L.L.C. | |
| New Zealand | HYPERSONIC STEEL | 821770 | RA Brands, L.L.C. | Ammunition |
| United States of America | HYPERSONIC STEEL | 3,929,560 | RA Brands, L.L.C. | Ammunition |
| US | INJECT ALLOY* | 1399828 | RA Brands, L.L.C. | |
| US | INJECT ALLOY* | 2121942 | RA Brands, L.L.C. | |
| France | KLEANBORE | 1471365 | RA Brands, L.L.C. | |
| New Zealand | KLEANBORE | 63761 | RA Brands, L.L.C. | All goods in class including firearms, particularly military and sporting rifles, shotguns, industrial guns, and parts thereof, and ammunition, particularly metallic cartridges, metallic shot shells, paper shot shells, industrial gun shells, empty metallic and paper shells, blank cartridges, caps, primers, wads, shot, bullets, and power cartridges for powder actuated tools and devices |
| Rwanda | KLEANBORE | 1959/006391 | Remington Arms Company, LLC | |
| South Africa | KLEANBORE | 59/1189 | RA Brands, L.L.C. | Firearms, ammunition, tools |
| United Kingdom | KLEANBORE | 915172 | RA Brands, L.L.C. | Cartridges (explosives) for small arms and priming materials for such cartridges |
| United States of America | KLEANBORE | 223,998 | RA Brands, L.L.C. | Ammunition |
| United States of America | MANAGED-RECOIL | 3,365,501 | RA Brands, L.L.C. | Ammunition |
| US | MASTER* | 4032817 | Remington Arms | |

31

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| US | | | Company, LLC | |
| US | MOISTUREGUARD | 4142044 | RA Brands, L.L.C. | Gun-cleaning preparations; Gun cleaning lubricants; Gun cleaning patches |
| United States of America | MZL | 4,729,388 | RA Brands, L.L.C. | Ammunition |
| United States of America | NITRO 27 | 2,041,087 | RA Brands, L.L.C. | Ammunition |
| United States of America | NITRO MAG | 1,086,881 | RA Brands, L.L.C. | |
| US | NITRO MAG* | 3609442 | RA Brands, L.L.C. | Ammunition |
| United States of America | NITRO PHEASANT | 3,397,580 | RA Brands, L.L.C. | Ammunition |
| United States of America | NITRO TURKEY | 3,397,579 | RA Brands, L.L.C. | Ammunition |
| United States of America | NITRO-STEEL | 3,365,502 | RA Brands, L.L.C. | Ammunition |
| Australia | PETERS | 1056190 | RA Brands, L.L.C. | Ammunition |
| Canada | PETERS | TMA711,662 | RA Brands, L.L.C. | Ammunition |
| China (People's Republic) | PETERS | 4575394 | RA Brands, L.L.C. | |
| European Union (Community) | PETERS | 4367868 | RA Brands, L.L.C. | Ammunition |
| Germany | PETERS | 1093458 | RA Brands, L.L.C. | Firearms, ammunition and projectiles as well as their parts, explosives |
| Mexico | PETERS | 952523 | RA Brands, L.L.C. | Ammunition |
| United States of America | PETERS | 324,506 | RA Brands, L.L.C. | Ammunition, particularly metallic cartridges, empty metallic shells, cartridges |
| United States of America | PETERS | 3,020,566 | RA Brands, L.L.C. | Ammunition |
| United States of America | PETERS (Stylized) | 60,728 | RA Brands, L.L.C. | Cartridges |

32

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| Canada | POWER LEVEL | TMA736,422 | RA Brands, L.L.C. | Small arms ammunition |
| US | POWER LEVEL* | 3387463 | RA Brands, L.L.C. | |
| Australia | POWER PISTON | 1798271 | RA Brands, L.L.C. | Ammunition, namely, wad columns for shotshells |
| Australia | POWER PISTON | A203107 | RA Brands, L.L.C. | |
| Benelux | POWER PISTON | 99303 | RA Brands, L.L.C. | |
| Canada | POWER PISTON | TMA154692 | RA Brands, L.L.C. | Shotshells containing wad columns and wad columns sold as components |
| Denmark | POWER PISTON | VR196700566 | RA Brands, L.L.C. | |
| European Union (Community) | POWER PISTON | IR1310272 | RA Brands, L.L.C. | Ammunition, namely, wad columns for shotshells |
| France | POWER PISTON | 1354441 | RA Brands, L.L.C. | |
| Germany | POWER PISTON | 835604 | RA Brands, L.L.C. | |
| Greece | POWER PISTON | 35834 | RA Brands, L.L.C. | |
| Int'l Registration - Madrid Protocol Only | POWER PISTON | IR1310272 | RA Brands, L.L.C. | Ammunition, namely, wad columns for shotshells |
| Norway | POWER PISTON | 70691 | RA Brands, L.L.C. | |
| Switzerland | POWER PISTON | IR1310272 | RA Brands, L.L.C. | Ammunition, namely, wad columns for shotshells |
| United Kingdom | POWER PISTON | 896507 | RA Brands, L.L.C. | Ammunition |
| International | POWER PISTON & DESIGN | 1310272 | RA Brands, L.L.C. | |
| United States of America | POWER PISTON (Stylized) | 799,017 | RA Brands, L.L.C. | Ammunition - namely, wad columns for shotshells |
| Norway | POWER PISTON and Design | 201610873 | RA Brands, L.L.C. | |

33

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| Norway | POWER PISTON* | IR1310272 | RA Brands, L.L.C. | Ammunition, namely, wad columns for shotshells |
| Sweden | POWER PISTON | 120082 | RA Brands, L.L.C. | |
| Switzerland | POWER PISTON | 348.376 | RA Brands, L.L.C. | |
| Finland | POWER-LO KT | 221597 | RA Brands, L.L.C. | |
| France | POWER-LO KT | 1471363 | RA Brands, L.L.C. | |
| Canada | POWER-LO KT* | TMA587,761 | RA Brands, L.L.C. | |
| Canada | POWER-LO KT PREMIER CORELOKT ULTRA BONDED | TMA710,896 | RA Brands, L.L.C. | |
| US | POWER-LOKT (Stylized)* | 818517 | RA Brands, L.L.C. | |
| US | PPC* | 1419124 | Remington Arms Company, LLC | |
| US | PPC* | 3349403 | Remington Arms Company, LLC | |
| United States of America | PREMIER | 1,908,366 | RA Brands, L.L.C. | Ammunition |
| US | PREMIER* | 3556214 | RA Brands, L.L.C. | |
| Canada | PREMIER CORE-LOKT ULTRA BONDED | TMA710,896 | RA Brands, L.L.C. | Small arms ammunition |
| European Union (Community) | PREMIER CORE-LOKT ULTRA BONDED | 4954871 | RA Brands, L.L.C. | Paints, varnishes, lacquers; preservatives against rust and against deterioration of wood; colorants; mordants; raw natural resins; metals in foil and powder form for painters, decorators, printers and artists; coatings; preservatives; protective coating for use in connection with firearms; Lubricants, gun lubricants |

34

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| | | | | and lubricants for bullets; gas for firearms; Firearms; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; medium calibre ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shields adapted for firearms; scrapers for cleaning firearms; breeches of firearms; covers for firearms; barrel reflectors for firearms; firearm sights; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms |
| Canada | R (Stylized) | TMA497,716 | RA Brands, L.L.C. | |
| United States of America | R (Stylized) | 2,061,907 | RA Brands, L.L.C. | Firearms and ammunition, namely, shotguns, rifles, metallic cartridges, shotshells, caps |
| United States of America | R (Stylized) | 4827872 | RA Brands, L.L.C. | |
| US | R (Stylized) | 2211023 | RA Brands, L.L.C. | |
| Mexico | R DEFENSE and Design | 1388649 | RA BRANDS, L.L.C. | |
| European Union (Community) | R DEFENSE Logo | 11790409 | RA Brands, L.L.C. | Firearms; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; medium calibre ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shields adapted for firearms; scrapers for cleaning firearms; breeches of firearms; covers for firearms; barrel reflectors for firearms; firearm sights; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms; parts and fittings for firearms |
| US | R-25 Gii | 5042485 | RA Brands, L.L.C. | |

35

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| United States of America | R2Mi | Appln. No. 88/842,808 (Pending) | RA Brands, L.L.C. | |
| US | R51 | 4614494 | RA Brands, L.L.C. | |
| US | R700 & DESIGN* | 4023818 | RA Brands, L.L.C. | |
| US | REM | 1960454 | RA Brands, L.L.C. | |
| US | REM | 4240074 | RA Brands, L.L.C. | |
| US | REM ALL IN | 4552751 | RA Brands, L.L.C. | |
| Canada | REM DRI | TMA683,782 | RA Brands, L.L.C. | |
| US | REM DRI | 3080581 | RA Brands, L.L.C. | |
| African Intellectual Property Organization (OAPI) | REMINGTON | 15821 | RA Brands, L.L.C. | Firearms – namely, military and sporting rifles; shotguns, pistols, air rifles and parts thereof; and ammunition–namely, metallic cartridges, metallic shot shells, paper shotshells , empty metallic and paper shells, blank cartridges, caps, primers, wads shot and bullets |
| Argentina | REMINGTON | 1967026 | RA Brands, L.L.C. | |
| Australia | REMINGTON | 65782 | RA Brands, L.L.C. | Ammunition |
| Australia | REMINGTON | A18407 | RA Brands, L.L.C. | |
| Austria | REMINGTON | 41764 | RA Brands, L.L.C. | Cutlery, tools, scythes, sickles and cutting, slashing and stabbing weapons, powder actuated tools ; Firearms, particularly military and sporting rifles, shotguns, industrial guns and parts thereof; ammunition; Machines, machine parts, driving belts flexible pipes; coin- freed apparatus, household and kitchen utensils, etc. |
| Belarus | REMINGTON | 6475 | RA Brands, L.L.C. | |

36

| Country | Trademark | Registration Number | Owner | Goods |
|---------|-----------|---------------------|-------|-------|
| Benelux | REMINGTON | 98650 | RA Brands, L.L.C. | Powered chain saws (gasoline, pneumatic or electric), concrete rubbing machines, concrete vibrators, power trailers, concrete screeds, cut-off saws and sail grinders, drills, screwdrivers, put setters, impact wrenches, grinders, sanders and circular saws, terrazzo grinders, flexible shaft grinders, sanders, polishers, brushes, parts, accessories and attachments for the aforesaid tools including chain saw guide bars, chain saw sprockets, saw chains, flexible shafts, spindles and electric motors but not included wheels, blades, discs and similar devices which are abrasive coated; powder actuated stud drivers, hole punchers, livestock stunning tools and 8 gauge industrial kiln guns, their parts, accessories and devices including studs, pins and mechanically held expansion bolts (not included in other classes); Hand manipulated chain saws, concrete vibrators, power trailers, concrete screeds, cut-off saws and sail grinders, drills, screwdrivers, put setters, impact wrenches, grinders, sanders and circular saws, terrazzo grinders, flexible shaft grinders, sanders, polishers, brushes, parts, accessories and attachments for the aforesaid tools including chain saw guide bars, chain saw sprockets, saw chains, flexible shafts, spindles and electric motors but not included wheels, blades, discs and similar devices which are abrasive coated; powder actuated stud drivers, hole punchers, livestock stunning tools and 8 gauge industrial kiln guns, their parts, accessories and devices including studs, pins and mechanically held expansion bolts (not included in other classes) |
| Benelux | REMINGTON | 99281 | RA Brands, L.L.C. | Lubricants, particularly gun oils and bullet lubricants ; Firearms, particularly military and sporting rifles, shotguns, pistols, industrial guns and gun implements and parts and accessories thereof, and ammunition, particularly metallic cartridges, metallic shot shells, paper shot shells, industrial gun shells, empty metallic and paper shells, blank cartridges, caps, primers, wads, shot and bullets, and power cartridges for powder actuated tools and devices |

37

| Country | Trademark | Registration Number | Owner | Goods |
|---------|-----------|--------------------|-------|-------|
| Bolivia | REMINGTON | 65258-A | RA Brands, L.L.C. | Gunpowder and explosives for all use, including industrial use, fireworks, cartridges, projectiles and firearms and war material in general |
| Brazil | REMINGTON | 3360580 | RA Brands, L.L.C. | Firearms and ammunition |
| Brazil | REMINGTON | 816093091 | RA Brands, L.L.C. | Firearms and ammunition |
| Canada | REMINGTON | TM55373 | Remington Arms Company, LLC | |
| Canada | REMINGTON | TMA468,948 | RA Brands, L.L.C. | |
| Canada | REMINGTON | TMDA020942 | RA Brands, L.L.C. | Rifles, shotguns, pistols, cartridges, cartridge shells, shot gun cartridges, paper shot shells, powders, wads, percussion caps, primers, bullets and shot |
| Caribbean Netherlands(Bonaire, St Eustatius, Saba) | REMINGTON | 1085 | RA Brands, L.L.C. | Firearms and ammunition |
| China (People's Republic) | REMINGTON | 630750 | RA Brands, L.L.C. | |
| China (People's Republic) | REMINGTON | 630807 | RA Brands, L.L.C. | |
| China (People's Republic) | REMINGTON | 630825 | RA Brands, L.L.C. | |
| Colombia | REMINGTON | 105.703 | RA Brands, L.L.C. | Firearms and ammunition accessories, ammunition, cartridge cases, blank cartridges, caps, primers and powder actuated tools |
| Colombia | REMINGTON | 2640 | RA Brands, L.L.C. | Firearms, ammunition, projectiles, explosive Substances, fireworks |
| Costa Rica | REMINGTON | 21743 | RA Brands, L.L.C. | |
| Costa Rica | REMINGTON | 168404 | RA Brands, L.L.C. | Firearms and ammunition |
| Curacao | REMINGTON | 15357 | RA Brands, L.L.C. | Firearms and ammunition |

38

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| Curacao (Old Code) | REMINGTON | 3812 | RA Brands, L.L.C. | |
| Czech Republic | REMINGTON | 190834 | RA Brands, L.L.C. | Firearms and ammunition |
| Denmark | REMINGTON | VG 1962 00168 | RA Brands, L.L.C. | Powder driven machine tools ; Firearms and parts thereof; ammunition |
| Denmark | REMINGTON | VG19620 0168 | RA Brands, L.L.C. | |
| Egypt | REMINGTON | 36 | RA Brands, L.L.C. | |
| European Union (Community) | REMINGTON | 64634 | RA Brands, L.L.C. | Firearms and ammunition |
| Finland | REMINGTON | 221596 | RA Brands, L.L.C. | |
| France | REMINGTON | 1223308 | RA Brands, L.L.C. | Firearms, ammunition and projectiles; explosive substances; fireworks |
| France | REMINGTON | 1471368 | RA Brands, L.L.C. | Chemicals used in industry science & photography as well as in agriculture, horticulture & forestry; unprocessed artificial resins; unprocessed plastics; manures; fire extinguishing compositions; tempering & soldering preparations, etc.; Industrial oils & greases; lubricants; dust absorbing, wetting & binding compositions fuels (including motor spirit) & illuminants; candles wicks ; Common metals & their alloys; metal building materials; transportation buildings of metal; materials of metal for railway tracks; non-electric cables & wires of common metal ironmongery small items of metal hardware; pipes & tubes of metal; safes; goods of common metal not included etc. ; Machines & Machine tools; motors (except for land vehicles); machine coupling & belting (except for land vehicles); agricultural implements; incubators for eggs ; Hand tools and implements (hand operated); cutlery; side arms; razors ; Firearms; ammunition & projectiles; explosives; fireworks ; Rubber gutta-percha gum asbestos mica & goods made from these materials & not included in other classes; plastics in extruded form for use in manufacture; packing stoping & insulating materials flexible pipes not of metal ; |

39

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| France | | 1630467 | | Ropes string nets tents awnings tarpaulins sails sacks & bags (not included in other classes); padding & stuffing materials (except of rubber or plastics); raw fibrous textile materials ; Clothing footwear headgear ; Games & playthings; gymnastic & sporting articles not included in other classes; decorations for Christmas trees ; Construction & repair ; Material treatment ; Miscellaneous |
| Germany | REMINGTON | 348084 | RA Brands, L.L.C. | Shot guns, pistols, accessories for hand firearms, metallic cartridges, metallic shotshells, shot shells of paper and cardboard, cartridge covers consisting of metal or paper explosion cartridges, ignition caps, percussion caps, cartridge wads and bullets |
| Germany | REMINGTON | 869020 | RA Brands, L.L.C. | Firearms, particularly, military and sporting rifles, shotguns, industrial guns and parts thereof; ammunition |
| Germany | REMINGTON | 928,260 | RA Brands, L.L.C. | Firearms, military and sporting rifles, shotguns, pistols, industrial guns and parts thereof; explosives, inflammables, fireworks, projectiles and munitions, ammunition, metallic cartridges and shot shells; empty metallic cartridges and paper shells; blank cartridges, cartridge cases, caps, primers, wads, shot bullets and powder cartridges for power activated tools |
| Greece | REMINGTON | 14337 | RA Brands, L.L.C. | Firearms, ammunition |
| Greece | REMINGTON | 49834 | RA Brands, L.L.C. | Firearms and firearm accessories, military and sporting rifles, shotguns, pistols, industrial guns and parts thereof; explosives, inflammables, matches, fireworks projectiles and munitions, ammunition, metallic cartridges and shotshells; empty metallic shells |
| Guatemala | REMINGTON | 12409 | RA Brands, L.L.C. | Ammunition |
| Honduras | REMINGTON | 64504 | RA Brands, L.L.C. | |
| Hong Kong | REMINGTON | 4780 | RA Brands, L.L.C. | |

40

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| Israel | REMINGTON | 17800 | RA Brands, L.L.C. | Firearms and parts thereof; ammunition |
| Italy | REMINGTON | 659603 | RA Brands, L.L.C. | |
| Italy | REMINGTON | 898380 | RA Brands, L.L.C. | |
| Italy | REMINGTON | 1049345 | RA Brands, L.L.C. | Firearms and ammunition |
| Italy | REMINGTON | 1097635 | RA Brands, L.L.C. | Firearms and ammunition |
| Italy | remington | 0001394003 | Remington Arms Company, LLC | |
| Italy | REMINGTON | 0001535182 | RA BRANDS, L.L.C. | |
| Italy | remington | 0001609526 | Remington Arms Company, LLC | |
| Jamaica | REMINGTON | 8554 | RA Brands, L.L.C. | Firearms and ammunition |
| Japan | REMINGTON | 416557 | RA Brands, L.L.C. | Shotguns, pistols, revolvers, rifles, and other guns, accessories of gun; cartridges for all kinds of guns; components thereof (except torpedos) |
| Kazakhstan | REMINGTON | 5377 | RA Brands, L.L.C. | |
| Korea, Republic of | REMINGTON | 40258978 | RA Brands, L.L.C. | |
| Korea, Republic of | REMINGTON | 40-5564 | RA Brands, L.L.C. | Airgun, hunting gun, rifle, machine gun, pistol, cannon, anti-aircraft gun, trvoilless gun, motar, heavy machine-gun, gun barrel, safety lock, gun sight, cannon barrel, cannon stand, gun support, case shot, air gun bullet, hunting gun bullet, bullet, machine-gun bullet, cannon ball, cartridge, smokeless powder, black powder, gun-cotton, dynamite, ammonium nitrate explosive, carlit, initial explosive, liquid explosive, |

41

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| | | | | fuse, percussion cap, powder train, powder case, cartridge box, hand-grenade, landmine, depth charge, mine, torpedo, bomb, rocket bomb, guided missile, flare bomb, incendiary bomb, smoke shell, gas shell and bengal flame; Gun stand |
| Lebanon | REMINGTON | 97799 | RA Brands, L.L.C. | |
| Malaya | REMINGTON | 47.0974359 | RA Brands, L.L.C. | |
| Malaya | REMINGTON | M/31841 | RA Brands, L.L.C. | |
| Malaysia | REMINGTON | 95/03574 | RA Brands, L.L.C. | |
| Malaysia | REMINGTON | M/85845 | RA Brands, L.L.C. | Firearms and firearm accessories, military and sporting rifles, shotguns, pistols, revolvers, and parts thereof industrial guns and parts thereof, explosives, inflammables, projectiles and munitions, ammunition, cartridge cases, blank cartridges, caps, primer cartridges, caps, primers, etc. |
| Mexico | REMINGTON | 20059 | RA Brands, L.L.C. | Firearms, particularly military and sporting rifles, shotguns and pistols and implements and accessories for guns rifles, and shotguns; ammunition, particularly metallic cartridges, metallic shotshells, paper shotshells, empty metallic and paper shells, blank paper shells, blank cartridges, etc. |
| Mexico | REMINGTON | 291554 | RA Brands, L.L.C. | Firearms, ammunition |
| New Zealand | REMINGTON | 131933 | RA Brands, L.L.C. | Firearms and firearms accessories in this class, rifles, shotguns and parts thereof, industrial guns and parts thereof in the this class, explosives, projectiles and munitions, ammunition, cartridge cases, blank cartridges, primers, wads and shot pellets |
| Norway | REMINGTON | 132892 | RA Brands, L.L.C. | Firearms - namely, military and sporting rifles; shotguns, pistols, air rifles and parts thereof; and ammunition-namely, metallic cartridges, metallic shot shells, paper shotshells , empty metallic and paper shells, blank cartridges, caps, primers, wads shot and bullets |
| Paraguay | REMINGTON | 280055 | RA Brands, L.L.C. | Firearms; ammunition & Projectiles; explosives; fireworks |

42

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| Paraguay | REMINGTON | 343409 | RA Brands, L.L.C. | Firearms and ammunition |
| Peru | REMINGTON | 76920-2001 | RA Brands, L.L.C. | Firearms and ammunition |
| Poland | REMINGTON | R-98155 | RA Brands, L.L.C. | Firearms |
| Portugal | REMINGTON | 160158 | RA Brands, L.L.C. | Hunting guns, rifles, metallic shells, card shells for shots and cap guns |
| Puerto Rico | REMINGTON | 11210 | RA Brands, L.L.C. | |
| Russian Federation | REMINGTON | 142128 | RA Brands, L.L.C. | Firearms; ammunition and missiles; explosives; fireworks |
| Rwanda | REMINGTON | 1959/006390 | Remington Arms Company, LLC | |
| Singapore | REMINGTON | T95/01482C | RA Brands, L.L.C. | |
| Slovakia | REMINGTON | 181110 | RA Brands, L.L.C. | Firearms and ammuntion |
| South Africa | REMINGTON | 1995/15980 | Remington Arms Company, LLC | |
| South Africa | REMINGTON | 1995/15981 | Remington Arms Company, LLC | |
| South Africa | REMINGTON | 1999/00503 | RA Brands, L.L.C. | |
| South Africa | REMINGTON | B1982/08467 | Remington Arms Company, LLC | |
| Spain | REMINGTON | 107312 | RA Brands, L.L.C. | Shotguns, pistols and rifles |

43

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| Spain | REMINGTON | 1947427 | RA Brands, L.L.C. | |
| St. Maarten | REMINGTON | 13679 | RA Brands, L.L.C. | Firearms and ammunition |
| Sweden | REMINGTON | 183624 | RA Brands, L.L.C. | Machines and machine tools; motors (except for land vehicles); machine coupling and belting (except for land vehicles); agricultural implements; incubators for eggs; Hand tools and implements (hand operated); cutlery; side arms; razors; Firearms; ammunition and projectiles; explosives; fireworks |
| Switzerland | REMINGTON | 300058 | RA Brands, L.L.C. | Power actuated tools particularly arranged to drive or propel a driving, penetrating, or other element by the explosion of a propellent charge, driving and driven elements for use in and parts of and accessories for such tools, fastening devices, studs, pins and bolts adapted to be driven by such tools, captive piston tools adapted for stunning animals, and captive piston tools for performing various mechanical operations; hand manipulated portable power tools driven by electric pneumatic or gasoline engine power, including specifically chain saws, polishers, buffers, sanders, routers, grinders, screwdrivers, planes, impact wrenches, augers, concrete vibrators, concrete surfacers, generators, pumps, trowels, earth borers, flexible shafts, spindles, and accessories and attachments for such tools ; Power actuated tools particularly arranged to drive or propel a driving, penetrating, or other element by the explosion of a propellent charge, driving and driven elements for use in and parts of and accessories for such tools, fastening devices, studs, pins and bolts adapted to be driven by such tools, captive piston tools adapted for stunning animals, and captive piston tools for performing various mechanical operations; hand manipulated portable power tools driven by electric pneumatic or gasoline engine power, including specifically chain saws, polishers, buffers, sanders, routers, grinders, screwdrivers, planes, impact wrenches, augers, concrete vibrators, concrete surfacers, generators, pumps, trowels, earth borers, flexible shafts, spindles, and accessories and attachments for such tools : Firearms. |

44

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| | | | | particularly military and sporting rifles, shotguns, industrial guns, and parts thereof, and ammunition, particularly metallic cartridges, metallic shot shells, paper shot shells, industrial gun shells, empty metallic and paper shells, blank cartridges, caps, primers, wads, shot, bullets, and power cartridges for power actuated tools and devices |
| Switzerland | REMINGTON | 408457 | RA Brands, L.L.C. | |
| Turkey | REMINGTON | 131225 | RA Brands, L.L.C. | Shotguns, pistols, battle guns, firearms and accessories, metal cartridges, hunting shots with metal cartridges, hunting shots with paper cartridges, empty metal or paper shot cartridges, dummies, percussion caps, fuses, primers and projectiles |
| Ukraine | REMINGTON | 12980 | Remington Arms Company, LLC | Firearms |
| United Kingdom | REMINGTON | 2023571 | RA Brands, L.L.C. | |
| United States of America | REMINGTON | 745,041 | RA Brands, L.L.C. | Firearms and ammunition - namely, shotguns and parts thereof, rifles and parts thereof, metallic cartridges, shotshells, empty metallic shells, empty shotshells, blank cartridges, caps, primers, wads and bullets |
| United States of America | REMINGTON | 2872763 | RA Brands, L.L.C. | Industrial guns for use in kilns, mining and inseismic exploration |
| Uruguay | REMINGTON | 435.651 | RA Brands, L.L.C. | Firearms and ammunition |
| Uruguay | REMINGTON | 339739 | RA Brands, L.L.C. | |
| US | REMINGTON | 330832 | RA Brands, L.L.C. | |
| US | REMINGTON | 1092498 | RA Brands, L.L.C. | |
| US | REMINGTON | 1843652 | RA Brands, L.L.C. | |
| US | REMINGTON | 1908358 | RA Brands, L.L.C. | |

45

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| US | REMINGTON | 2019103 | RA Brands, L.L.C. | |
| US | REMINGTON | 2091798 | RA Brands, L.L.C. | |
| US | REMINGTON | 2109608 | RA Brands, L.L.C. | |
| US | REMINGTON | 2282454 | RA Brands, L.L.C. | |
| US | REMINGTON | 2377947 | RA Brands, L.L.C. | |
| US | REMINGTON | 4614361 | RA Brands, L.L.C. | |
| Venezuela | REMINGTON | 12841 | RA Brands, L.L.C. | |
| Venezuela | REMINGTON | 20914 | RA Brands, L.L.C. | |
| Venezuela | REMINGTON | F012841 | RA Brands, L.L.C. | Firearms, particularly military and hunting rifles, hunting shotguns, revolver and pistols, utensils, implements and accessories, implements for shot guns, ammunition, particularly metallic cartridges, metallic shotshells, paper shotshells, empty metallic and paper shells, blank cartridges, caps |
| Venezuela | REMINGTON | F020914 | RA Brands, L.L.C. | Firearms, ammunition |
| Zimbabwe | REMINGTON | 1519-95 | Remington Arms Company Inc. | |
| Zimbabwe | REMINGTON | 1997/001520 | Remington Arms Company Inc. | |
| Brazil | REMINGTON & BALL DEVICE | 3240363 | RA Brands, L.L.C. | |
| Chile | REMINGTON & Ball Device | 606.867 | RA Brands, L.L.C. | |
| Chile | REMINGTON & Ball Device | 940246 | RA Brands, L.L.C. | Arms of all kinds and explosive substances; destructive apparatus and substances of war; ammunition and shells; |

46

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| Pakistan | REMINGTON (Ball Design) | 31733 | | armors; plates, shields and personal shelters against cutting weapons; projectiles and all other destruction means; pyrotechnic products, accessories and apparatus for target shooting; firearms and its parts and pieces |
| Austria | REMINGTON (Script) | 74207 | RA Brands, L.L.C. | Design - firearms, ammunition |
| Argentina | REMINGTON (Stylized and Underlined) | 1985551 | RA Brands, L.L.C. | Firearms, ammunition and projectiles; explosive substances; fireworks |
| Argentina | REMINGTON (Stylized and Underlined) | 2,693,910 | RA Brands, L.L.C. | Firearms; ammunition and projectiles; explosive substances; fireworks |
| Australia | REMINGTON (Stylized and Underlined) | 18407 | RA Brands, L.L.C. | Rifles and guns |
| Austria | REMINGTON (Stylized and Underlined) | 58032 | RA Brands, L.L.C. | |
| Benelux | REMINGTON (Stylized and Underlined) | 98651 | RA Brands, L.L.C. | Lubricants, in particular gun oils and bullet lubricants; Powered chain saws (gasoline, pneumatic or electric), concrete rubbing machines, concrete vibrators, power trailers, concrete screeds, cut off saws and sail grinders, drills, screwdrivers, put setters, impact wrenches, grinders, sanders and circular saws, terrazzo grinders, flexible shaft grinders, sanders, polishers, brushes, parts, accessories and attachments for the aforesaid tools including chain saw guide bars, chain saw sprockets, saw chains, flexible shafts, spindles and electric motors but not included wheels, blades, discs and similar devices which are abrasive coated; powder actuated stud drivers, hole punchers, livestock stunning tools and 8 gauge industrial kiln guns, their parts, accessories and devices including studs, pins and mechanically held expansion bolts (not included in other classes); Hand manipulated chain saws, concrete vibrators, power trailers, concrete screeds, cut off saws and sail grinders, drills, screwdrivers, put setters, impact wrenches, grinders, sanders and circular saws, terrazzo grinders, flexibles shaft grinders, sanders, polishers, brushes, parts, accessories and attachments for the aforesaid tools including chain saw guide |

47

| Country | Trademark | Registration Number | Owner | Goods |
|---------|-----------|---------------------|-------|-------|
| | | | | bars, chain saw sprockets, saw chains, flexible shafts, spindles and electric motors but not included wheels, blades, discs and similar devices which are abrasive coated, powder actuated stud drivers, hole punchers, livestock stunning tools and 8 gauge industrial kiln guns, their parts, accessories and devices including studs, pins and mechanically held expansion bolts (not included in other classes; Firearms, in particular military and sporting rifles, shotguns, pistols, industrial guns and gun implements, parts and accessories therefor; ammunition, particularly metallic cartridges, metallic shot shells, paper shot shells, industrial gun shells, empty metallic and paper shells, blank cartridges; caps, primers, wads, shot, bullets and power cartridges for powder actuated devices |
| Chile | REMINGTON (Stylized and Underlined) | 882.915 | RA Brands, L.L.C. | Firearms of all kind, parts thereof and accessories thereto, ammunitions and cartridges; wads and apparatus for charging, cleaning and keeping up arms |
| United Kingdom | REMINGTON (Stylized and Underlined) | 747428 | RA Brands, L.L.C. | Firearms and parts thereof and ammunition |
| United States of America | REMINGTON (Stylized and Underlined) | 187.871 | RA Brands, L.L.C. | Firearms, particularly military and sporting rifles, shotguns, pistols, and parts thereof, metallic cartridges, empty metallic shells, blank cartridges, caps, primer wads, shot, and bullets |
| US | REMINGTON (Stylized and Underlined) | 2029536 | RA Brands, L.L.C. | |
| Argentina | REMINGTON (Stylized) | 2131555 | RA Brands, L.L.C. | |
| Benelux | REMINGTON (Stylized) | 315804 | RA Brands, L.L.C. | Firearms and firearm accessories; military and sporting rifles, shotguns, pistols, industrial guns and parts thereof, explosives, inflammables, fireworks, projectiles and munitions, ammunition, metallic cartridges and shot shells; empty metallic and paper shells; blank cartridges, cartridge cases, caps, primers, wads, shot bullets, and powder cartridges for power activated tools ; Matches |
| Canada | REMINGTON (Stylized) | TMA489,314 | RA Brands, L.L.C. | |
| Canada | REMINGTON (Stylized) | TMA669,968 | RA Brands, L.L.C. | |

48

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| Canada | REMINGTON (Stylized) | TMA681,490 | RA Brands, L.L.C. | |
| Canada | REMINGTON (Stylized) | TMA752,771 | RA Brands, L.L.C. | |
| Chile | REMINGTON (Stylized) | 672.128 | RA Brands, L.L.C. | |
| Chile | REMINGTON (Stylized) | 1041951 | RA Brands, L.L.C. | Firearms and projectiles, ammunition, explosives, fireworks |
| China (People's Republic) | REMINGTON (Stylized) | 9242352 | RA Brands, L.L.C. | |
| China (People's Republic) | REMINGTON (Stylized) | 9242353 | RA Brands, L.L.C. | |
| Denmark | REMINGTON (Stylized) | VR 1974 01985 | RA Brands, L.L.C. | Firearms, particularly military and sporting rifles, shotguns, industrial guns and parts thereof, ammunitions, particularly ordinary gun cartridges, shotgun cartridges, industrial cartridges, cartridge cases of metal and paper, loose cartridges for power activated tools |
| Denmark | REMINGTON (Stylized) | VR 1975 04394 | RA Brands, L.L.C. | Firearms and ammunition, namely, shotguns and parts thereof, rifles and parts thereof |
| Denmark | REMINGTON (Stylized) | VR197401985 | RA Brands, L.L.C. | |
| Denmark | REMINGTON (Stylized) | VR197504394 | RA Brands, L.L.C. | |
| Mexico | REMINGTON (Stylized) | 910051 | RA Brands, L.L.C. | |
| Mexico | REMINGTON (Stylized) | 943760 | RA Brands, L.L.C. | |
| Mexico | REMINGTON (Stylized) | 995340 | RA Brands, L.L.C. | |
| Nicaragua | REMINGTON (Stylized) | 1488 | RA Brands, L.L.C. | |
| Pakistan | REMINGTON (Stylized) | 74150 | RA Brands, L.L.C. | Firearms including rifles, shotguns, pistols, industrial guns and parts thereof, ammunition including loaded cartridges, empty cartridge cases, caps, primers, wads, projectiles shot pellets, and other components, and blank cartridges |

49

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| Panama | REMINGTON (Stylized) | 8882 | RA Brands, L.L.C. | Firearms and ammunition |
| South Africa | REMINGTON (Stylized) | 296/21 | RA Brands, L.L.C. | Firearms and ammunition |
| Switzerland | REMINGTON (Stylized) | P-408,457 | RA Brands, L.L.C. | Firearms; ammunition and projectiles; explosive substances; fireworks |
| Taiwan | REMINGTON (Stylized) | 734414 | RA Brands, L.L.C. | Firearms and ammunition |
| United Kingdom | REMINGTON (Stylized) | 1005010 | RA Brands, L.L.C. | Firearms and parts thereof included in Class 13, and ammunition |
| United States of America | REMINGTON (Stylized) | 1027328 | RA Brands, L.L.C. | |
| United States of America | REMINGTON (Stylized) | 2872762 | RA Brands, L.L.C. | Firearms and ammunition - namely, shotguns and parts thereof rifles and parts thereof, metallic cartridges, shotshells, empty metallic shells, empty shotshells, blank cartridges, caps, primers, wads, and bullets |
| US | REMINGTON (Stylized) | 2012463 | RA Brands, L.L.C. | |
| US | REMINGTON (STYLIZED) | 2035984 | RA Brands, L.L.C. | |
| US | REMINGTON (Stylized) | 2792880 | RA Brands, L.L.C. | |
| US | REMINGTON (Stylized) | 2821830 | RA Brands, L.L.C. | |
| US | REMINGTON (Stylized) | 2824186 | RA Brands, L.L.C. | |
| US | REMINGTON (Stylized) | 2824187 | RA Brands, L.L.C. | |
| US | REMINGTON (Stylized) | 2824188 | RA Brands, L.L.C. | |
| US | REMINGTON (Stylized) | 2824189 | RA Brands, L.L.C. | |
| US | REMINGTON (Stylized) | 2824190 | RA Brands, L.L.C. | |
| US | REMINGTON (Stylized) | 2824191 | RA Brands, L.L.C. | |

50

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| US | REMINGTON (Stylized) | 2995937 | RA Brands, L.L.C | |
| US | REMINGTON (Stylized) | 3001550 | RA Brands, L.L.C. | |
| US | REMINGTON (STYLIZED) | 3339403 | RA Brands, L.L.C. | |
| US | REMINGTON (Stylized) | 3999993 | RA Brands, L.L.C. | |
| US | REMINGTON (Stylized) | 4086621 | RA Brands, L.L.C. | |
| Canada | REMINGTON (Stylized) Design | TMA681490 | RA BRANDS, L.L.C. | |
| Panama | REMINGTON and Design | M8936-01 | RA Brands, L.L.C. | |
| Paraguay | REMINGTON and Design | 113989 | Remington Arms Company, LLC | |
| Paraguay | REMINGTON and Design | 140699 | REMINGTON ARMS COMP. INC. | |
| Paraguay | REMINGTON and Design | 183291 | RA BRANDS, L.L.C. | |
| Paraguay | REMINGTON and Design | 418804 | RA BRANDS, LLC | |
| Venezuela | REMINGTON and Design | F042140 | Remington Arms Company, LLC | |
| US | REMINGTON GAS PISTON | 85/128,002 | RA Brands, L.L.C. | |
| Canada | REMINGTON HTP HIGH TERMINAL PERFORMANCE | TMA936,742 | RA Brands, L.L.C. | Ammunition |

51

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| European Union (Community) | REMINGTON HTP HIGH TERMINAL PERFORMANCE | 11681012 | RA Brands, L.L.C. | Firearms; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; large calibre ammunition; medium calibre ammunition; small calibre ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shields adapted for firearms; scrapers for cleaning firearms; breeches of firearms; covers for firearms; barrel reflectors for firearms; firearm sights; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms; parts and fittings for firearms |
| Mexico | REMINGTON HTP HIGH TERMINAL PERFORMANCE | 1376580 | RA Brands, L.L.C. | Ammunition |
| Canada | REMINGTON HTP HIGH TERMINAL PERFORMANCE | TMA936742 | RA BRANDS, L.L.C. | |
| United States of America | REMINGTON HTP HIGH TERMINAL PERFORMANCE | 4,735,668 | RA Brands, L.L.C. | Ammunition |
| European Union (Community) | REMINGTON HYPERSONIC | 11696201 | RA Brands, L.L.C. | Firearms; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; medium calibre ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shields adapted for firearms; scrapers for cleaning firearms; breeches of firearms; covers for firearms; barrel reflectors for firearms; firearm sights; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms; component of firearms, namely, a gas operating system; parts and fittings for firearms |
| Singapore | REMINGTON in Circle | T59/25174 | RA Brands, L.L.C. | |

52

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| Singapore | REMINGTON in Circle | T67/41062J | RA Brands, L.L.C. | |
| Singapore | REMINGTON in Circle | T67/41063I | RA Brands, L.L.C. | |
| Singapore | REMINGTON in Circle & Underlined | T59251 74H | RA Brands, L.L.C. | Firearm and parts thereof included in Class 13; and ammunition |
| US | REMINGTON RACING | 2591799 | RA Brands, L.L.C. | |
| US | REMINGTON SPORTSMAN'S SERIES INSIGNIA EDITION | 3811305 | RA Brands, L.L.C. | |
| United Kingdom | REMINGTON (Stylized) & Red Device | 753173 | RA Brands, L.L.C. | |
| Finland | REMINGTON ULTRA | 223667 | RA Brands, L.L.C. | |
| European Union (Community) | REMINGTON UMC | 8282329 | RA Brands, L.L.C. | Paints, varnishes, lacquers; preservatives against rust and against deterioration of wood; colorants; mordants; raw natural resins; metals in foil and powder form for painters, decorators, printers and artists; coatings; preservatives; protective coating in the nature of a polymer sealant used to improve resistance to wear and marring for exterior use on firearms; Lubricants, gun lubricants and lubricants for bullets; gas for firearms; Firearms; ammunition; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; medium calibre ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shields adapted for firearms; scrapers for cleaning firearms; breeches of firearms; covers for firearms; barrel reflectors for firearms; firearm sights; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms |
| European Union (Community) | REMINGTON UMC and Design | 8282361 | RA Brands, L.L.C. | Paints, varnishes, lacquers; preservatives against rust and against deterioration of wood; colorants; mordants; raw natural |

53

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| Benelux | REMINGTON UMC and Red Ball Design | 99287 | RA Brands, L.L.C. | resins; metals in foil and powder form for painters, decorators, printers and artists; coatings; preservatives; protective coating in the nature of a polymer sealant used to improve resistance to wear and marring for exterior use on firearms; Lubricants, gun lubricants and lubricants for bullets; gas for firearms; Firearms; ammunition; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; medium calibre ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shields adapted for firearms; scrapers for cleaning firearms; breeches of firearms; covers for firearms; barrel reflectors for firearms; firearm sights; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms |
| Canada | REMINGTON UMC and Red Ball Design | TMDA16221 | RA Brands, L.L.C. | Firearms and ammunition, war and sporting rifles, shotguns, pistols, metallic shot shells, paper shot shells, empty metallic and paper shells, blank cartridges; caps, wads and bullets |
| Canada | REM-LITE* | TMA524,720 | RA Brands, L.L.C. | Firearms and ammunition |
| US | REM-LITE | 2312404 | RA Brands, L.L.C. | |
| Canada | REM-TECH* | TMA524,724 | RA Brands, L.L.C. | |
| Canada | REMTECH 2.0 | TMA717,940 | RA Brands, L.L.C. | |
| US | REMTECH 2.0* | 3308252 | RA Brands, L.L.C. | |
| United States of America | RP | 5,214,339 | RA Brands, L.L.C. | Firearms |
| United States of America | R-P (Stylized and Design) | 1,032,208 | RA Brands, L.L.C. | Ammunition - namely, metallic cartridges, empty metallic cartridges and blank cartridges |

54

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| Canada | SHUR SHOT | TMA386,597 | RA Brands, L.L.C. | Ammunition particularly fixed ammunition for small arms and components thereof |
| France | SHUR SHOT | 1471367 | RA Brands, L.L.C. | Firearms; ammunition and projectiles; explosive substances; fireworks |
| Mexico | SHUR SHOT | 64421 | RA Brands, L.L.C. | |
| United States of America | SHUR SHOT | 514,027 | RA Brands, L.L.C. | Ammunitions-particularly fixed ammunition for small arms and components thereof |
| United States of America | SLUGGER | 1,290,918 | RA Brands, L.L.C. | Ammunition |
| United States of America | SPORTSMAN | 3,365,500 | RA Brands, L.L.C. | Ammunition |
| Austria | STREN | 57.6 | RA Brands, L.L.C. | |
| South Africa | STREN | 1995/16650 | Remington Arms Company, LLC | |
| Canada | STS | TMA681,491 | RA Brands, L.L.C. | Ammunition |
| Mexico | STS | 894549 | RA Brands, L.L.C. | |
| United States of America | STS | 2047639 | RA Brands, L.L.C. | |
| US | STS* | 2992569 | RA Brands, L.L.C. | |
| US | STS* | 3628840 | RA Brands, L.L.C. | |
| Canada | SWIFT-LOKT | TMA698,747 | RA Brands, L.L.C. | |
| US | SWIFT-LOKT* | 3160225 | RA Brands, L.L.C. | |
| United States of America | TAC 8 | 2,843,948 | RA Brands, L.L.C. | Shotgun ammunition, buckshot ammunition, loaded ammunition |
| US | TACTICAL 20* | 3257281 | Remington Arms | |

55

| Country | Trademark | Registration Number | Owner | Goods |
|---------|-----------|---------------------|-------|-------|
| | | | Company, LLC | |
| Canada | TANGO | TMA750,646 | RA Brands, L.L.C. | |
| US | TANGO* | 3309829 | RA Brands, L.L.C. | |
| US | THE REMINGTON SPORTMEN'S LIBRARY* | 1776874 | RA Brands, L.L.C. | |
| Canada | THE VETERAN | TMA753,455 | RA Brands, L.L.C. | |
| US | THE VETERAN* | 3506106 | RA Brands, L.L.C. | |
| United States of America | THUNDERBOLT | 1,133,079 | RA Brands, L.L.C. | Ammunition |
| United States of America | TYRANT | 4783164 | RA Brands, L.L.C. | |
| United States of America | U.M.C. | 49,616 | RA Brands, L.L.C. | Gun and pistol cartridges |
| Canada | ULTRA BONDED | TMA710,596 | RA Brands, L.L.C. | Small arms ammunition |
| European Community | ULTRA BONDED* | 4907507 | RA Brands, L.L.C. | |
| United States of America | ULTRA BONDED | 3,188,363 | RA Brands, L.L.C. | Ammunition |
| European Union (Community) | ULTRA MAG | 7415466 | RA Brands, L.L.C. | Paints, varnishes, lacquers; preservatives against rust and against deterioration of wood; colorants; mordants; raw natural resins; metals in foil and powder form for painters, decorators, printers and artists; coatings; preservatives; protective coating for use in connection with firearms; Firearms; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; medium calibre ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shields adapted for firearms; scrapers for cleaning firearms; breeches of firearms; covers for firearms; |

56

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
|  |  |  |  | barrel reflectors for firearms; firearm sights; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms |
| United States of America | ULTRA MAG | 3,927,230 | RA Brands, L.L.C. | Ammunition |
| United States of America | UMC | 1,907,281 | RA Brands, L.L.C. | Ammunition |
| United States of America | UML | 5,256,597 | RA Brands, L.L.C. | Ammunition; muzzleloader ammunition |
| United States of America | VIPER | 1,786,679 | RA Brands, L.L.C. | Ammunition, namely, metallic cartridges |
| Canada | VORTEX | TMA555,666 | RA Brands, L.L.C. |  |
| Canada | WHITETAIL PRO | TMA747,700 | RA Brands, L.L.C. | Small arms ammunition |
| United States of America | WHITETAIL PRO | 3,390,008 | RA Brands, L.L.C. | Ammunition |
| US | WHITETAIL PRO* | 3366946 | RA Brands, L.L.C. |  |
| US | WINGMASTER HD | 3366872 | RA Brands, L.L.C. | LIND |
| Canada | WONDERLUBE* | TMA487,129 | RA Brands, L.L.C. | Firearms |
| Canada | XELERATOR | TMA830846 | RA BRANDS, L.L.C. |  |
| European Union (Community) | XELERATOR | 9222589 | RA Brands, L.L.C. | Paints, varnishes, lacquers; preservatives against rust and against deterioration of wood; colorants; mordants; raw natural resins; metals in foil and powder for painters, decorators, printers and artists; coatings; preservatives; protective coating in the nature of a polymer sealant used to improve resistance to wear and marring for exterior use on firearms ; Lubricants, gun lubricants and lubricants for bullets; gas for firearms; Ammunition; firearms; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; medium calibre |

57

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| United States of America | XELERATOR* | 3999053 | RA Brands, L.L.C. | ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shields adapted for firearms; scrapers for cleaning firearms; breeches of firearms; covers for firearms; barrel reflectors for firearms; firearm sights; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms; parts and fittings for firearms |
| Mexico | XELERATOR | 1174096 | RA Brands, L.L.C. | Trigger assemblies for firearms |
| United States of America | YELLOW JACKET | 1,177,128 | RA Brands, L.L.C. | Ammunition |
| Canada | ZULU | TMA750,647 | RA Brands, L.L.C. | |
| US | ZULU* | 3309830 | RA Brands, L.L.C. | |

IV. Domain names

| | Domain Name | Registrant | Registrar | Expiration Date |
|---|---|---|---|---|
| 1. | 300aac.com | Remington Arms Company, Inc. | Network Solutions LLC | 10/11/2020 |
| 2. | 300blackout.com | Remington Arms Company, Inc. | Network Solutions LLC | 9/18/2021 |
| 3. | 300blk.com | Remington Arms Company, Inc. | Network Solutions LLC | 10/1/2021 |
| 4. | remington-catalog.com | Remington Arms Company, Inc. | Network Solutions LLC | 11/26/2022 |

58

| | Domain Name | Registrant | Registrar | Expiration Date |
|---|---|---|---|---|
| 5. | remington-coop.com | Remington Arms Company, Inc. | Network Solutions LLC | 5/10/2021 |
| 6. | remington.com | Remington Arms Company, Inc. | Network Solutions LLC | 3/14/2023 |
| 7. | remington.info | Remington Arms Company, Inc. | Network Solutions LLC | 8/1/2023 |
| 8. | remington700.com | Remington Arms Company, Inc. | Network Solutions LLC | 12/23/2022 |
| 9. | remingtonarmericanbirdhunt.com | Remington Arms Company, Inc. | Network Solutions LLC | 10/2/2024 |
| 10. | remingtonarms.net | Remington Arms Company, Inc. | Network Solutions LLC | 9/17/2021 |
| 11. | remingtongamecalls.com | Remington Arms Company, Inc. | Network Solutions LLC | 1/22/2021 |
| 12. | remingtongreatamerican.com | Remington Arms Company, Inc. | Network Solutions LLC | 10/2/2024 |
| 13. | remingtongreatamericanbirdhunt.com | Remington Arms Company, Inc. | Network Solutions LLC | 10/2/2024 |
| 14. | remingtonle.com | Remington Arms Company, Inc. | Network Solutions LLC | 7/13/2022 |
| 15. | remingtonmil.com | Remington Arms Company, Inc. | Network Solutions LLC | 10/12/2024 |
| 16. | remingtonmilitary.com | Remington Arms Company, Inc. | Network Solutions LLC | 1/12/2023 |
| 17. | remingtonnewsletter.com | Remington Arms Company, Inc. | Network Solutions LLC | 6/11/2024 |
| 18. | remingtonoutdoor.info | Remington Arms Company, Inc. | Network Solutions LLC | 11/15/2022 |
| 19. | remingtonoutdoorco.com | Remington Arms Company, Inc. | Network Solutions LLC | 6/12/2023 |
| 20. | remingtonoutdoorcompany.co | Remington Arms Company, Inc. | Network Solutions LLC | 6/12/2023 |
| 21. | remingtonoutdoorcompany.com | Remington Arms Company, Inc. | Network Solutions LLC | 6/12/2023 |

59

| | Domain Name | Registrant | Registrar | Expiration Date |
|---|---|---|---|---|
| 22. | remingtonoutdoorcompany.info | Remington Arms Company, Inc. | Network Solutions LLC | 6/12/2023 |
| 23. | remingtonoutdoorcompany.net | Remington Arms Company, Inc. | Network Solutions LLC | 6/12/2023 |
| 24. | remingtonoutdoorcompany.org | Remington Arms Company, Inc. | Network Solutions LLC | 6/12/2023 |
| 25. | remingtonoutdoorcompany.us | Remington Arms Company, Inc. | Network Solutions LLC | 6/12/2023 |
| 26. | remingtonpartsstore.com | Remington Arms Company, Inc. | Network Solutions LLC | 11/17/2024 |
| 27. | remingtonrebates.com | Remington Arms Company, Inc. | Network Solutions LLC | 12/20/2020 |
| 28. | remingtonrepairs.com | Remington Arms Company, Inc. | Network Solutions LLC | 8/16/2021 |
| 29. | remingtonrewards.com | Remington Arms Company, Inc. | Network Solutions LLC | 12/6/2020 |
| 30. | remingtonshootingschool.com | Remington Arms Company, Inc. | Network Solutions LLC | 7/13/2025 |
| 31. | remingtonsucks.com | Remington Arms Company, Inc. | Network Solutions LLC | 7/25/2025 |
| 32. | remingtonturkey.com | Remington Arms Company, Inc. | Network Solutions LLC | 12/3/2020 |
| 33. | remingtonwaterfowl.com | Remington Arms Company, Inc. | Network Solutions LLC | 12/3/2020 |
| 34. | rempac.org | Remington Arms Company, Inc. | Network Solutions LLC | 12/20/2020 |
| 35. | rocperks.com | Remington Arms Company, Inc. | Network Solutions LLC | 9/3/2021 |
| 36. | rocstars.cool | Remington Arms Company, Inc. | Network Solutions LLC | 5/28/2022 |

V. Material Unregistered IP

60

61

None.

**Schedule 1.1(n)**
**Customer Orders**

None.

**Schedule 1.1(o)**
**Purchase Orders**

None.

**Schedule 1.1(w)**
**Acquired Assets**

None.

**Schedule 1.2(t)**
**Excluded Assets**

None.

**<u>Schedule 1.4(r)</u>**
**<u>Excluded Liabilities</u>**

1. All Liabilities of Seller and/or the Business relating to, resulting from or arising out of any Environmental Release, threatened Environmental Release, transport, disposal, recycling, reclamation, treatment or storage of Hazardous Substances, or the arrangement of the same, at any off-site location, in each case, to the extent arising or attributable to any period prior to the Closing, including, any Liability arising out of or related to the matter of Chemetco, Inc. Superfund Site, Hartford, Illinois, CERCLA Docket V-W-15-C-019 (2015).

## Schedule 1.5(c)
## Estimated Cure Amount

| # | Category | Relates Primarily to | Location / Function | Contract Counter Party | Services Provided | Inception Date | Expiration Date | Latest Cure Cost Estimate (1) |
|---|----------|---------------------|--------------------|----------------------|-------------------|----------------|-----------------|------------------------------|
| 1. | Ammunition | Lonoke | Federal | DHS-FLETC | Federal Contract | 04/27/17 | 05/27/22 | N/A |
| 2. | Ammunition | Lonoke | Federal | DHS-FLETC | Federal Contract | 10/07/19 | 09/30/24 | N/A |
| 3. | Ammunition | Lonoke | Federal | FRS | Federal Contract | 10/07/04 | 01/31/21 | N/A |
| 4. | Ammunition | Lonoke | Lonoke | National Machinery, LLC | Tooling and Technology | 11/20/15 | 05/18/34 | 92,605 |
| 5. | Ammunition | Lonoke | Lonoke | Video Jet | VJ Service | 12/11/17 | 12/31/20 | 6,575 |
| 6. | Ammunition | Lonoke | Lonoke | Westrock | Packaging Vendor | 03/11/18 | 12/31/20 | N/A |
| 7. | Ammunition | Lonoke | Lonoke | Arkansas Copier (De Large) | Copier and IT equipment | 01/01/17 | 12/31/21 | 4,183 |
| 8. | Ammunition | Lonoke | Lonoke | Wiese Lifts | Forklifts | 12/31/19 | 12/30/24 | 48,712 |
| 9. | Ammunition | Lonoke | Lonoke | Siemens | Fire Alarm | 06/06/18 | 06/05/25 | 13,228 |
| 10. | Corporate | Lonoke | Marketing | Illinois Department of Natural Resources | Facility rental for The Grand American | 01/01/16 | 12/31/20 | 9,000 |
| 11. | Corporate | Lonoke | Marketing | National Skeet Shooting Association | Facility rental-NSSA & NSCA Championships | 02/01/20 | 12/31/22 | 8,750 |
| 12. | Ammunition | Lonoke | Sourcing (2) | Doe Run Company | Lead Supplier | 01/01/20 | 12/31/20 | 626,539 |
| 13. | Ammunition | Lonoke | Sourcing (2) | Gopher Resource, LLC | Lead Supplier | 01/01/20 | 12/31/20 | 98,975 |
| 14. | Ammunition | Lonoke | Sourcing (2) | Quemetco, Inc., on behalf of Eco-Bat Indiana, LLC | Lead Supplier | 01/01/20 | 12/31/20 | 1,682,382 |
| 15. | Ammunition | Lonoke | Sourcing (2) | Sanders | Lead Supplier | 01/01/19 | 12/31/20 | 85,862 |
| 16. | Ammunition | Lonoke | Sourcing (2) | Aurubis | Brass Supplier | 08/10/18 | 12/31/20 | N/A |
| 17. | Ammunition | Lonoke | Sourcing (2) | St Marks Powder Inc (3) | Ammunition Propellant | 01/01/19 | 12/31/20 | 1,908,286 |

67

| # | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 18. | Ammunition | Lonoke | Sourcing(2) | Ordnance and Tactical Systems(3) | Ammunition Propellant | 01/01/19 | 12/31/20 | 279,753 |
| 19. | Ammunition | Lonoke | Sourcing(2) | Luvata Appleton LLC | Supplier | 01/01/20 | 12/31/20 | N/A |
| 20. | Ammunition | Lonoke | Sourcing(2) | A2Z Supply Corp | Supplier | 08/03/20 | 08/02/25 | N/A |
| 21. | Corporate | Corporate | Bailment | Buffalo Bill Center of the West | Artwork loan agreement | 05/31/16 | 10/22/20 | N/A |
| 22. | Corporate | Corporate | Bailment | Ducks Unlimited / Bass Pro Shops | Artwork loan agreement | 04/15/15 | (See Footnote 6) | N/A |
| 23. | Corporate | Corporate | Bailment | NRA museum / Bass Pro Shops | Artwork loan agreement | 06/06/13 | (See Footnote 6) | N/A |
| 24. | Corporate | Corporate | Credit | S&P Global Ratings | Credit Ratings | 05/02/18 | (See Footnote 6) | N/A |
| 25. | Corporate | Corporate | Environmental | DuPont de Nemours and Company | Indemnification Agreement for Environmental Liabilities | 11/24/93 | (See Footnote 6) | N/A |
| 26. | Corporate | Corporate | HR | SAP Success Factors | Premium Content Management (PCM) | 12/31/16 | 12/30/21 | 50,960 |
| 27. | Corporate | Corporate | IT | Ameri100 | S/4HANA and HCM Suite Products | 05/13/20 | 10/21/20 | 235,565 |
| 28. | Corporate | Corporate | IT | CISCO SmartNet (via SHI) | Cisco Equipment Maintenance | Annual | 12/31/20 | N/A |
| 29. | Corporate | Corporate | IT | DPSI(4) | Scanner Maint. | 10/02/18 | 12/31/20 | 9,348 |
| 30. | Corporate | Corporate | IT | Paymetric | Credit Card Tokenization | 12/21/10 | 12/31/20 | 38,262 |
| 31. | Corporate | Corporate | IT | Elavon | Payment Processing Solutions | Mar-19 | (See Footnote 6) | N/A |
| 32. | Corporate | Corporate | IT | SEI | HP / EMC Maint. | 04/01/20 | 03/31/23 | 2,006 |
| 33. | Corporate | Corporate | IT | Windstream | Global WAN | 09/01/17 | 03/26/24 | N/A |
| 34. | Corporate | Corporate | IT | Panaya | Testing Automation | 05/31/18 | 05/31/21 | 7,372 |
| 35. | Corporate | Corporate | IT | AT&T | IP Flex at Madison | 08/01/18 | 08/01/21 | 2,174 |
| 36. | Corporate | Corporate | IT | DPSI(4) | Printer Maint. | 09/07/18 | 09/07/21 | N/A |
| 37. | Corporate | Corporate | IT | Microsoft EA & SCE | Microsoft Licensing; excludes subscription | 10/31/18 | 10/31/21 | 6,819 |
| 38. | Corporate | Corporate | IT | ERP Maestro | SAP SOD | 02/06/19 | 02/05/22 | 1,769 |

68

| # | | | | Company | Description | | | |
|---|---|---|---|---|---|---|---|---|
| 39. | Corporate | Corporate | | Sunview Software | Change Gear | 03/30/16 | 03/31/21 | N/A |
| 40. | Corporate | | IT | NetBrain | Network Monitoring Tool | 06/28/19 | 06/30/22 | 9,052 |
| 41. | Corporate | | IT | SAP / SuccessFactors | SAP S4/HANA and SF Licensing | 12/31/19 | 03/30/23 | N/A |
| 42. | Corporate | | IT | SAP C4C | SAP C4C Licensing | 07/12/13 | Annual | 472,524 |
| 43. | Corporate | | IT | Segra (formerly Data Chambers / Northstate) | Data Center Hosting | 02/20/14 | 2/29/2021 | 53,592 |
| 44. | Corporate | | IT | Darktrace | Network Packet AI | 05/31/19 | 05/31/22 | N/A |
| 45. | Corporate | | Legal | DuPont De Nemours | Liability Claims | 12/01/93 | (See Footnote 6) | N/A |
| 46. | Corporate | | Legal | GEODIS Logistics LLC | Lease agreement for warehouse in Southaven, MS | 04/11/16 | 06/09/26 | 583,928 |
| 47. | Corporate | | Legal | Glassell Family LLC | Lease agreement for office space in Bentonville, AR | 05/28/08 | 10/31/21 | N/A |
| 48. | Ammunition and Firearms | Corporate | Licensing | National Rifle Association | Advertising and Licensing Agreement | 10/12/18 | 10/12/21 | 251,028 |
| 49. | Corporate | | Licensing | Advanced Technology (Saiga) | Licensing - Inbound | 11/01/12 | (See Footnote 6) | N/A |
| 50. | Corporate | | Licensing | Buck Knives | Licensing - Outbound | 01/18/17 | 12/31/20 | N/A |
| 51. | Corporate | | Licensing | Coastal Pet | Licensing - Outbound | 01/18/17 | 12/31/21 | 1,341 |
| 52. | Corporate | | Licensing | Crosman / Velocity Outdoor | Licensing - Outbound | 12/17/16 | 12/31/25 | N/A |
| 53. | Corporate | | Licensing | Gator Cases | Licensing - Outbound | 12/05/19 | 12/31/24 | N/A |
| 54. | Corporate | | Licensing | Spectrum / Remington Products, Inc. | Intellectual Property Licensing Agreement | 12/5/1986 | (See Footnote 6) | 235 |
| 55. | Corporate | | Licensing | VEIL CAMO LLC | Licensing - Inbound | 7/12/2018 | (See Footnote 6) | N/A |
| 56. | Corporate | | Licensing | Velocity | Rebate Processor | 06/02/11 | (See Footnote 6) | N/A |
| 57. | Corporate | | Marketing | Zmags Corp | Digital Catalog Software | 12/02/19 | 11/30/20 | N/A |
| 58. | Corporate | | Marketing | Boone & Crockett Club | Conservation Sponsorship | 11/10/19 | 12/31/20 | 7,500 |

69

| # | | | | Name | Description | | | Amount |
|---|---|---|---|---|---|---|---|---|
| 59. | Corporate | Corporate | Marketing | Delta Waterfowl | Conservation Sponsorship | 10/28/19 | 12/31/20 | 16,500 |
| 60. | Corporate | Corporate | Marketing | Ducks Unlimited | Conservation Sponsorship | 01/03/20 | 12/31/20 | 166,500 |
| 61. | Corporate | Corporate | Marketing | Full Curl Society | Conservation Sponsorship | 12/01/19 | 12/31/20 | N/A |
| 62. | Corporate | Corporate | Marketing | Heartland Waterfowl | TV Sponsorship | 09/23/19 | 12/31/20 | 85,000 |
| 63. | Corporate | Corporate | Marketing | Independent Hunting LLC | TV Sponsorship | 09/23/19 | 12/31/20 | N/A |
| 64. | Corporate | Corporate | Marketing | MODX System | Website Hosting | 01/13/20 | 12/31/20 | N/A |
| 65. | Corporate | Corporate | Marketing | National Wild Turkey Federation | Conservation Sponsorship | 01/02/20 | 12/31/20 | 11,167 |
| 66. | Corporate | Corporate | Marketing | NRA Publications | ROC print and digital advertising | 10/12/18 | 12/31/20 | N/A |
| 67. | Corporate | Corporate | Marketing | Oracle/Bronto | Email Distribution Software | 01/13/20 | 12/31/20 | 32,550 |
| 68. | Corporate | Corporate | Marketing | Outdoor Sportsmans Group | Digital Marketing | 01/22/20 | 12/31/20 | 329,467 |
| 69. | Corporate | Corporate | Marketing | Outdoor Sportsmans Group | TV Sponsorship | 10/29/19 | 12/31/20 | N/A |
| 70. | Corporate | Corporate | Marketing | Outdoor Sportsmans Group | TV Sponsorship | 10/29/19 | 12/31/20 | N/A |
| 71. | Corporate | Corporate | Marketing | Pheasants Forever | Conservation Sponsorship | 12/03/19 | 12/31/20 | 35,000 |
| 72. | Corporate | Corporate | Marketing | Rocky Mountain Elk Foundation | Conservation Sponsorship | 12/19/19 | 12/31/20 | 57,300 |
| 73. | Corporate | Corporate | Marketing | Ruffed Grouse Society | Conservation Sponsorship | 11/05/19 | 12/31/20 | 12,500 |
| 74. | Corporate | Corporate | Marketing | Safari Classic Productions | TV Sponsorship | 10/15/19 | 12/31/20 | 243,750 |
| 75. | Corporate | Corporate | Marketing | Sportscar Vintage Racing Association | Event Sponsorship/Promotion | 10/15/19 | 12/31/20 | 12,500 |
| 76. | Corporate | Corporate | Marketing | Sportsman for Fish & Wildlife | Conservation Sponsorship | 12/01/19 | 12/31/20 | 68,698 |
| 77. | Corporate | Corporate | Marketing | Union Sportsmen's Alliance | Conservation Sponsorship | 12/02/19 | 12/31/20 | N/A |
| 78. | Corporate | Corporate | Marketing | Whitetails Unlimited | Conservation Sponsorship | 10/31/19 | 12/31/20 | N/A |
| 79. | Corporate | Corporate | Marketing | Widen Enterprise Inc. | Asset Management Software | 06/01/20 | 05/30/21 | N/A |

70

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 80. | Corporate | Corporate | Marketing | Magento/Adobe | Ecommerce Software | 12/03/18 | 01/02/22 | N/A |
| 81. | Ammunition and Firearms | Corporate | Sales | Borchers, S.A. | International Sales Related | 04/17/15 | 10/31/20 | N/A |
| 82. | Ammunition and Firearms | Corporate | Sales | Helmut Hofmann GMBH | International Sales Related | 11/08/18 | 10/31/28 | N/A |
| 83. | Ammunition and Firearms | Corporate | Sales | Jaguar Gruppen A/S | International Sales Related | 01/30/17 | 10/31/26 | N/A |
| 84. | Ammunition and Firearms | Corporate | Sales | Maschmedt & Associates Inc. | Sales Rep Agreement | 12/19/17 | 12/03/22 | N/A |
| 85. | Ammunition and Firearms | Corporate | Sales | Midarms, SPRL | International Sales Related | 2/1/2016 | 10/31/20 | N/A |
| 86. | Ammunition and Firearms | Corporate | Sales | Murski Breeding Sales, Inc. | Sales Rep Agreement | 12/19/17 | 12/18/22 | N/A |
| 87. | Ammunition and Firearms | Corporate | Sales | ProActive Sales & Marketing | Sales Rep Agreement | 12/19/17 | 11/26/22 | N/A |
| 88. | Ammunition and Firearms | Corporate | Sales | Raytrade Pty Ltd. | International Sales Related | 09/22/15 | 10/31/20 | N/A |
| 89. | Ammunition and Firearms | Corporate | Sales | Raytrade UK Limited | International Sales Related | 10/05/18 | 10/31/20 | N/A |
| 90. | Ammunition and Firearms | Corporate | Sales | Skenco Europe, Kft. | International Sales Related | 05/17/17 | 10/31/27 | N/A |
| 91. | Corporate | Corporate | Sourcing[2] | Cintas | Uniform rental at HSV complex | 12/18/18 | 12/17/23 | 90,832 |
| 92. | Corporate | Corporate | Sourcing[2] | G4S | Security Services at HSV complex | 06/26/14 | Evergreen | 236,656 |
| 93. | Corporate | Corporate | Employment | International Union, United Mine Workers of America[5] | Collective Bargaining Agreement | 12/16/16 | 10/29/20 | N/A |
| 94. | Firearms | Corporate | Sourcing[2] | Norgon LLC | Magazine Catch Manufacturing License Agreement | 11/23/11 | (See Footnote 6) | N/A |
| 95. | Corporate | Corporate | Licensing | Ashgrove Marketing Ltd. | Trademark License Agreement | 03/19/15 | (See Footnote 6) | N/A |
| 96. | Corporate | Corporate | Licensing | Ashgrove Marketing Ltd. | Exclusive Trademark License Agreement | 03/19/15 | (See Footnote 6) | N/A |
| 97. | Corporate | Corporate | Licensing | AVT Leather Inc. | Trademark License Agreement | 04/02/14 | | N/A |

71

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 98. | Corporate | Corporate | Licensing | Desperate Enterprises, Inc. | Trademark License Agreement | 01/01/15 | 12/31/21 | N/A |
| 99. | Corporate | Corporate | Licensing | IRIS USA Inc. | Trademark License Agreement | 01/01/20 | 12/31/22 | N/A |
| 100. | Corporate | Corporate | Licensing | Open Roads Brands, LLC | Trademark License Agreement | 03/22/12 | 05/22/21 | N/A |
| 101. | Corporate | Corporate | Licensing | Outdoor Cap Company, Inc. | Trademark License Agreement | 01/01/09 | 12/31/20 | N/A |
| 102. | Corporate | Corporate | Licensing | PEM America Company | Trademark License Agreement | 12/01/14 | 12/31/20 | N/A |
| 103. | Corporate | Corporate | Licensing | L R Nash (SMK) LTD | Trademark License Agreement | 10/14/16 | | N/A |
| 104. | Corporate | Corporate | Licensing | Radiator Specialty Company DBA RSC Chemical Solutions | Trademark License Agreement | 03/29/17 | | N/A |
| 105. | Corporate | Corporate | Licensing | Southern Fried Cotton | Trademark License Agreement | 03/16/20 | 12/31/20 | N/A |
| 106. | Corporate | Corporate | Licensing | P.L. Austin, Inc. d/b/a Vintage Editions | Trademark License Agreement | 01/01/17 | 12/31/22 | N/A |
| 107. | Corporate | Corporate | Licensing | DE LAGE LANDEN FINANCIAL SER | Trademark License Agreement | 12/19/16 | | 14,131 |
| 108. | Corporate | Corporate | Licensing | THE ALLEN CO INC | Trademark License Agreement | 01/01/06 | | 8,842 |
| 109. | Corporate | Corporate | Licensing | HI - PERFORMANCE DESIGNS INC | Trademark License Agreement | 05/17/12 | 12/31/22 | 290 |
| 110. | Corporate | Corporate | Licensing | TOP PROMOTIONS INC | Trademark License Agreement | 09/01/15 | | 4,653 |

**Total Estimated Cure Costs** $ 8,024,659

**Notes:**
(1) Amounts represent what has been recorded in the accounts payable ledger as of the petition date, noting that "N/A" means the Cure Cost is $0. These figures do not include (i) future commitments under the contracts, (ii) amounts due under development agreements, (iii) future commitments under any purchase orders and (iv) goods received and not invoiced. The Debtors are continuing to review and reconcile pre-petition liabilities and cure costs; all amounts are subject material change.

(2) Sourcing arrangements listed in this schedule do not include purchase orders which are generally short term in nature (i.e. do not include long-term minimum volume commitments).
(3) Entities are affiliates of General Dynamics.
(4) DPSI has multiple agreements; current accounts payable balance was not bifurcated by agreement but rather shown only once.
(5) The Debtors are addressing the Collective Bargaining Agreement directly with the Union.
(6) Contract does not have a specific end date. Certain licensing agreements may terminate upon expiration of the patent.

72

## Schedule 4.3
## No Conflict or Violation

None.

**Schedule 4.5**
**Compliance with Law**

1. The Arkansas Department of Environmental Quality Consent Administrative Order No. LIS-15-051 (2015) (which, by its terms, incorporates by reference the Amended Consent Administrative Order 07-078-001 (2012), the Second Amended Consent Administrative Order 07-078-002 (2012), and the Third Amendment to Consent Administrative Order 07-078-003 (2013)), issued to Remington Arms Company, LLC, as further amended by Consent Administrative Order 15-051-001 (2017) and Consent Administrative Order 15-051-002 (2018).

2. Administrative Settlement, Agreement and Order on Consent for Remedial Investigation/Feasibility Study in the matter of Chemetco, Inc. Superfund Site, Hartford, Illinois, CERCLA Docket V-W-15-C-019 (2015).

3. Notice of Violation issued by the Arkansas Department of Environmental Quality on December 13, 2019, with regard to permitted effluent limitation violations.

4. Citation and Notification of Penalty regarding inspection number 1286782 issued by the U.S. Department of Labor, Occupational Safety and Health Administration, dated July 2, 2018 (Lonoke, AR).

5. Citation and Notification of Penalty regarding inspection number 1206048 issued by the U.S. Department of Labor, Occupational Safety and Health Administration, dated June 6, 2017 (Lonoke, AR).

74

**Schedule 4.6(b)**
**RLC Assets; Liabilities**

Remington Licensing Corporation

| Country/Jurisdiction | Mark/Name/AN/RN | Status/Key Dates | Full Goods/Services |
|---|---|---|---|
| United States (Federal) | REMINGTON<br>RN: 4405929<br>SN: 85778045 | Registered Principal Register - Sec. 2(F) 8 & 15, October 22, 2019<br>Int'l Class: 08<br>First Use: December 31, 1920<br>Filed: November 13, 2012<br>Registered: September 24, 2013 | (Int'l Class: 08)<br>knives |
| United States (Federal) | REMINGTON<br>RN: 4473605<br>SN: 85781305 | Registered Principal Register - Sec. 2(F) 8 & 15, March 23, 2020<br>Int'l Class: 16<br>First Use: 1960<br>Filed: November 16, 2012<br>Registered: January 28, 2014 | (Int'l Class: 16)<br>calendars and stationery items in the nature of stationery |
| United States (Federal) | REMINGTON<br>RN: 5151390<br>SN: 85791701 | Registered Principal Register - Sec. 2(F), February 28, 2017<br>Int'l Class: 25<br>First Use: April, 2014<br>Filed: November 30, 2012<br>Registered: February 28, 2017 | (Int'l Class: 25)<br>apparel, namely, belts |
| United States (Federal) | REMINGTON<br>RN: 4468908<br>SN: 85791697 | Registered Principal Register - Sec. 2(F) 8 & 15, March 15, 2020<br>Int'l Class: 25<br>First Use: 2001<br>Filed: November 30, 2012<br>Registered: January 21, 2014 | (Int'l Class: 25)<br>apparel, namely, hats, gloves, jackets, pants, t-shirts |

Foreign Marks

| Registration No. | Mark/Name (Text Only) | Country/Jurisdiction |
|---|---|---|
| TMA907567 | REMINGTON | Canada |
| TMA875652 | REMINGTON | Canada |
| 1468535 | REMINGTON | Mexico |
| 1317867 | REMINGTON | Mexico |
| 011803806 | REMINGTON | European Union |
| 009391525 | REMINGTON | European Union |

**Schedule 4.8**
**Permits**

a. Environmental

| Site | Type of Permit | Permit/ID # | Regulator (Agency) | Name of Permittee |
|---|---|---|---|---|
| Lonoke, AR | Above Ground Storage Tank (AST)(2-tanks) | 43001626 | Arkansas Department of Environmental Quality | Remington Arms Co, LLC |
| Lonoke, AR | Air Permit | 1272-AR-13 | Arkansas Department of Environmental Quality | Remington Arms Company, LLC |
| Lonoke, AR | Non-contact cooling water, cooling tower blowdown, and boiler blowdown general permit | ARG250000 (Permit Tracking Numbers: ARG250014 and ARG250017) | Arkansas Department of Environmental Quality | Remington Arms Company, LLC |
| Lonoke, AR | Hazardous Waste EPA ID | AR0000064311 | Arkansas Department of Environmental Quality | Remington Arms Co, LLC |
| Lonoke, AR | National Pollutant Discharge Elimination System (NPDES) wastewater discharge permit | AR0001163 (renewal pending) | Arkansas Department of Environmental Quality | Remington Arms Company, LLC |
| Lonoke, AR | Industrial Stormwater General Permit | ARR000000 (Permit Tracking Number: ARR00A251) | Arkansas Department of Environmental Quality | Remington Arms Company, LLC |

b. Special Tax Stamps and Federal Firearms Licenses

| Site | Type of License/Permit | License/Permit # | Regulator (Agency) | Name of Permittee(s) |
|---|---|---|---|---|
| Lonoke, AR | 2021 Special Tax Stamp | | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Lonoke, AR | Federal Firearms License | 5-71-085-01-1M-00856 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company |
| Lonoke, AR | Federal Firearms License | 5-71-085-06-1M-00857 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company |
| Lonoke, AR | Federal Firearms License | 5-71-085-08-1M-00861 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company |
| Lonoke, AR | Federal Firearms License | 5-71-085-01-1M-00846 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company |
| Lonoke, AR | Federal Firearms License | 5-AR-085-23-2E-00720 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Co LLC |
| Lonoke, AR | Federal Firearms License | 5-AR-085-20-2D-00404 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Co LLC |

76

c. Import/Export

| Business Area | Type of License/Permit | License/Permit # | Regulator (Agency) | Name of Permittee(s) |
|---|---|---|---|---|
| Ammunition | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202002215 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Ammunition | Annual Import Permit | PA001945/A | Natural Resources, Canada | Remington Arms Company, LLC |

d. Transportation

| Business Area | Type of License/Permit | License/Permit # | Regulator (Agency) | Name of Permittee(s) |
|---|---|---|---|---|
| Ammunition | Hazardous Materials Registration Number | M4180 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, LLC |
| Ammunition | Classification of Explosives | EX2006090046 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, Inc. |
| Ammunition | Classification of Explosives | EX2007040032 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, Inc. |
| Ammunition | Classification of Explosives | EX1995030142B | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, LLC |
| Ammunition | Classification of Explosives | EX1995030142C | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, LLC |
| Ammunition | Classification of Explosives | EX2014020364 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, Inc. |
| Ammunition | Classification of Explosives | EX2014020395 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, Inc. |
| Ammunition | Classification of Explosives | EX2014030068 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, Inc. |

| Ammunition | Classification of Explosives | EX2014020383 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, Inc. |
|---|---|---|---|---|
| Ammunition | Classification of Explosives | EX2014030068 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, Inc. |
| Ammunition | Classification of Explosives | EX2017040261 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arm Company, LLC |
| Ammunition | Classification of Explosives | EX2006080485 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, Inc. |
| Ammunition | Classification of Explosives | EX1994060261 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, Inc. |
| Ammunition | Classification of Explosives | EX1996010062 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, Inc. |
| Ammunition | Classification of Explosives | EX1996040083 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, Inc. |
| Ammunition | Classification of Explosives | EX1996110002 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, Inc. |
| Ammunition | Classification of Explosives | EX2000030054 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, Inc. |
| Ammunition | Application for Modification of Registration Number | M4180 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company |
| Ammunition | Hazardous Materials Registration | M5153 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Borden & Remington Corporation |
| Ammunition | Classification of Explosives | EX1986030168 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX1986030168A | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |

| Ammunition | Classification of Explosives | EX1986030168AA | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
|---|---|---|---|---|
| Ammunition | Classification of Explosives | EX1986030168AB | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX1986030168AC | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX1986030168AD | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX1986030168AE | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX1986030168AF | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX1986030168AG | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX1986030168AH | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX1986030168AI | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX1986030168AJ | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX1986030168AK | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX1986030168AL | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX1986030168AM | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |

| Ammunition | Classification of Explosives | EX1986030168AN | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
|---|---|---|---|---|
| Ammunition | Classification of Explosives | EX1986030168AO | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX1986030168AP | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX1986030168AQ | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX1986030168AR | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX1986030168AS | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX1986030168AT | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX1986030168AU | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Application for party status | DOT-SP 20973 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company |
| Ammunition | Hazardous Materials Certificate of Registration | 082420550003AC | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Co LLC |
| Ammunition | Special Permit | DOT-SP 8451 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, LLC |
| Ammunition | Special Permit | DT-SP 14249 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, Inc. |

**Schedule 4.13**
**Orders**

1.  The Orders disclosed on Schedule 4.5(1) and (2) are hereby incorporated by reference.

## Schedule 4.14
## Intellectual Property

(a)

    1.   Patent No. US 7,201,104 expired because of the failure to pay the applicable maintenance fee.


(c)

    1.   Patent No. US 7,201,104 expired because of the failure to pay the applicable maintenance fee.

82

**Schedule 4.14(f)**
**Personal Information Claims**

1. Data intrusion attempt in September 2018 that Seller was alerted to by the Federal Bureau of Investigation and subsequently investigated.

**Schedule 4.17**
**Security Arrangements**

1.  Intercompany Note.

2.  Priority Term Loan.

3.  FILO Facility.

4.  Exit Term Loan.

5.  Letter of Credit in favor of American Alternative Insurance/Roanoke Insurance Group issued by Cadence Bank in the amount of $100,000 on June 27, 2019.

6.  Letter of Credit in favor of National Union Fire Insurance issued by Cadence Bank in the amount of $1,352,477 on September 4, 2019.

7.  Letter of Credit in favor of First Stamford Place issued by Cadence Bank in the amount of $100,000 on October 18, 2019.

8.  Letter of Credit in favor of XL Specialty Insurance Company issued by US Bank in the amount of $750,000 on November 15, 2019.

9.  Letter of Credit in favor of Hartford Fire Insurance Company issued by Cadence Bank in the amount of $500,000 on November 18, 2019.

10. Letter of Credit in favor of Riyad Bank-MOI Performance Guarantee issued by US Bank in the amount of $21,232 on January 24, 2020.

11. Letter of Credit in favor of Chair, Workers' Compensation Board - State of New York issued by Cadence Bank in the amount of $204,000 on February 3, 2020.

84

**Schedule 4.18(a)**
**Material Customers**

| Customer | Sales (in thousands) |
|---|---|
| 1. Wal-Mart Consolidated | $ 43,179.33 |
| 2. Academy Ltd | $ 20,045.27 |
| 3. Bass Pro Consolidated | $ 13,310.23 |
| 4. Dick's Sporting Goods Consolidated | $ 10,822.57 |
| 5. Sports South LLC | $ 8,065.05 |

85

**Schedule 4.18(b)**
**Material Suppliers**

| Supplier | Purchases (in thousands) |
|---|---|
| 1. Aurubis Buffalo Inc | $ 17,610.7 |
| 2. Eco-Bat Indiana LLC | $ 10,372.6 |
| 3. St Marks Powder Inc | $ 5,763.9 |
| 4. The Doe Run Company | $ 5,669.7 |
| 5. Luvata Appleton LLC | $ 5,591.5 |

## Schedule 4.22
## Taxes; Permitted Liens

(a)

1. Excise Tax in the amount of $13,420,726 was due on July 29, 2020 has not been paid and the tax returns for such excise taxes have not been filed.

(b)

1. State of Alabama - Sales and Use Tax - Period 05/01/2014 through 04/30/2017. Current Status: Auditor is reviewing information provided by Seller.
2. State of Arkansas - Sales and Use Tax - Period 06/01/2017 through 06/30/2020. Current States: The Seller was notified on July 1, 2020 of the intent to commence a sales and use tax audit.
3. TTB - Firearms and Ammunition Excise Tax - Period - Unknown. Current Status: The Seller received e-mail communication on July 23, 2020 from the TTB of intent to audit.  TTB has informed Seller that it currently does not expect to assess excise tax for periods in amounts in excess of the amount reported in Seller's bankruptcy filings.

Permitted Lien; Taxes being contested:

None.

87

## Schedule 8.1
## Offered Employees

1. All employees based at Lonoke.
2. All employees fully dedicated to the ammunition business, even if not based in Lonoke, other than those employees based in Mona.
3. Norma Dunn
4. Scott Marsh
5. Direct Reports of (3) – (4)
6. [Open] – Lonoke Environmental Manager
7. Melissa Anderson
8. Adam Hunsicker
9. [Open] – Sr. Financial Analyst, Manufacturing FP&A
10. Hailie Seaton
11. Matthew Watts
12. Robert Tidmarsh
13. Sharon Reel
14. Anthony Shelton
15. Andrew Sexton
16. Stacy Cotton
17. Brandie Mouldin
18. Gloria Compton
19. Hayley Dunn
20. [Open] – Accounting Manager
21. Penny King
22. Donnell Hardy
23. Melody Adams
24. Bruce Elgin
25. Vickie Sharp
26. Deleia Hutcherson
27. Cory Jones
28. Patricia Edson
29. Elizabeth Morrison
30. Patrick Decareaux
31. [Open] – Sr. Financial Analyst
32. Pam Wright
33. Kris Carson
34. Alan Serven
35. Gary Eggers
36. Jacqueline Adams
37. [Open] – SAP Analyst
38. Priscilla Lemay
39. William Rorrer
40. Steve Swaby
41. Chris Everhart
42. Brad Banks
43. [Open] – Developer SAP Business Warehouse
44. Anke Kleine
45. Leah Jacobs
46. Donna Pendleton
47. Jim Spivey

48. John Epps
49. [Open] – Lead SAP Analyst
50. Beverly Conner
51. David Bell
52. Delland Sinclair
53. Amy Lillard
54. Diana Newman
55. Matt Brewer
56. Billy Hutchens
57. Derrick Isley
58. Ed Burns
59. Ron Richardson
60. Keith Quinn
61. Charlene Preston
62. Pat Stagle
63. Karen Johnson
64. Stephanie Hawkins
65. Susan Leggitt
66. John Trull
67. Annette Cobbs
68. Sara Lawson
69. Rosalyn Kidd
70. Alisha Locus
71. Dana Claybrook
72. John Loschin
73. Mitchell Kirkman
74. Thomas Galloway
75. Nick Sachse
76. Tim Yarboro
77. Danny Evans
78. Craig Thomas
79. Ricky Buckmaster
80. Jon Langenfield
81. Zachary Esch
82. Megan Overstreet
83. Dewayne Welch
84. Henry John
85. Carolyn Yeager
86. Rick Kitts
87. Chris Wright
88. Christian Hogg
89. William Shaw
90. Ben Peters
91. Eric Epperson

**Schedule 13.1(a)**
**Business Name**

1.  The information in Schedule 1.1(j) is hereby incorporated by reference.

90

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 1000469 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2000 | PRIMER WET MIX #721 | 10,493 | -3,836 | 6,657 | USD |
| 1000487 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2002 | REMODEL QUALITY OFFICE | 5,817 | -2,127 | 3,690 | USD |
| 1000489 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2002 | PR MIX STORAGE BLDG 722 | 7,220 | -2,639 | 4,581 | USD |
| 1000243 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CENTER FIRE MANUFACTURING BLDG 100 | 428,675 | -261,054 | 167,621 | USD |
| 1000243 | 1 | Ammo | | 21 Lonoke, AR | 4/15/1994 | ADDL-CONSTR PCH OFFICE 120050 | 6,267 | -3,818 | 2,449 | USD |
| 1000243 | 5 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADMIN & CF MFG BLDG-SPRINKLER SYSTEM | 13,356 | -8,135 | 5,221 | USD |
| 1000243 | 11 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST RIMFIRE PROJECT 110076 | 10,666 | -6,497 | 4,169 | USD |
| 1000243 | 12 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADMIN OFC 120500/PCHOFC 120519 | 36,751 | -22,382 | 14,369 | USD |
| 1000243 | 13 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CF RESTROOM - BUILDING | 2,982 | -1,817 | 1,165 | USD |
| 1000243 | 15 | Ammo | | 21 Lonoke, AR | 12/14/1995 | ADDL - REBUILD RESTROOM CF LEAD AREA | 4,145 | -1,895 | 2,250 | USD |
| 1000243 | 21 | Ammo | | 21 Lonoke, AR | 10/15/1998 | 2ND FLOOR ENGINEERING OFCS 101164 | 19,910 | -9,095 | 10,815 | USD |
| 1000243 | 23 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL FLOOR & CEILING TILE (HR) | 4,750 | -2,895 | 1,855 | USD |
| 1000243 | 24 | Ammo | | 21 Lonoke, AR | 8/15/2003 | ADDL ACCOUNTING OFFICES | 29,699 | -10,853 | 18,846 | USD |
| 1000243 | 25 | Ammo | | 21 Lonoke, AR | 1/15/2004 | ADDL SYSTEMS OFFICES | 8,842 | -3,233 | 5,609 | USD |
| 1000243 | 26 | Ammo | | 21 Lonoke, AR | 3/15/2004 | SYSTEMS COMPUTER REPAIR AREA | 4,677 | -1,710 | 2,967 | USD |
| 1000243 | 28 | Ammo | | 21 Lonoke, AR | 7/15/2005 | CF LOADING OFFICE | 6,580 | -2,005 | 4,575 | USD |
| 1000243 | 29 | Ammo | | 21 Lonoke, AR | 3/15/2006 | ADDL WEST CF ROOF | 125,442 | -38,196 | 87,246 | USD |
| 1000243 | 30 | Ammo | | 21 Lonoke, AR | 3/15/2006 | ADDL STAFF CONFERENCE ROOM | 7,490 | -2,283 | 5,207 | USD |
| 1000243 | 31 | Ammo | | 21 Lonoke, AR | 5/15/2007 | ADDL CF PR & LD CONDUCTIVE FLOORS | 9,281 | -2,827 | 6,454 | USD |
| 1000243 | 32 | Ammo | | 21 Lonoke, AR | 7/15/2007 | ADDL CONFERENCE ROOM | 7,444 | -2,268 | 5,176 | USD |
| 1000243 | 33 | Ammo | | 21 Lonoke, AR | 2/15/2008 | CF SLIDING FIRE DOOR | 8,203 | -2,499 | 5,704 | USD |
| 1000243 | 34 | Ammo | | 21 Lonoke, AR | 5/15/2008 | ADDL GAGE LAB FLOOR | 3,899 | -1,188 | 2,711 | USD |
| 1000243 | 35 | Ammo | | 21 Lonoke, AR | 10/15/2009 | CF AREA MANAGERS OFFICES 101558 | 5,800 | -1,768 | 4,032 | USD |
| 1000243 | 36 | Ammo | | 21 Lonoke, AR | 2/15/2010 | CF LOAD CONDUCTIVE FLOOR 101599 | 22,307 | -5,823 | 16,484 | USD |
| 1000243 | 37 | Ammo | | 21 Lonoke, AR | 4/15/2010 | CAFETERIA FLOORING/CEILING 101618 | 14,788 | -3,861 | 10,927 | USD |
| 1000243 | 38 | Ammo | | 21 Lonoke, AR | 12/31/2013 | RPL BUSS DUCTS 1, 2, 2A, 3, 4, 4A, 5 101871 | 67,969 | -17,687 | 50,282 | USD |
| 1000243 | 40 | Ammo | | 21 Lonoke, AR | 9/3/2017 | CF Fire Door -Packing to Hallway 102003 | 4,479 | -1,021 | 3,458 | USD |
| 1000244 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1994 | ADDL-SS POWDER DOCK 110089 | 47,601 | -28,989 | 18,612 | USD |
| 1000244 | 2 | Ammo | | 21 Lonoke, AR | 6/15/1994 | ADDL-MODIFY FLOOR FOR 6 RCAMS 120076 | 6,302 | -3,839 | 2,463 | USD |
| 1000244 | 4 | Ammo | | 21 Lonoke, AR | 8/15/1994 | ADDL-MAINTENANCE OFCS 2221 | 2,699 | -1,645 | 1,054 | USD |
| 1000244 | 5 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SHOT SHELL MANUFACTURING BLDG 200 | 426,198 | -259,545 | 166,653 | USD |
| 1000244 | 6 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SPRINKLER SYSTEM FOR SHOT SHELL | 17,798 | -10,840 | 6,958 | USD |
| 1000244 | 8 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST  SHOWER & DRESSING ROOM FACI | 3,217 | -1,961 | 1,256 | USD |
| 1000244 | 11 | Ammo | | 21 Lonoke, AR | 12/1/1993 | GUARD RAIL ST DOCK/CONSOLID. BLDG ADDNS | 20,721 | -12,620 | 8,101 | USD |
| 1000244 | 14 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST-REPLACE ROOF MAINT | 18,573 | -11,312 | 7,261 | USD |
| 1000244 | 15 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS RESTROOM - BUILDING | 2,982 | -1,817 | 1,165 | USD |
| 1000244 | 18 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL - SS BLDG GUARD RAILS | 7,079 | -3,235 | 3,844 | USD |
| 1000244 | 19 | Ammo | | 21 Lonoke, AR | 8/15/1996 | ADDL – SS PLATING FLOOR | 8,170 | -3,733 | 4,437 | USD |
| 1000244 | 23 | Ammo | | 21 Lonoke, AR | 5/15/1998 | FIRE DETECTION - SS SALVAGE | 5,419 | -2,476 | 2,943 | USD |
| 1000244 | 23 | Ammo | | 21 Lonoke, AR | 5/15/1999 | ADDL SHOTSHELL BREAKROOM | 2,998 | -1,370 | 1,628 | USD |
| 1000244 | 27 | Ammo | | 21 Lonoke, AR | 4/15/2004 | ADDL SHOT SHELL ROOF | 106,392 | -38,875 | 67,517 | USD |
| 1000244 | 28 | Ammo | | 21 Lonoke, AR | 4/15/2004 | ADDL SS ROOF | 6,203 | -2,268 | 3,935 | USD |
| 1000244 | 29 | Ammo | | 21 Lonoke, AR | 6/15/2005 | SCRAP BIN COVER | 3,418 | -1,042 | 2,376 | USD |
| 1000244 | 31 | Ammo | | 21 Lonoke, AR | 7/15/2007 | ADDL AH&P AREA FLOOR | 13,516 | -4,116 | 9,400 | USD |
| 1000244 | 32 | Ammo | | 21 Lonoke, AR | 12/15/2007 | ADDL SS CONDUCTIVE FLOORING | 22,798 | -6,943 | 15,855 | USD |
| 1000244 | 33 | Ammo | | 21 Lonoke, AR | 2/15/2008 | SS SLIDING FIRE DOOR | 10,874 | -3,312 | 7,562 | USD |
| 1000244 | 34 | Ammo | | 21 Lonoke, AR | 2/15/2008 | ROTARY CAM POLYMER FLOOR | 8,659 | -2,638 | 6,021 | USD |
| 1000244 | 35 | Ammo | | 21 Lonoke, AR | 3/15/2008 | ADDL MAINT PLANNER OFFICE | 2,626 | -801 | 1,825 | USD |
| 1000244 | 36 | Ammo | | 21 Lonoke, AR | 2/15/2009 | ADDL SHOT TOWER ROOF | 21,254 | -6,474 | 14,780 | USD |
| 1000244 | 38 | Ammo | | 21 Lonoke, AR | 2/15/2010 | CONSTRUCT SS OFFICES 101518 | 4,511 | -1,179 | 3,332 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis.val | Accum.dep. | Book val | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 1000244 | 39 | Ammo | | 21 Lonoke, AR | 2/15/2010 | SHOTSHELL OFFICES 101614 | 10,612 | -2,771 | 7,841 | USD |
| 1000244 | 40 | Ammo | | 21 Lonoke, AR | 2/15/2010 | BALLISTICS CONDUCTIVE FLOOR 101622 | 4,248 | -1,110 | 3,138 | USD |
| 1000244 | 41 | Ammo | | 21 Lonoke, AR | 3/15/2010 | SS LOAD FIRE DOORS 101624 | 15,185 | -3,965 | 11,220 | USD |
| 1000244 | 42 | Ammo | | 21 Lonoke, AR | 2/15/2012 | SS LOAD FLOOR COATING 101758 | 15,049 | -3,930 | 11,119 | USD |
| 1000244 | 43 | Ammo | | 21 Lonoke, AR | 7/15/2012 | SS ROOF INS MEMBREANE LOWER 101775 | 106,748 | -27,862 | 78,886 | USD |
| 1000248 | 1 | Ammo | | 21 Lonoke, AR | 1/15/2001 | PR DRY HOUSE HUMIDITY CONTROLS | 4,169 | -1,525 | 2,644 | USD |
| 1000252 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PRIMER MANUFACTURING BUILDING 709 | 36,239 | -22,070 | 14,169 | USD |
| 1000252 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS CON - BLDG 709 4658 SQ FT EXPANSION | 26,122 | -15,910 | 10,212 | USD |
| 1000252 | 6 | Ammo | | 21 Lonoke, AR | 12/14/1995 | ADDL - REBUILD PM RESTROOMS | 8,290 | -3,788 | 4,502 | USD |
| 1000252 | 7 | Ammo | | 21 Lonoke, AR | 5/15/1997 | ADDL-ROOF REPLACEMENT BLDG 708 & 709 | 35,520 | -16,224 | 19,296 | USD |
| 1000252 | 11 | Ammo | | 21 Lonoke, AR | 2/15/2007 | ADDL REPAIR WASH AREA FLOOR | 5,513 | -1,680 | 3,833 | USD |
| 1000254 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2007 | CONDUCTIVE FLOOR #709 | 27,664 | -8,424 | 19,240 | USD |
| 1000254 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | NITRATION BUILDING 711 | 2,645 | -1,612 | 1,033 | USD |
| 1000254 | 2 | Ammo | | 21 Lonoke, AR | 3/15/1996 | ADDL-NITRATION BLDG REBUILD | 9,617 | -4,395 | 5,222 | USD |
| 1000255 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SOLUTION, POLNOL, SENSOL AND SPOON  BLDG 712 | 19,150 | -11,663 | 7,487 | USD |
| 1000255 | 3 | Ammo | | 21 Lonoke, AR | 10/15/2001 | REB (2) ROOMS | 8,809 | -3,219 | 5,590 | USD |
| 1000255 | 4 | Ammo | | 21 Lonoke, AR | 12/15/2003 | ADDL BLDG 712 MIX ROOMS | 7,299 | -2,668 | 4,631 | USD |
| 1000255 | 5 | Ammo | | 21 Lonoke, AR | 3/15/2005 | ADDL BUILDING 712 | 4,701 | -1,433 | 3,268 | USD |
| 1000255 | 6 | Ammo | | 21 Lonoke, AR | 1/15/2008 | ADDL BLDG 712 CONDUCTIVE FLOOR | 10,294 | -3,135 | 7,159 | USD |
| 1000255 | 7 | Ammo | | 21 Lonoke, AR | 2/15/2012 | CONDUCTIVE FLOOR 712 MIX ROOMS 101745 | 4,556 | -1,191 | 3,365 | USD |
| 1000255 | 8 | Ammo | | 21 Lonoke, AR | 8/31/2018 | Addt'l- Bldg 712 Blast Door/Mods - 102035 | 25,600 | -1,541 | 24,059 | USD |
| 1000255 | 9 | Ammo | | 21 Lonoke, AR | 12/30/2019 | Addt Bldg 712 RO Addition  102064 | 7,840 | -4,776 | 3,064 | USD |
| 1000260 | 1 | Ammo | | 21 Lonoke, AR | 11/25/2016 | Pre-Mix Facility Improvements to BLDG 717 | 25,535 | -5,815 | 19,720 | USD |
| 1000269 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PRIMER CONDITION & STORAGE MAGAZINE #5 - 733 | 3,157 | -1,925 | 1,232 | USD |
| 1000270 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PRIMER CONDITION & STORAGE  MAGAZINE #6 - 734 | 3,157 | -1,925 | 1,232 | USD |
| 1000272 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWDER POURING BUILDING 804 | 11,746 | -7,155 | 4,591 | USD |
| 1000272 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CONDUCT FLOOR #804 120452 | 2,784 | -1,697 | 1,087 | USD |
| 1000272 | 3 | Ammo | | 21 Lonoke, AR | 11/15/2000 | RPL POWDER POUR ROOF | 12,124 | -4,431 | 7,693 | USD |
| 1000272 | 4 | Ammo | | 21 Lonoke, AR | 1/15/2008 | ADDL LOADING DOCK | 4,258 | -1,297 | 2,961 | USD |
| 1000273 | 1 | Ammo | | 21 Lonoke, AR | 1/15/2011 | ADDL BLDG #805 CONDUCTIVE FLOOR 101692 | 3,200 | -837 | 2,363 | USD |
| 1000281 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWDER STORAGE MAGAZINE #7 - 813 | 4,649 | -2,833 | 1,816 | USD |
| 1000283 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | RIM FIRE MANUFACTURING BLDG #301 | 34,723 | -21,147 | 13,576 | USD |
| 1000283 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDITIONAL FLASHING ON ROOF | 4,152 | -2,529 | 1,623 | USD |
| 1000283 | 3 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST-RF RELOCATION PROJ. 110076 | 159,024 | -96,844 | 62,180 | USD |
| 1000283 | 4 | Ammo | | 21 Lonoke, AR | 12/1/1993 | RF PROJECT 100076MEZ STAIR 120428 | 130,094 | -79,225 | 50,869 | USD |
| 1000283 | 5 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL-MISL/SPRINKLER 110076 | 9,072 | -5,526 | 3,546 | USD |
| 1000283 | 9 | Ammo | | 21 Lonoke, AR | 3/15/2000 | ADDL ACOUSTICAL BAFFLES 100696 | 2,602 | -1,190 | 1,412 | USD |
| 1000283 | 10 | Ammo | | 21 Lonoke, AR | 3/15/2008 | RF PRIMING DUCTWORK | 19,774 | -6,022 | 13,752 | USD |
| 1000283 | 11 | Ammo | | 21 Lonoke, AR | 4/15/2008 | ADDL LIGHTING RF LOADING | 5,524 | -1,683 | 3,841 | USD |
| 1000283 | 12 | Ammo | | 21 Lonoke, AR | 2/15/2009 | ADDL RF PR & LD CONDUCTIVE FLOORS | 13,013 | -3,964 | 9,049 | USD |
| 1000283 | 13 | Ammo | | 21 Lonoke, AR | 2/15/2011 | ADDL RF FLOOR REPLACEMENT 101689 | 19,545 | -5,103 | 14,442 | USD |
| 1000283 | 14 | Ammo | | 21 Lonoke, AR | 12/31/2013 | ADDL RF FLOOR COATING 101843 | 24,023 | -6,252 | 17,771 | USD |
| 1000284 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LONG SHELL BLDG #302  110076 | 14,918 | -9,086 | 5,832 | USD |
| 1000284 | 1 | Ammo | | 21 Lonoke, AR | 8/15/2005 | RPL ROOF BLDG #302 | 8,092 | -2,465 | 5,627 | USD |
| 1000285 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SHORT SHELL BLDG #303  110076 | 16,084 | -9,796 | 6,288 | USD |
| 1000286 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWDER STORAGE BLDG #815 110076 | 8,790 | -5,355 | 3,435 | USD |
| 1000287 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PRIMER STORAGE BLDG #304 110076 | 6,520 | -3,973 | 2,547 | USD |
| 1000288 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PRIMER WHSE BLDG #735 - SS CON | 11,431 | -6,963 | 4,468 | USD |
| 1000288 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL 90' X 70' X 17' BLDG #735 - SS CON | 41,926 | -25,533 | 16,393 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val | Accum. dep. | Book val | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C000293 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | PALLET STORAGE BLDG 515 - 120499 | 6,275 | -3,822 | 2,453 | USD |
| C000457 | | 0 Ammo | | 21 Lonoke, AR | 12/15/1998 | WET MIX HOUSE #723 | 11,881 | -5,429 | 6,455 | USD |
| C000466 | | 0 Ammo | | 21 Lonoke, AR | 1/15/1999 | PRIMER WET MIX #719 | 11,095 | -5,069 | 6,026 | USD |
| C000467 | | 0 Ammo | | 21 Lonoke, AR | 1/15/1999 | PRIMER LIGHTING PROTECTION 100682 | 7,605 | -3,476 | 4,129 | USD |
| C000597 | | 0 Ammo | | 21 Lonoke, AR | 12/31/2013 | EXPLOSIVE STORAGE MAG #715 101821 | 206,287 | -53,679 | 152,608 | USD |
| 1000606 | | 1 Ammo | | 21 Lonoke, AR | 12/31/2013 | ADD'L #715 DESIGN 101715 | 31,856 | -8,290 | 23,566 | USD |
| C000598 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 BUILDING #1000 101862 | 1,213,976 | -315,890 | 898,086 | USD |
| C000598 | | 1 Ammo | | 21 Lonoke, AR | 11/29/2015 | L2 Building #1000  101862 - Additional | 107,592 | -24,499 | 83,093 | USD |
| C000599 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 DOCK DOORS/LEVELERS #1000 101862 | 28,870 | -7,514 | 21,356 | USD |
| C000600 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 FIRE SUPPRESSION/SPRINKLER #1000 101862 | 110,869 | -28,850 | 82,019 | USD |
| C000602 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 12x16 High Speed Fabric Door (2) | 12,121 | -3,155 | 8,966 | USD |
| C000603 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 10X10 High Speed Fabric Doors (1) | 10,492 | -2,731 | 7,761 | USD |
| C000604 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 8x10 Rolling Steel Doors (3) | 7,781 | -2,026 | 5,755 | USD |
| C000605 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Trailer Restraints | 15,533 | -4,042 | 11,491 | USD |
| C000606 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Dock Seals | 4,649 | -1,211 | 3,438 | USD |
| C000608 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Cs#1, Rite Hite Hydraulics | 9,492 | -2,472 | 7,020 | USD |
| C000609 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Rolling Steel Dock Doors | 12,306 | -3,205 | 9,101 | USD |
| C000612 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 12X16 Rolling Steel Doors (2) | 8,251 | -2,148 | 6,103 | USD |
| C000616 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 10X10 Rolling Steel Doors (1) | 4,082 | -1,064 | 3,018 | USD |
| C000617 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Fire Alarm System | 77,043 | -23,390 | 53,653 | USD |
| C000619 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Sheet Metal Air Handling System | 177,586 | -46,211 | 131,375 | USD |
| C000619 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Controls | 49,283 | -12,825 | 36,458 | USD |
| C000620 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Hollow Doors | 29,067 | -7,565 | 21,502 | USD |
| C000621 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Co #3 - Aaon Curb Insulation | 125,498 | -32,658 | 92,840 | USD |
| C000623 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Domestic Water Building 100 to L2 | 21,561 | -5,612 | 15,949 | USD |
| C000625 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Natural Gas Building 100 to L2 | 8,008 | -2,086 | 5,922 | USD |
| C000627 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Insulation Building 100 to L2 | 14,169 | -3,689 | 10,480 | USD |
| C000628 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Hollow Metal 3 Sided 16 Guage Door Frames | 6,375 | -1,660 | 4,715 | USD |
| C000629 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Equipment Building 100 to L2 | 4,491 | -1,170 | 3,321 | USD |
| C000630 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Domestic Water Piping Material/Labor | 135,527 | -35,267 | 100,260 | USD |
| C000631 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Natural Gas Piping Material/Labor | 9,240 | -2,407 | 6,833 | USD |
| C000632 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Sewer Piping Material/Labor | 12,321 | -3,208 | 9,113 | USD |
| C000633 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 - Bldg 100 Indst Waste Line (IW) Line to L2 | 14,970 | -3,897 | 11,073 | USD |
| C000634 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Restroom Fixtures And Install | 11,089 | -2,888 | 8,201 | USD |
| C000635 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Domestic Hot Water Heater | 18,481 | -4,811 | 13,670 | USD |
| C000636 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Security System | 77,107 | -23,409 | 53,698 | USD |
| C000637 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Lighting Fixtures Int. & Ext. & Install | 61,603 | -16,031 | 45,572 | USD |
| C000641 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Stairs & Rails | 43,122 | -11,222 | 31,900 | USD |
| C000642 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Doors & Windows | 61,600 | -16,031 | 45,569 | USD |
| C000643 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Aluminum Windows-Phase I | 21,651 | -5,636 | 16,015 | USD |
| C000644 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Aluminum Windows-Phase II | 18,634 | -4,851 | 13,783 | USD |
| C000645 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Aluminum Entrance (Lobby/office area) | 6,468 | -1,685 | 4,783 | USD |
| C000646 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Aluminum Sliding Door (Break room) | 5,544 | -1,444 | 4,100 | USD |
| C000647 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Door Hardware | 15,869 | -4,130 | 11,739 | USD |
| C000652 | | 0 Ammo | | 21 Lonoke, AR | 12/14/2014 | REPLACE ROOF West End Bldg 709 - 101904 | 19,630 | -5,110 | 14,520 | USD |
| 1000695 | | 0 Ammo | | 21 Lonoke, AR | 10/31/2017 | Plating Room Doors (3) 102024 | 10,653 | -2,426 | 8,227 | USD |
| C000701 | | 0 Ammo | | 21 Lonoke, AR | 1/31/2019 | Building, Remelt #511 - 101941 | 588,361 | -25,524 | 562,837 | USD |
| C000702 | | 0 Ammo | | 21 Lonoke, AR | 1/31/2019 | Baghouse, Donaldson Torit Remelt #511 - 101941 | 386,577 | -16,771 | 369,806 | USD |
| C000703 | | 0 Ammo | | 21 Lonoke, AR | 1/31/2019 | Building, Remelt #511-Electrical - 101941 | 1,033,198 | -44,820 | 988,378 | USD |
| 1000704 | | 0 Ammo | | 21 Lonoke, AR | 1/31/2019 | Building, Remelt #511-Carpentry - 101941 | 10,290 | -447 | 9,843 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis val | Accum dep | Book val | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C000705 | 0 | Ammo | | 21 Lonoke, AR | 1/31/2019 | Building, Remelt #511-Concrete - 101941 | 245,180 | -10,637 | 234,543 | USD |
| C000706 | 0 | Ammo | | 21 Lonoke, AR | 1/31/2019 | Building, Remelt #511-Doors/Windows - 101941 | 28,752 | -1,248 | 27,504 | USD |
| C000707 | 0 | Ammo | | 21 Lonoke, AR | 1/31/2019 | Building, Remelt #511-Floors - 101941 | 9,272 | -403 | 8,869 | USD |
| C000708 | 0 | Ammo | | 21 Lonoke, AR | 1/31/2019 | Building, Remelt #511-Metal Building - 101941 | 116,890 | -5,072 | 111,818 | USD |
| C000709 | 0 | Ammo | | 21 Lonoke, AR | 1/31/2019 | Building, Remelt #511-Plumbing water/gas - 101941 | 41,100 | -1,783 | 39,317 | USD |
| C000710 | 0 | Ammo | | 21 Lonoke, AR | 1/31/2019 | Building, Remelt #511-Sprinkler/Fire Prot. - 101941 | 24,159 | -1,049 | 23,110 | USD |
| C000711 | 0 | Ammo | | 21 Lonoke, AR | 1/31/2019 | Building, Remelt #511-Misc Bldng Equip - 101941 | 90,591 | -3,930 | 86,661 | USD |
| C000711 | 1 | Ammo | | 21 Lonoke, AR | 5/28/2019 | Building, Remelt #511-Misc Bldng Equip - 101941 | 2,117 | -66 | 2,051 | USD |
| C009372 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2000 | ADDL DUCTWORK-CF PACK | 2,746 | -1,006 | 1,740 | USD |
| C008841 | 0 | Ammo | | 21 Lonoke, AR | 12/15/1997 | CF PACK - AIR CONDITIONER | 9,197 | -4,202 | 4,995 | USD |
| 3015198 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | Bollards | 9,733 | -2,534 | 7,199 | USD |
| 3115200 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Specialties - Explovent Relief Panels (roof) 14 | 17,040 | -4,435 | 12,605 | USD |
| 3115201 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Equipment Pads (National) | 13,460 | -3,504 | 9,956 | USD |
| 3015203 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Phase I masonry Explosion Walls | 17,742 | -4,618 | 13,124 | USD |
| 3015205 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Phase II Masonry Explosion Walls | 23,656 | -6,157 | 17,499 | USD |
| 3015207 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Lockers And Benches | 17,865 | -4,651 | 13,214 | USD |
| 3015210 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Breakroom Sink And Install | 3,080 | -804 | 2,276 | USD |
| 3115211 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Compressed Air Building 100 to L2 | 14,169 | -3,689 | 10,480 | USD |
| 3115212 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Process Water Building 100 to L2 | 6,776 | -1,765 | 5,011 | USD |
| 3115213 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Steam Piping Building 100 to L2 | 10,781 | -2,807 | 7,974 | USD |
| 3015214 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Compressed Air Piping Material/Labor | 98,565 | -25,648 | 72,917 | USD |
| 3115215 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Process Water Piping Material & Labor | 46,202 | -12,024 | 34,178 | USD |
| 3115216 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Steam Piping Material & Labor | 48,667 | -12,665 | 36,002 | USD |
| 3015218 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Powder Sink And Install | 6,160 | -1,605 | 4,555 | USD |
| 3015219 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Process Related Power Distribution | 138,607 | -36,069 | 102,538 | USD |
| 3015220 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Process Related Branch Wiring | 107,806 | -28,053 | 79,753 | USD |
| 3115221 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Plates At Bunkers | 28,298 | -7,365 | 20,933 | USD |
| 3115222 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Breakroom cabinet/countertop | 2,820 | -735 | 2,085 | USD |
| 3115223 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Vinyl Floors (Break room) | 11,515 | -2,999 | 8,516 | USD |
| 3016676 | 0 | Ammo | | 21 Lonoke, AR | 3/3/2017 | Racks, Warehouse racks & corner protectors 101935 | 73,296 | -16,689 | 56,607 | USD |
| C000622 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Co #2 - Cooling Tower | 40,545 | -10,552 | 29,993 | USD |
| C000640 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Structural & Miscellaneous Steel | 14,616 | -3,804 | 10,812 | USD |
| 3031101 | 3 | Ammo | | 21 Lonoke, AR | 2/15/2009 | ADDL CF #183 DRAW PRESS | 13,690 | -8,338 | 5,352 | USD |
| 3031101 | 4 | Ammo | | 21 Lonoke, AR | 12/15/2011 | REBUILD DRAW PRESS #161 101717 | 23,975 | -7,301 | 16,674 | USD |
| 3031103 | 3 | Ammo | | 21 Lonoke, AR | 1/15/2008 | ADDL DRAW PRESS #177 | 7,830 | -7,153 | 677 | USD |
| 3031103 | 4 | Ammo | | 21 Lonoke, AR | 2/15/2012 | ADDL #177 BLISS PRESS 101660 | 29,891 | -9,104 | 20,787 | USD |
| 3050235 | 7 | Ammo | | 21 Lonoke, AR | 5/15/2013 | ADDL LEAD EXTRUDER GUARDING 101791 | 17,228 | -3,140 | 14,088 | USD |
| 3040036 | 4 | Ammo | | 21 Lonoke, AR | 9/15/2011 | ADDL HYDRAULIC LIFT 101652 | 21,683 | -7,924 | 13,759 | USD |
| C004887 | 1 | Ammo | | 21 Lonoke, AR | 7/29/2016 | #82A 162 Bliss Taper Press REBUILD | 70,277 | -12,802 | 57,475 | USD |
| C004882 | 1 | Ammo | | 21 Lonoke, AR | 3/15/2011 | ADDL WIRE FEED INDEXING #347 101684 | 6,513 | -916 | 5,597 | USD |
| 3005148 | 6 | Ammo | | 21 Lonoke, AR | 12/15/2011 | ADDL MODIFY DIP CUP 101736 | 2,906 | -886 | 2,020 | USD |
| C006109 | 5 | Ammo | | 21 Lonoke, AR | 7/29/2016 | Overhaul #304 Bliss Press 213 101920 | 76,490 | -13,934 | 62,556 | USD |
| C006109 | 7 | Ammo | | 21 Lonoke, AR | 6/1/2017 | Addt'l - #213 Draw Press Overhaul 101958 | 83,808 | -13,878 | 69,930 | USD |
| C006109 | 8 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Addt'l for Overhaul on 213 CF Draw Press 101949 | 49,971 | -8,276 | 41,695 | USD |
| 3009370 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2000 | 9MM MANURHIN LOADER #5 2814/100703 | 7,742 | -6,287 | 1,455 | USD |
| 3009370 | 2 | Ammo | | 21 Lonoke, AR | 10/31/2013 | ADDL CAMERA SYSTEM #9 101841 | 7,261 | -2,647 | 4,614 | USD |
| C009370 | 1 | Ammo | | 21 Lonoke, AR | 2/15/2008 | ADDL BULLET ASSEMBLY #237 | 4,740 | -4,331 | 409 | USD |
| C009391 | 0 | Ammo | | 21 Lonoke, AR | 10/15/2000 | HVAC-MAINTENANCE | 24,702 | -9,028 | 15,674 | USD |
| C009501 | 1 | Ammo | | 21 Lonoke, AR | 10/31/2013 | ADDL #800 IPS HOT GLUE UNIT 101860 | 5,329 | -1,388 | 3,941 | USD |
| 3009502 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2001 | IPS PISTOL PACKING SYSTEM #800 | 137,688 | -94,332 | 43,356 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Description | Capitalized on | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 8109502 | 6 | Ammo | 21 | Lonoke, AR | ADD'L PISTOL PACKING SYSTEM | 6/15/2001 | 9,972 | -9,109 | 863 | USD |
| 8109502 | 5 | Ammo | 21 | Lonoke, AR | ADD'L IPS PRODUCT BELT | 5/15/2004 | 9,800 | -3,028 | 6,772 | USD |
| 8109502 | 10 | Ammo | 21 | Lonoke, AR | ADD'L PAGO CASE LABEL PRINTER 101849 | 11/22/2013 | 8,215 | -1,361 | 6,854 | USD |
| 8109502 | 11 | Ammo | 21 | Lonoke, AR | PISTOL IPS VIDEO JET PRINTER - CF 101876 | 2/4/2014 | 19,372 | -3,210 | 16,162 | USD |
| 8109503 | 1 | Ammo | 21 | Lonoke, AR | UPGRADE DISPLAY #288 101869 | 4/11/2014 | 3,480 | -793 | 2,687 | USD |
| 8109550 | 0 | Ammo | 21 | Lonoke, AR | UPGRADE DISPLAY #337 101869 | 4/11/2014 | 3,480 | -793 | 2,687 | USD |
| 8109551 | 0 | Ammo | 21 | Lonoke, AR | CAFETERIA KITCHEN A/C | 4/15/2001 | 3,753 | -1,177 | 2,576 | USD |
| 8109554 | 1 | Ammo | 21 | Lonoke, AR | ADD'L CONVEYOR #136 101865 | 1/6/2014 | 3,418 | -1,039 | 2,379 | USD |
| 8109555 | 1 | Ammo | 21 | Lonoke, AR | ADD'L CONVEYOR #131 101865 | 1/6/2014 | 3,418 | -1,039 | 2,379 | USD |
| 8109558 | 4 | Ammo | 21 | Lonoke, AR | ADD'L MODIFY #222 DRAW PRESS 101475 | 8/15/2009 | 7,834 | -4,772 | 3,062 | USD |
| 8109558 | 5 | Ammo | 21 | Lonoke, AR | ADD'L #222 BLISS PRESS 101660 | 2/15/2012 | 29,891 | -9,104 | 20,787 | USD |
| 8109558 | 6 | Ammo | 21 | Lonoke, AR | Overhaul Of Draw Press 222  101897 | 11/3/2014 | 55,858 | -12,719 | 43,139 | USD |
| 8109762 | 1 | Ammo | 21 | Lonoke, AR | ADD'L 154B HEADING MACHINE 101498 | 8/15/2010 | 10,119 | -9,245 | 874 | USD |
| 8109762 | 2 | Ammo | 21 | Lonoke, AR | ADD'L CONVEYOR #154B 101865 | 1/15/2014 | 3,432 | -1,044 | 2,388 | USD |
| 8109851 | 0 | Ammo | 21 | Lonoke, AR | ADD'L CONVEYOR #152 101865 | 1/13/2014 | 3,429 | -1,043 | 2,386 | USD |
| 8109863 | 0 | Ammo | 21 | Lonoke, AR | RF PRE-WASH EQUIPMENT | 3/15/2002 | 4,118 | -2,737 | 1,381 | USD |
| 8109939 | 1 | Ammo | 21 | Lonoke, AR | MOD/INS MANURHIN LOADER #4 | 7/15/2005 | 31,690 | -27,791 | 3,899 | USD |
| 8109970 | 1 | Ammo | 21 | Lonoke, AR | ADD'L CONVEYOR #151 101865 | 1/13/2014 | 3,429 | -1,043 | 2,386 | USD |
| 8109990 | 0 | Ammo | 21 | Lonoke, AR | IPS RIFLE CASE PACKER | 11/15/2002 | 17,009 | -12,860 | 4,149 | USD |
| 3010041 | 0 | Ammo | 21 | Lonoke, AR | MANURHIN LOADER (PCH) #3 | 5/15/2003 | 3,055 | -1,915 | 1,140 | USD |
| 3010041 | 1 | Ammo | 21 | Lonoke, AR | ADD'L MANURHIN LOADER #3 | 12/15/2007 | 93,535 | -34,177 | 59,358 | USD |
| 3010041 | 2 | Ammo | 21 | Lonoke, AR | ADD'L MANURHIN LOADER #3 | 3/15/2008 | 3,552 | -1,299 | 2,253 | USD |
| 3010042 | 0 | Ammo | 21 | Lonoke, AR | MANURHIN LOADER (PCH) #2 | 5/15/2003 | 3,055 | -1,915 | 1,140 | USD |
| 3010042 | 1 | Ammo | 21 | Lonoke, AR | ADD'L MANURHIN LOADER #2 | 12/15/2007 | 76,846 | -28,081 | 48,765 | USD |
| 3010042 | 2 | Ammo | 21 | Lonoke, AR | ADD'L MANURHIN LOADER #2 | 3/15/2008 | 5,951 | -2,176 | 3,775 | USD |
| 3010043 | 0 | Ammo | 21 | Lonoke, AR | MANURHIN LOADER (PCH) #1 | 5/15/2003 | 2,666 | -1,672 | 994 | USD |
| 3010043 | 1 | Ammo | 21 | Lonoke, AR | REFURBISH #1 MANURHIN 101726 | 2/15/2012 | 76,574 | -23,317 | 53,257 | USD |
| 3010044 | 0 | Ammo | 21 | Lonoke, AR | SS COOLING TOWER | 5/15/2003 | 3,505 | -2,197 | 1,308 | USD |
| 3010046 | 3 | Ammo | 21 | Lonoke, AR | COMPONENT CONVEYOR #234A 101870 | 3/11/2014 | 6,361 | -1,933 | 4,428 | USD |
| 3010102 | 1 | Ammo | 21 | Lonoke, AR | ADD'L CF SHELL HEADER #154 101809 | 7/15/2013 | 36,518 | -13,305 | 23,213 | USD |
| 3010102 | 2 | Ammo | 21 | Lonoke, AR | ADD'L CONVEYOR #154 101865 | 1/13/2014 | 3,429 | -1,043 | 2,386 | USD |
| 3010137 | 0 | Ammo | 21 | Lonoke, AR | NITRATION EXHAUST FILTER UNIT | 12/15/2003 | 5,662 | -4,138 | 1,524 | USD |
| 3010234 | 0 | Ammo | 21 | Lonoke, AR | CF GAS BONDED BULLET MACHINE | 3/15/2004 | 9,297 | -6,178 | 3,119 | USD |
| 3010267 | 1 | Ammo | 21 | Lonoke, AR | ADD'L CONVEYOR #145 101865 | 1/6/2014 | 3,418 | -1,039 | 2,379 | USD |
| 3010268 | 2 | Ammo | 21 | Lonoke, AR | ADD'L WIRE FEED INDEXING #344 101684 | 3/15/2011 | 3,789 | -534 | 3,255 | USD |
| 3010315 | 0 | Ammo | 21 | Lonoke, AR | ADD'L WIRE FEED INDEXING #345 101684 | 3/15/2011 | 6,513 | -916 | 5,597 | USD |
| 3010315 | 1 | Ammo | 21 | Lonoke, AR | ADD'L WIRE FEED INDEXING #343 101684 | 3/15/2011 | 6,513 | -916 | 5,597 | USD |
| 3010315 | 2 | Ammo | 21 | Lonoke, AR | Overhaul Manville Swage #343  101925 | 10/1/2017 | 36,531 | -6,050 | 30,481 | USD |
| 3010319 | 0 | Ammo | 21 | Lonoke, AR | HVAC BLDG #722 | 11/15/2004 | 3,261 | -1,193 | 2,068 | USD |
| 3010400 | 1 | Ammo | 21 | Lonoke, AR | #602 AIT PACKER | 5/15/2005 | 31,014 | -19,428 | 11,586 | USD |
| 3010401 | 1 | Ammo | 21 | Lonoke, AR | #629 AIT PACKER | 5/15/2005 | 34,222 | -21,437 | 12,785 | USD |
| 3010470 | 0 | Ammo | 21 | Lonoke, AR | 5.56MM LINKING EQUIPMENT | 11/15/2004 | 10,945 | -8,276 | 2,669 | USD |
| 3010504 | 0 | Ammo | 21 | Lonoke, AR | REBUILT 2 3/4 PACKER | 12/15/2005 | 5,639 | -2,945 | 2,694 | USD |
| 3010522 | 1 | Ammo | 21 | Lonoke, AR | ADD'L CONVEYOR #144 101865 | 1/6/2014 | 3,418 | -1,039 | 2,379 | USD |
| 3010689 | 0 | Ammo | 21 | Lonoke, AR | PUMP STATION ADVD TREATMENT | 6/15/2006 | 49,124 | -29,917 | 19,207 | USD |
| 3010691 | 0 | Ammo | 21 | Lonoke, AR | ADD'L REPLACE GENERATOR 101699 | 2/15/2011 | 5,377 | -1,967 | 3,410 | USD |
| 3010726 | 0 | Ammo | 21 | Lonoke, AR | BUCKSHOT LOADER | 9/15/2006 | 98,248 | -55,230 | 43,018 | USD |
| 3010726 | 1 | Ammo | 21 | Lonoke, AR | WADSHOT CONTAINER | 9/15/2006 | 2,775 | -2,255 | 520 | USD |
| 3010727 | 0 | Ammo | 21 | Lonoke, AR | 5RD BUCKSHOT PACKER #624 | 9/15/2006 | 38,378 | -21,575 | 16,803 | USD |
| 3010728 | 0 | Ammo | 21 | Lonoke, AR | 25RD BUCKSHOT PACKER | 9/15/2006 | 7,676 | -4,316 | 3,360 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3110738 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2006 | WASH & DRY UNIT PROGRESSIVE | 8,110 | -6,132 | 1,978 | USD |
| 3015580 | 0 | Ammo | | 21 Lonoke, AR | 5/21/2015 | OVH CF DUPLEX HEADER #151 101851 | 113,340 | -29,494 | 83,846 | USD |
| 3015581 | 0 | Ammo | | 21 Lonoke, AR | 5/21/2015 | SHELL FEED BOWL 101847 | 9,401 | -1,904 | 7,497 | USD |
| 3016179 | 0 | Ammo | | 21 Lonoke, AR | 5/1/2016 | HELIXA TORQUE TESTER 101940 | 13,344 | -2,432 | 10,912 | USD |
| 3016184 | 0 | Ammo | | 21 Lonoke, AR | 5/1/2016 | CF VACUUM SYSTEM 101921 | 114,870 | -16,096 | 98,774 | USD |
| 3016248 | 0 | Ammo | | 21 Lonoke, AR | 7/29/2016 | Kubota Mower ZD221 Diesel 101983 | 8,154 | -2,971 | 5,183 | USD |
| 3016387 | 0 | Ammo | | 21 Lonoke, AR | 8/26/2016 | Shotshell Dry Ice Cleaning System 101964 | 21,207 | -3,864 | 17,343 | USD |
| 3016388 | 0 | Ammo | | 21 Lonoke, AR | 8/26/2016 | Bridgeport Milling Machine | 22,992 | -4,190 | 18,802 | USD |
| 3016389 | 0 | Ammo | | 21 Lonoke, AR | 8/26/2016 | 4056 Bridgeport Milling Machine 101951 | 22,992 | -4,190 | 18,802 | USD |
| 3016390 | 0 | Ammo | | 21 Lonoke, AR | 8/26/2016 | Waterbury Farrell 6600 Frame | 64,615 | -11,770 | 52,845 | USD |
| 3117262 | 0 | Ammo | | 21 Lonoke, AR | 12/30/2019 | Osmosis-Applied Membrane Reverse- 102064 | 15,936 | -393 | 15,543 | USD |
| 3117263 | 0 | Ammo | | 21 Lonoke, AR | 12/30/2019 | Lube Sizer- REM Lead Bullet (new) - 102065 | 41,542 | -478 | 41,064 | USD |
| 3003054 | 6 | Ammo | | 21 Lonoke, AR | 8/15/2011 | ADDL REB CF #726 FURNACE 101681 | 12,093 | -2,764 | 9,329 | USD |
| 3003055 | 7 | Ammo | | 21 Lonoke, AR | 5/15/2008 | ADDL DISPATCH FURNACE #725 | 9,144 | -3,342 | 5,802 | USD |
| 3003056 | 5 | Ammo | | 21 Lonoke, AR | 5/15/2005 | ADDL CF #727 ANNEAL FURNACE | 4,912 | -3,079 | 1,833 | USD |
| 3003073 | 5 | Ammo | | 21 Lonoke, AR | 3/15/2010 | ADDL #727 WASH UNIT FRAME 101568 | 7,720 | -3,528 | 4,192 | USD |
| 3003090 | 3 | Ammo | | 21 Lonoke, AR | 5/15/2010 | REBUILD 229 CUPPING PRESS 101598 | 2,687 | -1,229 | 1,458 | USD |
| 3003090 | 4 | Ammo | | 21 Lonoke, AR | 5/15/2013 | OVH CF CUPPING PRESS #229 101792 | 38,357 | -9,983 | 28,374 | USD |
| 3003090 | 5 | Ammo | | 21 Lonoke, AR | 7/15/2013 | RPL CUPPING PRESS #229 101787 | 31,310 | -8,148 | 23,162 | USD |
| 3003090 | 6 | Ammo | | 21 Lonoke, AR | 7/15/2013 | ADDL 9MM CALIBUR 101787 | 17,268 | -4,495 | 12,773 | USD |
| 3003091 | 4 | Ammo | | 21 Lonoke, AR | 9/15/2010 | ADDL DRAW PRESS FEED SYS 101655 | 3,513 | -1,607 | 1,906 | USD |
| 3003093 | 4 | Ammo | | 21 Lonoke, AR | 9/15/2009 | ADDL #200 DRAW PRESS 101544 | 18,295 | -11,143 | 7,152 | USD |
| 3003093 | 5 | Ammo | | 21 Lonoke, AR | 9/15/2010 | ADDL DRAW PRESS FEED SYS #200 101655 | 3,513 | -1,607 | 1,906 | USD |
| 3003094 | 5 | Ammo | | 21 Lonoke, AR | 9/15/2010 | ADDL DRAW PRESS FEED SYS #201 101655 | 3,513 | -1,607 | 1,906 | USD |
| 3003095 | 4 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Titan Model 620 Type 3 Conveyor for #241 102030 | 6,763 | -1,371 | 5,392 | USD |
| 3003096 | 4 | Ammo | | 21 Lonoke, AR | 8/31/2018 | Add'l- Rebuild CF #193 Bliss Shell Draw - 102044 | 85,311 | -12,829 | 72,482 | USD |
| 3003100 | 3 | Ammo | | 21 Lonoke, AR | 11/15/2008 | ADDL REBUILD #159 DRAW PRESS | 10,657 | -6,491 | 4,166 | USD |
| 3003100 | 4 | Ammo | | 21 Lonoke, AR | 5/15/2011 | ADDL VIBRATORY FEEDER MCH #161 101719 | 4,893 | -1,789 | 3,104 | USD |
| 3003132 | 2 | Ammo | | 21 Lonoke, AR | 11/15/2012 | BUGGY LIFT #721 101764 | 4,809 | -1,256 | 3,553 | USD |
| 3003145 | 2 | Ammo | | 21 Lonoke, AR | 9/15/2010 | ADDL HEADTURN FEED SYS #106 101655 | 3,339 | -1,526 | 1,813 | USD |
| 3003159 | 5 | Ammo | | 21 Lonoke, AR | 3/15/2015 | Rpl Frame CF 720 Wash 101909 | 58,466 | -8,877 | 49,589 | USD |
| 3003159 | 6 | Ammo | | 21 Lonoke, AR | 3/19/2018 | Rpl Frame CF 720 Wash Add'l 101909 | 16,188 | -1,967 | 14,221 | USD |
| 3003160 | 7 | Ammo | | 21 Lonoke, AR | 3/15/2015 | RPL Frame CF 7 cone wash 723 / 101902 | 58,466 | -8,877 | 49,589 | USD |
| 3003160 | 8 | Ammo | | 21 Lonoke, AR | 3/19/2018 | Rpl Frame CF 7 Cone Wash 723 Add'l 101909 | 16,188 | -1,967 | 14,221 | USD |
| 3003167 | 3 | Ammo | | 21 Lonoke, AR | 9/15/2010 | ADDL HEADTURN FEED SYS #117 101655 | 3,339 | -1,526 | 1,813 | USD |
| 3003188 | 3 | Ammo | | 21 Lonoke, AR | 9/15/2010 | ADDL HEADTURN FEED SYS #118 101655 | 3,339 | -1,526 | 1,813 | USD |
| 3003193 | 1 | Ammo | | 21 Lonoke, AR | 4/15/2011 | ADDL #73 STEEL COLLATOR 101649 | 2,611 | -956 | 1,655 | USD |
| 3003194 | 4 | Ammo | | 21 Lonoke, AR | 4/15/2011 | ADDL #74 STEEL COLLATOR 101649 | 2,611 | -956 | 1,655 | USD |
| 3003199 | 4 | Ammo | | 21 Lonoke, AR | 4/15/2011 | ADDL #71 STEEL COLLATOR 101649 | 2,611 | -956 | 1,655 | USD |
| 3003218 | 2 | Ammo | | 21 Lonoke, AR | 12/15/2012 | ADDL 95 TAPER PRESS W/SERVO DRIVE 101786 | 51,294 | -13,389 | 37,905 | USD |
| 3003219 | 2 | Ammo | | 21 Lonoke, AR | 3/17/2014 | ADDL #81 TAPER PRESS 101835 | 63,987 | -14,571 | 49,416 | USD |
| 3003225 | 3 | Ammo | | 21 Lonoke, AR | 1/6/2014 | ADDL CONVEYOR #138 101865 | 3,418 | -1,039 | 2,379 | USD |
| 3003225 | 4 | Ammo | | 21 Lonoke, AR | 3/3/2017 | Overhaul #4 Duplex Header 101930 | 149,737 | -30,306 | 119,431 | USD |
| 3003225 | 5 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Overhaul Bliss Header #138 101994/101949 | 201,944 | -40,872 | 161,072 | USD |
| 3003225 | 6 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Add'l Overhaul Bliss Header #138 101949 | 49,454 | -10,010 | 39,444 | USD |
| 3003226 | 4 | Ammo | | 21 Lonoke, AR | 1/6/2014 | ADDL CONVEYOR #33 101865 | 3,418 | -1,039 | 2,379 | USD |
| 3003239 | 4 | Ammo | | 21 Lonoke, AR | 11/29/2015 | ADDL Remelt Controls and Conveyors 101913 | 43,839 | -9,983 | 33,856 | USD |
| 3003248 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2005 | ADDL CF LEAD ELEVATOR | 10,015 | -8,134 | 1,881 | USD |
| 3003254 | 3 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL LEAD EXTRUDER | 5,153 | -3,425 | 1,728 | USD |
| 3003322 | 2 | Ammo | | 21 Lonoke, AR | 5/15/2009 | ADDL CF PRIMING PRESS #32 | 6,610 | -4,027 | 2,583 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val | Accum. dep. | Book val | Currency |
|---|---|---|---|---|---|---|---|---|---|
| 3003324 | | 3 | Ammo | 21 Lonoke, AR | 9/15/2009 | ADDL REBUILD #36P PRIMING MACHINE 101549 | 10,386 | -6,327 | 4,059 | USD |
| 3003326 | | 5 | Ammo | 21 Lonoke, AR | 1/16/2014 | ADDL CF PRIMING MCH #40 SHELL FEED 101853 | 17,136 | -3,902 | 13,234 | USD |
| 3003331 | | 4 | Ammo | 21 Lonoke, AR | 7/15/2013 | ADDL 36P HIGH SPEED SERVO 101787 | 88,640 | -23,066 | 65,574 | USD |
| 3003332 | | 5 | Ammo | 21 Lonoke, AR | 7/15/2008 | ADDL #63P GEAR ASSEMBLY | 3,567 | -3,260 | 307 | USD |
| 3003344 | | 1 | Ammo | 21 Lonoke, AR | 2/15/2010 | ADDL ELEVATOR #2 SAFETY UPGRADE 101565 | 10,614 | -9,696 | 918 | USD |
| 3003363 | | 2 | Ammo | 21 Lonoke, AR | 5/15/2008 | ADDL CF DUPLEX #26 | 10,431 | -3,814 | 6,617 | USD |
| 3003363 | | 3 | Ammo | 21 Lonoke, AR | 8/15/2009 | ADDL FEEDERS #26 101464 | 2,585 | -1,576 | 1,009 | USD |
| 3003365 | | 3 | Ammo | 21 Lonoke, AR | 5/15/2009 | ADDL CF DUPLEX LOADER #28 | 33,683 | -10,257 | 23,426 | USD |
| 3003365 | | 4 | Ammo | 21 Lonoke, AR | 8/15/2009 | ADDL FEEDERS #28 101464 | 2,585 | -1,576 | 1,009 | USD |
| 3003366 | | 4 | Ammo | 21 Lonoke, AR | 8/15/2009 | ADDL FEEDERS #29 101464 | 2,585 | -1,576 | 1,009 | USD |
| 3003366 | | 5 | Ammo | 21 Lonoke, AR | 3/15/2013 | ADDL SHELL BOWL FEED SYS #29 101802 | 19,337 | -5,033 | 14,304 | USD |
| 3003367 | | 5 | Ammo | 21 Lonoke, AR | 4/15/2004 | ADDL CF #15 DUPLEX LOADER | 6,070 | -3,915 | 2,155 | USD |
| 3003368 | | 3 | Ammo | 21 Lonoke, AR | 8/15/2009 | ADDL FEEDERS #16 101464 | 2,585 | -1,576 | 1,009 | USD |
| 3003368 | | 4 | Ammo | 21 Lonoke, AR | 12/15/2012 | ADDL FEEDER BOWL W/STAND #16 101788 | 11,943 | -3,119 | 8,824 | USD |
| 3003368 | | 5 | Ammo | 21 Lonoke, AR | 7/15/2013 | SHELL BOWL (30CAL) #16 101788 | 21,892 | -5,698 | 16,194 | USD |
| 3003369 | | 3 | Ammo | 21 Lonoke, AR | 8/15/2009 | ADDL FEEDERS #17 101464 | 2,585 | -1,576 | 1,009 | USD |
| 3003370 | | 4 | Ammo | 21 Lonoke, AR | 4/15/2007 | ADDL CF #18 DUPLEX LOADER | 13,742 | -5,196 | 8,546 | USD |
| 3003370 | | 5 | Ammo | 21 Lonoke, AR | 8/15/2009 | ADDL FEEDERS #11 101464 | 2,585 | -1,576 | 1,009 | USD |
| 3003370 | | 6 | Ammo | 21 Lonoke, AR | 12/15/2012 | ADDL FEEDER BOWL W/STAND #28 101788 | 24,713 | -6,452 | 18,261 | USD |
| 3003370 | | 7 | Ammo | 21 Lonoke, AR | 12/3/2017 | Overhaul CF EX Loader #18  101933 | 125,240 | -15,210 | 110,030 | USD |
| 3003371 | | 2 | Ammo | 21 Lonoke, AR | 9/15/2009 | ADDL FEEDERS #25 101464 | 2,646 | -1,612 | 1,034 | USD |
| 3003372 | | 4 | Ammo | 21 Lonoke, AR | 4/15/2005 | ADDL #25 DUPLEX LOADER | 8,126 | -5,242 | 2,884 | USD |
| 3003372 | | 5 | Ammo | 21 Lonoke, AR | 8/15/2009 | ADDL FEEDERS #14 101464 | 2,585 | -1,576 | 1,009 | USD |
| 3003372 | | 6 | Ammo | 21 Lonoke, AR | 12/15/2012 | ADDL FEEDER BOWL W/STAND #7  101788 | 8,011 | -2,093 | 5,918 | USD |
| 3003373 | | 3 | Ammo | 21 Lonoke, AR | 8/15/2009 | ADDL FEEDERS #24 101464 | 2,585 | -1,576 | 1,009 | USD |
| 3003374 | | 3 | Ammo | 21 Lonoke, AR | 8/15/2009 | ADDL FEEDERS #19 101464 | 2,585 | -1,576 | 1,009 | USD |
| 3003390 | | 1 | Ammo | 21 Lonoke, AR | 2/15/2009 | ADDL RANSOHOFF TUMBLER | 3,604 | -2,196 | 1,408 | USD |
| 3003390 | | 1 | Ammo | 21 Lonoke, AR | 11/25/2016 | Rotoclone Dust Collector for Pre-Mix Operation | 18,369 | -2,392 | 15,977 | USD |
| 3003394 | | 2 | Ammo | 21 Lonoke, AR | 5/15/2010 | ADDL 780 PACKER FEED SYS 101611 | 17,478 | -4,563 | 12,915 | USD |
| 3003431 | | 2 | Ammo | 21 Lonoke, AR | 11/15/2012 | ADDL 721B WASH SYSTEM 101764 | 43,272 | -11,294 | 31,978 | USD |
| 3003435 | | 4 | Ammo | 21 Lonoke, AR | 4/15/2006 | ADDL REBUILD 401 CAP PRESS | 2,637 | -1,702 | 935 | USD |
| 3003435 | | 8 | Ammo | 21 Lonoke, AR | 1/15/2008 | ADDL INDEX FEED SYS | 11,908 | -10,878 | 1,030 | USD |
| 3003435 | | 11 | Ammo | 21 Lonoke, AR | 10/15/2011 | ADDL CAP PRESS #401 101729 | 22,115 | -8,081 | 14,034 | USD |
| 3003435 | | 1 | Ammo | 21 Lonoke, AR | 11/15/2006 | ADDL REFURBISH CAP PRESS | 24,332 | -18,396 | 5,936 | USD |
| 3003439 | | 4 | Ammo | 21 Lonoke, AR | 11/15/2006 | 12GA LB PROGRESSIVE DIE SET | 6,560 | -4,960 | 1,600 | USD |
| 3003439 | | 8 | Ammo | 21 Lonoke, AR | 1/15/2011 | ADDL #400 CAP PRESS FEED ROLL 101632 | 3,300 | -1,207 | 2,093 | USD |
| 3003439 | | 9 | Ammo | 21 Lonoke, AR | 8/5/2018 | Rebuild, SS 400 Cap Press Crankshaft, 102020 | 224,501 | -35,358 | 189,143 | USD |
| 3003525 | | 9 | Ammo | 21 Lonoke, AR | 12/15/2008 | ADDL EXT BARREL & SCREW | 2,818 | -1,718 | 1,100 | USD |
| 3003525 | | 8 | Ammo | 21 Lonoke, AR | 3/3/2017 | SS Extruder #420 Electrical Upgrade 101971 | 66,383 | -8,638 | 57,745 | USD |
| 3003526 | | 7 | Ammo | 21 Lonoke, AR | 9/3/2017 | 408 - 409 Electrical Upgrade 101970 | 106,421 | -10,204 | 96,217 | USD |
| 3003528 | | 5 | Ammo | 21 Lonoke, AR | 3/15/2005 | ADDL #422 EXTRUDER | 10,404 | -6,913 | 3,491 | USD |
| 3003538 | | 2 | Ammo | 21 Lonoke, AR | 4/15/2008 | ADDL REBUILD BODY FORMER #968 | 4,148 | -3,791 | 357 | USD |
| 3003538 | | 2 | Ammo | 21 Lonoke, AR | 12/15/2009 | ADDL REBUILD #968 BODY FORMER 101490 | 6,014 | -2,748 | 3,266 | USD |
| 3003558 | | 2 | Ammo | 21 Lonoke, AR | 7/15/2012 | ELECTRICAL UPGRADE #435 101774 | 6,878 | -900 | 5,978 | USD |
| 3003562 | | 2 | Ammo | 21 Lonoke, AR | 7/15/2012 | ELECTRICAL UPGRADE #433 101774 | 6,878 | -900 | 5,978 | USD |
| 3003671 | | 3 | Ammo | 21 Lonoke, AR | 4/15/2008 | ADDL #3 ELEVATOR | 15,685 | -14,329 | 1,356 | USD |
| 3003673 | | 9 | Ammo | 21 Lonoke, AR | 9/15/2009 | ADDL REBUILD #483 TRIPLEX 101530 | 24,361 | -14,837 | 9,524 | USD |
| 3003673 | | 10 | Ammo | 21 Lonoke, AR | 4/15/2010 | ADDL #483 AH&P-REBUILD CLUTCH 101582 | 7,613 | -3,479 | 4,134 | USD |
| 3003673 | | 11 | Ammo | 21 Lonoke, AR | 11/15/2012 | ADDL #483 SPROCKET DRIVE 101776 | 2,736 | -715 | 2,021 | USD |
| 3003673 | | 12 | Ammo | 21 Lonoke, AR | 9/6/2013 | ADDL #483 FERGUSON DRIVE UNIT 101776 | 10,605 | -2,761 | 7,844 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis.val | Accum. dep. | Book val | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3003674 | 10 | Ammo | | 21 Lonoke, AR | 3/15/2007 | ADDL #477 TRIPLEX | 3,111 | -2,068 | 1,043 | USD |
| 3003674 | 11 | Ammo | | 21 Lonoke, AR | 1/15/2011 | ADDL #477 AH&P BODY BOWL 101667 | 6,109 | -2,233 | 3,876 | USD |
| 3003675 | 11 | Ammo | | 21 Lonoke, AR | 12/15/2011 | OVERHAUL #480 TRIPLEX 101723 | 36,998 | -11,267 | 25,731 | USD |
| 3003676 | 9 | Ammo | | 21 Lonoke, AR | 10/15/2005 | ADDL #486 TRIPLEX AH&P | 3,693 | -2,892 | 801 | USD |
| 3003676 | 10 | Ammo | | 21 Lonoke, AR | 10/15/2009 | ADDL #486 AH&P BODY HOPPERS 101555 | 6,005 | -1,830 | 4,175 | USD |
| 3003676 | 11 | Ammo | | 21 Lonoke, AR | 4/12/2014 | ADDL #486 CAP BOWL REPLACEMENT 101873 | 10,775 | -2,454 | 8,321 | USD |
| 3003677 | 7 | Ammo | | 21 Lonoke, AR | 7/28/2017 | Addlt Rebuild AH&P Simplex 495  101987 | 68,190 | -11,294 | 56,896 | USD |
| 3003678 | 8 | Ammo | | 21 Lonoke, AR | 5/30/2019 | Controller, Allen Bradley PLC 496 Simplex  102049 | 11,415 | -578 | 10,837 | USD |
| 3003680 | 11 | Ammo | | 21 Lonoke, AR | 9/15/2007 | ADDL #489 TRIPLEX AH&P | 4,827 | -4,411 | 416 | USD |
| 3003681 | 11 | Ammo | | 21 Lonoke, AR | 4/15/2009 | ADDL 498 AH&P SIMPLEX DIAL | 7,271 | -4,429 | 2,842 | USD |
| 3003681 | 12 | Ammo | | 21 Lonoke, AR | 11/15/2009 | ADDL #498 BODY FEED BOWL 101546 | 9,972 | -4,555 | 5,417 | USD |
| 3003682 | 7 | Ammo | | 21 Lonoke, AR | 9/15/2011 | ADDL 494 BODY BOWL 101724 | 7,509 | -2,744 | 4,765 | USD |
| 3003683 | 10 | Ammo | | 21 Lonoke, AR | 3/15/2004 | ADDL #478 TRIPLEX ELECTRIC CONTROLS | 4,986 | -1,350 | 3,636 | USD |
| 3003718 | 6 | Ammo | | 21 Lonoke, AR | 1/15/2010 | ADDL SERVO CONTROLLED VALVE 101534 | 5,766 | -2,635 | 3,131 | USD |
| 3003718 | 7 | Ammo | | 21 Lonoke, AR | 2/15/2012 | REPLACE LEAD KETTLE 101734 | 75,509 | -22,994 | 52,515 | USD |
| 3003720 | 1 | Ammo | | 21 Lonoke, AR | 3/15/2002 | ADDL SHOT TOWER ELEVATOR | 3,494 | -3,193 | 301 | USD |
| 3003754 | 4 | Ammo | | 21 Lonoke, AR | 8/15/2011 | ADDL VIBRATORY FEED BOWL #515  101642 | 6,183 | -2,261 | 3,922 | USD |
| 3003757 | 9 | Ammo | | 21 Lonoke, AR | 8/15/2009 | ADDL #507 SLIDE POWDER CHARGERS 101547 | 10,578 | -6,444 | 4,134 | USD |
| 3003758 | 5 | Ammo | | 21 Lonoke, AR | 5/15/2005 | ADDL 516 LOADER UPGRADE | 6,844 | -4,289 | 2,555 | USD |
| 3003758 | 7 | Ammo | | 21 Lonoke, AR | 5/15/2010 | ADDL HYPERSONIC CHARGER/WAD FEED 101629 | 26,936 | -12,303 | 14,633 | USD |
| 3003760 | 10 | Ammo | | 21 Lonoke, AR | 11/15/2010 | ADDL SLIDE POWDER CHARGER 101547 | 16,330 | -5,969 | 10,361 | USD |
| 3003762 | 8 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL DATA COMMUNICATIONS UPG | 4,358 | -726 | 3,632 | USD |
| 3003762 | 11 | Ammo | | 21 Lonoke, AR | 5/15/2010 | ADDL HYPERSONIC CHARGER/WAD FEED 101629 | 36,199 | -16,535 | 19,664 | USD |
| 3003765 | 7 | Ammo | | 21 Lonoke, AR | 8/15/2008 | ADDL FIRE SUPPRESSION SYS | 2,767 | -2,529 | 238 | USD |
| 3003766 | 9 | Ammo | | 21 Lonoke, AR | 4/15/2011 | ADDL #509 H-WAD FEEDER 101686 | 5,275 | -1,928 | 3,347 | USD |
| 3003767 | 10 | Ammo | | 21 Lonoke, AR | 5/15/2005 | ADDL 511 LOADER UPGRADE | 6,203 | -3,887 | 2,316 | USD |
| 3003768 | 3 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL DATA COMMUNICATIONS UPG | 4,208 | -701 | 3,507 | USD |
| 3003769 | 3 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL DATA COMMUNICATIONS UPG | 4,358 | -726 | 3,632 | USD |
| 3003769 | 4 | Ammo | | 21 Lonoke, AR | 8/15/2011 | ADDL VIBRATORY FEED BOWL #512  101642 | 6,183 | -2,261 | 3,922 | USD |
| 3003770 | 5 | Ammo | | 21 Lonoke, AR | 2/15/2006 | ADDL #525 ELECTRICAL UPGRADE | 8,910 | -1,880 | 7,030 | USD |
| 3003770 | 10 | Ammo | | 21 Lonoke, AR | 10/15/2008 | ADDL VOLUMETRIC SHOT CHARGER | 2,994 | -2,737 | 257 | USD |
| 3003770 | 12 | Ammo | | 21 Lonoke, AR | 12/15/2011 | REBUILD SS LOADER #525 101744 | 23,102 | -4,691 | 18,411 | USD |
| 3003771 | 6 | Ammo | | 21 Lonoke, AR | 11/1/2013 | ADDL #525 POWDER CHARGER 101708 | 3,841 | -1,001 | 2,840 | USD |
| 3003771 | 7 | Ammo | | 21 Lonoke, AR | 12/15/2002 | LOADER MODIFICATION HEVI SHOT | 3,762 | -2,750 | 1,012 | USD |
| 3003771 | 9 | Ammo | | 21 Lonoke, AR | 2/15/2008 | ADDL UPGRADE #526 | 6,392 | -5,841 | 551 | USD |
| 3003771 | 11 | Ammo | | 21 Lonoke, AR | 1/2/2013 | ADDL #526 20GA WAD FEED BOWL 101708 | 9,973 | -2,596 | 7,377 | USD |
| 3003771 | 11 | Ammo | | 21 Lonoke, AR | 1/2/2013 | ADDL #526 20GA WAD ESCAPEMENT 101708 | 2,605 | -680 | 1,925 | USD |
| 3003771 | 12 | Ammo | | 21 Lonoke, AR | 11/1/2013 | ADDL #526 POWDER CHARGER 101708 | 3,841 | -1,001 | 2,840 | USD |
| 3003772 | 7 | Ammo | | 21 Lonoke, AR | 7/15/2008 | ADDL #527 LOADER SLUG TRANSFER | 2,959 | -1,082 | 1,877 | USD |
| 3003772 | 18 | Ammo | | 21 Lonoke, AR | 11/1/2013 | ADDL #527 POWDER CHARGER 101708 | 3,841 | -1,001 | 2,840 | USD |
| 3003782 | 3 | Ammo | | 21 Lonoke, AR | 2/15/2010 | ADDL ELEVATOR #4 MODIFICATIONS | 21,519 | -13,105 | 8,414 | USD |
| 3003801 | 6 | Ammo | | 21 Lonoke, AR | 8/4/2014 | ADDL #606 28GA PACKER 101868 | 18,090 | -2,997 | 15,093 | USD |
| 3003812 | 10 | Ammo | | 21 Lonoke, AR | 8/31/2018 | Addlt Electrical Upgrade, SS Packer 609 - 102045 | 51,130 | -7,689 | 43,441 | USD |
| 3003814 | 11 | Ammo | | 21 Lonoke, AR | 12/21/2016 | Packer #628 Overhaul with motor rplc 4063/101961 | 34,266 | -4,459 | 29,807 | USD |
| 3003821 | 2 | Ammo | | 21 Lonoke, AR | 10/31/2013 | ADDL #630 SS HOT GLUE UNIT 101860 | 5,329 | -1,388 | 3,941 | USD |
| 3003833 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LACHAUSSEE  LOADER # 510 | 5,589 | -5,107 | 482 | USD |
| 3003833 | 10 | Ammo | | 21 Lonoke, AR | 4/15/2005 | ADDL 510 ELECTRICAL UPGRADE | 14,214 | -3,317 | 10,897 | USD |
| 3003833 | 11 | Ammo | | 21 Lonoke, AR | 7/15/2008 | ADDL #510 LOADER INDICATOR LIGHTS | 3,097 | -1,133 | 1,964 | USD |
| 3003833 | 12 | Ammo | | 21 Lonoke, AR | 9/3/2017 | Addlt Automatic Fire Suppression for 510  101975 | 9,154 | -1,517 | 7,637 | USD |
| 3003833 | 13 | Ammo | | 21 Lonoke, AR | 10/1/2017 | 510 Vision System  102000 | 22,759 | -3,770 | 18,989 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val | Accum. dep. | Book val | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3003844 | 1 | Ammo | | 21 Lonoke, AR | 8/15/2009 | ADD'L REBUILD #1311 PLATER 101540 | 4,171 | -2,542 | 1,629 | USD |
| 3003858 | 2 | Ammo | | 21 Lonoke, AR | 3/31/2019 | Wash Unit-7 Cone-1075-102048 | 187,858 | -11,559 | 176,299 | USD |
| 3003859 | 2 | Ammo | | 21 Lonoke, AR | 3/15/2015 | Rpl Frame RF 4 Cone Wash - 101908 | 36,421 | -7,372 | 29,049 | USD |
| 3003859 | 3 | Ammo | | 21 Lonoke, AR | 3/3/2017 | Rpl Frame RF 4 Cone Wash - 101908 | 8,906 | -1,476 | 7,430 | USD |
| 3003861 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | Wash, Shell Relief Anneal 7-Cone Wash | 251 | -251 | 0 | USD |
| 3003866 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2009 | ADD'L #1004 CUPPING PRESS | 5,498 | -3,350 | 2,148 | USD |
| 3003867 | 6 | Ammo | | 21 Lonoke, AR | 10/15/2011 | ADD'L REBUILD V&O PRESS #1003 101714 | 27,430 | -10,023 | 17,407 | USD |
| 3003868 | 4 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADD'L #1002 PRESS | 6,265 | -3,817 | 2,448 | USD |
| 3003869 | 5 | Ammo | | 21 Lonoke, AR | 4/15/2005 | ADD'L 1045 ELECTRICAL UPGRADE | 6,062 | -1,414 | 4,648 | USD |
| 3003869 | 7 | Ammo | | 21 Lonoke, AR | 12/21/2018 | Shellmaker, Rebuild #1045  101980 | 446,262 | -53,410 | 392,852 | USD |
| 3003871 | 9 | Ammo | | 21 Lonoke, AR | 2/15/2010 | ADD'L #1047 GEAR REDUCER 101585 | 5,943 | -2,716 | 3,227 | USD |
| 3003871 | 10 | Ammo | | 21 Lonoke, AR | 12/27/2018 | Header, RF Shellmaking Rebuild #1047 102057/101980 | 22,226 | -2,625 | 19,601 | USD |
| 3003872 | 9 | Ammo | | 21 Lonoke, AR | 12/27/2018 | Header, RF Shellmaking Rebuild #1048 102057/101980 | 22,226 | -2,625 | 19,601 | USD |
| 3003873 | 8 | Ammo | | 21 Lonoke, AR | 12/27/2018 | Header, RF Shellmaking Rebuild #1045 102057/101980 | 22,226 | -2,625 | 19,601 | USD |
| 3003874 | 6 | Ammo | | 21 Lonoke, AR | 12/27/2018 | Header, RF Shellmaking Rebuild #1050 102057/101980 | 22,226 | -2,625 | 19,601 | USD |
| 3003875 | 2 | Ammo | | 21 Lonoke, AR | 2/15/2012 | OVH RF DRAW UNIT #1051 101740 | 18,922 | -5,763 | 13,159 | USD |
| 3003875 | 7 | Ammo | | 21 Lonoke, AR | 12/21/2018 | Shellmaker, Rebuild #1051  101980 | 446,262 | -53,410 | 392,852 | USD |
| 3003875 | 8 | Ammo | | 21 Lonoke, AR | 12/27/2018 | Header, RF Shellmaking Rebuild #1046 102057/101980 | 22,226 | -2,625 | 19,601 | USD |
| 3003914 | 5 | Ammo | | 21 Lonoke, AR | 12/15/2008 | ADD'L REBUILD #1196 AIM | 9,915 | -6,041 | 3,874 | USD |
| 3003915 | 11 | Ammo | | 21 Lonoke, AR | 12/15/2011 | ADD'L CONE & RING ASSEMBLY 101737 | 10,880 | -3,314 | 7,566 | USD |
| 3003915 | 10 | Ammo | | 21 Lonoke, AR | 2/15/2012 | REBUILD AIM #1198 101651 | 30,239 | -9,209 | 21,030 | USD |
| 3003919 | 4 | Ammo | | 21 Lonoke, AR | 10/31/2017 | RF Fire Suppression System for Loader A  101989 | 59,562 | -7,751 | 51,811 | USD |
| 3003920 | 4 | Ammo | | 21 Lonoke, AR | 10/31/2017 | RF Fire Suppression System for Loader B  101989 | 59,562 | -7,751 | 51,811 | USD |
| 3003921 | 3 | Ammo | | 21 Lonoke, AR | 12/31/2013 | ADD'L RF C LOADER 1235 FIRE SUSPRESSION 101817 | 14,865 | -2,463 | 12,402 | USD |
| 3003922 | 4 | Ammo | | 21 Lonoke, AR | 10/31/2017 | RF Fire Suppression System for Loader D  101989 | 59,562 | -7,751 | 51,811 | USD |
| 3003923 | 5 | Ammo | | 21 Lonoke, AR | 10/31/2017 | RF Fire Suppression System for Loader E  101989 | 59,562 | -7,751 | 51,811 | USD |
| 3003924 | 4 | Ammo | | 21 Lonoke, AR | 10/31/2017 | RF Fire Suppression System for Loader F  101989 | 59,562 | -7,751 | 51,811 | USD |
| 3003933 | 7 | Ammo | | 21 Lonoke, AR | 4/15/2006 | RF PACKER ELECTRICAL UPGRADE | 5,063 | -2,414 | 2,649 | USD |
| 3003933 | 8 | Ammo | | 21 Lonoke, AR | 10/31/2013 | ADD'L #1282 RF HOT GLUE UNIT 101860 | 5,329 | -1,388 | 3,941 | USD |
| 3003934 | 5 | Ammo | | 21 Lonoke, AR | 5/15/2005 | ADD'L #1283 ELECTRICAL UPGRADE | 7,400 | -1,709 | 5,691 | USD |
| 3003983 | 3 | Ammo | | 21 Lonoke, AR | 8/15/2011 | T&F #566 101448 | 17,527 | -6,405 | 11,122 | USD |
| 3003984 | 2 | Ammo | | 21 Lonoke, AR | 5/15/2010 | ADD'L 595 ASSEMBLY PRESS 101448 | 8,817 | -4,029 | 4,788 | USD |
| 3003985 | 2 | Ammo | | 21 Lonoke, AR | 5/15/2010 | ADD'L 853 ASSEMBLY PRESS 101448 | 4,659 | -2,129 | 2,530 | USD |
| 3003986 | 3 | Ammo | | 21 Lonoke, AR | 5/15/2010 | ADD'L 589 ASSEMBLY PRESS 101448 | 6,088 | -2,783 | 3,305 | USD |
| 3003987 | 4 | Ammo | | 21 Lonoke, AR | 5/15/2010 | ADD'L 586 TAMP & FOIL 101448 | 20,836 | -9,517 | 11,319 | USD |
| 3003987 | 4 | Ammo | | 21 Lonoke, AR | 8/15/2011 | T&F #586 101448 | 4,665 | -1,705 | 2,960 | USD |
| 3003988 | 4 | Ammo | | 21 Lonoke, AR | 8/15/2011 | T&F #571 101448 | 17,392 | -6,357 | 11,035 | USD |
| 3003989 | 4 | Ammo | | 21 Lonoke, AR | 8/15/2011 | T&F #576 101448 | 17,273 | -6,312 | 10,961 | USD |
| 3003990 | 2 | Ammo | | 21 Lonoke, AR | 5/15/2010 | ADD'L 584 ASSEMBLY PRESS 101448 | 8,035 | -3,671 | 4,364 | USD |
| 3003991 | 4 | Ammo | | 21 Lonoke, AR | 5/15/2010 | ADD'L 581 TAMP & FOIL 101448 | 28,713 | -13,116 | 15,597 | USD |
| 3004035 | 3 | Ammo | | 21 Lonoke, AR | 9/15/2011 | ADD'L HYDRAULIC LIFT 101652 | 21,683 | -7,924 | 13,759 | USD |
| 3004283 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUCTWORK - CENTERFIRE | 11,483 | -6,994 | 4,489 | USD |
| 3004284 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUCTWORK - SHOT SHELL & SHOT TOWER | 4,176 | -2,544 | 1,632 | USD |
| 3004299 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PROCESS PIPING FOR BLDG. 100 | 2,565 | -2,344 | 221 | USD |
| 3004309 | 2 | Ammo | | 21 Lonoke, AR | 11/25/2016 | Burnham Slender Radiators in BLDG 717 | 15,258 | -2,529 | 12,729 | USD |
| 3004328 | 0 | Ammo | | 21 Lonoke, AR | 6/15/2004 | ADD'L CAFETERIAL ELECTRICAL | 2,845 | -868 | 1,977 | USD |
| 3004416 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2005 | OFFICE AREA HVAC CONTROLS | 5,172 | -1,892 | 3,280 | USD |
| 3004419 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CF CAFETERIA AND TOOL CRIB AREA AIR CON | 2,651 | -1,615 | 1,036 | USD |
| 3004454 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | HVAC-SHELL & CUP BLDG 301 110076 | 12,981 | -7,907 | 5,074 | USD |
| 3004455 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | HVAC-PRIMING & AIM BLDG 301 110076 | 12,981 | -7,907 | 5,074 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3004456 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | HVAC-LOADING BLDG 301 110076 | 12,981 | -7,907 | 5,074 | USD |
| 3004457 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | HVAC-PACK & ADMIN BLDG 301 110076 | 2,876 | -2,628 | 248 | USD |
| 3004459 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL HVAC SS BLDG #200-SS CON | 29,998 | -18,270 | 11,728 | USD |
| 3004460 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | TRANE 30T HVAC UNIT ROOFTOP MODEL K BLDG 709 | 6,355 | -3,872 | 2,483 | USD |
| 3004482 | 2 | Ammo | | 21 Lonoke, AR | 2/15/2012 | OVH CF DRAW PRESS #157 101761 | 24,562 | -7,480 | 17,082 | USD |
| 3004853 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2006 | ADDL AIR CLUTCH/BRAKE ASSEMBLY #163/165 | 2,597 | -1,964 | 633 | USD |
| 3004853 | 2 | Ammo | | 21 Lonoke, AR | 8/15/2007 | ADDL #163 DRAW UPGRADE | 5,607 | -5,124 | 483 | USD |
| 3004854 | 1 | Ammo | | 21 Lonoke, AR | 3/15/2008 | ADDL #167 DRAW PRESS | 7,777 | -7,106 | 671 | USD |
| 3004855 | 2 | Ammo | | 21 Lonoke, AR | 1/15/2008 | ADDL DRAW PRESS #179 | 7,830 | -7,153 | 677 | USD |
| 3004855 | 3 | Ammo | | 21 Lonoke, AR | 7/29/2016 | Overhaul #304 Bliss Presses 179 101920 | 76,490 | -13,934 | 62,556 | USD |
| 3004857 | 2 | Ammo | | 21 Lonoke, AR | 4/15/2007 | ADDL #92 TAPER PRESS | 3,656 | -2,359 | 1,297 | USD |
| 3004857 | 4 | Ammo | | 21 Lonoke, AR | 12/15/2012 | ADDL 92 TAPER PRESS W/SERVO DRIVE 101786 | 51,294 | -13,389 | 37,905 | USD |
| 3004859 | 3 | Ammo | | 21 Lonoke, AR | 12/15/2012 | ADDL 94 TAPER PRESS W/SERVO DRIVE 101786 | 51,294 | -13,389 | 37,905 | USD |
| 3004860 | 2 | Ammo | | 21 Lonoke, AR | 4/15/2007 | ADDL #93 TAPER PRESS | 3,656 | -2,359 | 1,297 | USD |
| 3004860 | 4 | Ammo | | 21 Lonoke, AR | 12/15/2012 | ADDL 93 TAPER PRESS W/SERVO DRIVE 101786 | 51,294 | -13,389 | 37,905 | USD |
| 3004866 | 2 | Ammo | | 21 Lonoke, AR | 1/15/2011 | ADDL UPGRADE #91 TAPER PRESS 101670 | 28,358 | -10,363 | 17,995 | USD |
| 3004866 | 4 | Ammo | | 21 Lonoke, AR | 10/1/2017 | #91 162 Bliss Taper Press Rebuild 101990/101949 | 129,269 | -21,406 | 107,863 | USD |
| 3004866 | 5 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Addtl #91 162 Taper Press Rebuild 101949 | 49,971 | -8,276 | 41,695 | USD |
| 3004868 | 1 | Ammo | | 21 Lonoke, AR | 6/15/2007 | ADDL #85 TAPER PRESS | 3,948 | -3,607 | 341 | USD |
| 3004869 | 1 | Ammo | | 21 Lonoke, AR | 1/6/2014 | ADDL CONVEYOR #147 101865 | 3,418 | -1,039 | 2,379 | USD |
| 3004870 | 1 | Ammo | | 21 Lonoke, AR | 1/6/2014 | ADDL CONVEYOR #134 101865 | 3,418 | -1,039 | 2,379 | USD |
| 3004871 | 1 | Ammo | | 21 Lonoke, AR | 1/6/2014 | ADDL CONVEYOR #135 101865 | 3,418 | -1,039 | 2,379 | USD |
| 3004875 | 2 | Ammo | | 21 Lonoke, AR | 3/3/2017 | Rebuild 332 Modernized Bullet Asbly Press 101917 | 90,057 | -14,913 | 75,144 | USD |
| 3004877 | 2 | Ammo | | 21 Lonoke, AR | 10/15/2008 | ADDL #335 JACKET FD BOWL | 4,154 | -3,797 | 357 | USD |
| 3004878 | 1 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Rebuild 331 Modernized Bullet Assby Press 101918 | 38,868 | -6,437 | 32,431 | USD |
| 3004880 | 3 | Ammo | | 21 Lonoke, AR | 4/11/2014 | ADDL UPGRADE DISPLAY #324 101869 | 3,480 | -793 | 2,687 | USD |
| 3004886 | 1 | Ammo | | 21 Lonoke, AR | 12/15/2007 | ADDL REBUILD MCH #51P | 4,821 | -4,405 | 416 | USD |
| 3004886 | 4 | Ammo | | 21 Lonoke, AR | 8/15/2010 | ADDL FEED SYSTEM #51P 101638 | 2,744 | -1,254 | 1,490 | USD |
| 3004887 | 4 | Ammo | | 21 Lonoke, AR | 6/15/2011 | ADDL VIBRA FEED SYS #53P 101657 | 11,442 | -4,183 | 7,259 | USD |
| 3004887 | 5 | Ammo | | 21 Lonoke, AR | 12/15/2011 | ADDL VIBRATORY FEED BOWL #53P 101725 | 16,787 | -5,113 | 11,674 | USD |
| 3004888 | 3 | Ammo | | 21 Lonoke, AR | 5/15/2008 | ADDL CF PRIMING #44P | 8,103 | -2,962 | 5,141 | USD |
| 3004893 | 1 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL DATA COMMUNICATIONS UPG | 3,431 | -570 | 2,861 | USD |
| 3004893 | 2 | Ammo | | 21 Lonoke, AR | 9/15/2010 | ADDL #523 WAD FEED BOWL 101669 | 4,224 | -1,930 | 2,294 | USD |
| 3004894 | 10 | Ammo | | 21 Lonoke, AR | 2/15/2005 | ADDL #528 SIMPLEX LOADER ELECTRL UPGD | 5,714 | -3,915 | 1,799 | USD |
| 3004894 | 11 | Ammo | | 21 Lonoke, AR | 3/15/2007 | ADDL #528 SIMPLEX LOADER | 7,966 | -3,066 | 4,900 | USD |
| 3004894 | 12 | Ammo | | 21 Lonoke, AR | 10/15/2010 | ADDL HYPERSONIC CHARGE/WAD FEED 101629 | 9,263 | -4,232 | 5,031 | USD |
| 3004894 | 13 | Ammo | | 21 Lonoke, AR | 1/2/2013 | ADDL #528 10GA WAD FEED BOWL 101708 | 6,655 | -1,733 | 4,922 | USD |
| 3004894 | 14 | Ammo | | 21 Lonoke, AR | 1/2/2013 | ADDL #528 10GA WAD ESCAPEMENT 101708 | 3,219 | -839 | 2,380 | USD |
| 3004894 | 15 | Ammo | | 21 Lonoke, AR | 11/1/2013 | ADDL #528 POWDER CHARGER 101708 | 3,841 | -1,001 | 2,840 | USD |
| 3004913 | 2 | Ammo | | 21 Lonoke, AR | 5/15/2010 | ADDL 579 ASSEMBLY PRESS 101448 | 10,022 | -4,579 | 5,443 | USD |
| 3004914 | 2 | Ammo | | 21 Lonoke, AR | 5/15/2010 | ADDL 594 ASSEMBLY PRESS 101448 | 13,692 | -6,256 | 7,436 | USD |
| 3004915 | 2 | Ammo | | 21 Lonoke, AR | 2/15/2008 | ADDL TAMP & FOIL INDEXERS #856 | 8,522 | -7,786 | 736 | USD |
| 3004916 | 3 | Ammo | | 21 Lonoke, AR | 8/15/2011 | T&F #856 101448 | 22,009 | -8,043 | 13,966 | USD |
| 3004916 | 4 | Ammo | | 21 Lonoke, AR | 5/15/2010 | ADDL 573 TAMP & FOIL 101448 | 12,363 | -5,647 | 6,716 | USD |
| 3004916 | 5 | Ammo | | 21 Lonoke, AR | 8/15/2011 | T&F #573 101448 | 3,317 | -1,213 | 2,104 | USD |
| 3005196 | 1 | Ammo | | 21 Lonoke, AR | 9/15/2012 | ELECTRICAL UPGRADE 418/419 EXTRUDER 101756 | 65,037 | -13,203 | 51,834 | USD |
| 3005157 | 3 | Ammo | | 21 Lonoke, AR | 10/15/2008 | ADDL #971 BODY FORMER | 4,315 | -3,943 | 372 | USD |
| 3005157 | 4 | Ammo | | 21 Lonoke, AR | 7/15/2009 | ADDL #971 HYDRAULIC PUMP | 3,744 | -1,140 | 2,604 | USD |
| 3005158 | 4 | Ammo | | 21 Lonoke, AR | 7/15/2008 | ADDL #972 HYDROSTATIC PUMP | 3,473 | -1,271 | 2,202 | USD |
| 3005159 | 6 | Ammo | | 21 Lonoke, AR | 8/15/2009 | ADDL REBUILD #973 BODY FORMER 101553 | 4,855 | -2,959 | 1,896 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val | Accum. dep. | Book val | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3005161 | 4 | Ammo | | 21 Lonoke, AR | 7/15/2009 | ADDL #975 HYDRAULIC PUMP | 3,188 | -972 | 2,216 | USD |
| 3005177 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1994 | INK/BODY PRINT #471 12/10GA 110089 SN80476 | 2,742 | -2,507 | 235 | USD |
| 3005177 | 7 | Ammo | | 21 Lonoke, AR | 1/15/2010 | ADD'L VISION INSPECTION 101501 | 4,108 | -1,503 | 2,605 | USD |
| 3005177 | 8 | Ammo | | 21 Lonoke, AR | 2/15/2012 | SS BODY PRINTER #471 UPGRADE 101716 | 6,932 | -2,112 | 4,820 | USD |
| 3005178 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1994 | INK/BODY PRINT #470 12,16,20,28,410 110089 SN80482 | 2,686 | -2,456 | 230 | USD |
| 3005178 | 6 | Ammo | | 21 Lonoke, AR | 5/15/2010 | ADD'L 470 BODY PRINTER 2ND FLOOR 101528 | 11,684 | -5,338 | 6,346 | USD |
| 3005178 | 7 | Ammo | | 21 Lonoke, AR | 11/15/2010 | ADD'L VISION INSPECTION 101501 | 4,108 | -1,503 | 2,605 | USD |
| 3005178 | 8 | Ammo | | 21 Lonoke, AR | 2/15/2012 | SS BODY PRINTER #470 UPGRADE 101716 | 6,932 | -2,112 | 4,820 | USD |
| 3005260 | 4 | Ammo | | 21 Lonoke, AR | 7/15/2008 | ADD'L CF #205 DRAW PRESS | 7,262 | -6,635 | 627 | USD |
| 3005264 | 1 | Ammo | | 21 Lonoke, AR | 12/15/2007 | ADD'L REBUILD MCH #62 | 4,821 | -4,405 | 416 | USD |
| 3005254 | 2 | Ammo | | 21 Lonoke, AR | 8/15/2010 | ADD'L FEED SYSTEM #62 101638 | 2,744 | -1,254 | 1,490 | USD |
| 3005255 | 1 | Ammo | | 21 Lonoke, AR | 12/15/2008 | ADD'L #56P PRIMING MACHINE | 6,322 | -3,851 | 2,471 | USD |
| 3005258 | 1 | Ammo | | 21 Lonoke, AR | 12/15/2007 | ADD'L REBUILD MCH #42P | 4,821 | -4,406 | 415 | USD |
| 3005259 | 1 | Ammo | | 21 Lonoke, AR | 6/15/2011 | ADD'L VIBRA FEED SYS #46P 101657 | 11,442 | -4,183 | 7,259 | USD |
| 3005356 | 1 | Ammo | | 21 Lonoke, AR | 7/28/2017 | Add'l Rebuild AH&P Triplex 480  101985 | 67,737 | -11,218 | 56,519 | USD |
| 3005452 | 1 | Ammo | | 21 Lonoke, AR | 9/15/2008 | ADD'L #231 CUPPING PRESS | 8,750 | -7,995 | 755 | USD |
| 3005725 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1995 | #635 APEX PACKING CARTON PRINTER | 2,742 | -2,227 | 515 | USD |
| 3005725 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2009 | ADD'L PRINTER & APPLICATOR | 6,137 | -3,739 | 2,398 | USD |
| 3005726 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1995 | #636 APEX PACKING CARTON PRINTER | 2,742 | -2,227 | 515 | USD |
| 3005726 | 1 | Ammo | | 21 Lonoke, AR | 4/15/2009 | ADD'L PRINTER & APPLICATOR | 6,137 | -3,739 | 2,398 | USD |
| 3005727 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1995 | #1314 PACKING APEX CARTON PRINTER 100011 | 2,921 | -2,373 | 548 | USD |
| 3005727 | 1 | Ammo | | 21 Lonoke, AR | 4/15/2009 | ADD'L PRINTER & APPLICATOR | 6,137 | -3,739 | 2,398 | USD |
| 3005727 | 9 | Ammo | | 21 Lonoke, AR | 3/15/2009 | #473 BODY PRINTER-ELECTRIC UPGRADE | 8,250 | -1,371 | 6,879 | USD |
| 3005741 | 10 | Ammo | | 21 Lonoke, AR | 11/15/2010 | ADD'L VISION INSPECTION 101501 | 4,108 | -1,503 | 2,605 | USD |
| 3005741 | 11 | Ammo | | 21 Lonoke, AR | 6/15/2011 | ADD'L VIBRA FEED SYS #46P 101716 | 6,931 | -2,112 | 4,819 | USD |
| 3005745 | 4 | Ammo | | 21 Lonoke, AR | 12/15/2012 | ADD'L 82B TAPER PRESS W/SERVO DRIVE 101786 | 51,294 | -13,389 | 37,905 | USD |
| 3005747 | 4 | Ammo | | 21 Lonoke, AR | 7/15/2008 | ADD'L UPGRADE #88B TAPER PRESS | 7,740 | -7,071 | 669 | USD |
| 3005747 | 3 | Ammo | | 21 Lonoke, AR | 12/15/2011 | ADD'L SERVO DRIVE & FEED SYS 101722 | 17,694 | -5,390 | 12,304 | USD |
| 3005748 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2014 | ADD'L CONVEYOR #154A 101865 | 3,432 | -1,044 | 2,388 | USD |
| 3005750 | 5 | Ammo | | 21 Lonoke, AR | 8/15/2009 | ADD'L CF #219A DRAW PRESS 101541 | 17,652 | -10,752 | 6,900 | USD |
| 3005751 | 2 | Ammo | | 21 Lonoke, AR | 8/15/2009 | ADD'L FEEDERS #20 101464 | 2,585 | -1,576 | 1,009 | USD |
| 3005752 | 2 | Ammo | | 21 Lonoke, AR | 12/15/2012 | ADD'L FEEDER BOWL W/STAND #20 101788 | 24,713 | -6,452 | 18,261 | USD |
| 3005752 | 2 | Ammo | | 21 Lonoke, AR | 8/15/2009 | ADD'L FEEDERS #30 101464 | 2,585 | -1,576 | 1,009 | USD |
| 3005887 | 1 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #277 101869 | 3,480 | -793 | 2,687 | USD |
| 3005954 | 2 | Ammo | | 21 Lonoke, AR | 3/15/2011 | ADD'L WIRE FEED INDEXING #346 101684 | 6,513 | -916 | 5,597 | USD |
| 3005955 | 2 | Ammo | | 21 Lonoke, AR | 3/15/2011 | ADD'L WIRE FEED INDEXING #367 101684 | 6,513 | -916 | 5,597 | USD |
| 3005964 | 1 | Ammo | | 21 Lonoke, AR | 1/6/2014 | ADD'L CONVEYOR #140 101865 | 3,418 | -1,039 | 2,379 | USD |
| 3006014 | 3 | Ammo | | 21 Lonoke, AR | 3/15/2011 | ADD'L WIRE FEED INDEXING #357 101684 | 6,513 | -916 | 5,597 | USD |
| 3006014 | 2 | Ammo | | 21 Lonoke, AR | 7/29/2016 | #357 Rebuild Cold Header 101919 | 208,490 | -47,471 | 161,019 | USD |
| 3006018 | 3 | Ammo | | 21 Lonoke, AR | 5/21/2015 | OVH CF DRAW PRESS #220 101897 | 63,156 | -12,783 | 50,373 | USD |
| 3006020 | 2 | Ammo | | 21 Lonoke, AR | 10/15/2010 | ADD'L DRAW PRESS FEED SYS 101648 | 12,261 | -5,602 | 6,659 | USD |
| 3006020 | 0 | Ammo | | 21 Lonoke, AR | 8/15/1996 | 30-30 MANUHRN LOADER #6  2305/100060 | 6,652 | -5,611 | 1,041 | USD |
| 3006020 | 4 | Ammo | | 21 Lonoke, AR | 9/15/2011 | CONVERT TO 308/30-06 RIFLE 101720 | 16,523 | -6,038 | 10,485 | USD |
| 3006020 | 4 | Ammo | | 21 Lonoke, AR | 8/15/2012 | ADD'L #6 40 S&W CONVERSION 101777 | 59,484 | -18,113 | 41,371 | USD |
| 3006021 | 0 | Ammo | | 21 Lonoke, AR | 8/15/1996 | #57P V&O PRIME/WATERPROOF | 4,009 | -3,663 | 346 | USD |
| 3006022 | 0 | Ammo | | 21 Lonoke, AR | 8/15/1996 | #58P V&O PRIME/WATERPROOF | 4,009 | -3,663 | 346 | USD |
| 3006025 | 1 | Ammo | | 21 Lonoke, AR | 11/4/2018 | Priming, V&O Pressiless Priming 49P  102029 | 247,881 | -32,860 | 215,021 | USD |
| 3006110 | 2 | Ammo | | 21 Lonoke, AR | 1/6/2014 | ADD'L CONVEYOR #132 101865 | 3,418 | -1,039 | 2,379 | USD |
| 3006151 | 4 | Ammo | | 21 Lonoke, AR | 9/18/2013 | ADD'L OVERHAUL CF DRAW PRESS #173 101840 | 36,882 | -9,598 | 27,284 | USD |
| 3006167 | 1 | Ammo | | 21 Lonoke, AR | 5/15/2010 | ADD'L 599 CHARGING TABLE 101448 | 2,686 | -1,229 | 1,457 | USD |

Case 20-81688-CRJ11    Doc 904-1    Filed 09/30/20    Entered 09/30/20 13:40:13    Desc
Exhibit    Page 175 of 434

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis.val | Accum. dep. | Book val | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C3J06167 | 2 | Ammo | | 21 Lonoke, AR | 8/15/2011 | KNOCK-OUT #599-1 101448 | 10,858 | -3,968 | 6,890 | USD |
| C3J06167 | 3 | Ammo | | 21 Lonoke, AR | 10/1/2017 | Knockout modification #599 101965 | 4,838 | -802 | 4,036 | USD |
| C3J06168 | 1 | Ammo | | 21 Lonoke, AR | 5/15/2010 | ADD'L 565 CHARGING TABLE 101448 | 5,190 | -2,372 | 2,818 | USD |
| C3J06168 | 2 | Ammo | | 21 Lonoke, AR | 8/15/2011 | KNOCK-OUT #565-1 101448 | 10,322 | -3,773 | 6,549 | USD |
| C3J06168 | 3 | Ammo | | 21 Lonoke, AR | 10/1/2017 | Knockout modification #565 101965 | 4,838 | -802 | 4,036 | USD |
| C3J06169 | 1 | Ammo | | 21 Lonoke, AR | 5/15/2010 | ADD'L 574 CHARGING TABLE 101448 | 6,363 | -2,908 | 3,455 | USD |
| C3J06169 | 2 | Ammo | | 21 Lonoke, AR | 8/15/2011 | KNOCK-OUT #574-1 101448 | 13,607 | -4,974 | 8,633 | USD |
| C3J06169 | 3 | Ammo | | 21 Lonoke, AR | 10/1/2017 | Knockout modification #574 101965 | 4,838 | -802 | 4,036 | USD |
| C3J06182 | 2 | Ammo | | 21 Lonoke, AR | 3/15/2011 | ADD'L WIRE FEED INDEXING #394 101684 | 6,513 | -916 | 5,597 | USD |
| C3J06183 | 2 | Ammo | | 21 Lonoke, AR | 3/15/2011 | ADD'L WIRE FEED INDEXING #395 101684 | 6,513 | -916 | 5,597 | USD |
| C3J06186 | 0 | Ammo | | 21 Lonoke, AR | 1/15/1997 | #601 THIELE AUTO CARTONER (packer) | 7,519 | -5,319 | 2,200 | USD |
| C3J06186 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2008 | REFURBISH & INSTALL THIELE PACKER | 11,927 | -3,633 | 8,294 | USD |
| C3J06396 | 0 | Ammo | | 21 Lonoke, AR | 4/15/1997 | #603 THIELE AUTO CARTONER | 39,927 | -15,093 | 24,834 | USD |
| 3007453 | 1 | Ammo | | 21 Lonoke, AR | 1/15/2014 | ADD'L CONVEYOR #140A 101865 | 3,432 | -1,044 | 2,388 | USD |
| C3J06848 | 2 | Ammo | | 21 Lonoke, AR | 6/15/2010 | ADD'L 223 DRAW #189 101559 | 33,722 | -15,404 | 18,318 | USD |
| C3J08900 | 0 | Ammo | | 21 Lonoke, AR | 2/25/1998 | SHOTSHELL BODY PRINTER #472 | 8,042 | -5,345 | 2,605 | USD |
| C3J08900 | 3 | Ammo | | 21 Lonoke, AR | 3/15/2009 | #472 BODY PRINTER-ELECTRIC UPGRADE | 8,250 | -1,371 | 6,879 | USD |
| C3J08900 | 4 | Ammo | | 21 Lonoke, AR | 11/15/2010 | ADD'L VISION INSPECTION 101501 | 4,108 | -1,503 | 2,605 | USD |
| C3J08900 | 5 | Ammo | | 21 Lonoke, AR | 2/15/2012 | SS BODY PRINTER #472 UPGRADE 101716 | 6,931 | -2,112 | 4,819 | USD |
| C3J08979 | 4 | Ammo | | 21 Lonoke, AR | 3/15/2012 | RPL "B" KETTLE CONTROLS 101735 | 3,887 | -1,185 | 2,702 | USD |
| C3J08980 | 4 | Ammo | | 21 Lonoke, AR | 10/15/1998 | 9MM MANURHIN LOADER #8 2619/100459 | 5,431 | -4,253 | 1,178 | USD |
| C3J08980 | 5 | Ammo | | 21 Lonoke, AR | 8/15/2009 | ADD'L #10 LOADER FEED BOWL 101526 | 14,958 | -4,556 | 10,402 | USD |
| C3J08980 | 6 | Ammo | | 21 Lonoke, AR | 10/31/2013 | ADD'L CAMERA SYSTEM #10 101841 | 11,226 | -4,092 | 7,134 | USD |
| C3J08990 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1998 | CF ANNEAL-EXHAUST FANS | 2,747 | -1,160 | 1,587 | USD |
| C3J09032 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2008 | ADD'L CF BULLET PRESS | 3,755 | -3,431 | 324 | USD |
| C3J09085 | 0 | Ammo | | 21 Lonoke, AR | 6/15/1999 | 30 CAL PSPBT WFF BLT ASSEMBLY #234 2864/100489 | 2,740 | -2,505 | 235 | USD |
| C3J09085 | 1 | Ammo | | 21 Lonoke, AR | 11/15/2012 | PRODUCT FEED CONVEYOR 101764 | 3,910 | -1,430 | 2,480 | USD |
| C3J09085 | 2 | Ammo | | 21 Lonoke, AR | 3/11/2014 | COMPONENT CONVEYOR #234 101870 | 6,361 | -1,933 | 4,428 | USD |
| C3J09086 | 0 | Ammo | | 21 Lonoke, AR | 6/15/1999 | 40 S&W MANURHINE LOADER #7 2661/100491 | 7,961 | -7,273 | 688 | USD |
| C3J09089 | 0 | Ammo | | 21 Lonoke, AR | 6/15/1999 | INDUCTIVE BONDING UNIT | 34,758 | -14,112 | 20,646 | USD |
| C3J09089 | 3 | Ammo | | 21 Lonoke, AR | 2/15/2003 | ADD'L WIRE FEED UNIT | 6,304 | -2,034 | 4,270 | USD |
| C3J09155 | 1 | Ammo | | 21 Lonoke, AR | 5/15/2012 | ADD'L HEADER 139A 101742 | 23,814 | -10,878 | 12,936 | USD |
| C3J09155 | 2 | Ammo | | 21 Lonoke, AR | 1/6/2014 | ADD'L CONVEYOR #139 101865 | 3,418 | -1,039 | 2,379 | USD |
| C3J09156 | 2 | Ammo | | 21 Lonoke, AR | 1/13/2014 | ADD'L CONVEYOR #149 101865 | 3,429 | -1,043 | 2,386 | USD |
| C3J09229 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2010 | IPS RIFLE PACKER 100559 #799 | 79,576 | -52,867 | 26,709 | USD |
| C3J09229 | 1 | Ammo | | 21 Lonoke, AR | 8/15/2000 | ADD'L IPS PACKER | 3,364 | -2,838 | 526 | USD |
| C3J09229 | 5 | Ammo | | 21 Lonoke, AR | 4/15/2009 | IPS BELT WASHER | 16,568 | -10,091 | 6,477 | USD |
| C3J09229 | 6 | Ammo | | 21 Lonoke, AR | 6/15/2009 | ADD'L BUGGY HOPPER & LIFT | 7,050 | -2,149 | 4,901 | USD |
| C3J09229 | 8 | Ammo | | 21 Lonoke, AR | 4/16/2014 | RIFLE IPS VIDEO JET PRINTER - CF 101876 | 19,668 | -3,257 | 16,411 | USD |
| C3J09276 | 1 | Ammo | | 21 Lonoke, AR | 1/15/2010 | ADD'L RF WATER SOFTENER 101586 | 3,820 | -1,747 | 2,073 | USD |
| C3J09357 | 1 | Ammo | | 21 Lonoke, AR | 1/13/2014 | ADD'L CONVEYOR #150 101865 | 3,429 | -1,043 | 2,386 | USD |
| C3J09542 | 0 | Ammo | | 21 Lonoke, AR | 3/11/2014 | COMPONENT CONVEYOR #237A 101870 | 6,361 | -1,933 | 4,428 | USD |
| C3J09229 | 4 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #321 101869 | 3,480 | -793 | 2,687 | USD |
| C3J09574 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2001 | CF BLT TUMBLE BARREL #736 | 2,726 | -2,392 | 334 | USD |
| C3J09574 | 1 | Ammo | | 21 Lonoke, AR | 5/15/2010 | ADD'L 570 ASSEMBLY PRESS 101448 | 5,193 | -2,373 | 2,820 | USD |
| 3010781 | 1 | Ammo | | 21 Lonoke, AR | 8/15/2011 | T&F #598 101448 | 12,122 | -4,431 | 7,691 | USD |
| 3010782 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2007 | SS PRIMER BLANK & INSERT MCH | 6,116 | -4,191 | 1,925 | USD |
| 3010790 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2008 | ADD'L SS BLANK & INSERT MACHINE | 5,765 | -5,267 | 498 | USD |
| 3010810 | 1 | Ammo | | 21 Lonoke, AR | 1/6/2014 | ADD'L CONVEYOR #146 101865 | 3,418 | -1,039 | 2,379 | USD |
| 3010841 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2007 | CF BLT PKG LABELER | 9,866 | -3,731 | 6,135 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val | Accum. dep. | Book val | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C110842 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2007 | CF BLT PKG HEAT TUNNEL | 3,083 | -1,167 | 1,916 | USD |
| C110843 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2007 | CF BLT PKG SEALER | 3,259 | -1,233 | 2,026 | USD |
| C110876 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2007 | CF LEAD CLEANING SUMP | 3,992 | -1,824 | 2,168 | USD |
| C110893 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2007 | AAGARD SS 610 PACKER  Serial Number 80 | 183,504 | -67,051 | 116,453 | USD |
| C110896 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2007 | CF AREA 2 INTERCOM | 4,991 | -1,825 | 3,166 | USD |
| C110900 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2007 | MOUTH ANNEAL MCH #103 | 5,851 | -5,346 | 505 | USD |
| C110901 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2007 | HEADTURN MCH #119A | 10,365 | -9,469 | 896 | USD |
| C110902 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2007 | C-35 JACKET DRAW PRESS #240A | 13,759 | -12,570 | 1,189 | USD |
| C110920 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2008 | OKAMOTO SURFACE GRINDER-KITTING | 7,078 | -6,466 | 612 | USD |
| C110931 | 1 | Ammo | | 21 Lonoke, AR | 10/31/2017 | CF Plating Cyanide Tank Safety Upgrades 102024 | 22,580 | -4,571 | 18,009 | USD |
| C110978 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2008 | CF #183 BLISS DRAW PRESS 101421 | 4,133 | 0 | 4,133 | USD |
| C110979 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2008 | CF BLISS DRAW PRESS  101421 #221 | 4,133 | 0 | 4,133 | USD |
| C110979 | 1 | Ammo | | 21 Lonoke, AR | 8/15/2009 | ADDL #221 BLISS DRAW PRESS 101516 | 17,213 | -10,484 | 6,729 | USD |
| 3010980 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2008 | CF BLISS DRAW PRESS 101421 #197 | 4,133 | 0 | 4,133 | USD |
| 3010980 | 1 | Ammo | | 21 Lonoke, AR | 6/15/2010 | ADDL 40 S&W DRAW #197 101559 | 26,910 | -24,582 | 2,328 | USD |
| C110999 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2008 | ACCUTIP ASSEMBLY UNIT | 10,939 | -9,994 | 945 | USD |
| C111003 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2008 | CF PRIMER STORAGE UNIT | 4,196 | -1,535 | 2,661 | USD |
| C111003 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2008 | CF PRIMER STORAGE UNIT | 4,196 | -1,535 | 2,661 | USD |
| C111004 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2008 | CF PRIMER STORAGE UNIT | 4,196 | -1,535 | 2,661 | USD |
| C111020 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2008 | CF PRIMER STORAGE UNIT | 7,333 | -6,700 | 633 | USD |
| C111022 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2008 | BALLISTIC PKG ENVIRON CONTROL EQ | 8,583 | -7,842 | 741 | USD |
| 3011023 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2008 | USED JKT DRAW PRESS | 17,369 | -15,868 | 1,501 | USD |
| 3011023 | 1 | Ammo | | 21 Lonoke, AR | 11/15/2013 | ADDL MOD/INS USED PRESS | 13,251 | -4,037 | 9,214 | USD |
| C111893 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2008 | CF ROTARY MOUTH ANNEAL #97 | 17,868 | -8,163 | 9,705 | USD |
| C111994 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2010 | ADDL PRIMER ANVIL PRESS 101537 | 3,078 | -1,408 | 1,670 | USD |
| C111994 | 1 | Ammo | | 21 Lonoke, AR | 4/15/2010 | ADDL MOTORIZED STOCK REEL 101537 | 3,991 | -1,824 | 2,167 | USD |
| C111994 | 2 | Ammo | | 21 Lonoke, AR | 4/15/2010 | ADDL MONORAIL HOIST  101537 | 10,918 | -6,650 | 4,268 | USD |
| C111998 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2009 | #835 HYDRAULIC LIFT MIX MACHINE | 4,622 | -2,816 | 1,806 | USD |
| 3013010 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2009 | BLDG 717 8X20 STORAGE CONTAINERS | 6,514 | -3,968 | 2,546 | USD |
| 3013010 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2009 | BULLET ASSY 17 CAL JHP FEEDS | 61,180 | -37,259 | 23,921 | USD |
| C112027 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2009 | PRIMER WET MIX CONTROL SYS | 2,665 | -695 | 1,970 | USD |
| C112042 | 1 | Ammo | | 21 Lonoke, AR | 11/14/2013 | ADDL PRECISION WORK STATION (2) 101856 | 2,921 | -762 | 2,159 | USD |
| C112042 | 2 | Ammo | | 21 Lonoke, AR | 11/14/2013 | ADDL PRECISION PRO PLUS DATA SERVER 101856 | 8,360 | -5,093 | 3,267 | USD |
| C112042 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2009 | SWECO SEPERATOR & JAR MILL 101466 | 5,056 | -3,080 | 1,976 | USD |
| C112095 | 1 | Ammo | | 21 Lonoke, AR | 8/15/2009 | ADDL ENIEZ 36C VOLUMATIC FEED 101466 | 2,812 | -1,714 | 1,098 | USD |
| C112095 | 0 | Ammo | | 21 Lonoke, AR | 10/15/2009 | SS CAP PRESS LUBE SYSTEM 101556 | 3,845 | -1,758 | 2,087 | USD |
| C112114 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2009 | TAPER PRESS VACUUM SYSTEM 101561 | 16,586 | -7,577 | 9,009 | USD |
| C112129 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2010 | V&O CUPPING PRESS - USED 101609 | 37,410 | -13,671 | 23,739 | USD |
| C112185 | 1 | Ammo | | 21 Lonoke, AR | 12/15/2010 | ADDL CUPPING PRESS 101656 | 2,616 | -2,392 | 224 | USD |
| C112185 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2010 | NITRIC ACID TANK BLDG 711 101577 | 6,997 | -1,422 | 5,575 | USD |
| C112201 | 1 | Ammo | | 21 Lonoke, AR | 6/15/2012 | ADDL NITRIC ACID TRANSFER PUMP 101770 | 48,915 | -12,767 | 36,148 | USD |
| C112201 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2010 | HVAC UNIT BLDG 712 101579 | 2,724 | -713 | 2,011 | USD |
| C112202 | 1 | Ammo | | 21 Lonoke, AR | 3/15/2010 | ADDL HVAC UNIT BLDG 712 101579 | 3,783 | -1,729 | 2,054 | USD |
| C112202 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2010 | PRIMER CUPPING PRESS (USED) 101529 | 15,799 | -7,217 | 8,582 | USD |
| C112220 | 1 | Ammo | | 21 Lonoke, AR | 4/15/2010 | CUPPING PRESS MODIFY & INSTALL 101529 | 6,356 | -2,904 | 3,450 | USD |
| C112221 | 2 | Ammo | | 21 Lonoke, AR | 4/15/2010 | ADDL MOTORIZED STOCK REEL 101529 | 10,079 | -1,536 | 8,543 | USD |
| C112222 | 3 | Ammo | | 21 Lonoke, AR | 4/15/2010 | SERVOMATIC ELECTRONIC ROLL 101529 | 7,840 | -3,582 | 4,258 | USD |
| C112223 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2010 | 223 LEAD CORE INSPEC SYS 101608 | 10,722 | -2,800 | 7,922 | USD |
| C112224 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2010 | EXPLOSIVE PROOF VACUUM 101610 | 10,649 | -3,892 | 6,757 | USD |
| C112225 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2011 | KNOCK-OUT #857-1 101448 | 4,838 | -802 | 4,036 | USD |
| C112465 | 2 | Ammo | | 21 Lonoke, AR | 10/1/2017 | Knockout modification #857 101965 | | | | USD |
| 3012468 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2010 | UPGRADE 857 CHARGING TABLE 101448 | 3,473 | -1,588 | 1,885 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val | Accum. dep. | Book val | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 30122471 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2010 | C35 BLISS DRAW PRESS (SPARE) 101639 | 3,242 | -1,482 | 1,760 | USD |
| 30122472 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2010 | C35 BLISS DRAW PRESS (SPARE) 101639 | 3,850 | -1,760 | 2,090 | USD |
| 30122474 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2010 | ADD'L 575 CHARGING TABLE 101448 | 2,827 | -1,293 | 1,534 | USD |
| 30122475 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2010 | ADD'L 580 CHARGING TABLE 101448 | 5,338 | -2,439 | 2,899 | USD |
| 30122476 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2010 | ADD'L 585 CHARGING TABLE 101448 | 6,670 | -3,048 | 3,622 | USD |
| 30122476 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2010 | ADD'L 590 CHARGING TABLE 101448 | 3,713 | -1,697 | 2,016 | USD |
| 30122514 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2010 | CF LABEL APPLICATORS 101653 | 24,425 | -6,376 | 18,049 | USD |
| 30122515 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2010 | CF FLOOR DRAIN 101664 | 7,299 | -1,906 | 5,393 | USD |
| 30122546 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2010 | OFFLINE CASE LABELING SYS 101600 | 42,646 | -11,132 | 31,514 | USD |
| 30122548 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2010 | HEADTURN #123 - FEED SYS 101655 | 3,339 | -1,526 | 1,813 | USD |
| 30122549 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2010 | DRAW PRESS #199 - FEED SYS 101655 | 3,513 | -1,607 | 1,906 | USD |
| 30122549 | 1 | Ammo | | 21 Lonoke, AR | 2/15/2012 | REBUILD DRAW PRESS #199 101678 | 9,773 | -2,977 | 6,796 | USD |
| 30122549 | 2 | Ammo | | 21 Lonoke, AR | 6/1/2017 | Overhaul 199 Shell Draw Press 101966 | 90,230 | -14,943 | 75,287 | USD |
| 30122549 | 3 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Add'l Overhaul 199 Shell Draw Press 101949 | 49,971 | -8,276 | 41,695 | USD |
| 30121555 | 0 | Ammo | | 21 Lonoke, AR | 10/15/2010 | CF HEADTURN MACHINE - SPARE 101650 | 19,312 | -5,041 | 14,271 | USD |
| 30120556 | 0 | Ammo | | 21 Lonoke, AR | 10/15/2010 | CF TABLE ANNEALER #98 101659 | 22,521 | -5,879 | 16,642 | USD |
| 30120597 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2010 | RFID SS POWDER STACKS 101602 | 29,588 | -10,813 | 18,775 | USD |
| 30121598 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2010 | RFID CF POWDER STACKS 101602 | 43,085 | -9,842 | 33,243 | USD |
| 30122567 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2010 | RFID POWDER POUR EQUIP 101602 | 6,575 | -2,404 | 4,171 | USD |
| 30113004 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2011 | WIRE FEED INDEXING #342 101684 | 6,513 | -916 | 5,597 | USD |
| 30113224 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2011 | #837 HYDRAULIC LIFT MIX MCH 101576 | 22,018 | -8,047 | 13,971 | USD |
| 30113225 | 0 | Ammo | | 21 Lonoke, AR | 10/1/2017 | Knockout modification #571 101448 | 17,873 | -6,532 | 11,341 | USD |
| 30113225 | 1 | Ammo | | 21 Lonoke, AR | 10/1/2017 | Knockout modification #571 101965 | 4,838 | -802 | 4,036 | USD |
| 30113226 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2011 | KNOCK-OUT #580-1 101448 | 9,739 | -3,560 | 6,179 | USD |
| 30113226 | 1 | Ammo | | 21 Lonoke, AR | 1/15/2013 | ADD'L KNOCK-OUT 580-1 101448 | 4,484 | -1,168 | 3,316 | USD |
| 30113226 | 2 | Ammo | | 21 Lonoke, AR | 10/1/2017 | Knockout modification #580 101965 | 4,838 | -802 | 4,036 | USD |
| 30113227 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2011 | KNOCK-OUT #585-1 101448 | 13,399 | -4,897 | 8,502 | USD |
| 30113227 | 1 | Ammo | | 21 Lonoke, AR | 10/1/2017 | Knockout modification #585 101965 | 4,838 | -802 | 4,036 | USD |
| 30113228 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2011 | KNOCK-OUT #590-1 101448 | 13,450 | -4,916 | 8,534 | USD |
| 30113228 | 1 | Ammo | | 21 Lonoke, AR | 10/1/2017 | Knockout modification #590 101965 | 4,838 | -802 | 4,036 | USD |
| 30113249 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2011 | TRICKLE SHAKER INSP MCH 101730 | 4,291 | -1,570 | 2,721 | USD |
| 30113288 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2011 | CF DRAW LUBE SYS 101707 | 30,478 | -6,189 | 24,289 | USD |
| 30113289 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2011 | CF EZ-TEK CASE SEALER 101741 | 5,255 | -1,068 | 4,187 | USD |
| 30113292 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2011 | OVERHAUL HEADER 101713 | 15,389 | -7,030 | 8,359 | USD |
| 30113292 | 2 | Ammo | | 21 Lonoke, AR | 1/15/2014 | ADD'L CONVEYOR #139A 101865 | 3,432 | -1,044 | 2,388 | USD |
| 30113398 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2012 | REBUILD #239 JKT DRAW PRESS 101683 | 9,775 | -2,978 | 6,797 | USD |
| 30113226 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2012 | RFID CF PLATE LOADER 101706 | 14,480 | -2,940 | 11,540 | USD |
| 30113390 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2012 | P&R BULK PACK UNIT 101753 | 10,656 | -2,164 | 8,492 | USD |
| 30113397 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2012 | POWER WIRING BLDG 711/712 101752 | 51,570 | -6,731 | 44,839 | USD |
| 30113398 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2012 | PRIMED SHELL TRICKLE SHAKER 101759 | 3,677 | -1,122 | 2,555 | USD |
| 30113436 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2012 | CF PLATING RECTIFIERS (2) 101763 | 39,479 | -8,016 | 31,463 | USD |
| 30113436 | 0 | Ammo | | 21 Lonoke, AR | 6/15/2012 | LEAD POT & HOOD 101762 | 17,047 | -5,193 | 11,854 | USD |
| 30113437 | 0 | Ammo | | 21 Lonoke, AR | 6/15/2012 | WASTEWATER PIPELINE BLDG 737 101773 | 16,904 | -3,434 | 13,470 | USD |
| 30113438 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2012 | MICRO LUBE SYS (23 MCH) 101755 | 22,674 | -6,906 | 15,768 | USD |
| 30113440 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2012 | ADD'L 4-OUT BLT JKT CONVERSION #240 101749 | 39,376 | -11,991 | 27,385 | USD |
| 30113440 | 1 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #276 101869 | 3,480 | -793 | 2,687 | USD |
| 30113441 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2012 | ADD'L 4 OUT BLT JKT CONVERSION #243 101749 | 39,376 | -11,991 | 27,385 | USD |
| 30113443 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2012 | POWER WIRING BLDG 711, 712, 736 101794 | 24,885 | -3,249 | 21,636 | USD |
| 30113462 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2012 | PROCESS CHILLER BLDG 711 101793 | 11,442 | -3,486 | 7,956 | USD |
| 30113463 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2012 | PLATING SCALE 101796 | 5,118 | -1,559 | 3,559 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis.val | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3013464 | | 0 Ammo | | 21 Lonoke, AR | 9/15/2012 | PALLET INDEXER MDL 7525-52 101798 | 5,022 | -1,021 | 4,001 | USD |
| 3013466 | | 0 Ammo | | 21 Lonoke, AR | 10/15/2012 | MINSTER P2H-160 CAP PRESS 101654 | 388,614 | -118,330 | 270,284 | USD |
| 3013466 | 1 | 0 Ammo | | 21 Lonoke, AR | 10/15/2012 | MOHLER CONVEYOR/QC BIN 101654 | 68,686 | -31,372 | 37,314 | USD |
| 3013466 | 2 | 2 Ammo | | 21 Lonoke, AR | 10/15/2012 | SCRAP CONVEYOR EDG 75 101654 | 4,362 | -1,994 | 2,368 | USD |
| 3013466 | 3 | 3 Ammo | | 21 Lonoke, AR | 10/15/2012 | 12HB DIE SET 101654 | 60,080 | -54,882 | 5,198 | USD |
| 3013466 | 4 | 4 Ammo | | 21 Lonoke, AR | 10/15/2012 | 20LB DIE SET 101654 | 21,176 | -19,345 | 1,831 | USD |
| 3013466 | 5 | 5 Ammo | | 21 Lonoke, AR | 9/6/2013 | ADDL 12HB DIE SET 101654 | 9,861 | -8,982 | 879 | USD |
| 3013466 | 6 | 6 Ammo | | 21 Lonoke, AR | 9/6/2013 | ADDL 20LB DIE SET 101654 | 77,648 | -70,717 | 6,931 | USD |
| 3013467 | | 0 Ammo | | 21 Lonoke, AR | 10/15/2012 | ROSLER WASH UNIT 101654 | 79,385 | -24,173 | 55,212 | USD |
| 3013526 | | 0 Ammo | | 21 Lonoke, AR | 11/15/2012 | FURNACE #727A 101764 | 689,766 | -126,017 | 563,749 | USD |
| 3013526 | 1 | 1 Ammo | | 21 Lonoke, AR | 3/15/2013 | ADDL FURNACE #727A 101764 | 2,844 | -520 | 2,324 | USD |
| 3013526 | 2 | 2 Ammo | | 21 Lonoke, AR | 8/15/2013 | RPL 727A EXIT CONVEYOR 101823 | 9,702 | -3,536 | 6,166 | USD |
| 3013527 | | 0 Ammo | | 21 Lonoke, AR | 11/15/2012 | CONE SOAPER W/BUGGY LIFT 101764 | 173,114 | -45,182 | 127,932 | USD |
| 3013528 | | 0 Ammo | | 21 Lonoke, AR | 11/15/2012 | CF WIRE CUTTER #361 101782 | 42,975 | -5,235 | 37,740 | USD |
| 3013528 | 1 | 1 Ammo | | 21 Lonoke, AR | 5/14/2013 | ADDL CF WIRE CUTTER #361 101782 | 2,626 | -321 | 2,305 | USD |
| 3013529 | | 0 Ammo | | 21 Lonoke, AR | 11/15/2012 | CF WIRE CUTTER #362 101782 | 42,975 | -5,235 | 37,740 | USD |
| 3013529 | 1 | 1 Ammo | | 21 Lonoke, AR | 5/14/2013 | ADDL CF WIRE CUTTER #362 101782 | 2,626 | -321 | 2,305 | USD |
| 3013530 | | 0 Ammo | | 21 Lonoke, AR | 11/15/2012 | CF WIRE CUTTER #363 101782 | 42,975 | -5,235 | 37,740 | USD |
| 3013530 | 1 | 1 Ammo | | 21 Lonoke, AR | 5/14/2013 | ADDL CF WIRE CUTTER #363 101782 | 2,626 | -321 | 2,305 | USD |
| 3013531 | | 0 Ammo | | 21 Lonoke, AR | 11/15/2012 | CF WIRE CUTTER #364 101782 | 42,975 | -5,235 | 37,740 | USD |
| 3013531 | 1 | 1 Ammo | | 21 Lonoke, AR | 5/14/2013 | ADDL CF WIRE CUTTER #364 101782 | 2,626 | -321 | 2,305 | USD |
| 3013532 | | 0 Ammo | | 21 Lonoke, AR | 11/15/2012 | CF WIRE CUTTER #360 101782 | 42,975 | -5,235 | 37,740 | USD |
| 3013532 | 1 | 1 Ammo | | 21 Lonoke, AR | 5/14/2013 | ADDL CF WIRE CUTTER #360 101782 | 2,626 | -321 | 2,305 | USD |
| 3013533 | | 0 Ammo | | 21 Lonoke, AR | 11/15/2012 | DUPLEX SHELL HEADER #155 101784 | 148,864 | -54,393 | 94,471 | USD |
| 3013534 | | 0 Ammo | | 21 Lonoke, AR | 11/15/2012 | BLACKROCK HEADTURN #115A 101785 | 37,594 | -9,813 | 27,781 | USD |
| 3013535 | | 0 Ammo | | 21 Lonoke, AR | 11/15/2012 | BLACKROCK HEADTURN #116A 101785 | 37,594 | -9,813 | 27,781 | USD |
| 3013536 | | 0 Ammo | | 21 Lonoke, AR | 11/15/2012 | BLACKROCK HEADTURN #117A 101785 | 37,594 | -9,813 | 27,781 | USD |
| 3013537 | | 0 Ammo | | 21 Lonoke, AR | 11/15/2012 | BLACKROCK HEADTURN #118A 101785 | 37,594 | -9,813 | 27,781 | USD |
| 3013538 | | 0 Ammo | | 21 Lonoke, AR | 11/15/2012 | BLACKROCK HEADTURN #120A 101785 | 37,594 | -9,813 | 27,781 | USD |
| 3013539 | | 1 Ammo | | 21 Lonoke, AR | 11/15/2012 | C-35 SHELL DRAW #255 101779 | 51,587 | -18,850 | 32,737 | USD |
| 3013539 | 1 | 1 Ammo | | 21 Lonoke, AR | 11/15/2012 | ADDL TITAL INCLINE CONVEYOR #255 101779 | 3,076 | -1,126 | 1,950 | USD |
| 3013540 | | 1 Ammo | | 21 Lonoke, AR | 11/15/2012 | B2D SHELL DRAW #267 101779 | 78,502 | -28,685 | 49,817 | USD |
| 3013540 | 1 | 1 Ammo | | 21 Lonoke, AR | 11/15/2012 | ADDL VIBRATORY FEEDER #267 101779 | 6,505 | -1,699 | 4,806 | USD |
| 3013541 | | 1 Ammo | | 21 Lonoke, AR | 11/15/2012 | B2D SHELL DRAW #269 101779 | 78,502 | -28,685 | 49,817 | USD |
| 3013541 | 1 | 1 Ammo | | 21 Lonoke, AR | 11/15/2012 | ADDL VIBRATORY FEEDER #269 101779 | 6,505 | -1,699 | 4,806 | USD |
| 3013706 | | 0 Ammo | | 21 Lonoke, AR | 12/15/2012 | CF AAGARD AUTO PACKER 101697 | 1,174,941 | -214,655 | 960,286 | USD |
| 3013707 | | 0 Ammo | | 21 Lonoke, AR | 12/15/2012 | CF CARTRIDGE SEALER 101760 | 233,784 | -42,712 | 191,072 | USD |
| 3013707 | 1 | 0 Ammo | | 21 Lonoke, AR | 6/15/2013 | ADDL CF CARTRIDGE SEALER 101760 | 24,818 | -4,522 | 20,296 | USD |
| 3013708 | | 0 Ammo | | 21 Lonoke, AR | 12/15/2012 | CF CARTRIDGE SEALER 101760 | 233,784 | -42,712 | 191,072 | USD |
| 3013708 | 1 | 1 Ammo | | 21 Lonoke, AR | 6/15/2013 | ADDL CF CARTRIDGE SEALER 101760 | 24,818 | -4,522 | 20,296 | USD |
| 3013710 | | 0 Ammo | | 21 Lonoke, AR | 12/15/2012 | CF INSPECTION STATION 101800 | 9,589 | -1,752 | 7,837 | USD |
| 3013711 | | 0 Ammo | | 21 Lonoke, AR | 12/15/2012 | CF INSPECTION STATION 101800 | 9,589 | -1,752 | 7,837 | USD |
| 3013712 | | 0 Ammo | | 21 Lonoke, AR | 12/15/2012 | CF INSPECTION STATION 101800 | 9,589 | -1,752 | 7,837 | USD |
| 3013713 | | 0 Ammo | | 21 Lonoke, AR | 12/15/2012 | CF INSPECTION STATION 101800 | 9,604 | -1,756 | 7,848 | USD |
| 3013714 | | 0 Ammo | | 21 Lonoke, AR | 12/15/2012 | CF INSPECTION STATION 101800 | 9,574 | -1,750 | 7,824 | USD |
| 3013715 | | 0 Ammo | | 21 Lonoke, AR | 12/15/2012 | CF INSPECTION STATION 101800 | 9,589 | -1,752 | 7,837 | USD |
| 3013716 | | 0 Ammo | | 21 Lonoke, AR | 12/15/2012 | CF EXTRUDE WIRE WINDER 101781 | 12,255 | -2,241 | 10,014 | USD |
| 3013717 | | 0 Ammo | | 21 Lonoke, AR | 12/15/2012 | CF EXTRUDE WIRE WINDER 101781 | 12,255 | -2,241 | 10,014 | USD |
| 3013718 | | 0 Ammo | | 21 Lonoke, AR | 12/15/2012 | CF EXTRUDE WIRE WINDER 101781 | 12,255 | -2,241 | 10,014 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 6113719 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2012 | 61P V&O PRIMING PRESS 9MM 101787 | 149,720 | -39,076 | 110,644 | USD |
| 6113719 | 1 | Ammo | | 21 Lonoke, AR | 12/15/2012 | ADD'L 9MM FEED BOWL 101787 | 13,947 | -3,641 | 10,306 | USD |
| 6113720 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2012 | 62P V&O PRIMING PRESS 40S&W 101787 | 147,235 | -38,428 | 108,807 | USD |
| 6113720 | 1 | Ammo | | 21 Lonoke, AR | 12/15/2012 | ADD'L 40 S&W FEED BOWL 101787 | 11,496 | -3,002 | 8,494 | USD |
| 6113721 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2012 | 65P V&O PRIMING PRESS 45AUTO 101787 | 121,122 | -31,613 | 89,509 | USD |
| 6113721 | 1 | Ammo | | 21 Lonoke, AR | 12/15/2012 | ADD'L 45 AUTO FEED BOWL 101787 | 11,496 | -3,002 | 8,494 | USD |
| 6113722 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2012 | 50 SHELL BUGGIES 101789 | 21,158 | -5,524 | 15,634 | USD |
| 6113723 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2012 | 30 BULLET BUGGIES 101789 | 23,975 | -6,259 | 17,716 | USD |
| 6113723 | 1 | Ammo | | 21 Lonoke, AR | 3/15/2013 | ADD'L BULLET BUGGIES 101789 | 10,714 | -2,790 | 7,924 | USD |
| 6113724 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2012 | SCISSOR LIFT 40X50 101789 | 7,565 | -1,976 | 5,589 | USD |
| 6113725 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2012 | SCISSOR LIFT 40X50 101789 | 7,565 | -1,976 | 5,589 | USD |
| 6113726 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2012 | SCISSOR LIFT 44X70 101789 | 10,879 | -2,841 | 8,038 | USD |
| 6113728 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2012 | 4 OUT DIE SET 101783 | 16,605 | -15,169 | 1,436 | USD |
| 6113728 | 1 | Ammo | | 21 Lonoke, AR | 12/15/2012 | #251 30 CAL FEED BOWLS & BASE 101783 | 11,011 | -2,875 | 8,136 | USD |
| 6113728 | 2 | Ammo | | 21 Lonoke, AR | 12/15/2012 | #251 30 CAL FEED BOWLS & BASE 101783 | 11,011 | -2,875 | 8,136 | USD |
| 6113729 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2012 | 4 OUT DIE SET 101783 | 16,605 | -15,169 | 1,436 | USD |
| 6113729 | 1 | Ammo | | 21 Lonoke, AR | 12/15/2012 | #240 9MM FEED BOWL & BASE 101783 | 11,408 | -2,979 | 8,429 | USD |
| 6113729 | 2 | Ammo | | 21 Lonoke, AR | 12/15/2012 | #240 9MM FEED BOWL & BASE 101783 | 11,408 | -2,979 | 8,429 | USD |
| 6113730 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2012 | 4 OUT DIE SET 101783 | 16,605 | -15,169 | 1,436 | USD |
| 6113730 | 1 | Ammo | | 21 Lonoke, AR | 12/15/2012 | #242 40/45 FEED BOWL & BASE 101783 | 11,408 | -2,979 | 8,429 | USD |
| 6113730 | 2 | Ammo | | 21 Lonoke, AR | 12/15/2012 | #242 40/45 FEED BOWL & BASE 101783 | 11,408 | -2,979 | 8,429 | USD |
| 6113730 | 3 | Ammo | | 21 Lonoke, AR | 7/15/2013 | REB JKT DRAW PRESS #242 101783 | 4,826 | -1,257 | 3,569 | USD |
| 6113730 | 1 | Ammo | | 21 Lonoke, AR | 12/15/2012 | REBUILD #251 C-35 101783 | 25,285 | -6,601 | 18,684 | USD |
| 6113731 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Overhaul #251  101967/101949 | 29,832 | -4,941 | 24,891 | USD |
| 6113731 | 1 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Add'l Overhaul #251 101949 | 50,251 | -8,323 | 41,928 | USD |
| 6113731 | 3 | Ammo | | 21 Lonoke, AR | 3/20/2018 | Overhaul #251 Add'l 101967/101949 | 2,738 | -418 | 2,320 | USD |
| 6113732 | 0 | Ammo | | 21 Lonoke, AR | 12/20/2012 | #239 223 B165-71 4 OUT DIE SET 101783 | 15,005 | -13,708 | 1,297 | USD |
| 6113733 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2012 | #239 223 FEED BOWL & BASE 101783 | 10,754 | -2,808 | 7,946 | USD |
| 6113733 | 1 | Ammo | | 21 Lonoke, AR | 12/15/2012 | #239 223 FEED BOWL & BASE 101783 | 10,754 | -2,808 | 7,946 | USD |
| 6113734 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2012 | #240 9MM FEED BOWL & BASE 101783 | 10,754 | -2,808 | 7,946 | USD |
| 6113735 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2012 | 3" RELIFT PUMP JKT DRW LINE 101783 | 7,670 | -1,402 | 6,268 | USD |
| 6114035 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2013 | RF FED CONES/RING ASSY 101765 | 9,086 | -2,365 | 6,721 | USD |
| 6114037 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2013 | RF FEED CONE/RING ASSY 101765 | 9,086 | -2,365 | 6,721 | USD |
| 6114038 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2013 | SUMITOMO GEAR BOX 101772 | 7,657 | -1,994 | 5,663 | USD |
| 6114039 | 1 | Ammo | | 21 Lonoke, AR | 3/15/2013 | ROTO FNSH DUST COLECTR 352 101806 | 5,173 | -944 | 4,229 | USD |
| 6114040 | 1 | Ammo | | 21 Lonoke, AR | 3/15/2013 | ROTO FNSH DUST COLECTR 352A 101806 | 5,173 | -944 | 4,229 | USD |
| 6114050 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2013 | LEAD EXT HYDRAULIC PUMP SYS 101824 | 41,958 | -7,644 | 34,314 | USD |
| 6114095 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2013 | SMC COLTON 270-25 FRANGIBLE ROTARY PRESS  236C | 173,504 | -45,149 | 128,355 | USD |
| 6114095 | 1 | Ammo | | 21 Lonoke, AR | 7/15/2013 | D-500 POWDER HOPPER #236C 101803 | 11,061 | -2,017 | 9,044 | USD |
| 6114095 | 2 | Ammo | | 21 Lonoke, AR | 7/15/2013 | ARCO WAND VACUUM SYS #236C 101803 | 5,219 | -951 | 4,268 | USD |
| 6114095 | 3 | Ammo | | 21 Lonoke, AR | 7/15/2013 | ADD'L ELECTRICAL UPGRADE #236C 101803 | 8,785 | -1,068 | 7,717 | USD |
| 6114101 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2013 | RF DURANT 2525-52 PALLET DECOILER 101813 | 17,248 | -3,143 | 14,105 | USD |
| 6114101 | 1 | Ammo | | 21 Lonoke, AR | 7/15/2013 | BONDED BULLET SHAKER MACHINE #370 101703 | 49,222 | -12,809 | 36,413 | USD |
| 6114101 | 2 | Ammo | | 21 Lonoke, AR | 7/15/2013 | BONDED BULLET BUGGY LIFT #370 101703 | 5,615 | -1,463 | 4,152 | USD |
| 6114101 | 1 | Ammo | | 21 Lonoke, AR | 7/15/2013 | BONDED BULLET X-Y AXIS DISPENSING UNIT #370 101703 | 58,276 | -15,166 | 43,110 | USD |
| 6114101 | 3 | Ammo | | 21 Lonoke, AR | 7/15/2013 | BONDED BULLET WIRE CUTTER #370 101703 | 28,444 | -3,456 | 24,988 | USD |
| 6114101 | 4 | Ammo | | 21 Lonoke, AR | 7/15/2013 | BONDED BULLET HEAT/COOL SYS #370 101703 | 42,105 | -10,957 | 31,148 | USD |
| 6114102 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2013 | SHELL INSP SHAKER TABLE 101787 | 8,336 | -2,170 | 6,166 | USD |
| 6114103 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2013 | SSR ROTARY SCREW AIR COMPRESSOR 101746 | 109,555 | -19,956 | 89,599 | USD |
| 6114118 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2013 | INSTALL AIR CONVEYOR 101815 | 13,477 | -4,911 | 8,566 | USD |
| 6114119 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2013 | POWER HOUSE DRYER 101746 | 93,926 | -24,443 | 69,483 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 14119 | 1 | Ammo | | 21 Lonoke, AR | 8/15/2013 | INSTALL P/H DRYER 101815 | 15,057 | -3,920 | 11,137 | USD |
| 14253 | 0 | Ammo | | 21 Lonoke, AR | 11/22/2013 | SUNITOMO GEARBOX PX9015 MTO 101772 | 7,753 | -1,767 | 5,986 | USD |
| 14254 | 0 | Ammo | | 21 Lonoke, AR | 11/22/2013 | SUNITOMO GEARBOX PX9015 MTO 101772 | 7,753 | -1,767 | 5,986 | USD |
| 14255 | 0 | Ammo | | 21 Lonoke, AR | 11/11/2013 | CF COPPER CYANIDE PLATING TANK 101859 | 8,959 | -3,265 | 5,694 | USD |
| 14448 | 1 | Ammo | | 21 Lonoke, AR | 12/31/2013 | WF6600 BLT ASSY PRESS #232A 101771 | 225,230 | -51,282 | 173,948 | USD |
| 14448 | 2 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Blt Assy Press 232A Conversion 101997/101949 | 128,049 | -21,205 | 106,844 | USD |
| 14448 | 3 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Addtl Blt Assy Press 232A Conversion 101949 | 49,971 | -8,276 | 41,695 | USD |
| 14448 | 4 | Ammo | | 21 Lonoke, AR | 3/20/2018 | Blt Assy Press 232A Conv. Addt'l 101997/101949 | 5,040 | -766 | 4,274 | USD |
| 14449 | 0 | Ammo | | 21 Lonoke, AR | 12/31/2013 | WF6600 BLT ASSY PRESS #233A 101771 | 225,230 | -51,282 | 173,948 | USD |
| 14451 | 0 | Ammo | | 21 Lonoke, AR | 12/31/2013 | BONDED CORE CHECK WEIGHT SYS 101854 | 33,688 | -7,671 | 26,017 | USD |
| 14452 | 0 | Ammo | | 21 Lonoke, AR | 12/31/2013 | BONDED CORE CHECK WEIGHT SYS 101854 | 33,688 | -7,671 | 26,017 | USD |
| 14453 | 0 | Ammo | | 21 Lonoke, AR | 12/31/2013 | NICKEL HOLDING TANK & STAND 101857 | 20,023 | -6,081 | 13,942 | USD |
| 14453 | 1 | Ammo | | 21 Lonoke, AR | 2/4/2014 | ADDL TANK INSTALLATION 101857 | 7,528 | -2,287 | 5,241 | USD |
| 14507 | 0 | Ammo | | 21 Lonoke, AR | 3/3/2014 | BLUE M INERT OVEN IGF 7780 101872 | 16,605 | -2,751 | 13,854 | USD |
| 14541 | 0 | Ammo | | 21 Lonoke, AR | 3/31/2014 | CF LEAD AREA DUST COLLECTOR 101858 | 308,397 | -51,068 | 257,329 | USD |
| 14541 | 1 | Ammo | | 21 Lonoke, AR | 12/11/2014 | ADDL CF DUST COLLECTOR 101858 | 22,508 | -3,418 | 19,090 | USD |
| 14546 | 0 | Ammo | | 21 Lonoke, AR | 1/6/2014 | ADDL CONVEYOR #137 101865 | 3,418 | -1,039 | 2,379 | USD |
| 14547 | 0 | Ammo | | 21 Lonoke, AR | 1/13/2014 | ADDL CONVEYOR #153 101865 | 3,429 | -1,043 | 2,386 | USD |
| 14548 | 0 | Ammo | | 21 Lonoke, AR | 1/6/2014 | SPARE HEADER CONVEYOR 101865 | 5,023 | -1,527 | 3,496 | USD |
| 14549 | 0 | Ammo | | 21 Lonoke, AR | 1/6/2014 | SPARE HEADER CONVEYOR 101865 | 5,023 | -1,527 | 3,496 | USD |
| 14550 | 0 | Ammo | | 21 Lonoke, AR | 1/6/2014 | SPARE HEADER CONVEYOR 101865 | 5,022 | -1,527 | 3,495 | USD |
| 14551 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #278 101869 | 3,480 | -793 | 2,687 | USD |
| 14552 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #279 101869 | 3,480 | -793 | 2,687 | USD |
| 14553 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #280 101869 | 2,018 | -461 | 1,557 | USD |
| 14554 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #281 101869 | 3,480 | -793 | 2,687 | USD |
| 14555 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #282 101869 | 3,480 | -793 | 2,687 | USD |
| 14556 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #283 101869 | 3,480 | -793 | 2,687 | USD |
| 14557 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #284 101869 | 3,480 | -793 | 2,687 | USD |
| 14558 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #340 101869 | 3,480 | -793 | 2,687 | USD |
| 14559 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #354 101869 | 3,480 | -793 | 2,687 | USD |
| 14560 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #300 101869 | 3,480 | -793 | 2,687 | USD |
| 14561 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #291 101869 | 3,480 | -793 | 2,687 | USD |
| 14562 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #293 101869 | 3,480 | -793 | 2,687 | USD |
| 14563 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #294 101869 | 3,480 | -793 | 2,687 | USD |
| 14564 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #295 101869 | 3,480 | -793 | 2,687 | USD |
| 14565 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #296 101869 | 3,480 | -793 | 2,687 | USD |
| 14566 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #297 101869 | 3,480 | -793 | 2,687 | USD |
| 14567 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #339 101869 | 3,480 | -793 | 2,687 | USD |
| 14568 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #300 101869 | 3,480 | -793 | 2,687 | USD |
| 14569 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #304 101869 | 3,480 | -793 | 2,687 | USD |
| 14570 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #310 101869 | 3,480 | -793 | 2,687 | USD |
| 14571 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #311 101869 | 3,480 | -793 | 2,687 | USD |
| 14572 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #312 101869 | 3,480 | -793 | 2,687 | USD |
| 14573 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #315 101869 | 3,480 | -793 | 2,687 | USD |
| 14574 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #316 101869 | 3,480 | -793 | 2,687 | USD |
| 14575 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #322 101869 | 3,480 | -793 | 2,687 | USD |
| 14576 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #325 101869 | 3,480 | -793 | 2,687 | USD |
| 14577 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #326 101869 | 3,480 | -793 | 2,687 | USD |
| 14578 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #329 101869 | 3,480 | -793 | 2,687 | USD |
| 14579 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #330 101869 | 3,480 | -793 | 2,687 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis.val | Accum.dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 114580 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | BULLET FEED BOWL 101847 | 7,988 | -1,820 | 6,168 | USD |
| 114581 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | VIBRATORY FEED SYS PRIMING #1 101847 | 11,448 | -2,609 | 8,839 | USD |
| 114582 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | VIBRATORY FEED SYS PRIMING #2 101847 | 11,448 | -2,609 | 8,839 | USD |
| 114583 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | SHELL FEED BOWL 101847 | 8,607 | -1,961 | 6,646 | USD |
| 114584 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | AES LOADER 101829 | 751,368 | -124,419 | 626,949 | USD |
| 114585 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | VIBRATORY SHELL FEED 101829 | 7,287 | -1,660 | 5,627 | USD |
| 114586 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | BULLET FEED SYSTEM 101829 | 7,287 | -1,660 | 5,627 | USD |
| 114587 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | LASER DETECT SYSTEM 101829 | 7,896 | -1,800 | 6,096 | USD |
| 114588 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | FIRE DETECT UV SENSOR SYSTEM 101829 | 3,294 | -751 | 2,543 | USD |
| 114589 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | AAGARD PACKER S/N 224 CP2 101830 | 672,281 | -111,323 | 560,958 | USD |
| 114590 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | ACCUMALATOR CONVEYOR 101830 | 37,253 | -11,310 | 25,943 | USD |
| 114591 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | VIDEO JET PRINTER 101830 | 19,560 | -4,455 | 15,105 | USD |
| 114592 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | GLUE POT AAGARD PACKER 101830 | 6,533 | -1,082 | 5,451 | USD |
| 114593 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | VIBRON SHELL WASH 101833 | 56,833 | -12,942 | 43,891 | USD |
| 114593 | 1 | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | Vibron Shell Wash 101833 | 9,469 | -2,158 | 7,311 | USD |
| 114594 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | VIBRON CORE WASH 101833 | 42,356 | -9,645 | 32,711 | USD |
| 114594 | 1 | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | VIBRON CORE WASH 101833 | 7,914 | -1,803 | 6,111 | USD |
| 114595 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | VIBRON FINISH BULLET WASH 101833 | 63,247 | -14,401 | 48,846 | USD |
| 114595 | 1 | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | VIBRON FINISH BULLET WASH 101833 | 6,655 | -1,516 | 5,139 | USD |
| 114596 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | NATIONAL HEADER DRAW 101826 | 1,606,501 | -487,699 | 1,118,802 | USD |
| 114596 | 2 | 0 Ammo | | 21 Lonoke, AR | 3/31/2019 | Die sleeves-National punch Cell 1 - 102043 | 5,828 | -1,794 | 4,034 | USD |
| 114596 | 3 | 0 Ammo | | 21 Lonoke, AR | 3/31/2019 | Die sleeves-National punch Cell 1 - 102043 | 5,828 | -1,794 | 4,034 | USD |
| 114596 | 4 | 0 Ammo | | 21 Lonoke, AR | 3/31/2019 | Die sleeves-National punch Cell 1 - 102043 | 5,828 | -1,794 | 4,034 | USD |
| 114596 | 5 | 0 Ammo | | 21 Lonoke, AR | 3/31/2019 | Die sleeves-National punch Cell 1 - 102043 | 5,828 | -1,794 | 4,034 | USD |
| 114597 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | NATL HEADER DTI WIRE FEED 101826 | 11,988 | -3,641 | 8,347 | USD |
| 114598 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | NATL HEADER TOOLING 101826 | 69,869 | -21,211 | 48,658 | USD |
| 114600 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | NATL WIRE UNCOILER 101826 | 4,493 | -512 | 3,981 | USD |
| 114601 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | SCRAP RING CONVEYOR 101826 | 8,225 | -2,498 | 5,727 | USD |
| 114603 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | SHELL CONVEYOR - ELEVATOR 101826 | 16,646 | -5,055 | 11,591 | USD |
| 114604 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | PRIMING MACHINE #1 101844 | 150,939 | -34,368 | 116,571 | USD |
| 114605 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | PRIMING MACHINE #2 101844 | 150,939 | -34,368 | 116,571 | USD |
| 114606 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | VISANI TRAY FILL 101845 | 84,749 | -19,297 | 65,452 | USD |
| 114607 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | HOPPMAN TRAY FEEDER SYS 101845 | 10,016 | -1,660 | 8,356 | USD |
| 114607 | 1 | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | HOPPMAN TRAY FEEDER SYSTEM 101845 | 6,809 | -1,130 | 5,679 | USD |
| 114608 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | OCS CHECK WEIGH 101846 | 46,756 | -10,647 | 36,109 | USD |
| 114611 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | ORION STRETCHER WRAPPER 101848 | 14,099 | -3,211 | 10,888 | USD |
| 114614 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | OPTICAL COMPARITOR 101890 | 4,543 | -1,035 | 3,508 | USD |
| 114615 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 AIR HANDLER/HVAC SYS #1000 101862 | 423,272 | -110,140 | 313,132 | USD |
| 114616 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 WATER BOILER #1000 101862 | 46,559 | -10,601 | 35,958 | USD |
| 114617 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 AIR COMPRESSOR #1000 101862 | 92,984 | -15,399 | 77,585 | USD |
| 114618 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | CLEAN SHELL CONVEYOR 101862 | 12,355 | -3,753 | 8,602 | USD |
| 114619 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | PRIMER SHELL CONVEYOR 101862 | 12,355 | -3,753 | 8,602 | USD |
| 114620 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | TRANSFER CONVEYOR 101862 | 12,355 | -3,753 | 8,602 | USD |
| 114621 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | LIFT CONVEYOR FROM PRIME TO LOAD 101862 | 12,355 | -3,753 | 8,602 | USD |
| 114622 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | TRANSFER CONVEYOR 101862 | 12,355 | -3,753 | 8,602 | USD |
| 114623 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | TRANSFER CONVEYOR 101862 | 12,355 | -3,753 | 8,602 | USD |
| 114624 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | TRANSFER CONVEYOR 101862 | 12,355 | -3,753 | 8,602 | USD |
| 114625 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | TRANSFER CONVEYOR 101862 | 12,355 | -3,753 | 8,602 | USD |
| 114637 | | 0 Ammo | | 21 Lonoke, AR | 8/15/2014 | HYDRON EXTRUDER #1350 101827 | 142,793 | -23,646 | 119,147 | USD |
| 114637 | 1 | 0 Ammo | | 21 Lonoke, AR | 8/15/2014 | LEAD CONTINUOUS CASTING UNIT #1349 101827 | 135,336 | -30,815 | 104,521 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis.val | Accum. dep. | Book val | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C114637 | 2 | Ammo | | 21 Lonoke, AR | 8/15/2014 | LEAD PIG FEEDING SYS #1349 101827 | 69,129 | -15,742 | 53,387 | USD |
| C114637 | 3 | Ammo | | 21 Lonoke, AR | 8/15/2014 | LEAD CONVEYOR #1350 101827 | 6,645 | -2,019 | 4,626 | USD |
| C114637 | 4 | Ammo | | 21 Lonoke, AR | 8/15/2014 | WIRE WINDER SYS W/GUARDING 101827 | 32,580 | -3,711 | 28,869 | USD |
| C114637 | 5 | Ammo | | 21 Lonoke, AR | 8/15/2014 | RESIZE MACHINE #1353 101827 | 90,402 | -20,585 | 69,817 | USD |
| C114637 | 6 | Ammo | | 21 Lonoke, AR | 8/15/2014 | ROLLING MILL & CONVEYOR SYS #1352 101827 | 55,818 | -16,946 | 38,872 | USD |
| C114637 | 7 | Ammo | | 21 Lonoke, AR | 8/15/2014 | LEAD KETTLE MELTING POT W/HOOD #1 101827 | 25,125 | -5,722 | 19,403 | USD |
| C114637 | 8 | Ammo | | 21 Lonoke, AR | 8/15/2014 | LEAD KETTLE MELTING POT W/HOOD #2 101827 | 25,125 | -5,722 | 19,403 | USD |
| C114637 | 9 | Ammo | | 21 Lonoke, AR | 8/15/2014 | Extruder-Hydron-#1350-101827 | 19,733 | -3,268 | 16,465 | USD |
| C114637 | 10 | Ammo | | 21 Lonoke, AR | 8/15/2014 | Lead Continuous Casting Unit #1349 | 8,075 | -1,840 | 6,235 | USD |
| C114637 | 13 | Ammo | | 21 Lonoke, AR | 8/15/2014 | Resize Machine #1353 101827 | 5,168 | -1,177 | 3,991 | USD |
| C114637 | 14 | Ammo | | 21 Lonoke, AR | 8/15/2014 | Rolling Mill & Conveyor #1352 | 3,191 | -970 | 2,221 | USD |
| C114637 | 15 | Ammo | | 21 Lonoke, AR | 8/15/2014 | Lead Kettle Melting Pot W/Hood | 11,497 | -2,620 | 8,877 | USD |
| C114637 | 16 | Ammo | | 21 Lonoke, AR | 8/15/2014 | Lead Kettle Melting Pot w/Hood #2 | 11,497 | -2,620 | 8,877 | USD |
| C114637 | 17 | Ammo | | 21 Lonoke, AR | 8/15/2014 | Extend Hoist 101827 | 7,791 | -1,775 | 6,016 | USD |
| C114742 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | SCRAP RING CONVEYOR 101826 | 8,411 | -2,554 | 5,857 | USD |
| C114744 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | SHELL CONVEYOR ELEVATOR 101826 | 17,023 | -5,169 | 11,854 | USD |
| C114745 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | NATIONAL HEADER DRAW 101826 | 1,646,406 | -499,812 | 1,146,594 | USD |
| C114745 | 2 | Ammo | | 21 Lonoke, AR | 3/31/2019 | Die sleeves-National punch Cell 3 - 102043 | 5,828 | -1,794 | 4,034 | USD |
| C114745 | 3 | Ammo | | 21 Lonoke, AR | 3/31/2019 | Die sleeves-National punch Cell 3 - 102043 | 5,828 | -1,794 | 4,034 | USD |
| C114746 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | NATL HEADER DTI WIRE FEED 101826 | 12,286 | -3,731 | 8,555 | USD |
| C114747 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | NATL HEADER TOOLING 101826 | 71,605 | -21,740 | 49,865 | USD |
| C114748 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | NATL WIRE UNCOILER 101826 | 4,537 | -518 | 4,019 | USD |
| C114749 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | AES LOADER 101829 | 762,590 | -126,277 | 636,313 | USD |
| C114750 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | VIBRATORY SHELL FEED 101829 | 7,429 | -1,693 | 5,736 | USD |
| C114751 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | BULLET FEED SYSTEM 101829 | 7,429 | -1,693 | 5,736 | USD |
| C114753 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | VIBRON CORE WASH 101829 | 8,032 | -1,831 | 6,201 | USD |
| C114754 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | LASER DETECT SYS 101829 | 3,358 | -765 | 2,593 | USD |
| C114755 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | FIRE DETECT UV SENSOR SYSTEM 101829 | 679,062 | -112,446 | 566,616 | USD |
| C114756 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | AAGARD PACKER 101830 | 38,096 | -11,567 | 26,529 | USD |
| C114757 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | ACCUMULATOR CONVEYOR 101830 | 19,942 | -4,542 | 15,400 | USD |
| C114758 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | VIDEO JET PRINTER 101830 | 5,910 | -1,347 | 4,563 | USD |
| C114759 | 0 | Ammo | 1 | 21 Lonoke, AR | 9/21/2014 | GLUE POT 101830 | 57,927 | -13,190 | 44,737 | USD |
| C114760 | 0 | Ammo | 1 | 21 Lonoke, AR | 9/21/2014 | VIBRON SHELL WASH 101833 | 9,668 | -2,203 | 7,465 | USD |
| C114760 | 0 | Ammo | 1 | 21 Lonoke, AR | 9/21/2014 | VIBRON SHELL WASH 101833 | 43,182 | -9,833 | 33,349 | USD |
| C114761 | 1 | Ammo | 1 | 21 Lonoke, AR | 9/21/2014 | VIBRON CORE WASH 101833 | 8,068 | -1,839 | 6,229 | USD |
| C114761 | 1 | Ammo | 1 | 21 Lonoke, AR | 9/21/2014 | VIBRON FINISH BULLET WASH 101833 | 64,481 | -14,683 | 49,798 | USD |
| C114761 | 1 | Ammo | 1 | 21 Lonoke, AR | 9/21/2014 | VIBRON FINISH BULLET WASH 101833 | 6,785 | -1,547 | 5,238 | USD |
| C114762 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | PRIMING MCH #1 101844 | 153,883 | -35,038 | 118,845 | USD |
| C114763 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | PRIMING MCH #2 101844 | 153,883 | -35,038 | 118,845 | USD |
| C114764 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | VASINI TRAY FILL 101845 | 86,402 | -19,674 | 66,728 | USD |
| C114765 | 1 | Ammo | | 21 Lonoke, AR | 9/21/2014 | HOPPMAN TRAY FEEDER SYS 101845 | 10,165 | -1,686 | 8,479 | USD |
| C114765 | 1 | Ammo | 1 | 21 Lonoke, AR | 9/21/2014 | HOPPMAN TRAY FEEDER SYSTEM 101845 | 6,911 | -1,146 | 5,765 | USD |
| C114766 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | OCS CHECK WEIGH 101846 | 47,668 | -10,855 | 36,813 | USD |
| C114767 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | BULLET FEED BOWL 101847 | 8,144 | -1,855 | 6,289 | USD |
| C114768 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | VIBRATORY FEED SYS PRIMING #1 101847 | 11,672 | -2,659 | 9,013 | USD |
| C114769 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | VIBRATORY FEED SYS PRIMING #2 101847 | 11,672 | -2,659 | 9,013 | USD |
| C114771 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | CLEAN SHELL CONVEYOR 101862 | 12,635 | -3,836 | 8,799 | USD |
| C114772 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | PRIMER SHELL CONVEYOR 101862 | 12,635 | -3,836 | 8,799 | USD |
| C114773 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | TRANSFER CONVEYOR 101862 | 12,635 | -3,836 | 8,799 | USD |
| C114774 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | LIFT CONVEYOR PRIME TO LOAD 101862 | 12,635 | -3,836 | 8,799 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val | Accum. dep. | Book val | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C14775 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | TRANSFER CONVEYOR 101862 | 12,635 | -3,836 | 8,799 | USD |
| C14776 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | TRANSFER CONVEYOR 101862 | 12,635 | -3,836 | 8,799 | USD |
| C14777 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | TRANSFER CONVEYOR 101862 | 12,635 | -3,836 | 8,799 | USD |
| C14778 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | TRANSFER CONVEYOR 101862 | 12,635 | -3,836 | 8,799 | USD |
| C14781 | 0 | Ammo | | 21 Lonoke, AR | 9/2/2014 | VISION IMAGE MEASUREMENT SYS 101886 | 35,751 | -8,141 | 27,610 | USD |
| C14782 | 0 | Ammo | | 21 Lonoke, AR | 9/2/2014 | VISION IMAGE MEASUREMENT SYS 101886 | 35,751 | -8,141 | 27,610 | USD |
| C14783 | 0 | Ammo | | 21 Lonoke, AR | 9/2/2014 | VISION IMAGE MEASUREMENT SYS 101886 | 35,751 | -8,141 | 27,610 | USD |
| C15069 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY 323 101869 | 3,920 | -893 | 3,027 | USD |
| C15070 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY 328 101869 | 3,920 | -893 | 3,027 | USD |
| C15071 | 0 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY 338 101869 | 3,920 | -893 | 3,027 | USD |
| C15204 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 BUILDING #1000 101862 | 13,865 | -3,158 | 10,707 | USD |
| C15208 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Equipment 101862 Bldg | 13,270 | -3,023 | 10,247 | USD |
| C15208 | 1 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Equipment - Electrical Parts For Control System | 154,565 | -17,598 | 136,967 | USD |
| 3015217 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Water Softener Equipment And Install | 46,217 | -10,524 | 35,693 | USD |
| C15291 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2015 | HVAC - RF PRMMNG 101899 | 53,065 | -12,084 | 40,981 | USD |
| C15293 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2015 | VIBRATORY SHELL FEED 101829 | 7,642 | -1,548 | 6,094 | USD |
| C15294 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2015 | BULLET FEED SYSTEM 101829 | 7,642 | -1,548 | 6,094 | USD |
| C15295 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2015 | LASER DETECT SYSTEM 101829 | 8,278 | -1,677 | 6,601 | USD |
| C15296 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2015 | FIRE DETECT UV SYSTEM 101829 | 3,454 | -700 | 2,754 | USD |
| C15297 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2015 | AES LOADER 101829 | 760,399 | -115,422 | 644,977 | USD |
| 3015338 | 0 | Ammo | | 21 Lonoke, AR | 12/19/2014 | National Header Draw 101826 | 1,702,945 | -443,123 | 1,259,822 | USD |
| 3015338 | 1 | Ammo | | 21 Lonoke, AR | 3/31/2014 | Die sleeves-National punch Cell 2 - 102043 | 5,828 | -1,794 | 4,034 | USD |
| 3015338 | 2 | Ammo | | 21 Lonoke, AR | 3/31/2014 | Die sleeves-National punch Cell 2 - 102043 | 5,828 | -1,794 | 4,034 | USD |
| 3015339 | 0 | Ammo | | 21 Lonoke, AR | 12/19/2014 | National Header Tooling 101826 | 74,023 | -19,263 | 54,760 | USD |
| 3015341 | 0 | Ammo | | 21 Lonoke, AR | 12/19/2014 | National Wire Uncoiler 101826 | 4,607 | -495 | 4,112 | USD |
| 3015341 | 0 | Ammo | | 21 Lonoke, AR | 12/19/2014 | National Header DTI Wire Feed 101826 | 12,701 | -3,307 | 9,394 | USD |
| 3015342 | 0 | Ammo | | 21 Lonoke, AR | 12/19/2014 | Scrap Ring Conveyor 101826 | 8,677 | -2,259 | 6,418 | USD |
| 3015344 | 0 | Ammo | | 21 Lonoke, AR | 12/19/2014 | Shell Conveyor elevator 101826 | 17,562 | -4,571 | 12,991 | USD |
| 3015345 | 0 | Ammo | | 21 Lonoke, AR | 12/19/2014 | AXgard Packer 101830 | 670,258 | -101,739 | 568,519 | USD |
| 3015346 | 0 | Ammo | | 21 Lonoke, AR | 12/19/2014 | Video Jet Printer 101830 | 20,425 | -4,136 | 16,289 | USD |
| 3015347 | 0 | Ammo | | 21 Lonoke, AR | 12/19/2014 | Glue Pot 101830 | 6,053 | -1,227 | 4,826 | USD |
| 3015348 | 0 | Ammo | | 21 Lonoke, AR | 12/19/2014 | Accumulator 101830 | 41,793 | -8,459 | 33,334 | USD |
| 3015349 | 1 | Ammo | | 21 Lonoke, AR | 12/19/2014 | Vibron Shell Wash 101833 | 66,442 | -13,448 | 52,994 | USD |
| 3015349 | 2 | Ammo | | 21 Lonoke, AR | 12/19/2014 | VIBRON SHELL WASH 101833 | 2,791 | -567 | 2,224 | USD |
| 3015350 | 0 | Ammo | | 21 Lonoke, AR | 12/19/2014 | Vibron Core Wash 101833 | 49,700 | -10,060 | 39,640 | USD |
| 3015350 | 1 | Ammo | | 21 Lonoke, AR | 12/19/2014 | VIBRON CORE WASH 101833 | 2,791 | -567 | 2,224 | USD |
| 3015351 | 0 | Ammo | | 21 Lonoke, AR | 12/19/2014 | Vibron Finish Bullet Wash 101833 | 70,201 | -14,210 | 55,991 | USD |
| 3015351 | 1 | Ammo | | 21 Lonoke, AR | 12/19/2014 | VIBRON FINISH BULLET WASH 101833 | 2,791 | -567 | 2,224 | USD |
| 3015352 | 0 | Ammo | | 21 Lonoke, AR | 12/19/2014 | Vasini Tray Fill 101845 | 85,113 | -17,227 | 67,886 | USD |
| 3015353 | 0 | Ammo | | 21 Lonoke, AR | 12/19/2014 | Hopman Tray Feeder system 101845 | 15,588 | -3,157 | 12,431 | USD |
| 3015354 | 0 | Ammo | | 21 Lonoke, AR | 10/1/2014 | Bullet Assembly Machine (BAM) | 847,852 | -193,043 | 654,809 | USD |
| 3015354 | 1 | Ammo | | 21 Lonoke, AR | 8/31/2018 | Addt'l- L2 Rebuild WF BAM Transfer Press - 101934 | 97,233 | -14,622 | 82,611 | USD |
| 3015355 | 0 | Ammo | | 21 Lonoke, AR | 11/1/2014 | Bullet Assembly Machine (BAM) | 850,021 | -193,536 | 656,485 | USD |
| 3015355 | 1 | Ammo | | 21 Lonoke, AR | 8/31/2018 | Addt'l- L2 Rebuild WF BAM Transfer Press - 101934 | 97,233 | -14,622 | 82,611 | USD |
| 3015356 | 0 | Ammo | | 21 Lonoke, AR | 12/19/2014 | Bullet Assembly Machine (BAM) | 868,422 | -175,756 | 692,666 | USD |
| 3015356 | 1 | Ammo | | 21 Lonoke, AR | 8/31/2018 | Addt'l- L2 Rebuild WF BAM Transfer Press - 101934 | 97,233 | -14,622 | 82,611 | USD |
| 3015357 | 0 | Ammo | | 21 Lonoke, AR | 10/1/2014 | Lead Header | 192,896 | -58,561 | 134,335 | USD |
| 3015358 | 0 | Ammo | | 21 Lonoke, AR | 11/1/2014 | Lead Header | 194,724 | -59,115 | 135,609 | USD |
| 3015359 | 0 | Ammo | | 21 Lonoke, AR | 12/19/2014 | Lead Header | 198,610 | -51,681 | 146,929 | USD |
| 3015360 | 0 | Ammo | | 21 Lonoke, AR | 10/1/2014 | Leader Uncoiler | 12,560 | -2,862 | 9,698 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val | Accum. dep. | Book val | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3015361 | | 0 Ammo | | 21 Lonoke, AR | 11/1/2014 | Leader Uncoiler | 12,662 | -2,884 | 9,778 | USD |
| 3015362 | | 0 Ammo | | 21 Lonoke, AR | 12/19/2014 | Leader Uncoiler | 12,840 | -2,600 | 10,240 | USD |
| 3015363 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | Powder Delivery System 101831 | 76,858 | -12,729 | 64,129 | USD |
| 3015364 | | 0 Ammo | | 21 Lonoke, AR | 11/1/2014 | Powder Delivery System 101831 | 77,478 | -12,831 | 64,647 | USD |
| 3015365 | | 0 Ammo | | 21 Lonoke, AR | 7/21/2014 | Powder Delivery System 101831 | 77,861 | -11,820 | 66,041 | USD |
| 3015368 | | 0 Ammo | | 21 Lonoke, AR | 12/19/2014 | Clean Shell (B) | 13,861 | -2,807 | 11,054 | USD |
| 3015369 | | 0 Ammo | | 21 Lonoke, AR | 12/19/2014 | Primer Shell (B) | 13,861 | -2,807 | 11,054 | USD |
| 3015370 | | 0 Ammo | | 21 Lonoke, AR | 12/19/2014 | Transfer (B) | 13,861 | -2,807 | 11,054 | USD |
| 3015371 | | 0 Ammo | | 21 Lonoke, AR | 12/19/2014 | Lift (B) | 13,861 | -2,807 | 11,054 | USD |
| 3015372 | | 0 Ammo | | 21 Lonoke, AR | 12/19/2014 | Transfer (B) | 13,861 | -2,807 | 11,054 | USD |
| 3015373 | | 0 Ammo | | 21 Lonoke, AR | 12/19/2014 | Transfer (B) | 13,861 | -2,807 | 11,054 | USD |
| 3015374 | | 0 Ammo | | 21 Lonoke, AR | 12/19/2014 | Transfer (B) | 13,861 | -2,807 | 11,054 | USD |
| 3015375 | | 0 Ammo | | 21 Lonoke, AR | 12/19/2014 | Transfer (B) | 13,861 | -2,807 | 11,054 | USD |
| 3015376 | | 0 Ammo | | 21 Lonoke, AR | 12/19/2014 | Priming Machine #1 | 158,582 | -32,096 | 126,486 | USD |
| 3015377 | | 0 Ammo | | 21 Lonoke, AR | 12/19/2014 | Priming Machine #2 | 158,582 | -32,096 | 126,486 | USD |
| 3015378 | | 0 Ammo | | 21 Lonoke, AR | 12/19/2014 | OCS Check Weigh 101846 | 48,823 | -9,883 | 38,940 | USD |
| 3015379 | | 0 Ammo | | 21 Lonoke, AR | 12/19/2014 | Vibratory Feed sys Priming #1 101847 | 11,954 | -2,421 | 9,533 | USD |
| 3015380 | | 0 Ammo | | 21 Lonoke, AR | 12/19/2014 | Vibratory Feed sys Priming #2 101847 | 11,954 | -2,421 | 9,533 | USD |
| 3015381 | | 0 Ammo | | 21 Lonoke, AR | 12/19/2014 | Bullet Feed Bowl 101847 | 8,341 | -1,689 | 6,652 | USD |
| 3015386 | | 0 Ammo | | 21 Lonoke, AR | 12/15/2014 | REPLACE BUSS DUCTS - 101883 | 92,381 | -24,040 | 68,341 | USD |
| 3015387 | | 0 Ammo | | 21 Lonoke, AR | 12/8/2014 | METAL DETECTORS/HAND HELD WANDS | 24,340 | -4,927 | 19,413 | USD |
| T15431 | | 0 Ammo | | 21 Lonoke, AR | 2/17/2015 | Baird Barrel 3D Tumbling Unit 101891 | 50,432 | -9,873 | 40,559 | USD |
| 3015525 | | 0 Ammo | | 21 Lonoke, AR | 3/5/2015 | Date Code Stamper (Kiwi) 101902 | 19,841 | -4,029 | 15,812 | USD |
| 3015525 | | 1 Ammo | | 21 Lonoke, AR | 5/21/2015 | ADD'L DATE STAMPER 101902 | 8,824 | -1,788 | 7,036 | USD |
| 3015696 | | 0 Ammo | | 21 Lonoke, AR | 7/1/2015 | Powder Wet Scrubber 101912 | 4,736 | -960 | 3,776 | USD |
| 3015945 | | 0 Ammo | | 21 Lonoke, AR | 4/1/2012 | Bullet Trap 2 | 4,217 | -1,285 | 2,932 | USD |
| 3016614 | | 0 Ammo | | 21 Lonoke, AR | 11/25/2016 | FARO Edge 9ft 7 axis | 51,480 | -8,552 | 42,928 | USD |
| 3016615 | | 0 Ammo | | 21 Lonoke, AR | 12/21/2016 | HVAC R&D Explosive Lab 4109/102009 | 14,804 | -3,372 | 11,432 | USD |
| 3016616 | | 0 Ammo | | 21 Lonoke, AR | 12/21/2016 | Plating HCN Detection System 4091/101992 | 13,273 | -2,205 | 11,068 | USD |
| 3016617 | | 0 Ammo | | 21 Lonoke, AR | 12/21/2016 | HVAC Upgrade Shot Tower 4085/101986 | 3,645 | -833 | 2,812 | USD |
| 3016618 | | 0 Ammo | | 21 Lonoke, AR | 12/21/2016 | HVAC Upgrade Computer Room 4085/101986 | 2,959 | -677 | 2,282 | USD |
| 3016619 | | 0 Ammo | | 21 Lonoke, AR | 12/21/2016 | CAT Mini Excavator 2011 302.5 4083/101978 | 24,771 | -4,115 | 20,656 | USD |
| 3016620 | | 0 Ammo | | 21 Lonoke, AR | 12/21/2016 | Kubota F3990 4wd front cut mower 4083/101978 | 22,532 | -3,744 | 18,788 | USD |
| 3016621 | | 0 Ammo | | 21 Lonoke, AR | 12/21/2016 | Genie Boom Lift 45 foot 4083/101978 | 48,112 | -7,991 | 40,121 | USD |
| 3016622 | | 0 Ammo | | 21 Lonoke, AR | 12/22/2016 | Lonoke Camera Project- 87 cameras 4038/101922 | 412,479 | -83,731 | 328,748 | USD |
| 3016623 | | 0 Ammo | | 21 Lonoke, AR | 12/22/2016 | Watery Bullet Assembly Press (Rebuilt) 4014/101903 | 780,645 | -129,653 | 650,992 | USD |
| 3016625 | | 0 Ammo | | 21 Lonoke, AR | 12/22/2016 | Mold SP12 32 Cavity Tool 4043/101928 | 227,444 | -69,255 | 158,189 | USD |
| 3016626 | | 0 Ammo | | 21 Lonoke, AR | 12/22/2016 | HVAC Primer Manufacturing 2 units 4059/101947 | 95,429 | -21,729 | 73,700 | USD |
| 3016683 | | 0 Ammo | | 21 Lonoke, AR | 3/30/2017 | Reverse Osmosis Unit #711 101996 | 33,848 | -5,606 | 28,242 | USD |
| 3016684 | | 0 Ammo | | 21 Lonoke, AR | 3/30/2017 | Explosion Proof Ultrasonic Cleaner 101929 | 43,989 | -7,286 | 36,703 | USD |
| 3016751 | | 0 Ammo | | 21 Lonoke, AR | 3/31/2017 | Bullet Traps - 830W Box Trap 101974A | 26,337 | -4,363 | 21,974 | USD |
| 3016752 | | 0 Ammo | | 21 Lonoke, AR | 3/31/2017 | Bullet Traps - 830W Box Trap 101974B | 26,337 | -4,363 | 21,974 | USD |
| 3016753 | | 0 Ammo | | 21 Lonoke, AR | 3/31/2017 | Bullet Traps - 830W Box Trap 101974C | 26,337 | -4,363 | 21,974 | USD |
| 3016754 | | 0 Ammo | | 21 Lonoke, AR | 3/31/2017 | Bullet Traps - PF13000 Proof/Function 101974D | 17,134 | -2,838 | 14,296 | USD |
| 3016757 | | 0 Ammo | | 21 Lonoke, AR | 3/31/2017 | 12GA Heat Set Drum 101976 | 14,020 | -2,323 | 11,697 | USD |
| 3016758 | | 0 Ammo | | 21 Lonoke, AR | 3/31/2017 | 20GA Heat Set Drum 101977 | 13,943 | -2,310 | 11,633 | USD |
| 3016820 | | 0 Ammo | | 21 Lonoke, AR | 4/13/2017 | #738 Wash Rebuild 101938 | 273,818 | -44,800 | 229,018 | USD |
| 3016821 | | 0 Ammo | | 21 Lonoke, AR | 4/13/2017 | Primer Pellet Weight Collection System 101939 | 66,364 | -8,636 | 57,728 | USD |
| 3016829 | | 0 Ammo | | 21 Lonoke, AR | 6/1/2017 | Guarding for 59 Machines 102001 | 90,556 | -18,328 | 72,228 | USD |
| 3016830 | | 0 Ammo | | 21 Lonoke, AR | 6/1/2017 | Guarding for 45 Machines 102001 | 69,068 | -13,981 | 55,087 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis.val | Accum.dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3016831 | 0 | Ammo | | 21 Lonoke, AR | 6/1/2017 | Guarding for 84 Machines 102001 | 128,927 | -26,095 | 102,832 | USD |
| 3016832 | 0 | Ammo | | 21 Lonoke, AR | 6/1/2017 | Guarding for 35 Machines 102001 | 53,720 | -10,873 | 42,847 | USD |
| 3016833 | 0 | Ammo | | 21 Lonoke, AR | 6/1/2017 | Guarding for 145 Machines 102001 | 222,553 | -45,043 | 177,510 | USD |
| 3016834 | 0 | Ammo | | 21 Lonoke, AR | 6/1/2017 | Guarding for 39 Machines 102001 | 59,859 | -12,116 | 47,743 | USD |
| 3016835 | 0 | Ammo | | 21 Lonoke, AR | 6/1/2017 | Guarding for 33 Machines 102001 | 50,650 | -10,252 | 40,398 | USD |
| 3016836 | 0 | Ammo | | 21 Lonoke, AR | 6/1/2017 | Guarding for 23 Machines 102001 | 35,302 | -7,146 | 28,156 | USD |
| 3016838 | 0 | Ammo | | 21 Lonoke, AR | 6/1/2017 | Guarding for 33 Machines 102001 | 50,650 | -10,252 | 40,398 | USD |
| 3016839 | 0 | Ammo | | 21 Lonoke, AR | 6/1/2017 | Guarding for 26 Machines 102001 | 39,906 | -8,077 | 31,829 | USD |
| 3016840 | 0 | Ammo | | 21 Lonoke, AR | 6/1/2017 | Guarding for 119 Machines 102001 | 182,647 | -36,967 | 145,680 | USD |
| 3016841 | 0 | Ammo | | 21 Lonoke, AR | 6/1/2017 | Guarding for 69 Machines 102001 | 105,905 | -21,436 | 84,469 | USD |
| 3016842 | 0 | Ammo | | 21 Lonoke, AR | 6/1/2017 | Guarding for 23 Machines 102001 | 35,302 | -7,146 | 28,156 | USD |
| 3016843 | 0 | Ammo | | 21 Lonoke, AR | 6/1/2017 | Guarding for 32 Machines 102001 | 49,115 | -9,942 | 39,173 | USD |
| 3016844 | 0 | Ammo | | 21 Lonoke, AR | 6/1/2017 | Guarding for 13 Machines 102001 | 19,953 | -4,039 | 15,914 | USD |
| 3016845 | 0 | Ammo | | 21 Lonoke, AR | 6/1/2017 | Guarding for 3 Machines 102001 | 4,605 | -933 | 3,672 | USD |
| 3016846 | 0 | Ammo | | 21 Lonoke, AR | 6/1/2017 | Guarding for 2 Machines 102001 | 3,070 | -623 | 2,447 | USD |
| 3016847 | 0 | Ammo | | 21 Lonoke, AR | 6/1/2017 | Guarding for 2 Machines 102001 | 3,070 | -623 | 2,447 | USD |
| 3016848 | 0 | Ammo | | 21 Lonoke, AR | 6/1/2017 | Guarding for 2 Machines 102001 | 3,070 | -623 | 2,447 | USD |
| 3016860 | 0 | Ammo | | 21 Lonoke, AR | 6/1/2017 | Rebuilt 34 HS SSSD Cold Header 101993 | 213,234 | -43,156 | 170,078 | USD |
| 3016865 | 0 | Ammo | | 21 Lonoke, AR | 6/1/2017 | National #34 Cold Header Spare Frame 101936 | 44,392 | -8,986 | 35,406 | USD |
| 3016866 | 0 | Ammo | | 21 Lonoke, AR | 6/1/2017 | C-35 Press Spare Frame 101936 | 6,847 | -1,135 | 5,712 | USD |
| 3016867 | 0 | Ammo | | 21 Lonoke, AR | 6/1/2017 | Niagara Press E-75 Spare Frame 101936 | 22,124 | -3,665 | 18,459 | USD |
| 3016868 | 0 | Ammo | | 21 Lonoke, AR | 6/1/2017 | #62 Bliss Press Spare Frame 101936 | 4,564 | -757 | 3,807 | USD |
| 3016869 | 0 | Ammo | | 21 Lonoke, AR | 6/1/2017 | V&O 45ST Press Spare Frame 101936 | 49,112 | -8,134 | 40,978 | USD |
| 3016870 | 0 | Ammo | | 21 Lonoke, AR | 6/1/2017 | V&O 45ST Press Spare Frame 101936 | 49,112 | -8,134 | 40,978 | USD |
| 3016871 | 0 | Ammo | | 21 Lonoke, AR | 6/1/2017 | Bliss 3015 Bullet Assembly 102017 | 183,126 | -30,324 | 152,802 | USD |
| 3016887 | 1 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Bliss 3015 Bullet Assbly Relocation 102017/101949 | 3,465 | -576 | 2,889 | USD |
| 3016887 | 0 | Ammo | | 21 Lonoke, AR | 7/28/2017 | CF Shell Gagetaker System 101906 | 57,062 | -7,425 | 49,637 | USD |
| 3016909 | 0 | Ammo | | 21 Lonoke, AR | 9/3/2014 | Dissolved Air Flotation WWT System (DAF) 101968 | 995,632 | -164,865 | 830,767 | USD |
| 3016909 | 1 | Ammo | | 21 Lonoke, AR | 9/3/2017 | Dissolved Air Flotation WWT System (DAF) 101948 | 57,513 | -7,484 | 50,029 | USD |
| 3016909 | 2 | Ammo | | 21 Lonoke, AR | 3/2/2018 | DAF WWT System Addt'l 101988 | 11,836 | -1,439 | 10,397 | USD |
| 3016910 | 0 | Ammo | | 21 Lonoke, AR | 9/3/2017 | Peen Plating Filtration for Filter Press 101969 | 175,588 | -22,846 | 152,742 | USD |
| 3016910 | 1 | Ammo | | 21 Lonoke, AR | 12/31/2017 | Addt'l Peen Plating Filtration 101969 | 22,498 | -3,416 | 19,082 | USD |
| 3016910 | 2 | Ammo | | 21 Lonoke, AR | 3/20/2018 | Addt'l Peen Plating Filtration 101969 | 497 | -497 | 0 | USD |
| 3016911 | 0 | Ammo | | 21 Lonoke, AR | 9/3/2017 | Tamp & Foil Die Set Redesign 101972 | 35,080 | -10,651 | 24,429 | USD |
| 3016912 | 0 | Ammo | | 21 Lonoke, AR | 9/3/2017 | Brankamp Load Cells for Lead Insp (Qty 10) 101973 | 133,627 | -17,386 | 116,241 | USD |
| 3016913 | 0 | Ammo | | 21 Lonoke, AR | 9/3/2017 | CF Loading Bullet Conveyor 101979 | 5,976 | -1,210 | 4,766 | USD |
| 3016914 | 0 | Ammo | | 21 Lonoke, AR | 9/3/2017 | Lube Sizer- REM Lead Bullet - 101999 | 10,235 | -1,697 | 8,538 | USD |
| 3016914 | 1 | Ammo | | 21 Lonoke, AR | 12/30/2019 | Lube Sizer- REM Lead Bullet Addt'l - 102065 | 12,111 | -140 | 11,971 | USD |
| 3016919 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Bridgeport Milling Machine 102006/102004 | 11,924 | -1,976 | 9,948 | USD |
| 3016920 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Bridgeport Milling Machine 102033/102004 | 11,511 | -1,908 | 9,603 | USD |
| 3016921 | 0 | Ammo | | 21 Lonoke, AR | 10/1/2017 | Shrink wrap, Stretchwrap turntable-Orion- 102010 | 99,894 | -13,037 | 86,857 | USD |
| 3016922 | 0 | Ammo | | 28 Lonoke, AR | 10/1/2017 | CF 8 Cameras for Shell & Bullet Area 102019 | 28,338 | -5,736 | 22,602 | USD |
| 3016924 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Waste Water Treatment Ion Exchange Unit 102026 | 14,658 | -1,909 | 12,749 | USD |
| 3016925 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Waste Water Treatment Ion Exchange Unit 102026 | 14,658 | -1,909 | 12,749 | USD |
| 3016926 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Waste Water Treatment Ion Exchange Unit 102026 | 14,658 | -1,909 | 12,749 | USD |
| 3016927 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Waste Water Treatment Ion Exchange Unit 102026 | 14,658 | -1,909 | 12,749 | USD |
| 3016928 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Waste Water Treatment Ion Exchange Unit 102026 | 14,658 | -1,909 | 12,749 | USD |
| 3016929 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Office Remod for RRR Maint-Equip-101950/101949 | 16,651 | -2,759 | 13,892 | USD |
| 3016930 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Addt'l #341 National Header Overhaul 101949 | 49,454 | -10,010 | 39,444 | USD |
| 3016932 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | RF Load Central Vacuum System Tiger Vac 101995 | 117,383 | -15,274 | 102,109 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val | Accum. dep. | Book val | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C3016934 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Hydrogen Cyanide Gas Detector 102041 | 4,512 | -749 | 3,763 | USD |
| C3016935 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Forma Environmental Chamber 102028 | 14,157 | -2,346 | 11,811 | USD |
| C3016936 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Super Cold Chest Freezer 45-6.8A 102028 | 4,173 | -693 | 3,480 | USD |
| C3016938 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Copper Overflow/Boil Out Tank 102024 | 9,407 | -1,906 | 7,501 | USD |
| C3016961 | 0 | Ammo | | 21 Lonoke, AR | 12/31/2017 | Chem Lab and CF Lockers HVAC #520 102023 | 125,879 | -28,662 | 97,217 | USD |
| C3016963 | 0 | Ammo | | 21 Lonoke, AR | 12/31/2017 | Lonoke Emergency Alarm System 102039 | 1,925,992 | -350,813 | 1,575,179 | USD |
| C3016963 | 0 | Ammo | | 21 Lonoke, AR | 9/27/2019 | Lonoke Emergency Alarm System Addt'l 102039 | 83,030 | -2,379 | 80,651 | USD |
| C3016964 | 0 | Ammo | | 21 Lonoke, AR | 12/31/2017 | Automated Primed Pistol Shell Inspection #1 101963 | 57,384 | -8,711 | 48,673 | USD |
| C3016964 | 1 | Ammo | | 21 Lonoke, AR | 8/31/2018 | Addt'l- Auto. Primed Pistol Shell Insp. #1 - 101963 | 133 | -14 | 119 | USD |
| C3016965 | 0 | Ammo | | 21 Lonoke, AR | 12/31/2017 | Automated Primed Pistol Shell Inspection #2 101963 | 57,384 | -8,711 | 48,673 | USD |
| C3016965 | 1 | Ammo | | 21 Lonoke, AR | 8/31/2018 | Addt'l- Auto. Primed Pistol Shell Insp. #2 101963 | 133 | -14 | 119 | USD |
| C3016966 | 0 | Ammo | | 21 Lonoke, AR | 12/31/2017 | Automated Primed Pistol Shell Inspection #3 101963 | 57,384 | -8,711 | 48,673 | USD |
| C3016966 | 1 | Ammo | | 21 Lonoke, AR | 8/31/2018 | Addt'l- Auto. Primed Pistol Shell Insp. #3101963 | 133 | -14 | 119 | USD |
| 3017047 | 0 | Ammo | | 21 Lonoke, AR | 3/2/2018 | Building 804 Powder Lift 101981 | 8,819 | -1,340 | 7,479 | USD |
| 3017057 | 0 | Ammo | | 21 Lonoke, AR | 5/6/2018 | Lift, Buggy Safely lift for #734-Remington-101926 | 92,582 | -11,261 | 81,321 | USD |
| 3017123 | 0 | Ammo | | 21 Lonoke, AR | 8/5/2018 | Engraver, Roland Desktop Engraver, 102053 | 4,957 | -522 | 4,435 | USD |
| 3017129 | 0 | Ammo | | 21 Lonoke, AR | 9/30/2018 | Loader, Stripper Clip REM 102042 | 5,089 | -484 | 4,605 | USD |
| 3017130 | 0 | Ammo | | 21 Lonoke, AR | 9/30/2018 | Loader, Stripper Clip REM 102042 | 5,089 | -484 | 4,605 | USD |
| 3017143 | 0 | Ammo | | 21 Lonoke, AR | 11/14/2018 | Table, REM Lead Melt Cast Table 102018 | 305,061 | -26,960 | 278,101 | USD |
| 3017152 | 0 | Ammo | | 21 Lonoke, AR | 11/30/2018 | Plotter, Eng Drafting HP Design Jet 36" 102066 | 7,619 | -639 | 6,980 | USD |
| 3017153 | 0 | Ammo | | 21 Lonoke, AR | 12/21/2018 | Tractor, Ventrac 4500Z Lawn 102070 | 37,486 | -2,993 | 34,493 | USD |
| 3017154 | 0 | Ammo | | 21 Lonoke, AR | 12/27/2018 | Grinder, Supertec G20P Cylinder 102016/102004 | 44,568 | -3,509 | 41,059 | USD |
| 3017155 | 0 | Ammo | | 21 Lonoke, AR | 12/27/2018 | Grinder, Okamoto Acc12.24DX Surface 102016/102004 | 49,551 | -3,901 | 45,650 | USD |
| 3017156 | 0 | Ammo | | 21 Lonoke, AR | 12/27/2018 | Vacuum, TigerVac HY-C 2HP Exp Proof 102052 | 13,323 | -1,575 | 11,748 | USD |
| 3017167 | 0 | Ammo | | 21 Lonoke, AR | 1/31/2019 | Building, Remelt #511-Surveillance Sys - 101941 | 4,800 | -348 | 4,452 | USD |
| 3017169 | 0 | Ammo | | 21 Lonoke, AR | 1/31/2019 | Forklift, Yale Electric Rider Remelt #511 - 101941 | 43,320 | -3,133 | 40,187 | USD |
| 3017170 | 0 | Ammo | | 21 Lonoke, AR | 1/31/2019 | RO System, Applied Membranes Remelt #511-101941 | 28,670 | -2,074 | 26,596 | USD |
| 3017170 | 1 | Ammo | | 21 Lonoke, AR | 5/28/2019 | RO System, Applied Membranes Remelt #511-101941 | 31,737 | -1,617 | 30,120 | USD |
| 3017171 | 0 | Ammo | | 21 Lonoke, AR | 1/31/2019 | Air Compressor, Proc & Power 7100E15P - 101941 | 9,181 | -665 | 8,516 | USD |
| 3017173 | 0 | Ammo | | 21 Lonoke, AR | 1/31/2019 | Crane, Deshazon Series 45-3Ton - 101941 | 59,241 | -4,284 | 54,957 | USD |
| 3017179 | 0 | Ammo | | 21 Lonoke, AR | 1/31/2019 | Conveyor, Hydroton Pot 1348A Model 751 - 101941 | 15,078 | -1,091 | 13,987 | USD |
| 3017180 | 0 | Ammo | | 21 Lonoke, AR | 1/31/2019 | Pot, Seco/Warwick Remelt Lead Pot Cast - 101941 | 15,030 | -1,087 | 13,943 | USD |
| 3017181 | 0 | Ammo | | 21 Lonoke, AR | 1/31/2019 | Scale, Mettler Toledo Floor - 101941 | 5,816 | -421 | 5,395 | USD |
| 3017182 | 0 | Ammo | | 21 Lonoke, AR | 1/31/2019 | Inverter, Allen-Bradley 60HP Baghouse - 101941 | 7,514 | -544 | 6,970 | USD |
| 3017184 | 0 | Ammo | | 21 Lonoke, AR | 3/1/2019 | Camera, Ballistic - 102072 | 3,545 | -714 | 2,831 | USD |
| 3017185 | 0 | Ammo | | 21 Lonoke, AR | 3/1/2019 | Camera, Parking Lot - 102072 | 6,912 | -1,390 | 5,522 | USD |
| 3017186 | 0 | Ammo | | 21 Lonoke, AR | 3/1/2019 | NVR, Pelco for Cameras - 102072 | 14,181 | -2,851 | 11,330 | USD |
| 3017195 | 0 | Ammo | | 21 Lonoke, AR | 3/31/2019 | Jack-Toyota Motorized Pallet-102051 | 6,014 | -371 | 5,643 | USD |
| 3017204 | 0 | Ammo | | 21 Lonoke, AR | 5/28/2019 | Scaffolding, Zack Eaves, Remelt #511-101941 | 7,525 | -384 | 7,141 | USD |
| 3017204 | 0 | Ammo | | 21 Lonoke, AR | 9/27/2019 | Pumps, Wet Well for HCR 102021 | 219,446 | -11,177 | 208,269 | USD |
| 3017204 | 1 | Ammo | | 21 Lonoke, AR | 9/27/2019 | Equip, HCR- Elec, Mech, Instru, Pump 102021 | 171,200 | -4,905 | 166,295 | USD |
| 3017204 | 2 | Ammo | | 21 Lonoke, AR | 9/27/2019 | Equip, Streamflow Measurement Sys HCR 102021 | 44,650 | -1,280 | 43,370 | USD |
| 3017205 | 0 | Ammo | | 21 Lonoke, AR | 5/28/2019 | Press, Bruderer #149 Anvil Punch Press 102031 | 541,011 | -27,554 | 513,457 | USD |
| 3017209 | 0 | Ammo | | 21 Lonoke, AR | 5/30/2019 | Labeler, Zebra ZE500б2 Print Engine 1 of 2 102068 | 6,766 | -343 | 6,423 | USD |
| 3017210 | 0 | Ammo | | 21 Lonoke, AR | 5/30/2019 | Labeler, Zebra ZE500б2 Print Engine 2of 2 102068 | 6,766 | -343 | 6,423 | USD |
| 3017211 | 0 | Ammo | | 21 Lonoke, AR | 5/30/2019 | Lift, Maxx Ergo Electric MXE250 1 of 2 102071 | 2,985 | -152 | 2,833 | USD |
| 3017212 | 0 | Ammo | | 21 Lonoke, AR | 5/30/2019 | Lift, Maxx Ergo Electric MXE250 2 of 2 102071 | 2,985 | -152 | 2,833 | USD |
| 3017230 | 0 | Ammo | | 21 Lonoke, AR | 9/26/2019 | Feeder, Perf. Feeders RF Priming 102056/101980 | 145,000 | -4,181 | 140,819 | USD |
| 3017231 | 0 | Ammo | | 21 Lonoke, AR | 9/27/2019 | Wash, JenFab 10 Cone Wash #728 102038 | 1,073,260 | -30,745 | 1,042,515 | USD |
| 3017232 | 0 | Ammo | | 21 Lonoke, AR | 9/27/2019 | Dumper, HD Barrel 102038 | 9,312 | -268 | 9,044 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis.val | Accum. dep. | Book val | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C117233 | 0 | Ammo | | 21 Lonoke, AR | 9/27/2013 | Filter, Reverse Osmosis Unit 102038 | 3,648 | -157 | 3,491 | USD |
| C117234 | 0 | Ammo | | 21 Lonoke, AR | 9/27/2013 | Lift, IBC2000 Bulk Bag Unloader 102055/102038 | 29,746 | -854 | 28,892 | USD |
| C117266 | 0 | Ammo | | 21 Lonoke, AR | 2/27/2022 | Packer - Aagard CF Rifle 1460 - 102054 | 2,108,672 | -1,537 | 2,107,135 | USD |
| 100227 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2004 | SPARE SUBSTATION TRANSFORMER | 5,580 | -1,700 | 3,880 | USD |
| 2004234 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2010 | ADD'L REFURBISH DRUM 101597 | 8,233 | -3,762 | 4,471 | USD |
| 2004276 | 2 | Ammo | | 21 Lonoke, AR | 11/15/2017 | SPARE CIRCUIT BREAKERS | 2,549 | -2,330 | 219 | USD |
| 1805222 | 1 | Ammo | | 21 Lonoke, AR | 1/15/2008 | REBUILD SPARE SS GEAR PUMP | 4,507 | -1,648 | 2,859 | USD |
| 2006458 | 1 | Ammo | | 21 Lonoke, AR | 10/31/2017 | #262 Perkins 22 Electrical Upgrade 102027 | 37,500 | -3,596 | 33,904 | USD |
| 2006460 | 1 | Ammo | | 21 Lonoke, AR | 10/31/2017 | #263 Perkins Electrical Upgrade 102027 | 37,500 | -3,596 | 33,904 | USD |
| C107454 | 1 | Ammo | | 21 Lonoke, AR | 1/6/2014 | ADD'L CONVEYOR #148 101865 | 3,418 | -1,039 | 2,379 | USD |
| 3018960 | 1 | Ammo | | 21 Lonoke, AR | 12/27/2018 | Header, RF Shellmaking Rebuild 102057/101980 | 22,226 | -2,625 | 19,601 | USD |
| 110770 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2007 | SPARE CF IPS GEARBOX/ARM ASSBY | 10,584 | -4,220 | 6,364 | USD |
| 110770 | 1 | Ammo | | 21 Lonoke, AR | 4/15/2008 | SPARE CF IPS GEARBOX ARM ASSY | 23,454 | -8,571 | 14,883 | USD |
| 3011868 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2008 | SPARE ROCKPORT SAW DRUM (2) | 4,411 | -4,031 | 380 | USD |
| 2123123 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2009 | 6 SPARE CF POWDER CHARGER DRUMS 101477 | 17,226 | -4,497 | 12,729 | USD |
| 2132131 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2009 | 951086 HALF HEAD CRANKSHAFT 101574 | 4,773 | -2,182 | 2,591 | USD |
| 2132186 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2010 | SPARE CIRCUIT BREAKER SUB ST #10 101615 | 3,463 | -1,583 | 1,880 | USD |
| 2141420 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2013 | WASH CONES (6) 101822 | 69,424 | -18,066 | 51,358 | USD |
| 2141450 | 0 | Ammo | | 21 Lonoke, AR | 12/31/2013 | CF LEAD EXT CONTROL VALVES 101837 | 45,141 | -7,476 | 37,665 | USD |
| 3014609 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | SUBSTATION 2500KVA #12 101836 | 223,373 | -25,430 | 197,943 | USD |
| 3014610 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | SUBSTATION 2500kVA #11 101862 | 220,162 | -25,066 | 195,096 | USD |
| 3010159 | 0 | Ammo | | 21 Lonoke, AR | 6/15/2006 | ADVANCED WASTE TRMT FACILITY | 213,147 | -64,902 | 148,245 | USD |
| 3010182 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2013 | WASTE WATER EFFLUENT FILTRATION 101768 | 597,105 | -155,373 | 441,732 | USD |
| 3010182 | 1 | Ammo | | 21 Lonoke, AR | 2/11/2014 | ADD'L WASTE WATER EFFLUENT FILTRATION 101768 | 9,444 | -2,459 | 6,985 | USD |
| 3010191 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Phase II Sidewalks | 13,892 | -3,616 | 10,276 | USD |
| 3010191 | 1 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Phase I Sidewalks/Dock Concrete | 193,307 | -50,302 | 143,005 | USD |
| 3010377 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1996 | DRUMMED WASTE STORAGE FACILITY 516 | 4,579 | -2,093 | 2,486 | USD |
| 3010574 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2010 | PP CONTROL BUILDING 607 101580 | 24,712 | -6,451 | 18,261 | USD |
| 3010574 | 1 | Ammo | | 21 Lonoke, AR | 6/15/2010 | ADD'L BUILDING DESIGN 101548 | 6,260 | -1,635 | 4,625 | USD |
| 3010575 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2010 | ADD'L BUILDING DESIGN #738 101548 | 6,222 | -1,625 | 4,597 | USD |
| 3010575 | 1 | Ammo | | 21 Lonoke, AR | 9/15/2010 | EXPLOSIVE FILTER PRESS BLDG #738 101601 | 46,335 | -12,094 | 34,241 | USD |
| 3010580 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2011 | BIOLOGICAL TRMT BUILDING 101672 | 27,574 | -7,198 | 20,376 | USD |
| 3010639 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Sitework & Demolition | 629,001 | -163,674 | 465,327 | USD |
| 3010688 | 0 | Ammo | | 21 Lonoke, AR | 4/13/2017 | #738 Wash Floor and Walls | 23,677 | -5,409 | 18,268 | USD |
| 3010692 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Office Remod for RRR Maint-Building-101950/101949 | 31,495 | -7,172 | 24,323 | USD |
| 3010923 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2008 | CF STEAM CONDESATE PUMP | 3,018 | -1,104 | 1,914 | USD |
| 3012469 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2010 | WASTE TREATMENT PP CONTROLS 101580 | 32,159 | -8,395 | 23,764 | USD |
| 3012469 | 1 | Ammo | | 21 Lonoke, AR | 5/15/2010 | PP CONTROLS - ELECTRICAL 101580 | 22,753 | -3,466 | 19,287 | USD |
| 3012469 | 2 | Ammo | | 21 Lonoke, AR | 5/15/2010 | PP CONTROLS - PIPING 101580 | 29,015 | -7,574 | 21,441 | USD |
| 3012469 | 3 | Ammo | | 21 Lonoke, AR | 5/15/2010 | PP CONTROLS - TANKS 101580 | 3,430 | -3,134 | 296 | USD |
| 3013161 | 1 | Ammo | | 21 Lonoke, AR | 4/15/2011 | BIOLOGICAL TRMT CONTROL SYS 101672 | 52,146 | -19,056 | 33,090 | USD |
| 3010442 | 0 | Ammo | | 21 Lonoke, AR | 12/15/1997 | PLANT CLOCK SYSTEM | 2,927 | -1,338 | 1,589 | USD |
| 3010689 | 0 | Ammo | | 21 Lonoke, AR | 6/1/2017 | Rebuild Shop Ductwork Relocation 102022 | 8,848 | -2,016 | 6,832 | USD |
| 3010693 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Office Remod for RRR Maint-Build Fix-101950/101949 | 6,445 | -1,469 | 4,976 | USD |
| 3010694 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Rebuild Shop Bay Shelving 102015/102004 | 5,021 | -1,144 | 3,877 | USD |
| 3007762 | 0 | Ammo | | 21 Lonoke, AR | 8/14/1995 | ADD'L-PLANT SIGN REPAIR | 5,776 | -2,640 | 3,136 | USD |
| 200219 | 0 | Ammo | | 21 Lonoke, AR | 12/11/1993 | OFFICE TRAILER - BLDG 101 | 5,136 | -3,130 | 2,006 | USD |
| 200219 | 1 | Ammo | | 21 Lonoke, AR | 12/11/1993 | ADDITIONAL OFFICE TRAILER | 3,098 | -1,888 | 1,210 | USD |
| 200219 | 2 | Ammo | | 21 Lonoke, AR | 4/15/1999 | ADD'L OFFICE TRAILER | 3,292 | -1,505 | 1,787 | USD |
| 100219 | 3 | Ammo | | 21 Lonoke, AR | 12/15/2007 | ADD'L OFFICE TRAILER | 19,904 | -6,063 | 13,841 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis val | Accum dep. | Book val | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C000220 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | FINISHED PRODUCT AND RAW MATERIAL WHSE 300 | 71,976 | -43,834 | 28,142 | USD |
| C000220 | 1 | Ammo | | 21 Lonoke, AR | 3/15/1995 | ADD-EMPLOYEE SALES OFC 2280 | 3,081 | -1,878 | 1,203 | USD |
| C000220 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SPRINKLER SYSTEM | 5,389 | -3,283 | 2,106 | USD |
| C000220 | 6 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST-DOCK LEVELERS | 3,013 | -1,836 | 1,177 | USD |
| C000220 | 8 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST ROOF RPLMT 110078/110076 | 56,783 | -34,580 | 22,203 | USD |
| C000220 | 9 | Ammo | | 21 Lonoke, AR | 12/1/1993 | RITE-HITE DOK-LOK-3 120560 | 4,262 | -2,596 | 1,666 | USD |
| C000220 | 10 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SCRAP BRS LD FAC/DOCK DR SEAL120517/559 | 4,263 | -2,597 | 1,666 | USD |
| C000220 | 14 | Ammo | | 21 Lonoke, AR | 4/15/2001 | UPGRADE W/H DOCK LEVELOR | 10,814 | -3,953 | 6,861 | USD |
| C000220 | 15 | Ammo | | 21 Lonoke, AR | 11/15/2001 | EXP-PRODUCT SERVICE OFFICE | 3,734 | -1,366 | 2,368 | USD |
| C000220 | 16 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L OVERHEAD LIGHTING | 6,521 | -3,973 | 2,548 | USD |
| C000220 | 18 | Ammo | | 21 Lonoke, AR | 8/15/2008 | ADD'L WAREHOUSE VEHICLE RAMP | 6,217 | -1,895 | 4,322 | USD |
| C000220 | 19 | Ammo | | 21 Lonoke, AR | 2/15/2010 | ADD'L DOCK SEALS & BUMPERS 101584 | 6,710 | -1,752 | 4,958 | USD |
| C000220 | 20 | Ammo | | 21 Lonoke, AR | 1/15/2011 | RIMFIRE MAINTENANCE SHOP 101671 | 8,100 | -2,116 | 5,984 | USD |
| C000221 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BALLISTICS BUILDING 400 | 60,393 | -36,780 | 23,613 | USD |
| C000221 | 6 | Ammo | | 21 Lonoke, AR | 12/15/2007 | ADD'L F&C SOUND INSULATION | 6,676 | -2,034 | 4,642 | USD |
| C000221 | 7 | Ammo | | 21 Lonoke, AR | 5/15/2010 | BALLISTICS RANGE ROOF 101635 | 23,171 | -6,049 | 17,122 | USD |
| C000221 | 8 | Ammo | | 21 Lonoke, AR | 12/22/2016 | Ballistics Range Roof Replacement 4060/101946 | 46,863 | -10,671 | 36,192 | USD |
| C900222 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | UTILITY SERVICE BUILDING - POWER HOUSE BLDG 500 | 18,819 | -11,461 | 7,358 | USD |
| C000221 | 2 | Ammo | | 21 Lonoke, AR | 8/15/2013 | POWER HOUSE EXPANSION 101815 | 192,838 | -50,180 | 142,658 | USD |
| C000222 | 3 | Ammo | | 21 Lonoke, AR | 8/15/2013 | POWER HOUSE - DESIGN 101746 | 32,003 | -8,328 | 23,675 | USD |
| C000223 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | YARD SERVICE BUILDING 501 | 13,339 | -8,125 | 5,214 | USD |
| C000224 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | OIL AND SOLVENT STORAGE BUILDING 502 | 6,806 | -4,146 | 2,660 | USD |
| C000225 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | GATE HOUSE 503 | 4,224 | -2,573 | 1,651 | USD |
| C000225 | 1 | Ammo | | 21 Lonoke, AR | 5/15/1997 | ADD'L-GATEHOUSE ROOF REPLACEMENT | 2,578 | -1,179 | 1,399 | USD |
| C000226 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SCRAP/BURNING & STORAGE BUILDING 504 | 2,967 | -1,808 | 1,159 | USD |
| C000230 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | WASTE TREATMENT CONTROL AND STORAGE BLDG 600 | 4,446 | -2,710 | 1,736 | USD |
| C000231 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | UDYLITE CONTROL BUILDING 601 | 4,503 | -2,743 | 1,760 | USD |
| C000232 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLDG 736-EXPLOSIVES WST TRTMT 110331 | 16,694 | -10,168 | 6,526 | USD |
| C000232 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L-HEATER/CROSSOVER 110076 | 12,394 | -7,550 | 4,844 | USD |
| C000232 | 3 | Ammo | | 21 Lonoke, AR | 9/15/2010 | ADD'L #736 ROOF 101682 | 10,518 | -2,747 | 7,771 | USD |
| C000233 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | STORAGE/FILTER PRESS BLDG #601A | 3,374 | -2,056 | 1,318 | USD |
| C000235 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BUILDING #203 SS MAINTENACE STORAGE | 2,574 | -1,570 | 1,004 | USD |
| C000236 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BUILDING #737 PM MAINTENANCE STORAGE | 2,616 | -1,595 | 1,021 | USD |
| C000638 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 General Building Power Distribution | 615,398 | -160,133 | 455,265 | USD |
| C000696 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Garage Roof Replacement  102025 | 11,837 | -2,696 | 9,141 | USD |
| C000713 | 0 | Ammo | | 21 Lonoke, AR | 5/28/2019 | Building, Pump Station for HCR 102021 | 242,065 | -7,398 | 234,667 | USD |
| C017235 | 0 | Ammo | | 21 Lonoke, AR | 9/27/2019 | Security/Guardhouse Remodel 102061/102039 | 60,649 | -1,738 | 58,911 | USD |
| C004559 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2001 | SS & CF WATER SOFTNER | 4,108 | -2,574 | 1,534 | USD |
| C010065 | 0 | Ammo | | 21 Lonoke, AR | 6/15/2003 | P/H AIR COMPRESSOR XFE400-2S | 6,303 | -5,759 | 544 | USD |
| C010065 | 1 | Ammo | | 21 Lonoke, AR | 6/15/2010 | REBUILD #4 COMPRESSOR 101644 | 39,122 | -10,212 | 28,910 | USD |
| C010065 | 2 | Ammo | | 21 Lonoke, AR | 8/4/2014 | AIR FILTER 400HP COMPRESSOR 101885 | 6,007 | -997 | 5,010 | USD |
| C210739 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2006 | LIFT STATION 150' 6" CPVC LINE | 3,782 | -1,566 | 2,216 | USD |
| 3016180 | 0 | Ammo | | 21 Lonoke, AR | 5/1/2016 | LEBLOOD 1560 MANUAL LATHE 101952 | 26,186 | -4,771 | 21,415 | USD |
| 3016181 | 0 | Ammo | | 21 Lonoke, AR | 5/1/2016 | LEBLOOD 1560 MANUAL LATHE 101952 | 26,186 | -4,771 | 21,415 | USD |
| 3016182 | 0 | Ammo | | 21 Lonoke, AR | 5/1/2016 | AERO 40 FP BLASTER 101956 | 21,072 | -3,840 | 17,232 | USD |
| 3016183 | 0 | Ammo | | 21 Lonoke, AR | 5/1/2016 | CLAUSING DRILL PRESS 101957 | 4,374 | -798 | 3,576 | USD |
| C002561 | 6 | Ammo | | 21 Lonoke, AR | 2/15/2006 | ADD'L ROTARY FURNACE DRUM | 2,801 | -1,397 | 1,404 | USD |
| C010065 | 3 | Ammo | | 21 Lonoke, AR | 6/15/2011 | Elevator, ADD'L ELEVATOR #5 (modifications) 101679 | 41,873 | -15,301 | 26,572 | USD |
| C002649 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Rebuild Hardinge Lathe HVLH5336L  102007/102004 | 21,233 | -4,836 | 16,397 | USD |
| 3022697 | 1 | Ammo | | 21 Lonoke, AR | 6/1/2017 | Rebuild Clausing Colchester Lathe  101953 | 22,160 | -3,671 | 18,489 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val | Accum. dep. | Book val | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C002713 | 1 | Ammo | 21 | Lonoke, AR | 9/15/2009 | ADDL REBUILD FIRE PUMP 101513 | 10,458 | -3,186 | 7,272 | USD |
| C002720 | 3 | Ammo | 21 | Lonoke, AR | 11/15/2007 | ADDL BURNERS | 5,934 | -5,422 | 512 | USD |
| C002720 | 4 | Ammo | 21 | Lonoke, AR | 7/15/2008 | ADDL BOILER STACK HEAT RECOVERY | 6,972 | -6,370 | 602 | USD |
| C002721 | 3 | Ammo | 21 | Lonoke, AR | 11/15/2007 | ADDL BURNERS | 5,934 | -5,422 | 512 | USD |
| C002725 | 4 | Ammo | 21 | Lonoke, AR | 7/15/2008 | ADDL BOILER STACK HEAT RECOVERY | 6,972 | -6,370 | 602 | USD |
| C002725 | 1 | Ammo | 21 | Lonoke, AR | 5/15/1998 | ADDL REPLACE ROOF, INTERIOR COATING | 3,959 | -3,618 | 341 | USD |
| C002726 | 1 | Ammo | 21 | Lonoke, AR | 12/15/1998 | ADDL RPL TANK LINING | 3,093 | -2,263 | 830 | USD |
| C002731 | 2 | Ammo | 21 | Lonoke, AR | 2/15/2009 | ADDL REBUILD PUMP | 4,998 | -1,524 | 3,474 | USD |
| C002742 | 1 | Ammo | 21 | Lonoke, AR | 2/15/2009 | EXTEND #2 WELL | 2,894 | -1,763 | 1,131 | USD |
| C002765 | 1 | Ammo | 21 | Lonoke, AR | 2/15/2010 | ADDL SLUDGE PIT PLATFORM 101564 | 2,986 | -1,366 | 1,620 | USD |
| CRJ11 | 5 | Ammo | 21 | Lonoke, AR | 2/15/2009 | ADDL WASTE TREATMENT CLARIFIER | 27,812 | -8,470 | 19,342 | USD |
| C002779 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | EQUALIZATION TANK | 7,027 | -5,136 | 1,891 | USD |
| C002779 | 2 | Ammo | 21 | Lonoke, AR | 2/15/2009 | ADDL AEREATOR MOTOR (2) | 3,756 | -2,289 | 1,467 | USD |
| 3002780 | 1 | Ammo | 21 | Lonoke, AR | 12/1/1993 | DIVERSION TANK | 10,151 | -7,419 | 2,732 | USD |
| 3002780 | 2 | Ammo | 21 | Lonoke, AR | 3/15/1999 | ADDL DIVERSION TANK MIXERS | 4,269 | -2,838 | 1,431 | USD |
| C002780 | 4 | Ammo | 21 | Lonoke, AR | 4/15/2011 | ADDL BIOLOGICAL TRMT MODIFICATIONS 101672 | 162,473 | -59,367 | 103,106 | USD |
| 3002781 | 1 | Ammo | 21 | Lonoke, AR | 6/15/2012 | ADDL POTABLE WATER TANK #1 101738 | 107,354 | -49,034 | 58,320 | USD |
| C002817 | 3 | Ammo | 21 | Lonoke, AR | 6/15/2009 | ADDL UPDATE TELEPHONE CABLING | 5,835 | -3,555 | 2,280 | USD |
| C002833 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | POWER & SERVICE PIPING - UTILITY SERVIC | 10,743 | -9,814 | 929 | USD |
| C002879 | 1 | Ammo | 21 | Lonoke, AR | 10/15/2010 | ADDL 650 FT PLASTIC PIPE 101685 | 15,864 | -4,142 | 11,722 | USD |
| 3002929 | 8 | Ammo | 21 | Lonoke, AR | 2/15/2007 | UTILITY POLES | 2,593 | -2,370 | 223 | USD |
| 3002929 | 9 | Ammo | 21 | Lonoke, AR | 8/15/2007 | WOODEN UTILITY POLES | 4,493 | -4,105 | 388 | USD |
| C002929 | 10 | Ammo | 21 | Lonoke, AR | 10/15/2009 | UTILITY POLES 101554 | 7,056 | -4,299 | 2,757 | USD |
| C002929 | 11 | Ammo | 21 | Lonoke, AR | 11/15/2010 | UTILITY POLES (4) 101690 | 4,019 | -1,470 | 2,549 | USD |
| C002929 | 12 | Ammo | 21 | Lonoke, AR | 11/18/2014 | RPL HIGH VOLTAGE CABLING 101879 | 556,924 | -59,674 | 497,250 | USD |
| C003031 | 1 | Ammo | 21 | Lonoke, AR | 9/15/2002 | ADDL PR ELECTRICAL SUBSTATION | 7,206 | -3,292 | 3,914 | USD |
| C003035 | 1 | Ammo | 21 | Lonoke, AR | 12/15/2008 | ADDL RETROFIT CIRCUIT BREAKERS | 4,221 | -2,572 | 1,649 | USD |
| C003035 | 1 | Ammo | 21 | Lonoke, AR | 6/15/2006 | ADDL SUBSTATION TRANSFORMER | 10,336 | -2,361 | 7,975 | USD |
| C002936 | 1 | Ammo | 21 | Lonoke, AR | 11/15/2008 | ADDL SUBSTATION #2 | 20,427 | -3,394 | 17,033 | USD |
| C002936 | 2 | Ammo | 21 | Lonoke, AR | 12/15/2008 | ADDL RETROFIT CIRCUIT BREAKERS | 4,221 | -2,572 | 1,649 | USD |
| C002937 | 2 | Ammo | 21 | Lonoke, AR | 11/15/2008 | RETROFIT CIRCUIT BREAKERS | 2,549 | -2,330 | 219 | USD |
| C002938 | 1 | Ammo | 21 | Lonoke, AR | 1/15/2007 | ADDL SUBSTATION #4 TRANSFORMER | 9,860 | -2,003 | 7,857 | USD |
| C002938 | 2 | Ammo | 21 | Lonoke, AR | 1/15/2009 | ADDL CIRCUIT BREAKER #4 101532 | 4,295 | -1,962 | 2,333 | USD |
| C002938 | 2 | Ammo | 21 | Lonoke, AR | 11/15/2009 | ADDL CIRCUIT BREAKER #5 101532 | 4,295 | -1,962 | 2,333 | USD |
| C002942 | 2 | Ammo | 21 | Lonoke, AR | 7/15/2003 | SUBSTATION TRANSFORMER #8 | 6,646 | -2,431 | 4,215 | USD |
| C002943 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | SUBSTATION #10 W SS BLD 200 SS CON | 3,065 | -2,802 | 263 | USD |
| C002960 | 1 | Ammo | 21 | Lonoke, AR | 6/15/2010 | REBUILD MIXER GEARBOX 101633 | 4,936 | -2,255 | 2,681 | USD |
| C006015 | 1 | Ammo | 21 | Lonoke, AR | 8/15/1996 | 200 HP CF AIR COMPRESSER/REC TANK | 3,355 | -2,830 | 525 | USD |
| C006015 | 4 | Ammo | 21 | Lonoke, AR | 8/15/2010 | ADDL #6 AIR DRYER OF 101646 | 10,161 | -2,654 | 7,507 | USD |
| C006499 | 1 | Ammo | 21 | Lonoke, AR | 6/15/2012 | ADDL POTABLE WATER TANK #2 101739 | 109,298 | -49,922 | 59,376 | USD |
| C009560 | 0 | Ammo | 21 | Lonoke, AR | 6/15/2001 | WATER TREATMENT FILTER | 6,398 | -5,846 | 552 | USD |
| C210788 | 0 | Ammo | 21 | Lonoke, AR | 2/15/2007 | CNC MILLING MACHINE | 4,011 | -2,750 | 1,261 | USD |
| C210863 | 0 | Ammo | 21 | Lonoke, AR | 7/15/2007 | EDM MACHINE TOOL 101334 | 3,620 | -3,308 | 312 | USD |
| C210872 | 0 | Ammo | 21 | Lonoke, AR | 8/15/2007 | CNC MILLING MACHINE | 4,303 | -3,932 | 371 | USD |
| C210895 | 0 | Ammo | 21 | Lonoke, AR | 11/15/2007 | POWERHOUSE BOILER DRAIN LINE | 4,015 | -1,469 | 2,546 | USD |
| 3010925 | 0 | Ammo | 21 | Lonoke, AR | 2/15/2008 | BOILER DEAERATER TANK | 7,653 | -6,992 | 661 | USD |
| 3010926 | 0 | Ammo | 21 | Lonoke, AR | 2/15/2008 | TOOL ROOM CENTERLESS GRINDER | 3,756 | -3,433 | 323 | USD |
| 3010929 | 0 | Ammo | 21 | Lonoke, AR | 2/15/2008 | WASTE TREATMENT CLARIFIER PUMP | 4,258 | -1,557 | 2,701 | USD |
| 3010930 | 0 | Ammo | 21 | Lonoke, AR | 2/15/2008 | MACHINE SHOP CNC LATHE | 7,922 | -7,238 | 684 | USD |
| 3011895 | 0 | Ammo | 21 | Lonoke, AR | 11/15/2008 | BLOWDOWN HEAT RECOVERY UNIT | 5,610 | -3,417 | 2,193 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis.val | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C3122007 | 0 | Ammo | 21 | Lonoke, AR | 3/15/2009 | EXPLOSIVES WASTE TRANSPORT LINES | 345,967 | -105,344 | 240,623 | USD |
| C3122008 | 0 | Ammo | 21 | Lonoke, AR | 3/15/2009 | EXPLOSIVES WASTE HOLDING TANK | 65,203 | -59,562 | 5,641 | USD |
| 3122046 | 0 | Ammo | 21 | Lonoke, AR | 6/15/2009 | CNC MILLING MACHINE VF3 101524 | 33,484 | -20,392 | 13,092 | USD |
| 3122115 | 0 | Ammo | 21 | Lonoke, AR | 10/15/2009 | DUST COLLECTOR BALLISTIC RANGE 3&4 101563 | 2,842 | -866 | 1,976 | USD |
| 3122120 | 0 | Ammo | 21 | Lonoke, AR | 11/15/2009 | ADDL CIRCUIT BREAKER #3 101532 | 2,863 | -1,308 | 1,555 | USD |
| 3122121 | 0 | Ammo | 21 | Lonoke, AR | 11/15/2009 | SANITARY SEWER LINE 101560 | 66,180 | -17,274 | 48,906 | USD |
| 3122122 | 0 | Ammo | 21 | Lonoke, AR | 11/15/2009 | SPARE PROCESS WASTE LIFT PUMP 101562 | 5,426 | -1,418 | 4,008 | USD |
| 3122130 | 0 | Ammo | 21 | Lonoke, AR | 12/15/2009 | BUILDING 736 DRAIN LINE 101566 | 18,854 | -4,923 | 13,931 | USD |
| 3122176 | 0 | Ammo | 21 | Lonoke, AR | 1/15/2010 | SANITARY TRMT FILTER SYSTEM 101581 | 6,206 | -1,621 | 4,585 | USD |
| 3122178 | 0 | Ammo | 21 | Lonoke, AR | 1/15/2010 | CARPENTER SHOP DUST COLLECTOR 101588 | 10,695 | -2,793 | 7,902 | USD |
| 3122207 | 0 | Ammo | 21 | Lonoke, AR | 2/15/2010 | OAKS RELIFT PUMP 101628 | 3,046 | -797 | 2,249 | USD |
| 3122226 | 0 | Ammo | 21 | Lonoke, AR | 4/15/2010 | POWERHOUSE WATER SOFTENER 101613 | 12,076 | -5,516 | 6,560 | USD |
| 3122470 | 0 | Ammo | 21 | Lonoke, AR | 5/15/2010 | LUCIFER HEAT TREAT OVEN 101630 | 8,034 | -2,098 | 5,936 | USD |
| 3120483 | 0 | Ammo | 21 | Lonoke, AR | 6/15/2010 | CF WATERPROOFING AIR COMPRESSOR 101647 | 8,504 | -2,221 | 6,283 | USD |
| 3123547 | 0 | Ammo | 21 | Lonoke, AR | 9/15/2010 | EXPLOSIVES W/T FILTER PRESS 101601 | 96,151 | -25,096 | 71,055 | USD |
| 3123547 | 1 | Ammo | 21 | Lonoke, AR | 9/15/2010 | ADDL EXPLOSIVES FILTER PRESS CONTROLS 101601 | 23,310 | -6,085 | 17,225 | USD |
| 3123559 | 0 | Ammo | 21 | Lonoke, AR | 10/15/2010 | BYPASS LINE FROM CLARIFIER 101695 | 11,687 | -3,051 | 8,635 | USD |
| 3122600 | 0 | Ammo | 21 | Lonoke, AR | 11/15/2010 | HAAS SL-10 TURNING CENTER 101637 | 22,600 | -8,260 | 14,340 | USD |
| 3114025 | 0 | Ammo | 21 | Lonoke, AR | 2/15/2013 | STORM DRAIN 36"X325' 101795 | 101,546 | -26,424 | 75,122 | USD |
| 3114041 | 0 | Ammo | 21 | Lonoke, AR | 3/15/2013 | HAAS VF3SS CNC MILL 101814 | 43,752 | -11,386 | 32,366 | USD |
| 3014041 | 1 | Ammo | 21 | Lonoke, AR | 11/25/2016 | HAAS CF3SS Mill | 166,846 | -27,628 | 139,218 | USD |
| 3114042 | 0 | Ammo | 21 | Lonoke, AR | 3/15/2013 | BRIDGEPORT MILLING MCH 101816 | 11,179 | -2,910 | 8,269 | USD |
| 3114042 | 0 | Ammo | 21 | Lonoke, AR | 6/1/2017 | Addl Bridgeport Gx300 Tooling 101988 | 9,713 | -2,949 | 6,764 | USD |
| 3114049 | 0 | Ammo | 21 | Lonoke, AR | 4/15/2013 | 1987 TOYODA CYLINDER GRINDER 101819 | 24,644 | -6,414 | 18,230 | USD |
| 3114612 | 0 | Ammo | 21 | Lonoke, AR | 7/21/2014 | GRINDER 101889 | 4,243 | -968 | 3,275 | USD |
| 3114613 | 0 | Ammo | 21 | Lonoke, AR | 7/21/2014 | BRIDGEPORT MILLING MACHINE 101889 | 10,416 | -2,373 | 8,043 | USD |
| 3116849 | 0 | Ammo | 21 | Lonoke, AR | 6/1/2017 | Bridgeport Milling Machine Series 1 102005 | 19,112 | -3,166 | 15,946 | USD |
| 3116850 | 0 | Ammo | 21 | Lonoke, AR | 6/1/2017 | Mitutoyo Electronic Height Gage 24" 102011 | 7,603 | -731 | 6,872 | USD |
| 3116851 | 0 | Ammo | 21 | Lonoke, AR | 6/1/2017 | Starrett Surface Plate 102013 | 5,016 | -831 | 4,185 | USD |
| 3115209 | 0 | Ammo | 21 | Lonoke, AR | 7/21/2014 | L2 Equipment - Electrical Connections To Lon2 | 18,748 | -2,136 | 16,612 | USD |
| 3110924 | 0 | Ammo | 21 | Lonoke, AR | 2/15/2008 | SPARE SUBSTATION #10 TRANSFORMER | 30,636 | -5,599 | 25,037 | USD |
| 3000151 | 0 | Ammo | 21 | Lonoke, AR | 2/15/2013 | PR STORAGE BLDG DRIVES | 5,402 | -1,975 | 3,427 | USD |
| 3000160 | 0 | Ammo | 21 | Lonoke, AR | 6/15/2006 | OS ELECTRICAL-ADVD WST TRTMT | 5,444 | -1,660 | 3,784 | USD |
| 3000069 | 4 | Ammo | 21 | Lonoke, AR | 12/1/1993 | REBUILD PLANT ROAD 3.51MI 120595 | 22,009 | -13,404 | 8,605 | USD |
| 3000069 | 6 | Ammo | 21 | Lonoke, AR | 9/15/1997 | ADDL - REBUILD PLANT ROADS | 6,070 | -2,774 | 3,296 | USD |
| 3000070 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | BITUMASTIC ROAD 16794SY | 15,397 | -9,378 | 6,019 | USD |
| 3000071 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | BITUMASTIC ROAD 55488SY | 50,871 | -30,980 | 19,891 | USD |
| 3000073 | 1 | Ammo | 21 | Lonoke, AR | 2/15/1999 | ADDL SIDEWALK | 3,829 | -1,750 | 2,079 | USD |
| 3000076 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | REBUILD MAIN PLANT PARK LOT 120226 | 19,055 | -11,605 | 7,450 | USD |
| 3000076 | 2 | Ammo | 21 | Lonoke, AR | 9/15/1997 | ADDL - REBUILD PARKING LOT/BASKETBALL COURT | 17,368 | -7,933 | 9,435 | USD |
| 3000080 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | CONCRETE APRONS 1196SY | 3,212 | -1,958 | 1,254 | USD |
| 3000081 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | PERIMETER FENCE 19962FT INCUDES 9 GATES | 12,773 | -7,779 | 4,994 | USD |
| 3000081 | 1 | Ammo | 21 | Lonoke, AR | 9/15/2004 | ENTRANCE TURNSTILES | 7,176 | -2,624 | 4,552 | USD |
| 3000081 | 2 | Ammo | 21 | Lonoke, AR | 10/15/2014 | SECURITY FENCE LEAD EMISSION 101896 | 13,235 | -4,031 | 9,204 | USD |
| 3000100 | 1 | Ammo | 21 | Lonoke, AR | 11/15/1994 | ADDL-RECONSTR 45'x65' LD STOR BLDG 2257 | 4,308 | -2,624 | 1,684 | USD |
| 3000102 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | EARTHEN BARRICADE 2235.3 C.F. | 5,045 | -3,074 | 1,971 | USD |
| 3000104 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | EARTHEN BARRICADE 3490.6 CY. | 9,659 | -5,884 | 3,775 | USD |
| 3000114 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | EARTHEN BARRICADE FOR #815 | 5,973 | -3,639 | 2,334 | USD |
| 3000115 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ROADS FOR RIMFIRE | 35,726 | -21,758 | 13,968 | USD |
| 3000116 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | EARTHEN BARRICADE BLDG #735 - SS CON | 19,161 | -11,671 | 7,490 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 4000116 | 1 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ADDL EARTHEN BARRICADE #735 - SS CON | 7,452 | -4,539 | 2,913 | USD |
| 4000117 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ASPHALT/CONC ROAD BLDG #709 WEST-SS CON | 8,902 | -5,423 | 3,479 | USD |
| 4000149 | 0 | Ammo | 21 | Lonoke, AR | 3/15/2000 | LAWN SPRINKLER SYSTEM 100713 | 4,833 | -2,209 | 2,624 | USD |
| 4000161 | 0 | Ammo | 21 | Lonoke, AR | 2/15/2008 | RECREATION AREA CULVERT | 2,606 | -795 | 1,811 | USD |
| 4000178 | 0 | Ammo | 21 | Lonoke, AR | 2/15/2010 | CF LEAD DOCK PAVED DRIVE 101589 | 13,942 | -3,640 | 10,302 | USD |
| 4000183 | 0 | Ammo | 21 | Lonoke, AR | 11/18/2013 | PARKING LOT SECURITY IMPROVEMENT 101852 | 64,014 | -19,492 | 44,522 | USD |
| 4000184 | 0 | Ammo | 21 | Lonoke, AR | 12/31/2013 | SECURITY FENCING 101861 | 70,737 | -21,540 | 49,197 | USD |
| 4000185 | 0 | Ammo | 21 | Lonoke, AR | 12/31/2013 | SECURITY BADGE ACCESS GATES 101861 | 38,045 | -11,585 | 26,460 | USD |
| 4000186 | 0 | Ammo | 21 | Lonoke, AR | 7/21/2014 | L2 CONCRETE #1000 101862 | 675,946 | -176,415 | 499,531 | USD |
| 4000188 | 0 | Ammo | 21 | Lonoke, AR | 7/21/2014 | L2 MASONRY #1000 101862 | 220,213 | -57,475 | 162,738 | USD |
| 4000190 | 0 | Ammo | 21 | Lonoke, AR | 7/21/2014 | L2 Substation Pads (2) | 6,912 | -1,805 | 5,107 | USD |
| 4000192 | 0 | Ammo | 21 | Lonoke, AR | 7/21/2014 | L2 Contract Parking Lot (Visitor overflow) | 21,703 | -5,666 | 16,037 | USD |
| 4000195 | 0 | Ammo | 21 | Lonoke, AR | 1/15/2015 | AUTOMATIC GATE - PARKING LOT 101910 | 7,846 | -1,793 | 6,053 | USD |
| 4000197 | 1 | Ammo | 21 | Lonoke, AR | 11/29/2015 | Asphalt Main Parking Lot Phase 1 101931 | 36,984 | -8,447 | 28,537 | USD |
| 4000197 | 0 | Ammo | 21 | Lonoke, AR | 8/26/2016 | Asphalt Main Parking Lot Phase II 101984 | 37,217 | -8,501 | 28,716 | USD |
| 4000197 | 2 | Ammo | 21 | Lonoke, AR | 8/5/2018 | Asphalt Main Parking Lot Phase III 102047 | 225,000 | -25,097 | 199,903 | USD |
| 4000199 | 0 | Ammo | 21 | Lonoke, AR | 5/28/2019 | Fencing, Security for Reservoir 102021 | 13,259 | -439 | 12,820 | USD |
| 4000335 | 0 | Ammo | 21 | Lonoke, AR | 11/30/2018 | Reservoir, Hydrograph Control Release 102021 | 1,452,678 | -96,381 | 1,356,297 | USD |
| 4000335 | 1 | Ammo | 21 | Lonoke, AR | 5/28/2019 | Reservoir, Hydrograph Control Release Addtl 102021 | 76,336 | -3,157 | 73,179 | USD |
| 4000335 | 2 | Ammo | 21 | Lonoke, AR | 9/27/2019 | Reservoir, Hydrograph Control Release Addtl 102021 | 8,173 | -205 | 7,968 | USD |
| 4000495 | 1 | Ammo | 21 | Lonoke, AR | 10/15/2004 | PILOT PLANT BUILDING #614 | 19,800 | -7,236 | 12,564 | USD |
| 4000495 | 0 | Ammo | 21 | Lonoke, AR | 10/15/2004 | PP BUILDING LIGHTING | 4,216 | -1,542 | 2,674 | USD |
| 4000240 | 1 | Ammo | 21 | Lonoke, AR | 12/1/1993 | R&D LAB BUILDING #610 3710 SQ FT | 50,990 | -31,053 | 19,937 | USD |
| 4000240 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | R&D LAB BUILDING #611 240 SQ FT | 4,121 | -2,511 | 1,610 | USD |
| 2010410 | 3 | Ammo | 21 | Lonoke, AR | 3/15/2012 | ADDL R&D IMPROVEMENTS 101747 | 9,816 | -2,564 | 7,252 | USD |
| 2010293 | 0 | Ammo | 21 | Lonoke, AR | 10/15/2004 | PP BLDG EQUIPMENT/FIXTURE | 7,229 | -2,478 | 4,751 | USD |
| 2010524 | 0 | Ammo | 21 | Lonoke, AR | 2/15/2006 | PP TEMP CONTROL SYS | 3,337 | -2,288 | 1,049 | USD |
| 2010524 | 1 | Ammo | 21 | Lonoke, AR | 2/15/2006 | PP PROCESS CONTROL SYS | 3,214 | -2,203 | 1,011 | USD |
| 3016391 | 0 | Ammo | 21 | Lonoke, AR | 8/26/2016 | Bullet Trap - Model 830W Box Trap 101945 | 23,152 | -5,272 | 17,880 | USD |
| 3016391 | 1 | Ammo | 21 | Lonoke, AR | 8/26/2016 | Bullet Trap - Model 830W Box Trap 101945 | 23,152 | -5,272 | 17,880 | USD |
| 3016391 | 2 | Ammo | 21 | Lonoke, AR | 8/26/2016 | Bullet Trap - Model 830W Box Trap 101945 | 23,152 | -5,272 | 17,880 | USD |
| 3016391 | 3 | Ammo | 21 | Lonoke, AR | 8/26/2016 | Bullet Trap - Model 830W Box Trap 101945 | 23,152 | -5,272 | 17,880 | USD |
| 3016392 | 0 | Ammo | 21 | Lonoke, AR | 8/26/2016 | Bullet Trap - Model PF130000 101945 | 15,069 | -3,432 | 11,637 | USD |
| 3016392 | 1 | Ammo | 21 | Lonoke, AR | 8/26/2016 | Bullet Trap - Model PF130000 101945 | 15,238 | -3,471 | 11,767 | USD |
| 2012028 | 0 | Ammo | 21 | Lonoke, AR | 4/15/2009 | RANGES 3 & 4 BACKSTOP SYS 101502 | 4,148 | -3,791 | 357 | USD |
| 2012212 | 0 | Ammo | 21 | Lonoke, AR | 3/15/2010 | RANGES 1 & 2 BACKSTOP SYS 101603 | 8,603 | -7,860 | 743 | USD |
| 2012212 | 0 | Ammo | 21 | Lonoke, AR | 5/15/2012 | ADDL R-2 VELOCITY MEASURING SYS 101748 | 8,841 | -4,040 | 4,801 | USD |
| 4014020 | 0 | Ammo | 21 | Lonoke, AR | 1/15/2013 | SCROLL TRAPS RANGE 12 101790 | 10,673 | -3,901 | 6,772 | USD |
| 4014021 | 0 | Ammo | 21 | Lonoke, AR | 1/15/2013 | SCROLL TRAPS RANGE 13 101790 | 10,673 | -3,901 | 6,772 | USD |
| 2011894 | 0 | Ammo | 21 | Lonoke, AR | 11/15/2008 | R&D AUTOMATED BALANCE SYS | 3,981 | -3,638 | 343 | USD |
| 2012182 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | R&D ELEMENTAL ANALYZER 101596 | 12,293 | -11,230 | 1,063 | USD |
| 4000123 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | EARTHEN BARRICADE-R&D LAB 500'X10' | 5,174 | -3,152 | 2,022 | USD |
| 4000158 | 0 | Ammo | 21 | Lonoke, AR | 10/15/2004 | PP EARTHEN BARRICADE | 8,080 | -2,954 | 5,126 | USD |
| 3017114 | 0 | Ammo | 21 | Lonoke, AR | 5/31/2005 | Lonoke Range Enhancements - Berm Extension | 3,513 | -1,071 | 2,442 | USD |
| 3017114 | 0 | Ammo | 21 | Lonoke, AR | 6/30/2018 | Cameras, Pelco IME-219_4 R&D Bldg 610 - 102046 | 39,764 | -4,437 | 35,327 | USD |
| 3017114 | 0 | Ammo | 21 | Lonoke, AR | 6/30/2018 | Cameras, Dell Viewing Stations (2) R&D-610 102046 | 2,000 | -225 | 1,775 | USD |
| 5000001 | 3 | Ammo | 21 | Lonoke, AR | 7/15/2010 | YALE FAST CHARGE BATTERY 101643 | 4,312 | -3,941 | 371 | USD |
| 5000003 | 0 | Ammo | 21 | Lonoke, AR | 7/15/2010 | Battery, Fork Truck #37-Yale Fast Charge 101643 | 4,312 | -3,941 | 371 | USD |
| 5000004 | 0 | Ammo | 21 | Lonoke, AR | 7/15/2010 | Battery, Fork Truck #45-Yale Fast Charge-101643 | 4,312 | -3,941 | 371 | USD |
| 5000032 | 1 | Ammo | 21 | Lonoke, AR | 12/15/2009 | Battery, Deka For Truck-Deka-#41- 101569 | 4,361 | -3,985 | 376 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val | Accum. dep. | Book val | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 4000122 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2007 | 2004 FORD F250 TRUCK | 4,337 | -2,973 | 1,364 | USD |
| 4000135 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2010 | 2009 TOYOTA 8 PASS VAN 101627 | 8,611 | -7,868 | 743 | USD |
| 4000184 | 0 | Ammo | | 21 Lonoke, AR | 8/27/2014 | FORD EXPLOSIVE DELIVERY VAN 101887 | 12,936 | -7,856 | 5,080 | USD |
| 4000121 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2005 | Truck, Whse Fork Lift-Nissan- #35  101176 | 4,526 | -3,423 | 1,103 | USD |
| 4000121 | 1 | Ammo | | 21 Lonoke, AR | 7/15/2010 | Battery, Fork Truck #35-Yale Fast Charge  101643 | 4,312 | -3,941 | 371 | USD |
| 4000089 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2010 | Battery, Fork Truck #31-Fast Charge- 101643 | 4,312 | -3,941 | 371 | USD |
| 4000098 | 0 | Ammo | | 21 Lonoke, AR | 10/15/2009 | Battery, Fork Truck #50-Yale- 101557 | 2,540 | -2,322 | 218 | USD |
| 4000124 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2007 | KUBOTA F3680 MOWER | 4,170 | -2,690 | 1,480 | USD |
| 4000125 | 0 | Ammo | | 21 Lonoke, AR | 6/15/2008 | KABOTA F3680 MOWER | 5,252 | -4,800 | 452 | USD |
| 4000134 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2010 | KUBOTA F3680 4WD MOWER 101594 | 7,322 | -6,690 | 632 | USD |
| 4000177 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2013 | TOYOTA EE WALKIE PALLET TRUCK 101805 | 3,088 | -2,823 | 265 | USD |
| 4000178 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2013 | TOYOTA EE WALKIE PALLET TRUCK 101805 | 3,088 | -2,823 | 265 | USD |
| 4000201 | 0 | Ammo | | 21 Lonoke, AR | 1/31/2019 | Truck, 1998 Sterling LT9500 Remelt Box - 101941 | 39,237 | -8,511 | 30,726 | USD |
| 4002308 | 0 | Ammo | | 21 Lonoke, AR | 12/30/2019 | Software-Lumin Maintenance Dept- 102075 | 65,068 | -3,734 | 61,334 | USD |
| 4002392 | 0 | Ammo | | 21 Lonoke, AR | 11/27/2013 | Qlikview Seat Licenses CAR 240578 | 2,903 | -2,645 | 258 | USD |
| 4002278 | 0 | Ammo | | 21 Lonoke, AR | 4/13/2017 | Primer Pellet Weight Collection Software 101939 | 33,694 | -30,688 | 3,006 | USD |
| 4002285 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Office Remod for RRR Maint -Software-101950/101949 | 9,572 | -8,718 | 854 | USD |
| 4001816 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2011 | ELECTRONIC DATA COLLECTION SYS 101701 | 5,613 | -5,128 | 485 | USD |
| 4002071 | 0 | Ammo | | 21 Lonoke, AR | 11/5/2013 | Phones, UPG PB2 System- Avaya - 101855 | 27,392 | -24,948 | 2,444 | USD |
| 4002106 | 0 | Ammo | | 21 Lonoke, AR | 4/21/2014 | Switch, Network Core (2) - Cisco - 172.30.20.1 | 11,705 | -10,662 | 1,043 | USD |
| 4002107 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 TELEPHONE & DATE SYS #1000 101862 | 14,853 | -13,528 | 1,325 | USD |
| 4002159 | 0 | Ammo | | 21 Lonoke, AR | 3/20/2015 | Server, Storage Cluster-HP DL380P Gen8 | 3,833 | -3,492 | 341 | USD |
| 4002160 | 0 | Ammo | | 21 Lonoke, AR | 3/20/2015 | Server, Storage Cluster-HP DL380P Gen8 | 3,833 | -3,492 | 341 | USD |
| 4002275 | 0 | Ammo | | 21 Lonoke, AR | 3/31/2017 | Switches, Cisco Network 4way (7) 2960X 101991A | 7,960 | -7,251 | 709 | USD |
| 4002276 | 0 | Ammo | | 21 Lonoke, AR | 3/31/2017 | Switches, Cisco Network 4way (2) C3850 101991B | 9,902 | -9,021 | 881 | USD |
| 4002279 | 0 | Ammo | | 21 Lonoke, AR | 4/13/2017 | Primer Pellet Weight Collection Hardware 101939 | 9,745 | -8,877 | 868 | USD |
| 4002286 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Office Remod for RRR Maint -Comp Hard101950/101949 | 9,347 | -8,514 | 833 | USD |
| 4002287 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | DesignJet T795 Plotter for RRR Maint 101949 | 3,137 | -2,859 | 278 | USD |
| 4002288 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Switches, Samsung 7400 Emer. Fire Phone 102008 | 24,426 | -22,246 | 2,180 | USD |
| 4002290 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Primer Energetics Delta V13 Upgrade 102032 | 11,945 | -10,880 | 1,065 | USD |
| 4002077 | 0 | Ammo | | 21 Lonoke, AR | 12/31/2013 | SECURITY CAMERA & NETWORK 101861 | 45,675 | -13,867 | 31,808 | USD |
| 4002077 | 1 | Ammo | | 21 Lonoke, AR | 12/15/2014 | Add'k Keypad - Guard Shack 101861 | 2,846 | -2,593 | 253 | USD |
| 4002097 | 0 | Ammo | | 21 Lonoke, AR | 1/3/2014 | GUN CLUB SECURITY MONITORING SYS 101867 | 9,456 | -2,871 | 6,585 | USD |
| 4002098 | 0 | Ammo | | 21 Lonoke, AR | 1/27/2014 | CLOSE CIRCUIT NETWORK MIX HOUSES 101874 | 4,523 | -4,120 | 403 | USD |
| 4002289 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | CF Plating Room Card Access on 3 doors 102036 | 12,867 | -11,720 | 1,147 | USD |
| 4010780 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2007 | RADIO PAGING SYSTEM 101282 | 10,756 | -7,371 | 3,385 | USD |
| 4010780 | 1 | Ammo | | 21 Lonoke, AR | 5/30/2019 | Repeater, Motorola SL5700 Digital Radio Sys 102067 | 5,202 | -790 | 4,412 | USD |
| 4013439 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2012 | GRAIN SIZE MEASURE & ANALYSIS 101767 | 8,960 | -8,186 | 774 | USD |
| 4014636 | 0 | Ammo | | 21 Lonoke, AR | 8/14/2014 | ELECTROPOLISHER GRAIN SIZE ANALYZER 101895 | 4,524 | -2,748 | 1,776 | USD |
| 4016678 | 0 | Ammo | | 21 Lonoke, AR | 3/3/2017 | SCBA Unit with Tanks (Qty 12) 101998 | 32,874 | -10,011 | 22,863 | USD |
| 4016929 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Office Remod for RRR Maint-Office Eq.101950/101949 | 9,205 | -2,796 | 6,409 | USD |
| 4016939 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | CF Trajectory Chart Printer-VideoJet 8610 102037 | 6,819 | -2,072 | 4,747 | USD |
| 4016939 | 1 | Ammo | | 21 Lonoke, AR | 3/20/2018 | VideoJet 8610 Add'l 102037 | 650 | -650 | 0 | USD |
| 4110270 | 1 | Ammo | | 21 Lonoke, AR | 2/17/2014 | RF CUPPING DIE SET 101875 | 10,065 | -6,112 | 3,953 | USD |
| 4116393 | 0 | Ammo | | 21 Lonoke, AR | 8/26/2016 | SS 32 Cavity Wad Mold for SM 12 101944 | 83,676 | -30,485 | 53,191 | USD |
| 3007467 | 2 | Ammo | | 21 Lonoke, AR | 5/15/2008 | ADD'L SS SP410 WAD MOLD | 5,666 | -5,178 | 488 | USD |
| 3012604 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2010 | 410 STITCHED WAD MOLD 101642 | 3,158 | -2,886 | 272 | USD |
| 3014268 | 0 | Ammo | | 21 Lonoke, AR | 1/12/2013 | 10GA WAD MOLD (MICRO) 101708 | 4,466 | -4,069 | 397 | USD |
| 3014269 | 0 | Ammo | | 21 Lonoke, AR | 1/12/2013 | 20GA WAD MOLD (MICRO) 101708 | 9,610 | -8,753 | 857 | USD |
| 3014523 | 0 | Ammo | | 21 Lonoke, AR | 5/14/2014 | #5 EURO TRAY MOLD 101878 | 17,784 | -10,798 | 6,986 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val | Accum. dep. | Book val | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C116949 | 0 | Ammo | | 21 Lonoke, AR | 12/3/2017 | Injection Mold Core Pins (4) 20 GA @ vendor 102040 | 8,924 | -2,323 | 6,601 | USD |
| C107722 | 2 | Ammo | | 21 Lonoke, AR | 11/25/2016 | #290 Bullet Assy Overhaul - 101916 | 85,707 | -26,020 | 59,687 | USD |
| C107731 | 3 | Ammo | | 21 Lonoke, AR | 5/21/2015 | REB NATIONAL HEADER #341 101901 | 149,834 | -38,989 | 110,845 | USD |
| C107731 | 4 | Ammo | | 21 Lonoke, AR | 10/1/2017 | #341 National Header Overhaul  101960/101949 | 59,559 | -12,055 | 47,504 | USD |
| C014454 | 0 | Ammo | | 21 Lonoke, AR | 12/31/2013 | SPARE CF DUPLEX POWDER CHARGER 101842 | 9,714 | -5,900 | 3,814 | USD |
| C014630 | 0 | Ammo | | 21 Lonoke, AR | 8/4/2014 | #4 RIFLE TRAY MOLD 101877 | 47,422 | -28,794 | 18,628 | USD |
| C014634 | 0 | Ammo | | 21 Lonoke, AR | 8/4/2014 | CF BULLET GAGE TALKER 101893 | 5,399 | -3,279 | 2,120 | USD |
| C015382 | 0 | Ammo | | 21 Lonoke, AR | 4/1/2014 | Die Set- 3 Cut Progressive | 18,982 | -11,527 | 7,455 | USD |
| C015383 | 0 | Ammo | | 21 Lonoke, AR | 4/1/2014 | 3 Cut die set/mounting brackets | 33,361 | -20,257 | 13,104 | USD |
| C015384 | 0 | Ammo | | 21 Lonoke, AR | 4/1/2014 | 3 Cut Die Set | 18,580 | -11,283 | 7,297 | USD |
| R109743 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2010 | ADD'L #33 BATTERY & CHARGER 101573 | 4,360 | -1,993 | 2,367 | USD |
| C109998 | 1 | Ammo | | 21 Lonoke, AR | 7/15/2010 | Battery, Fork Truck #38 | 4,944 | -2,259 | 2,685 | USD |
| C110015 | 1 | Ammo | | 21 Lonoke, AR | 7/15/2010 | Battery, Fork Truck #30-Yale- 101643 | 4,944 | -2,259 | 2,685 | USD |
| 3015900 | 0 | Ammo | | 21 Lonoke, AR | 9/16/2015 | DRY ICE CLEANING MCH - 101927 | 19,976 | -4,044 | 15,932 | USD |
| C062011 | 1 | Ammo | | 21 Lonoke, AR | 4/15/2011 | REB PKG COMPRESSION TESTER 101578 | 11,660 | -4,262 | 7,398 | USD |
| C010927 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2008 | RF YALE ERP040TH RIDER TRUCK | 6,424 | -5,870 | 554 | USD |
| C010949 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2008 | CNC HOLDING FIXTURES | 3,757 | -3,434 | 323 | USD |
| C011960 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2008 | YALE ER0040AH RIDER FORK TRUCK | 6,515 | -5,952 | 563 | USD |
| C011961 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2008 | YALE MOW040-E WALKER STACKER #12 | 3,814 | -3,485 | 329 | USD |
| C111021 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2008 | PACKAGING DROP TEST MACHINE | 4,379 | -4,001 | 378 | USD |
| C311867 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2008 | BALLISTICS PEAK PRESSURE METERS (8) 101428 | 11,835 | -10,812 | 1,023 | USD |
| C112047 | 0 | Ammo | | 21 Lonoke, AR | 6/15/2009 | MAINTENANCE DOT PEEN MARKING SYS | 2,826 | -1,722 | 1,104 | USD |
| C112174 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2010 | SS LOAD HOPPERS (11) 101488 | 14,117 | -6,449 | 7,668 | USD |
| C112187 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2010 | YALE 4000LB RIDER TRUCK 101617 | 4,660 | -2,129 | 2,531 | USD |
| C112188 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2010 | Trucker, 2000LB Walker-Yale-101617 | 3,621 | -1,655 | 1,966 | USD |
| C112189 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2010 | YALE 4000LB WALKER TRUCK 101617 | 5,022 | -2,295 | 2,727 | USD |
| C112190 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2010 | YALE MPW050 PALLET TRUCK 101617 | 3,135 | -1,433 | 1,702 | USD |
| C112191 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2010 | FORK TRUCK MAINTENANCE LIFT 101621 | 8,814 | -4,027 | 4,787 | USD |
| C112192 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2010 | MAINTENANCE HIGH SPEED CAMERA 101623 | 3,203 | -2,928 | 275 | USD |
| C112206 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2010 | HOTSY PARTS WASHER #7663 101626 | 3,608 | -1,649 | 1,959 | USD |
| C112482 | 0 | Ammo | | 21 Lonoke, AR | 6/15/2010 | METTLER POWDERWEIGHT SCALE 101641 | 6,372 | -2,912 | 3,460 | USD |
| C112527 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2010 | YALE MCW025-E WALKER STACKER 101640 | 6,677 | -3,051 | 3,626 | USD |
| C112550 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2010 | FLOOR SCRUBBER MDL 7300 101676 | 6,303 | -2,880 | 3,423 | USD |
| C112553 | 0 | Ammo | | 21 Lonoke, AR | 10/15/2010 | TIGER VAC EXPLOSIVE PROOF VAC 101610 | 12,164 | -5,558 | 6,606 | USD |
| C112601 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2010 | YALE 4000LB WALKER STACKER 101675 | 3,278 | -1,199 | 2,079 | USD |
| C112706 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2011 | YALE WALKER STACKER 4000LB 101673 | 10,230 | -3,739 | 6,491 | USD |
| C112709 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2011 | SPARE CF LEAD EXTRUDER MOTOR 101702 | 8,819 | -3,224 | 5,595 | USD |
| C112710 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2011 | RF MONORAIL - HOIST 3T 101671 | 4,039 | -1,477 | 2,562 | USD |
| C113162 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2011 | PR CHEM MIX VAC PUMP (SPARE) 101704 | 3,521 | -1,288 | 2,233 | USD |
| C113162 | 1 | Ammo | | 21 Lonoke, AR | 9/15/2012 | MODIFY PR CHEM VAC PUMP 101799 | 4,739 | -1,444 | 3,295 | USD |
| C113400 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2012 | FLUKE TI-32 THERMAL IMAGER 101769 | 4,923 | -1,501 | 3,422 | USD |
| C214331 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2012 | BULLET PULL MCH POWDER WEIGHT 101731 | 3,196 | -976 | 2,220 | USD |
| C113432 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2012 | BULLET PULL MCH BALLISTICS 101731 | 3,196 | -976 | 2,220 | USD |
| C114058 | 1 | Ammo | | 21 Lonoke, AR | 6/15/2013 | MITSUBISHI MV2404D WIRE EDM 101825 | 105,323 | -27,408 | 77,915 | USD |
| C114058 | 0 | Ammo | | 21 Lonoke, AR | 11/25/2016 | Mitsubishi MV2400S Wire EDM | 156,458 | -25,909 | 130,549 | USD |
| C014059 | 0 | Ammo | | 21 Lonoke, AR | 6/15/2013 | IM 6120 IMAGE DIMENSION MEASURMENT SYS 101838 | 30,887 | -8,039 | 22,848 | USD |
| C014096 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2013 | METTLER TOLEDO MIX SCALE #835 101811 | 3,118 | -813 | 2,305 | USD |
| C014097 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2013 | METTLER TOLEDO WET MIX SCALE #836 101811 | 3,118 | -813 | 2,305 | USD |
| C014098 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2013 | METTLER TOLEDO WET MIX SCALE #837 101811 | 3,118 | -813 | 2,305 | USD |
| C014099 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2013 | METTLER TOLEDO WET MIX SCALE #838 101811 | 3,118 | -813 | 2,305 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C314521 | 0 | Ammo | | 21 Lonoke, AR | 4/22/2014 | MARK-10 BULLET PULL - CF LOAD 101880 | 5,668 | -1,292 | 4,376 | USD |
| C314599 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | BUTT WELDER 101826 | 6,523 | -1,486 | 5,037 | USD |
| C314602 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | JIB CRANE/HOIST 101826 | 10,038 | -2,287 | 7,751 | USD |
| C314743 | 0 | Ammo | | 21 Lonoke, AR | 9/21/2014 | JIB CRANE/HOIST 101826 | 10,234 | -2,332 | 7,902 | USD |
| C314779 | 0 | Ammo | | 21 Lonoke, AR | 9/20/2014 | NORDSON HOT GLUE UNIT - RF 101884 | 5,857 | -1,336 | 4,521 | USD |
| C314780 | 0 | Ammo | | 21 Lonoke, AR | 9/20/2014 | NORDSON HOT GLUE UNIT - SS 101884 | 5,857 | -1,336 | 4,521 | USD |
| C315292 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2015 | SPECTRO MAXX F BT CHEM LAB 101911 | 37,321 | -7,555 | 29,766 | USD |
| C315343 | 0 | Ammo | | 21 Lonoke, AR | 12/19/2014 | Jib Crane/Hoist 101826 | 10,482 | -2,123 | 8,359 | USD |
| C315695 | 0 | Ammo | | 21 Lonoke, AR | 7/1/2015 | High Pressure Calibration System 101914 | 44,987 | -9,107 | 35,880 | USD |
| R301427 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2012 | UPG SECURITY CAMERA SYSTEM 101757 | 7,284 | -3,328 | 3,956 | USD |
| R301476 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2013 | CF PLATE LOADER SURVEILLANCE 101808 | 8,463 | -3,085 | 5,378 | USD |
| R301482 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2013 | BALLISTICS SECURITY 101818 | 20,559 | -7,491 | 13,068 | USD |
| H301542 | 0 | Ammo | | 21 Lonoke, AR | 9/3/2017 | Security Station Upgrades 102002 | 10,518 | -2,130 | 8,388 | USD |
| 7000035 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PLANT REAL ESTATE 1044.22 ACRES | 3,643,382 | 0 | 3,643,382 | USD |
| 3000035 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PLANT REAL ESTATE 37.00 ACRES | 110,625 | 0 | 110,625 | USD |
| 3000035 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PLANT REAL ESTATE 7.21 ACRES | 70,992 | 0 | 70,992 | USD |
| 3000469 | 1 | Ammo | | 21 Lonoke, AR | 1/15/2011 | ADD'L BLDG 721 CONDUCTIVE FLOOR 101677 | 0 | 0 | 0 | USD |
| 3000511 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2006 | PP CONTROL BLDG #615 | 0 | 0 | 0 | USD |
| 3000150 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2001 | CONCRETE SLAB-RIFLE RANGE | 0 | 0 | 0 | USD |
| 3000152 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2003 | EXPAND PARKING AREA | 0 | 0 | 0 | USD |
| 2000155 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2004 | FLAG POLE INSTALLATION | 0 | 0 | 0 | USD |
| 2000155 | 2 | Ammo | | 21 Lonoke, AR | 2/15/2004 | ADD'L PROCESS CONTROL VALVES | 0 | 0 | 0 | USD |
| T02841 | 3 | Ammo | | 21 Lonoke, AR | 2/15/2004 | PR WASTE TRMT CIRCULATING PUMP | 0 | 0 | 0 | USD |
| 3003101 | 2 | Ammo | | 21 Lonoke, AR | 3/15/2004 | ADD'L #183 CHANNEL FEED | 0 | 0 | 0 | USD |
| 3003103 | 1 | Ammo | | 21 Lonoke, AR | 3/15/2004 | ADD'L #177 CHANNEL FEED | 0 | 0 | 0 | USD |
| 3003235 | 4 | Ammo | | 21 Lonoke, AR | 3/15/1995 | ADD'L COOLING TABLE 2217 | 0 | 0 | 0 | USD |
| 3003235 | 5 | Ammo | | 21 Lonoke, AR | 3/15/2003 | UPG TABLE CONTROLS | 0 | 0 | 0 | USD |
| 3003964 | 1 | Ammo | | 21 Lonoke, AR | 2/15/2005 | ADD'L INDEXER/MOD BOLSTER | 0 | 0 | 0 | USD |
| 3004006 | 1 | Ammo | | 21 Lonoke, AR | 6/15/2003 | ADD'L #810 METAL INDEXER | 0 | 0 | 0 | USD |
| 3004034 | 2 | Ammo | | 21 Lonoke, AR | 6/15/2006 | ADD'L 18 QT BOWL | 0 | 0 | 0 | USD |
| 3004036 | 3 | Ammo | | 21 Lonoke, AR | 6/15/2006 | ADD'L 18 QT BOWL | 0 | 0 | 0 | USD |
| 3004882 | 1 | Ammo | | 21 Lonoke, AR | 8/15/2004 | CF #347 CONVEYOR | 0 | 0 | 0 | USD |
| 3005148 | 2 | Ammo | | 21 Lonoke, AR | 5/15/2001 | ADD'L ALKALI CONTROL SYS | 0 | 0 | 0 | USD |
| 3005148 | 3 | Ammo | | 21 Lonoke, AR | 10/15/2003 | ADD'L RLC CHAIN DRIVE | 0 | 0 | 0 | USD |
| 3005888 | 1 | Ammo | | 21 Lonoke, AR | 2/15/2001 | CF BULLET FINISH MAC #289 | 0 | 0 | 0 | USD |
| 3008370 | 1 | Ammo | | 21 Lonoke, AR | 8/15/2001 | POWDER INSPECTION SYSTEM | 0 | 0 | 0 | USD |
| 3008869 | 1 | Ammo | | 21 Lonoke, AR | 8/15/2003 | ADD'L BULLET PRESS | 0 | 0 | 0 | USD |
| 3009230 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2000 | SKINETTA PACKER INSTALLATION | 0 | 0 | 0 | USD |
| 3009371 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2004 | ADD'L POWDER DETECTS | 0 | 0 | 0 | USD |
| 3009731 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2000 | BULLET ASSY MACHINE WFF #237 2853/100730 | 0 | 0 | 0 | USD |
| 3009387 | 0 | Ammo | | 21 Lonoke, AR | 10/15/2000 | PR FILTER PRESS DISCHARGE PUMP | 0 | 0 | 0 | USD |
| 3009388 | 0 | Ammo | | 21 Lonoke, AR | 10/15/2000 | GAGETALKER WORKSTATION | 0 | 0 | 0 | USD |
| 3009389 | 0 | Ammo | | 21 Lonoke, AR | 10/15/2000 | GAGETALKER WORKSTATION | 0 | 0 | 0 | USD |
| 3009390 | 0 | Ammo | | 21 Lonoke, AR | 10/15/2000 | PR COMPONENT WASH EQUIP | 0 | 0 | 0 | USD |
| 3009446 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2000 | PR AREA WASTE SYSTEM | 0 | 0 | 0 | USD |
| 3009458 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2000 | LA2B SPEED LATHE | 0 | 0 | 0 | USD |
| 3009490 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2001 | SS1 LOAD PALLET TRUCK #71 | 0 | 0 | 0 | USD |
| 3009501 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2001 | BUGGY LIFT | 0 | 0 | 0 | USD |
| 3009502 | 2 | Ammo | | 21 Lonoke, AR | 12/15/2002 | SPARE VIDEO PROCESSOR | 0 | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C009502 | 6 | Ammo | | 21 Lonoke, AR | 12/15/2004 | ADD'L COOLING IPS | | 0 | 0 | USD |
| C009502 | 7 | Ammo | | 21 Lonoke, AR | 4/15/2005 | ADD'L PISTOL CAMERA INSP SYSTEM | | 0 | 0 | USD |
| C009502 | 8 | Ammo | | 21 Lonoke, AR | 7/15/2007 | ADD'L - 100RD VALUE PACK SETUP | | 0 | 0 | USD |
| C009502 | 9 | Ammo | | 21 Lonoke, AR | 8/15/2008 | ADD'L RETURN CONVEYOR SYSTEM | | 0 | 0 | USD |
| C009503 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2001 | CF BULLET FINISH MCH #298 | | 0 | 0 | USD |
| C009504 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2001 | YALE MCW020 LIFT TRUCK #18 | | 0 | 0 | USD |
| C009534 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2001 | LIFT TRUCK-2ND FLOOR AH&P #19 | | 0 | 0 | USD |
| C009537 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2001 | RECOIL GUN MOUNTS 100837 | | 0 | 0 | USD |
| C009538 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2001 | SULFURIC ACID STORAGE TANK | | 0 | 0 | USD |
| C009539 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2001 | SHOT TOWER 5TH FLOOR EXHAUST FAN | | 0 | 0 | USD |
| C009540 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2001 | LIFT TRUCK-SS 3RD FLOOR #23 | | 0 | 0 | USD |
| C009541 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2001 | WAREHOUSE OVERHEAD HEATERS | | 0 | 0 | USD |
| C009549 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2001 | CHEM LAB WORK BENCH | | 0 | 0 | USD |
| C009550 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2001 | 45 GR JHP UMC #337 | | 0 | 0 | USD |
| C009554 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2001 | REB HEADER #136 | | 0 | 0 | USD |
| C009555 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2001 | #131 HEADING MACHINE | | 0 | 0 | USD |
| C009557 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2001 | SS CASE PACKER CONVEYOR | | 0 | 0 | USD |
| C009558 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2001 | #304 BLISS SHELL DRAW #222 | | 0 | 0 | USD |
| C009558 | 2 | Ammo | | 21 Lonoke, AR | 3/15/2003 | #222-304 BLISS DRAW - CONVEYOR | | 0 | 0 | USD |
| C009558 | 3 | Ammo | | 21 Lonoke, AR | 3/15/2003 | SPARE 304 DRAW - DIE SET | | 0 | 0 | USD |
| 3009559 | 1 | Ammo | | 21 Lonoke, AR | 2/15/2008 | RELOCATE BRINE TANK | | 0 | 0 | USD |
| 3009562 | 0 | Ammo | | 21 Lonoke, AR | 6/15/2001 | Switch, A/C Network Cabinet- At 4 Way - 100875 | | 0 | 0 | USD |
| C009732 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2001 | BLT ASSY PRESS WFF  2931/100883 | | 0 | 0 | USD |
| C009743 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2001 | CF LEAD FORK TRUCK | | 0 | 0 | USD |
| C009762 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2001 | #1548 HEADING MACHINE | | 0 | 0 | USD |
| C009763 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2001 | RF SHELL LUBE FILTERS | | 0 | 0 | USD |
| C009763 | 1 | Ammo | | 21 Lonoke, AR | 9/15/2003 | LUBING PIPING SHELLMAKERS | | 0 | 0 | USD |
| C009764 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2001 | AUTO EXTERNAL DEFIBRILLATOR 100894 | | 0 | 0 | USD |
| C009765 | 0 | Ammo | | 21 Lonoke, AR | 1/31/1997 | C-S SABOT ML ASSEMBLY MOLD, TOOLING | | 0 | 0 | USD |
| 3009833 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2001 | PR MIX TNR CONTROLS BLDG 711 | | 0 | 0 | USD |
| 3009834 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2001 | CF ROTARY MOUTH ANNEAL #99 | | 0 | 0 | USD |
| 3009835 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2001 | CF ROTARY MOUTH ANNEAL #101 | | 0 | 0 | USD |
| 3009836 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2001 | ADD'L CF BLT ASSEMBLY | | 0 | 0 | USD |
| C009836 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2001 | ADD'L CF BLT ASSEMBLY | | 0 | 0 | USD |
| C009837 | 1 | Ammo | | 21 Lonoke, AR | 5/6/2014 | UPG DISPLAY #289 101863 | | 0 | 0 | USD |
| C009838 | 0 | Ammo | | 21 Lonoke, AR | 10/15/2001 | TAPER PRESS #96 | | 0 | 0 | USD |
| C009838 | 1 | Ammo | | 21 Lonoke, AR | 3/15/2002 | ADD'L TAPER PRESS | | 0 | 0 | USD |
| C009851 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2002 | UPGRADE OF HEADER #152 | | 0 | 0 | USD |
| C009852 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2002 | HYDRAULIC SHEET METAL BRAKE | | 0 | 0 | USD |
| C009855 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2002 | TOOL INSPECTION AIR CONDITIONER | | 0 | 0 | USD |
| C009857 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2002 | PR THERMAL LABEL PRINTER ZEBRA #1055e | | 0 | 0 | USD |
| C009865 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2002 | YALE WALKER STACKER | | 0 | 0 | USD |
| C009866 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2002 | YALE WALKER STACKER | | 0 | 0 | USD |
| C009867 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2002 | GATE HOUSE GENERATOR | | 0 | 0 | USD |
| C009868 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2002 | BULLET GROOVING MACHING | | 0 | 0 | USD |
| 3009898 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2002 | PISTOL ANVIL DIE SET - 11STATION | | 0 | 0 | USD |
| 3009895 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2002 | WHEELED STRETCHER | | 0 | 0 | USD |
| C009939 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2002 | 223 MANURHIN LOADER #4 | | 0 | 0 | USD |
| 3009939 | 3 | Ammo | | 21 Lonoke, AR | 7/15/2005 | POWDER STACK | | 0 | 0 | USD |
| 3009939 | 4 | Ammo | | 21 Lonoke, AR | 7/15/2005 | PRIMER WATER PROOFING | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C109964 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2002 | RF STORAGE AREA STEAM LINE | | 0 | 0 | USD |
| C109965 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2002 | CF TAPER AIR LINE | | 0 | 0 | USD |
| C109966 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2002 | BALLISTICS RANGE 7-15 EXHAUST SYSTEM | | 0 | 0 | USD |
| C109970 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2002 | RES #151 CF HEADER | | 0 | 0 | USD |
| C109971 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2002 | YALE MPB040 PALLET TRUCK #66 | | 0 | 0 | USD |
| C109991 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2002 | CF ROTARY MOUTH ANNEAL #100 | | 0 | 0 | USD |
| C109992 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2002 | CF ROTARY MOUTH ANNEAL #102 | | 0 | 0 | USD |
| C109993 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2002 | REV OSMOSIS UNIT BLDG 712 | | 0 | 0 | USD |
| C109998 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2002 | Truck, Fork Lift-Yale ERC 050-Yard Svc Garage #967 | | 0 | 0 | USD |
| C109999 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2002 | YALE ERC060 FORK TRUCK | | 0 | 0 | USD |
| C110003 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2003 | BALLISTICS OSCILLOSCOPE 100991 | | 0 | 0 | USD |
| C110007 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2003 | PLATE COUNTER SYSTEM | | 0 | 0 | USD |
| C110008 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2003 | DIGITAL HEIGHT GAUGE 100983 | | 0 | 0 | USD |
| C110012 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2003 | #171-304 BLISS DRAW - CONVEYOR | | 0 | 0 | USD |
| C110012 | 1 | Ammo | | 21 Lonoke, AR | 3/15/2003 | 304 DRAW DIE SET | | 0 | 0 | USD |
| C110012 | 2 | Ammo | | 21 Lonoke, AR | 3/15/2003 | 304 DRAW PRESS - DIE SET | | 0 | 0 | USD |
| C110013 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2003 | 304 DRAW PRESS - DIE SET | | 0 | 0 | USD |
| C110014 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2003 | #807 WASH UNIT | | 0 | 0 | USD |
| C110015 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2003 | Truck, Fork Lift-Nissan Rider #38/#1305 | | 0 | 0 | USD |
| C110016 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2003 | NISSAN FORK LIFT | | 0 | 0 | USD |
| C110017 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2003 | NISSAN PALLET TRUCK | | 0 | 0 | USD |
| C110018 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2003 | CHEM LAB PURE WATER UNIT | | 0 | 0 | USD |
| C110020 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2003 | PITNEY BOWES MAIL MACHINE 101010 | | 0 | 0 | USD |
| C110045 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2003 | RF LABEL APPLICATOR MODEL 630 | | 0 | 0 | USD |
| C110046 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2003 | WF TRANSFER PRESS #234A 101114 | | 0 | 0 | USD |
| C110046 | 1 | Ammo | | 21 Lonoke, AR | 12/15/2004 | ADD'L INS TRANSFER PRESS #234A | | 0 | 0 | USD |
| C110046 | 2 | Ammo | | 21 Lonoke, AR | 7/15/2008 | ADD'L 234A 30CAL CHANGE PARTS | | 0 | 0 | USD |
| C110047 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2003 | WF TRANSFER PRESS (PCH) 101012 | | 0 | 0 | USD |
| C110048 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2003 | #4 BLISS HEADER (PCH) | | 0 | 0 | USD |
| C110049 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2003 | #4 BLISS HEADER (PCH) | | 0 | 0 | USD |
| C110083 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2003 | 3-TON BRIDGE CRANE | | 0 | 0 | USD |
| C110084 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2003 | HYDRAULIC LIFT - YARD SERVICE | | 0 | 0 | USD |
| C110086 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2003 | 1000GAL PROPANE TANK | | 0 | 0 | USD |
| C110090 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2003 | 1000GAL PROPANE TANK | | 0 | 0 | USD |
| C110096 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2003 | COLOR BLENDER | | 0 | 0 | USD |
| C110099 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2003 | AMUT 40 TON CHILLER | | 0 | 0 | USD |
| C110100 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2003 | VACUUM BLOWER | | 0 | 0 | USD |
| C110102 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2003 | ADD'L #154 HEADER | | 0 | 0 | USD |
| C110132 | 0 | Ammo | | 21 Lonoke, AR | 10/15/2003 | COMPONENT PR SEALING UNIT | | 0 | 0 | USD |
| C110133 | 0 | Ammo | | 21 Lonoke, AR | 10/15/2003 | SS PLASTICS COLOR METER | | 0 | 0 | USD |
| C110134 | 0 | Ammo | | 21 Lonoke, AR | 10/15/2003 | SOUTHBEND LATHE | | 0 | 0 | USD |
| C110137 | 1 | Ammo | | 21 Lonoke, AR | 11/15/2004 | RLC NITRATION SCRUBBER UNIT | | 0 | 0 | USD |
| C110138 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2003 | GAGE INSP AIR CONDITIONER | | 0 | 0 | USD |
| C110139 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2003 | LOT CODE IMPRINTER CC250TT | | 0 | 0 | USD |
| C110140 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2003 | LOT CODE IMPRINTER CC250TT | | 0 | 0 | USD |
| C110204 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2004 | SHOT TOWER 11TH FLR GRAVITY CONVEYOR | | 0 | 0 | USD |
| C110224 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2004 | CF PACK GLUE APPLICATOR | | 0 | 0 | USD |
| C110228 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2004 | BARCODE VERIFIER SCANNER | | 0 | 0 | USD |
| C110229 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2004 | CRANE LABEL PRINTER ZEBRA 170XIII | | 0 | 0 | USD |
| C110233 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2004 | METTLER TOLEDO CHECKWEIGHTER | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C110235 | | 0 Ammo | | 21 Lonoke, AR | 3/15/2004 | PRECISION TIG WELDER | | 0 | 0 | 0 USD |
| C110250 | | 0 Ammo | | 21 Lonoke, AR | 5/15/2004 | #38 - 357 PRIMER FEED SYSTEM | | 0 | 0 | 0 USD |
| C110251 | | 0 Ammo | | 21 Lonoke, AR | 5/15/2004 | SPARE IPS BELT | | 0 | 0 | 0 USD |
| C110253 | | 0 Ammo | | 21 Lonoke, AR | 6/15/2004 | SPARE SUBSTATION #8 TRANSFORMER | | 0 | 0 | 0 USD |
| C110254 | | 0 Ammo | | 21 Lonoke, AR | 6/15/2004 | #835 WET MIX TIMING CONTROLS | | 0 | 0 | 0 USD |
| C110255 | | 0 Ammo | | 21 Lonoke, AR | 6/15/2004 | #836 WET MIX TIMING CONTROLS | | 0 | 0 | 0 USD |
| C110256 | | 0 Ammo | | 21 Lonoke, AR | 6/15/2004 | #837 WET MIX TIMING CONTROLS | | 0 | 0 | 0 USD |
| C110265 | | 0 Ammo | | 21 Lonoke, AR | 6/15/2004 | #838 WET MIX TIMING CONTROL | | 0 | 0 | 0 USD |
| C110267 | | 0 Ammo | | 21 Lonoke, AR | 8/15/2004 | UPGRADE CF HEADER #145 | | 0 | 0 | 0 USD |
| C110268 | | 0 Ammo | | 21 Lonoke, AR | 8/15/2004 | CF #344 SWAGE CONVEYOR | | 0 | 0 | 0 USD |
| C110268 | | 1 Ammo | | 21 Lonoke, AR | 1/15/2005 | ADD'L #344 SWAGE MCH (OVH) | | 0 | 0 | 0 USD |
| C110269 | | 0 Ammo | | 21 Lonoke, AR | 8/15/2004 | CF #345 SWAGE CONVEYOR | | 0 | 0 | 0 USD |
| C110270 | | 0 Ammo | | 21 Lonoke, AR | 8/15/2004 | RF CUPPING DIE SET | | 0 | 0 | 0 USD |
| 3110271 | | 0 Ammo | | 21 Lonoke, AR | 8/15/2004 | Folder Sealer Unit, Fomax-Payroll office-101127 | | 0 | 0 | 0 USD |
| C110280 | | 0 Ammo | | 21 Lonoke, AR | 9/15/2004 | SS SALVAGE SHOT SEPARATOR | | 0 | 0 | 0 USD |
| C110281 | | 0 Ammo | | 21 Lonoke, AR | 9/15/2004 | CLARIFIER PH CONTROL SYSTEM | | 0 | 0 | 0 USD |
| C110283 | | 0 Ammo | | 21 Lonoke, AR | 10/15/2004 | PP WALK-IN FUME HOOD | | 0 | 0 | 0 USD |
| C110284 | | 0 Ammo | | 21 Lonoke, AR | 10/15/2004 | PP TABLE FUME HOOD | | 0 | 0 | 0 USD |
| C110285 | | 0 Ammo | | 21 Lonoke, AR | 10/15/2004 | PP RO SYSTEM | | 0 | 0 | 0 USD |
| C110286 | | 0 Ammo | | 21 Lonoke, AR | 10/15/2004 | PP OUTSIDE POWER POLE/WIRING | | 0 | 0 | 0 USD |
| 3010287 | | 0 Ammo | | 21 Lonoke, AR | 10/15/2004 | PP BUILDING ELECTRICAL | | 0 | 0 | 0 USD |
| 3010287 | | 1 Ammo | | 21 Lonoke, AR | 2/15/2006 | BLDG #614 ELECTRIC | | 0 | 0 | 0 USD |
| C110288 | | 0 Ammo | | 21 Lonoke, AR | 10/15/2004 | PP PROCESS SEWER | | 0 | 0 | 0 USD |
| C110288 | | 1 Ammo | | 21 Lonoke, AR | 2/15/2006 | PP WASTE WATER SYS | | 0 | 0 | 0 USD |
| C110289 | | 0 Ammo | | 21 Lonoke, AR | 10/15/2004 | PP SPECIALTY GAS PIPING | | 0 | 0 | 0 USD |
| C110290 | | 0 Ammo | | 21 Lonoke, AR | 10/15/2004 | PP AIR/VACUUM SERVICE | | 0 | 0 | 0 USD |
| C110291 | | 0 Ammo | | 21 Lonoke, AR | 10/15/2004 | PP WATER SERVICE | | 0 | 0 | 0 USD |
| C110292 | | 0 Ammo | | 21 Lonoke, AR | 10/15/2004 | PP STEAM SERVICE | | 0 | 0 | 0 USD |
| C110295 | | 0 Ammo | | 21 Lonoke, AR | 10/15/2004 | SS CAP PRESS GAUGING SYSTEM | | 0 | 0 | 0 USD |
| C110296 | | 0 Ammo | | 21 Lonoke, AR | 10/15/2004 | SS HH GAUGING SYSTEM | | 0 | 0 | 0 USD |
| C110297 | | 0 Ammo | | 21 Lonoke, AR | 10/15/2004 | SS EXTRUDE GAUGING SYSTEM | | 0 | 0 | 0 USD |
| C110315 | | 0 Ammo | | 21 Lonoke, AR | 11/15/2004 | #343 MANVILLE SWAGE MACHINE | | 0 | 0 | 0 USD |
| C110316 | | 0 Ammo | | 21 Lonoke, AR | 11/15/2004 | CLOSED LOOP COOLING BLT REFINISH | | 0 | 0 | 0 USD |
| C110316 | | 0 Ammo | | 21 Lonoke, AR | 11/15/2004 | CNC MILLING MACHINE | | 0 | 0 | 0 USD |
| C110353 | | 0 Ammo | | 21 Lonoke, AR | 1/15/2005 | CYLINDRICAL GRINDER | | 0 | 0 | 0 USD |
| C110354 | | 0 Ammo | | 21 Lonoke, AR | 1/15/2005 | #413 HALF HEADER (OVH) | | 0 | 0 | 0 USD |
| C110355 | | 0 Ammo | | 21 Lonoke, AR | 1/15/2005 | #414 HALF HEADER (OVH) | | 0 | 0 | 0 USD |
| C110356 | | 0 Ammo | | 21 Lonoke, AR | 1/15/2005 | PR SS CUPPING DIE SET | | 0 | 0 | 0 USD |
| C110357 | | 0 Ammo | | 21 Lonoke, AR | 1/15/2005 | MEDICAL ECG MACHINE 101148 | | 0 | 0 | 0 USD |
| C110365 | | 0 Ammo | | 21 Lonoke, AR | 2/15/2005 | VACUUM PUMPS 2 BLDG 712 | | 0 | 0 | 0 USD |
| C110366 | | 0 Ammo | | 21 Lonoke, AR | 2/15/2005 | COMPONENT PACK TAPE MACHINE | | 0 | 0 | 0 USD |
| C110369 | | 0 Ammo | | 21 Lonoke, AR | 3/15/2005 | 375 CALIBER CLU PRODUCT GAGES EX70680 101159 | | 0 | 0 | 0 USD |
| C110370 | | 0 Ammo | | 21 Lonoke, AR | 3/15/2005 | 375 CALIBER CLU PRODUCT GAGE EX70680 101159 | | 0 | 0 | 0 USD |
| C110371 | | 0 Ammo | | 21 Lonoke, AR | 3/15/2005 | SHOT TOWER 6TH FLOOR PLATFORM | | 0 | 0 | 0 USD |
| C110372 | | 0 Ammo | | 21 Lonoke, AR | 3/15/2005 | WASTE TREATMENT CAUSTIC PUMP | | 0 | 0 | 0 USD |
| 3010411 | | 0 Ammo | | 21 Lonoke, AR | 3/15/2003 | R/C HYDROSTATIC PUMP | | 0 | 0 | 0 USD |
| C110413 | | 0 Ammo | | 21 Lonoke, AR | 6/15/2005 | CF PLATE LOADER DUST COLLECTOR | | 0 | 0 | 0 USD |
| C110414 | | 0 Ammo | | 21 Lonoke, AR | 6/15/2005 | SHAFT/BELT ALIGNMENT UNIT | | 0 | 0 | 0 USD |
| C110415 | | 0 Ammo | | 21 Lonoke, AR | 6/15/2005 | BEARING HEATER | | 0 | 0 | 0 USD |
| 3010418 | | 0 Ammo | | 21 Lonoke, AR | 7/15/2005 | RELOCATE PLATE LOADER #1 | | 0 | 0 | 0 USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3010420 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2005 | GAGE LAB DIGITAL OPTICAL COMPARATOR 101173 | | 0 | 0 | USD |
| 3010429 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2005 | TOLEDO SCALE RF PRIMING | | 0 | 0 | USD |
| 3010457 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2005 | SS PACK LABEL PRINTER ZEBRA 170X III | | 0 | 0 | USD |
| 3010459 | 0 | Ammo | | 21 Lonoke, AR | 10/15/2005 | BALLISTICS UNIVERSAL RECEIVERS (5) 101187 | | 0 | 0 | USD |
| 3010460 | 0 | Ammo | | 21 Lonoke, AR | 10/15/2005 | SIMPLEX LDRH-WAD FEEDER | | 0 | 0 | USD |
| 3010462 | 0 | Ammo | | 21 Lonoke, AR | 10/15/2005 | ELECTRO ARC METAL DISINTEGRATOR 101206 | | 0 | 0 | USD |
| 3010463 | 0 | Ammo | | 21 Lonoke, AR | 10/15/2005 | SPARE #727 ANNEAL BELT | | 0 | 0 | USD |
| 3010464 | 0 | Ammo | | 21 Lonoke, AR | 10/15/2005 | LEAD STYPHNATE WEIGH SCALE | | 0 | 0 | USD |
| 3010470 | 1 | Ammo | | 21 Lonoke, AR | 11/15/2005 | ADD'L LINKING MACHINE | | 0 | 0 | USD |
| 3010471 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2005 | SHOT TOWER FEED LINES | | 0 | 0 | USD |
| 3010503 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2005 | RF LAPPING HEAD | | 0 | 0 | USD |
| 3010516 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2006 | SLUG FEEDER 965, 966, 967 | | 0 | 0 | USD |
| 3010517 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2006 | SLUG FEEDER 974, 975, 976 | | 0 | 0 | USD |
| 3010518 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2006 | SS CLAM PACK FORMING TOOL | | 0 | 0 | USD |
| 3010522 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2006 | BLISS HEADER #144 OVERHAUL | | 0 | 0 | USD |
| 3010523 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2006 | PP VIDEO MONITORING SYS | | 0 | 0 | USD |
| 3010525 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2006 | PP CHEMICAL FEED SYS | | 0 | 0 | USD |
| 3010526 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2006 | BLDG #615 ELECTRIC | | 0 | 0 | USD |
| 3010527 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2006 | BLDG #615 HEAT & AIR | | 0 | 0 | USD |
| 3010528 | 1 | Ammo | | 21 Lonoke, AR | 2/15/2006 | PP REACTOR/VESSELS | | 0 | 0 | USD |
| 3010528 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2008 | REPLACE REACTOR | | 0 | 0 | USD |
| 3010598 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2006 | BOILER - POWDER POUR 814 | | 0 | 0 | USD |
| 3010690 | 0 | Ammo | | 21 Lonoke, AR | 6/15/2006 | ISCO SAMPLER-ADVD TREATMENT | | 0 | 0 | USD |
| 3010691 | 0 | Ammo | | 21 Lonoke, AR | 6/15/2006 | ADVD TRTMT GENERATOR | | 0 | 0 | USD |
| 3010694 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2006 | PR COMPONENT LABEL PRINTER | | 0 | 0 | USD |
| 3010695 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2006 | UPG #573 TAMP & FOIL PRESS | | 0 | 0 | USD |
| 3010721 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2006 | MODEL 1812 TRAILER MOUNTED WATER JET | | 0 | 0 | USD |
| 3010724 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2006 | METTLER TOLEDO SCALE | | 0 | 0 | USD |
| 3010725 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2006 | BLDG 712 MOISTURE ANALYZER | | 0 | 0 | USD |
| 3010727 | 1 | Ammo | | 21 Lonoke, AR | 9/15/2006 | ADD'L CONVEYOR SYSTEMS | | 0 | 0 | USD |
| 3010727 | 2 | Ammo | | 21 Lonoke, AR | 9/15/2006 | ADD'L CASE TAPE MACHINE | | 0 | 0 | USD |
| 3010740 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2006 | MAINTENANCE PRESSURE WASHER | | 0 | 0 | USD |
| 3010741 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2006 | FIRE EXTINGUISHER SIMULATOR 101283 | | 0 | 0 | USD |
| 3010744 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2006 | 2 PCB PEAK PRESSURE SYSTEMS 101273 | | 0 | 0 | USD |
| 3010745 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2006 | PR BREAK ROOM ICE MAKER | | 0 | 0 | USD |
| 3016112 | 0 | Ammo | | 21 Lonoke, AR | 3/1/2016 | P J TRAILER GOOSENECK | | 0 | 0 | USD |
| 5000261 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2000 | Server, Warehouse Network(raw mat wall) - 100757 | | 0 | 0 | USD |
| 3001291 | 0 | Ammo | | 21 Lonoke, AR | 5/1/1998 | Printer, Barcode in Warehouse-Zebra | | 0 | 0 | USD |
| 3001382 | 1 | Ammo | | 21 Lonoke, AR | 5/15/2004 | EMPLOYEE ID BADGE SYSTEM 101088 | | 0 | 0 | USD |
| 3001382 | 2 | Ammo | | 21 Lonoke, AR | 10/15/2007 | ID BADGE PRINTER 101358 | | 0 | 0 | USD |
| 3001103 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2000 | EXPLOSIVE DELIVERY TRUCK | | 0 | 0 | USD |
| 5000104 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2000 | Truck, Electric Jeep- Yale- #56 & #58 - 100841 | | 0 | 0 | USD |
| 5000109 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2002 | TENNET POWER SCRUBBER | | 0 | 0 | USD |
| 5000109 | 1 | Ammo | | 21 Lonoke, AR | 11/25/2016 | Nobles 24 inch Scrubbers | | 0 | 0 | USD |
| 5000109 | 2 | Ammo | | 21 Lonoke, AR | 11/25/2016 | Nobles 24 inch Scrubbers | | 0 | 0 | USD |
| 5000109 | 3 | Ammo | | 21 Lonoke, AR | 11/25/2016 | Nobles 24 inch Scrubbers | | 0 | 0 | USD |
| 5000109 | 4 | Ammo | | 21 Lonoke, AR | 11/25/2016 | Nobles 24 inch Scrubbers | | 0 | 0 | USD |
| 5000109 | 5 | Ammo | | 21 Lonoke, AR | 11/25/2016 | Nobles 24 inch Scrubbers | | 0 | 0 | USD |
| 5000110 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2003 | KUBOTA MOWER | | 0 | 0 | USD |
| 5000111 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2003 | CHEVROLET ASTRO VAN | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 1000112 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2003 | POLARIS RANGER | | 0 | 0 | USD |
| 1000115 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2003 | 2002 CHEV ASTRO VAN | | 0 | 0 | USD |
| 1000118 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2005 | 1991 CHEVEROLET S-10 TRUCK | | 0 | 0 | USD |
| 1000192 | 0 | Ammo | | 21 Lonoke, AR | 3/1/2016 | 1993 FORD AEROSTAR | | 0 | 0 | USD |
| 1000194 | 0 | Ammo | | 21 Lonoke, AR | 3/1/2016 | 1995 FORD TRUCK F-250 | | 0 | 0 | USD |
| 1000195 | 0 | Ammo | | 21 Lonoke, AR | 3/1/2016 | 1995 FORD AEROSTAR | | 0 | 0 | USD |
| 1001279 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2003 | CHEM LAB STEREOSCOPE | | 0 | 0 | USD |
| 1001280 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2004 | MEDICAL X-RAY PROCESSOR 101070 | | 0 | 0 | USD |
| 1001281 | 0 | Ammo | | 21 Lonoke, AR | 10/15/2004 | PP LAB FIXTURES | | 0 | 0 | USD |
| 1001282 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2005 | RESPIRATOR FIT TEST UNIT 101149 | | 0 | 0 | USD |
| 1007467 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2007 | 36 CAVITY SP410 WAD MOLD | | 0 | 0 | USD |
| 1007467 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2007 | ADDL SS 410 WAD MOLD | | 0 | 0 | USD |
| 1009187 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2000 | 20GA COPPER SOLID SABOT MOLD 100686 | | 0 | 0 | USD |
| 3010101 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2003 | 12GA SABOT MOLD | | 0 | 0 | USD |
| 3011001 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2008 | 12 ga ACCUTIP - 8 CAVITY MOLD | | 0 | 0 | USD |
| 3011992 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2009 | 20 ga ACCUTIP - 6 CAVITY MOLD @ VENDOR | | 0 | 0 | USD |
| 3012716 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2011 | #3 - 8 CAVITY TRAY MOLD 101665 | | 0 | 0 | USD |
| 5900220 | 3 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDITIONAL FLASHING ON ROOF | | 0 | 0 | USD |
| 1000220 | 4 | Ammo | | 21 Lonoke, AR | 12/1/1993 | WAREHOUSE DOOR SENSORS U | | 0 | 0 | USD |
| 1000220 | 5 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST WOMEN'S LOCKER ROOM | | 0 | 0 | USD |
| 1000220 | 11 | Ammo | | 21 Lonoke, AR | 12/1/1993 | RITE-HITE DOK-LOK SCR BRASS 120049 | | 0 | 0 | USD |
| 1000220 | 13 | Ammo | | 21 Lonoke, AR | 3/15/2000 | ADDL LIGHTING EMPLOYEE SALES 100704 | | 0 | 0 | USD |
| 1000220 | 17 | Ammo | | 21 Lonoke, AR | 9/15/2006 | ADDL PRODUCT SERVICE SOUND PROOF | | 0 | 0 | USD |
| 1000221 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | INSTRUMENT TEST ROOM 10'X9' BALLISTICS | | 0 | 0 | USD |
| 1000221 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | STEAM HEAT BALLISTICS 52-12228-101-00 | | 0 | 0 | USD |
| 1000222 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BUILDING ADDITION U | | 0 | 0 | USD |
| 1000225 | 2 | Ammo | | 21 Lonoke, AR | 5/15/1998 | REBUILD RESTROOMS - GATEHOUSE | | 0 | 0 | USD |
| 1000226 | 1 | Ammo | | 21 Lonoke, AR | 7/15/1997 | ADDL-BLDG 504 AWNING | | 0 | 0 | USD |
| 1000229 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LEAD PAD STORAGE BUILDING 510 | | 0 | 0 | USD |
| 1000229 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CONCRETE PAD-LEAD STORAGE | | 0 | 0 | USD |
| 1000230 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST - BLDG #600 110572 | | 0 | 0 | USD |
| 1000230 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL-LAB BLDG #600 120479 | | 0 | 0 | USD |
| 1000230 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST - BLDG #601 110572 | | 0 | 0 | USD |
| 1000231 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL-PARTITION/FLOOR #601 120479 | | 0 | 0 | USD |
| 1000234 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POLYMER STORAGE BLDG #606 120479 | | 0 | 0 | USD |
| 1000237 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | WAREHOUSE SCALE HOUSE 507 | | 0 | 0 | USD |
| 1000238 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | HVAC RMI | | 0 | 0 | USD |
| 1000239 | 1 | Ammo | | 21 Lonoke, AR | 10/15/1994 | ADDL-MISCL BLD #610 2901 | | 0 | 0 | USD |
| 1000241 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | R&D LAB BUILDING #612 144 SQ FT | | 0 | 0 | USD |
| 1000241 | 1 | Ammo | | 21 Lonoke, AR | 10/15/1994 | ADDL-CONCRETE WALLS #612 2901 | | 0 | 0 | USD |
| 1000242 | 0 | Ammo | | 21 Lonoke, AR | 12/15/1996 | R&D LAB BUILDING #613 144 SQ FT | | 0 | 0 | USD |
| 1000243 | 5 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADMIN & CF MFG BLDG-ADDITIONAL COST | | 0 | 0 | USD |
| 1000243 | 6 | Ammo | | 21 Lonoke, AR | 12/1/1993 | WATER LINE-SS REDUCING STA TO SF/OAM MO | | 0 | 0 | USD |
| 1000243 | 7 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL POWER WIRING-C.F. | | 0 | 0 | USD |
| 1000243 | 16 | Ammo | | 21 Lonoke, AR | 8/15/1996 | ADDL - CF PACK FENCE PANELS | | 0 | 0 | USD |
| 1000243 | 18 | Ammo | | 21 Lonoke, AR | 12/15/1996 | ADDL - 8 GA INDUSTRIAL OFFICES | | 0 | 0 | USD |
| 1000243 | 19 | Ammo | | 21 Lonoke, AR | 1/15/1997 | ADDL-CF LEAD DOCK DOK-LOC | | 0 | 0 | USD |
| 1000243 | 20 | Ammo | | 21 Lonoke, AR | 12/15/1997 | CF PRIMING DOCK COVERING | | 0 | 0 | USD |
| 1000243 | 22 | Ammo | | 21 Lonoke, AR | 11/15/2000 | CF LOADING DOORS | | 0 | 0 | USD |
| 1000243 | 39 | Ammo | | 21 Lonoke, AR | 3/28/2014 | RPL BUSS DUCTS ADDL COST 101871 | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 1000244 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDITIONAL COST OF BUILDING SHOT SHELL | | 0 | 0 | USD |
| 1000244 | 3 | Ammo | | 21 Lonoke, AR | 6/15/1994 | ADDL-STEAM UNIT HEATER-SS DOCK 2223 | | 0 | 0 | USD |
| 1000244 | 9 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST-SS FIRE PROTECTION | | 0 | 0 | USD |
| 1000244 | 10 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST-DOORS-ELECTRIC SHOP | | 0 | 0 | USD |
| 1000244 | 13 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MAINT. WORK AREA BLK WALL 120195 120066U | | 0 | 0 | USD |
| 1000244 | 16 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST-RLC SPARE PTS CRIB 120321 | | 0 | 0 | USD |
| 1000244 | 17 | Ammo | | 21 Lonoke, AR | 9/5/1995 | ADDL - SS BLDG #473 FLOOR | | 0 | 0 | USD |
| 1000244 | 21 | Ammo | | 21 Lonoke, AR | 2/15/1998 | ADDL SPRINKLER SYSTEM | | 0 | 0 | USD |
| 1000244 | 22 | Ammo | | 21 Lonoke, AR | 4/15/1999 | ADDL SS AREA FLOORING | | 0 | 0 | USD |
| 1000244 | 26 | Ammo | | 21 Lonoke, AR | 12/15/2003 | ADDL OFFICE - MAINTENANCE | | 0 | 0 | USD |
| 1000244 | 30 | Ammo | | 21 Lonoke, AR | 12/15/2005 | ADDL ELECTRIC ENG OFFICE | | 0 | 0 | USD |
| 1000244 | 37 | Ammo | | 21 Lonoke, AR | 5/15/2009 | MAINTENANCE OVERHEAD DOOR 101520 | | 0 | 0 | USD |
| 1000245 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PRIMER SHIPPING SHED 701 | | 0 | 0 | USD |
| 1000245 | 1 | Ammo | | 21 Lonoke, AR | 3/15/2005 | ADDL HR MANAGERS OFFICE | | 0 | 0 | USD |
| 1000246 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PRIMER CONDITIONING AND STORAGE MAGAZIN 702 | | 0 | 0 | USD |
| 1000246 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | RADIATION HEAT FOR BLDG. 702 | | 0 | 0 | USD |
| 1000247 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PRIMER CONDITIONING AND STORAGE MAGAZIN 703 | | 0 | 0 | USD |
| 1000247 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | RADIATION HEAT FOR BLDG. 703 | | 0 | 0 | USD |
| 1000248 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PRIMER CONDITIONING AND STORAGE MAGAZIN 704 | | 0 | 0 | USD |
| 1000248 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | RADIATION HEAT FOR BLDG. 704 | | 0 | 0 | USD |
| 1000249 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PRIMER CONDITIONING AND STORAGE MAGAZIN 705 | | 0 | 0 | USD |
| 1000249 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | RADIATION HEAT FOR BLDG. 705 | | 0 | 0 | USD |
| 1000250 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | TNR STORAGE MAGAZINE NUMBER 1 - 706 | | 0 | 0 | USD |
| 1000250 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL-#706 CONDUCTIVE FLOOR 120036 | | 0 | 0 | USD |
| 1000251 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | TNR STORAGE MAGAZINE NUMBER 2 - 707 | | 0 | 0 | USD |
| 1000252 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | STEAM HEATER SYSTEM-PRIMER INSP. BLDG. | | 0 | 0 | USD |
| 1000252 | 3 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST-BLDG 709 OFFICE 120319    U | | 0 | 0 | USD |
| 1000252 | 5 | Ammo | | 21 Lonoke, AR | 8/14/1995 | ADDL-PRIMER BLDG PARTITION & SHELF | | 0 | 0 | USD |
| 1000252 | 8 | Ammo | | 21 Lonoke, AR | 5/15/1998 | PRIMER HVAC - INSULATION | | 0 | 0 | USD |
| 1000252 | 9 | Ammo | | 21 Lonoke, AR | 10/15/2004 | ADDL PR BUILDING 709 AWNING | | 0 | 0 | USD |
| 1000252 | 12 | Ammo | | 21 Lonoke, AR | 4/15/2007 | COATING PR WASH AREA FLOOR | | 0 | 0 | USD |
| 1000253 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SODA ASH STORAGE BUILDING 710 | | 0 | 0 | USD |
| 1000254 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | GUARD RAIL NITRATION | | 0 | 0 | USD |
| 1000255 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | STORAGE BLDG POLNOL 15'X15' | | 0 | 0 | USD |
| 1000261 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | WET MIX MAGAZINE NUMBER 1 #718 | | 0 | 0 | USD |
| 1000263 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | WET MIX CONTROL HOUSE 720 | | 0 | 0 | USD |
| 1000263 | 1 | Ammo | | 21 Lonoke, AR | 5/15/2004 | CONDUCTIVE FLOOR-BLDG 720 | | 0 | 0 | USD |
| 1000263 | 2 | Ammo | | 21 Lonoke, AR | 4/15/2008 | ADDL INSULATION BLDG 720 | | 0 | 0 | USD |
| 1000266 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | WET MIX MACHINE HOUSE NUMBER 3 - 724 | | 0 | 0 | USD |
| 1000267 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POLNOL STORAGE MAGAZINE NUMBER 1 - 725 | | 0 | 0 | USD |
| 1000268 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POLNOL STORAGE MAGAZINE NUMBER 2 - 726 | | 0 | 0 | USD |
| 1000271 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWDER CAN STORAGE BUILDING 803 | | 0 | 0 | USD |
| 1000272 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | HEAT & INSULATION | | 0 | 0 | USD |
| 1000273 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWDER PRE-POUR STORAGE BUILDING 805 | | 0 | 0 | USD |
| 1000275 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWDER STORAGE MAGAZINE NUMBER 1- 807 | | 0 | 0 | USD |
| 1000276 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWDER STORAGE MAGAZINE NUMBER 2 - 808 | | 0 | 0 | USD |
| 1000277 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWDER STORAGE MAGAZINE NUMBER 3 - 809 | | 0 | 0 | USD |
| 1000278 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWDER STORAGE MAGAZINE NUMBER 4- 810 | | 0 | 0 | USD |
| 1000279 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWDER STORAGE MAGAZINE NUMBER 5 - 811 | | 0 | 0 | USD |
| 1000280 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWDER STORAGE MAGAZINE NUMBER 6 - 812 | | 0 | 0 | USD |
| 1000282 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWDER HEATER BLDG - 814 | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C000283 | 1 | Ammo | | 21 Lonoke, AR | 8/15/1994 | ADDL-ENLGE RF WOMEN'S RESTROOM 2246 | 0 | 0 | 0 | USD |
| C000283 | 6 | Ammo | | 21 Lonoke, AR | 12/15/1996 | ADDL - RF DOCK GUARD RAIL | 0 | 0 | 0 | USD |
| C000283 | 11 | Ammo | | 21 Lonoke, AR | 7/15/2008 | ADD'L LIGHTING RF LOADING | 0 | 0 | 0 | USD |
| C000288 | 2 | Ammo | | 21 Lonoke, AR | 2/15/2000 | PRIMER WAREHOUSE DRAINAGE 100711 | 0 | 0 | 0 | USD |
| C000289 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BUILDING #740 120358 | 0 | 0 | 0 | USD |
| C000290 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BUILDING #741   120358 | 0 | 0 | 0 | USD |
| C000291 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BUILDING #742   120358 | 0 | 0 | 0 | USD |
| C000292 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BUILDING #743   120358 | 0 | 0 | 0 | USD |
| C000325 | 0 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL - ADMIN & CF BLDG - QUALITY MANAGER OFFICE | 0 | 0 | 0 | USD |
| C000326 | 0 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL - SS BUILDING - GUARDRAILS | 0 | 0 | 0 | USD |
| C000345 | 0 | Ammo | | 21 Lonoke, AR | 8/14/1995 | BLDG 711 EXHAUST SYSTEM | 0 | 0 | 0 | USD |
| C000378 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1996 | NITRATION BLDG EQUIPMENT - REPLACE | 0 | 0 | 0 | USD |
| C000440 | 0 | Ammo | | 21 Lonoke, AR | 12/15/1997 | PRODUCT SERVICE - HVAC | 0 | 0 | 0 | USD |
| C000441 | 0 | Ammo | | 21 Lonoke, AR | 12/15/1997 | PRODUCT SERVICE - SPRINKLER | 0 | 0 | 0 | USD |
| C000442 | 1 | Ammo | | 21 Lonoke, AR | 10/15/1998 | SS SYNCHRONIZED CLOCKS | 0 | 0 | 0 | USD |
| C000456 | 0 | Ammo | | 21 Lonoke, AR | 8/15/1998 | MAINTENANCE WIRE STORAGE AREA | 0 | 0 | 0 | USD |
| C000457 | 1 | Ammo | | 21 Lonoke, AR | 10/15/2009 | ADD'L BLDG #723 CONDUCTIVE FLOOR 101571 | 0 | 0 | 0 | USD |
| C000460 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1999 | RF LOAD DOCK DRAIN | 0 | 0 | 0 | USD |
| C000463 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1999 | CHEM LAB OFFICE 100648 | 0 | 0 | 0 | USD |
| C000464 | 1 | Ammo | | 21 Lonoke, AR | 9/15/1999 | TOOL INSPECTION OFFICE 100648 | 0 | 0 | 0 | USD |
| C000467 | 1 | Ammo | | 21 Lonoke, AR | 2/15/2003 | ADD'L LIGHTNING PROTECTION | 0 | 0 | 0 | USD |
| C000575 | 2 | Ammo | | 21 Lonoke, AR | 12/15/2010 | ADD'L FILTER PRESS BLDG 738 101601 | 0 | 0 | 0 | USD |
| C000581 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2011 | GUN CLUB PAVILION 101727 | 0 | 0 | 0 | USD |
| C000598 | 2 | Ammo | | 21 Lonoke, AR | 3/16/2018 | L2 Building #1000 Addt'l - Retainage Release101832 | 0 | 0 | 0 | USD |
| C000607 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Dock Bumpers | 0 | 0 | 0 | USD |
| C000610 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Stored Pressure Water Extinguisher | 0 | 0 | 0 | USD |
| C000611 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 5 Lb Abc Portable Fire Extinguisher | 0 | 0 | 0 | USD |
| C000613 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Surface Mount Cabinet With White Finish | 0 | 0 | 0 | USD |
| C000614 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 20 Lb Co2 Portable Fire Extinguisher | 0 | 0 | 0 | USD |
| C000615 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 10 #240 2.5 Gal Press Water With Wall Bracket | 0 | 0 | 0 | USD |
| C000624 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Hollow Metal Base | 0 | 0 | 0 | USD |
| C000626 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Hollow Metal Alt | 0 | 0 | 0 | USD |
| C000690 | 0 | Ammo | | 21 Lonoke, AR | 6/1/2017 | Rebuild Shop Lighting Relocate/Install  102022 | 0 | 0 | 0 | USD |
| C000069 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MODIFY PLANT ROAD CURVE 120282     U | 0 | 0 | 0 | USD |
| C000069 | 3 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PH-NEW STORAGE 124/8000/120483 | 0 | 0 | 0 | USD |
| C000072 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ROAD 285SY CONCRETE | 0 | 0 | 0 | USD |
| C000073 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | WALKWAY 3008BSF ASPHALTIC CONCRETE | 0 | 0 | 0 | USD |
| C000074 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PLT ENTRANCE WALK 300' 120516 | 0 | 0 | 0 | USD |
| C000075 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | WALK 4788SF CONCRETE 6' | 0 | 0 | 0 | USD |
| C000077 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PRIMER MFG PARKING LOT 4663SY BITUMASTI | 0 | 0 | 0 | USD |
| C000077 | 1 | Ammo | | 21 Lonoke, AR | 9/15/1997 | ADDL - REBUILD PM PARKING | 0 | 0 | 0 | USD |
| C000078 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LEAD STORAGE PAD REIN. CONCRETE 100X65 | 0 | 0 | 0 | USD |
| C000079 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | GRAVEL LAYDOWN AREA AT INCINERATOR 826S | 0 | 0 | 0 | USD |
| C000082 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | EARTHEN BARRICADE 1745.3CY | 0 | 0 | 0 | USD |
| C000083 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | EARTHEN BARRICADE 1745.3CY | 0 | 0 | 0 | USD |
| C000084 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | EARTHEN BARRICADE 1745.3CY | 0 | 0 | 0 | USD |
| C000085 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | EARTHEN BARRICADE 1745.3CY | 0 | 0 | 0 | USD |
| C000086 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | EARTHEN BARRICADE 1745.3CY | 0 | 0 | 0 | USD |
| C000087 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | EARTHEN BARRICADE 1745.3CY | 0 | 0 | 0 | USD |
| C000088 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | EARTHEN BARRICADE 2156CY | 0 | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 2000089 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | EARTHEN BARRICADE 2889.3CY | 0 | 0 | 0 | USD |
| 2000090 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | EARTHEN BARRICADE 946CY | 0 | 0 | 0 | USD |
| 2000091 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | EARTHEN BARRICADE 2192.7CY | 0 | 0 | 0 | USD |
| 2000092 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | EARTHEN BARRICADE 2610.7CY | 0 | 0 | 0 | USD |
| 2000093 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | EARTHEN BARRICADE 2016.7CY | 0 | 0 | 0 | USD |
| 2000094 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | EARTHEN BARRICADE 2016.7CY | 0 | 0 | 0 | USD |
| 2000095 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | EARTHEN BARRICADE 1472CY | 0 | 0 | 0 | USD |
| 2000096 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | EARTHEN BARRICADE 1472CY | 0 | 0 | 0 | USD |
| 2000097 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | EARTHEN BARRICADE 2618CY | 0 | 0 | 0 | USD |
| 2000098 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | EARTHEN BARRICADE 2618CY | 0 | 0 | 0 | USD |
| 2000100 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | CONCRETE SLAB 42 X 50 FT | 0 | 0 | 0 | USD |
| 2000101 | 2 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ROOF SS LEAD PAD 50'X60'X9' 120052 | 0 | 0 | 0 | USD |
| 2000101 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | RETAINING WALL - BITRATION BLD. | 0 | 0 | 0 | USD |
| 2000103 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | WALKWAY 222 S.Y. | 0 | 0 | 0 | USD |
| 2000105 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | SECURITY FENCE MAIN PARKING LOT | 0 | 0 | 0 | USD |
| 2000107 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | EARTHEN BARRICADE 230X40X10 TSITE | 0 | 0 | 0 | USD |
| 2000108 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | CATCH BASIN POWDER POUR BLDG 804 | 0 | 0 | 0 | USD |
| 2000109 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | TRUCK TRAILER PARKING LOT 400 SY. PWD P | 0 | 0 | 0 | USD |
| 2000110 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | OUTDOOR SAFETY SIGN | 0 | 0 | 0 | USD |
| 2000111 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | SIDEWALK-OFFICE TRAILER | 0 | 0 | 0 | USD |
| 2000112 | 0 | Ammo | 21 | Lonoke, AR | 9/15/1997 | ADDL - REBUILD SILO ROAD | 0 | 0 | 0 | USD |
| 2000113 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ROADWAY-CLEANING PAD | 0 | 0 | 0 | USD |
| 2000114 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | WALKWAY LIGHTING          U | 0 | 0 | 0 | USD |
| 2000115 | 1 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ADDL-MIX BLD PARK LOT 110076 | 0 | 0 | 0 | USD |
| 2000118 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | SIDEWALKS - WST TREATMENT 110572 | 0 | 0 | 0 | USD |
| 2000119 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ACCESS RD 100'X8' PM #737FT SOURCE WST TRT 110084 | 0 | 0 | 0 | USD |
| 2000120 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | LAB COMPLEX PARKING LOT 50'X30' | 0 | 0 | 0 | USD |
| 2000121 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | LAB COMPLEX SIDEWALKS 850' | 0 | 0 | 0 | USD |
| 2000123 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | LAB CHAIN LINK FENCE - 1045'X8' | 0 | 0 | 0 | USD |
| 2000124 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ASPHALT ROAD-SILO AREA 6000SF 120068 | 0 | 0 | 0 | USD |
| 2000124 | 1 | Ammo | 21 | Lonoke, AR | 9/15/1997 | ADDL - REBUILD SILO ROAD | 0 | 0 | 0 | USD |
| 2000125 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | LEAD PAD/ROOF CF 40'X60'X6' 120052 | 0 | 0 | 0 | USD |
| 2000126 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | STEAM CLEAN PAD 20'X20'/3-SIDE 2' 2100 | 0 | 0 | 0 | USD |
| 2000177 | 0 | Ammo | 21 | Lonoke, AR | 1/15/2010 | CONCRETE DRIVE BLDG 718 101570 | 0 | 0 | 0 | USD |
| 2000181 | 0 | Ammo | 21 | Lonoke, AR | 5/15/2010 | BLDG 607 GRAVEL ROAD 101580 | 0 | 0 | 0 | USD |
| 2000193 | 0 | Ammo | 21 | Lonoke, AR | 7/21/2014 | L2 Purchase 60Ft Of Culvert (Parking Lot) | 0 | 0 | 0 | USD |
| 2000194 | 0 | Ammo | 21 | Lonoke, AR | 7/21/2014 | L2 Provide Dozer & Operator For Sitework | 0 | 0 | 0 | USD |
| 2002537 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | LIFT EQUIPMENT-VACUUM HOIST | 0 | 0 | 0 | USD |
| 2002538 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | STRETCH WRAP "SIDEWINDER" | 0 | 0 | 0 | USD |
| 2002541 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | BARCODE LASER SCANNER-RMI 120520 | 0 | 0 | 0 | USD |
| 2002552 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | YALE WALKER STACKER 4000LB 120524 - #29 | 0 | 0 | 0 | USD |
| 2002557 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | Racks, Storage 1881ft finished mat-SS green racks | 0 | 0 | 0 | USD |
| 2002561 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ROTARY FUR BURNER & BLOWER ASSB | 0 | 0 | 0 | USD |
| 2002561 | 1 | Ammo | 21 | Lonoke, AR | 3/15/1995 | ADDL-MODIFY FOR RF SCRAP 2258 | 0 | 0 | 0 | USD |
| 2002561 | 4 | Ammo | 21 | Lonoke, AR | 9/15/1999 | REB ROTARY FURNACE  100669 | 0 | 0 | 0 | USD |
| 2002561 | 5 | Ammo | 21 | Lonoke, AR | 5/15/2000 | ADDL EMISSION CONTROLS | 0 | 0 | 0 | USD |
| 3002562 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | POT FURNACE SCRAP BURNING | 0 | 0 | 0 | USD |
| 3002562 | 1 | Ammo | 21 | Lonoke, AR | 3/15/2001 | BURNING POT FURNACE CONTROLS | 0 | 0 | 0 | USD |
| 3002563 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | POT FURNACE SCRAP BURNING | 0 | 0 | 0 | USD |
| 3002563 | 1 | Ammo | 21 | Lonoke, AR | 12/15/2001 | FURNACE CONTROLS | 0 | 0 | 0 | USD |
| 3002564 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | PAI FIRE HOSE & BOX | 0 | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3002566 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LOADING HOPPER | | 0 | 0 | USD |
| 3002576 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | TRANE HVAC UNIT | | 0 | 0 | USD |
| 3002576 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MODIFY HVAC & EXHAUST SYS 120526 | | 0 | 0 | USD |
| 3002590 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST EBT EQUIPMENT C.F. ITEMS | | 0 | 0 | USD |
| 3002590 | 2 | Ammo | | 21 Lonoke, AR | 12/15/2005 | ADD'L BALLISTICS CALIBRATION UNIT 101221 | | 0 | 0 | USD |
| 3002591 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DROP TEST MACHINE | | 0 | 0 | USD |
| 3002592 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | OEHLER 82 TEST SYST-ADDL COST (ILION | | 0 | 0 | USD |
| 3002593 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | OEHLER 82 TEST SYSTEM WITH PC      T | | 0 | 0 | USD |
| 3002597 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CENTER TABLE AND SERVICES | | 0 | 0 | USD |
| 3002598 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CENTER TABLE AND SERVICES | | 0 | 0 | USD |
| 3002608 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | Scale, Howe Outside truck 10 ton | | 0 | 0 | USD |
| 3002610 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | Air curtains for Warehouse-Miniveil | | 0 | 0 | USD |
| 3002611 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | Air curtains for Warehouse-Miniveil | | 0 | 0 | USD |
| 3002612 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | Elevator, SS Lead/Wad Elevator-Courion-#5 | | 0 | 0 | USD |
| 3002613 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SURFACE GRINDER | | 0 | 0 | USD |
| 3002614 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | WALKER STACKER - #24 | | 0 | 0 | USD |
| 3002618 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | Racks, 40 ft monorail w storage rack central store | | 0 | 0 | USD |
| 3002619 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | Racks, Raw material storage central stores | | 0 | 0 | USD |
| 3002624 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | RADIAL DRILL PRESS | | 0 | 0 | USD |
| 3002626 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SURFACE GRINDER BROWN & SHARP-#618 | | 0 | 0 | USD |
| 3002626 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST SURFACE GRINDER 52-12516 | | 0 | 0 | USD |
| 3002627 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SURFACE GINDER BROWN & SHARPE #612 | | 0 | 0 | USD |
| 3002628 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | TAFT PIERCE GRINDER SS CON | | 0 | 0 | USD |
| 3002629 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DO-ALL SAW | | 0 | 0 | USD |
| 3002631 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BRIDGEPORT MILLING MACHINE | | 0 | 0 | USD |
| 3002631 | 1 | Ammo | | 21 Lonoke, AR | 1/15/2006 | ADD'L MILLING MCH | | 0 | 0 | USD |
| 3002632 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BRIDGEPORT MILLING MACHINE | | 0 | 0 | USD |
| 3002632 | 1 | Ammo | | 21 Lonoke, AR | 11/15/2006 | ADD'L MILLING MCH | | 0 | 0 | USD |
| 3002633 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MILLING MACHINE | | 0 | 0 | USD |
| 3002633 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L REBUILD HEAD | | 0 | 0 | USD |
| 3002634 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BRIDGEPORT MILLING MACHINE S N 865202 | | 0 | 0 | USD |
| 3002634 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L REBUILD HEAD | | 0 | 0 | USD |
| 3002635 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BPT MILLING MACHINE | | 0 | 0 | USD |
| 3002635 | 1 | Ammo | | 21 Lonoke, AR | 12/15/1999 | ADD'L REB MILLING MACHINE | | 0 | 0 | USD |
| 3002636 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BPT MILLING MACHINE | | 0 | 0 | USD |
| 3002636 | 1 | Ammo | | 21 Lonoke, AR | 8/15/1997 | ADD'L-REBUILD HEAD | | 0 | 0 | USD |
| 3002641 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MILLING MACHINE W/DIGITAL READOUT | | 0 | 0 | USD |
| 3002644 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LEBLOND 14"OLATHE #1811       W | | 0 | 0 | USD |
| 3002644 | 1 | Ammo | | 21 Lonoke, AR | 10/15/2007 | ADD'L MAINTENANCE LATHE | | 0 | 0 | USD |
| 3002649 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | HARDINGE FLOOR LATHE | | 0 | 0 | USD |
| 3002650 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | HARDINGE LATHE | | 0 | 0 | USD |
| 3002652 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BROWN & SHARP SURFACE GRINDER | | 0 | 0 | USD |
| 3002654 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ELEC-DRAULIC PRESS 150 TON | | 0 | 0 | USD |
| 3002659 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BROWN & SHARP GRINDER | | 0 | 0 | USD |
| 3002661 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | INTERNAL GRINDER PARKER MAJESTIC #1 | | 0 | 0 | USD |
| 3002677 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SURFACE GRINDER B&S #618 | | 0 | 0 | USD |
| 3002679 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | HAMMOND WET CARBIDE TOOL GRINDER | | 0 | 0 | USD |
| 3002680 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 36 IN BAND SAW | | 0 | 0 | USD |
| 3002681 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 16 IN PULL SAW W TABLE | | 0 | 0 | USD |
| 3002682 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 16 IN TABLE SAW | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3002683 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CONTOUR BAND SAWING MACHINE | | 0 | 0 | 0 USD |
| 3002684 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | HAMMOND 6 IN ABRASIVE BELT GRINDER | | 0 | 0 | 0 USD |
| 3002685 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BRIDGEPORT MILLER & ACCESSORIES | | 0 | 0 | 0 USD |
| 3002687 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BRIDGEPORT MILLING MACHINE S N 86985 2 | | 0 | 0 | 0 USD |
| 3002693 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PRATT & WHITNEY STANDARD MEASURING MACH | | 0 | 0 | 0 USD |
| 3002695 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SUNNEN HONER | | 0 | 0 | 0 USD |
| 3002696 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | HIGH SPEED LATHE RIVETT MODEL 70 | | 0 | 0 | 0 USD |
| 3002697 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LATHE  COLCHESTER S#5-0014-08734 | | 0 | 0 | 0 USD |
| 3002699 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | IRONWORKER MODEL 55-24 MAINT       T | | 0 | 0 | 0 USD |
| 3002700 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | TOOLMAKERS MICROSCOPE  605-021385 | | 0 | 0 | 0 USD |
| 3002704 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BENDING BRAKE MOD BPO-612-6       T | | 0 | 0 | 0 USD |
| 3002707 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | HAND ROLL BENDER MODEL 4-48 | | 0 | 0 | 0 USD |
| 3002709 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PORTABLE PROPANE WELDER 120376 | | 0 | 0 | 0 USD |
| 3002712 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 500KW ELECT STANDBY GENERATING SYSTEM | | 0 | 0 | 0 USD |
| 3002713 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 2500 GPM FIRE PUMP - DIESEL | | 0 | 0 | 0 USD |
| 3002714 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 2500 GPM FIRE PUMP - ELECTRIC | | 0 | 0 | 0 USD |
| 3002715 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 2500 GPM FIRE PUMP - DIESEL | | 0 | 0 | 0 USD |
| 3002716 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DIESEL  ENGINE FIRE PUMP M#NT-380-I/F | | 0 | 0 | 0 USD |
| 3002717 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DIESEL  ENGINE FIRE PUMP M#NT-380-I/F | | 0 | 0 | 0 USD |
| 3002718 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MOTOR CONTROL PANEL  MODEL LX 1023 | | 0 | 0 | 0 USD |
| 3002719 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | WELL PUMPS-VAR. FRG. CONTROLS | | 0 | 0 | 0 USD |
| 3002720 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PACKAGE BOILER AND 20 HP MOTOR | | 0 | 0 | 0 USD |
| 3002720 | 1 | Ammo | | 21 Lonoke, AR | 8/15/2003 | CONVERSION UNIT FOR CLEAVER BROOK BOILE | | 0 | 0 | 0 USD |
| 3002720 | 2 | Ammo | | 21 Lonoke, AR | 8/15/2003 | ADD'L BOILER BLOWDOWN SYS | | 0 | 0 | 0 USD |
| 3002721 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PACKAGE BOILER AND 20 HP MOTOR | | 0 | 0 | 0 USD |
| 3002721 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CONVERSION UNIT FOR CLEAVER BROOKS BOIL | | 0 | 0 | 0 USD |
| 3002721 | 2 | Ammo | | 21 Lonoke, AR | 10/15/2004 | BOILER AUTO BLOWDOWN DEVICE | | 0 | 0 | 0 USD |
| 3002722 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AIR RECEIVER 48 INCH DIAMETER | | 0 | 0 | 0 USD |
| 3002723 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AIR RECEIVER MODEL 66 INCH DIAMETER | | 0 | 0 | 0 USD |
| 3002724 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AIR RECEIVER MODEL 66 INCH DIAMETER | | 0 | 0 | 0 USD |
| 3002724 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MOD AIR TANK                     U | | 0 | 0 | 0 USD |
| 3002725 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 750000 GAL WATER STORAGE TANK W PAD | | 0 | 0 | 0 USD |
| 3002725 | 2 | Ammo | | 21 Lonoke, AR | 9/15/1998 | ADD'L ROOF INT COATING | | 0 | 0 | 0 USD |
| 3002726 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 750000 GAL WATER STORAGE TANK W PAD | | 0 | 0 | 0 USD |
| 3002727 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLOWDOWN TANK | | 0 | 0 | 0 USD |
| 3002728 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | FUEL OIL STORAGE TANK | | 0 | 0 | 0 USD |
| 3002728 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD-FUEL OIL TANK CONTAINMENT | | 0 | 0 | 0 USD |
| 3002729 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | FUEL OIL STORAGE TANK | | 0 | 0 | 0 USD |
| 3002729 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD-FUEL OIL TANK CONTAINMENT | | 0 | 0 | 0 USD |
| 3002730 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | WELL PUMP AND 60 HP MOTOR | | 0 | 0 | 0 USD |
| 3002730 | 1 | Ammo | | 21 Lonoke, AR | 2/15/2005 | ADD'L REBUILD PUMP/MOTOR | | 0 | 0 | 0 USD |
| 3002731 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | WELL PUMP AND 60 HP MOTOR | | 0 | 0 | 0 USD |
| 3002732 | 0 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADD'L WELL PUMP SHAFT | | 0 | 0 | 0 USD |
| 3002732 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BOILER FEED PUMP | | 0 | 0 | 0 USD |
| 3002733 | 0 | Ammo | | 21 Lonoke, AR | 1/15/1997 | ADD'L-CONVERT BOILER WATER PUMP | | 0 | 0 | 0 USD |
| 3002734 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BOILER FEED PUMP AND 50 HP MOTOR | | 0 | 0 | 0 USD |
| 3002734 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DOMESTIC WATER PUMP AND 60 HP MOTOR | | 0 | 0 | 0 USD |
| 3002735 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DOMESTIC WATER PUMP AND 60 HP MOTOR | | 0 | 0 | 0 USD |
| 3002736 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AIR COMPRESSOR MODEL 1021M4 | | 0 | 0 | 0 USD |
| 3002736 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | VIBRATORY MONITORING SYS 120348 | | 0 | 0 | 0 USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C02736 | 2 | Ammo | | 21 Lonoke, AR | 8/15/1997 | ADDL-COOLER REPLACEMENT | | 0 | 0 | USD |
| C02736 | 3 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADDL AIR COMPRESSOR | | 0 | 0 | USD |
| C02737 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AIR COMPRESSOR MODEL 1201MH | | 0 | 0 | USD |
| C02737 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | VIBRATORY MONITORING SYS 120348 | | 0 | 0 | USD |
| C02737 | 2 | Ammo | | 21 Lonoke, AR | 10/12/1995 | ADDL - REBUILD AIR COMPRESSOR | | 0 | 0 | USD |
| C02737 | 3 | Ammo | | 21 Lonoke, AR | 11/15/1997 | ADDL - REBUILD AIR COMPRESSOR | | 0 | 0 | USD |
| C02739 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AIR COMPRESSOR 110076 | | 0 | 0 | USD |
| C02739 | 1 | Ammo | | 21 Lonoke, AR | 12/15/2000 | AIR COMPRESSOR MONITOR | | 0 | 0 | USD |
| C02741 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | WELL NUMBER 1 | | 0 | 0 | USD |
| C02741 | 1 | Ammo | | 21 Lonoke, AR | 2/15/2005 | EXTEND WELL #1 INTAKE | | 0 | 0 | USD |
| C02742 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | WELL NUMBER 2 | | 0 | 0 | USD |
| C02745 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AIR DRYER HANKISON H-45 38-4F    T | | 0 | 0 | USD |
| C02746 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PNEUMATIC AIR DRYER MOD TT50DHA4 | | 0 | 0 | USD |
| C02747 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | REFRIGERATED AIR DRYER 110076 | | 0 | 0 | USD |
| C02748 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 250 HP 2300 Y MOTOR | | 0 | 0 | USD |
| C02749 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 450 HP 3600 RPM 4160 Y MOTOR | | 0 | 0 | USD |
| C02750 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 450 HP 3600 RPM 4160 V MOTOR | | 0 | 0 | USD |
| C02755 | 0 | Ammo | | 21 Lonoke, AR | 12/15/1993 | TIRE CHANGER HOFFMAN MOD F410 120070 | | 0 | 0 | USD |
| C02758 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MOD ALARM SYSTEM | | 0 | 0 | USD |
| C02759 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ISCO FLOWMETER W/PLOTTER MODEL 3210 OUTFALL 004 | | 0 | 0 | USD |
| C02760 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ISCO SAMPLER MODEL 3710R AT OUTFALL 004 | | 0 | 0 | USD |
| C02761 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AERATION LAG VALVE STA (FBV2971) | | 0 | 0 | USD |
| C02762 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PLATING GATE BOX (FBV2157) | | 0 | 0 | USD |
| C02763 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PLAE WST LIFT STA (FBV14309) | | 0 | 0 | USD |
| C02764 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MAIN PROCESS LIFT STA (FBV10788) | | 0 | 0 | USD |
| C02765 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SLUDGE PUMP PIT | | 0 | 0 | USD |
| C02766 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SANITARY WASTE LIFT STATION | | 0 | 0 | USD |
| C02766 | 1 | Ammo | | 21 Lonoke, AR | 5/15/1999 | ENCLOSURE SANITARY LIFT STATION | | 0 | 0 | USD |
| C02767 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PARK AREA LIFT STATION | | 0 | 0 | USD |
| C02768 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SLUDGE LEVEL CONTROL SYSTEM | | 0 | 0 | USD |
| C02768 | 1 | Ammo | | 21 Lonoke, AR | 9/15/2004 | SLUDGE LEVEL MONITOR | | 0 | 0 | USD |
| C02769 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SLUDGE CONTAINMENT FACILITY | | 0 | 0 | USD |
| C02774 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 50 FT DIA CLARIFIER | | 0 | 0 | USD |
| C02774 | 4 | Ammo | | 21 Lonoke, AR | 6/15/1999 | ADDL REB CLARIFER STRUCTURE | | 0 | 0 | USD |
| C02775 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PURESTREAM SEWAGE UNIT | | 0 | 0 | USD |
| C02776 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | OUTFALL PARSHALL FLUME 120267 | | 0 | 0 | USD |
| C02780 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL-DIVERSION TANK | | 0 | 0 | USD |
| C02780 | 3 | Ammo | | 21 Lonoke, AR | 3/15/1999 | ADDL CVT TO EQUALIZATION TANK | | 0 | 0 | USD |
| C02781 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POTABLE WATER FILTER WST TRT 120479 | | 0 | 0 | USD |
| C02786 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLENDING TANK MIXER AND 2 HP MOTOR | | 0 | 0 | USD |
| C02792 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CLARIFIER PUMP & COVER 15 HP | | 0 | 0 | USD |
| C02793 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | EQUALIZATION PUMP & COVER 10 HP | | 0 | 0 | USD |
| C02794 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | EQUALIZATION PUMP & COVER 10 HP | | 0 | 0 | USD |
| C02795 | 1 | Ammo | | 21 Lonoke, AR | 11/14/1995 | ADDL - COVERED TRENCH 2322/100069 | | 0 | 0 | USD |
| C02798 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SANITARY TREATMENT PLANT | | 0 | 0 | USD |
| C02800 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MONITORING WELL | | 0 | 0 | USD |
| C02801 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MONITORING WELL | | 0 | 0 | USD |
| C02802 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MONITORING WELL | | 0 | 0 | USD |
| C02803 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | COMMINUTOR | | 0 | 0 | USD |
| C02805 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MONITORING WELL 120647 | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3002808 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | FILTER PR SCREW CONVYR SYS/SLUR TANK | | 0 | 0 | USD |
| 3002810 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LISTER GR PUMP ON WHEELS          T | | 0 | 0 | USD |
| 3002811 | 0 | Ammo | | 21 Lonoke, AR | 12/15/1993 | WASTEWATER SAMPLER- OUTFALL 002 | | 0 | 0 | USD |
| 3002811 | 1 | Ammo | | 21 Lonoke, AR | 12/15/2001 | REFRIGERATION UNIT | | 0 | 0 | USD |
| 3002812 | 0 | Ammo | | 21 Lonoke, AR | 12/15/1993 | HOIST YALE 2T FK TR RPR 120096 | | 0 | 0 | USD |
| 3002816 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL-SCRAP PAPER DOCK 120548 | | 0 | 0 | USD |
| 3002817 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AERIAL TELEPHONE CABLE 120371 | | 0 | 0 | USD |
| 3002817 | 1 | Ammo | | 21 Lonoke, AR | 7/15/1997 | ADDL-TELEPHONE CABLE - HAMMERMILL | | 0 | 0 | USD |
| 3002817 | 2 | Ammo | | 21 Lonoke, AR | 4/15/1999 | ADDL MIX HOUSE PHONE CABLE | | 0 | 0 | USD |
| 3002818 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AIR CONDITIONING DUCT - GATE HOUSE | | 0 | 0 | USD |
| 3002819 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUCTWORK - AIR CONDITIONING - BALLISTIC | | 0 | 0 | USD |
| 3002823 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ROADWAY AND PARKING LOT LIGHTING | | 0 | 0 | USD |
| 3002824 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | WALKWAY LIGHTING | | 0 | 0 | USD |
| 3002825 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | OUTSIDE LIGHTING-POWDER POUR | | 0 | 0 | USD |
| 3002826 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ROOF COVERING FOR OIL STORAGE PAD    U | | 0 | 0 | USD |
| 3002827 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ROOF COVERING FOR OIL STORAGE PAD    U | | 0 | 0 | USD |
| 3002828 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | OUTSIDE BURIED TELEPHONE CABLE 120371 | | 0 | 0 | USD |
| 3002829 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | HEATING & VENTILATION PIPING FOR WAREHO | | 0 | 0 | USD |
| 3002830 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SERVICE PIPING TO UNIT HEATERS - YARD S | | 0 | 0 | USD |
| 3002831 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SERVICE PIPING TO UNIT HEATERS - OIL & | | 0 | 0 | USD |
| 3002832 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PROCESS PIPING - SCRAP BURNING & STORAG | | 0 | 0 | USD |
| 3002834 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PIPING - WATER STORAGE TANK | | 0 | 0 | USD |
| 3002836 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PROCESS PIPING WST. TRT. | | 0 | 0 | USD |
| 3002837 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PROCESS WASTE EFFLUENT LINE | | 0 | 0 | USD |
| 3002838 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PROCESS SEWER LINE | | 0 | 0 | USD |
| 3002839 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SUPERNATANT PIPING (FBV2508) | | 0 | 0 | USD |
| 3002842 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | WASTE TREATMENT PIPING & SUPPORTS | | 0 | 0 | USD |
| 3002842 | 1 | Ammo | | 21 Lonoke, AR | 7/15/1996 | ADDL DIVERSION TANK PIPING | | 0 | 0 | USD |
| 3002843 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | STORM WTR DRAIN FACILITIES | | 0 | 0 | USD |
| 3002844 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING - UTILITY SERVICE | | 0 | 0 | USD |
| 3002844 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDTL POWER WIRING-UTILITY SERVICE    U | | 0 | 0 | USD |
| 3002845 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING - GATE HOUSE | | 0 | 0 | USD |
| 3002846 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING - YARD SERVICE | | 0 | 0 | USD |
| 3002847 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING-SCRAP BURNING & STORAGE | | 0 | 0 | USD |
| 3002848 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING - OIL & SOLVENT STORAGE | | 0 | 0 | USD |
| 3002849 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING-WASTE INCINERATOR | | 0 | 0 | USD |
| 3002850 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING - WAREHOUSE | | 0 | 0 | USD |
| 3002851 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING - BALLISTICS | | 0 | 0 | USD |
| 3002851 | 1 | Ammo | | 21 Lonoke, AR | 10/15/1999 | ADD'L BALLISTICS ELECTRIC SERVICE | | 0 | 0 | USD |
| 3002852 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | RAILROD TRUCK SCALE POWER WIRING | | 0 | 0 | USD |
| 3002853 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL ELECTRIC | | 0 | 0 | USD |
| 3002854 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | STDBY GENERATOR KOHLER 100KW W.T.120488 | | 0 | 0 | USD |
| 3002855 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | STEAM INSTRUMENTATION - UTILITY SERVICE | | 0 | 0 | USD |
| 3002855 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST-STEAM INSTRUMENTS | | 0 | 0 | USD |
| 3002856 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | FIRE PUMP INSTRUMENTATION - UTILITY SER | | 0 | 0 | USD |
| 3002857 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | INSTRUMENTATION - GROUND WATER TANKS | | 0 | 0 | USD |
| 3002858 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | INSTRUMENTATION - STEAM LINES   OS | | 0 | 0 | USD |
| 3002859 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | GAS INSTRUMENTATION | | 0 | 0 | USD |
| 3002860 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DOMESTIC WATER INSTRUMENTATION | | 0 | 0 | USD |
| 3002861 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AIR COMPRESSION INSTRUMENTATION | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 302862 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | WATER TREATMENT INSTRUMENTATION   U | 0 | 0 | 0 | USD |
| 302863 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | INSTRUMENTATION - WASTE TREATMENT | 0 | 0 | 0 | USD |
| 302864 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | INSTRUMENTATION W.T #600 120479 | 0 | 0 | 0 | USD |
| 302865 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 912 FT - 48 IN REINFORCED CONCRETE PIPE | 0 | 0 | 0 | USD |
| 302866 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 2430 FT - 36 IN REINFORCED CONCRETE PIP | 0 | 0 | 0 | USD |
| 302867 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 1713 FT - 30 IN REINFORCED CONCRETE PIP | 0 | 0 | 0 | USD |
| 302868 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 1958 FT - 24 IN C-14 CONCRETE PIPE | 0 | 0 | 0 | USD |
| 302869 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 1915 FT - 18 IN C-14 CONCRETE PIPE | 0 | 0 | 0 | USD |
| 302870 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 375 FT - 18 IN CAST IRON PIPE | 0 | 0 | 0 | USD |
| 302871 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 245 FT - 15 IN CAST IRON PIPE | 0 | 0 | 0 | USD |
| 302872 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 1714 FT - 12 IN C-14 CONCRETE PIPE | 0 | 0 | 0 | USD |
| 302873 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 445 FT - 12 IN CAST IRON PIPE | 0 | 0 | 0 | USD |
| 302874 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 1065 FT - 10 IN CAST IRON PIPE | 0 | 0 | 0 | USD |
| 302875 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 635 FT - 8 IN C-14 CONCRETE PIPE | 0 | 0 | 0 | USD |
| 302876 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 82 FT - 79 IN X 49 IN BCCMP ARCH PIPE | 0 | 0 | 0 | USD |
| 302877 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 60 FT - 58 IN X 36 IN BCCMP ARCH PIPE N | 0 | 0 | 0 | USD |
| 302878 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | MANHOLES - STORM SEWER | 0 | 0 | 0 | USD |
| 302879 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 4000 FT-12" REINF CONC EFFLUENT PIPE | 0 | 0 | 0 | USD |
| 302880 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 11 MANHOLES- EFFLUENT LINE     OS | 0 | 0 | 0 | USD |
| 302881 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 2125 FT - 10 IN VITRIFIED CLAY PIPE OS | 0 | 0 | 0 | USD |
| 302882 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 750 FT - 8 IN VITRIFIED CLAY PIPE  OS | 0 | 0 | 0 | USD |
| 302883 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 605 FT - 6 IN VITRIFIED CLAY PIPE  OS | 0 | 0 | 0 | USD |
| 302884 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 6 MANHOLES-SANITARY SEWER SYSTEM | 0 | 0 | 0 | USD |
| 302885 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 794FT-SST LINED CONC TRENCH-ACID SEWER | 0 | 0 | 0 | USD |
| 302886 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 1521 FT - 10 IN VITRIFIED CLAY PIPE | 0 | 0 | 0 | USD |
| 302887 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 108 FT - 8 IN GALVANIZE EFFLUENT LINE | 0 | 0 | 0 | USD |
| 302889 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 2055 FT - 8 IN VITRIFIED CLAY PIPE | 0 | 0 | 0 | USD |
| 302890 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 3760 FT - 6 IN VITRIFIED CLAY PIPE | 0 | 0 | 0 | USD |
| 302891 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | STAINLESS STL PIPE (FBV6643) | 0 | 0 | 0 | USD |
| 302892 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | STAINLESS STL PIPE (FBV5647) | 0 | 0 | 0 | USD |
| 302893 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 567 FT - 4 IN STEEL PIPE | 0 | 0 | 0 | USD |
| 302894 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 1695 FT - 4 IN CAST IRON FORCE MAIN | 0 | 0 | 0 | USD |
| 302895 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 1765 FT - 4 IN CAST IRON FORCE MAIN | 0 | 0 | 0 | USD |
| 302897 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 2320 FT - 4 IN VITRIFIED CLAY PIPE | 0 | 0 | 0 | USD |
| 302898 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | MANHOLES - PROCESS SEWER  OUTSIDE LINE | 0 | 0 | 0 | USD |
| 302899 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 1500 FT-2IN DUCTILE IRON PIPE CONDEN SE | 0 | 0 | 0 | USD |
| 302900 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 3900 FT - 3IN STEEL PIPE - OS PROC SEW | 0 | 0 | 0 | USD |
| 302901 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 325-'-10' CAST IRON FORCEDMAIN-OS PROC. | 0 | 0 | 0 | USD |
| 302902 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | OS SEWER LINE FROM BLDG 736 120267 | 0 | 0 | 0 | USD |
| 302903 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | OS 12 IN. OUTFALL SEWER LINE 120287 | 0 | 0 | 0 | USD |
| 302904 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | WST TRT 6" GAL STEEL PIPING 120479 | 0 | 0 | 0 | USD |
| 302905 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 4200 FT - 6 IN STEAM LINES OSON | 0 | 0 | 0 | USD |
| 302906 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 2650 FT - 4 IN STEAM LINES OSON | 0 | 0 | 0 | USD |
| 302907 | 1 | Ammo | 21 | Lonoke, AR | 12/15/2008 | ADD'L 4" STEAM REGULATOR | 0 | 0 | 0 | USD |
| 302908 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 660 FT - 4 IN CONDENSATE LINES OSON | 0 | 0 | 0 | USD |
| 302909 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 5328 FT - 3 IN STEAM LINES OSON | 0 | 0 | 0 | USD |
| 302910 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 3408 FT - 2 IN STEAM LINES OSON | 0 | 0 | 0 | USD |
| 302911 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 250FT-12IN CAST IRON PIPE OS WATER | 0 | 0 | 0 | USD |
| 302912 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 1000FT-8IN CAST IRON PIPE OS WATER | 0 | 0 | 0 | USD |
| 302913 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 800 FT - 310 CAST IRON PIPE OS WATER | 0 | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3002914 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 2827FT-2IN CAST IRON PIPE OS WATER | | 0 | 0 | 0 USD |
| 3002914 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | OUTSIDE WATER LINES  SAFETY SHOWERS | | 0 | 0 | 0 USD |
| 3002915 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 1415 FT-6IN NATURAL GAS LINE U'GD OS | | 0 | 0 | 0 USD |
| 3002916 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 780FT-4IN NATURAL GAS LINEU'GD OS | | 0 | 0 | 0 USD |
| 3002917 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 198FT-20IN CAST IRON PIPE OS FIRE LINES | | 0 | 0 | 0 USD |
| 3002918 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 5544FT-18 IN CAST IRON PIPE OS FIRE LIN | | 0 | 0 | 0 USD |
| 3002918 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST-INSTALL POST INDICATOR VALVE | | 0 | 0 | 0 USD |
| 3002919 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 2718FT-10IN CAST IRON PIPE OS FIRE LINE | | 0 | 0 | 0 USD |
| 3002920 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 5174FT-8IN CAST IRON PIPE OS FIRE LINE | | 0 | 0 | 0 USD |
| 3002921 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 3096FT-6IN CAST IRON PIPE OS FIRE LINE | | 0 | 0 | 0 USD |
| 3002922 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 684FT-4IN CAST IRON PIPE OS FIRE LINE | | 0 | 0 | 0 USD |
| 3002923 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 540 FT - 6 IN AIR LINE  GALVANIZED  OSO | | 0 | 0 | 0 USD |
| 3002924 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 5565 FT - 3 IN AIR LINE GALVANIZED  OSO | | 0 | 0 | 0 USD |
| 3002925 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 1732 FT - 2 IN AIR LINE GALVANIZED OSO | | 0 | 0 | 0 USD |
| 3002826 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 462FT-1.5IN SCH 40 GALV PIPE OS AIR LIN | | 0 | 0 | 0 USD |
| 3002927 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 651FT-1INSCH 40 GALV PIPE OS LINE | | 0 | 0 | 0 USD |
| 3002928 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | STEEL PIPE SUPPORTS OSON LINE SUPPORT | | 0 | 0 | 0 USD |
| 3002929 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | OSIDE ELEC LINES MAIN 13.8 KV & SEC 48 | | 0 | 0 | 0 USD |
| 3002929 | 1 | Ammo | | 21 Lonoke, AR | 2/15/1994 | ADDL-FEED LINE MAIN SUB 12/0093 | | 0 | 0 | 0 USD |
| 3002929 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PRIMARY FD LINES BLDG 709/804 | | 0 | 0 | 0 USD |
| 3002929 | 3 | Ammo | | 21 Lonoke, AR | 4/15/2004 | ADD'L PRIMARY ELECT FEED LINE | | 0 | 0 | 0 USD |
| 3002929 | 4 | Ammo | | 21 Lonoke, AR | 12/15/2005 | WOODEN UTILITY POLES | | 0 | 0 | 0 USD |
| 3002929 | 5 | Ammo | | 21 Lonoke, AR | 7/15/2006 | OUTSIDE UTILITY POLES | | 0 | 0 | 0 USD |
| 3002929 | 6 | Ammo | | 21 Lonoke, AR | 10/15/2006 | ADDL 8 UTILITY POLES | | 0 | 0 | 0 USD |
| 3002929 | 7 | Ammo | | 21 Lonoke, AR | 12/15/2006 | UTILITY POLE B-16 | | 0 | 0 | 0 USD |
| 3002930 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PURCHASED POWER SUBSTATION GRADING | | 0 | 0 | 0 USD |
| 3002930 | 1 | Ammo | | 21 Lonoke, AR | 8/15/1996 | ADDL - POWER FACTOR CORRECTION | | 0 | 0 | 0 USD |
| 3002930 | 2 | Ammo | | 21 Lonoke, AR | 1/15/2006 | POWER FACTOR CORRECTION EQUIPMENT | | 0 | 0 | 0 USD |
| 3002930 | 3 | Ammo | | 21 Lonoke, AR | 11/15/2007 | ADDL PF CONNECTION - SUB 3 | | 0 | 0 | 0 USD |
| 3002931 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ELECTRIC SUB STATION #9       6 | | 0 | 0 | 0 USD |
| 3002932 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER DISTRIBUTION PANEL #3-5 | | 0 | 0 | 0 USD |
| 3002933 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER DISTRIBUTION PANEL #3-5-2 | | 0 | 0 | 0 USD |
| 3002934 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER DISTRIBUTION PANEL #5-3-1 | | 0 | 0 | 0 USD |
| 3002935 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SUBSTATION #1   SHOT SHELL NORTH | | 0 | 0 | 0 USD |
| 3002935 | 2 | Ammo | | 21 Lonoke, AR | 2/15/2011 | ADD'L RETROFIT CIRCUIT BREAKER #1 101680 | | 0 | 0 | 0 USD |
| 3002936 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SUBSTATION #2   SHOT SHELL SOUTH | | 0 | 0 | 0 USD |
| 3002936 | 4 | Ammo | | 21 Lonoke, AR | 2/15/2011 | ADD'L RETROFIT CIRCUIT BREAKER #2 101680 | | 0 | 0 | 0 USD |
| 3002937 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SUBSTATION #3   CENTER FIRE COMMON | | 0 | 0 | 0 USD |
| 3002937 | 1 | Ammo | | 21 Lonoke, AR | 9/15/2004 | RETROFIT CIRCUIT BREAKER | | 0 | 0 | 0 USD |
| 3002938 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SUBSTATION #4   CENTER FIRE WEST | | 0 | 0 | 0 USD |
| 3002938 | 3 | Ammo | | 21 Lonoke, AR | 2/15/2011 | ADD'L RETROFIT CIRCUIT BREAKER #4 101680 | | 0 | 0 | 0 USD |
| 3002939 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SUBSTATION #5 C.F. EAST | | 0 | 0 | 0 USD |
| 3002939 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 2500 KVA SUBSTATION TRANSFORMER | | 0 | 0 | 0 USD |
| 3002939 | 3 | Ammo | | 21 Lonoke, AR | 2/15/2011 | ADD'L RETROFIT CIRCUIT BREAKER #5 101680 | | 0 | 0 | 0 USD |
| 3002940 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SUBSTATION #6   POWDER AREA | | 0 | 0 | 0 USD |
| 3002941 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SUBSTATION #7   POWER HOUSE | | 0 | 0 | 0 USD |
| 3002942 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SUBSTATION #8   POWER HOUSE | | 0 | 0 | 0 USD |
| 3002942 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | TRANSFMR COOLING FAN- CIRCUIT BRKR    U | | 0 | 0 | 0 USD |
| 3002942 | 3 | Ammo | | 21 Lonoke, AR | 2/15/2011 | ADD'L RETROFIT CIRCUIT BREAKER #8 101680 | | 0 | 0 | 0 USD |
| 3002943 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL-TRANSFORMER 110076 | | 0 | 0 | 0 USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3002944 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | MOTOR CONTROL CENTER #3-5            AL | 0 | 0 | 0 | USD |
| 3002945 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | MOTOR CONTROL CENTER #8-1 UTILITY SERVI | 0 | 0 | 0 | USD |
| 3002946 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | MOTOR CONTROL CENTER | 0 | 0 | 0 | USD |
| 3002947 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | MOTOR CONTROL CENTER #3-5-1          AL | 0 | 0 | 0 | USD |
| 3002948 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | 300T RAILROAD MOTOR TRUCK SCALE AND PIT | 0 | 0 | 0 | USD |
| 3002948 | | 1 Ammo | | 21 Lonoke, AR | 10/15/1999 | ADDL REBUILD TRUCK SCALE 100563 | 0 | 0 | 0 | USD |
| 3002949 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | PARK AREA LIFT PUMP AND 5 HP MOTOR MODE | 0 | 0 | 0 | USD |
| 3002950 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | PARK AREA LIFT PUMP AND 5 HP MOTOR MODE | 0 | 0 | 0 | USD |
| 3002952 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | EXHAUST SYSTEM W FAN BLDG 601 | 0 | 0 | 0 | USD |
| 3002952 | | 1 Ammo | | 21 Lonoke, AR | 3/15/1995 | ADDL-RELOCATE EXHAUST FAN #601 2230 | 0 | 0 | 0 | USD |
| 3002953 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | EXHAUST SYST-BALLISTICS SS CON | 0 | 0 | 0 | USD |
| 3002954 | | 1 Ammo | | 21 Lonoke, AR | 12/1/1993 | BALLISTICS AREA AIR CONDITIONER | 0 | 0 | 0 | USD |
| 3002955 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | SS LOAD, PACK AND CASE MAKE-UP AIR COND | 0 | 0 | 0 | USD |
| 3002956 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | AIR CONDITIONER MAMMOTH GATE HSE | 0 | 0 | 0 | USD |
| 3002957 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | POWERED HEATING & AIR COND - OFC TRAILE | 0 | 0 | 0 | USD |
| 3002958 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | HEAT-AIR CONDITIONING UNIT BLDG 101 | 0 | 0 | 0 | USD |
| 3002959 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | HEAT & VENT SYSTEM BLDG 736 | 0 | 0 | 0 | USD |
| 3002960 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | DUST COLLECTOR AND 7 1 2 HP MOTOR   SIZ | 0 | 0 | 0 | USD |
| 3002961 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | EXPLOSIVES SLUDGE TRTMNT INSTRUMENTN | 0 | 0 | 0 | USD |
| 3002961 | | 1 Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL-MISC PARTS #736 110076 | 0 | 0 | 0 | USD |
| 3002962 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | SUMP SYSTEM PUMP & SUMP Bldg 709 | 0 | 0 | 0 | USD |
| 3002963 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | SUMP SYSTEM, PUMP & SUMP Bldg 711 | 0 | 0 | 0 | USD |
| 3002964 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | SUMP SYSTEM, PUMP & SUMP (5) Bldg 712 | 0 | 0 | 0 | USD |
| 3002965 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | SUMP SYSTEM, PUMP & SUMP Bldg 719 | 0 | 0 | 0 | USD |
| 3002966 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | SUMP SYSTEM, PUMP & SUMP Bldg 721 | 0 | 0 | 0 | USD |
| 3002967 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | SUMP SYSTEM PUMP & SUMP Bldg 723 | 0 | 0 | 0 | USD |
| 3002968 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | SUMP SYSTEM, PUMP & SUMP Bldg 724 | 0 | 0 | 0 | USD |
| 3002970 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | MIX TANK SYSTEM W/EXHAUST | 0 | 0 | 0 | USD |
| 3002971 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | DUMP STATION W/FLEXIBLE CONVEYOR | 0 | 0 | 0 | USD |
| 3002973 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | PRETREAT HOLD TANK #736 110076 | 0 | 0 | 0 | USD |
| 3002974 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | PREFILTER HOLD TANK #736 110076 | 0 | 0 | 0 | USD |
| 3002975 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | PORTABLE ACID TANK #736 110076 | 0 | 0 | 0 | USD |
| 3002976 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | PORTABLE ACID TANK #736 110076 | 0 | 0 | 0 | USD |
| 3002986 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | E623-66 CLOSED HEX RECEIVING | 0 | 0 | 0 | USD |
| 3002987 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | E623-66 CLOSED HEX RECEIVING | 0 | 0 | 0 | USD |
| 3002988 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | E627-66 OPEN HEX RECEIVING | 0 | 0 | 0 | USD |
| 3002989 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | E627-66 OPEN HEX RECEIVING | 0 | 0 | 0 | USD |
| 3002990 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | E733-66 CLOSED HEX RECEIVING | 0 | 0 | 0 | USD |
| 3002991 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | E733-66 CLOSED HEX RECEIVING | 0 | 0 | 0 | USD |
| 3002992 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | E733-66 CLOSED HEX RECEIVING | 0 | 0 | 0 | USD |
| 3002993 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | E733-66 CLOSED HEX RECEIVING | 0 | 0 | 0 | USD |
| 3002994 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | E742-66 CLOSED HEX RECEIVING | 0 | 0 | 0 | USD |
| 3002997 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | E768-66 CLOSED HEX RECEIVING | 0 | 0 | 0 | USD |
| 3003044 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | E821-66 OPEN HEX RECEIVING | 0 | 0 | 0 | USD |
| 3003044 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | D407-67 PROFILE SECT-2 P&R LAW ENFOR | 0 | 0 | 0 | USD |
| 3003045 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | D406-67 PROFILE SECT-2 P&R LAW ENFOR | 0 | 0 | 0 | USD |
| 3003046 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | D408-67 PROFILE SECT-2 P&R LAW ENFOR | 0 | 0 | 0 | USD |
| 3003048 | | 2 Ammo | | 21 Lonoke, AR | 12/1/1993 | C27-67 PROFILE SECT-2 P&R LAW ENFOR | 0 | 0 | 0 | USD |
| 3003049 | | 0 Ammo | | 21 Lonoke, AR | 5/15/1997 | ADDL-SCALE CONVERSION 2ND FLR FURNACE | 0 | 0 | 0 | USD |
| 3003052 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | LUBE FILTER SYSTEM-CF DRAW S N 9419 | 0 | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3003054 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DISPATCH OVEN #726 | | 0 | 0 | USD |
| 3003054 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER PACKAGES & CONTROLLER FOR SMALL D #726 | | 0 | 0 | USD |
| 3003054 | 4 | Ammo | | 21 Lonoke, AR | 12/15/2001 | ADDL #726 ANNEAL FURNACE | | 0 | 0 | USD |
| 3003054 | 5 | Ammo | | 21 Lonoke, AR | 8/15/2004 | ADDL CF #726 ANNEAL EXIT CONVEYOR | | 0 | 0 | USD |
| 3003055 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ANNEALING FURNACE #725 | | 0 | 0 | USD |
| 3003055 | 3 | Ammo | | 21 Lonoke, AR | 3/15/2002 | ADDL #725 ANNEAL FURNACE | | 0 | 0 | USD |
| 3003055 | 4 | Ammo | | 21 Lonoke, AR | 12/15/2002 | ADDL BELT #725 | | 0 | 0 | USD |
| 3003055 | 7 | Ammo | | 21 Lonoke, AR | 3/15/2003 | ADDL #725 FURNACE | | 0 | 0 | USD |
| 3003056 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DESPATCH ANNEALING FURNACE #727 | | 0 | 0 | USD |
| 3003056 | 3 | Ammo | | 21 Lonoke, AR | 12/1/1993 | RPL/REP CERAMIC BLKS/WALLS #727 120593 | | 0 | 0 | USD |
| 3003056 | 4 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL REPLACE DISCHARGE CHUTE #727 | | 0 | 0 | USD |
| 3003056 | 5 | Ammo | | 21 Lonoke, AR | 2/15/1997 | ADDL-REBUILD #727 ANNEAL FURNACE | | 0 | 0 | USD |
| 3003056 | 6 | Ammo | | 21 Lonoke, AR | 3/15/2001 | ANNEAL FURNACE CONVEYOR #727 | | 0 | 0 | USD |
| 3003057 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CUP CONTAINER ELEVATOR & HOPPER #799 | | 0 | 0 | USD |
| 3003057 | 1 | Ammo | | 21 Lonoke, AR | 1/15/1997 | ADDL-REBUILD BUGGY LIFT #799 | | 0 | 0 | USD |
| 3003060 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CASE AREA BUGGY LIFT #10 | | 0 | 0 | USD |
| 3003061 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | USAR-LONEA BUGGY LIFT #11 | | 0 | 0 | USD |
| 3003062 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ELEVATOR VERTICAL LIFT MODEL VL-11-4 #727 | | 0 | 0 | USD |
| 3003062 | 1 | Ammo | | 21 Lonoke, AR | 1/15/1997 | ADDL-REBUILD BUGGY LIFT #727 | | 0 | 0 | USD |
| 3003069 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | COMPONENT DRYER FOR #725 FURNACE | | 0 | 0 | USD |
| 3003071 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 4 CONE WASH UNIT FOR #726 OVEN | | 0 | 0 | USD |
| 3003071 | 1 | Ammo | | 21 Lonoke, AR | 3/15/1994 | ADDL-VENT HOOD #726 120082 | | 0 | 0 | USD |
| 3003071 | 3 | Ammo | | 21 Lonoke, AR | 3/15/1996 | ADDL-FRAME,TANK-FLOOR #726 | | 0 | 0 | USD |
| 3003072 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 4 CONE PICKLE & WASH UNIT FOR #725 BURN | | 0 | 0 | USD |
| 3003072 | 1 | Ammo | | 21 Lonoke, AR | 3/15/1994 | ADDL-VENT HOOD #725 120082 | | 0 | 0 | USD |
| 3003072 | 4 | Ammo | | 21 Lonoke, AR | 3/15/1996 | ADDL-FRAME,TANK,FLOOR #725 | | 0 | 0 | USD |
| 3003073 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 4 CONE PICKLE & RINSE W MTR. #727 | | 0 | 0 | USD |
| 3003073 | 1 | Ammo | | 21 Lonoke, AR | 3/15/1994 | ADDL-VENT HOOD #727 120082 | | 0 | 0 | USD |
| 3003073 | 3 | Ammo | | 21 Lonoke, AR | 3/15/1996 | ADDL-FRAME & TANK #727 | | 0 | 0 | USD |
| 3003075 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2006 | #727 WASH UNIT CONE | | 0 | 0 | USD |
| 3003076 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | FARVAL LUBRICATION SYSTEM FOR #725 FURN | | 0 | 0 | USD |
| 3003077 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SECONDARY DRAW LUBE SYSTEM | | 0 | 0 | USD |
| 3003078 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | C-22 BLISS DRAW PRESS | | 0 | 0 | USD |
| 3003079 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | C-22 BLISS DRAW PRESS | | 0 | 0 | USD |
| 3003080 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | C-22 BLISS DRAW PRESS | | 0 | 0 | USD |
| 3003081 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | STANDARD REMINGTON DRAW PRESS | | 0 | 0 | USD |
| 3003082 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | STANDARD REMINGTON DRAW PRESS | | 0 | 0 | USD |
| 3003084 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | NIAGRA FIRST DRAW PRESS #185 | | 0 | 0 | USD |
| 3003085 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #6 BLISS CUPPING PRESS (STORAGE) | | 0 | 0 | USD |
| 3003085 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | NOISE CONTROL ENCLOSURE-52-11942    U | | 0 | 0 | USD |
| 3003085 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL–CONVEYOR STEEL BELT 12149    T | | 0 | 0 | USD |
| 3003086 | 4 | Ammo | | 21 Lonoke, AR | 10/15/1996 | ADDL-#226 OVERHAUL | | 0 | 0 | USD |
| 3003086 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1999 | ADDL UNCOILDER 100658 | | 0 | 0 | USD |
| 3003086 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #5 BLISS CUP PRESS S/N H57943 #231 | | 0 | 0 | USD |
| 3003087 | 2 | Ammo | | 21 Lonoke, AR | 10/15/1999 | ADDL UNCOILER 100658 | | 0 | 0 | USD |
| 3003088 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #6 BLISS CUPPING PRESS | | 0 | 0 | USD |
| 3003088 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL-REBUILD #227 CUPPING PRESS | | 0 | 0 | USD |
| 3003088 | 2 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL #227 CONVEYOR REPLACEMENT | | 0 | 0 | USD |
| 3003088 | 3 | Ammo | | 21 Lonoke, AR | 10/15/1999 | ADDL UNCOILER 100658 | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3003089 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | WATERBURRY-FARREL CUPPING PRESS | | 0 | 0 | USD |
| 3003089 | 1 | Ammo | | 21 Lonoke, AR | 9/15/1995 | ADDL - REBUILD CUPPING PRESS #228 | | 0 | 0 | USD |
| 3003089 | 2 | Ammo | | 21 Lonoke, AR | 9/15/1995 | ADDL - COMPONENT CONVEYOR REPLACEMENT | | 0 | 0 | USD |
| 3003089 | 3 | Ammo | | 21 Lonoke, AR | 10/15/1999 | ADDL UNCOILER 100658 | | 0 | 0 | USD |
| 3003090 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #229 BLISS CUPPING PRESS | | 0 | 0 | USD |
| 3003090 | 1 | Ammo | | 21 Lonoke, AR | 10/15/1999 | ADDL UNCOILER 100658 | | 0 | 0 | USD |
| 3003091 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | C-35 BLISS DRAW PRESS #195 | | 0 | 0 | USD |
| 3003091 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MOD DRAW PRESS | | 0 | 0 | USD |
| 3003091 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MOD-C-35 JKT DRAW 120150 | | 0 | 0 | USD |
| 3003091 | 3 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #195 C-35 DRAW PINCH CUTOFF 120540 | | 0 | 0 | USD |
| 3003091 | 4 | Ammo | | 21 Lonoke, AR | 12/15/1997 | ADDL SCRAP RING CONVEYOR | | 0 | 0 | USD |
| 3003091 | 5 | Ammo | | 21 Lonoke, AR | 12/1/1993 | C-35 BLISS DRAW PRESS #187 | | 0 | 0 | USD |
| 3003092 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | C-35 BLISS DRAW PRESS - ADDITIONAL COST | | 0 | 0 | USD |
| 3003092 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL 32 AUTO FEED BOWL | | 0 | 0 | USD |
| 3003092 | 2 | Ammo | | 21 Lonoke, AR | 12/15/2005 | C-35 BLISS DRAW PRESS #200 | | 0 | 0 | USD |
| 3003093 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL SCRAP RING CONVEYOR 2544/100376 | | 0 | 0 | USD |
| 3003093 | 1 | Ammo | | 21 Lonoke, AR | 3/15/1998 | C-35 BLISS DRAW PRESS #201 | | 0 | 0 | USD |
| 3003094 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL SCRAP RING CONVEYOR 2544/100376 | | 0 | 0 | USD |
| 3003094 | 1 | Ammo | | 21 Lonoke, AR | 3/15/1998 | ADDL DRAW PRESS #201 | | 0 | 0 | USD |
| 3003094 | 2 | Ammo | | 21 Lonoke, AR | 12/15/2002 | JKT DRAW PRESS C-36 BLISS-CF MOD | | 0 | 0 | USD |
| 3003095 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PRAB INCLINE CONVYR MCH #241 | | 0 | 0 | USD |
| 3003095 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL - CONVEYOR MODIFICATION - 241 | | 0 | 0 | USD |
| 3003095 | 2 | Ammo | | 21 Lonoke, AR | 12/14/1995 | VIBRATORY FEED BOWL 101783 | | 0 | 0 | USD |
| 3003095 | 3 | Ammo | | 21 Lonoke, AR | 12/15/2012 | MOD & INS DRAW PRESS #193 | | 0 | 0 | USD |
| 3003096 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL SCRAP RING CONVEYOR | | 0 | 0 | USD |
| 3003096 | 1 | Ammo | | 21 Lonoke, AR | 12/15/1997 | ADDL DIE SET | | 0 | 0 | USD |
| 3003096 | 3 | Ammo | | 21 Lonoke, AR | 2/15/2006 | PRAB INCLINE CONVEYR MCH #240 | | 0 | 0 | USD |
| 3003097 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL - CONVEYOR MODIFICATION - 240 | | 0 | 0 | USD |
| 3003097 | 1 | Ammo | | 21 Lonoke, AR | 12/14/1995 | C-35 JACKET DRAW PRESS #238    T | | 0 | 0 | USD |
| 3003098 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PIVOT BELT CONVYR #238 120249 | | 0 | 0 | USD |
| 3003098 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL - CONVEYOR MODIFICATION - 238 | | 0 | 0 | USD |
| 3003098 | 2 | Ammo | | 21 Lonoke, AR | 12/14/1995 | ADDL - CONVEYOR MODIFICATION - 239 | | 0 | 0 | USD |
| 3003100 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #62 BLISS DUPLEX DRAW PRESS #159/161 | | 0 | 0 | USD |
| 3003100 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #159/160 #62 DRAW PINCH CUTOFF 120540 #159/161 | | 0 | 0 | USD |
| 3003102 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #304 BLISS DRAW PRESS #175 | | 0 | 0 | USD |
| 3003102 | 1 | Ammo | | 21 Lonoke, AR | 6/15/1996 | ADDL-#175 DIE SET - PINCH TRIM | | 0 | 0 | USD |
| 3003102 | 2 | Ammo | | 21 Lonoke, AR | 12/15/1996 | ADDL - #175 PINCH TRIM FEED/CONVEYOR | | 0 | 0 | USD |
| 3003102 | 3 | Ammo | | 21 Lonoke, AR | 11/15/1999 | ADDL REBUILD #175 100645 | | 0 | 0 | USD |
| 3003104 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PERKINS PRESS 62-04860 | | 0 | 0 | USD |
| 3003104 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PERKINS PRESS    T | | 0 | 0 | USD |
| 3003104 | 3 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD COST PERKINS PRESS #1    U | | 0 | 0 | USD |
| 3003104 | 2 | Ammo | | 21 Lonoke, AR | 6/15/1999 | CONVEYORS | | 0 | 0 | USD |
| 3003105 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PERKINS PRESS 62-04860 | | 0 | 0 | USD |
| 3003105 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PERKINS PRESS    T | | 0 | 0 | USD |
| 3003105 | 2 | Ammo | | 21 Lonoke, AR | 6/15/1999 | CONVEYORS | | 0 | 0 | USD |
| 3003106 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | FEEDER - CIRCULAR VIBRATOR BOWL | | 0 | 0 | USD |
| 3003107 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | VIBRATORY FEED SYSTEM  PHILCO #174 | | 0 | 0 | USD |
| 3003108 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | VIBRATORY FEED SYSTEM  PHILCO #196 | | 0 | 0 | USD |
| 3003109 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | VIBRATORY FEED SYSTEM  PHILCO #200 | | 0 | 0 | USD |
| 3003110 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DOUBLE ROLL FEED | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3003111 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LASER INSPECT UNIT-CASE #742 | | 0 | 0 | USD |
| 3003123 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | HOWE 6 TON SCALE | | 0 | 0 | USD |
| 3003123 | 0 | Ammo | | 21 Lonoke, AR | 5/15/1997 | ADDL-SCALE CONVERSION 2ND FLR SHELL AREA | | 0 | 0 | USD |
| 3003125 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CARBURETOR KEMP MODEL 5-S #755 | | 0 | 0 | USD |
| 3003127 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SKIP HOIST DUMPER | | 0 | 0 | USD |
| 3003128 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | C.F. PRIMER AREA BUGGY LIFT    EAST | | 0 | 0 | USD |
| 3003129 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BUGGY ELEVATOR FOR #724 WASH & DRY | | 0 | 0 | USD |
| 3003129 | 1 | Ammo | | 21 Lonoke, AR | 1/15/1997 | ADDL-REBUILD BUGGY LIFT #724 | | 0 | 0 | USD |
| 3003130 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BUGGY ELEVATOR FOR #723 WASH & DRY | | 0 | 0 | USD |
| 3003130 | 1 | Ammo | | 21 Lonoke, AR | 1/15/1997 | ADDL-REBUILD BUGGY LIFT #723 | | 0 | 0 | USD |
| 3003131 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BUGGY ELEVATOR FOR #722 LUBE & DRY | | 0 | 0 | USD |
| 3003131 | 1 | Ammo | | 21 Lonoke, AR | 1/15/1997 | ADDL-REBUILD BUGGY LIFT #722 | | 0 | 0 | USD |
| 3003132 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BUGGY ELEVATOR FOR #721 CHIP SEPERATOR | | 0 | 0 | USD |
| 3003132 | 1 | Ammo | | 21 Lonoke, AR | 1/15/1997 | ADDL-REBUILD BUGGY LIFT #721 | | 0 | 0 | USD |
| 3003133 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BUGGY ELEVATOR FOR #720 WASH & DRY | | 0 | 0 | USD |
| 3003134 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CASE AREA BUGGY LIFT #5 | | 0 | 0 | USD |
| 3003135 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CASE AREA BUGGY LIFT #4 | | 0 | 0 | USD |
| 3003136 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CASE AREA BUGGY LIFT #3 | | 0 | 0 | USD |
| 3003137 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK CUT OFF MACHINE #389 | | 0 | 0 | USD |
| 3003138 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK CUT-OFF MACHINE #390 | | 0 | 0 | USD |
| 3003139 | 3 | Ammo | | 21 Lonoke, AR | 12/1/1993 | B.R. CUT-OFF MACHINE #114A | | 0 | 0 | USD |
| 3003141 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK CUT-OFF MACHINE #385 | | 0 | 0 | USD |
| 3003142 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK CUT-OFF MACHINE #393 | | 0 | 0 | USD |
| 3003143 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK CUT-OFF MACHINE #381 | | 0 | 0 | USD |
| 3003144 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK CAT-OFF MACHINE #380 | | 0 | 0 | USD |
| 3003145 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK HEADTURN MACHINE #106 | | 0 | 0 | USD |
| 3003151 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACKROCK CUT-OFF MACHINE #398 S/N 3646 | | 0 | 0 | USD |
| 3003152 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK HEAD TURN MACHINE #396 | | 0 | 0 | USD |
| 3003156 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DRYER FOR #723 WASH & DRY | | 0 | 0 | USD |
| 3003157 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | GAS FIRED DRYER #720 7-COVE WEST    T | | 0 | 0 | USD |
| 3003159 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 14 CONE WASH UNIT #720 | | 0 | 0 | USD |
| 3003159 | 2 | Ammo | | 21 Lonoke, AR | 5/15/2001 | ADD'L ALKALI CONTROLS SYS | | 0 | 0 | USD |
| 3003159 | 3 | Ammo | | 21 Lonoke, AR | 3/15/2003 | #720 WASH UNIT | | 0 | 0 | USD |
| 3003160 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 7 CONE WASH & DRY UNIT | | 0 | 0 | USD |
| 3003160 | 3 | Ammo | | 21 Lonoke, AR | 3/15/2001 | REBUILD #723 WASH | | 0 | 0 | USD |
| 3003161 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | RANSOHOFF LUBE & DRY UNIT | | 0 | 0 | USD |
| 3003162 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CONE WASH DRYER | | 0 | 0 | USD |
| 3003163 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK HEAD TURN MACHINE #113 | | 0 | 0 | USD |
| 3003163 | 1 | Ammo | | 21 Lonoke, AR | 4/15/2011 | ADD'L #113A SINGLE LINE FEEDER 101649 | | 0 | 0 | USD |
| 3003164 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK HEAD TURN MACHINE #114 | | 0 | 0 | USD |
| 3003164 | 1 | Ammo | | 21 Lonoke, AR | 4/15/2011 | ADD'L #114 SINGLE LINE FEEDER 101649 | | 0 | 0 | USD |
| 3003165 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK HEAD TURN MACHINE #115 | | 0 | 0 | USD |
| 3003166 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK HEAD TURN MACHINE #116 | | 0 | 0 | USD |
| 3003167 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK HEAD TURN MACHINE #117 | | 0 | 0 | USD |
| 3003167 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | VIBRATORY FEEDER MCH #117 | | 0 | 0 | USD |
| 3003168 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK HEAD TURN MACHINE #118 | | 0 | 0 | USD |
| 3003169 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK CUT-OFF TRIM MACHINE #119 | | 0 | 0 | USD |
| 3003169 | 1 | Ammo | | 21 Lonoke, AR | 4/15/2011 | ADD'L #119 SINGLE LINE FEEDER 101649 | | 0 | 0 | USD |
| 3003170 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK HEAD TURN MACHINE #120 | | 0 | 0 | USD |
| 3003171 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK HEAD TURN MACHINE #127 | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3103171 | 1 | Ammo | | 21 Lonoke, AR | 1/15/1997 | ADDL-#127 CONVEYOR/REARRANGE | 0 | 0 | 0 | USD |
| 3103172 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK HEAD TURN MACHINE #128 | 0 | 0 | 0 | USD |
| 3103172 | 1 | Ammo | | 21 Lonoke, AR | 1/15/1997 | ADDL-#128 CONVEYOR/REARRANGE | 0 | 0 | 0 | USD |
| 3103173 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK HEAD TURN MACHINE #129 | 0 | 0 | 0 | USD |
| 3103173 | 1 | Ammo | | 21 Lonoke, AR | 1/15/1997 | ADDL-#129 CONVEYOR/REARRANGE | 0 | 0 | 0 | USD |
| 3103174 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK HEAD TURN MACHINE #122 | 0 | 0 | 0 | USD |
| 3103175 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK HEAD TURN MACHINE #106 | 0 | 0 | 0 | USD |
| 3103175 | 1 | Ammo | | 21 Lonoke, AR | 1/15/1997 | ADDL-#126 CONVEYOR/REARRANGE | 0 | 0 | 0 | USD |
| 3103175 | 2 | Ammo | | 21 Lonoke, AR | 4/15/2011 | ADDL #106 SINGLE LINE FEEDER 101649 | 0 | 0 | 0 | USD |
| 3103176 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK HEAD TURN MACHINE #125 | 0 | 0 | 0 | USD |
| 3103176 | 1 | Ammo | | 21 Lonoke, AR | 1/15/1997 | ADDL-#125 CONVEYOR/REARRANGE | 0 | 0 | 0 | USD |
| 3103177 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK HEAD TURN MACHINE #109 | 0 | 0 | 0 | USD |
| 3103178 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK HEAD TURN MACHINE #108 | 0 | 0 | 0 | USD |
| 3103178 | 2 | Ammo | | 21 Lonoke, AR | 4/15/2011 | ADDL #108 SINGLE LINE FEEDER 101649 | 0 | 0 | 0 | USD |
| 3103179 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK HEAD TURN MACHINE #107 | 0 | 0 | 0 | USD |
| 3103179 | 2 | Ammo | | 21 Lonoke, AR | 4/15/2011 | ADDL #107 SINGLE LINE FEEDER 101649 | 0 | 0 | 0 | USD |
| 3103180 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK HEAD TURN MACHINE #105 | 0 | 0 | 0 | USD |
| 3103180 | 2 | Ammo | | 21 Lonoke, AR | 4/15/2011 | ADDL #105 SINGLE LINE FEEDER 101649 | 0 | 0 | 0 | USD |
| 3103181 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK HEAD TURN MACHINE #110 | 0 | 0 | 0 | USD |
| 3103182 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK HEAD TURN MACHINE #124 | 0 | 0 | 0 | USD |
| 3103182 | 1 | Ammo | | 21 Lonoke, AR | 1/15/1997 | ADDL-#124 CONVEYOR/REARRANGE | 0 | 0 | 0 | USD |
| 3103183 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK HEADTURN MACHINE #111 | 0 | 0 | 0 | USD |
| 3103184 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK HEADTURN #130 | 0 | 0 | 0 | USD |
| 3103184 | 1 | Ammo | | 21 Lonoke, AR | 1/15/1997 | ADDL-#130 CONVEYOR/REARRANGE | 0 | 0 | 0 | USD |
| 3103185 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACK ROCK HEADTURN #112 | 0 | 0 | 0 | USD |
| 3103186 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLACKROCK HEADTURN MACHINE #121 S/N 3635 | 0 | 0 | 0 | USD |
| 3103186 | 1 | Ammo | | 21 Lonoke, AR | 1/15/1997 | ADDL-#121 CONVEYOR/REARRANGE | 0 | 0 | 0 | USD |
| 3103188 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | REMINGTON DIAL ANNEALER | 0 | 0 | 0 | USD |
| 3103188 | 1 | Ammo | | 21 Lonoke, AR | 8/15/1996 | ADDL - #378 TABLE ANNEALER | 0 | 0 | 0 | USD |
| 3103188 | 2 | Ammo | | 21 Lonoke, AR | 1/15/1999 | ADDL BODY ANNEALER #378 | 0 | 0 | 0 | USD |
| 3103189 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #371 REMINGTON DIAL ANNEALER | 0 | 0 | 0 | USD |
| 3103189 | 1 | Ammo | | 21 Lonoke, AR | 8/15/1996 | ADDL - #371 TABLE ANNEALER | 0 | 0 | 0 | USD |
| 3103189 | 2 | Ammo | | 21 Lonoke, AR | 12/5/1998 | ADDL MOD ANNEALER #371 | 0 | 0 | 0 | USD |
| 3103193 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | REMINGTON TURRET MOUTH TRIM #73/74 | 0 | 0 | 0 | USD |
| 3103193 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | REMINGTON TURRET MOUTH TRIM | 0 | 0 | 0 | USD |
| 3103194 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | COLLATORS-2 MACHINE #75/76 120329 | 0 | 0 | 0 | USD |
| 3103194 | 1 | Ammo | | 21 Lonoke, AR | 3/15/2004 | ADDL #75 TURRET TRIM | 0 | 0 | 0 | USD |
| 3103194 | 3 | Ammo | | 21 Lonoke, AR | 11/15/2005 | TRIM STROKE MEASUREMENT | 0 | 0 | 0 | USD |
| 3103195 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | REMINGTON TURRET MOUTH TRIM #77/78 | 0 | 0 | 0 | USD |
| 3103195 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | COLLATOR-2 MACHINE #77/78 120329 | 0 | 0 | 0 | USD |
| 3103195 | 2 | Ammo | | 21 Lonoke, AR | 3/15/2004 | ADDL #77 TURRET TRIM | 0 | 0 | 0 | USD |
| 3103195 | 3 | Ammo | | 21 Lonoke, AR | 12/15/2004 | ADDL STROKE SENSOR | 0 | 0 | 0 | USD |
| 3103196 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | REM TURRET MOUTH TRIM #65/66 | 0 | 0 | 0 | USD |
| 3103196 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | REM TURRET MOUTH TRIM | 0 | 0 | 0 | USD |
| 3103197 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | TURRET MOUTH TRIM | 0 | 0 | 0 | USD |
| 3103198 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | COLLATORS-2 MACHINE #69/70 120329 | 0 | 0 | 0 | USD |
| 3103198 | 1 | Ammo | | 21 Lonoke, AR | 6/15/1997 | ADDL-69/70 22 WIN MAG FEED | 0 | 0 | 0 | USD |
| 3103198 | 3 | Ammo | | 21 Lonoke, AR | 11/15/2005 | TRIM STROKE MEASUREMENT | 0 | 0 | 0 | USD |
| 3103199 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MOUTH TRIM MACHINE | 0 | 0 | 0 | USD |
| 3103199 | 2 | Ammo | | 21 Lonoke, AR | 3/15/2004 | ADDL #71 TURRET TRIM | 0 | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3003199 | 3 | Ammo | | 21 Lonoke, AR | 2/16/2006 | ADD'L #71/72 STROKE MEASURE SYS | 0 | 0 | 0 | USD |
| 3003200 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | REMINGTON TURRET TRIM #79/80 | 0 | 0 | 0 | USD |
| 3003200 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | COLLATORS-2 MACHINE #79/80 120329 | 0 | 0 | 0 | USD |
| 3003200 | 2 | Ammo | | 21 Lonoke, AR | 3/15/2004 | ADD'L #79 TURRET TRM | 0 | 0 | 0 | USD |
| 3003200 | 3 | Ammo | | 21 Lonoke, AR | 11/15/2005 | TRIM STROKE MEASUREMENT | 0 | 0 | 0 | USD |
| 3003201 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | REMINGTON TURRET TRIM #63/64 | 0 | 0 | 0 | USD |
| 3003201 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MODERNIZATION & DESIGN | 0 | 0 | 0 | USD |
| 3003218 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST-TAPER TRIM #95 120330 | 0 | 0 | 0 | USD |
| 3003218 | 1 | Ammo | | 21 Lonoke, AR | 7/15/2010 | ADD'L FEED SYSTEM #95 101636 | 0 | 0 | 0 | USD |
| 3003219 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLISS TAPER PRESS #81 | 0 | 0 | 0 | USD |
| 3003219 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MODERNIZATION & DESIGN | 0 | 0 | 0 | USD |
| 3003219 | 2 | Ammo | | 21 Lonoke, AR | 11/15/1999 | ADD'L UPGRADE TAPER PRESS #81 | 0 | 0 | 0 | USD |
| 3003224 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | VIBRATORY FEED SYSTEM PHILCO #65 | 0 | 0 | 0 | USD |
| 3003225 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #4 BLISS HEADER #138 | 0 | 0 | 0 | USD |
| 3003225 | 1 | Ammo | | 21 Lonoke, AR | 5/15/2001 | REB HEADER #142 | 0 | 0 | 0 | USD |
| 3003225 | 2 | Ammo | | 21 Lonoke, AR | 3/15/2007 | ADD'L HEADER #138 | 0 | 0 | 0 | USD |
| 3003226 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #4 BLISS HORIZONTAL HEAD PRESS O/H #133 | 0 | 0 | 0 | USD |
| 3003226 | 1 | Ammo | | 21 Lonoke, AR | 6/15/1999 | ADD'L MAGNUM FEEDER #133 | 0 | 0 | 0 | USD |
| 3003226 | 2 | Ammo | | 21 Lonoke, AR | 4/15/2000 | ADD'L INSTALL FEED #133 | 0 | 0 | 0 | USD |
| 3003238 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LUBE FILTER SYSTEM BLT JKT DRAW | 0 | 0 | 0 | USD |
| 3003239 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SCRAP LEAD REMELT KETTLE SERIAL #8418 | 0 | 0 | 0 | USD |
| 3003239 | 2 | Ammo | | 21 Lonoke, AR | 2/15/2002 | ADD'L REMELT FURNACE CONTROLS | 0 | 0 | 0 | USD |
| 3003240 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LEAD KETTLE & STAND | 0 | 0 | 0 | USD |
| 3003240 | 3 | Ammo | | 21 Lonoke, AR | 11/15/2005 | KETTLE CONTROL SYSTEM | 0 | 0 | 0 | USD |
| 3003241 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | TUMBLING DUST COLLECTOR & 15 HP MOTOR | 0 | 0 | 0 | USD |
| 3003245 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SCRAP FEED HOPPER/VIB FEED LEAD REMLT | 0 | 0 | 0 | USD |
| 3003246 | 0 | Ammo | | 21 Lonoke, AR | 8/14/1995 | ADD'L-LEAD EXTRUDER CONTROLLER | 0 | 0 | 0 | USD |
| 3003247 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BULLET AREA BUGGY LIFT | 0 | 0 | 0 | USD |
| 3003248 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BULLET AREA BUGGY LIFT | 0 | 0 | 0 | USD |
| 3003248 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CF METAL FREIGHT ELEVATOR | 0 | 0 | 0 | USD |
| 3003248 | 2 | Ammo | | 21 Lonoke, AR | 5/15/2000 | REB CF #1 FREIGHT ELEVATOR | 0 | 0 | 0 | USD |
| 3003251 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LEAD PIG CONVEYOR | 0 | 0 | 0 | USD |
| 3003252 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | FEED CHUTES | 0 | 0 | 0 | USD |
| 3003253 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | VACUUM CLEANING SYSTEM-LEAD CORE INSP | 0 | 0 | 0 | USD |
| 3003254 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LEAD EXTRUDER & 200 HP MOTOR #68 WM2345 | 0 | 0 | 0 | USD |
| 3003254 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L-LEAD EXTRUDER CONTROLLER | 0 | 0 | 0 | USD |
| 3003256 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BULLET GROOVE MACHINE | 0 | 0 | 0 | USD |
| 3003257 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BULLET GROOVE MACHINE | 0 | 0 | 0 | USD |
| 3003258 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BULLET GROOVE MACHINE #775 | 0 | 0 | 0 | USD |
| 3003258 | 1 | Ammo | | 21 Lonoke, AR | 10/15/1999 | ADD'L MODIFY GROOVER 100662 | 0 | 0 | 0 | USD |
| 3003259 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BULLET GROVING MACHINE | 0 | 0 | 0 | USD |
| 3003259 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L BLT GROOVING MACHINE | 0 | 0 | 0 | USD |
| 3003260 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SLUG TUMBLE BARREL RANSO | 0 | 0 | 0 | USD |
| 3003260 | 1 | Ammo | | 21 Lonoke, AR | 2/15/1998 | ADD'L HOIST & MONORAIL | 0 | 0 | 0 | USD |
| 3003261 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | GRAPH TUMBLING BARREL RANSO | 0 | 0 | 0 | USD |
| 3003262 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | RANS-HOFF SAWDUST TUMBLER | 0 | 0 | 0 | USD |
| 3003264 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PARTSWASH DRYER COLT | 0 | 0 | 0 | USD |
| 3003265 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BUCKSHOT FORMER | 0 | 0 | 0 | USD |
| 3003265 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST-FORMER | 0 | 0 | 0 | USD |
| 3003265 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L-EXHAUST SYS B/S FORM MCH | 0 | 0 | 0 | USD |
| 3003267 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DENNISON BULLET REFINISHER SERIAL #2026 | 0 | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3003268 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | DENNISON BULLET REFINISHER SERIAL #1873 | | 0 | 0 | USD |
| 3003269 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | DENNISON BULLET REFINISHER #22565-5210 | | 0 | 0 | USD |
| 3003270 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | DENNISON BULLET REFINISHER SERIAL #2027 | | 0 | 0 | USD |
| 3003271 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | DENNISON BULLET REFINISHER SERIAL #2037 | | 0 | 0 | USD |
| 3003272 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | DENNISON BULLET REFINISHER #26377-5210 | | 0 | 0 | USD |
| 3003273 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | DENNISON BULLET REFINISHER #22566-5210 | | 0 | 0 | USD |
| 3003274 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | DENNISON BULLET REFINISHER SERIAL #1840 | | 0 | 0 | USD |
| 3003275 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | DENNISON BULLET PRESS SERIAL #21520-521 | | 0 | 0 | USD |
| 3003276 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | DENNISON BULLET PRESS SERIAL #21519-521 | | 0 | 0 | USD |
| 3003280 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | LASER INSPECT UNIT-BULLET #739 | | 0 | 0 | USD |
| 3003281 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | LASER INSPECT UNIT-BULLET #740 | | 0 | 0 | USD |
| 3003281 | | 1 | Ammo | 21 Lonoke, AR | 12/1/1993 | LASER INSPECT UNIT-BULLET #741 | | 0 | 0 | USD |
| 3003281 | | 0 | Ammo | 21 Lonoke, AR | 3/15/1998 | ADDL BOWL FEEDER 2604/100434 | | 0 | 0 | USD |
| 3003284 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | SINGLE GIRDER PILOT CRANE | | 0 | 0 | USD |
| 3003285 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | SINGLE GIRDER BRIDGE CRANE | | 0 | 0 | USD |
| 3003286 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | OVERHEAD BRIDGE CRANE | | 0 | 0 | USD |
| 3003287 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | 1 TON MOTORIZED HOIST | | 0 | 0 | USD |
| 3003288 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | SINGLE GIRDER PILOT BRIDGE CRANE   3 T | | 0 | 0 | USD |
| 3003289 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | HOIST W MONORAIL                     T | | 0 | 0 | USD |
| 3003292 | | 1 | Ammo | 21 Lonoke, AR | 11/15/1996 | 5 STATION PLATING TANK 2463/100225 | | 0 | 0 | USD |
| 3003293 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | RINSE TANK #5 | | 0 | 0 | USD |
| 3003294 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | RINSE TANK #4 | | 0 | 0 | USD |
| 3003297 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | NICKEL PLATING TANK | | 0 | 0 | USD |
| 3003297 | | 1 | Ammo | 21 Lonoke, AR | 12/1/1993 | ADD HEATING COILS-PLATING TANK       U | | 0 | 0 | USD |
| 3003297 | | 2 | Ammo | 21 Lonoke, AR | 11/15/1996 | ADDL - SINGLE STATION EXHAUST HOOD | | 0 | 0 | USD |
| 3003299 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | 3-STA COPPER SHOT PLATING SYSTEM | | 0 | 0 | USD |
| 3003299 | | 1 | Ammo | 21 Lonoke, AR | 7/15/1997 | ADDL-REFURBISH TANKS-COPPER PLATED LEAD CORE | | 0 | 0 | USD |
| 3003301 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | NICKEL PLAE RINSE TANK 120386 | | 0 | 0 | USD |
| 3003303 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | FILTER SYSTEM FOR CENTER FIRE PLATING | | 0 | 0 | USD |
| 3003305 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | CLEANING RECTIFIER | | 0 | 0 | USD |
| 3003311 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | BUGGY PLATFORM | | 0 | 0 | USD |
| 3003313 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | DRY PLATING BAIRD BARREL | | 0 | 0 | USD |
| 3003314 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | DRYER FOR CENTER FIRE PLATING UNIT | | 0 | 0 | USD |
| 3003315 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | 1 2 T CAP MONORAIL SYSTEM | | 0 | 0 | USD |
| 3003316 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | YALE HOIST  C F PLATING | | 0 | 0 | USD |
| 3003317 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | YALE HOIST  C F PLATING | | 0 | 0 | USD |
| 3003317 | | 0 | Ammo | 21 Lonoke, AR | 12/15/1993 | HOIST YALE 1T CF PLAE 120095/LC0095 | | 0 | 0 | USD |
| 3003320 | | 2 | Ammo | 21 Lonoke, AR | 5/15/1997 | ADDL-SCALE CONVERSION 2ND FLR PRIME/LOAD | | 0 | 0 | USD |
| 3003320 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | REM DIAL PRIMER PRESS WITH VIBRATORY FET | | 0 | 0 | USD |
| 3003322 | | 1 | Ammo | 21 Lonoke, AR | 3/15/1994 | ADDL-PRIMER DETECT SYS REM#23 120570 | | 0 | 0 | USD |
| 3003323 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | V&O PIERCE & PRIMING MACHINE #32P | | 0 | 0 | USD |
| 3003323 | | 1 | Ammo | 21 Lonoke, AR | 3/15/1994 | ADDL-PRIMER DETECT SYS V&O#32P 120570 | | 0 | 0 | USD |
| 3003323 | | 2 | Ammo | 21 Lonoke, AR | 12/1/1993 | VIBRATORY FEEDER - MDL VBF-6L #32P | | 0 | 0 | USD |
| 3003324 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | V&O PRIMING MACHINE #36P | | 0 | 0 | USD |
| 3003326 | | 0 | Ammo | 21 Lonoke, AR | 12/1/1993 | V&D PRIMING PRESS #40P | | 0 | 0 | USD |
| 3003326 | | 1 | Ammo | 21 Lonoke, AR | 3/15/1994 | ADDL-PRIMER DETECT SYS V&O#40P 120570 | | 0 | 0 | USD |
| 3003326 | | 2 | Ammo | 21 Lonoke, AR | 12/1/1993 | V&O PRIMING PRESS INSTALLATION COST #40P | | 0 | 0 | USD |
| 3003326 | | 3 | Ammo | 21 Lonoke, AR | 12/1/1993 | VIBRATORY FEEDER - MDL VBF-6L #40P | | 0 | 0 | USD |
| 3003326 | | 4 | Ammo | 21 Lonoke, AR | 12/1/1993 | ADDL COST-WATER PROOF SYSTEM #40P | | 0 | 0 | USD |
| 3003328 | | 3 | Ammo | 21 Lonoke, AR | 12/1/1993 | USAR-LONRY FEEDER - MDL VBF-6L #35P | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3003328 | 5 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST-WATERPROOF SYSTEM 52-12457 #35P | | 0 | 0 | USD |
| 3003328 | 6 | Ammo | | 21 Lonoke, AR | 1/15/1997 | ADDL-LASER INSPECTION 35P | | 0 | 0 | USD |
| 3003330 | 3 | Ammo | | 21 Lonoke, AR | 12/1/1993 | VIBRATORY FEEDER - MDL VBF-6L #39P | | 0 | 0 | USD |
| 3003331 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | V&O PRIMING PRESS #31P | | 0 | 0 | USD |
| 3003331 | 1 | Ammo | | 21 Lonoke, AR | 3/15/1994 | ADDL-PRIMER DETECT SYS V&O#31P 120570 | | 0 | 0 | USD |
| 3003331 | 3 | Ammo | | 21 Lonoke, AR | 12/1/1993 | VIBRATORY FEEDER - MDL VBF-6L #31P | | 0 | 0 | USD |
| 3003331 | 3 | Ammo | | 21 Lonoke, AR | 8/14/1995 | ADDL-PRIMING #45 WATERPROOFING | | 0 | 0 | USD |
| 3003332 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | V&O PRIMING PRESS HIGH SPEED P F #63P | | 0 | 0 | USD |
| 3003332 | 1 | Ammo | | 21 Lonoke, AR | 3/15/1994 | ADDL-PRIMER DETECT SYS V&O#63P 120570 | | 0 | 0 | USD |
| 3003332 | 3 | Ammo | | 21 Lonoke, AR | 6/15/2003 | UPG V&O PRIMING MACHINE #63P | | 0 | 0 | USD |
| 3003332 | 4 | Ammo | | 21 Lonoke, AR | 5/15/2004 | ADDL PRIMING MCH 40 S&W CONVERT #63P | | 0 | 0 | USD |
| 3003333 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | V&O PRIMING PRESS HIGH SPEED P F-65P | | 0 | 0 | USD |
| 3003333 | 1 | Ammo | | 21 Lonoke, AR | 3/15/1994 | ADDL-PRIMER DETECT SYS V&O#65P 120570 | | 0 | 0 | USD |
| 3003333 | 3 | Ammo | | 21 Lonoke, AR | 3/15/2004 | ADDL CF #65P HIGH SPEED PRIMING | | 0 | 0 | USD |
| 3003334 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | V&O PRIMING PRESS HIGH-SPEED-PF#60P | | 0 | 0 | USD |
| 3003334 | 1 | Ammo | | 21 Lonoke, AR | 3/15/1994 | ADDL-PRIMER DETECT SYS V&O#60P 120570 | | 0 | 0 | USD |
| 3003334 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST V&O PRESS #60P | | 0 | 0 | USD |
| 3003334 | 3 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MODIFY #60P FOR 9MM 120456 | | 0 | 0 | USD |
| 3003334 | 4 | Ammo | | 21 Lonoke, AR | 6/15/2003 | UPG V&O PRIMING MACHINE #60P | | 0 | 0 | USD |
| 3003342 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 2 FT X 6 FT SST POWDER POURING SINK | | 0 | 0 | USD |
| 3003344 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CF LOAD FREIGHT ELEVATOR | | 0 | 0 | USD |
| 3003346 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | FEED CHUTES | | 0 | 0 | USD |
| 3003346 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST-FEED CHUTES | | 0 | 0 | USD |
| 3003350 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWDER STACK | | 0 | 0 | USD |
| 3003351 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWDER STACK | | 0 | 0 | USD |
| 3003352 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWDER STACK | | 0 | 0 | USD |
| 3003353 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWDER STACK | | 0 | 0 | USD |
| 3003354 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWDER STACK | | 0 | 0 | USD |
| 3003355 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWDER STACK | | 0 | 0 | USD |
| 3003356 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWDER STACK | | 0 | 0 | USD |
| 3003357 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWDER STACK | | 0 | 0 | USD |
| 3003358 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWDER STACK | | 0 | 0 | USD |
| 3003359 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWDER STACK | | 0 | 0 | USD |
| 3003360 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWDER STACK | | 0 | 0 | USD |
| 3003361 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWDER STACK | | 0 | 0 | USD |
| 3003362 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWDER STACK | | 0 | 0 | USD |
| 3003363 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUPLEX LOADER #26 | | 0 | 0 | USD |
| 3003363 | 1 | Ammo | | 21 Lonoke, AR | 9/15/1996 | ADDL-REBUILD #26 DUPLEX LOADER | | 0 | 0 | USD |
| 3003364 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUPLEX LOADER #27 | | 0 | 0 | USD |
| 3003364 | 1 | Ammo | | 21 Lonoke, AR | 12/15/1996 | ADDL - #27 LOADER REJECT SYSTEM | | 0 | 0 | USD |
| 3003364 | 2 | Ammo | | 21 Lonoke, AR | 3/15/2001 | REBUILD #27 LOADER | | 0 | 0 | USD |
| 3003364 | 3 | Ammo | | 21 Lonoke, AR | 3/15/2008 | ADDL FEEDERS #27 | | 0 | 0 | USD |
| 3003365 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUPLEX LOADER #28 | | 0 | 0 | USD |
| 3003365 | 1 | Ammo | | 21 Lonoke, AR | 12/15/1996 | ADDL - #28 LOADER REJECT SYSTEM | | 0 | 0 | USD |
| 3003366 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUPLEX LOADER #29 | | 0 | 0 | USD |
| 3003366 | 2 | Ammo | | 21 Lonoke, AR | 2/15/1997 | ADDL-#29 REJECT SYSTEM | | 0 | 0 | USD |
| 3003366 | 3 | Ammo | | 21 Lonoke, AR | 5/15/1997 | ADDL-OVERHAUL #29 DUPLEX LOADER | | 0 | 0 | USD |
| 3003367 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUPLEX LOADER #15 | | 0 | 0 | USD |
| 3003367 | 1 | Ammo | | 21 Lonoke, AR | 12/15/1996 | ADDL - #15 LOADER REJECT SYSTEM | | 0 | 0 | USD |
| 3003367 | 3 | Ammo | | 21 Lonoke, AR | 3/15/2008 | ADDL FEEDERS #15 | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C003368 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | DUPLEX LOADER #16 | | 0 | 0 | USD |
| C003368 | 1 | Ammo | 21 | Lonoke, AR | 12/15/1996 | ADDL - #16 LOADER REJECT SYSTEM | | 0 | 0 | USD |
| C003368 | 2 | Ammo | 21 | Lonoke, AR | 2/15/2002 | ADD'L COST #16 DUPLEX LOADER | | 0 | 0 | USD |
| C003369 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | DUPLEX LOADER #17 | | 0 | 0 | USD |
| C003369 | 1 | Ammo | 21 | Lonoke, AR | 12/15/1996 | ADDL - #17 LOADER REJECT SYSTEM | | 0 | 0 | USD |
| C003369 | 3 | Ammo | 21 | Lonoke, AR | 3/15/2003 | ADD'L DUPLEX LOADER | | 0 | 0 | USD |
| C003370 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | DUPLEX LOADER #18 | | 0 | 0 | USD |
| C003370 | 1 | Ammo | 21 | Lonoke, AR | 12/1/1993 | REVISE DETECTS-DUPLEX LOADER    U | | 0 | 0 | USD |
| C003370 | 2 | Ammo | 21 | Lonoke, AR | 12/15/1996 | ADDL - #18 LOADER REJECT SYSTEM | | 0 | 0 | USD |
| C003371 | 4 | Ammo | 21 | Lonoke, AR | 7/15/2007 | ADD'L TOOLING DIAL | | 0 | 0 | USD |
| C003371 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | DUPLEX LOADER #25 | | 0 | 0 | USD |
| C003371 | 1 | Ammo | 21 | Lonoke, AR | 12/15/1996 | ADDL - REBUILD #25 DUPLEX LOADER | | 0 | 0 | USD |
| C003372 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | DUPLEX LOADER #14 | | 0 | 0 | USD |
| C003372 | 3 | Ammo | 21 | Lonoke, AR | 12/15/1996 | ADDL - #14 LOADER REJECT SYSTEM | | 0 | 0 | USD |
| C003373 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | DUPLEX LOADER #24 | | 0 | 0 | USD |
| C003373 | 1 | Ammo | 21 | Lonoke, AR | 12/1/1993 | DUPLEX LOADER INSTALLATION COST | | 0 | 0 | USD |
| C003373 | 2 | Ammo | 21 | Lonoke, AR | 12/15/1996 | ADDL - #24 LOADER REJECT SYSTEM | | 0 | 0 | USD |
| C003373 | 3 | Ammo | 21 | Lonoke, AR | 6/5/1999 | ADD'L REBUILD DUPLEX LOADER | | 0 | 0 | USD |
| C003374 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | DUPLEX LOADER #19 | | 0 | 0 | USD |
| C003374 | 1 | Ammo | 21 | Lonoke, AR | 12/1/1993 | MODERNIZATION & DESIGN | | 0 | 0 | USD |
| C003374 | 2 | Ammo | 21 | Lonoke, AR | 8/15/2004 | UPGRADE OF #19 DUPLEX LOADER | | 0 | 0 | USD |
| C003381 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | PACK AREA BUGGY LIFT | | 0 | 0 | USD |
| C003382 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | COMP PK CASE CONVYR    120285 | | 0 | 0 | USD |
| C003383 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | BOX CONVEYOR 18"X5"X30" | | 0 | 0 | USD |
| C003384 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | PACKED CASE CONVEYOR-CENTERFIRE | | 0 | 0 | USD |
| C003384 | 1 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ADDL-MOD CONVEYOR HEIGHT TO 36" | | 0 | 0 | USD |
| C003390 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | RANSOHOFF TUMBLING UNIT W MTR ROTOCLONE | | 0 | 0 | USD |
| C003394 | 1 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ADD-CONSTANT MOTION DRIVE #780 120564 | | 0 | 0 | USD |
| C003405 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | BARCODE LASER SCANNER-CF 120520 | | 0 | 0 | USD |
| C003413 | 1 | Ammo | 21 | Lonoke, AR | 3/15/1995 | ADDL-DRIVE MOTOR/CNTRL #401 2211 | | 0 | 0 | USD |
| C003413 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ROOF EXHAUST FAN (FBV6234) | | 0 | 0 | USD |
| C003414 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | CENT EXHAUST & MOTOR (FBV1234) | | 0 | 0 | USD |
| C003416 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | MONORIAL SYSTEM (FBV4703) | | 0 | 0 | USD |
| C003423 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | HOIST RIMFIRE MAINTENANCE AREA | | 0 | 0 | USD |
| C003427 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | SCRAP REMOVAL CONVEYOR 403 CAP PRESS    T | | 0 | 0 | USD |
| C003431 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | WASH UNIT #721B  101764 | | 0 | 0 | USD |
| C003432 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | #401 RANSONOFF WASH & DRY | | 0 | 0 | USD |
| C003432 | 1 | Ammo | 21 | Lonoke, AR | 5/15/2001 | ADD'L PROGRAMMABLE CONTROLS | | 0 | 0 | USD |
| C003435 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | CAP PRESS | | 0 | 0 | USD |
| C003435 | 1 | Ammo | 21 | Lonoke, AR | 12/1/1993 | DIE SET CAP PRESS | | 0 | 0 | USD |
| C003435 | 2 | Ammo | 21 | Lonoke, AR | 1/15/2001 | ADD'L FEED SYSTEM | | 0 | 0 | USD |
| C003435 | 6 | Ammo | 21 | Lonoke, AR | 4/15/2008 | ADD'L METAL TENSIONER #401 | | 0 | 0 | USD |
| C003437 | 9 | Ammo | 21 | Lonoke, AR | 12/1/1993 | BLISS HALF HEAD PRESS #404 | | 0 | 0 | USD |
| C003437 | 2 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ADD'L-OVERHAUL #404 HH 120575 | | 0 | 0 | USD |
| C003437 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ADDL #404 CAP HANDLING EQUIPMENT 120579 | | 0 | 0 | USD |
| C003437 | 4 | Ammo | 21 | Lonoke, AR | 4/15/1996 | ADDL-VIBRATORY FEED SYSTEM | | 0 | 0 | USD |
| C003437 | 5 | Ammo | 21 | Lonoke, AR | 4/15/1996 | ADDL-VIBRATOYR FEED SYSTEM | | 0 | 0 | USD |
| C003438 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | BLISS HALF HEADER PRESS | | 0 | 0 | USD |
| C003438 | 2 | Ammo | 21 | Lonoke, AR | 6/14/1995 | ADDL-#406 CAP HANDLING EQUIPMENT 120579 | | 0 | 0 | USD |
| C003438 | 3 | Ammo | 21 | Lonoke, AR | 6/14/1995 | ADD'L REBUILD #406 | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3003438 | 4 | Ammo | | 21 Lonoke, AR | 4/15/1996 | ADDL-VIBRATORY FEED SYSTEM | | 0 | 0 | USD |
| 3003438 | 5 | Ammo | | 21 Lonoke, AR | 4/15/1996 | ADDL-VIBRATORY FEED SYSTEM | | 0 | 0 | USD |
| 3003439 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CAP PRESS-LACHAUSSEE #400 | | 0 | 0 | USD |
| 3003439 | 3 | Ammo | | 21 Lonoke, AR | 11/15/2006 | ADD' STRIP FEEDER | | 0 | 0 | USD |
| 3003439 | 5 | Ammo | | 21 Lonoke, AR | 11/15/2006 | PRESS/DIE SET MONITORING | | 0 | 0 | USD |
| 3003439 | 6 | Ammo | | 21 Lonoke, AR | 10/15/2008 | ADD'L 20 GA LB DIE SETUP | | 0 | 0 | USD |
| 3003439 | 7 | Ammo | | 21 Lonoke, AR | 2/15/2009 | ADDL #410 CAP PRESS STRIP ALIGNMENT | | 0 | 0 | USD |
| 3003442 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | VIBRA BARREL FEEDER #404 HALF HEAD | | 0 | 0 | USD |
| 3003446 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ELECTRONIC PLATFORM SCALE CAP PRESS    T | | 0 | 0 | USD |
| 3003446 | 1 | Ammo | | 21 Lonoke, AR | 5/15/1997 | ADDL-SCALE CONVERSION  CAP PRESS | | 0 | 0 | USD |
| 3003450 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BULK STORAGE SILO | | 0 | 0 | USD |
| 3003451 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BULK STORAGE SILO | | 0 | 0 | USD |
| 3003452 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | COLOR SCRAP STORAGE BIN | | 0 | 0 | USD |
| 3003452 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST - ROOF COLOR REGRIND | | 0 | 0 | USD |
| 3003452 | 2 | Ammo | | 21 Lonoke, AR | 6/15/1997 | ADDL - VIBRATING PANELS | | 0 | 0 | USD |
| 3003452 | 3 | Ammo | | 21 Lonoke, AR | 12/15/1997 | MOD PLASTIC STORAGE SILO | | 0 | 0 | USD |
| 3003453 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER CONTROL PANEL FOR #422 EXTRUDER | | 0 | 0 | USD |
| 3003453 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER CONTROL PANEL FOR #418 EXTRUDER | | 0 | 0 | USD |
| 3003454 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER CONTROL PANEL FOR #418 GEAR PUMPS | | 0 | 0 | USD |
| 3003455 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER PANEL-EXTRUDER #420 | | 0 | 0 | USD |
| 3003456 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SOLID STATE CONTROLS FOR #420 EXTRUDER | | 0 | 0 | USD |
| 3003457 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ELECTRICAL CONTROL PANEL  #1 | | 0 | 0 | USD |
| 3003460 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER PANEL GEAR PUMP | | 0 | 0 | USD |
| 3003461 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PLASTIC TRANSFER CONTROLS FOR #420    T | | 0 | 0 | USD |
| 3003464 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 6 INCH ROTARY AIRLOCK VALVE X MOTOR | | 0 | 0 | USD |
| 3003465 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 6 INCH REGRIND AIRLOCK VALVE X MOTOR | | 0 | 0 | USD |
| 3003466 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 6 INCH REGRIND AIRLOCK VALVE & MOTOR | | 0 | 0 | USD |
| 3003467 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | VIRGIN BLEND ROTARY AIRLOCK VALVE & MOT | | 0 | 0 | USD |
| 3003468 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 6 INCH REGRIND AIRLOCK VALVE & MOTOR | | 0 | 0 | USD |
| 3003469 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | VIRGIN BLEND ROTARY AIRLOCK VALVE & MOT | | 0 | 0 | USD |
| 3003470 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 6 INCH REGRIND AIRLOCK VALVE & MOTOR | | 0 | 0 | USD |
| 3003471 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 6 INCH AIRLOCK VALVE & MOTOR | | 0 | 0 | USD |
| 3003472 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL-DRIVE UNITS 120298 | | 0 | 0 | USD |
| 3003472 | 2 | Ammo | | 21 Lonoke, AR | 11/15/1996 | ADDL - HOPPER VIBRATORS | | 0 | 0 | USD |
| 3003472 | 3 | Ammo | | 21 Lonoke, AR | 9/15/2003 | RLC COLOR BLENDER | | 0 | 0 | USD |
| 3003473 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | TRIPLEX BLENDER-MULTI COLOR | | 0 | 0 | USD |
| 3003473 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL-DRIVE UNITS 120298 | | 0 | 0 | USD |
| 3003473 | 2 | Ammo | | 21 Lonoke, AR | 11/15/1996 | ADDL - HOPPER VIBRATORS | | 0 | 0 | USD |
| 3003473 | 3 | Ammo | | 21 Lonoke, AR | 9/15/2003 | RLC COLOR BLENDER | | 0 | 0 | USD |
| 3003473 | 4 | Ammo | | 21 Lonoke, AR | 11/15/2009 | ADDL #404 FEED BOWL CONTROLLER 101567 | | 0 | 0 | USD |
| 3003473 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUPLEX BLENDER-YELLOW | | 0 | 0 | USD |
| 3003474 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL-DRIVE UNITS 120298 | | 0 | 0 | USD |
| 3003474 | 2 | Ammo | | 21 Lonoke, AR | 11/15/1996 | ADDL - HOPPER VIBRATORS | | 0 | 0 | USD |
| 3003474 | 3 | Ammo | | 21 Lonoke, AR | 9/15/2003 | RLC COLOR BLENDER | | 0 | 0 | USD |
| 3003475 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUPLEX BLENDER-BLACK | | 0 | 0 | USD |
| 3003475 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL-DRIVE UNITS 120298 | | 0 | 0 | USD |
| 3003475 | 2 | Ammo | | 21 Lonoke, AR | 11/15/1996 | ADDL - HOPPER VIBRATORS | | 0 | 0 | USD |
| 3003475 | 3 | Ammo | | 21 Lonoke, AR | 9/15/2003 | RLC COLOR BLENDER | | 0 | 0 | USD |
| 3003477 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 14' COOLING TANK FOR #418 EXTRUDER | | 0 | 0 | USD |
| 3003478 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 30' COOLING TANK FOR #422 EXTRUDER | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3003478 | 1 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 30FT. COOLING TANK - COOLING CONTROL SY | | 0 | 0 | USD |
| 3003479 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 30' COOLING TANK FOR #422 EXTRUDER | | 0 | 0 | USD |
| 3003480 | 1 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 30' COOLING TANK FOR #418 EXTRUDER | | 0 | 0 | USD |
| 3003480 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 30FT. COOLING TANK - COOLING CONTROL SY | | 0 | 0 | USD |
| 3003481 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 30' COOLING TANK FOR #418 EXTRUDER | | 0 | 0 | USD |
| 3003482 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 14' COOLING TANK FOR #418 EXTRUDER | | 0 | 0 | USD |
| 3003483 | 1 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 30' COOLING TANK FOR #418 EXTRUDER | | 0 | 0 | USD |
| 3003483 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 30FT. COOLING TANK - COOLING CONTROL SY | | 0 | 0 | USD |
| 3003484 | 1 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 30' COOLING TANK FOR #418 EXTRUDER | | 0 | 0 | USD |
| 3003484 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | COOLING TANK FOR #420 EXTRUDER | | 0 | 0 | USD |
| 3003485 | 1 | Ammo | 21 | Lonoke, AR | 12/1/1993 | MODIFY COOLING TANK | | 0 | 0 | USD |
| 3003485 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | COOLING TANK FOR #420 EXTRUDER | | 0 | 0 | USD |
| 3003486 | 1 | Ammo | 21 | Lonoke, AR | 12/1/1993 | MODIFY COOLING TANK | | 0 | 0 | USD |
| 3003486 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | COOLING TANK FOR #420 EXTRUDER | | 0 | 0 | USD |
| 3003487 | 1 | Ammo | 21 | Lonoke, AR | 12/1/1993 | MODIFY COOLING TANK | | 0 | 0 | USD |
| 3003487 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | MODIFY COOLING TANK | | 0 | 0 | USD |
| 3003492 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | EXTRUDER CHILLER | | 0 | 0 | USD |
| 3003493 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 14' COOLING TANK | | 0 | 0 | USD |
| 3003494 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 30' COOLING TANK | | 0 | 0 | USD |
| 3003495 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 30' COOLING TANK | | 0 | 0 | USD |
| 3003499 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | VACUUM PUMP #1 | | 0 | 0 | USD |
| 3003500 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | VACUUM PUMP #2 | | 0 | 0 | USD |
| 3003501 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | VIRGIN HOPPER VACUUM PUMP & MOTOR | | 0 | 0 | USD |
| 3003502 | 1 | Ammo | 21 | Lonoke, AR | 12/1/1993 | REGRIND HOPPER VACUUM PUMP & MOTOR | | 0 | 0 | USD |
| 3003502 | 0 | Ammo | 21 | Lonoke, AR | 10/15/1999 | ADDL REGRIND CONVEYOR 100668 | | 0 | 0 | USD |
| 3003503 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | EXTRUDER HOPPER VACUUM PUMP & MOTOR | | 0 | 0 | USD |
| 3003507 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ROTARY BLOWER-SS EXTRUDE | | 0 | 0 | USD |
| 3003508 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | GEAR PUMP & DRIVE FOR 408 409 EXTRUDER | | 0 | 0 | USD |
| 3003508 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | GEAR PUMP&DRIVE FOR 408 409 EXTRUDER | | 0 | 0 | USD |
| 3003509 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | REGRIND FILTER - COLLECTOR | | 0 | 0 | USD |
| 3003510 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | DUST BLOWER & MOTOR | | 0 | 0 | USD |
| 3003511 | 1 | Ammo | 21 | Lonoke, AR | 12/1/1993 | "Y" MANIFOLD FOR #418 EXTRUDER | | 0 | 0 | USD |
| 3003511 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | Y TRANSFER LINE ADDITIONAL COST | | 0 | 0 | USD |
| 3003511 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | Y TRANSFER LINE | | 0 | 0 | USD |
| 3003512 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | PROCEDYNE CLEANING FURANCE | | 0 | 0 | USD |
| 3003513 | 1 | Ammo | 21 | Lonoke, AR | 9/15/2003 | RLC PROCEDYNE FURNACE | | 0 | 0 | USD |
| 3003513 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | AIR COOLING SYS-7 EXTRUDE CONT. PANELS | | 0 | 0 | USD |
| 3003516 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | DUST FILTER - COLLECTOR | | 0 | 0 | USD |
| 3003517 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | HOLDING HOPPER W HOPPER LOADER FOR #422 | | 0 | 0 | USD |
| 3003518 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | HOLDING HOPPER W HOPPER LOADER FOR #418 | | 0 | 0 | USD |
| 3003520 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | PNEUMATIC CONVEYING SYSTEM | | 0 | 0 | USD |
| 3003521 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | WIRETAINER STANDS | | 0 | 0 | USD |
| 3003522 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | WIRETAINER STANDS | | 0 | 0 | USD |
| 3003523 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | WIRETAINER STANDS | | 0 | 0 | USD |
| 3003524 | 1 | Ammo | 21 | Lonoke, AR | 12/1/1993 | EXTRUDER #418/419 4-1/2" P/M 70 | | 0 | 0 | USD |
| 3003524 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ADDL COST-CNTRL SYS/SCREEN CHGR 120184 | | 0 | 0 | USD |
| 3003524 | 0 | Ammo | 21 | Lonoke, AR | 5/15/1997 | ADDL-#418 EXTRUDER OVERHAUL | | 0 | 0 | USD |
| 3003525 | 1 | Ammo | 21 | Lonoke, AR | 12/1/1993 | EXTRUDER #420 W/AUTO CONTROLS | | 0 | 0 | USD |
| 3003525 | 2 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ADDL. COST-CONT SCR. CHGR. #420 52-12473 | | 0 | 0 | USD |
| 3003525 | 2 | Ammo | 21 | Lonoke, AR | 12/15/1997 | ADDL OVERHAUL SCREEN | | 0 | 0 | USD |
| 3003525 | 3 | Ammo | 21 | Lonoke, AR | 12/15/2002 | ADDL MOTOR | | 0 | 0 | USD |
| 3003525 | 4 | Ammo | 21 | Lonoke, AR | | | | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3003526 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | EXTRUDER D #408/409 | | 0 | 0 | 0 USD |
| 3003526 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | EXTRUDER "D"-ADDITIONAL COST | | 0 | 0 | 0 USD |
| 3003526 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 4-1 2" EXTRUDER ADDITIONAL COST | | 0 | 0 | 0 USD |
| 3003526 | 3 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST-CNTRL SYS/SCREEN CHANGER #408 | | 0 | 0 | 0 USD |
| 3003526 | 4 | Ammo | | 21 Lonoke, AR | 12/15/1997 | ADD'L OVERHAUL | | 0 | 0 | 0 USD |
| 3003526 | 5 | Ammo | | 21 Lonoke, AR | 8/15/2002 | SS #408 EXTRUDER MOTOR | | 0 | 0 | 0 USD |
| 3003526 | 6 | Ammo | | 21 Lonoke, AR | 2/15/2007 | ADD'L #408/409 EXT BARREL & SCREW | | 0 | 0 | 0 USD |
| 3003528 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | NRM EXTRUDER D #422 | | 0 | 0 | 0 USD |
| 3003528 | 3 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST-CONTINUOUS SCREEN CHANGER-422 | | 0 | 0 | 0 USD |
| 3003528 | 4 | Ammo | | 21 Lonoke, AR | 5/15/1997 | ADD'L-#422 EXTRUDER OVERHAUL | | 0 | 0 | 0 USD |
| 3003531 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS BODY ACME-FAB DRYER SS CON #401    T | | 0 | 0 | 0 USD |
| 3003531 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | WASH UNIT INSATLL    T | | 0 | 0 | 0 USD |
| 3003531 | 2 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL REBUILD WASH UNIT #687 | | 0 | 0 | 0 USD |
| 3003532 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ACME-FAB SS CAP WASH/INHIB/LUB 120529 #558 | | 0 | 0 | 0 USD |
| 3003532 | 1 | Ammo | | 21 Lonoke, AR | 5/15/2001 | #558 WASH UNIT/PROG CONTROLS 2876/100754 | | 0 | 0 | 0 USD |
| 3003532 | 2 | Ammo | | 21 Lonoke, AR | 3/15/2004 | ADD'L #558 WASH UNIT | | 0 | 0 | 0 USD |
| 3003533 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BULK STORAGE SILO PAD | | 0 | 0 | 0 USD |
| 3003535 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | HYDRAULIC UNIT FOR #427 SLUG ORIENT | | 0 | 0 | 0 USD |
| 3003537 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SEMI-WORKS RC MCH SS CON #862 | | 0 | 0 | 0 USD |
| 3003537 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MODIFY INSTL. SNG STA RC HEAT SET 1201112T | | 0 | 0 | 0 USD |
| 3003537 | 3 | Ammo | | 21 Lonoke, AR | 1/15/2007 | ADD'L RC BODY FORMER #862 | | 0 | 0 | 0 USD |
| 3003538 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SINGLE STATION ROTARY CAM UNIT    T | | 0 | 0 | 0 USD |
| 3003538 | 1 | Ammo | | 21 Lonoke, AR | 11/15/1994 | ADDL-UNIBODY #986 HS/#963 RC 2917 | | 0 | 0 | 0 USD |
| 3003539 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SINGLE STATION ROTARY CAM UNIT #964 | | 0 | 0 | 0 USD |
| 3003539 | 1 | Ammo | | 21 Lonoke, AR | 1/15/2007 | ADD'L RC BODY FORMER #964 | | 0 | 0 | 0 USD |
| 3003546 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | HEAT SET, 6 STA MACHINE | | 0 | 0 | 0 USD |
| 3003546 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST-HEAT SET   120121 | | 0 | 0 | 0 USD |
| 3003546 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST - MODIFICATION 110077 | | 0 | 0 | 0 USD |
| 3003547 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | HEAT SET, 6 STA MACHINE | | 0 | 0 | 0 USD |
| 3003547 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST-HEAT SET   120121 | | 0 | 0 | 0 USD |
| 3003547 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST-MODIFICATION 110077 | | 0 | 0 | 0 USD |
| 3003548 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PARTS WASH VIBRATORY INSP TABLE #556 | | 0 | 0 | 0 USD |
| 3003549 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PARTS WASH VIBRATORY INSP TABLE #557 | | 0 | 0 | 0 USD |
| 3003553 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ROCKPORT SAW #2 | | 0 | 0 | 0 USD |
| 3003554 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ROCKPORT SAW #1 | | 0 | 0 | 0 USD |
| 3003554 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST-AIRVAC FEED SYSTEM | | 0 | 0 | 0 USD |
| 3003555 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ROCKPORT SAW CUT-OFF MACHINE | | 0 | 0 | 0 USD |
| 3003555 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST-AIRVAC FEED SYSTEM | | 0 | 0 | 0 USD |
| 3003557 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 410 GAGE SLUG ORIENT MACHINE | | 0 | 0 | 0 USD |
| 3003557 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | OIL RECOVERY SYS #427   120058 | | 0 | 0 | 0 USD |
| 3003558 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SLUG ORIENTING MACHINE | | 0 | 0 | 0 USD |
| 3003558 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | OIL RECOVERY SYS #435 120058 | | 0 | 0 | 0 USD |
| 3003560 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SLUG ORIENTOR F MACHINE | | 0 | 0 | 0 USD |
| 3003560 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | OIL RECOVERY SYS #425  120058 | | 0 | 0 | 0 USD |
| 3003561 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SLUG ORIENT MACHINE | | 0 | 0 | 0 USD |
| 3003561 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | OIL RECOVERY SYS #431  120058 | | 0 | 0 | 0 USD |
| 3003562 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SLUG ORIENT MACHINE SER # 2355 | | 0 | 0 | 0 USD |
| 3003562 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | OIL RECOVERY SYS #433  120058 | | 0 | 0 | 0 USD |
| 3003562 | 3 | Ammo | | 21 Lonoke, AR | 3/15/2013 | ADD'L ELECTRICAL UPGRADE 101774 | | 0 | 0 | 0 USD |
| 3003563 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ROCKPORT DRUM CUTTER #436 ORIENT | | 0 | 0 | 0 USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3003563 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST - SS CON | 0 | 0 | 0 | USD |
| 3003566 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PLATFORM SCALE 4'X6' 5000 LB | 0 | 0 | 0 | USD |
| 3003566 | 0 | Ammo | | 21 Lonoke, AR | 5/5/1997 | ADDL-SCALE CONVERSION 3RD FLR POWDER POUR | 0 | 0 | 0 | USD |
| 3003567 | 0 | Ammo | | 21 Lonoke, AR | 5/5/1997 | PLATFORM SCALE 4' X 6' 1000 LB | 0 | 0 | 0 | USD |
| 3003567 | 1 | Ammo | | 21 Lonoke, AR | 5/5/1997 | ADDL-SCALE CONVERSION  AH&P | 0 | 0 | 0 | USD |
| 3003572 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | FARRIS PIPE PULLER | 0 | 0 | 0 | USD |
| 3003573 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | FARRIS PIPE PULLER #672 | 0 | 0 | 0 | USD |
| 3003574 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | FARRIS PIPE PULLER | 0 | 0 | 0 | USD |
| 3003575 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | FARRIS PIPE PULLER | 0 | 0 | 0 | USD |
| 3003576 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | FARRIS PIPE PULLER | 0 | 0 | 0 | USD |
| 3003577 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | FARRIS PIPE PULLER | 0 | 0 | 0 | USD |
| 3003579 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | FARRIS PIPE PULLER #671 | 0 | 0 | 0 | USD |
| 3003580 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | FARRIS PIPE PULLER | 0 | 0 | 0 | USD |
| 3003581 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | FARRIS PIPE PULLER S N 0600 VT 3923 | 0 | 0 | 0 | USD |
| 3003582 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SLUG CUTTER | 0 | 0 | 0 | USD |
| 3003582 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST-MODIFY #651 120086 | 0 | 0 | 0 | USD |
| 3003583 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SLUG CUTTER | 0 | 0 | 0 | USD |
| 3003583 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST-MODIFY #650 120086 | 0 | 0 | 0 | USD |
| 3003586 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SLUG CUTTER | 0 | 0 | 0 | USD |
| 3003586 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST D.C. DRIVE CONVERSION | 0 | 0 | 0 | USD |
| 3003586 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST-MODIFY #653 120086 | 0 | 0 | 0 | USD |
| 3003587 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SLUG CUTTER | 0 | 0 | 0 | USD |
| 3003587 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST-MODIFY #656 120086 | 0 | 0 | 0 | USD |
| 3003588 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SLUG CUTTER | 0 | 0 | 0 | USD |
| 3003588 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST-MODIFY #654 120086 | 0 | 0 | 0 | USD |
| 3003589 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SLUG CUTTER | 0 | 0 | 0 | USD |
| 3003589 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST-MODIFY #657 120086 | 0 | 0 | 0 | USD |
| 3003591 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SLUG CUTOFF-FOSTER ALLEN #649 | 0 | 0 | 0 | USD |
| 3003591 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST-MODIFY #649 120086 | 0 | 0 | 0 | USD |
| 3003592 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MICROSTAT MOLD CONTROLLER AT VENDOR | 0 | 0 | 0 | USD |
| 3003618 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL-FIGURE 8 TOOLING 110084 | 0 | 0 | 0 | USD |
| 3003619 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL-FIGURE 8 TOOLING 110083 | 0 | 0 | 0 | USD |
| 3003620 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL-R20 MOLD TOOLING 110083 | 0 | 0 | 0 | USD |
| 3003621 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL-SP12 MOLD TOOLING 110083 | 0 | 0 | 0 | USD |
| 3003668 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PCH/INSTL OIL RECOVERY SYSTEM | 0 | 0 | 0 | USD |
| 3003669 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 72IN WET SEPARATOR | 0 | 0 | 0 | USD |
| 3003670 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 72IN WET SEPARATOR | 0 | 0 | 0 | USD |
| 3003671 | 0 | Ammo | | 21 Lonoke, AR | 12/15/1993 | STORAGE FREIGHT ELEVATOR | 0 | 0 | 0 | USD |
| 3003671 | 2 | Ammo | | 21 Lonoke, AR | 5/8/1998 | ADDL FREIGHT ELEVATOR | 0 | 0 | 0 | USD |
| 3003672 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PRIMER ELEVATOR-DOVER OILDRAULIC | 0 | 0 | 0 | USD |
| 3003673 | 0 | Ammo | | 21 Lonoke, AR | 12/15/1996 | AH&P TRIPLEX #483/VBRAT BOWL 62-04860 | 0 | 0 | 0 | USD |
| 3003673 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SECOND CONTROL CONSOLE #483 120480 | 0 | 0 | 0 | USD |
| 3003673 | 3 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #483 SHELL INSPECT/CONVEYOR SYS 110086 | 0 | 0 | 0 | USD |
| 3003673 | 4 | Ammo | | 21 Lonoke, AR | 6/15/1996 | ADDL-#483 CAP FEED BOWL | 0 | 0 | 0 | USD |
| 3003673 | 7 | Ammo | | 21 Lonoke, AR | 12/15/2005 | ADDL #483 DRIVE UNIT | 0 | 0 | 0 | USD |
| 3003674 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ASSEMBLE. HEAD & PRIME MACHINE # 477 | 0 | 0 | 0 | USD |
| 3003674 | 4 | Ammo | | 21 Lonoke, AR | 12/15/1996 | ADDL - #477 CAP BOWL FEEDER | 0 | 0 | 0 | USD |
| 3003674 | 6 | Ammo | | 21 Lonoke, AR | 11/15/1999 | ADDL#477 TRIPLEX 100689 CSHAFT-BEARINGS | 0 | 0 | 0 | USD |
| 3003674 | 7 | Ammo | | 21 Lonoke, AR | 5/15/2000 | ADDL #477 CRANKSHAFT | 0 | 0 | 0 | USD |
| 3003674 | 8 | Ammo | | 21 Lonoke, AR | 4/15/2003 | ADDL #477 TRIPLEX AH&P - UPGR CONTROLS | 0 | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3003674 | 9 | Ammo | 21 | Lonoke, AR | 3/15/2004 | ADD'L #477 SS TRIPLEX - FERGUSON | 0 | 0 | 0 | USD |
| 3003674 | 12 | Ammo | 21 | Lonoke, AR | 2/15/2012 | MODIFY #477 FEEDER BOWL 101705 | 0 | 0 | 0 | USD |
| 3003675 | 1 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ADDITIONAL COST - A.H. & P. MACHINE | 0 | 0 | 0 | USD |
| 3003675 | 4 | Ammo | 21 | Lonoke, AR | 12/1/1993 | SECOND CONTROL CONSOLE #480 120480 | 0 | 0 | 0 | USD |
| 3003675 | 8 | Ammo | 21 | Lonoke, AR | 12/15/1996 | ADD'L - #480 CAP BOWL FEEDER | 0 | 0 | 0 | USD |
| 3003676 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | AH&P TRIPLEX #486 | 0 | 0 | 0 | USD |
| 3003676 | 1 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 3 TRACK FEEDER | 0 | 0 | 0 | USD |
| 3003676 | 2 | Ammo | 21 | Lonoke, AR | 12/1/1993 | PROGRAMMABLE CONTROLLER #486 | 0 | 0 | 0 | USD |
| 3003676 | 3 | Ammo | 21 | Lonoke, AR | 12/1/1993 | VIBRATORY FEEDER 20 GA #486 120373 | 0 | 0 | 0 | USD |
| 3003676 | 4 | Ammo | 21 | Lonoke, AR | 12/1/1993 | SECOND CONTROL CONSOLE #486 120480 | 0 | 0 | 0 | USD |
| 3003676 | 5 | Ammo | 21 | Lonoke, AR | 12/1/1993 | #486 SHELL INSPECT/CONVEYOR SYS 110086 | 0 | 0 | 0 | USD |
| 3003676 | 0 | Ammo | 21 | Lonoke, AR | 3/15/2003 | #486 DRIVE UNIT | 0 | 0 | 0 | USD |
| 3003677 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | AH&P SIMPLEX #495 | 0 | 0 | 0 | USD |
| 3003677 | 1 | Ammo | 21 | Lonoke, AR | 11/15/1994 | ADD'L-UNIBODY #495 410GA 2917 | 0 | 0 | 0 | USD |
| 3003677 | 5 | Ammo | 21 | Lonoke, AR | 2/15/2003 | ADD'L WAD FEED SYSTEM | 0 | 0 | 0 | USD |
| 3003677 | 6 | Ammo | 21 | Lonoke, AR | 3/15/2003 | #495 PRIMER FEED BOWL | 0 | 0 | 0 | USD |
| 3003678 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | AH&P SIMPLEX #496 | 0 | 0 | 0 | USD |
| 3003678 | 3 | Ammo | 21 | Lonoke, AR | 12/1/1993 | #496 SHELL INSPECT/CONVEYOR SYS 110086 | 0 | 0 | 0 | USD |
| 3003678 | 5 | Ammo | 21 | Lonoke, AR | 2/15/2003 | ADD'L CAP FEED BOWL | 0 | 0 | 0 | USD |
| 3003678 | 6 | Ammo | 21 | Lonoke, AR | 2/15/2003 | ADD'L WAD FEED SYSTEM | 0 | 0 | 0 | USD |
| 3003678 | 7 | Ammo | 21 | Lonoke, AR | 3/15/2003 | #496 PRIMER FEED BOWL | 0 | 0 | 0 | USD |
| 3003679 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | AH&P SIMPLEX #497 | 0 | 0 | 0 | USD |
| 3003679 | 1 | Ammo | 21 | Lonoke, AR | 11/15/1994 | ADD'L-UNIBODY #497 28GA 2917 | 0 | 0 | 0 | USD |
| 3003679 | 4 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ADD'L-MODIFY #497 FOR 12GA 3-1/2" | 0 | 0 | 0 | USD |
| 3003679 | 5 | Ammo | 21 | Lonoke, AR | 2/15/2001 | ADD'L CAP FEED BOWL | 0 | 0 | 0 | USD |
| 3003679 | 7 | Ammo | 21 | Lonoke, AR | 2/15/2003 | ADD'L WAD FEED SYSTEM | 0 | 0 | 0 | USD |
| 3003679 | 8 | Ammo | 21 | Lonoke, AR | 3/15/2003 | #497 PRIMER FEED BOWL | 0 | 0 | 0 | USD |
| 3003679 | 0 | Ammo | 21 | Lonoke, AR | 3/15/2004 | ADD'L #497 SIMPLEX AH&P | 0 | 0 | 0 | USD |
| 3003680 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | AH&P TRIPLEX #489 | 0 | 0 | 0 | USD |
| 3003680 | 3 | Ammo | 21 | Lonoke, AR | 12/1/1993 | INSTALL 12-73/VIB BOWL-3 #489 62-04860 | 0 | 0 | 0 | USD |
| 3003680 | 4 | Ammo | 21 | Lonoke, AR | 12/1/1993 | VIBRATORY PRIMER FEEDER WIP TRANSFER | 0 | 0 | 0 | USD |
| 3003680 | 5 | Ammo | 21 | Lonoke, AR | 12/1/1993 | SURGE TANK & AIR LINE - CLUTCH | 0 | 0 | 0 | USD |
| 3003680 | 6 | Ammo | 21 | Lonoke, AR | 12/1/1993 | PROGRAM CONTROLLER AH&P 52-12164 | 0 | 0 | 0 | USD |
| 3003680 | 7 | Ammo | 21 | Lonoke, AR | 12/1/1993 | SECOND CONTROL CONSOLE #489 120480 | 0 | 0 | 0 | USD |
| 3003680 | 10 | Ammo | 21 | Lonoke, AR | 12/15/2005 | REBUILD #489 SS TRIPLEX | 0 | 0 | 0 | USD |
| 3003681 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | AH&P SIMPLEX #498 | 0 | 0 | 0 | USD |
| 3003681 | 6 | Ammo | 21 | Lonoke, AR | 7/15/1997 | ADD'L-CAP FEED BOWL/3 FEED LINES | 0 | 0 | 0 | USD |
| 3003681 | 8 | Ammo | 21 | Lonoke, AR | 2/15/2003 | ADD'L WAD FEED SYTEM | 0 | 0 | 0 | USD |
| 3003681 | 9 | Ammo | 21 | Lonoke, AR | 3/15/2003 | #498 PRIMER FEED BOWL | 0 | 0 | 0 | USD |
| 3003681 | 10 | Ammo | 21 | Lonoke, AR | 2/15/2012 | MODIFY #498 FEEDER BOWL 101705 | 0 | 0 | 0 | USD |
| 3003682 | 13 | Ammo | 21 | Lonoke, AR | 12/1/1993 | AH&P SIMPLEX #494 | 0 | 0 | 0 | USD |
| 3003682 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | PROGRAM CONTROLLER/ADD'L - SS CON | 0 | 0 | 0 | USD |
| 3003682 | 4 | Ammo | 21 | Lonoke, AR | 2/15/2001 | ADD'L CAP FEED BOWL | 0 | 0 | 0 | USD |
| 3003682 | 5 | Ammo | 21 | Lonoke, AR | 5/15/2002 | ADD'L PRIMER BOWL #494 | 0 | 0 | 0 | USD |
| 3003682 | 6 | Ammo | 21 | Lonoke, AR | 2/15/2003 | ADD'L WAD FEED SYSTEM | 0 | 0 | 0 | USD |
| 3003683 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | AH&P TRIPLEX #478 | 0 | 0 | 0 | USD |
| 3003683 | 1 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ADD'L COST-TRIPLEX | 0 | 0 | 0 | USD |
| 3003683 | 2 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 3" VIBRATORY FEEDER | 0 | 0 | 0 | USD |
| 3003683 | 3 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ADD'L COST-TRIPLEX/ADD'L COST FEEDER | 0 | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3003683 | 5 | Ammo | | 21 Lonoke, AR | 12/1/1993 | REVISE PRIMER FEED                    U | 0 | 0 | 0 | USD |
| 3003683 | 7 | Ammo | | 21 Lonoke, AR | 5/15/1996 | ADDL #478 TRIPLEX OVERHAUL | 0 | 0 | 0 | USD |
| 3003683 | 8 | Ammo | | 21 Lonoke, AR | 9/15/1997 | ADDL - CAP BOWL FEEDER #478 | 0 | 0 | 0 | USD |
| 3003683 | 11 | Ammo | | 21 Lonoke, AR | 2/15/2012 | MODIFY #478 FEEDER BOWL 101705 | 0 | 0 | 0 | USD |
| 3003706 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | VIBRATORY FEEDER W CONTROLS #472 | 0 | 0 | 0 | USD |
| 3003707 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | VIBRATORY FEEDER W CONTROLS #466 | 0 | 0 | 0 | USD |
| 3003707 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | INSTALL #466 BLOWN PRIMER/CT DN INSP 200-3 110086 | 0 | 0 | 0 | USD |
| 3003710 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | VIBRATORY FEEDER W CONTROLS #463 | 0 | 0 | 0 | USD |
| 3003716 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | VIBRATORY FEEDER W CONTROLS #464 | 0 | 0 | 0 | USD |
| 3003717 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LEAD SHOT STORAGE TANKS | 0 | 0 | 0 | USD |
| 3003718 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SHOT STORAGE TANKS | 0 | 0 | 0 | USD |
| 3003718 | 3 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SHOT DROPPING FURNANCE | 0 | 0 | 0 | USD |
| 3003718 | 4 | Ammo | | 21 Lonoke, AR | 3/15/2003 | ADDL SHOT FURNACE | 0 | 0 | 0 | USD |
| 3003720 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2004 | LEAD SHOT KETTLE CONTROLS | 0 | 0 | 0 | USD |
| 3003721 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | FREIGHT ELEVATOR | 0 | 0 | 0 | USD |
| 3003721 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PAI HORIZONTAL PIG CONVEYOR | 0 | 0 | 0 | USD |
| 3003722 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | TRANSFER CONVEYOR & DRIVE | 0 | 0 | 0 | USD |
| 3003723 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SHOT DRYER | 0 | 0 | 0 | USD |
| 3003723 | 1 | Ammo | | 21 Lonoke, AR | 2/15/1998 | ADDL REPLACE DRUM | 0 | 0 | 0 | USD |
| 3003724 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LEAD SHOT BAGGING EQUIPMENT (vendor) | 0 | 0 | 0 | USD |
| 3003725 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | TEMPERATURE CONTROL SYSTEM | 0 | 0 | 0 | USD |
| 3003726 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | WET SHOT ELEVATOR | 0 | 0 | 0 | USD |
| 3003726 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST-REBUILD WET SHOT CONV 120382 | 0 | 0 | 0 | USD |
| 3003726 | 2 | Ammo | | 21 Lonoke, AR | 3/15/2003 | REB CONVEYOR HOUSING | 0 | 0 | 0 | USD |
| 3003727 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SCRAP SHOT ELEVATOR & DRIVE | 0 | 0 | 0 | USD |
| 3003727 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST-REBUILD SCRAP SHOT CONV / 120382 | 0 | 0 | 0 | USD |
| 3003728 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PIG LEAD ELEVATOR | 0 | 0 | 0 | USD |
| 3003728 | 1 | Ammo | | 21 Lonoke, AR | 3/15/1995 | ADD-RPL LD PIG ELEV CHAIN 2286 | 0 | 0 | 0 | USD |
| 3003728 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ACCESS PIT-PIG LEAD ELEVATOR | 0 | 0 | 0 | USD |
| 3003728 | 3 | Ammo | | 21 Lonoke, AR | 3/15/2003 | REB LEAD PIG CONVEYOR | 0 | 0 | 0 | USD |
| 3003729 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DROPPING TUBE | 0 | 0 | 0 | USD |
| 3003729 | 1 | Ammo | | 21 Lonoke, AR | 10/15/2001 | ADD'L COST ACCESS DOORS | 0 | 0 | 0 | USD |
| 3003730 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BARREL PUMPER                    T | 0 | 0 | 0 | USD |
| 3003736 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | VACUUM PRODUCER & 25 HP MOTOR | 0 | 0 | 0 | USD |
| 3003737 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | VACUUM PRODUCER & 25HP MOTOR | 0 | 0 | 0 | USD |
| 3003738 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PAI WAX SUPPLY TANK SS CON | 0 | 0 | 0 | USD |
| 3003739 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUST COLLECTOR | 0 | 0 | 0 | USD |
| 3003740 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PRIMED SHELL CHUTES | 0 | 0 | 0 | USD |
| 3003741 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER PISTON CHUTES | 0 | 0 | 0 | USD |
| 3003742 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LEAD SHOT FEED LINES | 0 | 0 | 0 | USD |
| 3003744 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | WAD CHUTES | 0 | 0 | 0 | USD |
| 3003745 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SKIVING VACUUM SYSTEM | 0 | 0 | 0 | USD |
| 3003746 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LOADED ROUND TRANSFER TUBES | 0 | 0 | 0 | USD |
| 3003747 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LOADED ROUND SHOT SHELL SALVAGE MACHINE | 0 | 0 | 0 | USD |
| 3003747 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST-GUARDS/DETECTS #694 120325 | 0 | 0 | 0 | USD |
| 3003748 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ST LINE SALVAGE MACHINE SS CON #863 | 0 | 0 | 0 | USD |
| 3003748 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | INSTL MODIFY SALVAGE MACHINE        T | 0 | 0 | 0 | USD |
| 3003752 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | VIBRO BLOCK FEEDER FOR #500 LOADER | 0 | 0 | 0 | USD |
| 3003753 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | VIBRO-BLOCK FEEDER | 0 | 0 | 0 | USD |
| 3003754 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUPLEX LOADER #515 | 0 | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3003754 | 2 | Ammo | | 21 Lonoke, AR | 10/15/1996 | ADDL-SHOT & CONTAINER FEED | | 0 | 0 | USD |
| 3003754 | 3 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL DATA COMMUNICATIONS UPG | | 0 | 0 | USD |
| 3003755 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUPLEX LOADER #504 | | 0 | 0 | USD |
| 3003755 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST - STEEL SHOT CHARGER 82-12370 | | 0 | 0 | USD |
| 3003755 | 4 | Ammo | | 21 Lonoke, AR | 9/15/1995 | ADDL - #504 GLUE/CRIMP/STEEL SHOT | | 0 | 0 | USD |
| 3003755 | 5 | Ammo | | 21 Lonoke, AR | 10/15/1998 | ADDL WATERPROOFING | | 0 | 0 | USD |
| 3003755 | 6 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADDL DETECTION SYSTEM | | 0 | 0 | USD |
| 3003755 | 7 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADDL SKIVING MODIFICATIONS | | 0 | 0 | USD |
| 3003755 | 8 | Ammo | | 21 Lonoke, AR | 1/15/1999 | ADDL #504 LOADER | | 0 | 0 | USD |
| 3003755 | 9 | Ammo | | 21 Lonoke, AR | 4/15/1999 | ADDL #504 LOADER | | 0 | 0 | USD |
| 3003755 | 10 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL DATA COMMUNICATIONS UPG | | 0 | 0 | USD |
| 3003756 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUPLEX LOADER #506 | | 0 | 0 | USD |
| 3003756 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUPLEX LOADER - UPGRADE          U | | 0 | 0 | USD |
| 3003756 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | VIBRATORY WAD FEED SYS #506 120296 | | 0 | 0 | USD |
| 3003756 | 4 | Ammo | | 21 Lonoke, AR | 12/14/1995 | ADDL - MODIFY WAD FEED BOWL - 506 | | 0 | 0 | USD |
| 3003756 | 5 | Ammo | | 21 Lonoke, AR | 10/15/1998 | ADDL WATERPROOFING | | 0 | 0 | USD |
| 3003756 | 6 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADDL DETECTION SYSTEM | | 0 | 0 | USD |
| 3003756 | 7 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL DATA COMMUNICATIONS UPG | | 0 | 0 | USD |
| 3003757 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUPLEX LOADER #507 | | 0 | 0 | USD |
| 3003757 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | VIBRATORY WAD FEED SYS #507 120296 | | 0 | 0 | USD |
| 3003757 | 3 | Ammo | | 21 Lonoke, AR | 12/15/1996 | ADDL - WAD FEED BOWL | | 0 | 0 | USD |
| 3003757 | 4 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADDL DETECTION SYSTEM | | 0 | 0 | USD |
| 3003757 | 5 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADDL DETECTION SYSTEM | | 0 | 0 | USD |
| 3003757 | 6 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL DATA COMMUNICATIONS UPG | | 0 | 0 | USD |
| 3003758 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUPLEX LOADER #516 | | 0 | 0 | USD |
| 3003758 | 1 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADDL SKIVING MODIFICATIONS | | 0 | 0 | USD |
| 3003758 | 2 | Ammo | | 21 Lonoke, AR | 11/15/2000 | ADDL WATERPROOFING | | 0 | 0 | USD |
| 3003758 | 3 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL DATA COMMUNICATIONS UPG | | 0 | 0 | USD |
| 3003759 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUPLEX LOADER #505 | | 0 | 0 | USD |
| 3003759 | 2 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADDL DETECTION SYSTEM | | 0 | 0 | USD |
| 3003759 | 3 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADDL SKIVING MODIFICATION | | 0 | 0 | USD |
| 3003759 | 4 | Ammo | | 21 Lonoke, AR | 6/15/2001 | ADDL 505 DUPLEX LOADER | | 0 | 0 | USD |
| 3003759 | 5 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL DATA COMMUNICATIONS UPG | | 0 | 0 | USD |
| 3003760 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUPLEX LOADER #508 | | 0 | 0 | USD |
| 3003760 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | WAD BOWL -DPX LDR. | | 0 | 0 | USD |
| 3003760 | 4 | Ammo | | 21 Lonoke, AR | 9/15/1995 | ADDL - #508 VIBRATORY WAD FEED | | 0 | 0 | USD |
| 3003760 | 5 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADDL DETECTION SYSTEM | | 0 | 0 | USD |
| 3003760 | 6 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADDL SKIVING MODIFICATIONS | | 0 | 0 | USD |
| 3003760 | 7 | Ammo | | 21 Lonoke, AR | 7/15/2001 | ADDL #508 SHELL FEED SYSTEM | | 0 | 0 | USD |
| 3003760 | 9 | Ammo | | 21 Lonoke, AR | 6/15/2009 | ADDL DATA COMMUNICATIONS UPG | | 0 | 0 | USD |
| 3003761 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUPLEX LOADING MACHINE #520 | | 0 | 0 | USD |
| 3003761 | 2 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADDL DETECTION SYSTEM | | 0 | 0 | USD |
| 3003761 | 3 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADDL SKIVING MODIFICATIONS | | 0 | 0 | USD |
| 3003761 | 4 | Ammo | | 21 Lonoke, AR | 10/15/1999 | WAD BOWL FEEDER 100643 | | 0 | 0 | USD |
| 3003761 | 5 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL DATA COMMUNICATIONS UPG | | 0 | 0 | USD |
| 3003762 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUPLEX LOADER #518 | | 0 | 0 | USD |
| 3003762 | 4 | Ammo | | 21 Lonoke, AR | 9/15/1995 | ADDL - #518 GLUE/CRIMP/STEEL SHOT | | 0 | 0 | USD |
| 3003762 | 4 | Ammo | | 21 Lonoke, AR | 10/15/1998 | ADDL WATERPROOFING | | 0 | 0 | USD |
| 3003762 | 5 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADDL DETECTION SYSTEM | | 0 | 0 | USD |
| 3003762 | 6 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADDL SKIVING MODIFICATIONS | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3003762 | 7 | Ammo | | 21 Lonoke, AR | 10/15/1999 | WAD BOWL FEEDER 100643 | | 0 | 0 | USD |
| 3003763 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUPLEX LOADER  W/MOTORS #519 | | 0 | 0 | USD |
| 3003763 | 2 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADD'L DETECTION SYSTEM | | 0 | 0 | USD |
| 3003763 | 3 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADD'L SKIVING MODIFICATIONS | | 0 | 0 | USD |
| 3003763 | 4 | Ammo | | 21 Lonoke, AR | 10/15/1999 | WAD BOWL FEEDER 100643 | | 0 | 0 | USD |
| 3003763 | 5 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADD'L DATA COMMUNICATIONS UPG | | 0 | 0 | USD |
| 3003764 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS DUPLEX LOADER #521 | | 0 | 0 | USD |
| 3003764 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER PISTON FEEDER | | 0 | 0 | USD |
| 3003764 | 3 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST - SS CON | | 0 | 0 | USD |
| 3003764 | 4 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST - SS CON | | 0 | 0 | USD |
| 3003764 | 5 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST - STEEL SHOT CHARGER 52-12370 | | 0 | 0 | USD |
| 3003764 | 6 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST-MOD #521 LDR FOR 3" 120090    U | | 0 | 0 | USD |
| 3003764 | 7 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST MOD #521 LDR 3" 120090 | | 0 | 0 | USD |
| 3003764 | 8 | Ammo | | 21 Lonoke, AR | 12/1/1993 | UPGRADE #521 LOADER 20 GA 120201 | | 0 | 0 | USD |
| 3003764 | 9 | Ammo | | 21 Lonoke, AR | 9/5/1995 | ADD'L - #521 GLUE/CRIMP/STEEL SHOT | | 0 | 0 | USD |
| 3003764 | 10 | Ammo | | 21 Lonoke, AR | 9/5/1995 | ADD'L - #521 VIBRATORY FEEDER | | 0 | 0 | USD |
| 3003764 | 12 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADD'L DETECTION SYSTEM | | 0 | 0 | USD |
| 3003764 | 13 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADD'L DATA COMMUNICATIONS UPG | | 0 | 0 | USD |
| 3003765 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS DUPLEX LOADER # 503 | | 0 | 0 | USD |
| 3003765 | 4 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST - SS CON | | 0 | 0 | USD |
| 3003765 | 5 | Ammo | | 21 Lonoke, AR | 9/15/1995 | ADD'L - #503 GLUE/CRIMP/STEEL SHOT | | 0 | 0 | USD |
| 3003765 | 6 | Ammo | | 21 Lonoke, AR | 12/15/1996 | ADD'L - WAD FEED BOWL | | 0 | 0 | USD |
| 3003765 | 7 | Ammo | | 21 Lonoke, AR | 10/15/1998 | ADD'L WATERPROOFING | | 0 | 0 | USD |
| 3003765 | 8 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADD'L DETECTION SYSTEM | | 0 | 0 | USD |
| 3003765 | 9 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADD'L SKIVING MODIFICATION | | 0 | 0 | USD |
| 3003765 | 10 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADD'L DATA COMMUNICATIONS UPG | | 0 | 0 | USD |
| 3003766 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS DUPLEX LOADER #509 | | 0 | 0 | USD |
| 3003766 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST - SS CON | | 0 | 0 | USD |
| 3003766 | 3 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MODIFY 8 GA-SHOT CHGR CAP DESIGN    U | | 0 | 0 | USD |
| 3003766 | 4 | Ammo | | 21 Lonoke, AR | 5/15/1996 | ADD'L-#509 FIRE DAMAGE | | 0 | 0 | USD |
| 3003766 | 5 | Ammo | | 21 Lonoke, AR | 7/15/2001 | 8GA #509 FIRE EXT SYSTEM | | 0 | 0 | USD |
| 3003766 | 6 | Ammo | | 21 Lonoke, AR | 11/15/2004 | ADD'L #509 LOADER | | 0 | 0 | USD |
| 3003766 | 8 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADD'L DATA COMMUNICATIONS UPG | | 0 | 0 | USD |
| 3003767 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUPLEX LOADER #511 | | 0 | 0 | USD |
| 3003767 | 4 | Ammo | | 21 Lonoke, AR | 7/15/1997 | ADD'L-MODIFY OPERATING STATIONS | | 0 | 0 | USD |
| 3003767 | 6 | Ammo | | 21 Lonoke, AR | 10/15/1999 | VIBRATORY FEED SYSTEM/CRIMPER 100547 | | 0 | 0 | USD |
| 3003767 | 7 | Ammo | | 21 Lonoke, AR | 11/15/2000 | ADD'L WATERPROOFING | | 0 | 0 | USD |
| 3003767 | 8 | Ammo | | 21 Lonoke, AR | 2/15/2002 | ADD'L SS DUPLEX LOADER | | 0 | 0 | USD |
| 3003767 | 9 | Ammo | | 21 Lonoke, AR | 1/15/2003 | ADD'L POWDER CHARGER | | 0 | 0 | USD |
| 3003767 | 11 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADD'L DATA COMMUNICATIONS UPG | | 0 | 0 | USD |
| 3003768 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS DUPLEX LOADER #500 SS CON | | 0 | 0 | USD |
| 3003768 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CNVT/INSTL 12 RD SUPLES LDR #500 | | 0 | 0 | USD |
| 3003768 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L-SYNTRON SLUG FDR 12RS #500 | | 0 | 0 | USD |
| 3003769 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS DUPLEX LOADER #512 SS CON | | 0 | 0 | USD |
| 3003769 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUPLEX LDR #512-INSTL/MODIFY TO 410    T | | 0 | 0 | USD |
| 3003770 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SIMPLEX LOADER #525 | | 0 | 0 | USD |
| 3003770 | 2 | Ammo | | 21 Lonoke, AR | 7/15/2003 | OVH #525 SIMPLEX LOADER | | 0 | 0 | USD |
| 3003770 | 3 | Ammo | | 21 Lonoke, AR | 6/15/1996 | #525 BUCKSHOT CONVERSION KIT | | 0 | 0 | USD |
| 3003770 | 4 | Ammo | | 21 Lonoke, AR | 3/15/1998 | ADD'L REB #525 LOADER  2633/100462 | | 0 | 0 | USD |
| 3003770 | 6 | Ammo | | 21 Lonoke, AR | 11/15/1998 | ADD'L BUCKSHOT FEEDER #525  100514 | | 0 | 0 | USD |
| 3003770 | 7 | Ammo | | 21 Lonoke, AR | 2/15/1999 | ADD'L BUCKSHOT FEED #525 | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3003770 | 9 | Ammo | | 21 Lonoke, AR | 4/15/2006 | ADDL #525 UPGRADE | | 0 | 0 | 0 USD |
| 3003770 | 11 | Ammo | | 21 Lonoke, AR | 10/15/2008 | ADDL COUNTING SHOT CHARGER | | 0 | 0 | 0 USD |
| 3003771 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SIMPLEX LOADER #526 12 GA | | 0 | 0 | 0 USD |
| 3003771 | 4 | Ammo | | 21 Lonoke, AR | 9/15/1995 | ADDL - #526 GLUE/CRIMP/STEEL SHOT | | 0 | 0 | 0 USD |
| 3003771 | 5 | Ammo | | 21 Lonoke, AR | 9/15/1995 | ADDL - #526 STEEL SHOT CHARGER | | 0 | 0 | 0 USD |
| 3003771 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SIMPLEX LOADER #527  16-20 GA | | 0 | 0 | 0 USD |
| 3003772 | 3 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST-STEEL WAD FR DOBWL #527 120219 | | 0 | 0 | 0 USD |
| 3003772 | 5 | Ammo | | 21 Lonoke, AR | 9/15/1995 | ADDL - #527 GLUE/CRIMP/STEEL SHOT | | 0 | 0 | 0 USD |
| 3003772 | 6 | Ammo | | 21 Lonoke, AR | 1/15/1997 | ADDL-COLLATOR TURNOVER UNIT | | 0 | 0 | 0 USD |
| 3003772 | 8 | Ammo | | 21 Lonoke, AR | 2/15/2000 | 20GA SABOT FEEDER 100686 | | 0 | 0 | 0 USD |
| 3003772 | 9 | Ammo | | 21 Lonoke, AR | 2/15/2000 | 20GA SLUG FEEDER 100686 | | 0 | 0 | 0 USD |
| 3003772 | 10 | Ammo | | 21 Lonoke, AR | 7/15/2001 | 12 GA VIBRATORY FEED SYSTEM | | 0 | 0 | 0 USD |
| 3003772 | 11 | Ammo | | 21 Lonoke, AR | 9/15/2003 | ADDL 12GA FRANGIBLE SLUG SETUP | | 0 | 0 | 0 USD |
| 3003772 | 12 | Ammo | | 21 Lonoke, AR | 10/15/2003 | ADDL SABOT SLUG FEEDER | | 0 | 0 | 0 USD |
| 3003772 | 13 | Ammo | | 21 Lonoke, AR | 5/15/2004 | ADDL SS SIMPLEX #527 UPGRADE | | 0 | 0 | 0 USD |
| 3003772 | 14 | Ammo | | 21 Lonoke, AR | 10/15/2004 | ADDL 12 GA ULTRA SETUP | | 0 | 0 | 0 USD |
| 3003772 | 15 | Ammo | | 21 Lonoke, AR | 11/15/2004 | ADDL #527 TRANSFER UNITS | | 0 | 0 | 0 USD |
| 3003772 | 16 | Ammo | | 21 Lonoke, AR | 3/15/2000 | WAD FEED BOWL 100701 | | 0 | 0 | 0 USD |
| 3003772 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PLATFORM SCALE  4'X6'  1000 LB | | 0 | 0 | 0 USD |
| 3003780 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PORTABLE SHELL FEEDER W/BBL DUMP      T | | 0 | 0 | 0 USD |
| 3003782 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS PACK FREIGHT ELEVATOR | | 0 | 0 | 0 USD |
| 3003782 | 1 | Ammo | | 21 Lonoke, AR | 2/15/2002 | ADDL SS #5 ELEVATOR | | 0 | 0 | 0 USD |
| 3003782 | 0 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADDL FREIGHT ELEVATOR | | 0 | 0 | 0 USD |
| 3003792 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CARTRIDGE BOX IDENTIFICATION SYS #635 | | 0 | 0 | 0 USD |
| 3003793 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CARTRIDGE BOX IDENTIFICATION SYSTEM  #636 | | 0 | 0 | 0 USD |
| 3003797 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AUTO PALLETIZER-LITTON MCH #630 | | 0 | 0 | 0 USD |
| 3003800 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AUTOMATIC INSPECT AND PACK MACHINE #627 | | 0 | 0 | 0 USD |
| 3003800 | 3 | Ammo | | 21 Lonoke, AR | 9/15/1995 | ADDL - #605 COVERT TO STEEL | | 0 | 0 | 0 USD |
| 3003800 | 4 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL - INSTALLATION # 627 | | 0 | 0 | 0 USD |
| 3003800 | 5 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL #605 INSTALLATION | | 0 | 0 | 0 USD |
| 3003800 | 6 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL FEEDER/CHUTE #627 | | 0 | 0 | 0 USD |
| 3003800 | 8 | Ammo | | 21 Lonoke, AR | 2/15/2007 | ADDL TAPE MACHINE #627 | | 0 | 0 | 0 USD |
| 3003800 | 10 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL DATA COMMUNICATIONS UPG | | 0 | 0 | 0 USD |
| 3003800 | 11 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL DATA COMMUNICATIONS UPG | | 0 | 0 | 0 USD |
| 3003801 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AUTOMATIC INSPECT & PACK MACHINE #606 | | 0 | 0 | 0 USD |
| 3003801 | 3 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL #606 INSTALLATION | | 0 | 0 | 0 USD |
| 3003801 | 3 | Ammo | | 21 Lonoke, AR | 1/15/1997 | ADDL-OVERHAUL 606 PACKER | | 0 | 0 | 0 USD |
| 3003802 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AUTO INSPECTION & PACK MACHINE #608 | | 0 | 0 | 0 USD |
| 3003802 | 2 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL #608 INSTALLATION | | 0 | 0 | 0 USD |
| 3003802 | 3 | Ammo | | 21 Lonoke, AR | 10/15/2001 | CASE TAPE MACHINE | | 0 | 0 | 0 USD |
| 3003802 | 4 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL DATA COMMUNICATIONS UPG | | 0 | 0 | 0 USD |
| 3003803 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AUTOMATIC INSPECTION AND PACK MACHINE #615 | | 0 | 0 | 0 USD |
| 3003803 | 2 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL #615 INSTALLATION | | 0 | 0 | 0 USD |
| 3003803 | 3 | Ammo | | 21 Lonoke, AR | 10/15/2001 | CASE TAPE MACHINE | | 0 | 0 | 0 USD |
| 3003803 | 4 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL DATA COMMUNICATIONS UPG | | 0 | 0 | 0 USD |
| 3003804 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #3 AUTO INSPECT & PACK MACHINE #617 | | 0 | 0 | 0 USD |
| 3003804 | 2 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL - INSTALLATION # 617 | | 0 | 0 | 0 USD |
| 3003804 | 3 | Ammo | | 21 Lonoke, AR | 10/15/2001 | CASE TAPE MACHINE | | 0 | 0 | 0 USD |
| 3003804 | 4 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL DATA COMMUNICATIONS UPG | | 0 | 0 | 0 USD |
| 3003805 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AUTOMATIC INSPECT & PACK MACHINE #622 | | 0 | 0 | 0 USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3003805 | 2 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL - INSTALLATION # 622 | | 0 | 0 | USD |
| 3003805 | 5 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL DATA COMMUNICATIONS UPG | | 0 | 0 | USD |
| 3003806 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AUTOMATIC INSPECT & PACK MACHINE #619 | | 0 | 0 | USD |
| 3003806 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #619 MODIFY FOR 20/25 RD BOXES 120584 | | 0 | 0 | USD |
| 3003806 | 3 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL - INSTALLATION # 619 | | 0 | 0 | USD |
| 3003806 | 5 | Ammo | | 21 Lonoke, AR | 10/15/2001 | CASE TAPE MACHINE | | 0 | 0 | USD |
| 3003806 | 6 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL DATA COMMUNICATIONS UPG | | 0 | 0 | USD |
| 3003807 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AUTOMATIC INSPECT & PACK MACHINE #620 | | 0 | 0 | USD |
| 3003807 | 2 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL - INSTALLATION #620 | | 0 | 0 | USD |
| 3003807 | 4 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL DATA COMMUNICATIONS UPG | | 0 | 0 | USD |
| 3003808 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AUTOMATIC INSPECT & PACK MACHINE #618 | | 0 | 0 | USD |
| 3003808 | 2 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL - INSTALLATION # 618 | | 0 | 0 | USD |
| 3003808 | 4 | Ammo | | 21 Lonoke, AR | 5/15/2005 | ADDL 618 ALTERNATOR | | 0 | 0 | USD |
| 3003808 | 5 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL DATA COMMUNICATIONS UPG | | 0 | 0 | USD |
| 3003809 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AUTOMATIC INSPECT & PACK MACHINE #607 | | 0 | 0 | USD |
| 3003809 | 2 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL #607 INSTALLATION | | 0 | 0 | USD |
| 3003809 | 3 | Ammo | | 21 Lonoke, AR | 11/15/1996 | ADDL-MODIFY FOR 20/25 ROUND | | 0 | 0 | USD |
| 3003809 | 4 | Ammo | | 21 Lonoke, AR | 9/15/2007 | ADDL TAPE MACHINE #607 | | 0 | 0 | USD |
| 3003809 | 5 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL DATA COMMUNICATIONS UPG | | 0 | 0 | USD |
| 3003810 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS DUPLEX PACKER #621 | | 0 | 0 | USD |
| 3003810 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST - SS CON | | 0 | 0 | USD |
| 3003810 | 3 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL - INSTALLATION #621 | | 0 | 0 | USD |
| 3003810 | 4 | Ammo | | 21 Lonoke, AR | 2/15/2007 | ADDL TAPE MACHINE #621 | | 0 | 0 | USD |
| 3003810 | 5 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL DATA COMMUNICATIONS UPG | | 0 | 0 | USD |
| 3003811 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS DUPLEX PACKER #603 | | 0 | 0 | USD |
| 3003811 | 2 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL #603 INSTALLATION | | 0 | 0 | USD |
| 3003811 | 3 | Ammo | | 21 Lonoke, AR | 10/15/1996 | ADDL-REBUILD #603 PACKER | | 0 | 0 | USD |
| 3003811 | 4 | Ammo | | 21 Lonoke, AR | 9/15/2007 | ADDL TAPE MACHINE #603 | | 0 | 0 | USD |
| 3003811 | 6 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL DATA COMMUNICATIONS UPG | | 0 | 0 | USD |
| 3003812 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 250 RD PACK UNIT-8 GA  #609 | | 0 | 0 | USD |
| 3003812 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST-PACKER | | 0 | 0 | USD |
| 3003812 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST - SS CON | | 0 | 0 | USD |
| 3003812 | 4 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL #609 INSTALLATION | | 0 | 0 | USD |
| 3003812 | 5 | Ammo | | 21 Lonoke, AR | 1/15/2008 | CASE TAPE MACHINE | | 0 | 0 | USD |
| 3003812 | 6 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL DATA COMMUNICATIONS UPG | | 0 | 0 | USD |
| 3003813 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUPLEX PACKER #604 | | 0 | 0 | USD |
| 3003813 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST - SS CON | | 0 | 0 | USD |
| 3003813 | 3 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL #604 INSTALLATION | | 0 | 0 | USD |
| 3003813 | 5 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL DATA COMMUNICATIONS UPG | | 0 | 0 | USD |
| 3003814 | 6 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL - SEALER CARTONER 2921/100089 | | 0 | 0 | USD |
| 3003814 | 0 | Ammo | | 21 Lonoke, AR | 4/15/1996 | ADDL-INSPECTION BENCH 2337/100140 | | 0 | 0 | USD |
| 3003814 | 8 | Ammo | | 21 Lonoke, AR | 4/15/2003 | ADEPT ROBOTIC ARM | | 0 | 0 | USD |
| 3003814 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2006 | ADDL RELOCATE INSP STATION | | 0 | 0 | USD |
| 3003815 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS DUPLEX PACKER 3" SS CON #614 | | 0 | 0 | USD |
| 3003815 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 25-ROUND PACKER -INSTALL           T | | 0 | 0 | USD |
| 3003815 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #614 MODIFY FOR 20/25 RD BOXES 120584 | | 0 | 0 | USD |
| 3003815 | 3 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL INSTALLATION #614 | | 0 | 0 | USD |
| 3003815 | 4 | Ammo | | 21 Lonoke, AR | 2/15/2007 | ADDL TAPE MACHINE #614 | | 0 | 0 | USD |
| 3003815 | 6 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL DATA COMMUNICATIONS UPG | | 0 | 0 | USD |
| 3003817 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS AUTO INSP & PACKER #612 SS CON | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3003817 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUP PKR#612 INST/MOD TO 410 ADDL 120101 | 0 | 0 | 0 | USD |
| 3003817 | 3 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL #612 INSTALLATION | 0 | 0 | 0 | USD |
| 3003817 | 4 | Ammo | | 21 Lonoke, AR | 9/15/2007 | ADDL TAPE MACHINE #612 | 0 | 0 | 0 | USD |
| 3003817 | 5 | Ammo | | 21 Lonoke, AR | 3/15/2008 | ADDL ALTERNATOR #612 | 0 | 0 | 0 | USD |
| 3003817 | 6 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL DATA COMMUNICATIONS UPG | 0 | 0 | 0 | USD |
| 3003818 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS AUTO PACK MCH #611SS CON | 0 | 0 | 0 | USD |
| 3003818 | 4 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL - INSTALLATION #611 | 0 | 0 | 0 | USD |
| 3003818 | 5 | Ammo | | 21 Lonoke, AR | 2/15/2007 | ADDL TAPE MACHINE #611 | 0 | 0 | 0 | USD |
| 3003818 | 6 | Ammo | | 21 Lonoke, AR | 3/15/2008 | ADDL ALTERNATOR #611 | 0 | 0 | 0 | USD |
| 3003820 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 5-RD REDINGTON PKR 12 RS #600    T | 0 | 0 | 0 | USD |
| 3003820 | 2 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL #600 INSTALLATION | 0 | 0 | 0 | USD |
| 3003820 | 3 | Ammo | | 21 Lonoke, AR | 1/15/2008 | CASE TAPE MACHINE | 0 | 0 | 0 | USD |
| 3003820 | 4 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADDL DATA COMMUNICATIONS UPG | 0 | 0 | 0 | USD |
| 3003821 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AUTO CASE PACKER MOD 3000 FMS MCH#630 | 0 | 0 | 0 | USD |
| 3003829 | 1 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL EXIT CONVEYOR/PLATFORM | 0 | 0 | 0 | USD |
| 3003829 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | EZ LOAD PALLET LIFTS 4500# - 22 | 0 | 0 | 0 | USD |
| 3003831 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST POWDER STACK P F 510 | 0 | 0 | 0 | USD |
| 3003832 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | HOFFMAN VACUUM SYSTEM-LACHAUSSEE LOADER | 0 | 0 | 0 | USD |
| 3003832 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST LACHAUSSEE LOADER P F 510 | 0 | 0 | 0 | USD |
| 3003833 | 3 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST  LOADER-BLOWN PRM DETECT | 0 | 0 | 0 | USD |
| 3003833 | 4 | Ammo | | 21 Lonoke, AR | 12/1/1993 | FIRE PROTECTION/EXTINGUISHER 120418 | 0 | 0 | 0 | USD |
| 3003833 | 5 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL-MOD #510 FOR STEEL,SHOT FDR 110088 | 0 | 0 | 0 | USD |
| 3003833 | 6 | Ammo | | 21 Lonoke, AR | 9/15/1995 | ADDL - #510 VIBRATORY FEEDER | 0 | 0 | 0 | USD |
| 3003833 | 7 | Ammo | | 21 Lonoke, AR | 6/15/1996 | ADDL-8 GA SLUG FEED | 0 | 0 | 0 | USD |
| 3003833 | 8 | Ammo | | 21 Lonoke, AR | 5/15/1998 | ADDL SLUG FEED & DETECT | 0 | 0 | 0 | USD |
| 3003833 | 9 | Ammo | | 21 Lonoke, AR | 2/15/2001 | ADDL 510 GEAR BOXES | 0 | 0 | 0 | USD |
| 3003836 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BRIDGE CRANE RAILS 1 TON #38291HH1 | 0 | 0 | 0 | USD |
| 3003840 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LEAD SLUG SCRAP CONVEYOR | 0 | 0 | 0 | USD |
| 3003841 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LEAD SLUG BELT CONVEYOR | 0 | 0 | 0 | USD |
| 3003842 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PEEN PLAE VERTICAL CONVEYOR 120589 | 0 | 0 | 0 | USD |
| 3003843 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | WORK PLATFORM - LEAD AREA | 0 | 0 | 0 | USD |
| 3003844 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SLUG TUMBLE BARREL #1311 PEEN PLATER | 0 | 0 | 0 | USD |
| 3003845 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1997 | ADDL-REBUILD #1308 BULLET LUBE | 0 | 0 | 0 | USD |
| 3003845 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #1308 RF BULLET LUBRICATOR | 0 | 0 | 0 | USD |
| 3003846 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #1309 RF BULLET LUBRICATOR | 0 | 0 | 0 | USD |
| 3003846 | 1 | Ammo | | 21 Lonoke, AR | 2/15/1997 | ADDL-REBUILD #1309 BULLET LUBE | 0 | 0 | 0 | USD |
| 3003848 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PRODUCT SCALE - RF | 0 | 0 | 0 | USD |
| 3003849 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | RF ACID HANDLING SYS-2 TANKS 120508 | 0 | 0 | 0 | USD |
| 3003851 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | OVERHEAD CRANE 3-TON CUPPING | 0 | 0 | 0 | USD |
| 3003852 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | OVERHEAD CRANE 2-TON SHELL | 0 | 0 | 0 | USD |
| 3003854 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AIRVEYOR SYSTEM | 0 | 0 | 0 | USD |
| 3003854 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST TO ASSET #86336-00 | 0 | 0 | 0 | USD |
| 3003854 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST RIMFIRE PROJECT 110076 | 0 | 0 | 0 | USD |
| 3003855 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL-RF PROJ 110076/120417 AIRVEYOR SYS | 0 | 0 | 0 | USD |
| 3003859 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 4 CONE WASH UNIT | 0 | 0 | 0 | USD |
| 3003859 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST RIMFIRE PROJECT 110076 | 0 | 0 | 0 | USD |
| 3003860 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | Furnace-Cup Anneal 4-Cone Wash #1021 | 0 | 0 | 0 | USD |
| 3003860 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST RIMFIRE PROJECT 110076 | 0 | 0 | 0 | USD |
| 3003860 | 2 | Ammo | | 21 Lonoke, AR | 10/15/1996 | ADDL-ANNEAL FURNACE CONTROL | 0 | 0 | 0 | USD |
| 3003860 | 3 | Ammo | | 21 Lonoke, AR | 6/15/2010 | MOHLER CONVEYOR !01634 | 0 | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3003861 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | USD |
| 3003861 | 2 | Ammo | | 21 Lonoke, AR | 8/15/2005 | ADD'L #1074 ANNEAL OVEN | | 0 | 0 | USD |
| 3003864 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ROTARY DRUM DRYER PARTS WASH GAS FIRED U | | 0 | 0 | USD |
| 3003865 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DOUBLE ACTION CRANK PRESS #1001 | | 0 | 0 | USD |
| 3003865 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L-GUARDING 110076 | | 0 | 0 | USD |
| 3003865 | 3 | Ammo | | 21 Lonoke, AR | 11/15/2004 | ADD'L METAL INDEXER | | 0 | 0 | USD |
| 3003865 | 4 | Ammo | | 21 Lonoke, AR | 1/15/2003 | REB RF CUPPING PRESS #1001 | | 0 | 0 | USD |
| 3003865 | 5 | Ammo | | 21 Lonoke, AR | 7/15/2005 | ADD'L RF CUP PRESS #1001 | | 0 | 0 | USD |
| 3003865 | 6 | Ammo | | 21 Lonoke, AR | 5/15/2006 | ADD'L METAL STOCK REEL | | 0 | 0 | USD |
| 3003866 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | V&O CUPPING PRESS #1004 | | 0 | 0 | USD |
| 3003866 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L-GUARDING 110076 | | 0 | 0 | USD |
| 3003866 | 3 | Ammo | | 21 Lonoke, AR | 11/15/2004 | ADD'L METAL INDEXER | | 0 | 0 | USD |
| 3003866 | 4 | Ammo | | 21 Lonoke, AR | 5/15/2006 | ADD'L METAL STOCK REEL | | 0 | 0 | USD |
| 3003867 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | V&O DOUBLE ACTION PRESS #1003 | | 0 | 0 | USD |
| 3003867 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L-GUARDING 110076 | | 0 | 0 | USD |
| 3003867 | 3 | Ammo | | 21 Lonoke, AR | 11/15/2004 | ADD'L METAL INDEXER | | 0 | 0 | USD |
| 3003867 | 4 | Ammo | | 21 Lonoke, AR | 5/15/2006 | ADD'L METAL STOCK REEL | | 0 | 0 | USD |
| 3003867 | 5 | Ammo | | 21 Lonoke, AR | 11/15/2006 | ADD'L LUBE SYSTEM | | 0 | 0 | USD |
| 3003868 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DOUBLE ACTION PRESS #1002 | | 0 | 0 | USD |
| 3003868 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L-GUARDING 110076 | | 0 | 0 | USD |
| 3003868 | 3 | Ammo | | 21 Lonoke, AR | 8/15/2003 | RF #1001 METAL INDEXER | | 0 | 0 | USD |
| 3003868 | 4 | Ammo | | 21 Lonoke, AR | 11/15/2004 | ADD'L RF #1002 CUPPING | | 0 | 0 | USD |
| 3003868 | 5 | Ammo | | 21 Lonoke, AR | 5/15/2006 | ADD'L METAL STOCK REEL | | 0 | 0 | USD |
| 3003869 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SHELL MAKING MACHINE #1045 | | 0 | 0 | USD |
| 3003869 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | USD |
| 3003869 | 3 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L-GUARDING 110076 | | 0 | 0 | USD |
| 3003869 | 4 | Ammo | | 21 Lonoke, AR | 9/15/2002 | ADD'L RF TRIM UNIT | | 0 | 0 | USD |
| 3003869 | 6 | Ammo | | 21 Lonoke, AR | 1/15/2006 | ADD'L AUTO LUBE SYSTEM | | 0 | 0 | USD |
| 3003870 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SHELL MAKING MACHINE #1046 | | 0 | 0 | USD |
| 3003870 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ENGINEERING DESIGN PROJECT 61-04870 | | 0 | 0 | USD |
| 3003870 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | USD |
| 3003870 | 3 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L-GUARDING 110076 | | 0 | 0 | USD |
| 3003870 | 4 | Ammo | | 21 Lonoke, AR | 1/15/2006 | ADD'L AUTO LUBE SYSTEM | | 0 | 0 | USD |
| 3003870 | 5 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SHELL MAKING MACHINE #1047 | | 0 | 0 | USD |
| 3003871 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | TRIM CAM/#4 SHELL MAKER | | 0 | 0 | USD |
| 3003871 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L-GUARDING 110076 | | 0 | 0 | USD |
| 3003871 | 5 | Ammo | | 21 Lonoke, AR | 11/15/1998 | REB #1047 SHELLMAKER HEADER | | 0 | 0 | USD |
| 3003871 | 7 | Ammo | | 21 Lonoke, AR | 8/15/2003 | ADD'L RF SHELLMAKER #1047 | | 0 | 0 | USD |
| 3003871 | 8 | Ammo | | 21 Lonoke, AR | 1/15/2006 | ADD'L AUTO LUBE SYSTEM | | 0 | 0 | USD |
| 3003872 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SHELL MAKING MACHINE | | 0 | 0 | USD |
| 3003872 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | USD |
| 3003872 | 3 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L-GUARDING 110076 | | 0 | 0 | USD |
| 3003872 | 4 | Ammo | | 21 Lonoke, AR | 12/1/1993 | REBUILD #1048 RIMFIRE HEADER 2750/100632 | | 0 | 0 | USD |
| 3003872 | 5 | Ammo | | 21 Lonoke, AR | 12/15/2002 | ADD'L RF TRIM UNIT | | 0 | 0 | USD |
| 3003872 | 8 | Ammo | | 21 Lonoke, AR | 1/15/2006 | ADD'L AUTO LUBE SYSTEM | | 0 | 0 | USD |
| 3003873 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SHELL MAKING MACHINE | | 0 | 0 | USD |
| 3003873 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | USD |
| 3003873 | 3 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L-GUARDING 110076 | | 0 | 0 | USD |
| 3003873 | 4 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADD'L REB SHELLMAKER HEADER | | 0 | 0 | USD |
| 3003873 | 5 | Ammo | | 21 Lonoke, AR | 6/15/1999 | ADD'L REBUILD HEADER | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3003873 | 6 | Ammo | | 21 Lonoke, AR | 9/15/2002 | ADD'L RF TRIM UNIT | | 0 | 0 | 0 USD |
| 3003873 | 7 | Ammo | | 21 Lonoke, AR | 2/15/2004 | ADD'L RF w/LUBE SYSTEM | | 0 | 0 | 0 USD |
| 3003874 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SHELL MAKING MACHINE #1050 | | 0 | 0 | 0 USD |
| 3003874 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ENGINEERING DESIGN PROJECT 61-04870 | | 0 | 0 | 0 USD |
| 3003874 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | 0 USD |
| 3003874 | 3 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L-GUARDING 110076 | | 0 | 0 | 0 USD |
| 3003874 | 4 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADD'L REB SHELLMAKER HEADER | | 0 | 0 | 0 USD |
| 3003874 | 5 | Ammo | | 21 Lonoke, AR | 1/15/2006 | ADD'L AUTO LUBE SYSTEM | | 0 | 0 | 0 USD |
| 3003875 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SHELL MAKING MACHINE | | 0 | 0 | 0 USD |
| 3003875 | 3 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | 0 USD |
| 3003875 | 4 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L-INTERLOCKS 110076 | | 0 | 0 | 0 USD |
| 3003875 | 5 | Ammo | | 21 Lonoke, AR | 7/15/1998 | REB RF SHELLMAKER HEADER | | 0 | 0 | 0 USD |
| 3003875 | | Ammo | | 21 Lonoke, AR | 1/15/2006 | ADD'L AUTO LUBE SYSTEM | | 0 | 0 | 0 USD |
| 3003876 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | R F STORAGE HOPPER | | 0 | 0 | 0 USD |
| 3003877 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SHELLMAKER CARRIER MOLD RF AT VENDOR | | 0 | 0 | 0 USD |
| 3003878 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | TRIPLEX WASH SINK | | 0 | 0 | 0 USD |
| 3003879 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | VACUUM PUMP | | 0 | 0 | 0 USD |
| 3003880 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | VACUUM PUMP | | 0 | 0 | 0 USD |
| 3003881 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PRIMER WASTE HANDLE SYS-RF | | 0 | 0 | 0 USD |
| 3003881 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L-PAI IMPERMEABLE LINING 120594 | | 0 | 0 | 0 USD |
| 3003881 | 2 | Ammo | | 21 Lonoke, AR | 11/15/2004 | ADD'L RF EXPLOSIVE TANK LEVEL INDICATOR | | 0 | 0 | 0 USD |
| 3003883 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SELVE BARREL DUMPER & SHAKER | | 0 | 0 | 0 USD |
| 3003883 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SEMI AUTO R F PRIMING MCH | | 0 | 0 | 0 USD |
| 3003884 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | 0 USD |
| 3003884 | 2 | Ammo | | 21 Lonoke, AR | 7/15/2013 | PELLET MONITORING SYS #1124 101810 | | 0 | 0 | 0 USD |
| 3003885 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SEMI AUTO RF PRIMING MCH | | 0 | 0 | 0 USD |
| 3003885 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | 0 USD |
| 3003885 | 2 | Ammo | | 21 Lonoke, AR | 7/15/2013 | PELLET MONITORING SYS #1126 101810 | | 0 | 0 | 0 USD |
| 3003886 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SEMI AUTO RF PRIMING MCH | | 0 | 0 | 0 USD |
| 3003886 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | 0 USD |
| 3003886 | 2 | Ammo | | 21 Lonoke, AR | 7/15/2013 | PELLET MONITORING SYS #1127 101810 | | 0 | 0 | 0 USD |
| 3003887 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SEMI AUTO RF PRIMING MACHINE | | 0 | 0 | 0 USD |
| 3003887 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | 0 USD |
| 3003887 | 2 | Ammo | | 21 Lonoke, AR | 7/15/2013 | PELLET MONITORING SYS #1129 101810 | | 0 | 0 | 0 USD |
| 3003888 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SEMI AUTO RF PRIMING MACH | | 0 | 0 | 0 USD |
| 3003888 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | 0 USD |
| 3003888 | 2 | Ammo | | 21 Lonoke, AR | 7/15/2013 | PELLET MONITORING SYS #1130 101810 | | 0 | 0 | 0 USD |
| 3003889 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SEMI AUTO RF PRIMING MACH | | 0 | 0 | 0 USD |
| 3003889 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | 0 USD |
| 3003889 | 2 | Ammo | | 21 Lonoke, AR | 7/15/2013 | PELLET MONITORING SYS #1131 101810 | | 0 | 0 | 0 USD |
| 3003890 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SEMI AUTO R F PRIMING MACHINE | | 0 | 0 | 0 USD |
| 3003890 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | 0 USD |
| 3003890 | 2 | Ammo | | 21 Lonoke, AR | 7/15/2013 | PELLET MONITORING SYS #1133 101810 | | 0 | 0 | 0 USD |
| 3003891 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SEMI AUTO R F PRIMING MACHINE | | 0 | 0 | 0 USD |
| 3003891 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | 0 USD |
| 3003891 | 2 | Ammo | | 21 Lonoke, AR | 7/15/2013 | PELLET MONITORING SYS #1134 101810 | | 0 | 0 | 0 USD |
| 3003892 | 1 | Ammo | | 21 Lonoke, AR | 7/15/2013 | PELLET MONITORING SYS #1135 101810 | | 0 | 0 | 0 USD |
| 3003893 | 1 | Ammo | | 21 Lonoke, AR | 7/15/2013 | PELLET MONITORING SYS #1136 101810 | | 0 | 0 | 0 USD |
| 3003896 | 1 | Ammo | | 21 Lonoke, AR | 7/15/2013 | PELLET MONITORING SYS #1139 101810 | | 0 | 0 | 0 USD |
| 3003897 | 2 | Ammo | | 21 Lonoke, AR | 7/15/2013 | PELLET MONITORING SYS #1140 101810 | | 0 | 0 | 0 USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3003898 | 2 | Ammo | | 21 Lonoke, AR | 7/15/2013 | PELLET MONITORING SYS #1141 101810 | | 0 | 0 | USD |
| 3003899 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SEMI AUTO PRIMING MACHINE | | 0 | 0 | USD |
| 3003899 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | USD |
| 3003899 | 2 | Ammo | | 21 Lonoke, AR | 7/15/2013 | PELLET MONITORING SYS #1142 101810 | | 0 | 0 | USD |
| 3003900 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SEMI AUTO PRIMING MACHINE | | 0 | 0 | USD |
| 3003900 | 1 | Ammo | | 21 Lonoke, AR | 12/15/1994 | ADD'L-REBUILD RF PRIME MCH #11432226 | | 0 | 0 | USD |
| 3003900 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | USD |
| 3003900 | 3 | Ammo | | 21 Lonoke, AR | 7/15/2013 | PELLET MONITORING SYS #1143 101810 | | 0 | 0 | USD |
| 3003901 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SEMI AUTO PRIMING MACH | | 0 | 0 | USD |
| 3003901 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | USD |
| 3003901 | 2 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADD'L DRIVE CONTROLS | | 0 | 0 | USD |
| 3003901 | 3 | Ammo | | 21 Lonoke, AR | 7/15/2013 | PELLET MONITORING SYS #1144 101810 | | 0 | 0 | USD |
| 3003902 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SEMI AUTO R F PRIMING MACHINE | | 0 | 0 | USD |
| 3003902 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | USD |
| 3003902 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD-RPL DR MOTOR/CONTROL #1145 120605 | | 0 | 0 | USD |
| 3003902 | 3 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADD'L DRIVE CONTROLS | | 0 | 0 | USD |
| 3003902 | 4 | Ammo | | 21 Lonoke, AR | 7/15/2013 | PELLET MONITORING SYS #1145 101810 | | 0 | 0 | USD |
| 3003903 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SEMI AUTO R F PRIMING MACHINE | | 0 | 0 | USD |
| 3003903 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | USD |
| 3003903 | 2 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADD'L DRIVE CONTROLS | | 0 | 0 | USD |
| 3003903 | 3 | Ammo | | 21 Lonoke, AR | 7/15/2013 | PELLET MONITORING SYS #1146 101810 | | 0 | 0 | USD |
| 3003904 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SEMI AUTO R F PRIMING MACHINE | | 0 | 0 | USD |
| 3003904 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | USD |
| 3003904 | 2 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADD'L DRIVE CONTROLS | | 0 | 0 | USD |
| 3003904 | 3 | Ammo | | 21 Lonoke, AR | 7/15/2013 | PELLET MONITORING SYS #1147 101810 | | 0 | 0 | USD |
| 3003905 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SEMI AUTO PRIMING MACHINE | | 0 | 0 | USD |
| 3003905 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | USD |
| 3003905 | 2 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADD'L DRIVE CONTROLS | | 0 | 0 | USD |
| 3003905 | 3 | Ammo | | 21 Lonoke, AR | 7/15/2013 | PELLET MONITORING SYS #1148 101810 | | 0 | 0 | USD |
| 3003906 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | R F PRIME MACH | | 0 | 0 | USD |
| 3003906 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | USD |
| 3003906 | 2 | Ammo | | 21 Lonoke, AR | 7/15/2013 | PELLET MONITORING SYS #1149 101810 | | 0 | 0 | USD |
| 3003907 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SEMI AUTO PRIMING MACHINE | | 0 | 0 | USD |
| 3003907 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | USD |
| 3003907 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD-RPL DR MOTOR/CONTROL #1150 120605 | | 0 | 0 | USD |
| 3003907 | 3 | Ammo | | 21 Lonoke, AR | 7/15/2013 | PELLET MONITORING SYS #1150 101810 | | 0 | 0 | USD |
| 3003908 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SEMI AUTO PRIMING MACHINE | | 0 | 0 | USD |
| 3003908 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | USD |
| 3003908 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD-RPL DR MOTOR/CONTROL #1151 120605 | | 0 | 0 | USD |
| 3003909 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SEMI AUTO PRIMING MACHINE | | 0 | 0 | USD |
| 3003909 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | USD |
| 3003910 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SEMI AUTO PRIMING MACH | | 0 | 0 | USD |
| 3003910 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | USD |
| 3003911 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SEMI AUTO R F PRIMING MACHINE | | 0 | 0 | USD |
| 3003911 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | USD |
| 3003912 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SEMI AUTO R F PRIMING MACHINE | | 0 | 0 | USD |
| 3003912 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | USD |
| 3003913 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SEMI AUTO R F PRIMING MACHINE | | 0 | 0 | USD |
| 3003913 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | USD |
| 3003914 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | RIM FIRE INSPECTION MACHINE #1196 | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3003914 | 5 | Ammo | 21 | Lonoke, AR | 12/15/2004 | ADD'L #1196 AUTO INSP MCH | 0 | 0 | 0 | USD |
| 3003915 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 22 CAL. AUTO. INSPECTION MACH. #1197 | 0 | 0 | 0 | USD |
| 3003915 | 3 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | 0 | 0 | 0 | USD |
| 3003916 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | 22 CAL. AUTO. INSPECTION MACH. | 0 | 0 | 0 | USD |
| 3003916 | 3 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | 0 | 0 | 0 | USD |
| 3003916 | 4 | Ammo | 21 | Lonoke, AR | 6/15/1997 | ADD'L-OVERHAUL #1198 AIM | 0 | 0 | 0 | USD |
| 3003917 | 0 | Ammo | 21 | Lonoke, AR | 12/15/1993 | AIR PWR STRADDLE HYD LIFT #7022 RF PRIME | 0 | 0 | 0 | USD |
| 3003918 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | BULLET PULL MCH R F LOAD 120408 | 0 | 0 | 0 | USD |
| 3003918 | 1 | Ammo | 21 | Lonoke, AR | 2/15/1994 | ADD'L-AMETEK ACCUF RF LD 120548 | 0 | 0 | 0 | USD |
| 3003919 | 0 | Ammo | 21 | Lonoke, AR | 12/15/2008 | ADD'L FIRE HYDRANT | 0 | 0 | 0 | USD |
| 3003919 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | R F LOAD MACH | 0 | 0 | 0 | USD |
| 3003919 | 1 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ENGINEERING DESIGN PROJECT 61-04870 | 0 | 0 | 0 | USD |
| 3003919 | 2 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | 0 | 0 | 0 | USD |
| 3003919 | 3 | Ammo | 21 | Lonoke, AR | 9/15/2004 | ADD'L MOTOR | 0 | 0 | 0 | USD |
| 3003920 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | R F LOAD MACHINE | 0 | 0 | 0 | USD |
| 3003920 | 2 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | 0 | 0 | 0 | USD |
| 3003920 | 3 | Ammo | 21 | Lonoke, AR | 9/15/2004 | ADD'L MOTOR | 0 | 0 | 0 | USD |
| 3003921 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | R F LOAD MACH | 0 | 0 | 0 | USD |
| 3003921 | 1 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | 0 | 0 | 0 | USD |
| 3003921 | 2 | Ammo | 21 | Lonoke, AR | 9/15/2004 | ADD'L MOTOR | 0 | 0 | 0 | USD |
| 3003922 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | R F LOAD MACH | 0 | 0 | 0 | USD |
| 3003922 | 2 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | 0 | 0 | 0 | USD |
| 3003922 | 3 | Ammo | 21 | Lonoke, AR | 9/15/2004 | ADD'L MOTOR | 0 | 0 | 0 | USD |
| 3003923 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | R F LOAD MACH | 0 | 0 | 0 | USD |
| 3003923 | 2 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | 0 | 0 | 0 | USD |
| 3003923 | 3 | Ammo | 21 | Lonoke, AR | 9/15/2004 | ADD'L MOTOR | 0 | 0 | 0 | USD |
| 3003923 | 4 | Ammo | 21 | Lonoke, AR | 10/15/2006 | ADD'L #1233 POWDER CHARGER | 0 | 0 | 0 | USD |
| 3003924 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | R F LOAD MACH | 0 | 0 | 0 | USD |
| 3003924 | 2 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | 0 | 0 | 0 | USD |
| 3003924 | 3 | Ammo | 21 | Lonoke, AR | 9/15/2004 | ADD'L MOTOR | 0 | 0 | 0 | USD |
| 3003925 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | BULLET PRE-SWAGE UNIT #1223 | 0 | 0 | 0 | USD |
| 3003925 | 1 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | 0 | 0 | 0 | USD |
| 3003928 | 0 | Ammo | 21 | Lonoke, AR | 12/15/1993 | MICROSCOPE ZSB UNITRON RF LOAD 120041 | 0 | 0 | 0 | USD |
| 3003929 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | HOIST DUMPER | 0 | 0 | 0 | USD |
| 3003931 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | TRAYMAKER | 0 | 0 | 0 | USD |
| 3003931 | 1 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | 0 | 0 | 0 | USD |
| 3003931 | 2 | Ammo | 21 | Lonoke, AR | 10/12/1995 | ADD'L - HOT MELT GLUE SYSTEM | 0 | 0 | 0 | USD |
| 3003931 | 3 | Ammo | 21 | Lonoke, AR | 12/4/1995 | ADD'L - HOT MELT GLUE NOZZLE | 0 | 0 | 0 | USD |
| 3003932 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | PRELIM #1 AUTO LUB & PACK MACHINE | 0 | 0 | 0 | USD |
| 3003932 | 2 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | 0 | 0 | 0 | USD |
| 3003932 | 3 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ADD'L-GUARDS #1281 110076 | 0 | 0 | 0 | USD |
| 3003932 | 4 | Ammo | 21 | Lonoke, AR | 3/15/2003 | UPG PACKER | 0 | 0 | 0 | USD |
| 3003932 | 5 | Ammo | 21 | Lonoke, AR | 5/15/2004 | ADD'L CASE TAPER | 0 | 0 | 0 | USD |
| 3003933 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | AUTOMATIC R.F. LUBRICATE & TRAY PACK M | 0 | 0 | 0 | USD |
| 3003933 | 2 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | 0 | 0 | 0 | USD |
| 3003933 | 4 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ADD'L-GUARDS #1282 110076 | 0 | 0 | 0 | USD |
| 3003933 | 6 | Ammo | 21 | Lonoke, AR | 10/15/2003 | ADD'L CASE TAPER | 0 | 0 | 0 | USD |
| 3003933 | 0 | Ammo | 21 | Lonoke, AR | 12/1/1993 | AUTO LUBE & PACK "C" 50 PK #1283 | 0 | 0 | 0 | USD |
| 3003934 | 2 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | 0 | 0 | 0 | USD |
| 3003934 | 3 | Ammo | 21 | Lonoke, AR | 12/1/1993 | ADD'L-GUARDS #1283 110076 | 0 | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3003934 | 4 | Ammo | | 21 Lonoke, AR | 10/15/2003 | ADD'L CASE TAPER | | 0 | 0 | 0 USD |
| 3003935 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BAGGER "B" FOR #1282 | | 0 | 0 | 0 USD |
| 3003935 | 1 | Ammo | | 21 Lonoke, AR | 3/15/1995 | ADD'L-IMPRINTER #1282 2242 | | 0 | 0 | 0 USD |
| 3003935 | 3 | Ammo | | 21 Lonoke, AR | 12/15/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | 0 USD |
| 3003936 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BAGGER "C" FOR #1283 | | 0 | 0 | 0 USD |
| 3003936 | 1 | Ammo | | 21 Lonoke, AR | 3/15/1995 | ADD'L-IMPRINTER #1283 2242 | | 0 | 0 | 0 USD |
| 3003936 | 2 | Ammo | | 21 Lonoke, AR | 12/15/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | 0 USD |
| 3003943 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PALLET TRUCK 071679 - #83 | | 0 | 0 | 0 USD |
| 3003944 | 0 | Ammo | | 21 Lonoke, AR | 12/15/1993 | ELEC PALLET JACK/BATTERY 6000# N5240054 RF - #53 | | 0 | 0 | 0 USD |
| 3003945 | 0 | Ammo | | 21 Lonoke, AR | 12/15/1993 | MAC CHARGER FOR ELEC 6000# JK RF F25597 | | 0 | 0 | 0 USD |
| 3003955 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PARTS WASH DRYER MODEL RD-1147-2S | | 0 | 0 | 0 USD |
| 3003956 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | H&W BATTERY CUP PRESS | | 0 | 0 | 0 USD |
| 3003956 | 1 | Ammo | | 21 Lonoke, AR | 2/15/1996 | #820 BATTERY CUP PRESS & OVERHAUL 2315/100142 | | 0 | 0 | 0 USD |
| 3003956 | 3 | Ammo | | 21 Lonoke, AR | 3/15/2001 | SCRAP WEB CHOPPER | | 0 | 0 | 0 USD |
| 3003957 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | HENRY & WRIGHT BATTERY CUP PRESS | | 0 | 0 | 0 USD |
| 3003957 | 4 | Ammo | | 21 Lonoke, AR | 1/15/1997 | ADD'L-#821 SERVO DRIVE FEED SYSTEM | | 0 | 0 | 0 USD |
| 3003957 | 5 | Ammo | | 21 Lonoke, AR | 3/15/2001 | SCRAP WEB CHOPPER | | 0 | 0 | 0 USD |
| 3003959 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | H&W BATTERY CUP PRESS | | 0 | 0 | 0 USD |
| 3003959 | 1 | Ammo | | 21 Lonoke, AR | 10/15/1994 | ADD-O/H #828 H&W BAT CUP PR 2236 | | 0 | 0 | 0 USD |
| 3003959 | 4 | Ammo | | 21 Lonoke, AR | 9/15/1998 | ADD'L INDEXING UNIT #828 | | 0 | 0 | 0 USD |
| 3003959 | 5 | Ammo | | 21 Lonoke, AR | 5/15/1999 | ADD'L BATTERY CUP PRESS | | 0 | 0 | 0 USD |
| 3003959 | 6 | Ammo | | 21 Lonoke, AR | 3/15/2001 | SCRAP WEB CHOPPER | | 0 | 0 | 0 USD |
| 3003959 | 7 | Ammo | | 21 Lonoke, AR | 7/15/2005 | ADD'L #828 H&W PRESS | | 0 | 0 | 0 USD |
| 3003960 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | HIGH SPEED ANVIL PRESS MOD 27 L&J #813 | | 0 | 0 | 0 USD |
| 3003960 | 1 | Ammo | | 21 Lonoke, AR | 9/15/2004 | ADD'L #813 ANVIL METAL INDEXER | | 0 | 0 | 0 USD |
| 3003961 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ANVIL BLANKING PRESS #817       T | | 0 | 0 | 0 USD |
| 3003961 | 1 | Ammo | | 21 Lonoke, AR | 6/15/2004 | ADD'L #817 METAL INDEXER | | 0 | 0 | 0 USD |
| 3003962 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CUPPING PRESS #811 CF 120391 | | 0 | 0 | 0 USD |
| 3003962 | 2 | Ammo | | 21 Lonoke, AR | 2/15/2004 | ADD'L #811 CUPPING PRESS INDEXER | | 0 | 0 | 0 USD |
| 3003962 | 3 | Ammo | | 21 Lonoke, AR | 3/15/2007 | ADD'L #811 BLANK & CUP PRESS | | 0 | 0 | 0 USD |
| 3003963 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CUPPING PRESS #815 120394 | | 0 | 0 | 0 USD |
| 3003963 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L-#815 PR CUP PRESS OSHA 120394 | | 0 | 0 | 0 USD |
| 3003963 | 2 | Ammo | | 21 Lonoke, AR | 10/15/2005 | PR CUP METAL INDEXER | | 0 | 0 | 0 USD |
| 3003963 | 3 | Ammo | | 21 Lonoke, AR | 2/15/2008 | ADD'L PR CUPPING DIE SET #815 | | 0 | 0 | 0 USD |
| 3003965 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | METAL STRAIGHTENER #WPBSPS15995 #820 | | 0 | 0 | 0 USD |
| 3003966 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | METAL STRAIGHTENER HENRY &WRIGHT #821 | | 0 | 0 | 0 USD |
| 3003969 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 1 2 TON HOIST & MONORAIL       T | | 0 | 0 | 0 USD |
| 3003969 | 1 | Ammo | | 21 Lonoke, AR | 2/15/2007 | PRIMER BATTERY CUP HOIST | | 0 | 0 | 0 USD |
| 3003971 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | OIL STORAGE DISPENSER SYSTEM - PM | | 0 | 0 | 0 USD |
| 3003972 | 1 | Ammo | | 21 Lonoke, AR | 1/15/1997 | #590 ADJ HEIGHT CHARGING TABLE | | 0 | 0 | 0 USD |
| 3003973 | 1 | Ammo | | 21 Lonoke, AR | 1/15/1997 | #575 ADJ HEIGHT CHARGING TABLE | | 0 | 0 | 0 USD |
| 3003974 | 1 | Ammo | | 21 Lonoke, AR | 1/15/1997 | #580 ADJ HEIGHT CHARGING TABLE | | 0 | 0 | 0 USD |
| 3003975 | 1 | Ammo | | 21 Lonoke, AR | 1/15/1997 | #585 ADJ HEIGHT CHARGING TABLE | | 0 | 0 | 0 USD |
| 3003980 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PM HOT WATER SYSTEM-CHARGING | | 0 | 0 | 0 USD |
| 3003982 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ASSEMBLY PRESS Pistol | | 0 | 0 | 0 USD |
| 3003982 | 2 | Ammo | | 21 Lonoke, AR | 5/15/2010 | ADD'L 569 ASSEMBLY PRESS 101448 | | 0 | 0 | 0 USD |
| 3003983 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | TAMP & FOIL PRESS Pistol | | 0 | 0 | 0 USD |
| 3003983 | 2 | Ammo | | 21 Lonoke, AR | 2/15/2007 | ADD'L UPGRADE #566 | | 0 | 0 | 0 USD |
| 3003984 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ASSEMBLY PRESS Rifle | | 0 | 0 | 0 USD |
| 3003985 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ASSEMBLY PRESS Shotshell | | 0 | 0 | 0 USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3003986 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ASSEMBLY PRESS Shotshell | | 0 | 0 | 0 USD |
| 3003987 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | TAMP & FOIL PRESS Shotshell | | 0 | 0 | 0 USD |
| 3003988 | 2 | Ammo | | 21 Lonoke, AR | 2/15/2007 | ADDL UPGRADE #591 | | 0 | 0 | 0 USD |
| 3003989 | 2 | Ammo | | 21 Lonoke, AR | 2/15/2007 | ADDL UPGRADE #576 | | 0 | 0 | 0 USD |
| 3003991 | 4 | Ammo | | 21 Lonoke, AR | 12/1/1993 | TAMP AND FOIL PRESS Shotshell | | 0 | 0 | 0 USD |
| 3003991 | 4 | Ammo | | 21 Lonoke, AR | 8/15/2011 | T&F #581 101448 | | 0 | 0 | 0 USD |
| 3003993 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ANVIL SEATING PRESS | | 0 | 0 | 0 USD |
| 3003994 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SHOTSHELL UNPRIMED ANVIL ASSEMBLY PRESS | | 0 | 0 | 0 USD |
| 3003995 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ANVIL BATTERY CUP ASSEMBLY UNIT | | 0 | 0 | 0 USD |
| 3003997 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS BATTERY CUP SHAKER | | 0 | 0 | 0 USD |
| 3004000 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS PRIMER CUP SHAKER | | 0 | 0 | 0 USD |
| 3004001 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS PRIMER CUP SHAKER | | 0 | 0 | 0 USD |
| 3004002 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ANVIL SHAKER-PISTOL ADDL COST | | 0 | 0 | 0 USD |
| 3004003 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ANVIL SHAKER-RIFLE ADDL COST | | 0 | 0 | 0 USD |
| 3004004 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ANVIL SHAKER UNIT-ANVIL B.C. ASSB. | | 0 | 0 | 0 USD |
| 3004005 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ANVIL SHAKER | | 0 | 0 | 0 USD |
| 3004007 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS COMP PRIMER RESEAT MCH #831 120475 | | 0 | 0 | 0 USD |
| 3004008 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PERCUSSION CAP PACKING | | 0 | 0 | 0 USD |
| 3004008 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST - SS CON | | 0 | 0 | 0 USD |
| 3004010 | 1 | Ammo | | 21 Lonoke, AR | 5/15/1997 | ADDL-SCALE CONVERSION_PRIMER MFG | | 0 | 0 | 0 USD |
| 3004011 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PR MIX SST_STORAGE SINK #713 120640 | | 0 | 0 | 0 USD |
| 3004012 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PR MIX SST_STORAGE SINK #714 120640 | | 0 | 0 | 0 USD |
| 3004013 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PR MIX SST_STORAGE SINK #715 120640 | | 0 | 0 | 0 USD |
| 3004014 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PR MIX SST_STORAGE SINK #716 120640 | | 0 | 0 | 0 USD |
| 3004019 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DEMINERALIZE WATER SYSTEM | | 0 | 0 | 0 USD |
| 3004020 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LEAD NITRATE STORAGE TANK | | 0 | 0 | 0 USD |
| 3004021 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LEAD NITRATE STORAGE TANK | | 0 | 0 | 0 USD |
| 3004022 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MAGNESIUM STYPHNATE STORAGE TANK | | 0 | 0 | 0 USD |
| 3004023 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MAGNESIUM STYPHNATE STORAGE TANK | | 0 | 0 | 0 USD |
| 3004024 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POLNOL PRECIPITATION KETTLE | | 0 | 0 | 0 USD |
| 3004025 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POLNOL PRECIPITATION KETTLE | | 0 | 0 | 0 USD |
| 3004025 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2005 | ADDL AIR MOTOR | | 0 | 0 | 0 USD |
| 3004026 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SENSOL PRECIPITATION KETTLE | | 0 | 0 | 0 USD |
| 3004026 | 1 | Ammo | | 21 Lonoke, AR | 12/15/2005 | ADDL AIR MOTOR | | 0 | 0 | 0 USD |
| 3004027 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | NITRATION KETTLE | | 0 | 0 | 0 USD |
| 3004030 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ACID STORAGE TANK | | 0 | 0 | 0 USD |
| 3004030 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ACID STORAGE TANK-REMOTE OPERATOR T | | 0 | 0 | 0 USD |
| 3004032 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SULFONTAION TANK-AGB T | | 0 | 0 | 0 USD |
| 3004033 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | TYPE A-200 HOBART MIXER 836 Bldg 721 U | | 0 | 0 | 0 USD |
| 3004035 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MIXER STAND U | | 0 | 0 | 0 USD |
| 3004040 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | NITRATION KETTLE | | 0 | 0 | 0 USD |
| 3004042 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ACID UNLOADING PUMP | | 0 | 0 | 0 USD |
| 3004043 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | TRANSFER PUMP-AGB T | | 0 | 0 | 0 USD |
| 3004045 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ROTO-CONE EXHAUST SYSTEM PREMIX | | 0 | 0 | 0 USD |
| 3004047 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AIR CONDITIONING UNIT-3 TON | | 0 | 0 | 0 USD |
| 3004048 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DILUGE/MIST/HUMIDITY SYS #719 | | 0 | 0 | 0 USD |
| 3004049 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DILUGE/MIST/HUMIDITY SYS #721 | | 0 | 0 | 0 USD |
| 3004050 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DILUGE/MIST/HUMIDITY SYS #723 | | 0 | 0 | 0 USD |
| 3004051 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DILUGE/MIST/HUMIDITY SYS #724 | | 0 | 0 | 0 USD |
| 3004057 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUMBWAITER | | 0 | 0 | 0 USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C104066 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LAB EXHAUST/VENT SYSTEM BLDG #610 | | 0 | 0 | USD |
| C104067 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PROCESS/SVC PIPING - LAB BLDG #610 | | 0 | 0 | USD |
| C104067 | 1 | Ammo | | 21 Lonoke, AR | 6/5/2008 | ADD'L STORAGE TANKS | | 0 | 0 | USD |
| C104068 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PROCESS/SVC PIPING - LAB BLDG #611 | | 0 | 0 | USD |
| C104069 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PROCESS DRAIN LINES R&D LAB | | 0 | 0 | USD |
| C104070 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING-LAB BLDG #610 | | 0 | 0 | USD |
| C104071 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | OUTSIDE ELECT FEED LINE BLDG #610 | | 0 | 0 | USD |
| C104072 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | R&D LAB COMPLEX LIGHTNING PROTECTION | | 0 | 0 | USD |
| C104076 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ISOPER OXYGEN BOMB CALORIMETER100058 | | 0 | 0 | USD |
| C104077 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | WTR JET SIEVE WS1 SYSTEM #610 100058 | | 0 | 0 | USD |
| C104078 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MODUV3101 SPECTROPHOTOMETER #610 100058 | | 0 | 0 | USD |
| C104079 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MOD DSC50 DIFFER SCAN CALORIMETER 100058 | | 0 | 0 | USD |
| C104080 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MOD LFD1423 ROUND CHART RECORDER 100058 | | 0 | 0 | USD |
| C104081 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MOD16507 CHAN PROGRAMMER W/RECORDER 100058 | | 0 | 0 | USD |
| C104083 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PARTICLE SIZE ANALYZER #610  100058 | | 0 | 0 | USD |
| C104084 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MOD TGA50 THERMOGRAV ANALYZER 100058 | | 0 | 0 | USD |
| C104085 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MOD AEL 40SM SEMIMICRO BALANCE 100058 | | 0 | 0 | USD |
| C104086 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | HI POWER COMPOUND MICROSCOPE 100058 | | 0 | 0 | USD |
| C104087 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | UP5000 SONY COLOR VIDEO PRINTER 100058 | | 0 | 0 | USD |
| C104088 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | COLOR TV CAMERA/MONITOR #610 100058 | | 0 | 0 | USD |
| 3004212 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2008 | REWORK 12GA DRUM | | 0 | 0 | USD |
| 3004212 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BODY FEEDER 20 GA ROTARY CAM      O S S | | 0 | 0 | USD |
| R04213 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BODY FEEDER 20 GA ROTARY CAM | | 0 | 0 | USD |
| 3004214 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BODY FEEDER 20 GA ROTARY CAM | | 0 | 0 | USD |
| 3004215 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | UPPER DRUM ROTARY CAM   20 GA    O S S | | 0 | 0 | USD |
| 3004216 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 40 A BLANK & CUP DIE SET      O S S | | 0 | 0 | USD |
| 3004216 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LOWER DRUM ROTARY CAM     12 GA | | 0 | 0 | USD |
| 3004234 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | HEAT SET DRUM-ROTARY CAM 20GA     O S S | | 0 | 0 | USD |
| 3004235 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LOWER DRUM- ROTARY CAM- 12 GA | | 0 | 0 | USD |
| 3004235 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LOWER DRUM- ROTARY CAM- 12 GA     O S S | | 0 | 0 | USD |
| 3004237 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LOWER DRUM-ROTARY CAM- 12 GA | | 0 | 0 | USD |
| 3004238 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LOWER DRUM-ROTARY CAM -12 GA       O S S | | 0 | 0 | USD |
| 3004242 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | HEAT SET DRUM-UPPER & LOWER 12 GA OSS | | 0 | 0 | USD |
| 3004248 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CF SHELL COLLATORS 100-1 120294 | | 0 | 0 | USD |
| 3004249 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CF SHELL COLLATORS 100-1 120294 | | 0 | 0 | USD |
| 3004250 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CF SHELL COLLATORS 100-1 120294     O S S | | 0 | 0 | USD |
| 3004251 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CF SHELL COLLATORS 100-1 120294 | | 0 | 0 | USD |
| 3004253 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLANK&FORM ANVIL DIE SET 10 STA.     O S S | | 0 | 0 | USD |
| 3004254 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BLISS CAP PR DIE SET -12 TGT 120305     O S S | | 0 | 0 | USD |
| 3004261 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SCRAP CHOPPER FOR #227    O S S | | 0 | 0 | USD |
| 3004263 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BULLET COLLATORS BRU1 (6) #239 | | 0 | 0 | USD |
| 3004270 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | COLLATORS-11 CF SHELL 120329     O S S | | 0 | 0 | USD |
| 3004276 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CF COLLATORS-2 OP SV SP 120287 | | 0 | 0 | USD |
| 3004276 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2006 | RETROFIT CIRCUIT BREAKER | | 0 | 0 | USD |
| 3004277 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CIRCUIT BREAKERS 600 AMP-3 | | 0 | 0 | USD |
| 3004278 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AIR CONDITIONING DUCT - NITRATION BLDG | | 0 | 0 | USD |
| 3004278 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DROWNING TANKS EXHAUST DUCT-NITRATION B | | 0 | 0 | USD |
| 3004279 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | KETTLE EXHAUST DUCT - BLDG. 712 | | 0 | 0 | USD |
| 3004280 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AIR CONDITIONING DUCT FOR BLDG. 709 | | 0 | 0 | USD |
| 3004281 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUCTWORK FOR BLDG. 100 | | 0 | 0 | USD |
| 3004282 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PARTWASH EXHAUST DUCT | | 0 | 0 | USD |

Case 20-81688-CJ11    Doc 904-1    Filed 09/30/20    Entered 09/30/20 13:40:13    Desc Exhibit    Page 236 of 434

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3004283 | 1 | Ammo | | 21 Lonoke, AR | 10/15/2006 | ADDTL DUCTWORK 2ND FLOOR RESTROOM | 0 | 0 | 0 | USD |
| 3004286 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PROCESS PIPING FOR BLDG. 712 | 0 | 0 | 0 | USD |
| 3004286 | 0 | Ammo | | 21 Lonoke, AR | 12/5/2001 | ADDTL WATER FILTER | 0 | 0 | 0 | USD |
| 3004287 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PROCESS PIPING FOR BLDG. 709 | 0 | 0 | 0 | USD |
| 3004287 | 1 | Ammo | | 21 Lonoke, AR | 10/15/1994 | MODIFY PROCESS PIPE 709 2" 2256 | 0 | 0 | 0 | USD |
| 3004288 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PROCESS PIPING - POWDER POURING | 0 | 0 | 0 | USD |
| 3004289 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PROCESS PIPING - SHOTSHELL | 0 | 0 | 0 | USD |
| 3004290 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PROCESS PIPING - SHOTSHELL | 0 | 0 | 0 | USD |
| 3004290 | 1 | Ammo | | 21 Lonoke, AR | 5/15/1996 | ADDL-PROCESS WATER VALVE | 0 | 0 | 0 | USD |
| 3004291 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PROCESS PIPING - SHOT TOWER | 0 | 0 | 0 | USD |
| 3004292 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | H&V PIPING - SHOT TOWER | 0 | 0 | 0 | USD |
| 3004293 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SERVICE PIPING - CENTERFIRE | 0 | 0 | 0 | USD |
| 3004293 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CF RESTROOM PLUMBING | 0 | 0 | 0 | USD |
| 3004294 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | H & V PIPING - CENTERFIRE | 0 | 0 | 0 | USD |
| 3004295 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | H & V PIPING - SHOT SHELL | 0 | 0 | 0 | USD |
| 3004296 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PROCESS PIPING - NITRATION | 0 | 0 | 0 | USD |
| 3004296 | 1 | Ammo | | 21 Lonoke, AR | 12/5/2001 | ADDTL WATER FILTER | 0 | 0 | 0 | USD |
| 3004297 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PROCESS PIPING FOR BLDG. 200 | 0 | 0 | 0 | USD |
| 3004298 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PROCESS PIPING FOR BLDG.100 | 0 | 0 | 0 | USD |
| 3004299 | 1 | Ammo | | 21 Lonoke, AR | 8/15/1994 | ADDL-OVERHEAD PLASTIC PIPE 2231 | 0 | 0 | 0 | USD |
| 3004299 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL. COST-ACID SEWERLINE 120308 | 0 | 0 | 0 | USD |
| 3004299 | 3 | Ammo | | 21 Lonoke, AR | 12/1/1993 | OLD BULT WASH DRAIN LINE (FBV120)12231 | 0 | 0 | 0 | USD |
| 3004299 | 4 | Ammo | | 21 Lonoke, AR | 9/15/2004 | ADDTL #728 WASH UNIT DRAIN LINES | 0 | 0 | 0 | USD |
| 3004300 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | NEUTRALIZATION PIPING (FBV4578) | 0 | 0 | 0 | USD |
| 3004301 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | NEUTRALIZATION PIPING (FBV9007) | 0 | 0 | 0 | USD |
| 3004302 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | NEUTRALIZATION PIPING (FBV5380) | 0 | 0 | 0 | USD |
| 3004303 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | NEUTRALIZATION PIPING | 0 | 0 | 0 | USD |
| 3004304 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PIPING FOR CARBONATE REMOVAL | 0 | 0 | 0 | USD |
| 3004305 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PROCESS PIPING WST. TRT. | 0 | 0 | 0 | USD |
| 3004306 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CYANIDE DRAIN LINE (FBV2969) | 0 | 0 | 0 | USD |
| 3004307 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PROCESS PIPING - C.F. PLTG | 0 | 0 | 0 | USD |
| 3004308 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PROCESS PIPING BLDG #301 110076 | 0 | 0 | 0 | USD |
| 3004309 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DOMESTIC PIPING BLDG #301 110076 | 0 | 0 | 0 | USD |
| 3004309 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | STEAM WTR HEAT EXCHANGER-RF DOMEST | 0 | 0 | 0 | USD |
| 3004310 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SANITARY SEWER LINE BLDG #301 110076 | 0 | 0 | 0 | USD |
| 3004311 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PROCESS SEWER LINE BLDG #301 110076 | 0 | 0 | 0 | USD |
| 3004312 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | STORM SEWER LINE BLDG #301 110076 | 0 | 0 | 0 | USD |
| 3004313 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL SERVICE PIPING BLDG #200-SS CON | 0 | 0 | 0 | USD |
| 3004314 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MOD NC WATER DISCHARGE-ENVIRON 120623 | 0 | 0 | 0 | USD |
| 3004315 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SERVICE PIPING BLDG #723 | 0 | 0 | 0 | USD |
| 3004316 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING FOR NITRATION BLDG. | 0 | 0 | 0 | USD |
| 3004317 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING FOR POLNOL STORAGE BLDGS. | 0 | 0 | 0 | USD |
| 3004318 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING FOR BLDG. 719 | 0 | 0 | 0 | USD |
| 3004319 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING FOR BLDG. 721 | 0 | 0 | 0 | USD |
| 3004320 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING FOR BLDG. 724 | 0 | 0 | 0 | USD |
| 3004321 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING FOR BLDG. 720 | 0 | 0 | 0 | USD |
| 3004322 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING FOR BLDG. 717 | 0 | 0 | 0 | USD |
| 3004323 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING FOR BLDG. 709 | 0 | 0 | 0 | USD |
| 3004324 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING - POWDER POURING | 0 | 0 | 0 | USD |
| 3004325 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING - POST POUR STORAGE | 0 | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3004326 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING - POWDER BLENDING | | 0 | 0 | USD |
| 3004327 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING - SHOT TOWER | | 0 | 0 | USD |
| 3004328 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING - CENTERFIRE | | 0 | 0 | USD |
| 3004328 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST-POWER WIRING CENTER FIRE | | 0 | 0 | USD |
| 3004329 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CENTER FIRE - MRP WIRING | | 0 | 0 | USD |
| 3004330 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING - SHOT SHELL | | 0 | 0 | USD |
| 3004331 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING - SHOTSHELL | | 0 | 0 | USD |
| 3004332 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING - SHOTSHELL | | 0 | 0 | USD |
| 3004333 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING FOR BLDG. 702 | | 0 | 0 | USD |
| 3004334 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING FOR BLDG. 703 | | 0 | 0 | USD |
| 3004335 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING FOR BLDG. 704 | | 0 | 0 | USD |
| 3004336 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING FOR BLDG. 705 | | 0 | 0 | USD |
| 3004337 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING FOR BLDG. 701 | | 0 | 0 | USD |
| 3004338 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING FOR BLDG. 100 | | 0 | 0 | USD |
| 3004339 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING FOR BLDG. 709 | | 0 | 0 | USD |
| 3004340 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING FOR BLDG. 712 | | 0 | 0 | USD |
| 3004341 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING FOR BLDG. 100 | | 0 | 0 | USD |
| 3004342 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PROCESS WIRING FOR BLDG. 100 | | 0 | 0 | USD |
| 3004343 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L POWER LINE-MAGAZINE #807 | | 0 | 0 | USD |
| 3004344 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING SYSTEM RF BLDG 301 110076    U | | 0 | 0 | USD |
| 3004345 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL POWER WIRING BLDG #200-SS CON | | 0 | 0 | USD |
| 3004346 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER WIRING FOR BLDG 712 | | 0 | 0 | USD |
| 3004348 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | INSTRUMENTATION - SHOTSHELL | | 0 | 0 | USD |
| 3004349 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | INSTRUMENTATION FOR BLDG. 100 | | 0 | 0 | USD |
| 3004350 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | INSTRUMENTATION FOR BLDG. 709 | | 0 | 0 | USD |
| 3004351 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | INSTRUMENTATION FOR BLDG. 200 | | 0 | 0 | USD |
| 3004352 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | TEMPERATURE CONTROL SYSTEM - NITRATION | | 0 | 0 | USD |
| 3004353 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | TEMPERATURE CONTROL SYSTEM - BLDG. 712 | | 0 | 0 | USD |
| 3004355 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | TEMPERATURE CONTROL SYSTEM FOR BLDG. 70 | | 0 | 0 | USD |
| 3004356 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | TEMPERATURE CONTROL SYSTEM FOR BLDG. 70 | | 0 | 0 | USD |
| 3004357 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | TEMPERATURE CONTROL SYSTEM FOR BLDG. 70 | | 0 | 0 | USD |
| 3004358 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | TEMPERATURE CONTROL SYSTEM FOR BLDG. 70 | | 0 | 0 | USD |
| 3004359 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | TEMPERATURE CONTROL SYSTEM | | 0 | 0 | USD |
| 3004381 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | TEMPERATURE CONTROL SYSTEM - CF CASE MA | | 0 | 0 | USD |
| 3004362 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | OUTSIDE STEAM LINES W SUPPORT BLDG #733 | | 0 | 0 | USD |
| 3004363 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | OUTSIDE STEAM LINES W SUPPORT BLDG #734 | | 0 | 0 | USD |
| 3004363 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER DISTRIBUTION PANEL #5-3 | | 0 | 0 | USD |
| 3004364 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER DISTRIBUTION PANEL #5-5 | | 0 | 0 | USD |
| 3004366 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER DISTRIBUTION PANEL #5-4 | | 0 | 0 | USD |
| 3004367 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER DISTRIBUTION PANEL #4-3 | | 0 | 0 | USD |
| 3004368 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER DISTRIBUTION PANEL #4-4 | | 0 | 0 | USD |
| 3004369 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER DISTRIBUTION PANEL #4-2 | | 0 | 0 | USD |
| 3004370 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER DISTRIBUTION PANEL #3-2 | | 0 | 0 | USD |
| 3004371 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER DISTRIBUTION PANEL #9-1 | | 0 | 0 | USD |
| 3004372 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER DISTRIBUTION PANEL # 2 - 5 | | 0 | 0 | USD |
| 3004373 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER DISTRIBUTION PANEL # 2 - 3 | | 0 | 0 | USD |
| 3004373 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER DISTRIBUTION PANEL # 2 - 2 | | 0 | 0 | USD |
| 3004374 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER DISTRIBUTION PANEL # 2 - 1 | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3004375 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER DISTRIBUTION PANEL # 7 - 1 - 1 | | 0 | 0 | 0 USD |
| 3004376 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER DISTRIBUTION PANEL # 1 - 5 | | 0 | 0 | 0 USD |
| 3004377 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER DISTRIBUTION PANEL # 1 - 3 | | 0 | 0 | 0 USD |
| 3004378 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER DISTRIBUTION PANEL # 1 - 2 | | 0 | 0 | 0 USD |
| 3004379 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER DISTRIBUTION PANEL #9-6-1 | | 0 | 0 | 0 USD |
| 3004380 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | POWER DISTRIBUTION PANEL #2-6 | | 0 | 0 | 0 USD |
| 3004381 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | MOTOR CONTROL CENTER #5-3    AL | | 0 | 0 | 0 USD |
| 3004382 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | MOTOR CONTROL CENTER #5-5 | | 0 | 0 | 0 USD |
| 3004383 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | MOTOR CONTROL CENTER #5-4    AL | | 0 | 0 | 0 USD |
| 3004384 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | MOTOR CONTROL CENTER #4-3    AL | | 0 | 0 | 0 USD |
| 3004385 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | MOTOR CONTROL CENTER #4-2    AL | | 0 | 0 | 0 USD |
| 3004386 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | MOTOR CONTROL CENTER #3-3    AL | | 0 | 0 | 0 USD |
| 3004387 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | MOTOR CONTROL CENTER #9-4 | | 0 | 0 | 0 USD |
| 3004388 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | MOTOR CONTROL CENTER # 2 - 6 | | 0 | 0 | 0 USD |
| 3004389 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | MOTOR CONTROL CENTER #1 - 3 | | 0 | 0 | 0 USD |
| 3004390 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | MOTOR CONTROL CENTER #9-6-2 | | 0 | 0 | 0 USD |
| 3004391 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | MOTOR CONTROL CENTER #1-2 | | 0 | 0 | 0 USD |
| 3004392 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | MOTOR CONTROL CENTER #3-2    AL | | 0 | 0 | 0 USD |
| 3004393 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | MOTOR CONTROL CENTER #9-6-1 | | 0 | 0 | 0 USD |
| 3004394 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | MOTOR CONTROL CENTER # 1 - 7 | | 0 | 0 | 0 USD |
| 3004395 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | 1280 GALLON SEPTIC TANK 05 | | 0 | 0 | 0 USD |
| 3004396 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | HEATING SYSTEM BLDG #733 SER #76L08000 | | 0 | 0 | 0 USD |
| 3004397 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | HEATING SYSTEM BLDG #734 SER #K76L079 | | 0 | 0 | 0 USD |
| 3004398 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | HEATER-MAGAZINE #807                T | | 0 | 0 | 0 USD |
| 3004399 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | UNIT HEATERS - BLDG 301 110076 | | 0 | 0 | 0 USD |
| 3004400 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | UNIT HEATERS - BLDG 302 110076 | | 0 | 0 | 0 USD |
| 3004401 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | UNIT HEATERS - BLDG 303 110076 | | 0 | 0 | 0 USD |
| 3004402 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | ROOF VENTILATOR | | 0 | 0 | 0 USD |
| 3004403 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | CF LEAD DUST VENTILATION SYS | | 0 | 0 | 0 USD |
| 3004404 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | BARREL HOOD EXHAUST FAN & 2 HP MOTOR | | 0 | 0 | 0 USD |
| 3004405 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | EXTRUDER EXHAUST FAN & 2 HP MOTOR | | 0 | 0 | 0 USD |
| 3004406 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | LASER UNIT EXHAUST SYSTEM | | 0 | 0 | 0 USD |
| 3004407 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST-EXHAUST FANS VENT STACKS 12024 | | 0 | 0 | 0 USD |
| 3004408 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | BLDG #301 BREAD/PRM VENT EXH SYS 110076 | | 0 | 0 | 0 USD |
| 3004409 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | CF BULLET AREA AIR CONDITIONER | | 0 | 0 | 0 USD |
| 3004410 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | CF CASE AREA AIR CONDITIONER | | 0 | 0 | 0 USD |
| 3004411 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | CF CASE AREA AIR CONDITIONER | | 0 | 0 | 0 USD |
| 3004412 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | CF CASE AREA AIR CONDITIONER | | 0 | 0 | 0 USD |
| 3004413 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | CF LOAD AND PRIMER AREA AIR CONDITIONER | | 0 | 0 | 0 USD |
| 3004414 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | CF LOAD AREA AIR CONDITIONER | | 0 | 0 | 0 USD |
| 3004415 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | CF PACK AREA AIR CONDITIONER | | 0 | 0 | 0 USD |
| 3004416 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | CF EAST OFFICES AIR CONDITIONER | | 0 | 0 | 0 USD |
| 3004417 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | CF WEST OFFICES AIR CONDITIONER | | 0 | 0 | 0 USD |
| 3004420 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | CF CASE MAKE-UP AREA HEATING AND VENTIL | | 0 | 0 | 0 USD |
| 3004421 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | CF PACK AREA HEATING AND VENTILATION UN | | 0 | 0 | 0 USD |
| 3004422 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | CF PRIMER AREA HEATING AND VENTILATION | | 0 | 0 | 0 USD |
| 3004423 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | CF CASE AREA HEATING AND VENTILATION UN | | 0 | 0 | 0 USD |
| 3004424 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | CF BULLET AREA HEATING AND VENTILATION | | 0 | 0 | 0 USD |
| 3004425 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | CF MISC STORAGE HEATING AND VENTILATION | | 0 | 0 | 0 USD |
| 3004425 | | 1 Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST-H&V UNITS | | 0 | | 0 USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3004426 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | OF METAL STORAGE HEATING AND VENTILATIO | | 0 | 0 | USD |
| 3004427 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CF CASE AREA HEATING AND VENTILATION UN | | 0 | 0 | USD |
| 3004428 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PRIMER MFG AIR CONDITIONER | | 0 | 0 | USD |
| 3004429 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PRIMER MFG HEATING & VENTILATION AREA | | 0 | 0 | USD |
| 3004430 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PRIMER MFG HEATING & VENTILATION UNIT | | 0 | 0 | USD |
| 3004431 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS BODIES AND CAP STORAGE AREA AIR COND | | 0 | 0 | USD |
| 3004432 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS LOAD AND PACK AREA AIR CONDITIONER | | 0 | 0 | USD |
| 3004433 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS CONTAINER STORAGE AIR CONDITIONER | | 0 | 0 | USD |
| 3004434 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS INJECTION MOLDING AREA AIR CONDITION | | 0 | 0 | USD |
| 3004434 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST MULTI ZONE CONTROL SYSTEM | | 0 | 0 | USD |
| 3004435 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS THIRD FLOOR STORAGE AREA AIR CONDITI | | 0 | 0 | USD |
| 3004435 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | REBUILD #558 AIR CONDITIONING UNIT SS 110086 | | 0 | 0 | USD |
| 3004436 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS BLENDING AREA AIR-CONDITIONER   #C | | 0 | 0 | USD |
| 3004437 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS MAINTENANCE AREA AIR CONDITIONER | | 0 | 0 | USD |
| 3004438 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS LOCKER ROOM AND OFFICE AREA AIR COND | | 0 | 0 | USD |
| 3004439 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS HEADS AREA AIR CONDITIONER   #C | | 0 | 0 | USD |
| 3004440 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS MILITARY PACK AND OFFICE AREA AIR CO | | 0 | 0 | USD |
| 3004441 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PACKAGE AIR CONDITIONING UNIT BLDG 705 | | 0 | 0 | USD |
| 3004442 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PACKAGE AIR CONDITIONING UNIT BLDG 704 | | 0 | 0 | USD |
| 3004443 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PACKAGE AIR CONDITIONING UNIT BLDG 703 | | 0 | 0 | USD |
| 3004444 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PACKAGE AIR CONDITIONING UNIT BLDG 704 | | 0 | 0 | USD |
| 3004444 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PACKAGE AIR CONDITIONING UNIT BLDG 702 | | 0 | 0 | USD |
| 3004446 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | NITRATION AIR CONDITIONER | | 0 | 0 | USD |
| 3004448 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS BODIES AREA AIR CONDITIONER   #C | | 0 | 0 | USD |
| 3004449 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PACKAGE DEHUMIDIFIER BLDG 717 | | 0 | 0 | USD |
| 3004450 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | HUMIDITY STABILIZER BLDG 705 | | 0 | 0 | USD |
| 3004450 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ROOF HEATING & AIR CONDITIONING UNITS BLDG 709 | | 0 | 0 | USD |
| 3004451 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS PLATING AREA HEATING AND VENTILATION | | 0 | 0 | USD |
| 3004451 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST-H&V UNITS | | 0 | 0 | USD |
| 3004453 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS REFRIGERATION ROOM HEATING AND VENTI | | 0 | 0 | USD |
| 3004454 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL-STEAM COIL 110076 | | 0 | 0 | USD |
| 3004458 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | HVAC PRIMER PACK BLD #709-SS CON | | 0 | 0 | USD |
| 3004461 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SCRAP METAL CONTAIN-PROTECTION | | 0 | 0 | USD |
| 3004462 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | A/C CLEANING SYS-RF 120541 | | 0 | 0 | USD |
| 3004852 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2003 | ADDL #155/156 #62 DRAW PINCH CUTOFF 120540 #155/157 | | 0 | 0 | USD |
| 3004852 | 1 | Ammo | | 21 Lonoke, AR | 8/15/2003 | ADDL #155/156 BLISS PRESS #155/157 | | 0 | 0 | USD |
| 3004853 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL #163-166 #62 DRAW PINCH CUTOFF 120540 #163/165 | | 0 | 0 | USD |
| 3004854 | 1 | Ammo | | 21 Lonoke, AR | 8/15/2004 | ADDL #165/166 BLISS DUPLEX PRESS #163/165 | | 0 | 0 | USD |
| 3004854 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL #167 #62 DRAW PINCH CUTOFF 120540 | | 0 | 0 | USD |
| 3004855 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #304 BLISS DRAW PRESS & ADDITIONAL COST #179 | | 0 | 0 | USD |
| 3004855 | 1 | Ammo | | 21 Lonoke, AR | 3/15/2004 | ADDL #179 CHANNEL FEED | | 0 | 0 | USD |
| 3004856 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #88  162 BLISS TAPER PRESS | | 0 | 0 | USD |
| 3004857 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2010 | #92 62 BLISS TAPER PRESS & ADDL COST | | 0 | 0 | USD |
| 3004857 | 3 | Ammo | | 21 Lonoke, AR | 7/15/2010 | ADDL FEED SYSTEM #92 101636 | | 0 | 0 | USD |
| 3004858 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #89  162 BLISS TAPER PRESS & ADDL COST 120330 | | 0 | 0 | USD |
| 3004859 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #94  162 BLISS TAPER PRESS & ADDL COST 120330 | | 0 | 0 | USD |
| 3004859 | 2 | Ammo | | 21 Lonoke, AR | 7/15/2010 | ADDL FEED SYSTEM #94 101636 | | 0 | 0 | USD |
| 3004860 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #93  162 BLISS TAPER PRESS & ADDL COST 120330 | | 0 | 0 | USD |
| 3004860 | 3 | Ammo | | 21 Lonoke, AR | 7/15/2010 | ADDL FEED SYSTEM #93 101636 | | 0 | 0 | USD |
| 3004861 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #90  162 BLISS TAPER PRESS & ADDL COST 120330 | | 0 | 0 | USD |
| 3004862 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #83  162 BLISS TAPER PRRESS & ADDL COST 120330 | | 0 | 0 | USD |

Case 20-81688-CRJ11    Doc 904-11    Filed 09/30/20    Entered 09/30/20 13:40:13    Desc
Exhibit    Page 240 of 434

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C004863 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #84  162 BLISS TAPRE PRESS/TAPER PRESS 120246 | | 0 | 0 | USD |
| C004864 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #86  162 BLISS TAPER PRESS/TAPER TRIM 120330 | | 0 | 0 | USD |
| C004864 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2006 | REBUILD TAPER PRESS #86 | | 0 | 0 | USD |
| C004865 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #87  162 BLISS TAPER PRESS & TAPER TRIM 120330 | | 0 | 0 | USD |
| C004866 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #87  162 BLISS TAPER PRESS & TAPER TRIM 120330 | | 0 | 0 | USD |
| C004866 | 2 | Ammo | | 21 Lonoke, AR | 7/15/2010 | ADDL FEED SYSTEM #91 101636 | | 0 | 0 | USD |
| C004869 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #85  162 BLISS TAPER PRESS & TAPER TRIM 120330 | | 0 | 0 | USD |
| C004870 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #147 #4 BLISS HEADER | | 0 | 0 | USD |
| C004870 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #134  #4 BLISS HEADER | | 0 | 0 | USD |
| C004870 | 1 | Ammo | | 21 Lonoke, AR | 8/15/1996 | ADDL - REBUILD 134 HEADER | | 0 | 0 | USD |
| C004870 | 2 | Ammo | | 21 Lonoke, AR | 6/15/1999 | ADDL MAGNUM FEEDER #134 | | 0 | 0 | USD |
| C004870 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2000 | ADDL INSTALL FEED #134 | | 0 | 0 | USD |
| C004871 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #135  #4 BLISS HEADER | | 0 | 0 | USD |
| C004873 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | Conveyor, 8ga SLUG SWAGER & FEED | | 0 | 0 | USD |
| C004874 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SWAGER, RIFLE SLUG -12 GA DUPLEX | | 0 | 0 | USD |
| C004874 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SWAGER, RIFLE SLUG -12 GA DUPLEX Add'l Cost | | 0 | 0 | USD |
| C004875 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | REMINGTON DIAL BULLET ASSEMBLY #332 | | 0 | 0 | USD |
| C004875 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST MODERN -BULLET ASSY      U | | 0 | 0 | USD |
| C004875 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | REMINGTON DIAL BULLET ASSY#YR37296A4 #334 | | 0 | 0 | USD |
| C004876 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST MODERN -BULLET ASSY      U | | 0 | 0 | USD |
| C004876 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | REMINGTON DIAL BULLET ASSEMBLY #335 | | 0 | 0 | USD |
| C004877 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2004 | ADD'L #335 BLT ASSEMBLY PRESS | | 0 | 0 | USD |
| C004877 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | REMINGTON DIAL BULLET ASSEMBLY #331 | | 0 | 0 | USD |
| C004878 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST MODERN -BULLET ASSY      U | | 0 | 0 | USD |
| C004879 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | REMINGTON DIAL BULLET ASSEMBLY #349 | | 0 | 0 | USD |
| C004879 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST MODERN -BULLET ASSY      U | | 0 | 0 | USD |
| C004880 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | REMINGTON DIAL BULLET ASSEMBLER | | 0 | 0 | USD |
| C004880 | 2 | Ammo | | 21 Lonoke, AR | 5/15/1996 | ADDL-#324 VIBRATORY FEED HOPPER | | 0 | 0 | USD |
| C004881 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | REMINGTON DIAL BULLET REFINISHING #333 | | 0 | 0 | USD |
| C004881 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST MODERN -BULLET ASSY      U | | 0 | 0 | USD |
| C004883 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | Table, Buckshot Sorting | | 0 | 0 | USD |
| C004884 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #37P REMINGTON DIAL PRIMER PRESS & VIB FEED | | 0 | 0 | USD |
| C004884 | 1 | Ammo | | 21 Lonoke, AR | 3/15/1994 | ADDL-PRIMER DETECT SYS REM#37P 120570 | | 0 | 0 | USD |
| C004884 | 0 | Ammo | | 21 Lonoke, AR | 8/15/1994 | ADDL - #37P PRIMER BARRICADE | | 0 | 0 | USD |
| C004885 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #52P REMINGTON DIAL PRIMER PR & FEEDER/BARRACADE | | 0 | 0 | USD |
| C004885 | 1 | Ammo | | 21 Lonoke, AR | 3/15/1994 | ADDL-PRIMER DETECT SYS REM#52P 120570 | | 0 | 0 | USD |
| C004885 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | INS FEEDER & BARRACADE-52-12253 #52P | | 0 | 0 | USD |
| C004885 | 4 | Ammo | | 21 Lonoke, AR | 1/15/2002 | ADD'L #52P PRIMING PRESS | | 0 | 0 | USD |
| C004886 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #51P REMINGTON DIAL PRIMER PRESS & VIB FEED | | 0 | 0 | USD |
| C004886 | 1 | Ammo | | 21 Lonoke, AR | 3/15/1994 | ADDL-PRIMER DETECT SYS REM#51P 120570 | | 0 | 0 | USD |
| C004886 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1999 | REB PRIMING MACHINE 100649 #51P | | 0 | 0 | USD |
| C004887 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #53P REMINGTON DIAL PRIMER PR & FEEDER/BARRACADE | | 0 | 0 | USD |
| C004887 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | INS FEEDER & BARRACADE-52-12253 #53P | | 0 | 0 | USD |
| C004887 | 3 | Ammo | | 21 Lonoke, AR | 9/15/1999 | REB PRIMING MACHINE 100649 #53P | | 0 | 0 | USD |
| C004888 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #44P REMINGTON DIAL PRIMER PRESS & VIB FEED | | 0 | 0 | USD |
| C004888 | 2 | Ammo | | 21 Lonoke, AR | 9/15/2004 | ADD'L #44P PRIMING MACHINE | | 0 | 0 | USD |
| C004891 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | NIAGARA HALF-HEAD 8 GA | | 0 | 0 | USD |
| C004891 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | REB & MOD NIAGARA PRESS      U | | 0 | 0 | USD |
| C004891 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2001 | REB NIAGARA H/H | | 0 | 0 | USD |
| C004892 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #501 PETERS LOADER 28 GA & DETECT SYS 120348 | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3004892 | 2 | Ammo | | 21 Lonoke, AR | 12/15/1997 | ADD'L CONVEYOR | | 0 | 0 | USD |
| 3004892 | 3 | Ammo | | 21 Lonoke, AR | 9/15/2001 | UPGRADE CONTROLS | | 0 | 0 | USD |
| 3004892 | 4 | Ammo | | 21 Lonoke, AR | 10/15/2001 | ADD'L 501 INDEXER | | 0 | 0 | USD |
| 3004892 | 5 | Ammo | | 21 Lonoke, AR | 6/15/2003 | ADD'L 28GA WAD BOWL FEEDER | | 0 | 0 | USD |
| 3004892 | 6 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADD'L DATA COMMUNICATIONS UPG | | 0 | 0 | USD |
| 3004893 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PETERS LOADING MACHINE #523 | | 0 | 0 | USD |
| 3004894 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SIMPLEX LOADER-#528 12 RS GA | | 0 | 0 | USD |
| 3004894 | 1 | Ammo | | 21 Lonoke, AR | 11/15/1994 | ADD-#528 PROTO STL SHOT CHARGER 2915 | | 0 | 0 | USD |
| 3004894 | 4 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST-STEEL WAD FR DOBWL #528 120219 | | 0 | 0 | USD |
| 3004894 | 5 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MOD SHOT CHARGER 10GA #528 120372 | | 0 | 0 | USD |
| 3004894 | 7 | Ammo | | 21 Lonoke, AR | 9/15/1995 | ADD'L - #528 GLUE/CRIMP/STEEL SHOT | | 0 | 0 | USD |
| 3004894 | 8 | Ammo | | 21 Lonoke, AR | 2/15/2003 | ADD'L TOP WAD UNIT | | 0 | 0 | USD |
| 3004895 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #625 5 ROUND PACKER & CARTON SEALER/CODER | | 0 | 0 | USD |
| 3004895 | 1 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADD'L - INSTALLATION #625 | | 0 | 0 | USD |
| 3004895 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L ALTERNATOR #625 | | 0 | 0 | USD |
| 3004895 | 3 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADD'L DATA COMMUNICATIONS UPG | | 0 | 0 | USD |
| 3004896 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SLUG TUMBLING BARREL #1310 PEEN PLATER | | 0 | 0 | USD |
| 3004896 | 1 | Ammo | | 21 Lonoke, AR | 3/15/2000 | ADD'L REB #1310 100700 | | 0 | 0 | USD |
| 3004898 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2005 | ADD'L PEEN PLATER FRAME | | 0 | 0 | USD |
| 3004899 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LEAD SLUG TUMBLING BARREL | | 0 | 0 | USD |
| 3004900 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | LEAD SLUG TUMBLING BARREL | | 0 | 0 | USD |
| 3004901 | 1 | Ammo | | 21 Lonoke, AR | 2/1/1996 | ADD'L-OVERHAUL 1307 SLUG TUMBLE BARREL | | 0 | 0 | USD |
| 3004901 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 22 CAL SLUG FORM MACHINE 1300 | | 0 | 0 | USD |
| 3004902 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 22 CAL SLUG FORMING MACHINE 1301 | | 0 | 0 | USD |
| 3004903 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 22 CAL SLUG FORMING MACHINE 1302 | | 0 | 0 | USD |
| 3004904 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 22 CAL SLUG FORMING MACHINE 1303 | | 0 | 0 | USD |
| 3004905 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 22 CAL SLUG FORMING MACHINE 1304 | | 0 | 0 | USD |
| 3004906 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 22 CAL SLUG FORMING MACHINE 1305 | | 0 | 0 | USD |
| 3004907 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #1131 RF PRIMING MACHINE | | 0 | 0 | USD |
| 3004907 | 1 | Ammo | | 21 Lonoke, AR | 7/15/2013 | PELLET MONITORING SYS #1123 101810 | | 0 | 0 | USD |
| 3004908 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #1125 SEMI AUTO RF PRIMING MACHINE | | 0 | 0 | USD |
| 3004908 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD-RPL DR MOTOR/CONTROL #1125 120605 | | 0 | 0 | USD |
| 3004908 | 2 | Ammo | | 21 Lonoke, AR | 7/15/2013 | PELLET MONITORING SYS #1125 101810 | | 0 | 0 | USD |
| 3004909 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #1128 SEMI AUTO RF PRIMING MACHINE | | 0 | 0 | USD |
| 3004909 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MOD CONTROL SYS #1129 120523 | | 0 | 0 | USD |
| 3004909 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD-RPL DR MOTOR/CONTROL #1128 120605 | | 0 | 0 | USD |
| 3004909 | 3 | Ammo | | 21 Lonoke, AR | 7/15/2013 | PELLET MONITORING SYS #1128 101810 | | 0 | 0 | USD |
| 3004910 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | #1132 SEMI AUTO RF PRIMING MACHINE | | 0 | 0 | USD |
| 3004910 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MOD CONTROL SYS #1134 120523 | | 0 | 0 | USD |
| 3004910 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD-RPL DR MOTOR & CONTROL #1132 120506 | | 0 | 0 | USD |
| 3004910 | 3 | Ammo | | 21 Lonoke, AR | 7/15/2013 | PELLET MONITORING SYS #1132 101810 | | 0 | 0 | USD |
| 3004912 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | VIBRATORY FEEDER | | 0 | 0 | USD |
| 3004912 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BOX & GRID ASSEMBLE FDR MCH | | 0 | 0 | USD |
| 3004912 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADD'L COST RIMFIRE PROJECT 110076 | | 0 | 0 | USD |
| 3004913 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | INDEX ASSEMBLY PRESS-RIFLE & ADD'L COST | | 0 | 0 | USD |
| 3004914 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | INDEX ASSEMBLY PRESS-PISTOL & ADD'L COST | | 0 | 0 | USD |
| 3004915 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | TAMP & FOIL PRESS - REM GRIT 120230 & 120435 SS | | 0 | 0 | USD |
| 3004915 | 1 | Ammo | | 21 Lonoke, AR | 2/15/2007 | ADD'L UPGRADE #856 | | 0 | 0 | USD |
| 3004917 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | WATER STORAGE TANK & HEATER 62-0041 | | 0 | 0 | USD |
| 3004920 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SS RESTROOM PLUMBING | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C004920 | 3 | Ammo | | 21 Lonoke, AR | 6/15/2003 | SS WATER HEATER | | 0 | 0 | USD |
| C004921 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST-INSTALL DISCHARGE PIPING NI | | 0 | 0 | USD |
| C004922 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL COST-MODIFY WELD BOOTH EXHAUSTS | | 0 | 0 | USD |
| 3005114 | 0 | Ammo | | 21 Lonoke, AR | 3/5/1994 | LATHE, SOUTHBEND 10" R&D 120059 | | 0 | 0 | USD |
| 3005123 | 0 | Ammo | | 21 Lonoke, AR | 11/15/1994 | ATOMIC ABSORPTION SPECTROMETER 2204 | | 0 | 0 | USD |
| 3005126 | 0 | Ammo | | 21 Lonoke, AR | 6/15/1994 | ULTRASONIC CLNR TANK W/TIMER/HTR 2229 | | 0 | 0 | USD |
| 3005127 | 0 | Ammo | | 21 Lonoke, AR | 3/5/1994 | LAYNE WELL PUMP FOR #3 120005 | | 0 | 0 | USD |
| 3005128 | 0 | Ammo | | 21 Lonoke, AR | 3/5/1994 | WELL NUMBER 3 120005 | | 0 | 0 | USD |
| 3005129 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1994 | O/S PLASTIC WTR MAIN FOR #3 1750'-8" 120005 | | 0 | 0 | USD |
| 3005130 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1994 | ST STL 5000 GAL MIX TANK #736 2212 | | 0 | 0 | USD |
| 3005131 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1994 | ST STL 5000 GAL MIX TANK 2212 | | 0 | 0 | USD |
| 3005144 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1994 | SCHAUR SPEED LATHE 2-SPEED 2259 | | 0 | 0 | USD |
| 3005145 | 0 | Ammo | | 21 Lonoke, AR | 5/15/1994 | BLISS C35 DRAW PRESS #242 120027 | | 0 | 0 | USD |
| 3005146 | 0 | Ammo | | 21 Lonoke, AR | 5/15/1994 | BLISS C35 JKT DRAW PRESS #243 120027 | | 0 | 0 | USD |
| 3005147 | 0 | Ammo | | 21 Lonoke, AR | 11/15/1994 | ROWE METAL UNCOILER FOR #227 2299 | | 0 | 0 | USD |
| 3005149 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1994 | SCRAP LEAD V/B FD/VENT SYS 120019 | | 0 | 0 | USD |
| 3005155 | 0 | Ammo | | 21 Lonoke, AR | 3/5/1994 | GEAR PUMP & DRIVE #418/419 120032 | | 0 | 0 | USD |
| 3005156 | 0 | Ammo | | 21 Lonoke, AR | 3/5/1994 | GEAR PUMP & DRIVE #418/419 120032 | | 0 | 0 | USD |
| 3005157 | 0 | Ammo | | 21 Lonoke, AR | 6/15/1994 | SINGLE STA BODY FORMER #971 120076 | | 0 | 0 | USD |
| 3005157 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL-MODIFICATION PARTS 2076 | | 0 | 0 | USD |
| 3005158 | 0 | Ammo | | 21 Lonoke, AR | 6/15/1994 | SINGLE STA BODY FORMER #972 120076 | | 0 | 0 | USD |
| 3005158 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL-MODIFICATION PARTS 2076 | | 0 | 0 | USD |
| 3005158 | 4 | Ammo | | 21 Lonoke, AR | 1/15/2005 | ADDL #972 ROTARY CAM | | 0 | 0 | USD |
| 3005159 | 0 | Ammo | | 21 Lonoke, AR | 6/15/1994 | SINGLE STA BODY FORMER #973 120076 | | 0 | 0 | USD |
| 3005159 | 2 | Ammo | | 21 Lonoke, AR | 5/15/1996 | ADDL - HYDRAULIC PUMP #973 | | 0 | 0 | USD |
| 3005159 | 3 | Ammo | | 21 Lonoke, AR | 11/15/2005 | HYDRAULIC PUMP #973 | | 0 | 0 | USD |
| 3005160 | 0 | Ammo | | 21 Lonoke, AR | 8/15/1994 | SINGLE STATION BODY FORM #974 2076 | | 0 | 0 | USD |
| 3005160 | 2 | Ammo | | 21 Lonoke, AR | 12/15/1996 | ADDL - HYDRAULIC PUMP | | 0 | 0 | USD |
| 3005160 | 3 | Ammo | | 21 Lonoke, AR | 4/15/2004 | ADDL SS #974 BODY FORMER | | 0 | 0 | USD |
| 3005161 | 0 | Ammo | | 21 Lonoke, AR | 6/15/1994 | SINGLE STA BODY FORMER #975 120076 | | 0 | 0 | USD |
| 3005161 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL-MODIFICATION PARTS 2076 | | 0 | 0 | USD |
| 3005161 | 1 | Ammo | | 21 Lonoke, AR | 12/15/2003 | ADDL #975 BODY FORMER | | 0 | 0 | USD |
| 3005162 | 0 | Ammo | | 21 Lonoke, AR | 6/15/1994 | SINGLE STA BODY FORMER #976 120076 | | 0 | 0 | USD |
| 3005162 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDL-MODIFICATION PARTS 2076 | | 0 | 0 | USD |
| 3005164 | 0 | Ammo | | 21 Lonoke, AR | 6/15/1994 | HEAT SET CATWALKS-2 120076 | | 0 | 0 | USD |
| 3005169 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1994 | VACUUM SYS-SCRAP SHT/PWD SEPRTR 120635 | | 0 | 0 | USD |
| 3005169 | 1 | Ammo | | 21 Lonoke, AR | 4/15/2005 | ADDL SHOT VACUUM SYSTEM | | 0 | 0 | USD |
| 3005177 | 1 | Ammo | | 21 Lonoke, AR | 6/14/1995 | HEAT TREATER MATL HANDLING EQUIPMENT | | 0 | 0 | USD |
| 3005177 | 1 | Ammo | | 21 Lonoke, AR | 11/15/1997 | ADDL - VISION INSPECTION SYSTEM | | 0 | 0 | USD |
| 3005177 | 3 | Ammo | | 21 Lonoke, AR | 3/5/1998 | ADDL INK FOUNTAIN SYSTEM 2595/100420 | | 0 | 0 | USD |
| 3005177 | 4 | Ammo | | 21 Lonoke, AR | 12/15/2005 | SS PRINTER UV SYSTEM | | 0 | 0 | USD |
| 3005177 | 5 | Ammo | | 21 Lonoke, AR | 10/15/2006 | ADDL FEED SYSTEM | | 0 | 0 | USD |
| 3005177 | 6 | Ammo | | 21 Lonoke, AR | 2/15/2007 | ADDL UPGRADE 471 BODY PRINTER | | 0 | 0 | USD |
| 3005178 | 1 | Ammo | | 21 Lonoke, AR | 6/14/1995 | HEAT TREATER MATL HANDLING EQUIPMENT | | 0 | 0 | USD |
| 3005178 | 2 | Ammo | | 21 Lonoke, AR | 3/15/1998 | ADDL INK FOUNTAIN SYSTEM 2595/100420 | | 0 | 0 | USD |
| 3005178 | 3 | Ammo | | 21 Lonoke, AR | 12/15/2005 | SS PRINTER UV SYSTEM | | 0 | 0 | USD |
| 3005178 | 4 | Ammo | | 21 Lonoke, AR | 10/15/2006 | ADDL FEED SYSTEM | | 0 | 0 | USD |
| 3005178 | 5 | Ammo | | 21 Lonoke, AR | 2/15/2007 | ADDL UPGRADE 470 BODY PRINTER | | 0 | 0 | USD |
| 3005179 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1994 | HEV/-WT STORAGE CABINET 110089 | | 0 | 0 | USD |
| 3005181 | 0 | Ammo | | 21 Lonoke, AR | 8/15/1994 | FMC BUCKET LIFT LEAD SLUG CONVEYOR | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C305182 | 0 | Ammo | | 21 Lonoke, AR | 8/15/1994 | LEAD SLUG BUCKET LIFT-RF -2218 | 0 | 0 | 0 | USD |
| C305183 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1994 | AUTO LEAD BULLET LUBE SYS 120633 | 0 | 0 | 0 | USD |
| C305184 | 0 | Ammo | | 21 Lonoke, AR | 8/15/1994 | GAS FIRED DRYER (FBV28715) 2270 | 0 | 0 | 0 | USD |
| C305184 | 1 | Ammo | | 21 Lonoke, AR | 8/15/1994 | ADDL-MOD/INSTL 20' GAS DRYER 2270 | 0 | 0 | 0 | USD |
| C305185 | 0 | Ammo | | 21 Lonoke, AR | 8/15/1994 | CHARGING TABLE W/RUBBER TOP 2207 #1 | 0 | 0 | 0 | USD |
| C305185 | 1 | Ammo | | 21 Lonoke, AR | 4/15/1997 | ADDL-ADJUSTABLE HEIGHT | 0 | 0 | 0 | USD |
| C305185 | 2 | Ammo | | 21 Lonoke, AR | 2/15/2009 | ADDL RF CHARGING TABLE | 0 | 0 | 0 | USD |
| C305186 | 0 | Ammo | | 21 Lonoke, AR | 8/15/1994 | CHARGING TABLE W/RUBBER TOP 2207 #2 | 0 | 0 | 0 | USD |
| C305186 | 1 | Ammo | | 21 Lonoke, AR | 4/15/1997 | ADDL-ADJUSTABLE HEIGHT | 0 | 0 | 0 | USD |
| C305186 | 2 | Ammo | | 21 Lonoke, AR | 2/15/2009 | ADDL RF CHARGING TABLE | 0 | 0 | 0 | USD |
| C305187 | 0 | Ammo | | 21 Lonoke, AR | 8/15/1994 | CHARGING TABLE W/RUBBER TOP 2207 #3 | 0 | 0 | 0 | USD |
| C305187 | 1 | Ammo | | 21 Lonoke, AR | 4/15/1997 | ADDL-ADJUSTABLE HEIGHT | 0 | 0 | 0 | USD |
| C305187 | 2 | Ammo | | 21 Lonoke, AR | 2/15/2009 | ADDL RF CHARGING TABLE | 0 | 0 | 0 | USD |
| C305188 | 0 | Ammo | | 21 Lonoke, AR | 8/15/1994 | CHARGING TABLE W/RUBBER TOP 2207 #4 | 0 | 0 | 0 | USD |
| C305188 | 1 | Ammo | | 21 Lonoke, AR | 4/15/1997 | ADDL-ADJUSTABLE HEIGHT | 0 | 0 | 0 | USD |
| C305188 | 2 | Ammo | | 21 Lonoke, AR | 2/15/2009 | ADDL RF CHARGING TABLE | 0 | 0 | 0 | USD |
| C306192 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1994 | YALE MOTOR HAND TRUCK 4000# 120042 - #10 | 0 | 0 | 0 | USD |
| C305193 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1994 | EZ-45 PALLET LIFT TABLE 120042 | 0 | 0 | 0 | USD |
| C305194 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1994 | EZ-45 PALLET LIFT TABLE 120042 | 0 | 0 | 0 | USD |
| C305195 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1994 | EZ-45 PALLET LIFT TABLE 120042 | 0 | 0 | 0 | USD |
| C305199 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1994 | PILOT MIXER #611 2901 | 0 | 0 | 0 | USD |
| C305200 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1994 | MAG CHUCK-CHARGING TABLE #610 2901 | 0 | 0 | 0 | USD |
| C305201 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1994 | TAMP & FOIL W3A-3 #610 2901 | 0 | 0 | 0 | USD |
| C305203 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1994 | CARVER LAB PRESS 12TON #610 2901 | 0 | 0 | 0 | USD |
| C305205 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1994 | TEST BOX OUTSIDE #610 2901 | 0 | 0 | 0 | USD |
| C305206 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1994 | IMPACT TESTER W/ACCES #610 2901 | 0 | 0 | 0 | USD |
| C305207 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1994 | FRICTION TESTER W/ACCES #610 2901 | 0 | 0 | 0 | USD |
| C305209 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1994 | ESD TESTER #610 2901 | 0 | 0 | 0 | USD |
| C305210 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1994 | INDOOR MAGAZINE TYPE II #612 2901 | 0 | 0 | 0 | USD |
| C305211 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1994 | AIR COMPRESSOR 10HP #610 2901 | 0 | 0 | 0 | USD |
| C305212 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1994 | WILDEN SUMP PUMP #610 2901 | 0 | 0 | 0 | USD |
| C305215 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1994 | PACKAGE TRANSPORTATION SIMULATOR 2044 | 0 | 0 | 0 | USD |
| C305222 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1994 | EXTR GEAR PUMP/MOTOR OPSVCSP 418/419 120032 | 0 | 0 | 0 | USD |
| C305225 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1994 | #149 PISTOL ANVIL DIE SET OPSVSP #817 2035 | 0 | 0 | 0 | USD |
| C305227 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1994 | CF DRAW LUBE PUMP OP SV SP 2240 | 0 | 0 | 0 | USD |
| C305229 | 0 | Ammo | | 21 Lonoke, AR | 8/15/1994 | CF BUL WASH SETTLE TANK W/PUMPS 2231 | 0 | 0 | 0 | USD |
| C305230 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1994 | PKG TEST EQ ROOF VENTILATOR 2044 | 0 | 0 | 0 | USD |
| C305231 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1994 | EXHAUST FAN-CAFETERIA 2238 | 0 | 0 | 0 | USD |
| C305250 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1994 | #62 BLISS DRAW & VIB FD SYS #203/205 120642 | 0 | 0 | 0 | USD |
| C305250 | 3 | Ammo | | 21 Lonoke, AR | 6/15/2006 | ADDL #203 DRAW PRESS | 0 | 0 | 0 | USD |
| C305251 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1994 | #304 BLISS DRAW PRESS #209 | 0 | 0 | 0 | USD |
| C305251 | 1 | Ammo | | 21 Lonoke, AR | 11/15/2000 | PINCH TRIM DIE SET 2842/100723 #209 | 0 | 0 | 0 | USD |
| C305252 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1994 | #54P REMINGTON DIAL PRIMER PRESS & PRIMER DETECT | 0 | 0 | 0 | USD |
| C305252 | 1 | Ammo | | 21 Lonoke, AR | 9/15/2002 | ADDL CF #54P PRIMING MACHINE | 0 | 0 | 0 | USD |
| C305253 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1994 | #43P REMINGTON DIAL PRIMER PRESS & PRIMER DETECT | 0 | 0 | 0 | USD |
| C305254 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1994 | #62 REMINGTON DIAL PRIMER PRESS & PRIMER DETECT | 0 | 0 | 0 | USD |
| C305255 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1994 | #56P REMINGTON DIAL PRIMER PRESS & PRIMER DETECT | 0 | 0 | 0 | USD |
| C305256 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1994 | #41P REMINGTON DIAL PRIMER PRESS & PRIMER DETECT | 0 | 0 | 0 | USD |
| C305256 | 1 | Ammo | | 21 Lonoke, AR | 8/15/1996 | ADDL - #41P PRIMER BARRICADE | 0 | 0 | 0 | USD |
| C305257 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1994 | #55P -REMINGTON DIAL PRIMER PRESS & PRIMER DETECT | 0 | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 005258 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1994 | #42P REMINGTON DIAL PRIMER PRESS & PRIMER DETECT | 0 | 0 | 0 | USD |
| 005259 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1994 | #46P REMINGTON DIAL PRIMER PRESS & PRIMER DETECT | 0 | 0 | 0 | USD |
| 005259 | 0 | Ammo | | 21 Lonoke, AR | 8/15/1996 | ADDL - #46P PRIMER BARRICADE | 0 | 0 | 0 | USD |
| 005297 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1995 | HEADTURN MCH #113B PISTOL 2251 | 0 | 0 | 0 | USD |
| 3005301 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1995 | HEADTURN MCH #130B RIFLE 2251 | 0 | 0 | 0 | USD |
| 3005306 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1995 | CASE SEALER W/CONVEYOR 2242 | 0 | 0 | 0 | USD |
| 3005313 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1995 | MICRO BALANCE W/PRINTER #610 2303 | 0 | 0 | 0 | USD |
| 005315 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1995 | BUGGY LIFT CHAIN HOIST#728 OPSVSP 2298 | 0 | 0 | 0 | USD |
| 005317 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1995 | CHAIN HOIST #731 TUMBLE BARREL  2209   O S S | 0 | 0 | 0 | USD |
| 005331 | 0 | Ammo | | 21 Lonoke, AR | 6/13/1995 | CENTERFIRE PLATING MONORAIL | 0 | 0 | 0 | USD |
| 005332 | 0 | Ammo | | 21 Lonoke, AR | 6/13/1995 | ADDL - OVERHAUL 401 CAP PRESS | 0 | 0 | 0 | USD |
| 005333 | 0 | Ammo | | 21 Lonoke, AR | 6/13/1995 | ADDL - WELL PUMP SHAFT | 0 | 0 | 0 | USD |
| 005339 | 0 | Ammo | | 21 Lonoke, AR | 6/13/1995 | ADDL - METERING SYSTEM NITRATION | 0 | 0 | 0 | USD |
| 3005341 | 0 | Ammo | | 21 Lonoke, AR | 6/13/1995 | ADDL - SEALER/CARTONER | 0 | 0 | 0 | USD |
| 005344 | 0 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL - FEEDER/CHUTE #527 | 0 | 0 | 0 | USD |
| 005345 | 0 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL - REBUILD #406 | 0 | 0 | 0 | USD |
| 005348 | 0 | Ammo | | 21 Lonoke, AR | 6/14/1995 | DUST HOG UNIT - RIMFIRE LOAD | 0 | 0 | 0 | USD |
| 3005349 | 0 | Ammo | | 21 Lonoke, AR | 6/14/1995 | DUST HOG UNIT - RIMFIRE LOAD | 0 | 0 | 0 | USD |
| 005350 | 0 | Ammo | | 21 Lonoke, AR | 6/14/1995 | DUST HOG UNIT - RIMFIRE LOAD | 0 | 0 | 0 | USD |
| 005351 | 0 | Ammo | | 21 Lonoke, AR | 6/13/1995 | DUST HOG UNIT RIMFIRE LOAD | 0 | 0 | 0 | USD |
| 3005352 | 0 | Ammo | | 21 Lonoke, AR | 6/14/1995 | DUST HOG UNIT RIMFIRE SWAGE | 0 | 0 | 0 | USD |
| 005353 | 0 | Ammo | | 21 Lonoke, AR | 6/14/1995 | DUST HOG UNIT RIMFIRE SWAGE | 0 | 0 | 0 | USD |
| 005356 | 0 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL - OVERHAUL #480 TRIPLEX | 0 | 0 | 0 | USD |
| 005358 | 0 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL - EXIT CONVEYOR/PLATFORM | 0 | 0 | 0 | USD |
| 3005360 | 0 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL - STRETCH WRAP | 0 | 0 | 0 | USD |
| 3005361 | 0 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL - PURCHASE & INSTALL #470 | 0 | 0 | 0 | USD |
| 005362 | 0 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL - PURCHASE & INSTALL #471 | 0 | 0 | 0 | USD |
| 005385 | 0 | Ammo | | 21 Lonoke, AR | 6/14/1995 | HAND TRUCK - #25 | 0 | 0 | 0 | USD |
| 3005452 | 0 | Ammo | | 21 Lonoke, AR | 6/14/1995 | METAL COIL CRADLE - 231 | 0 | 0 | 0 | USD |
| 3005453 | 0 | Ammo | | 21 Lonoke, AR | 6/14/1995 | ADDL - BLDG 736 DISCHARGE PIPE | 0 | 0 | 0 | USD |
| 005496 | 0 | Ammo | | 21 Lonoke, AR | 8/14/1995 | COMPONENT PACK TABLE | 0 | 0 | 0 | USD |
| 3005498 | 0 | Ammo | | 21 Lonoke, AR | 8/14/1995 | COMPONENT PACK TABLE | 0 | 0 | 0 | USD |
| 005499 | 0 | Ammo | | 21 Lonoke, AR | 8/14/1995 | COMPONENT PACK TABLE | 0 | 0 | 0 | USD |
| 005500 | 0 | Ammo | | 21 Lonoke, AR | 8/14/1995 | COMPONENT PACK TABLE | 0 | 0 | 0 | USD |
| 005504 | 0 | Ammo | | 21 Lonoke, AR | 8/14/1995 | BURNING PLANT CRANE | 0 | 0 | 0 | USD |
| 3005506 | 1 | Ammo | | 21 Lonoke, AR | 8/14/1995 | PACKING TABLE WITH CONVEYOR #788 | 0 | 0 | 0 | USD |
| 3005507 | 1 | Ammo | | 21 Lonoke, AR | 8/14/1995 | PACKING TABLE WITH CONVEYOR #789 | 0 | 0 | 0 | USD |
| 3005508 | 1 | Ammo | | 21 Lonoke, AR | 8/14/1995 | PACKING TABLE WITH CONVEYOR #790 | 0 | 0 | 0 | USD |
| 005526 | 1 | Ammo | | 21 Lonoke, AR | 5/15/1996 | ADDL -#323 VIBRATORY FEED HOPPER | 0 | 0 | 0 | USD |
| 005530 | 1 | Ammo | | 21 Lonoke, AR | 8/15/1997 | ADDL -REBUILD #328 BASY | 0 | 0 | 0 | USD |
| 005534 | 1 | Ammo | | 21 Lonoke, AR | 5/15/1996 | ADDL -#336 VIBRATORY FEED HOPPER | 0 | 0 | 0 | USD |
| 005740 | 1 | Ammo | | 21 Lonoke, AR | 5/15/1996 | ADDL -#338 VIBRATORY FEED HOPPER | 0 | 0 | 0 | USD |
| 005741 | 1 | Ammo | | 21 Lonoke, AR | 9/15/1995 | RF LEAD FORM LUBE SYSTEM | 0 | 0 | 0 | USD |
| 005741 | 1 | Ammo | | 21 Lonoke, AR | 9/15/1995 | #473 PRINT SYSTEM | 0 | 0 | 0 | USD |
| 005741 | 1 | Ammo | | 21 Lonoke, AR | 10/12/1995 | ADDL - #473 BODY TREATER | 0 | 0 | 0 | USD |
| 3005741 | 2 | Ammo | | 21 Lonoke, AR | 11/15/2002 | ADDL #473 SS BODY PRINTER | 0 | 0 | 0 | USD |
| 3005741 | 3 | Ammo | | 21 Lonoke, AR | 12/15/2002 | PRINTER SET-UP HEVI SHOT | 0 | 0 | 0 | USD |
| 3005741 | 5 | Ammo | | 21 Lonoke, AR | 12/15/2005 | SS PRINTER UV SYSTEM | 0 | 0 | 0 | USD |
| 3005741 | 8 | Ammo | | 21 Lonoke, AR | 10/15/2006 | ADDL FEED SYSTEM | 0 | 0 | 0 | USD |
| 005743 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1995 | DRAIN CLEANING UNIT | 0 | 0 | 0 | USD |

Case 20-81688-CRJ11    Doc 904-1    Filed 09/30/20    Entered 09/30/20 13:40:13    Desc
Exhibit    Page 246 of 434

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C305744 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1995 | #82A TAPER MACHINE | 0 | 0 | 0 | USD |
| C305744 | 1 | Ammo | | 21 Lonoke, AR | 8/15/1996 | ADDL - 82A TAPER PRESS | 0 | 0 | 0 | USD |
| C305744 | 2 | Ammo | | 21 Lonoke, AR | 12/15/2005 | ADDL #82A TAPER PRESS | 0 | 0 | 0 | USD |
| C305744 | 3 | Ammo | | 21 Lonoke, AR | 4/15/2011 | ADDL #82A SINGLE LINE FEEDER 101649 | 0 | 0 | 0 | USD |
| C305745 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1995 | #82B TAPER MACHINE | 0 | 0 | 0 | USD |
| C305745 | 2 | Ammo | | 21 Lonoke, AR | 7/15/2005 | ADDL #82B TAPER PRESS | 0 | 0 | 0 | USD |
| C305745 | 3 | Ammo | | 21 Lonoke, AR | 7/15/2010 | ADDL FEED SYSTEM #82B 101636 | 0 | 0 | 0 | USD |
| C305746 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1995 | #88A TAPER MACHINE | 0 | 0 | 0 | USD |
| C305746 | 1 | Ammo | | 21 Lonoke, AR | 8/15/1996 | ADDL - #88A TAPER PRESS | 0 | 0 | 0 | USD |
| C305747 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1995 | #88B TAPER MACHINE | 0 | 0 | 0 | USD |
| C305748 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1995 | #154A HEADING MACHINE | 0 | 0 | 0 | USD |
| C305748 | 1 | Ammo | | 21 Lonoke, AR | 8/15/1996 | ADDL - #154A BLISS HEADER | 0 | 0 | 0 | USD |
| C305750 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1995 | 82 BLISS DRAW PRESS 219A $ 219B | 0 | 0 | 0 | USD |
| 3C05750 | 4 | Ammo | | 21 Lonoke, AR | 8/15/2006 | ADDL REBUILD 219B DRAW PRESS | 0 | 0 | 0 | USD |
| C305751 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1995 | DUPLEX LOADER #20 | 0 | 0 | 0 | USD |
| C305751 | 1 | Ammo | | 21 Lonoke, AR | 8/15/1996 | ADDL - #20 DUPLEX LOAD | 0 | 0 | 0 | USD |
| C305752 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1995 | DUPLEX LOADER #30 | 0 | 0 | 0 | USD |
| C305752 | 1 | Ammo | | 21 Lonoke, AR | 8/15/1996 | ADDL - #30 DUPLEX LOADER | 0 | 0 | 0 | USD |
| C305753 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1995 | #721A CHIP SEPARATOR | 0 | 0 | 0 | USD |
| C305753 | 1 | Ammo | | 21 Lonoke, AR | 8/15/1996 | ADDL - #721A CHIP SEPARATOR | 0 | 0 | 0 | USD |
| 3C05755 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1995 | #543 OVERFLOW FEEDER | 0 | 0 | 0 | USD |
| C305775 | 0 | Ammo | | 21 Lonoke, AR | 11/14/1995 | UNPRIMED SHELL TRICKLE SHAKER 1330 (in storage) | 0 | 0 | 0 | USD |
| C305775 | 1 | Ammo | | 21 Lonoke, AR | 8/15/1996 | ADDL - #1330 UNP TRICKLE SHAKE/INSP (in storage) | 0 | 0 | 0 | USD |
| C305812 | 0 | Ammo | | 21 Lonoke, AR | 2/1/1996 | 8 GA STORAGE RACKS - 3 EA. | 0 | 0 | 0 | USD |
| C305850 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1996 | OVERFLOW FEEDER-ENCLOSED-NITRO 27 | 0 | 0 | 0 | USD |
| C305851 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1996 | OVERFLOW FEEDER-ENCLOSED-NITRO 27 | 0 | 0 | 0 | USD |
| C305852 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1996 | BARREL DUMPER-NITRO 27 | 0 | 0 | 0 | USD |
| C305853 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1996 | BARREL DUMPER-NITRO 27 | 0 | 0 | 0 | USD |
| C305857 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1996 | YALE PALLET JACK 4000 LB - #65 | 0 | 0 | 0 | USD |
| C305884 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1996 | MAIN WASTE LIFT PUMP | 0 | 0 | 0 | USD |
| C305885 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1996 | MAIN WASTE LIFT PUMP | 0 | 0 | 0 | USD |
| C305954 | 0 | Ammo | | 21 Lonoke, AR | 5/15/1996 | #346 HARTFORD COLD HEADER | 0 | 0 | 0 | USD |
| C305955 | 0 | Ammo | | 21 Lonoke, AR | 5/15/1996 | #367 HARTFORD COLD HEADER | 0 | 0 | 0 | USD |
| C305957 | 0 | Ammo | | 21 Lonoke, AR | 5/15/1996 | BLDG 504 EXHAUST | 0 | 0 | 0 | USD |
| C305957 | 1 | Ammo | | 21 Lonoke, AR | 7/15/1997 | ADDL-EXHAUST SYSTEM - HAMMERMILLS | 0 | 0 | 0 | USD |
| C305957 | 2 | Ammo | | 21 Lonoke, AR | 12/15/2001 | ADDL SMOKE EXHAUST | 0 | 0 | 0 | USD |
| C305960 | 0 | Ammo | | 21 Lonoke, AR | 5/15/1996 | SIS OIL STORAGE RACKS | 0 | 0 | 0 | USD |
| C305962 | 0 | Ammo | | 21 Lonoke, AR | 5/15/1996 | TANDEM DISK HARROW | 0 | 0 | 0 | USD |
| C305964 | 0 | Ammo | | 21 Lonoke, AR | 5/15/1996 | #140 BLISS HEADER OVERHAUL | 0 | 0 | 0 | USD |
| C305966 | 0 | Ammo | | 21 Lonoke, AR | 5/15/1996 | #142 BLISS HEADER OVERHAUL | 0 | 0 | 0 | USD |
| C305966 | 1 | Ammo | | 21 Lonoke, AR | 6/15/1997 | ADDL-22 WIN MAG FEED | 0 | 0 | 0 | USD |
| C305969 | 0 | Ammo | | 21 Lonoke, AR | 6/14/1996 | LUBRICATOR UNIT #415 | 0 | 0 | 0 | USD |
| C305971 | 0 | Ammo | | 21 Lonoke, AR | 6/15/1996 | #215 BLISS PRESS OVERHAUL/PINCH TRIM | 0 | 0 | 0 | USD |
| C305971 | 1 | Ammo | | 21 Lonoke, AR | 12/15/1996 | ADDL - #215 PINCH TRIM FEED/CONVEYOR | 0 | 0 | 0 | USD |
| C305971 | 2 | Ammo | | 21 Lonoke, AR | 6/15/1996 | ADDL-#215 PINCH TRIM DIE SET | 0 | 0 | 0 | USD |
| 3C05971 | 3 | Ammo | | 21 Lonoke, AR | 2/15/2007 | ADDL CF #215 DRAW PRESS | 0 | 0 | 0 | USD |
| 3C05971 | 4 | Ammo | | 21 Lonoke, AR | 2/15/2008 | ADDL CRANKSHAFT SHELL DRAW #215 | 0 | 0 | 0 | USD |
| 3C05971 | 5 | Ammo | | 21 Lonoke, AR | 12/15/1996 | #161 - 304 BLISS DRAW & PINCH TRIM FEED/CONVEYOR | 0 | 0 | 0 | USD |
| C305972 | 2 | Ammo | | 21 Lonoke, AR | 6/15/1996 | ADDL-#181 PINCH TRIM DIE SET | 0 | 0 | 0 | USD |
| 3C05972 | 4 | Ammo | | 21 Lonoke, AR | 12/15/2002 | ADDL DRAW PRESS #181 | 0 | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3005976 | 0 | Ammo | 21 | Lonoke, AR | 6/15/1996 | D424-67 357 SIG 125 SJHP GAGE | | 0 | 0 | USD |
| 3005982 | 0 | Ammo | 21 | Lonoke, AR | 6/15/1996 | SALVAGE AREA FIRE EXTINGUISHER SYSTEM | | 0 | 0 | USD |
| 3005992 | 0 | Ammo | 21 | Lonoke, AR | 7/15/1996 | CAFETERIA KITCHEN EXHAUST | | 0 | 0 | USD |
| 3006014 | 0 | Ammo | 21 | Lonoke, AR | 8/15/1996 | #357 HIGH SPEED NATIONAL LEAD SWAGER | | 0 | 0 | USD |
| 3006015 | 1 | Ammo | 21 | Lonoke, AR | 8/15/1997 | ADDL-AIR FILTER SYSTEM | | 0 | 0 | USD |
| 3006015 | 2 | Ammo | 21 | Lonoke, AR | 4/15/2003 | OUTLET COMPRESSOR FILTER | | 0 | 0 | USD |
| 3006015 | 3 | Ammo | 21 | Lonoke, AR | 3/15/2005 | ADDL AIR COMPRESSOR MOTOR | | 0 | 0 | USD |
| 3006017 | 0 | Ammo | 21 | Lonoke, AR | 8/15/1996 | SHEET METAL SHEAR | | 0 | 0 | USD |
| 3006018 | 0 | Ammo | 21 | Lonoke, AR | 8/15/1996 | #220 304 BLISS DRAW PRESS | | 0 | 0 | USD |
| 3006018 | 1 | Ammo | 21 | Lonoke, AR | 3/15/1998 | ADD'L SCRAP RING CONVEYOR 2544/100376 | | 0 | 0 | USD |
| 3006019 | 0 | Ammo | 21 | Lonoke, AR | 8/15/1996 | 304 BLISS DRAW PRESS (SPARE) | | 0 | 0 | USD |
| 3006019 | 1 | Ammo | 21 | Lonoke, AR | 4/15/2002 | REBUILD CF DRAW PRESS | | 0 | 0 | USD |
| 3006020 | 0 | Ammo | 21 | Lonoke, AR | 8/15/2001 | POWDER INSPECTION SYSTEM #6 | | 0 | 0 | USD |
| 3006020 | 2 | Ammo | 21 | Lonoke, AR | 12/15/2004 | ADDL POWDER DETECTS | | 0 | 0 | USD |
| 3006022 | 1 | Ammo | 21 | Lonoke, AR | 1/15/1997 | ADDL-LASER INSPECTION #58P | | 0 | 0 | USD |
| 3006024 | 0 | Ammo | 21 | Lonoke, AR | 8/15/1996 | #48P V&O PRIME | | 0 | 0 | USD |
| 3006025 | 0 | Ammo | 21 | Lonoke, AR | 8/15/1996 | #49P V&O PRIME | | 0 | 0 | USD |
| 3006026 | 0 | Ammo | 21 | Lonoke, AR | 8/15/1996 | #59P V&O PRIME | | 0 | 0 | USD |
| 3006027 | 0 | Ammo | 21 | Lonoke, AR | 8/15/1996 | #375 TABLE ANNEALER | | 0 | 0 | USD |
| 3006027 | 1 | Ammo | 21 | Lonoke, AR | 12/15/1998 | ADD'L MOD ANNEALER #375 | | 0 | 0 | USD |
| 3006028 | 0 | Ammo | 21 | Lonoke, AR | 8/15/1996 | #376 TABLE ANNEALER | | 0 | 0 | USD |
| 3006028 | 1 | Ammo | 21 | Lonoke, AR | 12/15/1998 | ADD'L MOD ANNEALER #376 | | 0 | 0 | USD |
| 3006029 | 0 | Ammo | 21 | Lonoke, AR | 8/15/1996 | #377 TABLE ANNEALER | | 0 | 0 | USD |
| 3006029 | 1 | Ammo | 21 | Lonoke, AR | 12/15/1998 | ADD'L MOD ANNEALER #377 | | 0 | 0 | USD |
| 3006030 | 0 | Ammo | 21 | Lonoke, AR | 8/15/1996 | #787 HAND VIBRO PACK | | 0 | 0 | USD |
| 3006030 | 2 | Ammo | 21 | Lonoke, AR | 8/15/1996 | ADDL - 9mm CONVERSION KIT #787 PACKER | | 0 | 0 | USD |
| 3006079 | 0 | Ammo | 21 | Lonoke, AR | 9/15/1996 | OKAMOTO SURFACE GRINDER | | 0 | 0 | USD |
| 3006080 | 0 | Ammo | 21 | Lonoke, AR | 9/15/1996 | INDUSTRIAL SEWING MACHINE - LEAD SHOT | | 0 | 0 | USD |
| 3006105 | 0 | Ammo | 21 | Lonoke, AR | 10/15/1996 | ROTARY FURNACE CONVEYOR | | 0 | 0 | USD |
| 3006106 | 0 | Ammo | 21 | Lonoke, AR | 10/15/1996 | WALKER STACKER - CROWN - #14 | | 0 | 0 | USD |
| 3006107 | 0 | Ammo | 21 | Lonoke, AR | 10/15/1996 | WALKER PALLET TRUCK - CROWN - #69 | | 0 | 0 | USD |
| 3006108 | 1 | Ammo | 21 | Lonoke, AR | 10/15/1996 | DELTRONIC COMPARATOR | | 0 | 0 | USD |
| 3006110 | 0 | Ammo | 21 | Lonoke, AR | 10/15/1996 | #132 HEADER - #4 BLISS | | 0 | 0 | USD |
| 3006110 | E | Ammo | 21 | Lonoke, AR | 4/15/2006 | OVERHAUL HEADER #132 | | 0 | 0 | USD |
| 3006111 | 0 | Ammo | 21 | Lonoke, AR | 10/15/1996 | RIDGID PIPE THREADER | | 0 | 0 | USD |
| 3006146 | 0 | Ammo | 21 | Lonoke, AR | 11/15/1996 | BODY FLAME TREATMENT FOR #489 | | 0 | 0 | USD |
| 3006148 | 0 | Ammo | 21 | Lonoke, AR | 11/15/1996 | LIFT TRUCK CHARGER - MAINTENANCE | | 0 | 0 | USD |
| 3006149 | 0 | Ammo | 21 | Lonoke, AR | 11/15/1996 | BOILER TUBE CLEANER | | 0 | 0 | USD |
| 3006150 | 0 | Ammo | 21 | Lonoke, AR | 11/15/1996 | MICROSCOPE - TOOLROOM | | 0 | 0 | USD |
| 3006151 | 0 | Ammo | 21 | Lonoke, AR | 12/15/1996 | #173 - 304 BLISS PINCH TRIM | | 0 | 0 | USD |
| 3006151 | 1 | Ammo | 21 | Lonoke, AR | 1/15/1997 | ADDL-#173 DRAW PRESS OVERHAUL | | 0 | 0 | USD |
| 3006151 | 2 | Ammo | 21 | Lonoke, AR | 12/15/1997 | ADDL-#173 PINCH TRIM DIE SET | | 0 | 0 | USD |
| 3006151 | 3 | Ammo | 21 | Lonoke, AR | 1/15/1997 | ADD'L SCRAP RING CONVEYOR | | 0 | 0 | USD |
| 3006154 | 0 | Ammo | 21 | Lonoke, AR | 12/15/1996 | QUALITY PROFILOMETER | | 0 | 0 | USD |
| 3006165 | 0 | Ammo | 21 | Lonoke, AR | 1/15/1997 | D425-67 50 CALIBER GAGE | | 0 | 0 | USD |
| 3006167 | 0 | Ammo | 21 | Lonoke, AR | 1/15/1997 | #599 ADJ HEIGHT CHARGING TABLE | | 0 | 0 | USD |
| 3006167 | 4 | Ammo | 21 | Lonoke, AR | 12/3/2017 | 599 Charging Table Hollow Tubing 101932 | | 0 | 0 | USD |
| 3006168 | 0 | Ammo | 21 | Lonoke, AR | 1/15/1997 | #565 ADJ HEIGHT CHARGING TABLE | | 0 | 0 | USD |
| 3006168 | 4 | Ammo | 21 | Lonoke, AR | 12/3/2017 | 565 Charging Table Hollow Tubing 101932 | | 0 | 0 | USD |
| 3006169 | 0 | Ammo | 21 | Lonoke, AR | 1/15/1997 | #574 ADJ HEIGHT CHARGING TABLE | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C006169 | 4 | Ammo | | 21 Lonoke, AR | 12/3/2017 | 574 Charging Table Hollow Tubing 101932 | 0 | 0 | 0 | USD |
| C006170 | 0 | Ammo | | 21 Lonoke, AR | 1/15/1997 | LOMA CHECKWEIGHING SYSTEM | 0 | 0 | 0 | USD |
| C006172 | 0 | Ammo | | 21 Lonoke, AR | 1/15/1997 | #217 304 BLISS DRAW PINCH TRIM/CONVEYOR | 0 | 0 | 0 | USD |
| C006172 | 1 | Ammo | | 21 Lonoke, AR | 4/15/1997 | ADDL-REBUILD #217 DRAW PRESS | 0 | 0 | 0 | USD |
| C006172 | 2 | Ammo | | 21 Lonoke, AR | 1/15/1997 | ADDL-#217 PINCH TRIM DIE SET 2250/1000025 | 0 | 0 | 0 | USD |
| C006172 | 3 | Ammo | | 21 Lonoke, AR | 3/15/1998 | ADD'L SCRAP RING CONVEYOR 2544/100376 | 0 | 0 | 0 | USD |
| C006173 | 0 | Ammo | | 21 Lonoke, AR | 1/15/1997 | #233 WFF TRANSFER PRESS 2305/100060 | 0 | 0 | 0 | USD |
| C006174 | 0 | Ammo | | 21 Lonoke, AR | 1/15/1997 | #232 WFF TRANSFER PRESS 2350/I00060 | 0 | 0 | 0 | USD |
| C006179 | 0 | Ammo | | 21 Lonoke, AR | 1/15/1997 | #125B BLACKROCK HEADTURN | 0 | 0 | 0 | USD |
| C006180 | 0 | Ammo | | 21 Lonoke, AR | 1/15/1997 | #126B BLACK ROCK HEADTURN | 0 | 0 | 0 | USD |
| C006181 | 0 | Ammo | | 21 Lonoke, AR | 1/15/1997 | #126B BLACKROCK HEADTURN | 0 | 0 | 0 | USD |
| C006182 | 0 | Ammo | | 21 Lonoke, AR | 1/15/1997 | #394 HILGELAND COLD HEADER | 0 | 0 | 0 | USD |
| C006183 | 0 | Ammo | | 21 Lonoke, AR | 1/15/1997 | #395 HILGELAND COLD HEADER | 0 | 0 | 0 | USD |
| C006190 | 0 | Ammo | | 21 Lonoke, AR | 1/15/1997 | #374 TABLE ANNEAL MODIFICATION | 0 | 0 | 0 | USD |
| C006195 | 0 | Ammo | | 21 Lonoke, AR | 1/15/1997 | BUGGY LIFT #702 TUMBLER | 0 | 0 | 0 | USD |
| C006196 | 0 | Ammo | | 21 Lonoke, AR | 1/15/1997 | BUGGY LIFT #728 ANNEAL OVEN | 0 | 0 | 0 | USD |
| C006201 | 0 | Ammo | | 21 Lonoke, AR | 1/15/1997 | PACKAGING COMPRESSION TESTER | 0 | 0 | 0 | USD |
| C006277 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1997 | PORTABLE SHELL CONVEYOR | 0 | 0 | 0 | USD |
| C006278 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1997 | PORTABLE SHELL CONVEYOR | 0 | 0 | 0 | USD |
| C006279 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1997 | PORTABLE SHELL CONVEYOR | 0 | 0 | 0 | USD |
| C006281 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1997 | EXHAUST HOOD - SS PACKING | 0 | 0 | 0 | USD |
| C006283 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1997 | SS INTERFLOOR COMMUNICATIONS | 0 | 0 | 0 | USD |
| C006283 | 1 | Ammo | | 21 Lonoke, AR | 9/15/2006 | PHONE - BUCKSHOT LOADER | 0 | 0 | 0 | USD |
| C006284 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1997 | CUT-OFF SAW / CHEM LAB | 0 | 0 | 0 | USD |
| C006388 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1997 | BROWN & SHARPE CYLINDRICAL GRINDER | 0 | 0 | 0 | USD |
| C006389 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1997 | CLARK ELECTRIC FORK TRUCK - #46 | 0 | 0 | 0 | USD |
| C006391 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1997 | Truck, Flat Bed orange del. truck-Taylor Dunn-#100 | 0 | 0 | 0 | USD |
| C006392 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1997 | PALLET POSITIONER | 0 | 0 | 0 | USD |
| C006393 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1997 | OKAMOTO SURFACE GRINDER | 0 | 0 | 0 | USD |
| C006395 | 0 | Ammo | | 21 Lonoke, AR | 4/15/1997 | ADJUSTABLE HEIGHT CHARGING TABLE #5 | 0 | 0 | 0 | USD |
| C006395 | 1 | Ammo | | 21 Lonoke, AR | 2/15/2009 | ADD'L RF CHARGING TABLE | 0 | 0 | 0 | USD |
| C006396 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2000 | ADD'L PLS SYSTEM 100672 | 0 | 0 | 0 | USD |
| C006396 | 1 | Ammo | | 21 Lonoke, AR | 3/15/2009 | ADD'L DATA COMMUNICATIONS UPG | 0 | 0 | 0 | USD |
| C006419 | 2 | Ammo | | 21 Lonoke, AR | 5/15/1997 | BODY FLAME EXHAUST - SS | 0 | 0 | 0 | USD |
| C006420 | 0 | Ammo | | 21 Lonoke, AR | 5/15/1997 | BODY FLAME TREATMENT #477 | 0 | 0 | 0 | USD |
| C006421 | 0 | Ammo | | 21 Lonoke, AR | 5/15/1997 | BODY FLAME TREATMENT #478 | 0 | 0 | 0 | USD |
| C006422 | 0 | Ammo | | 21 Lonoke, AR | 5/15/1997 | BODY FLAME TREATMENT #486 | 0 | 0 | 0 | USD |
| C006423 | 0 | Ammo | | 21 Lonoke, AR | 5/15/1997 | BODY FLAME TREATMENT #480 | 0 | 0 | 0 | USD |
| C006424 | 0 | Ammo | | 21 Lonoke, AR | 5/15/1997 | BODY FLAME TREATMENT #483 | 0 | 0 | 0 | USD |
| C006425 | 0 | Ammo | | 21 Lonoke, AR | 5/15/1997 | BODY FLAME TREATMENT #494, 495, 496 | 0 | 0 | 0 | USD |
| C006426 | 0 | Ammo | | 21 Lonoke, AR | 5/15/1997 | BODY FLAME TREATMENT #497 - 498 | 0 | 0 | 0 | USD |
| C006429 | 0 | Ammo | | 21 Lonoke, AR | 5/15/1997 | PRINTER EXHAUST - SS BLDG | 0 | 0 | 0 | USD |
| C006458 | 0 | Ammo | | 21 Lonoke, AR | 5/15/1997 | POWER WIRING - SS PRINT/INSP | 0 | 0 | 0 | USD |
| C006458 | 1 | Ammo | | 21 Lonoke, AR | 6/15/1997 | #262 PERKINS 22 WIN MAG FEED    O S S | 0 | 0 | 0 | USD |
| C006460 | 0 | Ammo | | 21 Lonoke, AR | 6/15/1997 | #263 PERKINS 22 WIN MAG FEED    O S S | 0 | 0 | 0 | USD |
| C006473 | 0 | Ammo | | 21 Lonoke, AR | 7/15/1997 | PRE-MIX SCALE/BARCODE SCANNER/PRINTER | 0 | 0 | 0 | USD |
| C006483 | 0 | Ammo | | 21 Lonoke, AR | 8/15/1997 | PRIMER COMPONENET CLEANING EXHAUST | 0 | 0 | 0 | USD |
| C006498 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1997 | OKAMOTO SURFACE GRINDER | 0 | 0 | 0 | USD |
| C006499 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1997 | POTABLE WATER SYSTEM FILTER | 0 | 0 | 0 | USD |
| C006500 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1997 | FIRE DETECTION SYSTEM - BODY FLAME TREATMENT | 0 | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C006501 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1997 | Metal Banding Machine for Shipping-Signode | | 0 | 0 | 0 USD |
| C006554 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1997 | MODIFY #372 BODY ANNEAL | | 0 | 0 | 0 USD |
| C006555 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1997 | MODIFY #373 BODY ANNEAL | | 0 | 0 | 0 USD |
| C006558 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1997 | NORTH BURN POT CONVEYOR | | 0 | 0 | 0 USD |
| C006559 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1997 | WASTEWATER SAMPLER REFRIGERATOR OUTFALL 004 | | 0 | 0 | 0 USD |
| C006560 | 0 | Ammo | | 21 Lonoke, AR | 7/15/1996 | SOUTH BURNING POT CONVEYOR | | 0 | 0 | 0 USD |
| C006564 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | STARRETT GAGE BLOCK SET RC88LM | | 0 | 0 | 0 USD |
| C006568 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ADDITIONAL DRAINAGE IN PLATING AREA | | 0 | 0 | 0 USD |
| C006569 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BULLET TRAPS - RANGES 9 & 10 | | 0 | 0 | 0 USD |
| C006576 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BULLET TRAPS - RANGE 5&6 - 120384 | | 0 | 0 | 0 USD |
| C006578 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUCTWORK - BALLISTICS | | 0 | 0 | 0 USD |
| C006579 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SERVICE PIPING BALLISTICS | | 0 | 0 | 0 USD |
| C006580 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E 3756-67 COMBINATION GAGE | | 0 | 0 | 0 USD |
| C006581 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E 3756-67 COMBINATION GAGE | | 0 | 0 | 0 USD |
| C006582 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E3756-67 COMBINATION GAGE | | 0 | 0 | 0 USD |
| C006583 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | D402-67 COMBINATION GAGE | | 0 | 0 | 0 USD |
| C006584 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | D402-67 COMBINATION GAGE | | 0 | 0 | 0 USD |
| C006585 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E3384-67 COMBINATION GAGE | | 0 | 0 | 0 USD |
| C006586 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E3384-67 COMBINATION GAGE | | 0 | 0 | 0 USD |
| C006590 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E1734-66 10MM AUTO GAGE(2) 120336 | | 0 | 0 | 0 USD |
| 3006591 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E1941-67 COMBINATION PROFILE GAGE 2 | | 0 | 0 | 0 USD |
| C006592 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E8021-67 PROF GA SECT 62-00067 | | 0 | 0 | 0 USD |
| C006593 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E8013-67 PROF GA SECT-2 62-00067 | | 0 | 0 | 0 USD |
| C006594 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E3500-67 PROF GA SECT-2 62-00067 | | 0 | 0 | 0 USD |
| C006595 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E2407-67 PROF GA SECT 2 62-00067 | | 0 | 0 | 0 USD |
| C006596 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E2380-67 PROF GA SECT-2 | | 0 | 0 | 0 USD |
| C006599 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E475-67 COMB GAGE-2 62-00067 | | 0 | 0 | 0 USD |
| C006601 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E3420-67 COMB GA-2 62-00067 | | 0 | 0 | 0 USD |
| C006604 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | D405-67 COMB GAGE 62-00068 | | 0 | 0 | 0 USD |
| C006605 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E8021-67 COMB GAGE-2 62-00068 | | 0 | 0 | 0 USD |
| C006606 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | D403-67 COMB GAGE 62-00068 | | 0 | 0 | 0 USD |
| C006607 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E720-66 OPEN HEX REC 62-00068 | | 0 | 0 | 0 USD |
| C006608 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | D403-67 PROFILE GA SEC 62-00067 | | 0 | 0 | 0 USD |
| C006609 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E3620-67 PROF GA SEC-2 62-00067 | | 0 | 0 | 0 USD |
| C006610 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E2434-67 PROF GA SECT 62-00067 | | 0 | 0 | 0 USD |
| C006611 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E420-67 PROF GA SECT 62-00067 | | 0 | 0 | 0 USD |
| C006612 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E2258-67 OF GA SEC 62-00067 | | 0 | 0 | 0 USD |
| C006613 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E3768-67 PROF GA SECT 62-00067 | | 0 | 0 | 0 USD |
| C006614 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E1596-67 COMB GA 62-00067 | | 0 | 0 | 0 USD |
| C006615 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E1741-66 CLOSED HEX REC GA-2 7MM W/B 120522 | | 0 | 0 | 0 USD |
| C006616 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E1742-66 OPEN HEX REC GA-2 7MM W/B 120522 | | 0 | 0 | 0 USD |
| C006617 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E8060-67 COMBINATION GA 10MM/40SW 120530 | | 0 | 0 | 0 USD |
| C006618 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | D258-66 OPEN HEX RECEIVING GAGE-2 | | 0 | 0 | 0 USD |
| C006619 | 0 | Ammo | | 21 Lonoke, AR | 12/15/1993 | E338-63 BBL RECEIVER GA 375 H&H MAG 120069 | | 0 | 0 | 0 USD |
| C006620 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | C140-63 BBL REC GAGE 7x64 BRENNEKE 120061 | | 0 | 0 | 0 USD |
| 3006621 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | D268-66 HEX REC GAGE 7x64 BRENEKE 120061 | | 0 | 0 | 0 USD |
| C006622 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | D269-66 HEX REC GAGE 7x64 BRENNEKE 12061 | | 0 | 0 | 0 USD |
| C006623 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | BUTTON RECEIVING GAGE C111-66 | | 0 | 0 | 0 USD |
| C006624 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E1723-66  OPEN HEX RECEIVER GAGE T | | 0 | 0 | 0 USD |
| 3006625 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E1722-67 CLOSED HEX RECEIVER GAGE T | | 0 | 0 | 0 USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3006626 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E1721-66 CLOSED HEX RECEIVER GAGE T | | 0 | 0 | USD |
| 3006630 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E6059-67 PROFILE GAGES-2 12064 38SPL 130MC BULLET | | 0 | 0 | USD |
| 3006631 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | D264-66 OPEN HEX REC GA SWEDISH 6.5 TAPER | | 0 | 0 | USD |
| 3006632 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | D265-66 HEX REC GA SWEDISH 6.5 CF LOAD | | 0 | 0 | USD |
| 3006633 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | C138-63 RECEIVER GA SWEDISH 6.5 TAPER | | 0 | 0 | USD |
| 3006634 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | C-35 BLISS PRESS & DIE SET T | | 0 | 0 | USD |
| 3006634 | 1 | Ammo | | 21 Lonoke, AR | 1/15/2011 | ADDL MODIFY #240 DRAW PRESS 101687 | | 0 | 0 | USD |
| 3006635 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 11B DIE SET - BLANK & CUP | | 0 | 0 | USD |
| 3006636 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DIE SET ASSEMBLY 23A CUP | | 0 | 0 | USD |
| 3006637 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DIE SET ASSEMBLY 13A CUP | | 0 | 0 | USD |
| 3006638 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DIE SET 15A CUPS | | 0 | 0 | USD |
| 3006639 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DIE SET 28A - BLANK & CUP | | 0 | 0 | USD |
| 3006640 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DIE SET 23A BLANK & CUP | | 0 | 0 | USD |
| 3006641 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DIE SET 6A  20A  20B  39B CUPS T | | 0 | 0 | USD |
| 3006642 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CUPPINGDIE SET 5A-120273 | | 0 | 0 | USD |
| 3006643 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CF 24A BULLET JKT DIE SET 120625 | | 0 | 0 | USD |
| 3006645 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DIE SET CAP PRESS | | 0 | 0 | USD |
| 3006647 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | FAI SINGLE STA BODY FORMER 11007 | | 0 | 0 | USD |
| 3006647 | 1 | Ammo | | 21 Lonoke, AR | 11/15/2001 | OVH SS #985 R/C BODY FORMER | | 0 | 0 | USD |
| 3006647 | 2 | Ammo | | 21 Lonoke, AR | 9/15/2010 | ADD'L HYDRAULIC PUMP #985 101662 | | 0 | 0 | USD |
| 3006648 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SINGLE STA BODY FORMER  11066 | | 0 | 0 | USD |
| 3006649 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | FAI SINGLE STA BODY FORMER 110066 #966 | | 0 | 0 | USD |
| 3006649 | 1 | Ammo | | 21 Lonoke, AR | 10/1/2008 | ADD'L #966 BODY FORMER | | 0 | 0 | USD |
| 3006650 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SINGLE STA BODY FORMER  110066 | | 0 | 0 | USD |
| 3006651 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | FAI SINGLE STA BODY FORMER 110077 | | 0 | 0 | USD |
| 3006652 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SINGLE STA BODY FORMER 110066 | | 0 | 0 | USD |
| 3006653 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | FAI SINGLE STA BODY FORMER 110077 | | 0 | 0 | USD |
| 3006653 | 1 | Ammo | | 21 Lonoke, AR | 12/15/2004 | ADD'L UPGRADE #963 BODY FORMER | | 0 | 0 | USD |
| 3006655 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | FAI SINGLE STA BODY FORMER 110077 #969 | | 0 | 0 | USD |
| 3006655 | 1 | Ammo | | 21 Lonoke, AR | 9/15/2010 | ADD'L HYDRAULIC PUMP #969 101662 | | 0 | 0 | USD |
| 3006656 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SINGLE STA BODY FORMER 110066 | | 0 | 0 | USD |
| 3006656 | 2 | Ammo | | 21 Lonoke, AR | 12/15/2009 | ADD'L REBUILD #970 BODY FORMER 101490 | | 0 | 0 | USD |
| 3006657 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | FAI SINGLE STA BODY FORMER 110077 | | 0 | 0 | USD |
| 3006657 | 1 | Ammo | | 21 Lonoke, AR | 3/15/2003 | R/C HYDROSTATIC PUMP | | 0 | 0 | USD |
| 3006752 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DIE SET 12 GA HP-CAP PRESS    O S S | | 0 | 0 | USD |
| 3006753 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DIE SET - 12 GA TARGET    O S S | | 0 | 0 | USD |
| 3006754 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DIE SET CAP PRESS 16 GA 1B    O S S | | 0 | 0 | USD |
| 3006755 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DIE SET CAP PRESS 20GA LB    O S S | | 0 | 0 | USD |
| 3006756 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DIE SET CAP PRESS 12 GA LB    O S S | | 0 | 0 | USD |
| 3006757 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DIE SET CAP PRESSS 12 GA LB    O S S | | 0 | 0 | USD |
| 3006758 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DIE SET CAP PRESS KGA 4B - 2    O S S | | 0 | 0 | USD |
| 3006759 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DIE SET 8 GA    O S S | | 0 | 0 | USD |
| 3006760 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DIE SET 20GA TARGET    O S S | | 0 | 0 | USD |
| 3006762 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DIE SET 12 GA    O S S | | 0 | 0 | USD |
| 3006767 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | H WAD MOLD 9MM | | 0 | 0 | USD |
| 3006779 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | E8012-67 PROF GA SECT  62-00067 | | 0 | 0 | USD |
| 3006782 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | RC GAGETALKER WORKSTATION 120528 | | 0 | 0 | USD |
| 3006782 | 1 | Ammo | | 21 Lonoke, AR | 4/15/1999 | ADD'L UPGRADE GAGETALKER | | 0 | 0 | USD |
| 3006783 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AHP GAGETALKER WORKSTATION 120528 | | 0 | 0 | USD |
| 3006783 | 1 | Ammo | | 21 Lonoke, AR | 4/15/1999 | ADD'L UPGRADE GAGETALKER | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C006784 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AHP GAGETALKER WORKSTATION 120528 | | 0 | 0 | USD |
| C006784 | 1 | Ammo | | 21 Lonoke, AR | 4/15/1999 | ADD'L UPGRADE GAGETALKER | | 0 | 0 | USD |
| C006785 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AHP GAGETALKER WORKSTATION 120528 | | 0 | 0 | USD |
| C006785 | 1 | Ammo | | 21 Lonoke, AR | 4/15/1999 | ADD'L UPGRADE GAGETALKER | | 0 | 0 | USD |
| C006786 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AHP GAGETALKER WORKSTATION 120528 | | 0 | 0 | USD |
| C006786 | 1 | Ammo | | 21 Lonoke, AR | 4/15/1999 | ADD'L UPGRADE GAGETALKER | | 0 | 0 | USD |
| C006787 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AHP GAGETALKER WORKSTATION 120528 | | 0 | 0 | USD |
| C006787 | 1 | Ammo | | 21 Lonoke, AR | 4/15/1999 | ADD'L UPGRADE GAGETALKER | | 0 | 0 | USD |
| C006790 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1994 | E1724-66 HEX REC GAGE 35 WHELM 120096 | | 0 | 0 | USD |
| C006791 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1994 | D269-66 OPEN HEX REC GA-2 120587 | | 0 | 0 | USD |
| C006792 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1994 | D261-66 OPEN HEX REC GA2 120587 | | 0 | 0 | USD |
| C006793 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1994 | D260-66 OPEN HEX REC GA2 120587 | | 0 | 0 | USD |
| C006794 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1994 | D262-66 OPEN HEX REC GA-2 120587 | | 0 | 0 | USD |
| 3006795 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1994 | E340-63 RECEIVING GAGE 2-120587 | | 0 | 0 | USD |
| C006796 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1994 | E1745-66 RECEIVING GAGE 2 -120587 | | 0 | 0 | USD |
| C006797 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1994 | E339-63 RECEIVING GAGE 2 120587 | | 0 | 0 | USD |
| C006798 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1994 | E-1746-66 RECEIVING GAGE 2 -120587 | | 0 | 0 | USD |
| C006799 | 0 | Ammo | | 21 Lonoke, AR | 8/15/1994 | D415-67 PROFILE SECT. 6.5 x 55 2277 SWED GA | | 0 | 0 | USD |
| C006800 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1994 | D415-67 6.5 x 55 SWEDISH RIFLE GA 2247 | | 0 | 0 | USD |
| C006801 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1994 | CF LEAD BULLET LIFT 255Y 2244 | | 0 | 0 | USD |
| 3006805 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1994 | GAGETALKER WORKSTATION SS LD 120548 | | 0 | 0 | USD |
| C006805 | 1 | Ammo | | 21 Lonoke, AR | 4/15/1999 | ADD'L UPGRADE GAGETALKER | | 0 | 0 | USD |
| C006806 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1994 | GAGETALKER WORKSTATION SS LD 120548 | | 0 | 0 | USD |
| C006806 | 1 | Ammo | | 21 Lonoke, AR | 4/15/1999 | ADD'L UPGRADE GAGETALKER | | 0 | 0 | USD |
| C006807 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1994 | GAGETALKER WORKSTATION RF LD 120548 | | 0 | 0 | USD |
| C006807 | 1 | Ammo | | 21 Lonoke, AR | 4/15/1999 | ADD'L UPGRADE GAGETALKER | | 0 | 0 | USD |
| C006126 | 0 | Ammo | | 21 Lonoke, AR | 8/14/1995 | BULLET ASSEMBLY #322 WITH STRIPPER ASSY | | 0 | 0 | USD |
| C006129 | 0 | Ammo | | 21 Lonoke, AR | 8/14/1995 | BULLET ASSEMBLY #323 WITH STRIPPER ASSY | | 0 | 0 | USD |
| C006131 | 0 | Ammo | | 21 Lonoke, AR | 8/14/1995 | BULLET ASSEMBLY #325 WITH STRIPPER ASSY | | 0 | 0 | USD |
| C006134 | 0 | Ammo | | 21 Lonoke, AR | 8/14/1995 | BULLET ASSEMBLY #326 WITH STRIPPER ASSY | | 0 | 0 | USD |
| C006136 | 0 | Ammo | | 21 Lonoke, AR | 8/14/1995 | BULLET ASSEMBLY #327 WITH STRIPPER ASSY | | 0 | 0 | USD |
| C006136 | 1 | Ammo | | 21 Lonoke, AR | 10/15/2010 | ADD'L #327 BLT ASSY FEEDERS 101658 | | 0 | 0 | USD |
| C006136 | 2 | Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #327 101869 | | 0 | 0 | USD |
| C006139 | 0 | Ammo | | 21 Lonoke, AR | 8/14/1995 | BULLET ASSEMBLY #328 WITH STRIPPER ASSY | | 0 | 0 | USD |
| C006139 | 1 | Ammo | | 21 Lonoke, AR | 10/15/2010 | ADD'L #328 BLT ASSY FEEDERS 101658 | | 0 | 0 | USD |
| C006140 | 0 | Ammo | | 21 Lonoke, AR | 8/14/1995 | BULLET ASSEMBLY #329 WITH STRIPPER ASSY | | 0 | 0 | USD |
| C006141 | 0 | Ammo | | 21 Lonoke, AR | 8/14/1995 | BULLET ASSEMBLY #330 WITH STRIPPER ASSY | | 0 | 0 | USD |
| C006143 | 0 | Ammo | | 21 Lonoke, AR | 8/14/1995 | BULLET ASSEMBLY #336 WITH STRIPPER ASSY | | 0 | 0 | USD |
| C006145 | 0 | Ammo | | 21 Lonoke, AR | 8/14/1995 | BULLET ASSEMBLY #338 WITH STRIPPER ASSY | | 0 | 0 | USD |
| C006148 | 0 | Ammo | | 21 Lonoke, AR | 8/14/1995 | BULLET ASSEMBLY #339 WITH STRIPPER ASSY | | 0 | 0 | USD |
| C006148 | 1 | Ammo | | 21 Lonoke, AR | 2/15/2005 | ADD'L BOWL FEEDER | | 0 | 0 | USD |
| C007151 | 0 | Ammo | | 21 Lonoke, AR | 8/14/1995 | D420-67 COMBINATION GAGE | | 0 | 0 | USD |
| C007152 | 0 | Ammo | | 21 Lonoke, AR | 8/14/1995 | D420-67 COMBINATION GAGE | | 0 | 0 | USD |
| C007155 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1995 | D416-67 COMBINATION GAGE | | 0 | 0 | USD |
| C007157 | 0 | Ammo | | 21 Lonoke, AR | 8/14/1995 | D419-67 COMBINATION GAGE | | 0 | 0 | USD |
| 3007159 | 0 | Ammo | | 21 Lonoke, AR | 8/14/1995 | D423-67 COMBINATION GAGE | | 0 | 0 | USD |
| 3007161 | 0 | Ammo | | 21 Lonoke, AR | 8/14/1995 | D423-67 COMBINATION GAGE | | 0 | 0 | USD |
| C007162 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1995 | D422-67 COMBINATION GAGE | | 0 | 0 | USD |
| C007166 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1995 | D422-67 COMBINATION GAGE | | 0 | 0 | USD |
| 3007172 | 0 | Ammo | | 21 Lonoke, AR | 8/14/1995 | D416-67 PROFILE GAGE | | 0 | 0 | USD |

Case 20-81688-CRJ11    Doc 904-1    Filed 09/30/20    Entered 09/30/20 13:40:13    Desc
Exhibit    Page 251 of 434

Case 20-81688-CRJ11    Doc 904-1    Filed 09/30/20    Entered 09/30/20 13:40:13    Desc
Exhibit    Page 252 of 434

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3007174 | | 0 Ammo | | 21 Lonoke, AR | 8/14/1995 | D416-67 PROFILE GAGE | | 0 | 0 | 0 USD |
| 3007175 | | 0 Ammo | | 21 Lonoke, AR | 8/14/1995 | D417-67 PROFILE GAGE | | 0 | 0 | 0 USD |
| 3007176 | | 0 Ammo | | 21 Lonoke, AR | 8/14/1995 | D417-67 PROFILE GAGE | | 0 | 0 | 0 USD |
| 3007178 | | 0 Ammo | | 21 Lonoke, AR | 8/14/1995 | C25-67 PROFILE GAGE | | 0 | 0 | 0 USD |
| 3007180 | | 0 Ammo | | 21 Lonoke, AR | 8/14/1995 | C25-67 PROFILE GAGE | | 0 | 0 | 0 USD |
| 3007182 | | 0 Ammo | | 21 Lonoke, AR | 8/14/1995 | D408-68 PROFILE GAGE | | 0 | 0 | 0 USD |
| 3007184 | | 0 Ammo | | 21 Lonoke, AR | 8/14/1995 | D408-68 PROFILE GAGE | | 0 | 0 | 0 USD |
| 3007188 | | 0 Ammo | | 21 Lonoke, AR | 9/1/1995 | C144-63 RECEIVER GAGE | | 0 | 0 | 0 USD |
| 3007191 | | 0 Ammo | | 21 Lonoke, AR | 9/15/1995 | E1748-66 CLOSED HEX RECEIVER GAGE | | 0 | 0 | 0 USD |
| 3007193 | | 0 Ammo | | 21 Lonoke, AR | 9/15/1995 | E1748-66 CLOSED HEX RECEIVING GAGE | | 0 | 0 | 0 USD |
| 3007196 | | 0 Ammo | | 21 Lonoke, AR | 9/15/1995 | E1747-66 OPEN HEX RECEIVING GAGE | | 0 | 0 | 0 USD |
| 3007199 | | 0 Ammo | | 21 Lonoke, AR | 9/15/1995 | E1747-66 OPEN HEX RECEIVING GAGE | | 0 | 0 | 0 USD |
| 3007201 | | 0 Ammo | | 21 Lonoke, AR | 9/15/1995 | E1750-66 CLOSED HEX RECEIVING GAGE | | 0 | 0 | 0 USD |
| 3007218 | | 0 Ammo | | 21 Lonoke, AR | 9/15/1995 | E1750-66 CLOSED HEX RECEIVER GAGE | | 0 | 0 | 0 USD |
| 3007220 | | 0 Ammo | | 21 Lonoke, AR | 9/15/1995 | E1749-66 OPEN HEX RECEIVER GAGE | | 0 | 0 | 0 USD |
| 3007222 | | 0 Ammo | | 21 Lonoke, AR | 9/15/1995 | E1749-66 OPEN HEX RECEIVER GAGE | | 0 | 0 | 0 USD |
| 3007449 | | 0 Ammo | | 21 Lonoke, AR | 11/15/1997 | #271 DRAW PRESS OVERHAUL | | 0 | 0 | 0 USD |
| 3007450 | | 0 Ammo | | 21 Lonoke, AR | 11/15/1997 | AUTO CASER CHECK WEIGHER | | 0 | 0 | 0 USD |
| 3007451 | | 0 Ammo | | 21 Lonoke, AR | 11/15/1997 | #1312 RF GAGING SHAKER | | 0 | 0 | 0 USD |
| 3007452 | | 0 Ammo | | 21 Lonoke, AR | 11/15/1997 | #1313 RF GAGING SHAKER | | 0 | 0 | 0 USD |
| 3007453 | | 0 Ammo | | 21 Lonoke, AR | 11/15/1997 | #140A #4 BLISS HEADER | | 0 | 0 | 0 USD |
| 3007454 | | 0 Ammo | | 21 Lonoke, AR | 11/15/1997 | #4 BLISS HEADER #148 | | 0 | 0 | 0 USD |
| 3007477 | | 0 Ammo | | 21 Lonoke, AR | 7/15/1997 | BATTERY CUP DIE SET # 820 | | 0 | 0 | 0 USD |
| 3007478 | | 0 Ammo | | 21 Lonoke, AR | 7/15/1997 | BATTERY CUP DIE ST #828 | | 0 | 0 | 0 USD |
| 3007692 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | REMINGTON PLANT SIGN | | 0 | 0 | 0 USD |
| 3007711 | | 0 Ammo | | 21 Lonoke, AR | 6/15/1996 | D424-67 357 SIG 125 SJHP GAGE | | 0 | 0 | 0 USD |
| 3007721 | | 0 Ammo | | 21 Lonoke, AR | 3/15/1996 | #286 BULLET ASSY - 162 BLISS | | 0 | 0 | 0 USD |
| 3007721 | | 1 Ammo | | 21 Lonoke, AR | 5/6/2014 | UPG DISPLAY #286 101863 | | 0 | 0 | 0 USD |
| 3007722 | | 0 Ammo | | 21 Lonoke, AR | 3/15/1996 | #290 BULLET ASSY - 162 BLISS | | 0 | 0 | 0 USD |
| 3007722 | | 1 Ammo | | 21 Lonoke, AR | 4/11/2014 | UPGRADE DISPLAY #290 101869 | | 0 | 0 | 0 USD |
| 3007724 | | 0 Ammo | | 21 Lonoke, AR | 6/15/1996 | ADDL-HALF HEAD DIE SET #404 | | 0 | 0 | 0 USD |
| 3007724 | | 0 Ammo | | 21 Lonoke, AR | 6/15/1996 | ADDL-HALF HEAD DIE SET #406 | | 0 | 0 | 0 USD |
| 3007725 | | 0 Ammo | | 21 Lonoke, AR | 8/15/1996 | ADDL-HALF HEAD DIE SET #406 | | 0 | 0 | 0 USD |
| 3007728 | | 0 Ammo | | 21 Lonoke, AR | 9/15/1996 | OPEN HEX RECEIVER GAGE E1752-66 | | 0 | 0 | 0 USD |
| 3007729 | | 0 Ammo | | 21 Lonoke, AR | 9/15/1996 | OPEN HEX RECEIVER GAGE E1752-66 | | 0 | 0 | 0 USD |
| 3007731 | | 0 Ammo | | 21 Lonoke, AR | 5/15/1996 | #341 NATIONAL SINGLE DIE HEADER | | 0 | 0 | 0 USD |
| 3007731 | | 1 Ammo | | 21 Lonoke, AR | 3/15/2011 | ADD'L WIRE FEED INDEXING #341 101684 | | 0 | 0 | 0 USD |
| 3007731 | | 2 Ammo | | 21 Lonoke, AR | 6/15/2001 | MODIFY SIGN | | 0 | 0 | 0 USD |
| 3007762 | | 1 Ammo | | 21 Lonoke, AR | 6/15/1997 | D432-67 COMBINATION GAGE 22 WIN MAG | | 0 | 0 | 0 USD |
| 3007813 | | 0 Ammo | | 21 Lonoke, AR | 6/15/1997 | EXT759-66 GAGE 22 WIN MAG | | 0 | 0 | 0 USD |
| 3007815 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | UNIVERSAL RECEIVER | | 0 | 0 | 0 USD |
| 3008069 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | SPECTROPHOTOMETER 120462 | | 0 | 0 | 0 USD |
| 3008078 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | X-RAY EQUIPTMENT AND ACCESSORIES | | 0 | 0 | 0 USD |
| 3008081 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | PORTABLE VACUUM EXPL PROOF | | 0 | 0 | 0 USD |
| 3008085 | | 0 Ammo | | 21 Lonoke, AR | 12/1/1993 | TEST BOMB INSTRUMENTATION R&D 120512 | | 0 | 0 | 0 USD |
| 3008092 | | 0 Ammo | | 21 Lonoke, AR | 6/14/1995 | SCBA UNIT WITH TANK | | 0 | 0 | 0 USD |
| 3008111 | | 0 Ammo | | 21 Lonoke, AR | 8/15/1996 | CF LOAD VACUUM CLEANER | | 0 | 0 | 0 USD |
| 3008117 | | 0 Ammo | | 21 Lonoke, AR | 8/15/1997 | BURDIX EKG MACHINE | | 0 | 0 | 0 USD |
| 3008118 | | 0 Ammo | | 21 Lonoke, AR | 1/13/1995 | LAMINATOR MACHINE | | 0 | 0 | 0 USD |
| 3008120 | | 0 Ammo | | 21 Lonoke, AR | 8/14/1995 | TOOL ORGANIZATION CABINET | | 0 | 0 | 0 USD |
| 3008772 | | 0 Ammo | | 21 Lonoke, AR | 8/4/1995 | ADDL BULLET ASSEMBLY #324 WITH STRIPER ASSY | | 0 | 0 | 0 USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3008805 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUCTWORK - RANGE EXHAUST - BALLISTICS | | 0 | 0 | USD |
| 3008806 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DUCTWORK - BULLET TRAP EXHAUST - BALLISTICS | | 0 | 0 | USD |
| 3008814 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PORTABLE VACUUM-EXPL. PROOF | | 0 | 0 | USD |
| 3008821 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MODUPURE SYSTEM   100068 | | 0 | 0 | USD |
| 3008840 | 0 | Ammo | | 21 Lonoke, AR | 1/15/1997 | ACOUSTIC TARGET | | 0 | 0 | USD |
| 3008841 | 1 | Ammo | | 21 Lonoke, AR | 1/15/1998 | ADD'L COST AIR CONDITIONER | | 0 | 0 | USD |
| 3008843 | 0 | Ammo | | 21 Lonoke, AR | 12/15/1997 | ADD'L TELEPHONE CABLING | | 0 | 0 | USD |
| 3008847 | 0 | Ammo | | 21 Lonoke, AR | 12/15/1997 | BULLET LUBE CRANE SYSTEM | | 0 | 0 | USD |
| 3008848 | 0 | Ammo | | 21 Lonoke, AR | 12/15/1997 | #189/190 #62 DRAW CONVEYOR | | 0 | 0 | USD |
| 3008848 | 1 | Ammo | | 21 Lonoke, AR | 3/15/2000 | ADD'L REV #189 DRAW PRESS 100698 | | 0 | 0 | USD |
| 3008849 | 0 | Ammo | | 21 Lonoke, AR | 12/15/1997 | RF DIA & LENGTH GAGING SHAKER | | 0 | 0 | USD |
| 3008885 | 0 | Ammo | | 21 Lonoke, AR | 1/15/1998 | SHOT TOWER SCREEN DRIVE | | 0 | 0 | USD |
| 3008886 | 0 | Ammo | | 21 Lonoke, AR | 1/15/1998 | PORTABLE TILTER | | 0 | 0 | USD |
| 3008900 | 1 | Ammo | | 21 Lonoke, AR | 12/15/2005 | SS PRINTER UV SYSTEM | | 0 | 0 | USD |
| 3008900 | 2 | Ammo | | 21 Lonoke, AR | 10/15/2006 | ADD'L FEED SYSTEM | | 0 | 0 | USD |
| 3008903 | 0 | Ammo | | 21 Lonoke, AR | 2/25/1998 | SIEVES STORAGE RACKS | | 0 | 0 | USD |
| 3008904 | 0 | Ammo | | 21 Lonoke, AR | 2/25/1998 | MUFFLE FURNACE/CHEM LAB | | 0 | 0 | USD |
| 3008910 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1998 | PRIMER COMPONENT WASH UNIT  2578/100405 | | 0 | 0 | USD |
| 3008910 | 1 | Ammo | | 21 Lonoke, AR | 2/15/2007 | ADD'L WASH CONTROLS | | 0 | 0 | USD |
| 3008911 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1998 | PISTOL LOADER CONVERSION KIT  2607/100439 | | 0 | 0 | USD |
| 3008928 | 0 | Ammo | | 21 Lonoke, AR | 5/15/1998 | EXHAUST FAN - SS SALVAGE | | 0 | 0 | USD |
| 3008931 | 0 | Ammo | | 21 Lonoke, AR | 6/15/1998 | PRIMER CUP DIE SET | | 0 | 0 | USD |
| 3008962 | 0 | Ammo | | 21 Lonoke, AR | 8/15/1998 | RF SCRAP POWDER EQUIPMENT | | 0 | 0 | USD |
| 3008962 | 0 | Ammo | | 21 Lonoke, AR | 8/15/1998 | CF LEAD AREA SCALE | | 0 | 0 | USD |
| 3008971 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1998 | COMPACTION PRESS TOOLING | | 0 | 0 | USD |
| 3008971 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1998 | IMPREX MACHINE | | 0 | 0 | USD |
| 3008972 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1998 | BRIDGE/CRANE HOIST | | 0 | 0 | USD |
| 3008975 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1998 | MILWAUKEE BASE DRILL PRESS | | 0 | 0 | USD |
| 3008979 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1998 | LEAD STYPHNATE PROCESS CONTROL SYSTEM | | 0 | 0 | USD |
| 3008979 | 1 | Ammo | | 21 Lonoke, AR | 8/15/1999 | UPDATE LEAD STYPHNATE CONTROLS | | 0 | 0 | USD |
| 3008979 | 2 | Ammo | | 21 Lonoke, AR | 6/15/2000 | TETRAZENE PROCESS CONTROLS | | 0 | 0 | USD |
| 3008980 | 0 | Ammo | | 21 Lonoke, AR | 12/15/1998 | ADD'L MODIFY 9MM LOADER #10 | | 0 | 0 | USD |
| 3008980 | 3 | Ammo | | 21 Lonoke, AR | 8/15/2001 | POWDER INSPECTION SYSTEM | | 0 | 0 | USD |
| 3008980 | 4 | Ammo | | 21 Lonoke, AR | 12/15/2004 | ADD'L POWDER DETECTS | | 0 | 0 | USD |
| 3008982 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1998 | PHOTOPOLYMER PLATEMAKER | | 0 | 0 | USD |
| 3008983 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1998 | MAINT SKILLS TEST UNIT | | 0 | 0 | USD |
| 3008985 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1998 | OKAMOTO SURFACE GRINDER | | 0 | 0 | USD |
| 3008986 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1998 | DELTRONIC OPTICAL COMPARATOR | | 0 | 0 | USD |
| 3008987 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1998 | WIRETAINER STAND | | 0 | 0 | USD |
| 3008995 | 0 | Ammo | | 21 Lonoke, AR | 1/15/1998 | Printer, Inside Scale/Printer - Mettler Toledo | | 0 | 0 | USD |
| 3009007 | 0 | Ammo | | 21 Lonoke, AR | 12/15/1998 | YALE MPB040AC PALLET JACK - #62 | | 0 | 0 | USD |
| 3009008 | 0 | Ammo | | 21 Lonoke, AR | 12/15/1998 | CHEM LAB WORK BENCH | | 0 | 0 | USD |
| 3009031 | 0 | Ammo | | 21 Lonoke, AR | 1/15/1999 | COORDINATE MEASURING MACHINE | | 0 | 0 | USD |
| 3009031 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1999 | COMPACTING PRESS (LONOKE) | | 0 | 0 | USD |
| 3009031 | 1 | Ammo | | 21 Lonoke, AR | 8/15/2003 | ADD'L BULLET PRESS | | 0 | 0 | USD |
| 3009032 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1999 | COMPACTING PRESS (from ET/OWN) #236A | | 0 | 0 | USD |
| 3009038 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1999 | VISION INSPECTION SYSTEM | | 0 | 0 | USD |
| 3009039 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1999 | VISION INSPECTION SYSTEM | | 0 | 0 | USD |
| 3009040 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1999 | VISION INSPECTION SYSTEM | | 0 | 0 | USD |
| 3009043 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1999 | D&A TRIPOD ANVIL DIE SET      O S S | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3009044 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1999 | PERCUSSION CAP DIE SET    O S S | | 0 | 0 | USD |
| 3009047 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1999 | PRINTER PLATFORM | | 0 | 0 | USD |
| 3009048 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1999 | PRINTER PLATFORM | | 0 | 0 | USD |
| 3009049 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1999 | PRINTER PLATFORM | | 0 | 0 | USD |
| 3009053 | 0 | Ammo | | 21 Lonoke, AR | 3/15/1999 | SS CAP PRESS WATER LINE | | 0 | 0 | USD |
| 3009053 | 1 | Ammo | | 21 Lonoke, AR | 4/15/2005 | ADD'L REVERSE OSMOSIS UNIT | | 0 | 0 | USD |
| 3009057 | 0 | Ammo | | 21 Lonoke, AR | 4/15/1999 | RF PRIMING DUCTWORK | | 0 | 0 | USD |
| 3009059 | 0 | Ammo | | 21 Lonoke, AR | 4/15/1999 | RANDOM CASE SEAL MACHINE 2ND FLR | | 0 | 0 | USD |
| 3009061 | 0 | Ammo | | 21 Lonoke, AR | 4/15/1999 | SS LOAD GAGETALKER WORKSTATION | | 0 | 0 | USD |
| 3009062 | 0 | Ammo | | 21 Lonoke, AR | 4/15/1999 | SS LOAD GAGETALKER WORKSTATION | | 0 | 0 | USD |
| 3009063 | 0 | Ammo | | 21 Lonoke, AR | 4/15/1999 | SS LOAD GAGETALKER WORKSTATION | | 0 | 0 | USD |
| 3009075 | 0 | Ammo | | 21 Lonoke, AR | 5/15/1999 | SHOT TOWER SEWING MACHINE | | 0 | 0 | USD |
| 3009086 | 1 | Ammo | | 21 Lonoke, AR | 12/15/2004 | ADD'L POWDER DETECTS | | 0 | 0 | USD |
| 3009088 | 0 | Ammo | | 21 Lonoke, AR | 6/15/1999 | YORK CHILLER | | 0 | 0 | USD |
| 3009088 | 1 | Ammo | | 21 Lonoke, AR | 2/15/2007 | ADD'L YORK CHILLER ROTARY CAM | | 0 | 0 | USD |
| 3009089 | 1 | Ammo | | 21 Lonoke, AR | 5/15/2000 | CF BONDED BULLET - RELOCATION | | 0 | 0 | USD |
| 3009089 | 2 | Ammo | | 21 Lonoke, AR | 10/15/2001 | ADD'L CORE LOCK | | 0 | 0 | USD |
| 3009089 | 4 | Ammo | | 21 Lonoke, AR | 1/15/2007 | ADD'L FEED SYSTEM #368 | | 0 | 0 | USD |
| 3009105 | 0 | Ammo | | 21 Lonoke, AR | 7/15/1999 | SHOTSHELL HEAD PULL TEST UNIT 2724/100546 | | 0 | 0 | USD |
| 3009110 | 0 | Ammo | | 21 Lonoke, AR | 8/15/1999 | CRANE SYSTEM/HOIST | | 0 | 0 | USD |
| 3009111 | 0 | Ammo | | 21 Lonoke, AR | 8/15/1999 | CF LOAD DOCK LEVELER | | 0 | 0 | USD |
| 3009113 | 0 | Ammo | | 21 Lonoke, AR | 8/15/1999 | WIRE WELDER | | 0 | 0 | USD |
| 3009120 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1999 | SABOT SLUG MOLD | | 0 | 0 | USD |
| 3009121 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1999 | MOSQUITO SPRAYING EQUIPMENT 100664 | | 0 | 0 | USD |
| 3009148 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1999 | BLDG 712 PROCESS CONTROLS | | 0 | 0 | USD |
| 3009155 | 0 | Ammo | | 21 Lonoke, AR | 11/15/1999 | REBUILD HEADER #139 | | 0 | 0 | USD |
| 3009156 | 0 | Ammo | | 21 Lonoke, AR | 11/15/1999 | REBUILT HEADER #149 | | 0 | 0 | USD |
| 3009156 | 1 | Ammo | | 21 Lonoke, AR | 5/15/2006 | ADD'L CF #149 HEADER | | 0 | 0 | USD |
| 3009157 | 0 | Ammo | | 21 Lonoke, AR | 11/15/1999 | PRIMER CUP MIST COLLECTOR | | 0 | 0 | USD |
| 3009162 | 0 | Ammo | | 21 Lonoke, AR | 12/15/1999 | CF FURNACE DRYER #726 | | 0 | 0 | USD |
| 3009186 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2000 | 24A WFF CUPPING DIE SET 100676 | | 0 | 0 | USD |
| 3009188 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2000 | SCHAUER LATHE W/JAW CHUCKS 100708 | | 0 | 0 | USD |
| 3009189 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2000 | SCHAUER LATHE W/JAW CHUCKS 100708 | | 0 | 0 | USD |
| 3009190 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2000 | SCHAUER LATHE W/JAW CHUCKS 100708 | | 0 | 0 | USD |
| 3009192 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2000 | YALE MPB040AC PALLET JACK 100709 - #74 | | 0 | 0 | USD |
| 3009215 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2000 | PERKINS TOOL MODULE | | 0 | 0 | USD |
| 3009216 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2000 | PERKINS TOOL MODULE | | 0 | 0 | USD |
| 3009217 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2000 | LEAD BILLET EXTRACTOR | | 0 | 0 | USD |
| 3009218 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2000 | PREFILTER HOLD TANK PUMP BLDG 736 100652 | | 0 | 0 | USD |
| 3009220 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2000 | SS GRAPHITE COLLECTION SYS 100667 | | 0 | 0 | USD |
| 3009222 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2000 | YALE MLW060 HAND TRUCK 100684 - #82 | | 0 | 0 | USD |
| 3009223 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2000 | RF STEAM CONDENSATE RETURN 100687 | | 0 | 0 | USD |
| 3009224 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2000 | SS STEAM CONDENSATE RETURN | | 0 | 0 | USD |
| 3009225 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2000 | BILLET CONVEYOR 2848/100699 | | 0 | 0 | USD |
| 3009226 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2000 | MODEL SB CONVEYOR-PEAN PLTG 100700 | | 0 | 0 | USD |
| 3009227 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2000 | PEEN PLATE VIBRA FEEDER | | 0 | 0 | USD |
| 3009229 | 2 | Ammo | | 21 Lonoke, AR | 2/15/2003 | ADD'L AUTO TRAY FEED | | 0 | 0 | USD |
| 3009229 | 3 | Ammo | | 21 Lonoke, AR | 12/15/2004 | ADD'L COOLING IPS | | 0 | 0 | USD |
| 3009229 | 4 | Ammo | | 21 Lonoke, AR | 8/15/2008 | ADD'L RETURN CONVEYOR SYSTEM | | 0 | 0 | USD |
| 3009264 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2000 | D437-67 1ST DRW OD GAGES-2 100519 | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C009265 | 0 | Ammo | 21 | Lonoke, AR | 4/15/2000 | D435-67 2ND DRW. OD GAGES-2 | | 0 | 0 | USD |
| C009266 | 0 | Ammo | 21 | Lonoke, AR | 4/15/2000 | D436-67 FINAL DRW OD GAGES-2_100519 | | 0 | 0 | USD |
| C009267 | 0 | Ammo | 21 | Lonoke, AR | 4/15/2000 | D305-63A DRW WALL VARI GAGE-2_100519 | | 0 | 0 | USD |
| C009268 | 0 | Ammo | 21 | Lonoke, AR | 4/15/2000 | D-438-67 HEADING COMBO GAGE-2 | | 0 | 0 | USD |
| C009269 | 0 | Ammo | 21 | Lonoke, AR | 4/15/2000 | D439-67 HT COMBO GAGES-2 | | 0 | 0 | USD |
| C009271 | 0 | Ammo | 21 | Lonoke, AR | 4/15/2000 | D276-66 OPEN HEX REC GAGE-2 | | 0 | 0 | USD |
| C009272 | 0 | Ammo | 21 | Lonoke, AR | 4/15/2000 | D275-66 CLOSED HEX REC GAGE-2 | | 0 | 0 | USD |
| C009273 | 0 | Ammo | 21 | Lonoke, AR | 4/15/2000 | PAI GENERATOR | | 0 | 0 | USD |
| C009274 | 0 | Ammo | 21 | Lonoke, AR | 4/15/2000 | PLANT AIR COMPRESSOR - SHOTSHELL | | 0 | 0 | USD |
| C009275 | 0 | Ammo | 21 | Lonoke, AR | 4/15/2000 | SURFACE GRINDER-CF KITTING | | 0 | 0 | USD |
| C009276 | 0 | Ammo | 21 | Lonoke, AR | 4/15/2000 | RF CUP-WATER SOFTENER | | 0 | 0 | USD |
| C009277 | 0 | Ammo | 21 | Lonoke, AR | 4/15/2000 | MILLING MACHINE-ENGINEERING_100710 | | 0 | 0 | USD |
| C009278 | 0 | Ammo | 21 | Lonoke, AR | 4/15/2000 | PR MOISTURE ANALYZER | | 0 | 0 | USD |
| C009279 | 0 | Ammo | 21 | Lonoke, AR | 7/1/1998 | ELECTRIC PRIMER ASSEMBLY PRESS | | 0 | 0 | USD |
| C009279 | 1 | Ammo | 21 | Lonoke, AR | 6/1/1998 | ADD'L ELECTRIC PRIMER PRESS | | 0 | 0 | USD |
| C009279 | 2 | Ammo | 21 | Lonoke, AR | 2/28/1999 | ADD'L COST ELECTRIC PRIMER PRESS | | 0 | 0 | USD |
| C009279 | 3 | Ammo | 21 | Lonoke, AR | 2/15/2007 | ADD'L UPGRADE #840 | | 0 | 0 | USD |
| C009333 | 0 | Ammo | 21 | Lonoke, AR | 6/5/2000 | STORES PAPER CUTTER. In the store as of Dec 2011 | | 0 | 0 | USD |
| C009356 | 0 | Ammo | 21 | Lonoke, AR | 7/15/2000 | CF PLT TEMPERATURE CONTROL SYSTEM | | 0 | 0 | USD |
| C009357 | 0 | Ammo | 21 | Lonoke, AR | 7/15/2000 | CF #150 HEADING PRESS | | 0 | 0 | USD |
| C009542 | 0 | Ammo | 21 | Lonoke, AR | 3/15/2001 | BULLET ASSEMBLY WFF #237A 100854 | | 0 | 0 | USD |
| C009560 | 1 | Ammo | 21 | Lonoke, AR | 6/15/2002 | SLURRY TANK CONTROLS | | 0 | 0 | USD |
| C009573 | 0 | Ammo | 21 | Lonoke, AR | 7/15/2001 | 223 DISINTEGRATOR #321 | | 0 | 0 | USD |
| C009575 | 0 | Ammo | 21 | Lonoke, AR | 7/15/2001 | LEAD REMELT JIB CRANE | | 0 | 0 | USD |
| C009744 | 0 | Ammo | 21 | Lonoke, AR | 9/15/2001 | PR WATER FILTER | | 0 | 0 | USD |
| C010410 | 0 | Ammo | 21 | Lonoke, AR | 5/31/2005 | 50 Yds Range Enhancements - 24' x 24' Cover #950 | | 0 | 0 | USD |
| C010410 | 1 | Ammo | 21 | Lonoke, AR | 7/15/2005 | 300 YARD SHOOTING PLATFORM #952 | | 0 | 0 | USD |
| C010410 | 2 | Ammo | 21 | Lonoke, AR | 3/15/2008 | 500 YD SHOOTING POSITION | | 0 | 0 | USD |
| C010777 | 0 | Ammo | 21 | Lonoke, AR | 2/15/2007 | SPARE AIR CLUTCH/BRAKE | | 0 | 0 | USD |
| C010782 | 0 | Ammo | 21 | Lonoke, AR | 2/15/2007 | UPGRADE #598 RIFLE T&F | | 0 | 0 | USD |
| C010784 | 0 | Ammo | 21 | Lonoke, AR | 2/15/2007 | PR COMP PACK CODE EMBOSSER | | 0 | 0 | USD |
| C010785 | 0 | Ammo | 21 | Lonoke, AR | 2/15/2007 | CF PLATING CARBON FILTER | | 0 | 0 | USD |
| C010789 | 0 | Ammo | 21 | Lonoke, AR | 2/15/2007 | MAINTENANCE SCISSOR LIFT | | 0 | 0 | USD |
| C010810 | 0 | Ammo | 21 | Lonoke, AR | 3/15/2007 | BLISS HEADER #146-REBUILD | | 0 | 0 | USD |
| C010811 | 0 | Ammo | 21 | Lonoke, AR | 3/15/2007 | CF #1309 PEEN PLATE DRYER | | 0 | 0 | USD |
| C010851 | 0 | Ammo | 21 | Lonoke, AR | 6/15/2007 | SP RF CUPPING DIE SET | | 0 | 0 | USD |
| C010853 | 0 | Ammo | 21 | Lonoke, AR | 6/15/2007 | SP ROTARY FURNACE DRUM | | 0 | 0 | USD |
| C010854 | 0 | Ammo | 21 | Lonoke, AR | 6/15/2007 | GENERATOR - SHOT TOWER | | 0 | 0 | USD |
| C010855 | 0 | Ammo | 21 | Lonoke, AR | 6/15/2007 | GENERATOR - MAINTENANCE | | 0 | 0 | USD |
| C010866 | 0 | Ammo | 21 | Lonoke, AR | 8/15/2007 | BALLISTICS PEAK PRESSURE SYS 101319 | | 0 | 0 | USD |
| C010867 | 0 | Ammo | 21 | Lonoke, AR | 8/15/2007 | BALLISTICS PEAK PRESSURE SYS | | 0 | 0 | USD |
| C010868 | 0 | Ammo | 21 | Lonoke, AR | 8/15/2007 | BALLISTICS PEAK PRESSURE SYS | | 0 | 0 | USD |
| C010869 | 0 | Ammo | 21 | Lonoke, AR | 8/15/2007 | BALLISTICS PEAK PRESSURE SYS 101319 | | 0 | 0 | USD |
| C010870 | 0 | Ammo | 21 | Lonoke, AR | 8/15/2007 | BALLISTICS PEAK PRESSURE SYS 101319 | | 0 | 0 | USD |
| C010872 | 1 | Ammo | 21 | Lonoke, AR | 4/15/2008 | ADD'L TOOL CHANGER & HEIGHT GAGE | | 0 | 0 | USD |
| C010898 | 0 | Ammo | 21 | Lonoke, AR | 12/15/2007 | TOOL INSP DIGITAL HEIGHT GAGE 101362 | | 0 | 0 | USD |
| C010899 | 0 | Ammo | 21 | Lonoke, AR | 8/15/2007 | JOHN DEERE HX15 ROT CUTTER | | 0 | 0 | USD |
| C010900 | 1 | Ammo | 21 | Lonoke, AR | 3/15/2008 | ADD'L JACKET DRAW 240A | | 0 | 0 | USD |
| C010903 | 0 | Ammo | 21 | Lonoke, AR | 12/15/2007 | CAPITAL SPARE MOTOR | | 0 | 0 | USD |
| C010918 | 0 | Ammo | 21 | Lonoke, AR | 1/15/2008 | CASE TAPE MACHINE | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3110919 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2008 | CASE TAPE MACHINE | | 0 | 0 | USD |
| 3110925 | 1 | Ammo | | 21 Lonoke, AR | 11/15/2008 | ADD'L INSULATE BOILER TANK | | 0 | 0 | USD |
| 3110928 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2008 | SHOT TOWER HOIST | | 0 | 0 | USD |
| 3110931 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2008 | CF PLATING CYANIDE TANK | | 0 | 0 | USD |
| 3110932 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2008 | MONOSET GRINDING MCH-USED | | 0 | 0 | USD |
| 3110933 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2008 | BRIDGEPORT MILLING MCH-USED | | 0 | 0 | USD |
| 3110950 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2008 | CNC ROTARY TABLE | | 0 | 0 | USD |
| 3110951 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2008 | WASTE TRMT PORTABLE PUMP | | 0 | 0 | USD |
| 3110962 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2008 | BALLISTICS PEAK MONITORING SYS 101371 | | 0 | 0 | USD |
| 3110963 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2008 | BALLISTICS PEAK MONITORING SYS 101371 | | 0 | 0 | USD |
| 3110964 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2008 | HAAS TL-2 TOOL ROOM LATHE | | 0 | 0 | USD |
| 3110974 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2008 | BALLISTICS AIR GAUGING EQUIP 101425 | | 0 | 0 | USD |
| 3110975 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2008 | SS REGRIND CONVEYOR | | 0 | 0 | USD |
| 3110977 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2008 | MACHINE SHOP DRILL PRESS | | 0 | 0 | USD |
| 3110986 | 0 | Ammo | | 21 Lonoke, AR | 6/15/2008 | AH&P YALE PALLET TRUCK | | 0 | 0 | USD |
| 3111000 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2008 | EXP 10117/10157 ACCUTIP GAGES | | 0 | 0 | USD |
| 3111005 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2008 | WASHING MACHINE | | 0 | 0 | USD |
| 3111024 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2008 | D491-67 GAGE 101457 | | 0 | 0 | USD |
| 3111025 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2008 | D491-67 GAGE 101457 | | 0 | 0 | USD |
| 3111026 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2008 | CART CADDY | | 0 | 0 | USD |
| 3011892 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2008 | 20GA HEAT SET DRUM REWORKED | | 0 | 0 | USD |
| 3111896 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2008 | METTLER TOLEDO SCALES (2) | | 0 | 0 | USD |
| 3111993 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2009 | EX70760 COMBINATION GAGE 101472 | | 0 | 0 | USD |
| 3111994 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2009 | V&O PRIMING PRESS | | 0 | 0 | USD |
| 3111995 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2009 | YALE MPB040E PALLET TRUCK | | 0 | 0 | USD |
| 3111999 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2009 | JDP DRILL PRESS 101500 | | 0 | 0 | USD |
| 3112000 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2009 | ZEBRA BARCODE PRINTER | | 0 | 0 | USD |
| 3112001 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2009 | ZEBRA BARCODE PRINTER | | 0 | 0 | USD |
| 3112002 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2009 | BUGGY HANDLING TRUCK | | 0 | 0 | USD |
| 3012011 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2009 | HYDRAULIC BARREL DUMPER | | 0 | 0 | USD |
| 3012095 | 2 | Ammo | | 21 Lonoke, AR | 9/15/2009 | ADD'L SEPERATOR & MILL 101466 | | 0 | 0 | USD |
| 3112096 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2009 | BALLISTIC SENSOR VACUUM OVEN 101536 | | 0 | 0 | USD |
| 3012097 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2009 | YALE MPB PALLET JACK # 81 101551 | | 0 | 0 | USD |
| 3112175 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2010 | PALLET TRUCK YALE MPB040-E 101575 | | 0 | 0 | USD |
| 3112177 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2010 | PALLET TRUCK YALE MPB040-E 101587 | | 0 | 0 | USD |
| 3112179 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2010 | GAUGE-308 MARLIN EXPRESS 101590 | | 0 | 0 | USD |
| 3112183 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2010 | Printer, MRP label finished goods- Zebra 101604 | | 0 | 0 | USD |
| 3012203 | 0 | Ammo | | 21 Lonoke, AR | 2/15/2010 | INDUSTRIAL LABEL PRINTER 101612 | | 0 | 0 | USD |
| 3012468 | 1 | Ammo | | 21 Lonoke, AR | 12/3/2017 | 857 Charging Table Hollow Tubing 101932 | | 0 | 0 | USD |
| 3012473 | 1 | Ammo | | 21 Lonoke, AR | 5/15/2010 | CF FLOOR SCRUBBER 101645 | | 0 | 0 | USD |
| 3012474 | 1 | Ammo | | 21 Lonoke, AR | 12/3/2017 | 575 Charging Table Hollow Tubing 101932 | | 0 | 0 | USD |
| 3012475 | 1 | Ammo | | 21 Lonoke, AR | 12/3/2017 | 580 Charging Table Hollow Tubing 101932 | | 0 | 0 | USD |
| 3012476 | 1 | Ammo | | 21 Lonoke, AR | 12/3/2017 | 585 Charging Table Hollow Tubing 101932 | | 0 | 0 | USD |
| 3012477 | 1 | Ammo | | 21 Lonoke, AR | 12/3/2017 | 590 Charging Table Hollow Tubing 101932 | | 0 | 0 | USD |
| 3012528 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2010 | MEDICAL AUDIOMETER 101663 | | 0 | 0 | USD |
| 3012546 | 1 | Ammo | | 21 Lonoke, AR | 11/15/2010 | ADD'L CASE COMPUTER PRINTER 101600 | | 0 | 0 | USD |
| 3012552 | 0 | Ammo | | 21 Lonoke, AR | 10/15/2010 | AMERICAN VAC EXPLOSIVE PROOF VAC 101610 | | 0 | 0 | USD |
| 3012557 | 0 | Ammo | | 21 Lonoke, AR | 10/15/2010 | DIGITAL INDICATOR SCALE 101688 | | 0 | 0 | USD |
| 3012558 | 0 | Ammo | | 21 Lonoke, AR | 10/15/2010 | DIGITAL INDICATOR SCALE 101688 | | 0 | 0 | USD |
| 3012559 | 1 | Ammo | | 21 Lonoke, AR | 12/15/2010 | ADD'L BYPASS LINE 101695 | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3012705 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2011 | R&D EXPL PROOF VACUUM PUMP 101668 | 0 | 0 | 0 | USD |
| 3013160 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2011 | CF HEADTURN SINGLE LINE FEEDER 101649 | 0 | 0 | 0 | USD |
| 3013203 | 0 | Ammo | | 21 Lonoke, AR | 6/15/2011 | #9 TRAY MOLD 101709 | 0 | 0 | 0 | USD |
| 3013205 | 0 | Ammo | | 21 Lonoke, AR | 6/15/2011 | #10 TRAY MOLD 101709 | 0 | 0 | 0 | USD |
| 3013240 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2011 | 20 RD #9 & #10 TRAY MOLD 101710 | 0 | 0 | 0 | USD |
| 3013248 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2011 | PILOT PLANT SERVER 101721 | 0 | 0 | 0 | USD |
| 3013250 | 0 | Ammo | | 21 Lonoke, AR | 9/15/2011 | EXPLOSIVE PROOF REFRIGERATOR 101732 | 0 | 0 | 0 | USD |
| 3013290 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2011 | MITSIBISHI FX20K WIRE EDM 101743 | 28,373 | -8,640 | 19,733 | USD |
| 3013291 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2011 | HVAC R&D WORKS AREA 101750 | 0 | 0 | 0 | USD |
| 3013292 | 1 | Ammo | | 21 Lonoke, AR | 5/15/2012 | ADDL INSTALLATION HEADER 101713 | 0 | 0 | 0 | USD |
| 3013442 | 0 | Ammo | | 21 Lonoke, AR | 8/15/2012 | FISHER GLASS DOOR REFRIGERATOR 101778 | 0 | 0 | 0 | USD |
| 3013539 | 1 | Ammo | | 21 Lonoke, AR | 5/14/2013 | ADD'L C-35 SHELL DRAW #255 101779 | 0 | 0 | 0 | USD |
| 3013540 | 2 | Ammo | | 21 Lonoke, AR | 5/14/2013 | ADD'L 62D SHELL DRAW #267 101779 | 0 | 0 | 0 | USD |
| 3013541 | 2 | Ammo | | 21 Lonoke, AR | 5/14/2013 | ADD'L 62D SHELL DRAW #269 101779 | 0 | 0 | 0 | USD |
| 3013727 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2012 | MICRO AIR UNIT SS 2ND FL 101789 | 0 | 0 | 0 | USD |
| 3013728 | 3 | Ammo | | 21 Lonoke, AR | 7/15/2013 | REBUILD FEED #251 101783 | 0 | 0 | 0 | USD |
| 3014036 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2013 | RF FEED CONE/RING ASSY 101765 | 9,086 | -2,365 | 6,721 | USD |
| 3014448 | 1 | Ammo | | 21 Lonoke, AR | 6/30/2017 | Add'l WF6600 Bit Assy Press 232A 101771 | 0 | 0 | 0 | USD |
| 3014449 | 1 | Ammo | | 21 Lonoke, AR | 6/30/2017 | Add'l WF6600 Bit Assy Press 233A 101771 | 0 | 0 | 0 | USD |
| 3014451 | 1 | Ammo | | 21 Lonoke, AR | 8/4/2014 | ADD'L BONDED CORE CHECK WEIGHT 101854 | 0 | 0 | 0 | USD |
| 3014542 | 0 | Ammo | | 21 Lonoke, AR | 5/6/2014 | UPG DISPLAY #355 101863 | 0 | 0 | 0 | USD |
| 3014543 | 0 | Ammo | | 21 Lonoke, AR | 5/6/2014 | UPG DISPLAY #292 101863 | 0 | 0 | 0 | USD |
| 3014584 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | High Speed Loader | 0 | 0 | 0 | USD |
| 3014596 | 1 | Ammo | | 21 Lonoke, AR | 7/21/2014 | National Header Draw 101826 | 0 | 0 | 0 | USD |
| 3014604 | 1 | Ammo | | 21 Lonoke, AR | 7/21/2014 | PRIMING MACHINE #1 | 0 | 0 | 0 | USD |
| 3014605 | 1 | Ammo | | 21 Lonoke, AR | 7/21/2014 | PRIMING MACHINE #2 | 0 | 0 | 0 | USD |
| 3014631 | 0 | Ammo | | 21 Lonoke, AR | 8/4/2014 | BULLET PULL MACHINE 2A 101888 | 0 | 0 | 0 | USD |
| 3014632 | 0 | Ammo | | 21 Lonoke, AR | 8/29/2014 | BULLET PULL MACHINE 2B 101888 | 0 | 0 | 0 | USD |
| 3014633 | 0 | Ammo | | 21 Lonoke, AR | 8/29/2014 | BULLET PULL MACHINE 2C 101888 | 0 | 0 | 0 | USD |
| 3014637 | 11 | Ammo | | 21 Lonoke, AR | 8/15/2014 | Lead Conveyor $1350 | 0 | 0 | 0 | USD |
| 3014637 | 12 | Ammo | | 21 Lonoke, AR | 8/15/2014 | Wire Winder System 101827 | 0 | 0 | 0 | USD |
| 3014745 | 1 | Ammo | | 21 Lonoke, AR | 9/21/2014 | National Header Draw 101826 | 0 | 0 | 0 | USD |
| 3014749 | 1 | Ammo | | 21 Lonoke, AR | 7/21/2014 | High Speed Loading 101829 | 0 | 0 | 0 | USD |
| 3014762 | 1 | Ammo | | 21 Lonoke, AR | 9/21/2014 | PRIMING MACHINE #1 101844 | 0 | 0 | 0 | USD |
| 3014763 | 1 | Ammo | | 21 Lonoke, AR | 9/21/2014 | PRIMING MACHINE #2 | 0 | 0 | 0 | USD |
| 3015202 | 0 | Ammo | | 21 Lonoke, AR | 7/21/2014 | L2 Metal Cubbies-Primer Barricades | 0 | 0 | 0 | USD |
| 3015385 | 0 | Ammo | | 21 Lonoke, AR | 12/19/2014 | VASINI TRAY FILL 101845 | 0 | 0 | 0 | USD |
| 3016684 | 1 | Ammo | | 21 Lonoke, AR | 3/31/2017 | Addtl Explosion Proof Ultrasonic Cleaner 101929 | 0 | 0 | 0 | USD |
| 3016755 | 0 | Ammo | | 21 Lonoke, AR | 3/31/2017 | Bullet Traps - Shotshell Wet Recovery 101974E | 0 | 0 | 0 | USD |
| 3016756 | 0 | Ammo | | 21 Lonoke, AR | 3/31/2017 | Bullet Traps - Shotshell Wet Recovery 101974F | 0 | 0 | 0 | USD |
| 3016837 | 0 | Ammo | | 21 Lonoke, AR | 6/1/2017 | Guarding for 1 Machine 102001 | 0 | 0 | 0 | USD |
| 3016851 | 1 | Ammo | | 21 Lonoke, AR | 6/1/2017 | Starrett Surface Plate Rolling Stand 102013 | 0 | 0 | 0 | USD |
| 3016933 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Mitutoyo Micrometer Set 102014/102004 | 0 | 0 | 0 | USD |
| 3016937 | 0 | Ammo | | 21 Lonoke, AR | 10/31/2017 | Water Purifier 102028 | 0 | 0 | 0 | USD |
| 4000416 | 0 | Ammo | | 21 Lonoke, AR | 4/15/1994 | HUTRON TRACKER 640 2043 | 0 | 0 | 0 | USD |
| 4000716 | 0 | Ammo | | 21 Lonoke, AR | 6/1/1996 | SAP PERSONAL COMPUTER SYSTEM-RF SHELL | 0 | 0 | 0 | USD |
| 4000868 | 0 | Ammo | | 21 Lonoke, AR | 1/15/1997 | Printer, Warehouse office label - Zebra | 0 | 0 | 0 | USD |
| 4000922 | 0 | Ammo | | 21 Lonoke, AR | 7/15/1997 | PRE-MIX CONTROL COMPUTER | 0 | 0 | 0 | USD |
| 4000990 | 0 | Ammo | | 21 Lonoke, AR | 11/15/1997 | Computers, Central Stores- Dell and HP | 0 | 0 | 0 | USD |
| 4001014 | 0 | Ammo | | 21 Lonoke, AR | 4/15/1997 | AUTO CAD SOFTWARE | 0 | 0 | 0 | USD |

Case 20-81688-CRJ11   Doc 904-1   Filed 09/30/20   Entered 09/30/20 13:40:13   Desc
Exhibit     Page 258 of 434

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| CR001014 | 1 | Ammo | | 21 Lonoke, AR | 6/15/2008 | ADD'L SOLID WORKS LICENSE | 0 | 0 | 0 | USD |
| CR001015 | 0 | Ammo | | 21 Lonoke, AR | 4/15/1997 | RSLOGIX SOFTWARE 2 EA | 0 | 0 | 0 | USD |
| CR001124 | 0 | Ammo | | 21 Lonoke, AR | 4/1/1998 | Printer, HP Laser - Purchasing | 0 | 0 | 0 | USD |
| CR001210 | 0 | Ammo | | 21 Lonoke, AR | 5/15/1999 | LADDER LOGISTICS SOFTWARE | 0 | 0 | 0 | USD |
| CR001225 | 0 | Ammo | | 21 Lonoke, AR | 7/15/1999 | HUMAN RESRCS ONLINE PERSONAL COMPUTER 2771100651 | 0 | 0 | 0 | USD |
| CR001436 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2007 | Software, Time Centre Software/License   101238 | 0 | 0 | 0 | USD |
| CR001437 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2007 | Modem, Accutime Time Centre Data Clock  101238 | 0 | 0 | 0 | USD |
| CR001450 | 0 | Ammo | | 21 Lonoke, AR | 7/15/2007 | MAINT EDM SOFTWARE 101334 | 0 | 0 | 0 | USD |
| CR001468 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2008 | Cabling, Fiber Internet  101348 | 0 | 0 | 0 | USD |
| CR001481 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2008 | MAINTENANCE AREA PLOTTER | 0 | 0 | 0 | USD |
| CR001522 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2008 | CF LOAD MONITORING SYS | 0 | 0 | 0 | USD |
| CR001523 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2008 | TRASH COMPACTOR MONITOR | 0 | 0 | 0 | USD |
| CR001537 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2009 | HP Z6100PS 42" PLOTTER | 0 | 0 | 0 | USD |
| CR001538 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2009 | HP500 COLOR PLOTTER | 0 | 0 | 0 | USD |
| CR001575 | 0 | Ammo | | 21 Lonoke, AR | 12/15/2009 | Tracking, Wireless System-Aruba on wall 101552 | 0 | 0 | 0 | USD |
| CR001588 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2010 | Server, HP Proliant Lonoke Network   101607 | 0 | 0 | 0 | USD |
| CR001589 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2010 | BALLISTICS VELOCITY SCREENS (6) 101619 | 0 | 0 | 0 | USD |
| CR001595 | 0 | Ammo | | 21 Lonoke, AR | 3/15/2010 | BALLISTICS VELOCITY SCREENS (8) 101631 | 0 | 0 | 0 | USD |
| CR001600 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2010 | PLANT ELECTRONIC MESSAGING SYS 101583 | 0 | 0 | 0 | USD |
| CR001809 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2010 | QUALITY HEADTURN SPC INSP 101661 | 0 | 0 | 0 | USD |
| CR001810 | 0 | Ammo | | 21 Lonoke, AR | 11/15/2010 | QUALITY HEADTURN SPC INSP 101661 | 0 | 0 | 0 | USD |
| CR001824 | 0 | Ammo | | 21 Lonoke, AR | 2/1/2011 | Server, HP Proliant - Virtualization | 0 | 0 | 0 | USD |
| CR002062 | 0 | Ammo | | 21 Lonoke, AR | 6/21/2013 | Server, Exchange-HP Proliant DL580G7-LN508EX01 | 0 | 0 | 0 | USD |
| CR002072 | 0 | Ammo | | 21 Lonoke, AR | 11/26/2013 | Switch, Network & Transceiver- 101866 | 0 | 0 | 0 | USD |
| CR002072 | 1 | Ammo | | 21 Lonoke, AR | 1/29/2014 | Switch, Network & Transceiver- Add'l - 101866 | 0 | 0 | 0 | USD |
| CR002122 | 0 | Ammo | | 21 Lonoke, AR | 10/15/2014 | Server, HP Proliant - Qlikview 2 Server - 101892 | 0 | 0 | 0 | USD |
| 4000001 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CLARKLIFT ELECTRIC FORKLIFT TRUCK 7000# -#42 | 0 | 0 | 0 | USD |
| 4000001 | 2 | Ammo | | 21 Lonoke, AR | 2/15/2008 | FORKLIFT #42 BATTERY | 0 | 0 | 0 | USD |
| 4000004 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | Truck, Electric Fork 6000#-Yale-Whse-#30  120627 | 0 | 0 | 0 | USD |
| 4000004 | 2 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PAYLOADER   Y | 0 | 0 | 0 | USD |
| 4000006 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DIESEL TRACTOR MODEL 2440 | 0 | 0 | 0 | USD |
| 4000007 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | DIESEL TRACTOR JOHN DEERE MOD 6400 | 0 | 0 | 0 | USD |
| 4000009 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 1988 FORD F250 PICKUP TRUCK   U | 0 | 0 | 0 | USD |
| 4000010 | 1 | Ammo | | 21 Lonoke, AR | 8/15/1996 | ADD'L - EXPLOSIVE BED BOX | 0 | 0 | 0 | USD |
| 4000011 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 1966 GMC FIRE TRUCK S/N V4001F31178E | 0 | 0 | 0 | USD |
| 4000013 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MODIFICATIONS/3000 GAL TANK 110076 | 0 | 0 | 0 | USD |
| 4000018 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | 1989 FORD F6 POWDER TRUCK | 0 | 0 | 0 | USD |
| 4000018 | 1 | Ammo | | 21 Lonoke, AR | 8/15/1996 | ADD'L - EXPLOSIVE BED BOX | 0 | 0 | 0 | USD |
| 4000020 | 0 | Ammo | | 21 Lonoke, AR | 8/15/1996 | ADD'L - EXPLOSIVE BED BOX | 0 | 0 | 0 | USD |
| 4000022 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1994 | CHEVROLET 1991 KODIAC TR 2239 1GBL7H1PQMJ100560 | 0 | 0 | 0 | USD |
| 4000023 | 0 | Ammo | | 21 Lonoke, AR | 2/1/1996 | SAFETY MODIFICATIONS TO LEASED | 0 | 0 | 0 | USD |
| 4000032 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | Truck, Electric Lift 6000#-Yale- #37 | 0 | 0 | 0 | USD |
| 4000035 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ELEC TELE TILING FORKLIFT WALKER - #4 | 0 | 0 | 0 | USD |
| 4000038 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ELEC TELE TILTING FORK LIFT W/ BATTERY - #5 | 0 | 0 | 0 | USD |
| 4000064 | 0 | Ammo | | 21 Lonoke, AR | 6/13/1995 | YALE FORK LIFT TRUCK - #32 | 0 | 0 | 0 | USD |
| 5000080 | 0 | Ammo | | 21 Lonoke, AR | 6/15/1996 | LINCOLN INDUSTRIAL SCRUBBER | 0 | 0 | 0 | USD |
| 5000081 | 0 | Ammo | | 21 Lonoke, AR | 9/15/1996 | Truck, Fork Lift-Yale-#45 | 0 | 0 | 0 | USD |
| 5000082 | 0 | Ammo | | 21 Lonoke, AR | 6/15/1997 | Truck, Green Lift- Clark - #15 | 0 | 0 | 0 | USD |
| 5000089 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | Truck, Electric Fork Lift 6000#- Yale-#31 | 0 | 0 | 0 | USD |
| 5000092 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | Truck, Yellow Gas Forklift 6000LB-Yale-#14 | 0 | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 5000094 | 0 | Ammo | | 21 Lonoke, AR | 12/15/1997 | CLARK FORK TRUCK - #47 | | 0 | 0 | USD |
| 5000095 | 0 | Ammo | | 21 Lonoke, AR | 8/15/1998 | PRIMER DELIVERY TRUCK | | 0 | 0 | USD |
| 5000095 | 1 | Ammo | | 21 Lonoke, AR | 8/15/1998 | ADD'L PRIMER DELIVERY TRUCK 2591/100427 | | 0 | 0 | USD |
| 5000096 | 0 | Ammo | | 21 Lonoke, AR | 8/15/1998 | WASTE DELIVERY TRUCK | | 0 | 0 | USD |
| 5000097 | 0 | Ammo | | 21 Lonoke, AR | 10/15/1998 | UTILITY TRAILER | | 0 | 0 | USD |
| 5000098 | 0 | Ammo | | 21 Lonoke, AR | 2/15/1999 | Truck, Fork Lift- Yale- #50 | | 0 | 0 | USD |
| 5000100 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2000 | SHOT TOWER LIFT TRUCK - #85 | | 0 | 0 | USD |
| 5000180 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2014 | 1971 FORD DUMP TRUCK F600 | | 0 | 0 | USD |
| 5000181 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2014 | 1988 CHEV PICKUP TRUCK M-1500 | | 0 | 0 | USD |
| 5000182 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2014 | 1988 CHEV PICKUP TRUCK M-1500 | | 0 | 0 | USD |
| 5000183 | 0 | Ammo | | 21 Lonoke, AR | 5/15/2014 | 1991 FORD TRUCK | | 0 | 0 | USD |
| H000152 | 2 | Ammo | | 21 Lonoke, AR | 2/15/2000 | SURVEILLANCE CAMERA - 2_100715 | | 0 | 0 | USD |
| H000156 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MOVABLE PARTITIONS - GATE HOUSE | | 0 | 0 | USD |
| H000157 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MOVABLE PARTITIONS - WAREHOUSE | | 0 | 0 | USD |
| H000157 | 1 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MOVEABLE PARTITION-STORES OFFICE | | 0 | 0 | USD |
| H000158 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PARTITIONS-EPT TRAINING ROOMS          U | | 0 | 0 | USD |
| H000159 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PAI PARTITIONS-ACCOUNTING               U | | 0 | 0 | USD |
| H000178 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | R&D LAB CASEWORK | | 0 | 0 | USD |
| H000186 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MODULAR WORK STATION #610_100058 | | 0 | 0 | USD |
| H000187 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MOVABLE PARTITIONS - ADMIN & CF | | 0 | 0 | USD |
| 6000188 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MOVABLE PARTITIONS - SHOTSHELL | | 0 | 0 | USD |
| H000189 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MOVABLE PARTITIONS - PRIMER MFG. | | 0 | 0 | USD |
| H000190 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MOVEABLE PARTITIONS-DRAFTING AREA | | 0 | 0 | USD |
| H000191 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MOVEABLE PARTITION-ENGINEERING | | 0 | 0 | USD |
| H000192 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MOVEABLE PARTITION-C.F. LOAD | | 0 | 0 | USD |
| H000193 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MOVEABLE PARTITION-COMPUTER ROOM | | 0 | 0 | USD |
| H000194 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MOVEABLE PARTITION-C.F. OFFICE | | 0 | 0 | USD |
| H000195 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MOVEABLE PARTITION-SS. OFFICE | | 0 | 0 | USD |
| H000196 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | OFFICE PARTITIONING                          U | | 0 | 0 | USD |
| 6000197 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | ACCORDIAN PARTITION-LRG SS CONF        U | | 0 | 0 | USD |
| 6000198 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PRIMER WHSE STORAGE FIXTURES-SS CON | | 0 | 0 | USD |
| H000199 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PARTITIONS - SS PACK OFFICE | | 0 | 0 | USD |
| 5001265 | 0 | Ammo | | 21 Lonoke, AR | 11/15/1999 | GAGE LAB STORAGE CABINET_100674 | | 0 | 0 | USD |
| 5001284 | 0 | Ammo | | 21 Lonoke, AR | 1/15/2008 | HIGH SPEED DIGITAL CAMERA | | 0 | 0 | USD |
| 5001328 | 0 | Ammo | | 21 Lonoke, AR | 4/15/2010 | CAFETERIA SOUND SYSTEM 101618 | | 0 | 0 | USD |
| 5001409 | 0 | Ammo | | 21 Lonoke, AR | 10/15/2010 | UNIMAC CLOTHES DRYER 101693 | | 0 | 0 | USD |
| 7000045 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | OLD BULT WASH DRIVE LINE | | 0 | 0 | USD |
| 7000046 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | NEUTRALIZATION PIPING | | 0 | 0 | USD |
| 7000047 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | NEUTRALIZATION PIPING | | 0 | 0 | USD |
| 7000048 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | NEUTRALIZATION PIPING | | 0 | 0 | USD |
| 7000049 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | CYANIDE DRAIN LINE | | 0 | 0 | USD |
| 7000050 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | AERATION LAG VALVE STA | | 0 | 0 | USD |
| 7000051 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PLATING GATE BOX | | 0 | 0 | USD |
| 7000052 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | PLAE WST LIFT STA | | 0 | 0 | USD |
| 7000053 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | MAIN PROCESS LIFT STA | | 0 | 0 | USD |
| 7000054 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | OUTSIDE BURIED TELEPHONE CABLE 120371 | | 0 | 0 | USD |
| 7000055 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | SUPERNATANT PIPING | | 0 | 0 | USD |
| 7000056 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | STAINLESS STL PIPE | | 0 | 0 | USD |
| 7000057 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | STAINLESS STL PIPE | | 0 | 0 | USD |
| 7000058 | 0 | Ammo | | 21 Lonoke, AR | 12/1/1993 | EMERGENCY STOR BASIN | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C107697 | 0 | Ammo | | 21 | Lonoke, AR | 6/15/1996 | 12 CAVITY 3 OZ 8GA ZINC SLUGMOLD | 0 | 0 | 0 | USD |
| C312043 | 0 | Ammo | | 99 | Lonoke, AR | 4/15/2009 | PAT TRAP TRAP MACHINE | 3,192 | -1,946 | 1,246 | USD |
| C312044 | 0 | Ammo | | 99 | Lonoke, AR | 4/15/2009 | PAT TRAP TRAP MACHINE | 3,192 | -1,946 | 1,246 | USD |
| C169859 | 0 | Corporate/Shared | | 99 | Lonoke, AR | 11/30/2017 | 338 Lapua Magnum in house Shell | 25,592 | -3,886 | 21,706 | USD |
| C000556 | 0 | Ammo | | 99 | Lonoke, AR | 8/15/2008 | TRAP HOUSE | 6,757 | -2,059 | 4,698 | USD |
| C000557 | 0 | Ammo | | 99 | Lonoke, AR | 8/15/2008 | TRAP HOUSE | 6,757 | -2,059 | 4,698 | USD |
| C000531 | 0 | Ammo | | 99 | Lonoke, AR | 12/15/2007 | GUN CLUB SEPTIC SYSTEM | 4,033 | -1,230 | 2,803 | USD |
| C000443 | 0 | Corporate/Shared | | 99 | Lonoke, AR | 12/1/1993 | CLUB HOUSE-GUN CLUB 900 | 8,418 | -5,128 | 3,290 | USD |
| C000443 | 0 | Corporate/Shared | | 99 | Lonoke, AR | 11/15/1997 | PISTOL SHOOTING RANGE STRUCTURE 940 | 6,225 | -2,845 | 3,380 | USD |
| C000567 | 0 | Corporate/Shared | | 99 | Lonoke, AR | 7/15/2009 | ADDL REMODEL GUN CLUB | 9,685 | -2,951 | 6,734 | USD |
| C000140 | 0 | Corporate/Shared | | 99 | Lonoke, AR | 12/1/1993 | WALKWAYS - GUN CLUB | 4,561 | -2,779 | 1,782 | USD |
| C000148 | 0 | Corporate/Shared | | 99 | Lonoke, AR | 11/15/1997 | SHOOTING EARTHEN BERM | 2,899 | -1,325 | 1,574 | USD |
| C015895 | 0 | Ammo | | 99 | Lonoke, AR | 8/21/2015 | Ozone Generator | 5,769 | -1,168 | 4,601 | USD |
| 3015896 | 0 | Ammo | | 99 | Lonoke, AR | 8/21/2015 | Ultra Cold Freezer | 4,091 | -829 | 3,262 | USD |
| C216073 | 0 | Ammo | | 99 | Lonoke, AR | 12/4/2015 | Lab Pellet Press | 3,106 | -567 | 2,539 | USD |
| C017142 | 0 | Ammo | | 99 | Lonoke, AR | 11/4/2018 | Subsonic Optimized 300 AAC 220 GR 102050 | 3,187 | -283 | 2,904 | USD |
| C000170 | 0 | Ammo | | 99 | Lonoke, AR | 4/6/2012 | 2012 Dodge Caravan SE | 10,027 | -9,161 | 866 | USD |
| C000136 | 0 | Ammo | | 99 | Lonoke, AR | 1/15/2010 | GUN CLUB UTILITY VEHICLE | 2,697 | -2,465 | 232 | USD |
| C202302 | 0 | Ammo | | 99 | Lonoke, AR | 8/5/2018 | DCSI Upgrade - Lonoke | 161,808 | -84,945 | 76,863 | USD |
| C202302 | 2 | Ammo | | 99 | Lonoke, AR | 12/31/2018 | DCSI Upgrade - Lonoke | 42,145 | -16,430 | 25,715 | USD |
| 3006288 | 1 | Ammo | | 99 | Lonoke, AR | 6/15/2013 | REBUILD TRAP MACHINE 101812 | 3,059 | -798 | 2,261 | USD |
| C206289 | 1 | Ammo | | 99 | Lonoke, AR | 6/15/2013 | REBUILD TRAP MACHINE 101812 | 3,059 | -798 | 2,261 | USD |
| C206290 | 1 | Ammo | | 99 | Lonoke, AR | 6/15/2013 | REBUILD TRAP MACHINE 101812 | 3,059 | -798 | 2,261 | USD |
| C014544 | 0 | Ammo | | 99 | Lonoke, AR | 7/11/2014 | PAT TRAP 101882 | 3,315 | -757 | 2,558 | USD |
| C014545 | 0 | Ammo | | 99 | Lonoke, AR | 7/11/2014 | PAT TRAP 101882 | 3,315 | -757 | 2,558 | USD |
| C117157 | 0 | Ammo | | 99 | Lonoke, AR | 12/27/2018 | Gun Club Crazy Quail Target Machine (2) 102062 | 14,459 | -1,707 | 12,752 | USD |
| C000038 | 1 | Ammo | | 99 | Lonoke, AR | 12/1/1993 | REAL ESTATE GUN CLUB 38.64 ACRES | 229,761 | 0 | 229,761 | USD |
| C000038 | 1 | Ammo | | 99 | Lonoke, AR | 12/1/1993 | REAL ESTATE GUN CLUB 1.16 | 19,471 | 0 | 19,471 | USD |
| C000869 | 0 | Ammo | | 99 | Lonoke, AR | 2/15/2002 | HVAC UNIT - GUN CLUB | 0 | 0 | 0 | USD |
| 3009967 | 0 | Ammo | | 99 | Lonoke, AR | 8/15/2002 | GUN CLUB LAWN MOWER | 0 | 0 | 0 | USD |
| C000346 | 0 | Ammo | | 99 | Lonoke, AR | 4/15/1994 | SKEET HI HOUSE 120054 - 907 | 0 | 0 | 0 | USD |
| C000347 | 0 | Ammo | | 99 | Lonoke, AR | 4/15/1994 | SKEET LO HOUSE 120054 - 908 | 0 | 0 | 0 | USD |
| C000348 | 0 | Ammo | | 99 | Lonoke, AR | 4/15/1994 | TRAP HOUSE 120054 - 914 | 0 | 0 | 0 | USD |
| C000349 | 0 | Ammo | | 99 | Lonoke, AR | 4/15/1994 | TRAP HOUSE 120054 - 915 | 0 | 0 | 0 | USD |
| C000350 | 1 | Ammo | | 99 | Lonoke, AR | 12/15/1993 | ADDL-REPAIR CLUBHOUSE 120568 | 0 | 0 | 0 | USD |
| C000350 | 3 | Ammo | | 99 | Lonoke, AR | 7/15/2004 | ADDL GUN CLUB ROOF | 0 | 0 | 0 | USD |
| C000353 | 0 | Ammo | | 99 | Lonoke, AR | 12/1/1993 | PAVILION 18 X 36' 120537 #901 | 0 | 0 | 0 | USD |
| C000354 | 0 | Ammo | | 99 | Lonoke, AR | 12/1/1993 | SKEET HOUSE - GUN CLUB 902 | 0 | 0 | 0 | USD |
| C000355 | 0 | Ammo | | 99 | Lonoke, AR | 12/1/1993 | SKEET HOUSE - GUN CLUB 903 | 0 | 0 | 0 | USD |
| C000356 | 0 | Ammo | | 99 | Lonoke, AR | 12/1/1993 | SKEET HOUSE - GUN CLUB 904 | 0 | 0 | 0 | USD |
| C000357 | 0 | Ammo | | 99 | Lonoke, AR | 12/1/1993 | SKEET HOUSE - GUN CLUB 905 | 0 | 0 | 0 | USD |
| C000358 | 0 | Ammo | | 99 | Lonoke, AR | 12/1/1993 | TRAP HOUSE - GUN CLUB 909 | 0 | 0 | 0 | USD |
| C000359 | 0 | Ammo | | 99 | Lonoke, AR | 12/1/1993 | TRAP HOUSE - GUN CLUB 910 | 0 | 0 | 0 | USD |
| C000360 | 0 | Ammo | | 99 | Lonoke, AR | 12/1/1993 | TRAP HOUSE - GUN CLUB 911 | 0 | 0 | 0 | USD |
| C000361 | 0 | Ammo | | 99 | Lonoke, AR | 12/1/1993 | TRAP HOUSE - GUN CLUB 912 | 0 | 0 | 0 | USD |
| C000362 | 0 | Ammo | | 99 | Lonoke, AR | 12/1/1993 | TRAP HOUSE - GUN CLUB 913 | 0 | 0 | 0 | USD |
| C000363 | 0 | Ammo | | 99 | Lonoke, AR | 12/1/1993 | STORAGE HOUSE - GUN CLUB 916 | 0 | 0 | 0 | USD |
| C000364 | 0 | Ammo | | 99 | Lonoke, AR | 12/1/1993 | STORAGE HOUSE - GUN CLUB 917 | 0 | 0 | 0 | USD |
| C000365 | 0 | Ammo | | 99 | Lonoke, AR | 12/1/1993 | STORAGE HOUSE - GUN CLUB 918 | 0 | 0 | 0 | USD |
| C000366 | 0 | Ammo | | 99 | Lonoke, AR | 12/1/1993 | LO HOUSE FIELD #15 - 906 | 0 | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C000461 | | 0 Ammo | | 99 Lonoke, AR | 1/15/1999 | SPORTING CLAY CONCRETE PAD | | 0 | 0 | 0 USD |
| C000523 | | 0 Ammo | | 99 Lonoke, AR | 3/12/2007 | Type 2 Storage Magazine | | 0 | 0 | 0 USD |
| C000137 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | SKEET & TRAP FIELDS - GUN CLUB | | 0 | 0 | 0 USD |
| C000138 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | ROAD & PARKING AREA - GUN CLUB | | 0 | 0 | 0 USD |
| C000138 | | 1 Ammo | | 99 Lonoke, AR | 12/1/1993 | ASPHALT OVERLAY ROAD & LOT 120595 | | 0 | 0 | 0 USD |
| C000141 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | INSTALL SIDEWALKS | | 0 | 0 | 0 USD |
| C000142 | | 0 Ammo | | 99 Lonoke, AR | 4/15/1994 | CONCRETE SHOOTING STATIONS 120054 | | 0 | 0 | 0 USD |
| C000143 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | SECURITY FENCE - GUN CLUB | | 0 | 0 | 0 USD |
| C000144 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | OUTSIDE ELECTRICS - GUN CLUB | | 0 | 0 | 0 USD |
| C000145 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | REPLACE SCOREBOARD 120568 | | 0 | 0 | 0 USD |
| C000145 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | RV HOOKUPS-10 120537 | | 0 | 0 | 0 USD |
| 3005537 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #81 TYPE 401S | | 0 | 0 | 0 USD |
| 3005541 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #405 - TYPE 401 | | 0 | 0 | 0 USD |
| 3005542 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #419 - TYPE 401S | | 0 | 0 | 0 USD |
| 3005546 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #420 - TYPE 401S | | 0 | 0 | 0 USD |
| 3005547 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #421 - TYPE 401S | | 0 | 0 | 0 USD |
| 3005548 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #15 TYPE 401S | | 0 | 0 | 0 USD |
| 3005549 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #115 TYPE 401 | | 0 | 0 | 0 USD |
| 3005551 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #124 TYPE 401S | | 0 | 0 | 0 USD |
| 3005552 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #434 - TYPE 401S | | 0 | 0 | 0 USD |
| 3005553 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #465 - TYPE 401 | | 0 | 0 | 0 USD |
| 3005555 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #104 - TYPE 401 | | 0 | 0 | 0 USD |
| 3005560 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #12 TYPE 401 | | 0 | 0 | 0 USD |
| 3005563 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #106 TYPE 401 | | 0 | 0 | 0 USD |
| 3005564 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #16 TYPE 401 | | 0 | 0 | 0 USD |
| 3005569 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #18 TYPE 401 | | 0 | 0 | 0 USD |
| 3005573 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #574 - TYPE 401S | | 0 | 0 | 0 USD |
| 3005574 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #576 - TYPE 401 | | 0 | 0 | 0 USD |
| 3005577 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #579 - TYPE 401 | | 0 | 0 | 0 USD |
| 3005578 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #19 TYPE 401 | | 0 | 0 | 0 USD |
| 3005579 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #20 TYPE 401 | | 0 | 0 | 0 USD |
| 3005580 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #590 - TYPE 401S | | 0 | 0 | 0 USD |
| 3005581 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #596 - TYPE 401S | | 0 | 0 | 0 USD |
| 3005585 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #133 TYPE 401S | | 0 | 0 | 0 USD |
| 3005586 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #524 TYPE 401 (BALLISTICS SPARE) | | 0 | 0 | 0 USD |
| 3005587 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #587 TYPE 401S | | 0 | 0 | 0 USD |
| 3005588 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #615 - TYPE 401S | | 0 | 0 | 0 USD |
| 3005589 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1176 - TYPE 401S | | 0 | 0 | 0 USD |
| 3005591 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #467 - TYPE 401S | | 0 | 0 | 0 USD |
| 3005593 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #633 - TYPE 401 | | 0 | 0 | 0 USD |
| 3005595 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #471 - TYPE 401S | | 0 | 0 | 0 USD |
| 3005596 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #551 TYPE 401 | | 0 | 0 | 0 USD |
| 3005598 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #675 TYPE 401 | | 0 | 0 | 0 USD |
| 3005599 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #651 BOILER GUN | | 0 | 0 | 0 USD |
| 3005601 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #715 TYPE 401 | | 0 | 0 | 0 USD |
| 3005603 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #879 TYPE 401S | | 0 | 0 | 0 USD |
| 3005606 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #629 TYPE 401S | | 0 | 0 | 0 USD |
| 3005609 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1331 BOILER GUN | | 0 | 0 | 0 USD |
| 3005610 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1034 TYPE 401 | | 0 | 0 | 0 USD |
| 3005611 | | 0 Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1065 TYPE 401 | | 0 | 0 | 0 USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 3005612 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1069 TYPE 401S | | 0 | 0 | USD |
| 3005615 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1082 TYPE 401S | | 0 | 0 | USD |
| 3005616 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1094 TYPE 401 | | 0 | 0 | USD |
| 3005620 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1106 TYPE 401 | | 0 | 0 | USD |
| 3005627 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1132 TYPE 401 | | 0 | 0 | USD |
| 3005628 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #884 TYPE 401 (BALLISTICS) | | 0 | 0 | USD |
| 3005629 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1134 TYPE 401S | | 0 | 0 | USD |
| 3005632 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1155 TYPE 401 | | 0 | 0 | USD |
| 3005633 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #801 TYPE 401 | | 0 | 0 | USD |
| 3005634 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1157 TYPE 401 | | 0 | 0 | USD |
| 3005635 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #615 TYPE 401S | | 0 | 0 | USD |
| 3005637 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1164 TYPE 401S | | 0 | 0 | USD |
| 3005639 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1172 TYPE 401 | | 0 | 0 | USD |
| 3005640 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #803 TYPE 401 | | 0 | 0 | USD |
| 3005643 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #875 TYPE 401 (DISPLAY) | | 0 | 0 | USD |
| 3005645 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1180 TYPE 401 | | 0 | 0 | USD |
| 3005647 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1182 TYPE 401S | | 0 | 0 | USD |
| 3005650 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #956 TYPE 401 | | 0 | 0 | USD |
| 3005652 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1189 TYPE 401S | | 0 | 0 | USD |
| 3005654 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1190 TYPE 401 | | 0 | 0 | USD |
| 3005656 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #801 TYPE 401S | | 0 | 0 | USD |
| 3005657 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1197 TYPE 401 | | 0 | 0 | USD |
| 3005658 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1198 TYPE 401S | | 0 | 0 | USD |
| 3005662 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #923 TYPE 401S | | 0 | 0 | USD |
| 3005664 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1203 TYPE 401 | | 0 | 0 | USD |
| 3005666 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1128 TYPE 401S | | 0 | 0 | USD |
| 3005667 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1244 TYPE 401S | | 0 | 0 | USD |
| 3005668 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1247 TYPE 401S | | 0 | 0 | USD |
| 3005669 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #939 TYPE 401S | | 0 | 0 | USD |
| 3005670 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1256 TYPE 401S | | 0 | 0 | USD |
| 3005674 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1257 TYPE 401 | | 0 | 0 | USD |
| 3005676 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1300 TYPE 401 | | 0 | 0 | USD |
| 3005677 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1309 TYPE 401 | | 0 | 0 | USD |
| 3005679 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1104 TYPE 401S | | 0 | 0 | USD |
| 3005680 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1143 TYPE 401S | | 0 | 0 | USD |
| 3005682 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1109 TYPE 401 | | 0 | 0 | USD |
| 3005683 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1319 TYPE 401 | | 0 | 0 | USD |
| 3005688 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1127 TYPE 401 | | 0 | 0 | USD |
| 3005689 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1326 TYPE 401 | | 0 | 0 | USD |
| 3005690 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1403 TYPE 401 | | 0 | 0 | USD |
| 3005692 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1179 TYPE 401S | | 0 | 0 | USD |
| 3005697 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #1322 - TYPE 401 | | 0 | 0 | USD |
| 3005698 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #105 - TYPE 401S | | 0 | 0 | USD |
| 3005699 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | 8 GA KILN GUN #181- TYPE 401 | | 0 | 0 | USD |
| 3006042 | 0 | Ammo | | 99 Lonoke, AR | 7/1/1996 | SDC-50 Diff Scanning Calorimeter (45) serial # | | 0 | 0 | USD |
| 3006093 | 0 | Ammo | | 99 Lonoke, AR | 9/15/1996 | PAT-TRAP TRAP MACHINE | | 0 | 0 | USD |
| 3006094 | 0 | Ammo | | 99 Lonoke, AR | 9/15/1996 | PAT-TRAP TRAP MACHINE | | 0 | 0 | USD |
| 3006219 | 0 | Ammo | | 99 Lonoke, AR | 1/31/1997 | Hydraulic Assembly Press / Die | | 0 | 0 | USD |
| 3006221 | 0 | Ammo | | 99 Lonoke, AR | 1/31/1997 | High Speed Optical Spectrometer | | 0 | 0 | USD |

| Asset | Subnumber | Segment | Business Area | Location - v2 | Capitalized on | Description | Acquis. val. | Accum. dep. | Book val. | Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| C006226 | 0 | Ammo | | 99 Lonoke, AR | 1/31/1997 | 7mm STW Cart, Quality Assurance Gages. | 0 | 0 | 0 | USD |
| C006287 | 0 | Ammo | | 99 Lonoke, AR | 2/15/1997 | PAT-TRAP  TRAP MACHINE | 0 | 0 | 0 | USD |
| C006288 | 0 | Ammo | | 99 Lonoke, AR | 2/15/1997 | PAT-TRAP  TRAP MACHINE | 0 | 0 | 0 | USD |
| C006289 | 0 | Ammo | | 99 Lonoke, AR | 2/15/1997 | PAT-TRAP   TRAP MACHINE | 0 | 0 | 0 | USD |
| C006290 | 0 | Ammo | | 99 Lonoke, AR | 2/15/1997 | PAT-TRAP  TRAP MACHINE | 0 | 0 | 0 | USD |
| C008994 | 0 | Ammo | | 99 Lonoke, AR | 6/15/1998 | PAT-TRAP MACHINE | 0 | 0 | 0 | USD |
| C009037 | 0 | Ammo | | 99 Lonoke, AR | 3/16/1999 | EK High Speed Video System 40975 | 0 | 0 | 0 | USD |
| C009184 | 0 | Ammo | | 99 Lonoke, AR | 1/15/2000 | SUPER COLD FREEZER | 0 | 0 | 0 | USD |
| C009393 | 0 | Ammo | | 99 Lonoke, AR | 10/15/2000 | GUNCLUB SKEET MCH (10) | 0 | 0 | 0 | USD |
| C009545 | 0 | Ammo | | 99 Lonoke, AR | 3/15/2001 | PRIMER DROP TEST FIXTURE | 0 | 0 | 0 | USD |
| C009588 | 0 | Ammo | | 99 Lonoke, AR | 7/15/2001 | Fourier Transform Infrared Spectrometer | 0 | 0 | 0 | USD |
| C009903 | 0 | Ammo | | 99 Lonoke, AR | 5/1/2002 | Oscilloscope - Tektronix - TDS3054B | 0 | 0 | 0 | USD |
| C009952 | 0 | Ammo | | 99 Lonoke, AR | 7/16/2002 | Rotary Evaporation System | 0 | 0 | 0 | USD |
| C009953 | 0 | Ammo | | 99 Lonoke, AR | 7/16/2002 | Differential Scanning Calorimeter | 0 | 0 | 0 | USD |
| C010000 | 0 | Ammo | | 99 Lonoke, AR | 12/15/2002 | Environmental Oven | 0 | 0 | 0 | USD |
| C010002 | 0 | Ammo | | 99 Lonoke, AR | 12/15/2002 | Universal Receiver | 0 | 0 | 0 | USD |
| C010010 | 0 | Ammo | | 99 Lonoke, AR | 2/1/2003 | Digital Microscope System | 0 | 0 | 0 | USD |
| C010010 | 1 | Ammo | | 99 Lonoke, AR | 2/1/2003 | Digital Microscope System Shipping | 0 | 0 | 0 | USD |
| C010349 | 0 | Ammo | | 99 Lonoke, AR | 10/29/2004 | Thermal Analysis System Upgrade | 0 | 0 | 0 | USD |
| C011217 | 0 | Ammo | | 99 Lonoke, AR | 5/28/1999 | TIGERWIN ANALYSIS SOFTWARE - IO 240180 | 0 | 0 | 0 | USD |
| C100091 | 0 | Ammo | | 99 Lonoke, AR | 12/1/1993 | "UMC Plant Bridgeport"  by C. Gebauer  #321 | 0 | 0 | 0 | USD |

# EXHIBIT 1

(*See* attached copy of Bidding Procedures Order)

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

In re:

REMINGTON OUTDOOR COMPANY,
INC., *et al.*, [1]

                    Debtors.

Chapter 11

Case No. 20-81688-11

Joint Administration Requested

**ORDER ESTABLISHING BIDDING PROCEDURES RELATING**
**TO THE SALES OF ALL OR A PORTION OF THE DEBTORS' ASSETS**

This matter having come before the Court upon the motion (the "**Motion**")[2] by Remington

Outdoor Company, Inc., ("**Remington**" or the "**Company**"), and its affiliated debtors and debtors

in possession (collectively the "**Debtors**") in the above-captioned Chapter 11 cases (collectively,

the "**Chapter 11 Cases**"), seeking entry of this order (this "**Bidding Procedures Order**") (i)

approving the proposed bidding procedures attached hereto as <u>Exhibit 1</u> (the "**Bidding**

**Procedures**") by which the Debtors will solicit and select the highest or otherwise best offer for

the sale of substantially all or a portion of their assets (the "**Acquired Assets**") through one or

more sales of the Acquired Assets (each, a "**Sale Transaction**" or "**Sale**"); (ii) establishing

procedures for the assumption and assignment of executory contracts and unexpired leases,

including notice of proposed cure amounts (the "**Assumption and Assignment Procedures**");

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC 9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405).  The Debtors' corporate headquarters is located at 100 Electronics Blvd SW, Huntsville, Alabama  35824.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion or the Bidding Procedures, as applicable.

(iii) approving the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described herein and attached hereto, including the procedures for the Debtors' selection of one or more stalking horse bidders (each, a "**Stalking Horse Bidder**"), if any, and the provision of Bid Protections (as defined below) to such Stalking Horse Bidder, if necessary; (iv) scheduling (a) an auction (the "**Auction**") if the Debtors receive two (2) or more timely and acceptable Qualified Bids (as defined below), and (b) a final hearing (the "**Sale Hearing**") to approve one or more Sales of the Acquired Assets; and (v) granting related relief; and it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors, and other parties-in-interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that the Motion is a core proceeding pursuant to 28 U.S.C. § 157; and adequate notice of the Motion and opportunity for objection having been given, with no objections having been filed, or all objections having been resolved or overruled, as the case may be; and it appearing that no other notice need be given; and after due deliberation and sufficient cause therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *General Order of Reference* of the United States District Court for the Northern District of Alabama dated July 16, 1984, as amended on July 17, 1984.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The predicates for the relief granted herein are Sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.  Entry of this Bidding Procedures Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties in interest.

OMM_US:78645958.8

C.      The notice of the Motion, the Bidding Procedures Hearing, and the proposed entry of this Bidding Procedures Order was adequate and sufficient under the circumstances of the Chapter 11 Cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  Accordingly, no further notice of the Motion, the Bidding Procedures Hearing, or this Bidding Procedures Order is necessary or required.

D.      The Debtors have demonstrated a compelling and sound business justification for the Court to grant the relief requested in the Motion, including, without limitation, to (i) approve the Bidding Procedures, including the procedures for selecting one or more Stalking Horse Bidders and the provision of the Bid Protections to be determined, (ii) establish the Assumption and Assignment Procedures, (iii) approve the form and manner of notice of all procedures, protections, schedules, and agreements described in the Motion and attached hereto, (iv) schedule a date for the (a) Auction and (b) Sale Hearing; and (v) grant related relief as set forth herein.  Such compelling and sound business justification, which was set forth in the Motion and on the record at the Bidding Procedures Hearing, including the *Declaration of Bradley C. Meyer in Support of Debtors' Cash Collateral Motion and Bidding Procedures Motion* (the "**Meyer Declaration**") and the *Declaration of Colin M. Adams in Support of Debtors' Cash Collateral Motion and Bidding Procedures Motion* (the "**Adams Declaration**") are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

E.      The Bidding Procedures, substantially in the form attached hereto as Exhibit 1 and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are fair, reasonable and appropriate and represent the best method for maximizing the value of the Debtors' estates.

3

OMM_US:78645958.8

F.      The Debtors are authorized to pay the break-up fee and expense reimbursement comprising the Bid Protections.  The Bid Protections, to the extent payable under any Stalking Horse APA, (a)(x) are actual and necessary costs and expenses of preserving the Debtors' estate within the meaning of Section 503(b) of the Bankruptcy Code, and (y) shall be treated as allowed administrative claims against the Debtors' estates pursuant to Sections 105(a) and 364(c)(1) of the Bankruptcy Code, are commensurate to the real and material benefits conferred upon the Debtors' estates by the Stalking Horse Bidders, and (c) are fair, reasonable and appropriate, including in light of the size and nature of the Sale Transaction, the necessity to announce a sale transaction for the Acquired Assets, and the efforts that have been and will be expended by the Stalking Horse Bidders.  The Bid Protections are a material inducement for, and condition of, each Stalking Horse Bidder's execution of the applicable Stalking Horse APA.  Unless it is assured that the Bid Protections will be available, the Stalking Horse Bidders are unwilling to remain obligated to consummate the Sale Transaction or otherwise be bound under its Stalking Horse APA (including the obligations to maintain its committed offer while such offer is subject to higher or better offers as contemplated by the Bidding Procedures).

G.      The Sale Notice and the Publication Notice, substantially in the forms attached hereto as Exhibit 2 and Exhibit 3, respectively, and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of Acquired Assets, including the sale of Acquired Assets free and clear of all liens, claims, and encumbrances, the Sale Transaction(s), the Bidding Procedures, the Auction and the Sale Hearing, and no other or further notice is required.

H.    The Post-Auction Notice, substantially in the form attached hereto as <u>Exhibit 4</u> and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Successful Bidder(s), and no other or further notice is required.

I.    The Assumption and Assignment Notice, substantially in the form attached hereto as <u>Exhibit 5</u> and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the potential assumption and assignment of the Designated Contracts in connection with the sale of the Acquired Assets and the related Cure Costs, and no other or further notice is required.

J.    The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.    The Motion is granted as set forth herein.[3]

2.    All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the Bidding Procedures Hearing or by stipulation filed with the Court are overruled except as otherwise set forth herein.

---

[3] Notwithstanding anything to the contrary herein, the consummation of any Sale Transaction(s) is subject to entry of the Sale Order(s).

OMM_US:78645958.8

## I.    The Timeline for the Sale

3.    The Debtors are authorized to proceed with the Sale Transaction(s) in accordance with the Bidding Procedures and are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance with the following timeline:

4.    Deadline                                                    **Action**

| Deadline | Action |
|---|---|
| August 18, 2020 at 10:00 a.m. (prevailing Central Time) | Hearing to consider approval of the Bidding Procedures and entry of the Bidding Procedures Order |
| August 21, 2020 | Sale Notice Mailing Date |
| August 21, 2020 | Assumption and Assignment Service Date |
| September 1, 2020 at 4:00 p.m. (prevailing Central Time) | Sale Objection Deadline (defined below) excluding any objection based on identity of Stalking Horse Bidders, Successful Bidder or Backup Bidder or the form or substance of the Stalking Horse Bid, Successful Bid or Backup Bid |
| September 4, 2020 at 5:00 p.m. (prevailing Central Time) | Bid Deadline |
| September 8, 2020 at 12:00 p.m. (prevailing Central Time) | Reply Deadline (defined below) |
| September 8, 2020 by 4:00 p.m. (prevailing Central Time) or 14 days following service of the Supplemental Notice of Assumption and Assignment | Assumption and Assignment Objection Deadline (defined below) excluding any objection related to adequate assurance of future performance of any Stalking Horse Bidder, Successful Bidder or Backup Bidder |
| September 17, 2020 at 10:00 a.m. (prevailing Central Time) | Auction |
| September 21, 2020 | Post-Auction Notice |
| September 23, 2020 at 10:00 a.m. (prevailing Central Time) | Sale Hearing |

6

5.      For the avoidance of doubt, the Debtors reserve the right, and are authorized to, modify the above timeline and the Bidding Procedures (the "**Modifications**") in accordance with the provisions of the Bidding Procedures; *provided, however*, that the Debtors shall consult with the Consultation Parties or, to the extent provided therein, the Bid Consultation Parties, with respect to any Modifications.  The Committee's right to request an extension of the above timeline for cause is expressly reserved.

**II.      The Bidding Procedures**

6.      The Bidding Procedures are approved in their entirety.  The Debtors are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance therewith.  The failure to specifically include or reference a particular provision of the Bidding Procedures in this Bidding Procedures Order shall not diminish or impair the effectiveness of such provision.

7.      The Debtors are authorized, in accordance with the Bidding Procedures, to require Diligence Parties to submit written indications of interest specifying, among other things, the Acquired Assets proposed to be acquired, the amount and type of consideration to be offered, and any other material terms to be included in a bid by such party.

8.      The process and requirements associated with submitting a Qualified Bid are approved as fair, reasonable, appropriate and designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties in interest.  As further described in the Bidding Procedures, the Bid Deadline shall be **September 4, 2020 at 5:00 p.m. (prevailing Central Time)**.  Any disputes or objections to the selection of Qualified Bid(s), Successful Bid(s), or Backup Bid(s) (all as defined in the Bidding Procedures) shall be resolved by this Court at the Sale Hearing as set forth herein.

7

OMM_US:78645958.8

9.     The Debtors are authorized to conduct the Auction in accordance with the Bidding Procedures.  The Auction shall take place on **September 17, 2020 at 10:00 a.m. (prevailing Central Time)** virtually via video conferencing technology, or at such other place and time as the Debtors shall notify all Qualified Bidders and the Consultation Parties.

10.    The Prepetition Secured Creditors shall have the right, subject in all respects to the Bankruptcy Code and other applicable law and the satisfaction in cash or assumption of claims secured by senior liens, to credit bid all or any portion of their allowed secured claims pursuant to Section 363(k) of the Bankruptcy Code or other applicable law, in accordance with the applicable provisions of the Prepetition Credit Documents and any such credit bid shall be deemed a Qualified Bid subject to the Intercreditor Agreement (as defined in the D'Arcy Declaration); *provided*, *however*, that nothing herein or in the Bidding Procedures shall affect or in any way limit the right or ability of any party in interest, including the Committee, to object to the Prepetition Secured Creditors' right to credit bid, including the nature, amount, or scope of such credit bid, subject to the (a) applicable provisions of the Court's *Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing Use Of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying Automatic Stay, (IV) Granting Related Relief, and (V) Scheduling A Final Hearing* Docket No. 90, including paragraph 20 and the Challenge Period (as defined therein), as the same may be modified in accordance with its terms and (b) Sale Objection Deadline (as defined below).

## III.    Stalking Horse Bidder and Bid Protections

11.    In accordance with the Bidding Procedures, the Debtors may designate one or more Stalking Horse Bidders for the various segments of their business and may enter into an asset purchase agreement with each Stalking Horse Bidder (each, a "**Stalking Horse APA**"), subject to higher or otherwise better offers at the Auction, which establishes a minimum Qualified Bid at the Auction with respect to the assets that are the subject thereof.

8

12.     Absent further order of the Court, the Stalking Horse APA shall (i) limit the break-up fee in favor of the Stalking Horse Bidder in the amount of no more than 3.5% of the cash consideration proposed to be paid at closing by the Stalking Horse Bidder under the applicable Stalking Horse APA (the "**Break-Up Fee**"); (ii) limit any reimbursement for the Stalking Horse Bidder's and its attorneys', accountants', investment bankers' and representatives' documented fees and expenses actually and reasonably incurred in negotiating and documenting the Stalking Horse APA, and in preserving and protecting Stalking Horse Bidder's rights and interests as buyer and lender in connection with the Chapter 11 Cases to an amount not to exceed 1.0% of the cash consideration proposed to be paid by at closing the Stalking Horse Bidder under the applicable Stalking Horse APA (the "**Expense Reimbursement**"); and/or (iii) set the initial overbid protection (the "**Minimum Overbid Increment**" and, together with the Break-Up Fee and the Expense Reimbursement, the "**Bid Protections**") in amounts to be determined by the Debtors in accordance with the Bidding Procedures.  In the event that the Debtors determine that the Bid Protections must exceed the amounts set forth herein, the Court shall hold a hearing on the approval of any such greater Bid Protections on an expedited basis, upon the request of the Debtors.

13.     The Bid Protections, to the extent payable under the Stalking Horse APAs, shall (a) constitute an allowed administrative expense claim against the Debtors pursuant to Sections 105(a) and 364(c)(1) of the Bankruptcy Code.  Subject to the foregoing, the Bid Protections shall be paid (i) in cash from the proceeds of any approved Sale or (ii) credited against the purchase price if, after an Auction, the Stalking Horse Bid, as enhanced at the Auction, is the Successful Bid and the Sale contemplated by the Stalking Horse APA (as enhanced at the auction) is consummated.

14.     In the event that the Debtors select one or more parties to serve as a Stalking Horse Bidder, upon such selection, the Debtors shall provide, to all parties on the Rule 2002 List, all

OMM_US:78645958.8

parties expressing an interest in the Acquired Assets and all parties holding liens on such Acquired Assets, three (3) business days' notice and an opportunity to object to the determination of such Stalking Horse Bidder and disclosure of the Bid Protections set forth in the Stalking Horse APA, and absent objection, the Debtors selection of such Stalking Horse Bidder shall be deemed designated without further order of the Court.  To the extent necessary, the Debtors' right to seek this Court's approval of one or more Stalking Horse Bidders, with notice and a hearing, is hereby preserved.

**IV.    Notice Procedures**

15.    The form of Sale Notice substantially in the form attached hereto as <u>Exhibit 2</u> is approved.

16.    Within seven (7) days after the entry of this Bidding Procedures Order or as soon as reasonably practicable thereafter, the Debtors shall serve the Sale Notice and this Bidding Procedures Order, including the Bidding Procedures by first-class mail, postage prepaid, or, for those parties who have consented to receive notice by the Electronic Case Files ("**ECF**") system, by ECF, upon (i) all entities reasonably known to have expressed an interest in a transaction with respect to all or part of the Acquired Assets within the past two years; (ii) any parties identified by AlixPartners as potential bidders; (iii) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon or with respect to any of the Acquired Assets; (iv) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief granted herein; (v) counsel for the Committee; (vi) counsel to Cantor Fitzgerald Securities, as Priority Term Loan Agent under the Debtors' prepetition Priority Term Loan Credit Agreement; (vii) counsel to Ankura Trust Company, LLC, as FILO Agent under the Debtors' prepetition FILO Term Loan Agreement, and as Exit Term Loan Agent under the Debtors' prepetition Exit Term Loan Agreement; (viii) counsel to FILO Lenders; (ix) counsel to

10

the Stalking Horse Bidder, if any; (x) counsel to Whitebox Advisors LLC; (xi) counsel for the

Restructuring Committee; (xii) counsel to the Huntsville Note holder; (xiii) the Bankruptcy

Administrator; (xiv) the Securities and Exchange Commission; (xv) the Internal Revenue Service;

(xvi) counsel to the United Mine Workers of America; and (xvii) all known creditors of the

Debtors, including their contract counterparties; *provided, however*, that to the extent email

addresses are available, parties referenced in this paragraph 15 may be served by email.

17.    Service of the Sale Notice as described above shall be sufficient and proper notice

of the Sale Transaction with respect to known interested parties.

18.    The Publication Notice, substantially in the form attached hereto as <u>Exhibit 3</u>, is

approved.  The Debtors are directed to publish the Sale Notice, as modified for publication, in the

*New York Times*, on one occasion on the Mailing Date or as soon as reasonably practicable

thereafter.  In addition, the Debtors are authorized, but not directed, to (i) publish the Sale Notice

in additional publications as the Debtors deem appropriate and (ii) cause the Sale Notice to be

posted on their case information website at https://cases.primeclerk.com/RemingtonOutdoor.

19.    Service of the Publication Notice as described above shall be sufficient and proper

notice of the Sale Transaction with respect to all unknown parties.

20.    The form of the Post-Auction Notice, substantially in the form attached hereto as

<u>Exhibit 4</u> is approved.  As soon as reasonably practicable after the conclusion of the Auction, the

Debtors shall file on the docket, but not serve, the Post-Auction Notice identifying any Successful

Bidder(s).

## V.    Assumption and Assignment Procedures

21.    The Assumption and Assignment Procedures, as detailed in the Motion and

incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are

approved.

OMM_US:78645958.8

22.      The Notice of Assumption and Assignment, substantially in the form attached hereto as Exhibit 5 is approved.

23.      On or before **August 21, 2020** (any such date, the "**Assumption and Assignment Service Date**"), the Debtors shall file with the Court, and post on the Case Website at https://cases.primeclerk.com/RemingtonOutdoor, the Notice of Assumption and Assignment and Designated Contracts List.  If no Cure Cost is listed on the Designated Contracts List, the Debtors believe that there is no Cure Cost, as of the date of such notice.   On the Assumption and Assignment Service Date, the Debtors shall serve, via first-class mail, a customized version of the Notice of Assumption and Assignment that contains the DCL Instructions and Necessary Notice Information, but omits the Designated Contracts List, on all counterparties to the Designated Contracts.  In addition, the Debtors shall serve, via first-class mail, a modified version of the Notice of Assumption and Assignment that contains the DCL Instructions and Necessary Notice Information, but omits the Designated Contracts List on all parties on the Rule 2002 Notice List. Service of such Notice of Assumption and Assignment as set forth herein shall be deemed proper, due, timely, good and sufficient notice of, among other things, the proposed assumption and assignment of the Designated Contracts and rights thereunder, the Cure Costs, and the procedures for objecting thereto, and no other or further notice is necessary.

24.      Any objection by a counterparty to a Designated Contract (which does not, for the avoidance of doubt, include any objection regarding the adequate assurance of future performance of any Stalking Horse Bidder, Successful Bidder or the Backup Bidder) (a "**Designated Contract Objection**") must (i) be to the proposed assumption and assignment of the applicable Designated Contract or Cure Costs, if any; (ii) state, with specificity, the legal and factual basis thereof as well as what Cure Costs such objecting party believes are required, if any; and (iii) include appropriate

OMM_US:78645958.8

documentation in support thereof.  All Designated Contract Objections must be filed and served

on (i) counsel for the Debtors, O'Melveny & Myers LLP, 400 South Hope Street, 18th Floor, Los

Angeles, CA   90071, Attn:   Steve Warren (swarren@omm.com) and Jennifer Taylor

(jtaylor@omm.com); (ii) co-counsel for the Debtors, Burr & Forman LLP, 420 North 20th Street,

Suite 3400, Birmingham, Alabama 35203, Attn: Derek Meek (dmeek@burr.com) and Hanna Lahr

(hlahr@burr.com); (iii) counsel for the Restructuring Committee, Akin Gump Strauss Hauer &

Feld LLP, 2300 N. Field Street, Suite 1800, Dallas, TX 75201, Attn: Sarah Schultz

(sschultz@akingump.com); (iv) counsel for the Committee, Fox Rothschild LLP, 345 California

Street, Suite 2200, San Francisco, California 94104, Attn: Michael A. Sweet

(msweet@foxrothschild.com) and Baker Donelson Bearman Caldwell & Berkowitz, P.C., 420 20th

Street North, Birmingham, Alabama 35203, Attn: Matthew Cahill (mcahill@bakerdonelson.com)

and Rita Hullett (rhullett@bakerdonelson.com); (v) the Bankruptcy Administrator, 400 Well

Street, Decatur, Alabama 35602, Attn:  Richard Blythe (richard_blythe@alnba.uscourts.gov); (vi)

counsel to the Stalking Horse Bidder, if any; (vii) counsel to the FILO Lenders, Pillsbury Winthrop

Shaw Pittman LLP, Four Embarcadero Center, 22nd Floor, San Francisco, CA 94111-5998,

Attn: Joshua D.  Morse  (joshua.morse@pillsburylaw.com)  and  Andrew  V.  Alfano

(andrew.alfano@pillsburylaw.com); (viii) counsel to Whitebox Advisors LLC, Brown Rudnick

LLP, One Financial Center, Boston, Massachusetts 02111, Attn: Andreas Andromalos

(aandromalos@brownrudnick.com) and Tia C. Wallach (twallach@brownrudnick.com); (ix) all

parties that have requested notice in the Chapter 11 Cases  (collectively (i)–(ix), the "**Objection**

**Recipients**"); and (x) counsel to any Successful Bidder(s), if known on the Sale Objection

Deadline no later than 4:00 p.m. (prevailing Central Time) fourteen (14) days following the

13

Assumption and Assignment Service Date (the "**Assumption and Assignment Objection Deadline**").

25.    If a Designated Contract Objection is not consensually resolved before the Sale Hearing, the amount to be paid or reserved with respect to such objection shall be determined at the Sale Hearing, such later hearing date that the Debtors determine in their discretion, or such other date determined by this Court.

26.    Any time after the Assumption and Assignment Service Date and before the closing of a Sale Transaction, the Debtors reserve the right, and are authorized but not directed, to (i) supplement the Designated Contracts List with previously omitted Designated Contracts in accordance with the definitive agreement for a Sale Transaction, (ii) remove a Designated Contract from the list of contracts that a Successful Bidder proposes be assumed and assigned to it in connection with a Sale Transaction, or (iii) modify the previously stated Cure Cost associated with any Designated Contract.

27.    In the event the Debtors exercise any of the rights listed above, the Debtors shall promptly serve the Supplemental Notice of Assumption and Assignment by electronic transmission, hand delivery, or overnight mail on the counterparty (and its attorney, if known) to each Designated Contract listed on the Supplemental Notice of Assumption and Assignment at the last known address available to the Debtors.  Each Supplemental Notice of Assumption and Assignment shall set forth (i) the name and address of the counterparty to the Designated Contract listed thereon; (ii) the proposed effective date of the assignment (subject to the right of the applicable Successful Bidder, if any, to withdraw such request for assumption and assignment of that Designated Contract prior to the closing of the applicable Sale Transaction); (iii) sufficient information to identify the Designated Contract; (iv) the Cure Costs, if any; and (v) proposed

14

adequate assurance, if known on the Assumption and Assignment Service Date. The Debtors are authorized, but not directed, to modify the Supplemental Notice of Assumption and Assignment as necessary and appropriate to provide customized individual notice to each Designated Contract counterparty. In addition, the Debtors are authorized, but not directed, to supplement the Designated Contract List on the Case Website with any additional Designated Contracts as the Debtors deem appropriate in their discretion. Service of such Supplemental Notice of Assumption and Assignment as set forth herein shall be deemed proper, due, timely, good and sufficient notice of, among other things, the proposed assumption and assignment of the Designated Contracts and rights thereunder, the Cure Costs, and the procedures for objecting thereto, and no other or further notice is necessary.

28.     Any objection by a counterparty to a Designated Contract listed on a Supplemental Notice of Assumption and Assignment (which does not, for the avoidance of doubt, include any objection regarding the adequate assurance of future performance of any Stalking Horse Bidder, Successful Bidder or the Backup Bidder) (a "**Supplemental Designated Contract Objection**") must (i) be to the proposed assumption and assignment of the applicable Designated Contract or the proposed Cure Costs, if any; (ii) state, with specificity, the legal and factual basis thereof as well as what Cure Costs such objecting party believes are required, if any; (iii) include appropriate documentation in support of the objection; and (iv) be filed and served on the Objection Recipients no later than fourteen (14) days from the date of service of such Supplemental Notice of Assumption and Assignment.

29.     If a Supplemental Designated Contract Objection is not consensually resolved by the proposed effective date of assignment of the Designated Contract that is the subject of a Supplemental Designated Contract Objection, the Debtors shall seek an expedited hearing before

15

the Court (a "**Supplemental Designated Contract Hearing**") to determine the Cure Costs, if any, and approve the assumption of the relevant Designated Contracts. If there is no such objection, then the Debtors shall obtain an order of this Court, including by filing a certification of no objection, (a "**Supplemental Designated Contract Order**") fixing the Cure Costs and approving the assumption of any Designated Contract listed on a Supplemental Notice of Assumption and Assignment.

30.     Absent the filing of a Designated Contract Objection or Supplemental Designated Contract Objection and a subsequent order of the Court establishing an alternative Cure Cost, the Cure Costs, if any, set forth in the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) shall be controlling, notwithstanding anything to the contrary in any Designated Contract or any other document, and the counterparty to the Designated Contract will be deemed to have consented to the assumption, assignment, and sale of the Designated Contract and the Cure Costs, if any, and will be forever barred from asserting any other claims related to such Designated Contract against the Debtors or the applicable Successful Bidder, or the property of any of them, except with respect to adequate assurance of future performance by such Successful Bidder. For the avoidance of doubt, any objections to the proposed form of adequate assurance of future performance of any Successful Bidder (other than a Stalking Horse Bidder) must be raised at the Sale Hearing or Supplemental Designated Contract Hearing, as applicable, and will be resolved at the hearing at which it is raised or, in the Debtors' discretion, adjourned to a later hearing.

31.     The inclusion of a Designated Contract on the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) will not (a) obligate the Debtors to assume any Designated Contract listed thereon nor the Successful Bidder(s) to take

OMM_US:78645958.8

assignment of such Designated Contract or (b) constitute any admission or agreement of the Debtors that such Designated Contract is an "executory" contract.  Only those Designated Contracts that are included on a schedule of assumed and Acquired Contracts attached to the final purchase agreement with the Successful Bidder(s) (each, an "**Acquired Contract**") will be assumed and assigned to the Successful Bidder(s).

32.    Assignment by the Debtors to the Successful Bidder of a contract, lease or any other liability assumed under Section 365 of the Bankruptcy Code or otherwise relieves the Debtors and their estates from any such liability so assigned.

**VI.    The Sale Hearing**

33.    A Sale Hearing to (i) approve a sale of a portion or substantially all of the Acquired Assets to the Successful Bidder(s) and (ii) authorize the assumption and assignment of certain executory contracts and unexpired leases shall be held on **September 23, 2020 at 10:00 a.m. (prevailing Central Time)**, and may be adjourned or rescheduled without notice, subject to paragraph 4 of this Bidding Procedures Order.  At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Successful Bid(s) and the Backup Bid(s) (if any).  Unless the Bankruptcy Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the Sale Transaction(s) and there will be no further bidding at the Sale Hearing.  In the event that the Successful Bidder(s) cannot or refuses to consummate the Sale(s) because of the breach or failure on the part of such Successful Bidder, the Debtors may, in accordance with the Bidding Procedures, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors shall be authorized, but not required, to consummate the applicable transaction with the Backup Bidder without further order of the Bankruptcy Court.

17

34.     Any and all objections, if any, to any Sale Transaction (but excluding any objection based on the specific identity of any Stalking Horse Bidder, the form or substance of any Stalking Horse APA, the specific identity of the Successful Bidder or the Backup Bidder, or the form or substance of the Successful Bid or the Backup Bid) must be filed no later than **September 1, 2020 at 4:00 p.m. (prevailing Central Time)** (the "**Sale Objection Deadline**").  Any and all such objections must be served on the Objection Recipients and counsel to any Successful Bidder(s), if known on the Sale Objection Deadline.  All replies to such objections must be filed by **September 8, 2020 at 12:00 p.m.** (prevailing Central Time) (the "**Reply Deadline**").

35.     Any party failing to timely file an objection to any Sale Transaction will be forever barred from objecting and will be deemed to have consented to any Sale Transaction, including the transfer of the Debtors' right, title and interest in, to, and under the Debtors' Acquired Assets free and clear of any and all liens, claims, encumbrances and other interests in accordance with a definitive agreement for any Sale Transaction.

36.     Promptly following the Auction, the Debtors shall serve the Post-Auction Notice. The Debtors propose that any objections regarding the adequate assurance of future performance of the Successful Bidder or the Backup Bidder (other than the Stalking Horse Bidder) may be raised at the Sale Hearing.

**VII.    Other Provisions**

37.     Notwithstanding anything herein or in the Bidding Procedures to the contrary, the Debtors shall not be permitted to modify the consultation rights of the Consultation Parties or the Bid Consultation Parties in the Bidding Procedures absent further order of this Court or the consent of any affected Consultation or Bid Consultation Parties.

38.     Oneida's rights and priority in connection with any security interests it held in any assets of the Debtors pre-petition are hereby preserved and retained by Oneida to the extent they

18

existed pre-petition and any such security interests shall attach to proceeds of such assets with the same priority, extent, validity, avoidability and enforceability. Nothing herein shall constitute a finding or ruling by this Court that any such security interests are valid, senior, enforceable, perfected or non-avoidable. Moreover, nothing shall prejudice the rights of any party in interest including, but not limited to, the Debtors and any Committee to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such security interest.

39.     The Debtors are authorized and empowered to take such action as may be necessary to implement and effect the terms and requirements established under this Bidding Procedures Order.

40.     This Bidding Procedures Order shall be binding on and inure to the benefit of the Debtors, including any Chapter 7 or Chapter 11 trustee or other fiduciary appointed for the estates of the Debtors.

41.     This Bidding Procedures Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

42.     To the extent this Bidding Procedures Order is inconsistent with any prior order or pleading with respect to the Motion in these cases, the terms of this Bidding Procedures Order shall govern.

43.     To the extent any of the deadlines set forth in this Bidding Procedures Order do not comply with the Local Rules, such Local Rules are waived and the terms of this Bidding Procedures Order shall govern.

44.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry.

19

OMM_US:78645958.8

45.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Bidding Procedures Order, including, but not limited to, any matter, claim, or dispute arising from or relating to the Bidding Procedures, any Stalking Horse APA, and the implementation of this Bidding Procedures Order.

Dated: _____, 2020

_____
UNITED STATES BANKRUPTCY JUDGE

20

# **Exhibit 1**

**Bidding Procedures**

# EXHIBIT 2

(*See* attached Good Faith Deposit Escrow Agreement)

EXHIBIT 2

## GOOD FAITH DEPOSIT ESCROW AGREEMENT

THIS GOOD FAITH DEPOSIT ESCROW AGREEMENT (this "Escrow Agreement"), dated as of this [●] day of July, 2020, (the "Effective Date"), is entered into by and amsong Vista Outdoor Inc., a Delaware corporation ("Buyer"), Remington Outdoor Company, Inc., a Delaware corporation ("ROC"), and Delaware Trust Company, as escrow agent hereunder (the "Escrow Agent"). Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Purchase Agreement (as defined below).

WHEREAS, ROC, each of the subsidiaries of ROC set forth on the signature pages to the Purchase Agreement (collectively with ROC, "Seller") and Buyer, or a Buyer Acquisition Vehicle as assignee in accordance with Section 12.2 of the Purchase Agreement, have entered into that certain Asset Purchase Agreement (the "Purchase Agreement"), dated as of the Effective Date, whereby Buyer has agreed to purchase certain assets and liabilities of Seller;

WHEREAS,  Section 2.2(a) of the Purchase Agreement requires Buyer, within one (1) Business Day (as defined below) of the Effective Date, to deposit, or cause to be deposited, with the Escrow Agent an amount equal to $[●] (the "Good Faith Deposit") to a separate and distinct account specified by the Escrow Agent (the "Good Faith Deposit Escrow Account"), which Good Faith Deposit shall be held, safeguarded and released pursuant to the terms of this Escrow Agreement and the Purchase Agreement; and

WHEREAS, the parties desire to appoint the Escrow Agent to act as escrow agent hereunder, and the Escrow Agent has agreed to so act upon the terms and subject to the conditions hereinafter set forth.

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     **Appointment**. Buyer and ROC hereby appoint the Escrow Agent as their escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment under the terms and conditions set forth herein.

2.     **Escrow Fund**. Within one (1) Business Day of the Effective Date, Buyer shall deposit or shall cause to be deposited with the Escrow Agent an amount equal to the Good Faith Deposit in immediately available funds, which shall be deposited in the Good Faith Deposit Escrow Account. Promptly upon receipt of the Good Faith Deposit, the Escrow Agent will acknowledge in writing to Buyer and Seller that (a) it has received the Good Faith Deposit and (b) has deposited the Good Faith Deposit into the Good Faith Deposit Escrow Account. The Escrow Agent (i) shall hold the Good Faith Deposit in the Good Faith Deposit Escrow Account and (ii) subject to the terms and conditions hereof, may invest and reinvest the Good Faith Deposit and the proceeds thereof (collectively with the Good Faith Deposit, the "Escrow Fund") as directed in Section 3. The Escrow Funds shall at all times remain available for distribution in accordance with Section 4 of this Escrow Agreement. The Good Faith Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any Seller or Buyer.

US_ACTIVE-154416097.8

3.     **Investment of Escrow Fund**.

(i)     Unless otherwise instructed in a joint writing signed by both the Buyer and ROC, the Escrow Agent shall hold all Escrow Funds in a "noninterest-bearing deposit account" insured by the Federal Deposit Insurance Corporation ("FDIC") to the applicable limits.  The Escrow Funds shall at all times remain available for distribution in accordance with Section 4 below.

(ii)    The Escrow Agent shall send an account statement to each of the Buyer and ROC on a monthly basis reflecting activity in the Escrow Accounts for the preceding month.

(iii)   The Escrow Agent shall have no responsibility for any investment losses resulting from the investment, reinvestment or liquidation of the escrowed property, as applicable, provided that the Escrow Agent has made such investment, reinvestment or liquidation of the escrowed property in accordance with the terms, and subject to the conditions of this Escrow Agreement.  The Escrow Agent does not have a duty nor will it undertake any duty to provide investment advice.  The Escrow Agent may earn compensation in the form of short term interest on items like uncashed distribution checks (from the date issued until the date cashed), funds that the Escrow Agent is directed not to invest, deposits awaiting investment direction or received too late to be invested overnight in previously directed investments.

4.     **Disposition of the Good Faith Deposit**. The Escrow Agent agrees that it will not deliver custody or possession of any of the Escrow Fund or of the Good Faith Deposit Escrow Account to anyone except pursuant to the terms of this Escrow Agreement or a Final Determination (defined below).  The Escrow Fund shall be promptly released from the Good Faith Deposit Escrow Account by the Escrow Agent and delivered to either Buyer or ROC, as applicable, in accordance with the provisions of this Escrow Agreement and the Purchase Agreement as follows (and Buyer and ROC shall deliver joint written instructions to the Escrow Agent (a "Joint Instruction"), within three (3) Business Days, to effect such distributions as and when required hereunder):

(i)     if the Closing occurs, then the Escrow Fund shall be released from the Good Faith Deposit Escrow Account to ROC;

(ii)    if the Purchase Agreement has been terminated by Seller pursuant to Section 11.1(b) of the Purchase Agreement, then the Escrow Fund shall be released from the Good Faith Deposit Escrow Account to ROC; or

(iii)   if the Purchase Agreement has been terminated by any party, other than as contemplated by Section 2.2(b)(ii) of the Purchase Agreement, then the Escrow Fund shall be released from the Good Faith Deposit Escrow Account to Buyer.

All payments of any part of the Escrow Funds shall be made by wire transfer of immediately available funds to the account specified by the Buyer or ROC, as applicable.

2

Upon delivery of the Escrow Fund by the Escrow Agent, this Escrow Agreement shall terminate, subject to the provisions of <u>Section 8</u>.

5.    **Escrow Agent**. The Escrow Agent undertakes to perform only such duties as are expressly set forth herein and no duties shall be implied. The Escrow Agent shall have no liability under and no duty to inquire as to the provisions of any agreement other than this Escrow Agreement and the definitions set forth in the Purchase Agreement. The Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any written notice, Joint Instruction, Final Determination (as defined below) or request furnished to it hereunder and believed by it to be genuine and to have been signed or presented by the proper party or parties. The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, Joint Instruction or Final Determination. The Escrow Agent shall have no duty to solicit any payments which may be due it or the Escrow Fund. The Escrow Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction determines that the Escrow Agent's fraud, gross negligence or willful misconduct was the primary cause of any loss to Buyer or ROC. The Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through agents or attorneys (and shall be liable only for the careful selection of any such agent or attorney) and may consult with counsel, accountants and other skilled persons to be selected and retained by it. The Escrow Agent shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel, accountants or other skilled persons. In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive a Joint Instruction or other instructions, claims or demands from any party hereto which, in its opinion, conflict with any of the provisions of this Escrow Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be directed otherwise in writing by all of the other parties hereto or by a final non-appealable order of any court of competent jurisdiction which may be issued, together with (A) a certificate of the prevailing party to the effect that such order is final and non-appealable and from a court of competent jurisdiction having proper authority and (B) the written payment instructions of the prevailing party to effectuate such order (a "<u>Final Determination</u>"). Upon receipt by the Escrow Agent of a copy of a Final Determination from any party, the Escrow Agent shall (a) promptly inform all other parties to this Escrow Agreement of such receipt (including providing a copy of such Final Determination) and (b) within three (3) Business Days following receipt of such determination, disburse as directed, part or all, as the case may be, of the Escrow Fund in accordance with such Final Determination. Anything in this Escrow Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

6.    **Succession**. The Escrow Agent (a) may resign and be discharged from its duties or obligations hereunder by giving thirty (30) days advance notice in writing of such resignation to the other parties hereto specifying a date when such resignation shall take effect or (b) may be removed, with or without cause, by ROC and Buyer acting jointly at any time by providing written notice to the Escrow Agent. Upon such resignation or removal becoming effective, Escrow Agent will deliver the remaining Escrow Funds to a successor escrow agent pursuant to a Joint Instruction after deducting payment for all documented fees owed to it in accordance with

3

the terms of this Escrow Agreement.. Any corporation or association into which the Escrow Agent may be merged or converted or with which it may be consolidated shall be the Escrow Agent under this Escrow Agreement without further act.

7.    **Fees**. ROC and the Buyer each agree to pay one-half of any fees and expenses owed to the Escrow Agent upon execution of this Escrow Agreement and from time to time thereafter reasonable compensation for the services to be rendered hereunder in an aggregate amount not to exceed $5,000, which unless otherwise agreed in writing shall be as described on schedule 1 hereto ("Schedule 1").

8.    **Indemnity**. Buyer and ROC shall jointly and severally indemnify, defend and save harmless the Escrow Agent and its directors, officers, agents and employees (the "indemnitees") from all loss, liability or expense (including the fees and expenses of outside counsel) arising out of or in connection with the Escrow Agent's (i) execution and performance of this Escrow Agreement, except to the extent that such loss, liability or expense is due to the fraud, gross negligence or willful misconduct of the Escrow Agent or another indemnitee, or (ii) following of any Joint Instruction, Final Determination or other directions from Buyer or ROC except to the extent that the Escrow Agent's following of any such Joint Instruction, Final Determination or direction is expressly forbidden by the terms hereof.  Notwithstanding anything to the contrary herein, Buyer and ROC agree, solely as between themselves, that (x) any obligation for indemnification under this Section 8 (or for reasonable fees and expenses of the Escrow Agent described in Section 7) shall be borne by the party or parties (as between the two of them) determined by a court of competent jurisdiction to be most responsible for causing the loss, damage, liability, cost or expense against which the Escrow Agent is entitled to indemnification or, if no such determination is made, then one-half by Buyer and one-half by ROC, and (y) if either Buyer or ROC pays any amounts to the Escrow Agent under this Section 8 or under Section 7 for reimbursement, such Party shall have the right of contribution against the other party (as between the two of them) for reimbursement of such other party's share thereof in accordance with the foregoing apportionment. The parties hereto acknowledge that the foregoing indemnities shall survive the resignation or removal of the Escrow Agent or the termination of this Escrow Agreement.  The parties hereby grant the Escrow Agent a lien on, right of set-off against and security interest in the Escrow Fund for the payment of any claim for indemnification, compensation, expenses and amounts due hereunder.

9.    **TINs**. Buyer and ROC each represent that its correct Taxpayer Identification Number ("TIN") assigned by the Internal Revenue Service or any other taxing authority is set forth on Schedule 1.  All interest or other income earned under this Escrow Agreement shall be allocated to ROC and reported, to the extent required by law, by the Escrow Agent to the IRS or any other taxing authority, as applicable, on IRS form 1099-INT, 1099-DIV or 1042-S (or other appropriate form) as income earned from the Escrow Fund by ROC whether or not said income has been distributed during the year. Unless otherwise indicated in writing by the parties hereto, no taxes or other withholdings are required to be made under applicable law or otherwise with respect to any payment to be made by Escrow Agent. All documentation necessary to support a claim of exemption or reduction in such taxes or other withholdings has been timely collected by ROC and copies will be provided to Escrow Agent promptly upon a request therefor. Unless otherwise agreed to in writing by Escrow Agent, all tax returns required to be filed with the IRS and any other taxing authority as required by law with respect to payments made hereunder shall

4

be timely filed and prepared by ROC including but not limited to any applicable reporting or withholding pursuant to the Foreign Account Tax Compliance Act ("FATCA"). The parties hereto acknowledge and agree that the Escrow Agent shall have no responsibility for the preparation and/or filing of any tax return or any applicable FATCA reporting with respect to the Escrow Fund.  The Escrow Agent shall withhold any taxes it deems appropriate, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities as it determines may be required by any law or regulation in effect at the time of the distribution.

10.    **Notices**. All communications hereunder shall be in writing and shall be deemed to be duly given and received:

       (i)      upon delivery if delivered personally or upon confirmed transmittal if by facsimile;

       (ii)     on the next Business Day if sent by overnight courier; or

       (iii)    four (4) Business Days after mailing if mailed by prepaid registered mail, return receipt requested, to the appropriate notice address set forth on Schedule 1 or at such other address as any party hereto may have furnished to the other parties in writing by registered mail, return receipt requested.

Notwithstanding the above, in the case of communications delivered to the Escrow Agent pursuant to (ii) and (iii) of this Section 10, such communications shall be deemed to have been given on the date received by the Escrow Agent. In the event that the Escrow Agent, in its sole discretion, shall determine that an emergency exists, the Escrow Agent may use such other means of communication as the Escrow Agent deems appropriate. "Business Day" shall mean any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in Wilmington, Delaware, Anoka, Minnesota or [Huntsville, Alabama] are authorized by applicable law or other governmental action to close.

11.    **Security Procedures**. In the event funds transfer instructions are given (other than in writing at the time of execution of this Escrow Agreement), whether in writing, by telecopier or otherwise, the Escrow Agent is authorized to seek confirmation of such instructions by telephone call-back to the person or persons designated on schedule 2 hereto ("Schedule 2"), and the Escrow Agent may rely upon the confirmation of anyone purporting to be the person or persons so designated. The persons and telephone numbers for call-backs may be changed only in a writing actually received and acknowledged by the Escrow Agent. The Escrow Agent and the beneficiary's bank in any funds transfer may rely solely upon any account numbers or similar identifying numbers provided by Buyer or ROC to identify (i) the beneficiary, (ii) the beneficiary's bank, or (iii) an intermediary bank. The Escrow Agent may apply any of the escrowed funds for any payment order it executes using any such identifying number, even where its use may result in a person other than the beneficiary being paid, or the transfer of funds to a bank other than the beneficiary's bank or an intermediary bank designated. The parties to this Escrow Agreement acknowledge that these security procedures are commercially reasonable.

12.    **Miscellaneous**. The provisions of this Escrow Agreement may be waived, altered, amended or supplemented, in whole or in part, only by a writing signed by all of the parties hereto. Neither this Escrow Agreement nor any right or interest hereunder may be assigned in whole or in part by any party, except as provided in <u>Section 6</u>, without the prior consent of the other parties. This Escrow Agreement shall be governed by and construed under the laws of the State of Delaware. Each party hereto irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by applicable law and consents to the jurisdiction of the courts located in the State of Delaware. The parties further hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising or relating to this Escrow Agreement. No party to this Escrow Agreement is liable to any other party for losses due to, or if it is unable to perform its obligations under the terms of this Escrow Agreement because of, acts of God, fire, floods, strikes, equipment or transmission failure, or other causes reasonably beyond its control. This Escrow Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

13.    **Patriot Act Compliance**. In order to comply with laws, rules, regulations and executive orders in effect from time to time applicable to banking institutions, including those relating to the funding of terrorist activities and money laundering and the Customer Identification Program ("<u>CIP</u>") requirements under the USA PATRIOT Act and its implementing regulations, pursuant to which the Escrow Agent must obtain, verify and record information that allows the Escrow Agent to identify customers ("<u>Applicable Law</u>"), the Escrow Agent is required to obtain, verify and record certain information relating to individuals and entities which maintain a business relationship with the Escrow Agent. Accordingly, each of Buyer and ROC agrees to provide to the Escrow Agent upon its request from time to time such identifying information and documentation as may be available for such party in order to enable the Escrow Agent to comply with Applicable Law, including, but not limited to, information as to name, physical address, tax identification number and other information that will help the Escrow Agent to identify and verify such party such as organizational documents, certificates of good standing (where applicable), licenses to do business or other pertinent identifying information. Buyer and ROC each understand and agree that the Escrow Agent cannot open the Escrow Account unless and until the Escrow Agent verifies the identities of Buyer and ROC in accordance with its CIP.

*[Signatures are on the following pages.]*

6

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Escrow Agreement as of the Effective Date.

**ESCROW AGENT:**

**DELAWARE TRUST COMPANY**

By: _____
    Name:
    Title:

[Signature Page to Good Faith Deposit Escrow Agreement]

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Escrow Agreement as of the Effective Date.

**BUYER:**

**VISTA OUTDOOR INC.**

By: _____
    Name:
    Title:

[Signature Page to Good Faith Deposit Escrow Agreement]

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Escrow Agreement as of the Effective Date.

**ROC**:

**REMINGTON OUTDOOR COMPANY, INC.**

By: _____
    Name:
    Title:

[Signature Page to Good Faith Deposit Escrow Agreement]

## <u>Schedule 1</u>

**Effective Date**:           [●], 2020

**Name of Buyer**:         Vista Outdoor Inc.
Buyer Notice Address:     c/o Vista Outdoor Inc.
                       1 Vista Way
                       Anoka, MN 55303
                       Attention: Dylan S. Ramsey
                       Email: Dylan.Ramsey@VistaOutdoor.com

Buyer TIN:             47-1016855

**Name of ROC**:         Remington Outdoor Company, Inc.
ROC Notice Address:      100 Electronics Blvd., SW
                       Huntsville, Alabama 35824
                       Attention: Ken D'Arcy
                       Email: ken.darcy@remington.com

ROC TIN:              26-0174491

**Name of Escrow Agent**:     **Delaware Trust Company**
Escrow Agent Notice Address:  251 Little Falls Drive
                       Wilmington, DE 19808
                       Attn: Escrow Administration
                       Telephone: 866-291-6119
                       Facsimile: 302-636-8666

                       Email: trustadmin@delawaretrust.com

**Escrow Agent Fees:**
**$1,000 – set up fee payable in advance of the closing of the transaction**
**$2,500 – escrow agent fee payable in advance of the closing of the transaction**
**and upon each subsequent annual anniversary date.**

**TRANSACTION FEES:**
Wire transfer of fund: $35.00/domestic wire initiated; $75.00/international payment
Checks Cut: $10.00/check cut
1099 Preparation: $12.00/1099 prepared
1042-S Preparation: $50.00/per 1042-S
Returned Check: $30.00/returned item

**Good Faith Deposit**: $[●]

**Investment**:       [select one]

         [ ]    BlackRock FedFund Cash Management Class (the "Share Class"), an
              institutional money market mutual fund for which the Escrow Agent

US_ACTIVE-154416097.8

serves as shareholder servicing agent and/or custodian or subcustodian. The parties hereto: (i) acknowledge Escrow Agent's disclosure of the services the Escrow Agent is providing to and the fees it receives from BlackRock; (ii) consent to the Escrow Agent's receipt of these fees in return for providing shareholder services for the Share Class; and (iii) acknowledge that the Escrow Agent has provided on or before the date hereof a BlackRock FedFund Cash Management Class prospectus which discloses, among other things, the various expenses of the Share Class and the fees to be received by the Escrow Agent.

[ ]    Such other investments as Buyer, ROC and Escrow Agent may from time to time mutually agree upon in a writing executed and delivered by Buyer and ROC and accepted by the Escrow Agent.

[X]    The Good Faith Deposit shall be held in a non-interest bearing deposit account insured by the Federal Deposit Insurance Corporation to the applicable limits.

US_ACTIVE-154416097.8

**Schedule 2**

**Telephone Number(s) for Call-Backs and**
**<u>Person(s) Designated to Confirm Funds Transfer Instructions</u>**

If to Buyer:

    <u>Name</u>                                 <u>Telephone Number</u>

1.  Dylan Ramsey                   (m) 801-989-8972; (o) 801-447-3039

If to ROC:

    <u>Name</u>                                 <u>Telephone Number</u>

1.  <u>William Krogseng       </u>       <u>(336) 548-8506         </u>

2.  <u>Mark Little          </u>          <u>(336) 508-1176       </u>

3.  <u>                      </u>       <u>                    </u>

Telephone call-backs may be made to both Buyer and ROC if joint instructions are required pursuant to this Escrow Agreement.

US_ACTIVE-154416097.8

# EXHIBIT 3

(*See* attached form of Bill of Sale)

EXHIBIT 3

## BILL OF SALE

THIS BILL OF SALE (this "Bill of Sale"), dated as of this [●] day of [●], 2020, is entered into by and among Remington Outdoor Company, Inc., Barnes Bullets, LLC, Remington Arms Company, LLC, RA Brands, L.L.C. (each, an "Seller" and collectively, the "Seller"), and [●][1] (the "Buyer"). Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Purchase Agreement (as defined below).

**WHEREAS**, the Sellers and the Buyer are parties to that certain Asset Purchase Agreement, dated as of [●], 2020 (as amended from time to time in accordance with its terms, the "Purchase Agreement"), pursuant to which, among other things, the Buyer will purchase and assume from the Sellers certain assets, properties and rights and certain specified liabilities and obligations of the Sellers;

**WHEREAS**, the Sellers are the owners, collectively, of all right, title and interest in, to and under the Acquired Assets;

**WHEREAS,** pursuant to the Purchase Agreement, each Seller desires to assign to the Buyer, and the Buyer desires to acquire from such Seller, all of such Seller's respective right, title, and interest in, to and under the applicable Acquired Assets; and

**WHEREAS,** the United States Bankruptcy Court for the Northern District of Alabama Northern Division presiding over Sellers' bankruptcy cases entered that certain *Order Approving the Sale of the Debtors' Assets free and clear of all Claims, Liens, and Interests* on [____], 2020 approving and authorizing the sale of the Acquired Assets to the Buyer on the terms and conditions set forth in the Purchase Agreement.

**NOW, THEREFORE,** in consideration of the foregoing and in consideration of the mutual agreements, provisions and covenants contained herein and in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Sellers and the Buyer hereby agree as follows:

1.    Assignment. Effective as of the Closing, pursuant to the terms and subject to the conditions of the Purchase Agreement, each Seller hereby sells, transfers, conveys, assigns and delivers to the Buyer, and the Buyer hereby purchases and accepts, all of such Seller's right, title and interest in, to and under the Acquired Assets. For the avoidance of doubt, no Seller hereby sells, transfers, conveys, assigns or delivers to the Buyer, and the Buyer does not accept, any of the Excluded Assets.

2.    Purchase Agreement Controls.  This Bill of Sale is executed and delivered pursuant to the Purchase Agreement and in all respects is subject to the representations, warranties, agreements, covenants, terms, conditions, limitations and other provisions thereof (including the Schedules attached thereto). No provision set forth in this Bill of Sale shall be deemed to enlarge, alter or amend the terms or provisions of the Purchase Agreement or affect, expand or limit the rights and obligations of the parties under the Purchase Agreement. In the event of any conflict between this Bill of Sale and the Purchase Agreement, the Purchase

---

[1] RS Note to Draft: Name of final Buyer entity to be inserted.

Agreement shall control. The Buyer acknowledges that the Sellers make no representation or warranty with respect to the Acquired Assets being conveyed hereby except as specifically set forth in the Purchase Agreement.

3.    <u>No Rights in Third Parties</u>. Nothing expressed or implied in this Bill of Sale is intended to confer upon any person or entity, other than the Sellers and the Buyer and their respective successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this Bill of Sale.

4.    <u>Further Assurances and Miscellaneous</u>. This Bill of Sale shall be subject to Article 12 of the Purchase Agreement, which is hereby incorporated by reference herein, *mutatis mutandis*.

[*Signatures are on the following pages.*]

- 2 -

**IN WITNESS WHEREOF**, the Sellers and the Buyer have caused this Bill of Sale to be executed as of the date first above written.

<u>**SELLERS**</u>**:**

**REMINGTON OUTDOOR COMPANY, INC.**

By: _____
    Name:
    Title:

**BARNES BULLETS, LLC**

By: _____
    Name:
    Title:

**REMINGTON ARMS COMPANY, LLC**

By: _____
    Name:
    Title:

**RA BRANDS, L.L.C.**

By: _____
    Name:
    Title:

[Signature Page to Bill of Sale]    US_ACTIVE-154422547.6

**IN WITNESS WHEREOF**, the Sellers and the Buyer have caused this Bill of Sale to be executed as of the date first above written.

<u>**BUYER**</u>**:**

**[●]**

By: _____
    Name:
    Title:

[Signature Page to Bill of Sale]                    US_ACTIVE-154422547.6

# EXHIBIT 4

(*See* attached form of Assignment and Assumption Agreement)

EXHIBIT 4

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement"), dated as of this [●] day of [●], 2020, is entered into by and among Remington Outdoor Company, Inc., Barnes Bullets, LLC, Remington Arms Company, LLC, RA Brands, L.L.C. (each, an "Assignor" and collectively, the "Assignors"), and [●][1] (the "Assignee"). Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Purchase Agreement (as defined below).

WHEREAS, the Assignors and the Assignee are parties to that certain Asset Purchase Agreement, dated as of [●], 2020 (as amended from time to time in accordance with its terms, the "Purchase Agreement"), pursuant to which, among other things, the Assignee will purchase and assume from the Assignors certain assets, properties and rights and certain specified liabilities and obligations of the Assignors;

WHEREAS, pursuant to the Purchase Agreement, each Assignor desires to assign to the Assignee, and the Assignee desires to assume from such Assignor, the respective Assumed Contracts and the Assumed Liabilities held by such Assignor; and

WHEREAS, the United States Bankruptcy Court for the Northern District of Alabama Northern Division presiding over Assignors' bankruptcy cases entered that certain *Order Approving the Sale of the Debtors' Assets free and clear of all Claims, Liens, and Interests* on [____], 2020 approving and authorizing the sale of the Acquired Assets to Assignee on the terms and conditions set forth in the Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing and in consideration of the mutual agreements, provisions and covenants contained herein and in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Assignors and the Assignee hereby agree as follows:

1.      Assignment. Effective as of the Closing, pursuant to the terms and subject to the conditions of the Purchase Agreement, each Assignor hereby sells, transfers, conveys, assigns and delivers to the Assignee all of the Assumed Contracts and the Assumed Liabilities held by such Assignor. For the avoidance of doubt, no Assignor hereby sells, transfers, conveys, assigns and delivers to the Assignee, and the Assignee does not accept, any of the Excluded Assets.

2.      Assumption. Effective as of the Closing, pursuant to the terms and subject to the conditions of the Purchase Agreement, the Assignee hereby assumes and agrees to pay, perform and discharge all Assumed Liabilities. For the avoidance of doubt, the Assignee neither assumes from the Assignors, nor shall the Assignee be liable or responsible for, any Excluded Liabilities. Assignees acknowledge that Assignors make no representation or warranty with respect to the Acquired Assets being conveyed hereby except as specifically set forth in the Purchase Agreement.

3.      Purchase Agreement Controls.   This Agreement is executed and delivered pursuant to the Purchase Agreement and in all respects is subject to the representations,

---

[1] RS Note to Draft: Name of final Buyer entity to be inserted.

US_ACTIVE-154425221.7

warranties, agreements, covenants, terms, conditions, limitations and other provisions thereof (including the Schedules attached thereto). No provision set forth in this Agreement shall be deemed to enlarge, alter or amend the terms or provisions of the Purchase Agreement or affect, expand or limit the rights and obligations of the parties under the Purchase Agreement. In the event of any conflict between this Agreement and the Purchase Agreement, the Purchase Agreement shall control.

4.      <u>No Rights in Third Parties</u>.  Nothing expressed or implied in this Agreement is intended to confer upon any person or entity, other than the Assignors and the Assignee and their respective successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

5.      <u>Further Assurances and Miscellaneous</u>. This Agreement shall be subject to Article 12 of the Purchase Agreement, which are hereby incorporated by reference herein, *mutatis mutandis*.

[*Signatures are on the following pages*.]

**IN WITNESS WHEREOF**, the Assignors and the Assignee have caused this Agreement to be executed as of the date first above written.

<u>**ASSIGNORS**</u>:

**REMINGTON OUTDOOR COMPANY, INC.**

By: _____
    Name:
    Title:

**BARNES BULLETS, LLC**

By: _____
    Name:
    Title:

**REMINGTON ARMS COMPANY, LLC**

By: _____
    Name:
    Title:

**RA BRANDS, L.L.C.**

By: _____
    Name:
    Title:

[Signature Page to Assignment and Assumption Agreement]    US_ACTIVE-154425221.7

**IN WITNESS WHEREOF**, the Assignors and the Assignee have caused this Agreement to be executed as of the date first above written.

<u>**ASSIGNEE:**</u>

**[●]**

By: _____
    Name:
    Title:

[Signature Page to Assignment and Assumption Agreement]    US_ACTIVE-154425221.7

**EXHIBIT 5**

[Reserved]

# EXHIBIT 6

(*See* attached form of Intellectual Property Assignment Agreement)

**EXHIBIT 6**

## INTELLECTUAL PROPERTY ASSIGNMENT

This Intellectual Property Assignment (this "Assignment") dated as of [●], 2020, is entered into by and by and among, on the one hand, , REMINGTON OUTDOOR COMPANY, INC., a Delaware corporation (the "ROC"), REMINGTON ARMS COMPANY, LLC, a Delaware limited liability company ("Remington"), BARNES BULLETS, LLC, a Delaware limited liability company ("Barnes"), and RA BRANDS, L.L.C., a Delaware limited liability company ("Brands", and together with ROC, Remington and Barnes, each individually an "Assignor" and collectively, "Assignors"), and on the other hand, [●][1] ("Assignee").  Assignors and Assignee are each sometimes referred to herein individually as a "Party" and collectively as the "Parties."

RECITALS

WHEREAS, Assignors desire to sell, assign, transfer, convey and deliver to Assignee, and Assignee desires to purchase and assume from Assignor, the Purchased Assets and the Assumed Liabilities pursuant to that certain Asset Purchase Agreement (the "Purchase Agreement"; capitalized terms used herein without definition shall have the meanings assigned to such terms in the Purchase Agreement), dated as of [●], 2020, by and among Assignors and Assignee; and

WHEREAS, this Assignment is being executed and delivered by the Parties in connection with the consummation of the transactions contemplated by the Purchase Agreement.

NOW, THEREFORE, IT IS AGREED THAT:

1.        Assignment. Each Assignor shall and hereby does irrevocably assign, convey and transfer to Assignee all of Assignor's right, title and interest in all of the Acquired Intellectual Property, including, without limitation, all of the registered Intellectual Property set forth below included in the Acquired Intellectual Property:

(a)        the patents and patent applications set forth on Schedule 1 of Exhibit A hereto (if any), the rights to file for patent protection for the inventions described therein, and all issuances, divisions, continuations, continuations-in-part, reissues, extensions, reexaminations, and renewals thereof, including all priority rights, and the right to claim priority rights and the privileges and benefits thereof, including those under the Patent Cooperation Treaty, and all other conventions, and the worldwide right to file applications for said inventions in Assignor's own name (collectively, the "Patents");

(b)        the trademark registrations and applications set forth on Schedule 1 of Exhibit B hereto (if any), together with the goodwill connected with the use thereof and symbolized thereby, and all issuances, extensions, and renewals thereof (collectively, the "Trademarks");

(c)        the copyright registrations and applications set forth on Schedule 1 of Exhibit C hereto (if any), and all issuances, extensions, and renewals thereof (the "Copyrights"); and

---

[1] RS Note to Draft: Name of final Buyer entity to be inserted.

US_ACTIVE-154447764.7

(d)     the internet domain names set forth on <u>Exhibit D</u> hereto (if any) (collectively, the "<u>Domain Names</u>").

2.     <u>Maintenance, Prosecution, and Enforcement</u>. After the closing of the transactions contemplated under the Purchase Agreement, Assignee shall be solely responsible for maintaining and prosecuting any registrations of Intellectual Property associated with the Acquired Intellectual Property, including the filing and prosecution of all necessary applications, and the payment of all necessary fees relating to the Acquired Intellectual Property that constitutes registered Intellectual Property.  The following short form assignment agreements shall be executed by the Parties and recorded by Assignee with the relevant Government authority: (i) the Patent Assignment attached hereto as <u>Exhibit A</u>, (ii) the Trademark Assignment attached hereto as <u>Exhibit B</u> (except that any U.S. intent-to-use trademark application for which a statement of use has not been filed with and duly accepted by the United States Patent and Trademark Office shall not be assigned until after such statement is accepted by the United States Patent and Trademark Office), and (iii) the Copyright Assignment attached hereto as <u>Exhibit C</u>.  The assignment in <u>Section 1</u> above includes all rights to enforce rights in the Acquired Intellectual Property (including, without limitation, any rights to sue and collect damages, payments or other consideration resulting from any past or future claim or action against any third person for infringing upon any Acquired Intellectual Property).

3.     <u>Unassignable Intellectual Property</u>. To the extent that any of the Acquired Intellectual Property is not assignable or otherwise transferable by Assignors to Assignee ("<u>Unassignable IP</u>"), a non-inclusive list of which is set forth on <u>Exhibit E</u> hereto (if any), Assignors shall, in descending order based on the rights to such Unassignable IP held by Assignors:

(i)     use commercially reasonable efforts to obtain any necessary waiver, approval, or consent from any required third party to assign such Unassignable IP to Assignee, and upon obtaining such waiver, approval, or consent, such Unassignable IP shall be deemed to have been automatically sold, assigned, transferred, conveyed, and delivered by Assignors to Assignee as Acquired Intellectual Property;

(ii)     grant to Assignee an exclusive, even as to Assignors, royalty free, irrevocable, perpetual, transferrable, fully paid-up, worldwide license (with rights to sublicense through multiple tiers of sublicenses) to make, have made, modify, use, create derivative works from, import, export, and sell such Unassignable IP and products or services based on such Unassignable IP;

(iii)     grant to Assignee a non-exclusive license that shall be, to the fullest extent possible, royalty free, irrevocable, perpetual, transferrable, fully paid-up and worldwide (with rights to sublicense through multiple tiers of sublicenses) to make, have made, modify, use, create derivative works from, import, export, and sell such Unassignable IP and products or services based on such Unassignable IP; and

(iv)     covenant to never assert against Assignee, its affiliates, successors, assigns, or their respective customers, agents, or representatives any such Unassignable IP in which Assignors cannot grant the licenses listed above.

4.　　Cooperation; Power of Attorney. Each Assignor hereby irrevocably designates and appoints each officer of Assignee as such Assignor's agent and attorney-in-fact to execute any papers on such Assignor's behalf, and to take any and all actions as Assignee may deem necessary or desirable, in order to effectuate the assignment to Assignee of the Acquired Intellectual Property that is the subject of any registration or application for registration in any jurisdiction and to record or otherwise perfect such assignment with any applicable authority in any applicable jurisdiction. This power of attorney is coupled with an interest and shall be irrevocable.

5.　　Moral Rights. To the fullest extent allowed under applicable Law, each Assignor irrevocably assigns, conveys, and transfers to Assignee any moral rights in or with respect to the Acquired Intellectual Property that may exist anywhere in the world, together with all claims for damages and other remedies asserted on the basis of moral rights, and irrevocably waives and agrees never to assert any moral rights in or with respect to any and all of the Acquired Intellectual Property that may exist anywhere in the world.

6.　　Notices. Notices hereunder shall be given in accordance with the Purchase Agreement.

7.　　Successors and Assigns. This Assignment shall be binding on the Parties and their successors and assigns.

8.　　Terms of Purchase Agreement. Nothing contained in this Assignment shall be deemed to modify, limit, expand, supersede, or amend any rights or obligations of Assignors or Assignee under the Purchase Agreement. Assignee acknowledges that Assignors make no representation or warranty with respect to the assets being conveyed hereby except as specifically set forth in the Purchase Agreement. To the extent any conflict or inconsistency arises between any of the terms and provisions of this Assignment and the Purchase Agreement, the terms and provisions of the Purchase Agreement shall govern and control.

9.　　Severability. If any term or provision of this Assignment is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Assignment or invalidate or render unenforceable such term or provision in any other jurisdiction.

10.　　Entire Agreement; Amendment. This Assignment constitutes the Parties' entire agreement with respect to the subject matter hereof and supersedes all prior or contemporaneous negotiations, communications, discussions and correspondence concerning such subject matter. This Assignment may be amended or modified only with the prior written consent of the Parties.

11.　　Headings. The section headings hereof have been inserted for convenience of reference only and shall not be construed to affect the meaning, construction or effect of this Assignment.

12.　　Counterparts. This Assignment may be executed in counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same agreement. If any signature is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format date file, such signature shall create a valid

and binding obligation of the executing Party (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

13.    <u>Governing Law; Dispute Resolution</u>.  Section 12.3 and Section 12.4 of the Purchase Agreement are incorporated herein.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties have executed this Assignment as of the date first written above.

<u>**ASSIGNORS**</u>:

**REMINGTON ARMS COMPANY, LLC**

By: _____
Name:
Title:

**BARNES BULLETS, LLC**

By: _____
Name:
Title:

**RA BRANDS, L.L.C.**

By: _____
Name:
Title:

**REMINGTON OUTDOOR COMPANY, INC.**

By: _____
Name:
Title:

[SIGNATURE PAGE TO ASSIGNMENT OF INTELLECTUAL PROPERTY]

US_ACTIVE-154447764.7

**ASSIGNEE**:

[●]


By: _____

Name:

Title:

# EXHIBIT A

# PATENT ASSIGNMENT

This Patent Assignment (this "**Patent Assignment**"), dated as of [●], 2020 (the "**Effective Date**"), is made by and by and by and among, on the one hand, REMINGTON OUTDOOR COMPANY, INC., a Delaware corporation (the "**ROC**"), REMINGTON ARMS COMPANY, LLC, a Delaware limited liability company ("**Remington**"), BARNES BULLETS, LLC, a Delaware limited liability company ("**Barnes**"), and RA BRANDS, L.L.C., a Delaware limited liability company ("**Brands**", and together with ROC, Remington and Barnes, each individually an "**Assignor**" and collectively, "**Assignors**"), and on the other hand, [●][2] ("**Assignee**").  Assignors and Assignee are each sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**."

WHEREAS, Assignors are the owners of the patents and patent applications described on **Schedule 1** (the "**Patents**"); and

WHEREAS, pursuant to the terms of that certain Asset Purchase Agreement, by and among Assignors and Assignee, dated as of [●], 2020 (the "**Purchase Agreement**"), Assignors have agreed to assign to Assignee all of Assignors' right, title, and interest in and to the Patents. Capitalized terms used herein and not otherwise defined herein shall have the respective meanings assigned to such terms in the Purchase Agreement.

NOW THEREFORE, for the consideration set forth in the Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, as of the Effective Date, Assignors shall and hereby do sell, transfer, and assign to Assignee, and its successors and assigns, Assignors' entire right, title, and interest in the Patents, including all reissues, divisions, reexaminations, renewals, extensions, provisionals, substitutions, continuations and continuations-in-part thereof, and all equivalent or similar rights anywhere in the world in inventions and discoveries first disclosed in such Patents therefor, together with all causes of action (whether known or unknown or whether currently pending, filed, or otherwise) and other enforcement rights with respect to the Patents, including causes of action and other enforcement rights for (a) damages, (b) injunctive relief, and (c) any other remedies of any kind, and in each case for past, current, and future infringement of any such Patents, including royalties and other payments.

Assignors hereby authorize the respective patent office (e.g., US Patent and Trademark Office) or Government authority in each applicable jurisdiction to issue any and all patents, certificates of invention or other similar governmental grants or issuances that may be granted for any of the Patents in the name of Assignee, as the assignee.

This Patent Assignment is governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule that would require or permit the application of the laws of any jurisdiction other than those of the State of Delaware. Any legal suit, action, or proceeding arising out of or related to this Agreement or the licenses granted hereunder may be instituted in the federal courts of the United States or the

---

[2] <u>RS Note to Draft</u>: Name of final Buyer entity to be inserted.

courts of the State of Delaware in each case located in New Castle County, Delaware, and each Party irrevocably submits to the jurisdiction of such courts in any such suit, action, or proceeding. The parties hereto agree that irreparable damage would occur if any provision of this Patent Assignment were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

This Patent Assignment shall inure to the benefit of and be binding upon Assignee and Assignors and their respective successors and assigns.  This Patent Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Patent Assignment delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Patent Assignment.

[SIGNATURE PAGE FOLLOWS]

US_ACTIVE-154447764.7

IN WITNESS WHEREOF, each of the undersigned has caused this Patent Assignment to be executed and delivered by its duly authorized representative as of the Effective Date.

**ASSIGNORS**:

**REMINGTON ARMS COMPANY, LLC**

By: _____
Name:
Title:

**BARNES BULLETS, LLC**

By: _____
Name:
Title:

**RA BRANDS, L.L.C.**

By: _____
Name:
Title:

**REMINGTON OUTDOOR COMPANY, INC.**

By: _____
Name:
Title:

[Signature Page to Patent Assignment]

US_ACTIVE-154447764.7

**<u>ASSIGNEE</u>:**

**[●]**


By: _____
Name:
Title:


[Signature Page to Patent Assignment]

US_ACTIVE-154447764.7

## SCHEDULE 1 OF EXHIBIT A

**PATENTS AND PATENT APPLICATIONS**

[To be provided]

US_ACTIVE-154447764.7

EXHIBIT B

**TRADEMARK ASSIGNMENT**

This Trademark Assignment (this "**Trademark Assignment**"), dated as of [●], 2020 (the "**Effective Date**"), is made by and among, on the one hand, REMINGTON OUTDOOR COMPANY, INC., a Delaware corporation (the "**ROC**"), REMINGTON ARMS COMPANY, LLC, a Delaware limited liability company ("**Remington**"), BARNES BULLETS, LLC, a Delaware limited liability company ("**Barnes**"), and RA BRANDS, L.L.C., a Delaware limited liability company ("**Brands**", and together with ROC, Remington and Barnes, each individually an "**Assignor**" and collectively, "**Assignors**"), and on the other hand, [●][3] ("**Assignee**"). Assignors and Assignee are each sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**."

WHEREAS, Assignors are the owners of the trademarks and trademark applications described on **Schedule 1** (the "**Trademarks**"); and

WHEREAS, pursuant to the terms of that certain Asset Purchase Agreement, by and among Assignors and Assignee, dated as of [●], 2020 (the "**Purchase Agreement**"), Assignors have agreed to assign to Assignee all of Assignors' right, title, and interest in and to the Trademarks, together with the goodwill associated therewith. Capitalized terms used herein and not otherwise defined herein shall have the respective meanings assigned to such terms in the Purchase Agreement.

NOW THEREFORE, for the consideration set forth in the Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, as of the Effective Date, Assignors shall and hereby do sell, transfer, and assign to Assignee, and its successors and assigns, Assignor's entire right, title, and interest in the Trademarks (except that any U.S. intent-to-use trademark application for which a statement of use has not been filed with and duly accepted by the United States Patent and Trademark Office shall not be assigned until after such statement is accepted by the United States Patent and Trademark Office) including, without limitation, all registrations and applications therefor and the right to apply for and register the Trademarks, in the United States of America and all foreign countries, together with the goodwill of Assignors' business in which the Trademarks are used and symbolized by the Trademarks, all common law and statutory rights related thereto, all rights of renewal and extension, together with all causes of action (whether known or unknown or whether currently pending, filed, or otherwise) and other enforcement rights with respect to the Trademarks, including causes of action and other enforcement rights for (a) damages, (b) injunctive relief, and (c) any other remedies of any kind, and in each case for past, current, and future infringement of any such Trademarks, including royalties and other payments.

Assignor hereby authorizes the respective trademark office (e.g., US Patent and Trademark Office) or Government authority in each applicable jurisdiction to issue any and all trade and

---

[3] <u>RS Note to Draft</u>: Name of final Buyer entity to be inserted.

US_ACTIVE-154447764.7

service marks or other similar governmental grants, registrations, or issuances that may be granted for any of the Trademarks in the name of Assignee, as the assignee.

This Trademark Assignment is governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule that would require or permit the application of the laws of any jurisdiction other than those of the State of Delaware. Any legal suit, action, or proceeding arising out of or related to this Agreement or the licenses granted hereunder may be instituted in the federal courts of the United States or the courts of the State of Delaware in each case located in New Castle County, Delaware, and each Party irrevocably submits to the jurisdiction of such courts in any such suit, action, or proceeding. The parties hereto agree that irreparable damage would occur if any provision of this Trademark Assignment were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

This Trademark Assignment shall inure to the benefit of and be binding upon Assignee and Assignors and their respective successors and assigns. This Trademark Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Trademark Assignment delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Trademark Assignment.

[SIGNATURE PAGE FOLLOWS]

US_ACTIVE-154447764.7

IN WITNESS WHEREOF, each of the undersigned has caused this Trademark Assignment to be executed and delivered by its duly authorized representative as of the Effective Date.

**ASSIGNORS**:

**REMINGTON ARMS COMPANY, LLC**

By: _____
Name:
Title:

**BARNES BULLETS, LLC**

By: _____
Name:
Title:

**RA BRANDS, L.L.C.**

By: _____
Name:
Title:

**REMINGTON OUTDOOR COMPANY, INC.**

By: _____
Name:
Title:

[Signature Page to Trademark Assignment]

US_ACTIVE-154447764.7

**ASSIGNEE**:

[●]


By: _____
Name:
Title:

[Signature Page to Trademark Assignment]

US_ACTIVE-154447764.7

## <u>SCHEDULE 1 OF EXHIBIT B</u>

**TRADEMARKS AND TRADEMARK APPLICATIONS**

[To be provided]

US_ACTIVE-154447764.7

**EXHIBIT C**

**COPYRIGHT ASSIGNMENT**

This Copyright Assignment (this "**Copyright Assignment**"), dated as of [●], 2020 (the "**Effective Date**"), is made by and among, on the one hand, REMINGTON OUTDOOR COMPANY, INC., a Delaware corporation (the "**ROC**"), REMINGTON ARMS COMPANY, LLC, a Delaware limited liability company ("**Remington**"), BARNES BULLETS, LLC, a Delaware limited liability company ("**Barnes**"), and RA BRANDS, L.L.C., a Delaware limited liability company ("**Brands**", and together with ROC, Remington and Barnes, each individually an "**Assignor**" and collectively, "**Assignors**") and on the other hand, [●][4] ("**Assignee**"). Assignors and Assignee are each sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**."

WHEREAS, Assignors are the owner of the registered copyrights and applications for registered copyrights described on **Schedule 1** (the "**Copyrights**"); and

WHEREAS, pursuant to the terms of that certain Asset Purchase Agreement, by and among Assignors and Assignee, dated as of [●], 2020 (the "**Purchase Agreement**"), Assignors have agreed to assign to Assignee all of Assignor's right, title, and interest in and to the Copyrights. Capitalized terms used herein and not otherwise defined herein shall have the respective meanings assigned to such terms in the Purchase Agreement.

NOW THEREFORE, for the consideration set forth in the Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, as of the Effective Date, Assignors shall and hereby do sell, transfer, and assign to Assignee, and its successors and assigns, Assignors' entire right, title, and interest in the Copyrights, without condition, limitation, or reservation, including, but not limited to: (a) all common law and statutory rights related to the Copyrights, all rights of renewal and extension; (b) the right to apply for registration in the United States of America and all foreign countries; (c) the right to sue for, settle and release past, present and future infringement of the Copyrights, and in each case for past, current, and future infringement of any such Copyrights, including royalties and other payments. Not limiting the foregoing, Assignee may use, sell, license, translate, copy, duplicate, record, broadcast, distribute, perform, display, add to, subtract from, arrange, rearrange, revise, modify, change, adapt and otherwise exploit the Copyrights and any derivative works thereof in its sole and absolute discretion.

If Assignors have any rights, including without limitation "artist's rights" or "moral rights," in the Copyrights that cannot be assigned, Assignors agree to waive and hereby waive enforcement worldwide of such rights against Assignee. In the event that Assignors have any such rights, that cannot be assigned or waived, Assignors hereby grant to Assignee an exclusive, worldwide, irrevocable, perpetual license to use, reproduce, distribute, create derivative works of, publicly perform and publicly display the Copyrights in any medium or format, whether now known or later developed.

---

[4] RS Note to Draft: Name of final Buyer entity to be inserted.

US_ACTIVE-154447764.7

Assignors hereby authorize the respective copyright office (e.g., US Copyright Office) or Government authority in each applicable jurisdiction to issue any and all copyrights or other similar governmental grants or registrations that may be granted for any of the Copyrights in the name of Assignee, as the assignee.

This Copyright Assignment is governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule that would require or permit the application of the laws of any jurisdiction other than those of the State of Delaware. Any legal suit, action, or proceeding arising out of or related to this Agreement or the licenses granted hereunder may be instituted in the federal courts of the United States or the courts of the State of Delaware in each case located in New Castle County, Delaware, and each Party irrevocably submits to the jurisdiction of such courts in any such suit, action, or proceeding.  The parties hereto agree that irreparable damage would occur if any provision of this Copyright Assignment were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

This Copyright Assignment shall inure to the benefit of and be binding upon Assignee and Assignors and their respective successors and assigns.  This Copyright Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Copyright Assignment delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Copyright Assignment.

[SIGNATURE PAGE FOLLOWS]

US_ACTIVE-154447764.7

IN WITNESS WHEREOF, each of the undersigned has caused this Copyright Assignment to be executed and delivered by its duly authorized representative as of the Effective Date.

**ASSIGNORS**:

**REMINGTON ARMS COMPANY, LLC**

By: _____
Name:
Title:

**BARNES BULLETS, LLC**

By: _____
Name:
Title:

**RA BRANDS, L.L.C.**

By: _____
Name:
Title:

**REMINGTON OUTDOOR COMPANY, INC.**

By: _____
Name:
Title:

[Signature Page to Copyright Assignment]

US_ACTIVE-154447764.7

**<u>ASSIGNEE</u>:**

[●]

By: _____
Name:
Title:

[Signature Page to Copyright Assignment]

US_ACTIVE-154447764.7

## <u>SCHEDULE 1 OF EXHIBIT C</u>

**COPYRIGHTS AND COPYRIGHT APPLICATIONS**

[To be provided]

US_ACTIVE-154447764.7

**EXHIBIT D**

**DOMAIN NAMES**

[To be provided]

US_ACTIVE-154447764.7

# EXHIBIT E

## UNASSIGNABLE INTELLECTUAL PROPERTY

[To be provided]

# EXHIBIT 7

(*See* attached form of Transition Services Agreement)

EXHIBIT 7

## TRANSITION SERVICES AGREEMENT

**THIS TRANSITION SERVICES AGREEMENT** (this "Agreement"), dated as of this [●] day of [●], 2020, is entered into by and among Remington Outdoor Company, Inc. ("ROC", and together with the subsidiaries of ROC set forth on the signature pages hereto, "Seller"), and Vista Outdoor Inc., a Delaware corporation ("Buyer", and together with Seller, the "Parties" and each a "Party"). Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Purchase Agreement (as defined below).

## RECITALS

**WHEREAS**, Seller and Buyer are parties to that certain Asset Purchase Agreement, dated as of September [●], 2020 (as amended from time to time in accordance with its terms, the "Purchase Agreement"), pursuant to which, among other things, Buyer will purchase and assume from Seller certain assets, properties and rights and certain specified liabilities and obligations of Seller;

**WHEREAS**, to facilitate the transactions contemplated by the Purchase Agreement, Seller and Buyer have agreed to provide each other certain Transition Services (as defined below); and

**WHEREAS**, the Parties are willing to provide such respective services upon the terms and subject to the conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the covenants, promises, representations, and warranties set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE 1

## SERVICES PROVIDED

1.1. During the Term (as defined below), Seller will provide, or cause to be provided, to Buyer those specific services as described and for up to the length of time specified on Schedule 1 to this Agreement, upon the terms and subject to the conditions set forth in this Agreement (the "Seller Transition Services"); provided, that Seller may delegate all or any portion of its obligations to perform Seller Transition Services hereunder to M-III Partners, LP or its affiliates, to former employees of Seller re-engaged as contractors for the benefit of the Seller's bankruptcy estate, or other third-party firms; and provided, further that no such assignment or delegation shall release the applicable Seller of its obligations hereunder.

1.2. During the Term, Buyer will provide, or cause to be provided, to Seller those specific services as described and for up to the length of time specified on Schedule 2 to this Agreement, upon the terms and subject to the conditions set forth in this Agreement (the "Buyer Transition Services" and, together with Seller Transition Services, the "Transition Services").

1.3. During the Term, a Party may request that the other Party (i) provide additional Transition Services that are not currently described on Schedule 1 or Schedule 2 and/or (ii) make

1

US_ACTIVE-154426196.9

modifications to existing Transition Services. Seller or Buyer, as applicable, will use commercially reasonable efforts to accommodate any such reasonable requests. The requesting Party shall submit a request in writing to the other Party specifying the nature of the additional or modified Transition Services; the Parties shall negotiate as to any such applicable changes, including, without limitation, pricing, scope and term; and Schedule 1 or Schedule 2, as applicable, shall be amended to incorporate such changes that are finally agreed upon pursuant to a written instrument signed by Seller and Buyer.

ARTICLE 2

TERM AND TERMINATION

2.1.     Schedule 1 and Schedule 2 sets forth the length of the contemplated Transition Services, the term of this Agreement (the "Term") will commence on the Closing Date and continue until the date no Transition Services are being provided hereunder by any Party (such date, the "Termination Date").

(a)     Upon transition of a Seller Transition Service to Buyer or upon Buyer's determination, prior to the Termination Date, that it otherwise no longer requires one or more Seller Transition Services, Buyer may terminate one or more Seller Transition Service(s) (the "Seller Terminated Transition Services") by providing thirty (30) days advance written notice thereof to ROC (or such other notice period as specified on Schedule 1 for the particular Seller Transition Service). Upon expiration of the applicable notice period, Seller's obligation under this Agreement to provide such Seller Terminated Transition Services shall terminate, and Buyer shall no longer be obligated to make payment for such Seller Terminated Transition Services (except with respect to any amounts due and owing for any Seller Transition Service performed prior to such termination). For the avoidance of doubt, other than Seller Terminated Transition Services, all other Seller Transition Services shall continue in accordance with the terms hereof.

(b)     Upon transition of a Buyer Transition Service to Seller or upon Seller's determination, prior to the Termination Date, that it otherwise no longer requires one or more Buyer Transition Services, Seller may terminate one or more Buyer Transition Service(s) (the "Buyer Terminated Transition Services") by providing thirty (30) days advance written notice thereof to Buyer (or such other notice period as specified on Schedule 2 for the particular Buyer Transition Service). Upon expiration of the applicable notice period, Buyer's obligation under this Agreement to provide such Buyer Terminated Transition Services shall terminate, and Seller shall no longer be obligated to make payment for such Buyer Terminated Transition Services (except with respect to any amounts due and owing for any Buyer Transition Service performed prior to such termination). For the avoidance of doubt, other than Buyer Terminated Transition Services, all other Buyer Transition Services shall continue in accordance with the terms hereof.

2.2.     This Agreement shall terminate on the Termination Date, but may be terminated earlier:

(a)     Upon the written mutual agreement of Buyer and ROC; or

(b)     By Seller or Buyer:

(i)      if the other Party defaults in the payment when due of any invoiced amount payable pursuant to Article 3 and such default continues unremedied for fifteen (15) days after written notice of such default is delivered to the defaulting Party; or

(ii)     if the other Party materially breaches of any of its obligations under this Agreement (other than with respect to any failure to make payments for invoiced amounts) and such breach is not cured within thirty (30) days after written notice of such breach is delivered to the breaching Party.

(c)      Notwithstanding any provision herein to the contrary, this Section 2.2, ARTICLE 3, ARTICLE 5, ARTICLE 8 and ARTICLE 10 shall survive the termination of this Agreement and no such termination shall relieve either Party for any liability arising prior to the date of such termination, including with respect to any payment obligations.

ARTICLE 3

CHARGES FOR SERVICES

3.1.    Seller will provide Seller Transition Services to Buyer and Buyer will pay the fee(s) set forth for each such Seller Transition Service in Schedule 1 to this Agreement. In addition to such amount, in the event that Seller incurs reasonable and documented out-of-pocket expenses in the provision of any Seller Transition Services, Buyer shall reimburse Seller for all such out-of-pocket expenses. Seller shall invoice Buyer at the end of each month for the amounts owed in connection with Seller Transition Services and any other amounts that may be due hereunder. With respect to any amounts owed in connection with any Seller Terminated Transition Service, Buyer shall only be obligated to pay a *pro rata* portion of the applicable monthly fee for such Seller Terminated Transition Service, based on the number of days elapsed in the applicable month up to, and including, the effective termination date.

3.2.    Buyer will provide Buyer Transition Services to Seller and Seller will pay the fee(s) set forth for each such Buyer Transition Services in Schedule 2 to this Agreement. In addition to such amount, in the event that Buyer or any of its Affiliates incurs reasonable and documented out-of-pocket expenses in the provision of any Buyer Transition Services, Seller shall reimburse Buyer for all such out-of-pocket expenses. Buyer shall invoice Seller at the end of each month for the amounts owed in connection with Buyer Transition Services and any other amounts that may be due hereunder. With respect to any amounts owed in connection with any Buyer Terminated Transition Service, Seller shall only be obligated to pay a *pro rata* portion of the applicable monthly fee for such Buyer Terminated Transition Service, based on the number of days elapsed in the applicable month up to, and including, the effective termination date.

3.3.    Each Party acknowledges and agrees that the other Party, at its reasonable discretion, may employ third party service providers to perform or provide any of the Transition Services or any secretarial, administrative, telephone, e-mail or other services necessary or ancillary to the Transition Services, all of which may be contracted for separately by the Party providing such Transition Services through a third party. The Party providing such subcontracted Transition Services shall cause each such third party service provider to comply with the terms of this Agreement as if it was an original party hereto and to provide the Transition Services or

3

ancillary services, as applicable, in the same manner and with the same level and quality of service and degree of care as the Party responsible for providing such Transition Services is obligated to provide under this Agreement. The Party subcontracting such Transition Services shall be liable to the other Party for any breach by such third party service provider of the terms and conditions of this Agreement. Any fees charged by such third party service providers shall be included in the invoiced amounts sent to Buyer or Seller, as applicable

    3.4.    All consideration under this Agreement is exclusive of any sales, transfer, goods or services taxes or similar gross receipts based tax (including any such taxes that are required to be withheld, but excluding all other taxes including taxes based upon or calculated by reference to income, receipts or capital) imposed against or on services and other amounts due under this Agreement ("Sales Taxes") and such Sales Taxes will be added to the consideration payable by the Party receiving the Transition Services, where applicable. Such Sales Taxes shall be separately stated on the relevant invoice.

    3.5.    All amounts due to Buyer or Seller, as applicable, under this Agreement will be due and payable by wire transfer of immediately available funds within fifteen (15) calendar days of Seller's receipt or Buyer's receipt, respectively, of the invoice therefor, in each case, except as otherwise set forth on Schedule 1 or Schedule 2, as applicable. Such invoice will set forth in reasonable detail the amounts due and owing in respect of the Transition Services provided during the period since the immediately preceding invoice was submitted to the applicable Party, including fees for the Transition Services, any out-of-pocket expenses, third party costs and any applicable Sales Taxes thereon.

    3.6.    In connection with the performance of the Transition Services, no Party shall have any obligation to (a) purchase, renew, upgrade, enhance or otherwise modify any computer hardware, software, or network environment currently used, (b) provide any support or maintenance services for any computer hardware, software, or network environment that has been upgraded, enhanced or otherwise materially modified such that the cost of performing, or ability to perform, such services is materially increased from the computer hardware, software, or network environment that is currently used or (c) convert from one format to another any business data for use by any Party or any other Person in connection with the Transition Services or otherwise.

ARTICLE 4

PERFORMANCE STANDARD

    4.1.    Buyer acknowledges that Seller is not in the business of providing Seller Transition Services (or services of a like nature) to third parties, and that Seller Transition Services are being provided to Buyer by Seller as an accommodation to facilitate the transactions contemplated by the Purchase Agreement. As such, nothing in this Agreement will require or be interpreted to require Seller or its Affiliates to provide a Seller Transition Service to Buyer beyond the scope, manner, content and quality standard of such Seller Transition Service as performed by Seller as of immediately prior to the Closing Date. Seller will perform, or cause to be performed, each Seller Transition Service in good faith, in accordance with applicable Legal Requirements and in substantially the same manner and with substantially the same level and quality of service and degree of care as Seller provides the same or similar services to its operations during the Term.

4

4.2.    Seller acknowledges that Buyer is not in the business of providing Buyer Transition Services (or services of a like nature) to third parties, and that Buyer Transition Services are being provided to Seller by Buyer as an accommodation to facilitate the transactions contemplated by the Purchase Agreement. As such, nothing in this Agreement will require or be interpreted to require Buyer or its Affiliates to provide a Buyer Transition Services to Seller beyond the scope, manner, content and quality standard of such Buyer Transition Services as performed by Seller or its Affiliates as of immediately prior to the Closing Date. Buyer will perform, or cause to be performed, each Buyer Transition Services in good faith, in accordance with applicable Legal Requirements, and in substantially the same manner and with substantially the same level and quality of service and degree of care as Buyer provides the same or similar services to its operations during the Term; provided, however, to the extent that Buyer is not transferred all or any of the necessary assets to perform any of the Buyer Transition Services (for any reason), including any of the Business Data, and Buyer, in good faith, is unable to perform any of the Buyer Transition Services as a result thereof, then Buyer shall not be required to perform any such Buyer Transition Services. For the avoidance of doubt, this inability to perform any such Buyer Transition Service shall not constitute a breach of this Agreement.

4.3.    Seller and Buyer acknowledge that any Other Buyer (as defined below) shall be a third party beneficiary of, with rights to enforce, this Agreement.

ARTICLE 5

NO WARRANTIES; MAXIMUM LIABILITY

5.1. NONE OF SELLER, BUYER OR THEIR RESPECTIVE SUBSIDIARIES OR AFFILIATES MAKES ANY WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE TRANSITION SERVICES TO BE PROVIDED HEREUNDER. NONE OF SELLER, BUYER OR THEIR RESPECTIVE SUBSIDIARIES OR AFFILIATES SHALL HAVE ANY LIABILITY TO ANY OTHER PARTY HERETO, OTHER THAN IN THE CASE OF INTENTIONAL MISCONDUCT OR FRAUD ON THE PART OF SUCH PARTY WITH RESPECT TO THE TRANSITION SERVICES TO BE PROVIDED HEREUNDER, AND IN SUCH CASE, THE MAXIMUM LIABILITY OF THE PARTIES AND THEIR RESPECTIVE SUBSIDIARIES AND AFFILIATES UNDER, IN CONNECTION WITH OR RELATING TO THIS AGREEMENT AND/OR THE TRANSITION SERVICES PROVIDED BY OR ON BEHALF OF SUCH PARTY, AND THE SOLE REMEDY OF THE OTHER PARTY UNDER, IN CONNECTION WITH OR RELATING TO THIS AGREEMENT AND/OR THE SERVICES, SHALL BE A REFUND OF THE PRICE PAID FOR THE PARTICULAR TRANSITION SERVICE OR A RE-DELIVERY (OR DELIVERY) OF SUCH TRANSITION SERVICE. IN NO EVENT SHALL EITHER PARTY OR ITS RESPECTIVE SUBSIDIARIES OR AFFILIATES BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, SPECIAL, SPECULATIVE, REMOTE, PUNITIVE OR EXEMPLARY DAMAGES ARISING OUT OF THIS AGREEMENT, WHETHER RESULTING FROM NEGLIGENCE OF SUCH PARTY OR ITS SUBSIDIARIES OR AFFILIATES, OR OTHERWISE. EXCEPT AS MAY BE SPECIFICALLY PROVIDED HEREIN, ALL TRANSITION SERVICES ARE PROVIDED ON AN "AS IS" BASIS WITHOUT ANY WARRANTY, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF

5

MERCHANTABILITY, NON-INFRINGEMENT OR FITNESS FOR A PARTICULAR PURPOSE.

## ARTICLE 6

## ACCESS RIGHTS

6.1.    Buyer's Facility Access. During the Term, Buyer and its employees and representatives shall be provided reasonable access, during regular business hours and upon reasonable prior request, to, and office space within, Seller's facilities set forth on Schedule 1 for the purpose of providing Buyer Transition Services.

6.2.    Seller's Facility Access. During the Term, Seller and its employees and representatives shall be provided reasonable access, during regular business hours and upon reasonable prior request, to, and office space within, Buyer's facilities set forth on Schedule 2 for the purpose of providing Seller Transition Services.

6.3.    Compliance with Rules and Regulations. Each Party will instruct its personnel, agents, subcontractors, and other representatives to comply with the safety standards, security regulations and other published policies of the other Party while on the other Party's premises for purposes related to the Transition Services. Each Party shall ensure that when entering or within the other Party's premises, all such Party's personnel, agents, subcontractors, and other representatives must establish their identity to the satisfaction of security personnel and comply with all directions given by them, including directions to display any identification cards provided by such other Party.

## ARTICLE 7

## RELATIONSHIP MANAGEMENT

7.1.    Seller and Buyer will each appoint one (1) individual to have primary responsibility and oversight for the provision of all services under this Agreement and to be each Party's primary point of contact (each a "TSA Coordinator"). The initial TSA Coordinator on behalf of Seller will be [●]. The initial TSA Coordinator on behalf of Buyer will be Peter Mark. Each of ROC and Buyer may replace its respective TSA Coordinator by providing written notice to the other Party in accordance with Section 10.4.

7.2.    The TSA Coordinators will hold meetings, from time to time, to discuss the performance of this Agreement and seek in good faith to resolve any disputes that may arise pertaining to this Agreement.

7.3.    In the event that either Seller or Buyer, in good faith, disputes any charge set forth on an invoice provided to it by the other Party (a "Dispute"), Buyer or Seller, as applicable, shall deliver a written statement to such other Party no later than ten (10) calendar days prior to the date payment is due on such invoice providing a reasonably detailed description of each disputed item. Amounts not so disputed shall be deemed accepted and shall be paid in accordance with Section 3.5. The Parties shall work in good faith to resolve all Disputes within thirty (30) days following the delivery of a written statement to either Party, and the applicable Party's obligation to pay such

6

disputed amounts shall be tolled during the pendency of such Dispute. In the event that Buyer and Seller are unable to resolve any Dispute involving amounts that exceed One Hundred Thousand Dollars ($100,000), in the aggregate, during such thirty (30) day period, the Parties shall submit such Dispute at the earliest possible date to mediation conducted in accordance with the Commercial Mediation Procedures of the American Arbitration Association, which shall be held in New York, New York or such other place as the Parties may mutually agree. Each Party shall bear its own costs and expenses in connection with such mediation and the Parties shall equally bear the costs of the mediation. The Parties agree to participate in good faith in the mediation and negotiations related thereto for a period of thirty (30) days or such longer period as they may mutually agree following the initial mediation session. Buyer and Seller shall continue performing the Transition Services in accordance with this Agreement during the pendency of any Dispute; provided, however, that such Transition Services shall not extend beyond the Term.

ARTICLE 8

CONFIDENTIALITY

8.1.    During the Term and for a period of three (3) years thereafter, each Party shall, and shall cause its personnel, agents and subcontractors or any other Persons providing Transition Services on its behalf to, keep confidential and not make available or disclose any non-public information or material of the other Party that is or has been (a) disclosed or made available to such Persons under or in connection with this Agreement, whether orally, electronically, in writing or otherwise, including copies, or (b) learned, acquired, or generated by such Persons in connection with this Agreement (collectively, "Confidential Material"), without the prior written consent of the other Party. Each Party shall use the same degree of care, but no less than reasonable care, to protect the other Party's Confidential Material as it uses to protect its own Confidential Material of like nature. Notwithstanding the foregoing, Confidential Material may be disclosed on an as needed basis to personnel, subcontractors, agents or advisors of the receiving Party as necessary for the purpose of fulfilling the receiving Party's obligations under this Agreement; provided that (i) the receiving Party takes all reasonable steps to ensure that any such Confidential Material disclosed to any of its Affiliates, personnel, subcontractors, agents or any other Persons providing Transition Services on its behalf pursuant to this Section 8.1 is treated as confidential by such Persons and (ii) the receiving Party remains liable for any breach of this ARTICLE 8 by such Persons.

8.2.    The provisions of this ARTICLE 8 shall not apply to any Confidential Material which: (a) is or becomes commonly known within the public domain other than by breach of this Agreement or by breach of another agreement; (b) is obtained from a third party who is lawfully authorized to disclose such information free from any obligation of confidentiality; (c) is independently developed without reference to any Confidential Material; (d) is disclosed or used with the prior written approval of the disclosing Party; or (e) is disclosed by the receiving Party in response to a legal mandate (e.g., a subpoena or court order), after the receiving Party promptly notifies the disclosing Party (to the extent permitted by applicable law) and provides a reasonable opportunity to oppose such mandate (to the extent permitted by applicable law).

ARTICLE 9

SYSTEM ACCESS

9.1.    If a Party is given access to the other Party's computer systems or software (collectively, the "Systems") in connection with the Transition Services, the Party given access shall, and shall cause its personnel, agents and subcontractors to, comply with all of the other Party's commercially reasonable system security policies, procedures and requirements that have been provided to it in writing (collectively, "Security Policies"), and not tamper with, compromise or circumvent any security or audit measures employed by such other Party. The Party given access shall, and shall cause its personnel, agents and subcontractors to, access and use only those Systems of the other Party for which it has been granted the right to access and use.

9.2.    Each Party is responsible for performing commercially reasonable checks on its personnel, agents, subcontractors or any other Persons providing Transition Services on its behalf, before granting such Persons access to use the other Party's Systems.

9.3.    Each Party shall use commercially reasonable efforts to ensure that only those of its personnel, agents, or subcontractors who are specifically authorized to have access to the Systems of the other Party gain such access, and prevent unauthorized access, use, destruction, alteration or loss of information contained therein, including notifying its personnel, agents, or subcontractors of the restrictions set forth in this Agreement and of the Security Policies.

9.4.    If, at any time, a Party given access to the other Party's Systems determines that any of its personnel, agents, or subcontractors has sought to circumvent, or has circumvented, the Security Policies, gained unauthorized access, or has engaged in activities that may lead to the unauthorized access, use, destruction, alteration or loss of data, information or software of the other Party, the Party given access shall promptly terminate any such Person's access to the Systems and immediately notify the other Party. The Parties shall use commercially reasonable efforts to cooperate with each other in investigating any apparent unauthorized access to the other Party's Systems.

ARTICLE 10

MISCELLANEOUS

10.1.    Entire Agreement; Assignment. This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof. The rights and obligations under this Agreement may not be assigned by either Party without the prior written consent of the other Party which shall not be unreasonably withheld, conditioned or delayed; provided, however, that (a) either Party may assign its rights and obligations hereunder without such consent to a Subsidiary or Affiliate of such Party and (b) Seller shall have the right to assign its rights and obligations hereunder pursuant to the last sentence of this Section 10.1. This Agreement will be binding upon, inure to the benefit of, and be enforceable by the successors and permitted assigns of the Parties and the name of a Party appearing herein will be deemed to include the names of such Party's successors and permitted assigns to the extent

8

necessary to carry out the intent of this Agreement. Notwithstanding anything to the contrary herein, in the event that Seller sells, assigns or conveys a significant part of those of its assets that are not purchased and assumed by Buyer, including in connection with the Bankruptcy Case or otherwise, to one Person or a group of affiliated Persons (other than to Buyer) (an "Other Buyer"), then Seller (i) shall require the Other Buyer to assume all obligations and liabilities of Seller related to the relevant Transition Services being provided by Seller under this Agreement as if the Other Buyer was an original party to this Agreement and (ii) may, without the consent of Buyer, freely assign this Agreement in whole and all of its rights under this Agreement, to the Other Buyer and, with respect to each applicable Transition Service under this Agreement, the term "Seller" shall be deemed to include the Other Buyer to the extent that the Other Buyer is an obligee of such applicable Transition Service.

10.2.    Relationship between the Parties. Each Party's relationship with the other hereunder shall be solely that of an independent contractor, and there is no agency, joint venture, partnership, or any other relationship between the Parties. Each Party shall be solely responsible for all salary, employment, payroll and other benefits of and liabilities owed to, and compliance with immigration and visa laws and requirements in respect of, its personnel assigned to perform services. In performing their respective duties hereunder, all personnel engaged in providing Transition Services shall be under the direction, control and supervision of the providing Party; and the providing Party shall have the sole right to exercise all authority with respect to the employment (including termination of employment), assignment and compensation of such personnel. The employees of the providing Party engaged in providing Transition Services to the receiving Party shall not, by virtue thereof, become employees of the receiving Party.

10.3.    Data Ownership. Financial and accounting data newly created pursuant to a Transition Service provided hereunder and on behalf of the Party receiving such Transition Service shall be owned by such receiving Party. The Parties hereby acknowledge and agree that, as between the Parties, any and all intellectual property and other properties and assets owned or licensed by any Party hereunder shall remain at all times the sole and exclusive property and assets of such Party; provided that nothing herein shall create, grant or imply to any Party providing Transition Services any licenses under any trademark, patent or copyright or any other intellectual property right in respect of any intellectual property of the Party receiving Transition Services or its Affiliates. No Party or any of its Affiliates will otherwise gain, by virtue of this Agreement, any rights of ownership or use for any patents, copyrights, trade secrets, trademarks or any other intellectual property rights owned by the other Party or its Affiliates.

10.4.    Notices.

(a)    All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (i) on the date of service, if served personally on the Party to whom notice is to be given; (ii) when transmitted via electronic mail to the applicable electronic mail address set forth below if confirmation of receipt is obtained promptly after completion of transmission; (iii) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service; or (iv) on the fifth (5th) day after mailing, if mailed to the Party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the Party as follows:

If to Seller:

      Remington Outdoor Company, Inc.
      100 Electronics Blvd., SW
      Huntsville, Alabama 35824
      Attention: Ken D'Arcy
      Email: ken.darcy@remington.com

With a copy in either case to (which copy alone shall not constitute notice):

      O'Melveny & Myers LLP
      400 South Hope Street
      Los Angeles, California 90071
      Attention: John-Paul Motley, Esq., and Stephen H. Warren, Esq.
      Phone: (213) 430-6100 and (213) 430-7875, respectively
      Email: jpmotley@omm.com and swarren@omm.com, respectively

If to Buyer:

      Vista Outdoor Inc.
      1 Vista Way
      Anoka, MN 55303
      Attention: Dylan S. Ramsey
      Email: Dylan.Ramsey@VistaOutdoor.com

With a copy to (which copy alone shall not constitute notice):

      Reed Smith LLP
      599 Lexington Avenue
      New York, NY 10022
      Attention: Christopher M. Sheaffer
      Email: CSheaffer@ReedSmith.com

(b)      Any Party may change its address for the purpose of this <u>Section 10.4</u> by giving the other Party written notice of its new address in the manner set forth above

10.5.  <u>Cooperation</u>. The Parties will reasonably cooperate with each other in all matters relating to the provision and receipt of Transition Services hereunder and to mitigate problems should they arise. Either Party may substitute any of their controlled Affiliates to provide a service; <u>provided</u>, in each case, any additional cost to the receiving Party for a service caused by, relating to or arising out of any such substitution shall be borne by the providing Party for that service and, the performance and quality of the services provided by such controlled Affiliate shall ultimately be the responsibility of the original Party to this Agreement. To the extent that any service is provided or received by an controlled Affiliate of a Party, such Party shall cause (and be liable for) its respective controlled Affiliates to comply with the terms and conditions of this Agreement relating to the provision and receipt of services, and the performance and quality thereof, including

10

providing necessary information and documentation, as if such controlled Affiliate or successor were a "Party" under this Agreement.

10.6.    <u>Governing Law; Jurisdiction</u>. This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of Delaware (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such State are superseded by the Bankruptcy Code. For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After Seller is no longer subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction over the Northern District of Alabama.

10.7.    <u>Waiver of Jury Trial</u>. EACH PARTY TO THIS AGREEMENT IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE SUCH WAIVER, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, (C) IT MAKES SUCH WAIVER VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 10.7</u>.

10.8.    <u>Construction</u>. The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement. The Parties have jointly participated in the negotiation and drafting of this Agreement. In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumptions or burdens of proof shall arise favoring any Party by virtue of the authorship of any of the provisions of this Agreement.

10.9.    <u>Schedules</u>. All Schedules to this Agreement are hereby incorporated into this Agreement and are hereby made a part hereof as if set out in full in this Agreement.

10.10.    <u>Severability</u>. If any term, provision, agreement, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, agreements, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner so that the transactions contemplated hereby may be consummated as originally contemplated to the fullest extent possible.

10.11.  Amendments; Waiver. This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the Parties, or in the case of a waiver, by the Party waiving compliance. Any waiver by any Party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

10.12.  Force Majeure. No Party shall be responsible for failure to perform its respective obligations hereunder during the pendency of a force majeure which shall include, but not be limited to: fires; floods; riots; strikes; labor disputes; freight embargoes or transportation delays (not caused by such Party); inability or delay attributable to acts of third parties to secure fuel, material, supplies, equipment, or power at reasonable prices or on account of shortages thereof; acts of God or of the public enemy; any existing or future laws, rules, regulations, or acts of any federal, state, or local government (including specifically, but not exclusively, any orders, rules, or regulations issued by any official or agency of any such government, including those relating to any declared pandemic) that would prohibit under applicable law, or otherwise render impossible, performance hereunder; or any other cause beyond the reasonable control of a Party. The Party claiming that its failure to perform is caused by force majeure shall give written notice to the Party receiving the affected Transition Services as soon as reasonably practicable, stating the date and the anticipated impact of such event. During the pendency of such force majeure, the Party whose performance is prevented shall use commercially reasonable efforts to fulfill its obligations hereunder by other means, shall perform all other obligations under this Agreement that are not subject to a force majeure and, in any event, shall upon termination of such force majeure, promptly cure the failure to perform as soon as possible. If performance has not been cured within ten (10) days, the other Party may arrange for such performance from a third party (and deduct any reasonable out-of-pocket costs payable to the third party in connection therewith from the amounts due hereunder for the applicable affected services) or terminate this Agreement with respect to the affected Transition Service(s).

10.13.  Counterparts and Facsimiles. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument. Executed signature pages to this Agreement may be delivered by electronic mail and such electronic copies will be deemed as sufficient as if actual signature pages had been delivered.

[*Signatures are on the following pages.*]

**IN WITNESS WHEREOF**, the Parties have executed and delivered this Agreement as of the date first above written.

**SELLER:**

**REMINGTON OUTDOOR COMPANY, INC.**

By: _____
    Name: Ken D'Arcy
    Title: Chief Executive Officer

**FGI OPERATING COMPANY, LLC**

By: _____
    Name: Ken D'Arcy
    Title: Chief Executive Officer

**FGI HOLDING COMPANY, LLC**

By: _____
    Name: Ken D'Arcy
    Title: Chief Executive Officer

**BARNES BULLETS, LLC**

By: _____
    Name: Ken D'Arcy
    Title: Chief Executive Officer

**REMINGTON ARMS COMPANY, LLC**

By: _____
    Name: Ken D'Arcy
    Title: Chief Executive Officer

**RA BRANDS, L.L.C.**

By: _____
    Name: Ken D'Arcy
    Title: Chief Executive Officer

**OUTDOOR SERVICES, LLC**

By: _____
    Name: Ken D'Arcy
    Title: Chief Executive Officer

[Signature page to Transition Services Agreement]

**FGI FINANCE INC.**

By: _____
    Name: Ken D'Arcy
    Title: Chief Executive Officer

**HUNTSVILLE HOLDINGS LLC**

By: _____
    Name: Ken D'Arcy
    Title: Chief Executive Officer

**TMRI, INC.**

By: _____
    Name: Ken D'Arcy
    Title: Chief Executive Officer

**REMINGTON ARMS DISTRIBUTION
COMPANY, LLC**

By: _____
    Name: Ken D'Arcy
    Title: Chief Executive Officer

**32E PRODUCTIONS, LLC**

By: _____
    Name: Ken D'Arcy
    Title: Chief Executive Officer

**GREAT OUTDOORS HOLDCO, LLC**

By: _____
    Name: Ken D'Arcy
    Title: Chief Executive Officer

[Signature page to Transition Services Agreement]

**IN WITNESS WHEREOF**, the Parties have executed and delivered this Agreement as of the date first above written.

<u>**BUYER**</u>**:**

**VISTA OUTDOOR INC.**

By: _____
   Name:
    Title:

[Signature page to Transition Services Agreement]

# SCHEDULE 1

## Seller Transition Services

(See Attached)

# SCHEDULE 1

# FORWARD (SELLER / REMAINCO TO PROVIDE TO BUYER) TRANSITION SERVICES AGREEMENT

**Services to be provided and administered consistent with past practices at Remington Outdoor Company pre-bankruptcy filing**

i) Madison, NC Facility (870 Remington Dr., Madison, NC 27025)
ii) Huntsville, AL Facility (1816 Remington Circle SW, Huntsville, AL 35824)
iii) Mona, UT Facility (38 Frontage Rd, Mona, UT 84645)

| Service Level | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Facility Access | | | | | | | | | |
| Function | Service Name | Payment Terms | Monthly Cost Metric | Term | Remington Contact | Contact Info | VSTO Contact | Contact Info | |
| Finance / HR | Payroll / ADP Contract / Timekeeping Software | Direct ACH from Buyer | Actual cost of the Buyer's employees, plus applicable fees, surcharges or headcount hours of Seller FTE's required to administer payroll; plus actual cost of timekeeping software applicable to the Business | The later of: 45 calendar days or the Wind-Up Date | Melissa Briggs | [TBD][1] | Laura Burgess | laura.burgess@vistaoutdoor.com 763-712-6210 | |
| HR | Benefits Administration | Direct ACH from Buyer | Actual cost of the Buyer's employees plus applicable fees, surcharges or headcount hours of Seller FTE's required to administer benefits | The later of: 45 calendar days or the Wind-Up Date | Oralia Johnson | [TBD][1] | Christine Roth | christine.roth@vistaoutdoor.com 571-343-7008 | |
| IT | Backup Server | N15 | Actual cost to keep server operational | The later of: 45 calendar days or the Wind-Up Date | [TBD][1] | [TBD][1] | Aimee Martin | aimee.martin@vistaoutdoor.com 763-433-1008 | |
| Facilities | Office Space (Madison and Huntsville Offices) | N15 | Number of Buyer's employees on-site divided by total number of employees onsite in each applicable month, multiplied by actual lease costs for that month for each facility | The later of: 45 calendar days or the Wind-Up Date | [TBD][1] | [TBD][1] | Doug Larson | douglas.larson@vistaoutdoor.com 763-323-3876 | |
| Warehouse / Logistics / Distribution | Geodis Contract | N15 | Any freight and management fees specifically identifiable to the Business (as defined in the APA), plus average inventory at facility for the Business divided by total average inventory for the Firearms, Ammunition, Barnes and Consumer businesses at the facility, multiplied by any rent or additional costs to the Firearms, Barnes or Consumer businesses) (to exclude costs specifically identifiable | The later of: 45 calendar days or the Wind-Up Date | [TBD][1] | [TBD][1] | Greg Butler | greg.butler@vistaoutdoor.com 763-323-2534 | |
| Supply Chain | Corp. Ammo Supply Chain Oversight (One FTE) | N15 | Actual cost of one FTE | 30 calendar days | [TBD][1] | [TBD][1] | Tyson Schmidtke | tyson.schmidtke@vistaoutdoor.com 763-323-3701 | |
| General | Business Data | N15 | No charge (so long as no custom reports are requested) | The later of: 45 calendar days or the Wind-Up Date | [TBD][1] | [TBD][1] | Peter Mark | peter.mark@vistaoutdoor.com 612-240-7993 | |

Seller to Provide

# SCHEDULE 2

## Buyer Transition Services

(See Attached)

# SCHEDULE 2

## REVERSE (BUYER TO PROVIDE TO SELLER / REMAINCO / REMINGTON FIREARMS ACQUIROR / BARNES BULLETS ACQUIROR) TRANSITION SERVICES AGREEMENT

Error! Unknown document property name.

| Service Level | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Facility Access | | | | | | | | |
| **Function** | **Service Name** | **Payment Terms** | **Monthly Cost Metric** | **Term** | **Remington Contact** | **Contact Info** | **VSTO Contact** | **Contact Info** |
| Finance | Finance Services (to exclude AR, Tax and any services currently provided by employees not retained by Vista Outdoor) – provided on Vista Outdoor's financial reporting cadence | N15 | At cost, including an allocation for FTEs and services based on estimated time spent providing services | Earlier of 12 months or transition of functions by Seller / Remington Firearms Acquiror / Barnes Bullets Acquiror | [TBD][2] | [TBD][2] | Mark Kowalski  Al Kerfeld | mark.kowalski@vistaoutdoor.com  763-712-6244  allan.kerfeld@vistaoutdoor.com  763-323-3761 |
| IT & HR | SAP and Other Software Platform Access (Vista Outdoor will not support the SAP S4 Hana update nor will it maintain the firearms A&D book) | N15 | At cost (non-software / platform related IT services will be categorized as Separation Support) | Earlier of 12 months or transition of functions by Seller / Remington Firearms Acquiror / Barnes Bullets Acquiror | [TBD][2] | [TBD][2] | Aimee Martin | aimee.martin@vistaoutdoor.com  763-433-1008 |
| General | Business Data | N/A | No charge (so long as no custom reports are requested) | Earlier of 12 months or transition of functions by Seller / Remington Firearms Acquiror / Barnes Bullets Acquiror | [TBD][2] | [TBD][2] | Peter Mark | peter.mark@vistaoutdoor.com  612-240-7993 |
| General | Separation Support | N15 | At cost (including charge for FTE time spent) | Earlier of 12 months or transition of functions by Seller / Remington Firearms Acquiror / Barnes Bullets Acquiror | [TBD][2] | [TBD][2] | Peter Mark | peter.mark@vistaoutdoor.com  612-240-7993 |

Services to be provided and administered consistent with past practices at Remington Outdoor Company pre-bankruptcy filing

ij) Lonoke, AR Facility (2592 AR 15 N, Lonoke, AR 72086)

Seller to Provide

# EXHIBIT 8

(*See* attached form of Trademark License Agreement)

**EXHIBIT 8**

## TRADEMARK LICENSE AGREEMENT

This Trademark License Agreement ("Agreement"), dated as of September __, 2020, (the "Effective Date"), is entered into by and between Vista Outdoor Inc., a Delaware corporation located at 1 Vista Way, Anoka, MN 55303 ("Licensor"), and the Roundhill Group, LLC ("Licensee"). Licensor and Licensee are sometimes referred to herein individually as a "Party" and together as the "Parties".

## RECITALS

WHEREAS, Licensor and Remington Outdoor Company, Inc., ("ROC") a Delaware corporation located at 100 Electronics Blvd., SW Huntsville, AL 35824 are, among others, parties to that certain Asset Purchase Agreement, dated September [●], 2020 (the "Ammunition APA"), pursuant to which Licensor, among other things, has acquired certain assets related to the ammunition business operated by ROC and certain of its Affiliates; and

WHEREAS, Licensee and ROC are, among others, parties to that certain Asset Purchase Agreement, dated September [●], 2020 (the "Firearms APA"), pursuant to which Licensee, among other things, has acquired certain assets (the "Firearms Assets") related to the firearms business operated by ROC and certain of its Affiliates; and

WHEREAS, in connection with the transactions contemplated by the Firearms APA, Licensee paid an aggregate purchase price of $12,500,000 to ROC in order to acquire the Firearms Assets; and

WHEREAS, following the Effective Date, Licensee has agreed to continue to invest in and otherwise develop the value of the brand and other intellectual property right included in the Licensed Trademarks; and

WHEREAS, Licensee's willingness to purchase the Firearms Assets and willingness to continue to invest in the Licensed Trademarks will have a direct and material benefit to Licensor, without which, Licensor would not have been willing to consummate the transactions contemplated by the Ammunition APA; and

WHEREAS, in connection with the transactions contemplated by the Ammunition APA and Firearms APA, Licensor has agreed, as of the Effective Date, to enter into this Agreement to enable use of the Licensed Trademarks (as defined below) in connection with Licensee's operation of the Firearms Business (as defined herein); and

WHEREAS, subject to the terms and conditions set forth herein, Licensor desires to exclusively license use of the Licensed Trademarks to License to manufacture, sell and/or distribute the Licensed Products;

WHEREAS, Licensee has the capability to perform such duties and desires to become an exclusive licensee of the Licensed Trademarks for said purpose; and

US_ACTIVE-154476691.21

WHEREAS, Licensor is willing to grant an exclusive trademark license for this purpose to use the Licensed Trademarks on the terms set forth in this Agreement and the Appendices attached to and forming part of this Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

DEFINITIONS

Capitalized terms used but not defined in this list herein shall have the meaning given them in the body of this Agreement.

"Affiliate" means, with respect to any Person, any other Person who, as of the Effective Date or subsequent thereto, controls, is controlled by, or is under common control with such Person, but any such other Person shall be deemed to be an Affiliate only as long as such control exists.

"Field of Use" means manufacture, distribution, advertising, promotion, offer for sale, sale, import, export, servicing, and support of Licensed Products.

"Firearms Business" means Licensee's business related to the manufacture, distribution, advertising, promotion, offer for sale, sale, servicing, and support of Licensed Products under the Licensed Trademarks, which business, for the avoidance of doubt, excludes any business related to the manufacturing, distribution and sale of ammunition and any products not listed on Appendix A.

"Licensed Products" means the products listed on Appendix A.

"Licensed Trademarks" means the trademarks used in the Firearms Business including those listed in Appendix B, as such Appendix may be updated by mutual written agreement of the Parties from time to time.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government.

"Restricted Product" means: (a) any semi-automatic rifles; (b) any rifle-caliber pistols; (c) receivers and partial receivers of the foregoing, and (d) pistols with arm braces.

"Subsidiary" means, with respect to any Person, any other Person who, as of the Effective Date or subsequent thereto, is controlled by such Person, but any such other Person shall be deemed to be a Subsidiary only as long as such control exists.

"Third Party" means any Person other than Licensor, Licensee, and their respective Affiliates and Subsidiaries.

1.    LICENSE GRANT

A.    <u>Trademark License</u>. Licensor hereby grants to Licensee a non-transferable, exclusive (even as to Licensor), sublicensable (subject to <u>Section 1.F</u> herein), worldwide, royalty free, fully paid-up, right and license during the Term in the Field of Use to utilize the Licensed Trademarks solely (i) on all Licensed Products, (ii) the packaging accompanying Licensed Products, (iii) marketing materials and web site content relating to Licensed Products, and (iv) within a domain name (but, except as otherwise set forth herein) only in conjunction with the word "firearm", "firearms", "arms" or another word of similar meaning). For avoidance of doubt, neither the license in this <u>Section 1.A</u> herein nor any other provision of this Agreement shall restrict (or is intended to restrict) the right of Licensor to license the Licensed Trademarks to any other entity relating to any products or services outside the Field of Use. Licensee shall place on all packaging and marketing materials for Licensed Products appropriate trademark notices for the Licensed Trademarks and a notice indicating that the Licensed Trademarks are owned by Licensor and are used under license, and that Licensor is not a manufacturer, endorser, or seller of the Licensed Products.

B.    <u>Limitation on Licensee.</u> Notwithstanding anything to the contrary set forth herein, Licensee shall not (i) use the Licensed Trademarks on any Restricted Products (other than in connection with sales of Restricted Products to the military or a law enforcement agency), or (ii) otherwise market or sell Restricted Products under any other trademark on any web site or within any marketing materials that also include or reference the Licensed Trademarks or the Licensed Products marketed or sold using the Licensed Trademarks.

C.    <u>Exclusivity; Reservation of Rights</u>. The license granted hereunder is exclusive, except as otherwise contemplated hereby, even as to Licensor. Accordingly, during the Term, , Licensor shall not use or permit any Third Party to use any of the Licensed Trademarks on or in connection with the manufacture, distribution, advertising, promotion, offer for sale, sale, import, export, servicing, or support of Licensed Products, anywhere in the world. With the exception of the license specifically granted in this Agreement to the Licensed Trademarks, no license or rights beyond the scope set forth herein or under any other trademark, service mark, trade name, trade dress, domain name or any other intellectual property or other proprietary right of Licensor is granted by this Agreement. All rights not expressly granted by Licensor hereunder are expressly reserved by Licensor.

D.    <u>Trademark Usage Guidelines</u>. Licensee agrees to use the Licensed Trademarks in accordance with the Trademark Usage Guidelines included as <u>Appendix C</u> ("<u>Trademark Usage Guidelines</u>"). However, Licensee's continued use of the Licensed Trademarks in connection with the Licensed Products in the same or substantially the same manner as such Licensed Trademarks were previously used or are currently used shall be deemed to comply with the Trademark Usage Guidelines. If Licensee wishes to use the Licensed Trademarks in a manner that is not in accordance with the Trademark Usage Guidelines or in a manner that is not the same or substantially the same manner as such Licensed Trademarks were previously used or are currently used, Licensee must request Licensor's approval prior to such use. Requests for such approvals from Licensor in relation to the Licensed Trademarks under this Agreement are to be submitted in writing to the Licensor's authorized brand licensing representative designated to review and approve such uses; Licensor shall not unreasonably withhold its approval for any such use. Should

3

Licensor update or modify the Trademark Usage Guidelines, which must be reasonable and may not occur more than once per calendar year, such updates or modifications shall take effect ninety (90) days after written notice thereof is provided to Licensee, and Licensee shall implement any applicable changes within such timeframe or a commercially reasonable timeframe agreed by the Parties in writing; provided, however, that in no event may Licensor modify the Trademark Usage Guidelines in a manner that limits, eliminates or otherwise modifies the scope of the license granted to Licensee under <u>Section 1.D</u> or prohibits use of the Licensed Trademarks on and in connection with Licensed Products as used on the date hereof. For the avoidance of doubt, Licensee shall not be required to modify any Licensed Products or other materials and collateral existing prior to such effective date that were in compliance with the Trademark Usage Guidelines applicable as of their release. Licensee shall ensure that all Licensed Products sold by Licensee and all related quotations, specifications, and descriptive literature, and all other materials carrying the Licensed Trademarks, be marked with the appropriate trademark notices in accordance with the Trademark Usage Guidelines.

E.     <u>No Assignment</u>. Nothing in <u>Section 1.A</u> or <u>Section 1.C</u> of this Agreement is to be construed as an assignment or grant to Licensee of any right, title, or interest in the Licensed Trademarks or in any copyright, design, trademark, trade dress, domain name or other property right of Licensor beyond the license expressly granted.

F.     <u>Sublicense Rights</u>. Licensee shall be permitted to freely sublicense the Licensed Trademarks in the Field of Use, provided that all sublicensees shall be bound to the terms and conditions herein and shall be required to fully comply with the terms of this Agreement (including the confidentiality provisions and all Licensee restrictions). Licensee shall be strictly liable for any breach of the terms of this Agreement by a sublicensee, and shall be responsible for enforcing the usage restrictions set forth in this Agreement with regard to the Licensed Trademarks against all of its sublicensees. Any Affiliate sublicensee shall be jointly and severally liable with Licensee under this Agreement. Licensee shall provide Licensor with an updated list of all active sublicense agreements including the scope of and parties to the relevant sublicenses at least once per calendar year and additionally upon Licensor's reasonable request.

G.     <u>Remington Domain Name</u>.  Notwithstanding anything to the contrary set forth herein, promptly following the Effective Date, the Parties shall cooperate in good faith and take all commercially reasonable measures to ensure that the "Remington.com" domain name (as well as any other domain names mutually agreed to by the Parties) link or otherwise provide access to separate websites for (i) the business of Licensor and its Affiliates (which, subject to the terms hereof, will be managed by Licensor) and (ii) the Firearms Business (which, subject to the terms hereof, will be managed by Licensee).

2.     QUALITY STANDARDS, QUALITY CONTROL AND INSPECTION

A.     <u>Suppliers</u>. Licensee will manufacture, or cause, direct, and supervise the manufacture of Licensed Products and will provide, or cause, direct and supervise, the provision of related services by the supplier(s) used by Licensee (or any other entity that controlled the Firearms Business) as of the Effective Date and such new suppliers as may be added from time to time by Licensee ("<u>Suppliers</u>"). Licensor and Licensee agree that such new Suppliers shall be of

4

at least comparable quality in terms of the products or services supplied as the Suppliers used by or on behalf of Licensor as of the Effective Date.

B. <u>Product Standards</u>. Licensee shall make, label, distribute, offer, provide and sell Licensed Products in accordance with the Trademark Usage Guidelines and the general product/service quality standards established used in the Firearms Business as of the Effective Date ("<u>Existing Standards</u>"). Quality standards for Licensed Products not in existence as of the Effective Date shall be at least of a level comparable with the Existing Standards to the extent applicable to such Licensed Product ("<u>Comparable Standards</u>"). Licensee will distribute and sell only Licensed Products that meet the Existing Standards or Comparable Standards. Each Party acknowledges that it is in the Parties' mutual interest that Licensee market, promote, and sell Licensed Products branded with the Licensed Trademarks at prices and on terms that reflect the high value and quality associated with the Licensed Trademarks to preserve and enhance the goodwill and reputation associated with the Licensed Trademarks for premium quality products. Each Party covenants that it shall not take any actions that would be reasonably likely to result in a diminution in value to the value of the brands or the quality of the products associated with the Licensed Trademarks.

C. <u>Quality Verification</u>. Licensee will assure testing, inspection and auditing of the products sufficient to minimize the likelihood of defective products entering the stream of commerce and, (1) before first sale or distribution of any Licensed Products manufactured and launched after the Effective Date and (2) during the Term as reasonably required by Licensor from time to time but no more than once per calendar year, furnish to Licensor without charge a copy of Licensee's and, if applicable, its Suppliers', quality verification, auditing and testing data for Licensor's review.

D. <u>Quality Control Records</u>. If requested in writing by Licensor, Licensee shall reasonably make available and provide to Licensor, for Licensor's review, inspection and retention, such reasonable reports or data relating to quality control systems or processes for the Licensed Products. Should Licensor provide written notice outlining a reasonable basis upon which it believes that one or more Licensed Products does not conform to the applicable Existing Standards or Comparable Standards in accordance with this Agreement, Licensee will carry out appropriate quality control tests reasonably requested in writing by Licensor to determine whether such Licensed Products conform to the Existing Standards or Comparable Standards and will make commercially reasonable modifications and correction to Licensed Products to conform them to the Existing Standard or Comparable Standard and promptly provide to Licensor confirmation of such compliance activities and results. Licensee will keep, and request its Suppliers and Affiliates to keep, reasonable testing and quality control records for up to three (3) years from creation which records shall be open to inspection, during regular business hours of Licensee or its Suppliers, as applicable, by Licensor, upon at least ten (10) business days' prior written notice by Licensor.

E. <u>Audits</u>. Upon Licensor's written request, Licensee shall permit Licensor's authorized representatives to inspect and audit during any operational hours the facilities, operations, and procedures of Licensee once per calendar year at a mutually agreed date for the sole purposes of determining whether the Licensed Products conform to the terms of this Agreement (the "<u>Annual Inspection</u>"). Licensee shall make available to Licensor for its review during such Annual Inspection, any requested information for evaluation of Licensee's compliance

hereunder, the Licensed Products, including information related to the manufacturing, handling, processing, offering, sale, marketing and distribution of the Licensed Products to the extent necessary to confirm compliance with this Agreement. During the Annual Inspection, Licensee will provide access to quality verification and testing data and any requested samples of Licensed Products including packaging, tags, labels, marketing and advertising materials and collateral and claims substantiation data for the Licensed Products that is specifically requested by Licensor at least two (2) weeks in advance for Licensor to determine and ensure compliance with this Agreement. Licensee, its Affiliates and Suppliers will make commercially reasonable modifications or corrections to their operations, processes and procedures, brand uses, corporate identification practices, the Licensed Products that Licensor deems necessary to ensure the Licensed Products and Licensee's operations, processes and procedures, brand uses, corporate identification practices, meet and maintain the requirements of this Agreement provided that a formal request for any such modifications is submitted in writing to Licensee.

F.    Customer Service. Licensee shall also include with Licensed Products appropriate contact information for customer service and support in each country where the Licensed Products are distributed and sold. If requested in writing by Licensor, Licensee shall provide to Licensor a general outline of Licensee's warranty and service processes.

G.    Confidentiality. All of the products, information and materials provided or made available by Licensee or its Suppliers pursuant to this Section 2 will be deemed Licensee's confidential information, are for Licensor's internal purposes, and shall be used only by Licensor for confirming Licensee's compliance with this Agreement; in no event shall any such materials be disclosed to any other Person or used for any other purpose without Licensee's prior written consent.

H.    Compliance with Laws. Licensee shall use the Licensed Trademarks only in such manner as will comply with the provisions of applicable laws relating to the Licensed Products. Licensee shall affix to all Licensed Products and all materials that bear a Licensed Trademark, including, but not limited to all labels, packaging, advertising, and promotional materials, invoices, and other printed materials (i) notices, warnings, instructions and safety information in compliance with applicable law (including trademark law), and (ii) a conspicuous statement, and such other legend as Licensor may from time to time require on the packaging of the Licensed Products indicating that the Licensed Products are sold, distributed, or manufactured under license from Licensor.

3.    LICENSOR BANKRUPTCY AND COMMERCIAL LENDING TRANSACTIONS

A.    Licensor acknowledges that Licensee's rights hereunder are preserved notwithstanding any putative rejection thereof under Section 365 of the Bankruptcy Code pursuant to *Mission Product Holdings, Inc. v. Tempnology LLC*, 139 S.Ct. 165 (2019). In the event any repudiation, disclaimer, rejection, proposed repudiation, proposed disclaimer or proposed rejection of this Agreement by Licensor in any bankruptcy proceeding or liquidation whether compulsory or voluntary or compounds with its creditors or takes or suffers any similar action in consequence ("Bankruptcy Event"), Licensee shall have the right to retain and fully exercise all of its rights hereunder. Without limiting the generality of the foregoing, no putative rejection of this Agreement or other Bankruptcy Event shall terminate or rescind any right granted to the Licensee.

6

B.    In the event of a Bankruptcy Event, Licensee further reserves all rights to assert that Section 365(n) of the Bankruptcy Code or similar laws of another jurisdiction, shall be implicated. The Parties intend that the Licensed Trademarks shall constitute and have the protections afforded "intellectual property" as the term is defined in 11 U.S.C. Section 101(35A) of the United States Code or similar laws of another jurisdiction. All of the rights granted to Licensee under this Agreement shall be deemed to exist immediately before the occurrence of any Bankruptcy Event in which Licensor is a debtor. The Parties wish for the protections of Section 365(n) of the Bankruptcy Code to apply fully if Licensor commences or has commenced against it a bankruptcy case under the Bankruptcy Code and for the protections of similar laws in other jurisdictions to apply in a Bankruptcy Event of Licensor or its property. Licensor acknowledges that the rights and licenses granted to Licensee pursuant to this Agreement shall not be affected by the rejection or repudiation of this Agreement. Licensor waives all rights to object to the application of Section 365(n) of the Bankruptcy Code or similar laws of another jurisdiction or any request for relief pursuant to Section 365(n) or similar laws of another jurisdiction by or on behalf of Licensee.

C.    In the event Licensor enters into a commercial lending transaction through which its lender requires assignment of the Licensed Trademarks be pledged as collateral, Licensor shall request that such lender shall acknowledge the rights of licensee hereunder, in writing, and accord Licensee protections substantially similar, but in no event less than, to those set forth in sections (a) and (b); provided, however, that if such lender is not willing to grant such consent, Licensor shall cooperate with Licensee in good faith in an effort to ensure that Licensee obtains such protections (provided, that, in no event shall Licensor be required to engage in any litigation or incur any out of pocket expenses in connection therewith). For the avoidance of doubt, it is the intent of the Parties for the license granted pursuant to this Agreement to extend and survive notwithstanding the exercise of any rights of foreclosure and/or sale by a lender pursuant to Article IX of the Uniform Commercial Code, as made applicable by state law.

D.    Promptly following the Effective Date, the Parties shall record a summary of this Agreement, in form and substance substantially similar to that attached hereto as Appendix D, with the United States Patent and Trademark Office.

4.    PACKAGING, ADVERTISING MATERIALS AND SAMPLES

A.    All packaging and related materials shall conform to the Existing Standards or Comparable Standards and the Trademark Usage Guidelines. If Licensee wishes to use any packaging or related materials that do not conform to the Existing Standards or Comparable Standards and the Trademark Usage Guidelines, such uses must be previewed with Licensor prior to Licensee's use.

B.    Except as otherwise contemplated hereby, Licensee will have sole responsibility for advertising and marketing expenses relating to Licensed Products. Licensee will reimburse Licensor for Licensor's reasonable out-of-pocket costs of producing any artwork and related materials requested by Licensee that Licensor chooses to create on Licensee's request, upon the submission of appropriate documentation as to Licensor's out-of-pocket costs.  Licensor acknowledges that it will receive a direct economic benefit from Licensee's investment in the Licensed Trademarks and Licensed Products, including through Licensee's marketing efforts to

7

promote the shared brands. In furtherance of the foregoing, following the Effective Date, upon the written request of Licensee, Licensor shall promptly reimburse Licensee for up to Seven Million Five Hundred Thousand ($7,500,000) of its expenses incurred in connection with (i) the marketing, promotion or sale of the Licensed Products and/or (ii) Licensee's hiring of employees in connection with the operation of the Firearms Business and/or (iii) Licensee's reorganizing or modernizing the facilities used in the Firearms Business, which will be paid Licensor by wire transfer to an account designated by Licensee.

      C.     Licensee shall not make any false claims or material misrepresentations about Licensed Products and agrees to include appropriate disclaimers or informational statements on packaging and in promotional materials for Licensed Products. Licensor assumes no liability to Licensee, its Affiliates, its customers, or any other Third Party, with respect to the performance of Licensed Products.

5.      OWNERSHIP AND PROTECTION OF RIGHTS

      A.     <u>Ownership</u>. Licensee acknowledges that the Licensed Trademarks are inherently distinctive, that Licensor (and/or its Affiliates) is the owner of and has acquired a substantial and valuable goodwill in the Licensed Trademarks, and that all use thereof by Licensee and its Affiliates and Suppliers inures solely to the benefit of Licensor (and/or its Affiliates). Licensee agrees to put reasonable notice of such ownership that Licensor shall require on the tags or labels or packaging and/or advertising materials for the Licensed Products, including a trademark notice as applicable and in accordance with the Trademark Usage Guidelines.

      B.     <u>No Impairment; Undertakings</u>. Licensee will not and will not permit its Affiliates or authorize its Suppliers or sublicensees to do anything that is intended to impair Licensor's proprietary rights in and to the Licensed Trademarks. Neither Licensee nor any of its Affiliates will claim any right or interest in the Licensed Trademarks, except such right as is expressly granted by this Agreement. Licensee and its Affiliates further agree not to dispute, or assist in disputing, directly or indirectly Licensor's right and title in the Licensed Trademarks. If, as a result of Licensee's use of the Licensed Trademarks, Licensee or any of its Affiliates are deemed by operation of law or otherwise to have acquired any title or other rights to any of the Licensed Trademarks or any of their components, Licensee agrees to and hereby does assign (and shall have its Affiliate(s) assign in writing, if applicable) the same to Licensor without the requirement of any further consideration. In furtherance of the above, Licensee shall ensure the concepts in <u>Appendix E</u>, to the extent reasonably practicable, are included in the relevant agreements between the Licensee and its Suppliers or sublicensees.

      C.     <u>Product Materials</u>. Licensor acknowledges that Licensee owns all rights in all graphic designs and other creative works containing the Licensed Trademarks including in packaging, promotional materials, advertising, collateral materials and other merchandising materials prepared by or for Licensee for use in connection with the distribution of Licensed Products (apart from the Licensed Trademarks themselves).

      D.     <u>Obligation to Notify</u>. Licensee shall promptly notify Licensor of any suspected infringement or misuse of any of the Licensed Trademarks that is brought to the attention of Licensee, and shall cooperate with Licensor, as Licensor shall reasonably require and at Licensor's

8

expense, in any action taken against such suspected infringement or misuse. Licensor agrees to keep Licensee reasonably informed of actual or suspected infringement or misuse of the Licensed Trademarks of which it is aware, upon Licensee's reasonable request.

E.     Prosecution. Licensee shall take reasonable steps that are necessary and prudent to maintain and protect Licensor's proprietary rights in the Licensed Trademarks during the Term. Accordingly, Licensee shall perform all reasonable actions and bear all costs and expenses incurred by Licensor associated with the prosecution and maintenance of the registrations for the Licensed Trademarks that are solely within the Field of Use, and shall promptly reimburse Licensor for any such costs and expenses within thirty (30) days of receiving Licensor's invoice therefore. For the avoidance of doubt, Licensor shall bear all costs and expenses associated with the prosecution and maintenance of the registrations for all trademarks acquired by Licensor under the Ammunition APA that are solely outside the Field of Use. With respect to registrations for Licensed Trademarks that are used both within and outside the Field of Use, Licensee and Licensor shall each pay one-half of all costs and expenses associated with the prosecution and maintenance of such registrations. Upon Licensee's reasonable request, Licensor shall cooperate with Licensee with respect to the filing and prosecution, and upon registration, maintenance, of any new trademarks that are the same or that are or could be deemed confusingly similar to any of the Licensed Trademarks in the existing territories or in new territories in order to further protect and/or expand existing trademark coverage relating to the Licensed Trademarks. In all such cases, Licensee shall be solely responsible for all of the costs and expenses related to such filing, prosecution, and maintenance, including Licensor's reasonable costs in relation thereto. All such applications and registrations shall be solely owned by Licensor and shall be deemed part of the Licensed Trademarks. In addition, Licensee shall cooperate with Licensor and execute any documents reasonably required by Licensor to protect the Licensed Trademarks.

F.     License Enforcement. Prior to bringing any claim or action against a Third Party under this Section 5.F, Licensee shall notify Licensor of the discovered suspected infringement or misuse that is the basis of such claim or action, and Licensor shall have the first right to elect to bring an enforcement action against such Third Party subject to Section 5.G. In the event that Licensor elects not to bring an action, or has not brought such action within sixty (60) days of receiving Licensee's notice, Licensee shall have the right to prosecute any such claims against such Third Party for infringement of the Licensed Trademarks within the Field of Use in Licensee's own name. Any such enforcement actions shall be brought against such Third Parties at Licensee's sole cost and expense. Licensee shall retain any recovery obtained from any such enforcement proceedings. If Licensor is required to be joined to any such proceeding (e.g., to establish standing), Licensor agrees to join such proceeding and Licensee agrees to reimburse Licensor for all of Licensor's reasonable costs and expenses associated with such proceedings (including attorney's fees). Licensor further agrees to provide documents and otherwise assist in such proceedings as may be reasonably requested by Licensee.

G.     Licensor may, in its sole discretion, take such steps to bring and/or prosecute such claims for infringement, misappropriation, or dilution of the Licensed Trademarks as Licensor may deem necessary both within and outside of the Field of Use. In the event Licensor elects to take such steps, Licensee shall cooperate fully with Licensor in such actions. Licensor shall have full control over any such enforcement action that it initiates or prosecutes, including, without limitation, the right to select counsel, to settle on any terms it deems advisable, to appeal any

adverse decision rendered in court, to discontinue any action taken by it, and to otherwise make any decision in respect thereto as Licensor deems advisable in its sole discretion. Licensor shall bear all expenses associated with any such actions brought by Licensor, provided, however, that Licensor shall also retain any recovery or settlement resulting from such enforcement actions. Licensor does not represent, warrant, or covenant that it will bring any enforcement action against any Third Party, and will bring such actions in Licensor's sole discretion. Licensor agrees to keep Licensee reasonably informed of any litigation brought by Licensor to enforce its rights in the Licensed Trademarks. For purpose of clarity, the entirety of this <u>Section 5.G</u> is subject <u>Section 5.F</u> above.

6.     INDEMNIFICATION

A.     Licensor agrees to defend, indemnify and hold harmless Licensee against all loss, expense and damage incurred and occasioned by any claim or action asserted by any Third Party (including any governmental agency) based on allegations that the Licensed Trademarks themselves (and not their uses) violate the intellectual property rights of any Third Party, provided that Licensor is reasonably notified of and tendered the defense to such claims solely with counsel of Licensor's own choosing, and no settlement is made without Licensor's prior written consent; and provided further that such indemnification obligation will not apply to third-party claims based on the use of the Licensed Trademark by Licensee in material violation of the terms and conditions of this Agreement. Licensee shall cooperate with Licensor in any such defense as Licensor shall request and at Licensor's expense. Except as expressly set forth in this Agreement, Licensor makes no warranties under this Agreement, either express or implied.

B.     Licensee agrees to defend, indemnify, and hold harmless Licensor and its Affiliates (including subsidiaries) and their parents, officers, directors, insurers, and agents against all loss, expense and damage incurred and occasioned by any claim or action asserted by any Third Party (including any governmental agency) arising out of or in any way related to the use, manufacture, distribution, offering, provision, marketing, or sale of the Licensed Products bearing or under the Licensed Trademarks (including product liability claims) and related marketing materials (including as described in <u>Section 4</u> herein) by Licensee or its Affiliates or its sublicensees (including, without limitation, any misuse of the Licensed Trademarks by such sublicensees), provided that Licensee is reasonably notified of and tendered the defense to such claims solely with counsel of the Licensee's own choosing and no settlement is made without the Licensee's prior written consent, not to be unreasonably withheld. Failure of Licensor to give prompt notice will not relieve Licensee of its obligations hereunder except to the extent such delayed notice materially prejudices Licensee. Licensor shall reasonably cooperate with Licensee in any such defense as Licensee shall request, at Licensee's expense.

C.     Licensor assumes no liability with respect to the Licensed Products. Licensee agrees to defend, indemnify and hold Licensor, its officers, agents, employees, successors or assigns harmless against any and all claims, demands, causes of action including, but not limited to, those relating to product liability, patent infringement and environmental law, and associated judgments, costs and expenses, including reasonable attorney's fees, arising out of (i) Licensee's manufacture, distribution, shipment, disposal, advertising, promotion or sale of the Licensed Products or (ii) any grossly negligent or willful act or omission by Licensee, agents or employees,

provided that Licensee receives prompt notice of such claim, demand or cause of action and is permitted to deal with it in Licensee's sole discretion.

D.    Licensee hereby agrees, and shall ensure that its Affiliates and sublicensees agree, to comply with all laws and regulations applicable to the manufacture, sale, marketing and distribution of Licensed Products bearing the Licensed Trademarks. Licensee shall provide a warranty to its end customers of the Licensed Products bearing the Licensed Trademarks against defects in design, materials, and workmanship that reflects the high quality of the Licensed Products bearing the Licensed Trademarks.

E.    Licensee will acquire and maintain at Licensee's sole expense throughout the Term and five (5) years thereafter, a policy of standard non-cancelable Commercial General Liability Insurance including coverage for Contractual Liability, Products Liability and Completed Operations on an occurrence basis. The limits of liability shall be $10,000,000 per occurrence, which may be satisfied through any combination of primary and excess or umbrella liability insurance. Licensor shall be named as an additional insured, and Licensee's insurance shall be primary and non-contributory to any insurance that may be carried by Licensor. Licensee's insurers shall be reasonably acceptable to Licensor. Licensee will direct the insurance company(ies) to furnish Licensor with a Certificate of Insurance evidencing such coverage on the Effective Date (or if not practicable, promptly thereafter), and to provide Licensor with at least thirty (30) days written notice prior to termination of coverage. For the avoidance of doubt, each Party's indemnification obligations under this Section 6 herein include the obligation to defend the other indemnified Party against each applicable third-party claim, to pay all costs and expenses, including, without limitation, attorneys' fees, associated with such defense, and to pay all damages awarded (or settlement amounts agreed to) in connection with each such claim.

F.    The undertakings of this Section 6 shall survive expiration or termination of this Agreement.

7.    TERM AND TERMINATION

A.    This Agreement will begin on the Effective Date and will continue in perpetuity unless terminated earlier in accordance with the terms hereof (the "Term").

B.    This Agreement may be terminated by Licensor upon written notice to Licensee under the following conditions:

1)    if Licensee or its Affiliates or any its other sublicensees fails to comply with any of the material terms and conditions of this Agreement and, if curable, fails to cure or otherwise remedy such breach within one hundred twenty sixty (120) days after the Licensor provides written notice to Licensee thereof; or

2)    if the Licensee enters into a bankruptcy proceeding or liquidation whether compulsory or voluntary (other than for the purpose of reorganization) or compounds with its creditors or takes or suffers any similar action in consequence and fails to operate the Firearms Business for a period of at least

11

twenty four (24) months following the date of such bankruptcy, liquidation or composition.

C.      All licenses and permissions granted by Licensor herein cease upon termination of this Agreement for any reason. After termination, Licensee shall and will continue thereafter to be obligated to assign to Licensor any rights Licensee may acquire in the Licensed Trademarks, if any, and to hold Licensor (and its Affiliates) harmless, and to defend and indemnify Licensor (and its Affiliates) as provided under <u>Section 6</u> of this Agreement. Licensee will promptly discontinue all use of and sale of Licensed Products incorporating the Licensed Trademarks and any materials using the Licensed Trademarks.

8.      MISCELLANEOUS

A.      <u>Independent Entities</u>. The Parties are independent and distinct entities. Licensee may not incur any obligation in Licensor's name or on its behalf. This Agreement will not be construed as constituting any joint venture, partnership, franchise or principal/agent relationship, nor will either Party do or permit any act that will be regarded as such.

B.      <u>Severability</u>. The declaration of any provision of this Agreement as invalid or not enforceable will not affect the remaining terms. The failure by either Party to enforce any provision of this Agreement will not affect that Party's right to enforce the same or any other provision of this Agreement.

C.      <u>Governing Law</u>. This Agreement is to be construed according to the laws of the State of Delaware without giving effect to any choice of law or conflict of law provision or rule that would cause the application of the law any other jurisdiction.

D.      <u>LIMITATION OF LIABILITY</u>. EXCEPT FOR DAMAGES ARISING FROM THE INDEMNIFICATION AND INSURANCE OBLIGATIONS PURSUANT TO <u>SECTION 6</u> HEREIN, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR SPECIAL, CONSEQUENTIAL, INCIDENTAL, PUNITIVE OR INDIRECT DAMAGES ARISING OUT OF THIS AGREEMENT, WHETHER UNDER THEORY OF CONTRACT, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR OTHERWISE, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

E.      <u>LIMIT ON WARRANTY</u>. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER PARTY MAKES ANY REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT.

F.      <u>Force Majeure</u>. Notwithstanding anything to the contrary, neither Party will be liable (for any failure to perform or otherwise) under this Agreement in accordance with its terms if failure arises out of causes beyond the control of the Parties. Such causes may include, but are not limited to, acts of God or the public enemy, acts of civil or military authority, fires, floods, earthquakes, water disasters, strikes, sabotage, insurrection, epidemic, pandemic, nuclear incident, unavailability of energy or communications sources, materials or equipment not caused by the Parties, increase in component costs, riots, war or priorities resulting from the foregoing.

G.    Delivery. A written notice by either Party to the other will be deemed delivered if personally delivered or sent by an overnight international courier, or if sent registered or certified mail, return receipt requested, to the other Party at its address given in Section 8.H, or at the address specified by the other Party in the last notice of change of address, or otherwise provided under the terms of Section 8.C herein.

H.    Notices. Notices under this Agreement are to be addressed as follows:

If to Licensee:

> Attention: Scott Soura
> 888 SE 3 Avenue, Suite 500
> Fort Lauderdale, FL 33316
> Email: soura@roundhillgroup.com

> With a copy to (which copy alone shall not constitute notice):

> Shulman Bastian Friedman & Bui, LLP
> 100 Spectrum Center Drive, Suite 600
> Irvine, California 92618
> Attention: James C. Bastian, Jr., Esq.
> Email: jbastian@shulmanbastian.com

If to Licensor:

> Vista Outdoor Inc.
> 1 Vista Way
> Anoka, MN 55303
> Attention: Dylan S. Ramsey
> Email: Dylan.Ramsey@VistaOutdoor.com

> With a copy to (which copy alone shall not constitute notice):

> Reed Smith LLP
> 599 Lexington Avenue
> New York, NY 10022
> Attention: Christopher M. Sheaffer
> Email: Csheaffer@ReedSmith.com

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the second calendar day after deposit with a reputable overnight courier service, as applicable.

I.    Execution. This Agreement may be executed by facsimile or PDF (electronic mail) copies in counterparts, each of which will be deemed an original and all of which together will constitute one and the same Agreement. Notwithstanding the foregoing, the Parties will deliver

13

original execution copies of this Agreement to one another as soon as practicable following execution thereof.

J.    Merger; Amendments. This Agreement, including all Appendices hereto, constitutes the entire understanding of the Parties with respect to the subject matter hereof, and will supersede any and all prior communications, negotiations, correspondence, course of dealings and other agreements between the Parties regarding such subject matter. This Agreement may only be amended or modified in a writing signed by both Parties. The terms and conditions of this Agreement will prevail notwithstanding any conflict with the terms and conditions of any purchase order, acknowledgment or other instrument submitted by Licensee.

K.    Assignment. Licensee may not directly or indirectly assign this Agreement or transfer any of its rights or obligations under this Agreement, in each case, operation of law or otherwise, without the prior written consent of Licensor which shall not be unreasonably withheld; provided,  however, that Licensee shall have the right to assign, transfer, sell, or pledge its rights hereunder without any required consent to: (i) any Affiliate of Licensee ; (ii) to a third-party as part of a sale of substantially all of  Licensee's business, whether through an asset purchase, stock purchase, merger, consolidation, or the like; and (iii) to any lending institution, for security purposes or as collateral, from which Licensee obtains financing, which right of assignment shall include any rights of Licensee as a third-party beneficiary.  Licensor may assign this Agreement, any of the Licensed Trademarks (subject to the license granted to Licensee hereunder), and/or any of its rights and obligations under this Agreement without restriction. Nothing in this Agreement, express or implied, is intended to confer upon any Person or party other than Licensee or Licensor, or their respective successors or permitted assigns, any rights or remedies under or by reason of this Agreement.

L.    Survival. The following Sections shall survive expiration or termination of this Agreement: Section 5, Section 6, and Section 8.

M.    Equitable Relief. Each Party acknowledges and agrees that a breach or threatened breach by the other Party of its obligations under this Agreement shall give rise to irreparable harm to such Party for which monetary damages shall not be an adequate remedy, and if such a breach or threatened breach occurs such Party will, in addition to any and all other rights and remedies that may be available to such Party under this Agreement, whether at law, at equity, or otherwise in respect of such breach, be entitled to seek equitable relief, including a temporary restraining order, an injunction, specific performance and any other equitable relief that may be available from a court of competent jurisdiction, without any requirement to (i) post a bond or other security, or (ii) prove that monetary damages will not afford an adequate remedy. Each Party agrees that it will not oppose or otherwise challenge the appropriateness of reasonably requested equitable relief with respect to a breach of this Agreement by such Party.

N.    To the extent that Licensee acquires the artwork of the Remington Museum (wherever located) pursuant to the terms of the Firearms APA, the Parties shall cooperate in good faith to ensure that such assets are split equally between the Parties based on value.

14

O.      To the extent Licensee receives any inventory related to the Dakota Arms business operated by ROC and its Affiliates, Licensee shall, following Licensor's written request, promptly transfer such inventory to Licensor.

[SIGNATURE PAGE FOLLOWS]

15

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the as of the date first above written.


LICENSOR


_____

Name:
Date:


LICENSEE


_____

Name:
Date:


[Signature Page to Trademark License Agreement]

## APPENDIX LIST

**Appendix A**: Accessories Included in Field of Use

**Appendix B**: Licensed Trademarks

**Appendix C**: Trademark Guidelines (relating to the Licensed Trademarks)

**Appendix D**: License Summary

**Appendix E**: Undertaking by Suppliers

17

## APPENDIX A
### Licensed Products

- Firearms

- Receivers

- Barrels

- Stocks

- Grips

- Rails

- Butts

- Triggers

- Safeties

- Iron Sights (excluding any electronic, or optical sights, and any scopes)

- Flash suppressors

- Recoil compensators

- Heatshields

- Silencers

- Sight adjustment tools

- Gunsmithing tools and kits

- Books and manuals (firearms related)

- Magazines

- Air Guns

- Paintball Guns

- Gun Cases; and

- Any other part or item not listed above that that can be affixed to or installed within a firearm and that was manufactured by ROC and sold under the Remington brand as part of a completed firearm as of the date of this Agreement.

18

**APPENDIX B**
**Licensed Trademarks[1]**

AIRMASTER (*for airguns and paintball guns only)
EXPRESS (*for airguns and paintball guns only)
TYRANT (*for airguns and paintball guns only)
R (Stylized)
R DEFENSE Logo
REMINGTON
REMINGTON & Ball Device
REMINGTON (Ball Design)
REMINGTON (Script)
REMINGTON (Stylized and Underlined)
REMINGTON (Stylized)
REMINGTON HTP HIGH TERMINAL PERFORMANCE
REMINGTON HYPERSONIC
REMINGTON in Circle & Underlined
REMINGTON UMC
REMINGTON UMC and Design
REMINGTON UMC and Red Ball Design

---

[1] RS Note to Draft: Parties to agree on any additional trademarks.

## APPENDIX C

### <u>Trademark Usage Guidelines (Relating to the Licensed Trademarks)</u>

1. Use of the Licensed Trademarks should include the appropriate trademark symbol, the ® or ™, in superscript following the most prominent occurrence in the relevant branding context. Every instance of use of a mark in running copy or otherwise must be capitalized, italicized, bolded, or otherwise treated with prominence.

2. Licensee shall clearly indicate on product packaging and advertising and promotional materials, that the Licensed Trademarks are used under license, and that Licensor is not a manufacturer, seller, distributor, or endorser of such products.

3. Licensee shall ensure that the Licensed Trademarks are displayed according to any specifications and/or brand standards which Licensor may provide or amend from time to time. It is Licensee's obligation to understand these restrictions and limitations.

4. Licensee shall not do anything inconsistent with Licensor's ownership of the Licensed Trademarks.

5. The Licensed Trademarks must be reproduced exactly as provided by Licensor. The Licensed Trademarks may not be altered, amended, distorted, or combined with any other symbols, words, images, or designs, and may not be incorporated into a tagline or slogan.

6. Any use of a Licensed Trademark which is not addressed in the guidelines set forth herein, must be approved by Licensor prior to its use. Submittals for approval should be faxed/emailed to the attention of the Licensor representative.

7. Usage of the Licensed Trademarks shall be in strict compliance with those restrictions set forth in that certain Trademark Settlement Agreement by and between Remington Arms Company, Inc. and Remington Products, Inc. dated December 5, 1986.

## APPENDIX D

## License Summary

NOTICE OF LICENSE

This document provides notice of a License Agreement (the "License Agreement") by and between [Vista Outdoor Inc.] ("Licensor") and Roundhill Group, LLC ("Licensee"), dated October __, 2020.

The material terms of the License Agreement are set forth below.  Any owner of the Licensed Trademarks (as defined below) takes such ownership subject to the rights granted under the License Agreement.

1) Licensor has granted Licensee a non-transferable, exclusive (even as to Licensor), sublicensable, worldwide, royalty free, fully paid-up, right and license to use the trademarks attached hereto as Exhibit A (the "Licensed Trademarks").

2) Licensee has the exclusive right (even as to Licensor) to use the Licensed Trademarks in connection with the manufacture, distribution, advertising, promotion, offer for sale, sale, import, export, servicing, and support of firearms products.

3) The license granted to Licensee pursuant to the terms of the License Agreement does not include the right to use the Licensed Trademarks in connection with the manufacturing, distribution and sale of ammunition products, as well as certain other product categories mutually agreed to by Licensor and Licensee.

4) The license granted under the License Agreement is perpetual unless terminated in accordance with the terms of the License Agreement.

# APPENDIX E

## UNDERTAKING BY LICENSEE'S SUPPLIER(S)

Licensee shall ensure that its suppliers and sublicensees agree to the following provisions:

**1.** SUPPLIER ACKNOWLEDGES THAT THE TRADEMARKS (THE "PROPERTY RIGHTS") SPECIFIED BY LICENSEE AND/OR LICENSOR FOR USE ON _____ (THE "LICENSED PRODUCTS") ARE THE EXCLUSIVE PROPERTY OF LICENSOR AND ITS AFFILIATES AND THE LICENSED PRODUCTS ARE MADE BY US EXCLUSIVELY FOR LICENSEE AND FOR THE BENEFIT OF LICENSOR AND ITS AFFILIATES.

**2.** SUPPLIER WILL NOT AT ANY TIME CLAIM ANY RIGHT, TITLE OR INTEREST OR IMPAIR THE RIGHTS OF LICENSOR OR ITS AFFILIATES OR LICENSEE IN THE PROPERTY RIGHTS. SUPPLIER AGREES TO EXECUTE SUCH ADDITIONAL UNDERTAKINGS OR OTHER DOCUMENTS AS LICENSOR MAY DEEM APPROPRIATE IN THIS RESPECT.

**3.** SUPPLIER AGREES TO COMPLY WITH ALL LAWS AND REGULATIONS APPLICABLE TO THE MANUFACTURE OF LICENSED PRODUCTS.

**4.** SUPPLIER WILL CARRY OUT ALL QUALITY CONTROL PROCEDURES DESIGNATED BY LICENSEE TO DETERMINE THAT THE LICENSED PRODUCTS CONFORM TO THE QUALITY CONTROL SPECIFICATIONS SPECIFIED BY LICENSOR. SUPPLIER WILL COMPLY WITH ANY GUIDELINES PROVIDED BY LICENSEE OR LICENSOR WITH RESPECT TO THE LICENSED PRODUCTS. ANY PRODUCT NOT MEETING THE PRESCRIBED QUALITY STANDARDS WILL NOT BE SOLD UNDER ANY OF THE PROPERTY RIGHTS.

**5.** SUPPLIER WILL NOT SUBCONTRACT ANY ORDER OR PART THEREOF PLACED BY LICENSEE WITHOUT LICENSEE'S EXPRESS WRITTEN CONSENT.

**6.** UPON NOTICE TO SUPPLIER BY LICENSEE, SUPPLIER WILL PROMPTLY DELIVER OR DESTROY ALL MATERIALS IN SUPPLIER'S POSSESSION BEARING ANY OF THE PROPERTY RIGHTS.

**7.** WITHOUT LICENSOR'S EXPRESS WRITTEN CONSENT, SUPPLIER WILL NOT USE OR AUTHORIZE OTHERS TO USE LICENSOR'S OR ANY OF ITS AFFILIATES' NAMES OR ANY OF THE PROPERTY RIGHTS IN ADVERTISING OR PROMOTING ANY OF SUPPLIER'S ACTIVITIES, PRODUCTS OR SERVICES. NOTWITHSTANDING THE FOREGOING, SUPPLIER SHALL ENSURE THAT A

22

NOTICE INDICATING THAT THE PROPERTY RIGHTS ARE OWNED BY LICENSOR AND ARE USED UNDER LICENSE, AND THAT LICENSOR IS NOT A MANUFACTURER, ENDORSER, OR SELLER OF THE LICENSED PRODUCTS.

     **8.**    SUPPLIER AGREES AND CONFIRMS THAT LICENSOR HAS THE RIGHT TO ENFORCE THIS UNDERTAKING AGAINST SUPPLIER IN ANY APPROPRIATE LEGAL FORUM INDEPENDENTLY OF LICENSEE.

     **9.**    SUPPLIER'S AGREEMENT WITH LICENSEE SHALL BE CONSTRUED ACCORDING TO THE LAWS OF THE STATE OF DELAWARE, U.S.A. AS APPLIED TO INSTRUMENTS EXECUTED AND PERFORMED IN DELAWARE.

# EXHIBIT 9

(*See* attached form of Adjustment Escrow Agreement)

EXHIBIT 9

## ADJUSTMENT ESCROW AGREEMENT

THIS ADJUSTMENT ESCROW AGREEMENT (this "Escrow Agreement"), dated as of this [●] day of [●], 2020, (the "Effective Date"), is entered into by and among Vista Outdoor Inc., a Delaware corporation ("Buyer"), Remington Outdoor Company, Inc., a Delaware corporation ("ROC"), and Delaware Trust Company, as escrow agent hereunder (the "Escrow Agent"). Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Purchase Agreement (as defined below).

WHEREAS, ROC, each of the subsidiaries of ROC set forth on the signature pages to the Purchase Agreement (collectively with ROC, "Seller") and Buyer, or a Buyer Acquisition Vehicle as assignee in accordance with Section 12.2 of the Purchase Agreement, have entered into that certain Asset Purchase Agreement (the "Purchase Agreement"), dated as of [●], 2020, whereby Buyer has agreed to purchase certain assets and liabilities of Seller;

WHEREAS, Section 3.3(a)(ii) of the Purchase Agreement requires Buyer, at the Closing, to deliver or cause to be delivered to the Escrow Agent, an amount equal to $[●] (the "Adjustment Escrow Amount"), by wire transfer of immediately available funds, to a separate and distinct account specified by the Escrow Agent (the "Adjustment Escrow Account"), which Adjustment Escrow Amount shall be held, safeguarded and released pursuant to the terms of this Escrow Agreement and the Purchase Agreement; and

WHEREAS, the parties desire to appoint the Escrow Agent to act as escrow agent hereunder, and the Escrow Agent has agreed to so act upon the terms and subject to the conditions hereinafter set forth.

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Appointment**. Buyer and ROC hereby appoint the Escrow Agent as their escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment under the terms and conditions set forth herein.

2.    **Escrow Fund**. On the Effective Date, Buyer shall deposit or shall cause to be deposited with the Escrow Agent, an amount equal to the Adjustment Escrow Amount, by wire transfer of immediately available funds, which shall be deposited in the Adjustment Escrow Account. Promptly upon receipt of the Adjustment Escrow Amount, the Escrow Agent will acknowledge in writing to Buyer and Seller that (a) it has received the Adjustment Escrow Amount and (b) has deposited the Adjustment Escrow Amount into the Adjustment Escrow Account. The Escrow Agent (i) shall hold the Adjustment Escrow Amount in the Adjustment Escrow Account and, (ii) subject to the terms and conditions hereof, may invest and reinvest the Adjustment Escrow Amount and the proceeds thereof (collectively with the Adjustment Escrow Amount, the "Escrow Fund") as directed in Section 3. The Escrow Funds shall at all times remain available for distribution in accordance with Section 4 of this Escrow Agreement. The Adjustment Escrow Amount shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any Seller or Buyer.

US_ACTIVE-154425292.7

3.    **Investment of Escrow Fund**.

(a)    Unless otherwise instructed in a joint writing signed by both the Buyer and ROC, the Escrow Agent shall hold all Escrow Funds in a "noninterest-bearing deposit account" insured by the Federal Deposit Insurance Corporation ("FDIC") to the applicable limits. The Escrow Funds shall at all times remain available for distribution in accordance with Section 4  below.

(b)    The Escrow Agent shall send an account statement to each of the Buyer and ROC on a monthly basis reflecting activity in the Escrow Accounts for the preceding month.

(c)    The Escrow Agent shall have no responsibility for any investment losses resulting from the investment, reinvestment or liquidation of the escrowed property, as applicable, provided that the Escrow Agent has made such investment, reinvestment or liquidation of the escrowed property in accordance with the terms, and subject to the conditions of this Escrow Agreement. The Escrow Agent does not have a duty nor will it undertake any duty to provide investment advice. The Escrow Agent may earn compensation in the form of short term interest on items like uncashed distribution checks (from the date issued until the date cashed), funds that the Escrow Agent is directed not to invest, deposits awaiting investment direction or received too late to be invested overnight in previously directed investments.

4.    **Disposition of the Adjustment Escrow Amount**. The Escrow Agent agrees that it will not deliver custody or possession of any of the Escrow Fund or of the Adjustment Escrow Account to anyone except pursuant to the terms of this Escrow Agreement or a Final Determination (defined below). Within five (5) Business Days (as defined below) after the final determination of the Final Working Capital, and the resulting Purchase Price, the following payments shall be made, as applicable:

(a)    If the Purchase Price is *greater than* the Estimated Purchase Price calculated at the Closing, then Buyer and ROC shall execute and deliver a joint written instruction to the Escrow Agent (a "Joint Instruction") directing the Escrow Agent to release the Escrow Fund, to ROC (on behalf of itself and, if and to the extent applicable, Seller); and

(b)    If the Purchase Price *is less than* the Estimated Purchase Price calculated at the Closing (such amount, expressed as a positive number, the "Adjustment Deficit Amount"), then Buyer and ROC shall execute and deliver a Joint Instruction to the Escrow Agent directing the Escrow Agent to release from the Adjustment Escrow Account and pay to Buyer an amount equal to such Adjustment Deficit Amount, and in the event that such Adjustment Deficit Amount *is less than* the Escrow Fund, Buyer and ROC shall execute and deliver a Joint Instruction to the Escrow Agent directing the Escrow Agent to release from the Adjustment Escrow Account any remaining amounts in the Adjustment Escrow Account (after payment of such

2

Adjustment Deficit Amount from the Adjustment Escrow Account to Buyer), to ROC (on behalf of itself and, if and to the extent applicable, Seller).

All payments of any part of the Escrow Funds shall be made by wire transfer of immediately available funds to the account specified by the Buyer or ROC, as applicable.

Upon delivery of the Escrow Fund by the Escrow Agent, this Escrow Agreement shall terminate, subject to the provisions of <u>Section 8</u>.

5.    **Escrow Agent**. The Escrow Agent undertakes to perform only such duties as are expressly set forth herein and no duties shall be implied. The Escrow Agent shall have no liability under and no duty to inquire as to the provisions of any agreement other than this Escrow Agreement and the definitions set forth in the Purchase Agreement. The Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any written notice, Joint Instruction, Final Determination (as defined below) or request furnished to it hereunder and believed by it to be genuine and to have been signed or presented by the proper party or parties. The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, Joint Instruction or Final Determination. The Escrow Agent shall have no duty to solicit any payments which may be due it or the Escrow Fund. The Escrow Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction determines that the Escrow Agent's fraud, gross negligence or willful misconduct was the primary cause of any loss to Buyer or ROC. The Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through agents or attorneys (and shall be liable only for the careful selection of any such agent or attorney) and may consult with counsel, accountants and other skilled persons to be selected and retained by it. The Escrow Agent shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel, accountants or other skilled persons. In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive a Joint Instruction or other instructions, claims or demands from any party hereto which, in its opinion, conflict with any of the provisions of this Escrow Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be directed otherwise in writing by all of the other parties hereto or by a final non-appealable order of any court of competent jurisdiction which may be issued, together with (A) a certificate of the prevailing party to the effect that such order is final and non-appealable and from a court of competent jurisdiction having proper authority and (B) the written payment instructions of the prevailing party to effectuate such order (a "<u>Final Determination</u>"). Upon receipt by the Escrow Agent of a copy of a Final Determination from any party, the Escrow Agent shall (a) promptly inform all other parties to this Escrow Agreement of such receipt (including providing a copy of such Final Determination) and (b) within three (3) Business Days following receipt of such determination, disburse as directed, part or all, as the case may be, of the Escrow Fund in accordance with such Final Determination. Anything in this Escrow Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

US_ACTIVE-154425292.7

6.    **Succession**. The Escrow Agent (a) may resign and be discharged from its duties or obligations hereunder by giving thirty (30) days advance notice in writing of such resignation to the other parties hereto specifying a date when such resignation shall take effect or (b) may be removed, with or without cause, by ROC and Buyer acting jointly at any time by providing written notice to the Escrow Agent. Upon such resignation or removal becoming effective, Escrow Agent will deliver the remaining Escrow Funds to a successor escrow agent pursuant to a Joint Instruction after deducting payment for all documented fees owed to it in accordance with the terms of this Escrow Agreement.. Any corporation or association into which the Escrow Agent may be merged or converted or with which it may be consolidated shall be the Escrow Agent under this Escrow Agreement without further act.

7.    **Fees**. ROC and the Buyer each agree to pay one-half of any fees and expenses owed to the Escrow Agent upon execution of this Escrow Agreement and from time to time thereafter reasonable compensation for the services to be rendered hereunder in an aggregate amount not to exceed $5,000, which unless otherwise agreed in writing shall be as described on <u>Schedule 1</u> attached hereto.

8.    **Indemnity**. Buyer and ROC shall jointly and severally indemnify, defend and save harmless the Escrow Agent and its directors, officers, agents and employees (the "<u>indemnitees</u>") from all loss, liability or expense (including the fees and expenses of outside counsel) arising out of or in connection with the Escrow Agent's (i) execution and performance of this Escrow Agreement, except to the extent that such loss, liability or expense is due to the fraud, gross negligence or willful misconduct of the Escrow Agent or another indemnitee, or (ii) following of any Joint Instruction, Final Determination or other directions from Buyer or ROC except to the extent that the Escrow Agent's following of any such Joint Instruction, Final Determination or direction is expressly forbidden by the terms hereof. Notwithstanding anything to the contrary herein, Buyer and ROC agree, solely as between themselves, that (x) any obligation for indemnification under this <u>Section 8</u> (or for reasonable fees and expenses of the Escrow Agent described in <u>Section 7</u>) shall be borne by the party or parties (as between the two of them) determined by a court of competent jurisdiction to be most responsible for causing the loss, damage, liability, cost or expense against which the Escrow Agent is entitled to indemnification or, if no such determination is made, then one-half by Buyer and one-half by ROC, and (y) if either Buyer or ROC pays any amounts to the Escrow Agent under this <u>Section 8</u> or under <u>Section 7</u> for reimbursement, such Party shall have the right of contribution against the other party (as between the two of them) for reimbursement of such other party's share thereof in accordance with the foregoing apportionment. The parties hereto acknowledge that the foregoing indemnities shall survive the resignation or removal of the Escrow Agent or the termination of this Escrow Agreement. The parties hereby grant the Escrow Agent a lien on, right of set-off against and security interest in the Escrow Fund for the payment of any claim for indemnification, compensation, expenses and amounts due hereunder.

9.    **TINs**. Buyer and ROC each represent that its correct Taxpayer Identification Number ("TIN") assigned by the Internal Revenue Service or any other taxing authority is set forth on <u>Schedule 1</u>. All interest or other income earned under this Escrow Agreement shall be allocated to ROC and reported, to the extent required by law, by the Escrow Agent to the IRS or any other taxing authority, as applicable, on IRS form 1099-INT, 1099-DIV or 1042-S (or other appropriate

form) as income earned from the Escrow Fund by ROC whether or not said income has been distributed during the year. Unless otherwise indicated in writing by the parties hereto, no taxes or other withholdings are required to be made under applicable law or otherwise with respect to any payment to be made by Escrow Agent. All documentation necessary to support a claim of exemption or reduction in such taxes or other withholdings has been timely collected by ROC and copies will be provided to Escrow Agent promptly upon a request therefor. Unless otherwise agreed to in writing by Escrow Agent, all tax returns required to be filed with the IRS and any other taxing authority as required by law with respect to payments made hereunder shall be timely filed and prepared by ROC including but not limited to any applicable reporting or withholding pursuant to the Foreign Account Tax Compliance Act ("FATCA"). The parties hereto acknowledge and agree that the Escrow Agent shall have no responsibility for the preparation and/or filing of any tax return or any applicable FATCA reporting with respect to the Escrow Fund. The Escrow Agent shall withhold any taxes it deems appropriate, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities as it determines may be required by any law or regulation in effect at the time of the distribution.

10.    **Notices**. All communications hereunder shall be in writing and shall be deemed to be duly given and received:

      (a)    upon delivery if delivered personally or upon confirmed transmittal if by facsimile;

      (b)    on the next Business Day if sent by overnight courier; or

      (c)    four (4) Business Days after mailing if mailed by prepaid registered mail, return receipt requested, to the appropriate notice address set forth on Schedule 1 or at such other address as any party hereto may have furnished to the other parties in writing by registered mail, return receipt requested.

Notwithstanding the above, in the case of communications delivered to the Escrow Agent pursuant to (ii) and (iii) of this Section 10, such communications shall be deemed to have been given on the date received by the Escrow Agent. In the event that the Escrow Agent, in its sole discretion, shall determine that an emergency exists, the Escrow Agent may use such other means of communication as the Escrow Agent deems appropriate. "Business Day" shall mean any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in Wilmington, Delaware, Anoka, Minnesota or Huntsville, Alabama are authorized by applicable law or other governmental action to close.

11.    **Security Procedures**. In the event funds transfer instructions are given (other than in writing at the time of execution of this Escrow Agreement), whether in writing, by telecopier or otherwise, the Escrow Agent is authorized to seek confirmation of such instructions by telephone call-back to the person or persons designated on schedule 2 hereto ("Schedule 2"), and the Escrow Agent may rely upon the confirmation of anyone purporting to be the person or persons so designated. The persons and telephone numbers for call-backs may be changed only in a writing actually received and acknowledged by the Escrow Agent. The Escrow Agent and the beneficiary's bank in any funds transfer may rely solely upon any account numbers or similar identifying numbers provided by Buyer or ROC to identify (i) the beneficiary, (ii) the beneficiary's

US_ACTIVE-154425292.7

bank, or (iii) an intermediary bank. The Escrow Agent may apply any of the escrowed funds for any payment order it executes using any such identifying number, even where its use may result in a person other than the beneficiary being paid, or the transfer of funds to a bank other than the beneficiary's bank or an intermediary bank designated. The parties to this Escrow Agreement acknowledge that these security procedures are commercially reasonable.

12.    **Miscellaneous**. The provisions of this Escrow Agreement may be waived, altered, amended or supplemented, in whole or in part, only by a writing signed by all of the parties hereto. Neither this Escrow Agreement nor any right or interest hereunder may be assigned in whole or in part by any party, except as provided in Section 6, without the prior consent of the other parties. This Escrow Agreement shall be governed by and construed under the laws of the State of Delaware. Each party hereto irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by applicable law and consents to the jurisdiction of the courts located in the State of Delaware. The parties further hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising or relating to this Escrow Agreement. No party to this Escrow Agreement is liable to any other party for losses due to, or if it is unable to perform its obligations under the terms of this Escrow Agreement because of, acts of God, fire, floods, strikes, equipment or transmission failure, or other causes reasonably beyond its control. This Escrow Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

13.    **Patriot Act Compliance**. In order to comply with laws, rules, regulations and executive orders in effect from time to time applicable to banking institutions, including those relating to the funding of terrorist activities and money laundering and the Customer Identification Program ("CIP") requirements under the USA PATRIOT Act and its implementing regulations, pursuant to which the Escrow Agent must obtain, verify and record information that allows the Escrow Agent to identify customers ("Applicable Law"), the Escrow Agent is required to obtain, verify and record certain information relating to individuals and entities which maintain a business relationship with the Escrow Agent. Accordingly, each of Buyer and ROC agrees to provide to the Escrow Agent upon its request from time to time such identifying information and documentation as may be available for such party in order to enable the Escrow Agent to comply with Applicable Law, including, but not limited to, information as to name, physical address, tax identification number and other information that will help the Escrow Agent to identify and verify such party such as organizational documents, certificates of good standing (where applicable), licenses to do business or other pertinent identifying information. Buyer and ROC each understand and agree that the Escrow Agent cannot open the Escrow Account unless and until the Escrow Agent verifies the identities of Buyer and ROC in accordance with its CIP.

[*Signatures are on the following pages.*]

US_ACTIVE-154425292.7

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Escrow Agreement as of the Effective Date.

**ESCROW AGENT:**

**DELAWARE TRUST COMPANY**

By: _____
    Name:
    Title:

[Signature Page to Adjustment Escrow Agreement]
US_ACTIVE-154425292.7

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Escrow Agreement as of the Effective Date.

**BUYER**:

**VISTA OUTDOOR INC.**

By: _____
    Name:
    Title:

[Signature Page to Adjustment Escrow Agreement]

US_ACTIVE-154425292.7

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Escrow Agreement as of the Effective Date.

**ROC:**

**REMINGTON OUTDOOR COMPANY, INC.**

By: _____
    Name:
    Title:

[Signature Page to Adjustment Escrow Agreement]

US_ACTIVE-154425292.7

## Schedule 1

| | |
|---|---|
| **Effective Date**: | [●], 2020 |
| **Name of Buyer**:<br>Buyer Notice Address: | Vista Outdoor Inc.<br>c/o Vista Outdoor Inc.<br>1 Vista Way<br>Anoka, MN 55303<br>Attention: Dylan S. Ramsey<br>Email: Dylan.Ramsey@VistaOutdoor.com |
| Buyer TIN: | 47-1016855 |
| **Name of ROC**:<br>ROC Notice Address: | Remington Outdoor Company, Inc.<br>100 Electronics Blvd., SW<br>Huntsville, Alabama 35824<br>Attention: Ken D'Arcy<br>Email: ken.darcy@remington.com |
| ROC TIN: | 26-0174491 |
| **Name of Escrow Agent**:<br>Escrow Agent Notice Address: | **Delaware Trust Company**<br>251 Little Falls Drive<br>Wilmington, DE 19808<br>Attn: Escrow Administration<br>Telephone: 866-291-6119<br>Facsimile: 302-636-8666<br>Email: trustadmin@delawaretrust.com |

**Escrow Agent Fees:**
**$1,000 - set up fee payable in advance of the closing of the transaction**
**$2,500 – escrow agent fee payable in advance of the closing of the transaction**
**and upon each subsequent annual anniversary date.**

**TRANSACTION FEES:**
Wire transfer of fund: $35.00/domestic wire initiated; $75.00/international payment
Checks Cut: $10.00/check cut
1099 Preparation: $12.00/1099 prepared
1042-S Preparation: $50.00/per 1042-S
Returned Check: $30.00/returned item

**Adjustment Escrow Amount**: $[●]

**Investment**:        [select one]

       [ ]    BlackRock FedFund Cash Management Class (the "Share Class"), an institutional money market mutual fund for which the Escrow Agent serves

US_ACTIVE-154425292.7

as shareholder servicing agent and/or custodian or subcustodian. The parties hereto: (i) acknowledge Escrow Agent's disclosure of the services the Escrow Agent is providing to and the fees it receives from BlackRock; (ii) consent to the Escrow Agent's receipt of these fees in return for providing shareholder services for the Share Class; and (iii) acknowledge that the Escrow Agent has provided on or before the date hereof a BlackRock FedFund Cash Management Class prospectus which discloses, among other things, the various expenses of the Share Class and the fees to be received by the Escrow Agent.

[ ]     Such other investments as Buyer, ROC and Escrow Agent may from time to time mutually agree upon in a writing executed and delivered by Buyer and ROC and accepted by the Escrow Agent.

[X]     The Adjustment Escrow Amount shall be held in a non-interest bearing deposit account insured by the Federal Deposit Insurance Corporation to the applicable limits.

**Schedule 2**

**Telephone Number(s) for Call-Backs and**
**<u>Person(s) Designated to Confirm Funds Transfer Instructions</u>**

If to Buyer:

| <u>Name</u> | <u>Telephone Number</u> |
|---|---|
| 1.  Dylan Ramsey | (m) 801-989-8972; (o) 801-447-3039 |

If to ROC:

| <u>Name</u> | <u>Telephone Number</u> |
|---|---|
| 1.  William Krogseng | (336) 548-8506 |
| 2.  Mark Little | (336) 508-1176 |

Telephone call-backs may be made to both Buyer and ROC if joint instructions are required pursuant to this Escrow Agreement.

US_ACTIVE-154425292.7

# EXHIBIT 10

(*See* attached form of Sale Order)

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| In re:<br><br>REMINGTON OUTDOOR COMPANY, INC., *et al.*, [1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-81688-CRJ11<br><br>Joint Administration Requested |

**ORDER APPROVING THE SALE OF THE DEBTORS' LONOKE AMMUNITION
BUSINESS AND CERTAIN OF THE DEBTORS' INTELLECTUAL PROPERTY
<u>ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS, AND INTERESTS</u>**

This matter having come before the Court upon the motion (the "**Motion**")[2] by Remington

Outdoor Company, Inc., ("**Remington**" or the "**Company**"), and its affiliated debtors and debtors

in possession (collectively the "**Debtors**") in the above-captioned Chapter 11 cases seeking entry

of this order (this "**Sale Order**") (a) authorizing the sale of the Acquired Assets (as defined in the

Asset Purchase Agreement (as defined below)) free and clear of all Interests (as defined below),

pursuant to that certain Asset Purchase Agreement, dated as of September [__], 2020, attached

hereto as <u>Exhibit A</u> (the "**Asset Purchase Agreement**"), by and among the Debtors and Vista

Outdoor, Inc. (the "**Buyer**"), and all other transaction documents related thereto; (b) authorizing

the assumption and assignment of certain executory contracts and unexpired leases; and (c)

granting the related relief contemplated therein; and the Court having found that (i) the Court has

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405).  The Debtors' corporate headquarters is located at 100 Electronics Blvd SW, Huntsville, Alabama 35824.

[2]  Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion or the Asset Purchase Agreement, as applicable.

US_ACTIVE-154466812.6

jurisdiction over this matter; (ii) venue is proper in this District; (iii) this is a core proceeding; (iv) the notice of the Motion and the Sale Hearing (as defined below) was sufficient under the circumstances; and (v) there is good cause to waive the stay of Bankruptcy Rule 6004(h); and based on the statements of counsel and the evidence presented in support of the relief requested by the Debtors in the Motion at a hearing before this Court on September 29 [and 30], 2020 (the "**Sale Hearing**"); and it appearing that no other notice need be given; and it further appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.    **Jurisdiction, Core Proceeding, Statutory Predicates, and Venue**.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *General Order of Reference* of the United States District Court for the Northern District of Alabama dated July 16, 1984 as amended July 17, 1984.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The predicates for the relief granted herein are Bankruptcy Code Sections 105, 363, and 365 and Bankruptcy Rules 2002, 6004, and 6006.  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    **Just Cause**.  The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.  Entry of this Sale Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties in interest.

C.    **Notice**.  The notice of the Motion, the Sale Hearing, the Asset Purchase Agreement, the transactions contemplated therein or in connection therewith and corresponding transactions documents (the "**Transactions**"), and the proposed entry of this Sale Order was adequate and sufficient under the circumstances of the Chapter 11 Cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  A

2

reasonable opportunity to object or be heard regarding the relief granted by this Sale Order has been afforded to those parties entitled to notice pursuant to the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  Accordingly, no further notice of the Motion, the Sale Hearing, or this Sale Order is necessary or required.

D.      Actual written notice of the Motion, the Bidding Procedures, the Bidding Procedures Hearing, the Auction, the Sale Hearing, the Assumption and Assignment Procedures, the proposed Cure Costs, the Sale and all Transactions, and all deadlines related thereto has been given to all interested persons and entities, including, without limitation:  (i) all entities reasonably known to have expressed an interest in a transaction with respect to all or part of the Acquired Assets within the past two years; (ii) all parties identified by AlixPartners as potential bidders; (iii) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon any of the Acquired Assets; (iv) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief granted herein; (v) counsel for the Committee; (vi) counsel to Cantor Fitzgerald Securities, as Priority Term Loan Agent under the Debtors' prepetition Priority Term Loan Credit Agreement; (vii) counsel to Ankura Trust Company, LLC, as FILO Agent under the Debtors' prepetition FILO Term Loan Agreement, and as Exit Term Loan Agent under the Debtors' prepetition Exit Term Loan Agreement; (viii) counsel to the FILO Lenders; (ix) counsel to the Stalking Horse Bidder; (x) counsel to Whitebox Advisors LLC; (xi) counsel for the Restructuring Committee; (xii) counsel to the Huntsville Note holder; (xiii) the Bankruptcy Administrator; (xiv) the Securities and Exchange Commission; (xv) the Internal Revenue Service; (xvi) counsel to the United Mine Workers of America; (xvii) all counterparties to the Designated Contracts; and (xviii) all known creditors of the Debtors, including their contract counterparties.  The foregoing constitutes proper, timely, adequate, and

US_ACTIVE-154466812.6

sufficient notice under the particular circumstances of these Chapter 11 Cases, and no further notice need be provided.

E.    The Publication Notice was published in the *New York Times* on August 24, 2020. Such Publication Notice was compliant with the Bidding Procedures Order, and was sufficient and proper notice to any other interested parties, including those whose identities are unknown to the Debtors.

F.    **Extensive Efforts by Debtors**.  Since before the commencement of the Chapter 11 Cases, the Debtors worked with their counsel and financial advisors to implement a viable transaction that would allow them to maximize the value of the Acquired Assets.  The Sale Transaction that is the subject of this Sale Order is the result of the Debtors' extensive efforts seeking to maximize recoveries to the Debtors' estates for the benefit of the Debtors' creditors.

G.    **Business Justification**.  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business justification for the Court to grant the relief requested in the Motion, including, without limitation, to (i) authorize the sale of the Acquired Assets free and clear of Interests other than Permitted Liens (as defined in the Asset Purchase Agreement) and Assumed Liabilities (as defined in the Asset Purchase Agreement); (ii) authorize the assumption and assignment of certain executory contracts and unexpired leases; and (iii) grant related relief as set forth herein.  Such compelling and sound business justification, which was set forth in the Motion and on the record at the Sale Hearing, are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

H.    **Bidding Procedures Order**.  The Bidding Procedures Order [Docket No. 411] was entered by the Court on August 20, 2020, which, among other things (i) approved the Bidding Procedures; (ii) established the Assumption and Assignment Procedures; (iii) approved the form

and manner of notice with respect to all procedures, protections, schedules, and agreements described in the Motion and attached thereto; and (iv) scheduled a date for the Auction and Sale Hearing. The Bidding Procedures provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the Acquired Assets.

I.      **Auction; Successful Bidder**. The sale process was properly conducted by the Debtors in accordance with the Bidding Procedures Order and in a manner designed to result in the highest or otherwise best offer for the Acquired Assets. At the Auction, the Debtors agreed in a reasonable exercise of their business judgment, in consultation with their management, the Restructuring Committee, advisors and the Bid Consultation Parties, to enter into and consummate the Asset Purchase Agreement with the Buyer. At the conclusion of the Auction, the Buyer was determined to be the Successful Bidder.

J.      **Asset Purchase Agreement**. The consummation of the Transactions contemplated by the Asset Purchase Agreement, the Motion, and this Sale Order is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and all of the applicable requirements of such sections and rules have been complied with in respect of such transactions.

K.      **Sale Hearing**. The Sale Hearing occurred on September 29 [and 30], 2020 in accordance with the Bidding Procedures Order.

L.      **Adequate Marketing; Highest or Otherwise Best Offer.** As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing, including the *Declaration of Ken D'Arcy in Support of Chapter 11 Petitions and First Day Pleadings of Remington Outdoor Company, Inc. and Its Affiliated Debtors and Debtors-Possession* [Docket No. 6 and the *Declaration of Bradley C. Meyer in Support of Debtors' Cash Collateral Motion*

5

*and Bidding Procedures Motion* [Docket No. 355]; and (ii) the representations of counsel made on the record at the Bidding Procedures Hearing and the Sale Hearing, (a) the Debtors have adequately marketed the Acquired Assets and conducted a sale process in a non-collusive, fair and good faith manner in compliance with the Bidding Procedures Order; (b) the process set forth in the Bidding Procedures Order afforded a full, fair and reasonable opportunity for any interested party to make the highest or otherwise best offer to purchase the Acquired Assets and assume the Assumed Liabilities; (c) the consideration provided by the Buyer in the Asset Purchase Agreement constitutes the highest or otherwise best offer to purchase the Acquired Assets and assume the Assumed Liabilities; (d) the consideration provided by the Buyer in the Asset Purchase Agreement provides fair and reasonable consideration for the Acquired Assets and the assumption of the Assumed Liabilities and constitutes reasonably equivalent value, fair value and reasonable market value under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, the District of Columbia, or other applicable law; (e) the Sale will provide a greater recovery for the Debtors' creditors with respect to the Acquired Assets than would be provided by any other practically available alternative; (f) taking into consideration all relevant factors and circumstances, and after taking account of the Bid Protections, no other entity has offered to purchase the Acquired Assets for greater economic value to the Debtors or their estates; and (g) the Debtors' determination that the Asset Purchase Agreement constitutes the highest or otherwise best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment.

M.      **No Successor Liability.**  Neither the Buyer nor any of its affiliates, officers, directors, shareholders, members, partners, principals or any of their respective representatives, successors, or assigns is an "insider or "affiliate" of the Debtors, as those terms are defined in the

Bankruptcy Code, and no common identity of incorporators, directors, or stockholders existed or exists between the Buyer and the Debtors. The transfer of the Acquired Assets to and the assumption of the Assumed Liabilities by the Buyer, except as otherwise set forth in the Asset Purchase Agreement, does not, and will not, subject the Buyer to any liability whatsoever, with respect to the operation of the Debtors' businesses prior to the closing of the Sale or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity including, without limitation, any laws affecting antitrust, successor, transferee, or vicarious liability. Pursuant to the Asset Purchase Agreement, the Buyer is not purchasing all of the Debtors' assets in that the Buyer is not purchasing any of the Excluded Assets or assuming the Excluded Liabilities, and the Buyer is not holding itself out to the public as an *alter ego* or a continuation of the Debtors. The Sale does not amount to a consolidation, merger, or *de facto* merger of the Buyer and the Debtors. There is no substantial continuity between the Buyer and the Debtors, and there is no continuity of enterprise between the Debtors and the Buyer. The Buyer is not a mere continuation of the Debtors or the Debtors' estates, and the Buyer does not constitute a successor to the Debtors or the Debtors' estates. None of the Transactions, including, without limitation, the Sale or the assumption and assignment of the Assigned Contracts, is being undertaken for the purpose of escaping liability for any of the Debtors' debts or hindering, delaying, or defrauding creditors under the Bankruptcy Code or for any other purpose that would give rise to statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, the District of Columbia, or any other applicable jurisdiction with laws substantially similar to the foregoing.

US_ACTIVE-154466812.6

N.      **Acquired Assets Property of the Estate.**  The Acquired Assets are property of the Debtors' estates and title thereto is vested in the Debtors' estates.

O.      **Sale in Best Interest/Fiduciary Duties**.  The Debtors have demonstrated a sufficient basis and compelling circumstances requiring them to enter into the Asset Purchase Agreement and sell the Acquired Assets and such actions are appropriate under the circumstances of these Chapter 11 Cases, are in the best interests of the Debtors, their estates and creditors, and other parties in interest, and represent a reasonable exercise of business judgment by the Debtors and the Restructuring Committee and their fulfillment of their fiduciary duties under applicable law.  Approval of the Asset Purchase Agreement, the Sale, and the Transactions at this time is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest. Unless the sale is concluded expeditiously, the recoveries of all of the Debtors' estates and constituencies are likely to be adversely affected.

P.      **Not a *Sub Rosa* Plan.**  The consummation of the Sale outside of a plan of reorganization pursuant to the Asset Purchase Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a plan of reorganization or liquidation for the Debtors.  The Asset Purchase Agreement, the Sale and the transactions contemplated therein and associated therewith do not constitute an impermissible *sub rosa* Chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford.

Q.      **Arm's-Length Sale.**  The Asset Purchase Agreement, the Sale, and the Transactions were negotiated, proposed, and entered into by the Debtors and the Buyer without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Debtors, their insiders and affiliates, nor the Buyer have engaged in any conduct that would cause or permit the

Asset Purchase Agreement, the Sale, or any part of the transactions thereby to be avoided under

Bankruptcy Code Section 363(n).

R.    **Good Faith Buyer.**  The Buyer is a good faith purchaser under Bankruptcy Code

Section 363(m) and, as such, is entitled to all of the protections afforded thereby.  Specifically:

(i) the Buyer recognized that the Debtors were free to deal with any other party interested in

acquiring the Acquired Assets; (ii) the Buyer complied in all respects with the provisions of the

Bidding Procedures Order; (iii) the Buyer agreed to subject its bid to the competitive bid

procedures set forth in the Bidding Procedures Order; (iv) all payments to be made by the Buyer

in connection with the Sale have been disclosed; (v) no common identity of directors, officers or

controlling stockholders exists among the Buyer and the Debtors; (vi) the negotiations and

execution of the Asset Purchase Agreement was at arm's-length and in good faith, and at all times

each of the Buyer and the Debtors were represented by competent counsel of their choosing; (vii)

the Buyer did not in any way induce or cause the Chapter 11 filing of the Debtors; and (viii) the

Buyer has not acted in a collusive manner with any person.  The Buyer will be acting in good faith

within the meaning of Bankruptcy Code Section 363(m) in closing the transactions contemplated

by the Asset Purchase Agreement.

S.    **Corporate Authority.**  Each Debtor (i) has full corporate power and authority to

execute the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale

of the Acquired Assets has been duly and validly authorized by all necessary corporate actions of

each of the Debtors; (ii) has all of the corporate power and authority necessary to consummate the

transactions contemplated by the Asset Purchase Agreement; (iii) has taken all corporate action

necessary to authorize and approve the Asset Purchase Agreement and the consummation by the

Debtors of the transactions contemplated thereby; and (iv) needs no consents or approvals, other

than those expressly provided for in the Asset Purchase Agreement, which may be waived in accordance with the terms therewith.

      T.    **Free and Clear Findings Required by the Buyer.** The Buyer would not have entered into the Asset Purchase Agreement and would not consummate the Sale Transaction, thus adversely affecting the Debtors, their estates, and their creditors, if the Sale of the Acquired Assets to the Buyer and the assumption and assignment of Acquired Contracts, were not, pursuant to Bankruptcy Code Section 363(f), free and clear (except for Permitted Liens and Assumed Liabilities) of (i) all liens (statutory or otherwise), claims, mortgages, deeds of trust, pledges, charges, security interests, rights of first refusal, hypothecations, encumbrances, easements, servitudes, leases or subleases, rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, rights of offset or recoupment, right of use or possession, licenses, indentures, instruments, conditional sale arrangements, (ii) all claims as defined in Bankruptcy Code Section 101(5), including all rights or causes of action (whether in law or in equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, indemnity or contribution, obligations, demands, restrictions, indemnification claims, or liabilities relating to any act or omission of the Debtors or any other person prior to the Closing, consent rights, options, contract rights, covenants, and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of the above-captioned cases, and whether imposed by agreement, understanding, law, equity or otherwise, and (iii) all debts, liabilities, obligations, contractual rights and claims and labor, employment and pension claims, in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected,

allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or un-matured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise (excluding Permitted Liens and Assumed Liabilities, (i), (ii), and (iii) collectively, the "**Interests**").  Except as expressly provided in the Asset Purchase Agreement, the Sale shall be free and clear of, and the Buyer shall not be responsible for, any Interests, including, without limitation, in respect of the following:  (i) any rights or Interests based on any successor or transferee liability, (ii) any Interests that purport to give any party a right or option to effect any forfeiture, modification, right of first offer or first refusal, or termination of the Debtors' or the Buyer's interest in the Acquired Assets, or any similar rights; (iii) any labor or employment agreements; (iv) mortgages, deeds of trust, and security interests; (v) intercompany loans and receivables between the Debtors and any non-Debtor subsidiary; (vi) any pension, multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of ERISA), health or welfare, compensation or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plans of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (vii) any other employee, worker's compensation, occupational disease, or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget

11

Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code and of any similar state law (collectively, "**COBRA**"), (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors, or (1) the WARN Act (29 U.S.C. §§2101 *et seq.*); (viii) any bulk sales or similar law; (ix) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (xii) any unexpired and executory contract or unexpired lease to which a Debtor is a party that is not an Assigned Contract that will be assumed and assigned pursuant to this Sale Order and the Asset Purchase Agreement; (xiii) any other Excluded Liabilities as provided in the Asset Purchase Agreement.  A sale of the Acquired Assets other than one free and clear of all Interests would yield substantially less value for the Debtors' estates, with less certainty, than the Sale as contemplated.  Therefore, the Sale contemplated by the Asset Purchase Agreement and approved herein free and clear of all Interests, except for Permitted Liens and Assumed Liabilities, is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

U.    **Valid and Binding Transfer.**  The transfer of the Acquired Assets to the Buyer will be a legal, valid, and effective transfer of the Acquired Assets and, except for the Permitted Liens and Assumed Liabilities, will vest the Buyer with all right, title, and interest of the Debtors to the Acquired Assets free and clear of all Interests and any liabilities of the Debtors.

V.    **Satisfaction of Section 363(f) Standards.**  The transfer of the Acquired Assets to the Buyer under the Asset Purchase Agreement shall be a legal, valid, and effective transfer of all the legal, equitable, and beneficial right, title and interest in and to the Acquired Assets free and clear of all Interests, other than the Assumed Liabilities and Permitted Liens.  The Debtors may

sell the Acquired Assets free and clear of all Interests, except for the Permitted Liens and the Assumed Liabilities, because, in each case, one or more of the standards set forth in Bankruptcy Code Section 363(f)(1) through (5) has been satisfied, with all such Liens and Interests to attach to the proceeds of the Sale Transaction to be received by the Debtors with the same validity, force, priority and effect that they had as against the Acquired Assets, and any claims and defenses the Debtors and their estates may possess with respect thereto.  Those holders of Interests, and non-debtor parties to the Assigned Contracts who did not object, or who withdrew their objections, to the Motion are, without limitation, deemed to have consented pursuant to Bankruptcy Code Section 363(f)(2).  In all cases, each such person with Interests in the Acquired Assets is enjoined from taking any action against the Buyer, the Buyer's affiliates, or any agent of the foregoing to recover any such Interest.

W.     **Necessity of Order.**  The Buyer would not have entered into the Asset Purchase Agreement and would not consummate the Sale Transaction without all of the relief provided for in this Sale Order (including, but not limited to, that the transfer of the Acquired Assets to the Buyer be free and clear of all Interests (other than Permitted Liens and the Assumed Liabilities)). The consummation of the Sale Transaction pursuant to this Sale Order and the Asset Purchase Agreement is necessary for the Debtors to maximize the value of their estates for the benefit of all creditors and other parties in interest.

X.     **Time of the Essence**.  The sale of the Acquired Assets must be approved and consummated promptly in order to preserve the value of the Acquired Assets.  Therefore, time is of the essence in consummating the Sale, and the Debtors and the Buyer intend to close the Sale as soon as reasonably practicable.

13

Y.     **Assigned Contracts.**  The Debtors have demonstrated that it is their sound business judgment to sell, assume, and assign the "Assumed Contracts" and "Assumed Leases" (as such terms are defined in the Asset Purchase Agreement), including, without limitation, the unexpired leases and executory contracts designated on Schedule 1.1(j) of the Asset Purchase Agreement (collectively, the "**Assigned Contracts**" and, individually, an "**Assigned Contract**") to the Buyer in connection with the consummation of the Sale, and the assumption and assignment of the Assigned Contracts is in the best interests of the Debtors, their estates and creditors, and other parties in interest.  The Assigned Contracts being assigned to the Buyer are an integral part of the Acquired Assets being purchased by the Buyer, and, accordingly, such assumption and assignment of the Assigned Contracts and the liabilities associated therewith are reasonable and enhance the value of the Debtors' estates.  No section of any Assigned Contract that purports to prohibit, restrict, impose any penalty or fee on, or condition the use, consideration, or assignment of any such Assigned Contract in connection with the Transactions shall have any force or effect.

Z.     **Cure and Adequate Assurance.**  Through Buyer's commitment to pay the Buyer Cure Amount (or, in the case of the Backup Bidder (as defined below), the Cure Amount) related to the Assigned Contracts and upon the payment of the Buyer Cure Amount (or, in the case of the Backup Bidder, the Cure Amount) by the Buyer and the Seller Cure Amount, if any, pursuant to the terms of the Asset Purchase Agreement, the Debtors (solely in connection with closing of the Successful Bid and not in connection with the Backup Bid) and the Buyer, as applicable, have cured or otherwise have demonstrated their ability to cure any default with respect to any act or omission that occurred prior to the Closing (as defined in the Asset Purchase Agreement) under any of the Assigned Contracts, within the meaning of Bankruptcy Code Section 365(b)(l)(A).  The proposed Cure Costs or any other cure amount reached by agreement after any objection by a

14

counterparty to an Assigned Contract (an "**Assigned Contract Objection**") or otherwise are deemed the amounts necessary to "cure" all "defaults," each within the meaning of Bankruptcy Code Section 365(b), under such Assigned Contracts. The Buyer's promise to perform the obligations under the Assigned Contracts shall constitute adequate assurance of its future performance of and under the Assigned Contracts, within the meaning of Bankruptcy Code Sections 365(b)(l) and 365(f)(2). Subject to the Bidding Procedures Order, all counterparties to the Assigned Contracts who did not file an Assigned Contract Objection or an objection to the assumption and assignment of the Assigned Contracts prior to the Sale Hearing, are deemed to consent to the assumption by the Debtors of their respective Assigned Contract and the assignment thereof to the Buyer. The filed objections of all counterparties to the Assigned Contracts that were heard at the Sale Hearing (to the extent not withdrawn or adjourned), were considered by the Court, and are overruled on the merits with prejudice. The Court finds that, with respect to all such Assigned Contracts, the payment of the proposed Cure Costs by the Buyer or, solely in connection with Successful Bid and not in connection with the Backup Bid, the Seller, as applicable, in accordance with the terms of the Asset Purchase Agreement is appropriate and is deemed to fully satisfy the Debtors' obligations under Bankruptcy Code Section 365(b). Accordingly, and without limitation of the Buyer's rights under Sections 1.5(b) and 1.5(d) of the Asset Purchase Agreement (or Sections 1.5(a) and 1.5(d) of the Backup Bid Agreement (as defined below)), all of the requirements of Bankruptcy Code Section 365(b) have been satisfied for the assumption and the assignment by the Debtors to the Buyer of each of the Assigned Contracts. To the extent any Assigned Contract is not an executory contract within the meaning of Bankruptcy Code Section 365, it shall be transferred to the Buyer in accordance with the terms of this Sale Order that are applicable to the Acquired Assets. In addition, for the avoidance of doubt, to the extent the Backup

Bidder becomes the Successful Bidder as set forth in this Sale Order, the provisions herein with respect to the Assigned Contracts shall apply likewise to the Backup Bidder as Buyer, in accordance with the terms of the Backup Bid Agreement.

AA.    **Unenforceability of Anti-Assignment Provisions.**    Any provisions in any Assigned Contract that restrict, limit, prohibit or condition the assumption, assignment, and sale of the Assigned Contracts or that allow the counterparty so such Assigned Contract to terminate, recapture, impose any penalty or fee, accelerate, increase any rate, condition on renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract, should be deemed and found to be unenforceable anti-assignment provisions that are void and of no force and effect within the meaning of Bankruptcy Code Section 365(f).

BB.    **Objections are Overruled**.    All objections to the relief requested in the Motion that have not been withdrawn, waived, adjourned or settled as announced to the Court at the Sale Hearing or by stipulations filed with the Court are overruled except as otherwise set forth herein.

CC.    **Final Order**.    This Sale Order constitutes a final order within the meaning of 20 U.S.C. § 158(a).    Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order and expressly directs entry of judgment as set forth herein.

DD.    **Best Interest**.    Entry of this Sale Order is in the best interests of the Debtors, the Debtors' estates, their creditors, and other parties in interest.

EE.    **Findings and Conclusions**.    The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.    To the extent any findings of facts are

conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of

fact, they are adopted as such.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

<u>**General Provisions**</u>

1.      The Motion is granted and the relief requested therein with respect to the Sale is

granted and approved in its entirety, as set forth herein.

2.      Any objections to the entry of this Sale Order or to the relief granted herein or the

relief requested in the Motion, including any objections to the proposed Cure Costs or the

assumption and assignment of any Assigned Contracts, that have not been adjourned, withdrawn,

waived, or settled, or not otherwise addressed or resolved pursuant to the terms hereof, if any,

hereby are denied and overruled on the merits with prejudice.

<u>**Approval of the Sale of the Acquired Assets**</u>

3.      The Debtors are authorized to enter into the Asset Purchase Agreement (and all

ancillary documents) and all the terms and conditions thereof, and all of the Transactions

contemplated therein are approved in all respects.  The transfer of the Acquired Assets by the

Debtors to the Buyer shall be a legal, valid and effective transfer of the Acquired Assets.

4.      Pursuant to Bankruptcy Code Section 363(b), the sale of the Acquired Assets to the

Buyer free and clear of all Interests (other than the Permitted Liens and the Assumed Liabilities),

and the transactions contemplated thereby is approved in all respects.

<u>**Sale and Transfer of the Acquired Assets**</u>

5.      Pursuant to Bankruptcy Code Sections 105, 363, and 365, the Debtors are

authorized to (a) take any and all actions necessary or appropriate to perform their obligations

under, and comply with the terms of, the Asset Purchase Agreement and consummate the Sale and

the Transactions pursuant to, and in accordance with, the terms and conditions of the Asset

Purchase Agreement and this Sale Order, including, without limitation (i) executing, acknowledging, and delivering such deeds, assignments, conveyances and other assurances, documents, and instruments of transfer and taking any action for purposes of assigning, transferring, granting, conveying, and conferring to the Buyer, or reducing to possession, any or all of the Acquired Assets and (ii) entering into the Ancillary Agreements, any transition services or operations support agreements with the Buyer and any other agreements related to implementing the Transactions and (b) take any and all further actions as may be necessary or appropriate to the performance of their obligations as contemplated by the Asset Purchase Agreement or this Sale Order.  The Debtors are further authorized to pay, without further order of this Court, whether before, at, or after the Closing, any reasonable expenses or costs that are required to be paid to consummate the Transactions or perform their obligations under the Asset Purchase Agreement.

6.    Following the Closing, the Debtors or the Buyer and/or their respective designees are authorized to execute and file a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all obligations, liabilities, and Interests in the Acquired Assets of any kind or nature whatsoever (other than the Permitted Liens and Assumed Liabilities).  Upon the Closing and the Debtors' receipt of the Purchase Price, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Debtors' interests in the Acquired Assets and a bill of sale transferring good and marketable title in the Acquired Assets to the Buyer free and clear of all Interests, except for the Permitted Liens and Assumed Liabilities. Each and every federal, state, and local governmental agency, quasi-agency, or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions.

US_ACTIVE-154466812.6

7.      Except for the Permitted Liens, Assumed Liabilities or as expressly provided in the Asset Purchase Agreement, pursuant to Bankruptcy Code Sections 105(a) and 363(f), upon the Closing and the Debtors' receipt of the Purchase Price, the Acquired Assets shall be transferred to the Buyer as required under the Asset Purchase Agreement, and such transfer shall be free and clear of all Interests of any person, including, without limitation, all such Interests specifically enumerated in this Sale Order, whether arising by agreement, by statute, or otherwise and whether occurring or arising before, on, or after the Petition Date, whether known or unknown, occurring, or arising prior to such transfer, with all such Interests to attach to the proceeds of the Sale ultimately attributable to the property against or in which the holder of an Interest claims or may claim an Interest, in the order of their priority, with the same validity, force, and effect which they now have, subject to any claims and defenses the Debtors may possess with respect thereto. Without limiting the generality of the foregoing, the Acquired Assets shall be transferred to the Buyer free and clear of the following: (i) satisfy and release of record, Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated June 15, 2018, and filed for record June 19, 2018, in/as Instrument No. 2018-05836 of the Records of Lonoke County, AR, executed by Remington Arms Company, LLC, in favor of Ankura Trust Company, LLC, securing the original principal amount of $55,000000; (ii) satisfy and release of record, Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated June 15, 2018, and filed for record June 19, 2020, in/as Instrument No. 2018-05387, of the records of Lonoke County, AR, executed by Remington Arms Company, LLC, in favor of Ankura Trust Company, LLC, securing the original principal amount of $100,000,000; (iii) satisfy and release of record, Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated April 18, 2019, and filed for record April 22, 2019, in/as Instrument No. 2019-03652, of the Records of Lonoke

19

County, AR, executed by Remington Arms Company, LLC, in favor of Cantor Fitzgerald Securities, securing the original principal amount of $90,500,000; and (iv) satisfy and release of record, Lien Subordination Agreement by and between Remington Arms Company, LLC, Cantor Fitzgerald Securities, and Ankura Trust Company, LLC, dated February 21, 2020, and filed for record February 28, 2020, in/as Instrument No. 2020-02102, records of Lonoke County, Arkansas.

8.    The transfer of the Acquired Assets to the Buyer pursuant to the Asset Purchase Agreement constitutes a legal, valid, and effective transfer of the Acquired Assets and shall vest the Buyer with all right, title, and interest of the Debtors in and to the Acquired Assets free and clear of all Interests of any kind or nature whatsoever, except for the Permitted Liens and Assumed Liabilities, with all such Interests to attach to the proceeds of the Sale ultimately attributable to the property against or in which the holder of an Interest claims or may claim an Interest, in the order of their priority, with the same validity, force, and effect which they now have, subject to any claims and defenses the Debtors may possess with respect thereto.

9.    All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Acquired Assets to the Buyer in accordance with the Asset Purchase Agreement and this Sale Order; *provided* that the foregoing restriction shall not prevent any party from appealing this Sale Order in accordance with applicable law or opposing any appeal of this Sale Order, or from enforcing its rights under Bankruptcy Code Section 365 or relieve the Buyer of any Assumed Liability.

10.    Except as expressly permitted by the Asset Purchase Agreement or this Sale Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, dealers, employees, litigation claimants, contract counterparties and other creditors, holding liens, claims

20

encumbrances, and other interests of any kind or nature whatsoever, including, without limitation, rights or claims based on any taxes or successor or transferee liability, against or in a Debtor or the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtors, the Acquired Assets or the operation of the Acquired Assets before the Closing, or the transactions contemplated by the Asset Purchase Agreement, including, without limitation, the Sale and the assumption and assignment of the Assigned Contracts, are forever barred, estopped, and permanently enjoined from asserting against the Buyer, its respective successors and assigns, its respective property and the Acquired Assets, such persons' or entities' liens, claims, encumbrances, or other Interests, including, without limitation, rights or claims based on any taxes or successor or transferee liability, *provided* that nothing herein shall impair or otherwise affect any right under Bankruptcy Code Section 365 of a lease or contract counterparty to an Assigned Contract under its respective Assigned Contract(s), or relieve the Buyer of any Assumed Liability.

11.    Upon the Closing, each of the Debtors' creditors and any other holder of an Interest is authorized and directed, without cost to the Debtors, to execute such documents and take all other actions as may be necessary to release its Interest in the Acquired Assets, if any, as such Interest may have been recorded or may otherwise exist.  If any person or entity that has filed financing statements or other documents or agreements evidencing an Interest in the Debtors or the Acquired Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Interests, which the person or entity has with respect to the Debtors or the Acquired Assets or otherwise, then the Buyer and its designees are authorized to execute and

US_ACTIVE-154466812.6

file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Debtors or the Acquired Assets and to file, register, or otherwise record a certified copy of this Sale Order, which shall constitute conclusive evidence of the release of all Interests of any kind or nature whatsoever in the Debtors or the Acquired Assets (other than the Permitted Liens and Assumed Liabilities).  Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement, including, without limitation, recordation of this Sale Order.

12.    Upon the Closing and the Debtors' receipt of the Purchase Price, all entities that are currently, or on the Closing may be, in possession of some or all of the Acquired Assets are hereby directed to surrender possession of the Acquired Assets to the Buyer, unless the Buyer otherwise agrees.

13.    This Sale Order is self-executing, and neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Sale Order.

14.    To the maximum extent permitted by applicable non-bankruptcy law, (a) the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval (collectively, the "**Permits**") of the Debtors with respect to and included in the Acquired Assets, and (b) all Permits that are included in the Acquired Assets are deemed to have been, and hereby are directed to be, transferred to the Buyer as of the Closing Date.  Nothing in this Sale Order, and nothing in the foregoing sentence, authorizes the transfer or assignment of any governmental Permit or the discontinuation of any obligation thereunder without compliance with all applicable legal requirements and approvals under police or regulatory

22

law.  To the extent any Permit cannot be transferred to the Buyer in accordance with this paragraph, the Buyer, with such assistance from the Debtors as is required under the Asset Purchase Agreement, will work promptly and diligently to apply for and secure all necessary government approvals for the transfer or new issuance of the Permit(s) to the Buyer, and the Debtors shall maintain the Permits to the extent required under and subject to the terms of the Asset Purchase Agreement.  For the avoidance of doubt, while nothing in this Sale Order or the Asset Purchase Agreement releases, nullifies, limits, waives, precludes, or enjoins the enforcement of any police or regulatory authority of a governmental unit, Buyer shall be entitled to operate under each state Permit currently held by or on behalf of the Debtors in relation to the Acquired Assets until such time as each such Permit is transferred to the Buyer and/or an equivalent Permit is issued to the Buyer.

15.    To the extent provided by Bankruptcy Code Section 525, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Acquired Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these Chapter 11 Cases or the consummation of the transactions contemplated by the Asset Purchase Agreement and this Sale Order.

**Implementation of the Sale**

16.    On Closing, the Buyer shall (a) pay the Purchase Price to the Debtors; (b) pay the Cure Costs as more fully described in paragraph 30 of this Sale Order and the Asset Purchase Agreement; (c) assume the Assumed Liabilities; and (d) perform any other obligations required to be performed by Buyer on the Closing.  Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments

23

necessary and appropriate to consummate the transactions contemplated by the Asset Purchase
Agreement, including, without limitation, recordation of this Sale Order.

17.    Within three (3) business days of the Debtors' receipt of the Net Sale Proceeds (as
defined in the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I)
Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying Automatic
Stay, and (IV) Granting Related Relief* [Docket No. 410] (as it may be modified from time to time,
the "**Cash Collateral Order**")) from the sale of the Acquired Assets, the Debtors shall pay the
Net Sale Proceeds of the Acquired Assets to the Priority Term Loan Agent, for the account of the
Priority Term Loan Secured Creditors, to the extent required under and in accordance with the
terms of the Cash Collateral Order or such other order of the Court.  Upon the Priority Term Loan
Agent's timely receipt of such payment, (a) the Priority Term Loan Obligations shall be paid and
satisfied to the extent of the payment and (b) all liens and security interests against the Acquired
Assets securing the Priority Term Loan Obligations shall be automatically released and discharged
without further action by any person.  Upon the payment in full in cash of the Priority Term Loan
Obligations and the occurrence of the Challenge Period Termination Date (as defined in the Cash
Collateral Order), (w) the Debtors shall have no further indebtedness, liabilities or obligations
owing under the Priority Term Loan Credit Agreement or the other "Financing Agreements" (as
defined in the Priority Term Loan Agreement, the "**Priority Term Loan Documents**"), (x) other
than any provisions thereof that survive pursuant to the terms thereof, the Priority Term Loan
Credit Agreement and all other Priority Term Loan Documents (including, without limitation, any
mortgages, guaranties and security agreements) and all of the Debtors' obligations thereunder shall
terminate and be of no further force and effect, (y) all liens and security interests against the
property and assets of the Debtors securing the Priority Term Loan Obligations shall be

24

automatically fully released and discharged without further action by any person, and (z) each deposit account control agreement in respect of or other sweeps or blocks of any Debtor's deposit accounts or lockboxes in favor of any of the Priority Term Loan Secured Parties shall terminate.

18.     The Debtors shall pay the Net Sale Proceeds from the sale of the Acquired Assets to the FILO Agent, for the account of the FILO Term Loan Secured Creditors, to the extent required under and in accordance with the terms of the Cash Collateral Order or such other order of the Court.  For the avoidance of doubt, any further payment to the FILO Agent shall be subject to orders previously entered by this Court and any further orders of this Court or provided under the Debtors' Chapter 11 plan.

19.     All parties in interest in these Chapter 11 Cases expressly reserve their rights with respect to any allocation of the Purchase Price or value among the purchased Acquired Assets, and any allocation of the Purchase Price or value among the purchased Acquired Assets as determined by the Buyer shall not be determinative or binding on any party in interest in these Chapter 11 Cases except as ordered by the Court after notice and a hearing.

**<u>No Successor Liability</u>**

20.     Other than as expressly set forth in the Asset Purchase Agreement, the Buyer shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any Interests, including under any theory of successor or transferee liability, *de facto* merger or continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated, including without limitation, with respect to any of the following: (i) any foreign, federal, state, or local revenue law, pension law, ERISA, COBRA, tax law, labor law, employment law, the WARN Act, antitrust law, CERCLA, and any other environmental, health and safety laws, or other law, rule, or regulation

(including, without limitation, filing requirements under any such laws, rules or regulations); (ii) under any products liability law, rule, regulation, or doctrine with respect to the Debtors' liability under such law, rule, regulation, or doctrine, or under any product warranty liability law or doctrine; (iii) under any unfair trade practices law, rule, regulation or doctrine with respect to the Debtors' liability under such law, rule, regulation or doctrine, or under any unfair trade practices liability law or doctrine; (iv) any employment or labor agreements, consulting agreements, severance arrangements, change-in-control agreements, or other similar agreement to which the Debtors are a party; (v) any welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of the Debtors; (vi) the cessation of the Debtors' operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation, or other employee benefit plans, agreements, practices and programs, obligations that might otherwise arise from or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967, (g) the Americans with Disabilities Act of 1990, or (h) COBRA; (vii) any liabilities, debts, or obligations of or required to be paid by the Debtors for any taxes of any kind for any period; (viii) any environmental liabilities, debts, claims fines, penalties, or obligations arising from conditions, facts or circumstances first existing or occurring on or prior to the Closing (including, without limitation, the presence of or exposure to chemical, hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis and at any time, including, without limitation, any liabilities, debts, claims, fines, penalties or obligations arising under CERCLA, or any other environmental, health, and safety laws; (viii) any liabilities, debts, claims, fines, penalties, or obligations of or required to be paid by the Debtors for

26

any taxes of any kind for any period; (ix) any liabilities, debts, claims, fines, penalties, or obligations of or required to be paid by the Debtors under any labor, employment, or other law, rule, or regulation (including, without limitation, filing requirements under any such laws, rules, or regulations); (x) any bulk sale law; and (xi) any litigation. The Buyer shall have no liability or obligation under the WARN Act simply by virtue of its purchase of assets from the Debtors.

21.    The Buyer has given substantial consideration under the Asset Purchase Agreement, which consideration shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of the Buyer and which shall be deemed to have been given in favor of the Buyer by all holders of Interests and liabilities (except for Permitted Liens and the Assumed Liabilities) in or against the Debtors, or the Acquired Assets. Without limiting the Buyer's obligation to pay and satisfy the Assumed Liabilities, upon consummation of the Sale, the Buyer shall not be deemed to (a) be the successor to the Debtors or their estates, (b) have, *de facto* or otherwise, merged with or into the Debtors, or (c) be a mere continuation, alter ego or substantial continuation of the Debtors under any theory of law or equity as a result of any action taken in connection with the Asset Purchase Agreement or any of the transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Acquired Assets.

22.    Effective upon the Closing, except with respect to Assumed Liabilities and Permitted Liens, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against the Buyer or its assets (including the Acquired Assets) with respect to any (a) Claim or Lien or (b) successor or transferee liability, including, without limitation, the following actions with respect to clauses (a) and (b): (i) commencing or

US_ACTIVE-154466812.6

continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching,

collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating,

perfecting, or enforcing any Lien or Claim; (iv) asserting any setoff, right of subrogation, or

recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that

does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of

this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking,

terminating, or failing or refusing to renew any License, permit, or authorization to operate any of

the Acquired Assets or conduct any of the businesses operated with such assets.

**<u>Good Faith</u>**

23.     The transactions contemplated by the Asset Purchase Agreement are undertaken by

the Buyer without collusion and in good faith, as that term is used in Bankruptcy Code Section

363(m), and, accordingly, the reversal or modification on appeal of the authorization provided in

this Sale Order to consummate the Sale and the Transactions shall not affect the validity of the

transactions (including the assumption and assignment of any of the Assigned Contracts). The

Buyer is a purchaser in good faith of the Acquired Assets and is entitled to all the protections

afforded by Bankruptcy Code Section 363(m).

24.     As a good faith purchaser of the Acquired Assets, the Buyer has not entered into an

agreement with any other potential bidders at the Auction (other than its agreement with the

Firearms Buyer as was fully disclosed to all participants at the Auction), and has not colluded with

any of the other bidders, potential bidders or any other parties interested in the Acquired Assets,

and, therefore, neither the Debtors nor any successor in interest to the Debtors' estates shall be

entitled to bring an action against the Buyer, and the Sale may not be avoided pursuant to Section

363(n) of the Bankruptcy Code.

US_ACTIVE-154466812.6

25.     The consideration provided by the Buyer for the Acquired Assets under the Asset Purchase Agreement constitutes reasonably equivalent value, fair value, reasonable market value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.  The Sale may not be avoided under Bankruptcy Code Section 363(n).  The Asset Purchase Agreement was not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or for any other purpose that would give rise to statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable jurisdiction with laws substantially similar to the foregoing.  Neither the Debtors nor the Buyer have entered into the Asset Purchase Agreement or any agreement contemplated thereby or are consummating the Sale with any fraudulent or otherwise improper purpose, including, without limitation, to evade any pension liabilities.  No other person or entity or group of persons or entities has offered to purchase the Acquired Assets for an amount that would provide greater value to the Debtors and their estates than the value provided by the Buyer.  The Court's approval of the Motion and the Asset Purchase Agreement are in the best interests of the Debtors, the Debtors' estates, their creditors, and all other parties in interest.

26.     The Buyer is not an "insider" as that term is defined in Section 101(31) of the Bankruptcy Code.

**Assumption and Assignment of Assigned Contracts; Assumed Liabilities**

27.     Pursuant to Bankruptcy Code Sections 105(a), 363, and 365, the Bidding Procedures Order, and subject to and conditioned upon the Closing of the Sale, the Debtors' sale,

29

assumption and assignment to the Buyer of the Assigned Contracts is approved, and the requirements of Bankruptcy Code Section 365(b)(1) with respect thereto are deemed satisfied.

28.    The Debtors are authorized in accordance with Bankruptcy Code Sections 105(a) and 365 to (i) assume and assign to the Buyer, effective as of the Closing and at such other times as may be specified in accordance with the terms and conditions of the Asset Purchase Agreement, as provided by, and in accordance with, the Bidding Procedures Order and the Asset Purchase Agreement, the Assigned Contracts free and clear of all Interests of any kind or nature whatsoever, other than the Permitted Liens and Assumed Liabilities, and (ii) execute and deliver to the Buyer such documents or other instruments as the Buyer reasonably deems necessary to assign and transfer the Assigned Contracts to the Buyer.

29.    The Assigned Contracts shall be transferred and assigned to, pursuant to the Bidding Procedures Order and the Asset Purchase Agreement, and thereafter remain in full force and effect for the benefit of, the Buyer, notwithstanding any provision in any such Assigned Contract (including, but not limited to, those of the type described in Bankruptcy Code Sections 365(b)(2), (e)(1), and (f)) that prohibits, restricts, or conditions such assignment or transfer. The Debtors shall be relieved from any further liability with respect to the Assigned Contracts after such assumption and assignment to the Buyer. The Debtors may assign each Assigned Contract in accordance with Bankruptcy Code Sections 363 and 365, and any provisions in any Assigned Contracts that prohibit or condition the assignment of such Assigned Contracts or terminate, recapture, impose any penalty, condition, renewal, or extension, or modify any term or condition upon the assignment of such Assigned Contracts, constitute unenforceable anti-assignment provisions which are void and of no force and effect. All other requirements and conditions under

US_ACTIVE-154466812.6

Bankruptcy Code Sections 363 and 365 for the assumption by the Debtors and assignment to the

Buyer of each Assigned Contract have been satisfied.

30.     All defaults and all other obligations or liabilities under any Assigned Contract

occurring, arising, or accruing prior to the date of the assignment or transfer to the Buyer shall be

deemed cured or satisfied upon payment by the Buyer and/or the Debtors (in each case in

accordance with Section 1.5 of the Asset Purchase Agreement) of the proposed Cure Cost, as set

forth in the Notice of Assumption and Assignment, any Supplemental Notice of Assumption and

Assignment, or any other cure amount reached by agreement after an Assigned Contract Objection

or otherwise, and, without limiting the foregoing, no effect shall be given to any default of the type

set forth in Bankruptcy Code Section 365(b)(2), or the type of default concerning an unexpired

lease of real property described in Bankruptcy Code Section 365(b)(1) whether or not such

Assigned Contract is an executory contract within the meaning of Bankruptcy Code Section 365.

31.     Each non-Debtor counterparty to the Assigned Contracts shall be forever barred,

estopped, and permanently enjoined from (a) asserting against the Debtors, the Buyer, or their

respective property (including the Acquired Assets) any fee, acceleration, default, breach, Claim

(including any counterclaim, defense, or setoff capable of being asserted against the Debtors),

pecuniary loss, or condition to assignment existing, arising, or accruing as of the Closing Date, or

arising by reason of the Closing, including any breach related to or arising out of any change-in-

control provision in such Assigned Contracts, or any purported written or oral modification to the

Assigned Contracts, and (b) asserting against the Buyer (or its property, including the Acquired

Assets) any Claim or Lien, counterclaim, breach, condition or setoff asserted or capable of being

asserted against the Debtors existing as of the Closing Date or arising by reason of the Closing

except for the Assumed Liabilities and Permitted Liens.

31

US_ACTIVE-154466812.6

32.     The Cure Costs amounts listed on the Notice of Assumption and Assignment, any Supplemental Notice of Assumption and Assignment, or any other cure amount reached by agreement after an Assigned Contract Objection or otherwise, reflect the sole amounts necessary under Bankruptcy Code Section 365(b) to cure all monetary defaults under the Assigned Contracts, and no other amounts are or shall be due to the non-debtor parties in connection with the assumption by the Debtors and assignment to the Buyer of the Assigned Contracts. Notwithstanding anything to the contrary herein, if the Cure Costs for an Assigned Contract is determined to be greater than the proposed Cure Costs asserted in the Notice of Assumption and Assignment or Supplemental Notice of Assumption and Assignment, the Buyer may decide, in its discretion, not to assume that Assigned Contract.  Notwithstanding anything to the contrary herein, in each case in accordance with Bidding Procedures Order and the terms and conditions of the Asset Purchase Agreement, the Buyer may decide (i) not to assume one or more unexpired leases and executory contracts designated on Schedule 1.1(h) of the Asset Purchase Agreement (or Schedule 1.1(g) of the Backup Bid Agreement), and (ii) to supplement Schedule 1.1(h) of the Asset Purchase Agreement (or Schedule 1.1(g) of the Backup Bid Agreement) by including any previously omitted unexpired lease or executory contract.

33.     The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Buyer's rights to enforce every term and condition of the Assigned Contracts.

34.     Notwithstanding anything in the Asset Purchase Agreement or this Sale Order to the contrary and for the avoidance of doubt, the Acquired Assets shall not include any of the Excluded Assets as set forth in Section 1.2 of the Asset Purchase Agreement.

35.     The Buyer shall be responsible for the satisfaction of the Assumed Liabilities under the Asset Purchase Agreement, including without limitation the Buyer Cure Amount (or in the case of the Backup Bid Agreement, the Cure Amount) arising under the Assigned Contracts. Except as provided in the Asset Purchase Agreement or this Sale Order, after the Closing, the Debtors and their estates shall have no further liability or obligations with respect to any Assumed Liability, including those arising under the Assigned Contracts, and all holders of such claims are forever barred and estopped from asserting any claims under any Assumed Liability (including those arising under the Assigned Contracts) against the Debtors, their successors or assigns, and their estates.

**Backup Bidder**

36.     SIG Sauer, Inc. (the "**Backup Bidder**") is hereby approved as the "Backup Bidder" under the Bidding Procedures Order, and pursuant to Bankruptcy Code Sections 105, 363, and 365, the Asset Purchase Agreement attached hereto as Exhibit B (the "**Backup Bid Agreement**") submitted by the Backup Bidder, the sale of the Acquired Assets (as defined in the Backup Bid Agreement), and consummation of the Sale to the Backup Bidder are hereby approved as the Backup Bid under the Bidding Procedures Order.  The Backup Bid on the terms set forth in the Backup Bid Agreement is hereby approved and authorized as a Backup Bid and shall remain open as a Backup Bid pursuant to the terms of the Bidding Procedures Order and the bid terms submitted at the Auction.  In the event that the Successful Bidder cannot or refuses to consummate the Sale because of a breach or failure on the part of the Successful Bidder, the Backup Bidder will be deemed the new Successful Bidder and the Debtors shall be authorized, but not directed, to close, and take all actions necessary to close, with the Backup Bidder on the Backup Bid Agreement without further order of the Court, and in such case, all findings and other provisions of this Sale

33

Order shall apply to the Backup Bidder and the Backup Bid Agreement to the same extent they do with respect to the Buyer and the Asset Purchase Agreement.

**Other Provisions**

37.    Nothing in this Sale Order or in the Asset Purchase Agreement entered into pursuant to this Sale Order releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory authority of a governmental unit.

38.    This Sale Order and the Asset Purchase Agreement shall be binding in all respects upon all known and unknown creditors of, and holders of equity security interests in, any Debtor, including any holders of Interests, all counterparties to the Assigned Contracts, all counterparties to contracts that are not assumed or assigned, all successors and assigns of the Buyer, each Debtor and their affiliates and subsidiaries, the Acquired Assets, and any trustees appointed in the Chapter 11 Cases or upon a conversion to cases under Chapter 7 of the Bankruptcy Code, and this Sale Order shall not be subject to amendment or modification and the Asset Purchase Agreement shall not be subject to rejection.  Nothing contained in any Chapter 11 plan confirmed in any Debtor's bankruptcy case, any order confirming any such Chapter 11 plan, or any other order in the Chapter 11 Cases shall alter, conflict with, or derogate from, the provisions of the Asset Purchase Agreement or this Sale Order.

39.    To the extent applicable, the automatic stay pursuant to Section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtors to the extent necessary, without further order of the Court (a) to allow the Buyer to give the Debtors any notice provided for in the Asset Purchase Agreement, and (b) to allow the Buyer to take any and all actions permitted by the Asset Purchase Agreement.

40.    No bulk sales law or similar law shall apply in any way to the transactions contemplated by the Sale, the Asset Purchase Agreement, the Motion, and this Sale Order.

41.    This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the Asset Purchase Agreement, all amendments thereto, and any waivers and consents thereunder, including, but not limited to, retaining jurisdiction to (i) enforce the terms of the Asset Purchase Agreement; (ii) compel delivery of the Acquired Assets to the Buyer; (iii) interpret, implement, and enforce the provisions of this Sale Order; (iii) protect the Buyer, any of the Buyer's affiliates, or any agent of the foregoing, against any Interests against the Debtors or the Acquired Assets of any kind or nature whatsoever, except for the Permitted Liens and Assumed Liabilities, and (iv) enter any order under Bankruptcy Code Sections 363 and 365.

42.    No brokers were involved in consummation of the Sale, and no brokers' commissions are due to any person in connection with the Sale; *provided, however*, that this provision does not impact any transaction or other fees due to investment bankers or financial advisors employed (a) by the Debtors, including, but not limited to Ducera Partners LLC, or certain of their creditors for which the Debtors may be obligated to pay in accordance with an engagement letter with such professional(s), or (b) by the Buyers.

43.    To the extent there is any inconsistency between the terms of this Sale Order and the terms of the Asset Purchase Agreement (including all ancillary documents executed in connection therewith), the terms of this Sale Order shall govern.

44.    The failure to specifically include any particular provision of the Asset Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it

being the intent of the Court that the Asset Purchase Agreement be authorized and approved in its

entirety.

45.    The Asset Purchase Agreement and any related agreements, documents, or other

instruments may be modified, amended, or supplemented by the parties thereto and in accordance

with the terms thereof, without further order of the Court, *provided* that the Debtors shall provide

the Bid Consultation Parties with three (3) business days' notice thereof and *provided* further that

any such modification, amendment, or supplement does not, based on the Debtors' judgment, have

a material adverse effect on the Debtors' estates.

46.    Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), this Sale

Order shall not be stayed for fourteen (14) days after its entry and shall be effective immediately

upon entry, and the Debtors and the Buyer are authorized to close the transaction immediately

upon entry of this Sale Order.  Time is of the essence in closing the transactions referenced herein,

and the Debtors and the Buyer intend to close the transactions as soon as practicable.  This Sale

Order is a final, appealable order and the period in which an appeal must be filed shall commence

upon the entry of this Sale Order.

47.    The provisions of the Asset Purchase Agreement and this Sale Order may be

specifically enforced in accordance with the Asset Purchase Agreement notwithstanding the

appointment of any Chapter 7 or Chapter 11 trustee after the Closing.

48.    Headings utilized in this Sale Order are for convenience of reference only, and do

not constitute a part of this Sale Order for any other purpose.

49.    All time periods set forth in this Sale Order shall be calculated in accordance with

Bankruptcy Rule 9006(a).

50.    The provisions of this Sale Order are non-severable and mutually dependent.

51.     <u>All issues raised by</u> Oracle America, Inc. ("**Oracle**") in *Oracle's Limited Objection and Reservation of Rights Regarding (a) Debtors' Motion for (a) an Order Establishing Bidding Procedures and Granting Related Relief and (ii) an Order or Orders Approving the Sale of the Debtors' Assets; and (b) Notice of Executory Contracts and Unexpired Leases that May Be Assumed and Assigned in Connection with the Sale of the Debtors' Assets and the Proposed Cure Cost with Respect Thereto* (the "Oracle Objection") [Docket No. 529] are expressly reserved.  <u>The</u> Oracle Objection <u>may</u> be set for hearing on an expedited basis upon the request of Oracle and/or the Debtors.

Dated: _____, 2020

_____
UNITED STATES BANKRUPTCY JUDGE

US_ACTIVE-154466812.6

# Exhibit A

**Asset Purchase Agreement**

US_ACTIVE-154466812.6

# EXHIBIT 11

(*See* attached Balance Sheet Rules and Inventory Amount Illustrative Example)

EXHIBIT 11

## Balance Sheet Rules

Capitalized terms used but not defined in this Exhibit shall have the meanings given to them in the Agreement or if not defined in the Agreement, the meaning given to them under "GAAP", which means generally accepted accounting principles in effect from time to time.

"Balance Sheet Rules" means GAAP, as applied using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies that were used in the preparation of the Financial Statements. For purposes of the Pre-Closing Statement, Post-Closing Statement, Estimated Inventory Amount, Closing Inventory Amount, and Final Inventory Amount, in the event of a difference between GAAP and past practice, all amounts shall be recorded in accordance with GAAP.

Notwithstanding the foregoing, the value of Inventory set forth on the Pre-Closing Statement and Estimated Inventory Amount may not be increased by way of a new account or change in accounting methodology as compared to past practice.

For purposes of determining Estimated Inventory Amount and Closing Inventory Amount, Inventory shall mean means the merchantable, quality inventory of the Business, (calculated in the same manner as the balances set forth in data-room file 1.1.1.2.46, including reserves), that is saleable in the ordinary course of business, recorded in accordance with GAAP (for avoidance of doubt, Inventory will include sufficient reserves for damaged, slow-moving, shrink, spoilage, and obsolete inventory, and will be adjusted for the results of inventory counts performed as required for closing)

Any purchase accounting adjustments required under ASC 805 (the former Statement of Financial Accounting Standards No. 141R, Business Combinations) that result from the transactions contemplated by the Asset Purchase Agreement will be excluded.

## Inventory Amount Illustrative Example

| Account description | Account number | 08/31/2020[1] |
|---|---|---|
| Inventory, net: | | |
| Raw materials, net: | | |
| Raw materials | A1010301A | 9,457,939 |
| Raw materials reserves | A1010301B | (1,333,242) |
| **Raw materials, net** | | 8,124,698 |
| Work in process, net: | | |
| Work in process | A1010302A | 5,239,874 |
| | A1010302C | |
| WIP reserves | A1010302B | (251,932) |
| **Work in process, net** | | 4,987,942 |
| Finished goods, net: | | |
| Finished goods | A1010303A | 5,900,097 |
| Finished goods reserves | A1010303B | (831,670) |
| **Finished goods, net** | | 5,068,427 |
| **Total Inventory (Net) [2]** | | **$18,181,067** |
| **Inventory Amount Target** | | **$17,100,000** |

Sample Calculation
Sample Final Inventory Amount: $18,181,067
Inventory Amount Target: $17,100,000
Sample Inventory Amount Overage: $1,081,067

Inventory Collar Amount: +/- $2,000,000

Sample Purchase Price Adjustment: $0 (Sample Inventory Amount
Overage is less than or equal to the Inventory Collar Amount, resulting in
no Sample Purchase Price Adjustment)

1) *Based on dataroom file 1.1.1.2.56 (period end-date not specified – refers to 2020.AUG period).*
2) *For the avoidance of doubt, Estimated Inventory Amount and Closing Inventory Amount balances exclude impacts from unallocated Corporate amounts and should be calculated on a consistent basis with data-room files referenced in this exhibit.*

US_ACTIVE-154489535.8

**EXECUTION VERSION**

ASSET PURCHASE AGREEMENT

by and among

SIG SAUER, INC.

as Buyer

and

REMINGTON OUTDOOR COMPANY, INC.

and

EACH OF THE SUBSIDIARIES OF REMINGTON OUTDOOR COMPANY, INC.,
AS SET FORTH ON THE SIGNATURE PAGES HERETO

as Seller

Dated as of September 26, 2020

# TABLE OF CONTENTS

**Page**

ARTICLE 1    PURCHASE AND SALE OF THE ACQUIRED ASSETS ...................................2

    Section 1.1    Transfer of Acquired Assets.........................................................2

    Section 1.2    Excluded Assets ......................................................................4

    Section 1.3    Assumption of Liabilities..........................................................6

    Section 1.4    Retention of Liabilities.............................................................7

    Section 1.5    Assumed Contracts; Cure Amount ............................................8

    Section 1.6    Non-Assignment of Acquired Assets.........................................9

    Section 1.7    Further Conveyances and Assumptions...................................10

    Section 1.8    Conflicts with Other Bidders .................................................10

ARTICLE 2    CONSIDERATION ...........................................................................10

    Section 2.1    Consideration ........................................................................10

    Section 2.2    Good Faith Deposit ...............................................................10

    Section 2.3    Purchase Price Adjustment ....................................................11

    Section 2.4    Withholding ..........................................................................13

ARTICLE 3    CLOSING AND DELIVERIES ...........................................................13

    Section 3.1    Closing .................................................................................13

    Section 3.2    Seller's Deliveries ................................................................14

    Section 3.3    Buyer's Deliveries ................................................................15

ARTICLE 4    REPRESENTATIONS AND WARRANTIES.........................................16

    Section 4.1    Representations and Warranties of Seller ...............................16

    Section 4.2    Representations and Warranties of Buyer................................18

    Section 4.3    Warranties Exclusive; Schedules ...........................................20

    Section 4.4    Survival of Representations and Warranties ...........................20

ARTICLE 5    COVENANTS OF THE PARTIES .......................................................21

    Section 5.1    Covenants of Seller ...............................................................21

    Section 5.2    Covenants of Buyer ...............................................................22

    Section 5.3    HSR Act ................................................................................23

    Section 5.4    CFIUS. ..................................................................................23

i

ARTICLE 6    ADDITIONAL AGREEMENTS ..................................................................24

    Section 6.1    Bankruptcy Matters ...............................................................24

    Section 6.2    Transition Arrangements ........................................................25

    Section 6.3    Further Assurances .................................................................26

ARTICLE 7    EMPLOYEES AND EMPLOYEE BENEFITS ...................................26

    Section 7.1    Transferred Employees ..........................................................26

    Section 7.2    Employment Tax Reporting ...................................................27

    Section 7.3    Benefits ..................................................................................27

    Section 7.4    WARN Act ..............................................................................27

    Section 7.5    Third Party Beneficiary ..........................................................27

ARTICLE 8    TAXES ................................................................................................28

    Section 8.1    Taxes Related to Purchase of Assets .....................................28

    Section 8.2    Cooperation on Tax Matters ..................................................28

    Section 8.3    Allocation of Purchase Price ..................................................29

ARTICLE 9    CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES .................29

    Section 9.1    Conditions Precedent to Performance by Seller......................29

    Section 9.2    Conditions Precedent to Performance by Buyer .....................30

ARTICLE 10    TERMINATION ..................................................................................31

    Section 10.1    Conditions of Termination ....................................................31

    Section 10.2    Effect of Termination; Remedies ..........................................33

ARTICLE 11    MISCELLANEOUS ............................................................................34

    Section 11.1    Successors and Assigns .........................................................34

    Section 11.2    Governing Law; Jurisdiction .................................................34

    Section 11.3    WAIVER OF JURY TRIAL ..................................................34

    Section 11.4    Expenses ................................................................................35

    Section 11.5    Broker's and Finder's Fees ....................................................35

    Section 11.6    Severability ............................................................................35

    Section 11.7    Notices ...................................................................................35

    Section 11.8    Amendments; Waivers ..........................................................36

    Section 11.9    Time of Essence .....................................................................36

    Section 11.10    Specific Performance ..........................................................36

    Section 11.11    Public Announcements ........................................................37

    Section 11.12    Entire Agreement ................................................................37

Section 11.13 Parties in Interest ........................................................................37

Section 11.14 Bulk Sales Laws ...........................................................................38

Section 11.15 Construction .................................................................................38

Section 11.16 Counterparts and Facsimiles .......................................................38

ARTICLE 12  DEFINITIONS ...............................................................................38

Section 12.1  Certain Terms Defined .................................................................38

Section 12.2  All Terms Cross-Referenced ........................................................48

**SCHEDULES**

Schedule 1.1(g) - Assumed Business Contracts
Schedule 1.1(i) - Intellectual Property
Schedule 1.2(r) - Excluded Assets
Schedule 1.3(h) - Assumed Liabilities
Schedule 1.4(o) - Excluded Liabilities
Schedule 1.5(a) - Estimated Cure Amount
Schedule 4.1(g) - Compliance with Law
Schedule 4.1(h) - Contracts and Lease Defaults
Schedule 4.1(i) - Material Permits
Schedule 11.5 - Brokers and Finders
Schedule 12.1(a) - Business Name
Schedule 12.1(b) - Brand Names

**EXHIBITS**

Exhibit 1 - Bidding Procedures Order
Exhibit 2 - Good Faith Deposit Escrow Agreement
Exhibit 3 - Proposed Sales Order
Exhibit 4 – Form of Adjustment Escrow Agreement
Exhibit 5 - Balance Sheet Rules

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of September 26, 2020 (the "Effective Date"), is entered into by and among Remington Outdoor Company, Inc., a Delaware corporation and debtor-in-possession ("ROC"), each of the subsidiaries of ROC set forth on the signature pages to this Agreement (collectively with ROC, "Seller"), and SIG Sauer, Inc., a Delaware corporation ("Buyer"), or a Buyer Acquisition Vehicle as assignee in accordance with Section 11.1. Capitalized terms used in this Agreement are defined or cross-referenced in Article 12.

## *RECITALS*

A.      Seller is engaged in the manufacturing, design and sale of ammunition, ammunition products and related components at the Arkansas Property (the "Business Products") under the Remington brand and the other Brand Names (the "Business"), and owns various assets related to the Business. On July 27, 2020 (the "Petition Date") Seller filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Alabama (the "Bankruptcy Court" and the case arising under such petition, the "Bankruptcy Case").

B.      On the Petition Date, Seller filed a Motion for (I) an Order Establishing Bidding Procedures and Granting Related Relief and (II) an Order or Orders Approving the Sale of the Debtors' Assets pursuant to which Seller sought, and the Bankruptcy Court approved, the Bidding Procedures Order attached hereto as Exhibit 1 (the "Bidding Procedures Order").

C.      Buyer desires to purchase the Acquired Assets free and clear of Liens, Claims and Interests (other than Permitted Liens), except for assumption of the Assumed Liabilities from Seller, and Seller desires to sell, convey, assign and transfer to Buyer, the Acquired Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code.

D.      Buyer, in exchange for the transfer to Buyer of the Acquired Assets, desires to provide certain consideration (as set forth below) to Seller.

E.      Concurrently with the execution and delivery of this Agreement, in order to secure certain obligations of Buyer, each of ROC, Buyer and the Escrow Agent have entered into that certain Good Faith Deposit Escrow Agreement as further described herein.

F.      The Acquired Assets and Assumed Liabilities are assets and liabilities of Seller, which are to be purchased and assumed by Buyer pursuant to an order of the Bankruptcy Court approving such sale pursuant to Sections 105, 363 and 365 of the Bankruptcy Code (the "Sale Order"), which order will include the authorization for the assumption by Seller and assignment to Buyer of certain executory contracts and unexpired leases and liabilities thereunder under Section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with the applicable provisions of the Bankruptcy Code. The consummation of the transactions set forth in this Agreement is subject, among other things, to the entry of the Sale Order.

1

*STATEMENT OF AGREEMENT*

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer agree as follows:

ARTICLE 1
PURCHASE AND SALE OF THE ACQUIRED ASSETS

Section 1.1    Transfer of Acquired Assets. At the Closing, upon and subject to the terms and conditions set forth in this Agreement, Seller shall sell to Buyer, and Buyer shall acquire from Seller, all of Seller's right, title and interest in and to the Acquired Assets free and clear of all Liens, Claims and Interests (other than Permitted Liens and the Assumed Liabilities). For all purposes under this Agreement, the term "Acquired Assets" shall (i) not include any Excluded Assets, (ii) include the Business Name and the Brand Names and (iii) mean all of the other properties, assets, Interests and rights of Seller existing as of the Closing Date, of any kind or nature, real or personal, tangible or intangible, that in each case in this *clause (iii)* primarily relate to the ownership, operation and management of the Business, including, but not limited to the assets listed in Section 1.1(a) to (s) below.

(a)    the Arkansas Property;

(b)    all of Seller's owned (i) equipment, machinery, furniture, fixtures and improvements, tooling and spare parts and any other tangible property located at the Arkansas Property (including any consumables located thereon) or that is otherwise primarily used or primarily held for use in the ownership, operation or management of the Business (the "Owned FF&E"), and (ii) to the extent assignable, rights to any warranties and licenses received from manufacturers and sellers of the Owned FF&E;

(c)    all of Seller's (i) equipment, machinery, furniture, fixtures and improvements, tooling and spare parts and any other tangible property located at the Arkansas Property or that is otherwise primarily used or primarily held for use in the ownership, operation or management of the Business that are in each case leased pursuant to any Contract (the "Assumed FF&E Leases" and the equipment, machinery, furniture, fixtures and improvements, tooling and spare parts so leased, the "Leased FF&E"), (ii) rights under the Assumed FF&E Leases, and (iii) to the extent assignable, rights to any warranties and licenses received from manufacturers and lessors of the Leased FF&E; in each case with respect to the foregoing subclauses (i) through (iii), solely as listed on Schedule 1.1(g);

(d)    all of Seller's (i) owned cars, forklifts, trucks and other motor vehicles primarily used in connection with the Business at the Arkansas Property (the "Owned Motor Vehicles"), and (ii) rights to the warranties and licenses received from manufacturers and sellers of the Owned Motor Vehicles;

(e)    all of Seller's (i) cars, trucks and other motor vehicles that are leased pursuant to any Contract and primarily used for the ownership, operation of management of the Business at the Arkansas Property (the "Assumed Motor Vehicle Leases" and the cars, trucks and

2

other motor vehicles so leased, the "Leased Motor Vehicles"), (ii) rights under the Assumed Motor Vehicle Leases, and (iii) rights to the warranties and licenses received from manufacturers and lessors of the Leased Motor Vehicles; in each case with respect to the foregoing subclauses (i) through (iii), solely as listed on Schedule 1.1(g);

        (f)    all rights in and claims to proceeds and recoveries from, policies of insurance (but not, for the avoidance of doubt, the Insurance Policies themselves) to the extent attributable to any of the Acquired Assets or Assumed Liabilities (the rights described in this Section 1.1(f) being collectively the "Assumed Policy Rights");

        (g)    all Contracts set forth on Schedule 1.1(g) (collectively, the "Assumed Business Contracts" and, together with the Assumed FF&E Leases and the Assumed Motor Vehicle Leases, the "Assumed Contracts");

        (h)    to the extent transferable under applicable Law, all Permits issued to Seller that are used in connection with the ownership, operation and/or management of the Business, and all pending applications therefor, including, without limitation, any of the foregoing listed on Schedule 4.1(i);

        (i)    all (i) common law and other unregistered rights in the Business Name and the Brand Names existing in connection with the ownership, operation and/or management of the Business, (ii) all registrations for any Business Name or other Brand Name that relate, in whole or in part, ammunition, ammunition products and related components, (iii) all other registered and unregistered Intellectual Property owned and primarily used by Seller in connection with the ownership, operation and/or management of the Business, including but not limited to the Intellectual Property listed on Schedule 1.1(i), and any and all corresponding rights that, now or hereafter, may be secured throughout the world, and (iv) to the extent transferable under applicable Law, Intellectual Property licensed to Seller in connection with the ownership, operation and/or management of the Business (all the aforementioned, together with all associated goodwill, the "Acquired Intellectual Property");

        (j)    all documentation and data primarily about the Business Products and the operation of the Business in sufficient detail and content to enable the manufacture, production, commercialization, development and procurement of the Business Products (including, but not limited to, applicable Intellectual Property and related product specifications, enterprise resource planning data, and master data) in the manner in which such Business Products are currently or previously had been so manufactured, produced, commercialized, developed and procured, and to otherwise operate the Business as currently or previously had been so conducted, without reliance on the knowledge or memory of any individual, is in the possession and control of Seller;

        (k)    all sales orders or other commitments of Seller to purchasers of goods, services or products produced or sold by the Business (the "Customer Orders");

        (l)    all outstanding purchase orders or other commitments of Seller to suppliers of goods and services for materials, supplies or other items exclusively used in connection with the ownership, operation and/or management of the Business (the "Purchase Orders");

3

(m)      all right, title and interest in and to all inventory, supplies and finished goods within the scope of the operations of the Business, or other ammunition, ammunition products and related component under the Remington brand and the other Brand Names owned by Seller, wherever located, including (i) on the Arkansas Property, (ii) on the North Carolina Property, (iii) on the Alabama Facility, (iv) on the New York Facility, (v) on Mississippi Facility, or (vi) (to the extent within the scope of the operations of the Business) in the possession of any third-party bailees (collectively, the "Inventory");

(n)      all (i) rights to refunds relating to, and prepaid expenses and deposits attributable to, any Purchase Orders, Customer Orders, Assumed Contracts and Inventory, and all rights under credit card merchant accounts, (ii) prepaid charges and deposits in respect of telephone, electricity, water and sewer and other utilities provided to the Arkansas Property, (iii) ordinary holdbacks (including ordinary credit card holdback payments or protection reserves) in connection with or relating to any Acquired Asset and (iv) other deposits, prepaid charges and expenses paid by Seller and other rights of Seller in connection with or primarily relating to any Acquired Asset;

(o)      all goodwill and other intangible assets, including all goodwill associated with the Business, with the Acquired Intellectual Property, and with any of the other Acquired Assets;

(p)      Claims held by Seller that relate to Acquired Assets;

(q)      all other tangible or intangible assets of Seller primarily used in connection with the ownership, operation and/or management of the Business; and

(r)      to the extent permitted by applicable Law (and other than all Documents of Seller held by Seller or Seller's counsel related to the Retained Litigation), all Documents that are primarily used in or primarily held for use in, or that primarily relate to, the Acquired Assets, the Assumed Liabilities or the Business; provided, that Buyer shall provide (i) Seller with reasonable access at Seller's sole cost and expense, including the ability to make copies (during business hours with reasonable prior notice and subject to then-applicable COVID Restrictions) to the same following the Closing to the extent reasonably necessary to permit Seller to wind-down and liquidate its estate after the Closing and (ii) any other buyer of ROC's lines of business or assets pursuant to the auction contemplated by the Bidding Procedures Order (an "Other Buyer") reasonable access at such Other Buyer's sole cost and expense, including the ability to make copies (during business hours with reasonable prior notice and subject to then-applicable COVID Restrictions) to the same to the extent reasonably related to the assets of ROC purchased by such Other Buyer; and provided, further, that as a condition to such access, Seller and each such Other Buyer shall each keep such information confidential in accordance with all contractual requirements and any applicable Laws (or in the case of any such Other Buyer, a confidentiality agreement reasonably acceptable to Buyer).

Section 1.2      Excluded Assets. Except as provided in Section 1.1, the Acquired Assets shall not include any right, title or interest of any Person other than Seller in any property or asset, or Seller's right, title and interest in, to and under properties and assets not used in connection with the ownership, operation and/or to management of the Business, and shall specifically exclude the

following properties, Contracts, and other assets, interests and rights of Seller (all such items not being acquired by Buyer being referred to in this Agreement as the "Excluded Assets"):

(a)     all rights of every nature and description (other than Assumed Policy Rights) under or arising out of all insurance policies of Seller (the "Insurance Policies"), including without limitation (i) with respect to Claims made prior to the Effective Date (ii) to the extent of coverage of any Excluded Liabilities, (iii) under those insurance policies covering any tort liabilities that are not Assumed Liabilities, (iv) under the D&O Insurance, and (iv) under those insurance policies covering liabilities and Claims against Seller and its affiliates relating to the Excluded Employee Liabilities;

(b)     all Owned Real Property (including for the avoidance of doubt the North Carolina Property), other than the Arkansas Property;

(c)     any asset that is not owned or leased by Seller or not used or held for use in connection with the ownership, operation and management of the Business;

(d)     any minute books, stock ledgers, corporate seals and stock certificates of Seller, and other similar books and records that Seller is required by Law to retain and all Tax Returns, financial statements and corporate or other entity filings; provided that (i) Seller shall provide Buyer with reasonable access to the same following the Closing to the extent relating to the Acquired Assets and when reasonably requested by Buyer and (ii) Buyer shall be entitled upon reasonable request to be provided with copies of all such records, at its own expense, and provided, further, that Seller shall notify Buyer before disposing of any such records and upon Buyer's reasonable request shall transfer them to Buyer;

(e)     all (i) prepaid premiums in respect of all Insurance Policies, (ii) retainers, prepayments or on-account cash paid to Seller's professionals and advisors, including any carve-out under any DIP Facility or cash collateral arrangements (whether retained in the Bankruptcy Case or otherwise), and (iii) other deposits, prepaid charges and expenses paid by Seller to the extent in connection with or relating to any Excluded Asset;

(f)     all rights to or claims for refunds, overpayments or rebates of Pre-Closing Taxes, including any refunds, overpayments or rebates of Pre-Closing Taxes for any Straddle Period, other than, in any of the foregoing cases, any such refunds, overpayments or rebates that are attributable to Taxes actually paid by Buyer;

(g)     all shares of capital stock (and any other equity interests or rights convertible into equity interests) issued by any Seller entity;

(h)     all Documents exclusively relating to any Excluded Asset; provided, that Seller shall provide Buyer with reasonable access at Buyer's sole cost and expense, including the ability to make copies (during business hours with reasonable prior notice and subject to then-applicable COVID Restrictions) to the same to the extent reasonably related to the Acquired Assets;

(i)     all Documents exclusively relating to any Employees who do not become Transferred Employees; provided that, to the extent permitted by applicable Law, Seller shall make

5

copies of such Documents available to Buyer if reasonably related to addressing or defending any such Employees' claims against Buyer;

(j)     subject to Section 1.6, any asset that requires the consent of a third party to be transferred, assumed or assigned hereunder as to which, by the Closing Date (and after giving effect to the entry of the Sale Order and any other Order of the Bankruptcy Court eliminating any contractual right of third parties to withhold such consent), such consent to transfer, assumption or assignment has not been effected or excused (for clarity, all liabilities associated with each such asset are excluded from Assumed Liabilities pursuant to Section 1.4(a));

(k)     all Employee Benefit Plans and all assets of, and Contracts exclusively relating to or associated with such plans;

(l)     all Cash and all accounts or notes receivable held by Seller, and any security, claim, remedy or other right related to any of the foregoing;

(m)     any rights of Seller under this Agreement or any Ancillary Agreement to which Seller is a party, including without limitation any rights relating to the Purchase Price;

(n)     copies of all Historic Firearms Books and Records of Seller; provided, that Seller shall provide Buyer with reasonable access at Buyer's sole cost and expense, including the ability to make copies (during business hours with reasonable prior notice and subject to then-applicable COVID Restrictions) to the same to the extent reasonably related to the Acquired Assets;

(o)     all Documents of Seller held by Seller or Seller's counsel relating to (i) any litigation against Seller or (ii) the Excluded Employee Liabilities;

(p)     the D&O Insurance, and all proceeds thereof;

(q)     all rights of recovery, rights of set-off, rights of indemnity, contribution or recoupment, warranties, guarantees, rights, remedies, counter-claims, cross-claims and defenses related to any Excluded Liability;

(r)     any properties, Contracts, or other assets, interests and rights of Seller that (i) do not relate to the ownership, operation or management of the Business or (ii) are otherwise set forth on Schedule 1.2(r);

(s)     all Avoidance Actions; and

(t)     Claims held by Seller against any party that are covered by, relate to or are based upon any Insurance Policies (including the D&O Insurance).

Notwithstanding any provision to the contrary in this Section 1.2, "Excluded Assets" does not include the Business Name.

Section 1.3     Assumption of Liabilities. At the Closing, Buyer shall assume, and Buyer agrees to thereafter pay, perform and discharge when due, and indemnify, defend and hold

6

harmless Seller, its Affiliates and all of their respective Related Persons from and against, the following liabilities (all items in this <u>Section 1.3</u> being, collectively, the "<u>Assumed Liabilities</u>"):

      (a)     Except as set forth in <u>Section 1.5</u>, all liabilities and unperformed and unfulfilled obligations of Seller under the terms of any Assumed Contract (including all premium finance arrangements of Seller for Assumed Contracts), and the Cure Amount in connection with the assignment of the Assumed Contracts to, and the assumption of the Assumed Contracts by, Buyer;

      (b)     all liabilities and obligations of Seller under the Customer Orders and the Purchase Orders (including liabilities in respect of customer deposits, security deposits and prepaid items), excluding any trade payables;

      (c)     all liabilities and obligations for Post-Closing Taxes (including those relating to any Straddle Period);

      (d)     all liabilities and obligations for Transaction Taxes;

      (e)     all Employee Liabilities relating to Transferred Employees (other than the Excluded Employee Liabilities);

      (f)     all liabilities and obligations (including under applicable Environmental Laws and other Laws) arising out of or relating to Buyer's ownership or operation of the Business and the Acquired Assets after the Closing;

      (g)     all liabilities and obligations to indemnify and hold harmless any Transferred Employees; and

      (h)     all liabilities and obligations of Seller set forth on <u>Schedule 1.3(h)</u>.

    Section 1.4    <u>Retention of Liabilities</u>. Buyer is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of whatever nature, whether presently in existence or arising hereafter. All such other liabilities and obligations shall be retained by and remain liabilities and obligations of Seller (all such liabilities and obligations not being assumed being herein referred to as the "<u>Excluded Liabilities</u>"). The Excluded Liabilities include, without limitation, the following liabilities and obligations (but in each case except as specifically assumed in <u>Section 1.3</u>):

      (a)     all liabilities and obligations under or relating to the Excluded Assets;

      (b)     all liabilities and obligations of Seller under or relating to the Priority Term Loan, the FILO Facility, the Exit Term Loan or the Intercompany Note;

      (c)     all liabilities and obligations relating to any Employee Benefit Plans (the "<u>Excluded Employee Liabilities</u>");

      (d)     all liabilities and obligations for Pre-Closing Taxes;

(e)    all liabilities and obligations of Seller arising under or incurred in connection with the negotiation, preparation, execution and performance of this Agreement, the Ancillary Agreements to which Seller is a party and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

(f)    all liabilities of, and Claims against, Seller arising from and in connection with grants of restricted common unit/share awards and stock options by Seller;

(g)    any liabilities and obligations of Seller under this Agreement, or under any Ancillary Agreement to which Seller is a party;

(h)    all State of Alabama Project Development Liabilities;

(i)    all Liabilities to the State of Arkansas, including with respect to the Arkansas Grant Agreement;

(j)    the Retained Litigation;

(k)    all other liabilities and obligations arising out of or relating to Seller's ownership, operation or management of the Business and the Acquired Assets prior to the Closing (including trade payables);

(l)    all liabilities and obligations under the CBA and the WARN Act;

(m)    all liabilities and obligations under the Pension Plan;

(n)    all City of Huntsville Project Development Liabilities; and

(o)    all of Seller's other liabilities and obligations that are not Assumed Liabilities, including, without limitation, liabilities set forth on Schedule 1.4(o).

Section 1.5    Assumed Contracts; Cure Amount.

(a)    At such time as is specified in the Sale Order, pursuant to Section 365 of the Bankruptcy Code, Seller shall assume and assign to Buyer and Buyer shall assume from Seller, the Assumed Contracts, Customer Orders and Purchase Orders. The amounts necessary, pursuant to Section 365 of the Bankruptcy Code, to cure any and all defaults and to pay all actual or pecuniary losses that have resulted from any such defaults under any Assumed Contract, Customer Order or Purchase Order, in each case as and when finally determined by the Bankruptcy Court pursuant to the procedures set forth in the Sale Order and this Agreement (such aggregate amount, the "Cure Amount") shall be paid by Buyer. Schedule 1.5(a) contains Seller's estimate as of the Effective Date of the Cure Amount. Buyer may amend Schedule 1.1(g) in good faith to add or remove any executory contracts of Seller at any time prior to the date of Closing, consistent with the terms of the Bidding Procedures Order. Notwithstanding anything herein to the contrary, upon written notice to Seller, Buyer may amend any Schedule to this Agreement (including Schedule 1.1(g) and Schedule 1.2(r)) in good faith to remove and reject any executory contracts (and/or exclude any Purchase Order or Customer Order) of Seller at any time prior to the date of Closing.

8

For the avoidance of doubt and notwithstanding anything to the contrary in this Section 1.5(a), Seller shall have no liability under this Agreement in respect of any Cure Amounts, other than as set forth in this Section 1.5(a). Notwithstanding anything to the contrary (in this Agreement or otherwise), if Buyer chooses not to assume any executory contract, Purchase Order or Customer Order of Seller, then Buyer shall not be liable for or obligated to pay any Cure Amount with respect to such executory contract, Purchase Order or Customer Order.

(b)     Seller shall timely serve the motion seeking entry of the Sale Order to all parties to Contracts and, subject to Section 1.6 and the performance of Buyer's obligations in Section 5.2, Seller shall use commercially reasonable efforts to cause the Assumed Contracts to be assumed by Seller and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code, and Seller shall comply with all requirements under Section 365 of the Bankruptcy Code necessary to assign and delegate to Buyer all of Seller's rights and obligations under the Assumed Contracts.

(c)     Notwithstanding any provision in this Agreement to the contrary, if for any reason Buyer fails to pay the Cure Amount in respect of any Assumed Contract when due and payable pursuant to this Agreement, the Sale Order or any other Order of the Bankruptcy Court, (i) the other party may pay or otherwise satisfy such Cure Amount or any other liability or obligation under such Assumed Contract and shall be reimbursed by the party responsible to make such payment within five (5) Business Days of notice of such payment (ii) each party shall indemnify and hold harmless the other party in respect of such Cure Amount, liability or obligation as well as any expenses (including legal fees and expenses) incurred by the other in defending any claim for payment of the Cure Amount or any other liability or obligation arising under such Contract asserted by the counterparty thereto and (iii) Seller or Buyer may reject, and nothing in this Agreement shall prohibit Seller or Buyer from rejecting, such Contract.

Section 1.6     Non-Assignment of Acquired Assets. Notwithstanding any provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not effect the assignment or transfer of any Acquired Asset if (a) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any party thereto other than Seller (each such action, a "Necessary Consent"), would constitute a breach thereof (after giving effect to any waiver by the applicable counterparty, or any elimination of such approval, authorization or consent requirement by operation of the Sale Order) or in any way adversely affect the rights or obligations of Buyer thereunder and such Necessary Consent is not obtained and (b) the Bankruptcy Court shall not have entered an Order providing that such Necessary Consent is not required because the transfer thereof shall be deemed by the Bankruptcy Court to be (x) effective and (y) not a breach thereof, notwithstanding the failure to obtain such Necessary Consent. In such event, Seller and Buyer will use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Acquired Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Buyer as Buyer may reasonably request; provided, however, that Seller shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested (other than the applicable Cure Amount) or to initiate any litigation or legal proceedings to obtain any such consent or approval. If such Necessary Consent is not obtained, or if such Acquired Asset or an attempted assignment thereof would otherwise be ineffective or would adversely affect the rights of Seller thereunder so that Buyer would not in fact receive all such rights, Seller and Buyer will cooperate in a mutually agreeable arrangement, to the extent feasible and at no out-of-pocket

9

expense to Seller or Buyer, under which Buyer would obtain the benefits and assume the obligations (to the extent otherwise constituting Assumed Liabilities hereunder) thereunder in accordance with this Agreement, including subcontracting, sublicensing or subleasing to Buyer, or under which Seller would enforce for the benefit of, and at the direction of, Buyer, with Buyer assuming Seller's obligations (to the extent otherwise constituting Assumed Liabilities hereunder), any and all rights of Seller thereunder.

Section 1.7    Further Conveyances and Assumptions.

(a)    Seller shall deliver to Buyer at the Closing such Employee Records as is reasonably necessary for Buyer to transition the Transferred Employees into Buyer's records, as well as all other Documents included in the Acquired Assets.

(b)    At the Closing, and from time to time thereafter, Seller and Buyer shall, and Seller and Buyer shall cause their respective Affiliates to, execute, acknowledge and deliver all such further actions, as may be reasonably necessary or appropriate to sell, transfer, convey, assign and deliver fully to Buyer and its respective successors or permitted assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and to assure fully to Seller and its successors and permitted assigns, the assumption of the liabilities and obligations intended to be assumed by Buyer under this Agreement, and to otherwise make effective or evidence the transactions contemplated by this Agreement.

Section 1.8    Conflicts with Other Bidders.  In the event of any conflict between this Agreement and any other bidder or bidders for Seller's assets relating to the Acquired Assets or the Assumed Liabilities as defined herein or in the applicable asset purchase agreement or agreements by and between Seller and such other bidder or bidders (an "Other APA"), Buyer shall cooperate in good faith with any such other bidder or bidders, whether before or after the Closing Date, to ensure that all assets or liabilities are appropriately apportioned between Buyer and such bidder or bidders in order to reflect the intent of Buyer and any such other bidder or bidders under this Agreement and each applicable Other APA.

ARTICLE 2
CONSIDERATION

Section 2.1    Consideration. The aggregate consideration for the sale and transfer to Buyer of the Acquired Assets shall be:

(a)    an amount in cash equal to the Estimated Purchase Price (the Estimated Purchase Price as finally adjusted in accordance with Section 2.3, the "Purchase Price"); and

(b)    the assumption of the Assumed Liabilities.

Section 2.2    Good Faith Deposit.

(a)    Buyer, ROC and the Escrow Agent have entered into that certain Escrow Agreement (the "Good Faith Deposit Escrow Agreement"), dated as of September 4, 2020, which is attached hereto as Exhibit 2. Buyer has deposited with the Escrow Agent an amount equal to Six

10

Million Five Hundred Thousand Dollars (US$6,500,000) by wire transfer of immediately-available funds (the "Good Faith Deposit") to an account specified by Escrow Agent (the "Good Faith Deposit Escrow Account"), which Good Faith Deposit shall be held, safeguarded and released pursuant to the terms of this Agreement, the Good Faith Deposit Escrow Agreement and the Bidding Procedures Orders. The Good Faith Deposit shall not be subject to any Lien, attachment, trustee process or any other judicial process of any creditor of either of Seller or Buyer. Upon the Closing, the Good Faith Deposit shall be an Excluded Asset and shall not be subject to any restrictions under this Agreement.

(b)    The Good Faith Deposit shall be released from the Good Faith Deposit Escrow Account by the Escrow Agent and delivered to either Buyer or Seller, in accordance with the provisions of this Agreement, the Good Faith Deposit Escrow Agreement and the Bidding Procedures Orders as follows (and Buyer and ROC shall deliver joint written instructions to the Escrow Agent, within three (3) Business Days, to effect such distributions as and when required hereunder):

(i)    if the Closing occurs, the Good Faith Deposit shall be released from the Good Faith Deposit Escrow Account to Seller and applied towards the amount payable by Buyer pursuant to Section 2.1(a);

(ii)    if this Agreement has been terminated by Seller pursuant to Section 10.2(c), then the Good Faith Deposit shall be released by the Good Faith Deposit Escrow Account to Seller; or

(iii)    if this Agreement has been terminated by any party, other than as contemplated by Section 2.2(b)(ii), then the Good Faith Deposit shall be released from the Good Faith Deposit Escrow Account to Buyer.

Section 2.3    Purchase Price Adjustment.

(a)    At least five (5) Business Days prior to the Closing Date, ROC shall deliver to Buyer a reasonably detailed statement (the "Pre-Closing Statement") setting forth ROC's good faith calculation of (i) the Estimated Inventory Amount, as well as the resulting Estimated Inventory Amount Excess (if any) or Estimated Inventory Amount Shortfall (if any), as the case may be, and (ii) the Estimated Purchase Price. Following the delivery of the Pre- Closing Statement, ROC shall provide Buyer and its Representatives with reasonable access to work papers and other books and records for purposes of assisting Buyer in its review. Prior to the Closing, ROC shall consider in good faith any revisions to the Pre-Closing Statement raised by Buyer in connection with its review of the Pre-Closing Statement (which shall be modified to include any such revisions accepted by ROC in good faith). In connection with the preparation of the Pre-Closing Statement, within seven (7) days prior to the Closing, if requested by Buyer, ROC shall conduct a physical count of the Inventory, which Buyer and its Representatives may observe.

(b)    No later than thirty (30) days after the Closing Date, Buyer shall deliver to ROC a reasonably detailed statement (the "Post-Closing Statement") setting forth Buyer's good faith calculation of (i) the Closing Inventory Amount, as well as the resulting Closing Inventory

11

Amount Excess (if any) or Closing Inventory Amount Shortfall (if any), as the case may be, and any resulting adjustments to the Estimated Purchase Price.

(c)    After receipt of the Post-Closing Statement, ROC shall have ten (10) days (the "Review Period") to review the Post-Closing Statement. During the Review Period, ROC and its accountants, to the extent reasonably necessary for their review of the Post-Closing Statement, shall have reasonable access to the books and records of the Business, the personnel of, and work papers prepared by, Buyer and/or Buyer's accountants; provided, that such access shall be subject to then-applicable COVID Restrictions and shall be done in a manner that does not interfere with the normal business operations of Buyer or the Business. The Post-Closing Statement shall become final and binding upon the parties hereto following the expiration of the Review Period unless ROC delivers written notice of its disagreement with the Post-Closing Statement (a "Notice of Disagreement") to Buyer prior to such date. Any Notice of Disagreement shall specify in reasonable detail ROC's objections to the Post-Closing Statement, indicating each disputed item or amount and the basis for ROC's disagreement therewith. If a Notice of Disagreement is received by Buyer prior to the expiration of the Review Period, then during the ten (10) day period (the "Resolution Period") following the delivery of a Notice of Disagreement, ROC and Buyer shall negotiate in good faith to resolve in writing any differences that they may have with respect to the matters specified in such Notice of Disagreement. If such differences are so resolved within the Resolution Period, the revised Post-Closing Statement, with such changes as may have been previously agreed in writing by Buyer and ROC shall be final and binding. If, at the end of the Resolution Period, ROC and Buyer have not resolved in writing the matters specified in the Notice of Disagreement, ROC and Buyer shall submit any amounts remaining in dispute to the Accounting Firm, who, acting as experts and not arbitrators, shall resolve such disputed amounts only and make any adjustments to the Post-Closing Statement. Buyer and ROC agree that all adjustments shall be made without regard to materiality. The Accounting Firm shall render a written decision resolving the matters submitted to the Accounting Firm as soon as practicable, and in any event within ten (10) days of the receipt of such submission (or such other time as Buyer and ROC shall agree in writing). The scope of the disputes to be resolved by the Accounting Firm shall be limited to fixing mathematical errors and determining whether the items in dispute were determined in accordance with the Balance Sheet Rules and the terms of this Agreement, and no other matters. The Accounting Firm's decision shall be (w) limited to the specific items under dispute by the parties made strictly in accordance with the Balance Sheet Rules and the terms of this Agreement and (y) final and binding on all of the parties hereto, absent manifest error. The Accounting Firm may not assign a value greater than the greatest value for such item claimed by either party or smaller than the smallest value for such item claimed by either party. The fees and expenses of the Accounting Firm incurred pursuant to this Section 2.3(c) shall be borne pro rata as between ROC, on the one hand, and Buyer, on the other hand, in proportion to the final allocation made by such Accounting Firm of the disputed items weighted in relation to the claims made by ROC and Buyer, such that the prevailing party pays the lesser proportion of such fees, costs and expenses.

(d)    Within three (3) Business Days after the final determination of the final Inventory Amount, and the resulting Purchase Price, the following payments shall be made, as applicable:

(i)     If the Purchase Price is *greater than* the Estimated Purchase Price calculated at the Closing (such excess, the "Adjustment Surplus Amount"), then:

(A)     Buyer shall pay (or caused to be paid) to ROC (on behalf of itself and, if and to the extent applicable, Seller), by wire transfer of immediately available funds to a bank account designated in writing by ROC, the Adjustment Surplus Amount; and

(B)     Buyer and ROC shall execute and deliver a joint written instruction to the Escrow Agent directing the Escrow Agent to release the Adjustment Escrow Amount, to ROC (on behalf of itself and, if and to the extent applicable, Seller).

(ii)     If the Purchase Price *is less* than the Estimated Purchase Price calculated at the Closing (such amount , expressed as a positive number, the "Adjustment Deficit Amount"), then Buyer and ROC shall execute and deliver a joint written instruction to the Escrow Agent directing the Escrow Agent to release from the Adjustment Escrow Account and pay to Buyer an amount equal to such Adjustment Deficit Amount, and in the event that such Adjustment Deficit Amount:

(A)     is *greater than* the Adjustment Escrow Amount, then ROC shall pay, or cause to be paid, to Buyer, by wire transfer of immediately available funds to a bank account designated in writing by Buyer, an amount equal to the remaining portion of such Adjustment Deficit Amount to Buyer; or

(B)     is *less than* the Adjustment Escrow Amount, Buyer and ROC shall execute and deliver a joint written instruction to the Escrow Agent directing the Escrow Agent to release from the Adjustment Escrow Account any remaining amounts in the Adjustment Escrow Account (after payment of such Adjustment Deficit Amount from the Adjustment Escrow Account to Buyer), to ROC (on behalf of itself and, if and to the extent applicable, Seller).

Any payments made pursuant to this Section 2.3 shall be treated by the parties hereto as an adjustment to the Purchase Price for Tax purposes and shall be reported as such by the parties hereto on their Tax Returns, in each case to the greatest extent permitted by applicable Law.

Section 2.4     Withholding. Buyer and its applicable Affiliates may deduct and withhold from any consideration otherwise payable pursuant to this Agreement any amounts required to be deducted and withheld under applicable Law. To the extent that such amounts are deducted and withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person with respect to which such deduction and withholding was made.

ARTICLE 3
CLOSING AND DELIVERIES

Section 3.1     Closing. Subject to the terms and conditions set forth herein, the consummation of the transactions contemplated by this Agreement (the "Closing") shall take place

13

remotely by the electronic exchange of documents and signatures, or such other place as may be agreed upon, at 7:00 a.m., local Central Time, on the third (3rd) Business Day following the satisfaction or, to the extent permitted by this Agreement, waiver of each of the conditions set forth in Article 9 of this Agreement (other than those conditions that, by their nature, are to be satisfied at the Closing, but subject to the satisfaction, or waiver to the extent permitted by this Agreement, of such conditions), or such other date as may be agreed to by Seller and Buyer, which date shall not be earlier than the first day following the entry of the Sale Order by the Bankruptcy Court (the "Closing Date").  The Closing shall be deemed effective for all purposes as of 12:01 a.m. Central Time on the Closing Date (the "Calculation Time").

Section 3.2    Seller's Deliveries.  At the Closing, Seller shall deliver or cause to be delivered to Buyer:

(a)    a joint payment instruction letter, duly executed by Seller and ROC, directing the Escrow Agent to immediately release the Good Faith Deposit from the Good Faith Deposit Escrow Account to ROC;

(b)    all of the Acquired Assets, together with one or more duly executed bills of sale, endorsed certificates of title and other evidence of transfer of motor vehicles and instruments of conveyance appropriate for the applicable Acquired Assets, each as reasonably requested by Buyer and otherwise in form and substance customary for transactions of this nature and reasonably acceptable to Buyer and Seller; provided that Seller's conveyance of deliverables relating to the Arkansas Property shall be governed by Section 3.2(g);

(c)    one or more duly executed assignment and assumption agreements for the Assumed Contracts and the Assumed Liabilities, in form and substance customary for transactions of this nature and reasonably acceptable to Buyer and Seller (each, an "Assignment and Assumption Agreement");

(d)    duly executed, and notarized where indicated, assignments of (i) the patents, registrations and applications included in the Acquired Intellectual Property registered in the name of Seller, in forms suitable for recording in the U.S. Patent and Trademark Office and equivalent offices in jurisdictions outside the United States and (ii) general assignments of all other Acquired Intellectual Property, in each case in form and substance customary for transactions of this nature and reasonably acceptable to Buyer and Seller (each, an "Acquired Intellectual Property Assignment");

(e)    the officer's certificate required to be delivered pursuant to Section 9.2(a) and Section 9.2(b);

(f)    one or more affidavits executed by Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that Seller is not a foreign person within the meaning of Section 1445(f)(3) and Section 1446 of the Code;

(g)    quitclaim deeds, or their equivalent in the applicable state, for the Arkansas Property, executed by Seller;

14

(h)    a duly executed Limited Power of Attorney to enable Buyer to execute on Seller's behalf any further documents necessary to record the assignment to Buyer of Acquired Intellectual Property;

(i)    the Adjustment Escrow Agreement, duly executed by ROC; and

(j)    such other documents, instruments and certificates as Buyer may reasonably request to effect the transactions contemplated by this Agreement and each Ancillary Agreement.

Section 3.3    Buyer's Deliveries. At the Closing, Buyer shall deliver or cause to be delivered:

(a)    the following payments:

(i)    to Seller, cash in an amount equal to the Estimated Purchase Price minus (A) the Good Faith Deposit and (B) the Adjustment Escrow Account, by wire transfer of immediately available funds to the account or accounts of Seller identified by Seller in writing reasonably in advance of the Closing;

(ii)    to the Escrow Agent, the Adjustment Escrow Amount, by wire transfer of immediately available funds in accordance with the terms of the Adjustment Escrow Agreement;

(b)    to Seller, a joint payment instruction letter, duly executed by Buyer, directing the Escrow Agent to immediately release the Good Faith Deposit from the Good Faith Deposit Escrow Account to ROC;

(c)    to Seller, one or more duly executed Assignment and Assumption Agreements;

(d)    to Seller, the officer's certificate required to be delivered pursuant to Section 9.1(a) and Section 9.1(b);

(e)    to Huntsman Holdings, LLC, one or more agreements in form and substance reasonably satisfactory to Buyer and Huntsman Holdings, LLC as may be mutually agreed by Buyer and Huntsman Holdings, LLC prior to the Closing, licensing to Huntsman Holdings, LLC the use of all trademarks and service marks included in the Acquired Intellectual Property that are currently used by Seller outside of the Business for use in fields of use other than the Business related to the Excluded Assets of ROC purchased by Huntsman Holdings, LLC (such agreement or agreements being collectively, the "IP Back-License");

(f)    to Seller, the Adjustment Escrow Agreement, duly executed by Buyer; and

(g)    such other documents, instruments and certificates as Seller may reasonably request to transfer, assign and delegate the Assumed Liabilities to Buyer in accordance with the terms and conditions hereof.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES

Section 4.1    Representations and Warranties of Seller. Seller represents and warrants to Buyer as follows:

(a)    Corporate Organization. Each entity comprising Seller is duly formed or incorporated and validly existing and in good standing under the laws of its respective state of domicile. Subject to any necessary authority from the Bankruptcy Court, each entity comprising Seller has the requisite corporate or limited liability company power and authority to conduct the Business as now being conducted and to carry out its obligations under this Agreement.

(b)    Qualification to do Business. Each entity comprising Seller is duly qualified to do business and is in good standing in every jurisdiction in which the character of the properties owned or leased by it or the nature of the business(es) conducted by it makes such qualification necessary.

(c)    Authorization and Validity. Each entity comprising Seller has the corporate or limited liability company power and authority necessary to enter into this Agreement and each Ancillary Agreement to which Seller is a party and, subject to (i) the Bankruptcy Court's entry of the Sale Order, (ii) the termination or expiration of the waiting period under the HSR Act (if applicable) and (iii) the satisfaction of the CFIUS Condition (if applicable), to carry out its obligations hereunder and thereunder. The execution and delivery of this Agreement has been duly authorized, and at or before Closing the execution and delivery of the Ancillary Agreements to which Seller is a party will be duly authorized, by all necessary corporate or limited liability company action by the boards of directors or managers of Seller, and no other corporate or limited liability company proceedings are necessary for the performance by Seller of its obligations under this Agreement or the consummation by Seller of the transactions contemplated by this Agreement. This Agreement has been duly and validly executed and delivered by Seller, and at Closing the Ancillary Agreement to which Seller is a party will be duly and validly executed and delivered by Seller, and, subject to the Bankruptcy Court's entry of the Sale Order and assuming due authorization, execution and delivery by Buyer, the Agreement is, and each of the Ancillary Agreements to which Seller is a party will be at Closing, a valid and binding obligation of Seller enforceable against Seller in accordance with its terms.

(d)    No Conflict or Violation. Neither the execution and delivery by Seller of this Agreement or any of the Ancillary Agreements to which Seller is a party, nor (subject to (i) the Bankruptcy Court's entry of the Sale Order, (ii) the termination or expiration of the waiting period under the HSR Act (if applicable) and (iii) the satisfaction of the CFIUS Condition (if applicable)) the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements to which Seller is a party, nor compliance by Seller with any of the provisions hereof or thereof, will (x) conflict with or result in any breach of any provision of the respective certificates of incorporation or formation of Seller or the respective by-laws or operating agreements of Seller, (y) violate any provision of law, regulation, rule or other legal requirement of any Government ("Law") or any order, judgment or decree of any court or Government ("Order") applicable to Seller or any of its properties or assets, or (z) automatically result in a modification, violation or breach of, or constitute (with or without notice or lapse of time or both)

16

a default (or give rise to any right, including but not limited to, any right of termination, amendment, cancellation or acceleration) under, any of the terms, conditions or provisions of any contract, indenture, note, bond, lease, license or other agreement to which Seller is a party or by which it is bound or to which any of its properties or assets is subject, except, in either of the foregoing cases (x), (y) and (z), for any conflict or violation as would not reasonably be expected to cause a Material Adverse Effect.

(e)    <u>Consents and Approvals</u>. The execution, delivery and performance of this Agreement and the Ancillary Agreements to which Seller is a party do not and will not require the consent or approval of, or filing with, any Government or any other Person, other than (i) as may be required to be obtained by Seller after the Closing in order for Buyer to own or operate any of the Acquired Assets; (ii) as required pursuant to the HSR Act, if applicable; (iii) the entry of the Sale Order by the Bankruptcy Court; (iv) as required by CFIUS, if applicable, or (v) for such consents, approvals and filings, of which the failure to obtain or make would not, individually or in the aggregate, have a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Ancillary Agreements to which Buyer is a party.

(f)    <u>Title and Ownership</u>. Seller has good title to, or right by license, lease or other agreement to use, the Acquired Assets. Subject to the entry of the Sale Order, at the Closing, Seller will have the right to transfer the Acquired Assets to Buyer free and clear of all Liens, other than Liens included in the Assumed Liabilities and Permitted Liens.

(g)    <u>Compliance with Law</u>. Except as set forth on <u>Schedule 4.1(g)</u>, (i) Seller has operated the Business in material compliance with all applicable Laws, and (ii) except as may result from the Bankruptcy Case, Seller has not received written notice of any violation of any applicable Laws, nor is Seller in default with respect to any Order applicable to the Acquired Assets.

(h)    <u>Contracts</u>. As of the Effective Date, other than as set forth on <u>Schedule 4.1(h)</u> or in motions or other pleadings or similar items filed with the Bankruptcy Court, neither Seller nor, to Seller's Knowledge, any other party to any of the Assumed Contracts has commenced any action against any of the parties to such Assumed Contracts or given or received any written notice of any material default or violation under any Assumed Contract that was not withdrawn or dismissed, except only for those defaults that will be cured in accordance with the Sale Order (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Assumed Contracts). Assuming due authorization, execution, delivery and performance by the other parties thereto, each of the Assumed Contracts is, or will be at the Closing, valid, binding and in full force and effect against Seller, except as otherwise set forth on <u>Schedule 4.1(h)</u>.

(i)    <u>Permits</u>. <u>Schedule 4.1(i)</u> sets forth a complete and correct list of all material Permits currently held by Seller in connection with the Business ("<u>Material Permits</u>"), and all Material Permits at the current locations of the Business are, except as would not cause a Material Adverse Effect, in full force and effect.

17

(j)    Intellectual Property. Schedule 1.1(i) sets forth a complete and correct list of all registrations and applications of the trademarks, patents and domain names owned and primarily used by Seller in connection with the Business.

(k)    Business Name. Schedule 12.1(a) sets forth a complete and correct list of all trademarks and service marks comprising the Business Name.

(l)    Brand Names. Schedule 12.1(b) sets forth a complete and correct list of all trademarks and service marks for the Brand Names.

(m)    Seller Not a Foreign Person. Seller is not a "foreign person" within the meaning of Section 1445 or 1446 of the Code.

Section 4.2    Representations and Warranties of Buyer. Buyer represents and warrants to Seller as follows:

(a)    Corporate Organization. Buyer is a limited liability company duly formed, validly existing and in good standing under the Laws of the jurisdiction of its formation. Buyer has the requisite limited liability company power and authority to own its properties and assets and to conduct its business as now conducted and to carry out its obligations under this Agreement and each of the Ancillary Agreements to which Buyer is a party.

(b)    Qualification to do Business. Buyer is duly qualified to do business as an entity and is in good standing in every jurisdiction in which the character of the properties owned or leased by it or the nature of the business(es) conducted by it makes such qualification necessary.

(c)    Authorization and Validity. Buyer has the requisite corporate power and authority necessary to enter into this Agreement, and at Closing will have the requisite corporate power and authority necessary to enter into each of the Ancillary Agreements to which Buyer is a party, and to carry out its obligations hereunder and thereunder, subject to (i) the Bankruptcy Court's entry of the Sale Order, (ii) the termination or expiration of the waiting period under the HSR Act (if applicable) and (iii) the satisfaction of the CFIUS Condition (if applicable), to carry out its obligations hereunder and thereunder. The execution and delivery of this Agreement and those Ancillary Agreements to which Buyer is a party have been duly authorized by all necessary corporate action by the board of directors (or equivalent), and no other corporate proceedings are necessary for the performance by Buyer of its obligations under this Agreement and each of the Ancillary Agreements to which Buyer is a party, or the consummation by Buyer of the transactions contemplated hereby or thereby. This Agreement has been duly and validly executed and delivered by Buyer, and at Closing each Ancillary Agreement will be duly and validly executed and delivered by Buyer, and, subject to the Bankruptcy Court's entry of the Sale Order and assuming due authorization, execution and delivery by Seller, the Agreement is, and each of the Ancillary Agreements will be at Closing, a valid and binding obligation of Buyer enforceable against it in accordance with its terms.

(d)    No Conflict or Violation. Neither the execution and delivery by Buyer of this Agreement or any of the Ancillary Agreements to which Buyer is a party, nor (subject to (x) the Bankruptcy Court's entry of the Sale Order, (y) the termination or expiration of the waiting period under the HSR Act (if applicable) and (z) the satisfaction of the CFIUS Condition (if

18

applicable)) the consummation of the transactions contemplated hereby or thereby, nor compliance by Buyer with any of the provisions hereof or thereof, will (i) conflict with or result in any breach of any provision of the certificate of incorporation or by-laws (or equivalent documents) of Buyer, (ii) violate any provision of Law, or any Order applicable to Buyer or any of its properties or assets, or (iii) automatically result in a modification, violation or breach of, or constitute (with or without notice or lapse of time or both) a default (or give rise to any right, including but not limited to, any right of termination, amendment, cancellation or acceleration) under, any of the terms, conditions or provisions of any contract, indenture, note, bond, lease, license or other agreement to which Buyer is a party or by which it is bound or to which any of its properties or assets is subject, except as would not materially and adversely affect the ability of Buyer to consummate the transactions contemplated by this Agreement or any of the Ancillary Agreements.

(e)     <u>Consents and Approvals</u>. The execution, delivery and performance of this Agreement and the Ancillary Agreements to which Buyer is a party do not and will not require the consent or approval of, or filing with, any Government or any other Person, other than (i) as may be required to be obtained by Buyer after the Closing in order to own or operate any of the Acquired Assets; (ii) as required pursuant to the HSR Act, if applicable; (iii) for entry of the Sale Order by the Bankruptcy Court; (vi) as required by CFIUS, if applicable, or (iv) for such consents, approvals and filings, of which the failure to obtain or make would not, individually or in the aggregate, have a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Ancillary Agreements to which Buyer is a party.

(f)     <u>Adequate Assurances Regarding Assumed Contracts</u>. Buyer is and will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

(g)     <u>Financial Capability</u>. Buyer and any Buyer Acquisition Vehicle currently has or at Closing will have available funds necessary to consummate the transactions contemplated by this Agreement, including the acquisition of the Acquired Assets and assumption of the Assumed Liabilities, and the payment therefor (i) to Seller of the Purchase Price and (ii) of any Cure Amount, and to perform its obligations under this Agreement and the Ancillary Agreements to which Buyer is a party on the terms and subject to the conditions contemplated hereby and thereby.

(h)     <u>Investigation by Buyer</u>. Buyer has conducted its own independent review and analysis of the Business, the Acquired Assets and the Assumed Liabilities, operations, technology, assets, liabilities, financial condition and prospects of the Business as formerly carried on by Seller and acknowledges that Seller has provided Buyer with reasonable access to the personnel, properties, premises and records of the Business for this purpose. Buyer has conducted its own independent review of all Orders of, and all motions, pleadings, and other submissions to, the Bankruptcy Court in connection with the Bankruptcy Case. In entering into this Agreement, Buyer has relied solely upon its own investigation and analysis, and Buyer (i) acknowledges that neither Seller nor any of its Affiliates or Related Persons makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to Buyer or its Affiliates or Related Persons, except for the representations and warranties contained in <u>Section 4.1</u> (which are subject to the limitations and restrictions contained in this Agreement); and (ii) agrees, to the fullest extent permitted by Law,

19

that none of Seller, its Affiliates or any of their respective Related Persons shall have any liability or responsibility whatsoever to Buyer or its Affiliates or Related Persons on any basis (including, without limitation, in contract or tort, under federal or state securities Laws or otherwise, but excluding misrepresentation or concealment arising from actual fraud of Seller) based upon any information provided or made available, or statements made, to Buyer or its Affiliates or Related Persons (or any omissions therefrom), including, without limitation, in respect of the specific representations and warranties of Seller set forth in this Agreement, except, with regard to Seller, for the representations and warranties contained in Section 4.1 and, with respect to such representations and warranties, subject to the limitations and restrictions contained in this Agreement.

Section 4.3    Warranties Exclusive; Schedules.

(a)    The representations and warranties contained in Article 4 are the only representations or warranties given by the parties to this Agreement and all other express or implied warranties are disclaimed. Without limiting the foregoing, the Acquired Assets are otherwise conveyed "AS IS", "WHERE IS" and "WITH ALL FAULTS" and all warranties of merchantability or fitness for a particular purpose are disclaimed. WITHOUT LIMITING THE FOREGOING, SELLER AND SELLER'S AFFILIATES AND THEIR RESPECTIVE RELATED PERSONS HAVE MADE NO REPRESENTATION OR WARRANTY CONCERNING (A) ANY USE TO WHICH THE ACQUIRED ASSETS MAY BE PUT, (B) ANY FUTURE REVENUES, COSTS, EXPENDITURES, CASH FLOW, RESULTS OF OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE ACQUIRED ASSETS OR THE ASSUMPTION OF THE ASSUMED LIABILITIES, (C) ANY OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO BUYER OR ITS AFFILIATES OR RELATED PERSONS OR (D) THE CONDITION OF THE ACQUIRED ASSETS, INCLUDING, WITHOUT LIMITATION, COMPLIANCE WITH ANY ENVIRONMENTAL LAWS OR OTHER LAWS. SELLER AND SELLER'S AFFILIATES AND RELATED PERSONS HAVE MADE NO REPRESENTATIONS OR WARRANTIES IN ANY OTHER AGREEMENT.

(b)    The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgement that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect.

(c)    Notwithstanding anything to the contrary in this Agreement, nothing in this Section 4.3 or elsewhere in this Agreement, express or implied, shall limit a party's right to bring an action, suit or proceeding against the other party or any other Person for fraud by such Person in connection with the making of any representation and warranty or covenant in this Agreement or any breach thereof.

Section 4.4    Survival of Representations and Warranties. None of the representations or warranties of Buyer or Seller set forth in this Agreement or any Ancillary Agreement to which Buyer or Seller is a party or in any certificate delivered pursuant to Section 9.1(a), Section 9.1(b), Section 9.2(a) or Section 9.2(b) shall survive the Closing (and, for the avoidance of doubt, all covenants set forth in this Agreement or any Ancillary Agreement to which Buyer or Seller is a party shall survive in accordance with their respective terms).

ARTICLE 5
COVENANTS OF THE PARTIES

Section 5.1    Covenants of Seller. Seller covenants as follows:

(a)    Commercially Reasonable Efforts.  Between the Effective Date and the Closing Date, Seller shall use all commercially reasonable efforts to (i) obtain all necessary consents, waivers, authorizations and approvals of all Governments, and of all other Persons, required to be obtained by Seller in connection with the execution, delivery and performance by it of this Agreement and the Ancillary Agreements to which Seller is a party, (ii) take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective in an expeditious manner the transactions contemplated by this Agreement and the Ancillary Agreements, and (iii) maintain the Acquired Assets substantially in accordance with Seller's current practices and procedures (as adjusted for the effects of any COVID Restrictions).

(b)    Access to Properties and Documents; Confidentiality. Seller shall afford to Buyer, and to the accountants, counsel and representatives of Buyer, reasonable access (subject to any COVID Restrictions) during normal business hours throughout the period from the Effective Date until the Closing Date (or the earlier termination of this Agreement pursuant to Article 10) to all Documents of Seller relating to the Acquired Assets and the Assumed Liabilities. Upon reasonable prior notice, Seller shall also afford Buyer reasonable access, taking into account any COVID Restrictions and Seller's resources and other commitments, during normal business hours, to all Acquired Assets, and to Seller's executive officers, accountants, counsel, employees and other representatives, throughout the period prior to the Closing Date (or the earlier termination of this Agreement pursuant to Article 10). The rights of access contained in this Section 5.1(b) are granted subject to, and on, the following terms and conditions: (i) any such investigation shall include the right to physical testing or sampling in a reasonable manner; (ii) all information provided to Buyer or its agents or representatives by or on behalf of Seller or its agents or representatives (whether pursuant to this Section 5.1(b) or otherwise) will be governed and protected by the Mutual Non-Disclosure Agreement, dated as of August 24, 2020 by and between Buyer and Remington Arms Company, LLC (the "Confidentiality Agreement");  and (iii) such rights of access shall not affect or modify the conditions set forth in Article 9 in any way.

(c)    Operation of the Business. Except (i) as otherwise contemplated or permitted by this Agreement or the Ancillary Agreements, (ii) with the prior consent of Buyer (such consent not to be unreasonably withheld, conditioned or delayed), or (iii) in connection with any Order relating to the Bankruptcy Case, between the Effective Date and the Closing Date, Seller shall (A) use its commercially reasonable efforts to operate the Business in all material respects in the ordinary course consistent with current practices (after taking into account Seller's status as a debtor-in- possession and any COVID Restrictions), (B) not enter into, materially amend or terminate any Assumed Contract outside of the ordinary course of business where such amendment or termination would have a material and adverse effect on the value of the Acquired Assets taken as a whole, (C) not remove from the Arkansas Property any Owned FF&E, other than Inventory; and (D) notify Buyer of any notices relating to or proposed changes affecting Seller's insurance policies covering any of the Acquired Assets. Notwithstanding the foregoing, nothing in this Agreement shall restrict Seller from rejecting any Contract that is not an Assumed Contract.

21

(d)    In the event the CFIUS Condition becomes a condition of Closing as described in Section 5.4(a), then Seller shall not be obligated to comply with Section 5.1(a)(i) and (iii) or Section 5.1(c). Notwithstanding anything herein to the contrary, Seller shall use its commercially reasonable efforts to safeguard and maintain the Acquired Assets in accordance with commercially reasonable practices and procedures.

Section 5.2    Covenants of Buyer. Buyer covenants as follows:

(a)    Commercially Reasonable Efforts. Buyer shall use all commercially reasonable efforts to (except with Seller's prior written consent, in Seller's sole discretion) (i) obtain all consents and approvals of all Governments, and all other Persons, required to be obtained by Buyer to effect the transactions contemplated by this Agreement and the Ancillary Agreements, and (ii) take, or cause to be taken, all action, and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective in an expeditious manner the transactions contemplated by this Agreement and the Ancillary Agreements.

(b)    Adequate Assurances Regarding Assumed Contracts. With respect to each Assumed Contract, Buyer shall provide adequate assurance of the future performance of such Assumed Contract by Buyer. Buyer agrees that it will promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Sale Order, including, without limitation, furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's employees and representatives available to testify before the Bankruptcy Court.

(c)    Cure of Defaults. Buyer shall, without any adjustment to the Purchase Price, as of the Closing or, in respect of any Assumed Contract for which the Bankruptcy Court does not enter an Order fixing the Cure Amount until after the Closing, then immediately following the entry of such Order, cure any and all defaults under the Assumed Contracts, including paying the applicable Cure Amount, which defaults are required to be cured under the Bankruptcy Code, so that such Assumed Contracts may be assumed by Seller and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code.

(d)    Performance under Assumed Contracts. Buyer shall (i) from and after the Closing Date, assume all obligations and liabilities of Seller under the Assumed Contracts, (ii) from and after the Closing Date, take all actions necessary to satisfy its obligations and liabilities under the terms and conditions of each of the Assumed Contracts, and (iii) indemnify, defend and hold harmless Seller, Seller's Affiliates, and all of their respective Related Persons from and against any damages, losses, costs, expenses and other liabilities arising out of a breach of this Section 5.2(d) or any of Buyer's other covenants contained in this Agreement or any Ancillary Agreements to which Buyer is a party.

(e)    Indemnification for Use of Real Property. Buyer shall indemnify, defend and hold harmless (i) Seller, and (ii) Seller's Affiliates and Related Persons from and against any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including, without limitation, attorneys' fees and disbursements) suffered or incurred by such Persons in connection with (A) Buyer's or Buyer's agents' or representatives' entry upon the Arkansas Property in connection with their exercise of the right of access pursuant to Section

22

5.1(b), and (B) any and all other activities undertaken by Buyer or Buyer's agents or representatives with respect to the Arkansas Property.

        (f)    <u>Released Claims</u>. Effective as of the Closing Date, Buyer, on behalf of itself and its Affiliates and each of their respective employees, directors, officers, shareholders, and advisors, hereby covenants and agrees that it shall not (i) assert any Claims that constitute Acquired Assets to the extent such Claims have been, or are at any time thereafter, released by or on behalf of Seller or any other Person pursuant to the Plan, an Order of the Bankruptcy Court, or otherwise or (ii) pursue, prosecute or assert any rights related to any Claims against employees, officers, directors, counsel and other advisors of Seller, including by way of offset or recoupment.

        Section 5.3    <u>HSR Act</u>.

        (a)    Subject to the terms and conditions of this Agreement, each of the parties will (i) use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable Antitrust Laws to consummate the transactions contemplated by this Agreement, (ii) if the transactions contemplated hereby require a Notification and Report Form pursuant to the HSR Act, use commercially reasonable efforts to file such Notification and Report Form with respect to the transactions contemplated by this Agreement within ten (10) Business Days following the Effective Date, supplying as promptly as practicable any additional information and documentary material that may be requested pursuant to the HSR Act and (iii) use commercially reasonable efforts to cause the expiration or termination of the applicable waiting periods under the HSR Act as soon as practicable.

        (b)    In connection with the efforts referenced in <u>Section 5.3(a)</u> to obtain all requisite approvals and authorizations for the transactions contemplated by this Agreement under the HSR Act or any other Antitrust Law, each of the parties shall use commercially reasonable efforts to (i) cooperate with each other in connection with any filing or submission and in connection with any investigation or other inquiry, including any proceeding initiated by a private party, (ii) keep the other parties informed in all material respects of any material communication received by such party from, or given by such party to, the Federal Trade Commission (the "<u>FTC</u>"), the Antitrust Division of the Department of Justice (the "<u>DOJ</u>") or any other Government authority and of any material communication received or given in connection with any proceeding by a private party, in each case regarding any of the transactions contemplated by this Agreement and (iii) permit the other parties to review any material communication given to it by, and consult with each other in advance of any meeting or conference with, the FTC, the DOJ or any other Government authority in connection with any proceeding by a private party. The foregoing obligations in this <u>Section 5.3(b)</u> shall be subject to the Confidentiality Agreement with respect to the confidential information of Buyer and Seller, and any attorney-client, work product or other privilege, and each of the parties to this Agreement will coordinate and cooperate fully with the other parties to this Agreement in exchanging such information and providing such assistance as such other parties may reasonably request in connection with the foregoing and in seeking early termination of any applicable waiting periods under the HSR Act. Any competitively sensitive information that is disclosed pursuant to this <u>Section 5.3(b)</u> will be limited to each party's respective counsel and economists pursuant to a separate customary confidentiality agreement.

        Section 5.4    <u>CFIUS</u>.

(a)     If CFIUS issues an order suspending, prohibiting, or otherwise enjoining the Closing of the transactions contemplated by this Agreement, then the CFIUS Condition will immediately become a condition of Closing under Section 9.2. If the parties hereto, or either Buyer or Seller individually, are requested by CFIUS to submit a formal filing under the DPA with respect to the transactions contemplated by this Agreement, the parties hereto agree that they shall each use their reasonable best efforts to submit jointly to CFIUS a filing in accordance with the DPA as promptly as practicable following the request from CFIUS (provided such filing is complete in all material respects and the parties hereto have not, in good faith, determined that a delay in submitting the filing would be in the best interests of the parties in obtaining CFIUS clearance). In the event that CFIUS proposes any mitigation requirements, each of the Buyer and Seller shall use their reasonable best efforts to formulate an agreement with CFIUS and Buyer shall accept any mitigation requirements that do not, individually or in the aggregate, have a material adverse effect on the Business.

(b)     The "CFIUS Condition" will be deemed to have been satisfied if: (a)the parties hereto receive written notice from CFIUS stating that (i) CFIUS has concluded that the transactions contemplated by this Agreement are not subject to the DPA; or (ii) CFIUS has concluded all action under the DPA with respect to the transactions contemplated by this Agreement and CFIUS has determined that there are no unresolved national security concerns with respect to the transactions contemplated by this Agreement; or (b) if CFIUS has sent a report to the President of the United States requesting the President's decision with respect to the transactions contemplated by this Agreement, either (i) the President has announced a decision not to take any action to suspend, prohibit or place any limitations on the transactions contemplated by this Agreement, or (ii) the President shall have taken no action within 15 days after receiving the report from CFIUS; or (c) on the basis of a CFIUS declaration, the parties shall have received written notification from CFIUS to the effect that (i) CFIUS has concluded all actions under the DPA with respect to the transactions contemplated by this Agreement and determined there are no unresolved national security concerns regarding the same, or (ii) CFIUS is not able to conclude action under the DPA with respect to the transactions contemplated by this Agreement, but CFIUS has not requested that the parties submit a Joint Voluntary Notice in connection with the transactions contemplated by this Agreement, and has not initiated a unilateral CFIUS review of the transactions contemplated by this Agreement.

ARTICLE 6
ADDITIONAL AGREEMENTS

Section 6.1     Bankruptcy Matters.

(a)     Backup Bidder. In the event that Buyer is designated as the "Backup Bidder" in accordance with and as defined in the Bidding Procedures Order, Buyer agrees that it will keep the Backup Bid (as defined in the Bidding Procedures Order) open and irrevocable until the earlier of 5:00 p.m. (prevailing Central Time) on the date that is sixty (60) days after the date of entry of the Bankruptcy Court's Order approving the Alternative Transaction and the closing date of the Alternative Transaction. Notwithstanding anything to the contrary in this Agreement, Seller may also identify and enter into agreements respecting (x) a "back-up" bid relating to an Alternative Transaction, and/or (y) a liquidation sale of all or a portion of the Inventory and the

24

other assets of Seller, in either case to become effective in the event Buyer does not perform in accordance with the terms of this Agreement.

(b)     <u>Notice to Holders of Liens, Claims and Interests</u>. Seller has provided notice of the Sale Order to all holders of Liens, Claims and Interests in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules for the Bankruptcy Court and any other applicable Order of the Bankruptcy Court.

(c)     <u>Entry of Sale Order</u>. Seller has filed with the Bankruptcy Court one or more motions which, collectively, seek the entry of the Sale Order. The Sale Order provides that, without limitation and notwithstanding anything to the contrary in this Agreement (including any Assumed Contract), Buyer is not liable for, and is taking the Acquired Assets free of, any Excluded Liability. Seller and Buyer shall use reasonable best efforts to cooperate, assist and consult with each other to secure the entry of the Sale Order, and to consummate the transactions contemplated by this Agreement, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement. In the event that any Orders of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any such Order), Seller and Buyer will cooperate in determining and pursuing the response to any such appeal, petition or motion and Seller and Buyer shall use their commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion. For purposes of this <u>Section 6.1(c)</u> only, commercially reasonable efforts shall without limitation require each party to this Agreement to pay its costs and expenses reasonably required in connection with preparing and seeking entry of the Sale Order by the Bankruptcy Court and resolution of any appeal therefrom.

Section 6.2    <u>Transition Arrangements</u>.

(a)     <u>Access Covenant</u>. Upon reasonable request from Seller, during reasonable hours, and subject to the terms of the Confidentiality Agreement, Buyer will following the Closing Date provide to Seller, and the accountants, counsel and representatives of Seller, including any administrator of the Plan or Seller's estate, such access to the pre-closing books and records relating to the Business as is reasonably necessary to permit Seller to monetize any Excluded Assets and otherwise liquidate its estate after the Closing and confirmation of the Plan and to conclude the Bankruptcy Case, including the administration of the Plan, reconciliation and litigation of claims and making of distributions contemplated under the Plan, or otherwise. Such access will include (a) reasonable access to Buyer's personnel, information technology systems and books and records and (b) the use of office space for individuals and office support of appropriate secretaries or clerks for employees of Seller engaged in such wind-down and liquidation process. Buyer will provide such services free of any charges, fees or rents, provided that Seller will reimburse Buyer for reasonable out-of-pocket costs and expenses incurred by Buyer in connection with providing such services (which for the avoidance of doubt will not include salaries paid to Buyer's consultants or employees or Buyer's overhead but may include temporary service workers (at customary and reasonable hourly costs) if needed based upon the reasonable time demands of the regular work of Buyer's employees and the reasonable time demands of Seller's employees engaged in the liquidation).

(b)    Transitional License. Buyer covenants and agrees that the IP Back-License shall expressly include and reserve for Seller, for a period not to exceed one hundred and eighty (180) calendar days, a non-exclusive, royalty-free, non-transferrable, non-extendable right and license to use the Business Name and the Brand Names in connection with the firearms business, solely in connection with the wind-down and liquidation of Seller's estate and the conclusion of the Bankruptcy Case, including for purposes of administering a plan of liquidation of the Excluded Assets, reconciling claims and making distributions.

(c)    Transitional Regulatory Matters. From the Effective Date until the Closing Date, Buyer and Seller shall each use reasonable best efforts to cooperate in the registration of Buyer as licensee, as of and conditional upon the Closing, under the ATF Licenses.

(d)    Insurance Policies. From the Effective Date until the Closing, Seller shall use commercially reasonable efforts to seek endorsements to add, effective as of the Closing, Buyer (or, at Buyer's direction, Buyer Acquisition Vehicle or an Affiliate of Buyer) as an additional insured under that certain Premises Pollution Liability Policy number PPL G29003105 001 to the extent of the Assumed Policy Rights (it being understood and agreed that any additional premium associated with such endorsements shall be the responsibility of Buyer and that all other rights and privileges of the Seller in such policy shall be retained by the Seller).

Section 6.3    Further Assurances. At the request and the sole expense of the requesting party, either party shall, at any time after the Closing Date, execute and deliver such documents as the other party or its counsel may reasonably request to effectuate the purposes of this Agreement.

ARTICLE 7
EMPLOYEES AND EMPLOYEE BENEFITS

Section 7.1    Transferred Employees. Within two (2) days after entry of the Sale Order, Buyer may offer employment, effective as of the Closing, to any Employee. Each such offer shall include a waiver of any costs related to the termination of employment of such Employees by Seller in connection with the transactions contemplated by this Agreement (including without limitation any severance or WARN Act payments), as against Buyer, Seller and their respective Affiliates. If the Closing occurs, any such Employees who accept any such offer no later than five (5) days after the Closing Date are referred to in this Agreement as the "Transferred Employees". Seller hereby authorizes Buyer and its Affiliates to enter into discussions with the Employees regarding employment with Buyer or its Affiliates as contemplated by this Section 7.1 and, for the purpose of interviewing and pre-screening them, shall provide Buyer and its Representatives with reasonable access to the Employees, upon reasonable prior notice and during normal business hours and without material interference with the business or operations of Seller and its Representatives, and any such discussions and any resulting offers of employment by Buyer or its Affiliates with any such Employee shall not be a violation of any nonsolicitation agreement entered into by Buyer or any of its Affiliates with Seller or any of its Affiliates in connection with the transactions contemplated hereby. Seller agrees that neither it nor its Affiliates will actively discourage the Employees who receive an offer from Buyer or its Affiliates from accepting such offer.

26

Section 7.2    Employment Tax Reporting. With respect to Transferred Employees, Buyer and Seller shall use the standard procedure set forth in Revenue Procedure 2004-53, 2004-34 I.R.B. 320, for purposes of employment Tax reporting.

Section 7.3    Benefits. From and after the Closing (or with respect to any Transferred Employee who is on an approved leave of absence as of the Closing, from and after his or her return to work), Buyer shall, or shall cause an Affiliate of Buyer to, provide (whether under existing or newly-established Buyer compensation or benefits plans (collectively, the "Buyer Plans")) to each Transferred Employee, and to their eligible dependents, benefits under the Buyer Plans that are no less favorable to the applicable Transferred Employee in the aggregate than the practice, plans, policies or Contracts in effect for such Transferred Employee immediately prior to the Closing. If applicable, for purposes of eligibility, vesting and the calculation of the eligibility for and amount of vacation, sick pay, severance or other benefits under the Buyer Plans providing benefits to Transferred Employees, Buyer shall credit each Transferred Employee with his or her years of service with Seller to the same extent as such Transferred Employee was entitled immediately prior to the Closing to credit for such service under any similar Employee Benefit Plan; provided, however, that no such service recognition shall result in any duplication of benefits or apply to any defined benefit pension plans. In addition, to the extent it has the right to do so, Buyer shall use commercially reasonable efforts to (a) waive under any health or welfare plans maintained by Buyer for Transferred Employees any pre-existing condition limitations and eligibility waiting periods for Transferred Employees and their eligible dependents (but only to the extent such pre- existing condition limitations, eligibility waiting periods and evidence of insurability requirements were satisfied under Seller's comparable health plans as of the Closing Date), and (b) provide that dollar amount of all eligible expenses incurred by Transferred Employees and their eligible dependents during the calendar year in which the Closing Date occurs shall be taken into account for purposes of satisfying the applicable deductibles, co-payments or out-of-pocket limitations for such calendar year under the relevant Buyer's health or welfare plans.

Section 7.4    WARN Act. Buyer and Seller agree that:

(a)    (a)    The parties hereto have determined that the transactions contemplated by this Agreement do not give rise to any obligations or liabilities for provision of notice or payment in lieu of notice or any applicable penalties under the Worker Adjustment and Retraining Notification Act (the "WARN Act") or any similar state or local law arising on account of Buyer's acquisition of the Acquired Assets or Seller's termination of any of the Transferred Employees. Buyer does not assume obligations and liabilities for WARN Act compliance.

(b)    Buyer shall not, at any time prior to ninety (90) days after the Closing Date, effectuate a "plant closing" or "mass layoff" (as those terms are defined in the WARN Act) affecting the Transferred Employees without complying in full with the WARN Act.

Section 7.5    Third Party Beneficiary. No provision of this Article 7 shall:

(a)    create any third party beneficiary or other rights in any Employee or former employee (including any beneficiary or dependent thereof) of Seller, Buyer or any other Person;

27

(b)     constitute or create, or be deemed to constitute or create, an employment agreement or employee benefit plan;

(c)     constitute or be deemed to constitute an amendment to any employee benefit plan sponsored or maintained by Seller or Buyer; or

(d)     alter or change the employment at-will status of any Employees.

## ARTICLE 8
## TAXES

Section 8.1    <u>Taxes Related to Purchase of Assets</u>. All recording and filing fees and all federal, state and local sales, transfer, excise, value-added or other similar Taxes, including, without limitation, all state and local Taxes in connection with the transfer of the Acquired Assets, but excluding all income taxes and other fees based upon gain realized by Seller as a result of the sale of the Acquired Assets, and excluding any Taxes imposed under Section 4181 of the Code (and any corresponding provision of state, local or foreign Tax law) (collectively, "<u>Transaction Taxes</u>"), that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets, and which are not exempt under Section 1146(c) of the Bankruptcy Code, shall be paid by Buyer. Buyer and Seller agree to cooperate to determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement, and Seller agrees to assist Buyer reasonably in the preparation and filing of any and all required returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

Section 8.2    <u>Cooperation on Tax Matters</u>.

(a)     Buyer and Seller agree to furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Acquired Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other required or optional filings relating to Tax matters, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer to any governmental or regulatory inquiry relating to Tax matters.

(b)     Buyer agrees to retain possession, at its own expense, of all accounting, business, financial and Tax records and information (i) relating to the Acquired Assets or the Assumed Liabilities that are in existence on the Closing Date and transferred to Buyer hereunder and (ii) coming into existence after the Closing Date that relate to the Acquired Assets or the Assumed Liabilities before the Closing Date, for a period of at least six (6) years from the Closing Date, and will give Seller notice and an opportunity to retain any such records in the event that Buyer determines to destroy or dispose of them after such period. In addition, from and after the Closing Date, Buyer agrees that it will provide access to Seller and its attorneys, accountants and other representatives (after reasonable notice and during normal business hours and without charge) to those portions of books, records, documents and other information that relate solely to the Acquired Assets or the Assumed Liabilities and time periods on or prior to Closing as Seller may reasonably deem necessary to (x) properly prepare for, file, prove, answer, prosecute and/or defend any such Tax Return, claim, filing, tax audit, tax protest, suit, proceeding or answer or (y)

28

administer or complete any cases under Chapter 11 of the Bankruptcy Code of Seller. Such access shall include, without limitation, access to any computerized information retrieval systems relating to the Acquired Assets or the Assumed Liabilities as they existed on or before the Closing, unless such access cannot be limited to the appropriate information, in which case, Buyer may, at its reasonable discretion, retrieve electronic data compilations of the appropriate information.

(c)     If Seller receives any refund, overpayment or rebate of Taxes (including any refund, overpayment or rebate relating to any Straddle Period) that is attributable to Taxes paid by Buyer, it shall promptly, and in no case later than ten (10) Business Days after receipt thereof, pay such refund, overpayment or rebate over to Buyer net of any reasonable cost or expense incurred in connection with such refund, overpayment or rebate.

(d)     Seller shall prepare and file all Tax Returns for any Pre-Closing Taxes, whether or not such Tax Returns are required to be filed after the Closing Date, and Seller shall timely pay all Taxes reflected on such Tax Returns. Buyer shall prepare and file, or cause to be prepared and filed (with Seller's reasonable cooperation) all Tax Returns with respect to Post-Closing Taxes. Buyer and Seller shall reasonably cooperate in the preparation of any Tax Returns described in this Section 8.2(d).

(e)     Buyer and Seller will cooperate and Buyer shall use commercially reasonable efforts to cause the Buyer or any Buyer Acquisition Vehicle to be registered with the Alcohol and Tobacco Tax and Trade Bureau as a "manufacturer" for purposes of the Firearms Ammunition and Excise Tax on or before the Closing Date.

Section 8.3     Allocation of Purchase Price. Promptly (and in any event within sixty (60) days) following the determination of the Purchase Price pursuant to Section 2.3, Seller shall deliver a schedule to Buyer allocating the Purchase Price among the Acquired Assets (the "Allocation"). The Allocation shall be final and binding on Seller and Buyer unless, within thirty (30) days after delivery thereof to Buyer, Buyer delivers a written notice to Seller of its objections to the Allocation.  Seller and Buyer shall cooperate in good faith to resolve any disputes with respect to the Allocation as promptly as practicable.  If Seller and Buyer are able to resolve any dispute within thirty (30) days after Seller's timely receipt of Buyer's written notice of its objections, or Buyer does not deliver a written notice of objections within such thirty (30) day period, the Allocation will be binding on the parties, and Seller and Buyer will file with the Internal Revenue Service their respective Forms 8594 as provided for in Section 1060 of the Code on a basis consistent with the Allocation, and the Allocation shall be reflected on any Tax Returns required to be filed as a result of the transactions contemplated by this Agreement. If Seller and Buyer are unable to resolve all such written objections within thirty (30) days after Buyer's timely receipt of such objections, the Allocation shall not be binding on the Parties.

ARTICLE 9
CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES

Section 9.1     Conditions Precedent to Performance by Seller. The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which (other than the

29

conditions contained in <u>Section 9.1(c)(i)</u> and <u>Section 9.1(c)(ii)</u>) may be waived by Seller in its sole discretion:

(a)     <u>Representations and Warranties of Buyer</u>. All representations and warranties made by Buyer in <u>Section 4.2</u> shall be accurate in all material respects on and as of the Closing Date as if again made by Buyer on and as of such date, except for (i) those representations and warranties that speak solely as of a specific date and that were true and correct as of such date, and (ii) inaccuracies that do not result in a material adverse effect on Buyer's ability to perform its obligations hereunder, and Seller shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Buyer, solely in such capacity on behalf of Buyer, to that effect.

(b)     <u>Performance of the Obligations of Buyer</u>. Buyer shall have performed in all material respects all obligations required under this Agreement to be performed by it on or before the Closing Date (except with respect to the obligation to pay the Good Faith Deposit and the Purchase Price in accordance with the terms of this Agreement, which obligations shall be performed in all respects), and Seller shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Buyer, solely in such capacity on behalf of Buyer, to that effect.

(c)     <u>Consents and Approvals</u>.

(i)     The Bankruptcy Court shall have entered the Sale Order, and no Order staying, modifying, or amending the Sale Order shall be in effect on the Closing Date.

(ii)     The applicable waiting period under the HSR Act, if applicable, shall have expired or terminated.

(d)     <u>No Violation of Orders</u>. No preliminary or permanent injunction or other Order that declares this Agreement invalid or unenforceable in any respect or which prevents the consummation of the transactions contemplated by this Agreement shall be in effect.

(e)     <u>Cure of Defaults</u>. At or prior to the Closing, any and all defaults under the Assumed Contracts that are required to be cured under the Bankruptcy Code shall have been cured, so that such Assumed Contracts may be assumed by Seller and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code.

(f)     <u>Buyer's Deliveries</u>. Buyer shall have delivered to Seller all of the items set forth in <u>Section 3.3</u>.

(g)     <u>Huntsman APA</u>.  The transactions contemplated by the Huntsman APA shall be completed simultaneously with the Closing hereunder.

Section 9.2     <u>Conditions Precedent to Performance by Buyer</u>. The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which (other than the

30

conditions contained in Section 9.2(c)(i) and Section 9.2(c)(ii)) may be waived by Buyer in its sole discretion:

    (a)    Representations and Warranties of Seller. All representations and warranties made by Seller in Section 4.1 shall be accurate in all material respects on and as of the Closing Date as if again made by Seller on and as of such date, except for (i) those representations and warranties that speak solely as of a specific date and that were true and correct as of such date, and (ii) inaccuracies that do not result in a Material Adverse Effect, and Buyer shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Seller, solely in such capacity on behalf of Seller, to that effect.

    (b)    Performance of the Obligations of Seller. Seller shall have performed all obligations required under this Agreement to be performed by it on or before the Closing Date, other than failures of performance (i) that do not result in a Material Adverse Effect or (ii) under those obligations of Seller set forth in Section 6.2(c), and Buyer shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Seller, solely in such capacity on behalf of Seller, to that effect.

    (c)    Consents and Approvals.

    (i)    The Bankruptcy Court shall have entered the Sale Order, and no Order staying, modifying, or amending the Sale Order shall be in effect on the Closing Date.

    (ii)    The applicable waiting period under the HSR Act, if applicable shall have expired or terminated.

    (iii)    The ATF shall have approved Buyer's applications for such ATF Licenses as may be required for Buyer to operate the Business as of the Closing.

    (iv)    The CFIUS Condition, if applicable, shall have been satisfied.

    (d)    No Violation of Orders. No preliminary or permanent injunction or other Order that declares this Agreement invalid in any respect or prevents the consummation of the transactions contemplated by this Agreement shall be in effect.

    (e)    Seller's Deliveries. Seller shall have delivered to Buyer all of the items set forth in Section 3.2.

ARTICLE 10<br>TERMINATION

Section 10.1    Conditions of Termination. This Agreement may be terminated at any time before the Closing:

    (a)    By mutual written consent of Seller and Buyer;

31

(b)    By Seller, by notice to Buyer, on or after the date that is One Hundred and Fifty (150) calendar days after the Petition Date (the "Warranty Termination Date"), if the condition contained in Section 9.1(a) has not been satisfied or waived; provided, however, that Seller shall not have the right to terminate this Agreement under this Section 10.1(b) if Seller is then in material breach of this Agreement;

(c)    By Seller, by notice to Buyer, if Seller has previously provided Buyer with written notice of Buyer's failure to perform any material covenant of Buyer contained in this Agreement and Buyer has failed within five (5) days after such notice to perform such covenant; provided, however, that Seller shall not have the right to terminate this Agreement under this Section 10.1(c) if Seller is then in material breach of this Agreement;

(d)    By Seller, by notice to Buyer, on or after the date that is One Hundred and Fifty (150) calendar days after the Petition Date (the "Approval Termination Date"), if any condition contained in Section 9.1(c) or Section 9.1(d) has not been satisfied or waived; provided, however, that Seller shall not have the right to terminate this Agreement under this Section 10.1(d) if Seller is then in material breach of this Agreement;

(e)    By Buyer, by notice to Seller, on or after the Warranty Termination Date, if the condition contained in Section 9.2(a) has not been satisfied or waived; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 10.1(e) if Buyer is then in material breach of this Agreement;

(f)    By Buyer, by notice to Seller, if Buyer has previously provided Seller with written notice of a failure to perform any material covenant of Seller contained in this Agreement and Seller has failed within five (5) days after such notice to perform such covenant; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 10.1(f) if Buyer is then in material breach of this Agreement;

(g)    By Buyer, by notice to Seller, after the Approval Termination Date, if any condition contained in Section 9.2(c) or Section 9.2(d) has not been satisfied or waived; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 10.1(g) if Buyer is then in material breach of this Agreement;

(h)    By Buyer, by notice to Seller, or by Seller, by notice to Buyer, if the Bankruptcy Court enters an Order dismissing or converting the Bankruptcy Case into a case under Chapter 7 of the Bankruptcy Code, appointing a trustee in the Bankruptcy Case, or appointing an examiner with enlarged power related to the operation of the Business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, or the occurrence of any of the foregoing;

(i)    By Seller, five (5) Business Days after notice to Buyer, if the Bankruptcy Court has not entered the Sale Order by the date that is 60 calendar days after the Petition Date;

(j)    By Seller, if the Huntsman APA is validly terminated in accordance with its terms;

(k)     Automatically, upon the earlier of (i) Seller consummating an Alternative Transaction, and (ii) sixty (60) days following the date upon which the Bankruptcy Court issues a Final Order approving an Alternative Transaction.

Section 10.2    Effect of Termination; Remedies.

(a)     In the event of termination pursuant to Section 10.1, this Agreement shall become null and void and have no effect (other than Article 10, Article 11, and Article 12, which shall survive termination), with no liability on the part of Seller or Buyer, or their respective Affiliates or Related Persons, with respect to this Agreement, except for (i) the liability of a party for its own expenses pursuant to Section 11.4, (ii) the obligation of Buyer under Section 6.1(a) and (iii) any liability provided for in Section 10.2(b) through Section 10.2(d), inclusive.

(b)     Subject to Section 10.2(c), if this Agreement is terminated pursuant to Section 10.1, then the Good Faith Deposit shall, within three (3) Business Days, be returned by Seller to Buyer.

(c)     Subject to Section 10.2(e). if (x) this Agreement is terminated pursuant to Section 10.1(c) due to Buyer's failure to consummate the Closing, and (y) all of the conditions to Buyer's obligations to consummate the Closing under Section 9.2 have occurred (other than any such conditions which by their nature are to be satisfied by the Closing Date), then Seller may, at its sole election (i) within three (3) Business Days, retain the Good Faith Deposit, as liquidated damages (the "Break Fee") or (ii) seek specific performance of Buyer's obligations to consummate the Closing subject to and in accordance with Section 11.10.

(d)     Notwithstanding anything to the contrary herein, but without limitation to the right to enforce covenants as set forth in Article 3 and Article 6 (if the Closing shall have occurred) (i) Seller's entitlement to the Break Fee (to the extent provided for in this Agreement) will constitute liquidated damages (and not a penalty) and, if Seller retains such amount, then such Break Fee shall be the sole and exclusive remedy available to Seller and any other Person against Buyer, its Subsidiaries, and any of their respective Affiliates in connection with this Agreement and the transactions contemplated hereby (including as a result of the failure to consummate the Closing or for a breach or failure to perform hereunder or otherwise) and none of Buyer, its Subsidiaries or any of their respective Affiliates shall have any further liability relating to or arising out of this Agreement or the transactions contemplated hereby, and (ii) Buyer's entitlement to the reimbursement of the Good Faith Deposit (to the extent provided for in this Agreement) shall be the sole and exclusive remedy (at law, in equity or otherwise) available to Buyer and any other Person against Seller, its Subsidiaries, and any of their respective Affiliates in connection with this Agreement and the transactions contemplated hereby (including as a result of the failure to consummate the Closing or for a breach or failure to perform hereunder or otherwise) and none of Seller, its Subsidiaries or any of their respective Affiliates shall have any further liability relating to or arising out of this Agreement or the transactions contemplated hereby. Each Party acknowledges that the agreements contained in this Section 10.2 are an integral part of the transactions contemplated by this Agreement, that without these agreements such Party would not have entered into this Agreement.

(e)      For the avoidance of doubt, (i) Seller will be entitled to seek specific performance of this Agreement to the extent permitted by <u>Section 11.10</u> while also seeking payment of the Break Fee, but in no event shall Seller be entitled to both obtain specific performance to cause the Closing to occur and to also receive the Break Fee; and (ii) in no event shall the Break Fee be paid on more than one occasion. Notwithstanding anything to the contrary contained herein, and subject only to Seller's right, prior to the termination of this Agreement, to pursue (or any actual judicial award of) specific performance of Buyer's obligations to consummate the Closing subject to and in accordance with <u>Section 11.10</u>, upon the timely payment of an amount equal to the Break Fee (whether or not a Break Fee is due and payable), in no event shall Buyer have any liability hereunder or otherwise in connection with the transactions contemplated by this Agreement for any liabilities or other amounts in excess of the amount of the Break Fee including for any breach of this Agreement or for any other matter whatsoever (regardless of the theory of liability).

## ARTICLE 11
## <u>MISCELLANEOUS</u>

Section 11.1    <u>Successors and Assigns</u>. Prior to the Closing, neither Buyer nor Seller shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other, and any such attempted assignment without such prior written consent shall be void and of no force and effect; provided that if Buyer wishes, upon prior written notice to Seller, to assign all (or a portion of) its rights, obligations and liabilities hereunder no later than ten (10) days prior to the Closing Date to a Buyer Acquisition Vehicle, such prior written consent of Seller shall not unreasonably be withheld, conditioned or delayed. This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties to this Agreement.

Section 11.2    <u>Governing Law; Jurisdiction</u>. This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of Delaware (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such State are superseded by the Bankruptcy Code. For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties to this Agreement irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After Seller is no longer subject to the jurisdiction of the Bankruptcy Court, the parties to this Agreement irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction over the State of Delaware.

Section 11.3    <u>WAIVER OF JURY TRIAL</u>. EACH PARTY TO THIS AGREEMENT IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE SUCH WAIVER, (B) IT UNDERSTANDS AND HAS

34

CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, (C) IT MAKES SUCH WAIVER VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.3.

Section 11.4    Expenses. Except as expressly otherwise provided herein, each of the parties to this Agreement shall pay its own expenses in connection with this Agreement and the transactions contemplated by this Agreement, including, without limitation, any legal and accounting fees, whether or not the transactions contemplated by this Agreement are consummated. Buyer shall pay the cost of any surveys (without limitation to the restriction in Section 5.1(b)(i)), title insurance policies and title reports ordered by Buyer.

Section 11.5    Broker's and Finder's Fees. Each of the parties to this Agreement represents and warrants that it has dealt with no broker or finder in connection with any of the transactions contemplated by this Agreement other than as set forth on Schedule 11.5, whose fees and expenses shall, as between the parties to this Agreement, be the responsibility of the party indicated on Schedule 11.5, and, to such party's Knowledge, no other broker or other Person is entitled to any commission or broker's or finder's fee in connection with any of the transactions contemplated by this Agreement or the Ancillary Agreements.

Section 11.6    Severability. In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms shall provide for the consummation of the transactions contemplated by this Agreement in substantially the same manner as originally set forth at the later of the date this Agreement was executed or last amended.

Section 11.7    Notices.

(a)    All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (i) on the date of service, if served personally on the party to whom notice is to be given; (ii) when transmitted via electronic mail to the applicable electronic mail address set forth below if confirmation of receipt is obtained promptly after completion of transmission; (iii) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service; or (iv) on the fifth (5th) day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to Seller:

Remington Outdoor Company, Inc.
100 Electronics Blvd., SW
Huntsville, Alabama 35824
Attention: Ken D'Arcy
Email: ken.darcy@remington.com

35

With a copy in either case to (which copy alone shall not constitute notice):

> O'Melveny & Myers LLP
> 400 South Hope Street
> Los Angeles, California 90071
> Attention: John Paul Motley, Esq., and Stephen H. Warren, Esq.
> Phone: (213) 430-6100 and (213) 430-7875, respectively
> Email: jpmotley@omm.com and swarren@omm.com, respectively

If to Buyer:

> SIG Sauer, Inc.
> 72 Pease Boulevard
> Newington, New Hampshire 03801
> Attention:  Daryl Hanna, and Steven Shawver, Esq.
> Email: Daryl.Hanna@sigsauer.com and
> Steven.Shawver@sigsauer.com, respectively

With a copy to (which copy alone shall not constitute notice):

> Bryan Cave Leighton Paisner LLP
> 1155 F Street NW
> Washington, DC 20004-1357
> Attention: Jonathan S. Nesher, Esq.
> Email: jonathan.nesher@bclplaw.com

(b)    Any party may change its address for the purpose of this <u>Section 11.7</u> by giving the other party written notice of its new address in the manner set forth above.

Section 11.8    <u>Amendments; Waivers</u>. This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the parties to this Agreement, or in the case of a waiver, by the party waiving compliance. Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

Section 11.9    <u>Time of Essence</u>. Time is of the essence in the performance of each and every term of this Agreement.

Section 11.10 <u>Specific Performance</u>.   The provisions of this Agreement are uniquely related to Seller's and its Affiliates' desire to consummate the transactions contemplated by this Agreement, and such transactions represent a unique business opportunity at a unique time for the Seller and its Affiliates.  As a result, irreparable damage would occur to Seller and its Affiliates in the event that any of the obligations of Buyer under this Agreement were not performed in accordance with their specific terms.  Although liquidated or other monetary damages may be available for the breach of covenants and undertakings contained in this Agreement, monetary

36

damages would be difficult to ascertain and an inadequate remedy therefor. Accordingly, subject to Section 10.2, if Buyer breaches or threatens to breach any provision of this Agreement, then Seller shall be entitled to an injunction or injunctions, specific performance and any and all other equitable relief to prevent or restrain breaches or threatened breaches of this Agreement, this being in addition to any other remedies to which it is entitled at Law or equity. If Seller seeks an injunction or injunctions to prevent breaches of this Agreement or seeking to enforce specifically the terms and provisions of this Agreement, Seller shall not be required to provide, furnish or post any bond or other security in connection with or as a condition to obtaining any such Order or injunction. Buyer irrevocably waives any right it may have to require the provision, furnishing or posting of any such bond or other security. If any action or proceeding should be brought in equity to enforce the provisions of this Agreement, Buyer shall not allege, and hereby waives the defense, that there is an adequate remedy at Law. For the avoidance of doubt, while Seller may pursue any or all of a grant of specific performance (pursuant to this Section 11.10) and/or the payment of the Break Fee pursuant to Section 10.2, under no circumstances will Seller, or any other Person, be entitled to receive both a grant of such specific performance and monetary damages (including an award of all or any portion of the Break Fee) in connection with the grant of such specific performance.

Section 11.11  Public Announcements. Promptly after the execution and delivery of this Agreement, the parties shall make a joint press release in form and substance reasonably satisfactory to both of them regarding the transactions contemplated herein. Thereafter, no party shall make any press release or public announcement concerning the transactions contemplated by this Agreement without the prior written consent of the other party (such consent not to be unreasonably withheld, conditioned or delayed) unless a press release or public announcement is required by Law or Order of the Bankruptcy Court. If any such announcement or other disclosure is required by Law or Order of the Bankruptcy Court, the disclosing party agrees to give the nondisclosing party prior notice of, and an opportunity to comment on, the proposed disclosure. Notwithstanding anything to the contrary in this Section 11.11, Seller (a) shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order and (b) may disclose this Agreement to its equityholders and lenders to the extent required by the provisions of any of Seller's bylaws, credit agreements and other pre-existing contractual obligations.

Section 11.12  Entire Agreement. This Agreement (including the Ancillary Agreements referenced herein), the Sale Order and the Confidentiality Agreement contain the entire understanding between the parties to this Agreement with respect to the transactions contemplated by this Agreement and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions. All schedules to this Agreement and any documents and instruments delivered pursuant to any provision of this Agreement are expressly made a part of this Agreement as fully as though completely set forth in this Agreement.

Section 11.13  Parties in Interest. Nothing in this Agreement is intended to or shall confer any rights or remedies under or by reason of this Agreement on any Persons other than Seller and Buyer and their respective successors and permitted assigns; provided that, an Other Buyer shall have the right to access certain records in accordance with Section 1.1(r). Nothing in this Agreement is intended to or shall relieve or discharge the obligations or liability of any third Persons to Seller or Buyer. This Agreement is not intended to nor shall give any third Persons any right of subrogation or action over or against Seller or Buyer.

37

Section 11.14 <u>Bulk Sales Laws</u>. Buyer waives compliance by Seller and Seller waives compliance by Buyer, with the provisions of the "bulk sales", "bulk transfer" or similar laws of any state other than any Laws which would exempt any of the transactions contemplated by this Agreement from any Tax liability which would be imposed but for such compliance.

Section 11.15 <u>Construction</u>. The Article and Section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement. The parties to this Agreement have jointly participated in the negotiation and drafting of this Agreement. In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumptions or burdens of proof shall arise favoring any party by virtue of the authorship of any of the provisions of this Agreement. Each defined term used in this Agreement has a comparable meaning when used in its plural or singular form. As used in this Agreement, the word "including" and its derivatives means "without limitation" and its derivatives, the word "or" is not exclusive and the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. References to any Law are to it as amended, modified, supplemented, and restated as of the date of this Agreement, and, unless the context requires otherwise, any reference to any statute shall be deemed also to refer to all rules and regulations promulgated thereunder.

Section 11.16 <u>Counterparts and Facsimiles</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument. Executed signature pages to this Agreement may be delivered by electronic mail and such electronic copies will be deemed as sufficient as if actual signature pages had been delivered.

ARTICLE 12
<u>DEFINITIONS</u>

Section 12.1 <u>Certain Terms Defined</u>. As used in this Agreement, the following terms have the following meanings:

"<u>Affiliate</u>" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under direct or indirect common control with such other Person.

"<u>Alternative Transaction</u>" means Seller consummating one or more transactions or series of transactions, whether a going concern sale, liquidation or otherwise, that involves a sale of all or substantially all of the Business or the Acquired Assets by Seller to a purchaser or purchasers other than Buyer.

"<u>Accounting Firm</u>" means a nationally recognized accounting firm mutually agreed to by Buyer and Seller in writing.

"<u>Adjustment Escrow Account</u>" means the sub-account designated by the Escrow Agent as the "Adjustment Escrow Sub-Account" into which the Adjustment Escrow Amount is deposited with the Escrow Agent and held by it, subject to disbursement as provided in this Agreement and in the Adjustment Escrow Agreement.

38

"Adjustment Escrow Agreement" means that certain escrow agreement by and among ROC, Buyer and the Escrow Agent governing the administration of the Adjustment Escrow Amount, in the form attached hereto as Exhibit 4.

"Adjustment Escrow Amount" means $1,000,000.

"Alabama Facility" means the Corporate Headquarters; Gun and Silencer Factory located at 100 Electronics Blvd. (aka 1816 Remington Circle SW), Huntsville, Alabama 35824.

"Ancillary Agreements" means, collectively, the Good Faith Deposit Escrow Agreement, Adjustment Escrow Agreement, the Assignment and Assumption Agreements, Acquired Intellectual Property Assignments, the IP Back-License, quitclaim deeds, and other agreements, certificates, affidavits and releases delivered pursuant to Article 3.

"Antitrust Law" means the Sherman Act, as amended, the Clayton Act, as amended, the HSR Act, the Federal Trade Commission Act, as amended, and all other Laws and Orders, that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition.

"Arkansas Grant Agreement" means that certain Grant Agreement, dated January 21, 2016, by and between Remington Arms Company, LLC and Arkansas Economic Development Commission, as amended.

"ATF" means the United States Bureau of Alcohol, Tobacco, Firearms and Explosives.

"ATF Licenses" means all of those licenses issued by ATF as provided by the GCA and the GCA's implementing regulations that are necessary for Buyer to conduct the Business as currently conducted.

"Arkansas Property" the Owned Real Property of the Business located at 2592 Arkansas Highway 15 N, Lonoke, Arkansas 72086 (consisting of tax parcel numbers 001 13127 001, 001 13127 000 and 0014312), including all buildings, structures, fixtures and other improvements located thereon, and all easements, rights of way, servitudes, tenements, hereditaments, appurtenances, privileges and other rights thereto (including air, oil, gas, mineral, and water rights).

"Avoidance Actions" means any and all claims and remedies of Seller under Sections 510 and 542 through 553 of the Bankruptcy Code or under similar state laws including, without limitation, fraudulent conveyance claims, and all other causes of action of a trustee and debtor-in-possession under the Bankruptcy Code.

"Balance Sheet Rules" means the Balance Sheet Rules listed on Exhibit 5.

"Base Amount" means $65,000,000.

"Brand Names" means the trademarks listed on Schedule 12.1(b), alone and in combination with other words, graphics and designs, and all variations, derivatives, abbreviations, transliterations, and translations thereof, and including all rights throughout the world in said terms

39

as trade names, trademarks, corporate names, business names and service marks, together with all registered and unregistered rights in the aforementioned and the goodwill associated with all of the foregoing, including without limitation the trademark and domain name registrations set forth on <u>Schedule 1.1(i)</u>.

"<u>Business Day</u>" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in Huntsville, Alabama are authorized by Law or other governmental action to close.

"<u>Business Name</u>" means the "Remington" brand throughout the world comprising the trademark REMINGTON, alone and in combination with other words, graphics and designs, and all variations, derivatives, abbreviations, transliterations, and translations thereof, and including all rights in said term as a trade name, trademark, corporate name, business name and service mark, together with all registered and unregistered rights in the aforementioned and the goodwill associated with all of the foregoing, including without limitation the trademark and domain name the registrations set forth on <u>Schedule 1.1(i)</u>.

"<u>Buyer Acquisition Vehicle</u>" means a Creditworthy entity that is wholly-owned and controlled by Buyer.

"<u>Cash</u>" means all cash and cash equivalents held by Seller, including all petty cash, register cash, undeposited checks, cash in transit and marketable securities (and including without limitation (i) any fee reserves or escrows established by Seller, and (ii) any cash in the Dominion Account (as defined in the Priority Term Loan)); provided, however, that the Good Faith Deposit, the Purchase Price and the Adjustment Escrow Amount shall not be included in the definition of Cash.

"<u>CBA</u>" means that certain Collective Bargaining Agreement between Remington Arms Company, LLC and International Union, United Mine Workers of America (2016-2022), as amended or otherwise modified from time to time.

"<u>CFIUS</u>" means the Committee on Foreign Investment in the United States or any U.S. Governmental Body acting in its capacity as a member of CFIUS or directly involved in CFIUS's assessment, review or investigation of the Contemplated Transactions.

"<u>City of Huntsville Project Development Liabilities</u>" means all liabilities arising under (i) that certain Project Development Agreement dated as of February 27, 2014, by and among the City of Huntsville, Alabama, Madison County, Alabama, The Industrial Development Board of the City of Huntsville, and Seller, as amended or otherwise modified from time to time, (ii) that certain note issued by Seller to the City of Huntsville on February 27, 2014 in the original principal amount of $12,500,000 and (iii) that certain Mortgage and Security Agreement dated as of February 27, 2014, by Seller in favor of the City of Huntsville.

"<u>Claims</u>" encompasses the definition in Bankruptcy Code §101(5) and under this Agreement also includes any and all liabilities, rights, credits, defenses, allowances, rebates, choses in action, rights of recovery, set-off, causes of action, civil or criminal, any contributions received from or owed to charitable or other organizations, assertions of legal or moral responsibility, in each case known or unknown, pending or threatened, at law or in equity, direct

40

or derivative, liquidated or unliquidated, matured or unmatured, disputed or undisputed, choate or inchoate, judgments, demands, rights of first refusal or offer, recoupment, rights of recovery, reimbursement, contribution, indemnity, exoneration, rights under products liability, alter ego, environmental, intellectual property (including any infringement thereof), tort, contract and any other legal or equitable basis of liability, charges of any kind or nature, debts arising in any way in connection with any agreements, acts or failures to act, and all pending, threatened, asserted or unasserted actions against Seller or any of its Affiliates, or any of their respective current or former officers, employees, agents or independent contractors, any of their assets or properties, the Business, or any of their operations or activities arising out of or relating to any matter, occurrence, action, omission or circumstance, and includes any Claims against Buyer under doctrines of successor liability or any other ground or theory (which Claim may also be an Interest or Lien).

"Closing Inventory Amount" means the Inventory Amount, determined in accordance with the Balance Sheet Rules, as of the Calculation Time.

"Closing Inventory Amount Excess" means the amount, if any, by which (i) the Closing Inventory Amount exceeds (i) the Estimated Inventory Amount plus $2,000,000.

"Closing Inventory Amount Shortfall" means the amount, if any, by which (i) the Estimated Inventory Amount exceeds (ii) the Closing Inventory Amount plus $2,000,000.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, indenture, note, bond, lease, license, premium finance arrangement, purchase order, sales order or other agreement to which Seller is a party; provided that Contracts do not include any employment or similar Contracts.

"Creditworthy" means sufficiently capitalized, to the reasonable satisfaction of Seller upon provision to Seller of substantiating documentary evidence, to be able to pay the Purchase Price.

"D&O Insurance" means the policies in effect as of the Effective Date that provides for insurance from liability for current and former directors and officers of Seller, including insurance from liabilities with respect to all claims (including, under "tail" insurance coverage, those claims brought within six (6) years from the Closing Date) arising out of or relating to events which occurred on or prior to the Closing Date (including in connection with the transactions contemplated by this Agreement).

"DIP Facility" means any debtor-in-possession financing advanced to Seller in the Bankruptcy Case.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, surveys, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

41

"DPA" means Section 721 of the Defense Production Act of 1950, as amended (50 U.S.C. § 4565), and all rules and regulations thereunder, including those codified at 31 C.F.R. Part 800 *et seq.*

"Employee Benefit Plans" means (a) all "employee benefit plans," as defined in Section 3(3) of ERISA, (b) all employment, consulting or other individual compensation agreements, and (c) all bonus or other incentive, equity or equity-based compensation, deferred compensation, severance pay, sick leave, vacation pay, salary continuation, disability, hospitalization, medical, life insurance, scholarship programs or other plans, contracts, policies or arrangements that provide for compensation for employee benefits as to which Seller has any obligation or liability, contingent or otherwise.

"Employee Liabilities" means all liabilities of Seller to or with respect to all Employees whenever arising and liabilities of the type specified in Section 1114 of the Bankruptcy Code owing to retired employees of Seller.

"Employee Records" means all employment and benefit records (in whatever form maintained) in the possession of Seller or its agents and pertaining to any Transferred Employee, or any spouse, dependent or other beneficiary of any such Transferred Employee.

"Employees" means all individuals, as of the date of this Agreement, who are employed by Seller at the Arkansas Property (including Employees who are absent due to COVID Restrictions or vacation, family leave, short-term disability, COVID 19-related furloughs or absences or other approved leave of absence) in connection with the ownership, operation and management of the Business.

"Environmental Laws" means all applicable federal, state and local statutes, ordinances, rules, Orders, regulations and other provisions having the force of law, all judicial and administrative Orders and determinations, and all common law concerning pollution or protection of human health and the environment, including, without limitation, all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control or cleanup of any hazardous materials.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" means M-III Advisory Partners, LP.

"Estimated Inventory Amount" means Seller's good faith estimate of the Closing Inventory Amount, as set forth on the Pre-Closing Statement.

"Estimated Inventory Amount Excess" means the amount, if any, by which (i) the Estimated Inventory Amount exceeds (i) the Inventory Amount Target plus $2,000,000.

"Estimated Inventory Amount Shortfall" means the amount, if any, by which (i) the Inventory Amount Target exceeds (ii) the Estimated Inventory Amount plus $2,000,000.

"Estimated Purchase Price" means an amount equal to (a) the Base Amount, plus or minus

(b) the Estimated Inventory Amount Excess, if any, or the Estimated Inventory Amount Shortfall, if any, as applicable.

"Exit Term Loan" means that certain Term Loan Agreement, dated as of May 15, 2018 (as amended by that certain Amendment No. 1, dated as of April 18, 2019, that certain Amendment No. 2, dated as of May 1, 2019, that certain Amendment No. 3, dated as of August 15, 2019, that certain Amendment No. 4, dated as of February 21, 2020, and that certain Amendment No. 5, dated as of March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto from time to time, Ankura Trust Company, LLC, as administrative agent and collateral agent and the lenders party thereto.

"FILO Facility" means that certain First Lien Last-Out Term Loan Agreement, dated as of May 15, 2018 (as amended by that certain Amendment No. 1, dated as of April 18, 2019, that certain Amendment No. 2, dated as of May 1, 2019, that certain Amendment No. 3, dated as of August 15, 2019, that certain Amendment No. 4, dated as of October 11, 2019, that certain Amendment No. 5 dated as of February 21, 2020, and that certain Amendment No. 6, dated as of March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto from time to time, Ankura Trust Company, LLC, as administrative agent and collateral agent and the lenders party thereto.

"Final Order" means an Order, ruling or judgment of any court of competent jurisdiction that has not been reversed, stayed, modified or amended, and as to which no appeal, petition for certiorari, motion or petition for rehearing or reargument is pending, and the deadline for any such filing has expired.

"GCA" means Gun Control Act of 1968 (Chapter 44 of Title 18, United States Code § 921 et seq).

"Government" means any agency, division, subdivision, audit group, procuring office or governmental or regulatory authority in any event or any adjudicatory body thereof, of the United States, or any state, county or municipality thereof, including the employees or agents thereof.

"Historic Firearms Books and Records" means all historic books and records relating to the sale of firearms included in the Acquired Assets, including all records required to be kept pursuant to parts 447, 478, and, 479 of title 27, Code of Federal Regulations.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Huntsman APA" means that certain Asset Purchase Agreement entered into by and among Huntsman Holdings, LLC and Seller in connection with that certain auction contemplated by the Bidding Procedures Order.

"Income Tax" means any Tax based on, imposed on or measured by income, gross receipts or profits, including any interest, penalty or other addition with respect thereto.

43

"Income Tax Return" means any Tax Return with respect to Income Taxes.

"Intellectual Property" means throughout the world (1) all intellectual property arising from or in respect of the following: (a) all patents and applications therefore, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon, (b) all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names, websites, social media accounts and handles, and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, (c) copyrights and registrations and applications therefore and works of authorship, and mask work rights, (d) all Software of Seller, including product specifications, enterprise resource planning data (including, but not limited to product master data), manufacturing, accounting, manufacturing methods and processes (e) confidential information, know-how, research and development work product, trade secrets and inventions, and (f) all other intellectual property, (2) Seller's rights pursuant to any Contract with Remington Licensing Corporation and (3) all claims or causes of action arising out of or related to past, present or future infringement or misappropriation of Seller's rights or interests in intellectual property that is not an Excluded Asset and any related remedies, including, without limitation, the right to sue for past, present or future infringement, misappropriation, or violation of rights related to the Intellectual Property and collect damages therefor.

"Intercompany Note" means that certain Amended and Restated Promissory Note issued on April 18, 2019, for the principal amount of $100,000,000, by Remington Arms Company, LLC in favor of FGI Holding Company, LLC.

"Interests" means all rights and entitlements of any nature including, without limitation, security interests, assignments of Liens or Claims, licenses, leases, contract rights, indentures, instruments, licenses, options, escheatment, abandoned property, unclaimed property, covenants, conditions, zoning, planning and any other restrictions, easements, encroachments, permits or other interests in property or limitations on the use of real property or irregularities in title, rights of first refusal, rights to injunctive or other legal relief, any attributes of ownership, rights or restrictions of any kind and nature, whenever incurred, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, matured or unmatured, legal or equitable (which Interests may also be Liens or Claims).

"Inventory Amount" means, at any date, the value of the Inventory calculated in accordance with the Balance Sheet Rules. A sample calculation of the Inventory Amount is attached hereto as Exhibit 5.

"Inventory Amount Target" means $15,752,076.

"Knowledge" or any other similar term or knowledge qualification means, with respect to (i) Seller, the actual conscious knowledge of either of Ken D'Arcy (President and Chief Executive Officer of ROC) or Mark Little (Vice President and Chief Financial Officer of ROC), as of the date the applicable representation or warranty is made or deemed made under this Agreement and (ii) Buyer, the actual conscious knowledge of Ron Cohen (Chief Executive Officer of Buyer) , as of the date the applicable representation or warranty is made or deemed made under this Agreement.

44

"Lien" means any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement, other than a lessor's interest in, and any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement on or affecting a lessor's interest in, property underlying any leases.

"Material Adverse Effect" means a state of facts, event, change or effect on the value of the Acquired Assets that results in a material and adverse effect on the value of the Acquired Assets taken as a whole, but excludes any state of facts, event, change or effect caused by events, changes or developments relating to (A) changes resulting from, or from any motion, application, pleading or Order filed relating to, the Bankruptcy Case; (B) any action of Seller taken pursuant to, or any failure of Seller to take any action prohibited by, any Order of the Bankruptcy Court, this Agreement or any of the Ancillary Agreements to which Seller is a party; (C) the public disclosure of this Agreement or any of the Ancillary Agreements or any of the transactions contemplated hereby or thereby, (D) changes, after the Effective Date, in United States generally accepted accounting principles, (E) changes in general United States economic, monetary or financial conditions, including changes in prevailing interest rates, credit availability, and the credit markets generally, as well as changes in the commercial real estate markets in the geographic regions in which Seller operates the Business, (F) changes in the firearms, ammunition or sporting goods industries in general, (G) any acts of God, natural disasters, terrorism, armed hostilities, sabotage, war (whether or not declared) or (H) any occurrence, outbreak, escalation or worsening of, or furloughs or Government actions (including any quarantine, "shelter in place", "stay at home", workforce reduction, social distancing, shut down, closure, sequester or any other applicable Law, order, directive, guideline or recommendation by any Government of competent jurisdiction (collectively, "COVID Restrictions")) instituted in response to, any epidemic, pandemic or other disease (including without limitation the COVID-19 virus).

"Mississippi Facility" means that certain warehouse premises located at Southaven Distribution, Building 1, 366 Stateline Road, Southaven, Mississippi.

"New York Facility" means the Gun Factory located at 14 Hoefler Avenue, Ilion, New York 13357, Parcel Nos.: 120.37-4-1, 120.37-4-3, 120.37-4-29, 120.37-4-71, 120.37-4-77, 120.37-4-81, 120.37-5-8, 120.37-5-16, 120.37-5-36, 120.45-1-20.1.

"North Carolina Property" means the Administrative Office located at 870 Remington Drive, Madison, North Carolina 27025.

"Owned Real Property" means all land and all buildings, structures, fixtures and other improvements located thereon, and all easements, rights of way, servitudes, tenements, hereditaments, appurtenances, privileges and other rights thereto, owned by Seller and used in the ownership, operation or management of the Business.

"Pension Plan" means Remington Arms Company, LLC Pension and Retirement Plan, (f/k/a Remington Arms Company, Inc. Pension and Retirement Plan), as amended from time to time, whereby the Marlin Firearms Co. Employees' Pension Plan (a/k/a Marlin Firearms Company Employees Pension Plan), as amended from time to time, was merged into the Remington Arms Company, LLC Pension and Retirement Plan.

45

"Permit" means any permit, license, authorization, registration or certificate obtained from any Government.

"Permitted Liens" mean: (a) Liens and Interests consisting of (i) current Taxes and assessments not yet due and payable, or Liens for Taxes that are being contested in good faith by appropriate legal proceedings and for which appropriate reserves under GAAP have been established in the Balance Sheets, (ii) all easements, rights-of-way, servitudes, covenants, conditions, restrictions, obligations and other similar matters of record affecting title to real property, (iii) statutory, common law or contractual liens of landlords, and (iv) the applicable zoning and use regulations or other Laws of any Government, in each case, that do not materially affect the current use of the underlying asset and are not violated in any material respect by the current use or occupancy of the Arkansas Property or the operation of the Business as currently conducted thereon; (b) any imperfection of title with respect to any asset that does not materially interfere with the present occupancy, use or marketability of such asset and the continuation of the present occupancy or use of such asset; (c) such covenants, conditions, restrictions, easements, encroachments or encumbrances that are not created pursuant to mortgages or other financing or security documents, or any other state of facts, that do not materially interfere with the present occupancy of use of an asset; and (d) all terms, conditions and restrictions under any applicable Permits.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or Government.

"Plan" means a Joint Chapter 11 Plan filed by Seller with the Bankruptcy Court.

"Post-Closing Taxes" means any Taxes, other than Transaction Taxes, imposed on the Acquired Assets in respect of a taxable period (or portion thereof) beginning after the close of business on the day prior to the Closing Date.

"Pre-Closing Taxes" means any Taxes paid, payable, or that become payable, in connection with Seller or any of its Affiliates or relating to the Business, in respect of any taxable period (or portion thereof) ending on or before the close of business on the day prior to the Closing Date ; provided, however that Pre-Closing Taxes shall include any liability for Taxes imposed under Section 4181 of the Code (or any similar provision of state, local or foreign Tax law) attributable to any period ending on or before the day prior to the Closing Date.

"Priority Term Loan" means that certain Loan and Security Agreement, dated as of April 18, 2019 (as amended by that certain Amendment No. 1, dated May 1, 2019, that certain Amendment No. 2, dated June 24, 2019, that certain Amendment No. 3, dated August 15, 2019, that certain Amendment No. 4, dated October 11, 2019, that certain Amendment No. 5, dated February 21, 2020, and that certain Amendment No. 6, dated March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto, Cantor Fitzgerald Securities, as administrative agent and initial collateral agent, and the lenders party thereto.

"Related Person" means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, attorneys, accountants, investment bankers or representatives of any such Person.

"Representatives" means, with respect to any Person, any director, officer, agent, employee, general partner, member, stockholder, legal counsel, accountant, advisor or representative of such Person.

"Retained Litigation" means all litigation and Claims arising or related to events prior to the Closing.

"Software" means any and all (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, (d) screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (e) all Documents related to any of the foregoing.

"State of Alabama Project Development Liabilities" means all liabilities under that certain Project Agreement dated as of February 17, 2014, by and between the State of Alabama and ROC, as amended or otherwise modified from time to time.

"Straddle Period" means any taxable period beginning prior to, and ending after, the Closing Date.

"Subsidiary(ies)" means, when used with respect to any specified Person, any other Person (a) of which the specified Person or any Subsidiary thereof is a general partner, (b) of which the specified Person or a Subsidiary thereof own at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions for such other Person of which owns the specified person or a Subsidiary thereof, or (c) that is directly or indirectly controlled by the specified Person or any Subsidiary thereof.

"Tax Return" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"Taxes" means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Government, which taxes shall include all income taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise (whether or not deferred, and including, but not limited to, any excise Taxes imposed under Section 4181 of the Code (and any corresponding provision of state, local or foreign Tax law), franchise, gross receipts, occupation, real and personal property, ad valorem, unclaimed property or escheat, stamp, transfer, worker's compensation, customs duties, registration, documentary, value added, alternative or add-on minimum, estimated, environmental (including taxes under Section 59A of the Code) and other obligations of the same

47

or a similar nature, whether arising before, on or after the Closing Date, including any interest, penalty, or addition to any of the foregoing, whether disputed or not, and including any obligations to indemnify or otherwise assume or succeed to the Tax liability of any other Person, including by contract or otherwise; and "Tax" shall mean any one of them.

Section 12.2    All Terms Cross-Referenced. Each of the following terms is defined in the Section set forth opposite such term:

| **Term** | **Section** |
|---|---|
| Acquired Assets | Section 1.1 |
| Acquired Intellectual Property | Section 1.1(i) |
| Acquired Intellectual Property Assignment | Section 3.2(d) |
| Accounting Firm | Section 12.1 |
| Adjustment Deficit Amount | Section 2.3(d)(ii) |
| Adjustment Escrow Account | Section 12.1 |
| Adjustment Escrow Agreement | Section 12.1 |
| Adjustment Escrow Amount | Section 12.1 |
| Adjustment Surplus Amount | Section 2.3(d)(i) |
| Affiliate | Section 12.1 |
| Agreement | *Preamble* |
| Allocation | Section 8.3 |
| Alternative Transaction | Section 12.1 |
| Antitrust Law | Section 12.1 |
| Arkansas Grant Agreement | Section 12.1 |
| Approval Termination Date | Section 10.1(d) |
| Assignment and Assumption Agreement | Section 3.2(c) |
| Assumed Business Contracts | Section 1.1(g) |
| Assumed Contracts | Section 1.1(g) |
| Assumed FF&E Leases | Section 1.1(c) |
| Assumed Liabilities | Section 1.3 |
| Assumed Motor Vehicle Leases | Section 1.1(e) |
| Assumed Policy Rights | Section 1.1(f) |
| Avoidance Actions | Section 12.1 |
| Balance Sheet Rules | Section 12.1 |
| Base Amount | Section 12.1 |
| Bankruptcy Case | *Recitals* |
| Bankruptcy Code | *Recitals* |
| Bankruptcy Court | *Recitals* |
| Bidding Procedures Order | *Recitals* |
| Brand Names | Section 12.1 |
| Break Fee | Section 10.2(c) |
| Business | *Recitals* |
| Business Product | *Recitals* |
| Business Day | Section 12.1 |
| Business Name | Section 12.1 |
| Buyer | *Preamble* |
| Buyer Acquisition Vehicle | Section 12.1 |

48

Buyer Plans .................................................................................... Section 7.3
Calculation Time .............................................................................. Section 3.1
Cash ................................................................................................ Section 12.1
CBA ................................................................................................ Section 12.1
CFIUS ............................................................................................. Section 12.1
CFIUS Condition ............................................................................ Section 5.4(b)
City of Huntsville Project Development Liabilities ....................... Section 12.1
Claims ............................................................................................ Section 12.1
Closing ........................................................................................... Section 3.1
Closing Date ................................................................................... Section 3.1
Closing Inventory Amount ............................................................. Section 12.1
Closing Inventory Amount Excess ................................................ Section 12.1
Closing Inventory Amount Shortfall .............................................. Section 12.1
Closing Time .................................................................................. Section 3.1
Code ............................................................................................... Section 12.1
Confidentiality Agreement ............................................................. Section 5.1(b)
Contract .......................................................................................... Section 12.1
COVID Restrictions ....................................................................... Section 12.1
Creditworthy .................................................................................. Section 12.1
Cure Amount .................................................................................. Section 1.5(a)
Customer Order .............................................................................. Section 1.1(k)
Documents ..................................................................................... Section 12.1
DOJ ................................................................................................ Section 5.3(b)
DPA ................................................................................................ Section 12.1
Effective Date ................................................................................ Preamble
Employee Benefit Plans ................................................................. Section 12.1
Employee Liabilities ...................................................................... Section 12.1
Employee Records .......................................................................... Section 12.1
Employees ...................................................................................... Section 12.1
Environmental Laws ...................................................................... Section 12.1
ERISA ............................................................................................ Section 12.1
Escrow Agent ................................................................................. Section 12.1
Estimated Inventory Amount ......................................................... Section 12.1
Estimated Inventory Amount Excess ............................................. Section 12.1
Estimated Inventory Amount Shortfall .......................................... Section 12.1
Estimated Purchase Price ............................................................... Section 12.1
Excluded Assets ............................................................................. Section 1.2
Excluded Employee Liabilities ...................................................... Section 1.3(e)
Excluded Liabilities ....................................................................... Section 1.4
Final Order ..................................................................................... Section 12.1
FTC ................................................................................................ Section 5.3(b)
Good Faith Deposit ........................................................................ Section 2.2(a)
Good Faith Deposit Escrow Account ............................................. Section 2.2(a)
Good Faith Deposit Escrow Agreement ......................................... Section 2.2(a)
Government .................................................................................... Section 12.1
HSR Act ......................................................................................... Section 12.1

49

Insurance Policies ................................................................................Section 1.2(a)
Intellectual Property .................................................................................. Section 12.1
Intercompany Note .................................................................................... Section 12.1
Interests ...................................................................................................... Section 12.1
Inventory .................................................................................................Section 1.1(m)
Inventory Amount ...................................................................................... Section 12.1
Inventory Amount Target .......................................................................... Section 12.1
IP Back-License ......................................................................................Section 3.3(e)
Law ..........................................................................................................Section 4.1(c)
Leased FF&E ..........................................................................................Section 1.1(c)
Leased Motor Vehicles ...........................................................................Section 1.1(e)
Lien ............................................................................................................ Section 12.1
Material Adverse Effect ............................................................................ Section 12.1
Mississippi Facility ................................................................................... Section 12.1
Necessary Consent ...................................................................................... Section 1.6
New York Facility ...................................................................................... Section 12.1
North Carolina Property ............................................................................. Section 12.1
Notice of Disagreement ..........................................................................Section 2.3(c)
Other Buyer .............................................................................................Section 1.1(r)
Order ........................................................................................................Section 4.1(c)
Other APA .................................................................................................... Section 1.8
Owned FF&E ...........................................................................................Section 1.1(b)
Owned Motor Vehicles ...........................................................................Section 1.1(d)
Owned Real Property ................................................................................. Section 12.1
Pension Plan ............................................................................................... Section 12.1
Permitted Liens .......................................................................................... Section 12.1
Person ......................................................................................................... Section 12.1
Petition Date ..................................................................................................... Recitals
Plan ............................................................................................................. Section 12.1
Post-Closing Statement ...........................................................................Section 2.3(a)
Pre-Closing Statement .............................................................................Section 2.3(b)
Priority Term Loan .................................................................................... Section 12.1
Purchase Orders ......................................................................................Section 1.1(l)
Purchase Price ............................................................................................. Section 2.1
Related Person ........................................................................................... Section 12.1
Retained Litigation .................................................................................... Section 12.1
Representatives .......................................................................................... Section 12.1
Review Period ..........................................................................................Section 2.3(c)
ROC .............................................................................................................. Preamble
Sale Order ....................................................................................................... Recitals
Seller ............................................................................................................ Preamble
Seller's Knowledge .................................................................................... Section 12.1
Software ..................................................................................................... Section 12.1
State of Alabama Project Development Liabilities...................................... Section 12.1
Subsidiary(ies) ........................................................................................... Section 12.1
Tax Return .................................................................................................. Section 12.1

Taxes ........................................................................................................ Section 12.1
Transaction Taxes ...................................................................................... Section 8.1
Transferred Employees .............................................................................. Section 7.1
WARN Act ............................................................................................... Section 7.4(a)
Warranty Termination Date ..................................................................... Section 10.1(b)

*[Signatures are on the following pages.]*

51

IN WITNESS WHEREOF, the parties to this Agreement have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**BUYER**

SIG SAUER, INC.

By: _____

Name: Ron Cohen

Title: Chief Executive Officer

S-1

**ROC**

**REMINGTON OUTDOOR COMPANY, INC.**

By: _____
Name:
Title:


**SUBSIDIARIES OF ROC**

**FGI OPERATING COMPANY, LLC**

By: _____
Name:
Title:


**FGI HOLDING COMPANY, LLC**

By: _____
Name:
Title:


**BARNES BULLETS, LLC**

By: _____
Name:
Title:


**REMINGTON ARMS COMPANY, LLC**

By: _____
Name:
Title:


**RA BRANDS, L.L.C.**

By: _____
Name:
Title:

S-2

**FGI FINANCE INC.**

By: _____
Name:
Title:


**HUNTSVILLE HOLDINGS LLC**

By: _____
Name:
Title:


**TMRI, INC.**

By: _____
Name:
Title:


**REMINGTON ARMS DISTRIBUTION
COMPANY, LLC**

By: _____
Name:
Title:


**32E PRODUCTIONS, LLC**

By: _____
Name:
Title:

S-3

EXECUTION VERSION

**DISCLOSURE SCHEDULES**

**to**

**ASSET PURCHASE AGREEMENT**

**by and among**

**SIG SAUER, INC.**

**and**

**REMINGTON OUTDOOR COMPANY, INC.**

**and**

**EACH OF THE SUBSIDIARIES OF REMINGTON OUTDOOR COMPANY, INC.
AS SET FORTH ON THE SIGNATURE PAGES THERETO**

**Dated as of September 26, 2020**

EXECUTION VERSION

These Disclosure Schedules (these "Schedules" and each a "Schedule") are furnished pursuant to the Asset Purchase Agreement (the "Agreement"), dated as of September 26, 2020, by and among Remington Outdoor Company, Inc., a Delaware corporation and debtor-in-possession ("ROC"), each of the subsidiaries of ROC set forth on the signature pages to the Agreement (collectively with ROC, "Seller"), and SIG Sauer, Inc., a Delaware corporation ("Buyer"). All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Agreement, unless the context otherwise requires.

These Schedules are hereby incorporated in and made a part of the Agreement as if set forth in full therein and are an integral part of the Agreement. The information contained in these Schedules is disclosed solely for purposes of the Agreement, and no information contained herein shall be deemed to be an admission by any party to the Agreement to any third party of any matter whatsoever (including any violation of law or breach of contract). These Schedules and the information and disclosures contained herein are intended only to qualify and limit the representations, warranties or covenants of the Seller contained in the Agreement and shall not be deemed to expand in any way the scope or effect of any of such representations, warranties or covenants. In disclosing the information in these Schedules, Seller does not waive any attorney-client privilege associated with such information or any protection afforded by the work-product doctrine with respect to any of the matters disclosed or discussed herein. The disclosures in these Schedules are to be taken as relating to the representations and warranties as a whole, notwithstanding the fact that these Schedules are arranged by sections corresponding to the sections in the Agreement, or that a particular section of the Agreement makes reference to a specific section of the Schedules, and notwithstanding that a particular representation and warranty may not make a reference to the Schedules. Disclosure of an item on one Schedule shall be deemed disclosure on all other Schedules.

Neither the specification of any dollar amount in any representation or warranty nor the disclosure of a document or information in these Schedules is intended, or shall be construed or offered in any dispute between the parties to the Agreement as evidence of, the materiality of such dollar amount, document or information, nor does it establish any standard of materiality upon which to judge the inclusion or omission of any similar documents or information in such Schedule or any other Schedule. The headings and descriptions of the disclosures herein are for convenience of reference only and are not intended and do not alter the meaning of any provision of the Agreement or these Schedules.

EXECUTION VERSION

## Schedule 1.1(g)
## Assumed Business Contracts

| # | Category | Relates Primarily to | Location / Function | Contract Counter Party | Services Provided | Type | Inception Date | Expiration Date |
|---|----------|---------------------|---------------------|------------------------|-------------------|------|----------------|-----------------|
| 1 | Ammunition | Lonoke | Federal | DHS-FLETC | Federal Contract | Contract | 04/27/17 | 05/27/22 |
| 2 | Ammunition | Lonoke | Federal | DHS-FLETC | Federal Contract | Contract | 10/07/19 | 09/30/24 |
| 3 | Ammunition | Lonoke | Federal | FRS | Federal Contract | Contract | 10/07/04 | 01/31/21 |
| 4 | Ammunition | Lonoke | Lonoke | National Machinery, LLC | Tooling and Technology | Contract | 11/20/15 | 05/18/34 |

3

EXECUTION VERSION

## Schedule 1.1(i)
## Intellectual Property

### Registered Trademarks and Trademark Applications

| No. | Country | Trademark | Record Owner | Status | Class | Goods | Appln. No. | Filing date | Reg. No. | Reg. Date | Renewal Due |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | European Union (Community) | ARMORDLINT | RA Brands, L.L.C. | Registered | 02 Int., 04 Int., 13 Int. | Paints, varnishes, lacquers; preservatives against rust and against deterioration of wood; colorants; mordants; raw natural resins; metals in foil and powder form for painters, decorators, printers and artists; coatings; preservative, protective coating in the nature of a polymer sealant used to improve resistance to wear and marring for exterior use on firearms; Lubricants, gun lubricants and lubricants for bullets; gas for firearms; Firearms; ammunition; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; medium caliber ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shields adapted for firearms; scrapers for cleaning firearms; benches of firearms; covers for firearms; barrel reflectors for firearms; firearm sights; sighting telescopes for firearms; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes | 7256688 | 9/24/2008 | 7256688 | 7/21/2009 | 9/24/2028 |
| 2. | Canada | BLACK BELT | RA Brands, L.L.C. | Registered | 13 Int. |  | 1,617,186 | 3/4/2013 | TMA940,259 | 6/8/2016 | 6/8/2031 |
| 3. | European Union (Community) | BLACK BELT | RA Brands, L.L.C. | Registered | 13 Int. | Firearms, ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; medium caliber ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shields adapted for firearms; scrapers for cleaning firearms; firearm covers; barrel reflectors for firearms; firearm sights; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms; parts and fittings for firearms | 11624244 | 3/4/2013 | 11624244 | 7/16/2013 | 3/4/2023 |
| 4. | Mexico | BLACK BELT | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 1354161 | 3/4/2013 | 1374219 | 6/7/2013 | 3/4/2023 |
| 5. | United States of America | BLACK BELT | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 85/723,644 | 9/6/2012 | 4,708,640 | 3/24/2015 | 3/24/2025 |
| 6. | United States of America | BUCKHAMMER | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 78/222,506 | 3/6/2003 | 2,841,836 | 5/11/2004 | 5/11/2024 |
| 7. | United States of America | CIRE22 | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 74/077,020 | 7/10/1990 | 1,648,789 | 6/25/1991 | 6/25/2021 |
| 8. | European Union (Community) | CLAW | RA Brands, L.L.C. | Registered | 04 Int., 13 Int. | Goods: Industrial oils and greases; lubricants; lubricant for firearms, outdoor sports and outdoor equipment; oil for cleaning, lubrication and corrosion protection of firearms, outdoor sports and marine equipment; Ammunition; firearms; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; medium caliber ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shields adapted for firearms; scrapers for cleaning firearms; firearm covers for firearms; barrel reflectors for firearms; firearm sights; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms; parts and fittings for firearms | 012019493 | 7/26/2013 | 012019493 | 12/18/2013 | 7/26/2023 |
| 9. | European Union (Community) | COPPER SOLID | RA Brands, L.L.C. | Registered | 02 Int., 04 Int., 13 Int. | Paints, varnishes, lacquers; preservatives against rust and against deterioration of wood; colorants; mordants; raw natural resins; metals in foil and powder form for painters, decorators, printers and artists; coatings; preservatives, protective coating for use in connection with firearms; Lubricants, gun lubricants and lubricants for bullets; gas for firearms; Firearms; ammunition; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; medium caliber ammunition; pellets; bullets; rockets; shells; fuses | 6464961 | 11/26/2007 | 6464961 | 9/15/2008 | 11/26/2027 |

4

EXECUTION VERSION

| No. | Country | Trademark | Record Owner | Status | Class | Goods | Appln. No. | Filing date | Reg. No. | Reg. Date | Renewal Due |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10 | United States of America | COPPER SOLID | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 77/212,809 | 6/22/2007 | 3,500,765 | 9/16/2008 | 9/16/2028 |
| 11 | United States of America | COPPER-LOKT | RA Brands, L.L.C. | Registered | 13 Int. | Shot component of lead shot ammunition | 74/043,783 | 3/29/1990 | 1,631,525 | 1/15/1991 | 1/15/2021 |
| 12 | France | CORE-LOKT | RA Brands, L.L.C. | Registered | 13 Int. | Firearms, ammunition and projectiles, explosives, substances fireworks | 934,342 | 6/15/1988 | 1471,564 | 6/15/1998 | 6/15/2028 |
| 13 | United States of America | CORE-LOKT | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition, and specifically fixed ammunition for small arms and components and thereof | 71/581,081 | 8/21/1990 | 530,361 | 9/5/2020 | 9/5/2020 |
| 14 | Canada | DISINTEGRATOR | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 873561 | 3/27/1998 | TMA546,072 | 7/12/2001 | 7/12/2031 |
| 15 | United States of America | DISINTEGRATOR | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 75/564,862 | 11/5/1997 | 2,288,199 | 10/19/1999 | 10/19/2029 |
| 16 | Canada | DROP-DEAD BETTER | RA Brands, L.L.C. | No Maintenance | 13 Int. | Small arms ammunition | 1,130,601 | 1/2/2007 | TMA731,807 | 2/3/2009 | 2/3/2024 |
| 17 | Canada | DUPLEX | RA Brands, L.L.C. | Registered | 13 Nat. | Ammunition, namely, shotshells | 647,957 | 12/20/1989 | TMA382,702 | 4/5/1991 | 4/5/2021 |
| 18 | Australia | ETRONX | RA Brands, L.L.C. | Registered | 13 Int. | Firearms and ammunition | 818,762 | 12/31/1999 | 818762 | 12/31/2029 | 12/31/2029 |
| 19 | Switzerland | ETRONX | RA Brands, L.L.C. | Registered | 13 Int. | Firearms and ammunition | 00492000 | 1/14/2000 | P-468,601 | 1/14/2000 | 1/14/2010 |
| 20 | United States of America | ETRONX | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 75/574,336 | 10/21/1998 | 2,553,080 | 3/26/2002 | 3/26/2022 |
| 21 | European Union (Community) | ERPC | RA Brands, L.L.C. | Registered | 02 Int., 04 Int., 13 Int. | Paints, varnishes, lacquers; preservatives against rust and against deterioration of wood; colorants; mordants; raw natural resins; metals in foil and powder form for painters, decorators, printers and artists; coatings; preservatives; protective coating (in the nature of a polymer sealant used to improve resistance to wear and marring for exterior use on firearms); Lubricants, gun lubricants and lubricants for the bullets; gas for firearms; Firearms, ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; medium caliber ammunition; pellets; bullets; rockets; shot; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shields adapted for firearms; scrapers for cleaning firearms; breeches of firearms; covers for firearms; barrel reflectors for firearms; sights; firesights for firearms; sight protectors for firearms; sights; other than telescopic; for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes | 009219221 | 7/2/2010 | 009219221 | 11/17/2010 | 7/2/2020 |
| 22 | Benelux | EXPRESS | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 79391 | 6/1/1995 | 580177 | 8/1/1996 | 6/1/2025 |
| 23 | Canada | EXPRESS | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition, shotgun shells and cartridges | 1323565 | 5/30/1995 | 2003172 | 4/30/1996 | 4/30/2026 |
| 24 | France | EXPRESS | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition, shotgun shells and cartridges and firearms | 95573576 | 5/29/1995 | 95573576 | 5/29/1995 | 5/29/2025 |
| 25 | Germany | EXPRESS | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition, shotgun shell and cartridges and firearms | 39523637 | 5/29/1995 | 39523637 | 4/2/1996 | 5/29/2025 |
| 26 | Greece | EXPRESS | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition, namely shotgun shells | 122985 | 6/1/1995 | 122985 | 2/26/2003 | 6/1/2025 |
| 27 | Italy | EXPRESS | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition, shotgun shells and cartridges and firearms | RM95C002665 | 6/5/1995 | 714454 | 6/18/1997 | 6/5/2025 |
| 28 | Norway | EXPRESS | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition, shotgun shells and cartridges and firearms | 19953393 | 5/31/1995 | 172388 | 5/2/1996 | 5/31/2025 |
| 29 | Switzerland | EXPRESS | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition, ammunition and projectiles, explosives, firearms | 7855/1995.2 | 5/29/1995 | 442537 | 6/18/1997 | 5/29/2025 |
| 30 | United States of America | EXPRESS | RA Brands, L.L.C. | Registered | 13 Int. | Shotgun shells | 74/043,884 | 3/29/1990 | 1,629,078 | 12/25/1990 | 12/25/2020 |
| 31 | Canada | GOLDEN SABER | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition, namely, bullets | 1,374,526 | 11/26/2007 | TMA764,695 | 4/21/2010 | 4/21/2025 |
| 32 | European Union (Community) | GOLDEN SABER | RA Brands, L.L.C. | Registered | 02 Int., 04 Int., 13 Int. | Paints, varnishes, lacquers; preservatives against rust and against deterioration of wood; colorants; mordants; raw natural resins; metals in foil and powder form for painters, decorators, printers and artists; coatings; preservatives; protective coating for use in connection with (firearms); Lubricants, gun lubricants and lubricants for bullets; gas for firearms; Firearms; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; medium caliber ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shields adapted for firearms; scrapers for cleaning firearms; breeches of firearms; covers for firearms; barrel reflectors for firearms; sights; firesights for firearms; sight protectors for firearms; sights; other than telescopic; for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes | 6464952 | 11/26/2007 | 6464952 | 1/29/2009 | 11/26/2027 |
| 33 | United States of America | GOLDEN SABER | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 77/109,375 | 6/6/2007 | 3,456,762 | 7/1/2008 | 7/1/2028 |
| 34 | United States of America | GREEN (Box) | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 75/216,115 | 12/20/1996 | 2,132,273 | 1/27/1998 | 1/27/2028 |

5

**EXECUTION VERSION**

| No. | Country | Trademark | Record Owner | Status | Class | Goods | Appln. No. | Filing date | Reg. No. | Reg. Date | Renewal Due |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 35 | United States of America | GREEN (Bullet With Green Casing) | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition, namely doorbells | 75/216,649 | 12/23/1996 | 2,057,678 | 11/42/2003 | 1/14/2023 |
| 36 | Canada | GUN CLUB | RA Brands, L.L.C. | Registered | | Ammunition | 841364 | 4/4/1997 | UTMA459,982 | 6/23/1998 | 6/23/2028 |
| 37 | United States of America | GUN CLUB | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 75/285,999 | 5/2/1997 | 2,220,937 | 1/26/1999 | 1/26/2029 |
| 38 | United States of America | HI-SPEED | RA Brands, L.L.C. | Registered | 20 Int. | Ammunition | 77/109,115 | 6/1/2007 | 3,614,383 | 5/5/2009 | 5/5/2029 |
| 39 | Canada | HOG HAMMER | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 1,611,131 | 1/21/2013 | TMA977,085 | 1/26/2014 | 1/26/2031 |
| 40 | European Union (Community) | HOG HAMMER | RA Brands, L.L.C. | Registered | 13 Int. | Firearms, ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; large calibre ammunition; medium calibre ammunition; small calibre ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shield adapted for firearms; scopes for cleaning firearms; firearm sights; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms, parts and fittings for firearms | 11503216 | 1/21/2013 | 11503216 | 6/19/2013 | 1/21/2023 |
| 41 | Mexico | HOG HAMMER | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition; firearms | 1341223 | 1/21/2013 | 1361726 | 4/18/2013 | 1/21/2023 |
| 42 | United States of America | HOG HAMMER | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 85/996,864 | 7/3/2012 | 4,422,809 | 10/22/2013 | 10/22/2023 |
| 43 | Canada | HYPERSONIC | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 1,600,617 | 10/25/2012 | TMA939,832 | 10/29/2015 | 10/29/2030 |
| 44 | Mexico | HYPERSONIC | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 1320110 | 10/24/2012 | 1355526 | 3/19/2013 | 10/24/2022 |
| 45 | United States of America | HYPERSONIC | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 85/614,591 | 5/2/2012 | 4,471,615 | 1/21/2014 | 1/21/2024 |
| 46 | Australia | HYPERSONIC STEEL | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 1355562 | 5/30/2010 | 1355562 | 3/02/2010 | 5/30/2030 |
| 47 | Canada | HYPERSONIC STEEL | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 1,475,175 | 3/25/2010 | TMA814,526 | 12/20/2011 | 12/20/2026 |
| 48 | European Union (Community) | HYPERSONIC STEEL | RA Brands, L.L.C. | Registered | 02 Int., 04 Int., 13 Int. | Paints, varnishes, lacquers; preservatives against rust and against deterioration of wood; colorants; mordants; raw natural resins; metals in foil and powder form for painters, decorators, printers and artists; coatings; protective coatings; protective coating in the nature of a polymer sealant used to improve resistance to wear and marring for exterior use on firearms; Lubricants, gun lubricants and lubricants for bullets; gas for firearms; Firearms; ammunition, ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; medium calibre ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; firearms sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms | 8982803 | 3/25/2010 | 8982803 | 8/18/2010 | 3/25/2030 |
| 49 | Japan | HYPERSONIC STEEL | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 2010-027910 | 4/8/2010 | 5346205 | 8/13/2010 | 8/13/2020 |
| 50 | New Zealand | HYPERSONIC STEEL | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 821770 | 5/30/2010 | 821770 | 10/9/2009 | 10/9/2029 |
| 51 | United States of America | HYPERSONIC STEEL | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 77/845,085 | 10/9/2009 | 3,929,560 | 3/8/2011 | 3/8/2021 |
| 52 | New Zealand | KLEANBORE | RA Brands, L.L.C. | Registered | 13 Int. | All goods in class including firearms, particularly military and sporting rifles, shotguns, industrial guns, and parts thereof, and ammunition, particularly metallic cartridges, metallic shot shells, paper shot shells, industrial gun shells, empty metallic and paper shells, blank cartridges, caps, primers, wads, shot, bullets, and power cartridges for powder actuated tools and devices | 63761 | 4/22/1959 | 63761 | 4/22/1994 | 4/22/2028 |
| 53 | South Africa | KLEANBORE | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | Unknown | 4/27/1993 | 59/1199 | 4/27/1993 | 4/27/2023 |
| 54 | United Kingdom | KLEANBORE | RA Brands, L.L.C. | Registered | 13 Int. | Cartridges (explosives) for small arms and priming materials for such cartridges | B915,172 | 9/28/1981 | 915172 | 9/28/1988 | 9/28/2022 |
| 55 | United States of America | KLEANBORE | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 71/258,873 | 2/6/1987 | 223,998 | 2/15/1987 | 2/15/2027 |
| 56 | United States of America | MANAGED-RECOIL | RA Brands, L.L.C. | Registered | 20 Int. | Ammunition | 77/195,119 | 6/1/2007 | 3,365,501 | 1/8/2008 | 1/8/2028 |
| 57 | European Union (Community) | MODEL 700 | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition, firearms, ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; medium calibre ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shield adapted for firearms; scopes for cleaning firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms | 010376669 | 8/20/2013 | 010376669 | 8/20/2013 | 8/20/2023 |

6

EXECUTION VERSION

| No. | Country | Trademark | Record Owner | Status | Class | Goods | Appln. No. | Filing date | Reg. No. | Reg. Date | Renewal Due |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 58 | European Union (Community) | MODEL 870 | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition; firearms; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; medium caliber ammunition; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shields adapted for firearms; scopes for firearms; breeches of firearms; covers for firearms; barrel reflectors for firearms; firearm sights; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; component of firearms, namely, a gas operating system; firearms and replacement and structural parts therefor; recoil pads; parts and fittings for firearms | 012078093 | 8/20/2013 | 012078093 | 8/20/2013 | 8/20/2023 |
| 59 | United States of America | NITRO 27 | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 74/602,803 | 11/25/1994 | 2,041,087 | 2/25/1997 | 2/25/2027 |
| 60 | United States of America | NITRO MAG | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 73/139,082 | 8/29/1977 | 1,086,881 | 3/7/1978 | 3/7/2028 |
| 61 | United States of America | NITRO PHEASANT | RA Brands, L.L.C. | Registered | 20 Int. | Ammunition | 77/195,129 | 6/1/2007 | 3,397,580 | 3/18/2008 | 3/18/2028 |
| 62 | United States of America | NITRO TURKEY | RA Brands, L.L.C. | Registered | 20 Int. | Ammunition | 77/195,123 | 6/1/2007 | 3,397,579 | 3/18/2008 | 3/18/2028 |
| 63 | United States of America | NITRO-STEEL | RA Brands, L.L.C. | Registered | 20 Int. | Ammunition | 77/195,128 | 6/1/2007 | 3,365,502 | 1/8/2008 | 1/8/2028 |
| 64 | Australia | PETERS | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 1056190 | 5/19/2005 | 1056190 | 1/9/2006 | 5/19/2025 |
| 65 | Canada | PETERS | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 1,252,708 | 3/30/2005 | TMA711,662 | 4/11/2008 | 4/11/2023 |
| 66 | European Union (Community) | PETERS | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 4,367,668 | 4/1/2005 | 4,367,668 | 4/1/2005 | 4/1/2025 |
| 67 | Germany | PETERS | RA Brands, L.L.C. | Registered | 13 Int. | Firearms, ammunition and projectiles as well as their parts, explosives | 8434/13/13 | 8/23/1995 | 10934398 | 10/14/1995 | 8/31/2025 |
| 68 | Mexico | PETERS | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 709781 | 4/1/2005 | 905223 | 9/15/2006 | 4/1/2025 |
| 69 | United States of America | PETERS | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition, particularly metallic cartridges; empty metallic shells, cartridges | 71/361,113 | 1/24/1995 | 324,506 | 5/21/1995 | 5/21/2025 |
| 70 | United States of America | PETERS | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition, namely, wad columns and load columns sold as components | 78/403,022 | 10/1/2004 | 3,020,566 | 11/29/2005 | 11/29/2025 |
| 71 | United States of America | PETERS (Stylized) | RA Brands, L.L.C. | Registered | 13 Int. | Cartridges | 71/014,212 | 11/21/1930 | 60,728 | 2/19/1987 | 2/19/2027 |
| 72 | Canada | POWER LEVEL | RA Brands, L.L.C. | Registered | 13 Int. | Small arms ammunition | 1,137,440 | 7/21/2007 | TMA716,432 | 3/17/2009 | 3/17/2024 |
| 73 | Australia | POWER PISTON | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition, namely, wad columns for shotshells | 881310272 | 5/26/2016 | 1798271 | 5/26/2016 | 5/26/2026 |
| 74 | Australia | POWER PISTON | RA Brands, L.L.C. | No Maintenance | 13 Int. | Ammunition and components thereof | Unknown | 6/27/1966 | 203107 | 6/27/1966 | 6/27/2021 |
| 75 | Canada | POWER PISTON | RA Brands, L.L.C. | Registered | 13 Int. | Shotshells containing wad columns; wad columns sold as components | Unknown | 6/23/1966 | TMA154695 | 12/22/1967 | 12/22/2027 |
| 76 | European Union | POWER PISTON | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition, namely, wad columns for shotshells | A0059179 | 5/26/2016 | 881310272 | 5/26/2016 | 5/26/2026 |
| 77 | Int'l Registration - Madrid Protocol Other | POWER PISTON | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition, namely, wad columns for shotshells | A0059179 | 5/26/2016 | 881310272 | 5/26/2016 | 5/26/2026 |
| 78 | Norway | POWER PISTON | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition, namely, wad columns for shotshells | A0059179 | 5/26/2016 | 881310272 | 5/26/2016 | 5/26/2026 |
| 79 | Switzerland | POWER PISTON | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition, namely, wad columns for shotshells | A0059179 | 5/26/2016 | 881310272 | 5/26/2016 | 5/26/2026 |
| 80 | United Kingdom | POWER PISTON | RA Brands, L.L.C. | No Maintenance | 13 Int. | Ammunition, namely, wad columns for shotshells | Unknown | 6/21/1967 | 896507 | 6/21/1967 | 6/26/2021 |
| 81 | United States of America | POWER PISTON (Stylized) | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition - namely, wad columns for shotshells | 72/208,850 | 12/24/1964 | 799,017 | 11/23/1965 | 11/23/2025 |
| 82 | United States of America | PREMIER | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 74/544,334 | 6/29/1994 | 1,908,366 | 8/1/1995 | 8/1/2025 |
| 83 | Canada | PREMIER CORE-LOKT ULTRA BONDED | RA Brands, L.L.C. | Registered | 13 Int. | Small arms ammunition | 1,291,678 | 2/14/2006 | TMA710,896 | 4/3/2008 | 4/3/2023 |
| 84 | European Union (Community) | PREMIER CORE-LOKT ULTRA BONDED | RA Brands, L.L.C. | Registered | 02 Int., 04 Int., 13 Int. | Paints, varnishes, lacquers; preservatives against rust and against deterioration of wood; colorants; mordants; raw natural resins; metals in foil and powder form for painters, decorators, printers and artists; coatings; preservatives; protective coating for use in connection with firearms; Lubricants, gun lubricants and lubricants for bullets; gas for firearms; Firearms; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; medium caliber ammunition; pellets; bullets; shells; bases for explosives; cartridges; bags for carrying firearms; protective cases | 4954871 | 3/13/2006 | 4954871 | 3/13/2006 | 3/13/2026 |

7

EXECUTION VERSION

| No. | Country | Trademark | Record Owner | Status | Class | Goods | Appln. No. | Filing date | Reg. No. | Reg. Date | Renewal Due |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 85 | United States of America | R (Stylized) | RA Brands, L.L.C. | Registered | 13 Int. | adapted for firearms; protective shields adapted for firearms; scopes for firearms; covers for firearms; barrel reflectors for firearms; firearm sights; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms | 86/201,803 | 2/24/2014 | 4,827,872 | 10/6/2015 | 10/6/2025 |
| 86 | United States of America | R (Stylized) | RA Brands, L.L.C. | Registered | 13 Int. | Air guns, namely, BB guns and pellet guns and ammunition therefor | 74/626,499 | 1/27/1995 | 2,061,907 | 5/13/1997 | 5/13/2027 |
| 87 | European Union (Community) | R DEFENSE Logo | RA Brands, L.L.C. | Registered | 13 Int. | Firearms and ammunition, namely, shotguns, rifles, metallic cartridges, shotshells, cases | 11790409 | 5/3/2013 | 11790409 | 5/3/2013 | 5/3/2023 |
| 88 | African Intellectual Property Organization (OAPI) | REMINGTON | RA Brands, L.L.C. | Registered | 13 Int. | Firearms - namely, military and sporting rifles, shotguns, pistols, air rifles and parts thereof, and ammunition-namely, metallic cartridges, metallic shot shells, paper shotshells, empty metallic and paper shells, blank cartridges, caps, primers, wads, shot and bullets | 63849 | 1/30/1956 | 15821 | 1/30/1976 | 1/30/2026 |
| 89 | Australia | REMINGTON | RA Brands, L.L.C. | Registered | | Ammunition | A65782 | 4/11/1935 | 65782 | 4/11/1991 | 4/11/2025 |
| 90 | Austria | REMINGTON | RA Brands, L.L.C. | Registered | 00 Int., 08 Int., 13 Int. | Cutlery, tools, scythes, sickles and cutting, slashing and stabbing weapons, powder actuated tools ; Firearms, particularly military and sporting rifles, shotguns, industrial guns and parts thereof; ammunition; Machines, machine parts, driving belts flexible pipes, cetc- fixed | Unknown | 7/29/1999 | 41764 | 7/29/1989 | 5/20/2029 |
| 91 | Benelux | REMINGTON | RA Brands, L.L.C. | Registered | 04 Int., 13 Int. | Lubricants, particularly gun oils and bullet lubricants ; Firearms, particularly military and sporting rifles, shotguns, pistols, industrial guns and gun implements and parts and accessories thereof, and ammunition, particularly metallic shot shells, paper shot shells, industrial gun shells, empty metallic and paper shells, blank cartridges, caps, primers, wads, shot and bullets, and power cartridges for powder actuated tools and devices | 25884 | 12/24/1990 | 99281 | 12/24/1990 | 12/24/2020 |
| 92 | Brazil | REMINGTON | RA Brands, L.L.C. | Registered | 13 Nat. | Firearms and ammunition | 814059390 | 3/6/1991 | 816059390 | 7/4/1995 | 7/4/2025 |
| 93 | Brazil | REMINGTON | RA Brands, L.L.C. | Registered | 13 Nat. | Firearms and ammunition | 1560580 | 10/21/1986 | 1560580 | 10/21/1996 | 10/21/2026 |
| 94 | Canada | REMINGTON | RA Brands, L.L.C. | Registered | 13 Nat. | Rifles, shotguns, pistols, cartridges, cartridge shells, shot gun cartridges, paper shot shells, powders, wads, percussion caps, primers, bullets and shot | 80,998 | 7/12/1995 | TMDA030942 | 7/12/1995 | 7/12/2025 |
| 95 | Caribbean Netherlands(Bonaire, St Eustatius, Saba) | REMINGTON | RA Brands, L.L.C. | Registered | 13 Int. | Firearms and ammunition | 1885 | 6/13/2011 | 1885 | 6/13/2011 | 6/13/2021 |
| 96 | Colombia | REMINGTON | RA Brands, L.L.C. | Registered | 13 Int. | Firearms and ammunition accessories, ammunition, cartridge cases, blank cartridges, caps, primers and powder actuated tools | 294,384 | 10/13/1993 | 105,703 | 11/2/1993 | 11/2/2023 |
| 97 | Colombia | REMINGTON | RA Brands, L.L.C. | Registered | 13 Int. | Firearms, ammunition, projectiles, explosive Substances, fireworks | 337023 | 3/11/1991 | 26430 | 3/28/1991 | 3/28/2031 |
| 98 | Costa Rica | REMINGTON | RA Brands, L.L.C. | Registered | 13 Int. | Firearms and ammunition | 2006-00017739 | 8/24/2006 | 168404 | 6/12/2007 | 6/12/2027 |
| 99 | Curacao | REMINGTON | RA Brands, L.L.C. | Registered | 13 Int. | Firearms and ammunition | D10127 | 6/13/2011 | 19557 | 6/13/2011 | 6/13/2021 |
| 100 | Czech Republic | REMINGTON | RA Brands, L.L.C. | Registered | 13 Int. | Firearms and ammunition | 97842 | 11/1/1995 | 190634 | 5/21/1996 | 5/1/2025 |
| 101 | Denmark | REMINGTON | RA Brands, LLC | Registered | 07 Int., 13 Int. | Power driven machine tools, firearms and parts thereof, ammunition | 01223.1959 | 4/20/1959 | VG1962.00168 | 10/27/1992 | 10/27/2022 |
| 102 | European Union (Community) | REMINGTON | RA Brands, L.L.C. | Registered | 13 Nat. | Firearms and ammunition | 66034 | 4/1/1996 | 66034 | 3/10/1998 | 4/1/2026 |
| 103 | France | REMINGTON | RA Brands, L.L.C. | Registered | 01 Int., 04 Int., 06 Int., 07 Int., 08 Int., 13 Int., 17 Int., 22 Int., 25 Int., 28 Int., 37 Int., 40 Int. | Chemicals used in industry science & photography as well as in agriculture, horticulture & forestry; unprocessed artificial resins; unprocessed plastics; manures; fire extinguishing compositions; tempering & soldering preparations, etc. ; Industrial oils & greases; lubricants; dust absorbing, wetting & binding compositions; fuels (including motor spirit & illuminants; candles wicks ; Common metals & their alloys; metal building materials; transportation buildings of metal; materials of metal for railway tracks; non-electric cables & wires of common metal ; ironmongery small items of metal hardware; pipes & tubes of metal; safes; goods of common metal not included etc. ; Machines & Machine tools; motors (except for land vehicles; machine coupling & belting (except for land vehicles); agricultural implements; incubators for eggs ; Hand tools and implements (hand operated); | 934,346 | 6/15/1988 | 1471368 | 6/15/1998 | 6/30/2028 |

8

EXECUTION VERSION

9

| No. | Country | Trademark | Record Owner | Status | Class | Goods | Appln. No. | Filing date | Reg. No. | Reg. Date | Renewal Due |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 104 | France | REMINGTON | R.A. Brands, L.L.C. | Registered | Int., 42 Int. | cutlery; side arms; razors / Firearms; ammunition & projectiles; explosives; fireworks ; Rubber gutta-percha gum asbestos mica & goods made from these materials & not included in other classes; plastics in extruded form for use in manufacture; packing stopping & insulating materials flexible pipes (not of metal) ; Ropes string nets tents awnings tarpaulins sails sacks & bags (not included in other classes); padding & stuffing materials (except of rubber or plastics); raw fibrous textile materials ; Clothing footwear headgear ; Games & playthings; gymnastic & sporting articles not included in other classes; decorations for Christmas trees ; Construction & repair ; Material treatment ; Miscellaneous | 650280 | 12/31/1992 | 1223308 | 12/31/1992 | 12/31/2022 |
| 105 | Germany | REMINGTON | R.A. Brands, L.L.C. | Registered | 13 Int. | Firearms, military and sporting rifles, shotguns, pistols, industrial guns and parts thereof; explosives; inflammables, fireworks, projectiles and munitions, ammunition, metallic cartridges and shot shells; empty metallic cartridges and paper shells; blank cartridges, cartridge cases, caps, primers, wads, shot bullets and powder | R296.521/3Wz | 1/12/1973 | 928,260 | 1/12/1973 | 1/31/2023 |
| 106 | Germany | REMINGTON | R.A. Brands, L.L.C. | Registered | 13 Int. | Shot guns, pistols, accessories for hand firearms, metallic cartridges, metallic shoshells, shot shells of paper and cardboard, cartridge covers consisting of metal or paper explosives cartridges and shot shells | R31079 | 6/26/1995 | 340384 | 7/1/1995 | 6/30/2025 |
| 107 | Germany | REMINGTON | R.A. Brands, L.L.C. | Registered | 13 Int. | Firearms, particularly military and sporting rifles, shotguns, industrial guns and parts thereof; ammunition | R32551/13Wz | 7/8/1969 | 869020 | 7/31/1999 | 7/31/2029 |
| 108 | Greece | REMINGTON | R.A. Brands, L.L.C. | Registered | 13 Int. | Firearms, ammunition | 14253 | 7/31/1945 | 14337 | 7/31/1985 | 7/31/2025 |
| 109 | Greece | REMINGTON | R.A. Brands, L.L.C. | Registered | 13 Int. | Firearms and firearms accessories, military and sporting rifles, shotguns, pistols, industrial guns and parts thereof; explosives, inflammables, matches, fireworks projectiles and munitions, ammunition, metallic cartridges and shotshells; empty metallic shells | 49834 | 2/5/1973 | 49834 | 2/5/1993 | 2/5/2023 |
| 110 | Guatemala | REMINGTON | R.A. Brands, L.L.C. | Registered | 13 Int. | Ammunition | Unknown | 8/14/1990 | 12409 | 10/24/1990 | 10/25/2020 |
| 111 | Israel | REMINGTON | R.A. Brands, L.L.C. | Registered | 13 Int. | Cartridges; parts thereof; ammunition | Unknown | 5/13/1994 | 17900 | 6/24/1994 | 6/23/2022 |
| 112 | Italy | REMINGTON | R.A. Brands, L.L.C. | Registered | 13 Int. | Firearms and ammunition | 690601/Prec.Regz | 5/28/1993 | 1045945 | 10/3/1995 | 5/14/2023 |
| 113 | Italy | REMINGTON | R.A. Brands, L.L.C. | Registered | 13 Int. | Firearms and ammunition | RM95A005048 | 10/12/1994 | 1067035 | 10/16/1996 | 10/12/2024 |
| 114 | Jamaica | REMINGTON | R.A. Brands, L.L.C. | Registered | 13 Int. | Firearms and ammunition | Unknown | 4/30/1952 | 8354 | 5/15/1996 | 5/15/2030 |
| 115 | Japan | REMINGTON | R.A. Brands, L.L.C. | Registered | 13 Int. | Shotguns, pistols, revolvers, rifles, and other guns, accessories of gun; cartridges for all such of gun and components thereof (except torpedo) | 719307/92 | 6/21/1992 | 416557 | 3/26/1992 | 9/26/2022 |
| 116 | Korea, Republic of | REMINGTON | R.A. Brands, L.L.C. | Registered | 13 Int., 20 Int. | Firearms; hunting arm; rifle; machine gun; pistol; cannon; anti-aircraft gun; recoilless gun, mortar; heavy machine-gun, gun barrel; safety lock; gun sight; cannon barrel; cannon stand, gun support; case shot, air gun bullet; hunting gun bullet; bullet; machine-gun bullet; trench mortar bullet; cartridges; smokeless gun powder; black powder; gun-cotton; dynamite; ammonium nitrate explosive; cartel; initial explosive; liquid explosive; fuse; percussion cap; powder train; powder case; cartridge box; hand-grenade; landmine; depth charge; mine; torpedo; bomb; rocket bomb; guided missile; flare bomb; incendiary bomb; smoke shell; gas shell and bengal flame; Gun stand | 40-1961-1220 | 3/21/1961 | 40-5564 | 5/9/1961 | 5/9/2021 |
| 117 | Malaysia | REMINGTON | R.A. Brands, L.L.C. | Registered | 13 Int. | Firearms and firearms accessories, military and sporting rifles, shotguns, pistols, revolvers, and parts thereof industrial guns and parts thereof, explosives, inflammables, projectiles and munitions, ammunition, cartridge cases, blank cartridges, primer, cartridge caps, primers | M/85845 | 3/25/1980 | M/85845 | 3/25/1980 | 3/25/2021 |
| 118 | Mexico | REMINGTON | R.A. Brands, L.L.C. | Registered | 13 Int. | Firearms, particularly military and sporting rifles, shotguns and pistols and implements and accessories for guns rifles, and shotguns; ammunition, particularly metallic cartridges, metallic shotshells, paper shotshells, empty metallic and paper shells, blank paper shells, blank | Unknown | 10/12/1991 | 20659 | 10/12/1991 | 10/12/2021 |
| 119 | Mexico | REMINGTON | R.A. Brands, L.L.C. | Registered | 13 Int. | Firearms, ammunition | Unknown | 3/25/1993 | 291554 | 2/25/1993 | 3/25/2023 |
| 120 | New Zealand | REMINGTON | R.A. Brands, L.L.C. | Registered | 13 Int. | Firearms and firearms accessories in this class; rifles, shotguns and parts thereof, industrial guns and parts thereof in the this class; explosives, projectiles and munitions; ammunition; cartridge cases, blank cartridges, | 131033 | 3/27/1987 | 131033 | 3/27/1987 | 3/27/2025 |
| 121 | Norway | REMINGTON | R.A. Brands, L.L.C. | Registered | 13 Int. | Firearms - namely, military and sporting rifles, shotguns, pistols, air rifles and parts thereof, and ammunition-namely, metallic cartridges, metallic shot shells, paper shotshells - empty metallic and paper shells, blank cartridges, caps, primers, wads shot and bullets | 862866 | 7/16/1986 | 132892 | 8/4/1998 | 8/4/2028 |

**EXECUTION VERSION**

| No. | Country | Trademark | Record Owner | Status | Class | Goods | Appln. No. | Filing date | Reg. No. | Reg. Date | Renewal Due |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 122 | Paraguay | REMINGTON | RA Brands, L.L.C. | Registered | 13 Int. | Firearms and ammunition. | Unknown | 9/25/1990 | 141459 | 11/29/1990 | 9/25/2020 |
| 123 | Paraguay | REMINGTON | RA Brands, L.L.C. | Registered | 13 Int. | Firearms, ammunition & Projectiles, explosives, fireworks. | Unknown | 6/25/1985 | 289055 | 6/25/1995 | 6/25/2025 |
| 124 | Peru | REMINGTON | RA Brands, L.L.C. | Registered | 13 Int. | Firearms and ammunition | 416212 | 3/11/2001 | 70020-2001 | 12/10/2001 | 12/10/2021 |
| 125 | Peru | REMINGTON | RA Brands, L.L.C. | Registered | 13 Int. | Cartridges, ammunition and missiles; explosives, fireworks. | N59703.115 | 5/22/1995 | 14212R | 5/31/1996 | 3/22/2015 |
| 126 | Russian Federation | REMINGTON | RA Brands, L.L.C. | Registered | 13 Int. | Firearms and ammunition. | 924.95 | 4/4/1995 | 181110 | 6/16/1998 | 4/4/2015 |
| 127 | St. Marino | REMINGTON | RA Brands, L.L.C. | Registered | 13 Int. | Firearms and ammunition. | SM 2371114 | 6/13/2011 | 15679 | 6/13/2011 | 6/13/2021 |
| 128 | Sweden | REMINGTON | RA Brands, L.L.C. | Registered | 07 Int., 09 Int., 13 Int. | Machines and machine tools; motors (except for land vehicles); machine coupling and belting (except for land vehicles); agricultural implements; incubators for eggs; Hand tools and implements (hand operated); cutlery; side arms; razors; Firearms; ammunition and projectiles. | 82-5303 | 1/22/1992 | 183624 | 10/15/1992 | 10/15/2022 |
| 129 | Switzerland | REMINGTON | RA Brands, L.L.C. | Registered | 07 Int., 08 Int., 13 Int. | Power actuated tools particularly arranged to drive or propel a driving, penetrating, or other element by the explosion of a propellant charge, driving and driven elements for use in and parts of and accessories for such tools, fastening devices, studs, pins and bolts adapted to be driven by such tools, captive piston tools adapted for stunning animals, and captive piston tools for performing various mechanical operations; hand manipulated portable power tools driven by electric, pneumatic or gasoline engine power, including specifically chain saws, polishers, buffers, sanders, routers, grinders, screwdrivers, planes, impact wrenches, augers, concrete vibrators, concrete surfaces, generators, pumps, trowels, earth borers, flexible shafts, spindles, and accessories and attachments for such tools; Firearms, particularly military and sporting rifles, shotguns, metallic and paper shells, industrial gun shells, empty metallic and paper shells, blank cartridges, caps, primers, wads, shot, bullets, and power cartridges for power actuated tools and devices. | Unknown | 5/12/1959 | 300038 | 4/10/1999 | 4/10/2029 |
| 130 | Turkey | REMINGTON | RA Brands, L.L.C. | Registered | 13 Int. | Shotguns, pistols, battle guns, firearms and accessories, metal cartridges, hunting shots with metal cartridges, hunting shots with paper cartridges, empty metal or paper shot cartridges, dummies, percussion caps, fuses. | Unknown | 12/8/1991 | 131225 | 12/8/1991 | 12/8/2021 |
| 131 | United States of America | REMINGTON | RA Brands, L.L.C. | Registered | 13 Int. | Firearms and ammunition - namely, shotguns and parts thereof, rifles and parts thereof, metallic cartridges, shotshells, empty metallic shells, empty shotshells, blank cartridges, caps, primers, wads and bullets | 72/113,138 | 2/6/1981 | 745,041 | 2/12/1983 | 2/12/2023 |
| 132 | United States of America | REMINGTON | RA Brands, L.L.C. | Registered | 13 Int. | Air guns, namely, BB guns and pellet guns, and ammunition therefor | 78/203,505 | 1/15/2003 | 2,872,763 | 8/10/2004 | 8/10/2024 |
| 133 | Uruguay | REMINGTON | RA Brands, L.L.C. | Registered | 13 Int. | Firearms and ammunition | 339,739 (Prev. Reg.) | 5/6/1992 | 485,651 | 7/5/2002 | 5/6/2022 |
| 134 | Venezuela | REMINGTON | RA Brands, L.L.C. | Registered | 09 Int. | Firearms, particularly military and hunting rifles, hunting shotguns, revolver and pistols, utensils, implements and accessories, implements for shot guns, ammunition, particularly metallic cartridges, metallic shotshells, paper shotshells, empty metallic and paper shells, blank | Unknown | 4/8/1986 | F012841 | 4/8/1986 | 4/8/2026 |
| 135 | Venezuela | REMINGTON | RA Brands, L.L.C. | Registered | 13 Int. | Arms of all kinds and explosive substances, destructive apparatus and substances of war; ammunition and shells; armors; plates, shields and personal shelters against military weapons; projectiles and all other destructive apparatus; percussion caps, accessories and apparatus for target shooting; firearms and its parts and pieces | Unknown | 6/8/1994 | H02914 | 6/8/1994 | 6/8/2029 |
| 136 | Chile | REMINGTON & Ball Device | RA Brands, L.L.C. | Registered | 13 Int. | Design - firearms, ammunition | 606807 (Prior Reg) | 3/8/1991 | 944246 | 10/31/2001 | 10/31/2021 |
| 137 | Pakistan | REMINGTON (Ball Design) | RA Brands, L.L.C. | Registered | 13 Int. | Design - firearms, ammunition | Unknown | 11/3/1939 | 31733 | 11/3/1996 | 11/3/2011 |
| 138 | Austria | REMINGTON (Script) | RA Brands, L.L.C. | Registered | 13 Int. | Firearms, ammunition and projectiles; explosive substances, fireworks | Unknown | 4/30/1993 | 242057 | 4/30/1993 | 4/30/2023 |
| 139 | Argentina | REMINGTON (Stylized and Underlined) | RA Brands, L.L.C. | Registered | 13 Int. | Firearms, ammunition and projectiles; explosive substances; fireworks | 1911191 (Prev.Reg.) | 3/5/1984 | 2,495,930 | 7/19/2004 | 7/19/2024 |
| 140 | Bonilon | REMINGTON (Stylized and Underlined) | RA Brands, L.L.C. | Registered | 04 Int., 07 Int., 08 Int. | Lubricants, in particular gun oils and bullet lubricants; Powered chain saws (gasoline, pneumatic or electric), concrete rubbing machines, concrete vibrators, | 25649 | 12/23/1991 | 98651 | 12/23/1991 | 12/23/2021 |

10

EXECUTION VERSION

| No. | Country | Trademark | Record Owner | Status | Class | Goods | Appln. No. | Filing date | Reg. No. | Reg. Date | Renewal Due |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Int., 13 Int. | power trailers, concrete screeds, cut off saws and nail grinders, drills, screwdrivers, put setters, impact wrenches, grinders, sanders and circular saws, terrazzo grinders, flexible shaft grinders, sanders, polishers, brushes, parts, accessories and attachments for the aforesaid tools including chain saw guide bars, chain saw sprockets, saw chains, flexible shafts, spindles and electric motors but not included wheels, blades, discs and similar devices which are abrasive coated; powder actuated stud drivers, hole punchers, livestock stunning tools and S gauge industrial kiln guns, their parts, accessories and devices including studs, pins and mechanically held expansion bolts (not included in other classes); Hand manipulated chain saws, concrete vibrators, power graders, concrete screeds, cut off saws and nail grinders, drills, screwdrivers, put setters, impact wrenches, grinders, sanders and circular saws, terrazzo grinders, flexible shaft grinders, sanders, polishers, brushes, parts, accessories and attachments for the aforesaid tools including chain saw guide bars, chain saw sprockets, saw chains, flexible shafts, spindles and electric motors but not included wheels, blades, discs and similar devices which are abrasive coated; powder actuated stud drivers, hole punchers, livestock stunning tools and S gauge industrial kiln guns, their parts, accessories and devices including studs, pins and mechanically held expansion bolts (not included in other classes); Firearms, in particular military and sporting rifles, shotguns, pistols, industrial guns and gun implements, parts and accessories therefor, ammunition, particularly metallic cartridges, metallic shot shells, paper shot shells, industrial gun shells, empty metallic and paper shells, blank cartridges, caps, primers, wads, shot, bullets and power cartridges for powder actuated devices | | | | | |
| 141. | Chile | REMINGTON (Stylized and Underlined) | RA Brands, L.L.C. | Registered | | Firearms of all kind, parts thereof and accessories thereto, ammunitions and cartridges; wads and apparatus for charging, cleaning and keeping up arms | 561,620 (Prior Reg.) | 9/12/1989 | 882,915 | 11/11/1990 | 2/15/2010 |
| 142. | United Kingdom | REMINGTON (Stylized and Underlined) | RA Brands, L.L.C. | Registered | 13 Int. | Firearms and parts thereof and ammunition | 741428 | 10/27/1990 | 741428 | 10/27/1990 | 10/27/2024 |
| 143. | United States of America | REMINGTON (Stylized and Underlined) | RA Brands, L.L.C. | Registered | 13 Int. | Firearms, particularly military and sporting rifles, shotguns, pistols, and parts thereof, metallic cartridges, empty metallic shells, blank cartridges, caps, primers, wads, shot, and bullets | 71/192,644 | 2/21/1984 | 187,871 | 8/12/1984 | 8/12/2024 |
| 144. | Benelux | REMINGTON (Stylized) | RA Brands, L.L.C. | Registered | 13 Int., 34 Int. | Firearms and firearm accessories; military and sporting rifles, shotguns, pistols, industrial guns and parts thereof; explosives, inflammables, fireworks, projectiles and munitions, ammunition, metallic cartridges and shot shells, empty metallic and paper shells, blank cartridges, caps, primers, wads, shot bullets, and powder cartridges for power activated tools ; Matches | 31924 | 1/18/1995 | 315804 | 1/18/1995 | 1/18/2023 |
| 145. | Chile | REMINGTON (Stylized) | RA Brands, L.L.C. | Registered | 13 Int. | Firearms and projectiles, ammunition, explosives, fireworks | | | 1041951 | 8/28/2003 | 8/28/2003 |
| 146. | Denmark | REMINGTON (Stylized) | RA Brands, L.L.C. | Registered | 13 Int. | Firearms, particularly military and sporting rifles, shotguns, pistols, industrial guns and parts thereof, ammunitions, particularly ordinary gun cartridges, shotgun cartridges, industrial cartridges, cartridge cases of metal and paper, loose cartridges for power activated tools | 672,128 (Prov.Reg.) 00187/1973 | 1/29/1993 1/15/1973 | VR 197454965 | 6/21/1994 | 6/21/2024 |
| 147. | Denmark | REMINGTON (Stylized) | RA Brands, L.L.C. | Registered | 13 Int. | Firearms and ammunition, namely, shotguns and parts thereof, rifles and parts thereof | 1767/1975 | 4/30/1975 | VR 1975.04394 | 8/17/1995 | 10/24/2025 |
| 148. | Pakistan | REMINGTON (Stylized) | RA Brands, L.L.C. | Registered | 13 Int. | Firearms including rifles, shotguns, pistols, industrial guns and parts thereof, ammunition including loaded cartridges, empty cartridge cases, caps, primers, wads, projectiles shot pellets, and other components, and BB's and pellets | Unknown | 4/29/1988 | 74150 | 4/29/1988 | 4/29/2028 |
| 149. | Panama | REMINGTON (Stylized) | RA Brands, L.L.C. | Registered | 13 Int. | Firearms and ammunition | Unknown | 8/5/1985 | 8882 | 8/5/1985 | 8/5/2025 |
| 150. | South Africa | REMINGTON (Stylized) | RA Brands, L.L.C. | Registered | 13 Int. | Firearms and ammunition | Unknown | 3/21/1997 | 296/21 | 3/21/1997 | 3/21/2027 |
| 151. | Switzerland | REMINGTON (Stylized) | RA Brands, L.L.C. | Registered | 13 Int. | Firearms, ammunition and projectiles; explosive substances; fireworks | 740/1992 | 1/29/1993 | P-408,457 | 1/29/1993 | 1/29/2023 |
| 152. | Taiwan | REMINGTON (Stylized) | RA Brands, L.L.C. | Registered | 13 Int. | Firearms and ammunition | 80026857 | 5/23/1996 | 734414 | 11/1/1996 | 10/31/2026 |
| 153. | United Kingdom | REMINGTON (Stylized) | RA Brands, L.L.C. | Registered | 13 Int. | Firearms and parts thereof included in Class 13; and ammunition | 1005101 | 1/18/1994 | 1005101 | 1/18/1994 | 1/18/2028 |
| 154. | United States of America | REMINGTON (Stylized) | RA Brands, L.L.C. | Registered | 13 Int. | Firearms and ammunition - namely, shotguns and parts thereof rifles and parts thereof, metallic cartridges, shotshells, empty metallic shells, empty shotshells, blank cartridges, caps, primers, wads, shot, and bullets | 73/936,698 | 11/15/1995 | 1,027,528 | 12/16/1995 | 12/16/2025 |
| 155. | United States of America | REMINGTON (Stylized) | RA Brands, L.L.C. | Registered | 13 Int. | Air guns, namely, BB guns and pellet guns, and ammunition therefor | 78/295,503 | 1/15/2003 | 2,872,762 | 8/10/2004 | 8/10/2034 |
| 156. | Canada | REMINGTON IFTP HIGH TERMINAL PERFORMANCE | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 1,621,685 | 3/22/2013 | TMA936,742 | 5/4/2016 | 5/4/2031 |
| 157. | European Union (Community) | REMINGTON IFTP HIGH TERMINAL PERFORMANCE | RA Brands, L.L.C. | Registered | 13 Int. | Firearms, ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; large calibre | 11681012 | 3/22/2013 | 11681012 | 8/1/2013 | 3/22/2023 |

11

EXECUTION VERSION

| No. | Country | Trademark | Record Owner | Status | Class | Goods | Appln. No. | Filing date | Reg. No. | Reg. Date | Renewal Due |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 158. | Mexico | REMINGTON HTP HIGH TERMINAL PERFORMANCE | RA Brands, L.L.C. | Registered | 13 Int. | ammunition; medium calibre ammunition; small calibre ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for carrying firearms; bags for carrying firearms; scrapers for cleaning firearms; breeches of firearms; covers for firearms; barrel reflectors for firearms; firearm sights; other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms, parts and fittings for firearms | 1359750 | 3/22/2013 | 1376580 | 6/2/2013 | 3/22/2023 |
| 159. | United States of America | REMINGTON HTP HIGH TERMINAL PERFORMANCE | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 85736670 | 9/24/2012 | 4,735,668 | 5/12/2015 | 5/12/2025 |
| 160. | European Union (Community) | REMINGTON HYPERSONIC | RA Brands, L.L.C. | Registered | 13 Int. | Firearms; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; medium calibre ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; shields adapted for firearms; scrapers for cleaning firearms; breeches of firearms; covers for firearms; barrel reflectors for firearms; firearm sights; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms; component of firearms, namely, a gas operating system; parts and fittings for firearms | 11696201 | 3/27/2013 | 11696201 | 3/27/2013 | 3/27/2023 |
| 161. | Singapore | REMINGTON in Circle & Underlined | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition and projectiles included in Class 13.; and ammunition | Unknown | 7/2/1959 | T59251740I | 7/2/1980 | 7/2/2024 |
| 162. | European Union (Community) | REMINGTON UMC | RA Brands, L.L.C. | Registered | 02 Int., 04 Int., 13 Int. | Paints, varnishes, lacquers; preservatives against rust and against deterioration of wood; colorants; mordants; raw natural resins; metals in foil and powder form for painters, decorators, printers and artists; coatings; preservatives; protective coating in the nature of a polymer sealant used to improve resistance to wear and marring for exterior use on firearms; Lubricants, gun lubricants and lubricants for bullets; gas for firearms; Firearms; ammunition; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; medium calibre ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shields adapted for cleaning firearms; breeches of firearms; covers for firearms; barrel reflectors for firearms; firearm sights; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms | 8282329 | 5/6/2009 | 8282329 | 10/21/2009 | 5/6/2029 |
| 163. | European Union (Community) | REMINGTON UMC and Design | RA Brands, L.L.C. | Registered | 02 Int., 04 Int., 13 Int. | Paints, varnishes, lacquers; preservatives against rust and against deterioration of wood; colorants; mordants; raw natural resins; metals in foil and powder form for painters, decorators, printers and artists; coatings; preservatives; protective coating in the nature of a polymer sealant used to improve resistance to wear and marring for exterior use on firearms; Lubricants, gun lubricants and lubricants for bullets; gas for firearms; Firearms; ammunition; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; medium calibre ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shields adapted for cleaning firearms; breeches of firearms; covers for firearms; barrel reflectors for firearms; firearm sights; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms | 8282361 | 5/6/2009 | 8282361 | 10/21/2009 | 5/6/2029 |
| 164. | Benelux | REMINGTON UMC and Red Ball Design | RA Brands, L.L.C. | Registered | 13 Int. | Firearms and ammunition, war ammunition, rifles, shotguns, pistols, metallic shot shells, paper shot shells, empty metallic and paper shells, blank cartridges, caps, wads and bullets | 23891 | 12/24/1991 | 99287 | 12/24/1991 | 12/24/2021 |
| 165. | Canada | REMINGTON UMC and Red Ball Design | RA Brands, L.L.C. | Registered | 13 Nat. | Ammunition - namely, metallic cartridges, empty metallic cartridges and blank cartridges | 15425 | 9/1/1991 | TMDA30621 | 9/1/1991 | 9/1/2031 |
| 166. | United States of America | R-P (Stylized and Design) | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition - namely, metallic cartridges, empty metallic cartridges and blank cartridges | 73/036,832 | 11/11/1974 | 1,032,208 | 2/3/1996 | 2/3/2026 |

12

EXECUTION VERSION

| No. | Country | Trademark | Record Owner | Status | Class | Goods | Appln. No. | Filing date | Reg. No. | Reg. Date | Renewal Due |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 167 | Canada | SHUR SHOT | RA Brands, L.L.C. | Registered | 13 Nat. | Ammunition particularly fixed ammunition for small arms and components thereof | 647,557 | 12/23/1989 | TMA386,597 | 7/12/1991 | 7/12/2021 |
| 168 | France | SHUR SHOT | RA Brands, L.L.C. | Registered | 13 Nat. | Firearms, ammunition and projectiles, explosive substances, fireworks | 91,473,987 | 6/13/1991 | 1,473,987 | 6/13/1991 | 6/13/2021 |
| 169 | United States of America | SHUR SHOT | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition-particularly fixed ammunition for small arms and components thereof | 71/534,053 | 9/10/1947 | 514,027 | 8/23/1949 | 8/23/2029 |
| 170 | United States of America | SLUGGER | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 73/375,132 | 7/19/1982 | 1,290,918 | 8/21/1984 | 8/21/2034 |
| 171 | United States of America | SPORTSMAN | RA Brands, L.L.C. | Registered | 20 Int. | Ammunition | 77/105,990 | 6/1/2007 | 3,365,500 | 1/8/2008 | 1/8/2028 |
| 172 | United States of America | STS | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 75/086,416 | 4/10/1996 | 2,047,639 | 3/25/1997 | 3/25/2027 |
| 173 | European Union (Community) | SUPER CELL | RA Brands, L.L.C. | Registered | 13 Int. | Firearms, ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; medium caliber ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shields adapted for firearms; scopes for cleaning firearms; breeches of firearms; covers for firearms; barrel reflectors for firearms; firearm sights; fore sights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms; recoil pads; cases and fittings for firearms | 011787991 | 5/2/2013 | 011787991 | 5/2/2013 | 5/2/2023 |
| 174 | European Union (Community) | SUPER SLUG (Stylized) | RA Brands, L.L.C. | Registered | 02 Int., 04 Int., 13 Int. | Paints, varnishes, lacquers; preservatives against rust and against deterioration of wood; colorants; mordants; raw natural resins; metals in foil and powder form for painters, decorators, printers and artists; coatings; preservatives; protective coating in the nature of a polymer sealant used to improve resistance to wear and marring for exterior use on firearms; Lubricants, gun lubricants and lubricants for bullets; gas for firearms; Firearms, ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; medium caliber ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shields adapted for firearms; scopes for cleaning firearms; breeches of firearms; covers for firearms; barrel reflectors for firearms; firearm sights; fore sights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms | 8347239 | 6/8/2009 | 8347239 | 12/24/2009 | 6/8/2029 |
| 175 | United States of America | TAC 8 | RA Brands, L.L.C. | Registered | 13 Int. | Shotgun ammunition, buckshot ammunition, loaded ammunition | 78/170,963 | 10/4/2002 | 2,843,948 | 5/18/2004 | 5/18/2024 |
| 176 | United States of America | THUNDERBOLT | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 73/156,359 | 1/24/1978 | 1,133,079 | 4/15/1980 | 4/15/2030 |
| 177 | United States of America | TYRANT | RA Brands, L.L.C. | Registered | 13 Int. | Air gun, namely, BB guns and pellet guns and ammunition therefor | 86/294,414 | 5/29/2014 | 4,783,164 | 7/28/2015 | 7/28/2025 |
| 178 | United States of America | U.M.C. | RA Brands, L.L.C. | Registered | 13 Int. | Gun and pistol cartridges | 71/010,814 | 7/26/1905 | 49,616 | 2/13/1906 | 2/13/2026 |
| 179 | Canada | ULTRA BONDED | RA Brands, L.L.C. | Registered | 13 Int. | Small arms ammunition | 1,291,679 | 2/14/2006 | TMA710,506 | 4/1/2008 | 4/1/2023 |
| 180 | United States of America | ULTRA BONDED | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 78/717,164 | 9/21/2005 | 3,188,363 | 12/19/2006 | 12/19/2026 |
| 181 | European Union (Community) | ULTRA MAG | RA Brands, L.L.C. | Registered | 02 Int., 13 Int. | Paints, varnishes, lacquers; preservatives against rust and against deterioration of wood; colorants; mordants; raw natural resins; metals in foil and powder form for painters, decorators, printers and artists; coatings; preservatives; protective coating for use in connection with firearms; Firearms; ammunition; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shields adapted for firearms; scopes for cleaning firearms; breeches of firearms; covers for firearms; firearm sights; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms | 7415466 | 11/24/2008 | 7415466 | 11/10/2009 | 11/24/2028 |
| 182 | United States of America | ULTRA MAG | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 77/339,780 | 11/29/2007 | 3,927,230 | 3/8/2011 | 3/8/2031 |
| 183 | United States of America | UMC | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 74/543,592 | 6/29/1994 | 1,907,281 | 7/25/1995 | 7/25/2025 |
| 184 | United States of America | UML | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition; muzzleloader ammunition | 86/296,388 | 5/30/2014 | 5,256,597 | 8/1/2017 | 8/1/2027 |

13

EXECUTION VERSION

| No. | Country | Trademark | Record Owner | Status | Class | Goods | Appln. No. | Filing date | Reg. No. | Reg. Date | Renewal Due |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 185. | European Union (Community) | VERSAMAX | RA Brands, L.L.C. | Registered | 2 Int., 4 Int., 13 Int. | Paints, varnishes, lacquers; preservatives against rust and against deterioration of wood; colorants; mordants; raw natural resins; metals in foil and powder form for painters, decorators, printers and artists; coatings; preservatives; protective coating in the nature of a polymer sealant used to improve resistance to wear and marring for exterior use on firearms; Lubricants, gun lubricants and lubricants for bullets; gas for firearms; Firearms; ammunition; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; medium caliber ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; scrapers for cleaning firearms; firearms; protective shields adapted for firearms; scrapers for cleaning firearms; breeches of firearms; covers for firearms; barrel reflectors for firearms; firearm sights; sighting telescopes for firearms; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms | 008615411 | 10/14/2009 | 008615411 | 10/14/2009 | 10/14/2029 |
| 186. | European Union (Community) | VERSASPORT | RA Brands, L.L.C. | Registered | 2 Int., 4 Int., 13 Int. | Paints, varnishes, lacquers; preservatives against rust and against deterioration of wood; colorants; mordants; raw natural resins; metals in foil and powder form for painters, decorators, printers and artists; coatings; preservatives; protective coating in the nature of a polymer sealant used to improve resistance to wear and marring for exterior use on firearms; Lubricants, gun lubricants and lubricants for bullets; gas for firearms; Ammunition; firearms; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; medium caliber ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; scrapers for cleaning firearms; firearms; protective shields adapted for firearms; scrapers for cleaning firearms; breeches of firearms; covers for firearms; barrel reflectors for firearms; firearm sights; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms; component of firearms, namely, a gas operating system; parts and fittings for firearms | 009344906 | 8/31/2010 | 009344906 | 2/10/2011 | 8/31/2020 |
| 187. | European Union (Community) | VETERAN | Remington Arms Company, LLC | Registered | 13 Int. | Firearms; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; large caliber ammunition; medium caliber ammunition; small caliber ammunition; pellets; bullets; rockets; shells (projectiles); fuses for explosives; cartridges for firearms; bags for carrying firearms; scrapers for cleaning firearms; protective shields adapted for firearms; protective shields adapted for firearms; covers for firearms; breeches of firearms; firearm sights; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms; accessories for firearms, namely grips for pistols; parts and | 11606399 | 2/26/2013 | 11606399 | 2/26/2013 | 2/26/2023 |
| 188. | United States of America | VIPER | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition, namely, metallic cartridges | 74/237,737 | 1/15/1992 | 1,786,679 | 8/10/1993 | 8/10/2023 |
| 189. | Canada | WHITETAIL PRO | RA Brands, L.L.C. | Registered | 13 Int. | Small arms ammunition | 1,330,600 | 1/2/2007 | TMA747,700 | 9/15/2009 | 9/15/2024 |
| 190. | United States of America | WHITETAIL PRO | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 78/804,916 | 2/1/2006 | 3,390,008 | 2/26/2008 | 2/26/2028 |
| 191. | European Union (Community) | WINGMASTER | RA Brands, L.L.C. | Registered | 08 Int., 13 Int. | Hand tools and implements (hand-operated); cutlery; side arms; razors; knives; bayonets; utility knife sheaths; knife sharpeners; cutlery, namely, hunting knives and pocket knives; multi-function hand tool for hunters comprised of knives and one or more of shears, gut hooks, saws, wrenches, screwdrivers, rulers, and lights; Firearms; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; medium caliber ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; scrapers for cleaning firearms; protective shields adapted for firearms; scrapers for cleaning firearms; breeches of firearms; covers for firearms; barrel reflectors for firearms; firearm sights; sighting telescopes for firearms; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms | 8134413 | 3/3/2009 | 8134413 | 3/16/2010 | 3/3/2029 |

14

EXECUTION VERSION

| No. | Country | Trademark | Record Owner | Status | Class | Goods | Appln. No. | Filing date | Reg. No. | Reg. Date | Renewal Due |
|-----|---------|-----------|--------------|--------|-------|-------|------------|-------------|----------|-----------|-------------|
| 192. | Canada | XILERATOR | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 1,488,472 | 7/22/2010 | TMA918,366 | 8/29/2012 | 8/29/2027 |
| 193. | European Union (Community) | XILERATOR | RA Brands, L.L.C. | Registered | 02 Int., 04 Int., 13 Int. | Paints, varnishes, lacquers; preservatives against rust and against deterioration of wood; colorants; mordants; raw natural resins; metals in foil and powder for painters, decorators, printers and artists; coatings; coatings; preservatives; protective coating in the nature of a polymer sealant used to improve resistance to wear and marring for exterior use on firearms. Lubricants; gun lubricants and lubricants for bullets; gas for firearms; Ammunition; firearms; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; medium caliber ammunition; pellets; bullets; rockets; shells; fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shields adapted for firearms; scrapers for cleaning firearms; breeches of firearms; covers for firearms; barrel reflectors for firearms; firearm sights; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms; parts and fittings for firearms | 9222589 | 7/5/2010 | 9222589 | 11/25/2010 | 7/5/2030 |
| 194. | United States of America | YELLOW JACKET | RA Brands, L.L.C. | Registered | 13 Int. | Ammunition | 73/214,488 | 5/7/1979 | 1,177,128 | 11/10/1981 | 11/10/2021 |

15

## Patents and Patent Applications

**UNITED STATES PATENTS:**

| No. | Title | Patent Number | Issue Date | Application Number | Application Date |
|---|---|---|---|---|---|
| 1. | Firearm bullet | USD802705S1 | 2017-11-14 | 29/528,380 | 2015-05-28 |
| 2. | Firearm bullet | USD800246S1 | 2017-10-17 | 29/528,430 | 2015-05-28 |
| 3. | Firearm bullet | USD800245S1 | 2017-10-17 | 29/527,745 | 2015-05-21 |
| 4. | Firearm bullet | USD800244S1 | 2017-10-17 | 29/527,732 | 2015-05-21 |
| 5. | Firearm bullet | USD791266S1 | 2017-07-04 | 29/528,438 | 2015-05-28 |
| 6. | Firearm bullet and portions of a firearm cartridge | USD791265S1 | 2017-07-04 | 29/528,405 | 2015-05-28 |
| 7. | Firearm bullet and portions of a firearm cartridge | USD791264S1 | 2017-07-04 | 29/527,735 | 2015-05-21 |

16

EXECUTION VERSION

| No. | Title | Patent Number | Issue Date | Application Number | Application Date |
|-----|-------|---------------|------------|--------------------|------------------|
| 8. | Firearm bullet | USD735289S1 | 2015-07-28 | 29/462,556 | 2013-08-06 |
| 9. | Firearm bullet | USD734419S1 | 2015-07-14 | 29/462,561 | 2013-08-06 |
| 10. | Firearm bullet | USD733835S1 | 2015-07-07 | 29/462,558 | 2013-08-06 |
| 11. | Firearm bullet | USD733834S1 | 2015-07-07 | 29/462,552 | 2013-08-06 |
| 12. | Firearm bullet | USD733837S1 | 2015-07-07 | 29/462,563 | 2013-08-06 |
| 13. | Firearm bullet | USD733836S1 | 2015-07-07 | 29/462,559 | 2013-08-06 |
| 14. | Firearm bullet and portion of firearm cartridge | USD733252S1 | 2015-06-30 | 29/462,555 | 2013-08-06 |
| 15. | Shot cup wad | US9778002B2 | 2017-10-03 | 14/570,369 | 2014-12-15 |

17

| No. | Title | Patent Number | Issue Date | Application Number | Application Date |
|---|---|---|---|---|---|
| 16. | Projectile and mold to cast projectile | US9534876B2 | 2017-01-03 | 14/289,354 | 2014-05-28 |
| 17. | Multiple projectile fixed cartridge | US9506731B2 | 2016-11-29 | 13/815,670 | 2013-03-14 |
| 18. | Wad with ignition chamber | US9500453B2 | 2016-11-22 | 14/455,673 | 2014-08-08 |
| 19. | Wad with ignition chamber | US8800449B2 | 2014-08-12 | 13/548,464 | 2012-07-13 |
| 20. | Wad with ignition chamber | US8220393B2 | 2012-07-17 | 12/606,447 | 2009-10-27 |
| 21. | Reduced friction expanding bullet with improved core retention feature and method of manufacturing the bullet | US9188414B2 | 2015-11-17 | 13/768,424 | 2013-02-15 |
| 22. | Tipped projectiles | US9052174B2 | 2015-06-09 | 12/199,306 | 2008-08-27 |
| 23. | Priming mixtures for small arms | US8784583B2 | 2014-07-22 | 10/764,246 | 2004-01-23 |

18

EXECUTION VERSION

| No. | Title | Patent Number | Issue Date | Application Number | Application Date |
|-----|-------|---------------|------------|--------------------|------------------|
| 24. | Bismuth oxide primer composition | US8128766B2 | 2012-03-06 | 11/087,274 | 2005-03-23 |
| 25. | Lead attached sabot slug | US8261667B2 | 2012-09-11 | 11/669,595 | 2007-01-31 |
| 26. | Electric Primer | 6,131,515 | 2000-10-17 | 08/988,898 | 1997-12-11 |
| 27. | Non-Toxic Primer Mix | 6,478,903 | 2002-11-12 | 09/680,803 | 2000-10-06 |
| 28. | Conductive Primer Mix (Ra-0272) | 5,646,367 | 1997-07-08 | 08/609,294 | 1996-03-01 |
| 29. | Solid Copper Hollow Point Bullet | 5,811,723 | 1998-09-22 | 08/869,690 | 1997-06-05 |
| 30. | Lead-Free Primer Mix | 5,684,268 | 1997-11-04 | 08/536,614 | |
| 31. | Frangible Powdered Iron Projectiles | 5,917,143 | | | |

19

| No. | Title | Patent Number | Issue Date | Application Number | Application Date |
|-----|-------|---------------|------------|--------------------|------------------|
| 32. | Frangible Powdered Iron Projectiles | 6,691,623 | | | |
| 33. | Sabot | 6,073,560 | | | |
| 34. | Lead Attached Sabot Slug | 7,201,104 | | | |
| 35. | Electric Primer (Ra-0290a) | 6,272,993 | | | |
| 36. | Electric Primer | 6,487,972 | | | |
| 37. | Lead Free Powdered Metal Projectiles | 6,892,647 | | | |
| 38. | Bismuth-Oxide Primer Composition | 8,597,455 | | | |
| 39. | Bismuth Oxide Primer Composition | 8,597,445 | | | |

**Domain Name Registrations**

None

EXECUTION VERSION

### Schedule 1.2(r)
### Excluded Assets

1. Any and all of Seller's Contracts, locations and premises that Seller uses exclusively in its operations that are not included in the Business, including but not limited to any and all assets Seller uses exclusively in its Firearms Business (as defined in the IP Back-License).

2. That certain Professional Employer Agreement by and between A Plus Benefits, Inc. and BB Acquisitions Holding, LLC dated as of January 1, 2010, providing for health insurance, voluntary dental insurance, group term life insurance, voluntary life insurance, long-term disability coverage, short-term disability coverage, supplemental medical coverage, flexible spending account plan, retirement plan, flexible spending account for dependent care, and health savings account, as restated in part by that certain Multiple Employer Participation Agreement, dated as of May 5, 2016.

3. Helpside Cafeteria Plan

4. Remington Arms Company, LLC Pension and Retirement Plan

5. Remington Arms Company 401(k) Plan

6. Remington Savings and Investment Plan

7. Remington Supplemental Retirement Plan

8. Remington Outdoor Company, Inc. 2018 Equity Incentive Plan

9. Remington Arms Company, LLC Welfare Plan

10. Remington Arms Company, LLC Consumer Driven Health Plan

11. Remington Arms Company, LLC Medical Preferred Provider Plan

12. Remington Arms Company, LLC Union Medical PPO Plans – Options A, B and C

13. Remington Retiree Health and Welfare Plan

14. Any and all other pension, retirement, health, or welfare plans related to the Business

15. All Contracts that are not (i) Assumed Contracts, (ii) licenses within the scope of Acquired Intellectual Property, (iii) Purchase Orders, (iv) Customer Orders, or (v) any rights to any warranties and licenses received from manufacturers, sellers or lessors, as applicable, in connection with the Acquired Assets.

**EXECUTION VERSION**

## Schedule 1.3(h)
## Assumed Liabilities

1.  None.

**EXECUTION VERSION**

### Schedule 1.4(o)
### Excluded Liabilities

1.  None.

EXECUTION VERSION

### Schedule 1.5(a)
### Estimated Cure Amount

| # | Category | Relates Primarily to | Location / Function | Contract Counter Party | Services Provided | Type | Inception Date | Expiration Date | Cure Costs [1] |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Ammunition | Lonoke | Federal | DHS-FLETC | Federal Contract | Contract | 04/27/17 | 05/27/22 | N/A |
| 2 | Ammunition | Lonoke | Federal | DHS-FLETC | Federal Contract | Contract | 10/07/19 | 09/30/24 | N/A |
| 3 | Ammunition | Lonoke | Federal | FRS | Federal Contract | Contract | 10/07/04 | 01/31/21 | N/A |
| 4 | Ammunition | Lonoke | Lonoke | National Machinery, LLC | Tooling and Technology | Contract | 11/20/15 | 05/18/34 | 92,605 |

**Notes:**

(1) Amounts represent what has been recorded in the accounts payable ledger as of the petition date, noting that "N/A" means the Cure Cost is $0. These figures do not include (i) future commitments under the contracts, (ii) amounts due under development agreements, (iii) future commitments under any purchase orders and (iv) goods received and not invoiced. The Debtors are continuing to review and reconcile pre-petition liabilities and cure costs; all amounts are subject material change.

25

EXECUTION VERSION

## Schedule 4.1(g)
## Compliance with Law

1.  The Arkansas Department of Environmental Quality Consent Administrative Order No. LIS-15-051 (2015) (which, by its terms, incorporates by reference the Amended Consent Administrative Order 07-078-001 (2012), the Second Amended Consent Administrative Order 07-078-002 (2012), and the Third Amendment to Consent Administrative Order 07-078-003 (2013)), issued to Remington Arms Company, LLC, as further amended by Consent Administrative Order 15-051-001 (2017) and Consent Administrative Order 15-051-002 (2018).

2.  Administrative Settlement, Agreement and Order on Consent for Remedial Investigation/Feasibility Study in the matter of Chemetco, Inc. Superfund Site, Hartford, Illinois, CERCLA Docket V-W-15-C-019 (2015).

3.  Notice of Violation issued by the Arkansas Department of Environmental Quality on December 13, 2019, with regard to permitted effluent limitation violations.

4.  Citation and Notification of Penalty regarding inspection number 1286782 issued by the U.S. Department of Labor, Occupational Safety and Health Administration, dated July 2, 2018 (Lonoke, AR).

5.  Citation and Notification of Penalty regarding inspection number 1206048 issued by the U.S. Department of Labor, Occupational Safety and Health Administration, dated June 6, 2017 (Lonoke, AR).

EXECUTION VERSION

### Schedule 4.1(h)
### Contracts and Lease Defaults

1.  None.

27

EXECUTION VERSION

## Schedule 4.1(i)
## Material Permits

a. Environmental

| Site | Type of Permit | Permit/ID # | Regulator (Agency) | Name of Permittee |
|---|---|---|---|---|
| Lonoke, AR | Above Ground Storage Tank (AST)(2-tanks) | 43001626 | Arkansas Department of Environmental Quality | Remington Arms Co, LLC |
| Lonoke, AR | Air Permit | 1272-AR-13 | Arkansas Department of Environmental Quality | Remington Arms Company, LLC |
| Lonoke, AR | Non-contact cooling water, cooling tower blowdown, and boiler blowdown general permit | ARG250000 (Permit Tracking Numbers: ARG250014 and ARG250017) | Arkansas Department of Environmental Quality | Remington Arms Company, LLC |
| Lonoke, AR | Hazardous Waste EPA ID | AR000064311 | Arkansas Department of Environmental Quality | Remington Arms Co, LLC |
| Lonoke, AR | National Pollutant Discharge Elimination System (NPDES) wastewater discharge permit | AR0001163 (renewal pending) | Arkansas Department of Environmental Quality | Remington Arms Company, LLC |
| Lonoke, AR | Industrial Stormwater General Permit | ARR000000 (Permit Tracking Number: ARR00A251) | Arkansas Department of Environmental Quality | Remington Arms Company, LLC |

b. Special Tax Stamps and Federal Firearms Licenses

| Site | Type of License/Permit | License/Permit # | Regulator (Agency) | Name of Permittee(s) |
|---|---|---|---|---|
| Ilion, NY | 2021 Special Tax Stamp | | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Lonoke, AR | 2021 Special Tax Stamp | | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| | 2021 Special Tax Stamp | | U.S. Dept. of Justice, Bureau of | |

28

EXECUTION VERSION

| Site | Type of License/Permit | License/Permit # | Regulator (Agency) | Name of Permittee(s) |
|---|---|---|---|---|
| Huntsville, AL | | | Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Sturgis, SD | 2021 Special Tax Stamp | | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Lonoke, AR | Federal Firearms License | 5-71-085-01-1M-00856 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company |
| Lonoke, AR | Federal Firearms License | 5-71-085-06-1M-00857 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company |
| Lonoke, AR | Federal Firearms License | 5-71-085-08-1M-00861 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company |
| Lenoir City, TN | Federal Firearms License | 1-62-105-07-0A-07514 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Stormlake/Remington Arms |
| Lonoke, AR | Federal Firearms License | 5-71-085-01-1M-00846 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company |
| Lonoke, AR | Federal Firearms License | 5-AR-085-23-2E-00720 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Co LLC |
| Lonoke, AR | Federal Firearms License | 5-AR-085-20-2D-00404 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Co LLC |

c. Import/Export

| Business Area | Type of License/Permit | License/Permit # | Regulator (Agency) | Name of Permittee(s) |
|---|---|---|---|---|
| Ammunition and Firearms | ITAR Registration | M23608 | U.S. Dept. of State, Office of Defense Trade Controls Compliance | Remington Arms Company, LLC |

29

**EXECUTION VERSION**

| | | | | |
|---|---|---|---|---|
| Ammunition and Firearms | Export License<br><br>(Borchers, S.A. Warehouse Distribution Agreement) | 050553995 (DA-0520-15) | U.S. Dept. of State | Remington Outdoor Company, Inc.<br><br>Remington Arms Company, LLC |
| Ammunition and Firearms | Export License<br><br>(Helmut Hofmann GMBH Warehouse Distribution Agreement) | 050672664 (DA-1349-18) | U.S. Dept. of State | Remington Arms Company, LLC |
| Ammunition and Firearms | Export License<br><br>(Jaguar Gruppen A/S Warehouse Distribution Agreement) | 050614380 (DA-2227-16) | U.S. Dept. of State | Remington Outdoor Company, Inc.<br><br>Remington Arms Company, LLC |
| Ammunition and Firearms | Export License<br><br>(Midarms, SPRL Warehouse Distribution Agreement) | 050583291 (DA-0001-16) | U.S. Dept. of State | Remington Outdoor Company, Inc.<br><br>Remington Arms Company, LLC |
| Ammunition and Firearms | Export License<br><br>(Norma Precision AB Warehouse Distribution Agreement) | 050698288 (DA-0788-19) | U.S. Dept. of State | Remington Arms Company, LLC |
| Ammunition and Firearms | Export License<br><br>(Raytrade Pty Ltd. Warehouse Distribution Agreement) | 050569321 (DA-1597-15) | U.S. Dept. of State | Remington Outdoor Company, Inc.<br><br>Remington Arms Company, LLC |
| | | 050672127 (DA-1340-18) | U.S. Dept. of State | Remington Arms Company, |

30

EXECUTION VERSION

| Business Area | Type of License/Permit | License/Permit # | Regulator (Agency) | Name of Permittee(s) |
|---|---|---|---|---|
| Ammunition and Firearms | Export License (Raytrade UK Limited Warehouse Distribution Agreement) | | | LLC |
| Ammunition and Firearms | Export License (Sako Ltd. Warehouse Distribution Agreement) | 050515421 (DA-1428-14) | U.S. Dept. of State | Remington Outdoor Company, Inc. Barnes Bullets, LLC |
| Ammunition and Firearms | Export License (Skenco Europe, Kft. Warehouse Distribution Agreement) | 050627594 (DA-0635-17) | U.S. Dept. of State | Remington Outdoor Company, Inc. Remington Arms Company, LLC |
| Ammunition | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202002215 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Ammunition | Annual Import Permit | PA001945/A | Natural Resources, Canada | Remington Arms Company, LLC |

d. Transportation

| **Business Area** | **Type of License/Permit** | **License/Permit #** | **Regulator (Agency)** | **Name of Permittee(s)** |
|---|---|---|---|---|
| Ammunition | Hazardous Materials Registration Number | M4180 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, LLC |

31

EXECUTION VERSION

| Ammunition | Classification of Explosives | EX2006090046 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, Inc. |
|---|---|---|---|---|
| Ammunition | Classification of Explosives | EX2007040032 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, Inc. |
| Ammunition | Classification of Explosives | EX1995030142B | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, LLC |
| Ammunition | Classification of Explosives | EX1995030142C | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, LLC |
| Ammunition | Classification of Explosives | EX2014020364 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, Inc. |
| Ammunition | Classification of Explosives | EX2014020395 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, Inc. |
| Ammunition | Classification of Explosives | EX2014030068 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, Inc. |
| Ammunition | Classification of Explosives | EX2014020383 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, Inc. |
| Ammunition | Classification of Explosives | EX2014030068 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, Inc. |
| Ammunition | Classification of Explosives | EX2017040261 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arm Company, LLC |

32

EXECUTION VERSION

| Ammunition | Classification of Explosives | EX2006080485 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, Inc. |
|---|---|---|---|---|
| Ammunition | Classification of Explosives | EX1994060261 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, Inc. |
| Ammunition | Classification of Explosives | EX1996010062 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, Inc. |
| Ammunition | Classification of Explosives | EX1996040083 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, Inc. |
| Ammunition | Classification of Explosives | EX1996110002 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, Inc. |
| Ammunition | Classification of Explosives | EX2000030054 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, Inc. |
| Ammunition | Application for Modification of Registration Number | M4180 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company |
| Ammunition | Hazardous Materials Registration | M5153 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Borden & Remington Corporation |
| Ammunition | Classification of Explosives | EX1986030168 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX1986030168A | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |

33

EXECUTION VERSION

| Ammunition | Classification of Explosives | EX19860301168AA | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX19860301168AB | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX19860301168AC | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX19860301168AD | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX19860301168AE | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX19860301168AF | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX19860301168AG | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX19860301168AH | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX19860301168AI | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX19860301168AJ | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |

34

EXECUTION VERSION

| Ammunition | Classification of Explosives | EX19860030168AK | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
|---|---|---|---|---|
| Ammunition | Classification of Explosives | EX19860030168AL | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX19860030168AM | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX19860030168AN | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX19860030168AO | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX19860030168AP | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX19860030168AQ | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX19860030168AR | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX19860030168AS | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
| Ammunition | Classification of Explosives | EX19860030168AT | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |

35

EXECUTION VERSION

| Ammunition | Classification of Explosives | EX19860301168AU | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | RACI Acquisition Corp (renamed Remington Arms) |
|---|---|---|---|---|
| Ammunition | Application for party status | DOT-SP 20973 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company |
| Ammunition | Hazardous Materials Certificate of Registration | 082420550003AC | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Co LLC |
| Ammunition | Special Permit | DOT-SP 8451 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, LLC |
| Ammunition | Special Permit | DT-SP 14249 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Remington Arms Company, Inc. |
| Ammunition | Authorization under the Explosives Act | XP2050-M048-200316009 | Natural Resources, Canada | Marlin Firearms |
| Ammunition | Authorization under the Explosives Act | XP2050-M048-200316002 | Natural Resources, Canada | Marlin Firearms |
| Ammunition | Authorization under the Explosives Act | XP2050-M048-200316004 | Natural Resources, Canada | Marlin Firearms |
| Ammunition | Authorization under the Explosives Act | XP2050-M048-200316001 | Natural Resources, Canada | Marlin Firearms |
| Ammunition | Authorization under the Explosives Act | XP2050-M048-200316003 | Natural Resources, Canada | Marlin Firearms |

36

EXECUTION VERSION

### Schedule 11.5
### Brokers and Finders

1.  Ducera Partners.

37

EXECUTION VERSION

**Schedule 12.1(a)**
**Business Name**



REM
REM ALL IN
REM DRI
REMINGTON



REMINGTON COUNTRY
REMINGTON COUNTRY (design)
REMINGTON HTP HIGH TERMINAL PERFORMANCE
REMINGTON UMC
REMINGTON HYPERSONIC



R-P

RP

*Remington*

and all stylizations, variations, derivatives, abbreviations, transliterations, translations, registrations and applications for the above-listed trademarks, including but not limited to those set forth on Schedule 1.1(i).

38

EXECUTION VERSION

**Schedule 12.1(b)**
**Brand Names**

**ACCUTIP**

**ARMORLOKT**

**BLACK BELT**

**BUCKHAMMER**

**BULLET**



[the outline of a bullet]
[the color green as applied to top half of packaging of ammunition]

[the color dark green as applied to entire casing of shotshells]

**CBEE22**

**COPPER SOLID**

**COPPER-LOKT**

**CORE-LOKT**

**CYCLONE**

**DISINTEGRATOR**

**DROP-DEAD BETTER**

**DUPLEX**

**ETRONX**

**EXPRESS GOLDEN**

**GOLDEN SABER**

**GUN CLUB**

**HI-SPEED**

**HOG HAMMER**

**HYPERSONIC**

**HYPERSONIC STEEL**

**KLEANBORE**

**MANAGED-RECOIL**

**MATCH**

**NITRO**

**NITRO 27**

**NITRO MAG**

**NITRO PHEASANT**

**NITRO-STEEL**

**NITRO TURKEY**

**PERFORMANCE WHEELGUN**

**PETERS**

PETERS

**POWER LEVEL**

**POWER PISTON**

**PREMIER**

**PREMIER CORE-LOKT ULTRA BONDED**

**SCIROCCO**

**SHUR SHOT**

**SLUGGER**

**SPORTSMAN STS**

**SUPER SLUG**

40

EXECUTION VERSION



**TAC 8**

**THUNDERBOLT**

**U.M.C.**

**ULTRA BONDED**

**ULTRA MAG**

**UMC**

**UML**

**VARMINT GRENADE**

**VETERAN**

**VIPER**

**WHITETAIL PRO**

**WINGMASTER**

**XELERATOR**

**YELLOW JACKET**

and all stylizations, variations, derivatives, abbreviations, transliterations, translations, registrations and applications for the above-listed trademarks, including but not limited to those set forth on Schedule 1.1(i).

## EXHIBIT 1

(*See* attached Bidding Procedures Order)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| In re:<br><br>REMINGTON OUTDOOR COMPANY,<br>INC., *et al.*, [1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-81688-11<br><br>Joint Administration Requested |

ORDER ESTABLISHING BIDDING PROCEDURES RELATING
TO THE SALES OF ALL OR A PORTION OF THE DEBTORS' ASSETS

This matter having come before the Court upon the motion (the "**Motion**")[2] by Remington

Outdoor Company, Inc., ("**Remington**" or the "**Company**"), and its affiliated debtors and debtors

in possession (collectively the "**Debtors**") in the above-captioned Chapter 11 cases (collectively,

the "**Chapter 11 Cases**"), seeking entry of this order (this "**Bidding Procedures Order**") (i)

approving the proposed bidding procedures attached hereto as <u>Exhibit 1</u> (the "**Bidding**

**Procedures**") by which the Debtors will solicit and select the highest or otherwise best offer for

the sale of substantially all or a portion of their assets (the "**Acquired Assets**") through one or

more sales of the Acquired Assets (each, a "**Sale Transaction**" or "**Sale**"); (ii) establishing

procedures for the assumption and assignment of executory contracts and unexpired leases,

including notice of proposed cure amounts (the "**Assumption and Assignment Procedures**");

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC 9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405).  The Debtors' corporate headquarters is located at 100 Electronics Blvd SW, Huntsville, Alabama  35824.

[2]  Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion or the Bidding Procedures, as applicable.

(iii) approving the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described herein and attached hereto, including the procedures for the Debtors' selection of one or more stalking horse bidders (each, a "**Stalking Horse Bidder**"), if any, and the provision of Bid Protections (as defined below) to such Stalking Horse Bidder, if necessary; (iv) scheduling (a) an auction (the "**Auction**") if the Debtors receive two (2) or more timely and acceptable Qualified Bids (as defined below), and (b) a final hearing (the "**Sale Hearing**") to approve one or more Sales of the Acquired Assets; and (v) granting related relief; and it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors, and other parties-in-interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that the Motion is a core proceeding pursuant to 28 U.S.C. § 157; and adequate notice of the Motion and opportunity for objection having been given, with no objections having been filed, or all objections having been resolved or overruled, as the case may be; and it appearing that no other notice need be given; and after due deliberation and sufficient cause therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *General Order of Reference* of the United States District Court for the Northern District of Alabama dated July 16, 1984, as amended on July 17, 1984. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The predicates for the relief granted herein are Sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006. Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    The legal and factual bases set forth in the Motion establish just cause for the relief granted herein. Entry of this Bidding Procedures Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties in interest.

2

C.      The notice of the Motion, the Bidding Procedures Hearing, and the proposed entry of this Bidding Procedures Order was adequate and sufficient under the circumstances of the Chapter 11 Cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  Accordingly, no further notice of the Motion, the Bidding Procedures Hearing, or this Bidding Procedures Order is necessary or required.

D.      The Debtors have demonstrated a compelling and sound business justification for the Court to grant the relief requested in the Motion, including, without limitation, to (i) approve the Bidding Procedures, including the procedures for selecting one or more Stalking Horse Bidders and the provision of the Bid Protections to be determined, (ii) establish the Assumption and Assignment Procedures, (iii) approve the form and manner of notice of all procedures, protections, schedules, and agreements described in the Motion and attached hereto, (iv) schedule a date for the (a) Auction and (b) Sale Hearing; and (v) grant related relief as set forth herein.  Such compelling and sound business justification, which was set forth in the Motion and on the record at the Bidding Procedures Hearing, including the *Declaration of Bradley C. Meyer in Support of Debtors' Cash Collateral Motion and Bidding Procedures Motion* (the "**Meyer Declaration**") and the *Declaration of Colin M. Adams in Support of Debtors' Cash Collateral Motion and Bidding Procedures Motion* (the "**Adams Declaration**") are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

E.      The Bidding Procedures, substantially in the form attached hereto as Exhibit 1 and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are fair, reasonable and appropriate and represent the best method for maximizing the value of the Debtors' estates.

3

OMM_US:78645958.8

F.      The Debtors are authorized to pay the break-up fee and expense reimbursement comprising the Bid Protections.  The Bid Protections, to the extent payable under any Stalking Horse APA, (a)(x) are actual and necessary costs and expenses of preserving the Debtors' estate within the meaning of Section 503(b) of the Bankruptcy Code, and (y) shall be treated as allowed administrative claims against the Debtors' estates pursuant to Sections 105(a) and 364(c)(1) of the Bankruptcy Code, are commensurate to the real and material benefits conferred upon the Debtors' estates by the Stalking Horse Bidders, and (c) are fair, reasonable and appropriate, including in light of the size and nature of the Sale Transaction, the necessity to announce a sale transaction for the Acquired Assets, and the efforts that have been and will be expended by the Stalking Horse Bidders.  The Bid Protections are a material inducement for, and condition of, each Stalking Horse Bidder's execution of the applicable Stalking Horse APA.  Unless it is assured that the Bid Protections will be available, the Stalking Horse Bidders are unwilling to remain obligated to consummate the Sale Transaction or otherwise be bound under its Stalking Horse APA (including the obligations to maintain its committed offer while such offer is subject to higher or better offers as contemplated by the Bidding Procedures).

G.      The Sale Notice and the Publication Notice, substantially in the forms attached hereto as Exhibit 2 and Exhibit 3, respectively, and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of Acquired Assets, including the sale of Acquired Assets free and clear of all liens, claims, and encumbrances, the Sale Transaction(s), the Bidding Procedures, the Auction and the Sale Hearing, and no other or further notice is required.

4

OMM_US:78645958.8

H.      The Post-Auction Notice, substantially in the form attached hereto as <u>Exhibit 4</u> and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Successful Bidder(s), and no other or further notice is required.

I.      The Assumption and Assignment Notice, substantially in the form attached hereto as <u>Exhibit 5</u> and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the potential assumption and assignment of the Designated Contracts in connection with the sale of the Acquired Assets and the related Cure Costs, and no other or further notice is required.

J.      The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is granted as set forth herein.[3]

2.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the Bidding Procedures Hearing or by stipulation filed with the Court are overruled except as otherwise set forth herein.

---

[3] Notwithstanding anything to the contrary herein, the consummation of any Sale Transaction(s) is subject to entry of the Sale Order(s).

OMM_US:78645958.8

## I.    The Timeline for the Sale

3.    The Debtors are authorized to proceed with the Sale Transaction(s) in accordance with the Bidding Procedures and are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance with the following timeline:

4.    Deadline                              **Action**

| Deadline | Action |
|---|---|
| August 18, 2020 at 10:00 a.m. (prevailing Central Time) | Hearing to consider approval of the Bidding Procedures and entry of the Bidding Procedures Order |
| August 21, 2020 | Sale Notice Mailing Date |
| August 21, 2020 | Assumption and Assignment Service Date |
| September 1, 2020 at 4:00 p.m. (prevailing Central Time) | Sale Objection Deadline (defined below) excluding any objection based on identity of Stalking Horse Bidders, Successful Bidder or Backup Bidder or the form or substance of the Stalking Horse Bid, Successful Bid or Backup Bid |
| September 4, 2020 at 5:00 p.m. (prevailing Central Time) | Bid Deadline |
| September 8, 2020 at 12:00 p.m. (prevailing Central Time) | Reply Deadline (defined below) |
| September 8, 2020 by 4:00 p.m. (prevailing Central Time) or 14 days following service of the Supplemental Notice of Assumption and Assignment | Assumption and Assignment Objection Deadline (defined below) excluding any objection related to adequate assurance of future performance of any Stalking Horse Bidder, Successful Bidder or Backup Bidder |
| September 17, 2020 at 10:00 a.m. (prevailing Central Time) | Auction |
| September 21, 2020 | Post-Auction Notice |
| September 23, 2020 at 10:00 a.m. (prevailing Central Time) | Sale Hearing |

OMM_US:78645958.8

5.      For the avoidance of doubt, the Debtors reserve the right, and are authorized to, modify the above timeline and the Bidding Procedures (the "**Modifications**") in accordance with the provisions of the Bidding Procedures; *provided, however*, that the Debtors shall consult with the Consultation Parties or, to the extent provided therein, the Bid Consultation Parties, with respect to any Modifications.  The Committee's right to request an extension of the above timeline for cause is expressly reserved.

**II.     The Bidding Procedures**

6.      The Bidding Procedures are approved in their entirety.  The Debtors are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance therewith.  The failure to specifically include or reference a particular provision of the Bidding Procedures in this Bidding Procedures Order shall not diminish or impair the effectiveness of such provision.

7.      The Debtors are authorized, in accordance with the Bidding Procedures, to require Diligence Parties to submit written indications of interest specifying, among other things, the Acquired Assets proposed to be acquired, the amount and type of consideration to be offered, and any other material terms to be included in a bid by such party.

8.      The process and requirements associated with submitting a Qualified Bid are approved as fair, reasonable, appropriate and designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties in interest.  As further described in the Bidding Procedures, the Bid Deadline shall be **September 4, 2020 at 5:00 p.m. (prevailing Central Time)**.  Any disputes or objections to the selection of Qualified Bid(s), Successful Bid(s), or Backup Bid(s) (all as defined in the Bidding Procedures) shall be resolved by this Court at the Sale Hearing as set forth herein.

7

9.      The Debtors are authorized to conduct the Auction in accordance with the Bidding Procedures.  The Auction shall take place on **September 17, 2020 at 10:00 a.m. (prevailing Central Time)** virtually via video conferencing technology, or at such other place and time as the Debtors shall notify all Qualified Bidders and the Consultation Parties.

10.      The Prepetition Secured Creditors shall have the right, subject in all respects to the Bankruptcy Code and other applicable law and the satisfaction in cash or assumption of claims secured by senior liens, to credit bid all or any portion of their allowed secured claims pursuant to Section 363(k) of the Bankruptcy Code or other applicable law, in accordance with the applicable provisions of the Prepetition Credit Documents and any such credit bid shall be deemed a Qualified Bid subject to the Intercreditor Agreement (as defined in the D'Arcy Declaration); *provided*, *however*, that nothing herein or in the Bidding Procedures shall affect or in any way limit the right or ability of any party in interest, including the Committee, to object to the Prepetition Secured Creditors' right to credit bid, including the nature, amount, or scope of such credit bid, subject to the (a) applicable provisions of the Court's *Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing Use Of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying Automatic Stay, (IV) Granting Related Relief, and (V) Scheduling A Final Hearing* Docket No. 90, including paragraph 20 and the Challenge Period (as defined therein), as the same may be modified in accordance with its terms and (b) Sale Objection Deadline (as defined below).

## III.    Stalking Horse Bidder and Bid Protections

11.      In accordance with the Bidding Procedures, the Debtors may designate one or more Stalking Horse Bidders for the various segments of their business and may enter into an asset purchase agreement with each Stalking Horse Bidder (each, a "**Stalking Horse APA**"), subject to higher or otherwise better offers at the Auction, which establishes a minimum Qualified Bid at the Auction with respect to the assets that are the subject thereof.

8

12.     Absent further order of the Court, the Stalking Horse APA shall (i) limit the break-up fee in favor of the Stalking Horse Bidder in the amount of no more than 3.5% of the cash consideration proposed to be paid at closing by the Stalking Horse Bidder under the applicable Stalking Horse APA (the "**Break-Up Fee**"); (ii) limit any reimbursement for the Stalking Horse Bidder's and its attorneys', accountants', investment bankers' and representatives' documented fees and expenses actually and reasonably incurred in negotiating and documenting the Stalking Horse APA, and in preserving and protecting Stalking Horse Bidder's rights and interests as buyer and lender in connection with the Chapter 11 Cases to an amount not to exceed 1.0% of the cash consideration proposed to be paid by at closing the Stalking Horse Bidder under the applicable Stalking Horse APA (the "**Expense Reimbursement**"); and/or (iii) set the initial overbid protection (the "**Minimum Overbid Increment**" and, together with the Break-Up Fee and the Expense Reimbursement, the "**Bid Protections**") in amounts to be determined by the Debtors in accordance with the Bidding Procedures.  In the event that the Debtors determine that the Bid Protections must exceed the amounts set forth herein, the Court shall hold a hearing on the approval of any such greater Bid Protections on an expedited basis, upon the request of the Debtors.

13.     The Bid Protections, to the extent payable under the Stalking Horse APAs, shall (a) constitute an allowed administrative expense claim against the Debtors pursuant to Sections 105(a) and 364(c)(1) of the Bankruptcy Code.  Subject to the foregoing, the Bid Protections shall be paid (i) in cash from the proceeds of any approved Sale or (ii) credited against the purchase price if, after an Auction, the Stalking Horse Bid, as enhanced at the Auction, is the Successful Bid and the Sale contemplated by the Stalking Horse APA (as enhanced at the auction) is consummated.

14.     In the event that the Debtors select one or more parties to serve as a Stalking Horse Bidder, upon such selection, the Debtors shall provide, to all parties on the Rule 2002 List, all

OMM_US:78645958.8

parties expressing an interest in the Acquired Assets and all parties holding liens on such Acquired Assets, three (3) business days' notice and an opportunity to object to the determination of such Stalking Horse Bidder and disclosure of the Bid Protections set forth in the Stalking Horse APA, and absent objection, the Debtors selection of such Stalking Horse Bidder shall be deemed designated without further order of the Court. To the extent necessary, the Debtors' right to seek this Court's approval of one or more Stalking Horse Bidders, with notice and a hearing, is hereby preserved.

**IV.    Notice Procedures**

15.    The form of Sale Notice substantially in the form attached hereto as <u>Exhibit 2</u> is approved.

16.    Within seven (7) days after the entry of this Bidding Procedures Order or as soon as reasonably practicable thereafter, the Debtors shall serve the Sale Notice and this Bidding Procedures Order, including the Bidding Procedures by first-class mail, postage prepaid, or, for those parties who have consented to receive notice by the Electronic Case Files ("**ECF**") system, by ECF, upon (i) all entities reasonably known to have expressed an interest in a transaction with respect to all or part of the Acquired Assets within the past two years; (ii) any parties identified by AlixPartners as potential bidders; (iii) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon or with respect to any of the Acquired Assets; (iv) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief granted herein; (v) counsel for the Committee; (vi) counsel to Cantor Fitzgerald Securities, as Priority Term Loan Agent under the Debtors' prepetition Priority Term Loan Credit Agreement; (vii) counsel to Ankura Trust Company, LLC, as FILO Agent under the Debtors' prepetition FILO Term Loan Agreement, and as Exit Term Loan Agent under the Debtors' prepetition Exit Term Loan Agreement; (viii) counsel to FILO Lenders; (ix) counsel to

10

the Stalking Horse Bidder, if any; (x) counsel to Whitebox Advisors LLC; (xi) counsel for the Restructuring Committee; (xii) counsel to the Huntsville Note holder; (xiii) the Bankruptcy Administrator; (xiv) the Securities and Exchange Commission; (xv) the Internal Revenue Service; (xvi) counsel to the United Mine Workers of America; and (xvii) all known creditors of the Debtors, including their contract counterparties; *provided, however*, that to the extent email addresses are available, parties referenced in this paragraph 15 may be served by email.

17.    Service of the Sale Notice as described above shall be sufficient and proper notice of the Sale Transaction with respect to known interested parties.

18.    The Publication Notice, substantially in the form attached hereto as Exhibit 3, is approved.  The Debtors are directed to publish the Sale Notice, as modified for publication, in the *New York Times*, on one occasion on the Mailing Date or as soon as reasonably practicable thereafter.  In addition, the Debtors are authorized, but not directed, to (i) publish the Sale Notice in additional publications as the Debtors deem appropriate and (ii) cause the Sale Notice to be posted on their case information website at https://cases.primeclerk.com/RemingtonOutdoor.

19.    Service of the Publication Notice as described above shall be sufficient and proper notice of the Sale Transaction with respect to all unknown parties.

20.    The form of the Post-Auction Notice, substantially in the form attached hereto as Exhibit 4 is approved.  As soon as reasonably practicable after the conclusion of the Auction, the Debtors shall file on the docket, but not serve, the Post-Auction Notice identifying any Successful Bidder(s).

## V.    Assumption and Assignment Procedures

21.    The Assumption and Assignment Procedures, as detailed in the Motion and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are approved.

OMM_US:78645958.8

22.     The Notice of Assumption and Assignment, substantially in the form attached hereto as <u>Exhibit 5</u> is approved.

23.     On or before **August 21, 2020** (any such date, the "**Assumption and Assignment Service Date**"), the Debtors shall file with the Court, and post on the Case Website at https://cases.primeclerk.com/RemingtonOutdoor, the Notice of Assumption and Assignment and Designated Contracts List.  If no Cure Cost is listed on the Designated Contracts List, the Debtors believe that there is no Cure Cost, as of the date of such notice.   On the Assumption and Assignment Service Date, the Debtors shall serve, via first-class mail, a customized version of the Notice of Assumption and Assignment that contains the DCL Instructions and Necessary Notice Information, but omits the Designated Contracts List, on all counterparties to the Designated Contracts.  In addition, the Debtors shall serve, via first-class mail, a modified version of the Notice of Assumption and Assignment that contains the DCL Instructions and Necessary Notice Information, but omits the Designated Contracts List on all parties on the Rule 2002 Notice List. Service of such Notice of Assumption and Assignment as set forth herein shall be deemed proper, due, timely, good and sufficient notice of, among other things, the proposed assumption and assignment of the Designated Contracts and rights thereunder, the Cure Costs, and the procedures for objecting thereto, and no other or further notice is necessary.

24.     Any objection by a counterparty to a Designated Contract (which does not, for the avoidance of doubt, include any objection regarding the adequate assurance of future performance of any Stalking Horse Bidder, Successful Bidder or the Backup Bidder) (a "**Designated Contract Objection**") must (i) be to the proposed assumption and assignment of the applicable Designated Contract or Cure Costs, if any; (ii) state, with specificity, the legal and factual basis thereof as well as what Cure Costs such objecting party believes are required, if any; and (iii) include appropriate

12

documentation in support thereof.  All Designated Contract Objections must be filed and served

on (i) counsel for the Debtors, O'Melveny & Myers LLP, 400 South Hope Street, 18th Floor, Los

Angeles, CA  90071, Attn:  Steve Warren (swarren@omm.com) and Jennifer Taylor

(jtaylor@omm.com); (ii) co-counsel for the Debtors, Burr & Forman LLP, 420 North 20th Street,

Suite 3400, Birmingham, Alabama 35203, Attn: Derek Meek (dmeek@burr.com) and Hanna Lahr

(hlahr@burr.com); (iii) counsel for the Restructuring Committee, Akin Gump Strauss Hauer &

Feld LLP, 2300 N. Field Street, Suite 1800, Dallas, TX 75201, Attn: Sarah Schultz

(sschultz@akingump.com); (iv) counsel for the Committee, Fox Rothschild LLP, 345 California

Street, Suite 2200, San Francisco, California 94104, Attn: Michael A. Sweet

(msweet@foxrothschild.com) and Baker Donelson Bearman Caldwell & Berkowitz, P.C., 420 20th

Street North, Birmingham, Alabama 35203, Attn: Matthew Cahill (mcahill@bakerdonelson.com)

and Rita Hullett (rhullett@bakerdonelson.com); (v) the Bankruptcy Administrator, 400 Well

Street, Decatur, Alabama 35602, Attn:  Richard Blythe (richard_blythe@alnba.uscourts.gov); (vi)

counsel to the Stalking Horse Bidder, if any; (vii) counsel to the FILO Lenders, Pillsbury Winthrop

Shaw Pittman LLP, Four Embarcadero Center, 22nd Floor, San Francisco, CA 94111-5998,

Attn: Joshua D.  Morse  (joshua.morse@pillsburylaw.com)  and  Andrew V.  Alfano

(andrew.alfano@pillsburylaw.com); (viii) counsel to Whitebox Advisors LLC, Brown Rudnick

LLP, One Financial Center, Boston, Massachusetts 02111, Attn: Andreas Andromalos

(aandromalos@brownrudnick.com) and Tia C. Wallach (twallach@brownrudnick.com); (ix) all

parties that have requested notice in the Chapter 11 Cases  (collectively (i)–(ix), the "**Objection**

**Recipients**"); and (x) counsel to any Successful Bidder(s), if known on the Sale Objection

Deadline no later than 4:00 p.m. (prevailing Central Time) fourteen (14) days following the

Assumption and Assignment Service Date (the "**Assumption and Assignment Objection Deadline**").

25.    If a Designated Contract Objection is not consensually resolved before the Sale Hearing, the amount to be paid or reserved with respect to such objection shall be determined at the Sale Hearing, such later hearing date that the Debtors determine in their discretion, or such other date determined by this Court.

26.    Any time after the Assumption and Assignment Service Date and before the closing of a Sale Transaction, the Debtors reserve the right, and are authorized but not directed, to (i) supplement the Designated Contracts List with previously omitted Designated Contracts in accordance with the definitive agreement for a Sale Transaction, (ii) remove a Designated Contract from the list of contracts that a Successful Bidder proposes be assumed and assigned to it in connection with a Sale Transaction, or (iii) modify the previously stated Cure Cost associated with any Designated Contract.

27.    In the event the Debtors exercise any of the rights listed above, the Debtors shall promptly serve the Supplemental Notice of Assumption and Assignment by electronic transmission, hand delivery, or overnight mail on the counterparty (and its attorney, if known) to each Designated Contract listed on the Supplemental Notice of Assumption and Assignment at the last known address available to the Debtors. Each Supplemental Notice of Assumption and Assignment shall set forth (i) the name and address of the counterparty to the Designated Contract listed thereon; (ii) the proposed effective date of the assignment (subject to the right of the applicable Successful Bidder, if any, to withdraw such request for assumption and assignment of that Designated Contract prior to the closing of the applicable Sale Transaction); (iii) sufficient information to identify the Designated Contract; (iv) the Cure Costs, if any; and (v) proposed

OMM_US:78645958.8

adequate assurance, if known on the Assumption and Assignment Service Date.  The Debtors are authorized, but not directed, to modify the Supplemental Notice of Assumption and Assignment as necessary and appropriate to provide customized individual notice to each Designated Contract counterparty.  In addition, the Debtors are authorized, but not directed, to supplement the Designated Contract List on the Case Website with any additional Designated Contracts as the Debtors deem appropriate in their discretion.  Service of such Supplemental Notice of Assumption and Assignment as set forth herein shall be deemed proper, due, timely, good and sufficient notice of, among other things, the proposed assumption and assignment of the Designated Contracts and rights thereunder, the Cure Costs, and the procedures for objecting thereto, and no other or further notice is necessary.

28.      Any objection by a counterparty to a Designated Contract listed on a Supplemental Notice of Assumption and Assignment (which does not, for the avoidance of doubt, include any objection regarding the adequate assurance of future performance of any Stalking Horse Bidder, Successful Bidder or the Backup Bidder) (a "**Supplemental Designated Contract Objection**") must (i) be to the proposed assumption and assignment of the applicable Designated Contract or the proposed Cure Costs, if any; (ii) state, with specificity, the legal and factual basis thereof as well as what Cure Costs such objecting party believes are required, if any; (iii) include appropriate documentation in support of the objection; and (iv) be filed and served on the Objection Recipients no later than fourteen (14) days from the date of service of such Supplemental Notice of Assumption and Assignment.

29.      If a Supplemental Designated Contract Objection is not consensually resolved by the proposed effective date of assignment of the Designated Contract that is the subject of a Supplemental Designated Contract Objection, the Debtors shall seek an expedited hearing before

15

OMM_US:78645958.8

the Court (a "**Supplemental Designated Contract Hearing**") to determine the Cure Costs, if any, and approve the assumption of the relevant Designated Contracts.  If there is no such objection, then the Debtors shall obtain an order of this Court, including by filing a certification of no objection, (a "**Supplemental Designated Contract Order**") fixing the Cure Costs and approving the assumption of any Designated Contract listed on a Supplemental Notice of Assumption and Assignment.

30.     Absent the filing of a Designated Contract Objection or Supplemental Designated Contract Objection and a subsequent order of the Court establishing an alternative Cure Cost, the Cure Costs, if any, set forth in the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) shall be controlling, notwithstanding anything to the contrary in any Designated Contract or any other document, and the counterparty to the Designated Contract will be deemed to have consented to the assumption, assignment, and sale of the Designated Contract and the Cure Costs, if any, and will be forever barred from asserting any other claims related to such Designated Contract against the Debtors or the applicable Successful Bidder, or the property of any of them, except with respect to adequate assurance of future performance by such Successful Bidder.  For the avoidance of doubt, any objections to the proposed form of adequate assurance of future performance of any Successful Bidder (other than a Stalking Horse Bidder) must be raised at the Sale Hearing or Supplemental Designated Contract Hearing, as applicable, and will be resolved at the hearing at which it is raised or, in the Debtors' discretion, adjourned to a later hearing.

31.     The inclusion of a Designated Contract on the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) will not (a) obligate the Debtors to assume any Designated Contract listed thereon nor the Successful Bidder(s) to take

OMM_US:78645958.8

assignment of such Designated Contract or (b) constitute any admission or agreement of the Debtors that such Designated Contract is an "executory" contract. Only those Designated Contracts that are included on a schedule of assumed and Acquired Contracts attached to the final purchase agreement with the Successful Bidder(s) (each, an "**Acquired Contract**") will be assumed and assigned to the Successful Bidder(s).

32.      Assignment by the Debtors to the Successful Bidder of a contract, lease or any other liability assumed under Section 365 of the Bankruptcy Code or otherwise relieves the Debtors and their estates from any such liability so assigned.

**VI.     The Sale Hearing**

33.      A Sale Hearing to (i) approve a sale of a portion or substantially all of the Acquired Assets to the Successful Bidder(s) and (ii) authorize the assumption and assignment of certain executory contracts and unexpired leases shall be held on **September 23, 2020 at 10:00 a.m. (prevailing Central Time)**, and may be adjourned or rescheduled without notice, subject to paragraph 4 of this Bidding Procedures Order. At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Successful Bid(s) and the Backup Bid(s) (if any). Unless the Bankruptcy Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the Sale Transaction(s) and there will be no further bidding at the Sale Hearing. In the event that the Successful Bidder(s) cannot or refuses to consummate the Sale(s) because of the breach or failure on the part of such Successful Bidder, the Debtors may, in accordance with the Bidding Procedures, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors shall be authorized, but not required, to consummate the applicable transaction with the Backup Bidder without further order of the Bankruptcy Court.

OMM_US:78645958.8

34.     Any and all objections, if any, to any Sale Transaction (but excluding any objection based on the specific identity of any Stalking Horse Bidder, the form or substance of any Stalking Horse APA, the specific identity of the Successful Bidder or the Backup Bidder, or the form or substance of the Successful Bid or the Backup Bid) must be filed no later than **September 1, 2020 at 4:00 p.m. (prevailing Central Time)** (the "**Sale Objection Deadline**").  Any and all such objections must be served on the Objection Recipients and counsel to any Successful Bidder(s), if known on the Sale Objection Deadline.  All replies to such objections must be filed by **September 8, 2020 at 12:00 p.m.** (prevailing Central Time) (the "**Reply Deadline**").

35.     Any party failing to timely file an objection to any Sale Transaction will be forever barred from objecting and will be deemed to have consented to any Sale Transaction, including the transfer of the Debtors' right, title and interest in, to, and under the Debtors' Acquired Assets free and clear of any and all liens, claims, encumbrances and other interests in accordance with a definitive agreement for any Sale Transaction.

36.     Promptly following the Auction, the Debtors shall serve the Post-Auction Notice. The Debtors propose that any objections regarding the adequate assurance of future performance of the Successful Bidder or the Backup Bidder (other than the Stalking Horse Bidder) may be raised at the Sale Hearing.

**VII.    Other Provisions**

37.     Notwithstanding anything herein or in the Bidding Procedures to the contrary, the Debtors shall not be permitted to modify the consultation rights of the Consultation Parties or the Bid Consultation Parties in the Bidding Procedures absent further order of this Court or the consent of any affected Consultation or Bid Consultation Parties.

38.     Oneida's rights and priority in connection with any security interests it held in any assets of the Debtors pre-petition are hereby preserved and retained by Oneida to the extent they

18

existed pre-petition and any such security interests shall attach to proceeds of such assets with the same priority, extent, validity, avoidability and enforceability. Nothing herein shall constitute a finding or ruling by this Court that any such security interests are valid, senior, enforceable, perfected or non-avoidable. Moreover, nothing shall prejudice the rights of any party in interest including, but not limited to, the Debtors and any Committee to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such security interest.

39.    The Debtors are authorized and empowered to take such action as may be necessary to implement and effect the terms and requirements established under this Bidding Procedures Order.

40.    This Bidding Procedures Order shall be binding on and inure to the benefit of the Debtors, including any Chapter 7 or Chapter 11 trustee or other fiduciary appointed for the estates of the Debtors.

41.    This Bidding Procedures Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

42.    To the extent this Bidding Procedures Order is inconsistent with any prior order or pleading with respect to the Motion in these cases, the terms of this Bidding Procedures Order shall govern.

43.    To the extent any of the deadlines set forth in this Bidding Procedures Order do not comply with the Local Rules, such Local Rules are waived and the terms of this Bidding Procedures Order shall govern.

44.    Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry.

19

OMM_US:78645958.8

45.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Bidding Procedures Order, including, but not limited to, any matter, claim, or dispute arising from or relating to the Bidding Procedures, any Stalking Horse APA, and the implementation of this Bidding Procedures Order.

Dated: _____, 2020

_____
UNITED STATES BANKRUPTCY JUDGE

20

**<u>Exhibit 1</u>**

**Bidding Procedures**

OMM_US:78645958.8

# **EXHIBIT 2**

(*See* attached Good Faith Deposit Escrow Agreement )

# ESCROW AGREEMENT

This ESCROW AGREEMENT, dated as of the date set forth beneath the signature of the Depositor below (this "***Agreement***"), is made and entered into by and among Remington Outdoor Company, Inc. (the "***Company***"), the depositor signatory hereto (the "***Depositor***"), and M-III Advisory Partners, LP (the "***Escrow Agent***").

<u>RECITALS</u>

WHEREAS, the Depositor is seeking to acquire certain assets of the Company pursuant to an Asset Purchase Agreement by and between the Depositor and the Company and certain of its subsidiaries entered into in connection herewith (the "***APA***"), and in accordance with the APA, the Company requires the Depositor to post a deposit in the amount set forth beneath its signature to this Agreement (the "***Deposit***") with the Escrow Agent; and

WHEREAS, the Escrow Agent is willing to hold and administer the Deposit, but only upon the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby covenant and agree as follows:

1.   <u>Appointment</u>.  The Company and the Depositor hereby designate, constitute and appoint M-III Advisory Partners, LP as Escrow Agent under this Agreement, and the Escrow Agent accepts such designation and appointment.  In such capacity, the Escrow Agent shall hold and administer the Deposit in accordance with the terms of this Agreement.

2.   <u>Deposit of Funds</u>.  Unless the Escrow Agent shall otherwise agree in writing, the Depositor shall transfer the Deposit to the Deposit Account by wire transfer of immediately available funds in United States dollars.  Upon receipt of the Deposit, the Escrow Agent will notify the Depositor and the Company by email at the addresses set forth below their signatures to this Agreement.

3.   <u>Terms of Deposit</u>.  The Depositor and the Company irrevocably and unconditionally acknowledge and agree that:

(a)   The Deposit shall be deposited into a bank account owned by, and titled in the name of, the Escrow Agent (the "***Deposit Account***") with a federally-insured depositary institution.

(b)   The Deposit Account shall be segregated from the general operating funds of the Escrow Agent, but the Deposit Account shall **<u>not</u>** be a trust or similar account.

(c)   The Deposit Account shall **<u>not</u>** accrue interest for the benefit of the Depositor or the Company.

(d)  Notwithstanding anything to the contrary contained in this Agreement, the Escrow Agent shall have no obligation to disburse funds from the Deposit Account until the funds deposited into such account by the Depositor constitute cleared funds and are not subject to recapture by the Depositor's bank.

(e)  The Escrow Agent is not a party to any underlying purchase agreement (including the APA) between the Depositor and the Company and shall have no obligation to comply with the terms thereof.  The escrow arrangement contemplated by this Agreement and the administration of the Deposit shall be governed solely by the terms of this Agreement and without regard to the terms of the APA.

4.    Release of Funds.

(a)  The Deposit shall be released by the Escrow Agent only in accordance with the terms of this Agreement or order of a court of competent jurisdiction.

(b)  Promptly following an order of the United States Bankruptcy Court for the Northern District of Alabama (the "**Court**"), identifying the approved purchaser of the assets of the Company (the "**Sale Order**"), the Escrow Agent shall transfer the Deposit as specified in the Sale Order or other order of the Court entered in connection therewith; provided that if no such transfer is provided for in the Sale Order or other order entered in connection therewith, then (i) if the APA has not been fully-executed by such time, the Escrow Agent shall promptly refund the Deposit to the Depositor and (ii) if the APA has been fully-executed by such time, the Escrow Agent shall transfer the Deposit in accordance with the disposition of the "Good Faith Deposit" as defined and set forth in Bidding Procedures attached as Exhibit 1 to the Order Establishing Bidding Procedures Relating To The Sales Of All Or A Portion Of The Debtors' Assets entered by the Court on August 20, 2020.  Notwithstanding the foregoing, the Escrow Agent shall act upon any written instructions provided to it jointly by the Depositor and the Company.

(c)  In the event that the Deposit has not been released to the Depositor of the Company in accordance with the provisions of Section 4(b) by December 31, 2020, the Escrow Agent shall have the right (but not the obligation) to refund the Deposit to the Depositor without notice to, or consent of, the Company or the Court.

5.    Status of the Escrow Agent.

(a)  The Escrow Agent is to be considered and regarded as a depository only, and shall not be responsible or liable (except for its fraud, gross negligence, or willful misconduct) for the sufficiency or correctness as to form, manner of execution, or validity of any instrument deposited as part of the Deposit, nor as to the identity, authority, or rights of any person executing the same. The Escrow Agent's duties hereunder shall be limited to the safekeeping investment of money, instruments, and securities received by it as Escrow Agent and for their disbursement in accordance with the terms, provisions and conditions of this Agreement.

(b)  The Escrow Agent shall not be responsible for the genuineness of any certificate or signature and may rely conclusively upon and shall be protected when acting upon

any notice, affidavit, request, consent, instruction, check, or other instrument believed by the Escrow Agent in good faith to be genuine or to be signed or presented by the proper person, or duly authorized, or properly made. The Escrow Agent will not be required to investigate the authority of the person executing and delivering any instructions hereunder, or otherwise to verify the accuracy of the statements or information presented therein. The Escrow Agent shall have no responsibility except for the performance of the Escrow Agent's express duties under this Agreement and no additional duties shall be inferred or implied.

(c) The Escrow Agent shall not be liable for any act or omission in the performance of the duties of the Escrow Agent under this Agreement unless such act or omission constitutes fraud, bad faith or gross negligence. In furtherance, and not in limitation, of the foregoing sentence, the Escrow Agent will not be liable for any loss or damage resulting from the following (i) any default, error, action, or omission of any other party, (ii) the expiration of any time limit unless such time limit was known to Escrow Agent and such loss is solely caused by failure of Escrow Agent to proceed in its ordinary course of business, (iii) any loss or impairment of funds while on deposit with a federally-insured bank, resulting from failure, insolvency or suspension of such bank, and (iv) the Escrow Agent's compliance with any and all legal process, writs, orders, judgments, and decrees of any court, whether issued with or without jurisdiction and whether or not subsequently vacated, modified, set aside or reversed. The Escrow Agent will not be accountable for any incidental benefit that may be attributable to the Deposit.

(d) The Escrow Agent shall not be required to institute or defend any action involving any matters relating to this Agreement or which affect the Escrow Agent or the duties or liabilities of the Escrow Agent under this Agreement unless or until requested to do so by any party to this Agreement, and then only upon receiving full indemnity, in form and substance satisfactory to the Escrow Agent, against all claims, liabilities and expenses.

6.    <u>OFAC Representation</u>. Neither the Depositor nor any of its subsidiaries nor, to the knowledge of the Depositor, any director, officer, agent, employee, or person acting on behalf of the Depositor or any subsidiary of the Depositor is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC"), and the Depositor will not directly or indirectly lend, contribute or otherwise make available any proceeds to any joint venture partner or other person or entity, towards any sales or operations in Cuba, Iran, Syria, Sudan, Myanmar or any other country sanctioned by OFAC or for the purpose of financing the activities of any person or entity, including those designated by OFAC as "Specially Designated Nationals" or "SDNs," currently subject to any U.S. sanctions administered by OFAC.

7.    <u>Disputes</u>. In event of any dispute among the parties with respect to the Escrow Agent or the duties of the Escrow Agent:

(a)  the Escrow Agent may act or refrain from acting in respect of any matter referred to in this Escrow Agreement in full reliance upon and by and with the advice of counsel and shall be fully protected in so acting or in refraining from acting upon advice of counsel; or

(b)  the Escrow Agent may refrain from acting until required to do so by a final and non-appealable order of a court of competent jurisdiction.

In addition, the Escrow Agent will have the right, exercisable in its sole discretion, to resign by giving written notice to the Company and the Depositor, specifying a date on which such resignation will take effect, which will be no earlier than ten (10) business days after the delivery of such notice.  Promptly upon receipt of such notice, the Company and the Depositor will appoint a mutually acceptable successor escrow agent. Upon delivery by the successor escrow agent to Company, Depositor, and Escrow Agent of a written instrument accepting such appointment, the successor escrow agent will succeed to all the rights and duties of Escrow Agent hereunder.  If a successor escrow agent is not appointed by the expiration of such ten (10) business day period, the Escrow Agent will have the right, exercisable in its sole discretion, to be discharged by tendering unto the registry or custody of any court of competent jurisdiction the Deposit, together with any such legal pleadings as it deems appropriate.

8.  <u>Fee of Escrow Agent</u>. The Company shall be liable for the fees of the Escrow Agent in connection with this Agreement and such fees shall not be chargeable against the Escrow Fund. The Company further acknowledges and agrees that the services provided by the Escrow Agent hereunder constitute "Services" for the purposes of (and as defined in) the engagement letter, dated April 23, 2020, between the Escrow Agent and the Company.

9.  <u>Non-Waiver</u>. No delay or failure by any party to exercise any right hereunder, and no partial or single exercise of any such right, shall constitute a waiver of that or any other right, unless otherwise expressly provided herein.

10.  <u>Notices</u>.  All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered or mailed, by overnight express mail (e.g., Federal Express) to relevant party at the address set forth below is signature to this Agreement or as otherwise expressly set forth herein.  The address of any party may be changed by notice duly given as provided above.

11.  <u>Nonexclusive Protection</u>. The provisions of this Agreement are cumulative and not exclusive of any other rights or remedies which any party may have at law or equity.

12.  <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns; *provided* that any permitted assignment of either party's obligations or liabilities shall not relieve that party of any of its liabilities or obligations under this Agreement.

13.  <u>Titles</u>. The titles are for convenience or reference and shall not deemed to modify or affect the interpretation of this Agreement. The term "herein" in this Agreement refers to this Agreement as a whole and not to any particular section hereof.

14.  <u>Modification</u>. Neither this Escrow Agreement, nor any of its provisions, shall be modified, changed, discharged, or terminated except by an instrument in writing which has been

signed by the party against whom the enforcement of any modification, change, discharge or termination is sought.

    15.  <u>Further Assurances</u>. In connection with the transactions contemplated by this Escrow Agreement, the parties agree to execute any additional agreements, instruments or documents and to perform and do any additional acts and things as may be reasonably necessary and proper to effectuate and carry out the transactions contemplated by this Agreement.

    16.  <u>Delay</u>. No delay or omission on the part of any party in exercising any right shall operate as a waiver of that right or any other right.  A waiver on any one occasion shall not be construed as a bar to or waiver of any right on any future occasion.

    17.  <u>No Third-Party Beneficiaries</u>.  The terms and provisions of this Agreement are for the benefit only of the Company, the Depositor, and the Escrow Agent, and their respective successors and assigns. Nothing contained herein will be deemed or construed to inure to the benefit of any other person or party, it being the express intent of the Company, the Depositor, and the Escrow Agent that no such person or party will be entitled to any of the benefits hereunder, except as expressly provided herein.

    18.  <u>Governing Law</u>. This Agreement shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York.

    19.  <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall an original, but all of which together shall constitute the same Agreement. Any page of any such counterpart, or any electronic facsimile thereof, may be attached or appended to any other counterpart to complete a fully executed counterpart of this Agreement, and any telecopy or other facsimile transmission of any signature shall be deemed an original and shall bind each Party.

*[Signature Page Follows.]*

**IN WITNESS WHEREOF**, each party hereto has caused this Agreement to be executed and delivered by its duly authorized signatory as of this __4th__ day of __September__, 2020.

**COMPANY**:

REMINGTON OUTDOOR COMPANY, INC.

By: _____

   Name: Ken D'Arcy
   Title:   Chief Executive Officer

Address for Notices:

Remington Outdoor Company, Inc.
100 Electronics Blvd., SW
Huntsville, Alabama 35824
Attention: Ken D'Arcy
Email:  ken.darcy@remington.com

EIN: 26-0174491

With a copy to:

O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, California 90071
Attention: John Paul Motley, Esq., and
Stephen H. Warren, Esq.
Phone: (213) 430-6100 and (213) 430-7875,
respectively
Email: jpmotley@omm.com and
swarren@omm.com, respectively

**DEPOSITOR:**

_____
Insert Depositor Name Above

By:_____
   Name:
   Title:

Address for Notices:

_____
_____
Attention:
Email:

EIN:_____

Deposit Amount:  US$_____

IN WITNESS WHEREOF, each party hereto has caused this Agreement to be executed and delivered by its duly authorized signatory as of this 4th day of September, 2020.

**COMPANY**:

REMINGTON ARMS COMPANY, LLC

By:_____

     Name:

     Title:

Address for Notices:

870 Remington Drive
Madison, North Carolina 27025
Attention: [_____]
Email: [_____]

EIN:_____

**DEPOSITOR**:

**SIG SAUER INC.**
Insert Depositor Name Above

By:_____

     Name: Chris Erickson

     Title: Chief Financial Officer

Address for Notices:

SIG Sauer, Inc.
72 Pease Boulevard
Newington, New Hampshire 03801
Attention: Daryl Hanna, and Steven Shawver, Esq.
Email: Daryl.Hanna@sigsauer.com and Steven.Shawver@sigsauer.com, respectively

EIN: 020528156

Deposit Amount: US$3,000,000.00

**ESCROW AGENT**:

M-III ADVISORY PARTNERS, LP

By:_____
    Name:  Mohsin Y. Meghji
    Title: Managing Partner

Address for Notices:

1700 Broadway – 19th Floor
New York, New York 10019
Attention:  General Counsel
Email:  legal@miiipartners.com

# **EXHIBIT 3**

(*See* attached Proposed Sale Order)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

In re:

REMINGTON OUTDOOR COMPANY,
INC., *et al.*, [1]

Debtors.

Chapter 11

Case No. 20-81688-CRJ11

Joint Administration Requested

## ORDER APPROVING THE SALE OF THE DEBTORS' LONOKE AMMUNITION BUSINESS AND CERTAIN OF THE DEBTORS' INTELLECTUAL PROPERTY ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS, AND INTERESTS

This matter having come before the Court upon the motion (the "**Motion**")[2] by Remington

Outdoor Company, Inc., ("**Remington**" or the "**Company**"), and its affiliated debtors and debtors

in possession (collectively the "**Debtors**") in the above-captioned Chapter 11 cases seeking entry

of this order (this "**Sale Order**") (a) authorizing the sale of the Acquired Assets (as defined in the

Asset Purchase Agreement (as defined below)) free and clear of all Interests (as defined below),

pursuant to that certain Asset Purchase Agreement, dated as of September [__], 2020, attached

hereto as <u>Exhibit A</u> (the "**Asset Purchase Agreement**"), by and among the Debtors and Vista

Outdoor, Inc. (the "**Buyer**"), and all other transaction documents related thereto; (b) authorizing

the assumption and assignment of certain executory contracts and unexpired leases; and (c)

granting the related relief contemplated therein; and the Court having found that (i) the Court has

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405).  The Debtors' corporate headquarters is located at 100 Electronics Blvd SW, Huntsville, Alabama 35824.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion or the Asset Purchase Agreement, as applicable.

jurisdiction over this matter; (ii) venue is proper in this District; (iii) this is a core proceeding; (iv) the notice of the Motion and the Sale Hearing (as defined below) was sufficient under the circumstances; and (v) there is good cause to waive the stay of Bankruptcy Rule 6004(h); and based on the statements of counsel and the evidence presented in support of the relief requested by the Debtors in the Motion at a hearing before this Court on September 29 [and 30], 2020 (the "**Sale Hearing**"); and it appearing that no other notice need be given; and it further appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A. **Jurisdiction, Core Proceeding, Statutory Predicates, and Venue**. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *General Order of Reference* of the United States District Court for the Northern District of Alabama dated July 16, 1984 as amended July 17, 1984. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The predicates for the relief granted herein are Bankruptcy Code Sections 105, 363, and 365 and Bankruptcy Rules 2002, 6004, and 6006. Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B. **Just Cause**. The legal and factual bases set forth in the Motion establish just cause for the relief granted herein. Entry of this Sale Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties in interest.

C. **Notice**. The notice of the Motion, the Sale Hearing, the Asset Purchase Agreement, the transactions contemplated therein or in connection therewith and corresponding transactions documents (the "**Transactions**"), and the proposed entry of this Sale Order was adequate and sufficient under the circumstances of the Chapter 11 Cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. A

2

reasonable opportunity to object or be heard regarding the relief granted by this Sale Order has been afforded to those parties entitled to notice pursuant to the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  Accordingly, no further notice of the Motion, the Sale Hearing, or this Sale Order is necessary or required.

D.      Actual written notice of the Motion, the Bidding Procedures, the Bidding Procedures Hearing, the Auction, the Sale Hearing, the Assumption and Assignment Procedures, the proposed Cure Costs, the Sale and all Transactions, and all deadlines related thereto has been given to all interested persons and entities, including, without limitation:  (i) all entities reasonably known to have expressed an interest in a transaction with respect to all or part of the Acquired Assets within the past two years; (ii) all parties identified by AlixPartners as potential bidders; (iii) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon any of the Acquired Assets; (iv) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief granted herein; (v) counsel for the Committee; (vi) counsel to Cantor Fitzgerald Securities, as Priority Term Loan Agent under the Debtors' prepetition Priority Term Loan Credit Agreement; (vii) counsel to Ankura Trust Company, LLC, as FILO Agent under the Debtors' prepetition FILO Term Loan Agreement, and as Exit Term Loan Agent under the Debtors' prepetition Exit Term Loan Agreement; (viii) counsel to the FILO Lenders; (ix) counsel to the Stalking Horse Bidder; (x) counsel to Whitebox Advisors LLC; (xi) counsel for the Restructuring Committee; (xii) counsel to the Huntsville Note holder; (xiii) the Bankruptcy Administrator; (xiv) the Securities and Exchange Commission; (xv) the Internal Revenue Service; (xvi) counsel to the United Mine Workers of America; (xvii) all counterparties to the Designated Contracts; and (xviii) all known creditors of the Debtors, including their contract counterparties.  The foregoing constitutes proper, timely, adequate, and

3

sufficient notice under the particular circumstances of these Chapter 11 Cases, and no further notice need be provided.

E.      The Publication Notice was published in the *New York Times* on August 24, 2020. Such Publication Notice was compliant with the Bidding Procedures Order, and was sufficient and proper notice to any other interested parties, including those whose identities are unknown to the Debtors.

F.      **Extensive Efforts by Debtors**.  Since before the commencement of the Chapter 11 Cases, the Debtors worked with their counsel and financial advisors to implement a viable transaction that would allow them to maximize the value of the Acquired Assets.  The Sale Transaction that is the subject of this Sale Order is the result of the Debtors' extensive efforts seeking to maximize recoveries to the Debtors' estates for the benefit of the Debtors' creditors.

G.      **Business Justification**.  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business justification for the Court to grant the relief requested in the Motion, including, without limitation, to (i) authorize the sale of the Acquired Assets free and clear of Interests other than Permitted Liens (as defined in the Asset Purchase Agreement) and Assumed Liabilities (as defined in the Asset Purchase Agreement); (ii) authorize the assumption and assignment of certain executory contracts and unexpired leases; and (iii) grant related relief as set forth herein.  Such compelling and sound business justification, which was set forth in the Motion and on the record at the Sale Hearing, are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

H.      **Bidding Procedures Order**.  The Bidding Procedures Order [Docket No. 411] was entered by the Court on August 20, 2020, which, among other things (i) approved the Bidding Procedures; (ii) established the Assumption and Assignment Procedures; (iii) approved the form

4

and manner of notice with respect to all procedures, protections, schedules, and agreements described in the Motion and attached thereto; and (iv) scheduled a date for the Auction and Sale Hearing.  The Bidding Procedures provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the Acquired Assets.

I.    **Auction; Successful Bidder**.  The sale process was properly conducted by the Debtors in accordance with the Bidding Procedures Order and in a manner designed to result in the highest or otherwise best offer for the Acquired Assets.  At the Auction, the Debtors agreed in a reasonable exercise of their business judgment, in consultation with their management, the Restructuring Committee, advisors and the Bid Consultation Parties, to enter into and consummate the Asset Purchase Agreement with the Buyer.  At the conclusion of the Auction, the Buyer was determined to be the Successful Bidder.

J.    **Asset Purchase Agreement**.  The consummation of the Transactions contemplated by the Asset Purchase Agreement, the Motion, and this Sale Order is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and all of the applicable requirements of such sections and rules have been complied with in respect of such transactions.

K.    **Sale Hearing**.  The Sale Hearing occurred on September 29 [and 30], 2020 in accordance with the Bidding Procedures Order.

L.    **Adequate Marketing; Highest or Otherwise Best Offer.**  As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing, including the *Declaration of Ken D'Arcy in Support of Chapter 11 Petitions and First Day Pleadings of Remington Outdoor Company, Inc. and Its Affiliated Debtors and Debtors-Possession* [Docket No. 6 and the *Declaration of Bradley C. Meyer in Support of Debtors' Cash Collateral Motion*

5

US_ACTIVE-154466812.6

*and Bidding Procedures Motion* [Docket No. 355]; and (ii) the representations of counsel made on the record at the Bidding Procedures Hearing and the Sale Hearing, (a) the Debtors have adequately marketed the Acquired Assets and conducted a sale process in a non-collusive, fair and good faith manner in compliance with the Bidding Procedures Order; (b) the process set forth in the Bidding Procedures Order afforded a full, fair and reasonable opportunity for any interested party to make the highest or otherwise best offer to purchase the Acquired Assets and assume the Assumed Liabilities; (c) the consideration provided by the Buyer in the Asset Purchase Agreement constitutes the highest or otherwise best offer to purchase the Acquired Assets and assume the Assumed Liabilities; (d) the consideration provided by the Buyer in the Asset Purchase Agreement provides fair and reasonable consideration for the Acquired Assets and the assumption of the Assumed Liabilities and constitutes reasonably equivalent value, fair value and reasonable market value under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, the District of Columbia, or other applicable law; (e) the Sale will provide a greater recovery for the Debtors' creditors with respect to the Acquired Assets than would be provided by any other practically available alternative; (f) taking into consideration all relevant factors and circumstances, and after taking account of the Bid Protections, no other entity has offered to purchase the Acquired Assets for greater economic value to the Debtors or their estates; and (g) the Debtors' determination that the Asset Purchase Agreement constitutes the highest or otherwise best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment.

      M.    **No Successor Liability.**  Neither the Buyer nor any of its affiliates, officers, directors, shareholders, members, partners, principals or any of their respective representatives, successors, or assigns is an "insider or "affiliate" of the Debtors, as those terms are defined in the

6

Bankruptcy Code, and no common identity of incorporators, directors, or stockholders existed or exists between the Buyer and the Debtors. The transfer of the Acquired Assets to and the assumption of the Assumed Liabilities by the Buyer, except as otherwise set forth in the Asset Purchase Agreement, does not, and will not, subject the Buyer to any liability whatsoever, with respect to the operation of the Debtors' businesses prior to the closing of the Sale or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity including, without limitation, any laws affecting antitrust, successor, transferee, or vicarious liability. Pursuant to the Asset Purchase Agreement, the Buyer is not purchasing all of the Debtors' assets in that the Buyer is not purchasing any of the Excluded Assets or assuming the Excluded Liabilities, and the Buyer is not holding itself out to the public as an *alter ego* or a continuation of the Debtors. The Sale does not amount to a consolidation, merger, or *de facto* merger of the Buyer and the Debtors. There is no substantial continuity between the Buyer and the Debtors, and there is no continuity of enterprise between the Debtors and the Buyer. The Buyer is not a mere continuation of the Debtors or the Debtors' estates, and the Buyer does not constitute a successor to the Debtors or the Debtors' estates. None of the Transactions, including, without limitation, the Sale or the assumption and assignment of the Assigned Contracts, is being undertaken for the purpose of escaping liability for any of the Debtors' debts or hindering, delaying, or defrauding creditors under the Bankruptcy Code or for any other purpose that would give rise to statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, the District of Columbia, or any other applicable jurisdiction with laws substantially similar to the foregoing.

7

N.    **Acquired Assets Property of the Estate.**  The Acquired Assets are property of the Debtors' estates and title thereto is vested in the Debtors' estates.

O.    **Sale in Best Interest/Fiduciary Duties**.    The Debtors have demonstrated a sufficient basis and compelling circumstances requiring them to enter into the Asset Purchase Agreement and sell the Acquired Assets and such actions are appropriate under the circumstances of these Chapter 11 Cases, are in the best interests of the Debtors, their estates and creditors, and other parties in interest, and represent a reasonable exercise of business judgment by the Debtors and the Restructuring Committee and their fulfillment of their fiduciary duties under applicable law.  Approval of the Asset Purchase Agreement, the Sale, and the Transactions at this time is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest. Unless the sale is concluded expeditiously, the recoveries of all of the Debtors' estates and constituencies are likely to be adversely affected.

P.    **Not a *Sub Rosa* Plan.**  The consummation of the Sale outside of a plan of reorganization pursuant to the Asset Purchase Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a plan of reorganization or liquidation for the Debtors.  The Asset Purchase Agreement, the Sale and the transactions contemplated therein and associated therewith do not constitute an impermissible *sub rosa* Chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford.

Q.    **Arm's-Length Sale.**    The Asset Purchase Agreement, the Sale, and the Transactions were negotiated, proposed, and entered into by the Debtors and the Buyer without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Debtors, their insiders and affiliates, nor the Buyer have engaged in any conduct that would cause or permit the

US_ACTIVE-154466812.6

Asset Purchase Agreement, the Sale, or any part of the transactions thereby to be avoided under

Bankruptcy Code Section 363(n).

R.     **Good Faith Buyer.**  The Buyer is a good faith purchaser under Bankruptcy Code

Section 363(m) and, as such, is entitled to all of the protections afforded thereby.  Specifically:

(i) the Buyer recognized that the Debtors were free to deal with any other party interested in

acquiring the Acquired Assets; (ii) the Buyer complied in all respects with the provisions of the

Bidding Procedures Order; (iii) the Buyer agreed to subject its bid to the competitive bid

procedures set forth in the Bidding Procedures Order; (iv) all payments to be made by the Buyer

in connection with the Sale have been disclosed; (v) no common identity of directors, officers or

controlling stockholders exists among the Buyer and the Debtors; (vi) the negotiations and

execution of the Asset Purchase Agreement was at arm's-length and in good faith, and at all times

each of the Buyer and the Debtors were represented by competent counsel of their choosing; (vii)

the Buyer did not in any way induce or cause the Chapter 11 filing of the Debtors; and (viii) the

Buyer has not acted in a collusive manner with any person.  The Buyer will be acting in good faith

within the meaning of Bankruptcy Code Section 363(m) in closing the transactions contemplated

by the Asset Purchase Agreement.

S.     **Corporate Authority.**  Each Debtor (i) has full corporate power and authority to

execute the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale

of the Acquired Assets has been duly and validly authorized by all necessary corporate actions of

each of the Debtors; (ii) has all of the corporate power and authority necessary to consummate the

transactions contemplated by the Asset Purchase Agreement; (iii) has taken all corporate action

necessary to authorize and approve the Asset Purchase Agreement and the consummation by the

Debtors of the transactions contemplated thereby; and (iv) needs no consents or approvals, other

than those expressly provided for in the Asset Purchase Agreement, which may be waived in accordance with the terms therewith.

T.    **Free and Clear Findings Required by the Buyer.**  The Buyer would not have entered into the Asset Purchase Agreement and would not consummate the Sale Transaction, thus adversely affecting the Debtors, their estates, and their creditors, if the Sale of the Acquired Assets to the Buyer and the assumption and assignment of Acquired Contracts, were not, pursuant to Bankruptcy Code Section 363(f), free and clear (except for Permitted Liens and Assumed Liabilities) of (i) all liens (statutory or otherwise), claims, mortgages, deeds of trust, pledges, charges, security interests, rights of first refusal, hypothecations, encumbrances, easements, servitudes, leases or subleases, rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, rights of offset or recoupment, right of use or possession, licenses, indentures, instruments, conditional sale arrangements, (ii) all claims as defined in Bankruptcy Code Section 101(5), including all rights or causes of action (whether in law or in equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, indemnity or contribution, obligations, demands, restrictions, indemnification claims, or liabilities relating to any act or omission of the Debtors or any other person prior to the Closing, consent rights, options, contract rights, covenants, and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of the above-captioned cases, and whether imposed by agreement, understanding, law, equity or otherwise, and (iii) all debts, liabilities, obligations, contractual rights and claims and labor, employment and pension claims, in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected,

10

allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or un-

matured, material or non-material, disputed or undisputed, whether arising prior to or subsequent

to the commencement of these Chapter 11 Cases, and whether imposed by agreement,

understanding, law, equity or otherwise (excluding Permitted Liens and Assumed Liabilities, (i),

(ii), and (iii) collectively, the "**Interests**").  Except as expressly provided in the Asset Purchase

Agreement, the Sale shall be free and clear of, and the Buyer shall not be responsible for, any

Interests, including, without limitation, in respect of the following:  (i) any rights or Interests based

on any successor or transferee liability, (ii) any Interests that purport to give any party a right or

option to effect any forfeiture, modification, right of first offer or first refusal, or termination of

the Debtors' or the Buyer's interest in the Acquired Assets, or any similar rights; (iii) any labor or

employment agreements; (iv) mortgages, deeds of trust, and security interests; (v) intercompany

loans and receivables between the Debtors and any non-Debtor subsidiary; (vi) any pension,

multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of ERISA),

health or welfare, compensation or other employee benefit plans, agreements, practices, and

programs, including, without limitation, any pension plans of the Debtors or any multiemployer

plan to which the Debtors have at any time contributed to or had any liability or potential liability;

(vii) any other employee, worker's compensation, occupational disease, or unemployment or

temporary disability related claim, including, without limitation, claims that might otherwise arise

under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended

("**ERISA**"), (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the

Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age

Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, as

amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget

US_ACTIVE-154466812.6

Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6

of Subtitle B of Title I of ERISA and Section 4980B of the Code and of any similar state law

(collectively, "**COBRA**"), (i) state discrimination laws, (j) state unemployment compensation

laws or any other similar state laws, (k) any other state or federal benefits or claims relating to any

employment with the Debtors or any of their predecessors, or (1) the WARN Act (29 U.S.C.

§§2101 *et seq.*); (viii) any bulk sales or similar law; (ix) any tax statutes or ordinances, including,

without limitation, the Internal Revenue Code of 1986, as amended; (xii) any unexpired and

executory contract or unexpired lease to which a Debtor is a party that is not an Assigned Contract

that will be assumed and assigned pursuant to this Sale Order and the Asset Purchase Agreement;

(xiii) any other Excluded Liabilities as provided in the Asset Purchase Agreement.  A sale of the

Acquired Assets other than one free and clear of all Interests would yield substantially less value

for the Debtors' estates, with less certainty, than the Sale as contemplated.  Therefore, the Sale

contemplated by the Asset Purchase Agreement and approved herein free and clear of all Interests,

except for Permitted Liens and Assumed Liabilities, is in the best interests of the Debtors, their

estates and creditors, and all other parties in interest.

U.    **Valid and Binding Transfer.**  The transfer of the Acquired Assets to the Buyer

will be a legal, valid, and effective transfer of the Acquired Assets and, except for the Permitted

Liens and Assumed Liabilities, will vest the Buyer with all right, title, and interest of the Debtors

to the Acquired Assets free and clear of all Interests and any liabilities of the Debtors.

V.    **Satisfaction of Section 363(f) Standards.**  The transfer of the Acquired Assets to

the Buyer under the Asset Purchase Agreement shall be a legal, valid, and effective transfer of all

the legal, equitable, and beneficial right, title and interest in and to the Acquired Assets free and

clear of all Interests, other than the Assumed Liabilities and Permitted Liens.  The Debtors may

US_ACTIVE-154466812.6

sell the Acquired Assets free and clear of all Interests, except for the Permitted Liens and the Assumed Liabilities, because, in each case, one or more of the standards set forth in Bankruptcy Code Section 363(f)(1) through (5) has been satisfied, with all such Liens and Interests to attach to the proceeds of the Sale Transaction to be received by the Debtors with the same validity, force, priority and effect that they had as against the Acquired Assets, and any claims and defenses the Debtors and their estates may possess with respect thereto. Those holders of Interests, and non-debtor parties to the Assigned Contracts who did not object, or who withdrew their objections, to the Motion are, without limitation, deemed to have consented pursuant to Bankruptcy Code Section 363(f)(2). In all cases, each such person with Interests in the Acquired Assets is enjoined from taking any action against the Buyer, the Buyer's affiliates, or any agent of the foregoing to recover any such Interest.

W.    **Necessity of Order.** The Buyer would not have entered into the Asset Purchase Agreement and would not consummate the Sale Transaction without all of the relief provided for in this Sale Order (including, but not limited to, that the transfer of the Acquired Assets to the Buyer be free and clear of all Interests (other than Permitted Liens and the Assumed Liabilities)). The consummation of the Sale Transaction pursuant to this Sale Order and the Asset Purchase Agreement is necessary for the Debtors to maximize the value of their estates for the benefit of all creditors and other parties in interest.

X.    **Time of the Essence**. The sale of the Acquired Assets must be approved and consummated promptly in order to preserve the value of the Acquired Assets. Therefore, time is of the essence in consummating the Sale, and the Debtors and the Buyer intend to close the Sale as soon as reasonably practicable.

US_ACTIVE-154466812.6

Y.     **Assigned Contracts.** The Debtors have demonstrated that it is their sound business judgment to sell, assume, and assign the "Assumed Contracts" and "Assumed Leases" (as such terms are defined in the Asset Purchase Agreement), including, without limitation, the unexpired leases and executory contracts designated on Schedule 1.1(j) of the Asset Purchase Agreement (collectively, the "**Assigned Contracts**" and, individually, an "**Assigned Contract**") to the Buyer in connection with the consummation of the Sale, and the assumption and assignment of the Assigned Contracts is in the best interests of the Debtors, their estates and creditors, and other parties in interest. The Assigned Contracts being assigned to the Buyer are an integral part of the Acquired Assets being purchased by the Buyer, and, accordingly, such assumption and assignment of the Assigned Contracts and the liabilities associated therewith are reasonable and enhance the value of the Debtors' estates. No section of any Assigned Contract that purports to prohibit, restrict, impose any penalty or fee on, or condition the use, consideration, or assignment of any such Assigned Contract in connection with the Transactions shall have any force or effect.

Z.     **Cure and Adequate Assurance.** Through Buyer's commitment to pay the Buyer Cure Amount (or, in the case of the Backup Bidder (as defined below), the Cure Amount) related to the Assigned Contracts and upon the payment of the Buyer Cure Amount (or, in the case of the Backup Bidder, the Cure Amount) by the Buyer and the Seller Cure Amount, if any, pursuant to the terms of the Asset Purchase Agreement, the Debtors (solely in connection with closing of the Successful Bid and not in connection with the Backup Bid) and the Buyer, as applicable, have cured or otherwise have demonstrated their ability to cure any default with respect to any act or omission that occurred prior to the Closing (as defined in the Asset Purchase Agreement) under any of the Assigned Contracts, within the meaning of Bankruptcy Code Section 365(b)(l)(A). The proposed Cure Costs or any other cure amount reached by agreement after any objection by a

US_ACTIVE-154466812.6

counterparty to an Assigned Contract (an "**Assigned Contract Objection**") or otherwise are deemed the amounts necessary to "cure" all "defaults," each within the meaning of Bankruptcy Code Section 365(b), under such Assigned Contracts. The Buyer's promise to perform the obligations under the Assigned Contracts shall constitute adequate assurance of its future performance of and under the Assigned Contracts, within the meaning of Bankruptcy Code Sections 365(b)(l) and 365(f)(2). Subject to the Bidding Procedures Order, all counterparties to the Assigned Contracts who did not file an Assigned Contract Objection or an objection to the assumption and assignment of the Assigned Contracts prior to the Sale Hearing, are deemed to consent to the assumption by the Debtors of their respective Assigned Contract and the assignment thereof to the Buyer. The filed objections of all counterparties to the Assigned Contracts that were heard at the Sale Hearing (to the extent not withdrawn or adjourned), were considered by the Court, and are overruled on the merits with prejudice. The Court finds that, with respect to all such Assigned Contracts, the payment of the proposed Cure Costs by the Buyer or, solely in connection with Successful Bid and not in connection with the Backup Bid, the Seller, as applicable, in accordance with the terms of the Asset Purchase Agreement is appropriate and is deemed to fully satisfy the Debtors' obligations under Bankruptcy Code Section 365(b). Accordingly, and without limitation of the Buyer's rights under Sections 1.5(b) and 1.5(d) of the Asset Purchase Agreement (or Sections 1.5(a) and 1.5(d) of the Backup Bid Agreement (as defined below)), all of the requirements of Bankruptcy Code Section 365(b) have been satisfied for the assumption and the assignment by the Debtors to the Buyer of each of the Assigned Contracts. To the extent any Assigned Contract is not an executory contract within the meaning of Bankruptcy Code Section 365, it shall be transferred to the Buyer in accordance with the terms of this Sale Order that are applicable to the Acquired Assets. In addition, for the avoidance of doubt, to the extent the Backup

US_ACTIVE-154466812.6

Bidder becomes the Successful Bidder as set forth in this Sale Order, the provisions herein with respect to the Assigned Contracts shall apply likewise to the Backup Bidder as Buyer, in accordance with the terms of the Backup Bid Agreement.

AA.    **Unenforceability of Anti-Assignment Provisions.**    Any provisions in any Assigned Contract that restrict, limit, prohibit or condition the assumption, assignment, and sale of the Assigned Contracts or that allow the counterparty so such Assigned Contract to terminate, recapture, impose any penalty or fee, accelerate, increase any rate, condition on renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract, should be deemed and found to be unenforceable anti-assignment provisions that are void and of no force and effect within the meaning of Bankruptcy Code Section 365(f).

BB.    **Objections are Overruled**.    All objections to the relief requested in the Motion that have not been withdrawn, waived, adjourned or settled as announced to the Court at the Sale Hearing or by stipulations filed with the Court are overruled except as otherwise set forth herein.

CC.    **Final Order**.    This Sale Order constitutes a final order within the meaning of 20 U.S.C. § 158(a).    Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order and expressly directs entry of judgment as set forth herein.

DD.    **Best Interest**.    Entry of this Sale Order is in the best interests of the Debtors, the Debtors' estates, their creditors, and other parties in interest.

EE.    **Findings and Conclusions**.    The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.    To the extent any findings of facts are

16

conclusions of law, they are adopted as such. To the extent any conclusions of law are findings of fact, they are adopted as such.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

<u>**General Provisions**</u>

1.      The Motion is granted and the relief requested therein with respect to the Sale is granted and approved in its entirety, as set forth herein.

2.      Any objections to the entry of this Sale Order or to the relief granted herein or the relief requested in the Motion, including any objections to the proposed Cure Costs or the assumption and assignment of any Assigned Contracts, that have not been adjourned, withdrawn, waived, or settled, or not otherwise addressed or resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.

<u>**Approval of the Sale of the Acquired Assets**</u>

3.      The Debtors are authorized to enter into the Asset Purchase Agreement (and all ancillary documents) and all the terms and conditions thereof, and all of the Transactions contemplated therein are approved in all respects. The transfer of the Acquired Assets by the Debtors to the Buyer shall be a legal, valid and effective transfer of the Acquired Assets.

4.      Pursuant to Bankruptcy Code Section 363(b), the sale of the Acquired Assets to the Buyer free and clear of all Interests (other than the Permitted Liens and the Assumed Liabilities), and the transactions contemplated thereby is approved in all respects.

<u>**Sale and Transfer of the Acquired Assets**</u>

5.      Pursuant to Bankruptcy Code Sections 105, 363, and 365, the Debtors are authorized to (a) take any and all actions necessary or appropriate to perform their obligations under, and comply with the terms of, the Asset Purchase Agreement and consummate the Sale and the Transactions pursuant to, and in accordance with, the terms and conditions of the Asset

Purchase Agreement and this Sale Order, including, without limitation (i) executing, acknowledging, and delivering such deeds, assignments, conveyances and other assurances, documents, and instruments of transfer and taking any action for purposes of assigning, transferring, granting, conveying, and conferring to the Buyer, or reducing to possession, any or all of the Acquired Assets and (ii) entering into the Ancillary Agreements, any transition services or operations support agreements with the Buyer and any other agreements related to implementing the Transactions and (b) take any and all further actions as may be necessary or appropriate to the performance of their obligations as contemplated by the Asset Purchase Agreement or this Sale Order. The Debtors are further authorized to pay, without further order of this Court, whether before, at, or after the Closing, any reasonable expenses or costs that are required to be paid to consummate the Transactions or perform their obligations under the Asset Purchase Agreement.

6. Following the Closing, the Debtors or the Buyer and/or their respective designees are authorized to execute and file a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all obligations, liabilities, and Interests in the Acquired Assets of any kind or nature whatsoever (other than the Permitted Liens and Assumed Liabilities). Upon the Closing and the Debtors' receipt of the Purchase Price, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Debtors' interests in the Acquired Assets and a bill of sale transferring good and marketable title in the Acquired Assets to the Buyer free and clear of all Interests, except for the Permitted Liens and Assumed Liabilities. Each and every federal, state, and local governmental agency, quasi-agency, or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions.

US_ACTIVE-154466812.6

7.      Except for the Permitted Liens, Assumed Liabilities or as expressly provided in the Asset Purchase Agreement, pursuant to Bankruptcy Code Sections 105(a) and 363(f), upon the Closing and the Debtors' receipt of the Purchase Price, the Acquired Assets shall be transferred to the Buyer as required under the Asset Purchase Agreement, and such transfer shall be free and clear of all Interests of any person, including, without limitation, all such Interests specifically enumerated in this Sale Order, whether arising by agreement, by statute, or otherwise and whether occurring or arising before, on, or after the Petition Date, whether known or unknown, occurring, or arising prior to such transfer, with all such Interests to attach to the proceeds of the Sale ultimately attributable to the property against or in which the holder of an Interest claims or may claim an Interest, in the order of their priority, with the same validity, force, and effect which they now have, subject to any claims and defenses the Debtors may possess with respect thereto. Without limiting the generality of the foregoing, the Acquired Assets shall be transferred to the Buyer free and clear of the following: (i) satisfy and release of record, Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated June 15, 2018, and filed for record June 19, 2018, in/as Instrument No. 2018-05836 of the Records of Lonoke County, AR, executed by Remington Arms Company, LLC, in favor of Ankura Trust Company, LLC, securing the original principal amount of $55,000000; (ii) satisfy and release of record, Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated June 15, 2018, and filed for record June 19, 2020, in/as Instrument No. 2018-05387, of the records of Lonoke County, AR, executed by Remington Arms Company, LLC, in favor of Ankura Trust Company, LLC, securing the original principal amount of $100,000,000; (iii) satisfy and release of record, Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated April 18, 2019, and filed for record April 22, 2019, in/as Instrument No. 2019-03652, of the Records of Lonoke

US_ACTIVE-154466812.6

County, AR, executed by Remington Arms Company, LLC, in favor of Cantor Fitzgerald Securities, securing the original principal amount of $90,500,000; and (iv) satisfy and release of record, Lien Subordination Agreement by and between Remington Arms Company, LLC, Cantor Fitzgerald Securities, and Ankura Trust Company, LLC, dated February 21, 2020, and filed for record February 28, 2020, in/as Instrument No. 2020-02102, records of Lonoke County, Arkansas.

8.    The transfer of the Acquired Assets to the Buyer pursuant to the Asset Purchase Agreement constitutes a legal, valid, and effective transfer of the Acquired Assets and shall vest the Buyer with all right, title, and interest of the Debtors in and to the Acquired Assets free and clear of all Interests of any kind or nature whatsoever, except for the Permitted Liens and Assumed Liabilities, with all such Interests to attach to the proceeds of the Sale ultimately attributable to the property against or in which the holder of an Interest claims or may claim an Interest, in the order of their priority, with the same validity, force, and effect which they now have, subject to any claims and defenses the Debtors may possess with respect thereto.

9.    All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Acquired Assets to the Buyer in accordance with the Asset Purchase Agreement and this Sale Order; *provided* that the foregoing restriction shall not prevent any party from appealing this Sale Order in accordance with applicable law or opposing any appeal of this Sale Order, or from enforcing its rights under Bankruptcy Code Section 365 or relieve the Buyer of any Assumed Liability.

10.    Except as expressly permitted by the Asset Purchase Agreement or this Sale Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, dealers, employees, litigation claimants, contract counterparties and other creditors, holding liens, claims

encumbrances, and other interests of any kind or nature whatsoever, including, without limitation, rights or claims based on any taxes or successor or transferee liability, against or in a Debtor or the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtors, the Acquired Assets or the operation of the Acquired Assets before the Closing, or the transactions contemplated by the Asset Purchase Agreement, including, without limitation, the Sale and the assumption and assignment of the Assigned Contracts, are forever barred, estopped, and permanently enjoined from asserting against the Buyer, its respective successors and assigns, its respective property and the Acquired Assets, such persons' or entities' liens, claims, encumbrances, or other Interests, including, without limitation, rights or claims based on any taxes or successor or transferee liability, *provided* that nothing herein shall impair or otherwise affect any right under Bankruptcy Code Section 365 of a lease or contract counterparty to an Assigned Contract under its respective Assigned Contract(s), or relieve the Buyer of any Assumed Liability.

11.    Upon the Closing, each of the Debtors' creditors and any other holder of an Interest is authorized and directed, without cost to the Debtors, to execute such documents and take all other actions as may be necessary to release its Interest in the Acquired Assets, if any, as such Interest may have been recorded or may otherwise exist.  If any person or entity that has filed financing statements or other documents or agreements evidencing an Interest in the Debtors or the Acquired Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Interests, which the person or entity has with respect to the Debtors or the Acquired Assets or otherwise, then the Buyer and its designees are authorized to execute and

US_ACTIVE-154466812.6

file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Debtors or the Acquired Assets and to file, register, or otherwise record a certified copy of this Sale Order, which shall constitute conclusive evidence of the release of all Interests of any kind or nature whatsoever in the Debtors or the Acquired Assets (other than the Permitted Liens and Assumed Liabilities). Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement, including, without limitation, recordation of this Sale Order.

12.     Upon the Closing and the Debtors' receipt of the Purchase Price, all entities that are currently, or on the Closing may be, in possession of some or all of the Acquired Assets are hereby directed to surrender possession of the Acquired Assets to the Buyer, unless the Buyer otherwise agrees.

13.     This Sale Order is self-executing, and neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Sale Order.

14.     To the maximum extent permitted by applicable non-bankruptcy law, (a) the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval (collectively, the "**Permits**") of the Debtors with respect to and included in the Acquired Assets, and (b) all Permits that are included in the Acquired Assets are deemed to have been, and hereby are directed to be, transferred to the Buyer as of the Closing Date. Nothing in this Sale Order, and nothing in the foregoing sentence, authorizes the transfer or assignment of any governmental Permit or the discontinuation of any obligation thereunder without compliance with all applicable legal requirements and approvals under police or regulatory

law.  To the extent any Permit cannot be transferred to the Buyer in accordance with this paragraph, the Buyer, with such assistance from the Debtors as is required under the Asset Purchase Agreement, will work promptly and diligently to apply for and secure all necessary government approvals for the transfer or new issuance of the Permit(s) to the Buyer, and the Debtors shall maintain the Permits to the extent required under and subject to the terms of the Asset Purchase Agreement.  For the avoidance of doubt, while nothing in this Sale Order or the Asset Purchase Agreement releases, nullifies, limits, waives, precludes, or enjoins the enforcement of any police or regulatory authority of a governmental unit, Buyer shall be entitled to operate under each state Permit currently held by or on behalf of the Debtors in relation to the Acquired Assets until such time as each such Permit is transferred to the Buyer and/or an equivalent Permit is issued to the Buyer.

15.    To the extent provided by Bankruptcy Code Section 525, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Acquired Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these Chapter 11 Cases or the consummation of the transactions contemplated by the Asset Purchase Agreement and this Sale Order.

**Implementation of the Sale**

16.    On Closing, the Buyer shall (a) pay the Purchase Price to the Debtors; (b) pay the Cure Costs as more fully described in paragraph 30 of this Sale Order and the Asset Purchase Agreement; (c) assume the Assumed Liabilities; and (d) perform any other obligations required to be performed by Buyer on the Closing.  Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments

23

necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement, including, without limitation, recordation of this Sale Order.

17.     Within three (3) business days of the Debtors' receipt of the Net Sale Proceeds (as defined in the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying Automatic Stay, and (IV) Granting Related Relief* [Docket No. 410] (as it may be modified from time to time, the "**Cash Collateral Order**")) from the sale of the Acquired Assets, the Debtors shall pay the Net Sale Proceeds of the Acquired Assets to the Priority Term Loan Agent, for the account of the Priority Term Loan Secured Creditors, to the extent required under and in accordance with the terms of the Cash Collateral Order or such other order of the Court. Upon the Priority Term Loan Agent's timely receipt of such payment, (a) the Priority Term Loan Obligations shall be paid and satisfied to the extent of the payment and (b) all liens and security interests against the Acquired Assets securing the Priority Term Loan Obligations shall be automatically released and discharged without further action by any person. Upon the payment in full in cash of the Priority Term Loan Obligations and the occurrence of the Challenge Period Termination Date (as defined in the Cash Collateral Order), (w) the Debtors shall have no further indebtedness, liabilities or obligations owing under the Priority Term Loan Credit Agreement or the other "Financing Agreements" (as defined in the Priority Term Loan Agreement, the "**Priority Term Loan Documents**"), (x) other than any provisions thereof that survive pursuant to the terms thereof, the Priority Term Loan Credit Agreement and all other Priority Term Loan Documents (including, without limitation, any mortgages, guaranties and security agreements) and all of the Debtors' obligations thereunder shall terminate and be of no further force and effect, (y) all liens and security interests against the property and assets of the Debtors securing the Priority Term Loan Obligations shall be

US_ACTIVE-154466812.6

automatically fully released and discharged without further action by any person, and (z) each deposit account control agreement in respect of or other sweeps or blocks of any Debtor's deposit accounts or lockboxes in favor of any of the Priority Term Loan Secured Parties shall terminate.

18.    The Debtors shall pay the Net Sale Proceeds from the sale of the Acquired Assets to the FILO Agent, for the account of the FILO Term Loan Secured Creditors, to the extent required under and in accordance with the terms of the Cash Collateral Order or such other order of the Court.  For the avoidance of doubt, any further payment to the FILO Agent shall be subject to orders previously entered by this Court and any further orders of this Court or provided under the Debtors' Chapter 11 plan.

19.    All parties in interest in these Chapter 11 Cases expressly reserve their rights with respect to any allocation of the Purchase Price or value among the purchased Acquired Assets, and any allocation of the Purchase Price or value among the purchased Acquired Assets as determined by the Buyer shall not be determinative or binding on any party in interest in these Chapter 11 Cases except as ordered by the Court after notice and a hearing.

**No Successor Liability**

20.    Other than as expressly set forth in the Asset Purchase Agreement, the Buyer shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any Interests, including under any theory of successor or transferee liability, *de facto* merger or continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated, including without limitation, with respect to any of the following: (i) any foreign, federal, state, or local revenue law, pension law, ERISA, COBRA, tax law, labor law, employment law, the WARN Act, antitrust law, CERCLA, and any other environmental, health and safety laws, or other law, rule, or regulation

(including, without limitation, filing requirements under any such laws, rules or regulations); (ii) under any products liability law, rule, regulation, or doctrine with respect to the Debtors' liability under such law, rule, regulation, or doctrine, or under any product warranty liability law or doctrine; (iii) under any unfair trade practices law, rule, regulation or doctrine with respect to the Debtors' liability under such law, rule, regulation or doctrine, or under any unfair trade practices liability law or doctrine; (iv) any employment or labor agreements, consulting agreements, severance arrangements, change-in-control agreements, or other similar agreement to which the Debtors are a party; (v) any welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of the Debtors; (vi) the cessation of the Debtors' operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation, or other employee benefit plans, agreements, practices and programs, obligations that might otherwise arise from or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967, (g) the Americans with Disabilities Act of 1990, or (h) COBRA; (vii) any liabilities, debts, or obligations of or required to be paid by the Debtors for any taxes of any kind for any period; (viii) any environmental liabilities, debts, claims fines, penalties, or obligations arising from conditions, facts or circumstances first existing or occurring on or prior to the Closing (including, without limitation, the presence of or exposure to chemical, hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis and at any time, including, without limitation, any liabilities, debts, claims, fines, penalties or obligations arising under CERCLA, or any other environmental, health, and safety laws; (viii) any liabilities, debts, claims, fines, penalties, or obligations of or required to be paid by the Debtors for

26

US_ACTIVE-154466812.6

any taxes of any kind for any period; (ix) any liabilities, debts, claims, fines, penalties, or obligations of or required to be paid by the Debtors under any labor, employment, or other law, rule, or regulation (including, without limitation, filing requirements under any such laws, rules, or regulations);  (x) any bulk sale law; and (xi) any litigation.  The Buyer shall have no liability or obligation under the WARN Act simply by virtue of its purchase of assets from the Debtors.

21.     The Buyer has given substantial consideration under the Asset Purchase Agreement, which consideration shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of the Buyer and which shall be deemed to have been given in favor of the Buyer by all holders of Interests and liabilities (except for Permitted Liens and the Assumed Liabilities) in or against the Debtors, or the Acquired Assets.  Without limiting the Buyer's obligation to pay and satisfy the Assumed Liabilities, upon consummation of the Sale, the Buyer shall not be deemed to (a) be the successor to the Debtors or their estates, (b) have, *de facto* or otherwise, merged with or into the Debtors, or (c) be a mere continuation, alter ego or substantial continuation of the Debtors under any theory of law or equity as a result of any action taken in connection with the Asset Purchase Agreement or any of the transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Acquired Assets.

22.     Effective upon the Closing, except with respect to Assumed Liabilities and Permitted Liens, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against the Buyer or its assets (including the Acquired Assets) with respect to any (a) Claim or Lien or (b) successor or transferee liability, including, without limitation, the following actions with respect to clauses (a) and (b): (i) commencing or

27

continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or Claim; (iv) asserting any setoff, right of subrogation, or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating, or failing or refusing to renew any License, permit, or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with such assets.

**Good Faith**

23.    The transactions contemplated by the Asset Purchase Agreement are undertaken by the Buyer without collusion and in good faith, as that term is used in Bankruptcy Code Section 363(m), and, accordingly, the reversal or modification on appeal of the authorization provided in this Sale Order to consummate the Sale and the Transactions shall not affect the validity of the transactions (including the assumption and assignment of any of the Assigned Contracts). The Buyer is a purchaser in good faith of the Acquired Assets and is entitled to all the protections afforded by Bankruptcy Code Section 363(m).

24.    As a good faith purchaser of the Acquired Assets, the Buyer has not entered into an agreement with any other potential bidders at the Auction (other than its agreement with the Firearms Buyer as was fully disclosed to all participants at the Auction), and has not colluded with any of the other bidders, potential bidders or any other parties interested in the Acquired Assets, and, therefore, neither the Debtors nor any successor in interest to the Debtors' estates shall be entitled to bring an action against the Buyer, and the Sale may not be avoided pursuant to Section 363(n) of the Bankruptcy Code.

US_ACTIVE-154466812.6

25.     The consideration provided by the Buyer for the Acquired Assets under the Asset Purchase Agreement constitutes reasonably equivalent value, fair value, reasonable market value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.  The Sale may not be avoided under Bankruptcy Code Section 363(n).  The Asset Purchase Agreement was not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or for any other purpose that would give rise to statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable jurisdiction with laws substantially similar to the foregoing.  Neither the Debtors nor the Buyer have entered into the Asset Purchase Agreement or any agreement contemplated thereby or are consummating the Sale with any fraudulent or otherwise improper purpose, including, without limitation, to evade any pension liabilities.  No other person or entity or group of persons or entities has offered to purchase the Acquired Assets for an amount that would provide greater value to the Debtors and their estates than the value provided by the Buyer.  The Court's approval of the Motion and the Asset Purchase Agreement are in the best interests of the Debtors, the Debtors' estates, their creditors, and all other parties in interest.

26.     The Buyer is not an "insider" as that term is defined in Section 101(31) of the Bankruptcy Code.

**Assumption and Assignment of Assigned Contracts; Assumed Liabilities**

27.     Pursuant to Bankruptcy Code Sections 105(a), 363, and 365, the Bidding Procedures Order, and subject to and conditioned upon the Closing of the Sale, the Debtors' sale,

29

assumption and assignment to the Buyer of the Assigned Contracts is approved, and the requirements of Bankruptcy Code Section 365(b)(1) with respect thereto are deemed satisfied.

28.    The Debtors are authorized in accordance with Bankruptcy Code Sections 105(a) and 365 to (i) assume and assign to the Buyer, effective as of the Closing and at such other times as may be specified in accordance with the terms and conditions of the Asset Purchase Agreement, as provided by, and in accordance with, the Bidding Procedures Order and the Asset Purchase Agreement, the Assigned Contracts free and clear of all Interests of any kind or nature whatsoever, other than the Permitted Liens and Assumed Liabilities, and (ii) execute and deliver to the Buyer such documents or other instruments as the Buyer reasonably deems necessary to assign and transfer the Assigned Contracts to the Buyer.

29.    The Assigned Contracts shall be transferred and assigned to, pursuant to the Bidding Procedures Order and the Asset Purchase Agreement, and thereafter remain in full force and effect for the benefit of, the Buyer, notwithstanding any provision in any such Assigned Contract (including, but not limited to, those of the type described in Bankruptcy Code Sections 365(b)(2), (e)(1), and (f)) that prohibits, restricts, or conditions such assignment or transfer.  The Debtors shall be relieved from any further liability with respect to the Assigned Contracts after such assumption and assignment to the Buyer.  The Debtors may assign each Assigned Contract in accordance with Bankruptcy Code Sections 363 and 365, and any provisions in any Assigned Contracts that prohibit or condition the assignment of such Assigned Contracts or terminate, recapture, impose any penalty, condition, renewal, or extension, or modify any term or condition upon the assignment of such Assigned Contracts, constitute unenforceable anti-assignment provisions which are void and of no force and effect.  All other requirements and conditions under

Bankruptcy Code Sections 363 and 365 for the assumption by the Debtors and assignment to the Buyer of each Assigned Contract have been satisfied.

30.     All defaults and all other obligations or liabilities under any Assigned Contract occurring, arising, or accruing prior to the date of the assignment or transfer to the Buyer shall be deemed cured or satisfied upon payment by the Buyer and/or the Debtors (in each case in accordance with Section 1.5 of the Asset Purchase Agreement) of the proposed Cure Cost, as set forth in the Notice of Assumption and Assignment, any Supplemental Notice of Assumption and Assignment, or any other cure amount reached by agreement after an Assigned Contract Objection or otherwise, and, without limiting the foregoing, no effect shall be given to any default of the type set forth in Bankruptcy Code Section 365(b)(2), or the type of default concerning an unexpired lease of real property described in Bankruptcy Code Section 365(b)(1) whether or not such Assigned Contract is an executory contract within the meaning of Bankruptcy Code Section 365.

31.     Each non-Debtor counterparty to the Assigned Contracts shall be forever barred, estopped, and permanently enjoined from (a) asserting against the Debtors, the Buyer, or their respective property (including the Acquired Assets) any fee, acceleration, default, breach, Claim (including any counterclaim, defense, or setoff capable of being asserted against the Debtors), pecuniary loss, or condition to assignment existing, arising, or accruing as of the Closing Date, or arising by reason of the Closing, including any breach related to or arising out of any change-in-control provision in such Assigned Contracts, or any purported written or oral modification to the Assigned Contracts, and (b) asserting against the Buyer (or its property, including the Acquired Assets) any Claim or Lien, counterclaim, breach, condition or setoff asserted or capable of being asserted against the Debtors existing as of the Closing Date or arising by reason of the Closing except for the Assumed Liabilities and Permitted Liens.

US_ACTIVE-154466812.6

32.     The Cure Costs amounts listed on the Notice of Assumption and Assignment, any Supplemental Notice of Assumption and Assignment, or any other cure amount reached by agreement after an Assigned Contract Objection or otherwise, reflect the sole amounts necessary under Bankruptcy Code Section 365(b) to cure all monetary defaults under the Assigned Contracts, and no other amounts are or shall be due to the non-debtor parties in connection with the assumption by the Debtors and assignment to the Buyer of the Assigned Contracts. Notwithstanding anything to the contrary herein, if the Cure Costs for an Assigned Contract is determined to be greater than the proposed Cure Costs asserted in the Notice of Assumption and Assignment or Supplemental Notice of Assumption and Assignment, the Buyer may decide, in its discretion, not to assume that Assigned Contract.  Notwithstanding anything to the contrary herein, in each case in accordance with Bidding Procedures Order and the terms and conditions of the Asset Purchase Agreement, the Buyer may decide (i) not to assume one or more unexpired leases and executory contracts designated on Schedule 1.1(h) of the Asset Purchase Agreement (or Schedule 1.1(g) of the Backup Bid Agreement), and (ii) to supplement Schedule 1.1(h) of the Asset Purchase Agreement (or Schedule 1.1(g) of the Backup Bid Agreement) by including any previously omitted unexpired lease or executory contract.

33.     The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Buyer's rights to enforce every term and condition of the Assigned Contracts.

34.     Notwithstanding anything in the Asset Purchase Agreement or this Sale Order to the contrary and for the avoidance of doubt, the Acquired Assets shall not include any of the Excluded Assets as set forth in Section 1.2 of the Asset Purchase Agreement.

US_ACTIVE-154466812.6

35.     The Buyer shall be responsible for the satisfaction of the Assumed Liabilities under the Asset Purchase Agreement, including without limitation the Buyer Cure Amount (or in the case of the Backup Bid Agreement, the Cure Amount) arising under the Assigned Contracts. Except as provided in the Asset Purchase Agreement or this Sale Order, after the Closing, the Debtors and their estates shall have no further liability or obligations with respect to any Assumed Liability, including those arising under the Assigned Contracts, and all holders of such claims are forever barred and estopped from asserting any claims under any Assumed Liability (including those arising under the Assigned Contracts) against the Debtors, their successors or assigns, and their estates.

**Backup Bidder**

36.     SIG Sauer, Inc. (the "**Backup Bidder**") is hereby approved as the "Backup Bidder" under the Bidding Procedures Order, and pursuant to Bankruptcy Code Sections 105, 363, and 365, the Asset Purchase Agreement attached hereto as Exhibit B (the "**Backup Bid Agreement**") submitted by the Backup Bidder, the sale of the Acquired Assets (as defined in the Backup Bid Agreement), and consummation of the Sale to the Backup Bidder are hereby approved as the Backup Bid under the Bidding Procedures Order.  The Backup Bid on the terms set forth in the Backup Bid Agreement is hereby approved and authorized as a Backup Bid and shall remain open as a Backup Bid pursuant to the terms of the Bidding Procedures Order and the bid terms submitted at the Auction.  In the event that the Successful Bidder cannot or refuses to consummate the Sale because of a breach or failure on the part of the Successful Bidder, the Backup Bidder will be deemed the new Successful Bidder and the Debtors shall be authorized, but not directed, to close, and take all actions necessary to close, with the Backup Bidder on the Backup Bid Agreement without further order of the Court, and in such case, all findings and other provisions of this Sale

33

Order shall apply to the Backup Bidder and the Backup Bid Agreement to the same extent they do

with respect to the Buyer and the Asset Purchase Agreement.

**Other Provisions**

37.    Nothing in this Sale Order or in the Asset Purchase Agreement entered into

pursuant to this Sale Order releases, nullifies, precludes, or enjoins the enforcement of any police

or regulatory authority of a governmental unit.

38.    This Sale Order and the Asset Purchase Agreement shall be binding in all respects

upon all known and unknown creditors of, and holders of equity security interests in, any Debtor,

including any holders of Interests, all counterparties to the Assigned Contracts, all counterparties

to contracts that are not assumed or assigned, all successors and assigns of the Buyer, each Debtor

and their affiliates and subsidiaries, the Acquired Assets, and any trustees appointed in the Chapter

11 Cases or upon a conversion to cases under Chapter 7 of the Bankruptcy Code, and this Sale

Order shall not be subject to amendment or modification and the Asset Purchase Agreement shall

not be subject to rejection.  Nothing contained in any Chapter 11 plan confirmed in any Debtor's

bankruptcy case, any order confirming any such Chapter 11 plan, or any other order in the Chapter

11 Cases shall alter, conflict with, or derogate from, the provisions of the Asset Purchase

Agreement or this Sale Order.

39.    To the extent applicable, the automatic stay pursuant to Section 362 of the

Bankruptcy Code is hereby lifted with respect to the Debtors to the extent necessary, without

further order of the Court (a) to allow the Buyer to give the Debtors any notice provided for in the

Asset Purchase Agreement, and (b) to allow the Buyer to take any and all actions permitted by the

Asset Purchase Agreement.

34

40.     No bulk sales law or similar law shall apply in any way to the transactions contemplated by the Sale, the Asset Purchase Agreement, the Motion, and this Sale Order.

41.     This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the Asset Purchase Agreement, all amendments thereto, and any waivers and consents thereunder, including, but not limited to, retaining jurisdiction to (i) enforce the terms of the Asset Purchase Agreement; (ii) compel delivery of the Acquired Assets to the Buyer; (iii) interpret, implement, and enforce the provisions of this Sale Order; (iii) protect the Buyer, any of the Buyer's affiliates, or any agent of the foregoing, against any Interests against the Debtors or the Acquired Assets of any kind or nature whatsoever, except for the Permitted Liens and Assumed Liabilities, and (iv) enter any order under Bankruptcy Code Sections 363 and 365.

42.     No brokers were involved in consummation of the Sale, and no brokers' commissions are due to any person in connection with the Sale; *provided, however*, that this provision does not impact any transaction or other fees due to investment bankers or financial advisors employed (a) by the Debtors, including, but not limited to Ducera Partners LLC, or certain of their creditors for which the Debtors may be obligated to pay in accordance with an engagement letter with such professional(s), or (b) by the Buyers.

43.     To the extent there is any inconsistency between the terms of this Sale Order and the terms of the Asset Purchase Agreement (including all ancillary documents executed in connection therewith), the terms of this Sale Order shall govern.

44.     The failure to specifically include any particular provision of the Asset Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it

US_ACTIVE-154466812.6

being the intent of the Court that the Asset Purchase Agreement be authorized and approved in its entirety.

45.     The Asset Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, *provided* that the Debtors shall provide the Bid Consultation Parties with three (3) business days' notice thereof and *provided* further that any such modification, amendment, or supplement does not, based on the Debtors' judgment, have a material adverse effect on the Debtors' estates.

46.     Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), this Sale Order shall not be stayed for fourteen (14) days after its entry and shall be effective immediately upon entry, and the Debtors and the Buyer are authorized to close the transaction immediately upon entry of this Sale Order.  Time is of the essence in closing the transactions referenced herein, and the Debtors and the Buyer intend to close the transactions as soon as practicable.  This Sale Order is a final, appealable order and the period in which an appeal must be filed shall commence upon the entry of this Sale Order.

47.     The provisions of the Asset Purchase Agreement and this Sale Order may be specifically enforced in accordance with the Asset Purchase Agreement notwithstanding the appointment of any Chapter 7 or Chapter 11 trustee after the Closing.

48.     Headings utilized in this Sale Order are for convenience of reference only, and do not constitute a part of this Sale Order for any other purpose.

49.     All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

50.     The provisions of this Sale Order are non-severable and mutually dependent.

36

51.    <u>All issues raised by</u> Oracle America, Inc. ("**Oracle**") in *Oracle's Limited Objection and Reservation of Rights Regarding (a) Debtors' Motion for (a) an Order Establishing Bidding Procedures and Granting Related Relief and (ii) an Order or Orders Approving the Sale of the Debtors' Assets; and (b) Notice of Executory Contracts and Unexpired Leases that May Be Assumed and Assigned in Connection with the Sale of the Debtors' Assets and the Proposed Cure Cost with Respect Thereto* (the "Oracle Objection") [Docket No. 529] are expressly reserved.  <u>The</u> Oracle Objection <u>may</u> be set for hearing on an expedited basis upon the request of Oracle and/or the Debtors.

Dated: _____, 2020

_____
UNITED STATES BANKRUPTCY JUDGE

US_ACTIVE-154466812.6

# Exhibit A

**Asset Purchase Agreement**

US_ACTIVE-154466812.6

**<u>EXHIBIT 4</u>**

(*See* attached Adjustment Escrow Agreement)

EXHIBIT 4

## ESCROW AGREEMENT

This ESCROW AGREEMENT, dated as of the date set forth beneath the signature of the Buyer below (this "***Agreement***"), is made and entered into by and among Remington Outdoor Company, Inc. (the "***Company***"), the buyer signatory hereto (the "***Buyer***"), and M-III Advisory Partners, LP (the "***Escrow Agent***"). The Company and the Buyer are sometimes referred to individually as a "***Party***" and collectively as the "***Parties***".

<u>RECITALS</u>

WHEREAS, the Buyer is seeking to acquire certain assets of the Company pursuant to an Asset Purchase Agreement by and between the Buyer and the Company and certain of its subsidiaries entered into in connection herewith (the "***APA***"), and in accordance with the APA, the Company and the Buyer have agreed to deposit into escrow the amount set forth beneath the Buyer's signature to this Agreement (the "***Adjustment Escrow Amount***") with the Escrow Agent; and

WHEREAS, the Escrow Agent is willing to hold and administer the Adjustment Escrow Amount, but only upon the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby covenant and agree as follows:

1.    <u>Appointment</u>. The Company and the Buyer hereby designate, constitute and appoint M-III Advisory Partners, LP as Escrow Agent under this Agreement, and the Escrow Agent accepts such designation and appointment. In such capacity, the Escrow Agent shall hold and administer the Adjustment Escrow Amount in accordance with the terms of this Agreement.

2.    <u>Deposit of Funds</u>. Unless the Escrow Agent shall otherwise agree in writing, the Buyer shall transfer the Adjustment Escrow Amount to the Adjustment Escrow Account by wire transfer of immediately available funds in United States dollars. Upon receipt of the Adjustment Escrow Amount, the Escrow Agent will notify the Buyer and the Company by email at the addresses set forth below their signatures to this Agreement.

3.    <u>Terms of Adjustment Escrow Account</u>. The Buyer and the Company irrevocably and unconditionally acknowledge and agree that:

(a)   The Adjustment Escrow Account shall be deposited into a bank account owned by, and titled in the name of, the Escrow Agent (the "***Adjustment Escrow Account***") with a federally-insured depositary institution.

(b)   The Adjustment Escrow Account shall be segregated from the general operating funds of the Escrow Agent, but the Adjustment Escrow Account shall **<u>not</u>** be a trust or similar account.

(c)   The Adjustment Escrow Account shall **not** accrue interest for the benefit of the Buyer or the Company.

(d)   Notwithstanding anything to the contrary contained in this Agreement, the Escrow Agent shall have no obligation to disburse funds from the Adjustment Escrow Account until the funds deposited into such account by the Buyer constitute cleared funds and are not subject to recapture by the Buyer's bank.

(e)   The Escrow Agent is not a party to any underlying purchase agreement (including the APA) between the Buyer and the Company and shall have no obligation to comply with the terms thereof.  The escrow arrangement contemplated by this Agreement and the administration of the Adjustment Escrow Account shall be governed solely by the terms of this Agreement and without regard to the terms of the APA.

4.   Release of Funds.

(a)   The Adjustment Escrow Account shall be released by the Escrow Agent only in accordance with the terms of this Agreement or order of a court of competent jurisdiction.

(b)   The Parties shall act in accordance with, and the Escrow Agent shall hold and release the Escrow Funds as provided in, this Section 4(b) as follows:

(i)   Upon receipt of a Joint Release Instruction with respect to any of the Adjustment Escrow Amount, the Escrow Agent shall promptly, but in any event within two (2) business days after receipt of a Joint Release Instruction, disburse all or part of the Adjustment Escrow Amount in accordance with such Joint Release Instruction.

(ii)  Upon receipt by the Escrow Agent of a copy of Final Determination from any Party, the Escrow Agent shall on the fifth (5th) business day following receipt of such Final Determination, disburse as directed, part or all, as the case may be, of the Adjustment Escrow Amount which are the subject of the Final Determination (but only to the extent funds are available in the Adjustment Escrow Account) in accordance with such Final Determination.  The Escrow Agent may act on such Final Determination without further inquiry.

(iii) All payments of any part of the Adjustment Escrow Amount shall be made by wire transfer of immediately available funds or check as set forth in the Joint Release Instruction or Final Determination, as applicable.

(b)   Certain Definitions.

(i)   "***Final Determination***" means a final non appealable order of any court of competent jurisdiction with respect to the disposition of the Adjustment Escrow Amount, together with (A) a certificate of the prevailing Party to the effect that such order is final and non-appealable and from a court of competent jurisdiction

having proper authority and (B) the written payment instructions of the prevailing Party to effectuate such order.

(ii) "*Joint Release Instruction*" means the joint written instruction executed by an authorized signer of each of the Company and the Buyer directing the Escrow Agent to disburse all or a portion of the Adjustment Escrow Amount, as applicable.

5.    Status of the Escrow Agent.

(a)    The Escrow Agent is to be considered and regarded as a depository only, and shall not be responsible or liable (except for its fraud, gross negligence, or willful misconduct) for the sufficiency or correctness as to form, manner of execution, or validity of any instrument deposited as part of the Adjustment Escrow Account, nor as to the identity, authority, or rights of any person executing the same. The Escrow Agent's duties hereunder shall be limited to the safekeeping investment of money, instruments, and securities received by it as Escrow Agent and for their disbursement in accordance with the terms, provisions and conditions of this Agreement.

(b)    The Escrow Agent shall not be responsible for the genuineness of any certificate or signature and may rely conclusively upon and shall be protected when acting upon any notice, affidavit, request, consent, instruction, check, or other instrument believed by the Escrow Agent in good faith to be genuine or to be signed or presented by the proper person, or duly authorized, or properly made.  The Escrow Agent will not be required to investigate the authority of the person executing and delivering any instructions hereunder, or otherwise to verify the accuracy of the statements or information presented therein.  The Escrow Agent shall have no responsibility except for the performance of the Escrow Agent's express duties under this Agreement and no additional duties shall be inferred or implied.

(c)    The Escrow Agent shall not be liable for any act or omission in the performance of the duties of the Escrow Agent under this Agreement unless such act or omission constitutes fraud, bad faith or gross negligence.  In furtherance, and not in limitation, of the foregoing sentence, the Escrow Agent will not be liable for any loss or damage resulting from the following (i) any default, error, action, or omission of any other party, (ii) the expiration of any time limit unless such time limit was known to Escrow Agent and such loss is solely caused by failure of Escrow Agent to proceed in its ordinary course of business, (iii) any loss or impairment of funds while on deposit with a federally-insured bank, resulting from failure, insolvency or suspension of such bank, and (iv) the Escrow Agent's compliance with any and all legal process, writs, orders, judgments, and decrees of any court, whether issued with or without jurisdiction and whether or not subsequently vacated, modified, set aside or reversed.  The Escrow Agent will not be accountable for any incidental benefit that may be attributable to the Adjustment Escrow Account.

(d)    The Escrow Agent shall not be required to institute or defend any action involving any matters relating to this Agreement or which affect the Escrow Agent or the duties or liabilities of the Escrow Agent under this Agreement unless or until requested to do so by any

party to this Agreement, and then only upon receiving full indemnity, in form and substance satisfactory to the Escrow Agent, against all claims, liabilities and expenses.

6.    OFAC Representation. Neither the Buyer nor any of its subsidiaries nor, to the knowledge of the Buyer, any director, officer, agent, employee, or person acting on behalf of the Buyer or any subsidiary of the Buyer is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("*OFAC*"), and the Buyer will not directly or indirectly lend, contribute or otherwise make available any proceeds to any joint venture partner or other person or entity, towards any sales or operations in Cuba, Iran, Syria, Sudan, Myanmar or any other country sanctioned by OFAC or for the purpose of financing the activities of any person or entity, including those designated by OFAC as "Specially Designated Nationals" or "SDNs," currently subject to any U.S. sanctions administered by OFAC.

7.    Disputes. In event of any dispute among the parties with respect to the Escrow Agent or the duties of the Escrow Agent:

(a)    the Escrow Agent may act or refrain from acting in respect of any matter referred to in this Escrow Agreement in full reliance upon and by and with the advice of counsel and shall be fully protected in so acting or in refraining from acting upon advice of counsel; or

(b)    the Escrow Agent may refrain from acting until required to do so by a final and non-appealable order of a court of competent jurisdiction.

In addition, the Escrow Agent will have the right, exercisable in its sole discretion, to resign by giving written notice to the Company and the Buyer, specifying a date on which such resignation will take effect, which will be no earlier than ten (10) business days after the delivery of such notice. Promptly upon receipt of such notice, the Company and the Buyer will appoint a mutually acceptable successor escrow agent. Upon delivery by the successor escrow agent to Company, Buyer, and Escrow Agent of a written instrument accepting such appointment, the successor escrow agent will succeed to all the rights and duties of Escrow Agent hereunder. If a successor escrow agent is not appointed by the expiration of such ten (10) business day period, the Escrow Agent will have the right, exercisable in its sole discretion, to be discharged by tendering unto the registry or custody of any court of competent jurisdiction the Adjustment Escrow Account, together with any such legal pleadings as it deems appropriate.

8.    Fee of Escrow Agent. The Company shall be liable for the fees of the Escrow Agent in connection with this Agreement and such fees shall not be chargeable against the Escrow Fund. The Company further acknowledges and agrees that the services provided by the Escrow Agent hereunder constitute "Services" for the purposes of (and as defined in) the engagement letter, dated April 23, 2020, between the Escrow Agent and the Company.

9.    Non-Waiver. No delay or failure by any party to exercise any right hereunder, and no partial or single exercise of any such right, shall constitute a waiver of that or any other right, unless otherwise expressly provided herein.

10. <u>Notices</u>.  All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered or mailed, by overnight express mail (e.g., Federal Express) to relevant party at the address set forth below is signature to this Agreement or as otherwise expressly set forth herein.  The address of any party may be changed by notice duly given as provided above.

11. <u>Nonexclusive Protection</u>. The provisions of this Agreement are cumulative and not exclusive of any other rights or remedies which any party may have at law or equity.

12. <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns; *provided* that any permitted assignment of either party's obligations or liabilities shall not relieve that party of any of its liabilities or obligations under this Agreement.

13. <u>Titles</u>. The titles are for convenience or reference and shall not deemed to modify or affect the interpretation of this Agreement. The term "herein" in this Agreement refers to this Agreement as a whole and not to any particular section hereof.

14. <u>Modification</u>. Neither this Escrow Agreement, nor any of its provisions, shall be modified, changed, discharged, or terminated except by an instrument in writing which has been signed by the party against whom the enforcement of any modification, change, discharge or termination is sought.

15. <u>Further Assurances</u>. In connection with the transactions contemplated by this Escrow Agreement, the parties agree to execute any additional agreements, instruments or documents and to perform and do any additional acts and things as may be reasonably necessary and proper to effectuate and carry out the transactions contemplated by this Agreement.

16. <u>Delay</u>. No delay or omission on the part of any party in exercising any right shall operate as a waiver of that right or any other right.  A waiver on any one occasion shall not be construed as a bar to or waiver of any right on any future occasion.

17. <u>No Third-Party Beneficiaries</u>.  The terms and provisions of this Agreement are for the benefit only of the Company, the Buyer, and the Escrow Agent, and their respective successors and assigns. Nothing contained herein will be deemed or construed to inure to the benefit of any other person or party, it being the express intent of the Company, the Buyer, and the Escrow Agent that no such person or party will be entitled to any of the benefits hereunder, except as expressly provided herein.

18. <u>Governing Law</u>. This Agreement shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York.

19. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall an original, but all of which together shall constitute the same Agreement. Any page of any such counterpart, or any electronic facsimile thereof, may be attached or appended to any

other counterpart to complete a fully executed counterpart of this Agreement, and any telecopy or other facsimile transmission of any signature shall be deemed an original and shall bind each Party.

*[Signature Page Follows.]*

IN WITNESS WHEREOF, each party hereto has caused this Agreement to be executed and delivered by its duly authorized signatory as of this ___ day of September, 2020.

**COMPANY**:

**REMINGTON OUTDOOR COMPANY, INC.**

**BUYER**:

**SIG SAUER INC.**

By:_____

   Name:

   Title:

By:_____

   Name:

   Title:

Address for Notices:

Remington Outdoor Company, Inc.
100 Electronics Blvd., SW
Huntsville, Alabama 35824
Attention: Ken D'Arcy
Email:  ken.darcy@remington.com

EIN: 26-0174491

Address for Notices:

SIG Sauer, Inc.
72 Pease Boulevard
Newington, New Hampshire 03801
Attention: Daryl Hanna, and Steven Shawver, Esq.
Email: Daryl.Harma@sigsauer.com and Steven.Shawver@sigsauer.com, respectively

EIN: 020528156

Adjustment Escrow Amount:
US$1,000,000.00

With a copy to:

O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, California 90071
Attention: John Paul Motley, Esq., and Stephen H. Warren, Esq.
Phone: (213) 430-6100 and (213) 430-7875, respectively
Email: jpmotley@omm.com and swarren@omm.com, respectively

**<u>ESCROW AGENT</u>**:

M-III ADVISORY PARTNERS, LP


By:_____
   Name:
   Title:

Address for Notices:

1700 Broadway – 19th Floor
New York, New York 10019
Attention:  General Counsel
Email:  legal@miiipartners.com

# **EXHIBIT 5**

(*See* attached Balance Sheet Rules)

EXHIBIT 5

## Balance Sheet Rules

Capitalized terms used but not defined in this Exhibit shall have the meanings given to them in the Agreement or if not defined in the Agreement, the meaning given to them under "GAAP", which means generally accepted accounting principles in effect from time to time.

"Balance Sheet Rules" means GAAP, as applied using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies that were used in the preparation of the financial statements of the Business and the Seller. For purposes of the Pre-Closing Statement, Post-Closing Statement, Estimated Inventory Amount, Closing Inventory Amount, and Final Inventory Amount, in the event of a difference between GAAP and past practice, all amounts shall be recorded in accordance with GAAP.

Notwithstanding the foregoing, the value of Inventory set forth on the Pre-Closing Statement and Estimated Inventory Amount may not be increased by way of a new account or change in accounting methodology as compared to past practice.

For purposes of determining Estimated Inventory Amount and Closing Inventory Amount, Inventory shall mean means the merchantable, quality inventory of the Business (calculated in the same manner as the balances set forth in data-room file 1.1.1.2.46, including reserves), that is saleable in the ordinary course of business, recorded in accordance with GAAP (for avoidance of doubt, Inventory will include sufficient reserves for damaged, slow-moving, shrink, spoilage, and obsolete inventory, and will be adjusted for the results of inventory counts performed as required for closing).

Any purchase accounting adjustments required under ASC 805 (the former Statement of Financial Accounting Standards No. 141R, Business Combinations) that result from the transactions contemplated by the Asset Purchase Agreement will be excluded.

## Inventory Amount Illustrative Example

| Account description | Account number | 08/31/2020[1] |
|---|---|---|
| Inventory, net: | | |
|   Raw materials, net: | | |
|     Raw materials | A1010301A | 9,457,939 |
|     Raw materials reserves | A1010301B | (1,333,242) |
|     **Raw materials, net** | | 8,124,698 |
|   Work in process, net: | | |
|     Work in process | A1010302A | 5,239,874 |
| | A1010302C | |
|     WIP reserves | A1010302B | (251,932) |
|     **Work in process, net** | | 4,987,942 |
|   Finished goods, net: | | |
|     Finished goods | A1010303A | 5,900,097 |
|     Finished goods reserves | A1010303B | (831,670) |
|     **Finished goods, net** | | 5,068,427 |
| **Total Inventory (Net) [2]** | | **$18,181,067** |
| **Inventory Amount Target** | | **$15,752,076** |

Sample Calculation
Sample Final Inventory Amount: $16,181,067
Inventory Amount Target: $15,752,076
Sample Inventory Amount Overage: $428,991

Inventory Collar Amount: +/- $2,000,000

Sample Purchase Price Adjustment: $0 (Sample Inventory Amount
Overage is less than or equal to the Inventory Collar Amount, resulting in
no Sample Purchase Price Adjustment)

1)   *Based on dataroom file 1.1.1.2.56 (period end-date not specified – refers to*
    *2020.AUG period).*
2)   *For the avoidance of doubt, Estimated Inventory Amount and Closing Inventory*
    *Amount balances exclude impacts from unallocated Corporate amounts and should*
    *be calculated on a consistent basis with data-room files referenced in this exhibit.*

USA\602465995.2\3004856\000001

# Notice Recipients

District/Off: 1126–8        User: admin        Date Created: 9/30/2020

Case: 20–81688–CRJ11        Form ID: pdfall        Total: 190

**Recipients of Notice of Electronic Filing:**

| | | |
|---|---|---|
| ba | Richard M Blythe | Richard_Blythe@alnba.uscourts.gov |
| op | Sarah Link Schultz | sschultz@akingump.com |
| aty | Alexandra K. Garrett | agarrett@silvervoit.com |
| aty | Alinor C. Sterling | asterling@koskoff.com |
| aty | Andrew J. Shaver | ashaver@bradley.com |
| aty | Andrew Philip Walker | walker.andrew@pbgc.gov |
| aty | Benjamin L. Locklar | ben.locklar@beasleyallen.com |
| aty | Benjamin Shaw Goldman | bgoldman@handfirm.com |
| aty | Bill D Bensinger | bdbensinger@csattorneys.com |
| aty | Brenton K. Morris | bmorris@bcattys.com |
| aty | Brian R Walding | bwalding@waldinglaw.com |
| aty | Charles R. Johanson, III | rjohanson@ehjlaw.com |
| aty | Christopher A. Jones | cajones@wtplaw.com |
| aty | Christopher T. Conte | ctc@helmsinglaw.com |
| aty | Clark R Hammond | chammond@wallacejordan.com |
| aty | Clyde Ellis Brazeal, III | ebrazeal@joneswalker.com |
| aty | Cullen K. Kuhn | ckkuhn@bryancave.com |
| aty | Daniel D Sparks | ddsparks@csattorneys.com |
| aty | David Elsberg | delsberg@selendygay.com |
| aty | David H. Arkoosh | david@arkooshlaw.com |
| aty | David Lewis Selby, II | dselby@baileyglasser.com |
| aty | David M. Bernard | dbernard@koskoff.com |
| aty | David W. Ross, Esq. | dross@babstcalland.com |
| aty | Derek F Meek | dmeek@burr.com |
| aty | Donald Bernstein | Donald.bernstein@davispolk.com |
| aty | Donald K. Ludman | dludman@brownconnery.com |
| aty | Edward J Peterson, III | epeterson.ecf@srbp.com |
| aty | Edwin Bryan Nichols | bnichols@waldinglaw.com |
| aty | Elizabeth S. Lynch | lynch@lynchsharp.com |
| aty | Eric J. Taube | eric.taube@wallerlaw.com |
| aty | Eric T Ray | eric.ray@wallerlaw.com |
| aty | Erica K. Dausch | edausch@babstcalland.com |
| aty | Erica R. Iverson | eiverson@selendygay.com |
| aty | Faith Gay | fgay@selendygay.com |
| aty | Frederick Darrell Clarke, III | fclarke@rumberger.com |
| aty | Gregory Michael Taube | greg.taube@nelsonmullins.com |
| aty | Hanna Lahr | hlahr@burr.com |
| aty | Hannah Leah Uricchio | uricchio.hannah@pbgc.gov |
| aty | Henry C. Shelton, III | henry.shelton@arlaw.com |
| aty | Howard Marc Spector | hspector@spectorcox.com |
| aty | Jacob H. Marshall | jmarshall@beneschlaw.com |
| aty | Jan M. Hayden | jhayden@bakerdonelson.com |
| aty | Jay R. Bender | jbender@babc.com |
| aty | Jeffrey W. Wisner | jwisner@koskoff.com |
| aty | Jeremy L Retherford | jretherford@balch.com |
| aty | Jesse S Vogtle, Jr | jesse.vogtle@wallerlaw.com |
| aty | Joanna Caitlin Berry McDonald | joanna.mcdonald@davispolk.com |
| aty | Jonathan E Raulston | jraulston@ehjlaw.com |
| aty | Jonathan Paul Hoffmann | jhoffmann@balch.com |
| aty | Jordan Garman | jgarman@selendygay.com |
| aty | Joshua D. Koskoff | jkoskoff@koskoff.com |
| aty | Justin B. Little | jlittle@rrllaw.com |
| aty | Kathleen M. LaManna | klamanna@goodwin.com |
| aty | Kevin Michael Capuzzi | kcapuzzi@beneschlaw.com |
| aty | Kimberly E. Neureiter | neureiter.kimberly@pbgc.gov |
| aty | Lawrence B Voit | lvoit@silvervoit.com |
| aty | Lindan J. Hill | lhill@gattorney.com |
| aty | Mark P. Williams | mpwilliams@nwkt.com |
| aty | Masten Childers, III. | mchilders@wtplaw.com |
| aty | Matthew M Cahill | mcahill@bakerdonelson.com |
| aty | Melissa W. Larsen | mwlarsen67@gmail.com |
| aty | Nicholas Christian Glenos | cglenos@bradley.com |
| aty | Paul Greenwood | paul.greenwood@wallerlaw.com |
| aty | Paul M. Hoffmann | paul.hoffmann@stinson.com |
| aty | R. Scott Williams | swilliams@rumberger.com |
| aty | Richard Patrick Carmody | richard.carmody@arlaw.com |
| aty | Rita L Hullett | rhullett@bakerdonelson.com |
| aty | Robert Kolodney | rkolodney@kanekessler.com |
| aty | Scott M Harrington | sharrington@dmoc.com |

| aty | Stephen B Porterfield | sporterfield@sirote.com |
|---|---|---|
| aty | Steven Pohl | spohl@brownrudnick.com |
| aty | Steven D Altmann | steve@nomberglaw.com |
| aty | Stuart H. Memory | smemory@memorylegal.com |
| aty | Stuart M Maples | smaples@mapleslawfirmpc.com |
| aty | Susan M Freeman | sfreeman@lrrc.com |
| aty | Tazewell Shepard | taze@ssmattorneys.com |
| aty | Tazewell Taylor Shepard, IV | ty@ssmattorneys.com |
| aty | Thomas Benjamin Humphries | thumphries@sirote.com |
| aty | Vivek Vijay Tata | vtata@selendygay.com |
| aty | William F. Godbold IV, IV | william.godbold@natstatelaw.com |
| aty | William Wesley Causby | wcausby@memorylegal.com |

TOTAL: 81

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

| db | Remington Outdoor Company, Inc.    100 Electronics Boulevard SW    Huntsville, AL 35824 |
|---|---|
| cr | Franklin Advisers, Inc.    One Franklin Parkway    San Mateo, CA 94403 |
| sp | Stephen H. Warren    O'Melveny & Myers LLP    400 South Hope Street    Los Angeles, CA 90071–2899 |
| sp | Karen Rinehart    O'Melveny & Myers LLP    400 South Hope Street    Los Angeles, CA 90071–2899 |
| op | Bradley C Meyer    Ducera Partners LLC    499 Park Avenue, 16th Floor    New York, NY 10022 |
| op | Colin M. Adams    M–III Advisory Partners, LP    130 W 42nd Street, 17th Floor    New York, NY 10036 |
| sp | Nancy Mitchell    Times Square Tower    7 Times Square    New York, NY 10036 |
| sp | Diana M. Perez    Times Square Tower    7 Times Square    New York, NY 10036 |
| cr | Ankura Trust Company, LLC    c/o Benjamin S. Goldman    Hand Arendall Harrison Sale LLC    1801 5th Avenue North    Suite 400    Birmingham, AL 35203 |
| cr | United Mine Workers of America    c/o R. Scott Williams    2001 Park Place North    Suite 1300    Birmingham, AL 35203 UNITED STATES |
| cr | Pension Benefit Guaranty Corporation    Office of General Counsel    1200 K St., NW    Suite 340    Washington, DC 20005 |
| cr | CZ Acquisition, LLC    c/o Jesse S. Vogtle, Jr.    Waller Lansden Dortch & Davis, LLP    1901 Sixth Ave N Suite 1400    Birmingham, AL 35203 |
| cr | CZ Acquisition, LLC    c/o Paul H. Greenwood    Waller Lansden Dortch & Davis, LLP    1901 Sixth Avenue N, Suite 1400    Birmingham, AL 35203 |
| cr | Huntsville Utilities    c/o Maples Law Firm PC    200 Clinton Avenue West    Suite 1000    Huntsville, AL 35801 |
| cr | State of Alabama Department of Commerce    c/o Memory Memory & Causby    P.O. Box 4054    Montgomery, AL 36103 |
| sp | Jennifer Taylor    O'Melveny & Myers LLP    Two Embarcadero Center 28th Floor    San Francisco, CA 94111–3823 |
| cr | St. Marks Powder, Inc. and General Dynamics Ordnance & Tactical Systems Canada Valleyfield    c/o Stephen Porterfield    2311 Highland Avenue South    Birmingham, AL 35203 |
| intp | Corteva, Inc.    Ballard Spahr LLP    919 Market Street, 11th Floor    Wilmington, DE 19801 |
| cr | Constellation NewEnergy Gas Division, LLC    c/o Eric T. Ray    Waller Lansden Dortch & Davis, LLP    1901 Sixth Ave N, Suite 1400    Birmingham, AL 35203 |
| cr | Oneida Molded Plastics, Inc    104 South Warner Street    Oneida, NY 13421 |
| aty | Safety First Ammo, LLC    c/o Edward J. Peterson, Esquire    Stichter, Riedel, Blain & Postler, P.A.    110 E. Madison St., Ste. 200    Tampa, FL 33602 |
| cr | Kennametal, Inc.    Babst, Calland, Clements and Zomnir, P.C    Two Gateway Center    Pittsburgh, PA 15222 |
| cr | Official Committee of Unsecured Creditors of Remington Outdoor Company, Inc.    c/o Baker Donelson    420 20th St. N.    Suite 1400    Birmingham, AL 35203 |
| cr | Official Committee of Unsecured Creditors of Remington Outdoor Company, Inc.    Fox Rothschild LLP    345 California St. Ste 2200    San Francisco, CA 94104–2670 |
| cr | Oracle America, Inc.    Buchalter, A Professional Corporation    c/o Shawn M. Christianson    55 2nd St., 17th Fl.    San Francisco, CA 94105 SAN FRANCISCO |
| cr | Eagle Bulk Shipping International (USA) Inc.    c/o Lindan Hill, Esq.    Gordon, Dana & Gilmore, LLC    600 University Park Place, #100    Birmingham, AL 35209 |
| cr | Eagle Bulk Shipping International (USA) Inc.    c/o Scott M. Harrington, Esq.    Diserio Martin O'Connor & Castiglioni    One Atlantic Street    Stamford, CT 06901 |
| intp | Howard Marc Spector    Spector & Cox, PLLC    12770 Coit Road, Suite 1100    Dallas, TX 75251 |
| cr | HORNADY MANUFACTURING CO.    c/o C. Ellis Brazeal III    JONES WALKER LLP    400 20th St. N. Ste 1100    Birmingham, AL 35203 |
| cr | KSE Outdoor Sportsman Group, LLC    c/o Lewis Roca Rothgerber Christie LLP    201 E. Washington St. Suite 1200    Phoenix, AZ 85004 |
| cr | Benjamin & Joann Harris    c/o Jack Shrader    Shrader Law Firm    11212 N. May Avenue, Suite 405    Oklahoma City, OK 73120 |
| intp | Royal Defence Co., Ltd    77/122, 29th Fl. Sinn Sathorn Tower    Krungdhonburi Road    Klongtonsai, Klongsan    Bangkok    , 10600 THAILAND |
| intp | JJE Capital Holdings, LLC    Adams and Reese LLP    1901 6th Avenue North, Stuie 3000    Birmingham, AL 35203 |
| fa | M–III Advisory Partners, LP    130 West 42nd St.    17th Floor    New York, NY 10036 |
| cr | Vista Outdoor, Inc.    c/o Walding, LLC    2227 1st Ave South    Suite 100    Birmingham    Birmingham, AL 35233 |
| intp | Sturm, Ruger & Company, Inc.    c/o ENGEL, HAIRSTON & JOHANSON, P.C.    P.O. BOX 11405    BIRMINGHAM, AL 35202 UNITED STATES |

| | | | |
|---|---|---|---|
| intp | Huntsman Holdings, LLC      Reynolds, Reynolds & Little, LLC      c/o Justin B. Little, Esq.      P.O. Box 2863      Tuscaloosa, AL 35403 | | |
| intp | Roundhill Group, LLC      c/o Shulman Bastian Friedman & Bui LLP      100 Spectrum Center Drive      Suite 600      Irvine, CA 92618 | | |
| aty | Aaron Gregory Martin Javian      Reed Smith LLP      599 Lexington Avenue, 22nd Floor      New York, NY 10022 | | |
| aty | Andrea S. Hartley, Esq.      Akerman LLP–Three Brickell City Centre      98 Southeast Seventh Street, Ste 1100      Miami, FL 33131 | | |
| aty | Andreas P. Andromalos      Brown Rudnick LLP      One Financial Center      Boston, MA 02111 | | |
| aty | Andrew M. Carty      Brown Rudnick LLP      Seven Times Square      New York, NY 10036 | | |
| aty | Andrew V Alfano      Pillsbury Winthrop Shaw Pittman, LLP      31 West 52nd Street      New York, NY 10019 | | |
| aty | Chantelle D. McClamb      Ballard Spahr, LLP      919 Market Street, 11th Floor      Wilmington, DE 19801 | | |
| aty | Christopher P Hoffman      Reed Smith LLP      599 Lexington Avenue, 22nd Floor      New York, NY 10022 | | |
| aty | Claude Montgomery      Dentons US LLP      1221 Avenue of the Americas      New York, NY 10020–1089 | | |
| aty | Gary Svirsky      Times Square Tower      7 Times Square      New York, NY 10036 | | |
| aty | Gordon E. Gouveia      Fox, Rothschild LLP      321 N. Clark St. Ste 1600      Chicago, IL 60654 | | |
| aty | James C Bastian      Shulman Bastian Friedman & Bui LLP      100 Spectrum Center Drive, Ste. 600      Irvine, CA 92618 | | |
| aty | Janine Panchok–Berry      O'Melveny & Myers LLP      7 Times Square      New York, NY 10036 | | |
| aty | Jeffrey I. Kohn      O'Melveny & Myers LLP      7 Times Square      New York, NY 10036 | | |
| aty | John Scalzo      Reed Smith LLP      599 Lexington Avenue, 22nd Floor      New York, NY 10022 | | |
| aty | John M. Craig      Law Office of Russell R. Johnson III PLC      2258 Wheatlands Drive      Manakin–Sabot, VA 23103 | | |
| aty | Jordan W. Garmon      Selendy & Gay PLLC      1290 Avenue of the Americas      New York, NY 10104 | | |
| aty | Joshua Margolin      Selendy & Gay PLLC      1290 Avenue of the Americas      New York, NY 10104 | | |
| aty | Joshua D. Morse      Pillsbury Winthrop Shaw Pittman, LLP      Four Embarcadero Center, 22nd Floor      San Francisco, CA 94111 | | |
| aty | Kevin W. Barrett      Bailey & Glasser LLP      209 Capitol St      Charleston, WV 25301 | | |
| aty | Lacey E. Rochester      Baker, Donelson, Bearman, Caldwell & Ber      420 20th Street N      Birmingham, AL 35203 | | |
| aty | Lauren E. Macksoud      Dentons US LLP      1221 Avenue of the Americas      New York, NY 10020–1089 | | |
| aty | Lee Whidden      Dentons US LLP      1221 Avenue of the Americas      New York, NY 10020–1089 | | |
| aty | Maggie B. Burrus      Bailey & Glasser, LLP      3000 Riverchase Galleria, Suite 905      Birmingham, AL 35244 | | |
| aty | Martha B. Chovanes      Fox Rothschild LLP      2000 Market St., 20th Fl      Philadelphia, PA 19103 | | |
| aty | Michael A. Sweet      Fox Rothschild LLP      345 California St. Ste 2200      San Francisco, CA 94104–2670 | | |
| aty | Michael G. Menkowitz      Fox Rothschild LLP      2000 Market St. 20th Fl.      Philadelphia, PA 19103 | | |
| aty | Rachel S. Janger      O'Melveny & Myers LLP      1625 Eye Street NW      Washington, DC 20006 | | |
| aty | Richard A. Ramler      Ramler Law Office, P.C.      202 West Madison Ave.      Belgrade, MT 59714 | | |
| aty | Robert F. Elgidely      Fox Rothschild LLP      2 south Biscayne Blvd, Suite 2750      One Biscayne Tower      Miami, FL 33131 | | |
| aty | Russell R. Johnson, III      Law Firm of Russell R. Johnson III, PLC      14890 Washington Street, 1st Floor      Haymarket, VA 20169 | | |
| aty | Ryan O'Dea      Shulman Bastian Friedman & Bui LLP      100 Spectrum Centere, Ste. 600      Irvine, CA 92618 | | |
| aty | Sarah M. St. John      Shulman Bastian Friedman & Bui LLP      100 Spectrum Center Drive, Ste 600      Irvine, CA 92618 | | |
| aty | Shane G. Ramsey      Nelson, Mullins, Riley & Scarborough, LL      150 Fourth Avenue, North      Nashville, TN 37219 | | |
| aty | Tobey Marie Daluz      Ballard Sparh, LLP      919 Market Street, 11th Floor      Wilmington, DE 19801 | | |
| aty | Valerie Bantner Peo      Buchalter Firm      55 Second Street, Ste 1700      San Francisco, CA 94105 | | |
| aty | William F. Godbold, IV, IV      Natural State Law, PLLC      900 S. Shackleford Road, Ste 705      Little Rock, AR 72211 | | |
| smg | Richard Blythe      BA Decatur      P O Box 3045      Decatur, AL 35602 | | |
| 10509458 | 129 Southwood Dr      Madison, AL 35758–3575 | | |
| 10514810 | Bond Corp.      4237 W Ann Lurie Pl      Chicago, IL 60632 | | |
| 10506289 | Brown & Connery, LLP      6 North Broad Street, Ste 100      Woodbury, NJ 08096 | | |
| 10518577 | Dasan USA Inc.      c/o Andrea S. Hartley Esq.      Three Brickell City Centre      98 Southeast Seventh Street, Ste 1100      Miami, FL 33131 | | |
| 10502795 | Elizabeth S. Lynch      Lunch, Sharp & Associates      9229 Ward Parkway, Suite 370      Kansas City, MO 64114 | | |
| 10523570 | Ferrellgas      One Liberty Plaza MD 40      Liberty, MO 64068 | | |
| 10519730 | GreatAmerica Financial Services Corporation      ATTN: Peggy Upton      P.O. Box 609      Cedar Rapids, IA 52406 | | |
| 10507712 | Hartford Fire Ins. Assignee of Hartford Speicalty      Bankrptcy Unit, HO2–R, Home Office      Hartford, CO 06155 | | |
| 10490519 | Internal Revenue Service      P.O. Box 7346      Philadelphia, PA 19101–7346 | | |
| 10499502 | International Paper Company      1740 International Drive      Memphis, TN 38197 | | |
| 10523735 | Joseph T Ryerson & Son Inc      PO Box 731036      1502 CHAMPION DR      Dallas, TX 75373–7254 | | |
| 10518605 | Lynda Hall, Tax Collector of Madison CO, AL      100 Northside Square, Room 116      Huntsville, AL 35801 | | |
| 10499050 | Massachusetts Department of Revenue      P.O. Box 9564      Boston, MA 02114 | | |
| 10519803 | Melody A. Garrison      7122 Summit Lane      Shawnee, KS 66216 | | |
| 10503400 | Oracle America, Inc.      c/o Shawn M. Christianson, Esq.      Buchalter PC      55 2nd St., 17th Fl.      San Francisco, CA 94105 | | |
| 10503820 | Petron Automation, Inc.      65 Mountain View Dr.      Watertown, CT 06795–0679 | | |
| 10492389 | Praxair Distribution, Inc      4555 S. Palo Verde, Ste 125      Tucson, AZ 85714 | | |

| | | | | |
|---|---|---|---|---|
| 10509033 | Praxair, Inc. | 175 E. Park Drive | Tonawanda, NY 14150 | |
| 10502122 | Precious Seguin | c/o Lynch Sharp & Associates, LLC | 9229 Ward Parkway, Suite 370 | Kansas City, MO 64114 |
| 10492264 | RPA International Limited | Plot 3 Shipston Business Village | Tilemans Lane Industrial Estate | Shipston on Stour CV36 4FF United Kingdom GB |
| 10492388 | Ryan Frisbie | 4555 S. Palo Verde, Ste 125 | Tucson, AZ 85714 | |
| 10528655 | SOUTHERN MACHINERY REPAIR, INC. | 1545 AIRPORT ROAD | P.O. BOX 809 | ATTN: BETH SMITH    UNION CITY, TN 38281 |
| 10490578 | Secretary of the Treasury | 1500 Pennsylvania Ave., NW | Washington, DC 20220 | |
| 10504842 | Shockwave Technologies LLC | 2141 Main Street | Suite A    Dunedin, FL 34698 | |
| 10498882 | Spectrum | 1600 Dublin Rd | Columbus, OH 43215 | |
| 10508368 | State of Alabama | c/o Memory Memory & Causby, LLP | PO Box 4054 | Montgomery, AL 36103 |
| 10508367 | Stuart H. Memory | Post Office Box 4054 | Montgomery, AL 36103 | |
| 10502492 | Syracuse Supply | 43 County Route 59 | Phoenix, NY 13135 | |
| 10505763 | The National Rifle Association | Sarah Gervase | 11250 Waples Mill Road | Fairfax, VA 22030–2203 |
| 10490577 | U.S. Securities and Exchange Commission | Regional Director, Branch of Reorganizat | Atlanta Regional Office, Suite 900    950 East Paces Ferry Road    Atlanta, GA 30326 | |
| 10516158 | Union, LLC | PO Box 30667 | PMB 78277    Charlotte, NC 28230–0667 | |
| 10490580 | United States Attorney | Northern District of Alabama | 1801 Fourth Avenue North | Birmingham, AL 35203 |
| 10490581 | United States Bankruptcy Administrator | Northern District of Alabama | 1800 Fifth Avenue North    Birmingham, AL 35203 | |
| 10524761 | Windstream | 1450 N Center Point Rd | Hiawatha, IA 52233 | |

TOTAL: 109